# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SGCI HOLDINGS III LLC and
SOOHYUNG KIM,

> *Plaintiffs,*

v.

FEDERAL COMMUNICATIONS
COMMISSION;
JESSICA ROSENWORCEL, in her official
capacity as Chairwoman of the FCC;
HOLLY SAURER, in her official capacity
as Chief of the Media Bureau;
THE ALLEN MEDIA GROUP, INC., f/k/a
Entertainment Studios, Inc.;
DISH NETWORK CORPORATION;
THE GOODFRIEND GROUP, INC.;
THE NEWSGUILD-CWA;
NATIONAL ASSOCIATION OF
BROADCAST EMPLOYEES AND
TECHNICIANS-CWA;
UNITED CHURCH OF CHRIST, OC
INC., d/b/a United Church of Christ
Media Justice Ministry;
COMMON CAUSE;
BYRON ALLEN;
CHARLES ERGEN; and
DAVID GOODFRIEND,

> *Defendants.*

Case No. 24-1204

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.      Race discrimination at the Federal Communications Commission derailed

an $8.6 billion deal for the purchase of TEGNA, Inc., the publicly traded spinoff of media

giant Gannett. Race discrimination was unlawful then, and it must be condemned and compensated for now. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 208 (2023).

2.      The FCC makes no secret about the role race plays in its decisions. Race is a factor in deciding whether to approve broadcast license transfers. The FCC tracks broadcast ownership by the race of broadcast owners. And a recent FCC report to Congress says that "[a]dvancing equity is core to the agency's management and policymaking processes."

3.      In this case, "advancing equity" meant killing the chance for a Korean American, Soo Kim, to buy TEGNA's more than 60 television stations because Byron Allen wanted them for his black-owned media company. As far as the FCC's diversity policies and practices were concerned, being Asian did not count. Mr. Kim's race was used *against* him with pernicious stereotypes.

4.      As for Mr. Allen, he never had a problem getting the FCC to quickly approve his license applications for *his* black-owned media company—the right kind of diversity, according to Mr. Allen. In the years leading up to the TEGNA deal, the FCC quickly approved multi-billion-dollar deals where Mr. Allen's company would benefit by taking some stations. But Mr. Allen wasn't getting any stations in the TEGNA deal.

As a result, the FCC dealt Mr. Kim and his company, Standard General, an entirely different hand than Mr. Allen. Objectors, organized by Mr. Allen and allies, parroted Mr. Allen's widely publicized views that diversity for an Asian American-owned company like Mr. Kim's was "sham" diversity. They said the deal did "nothing" to advance diversity in broadcast ownership. And FCC Chairwoman Jessica Rosenworcel, under the thumb of high-ranking Democrats in Congress, went along with it. Chairwoman Rosenworcel had her staffer kill the deal with a pocket veto without ever putting it before the other Senate-confirmed FCC commissioners.

5.     The FCC's unraveling violated "the twin commands" of the U.S. Constitution's guarantee of equality: "that race may never be used as a 'negative' and that it may not operate as a stereotype." *Students for Fair Admissions*, 600 U.S. at 218. Mr. Kim—an American raised in Queens—was maligned as a "shadowy foreign investor." He was not the "right type of minority" for the FCC's diversity goals.

6.     "The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-90 (1978). Federal law protects "all persons," 42 U.S.C. §1981(a)—not just some—from "intentional discrimination solely because of their ancestry or ethnic characteristics," *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987). Soo Kim and the company he built are no exception to that promise of equality.

## NATURE OF THE ACTION

7.    In early 2022, Mr. Kim's company, Standard General, won a public bidding auction to buy TEGNA and its more than 60 television stations. Standard General had a long track record of investing in TEGNA and other broadcast companies. At the time, Standard General's affiliates owned other stations across the country, all run by CEO Deborah McDermott. Ms. McDermott would have been the new CEO of TEGNA too. The transaction was poised to be a historic leap forward for both minority ownership and female leadership of broadcast stations—making the new company the only minority-owned or female-led television station group in the top 10 in the country based on total revenue. It would have reduced industry consolidation. It would have created tremendous value for TEGNA shareholders, paying a $24/share premium for a company that traded as low as $10/share when bidding began in early 2020. And it would have offered significant benefits to employees, guaranteeing three years' job security to newsroom staff and increases to newsroom budgets.

8.    Standard General secured billions of dollars in financing to buy TEGNA, contingent on clearing regulatory hurdles at the Department of Justice and the FCC. Standard General had a lengthy 450-day window to do so. That was more than sufficient time for the FCC to complete its review process—which the FCC puts on a 180-day "shot clock"—and approve the license transfers.

9.     Other major transactions—which did not deliver the same racial or gender diversity benefits that the Standard General-TEGNA deal offered—had cleared in far less time. The FCC approved in 39 days license transfers as part of Scripps Media's $2.65 billion acquisition of ION Media in 2020. The FCC approved in 226 days license transfers for television stations acquired as part of Apollo Global Management's $3.1 billion purchase of Cox Media Group in 2019. The FCC approved in 170 days and 140 days transfers for Gray Television's $2.8 billion purchase of stations owned by Meredith Corp. and $925 million acquisition of Quincy Media, respectively—both in 2021, with Chairwoman Rosenworcel at the FCC's helm.

10.     Not so for Standard General. Although it had been over 300 days since the FCC accepted Standard General's filings, the FCC still had not approved or taken any action on its license-transfer applications for the TEGNA stations. That amount of time was unprecedented for the type of transaction. The FCC agreed that the transaction required no waivers of FCC rules; it was "rule compliant." No one at the FCC could point Standard General or TEGNA to any problem with the merger or otherwise explain why the applications had not been put to a vote on the FCC's normal 180-day shot clock. The deal had cleared the other regulatory hurdles at DOJ. But at the FCC, foot-dragging continued through February 2023 with no answers and no action.

11.     Then, without notice, the FCC's Media Bureau killed the deal without ever putting the license-transfer applications before the full Commission. With three months

5

to go before Standard General's financing would expire, the Media Bureau—run by FCC Chairwoman Rosenworcel's personal staffer, Holly Saurer—referred the applications to an administrative law judge for a hearing. That "Hearing Designation Order" (or HDO) was a pocket veto. It was a move that the Media Bureau knew would prolong the application-approval process by at least *another year*. It was a move that ensured the deal would not close on time. It was a move designed to remove every commissioner other than the chairwoman from the deal. And given its deal-killing consequences, it was a move that the Media Bureau had never previously deployed for a transaction like Standard General's. It worked.

12.     The FCC chairwoman refused to allow the full Commission to review the Media Bureau's decision to issue the HDO. The ALJ also refused to refer the matter to the full Commission or consider a proposal to expedite a years-long hearing schedule. The ALJ's decision to let Standard General's application languish in a dragged-out administrative process hewed closely to Chairwoman Rosenworcel's wishes to kill the deal—an unsurprising result given that ALJs are beholden to, and not independent of, the agency that hires them. As a result, Standard General's financing expired—just as Defendants intended. The deal died.

13.     TEGNA's shareholders lost approximately $1.2 billion when its stock dropped in response to the HDO news. And when the deal died, TEGNA's shareholders lost about $2 billion on the expected gains from a successful merger. Standard General

was one of the largest shareholders, losing nearly $85 million based on its 10.6 million shares owned when the deal died.

14.    Standard General was also left to pay TEGNA a $136 million break-up fee, on top of roughly $70 million in Standard General's own financing fees, attorneys' fees, and other transaction costs.

15.    The FCC chairwoman's move stunned the industry. Former FCC commissioners decried her actions as "extremely troubling" and "bureaucratic madness." Meanwhile, members of Congress raised concerns that "outside interests pushed Commission officials to block this transaction in order to pave the way for an alternative buyer, namely Byron Allen," who had tried and failed to acquire TEGNA for his black-owned media company. They demanded answers about whether the FCC "may be abandoning its rules and precedents based on the color of someone's skin."

16.    The former commissioners and congressmembers were correct. The FCC chairwoman and her personal staffer blocked the deal at the behest of Mr. Allen, who used business allies and six-figure political donations to destroy Mr. Kim's chances of acquiring TEGNA—to the tune of over $200 million in losses to Standard General and Mr. Kim and nearly $2 billion in losses to TEGNA shareholders.

17.    As the owner and figurehead of Allen Media Group, a black-owned media company valued at more than $1 billion, Mr. Allen wields tremendous leverage over the FCC's "advancing equity" for some but not others. Mr. Allen has publicly acknowledged

as much. Mr. Allen has sued the FCC (and a slew of private companies) for what Mr. Al-
len has called "sham" diversity—that is, benefiting minority broadcast owners other than
Mr. Allen's black-owned Allen Group. His pressure campaigns have paid big dividends.
The FCC has quickly approved transactions benefiting the Allen Group. But just the op-
posite for Standard General's merger with TEGNA, which stood to benefit Mr. Kim in-
stead of Mr. Allen.

18.   Mr. Allen wanted the TEGNA stations for his company. When Mr. Allen
lost the bidding auction for TEGNA to Mr. Kim at Standard General, Standard General
became the Allen Group's next target. Months after the merger agreements were executed
and the regulatory approval process for the Standard General-TEGNA transaction had
begun, Mr. Allen publicly said he was "still in the fight" for TEGNA.

19.   What came next echoed Mr. Allen's longtime view that the "only way to
promote diversity" is through "wholly-owned African American" media companies.
Mr. Allen and his longtime lobbyist orchestrated straw objectors at the FCC, who chal-
lenged the deal by amplifying Mr. Allen's views that it did "nothing to create a
more . . . diverse . . . media" and "promote ownership diversity"—that is, *the right kind* of
ownership diversity (*i.e.*, ownership by Mr. Allen). The straw objectors disparaged Mr.
Kim and maligned him as a foreigner. They cited the "changing geopolitical environ-
ment"—specifically, "China['s] increased tensions in the Taiwan Strait"—as a reason to

keep Mr. Kim and his company out of local news. And they decried his "anonymous foreign investment in American newsrooms" as a threat to "democracy."

20.    The objections were twenty-first-century race-baiting. Mr. Kim is an American citizen, raised in Queens. At age 5, he immigrated with his parents from South Korea, so they could pursue the American dream. He graduated from New York City's acclaimed Stuyvesant High School and then Princeton. He has spent more than 25 years in the finance industry and the last 15 building his company, Standard General.

21.    The objections were not only race-baiting but also completely unfounded. Mr. Kim had already earned a reputation as a successful leader in the media industry. Standard General previously was TEGNA's largest shareholder. And years earlier Mr. Kim and Ms. McDermott transformed New Young Broadcasting from a $300 million company emerging from bankruptcy into powerhouse Media General, acquired by Nexstar Broadcasting for $4.6 billion. That historic turnaround was largely attributable to their strategic improvement process—analyzing underperforming stations and determining the specific investments needed and the best path for each station's growth. They planned to turn around TEGNA's struggling stations using the same approach. Standard General was not some faceless private equity firm; Mr. Kim and Ms. McDermott were familiar faces in the media industry, well known to the FCC, with a proven track record of success in broadcast television.

22.     And yet, FCC Chairwoman Rosenworcel put the imprimatur of the federal government on Mr. Allen and his straw objectors' race-based attacks. With pressure from some of the highest-ranking Democrats in Congress—also organized by Mr. Allen and friends—Chairwoman Rosenworcel and her personal staffer, Ms. Saurer, dragged out the FCC's review process. Months into that process, they demanded information about other possible buyers for TEGNA—namely, Mr. Allen—contrary to the plain terms of the Communications Act. And they ultimately killed the deal by pocket veto with the HDO. Not long after, Mr. Allen publicly commented that he remained "very interested" in buying TEGNA.

23.     The FCC's race discrimination was enabled by several other players in the broadcast market, all of whom had their reasons to stop Standard General's acquisition of TEGNA. Their combined efforts resulted in the FCC's unprecedented—and ultimately successful—effort to kill a deal that should have garnered easy approval.

24.     On information and belief, the conspiracy to kill the Standard General deal reached as high as the halls of Congress and as far as the Allen Group and Mr. Allen, DISH Network and its chairman and majority shareholder Charlie Ergen, their lobbyist David Goodfriend at the Goodfriend Group, labor unions, public interest groups, and FCC Chairwoman Rosenworcel and her personal staffer and Media Bureau Chief, Ms. Saurer.

25.     Mr. Allen's longtime lobbyist, David Goodfriend at the Goodfriend Group, orchestrated objections to the Standard General-TEGNA transaction by labor unions and public interest groups at the FCC. But on information and belief, Mr. Goodfriend's real clients were Mr. Allen and his other longtime client DISH and its chairman Charlie Ergen, who also wanted the deal dead.

26.     Mr. Allen's conspiracy also included high-ranking members of Congress. He donated $350,000 to Democratic congressional Super PACs in October 2022; that same month, then-U.S. House Speaker Nancy Pelosi penned a letter to the FCC chairwoman that expressed "concerns" about the Standard General-TEGNA merger. It was no coincidence that around that time the FCC's Media Bureau ordered TEGNA to produce information about Mr. Allen's failed bid for the company. And Senator Elizabeth Warren later filed letters with the FCC expressing "serious concerns" and urging Chairwoman Rosenworcel to use the FCC's "full statutory authority to block" the deal.

27.     The government Defendants' actions violated the equal protection guarantee of the Fifth Amendment to the U.S. Constitution. The remaining Defendants' wrongdoing impaired Plaintiffs' rights to make and enforce the contracts for Standard General's purchase of TEGNA and for funding to consummate the acquisition free from racial discrimination—in violation of 42 U.S.C. §1981. Defendants conspired to deprive Plaintiffs of the equal protection of the laws, and of equal privileges and immunities under the laws, because of Mr. Kim's race and failed to prevent that race-based conspiracy—in

violation of 42 U.S.C. §1985(3) and §1986. Defendants' wrongdoing constituted common-law tortious interference with contract and economic expectation and a conspiracy to do the same.

**PARTIES**

28.     Plaintiff SGCI Holdings III LLC is a Delaware limited liability company with its principal place of business in New York, New York.

29.     Plaintiff Soohyung Kim is founder and chief investment officer of Standard General and managing member of SGCI Holdings III, an affiliate of Standard General. Under FCC rules and regulations, Mr. Kim is considered the controlling holder of any broadcast television licenses held by Standard General's affiliates. Mr. Kim resides in New York State. He is a U.S. citizen.

30.     Defendant Federal Communications Commission is an administrative agency of the U.S. government charged with regulating communications by radio, television, wire, satellite, and cable across the United States. The FCC is a resident of the District of Columbia with its principal place of business here.

31.     Defendant Jessica Rosenworcel is chairwoman of the FCC. Chairwoman Rosenworcel is a resident of the District of Columbia for purposes of this action because she performs her official duties here. Chairwoman Rosenworcel is sued in her official capacity only.

32.     Defendant Holly Saurer is chief of the FCC's Media Bureau and legal advisor to the chairwoman (Rosenworcel). Ms. Saurer is a resident of the District of Columbia for purposes of this action because she performs her official duties here. Ms. Saurer is sued in her official capacity only.

33.     Defendant Allen Media Group, Inc., formerly known as Entertainment Studios, Inc. (the "Allen Group"), is a privately held Delaware corporation with its principal place of business in Los Angeles, California.

34.     Defendant Byron Allen is founder, chairman, and chief executive officer of the Allen Group. He resides in Los Angeles, California.

35.     Defendant DISH Network Corporation is a publicly traded Nevada corporation with its principal place of business in Englewood, Colorado.

36.     Defendant Charles Ergen is co-founder and chairman of the board of DISH. He resides in Denver, Colorado.

37.     Defendant Goodfriend Group, Inc. is a Delaware corporation with its principal place of business in the District of Columbia. It is a subsidiary of Emmer Consulting.

38.     Defendant David Goodfriend is founder and president of the Goodfriend Group. He resides in Bethesda, Maryland. Mr. Goodfriend represented objectors during the FCC proceedings while continuing as the longtime lobbyist of both Mr. Allen's Allen Group and Mr. Ergen's DISH.

39.     Defendant NewsGuild-CWA is an unincorporated association and a sector of the Communications Workers of America with its principal place of business in the District of Columbia. NewsGuild was one of the objectors to the Standard General-TEGNA deal during the FCC proceedings.

40.     Defendant National Association of Broadcast Employees and Technicians-CWA is an unincorporated association and a sector of the Communications Workers of America with its principal place of business in the District of Columbia. NABET was one of the objectors to the Standard General-TEGNA deal during the FCC proceedings.

41.     Defendant United Church of Christ, OC Inc., doing business as United Church of Christ Media Justice Ministry, is, on information and belief, a District of Columbia nonprofit corporation. Its principal place of business is in the District of Columbia. UCC was one of the objectors to the Standard General-TEGNA deal during the FCC proceedings.

42.     Defendant Common Cause is a District of Columbia nonprofit corporation with its principal place of business in the District of Columbia. Common Cause was one of the objectors to the Standard General-TEGNA deal during the FCC proceedings.

## JURISDICTION AND VENUE

43.     The Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1343 because this action arises under the Constitution and laws of the United States.

44.     The Court has supplemental jurisdiction over additional state-law claims under 28 U.S.C. §1367.

45.     The Court has authority under 28 U.S.C. §2201 and §2202 to issue the relief sought. Sovereign immunity is waived for the relief sought against the government Defendants. *See* 5 U.S.C. §702.

46.     Venue is proper for Plaintiffs' claims against the FCC, Chairwoman Rosenworcel, and Ms. Saurer under 28 U.S.C. §1391(e)(1) because several Defendants reside in the District of Columbia and a substantial part of the events or omissions giving rise to the claims occurred here.

47.     Venue is proper for Standard General's claims against the Allen Group, Mr. Allen, DISH, Mr. Ergen, the Goodfriend Group, Mr. Goodfriend, NewsGuild, NABET, UCC, and Common Cause under 28 U.S.C. §1391(b) because these Defendants are subject to personal jurisdiction in the District of Columbia and a substantial part of the events or omissions giving rise to the claims occurred here.

48.     The Court has personal jurisdiction over the FCC, Chairwoman Rosenworcel, and Ms. Saurer under 28 U.S.C. §1391(e) because the FCC is an agency of the United States and Chairwoman Rosenworcel and Ms. Saurer were acting in their official capacities as officers or employees of the United States.

49.     The Court has personal jurisdiction over the Allen Group, Mr. Allen, DISH, Mr. Ergen, and Mr. Goodfriend under D.C. Code §13-423(a)(3) because Plaintiffs' claims

for relief arise from these Defendants' causing tortious injury in the District of Columbia by acts or omissions in the District of Columbia.

50.    This Court has personal jurisdiction over the Goodfriend Group, News-Guild, NABET, UCC, and Common Cause under D.C. Code §13-422 because they are organized under the laws of, or maintain their principal place of business in, the District of Columbia.

## FACTUAL ALLEGATIONS

I.    *The Standard General-TEGNA Transaction*

51.    Soo Kim is a Korean American raised in Queens, New York. He has spent 15 years building his company, Standard General.

52.    Standard General is a New York investment company with a long and successful track record of investing in television stations across the country. Standard General previously had large ownership stakes in media companies including TEGNA and Media General. Standard General affiliates currently own and operate television stations WLNE TV – ABC 6 (Providence, RI), KLKN TV – ABC 8 (Lincoln, NE), KBSI TV – FOX23 (Cape Girardeau, MO), and WDKA TV – MyNet (Paducah, KY). Standard General affiliates are actively seeking to acquire additional stations in major markets.

53.    For years, Mr. Kim has teamed up with broadcast executive Deborah McDermott to turn around struggling stations and return them to financial success. In 2011, Standard General took control of New Young Broadcasting as it emerged from

16

bankruptcy. Together, Mr. Kim and Ms. McDermott engineered an operating turnaround and a series of accretive mergers that grew the company—renamed Media General[1]—from 14 television stations to more than 70, reaching almost 20% of the United States.[2] In 2017, Nexstar Broadcasting acquired Media General for $4.6 billion[3]—more than 15 times New Young Broadcasting's $300 million valuation when it emerged from bankruptcy.[4] Media General shareholders, whose shares traded at $7.30 the day before the New Young Broadcasting-Media General merger was announced in June 2013,[5] received a package of considerations from Nexstar worth more than $32/share today.

54.     Mr. Kim and Ms. McDermott's success in broadcast turnaround is largely attributable to their strategic "move-the-needle" improvement process. This process consists of auditing underperforming stations, selecting specific stations for more extensive review and holistic analysis, and determining the specific investments needed and the best path for each station's growth. This includes, among other things, researching each station's local audiences to understand preferences and viewing habits, examining local

---

[1] *See* Sayantani Ghosh, *Media General to merge with privately held New Young Broadcasting*, Reuters (June 6, 2013), https://reut.rs/3SW2SzE.

[2] *See Media General Completes Merger with LIN Media*, Bus. Wire (Dec. 19, 2014), https://perma.cc/FTF8-QQTC.

[3] David Lieberman, *Nexstar Completes $4.6B Acquisition Of Media General*, Deadline (Jan. 17, 2017), https://perma.cc/S7GA-H7QD.

[4] Lisa Lee & Nabila Ahmed, *Hedge Fund Standard General Returns to Media Dealmaking Roots*, Bloomberg (Oct. 8, 2019), https://bloom.bg/3OHJ947.

[5] *Media General Inc (MEG_old)*, Investing.com, https://bit.ly/3Sz8P4d (closing price June 5, 2013).

news performance during severe weather events and other important local issues, and examining the stations' management priorities, systems, processes, workflows, staffing, training, and support functions.

55.     Mr. Kim and Ms. McDermott have improved performance of various stations by investing in local journalism and local content. They added over 40,000 hours of local news at New Young Broadcasting and Media General. When Nexstar acquired Media General in 2017, the stations annually were airing more than 11,500 hours of news above and beyond what they were airing before Mr. Kim and Ms. McDermott's involvement.

56.     After helping New Young Broadcasting emerge from bankruptcy, Standard General invested $25 million in its 14 stations over just 18 months for newsroom upgrades, including new field cameras, editing and production gear, news sets, and new master control facilities.[6] Standard General continued its investing after the Media General merger, leading to several success stories:

- **WFLA (Tampa-NBC)** – Invested in a new, more powerful radar that expanded the station's hurricane coverage, which helped improve its performance from third to second in the market area;

- **WATE (Knoxville-ABC)** – Added news programming that helped improve the station's performance from third to second in the market area;

---

[6] Letter from Scott R. Flick to Marlene H. Dortch 6-8, *In re Tegna Inc.*, MB No. 22-162 (June 13, 2022), https://perma.cc/C424-UKH2.

- **WKRN (Nashville-ABC)** – Invested in improvements to commuter traffic, breaking news, and weather coverage that improved the station's performance from third to second in the market area; and

- **WISH (Indianapolis-CW)** – Invested to increase local news to more than 60 hours per week, enabling the station to remain a substantial competitor with the third highest news preference in the market area.

57.    Standard General, moreover, has invested over $2.5 million in the stations its affiliates currently own, including total renovation of studio control for live news production; purchasing new field cameras, cars and live transmission equipment; total replacement of computer systems; and automated closed captioning systems to provide real-time captioning for the hearing impaired. Standard General has also increased newsroom staff at its affiliates' stations by 28%, improved the stations employees' health benefits, added paid time off, implemented employee training programs, and invested in the station facilities—all during a pandemic that had other broadcasters making cuts and implementing furloughs.

58.    Mr. Kim and Ms. McDermott have been widely recognized for their success in broadcasting. TVNewsCheck named Mr. Kim "The Most Important, Least Known Man In TV" in 2014,[7] and Gabelli Asset Management, one of Media General's largest

---

[7] Price Colman, *The Most Important, Least Known Man In TV*, TVNewsCheck (Sept. 24, 2014), https://perma.cc/V6P6-QBRW.

shareholders, inducted Mr. Kim into its Management Hall of Fame in 2016.[8] Ms. McDermott was inducted into the Broadcasting and Cable Hall of Fame in 2013[9] and received the Library of American Broadcasting Foundation's Giant of Broadcasting and Electronic Arts Award in 2022.[10] Ms. McDermott previously was chair of the boards of the National Association of Television Program Executives and the ABC Affiliate Board of Governors and served on the boards of the National Association of Broadcasters and the Television Bureau of Advertising.[11]

59.     TEGNA is a publicly traded broadcast and media company, spun off from the Gannett Company in 2015. It owns 64 broadcast television stations in 51 media markets.

60.     In 2020, facing mounting pressure to put itself up for sale, TEGNA started receiving bids from possible buyers. Early on, Mr. Allen expressed interest in buying TEGNA—something Mr. Kim, as TEGNA's largest shareholder at the time, said he supported.

---

[8] *Gabelli Funds Names Mark Donegan, James Dolan, Soo Kim, and Tom Gallagher to 2016 Management Hall of Fame*, Bus. Wire (May 23, 2016), https://perma.cc/3EJM-C4XN.

[9] *Heard At the B&C Hall of Fame 2013*, Next|TV (Oct. 29, 2013), https://perma.cc/2RPK-8JCB.

[10] *Standard Media CEO, Deb McDermott, Recognized as a Giant of Broadcasting by LABF*, Bus. Wire (Nov. 17, 2022), https://perma.cc/7GKH-H8RR.

[11] *Deborah A. McDermott*, Truxton Tr., https://perma.cc/2SHH-FJMJ.

61.     After a series of failed bids, both Mr. Kim and Mr. Allen courted TEGNA in 2021. The two found themselves competing in a public bidding auction, and both lined up billions in funding commitments to back their bids.

62.     In early 2022, TEGNA chose Standard General over the Allen Group. Standard General would buy TEGNA for $24/share—a dramatic increase from TEGNA's $10/share trading price in early 2020 when bidding began.

63.     By February 2022, Standard General, TEGNA, major banks, and investment funds had executed all the necessary merger and financing agreements. Standard General would acquire TEGNA through Standard General's affiliate, SGCI Holdings III. Mr. Kim would become the owner of 61 broadcast television stations with Ms. McDermott as CEO. Under the merger agreement, Standard General had, at the very latest, until May 22, 2023, to obtain regulatory approval, including the FCC's approval of the transfer of TEGNA's broadcast licenses to SGCI Holdings III and Mr. Kim. By industry standards, that 450-day financing window was lengthy. It allowed ample time for the FCC—which ordinarily approves license transfers "well within" 180 days, even for complex deals—to approve the transfer applications.[12]

64.     Standard General secured billions of dollars in financing to consummate the deal. A group of twelve major banks signed contracts to contribute a combined $7.7

---

[12] *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to Complex Mergers*, FCC, https://perma.cc/UAH9-KSYV.

billion in loans. The financing terms would be unobtainable today given present eco-
nomic conditions, including the surge in interest rates and inflation that began immedi-
ately after the parties executed the merger and financing agreements in early 2022. The
financing agreements were binding commitments. The banks could not walk away from
the deal absent some failure by Standard General to obtain regulatory approvals in time.

65.     Additional funding came from investment funds, including two affiliates
of Ares Capital Corporation and Apollo Global Management, which committed $463 mil-
lion and $255 million, respectively, in exchange for nonvoting preferred shares in the
company. SGCI Holdings III, an affiliate of Standard General, would hold all voting
shares as controlling shareholder, and funders would have only nonvoting preferred
shares in the new company. Also as part of Standard General's financing agreement with
the Apollo affiliates, SGCI Holdings III would spin off some stations to Cox Media
Group—the media company that Apollo had successfully acquired with FCC approval a
few years earlier.

66.     Under the merger agreement, TEGNA had the right to terminate the deal if
it did not close by November 22, 2022—the "outside date." But TEGNA could extend the
outside date by three months (to February 22, 2023) and further extend it by another three
months (to May 22, 2023). If the deal still failed to close by May 2023, then TEGNA would
have the right to terminate, and as a practical matter would terminate, the merger agree-
ment. And if the deal failed to close because Standard General could not obtain the

required regulatory approval, then Standard General would have to pay TEGNA a $136 million fee.

67.     All Defendants were aware of the general terms of the merger agreement and substantial financing commitments because they were widely reported and included in Standard General's public filings with the FCC.[13]

## II.     *FCC License-Transfer Application Process and Related Regulatory Reviews*

68.     As with other large mergers in the industry, the Standard General-TEGNA merger was conditioned on clearing three regulatory hurdles: (1) review by the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector, an inter-agency committee coordinated by DOJ and commonly known as "Team Telecom," (2) expiration of the DOJ's antitrust waiting period under the Hart-Scott-Rodino (HSR) Act, and (3) approval to transfer the broadcast licenses by the FCC. Each regulatory hurdle is discussed in detail below.

69.     As a general overview, Standard General and TEGNA began the regulatory approval process around March 2022, when they began submitting the required disclosures and license-transfer applications to DOJ and the FCC, respectively. In November 2022, Team Telecom told the FCC it had no objections to the merger. In February 2023, DOJ confirmed that the HSR waiting period had expired, allowing closing to occur under the HSR Act.

---

[13] *Standard General and Tegna, MB Docket 22-162*, FCC, https://perma.cc/8J2E-FGKZ.

70.     So by February 2023, just one regulatory hurdle remained to closing the deal: the FCC's approval of the license-transfer applications. Those applications had been pending since March 2022. But the FCC killed the deal at that final step—motivated by the belief that Mr. Allen's black-owned company deserved greater solicitude than Mr. Kim's Asian American-owned company.

### A.     Team Telecom Review

71.     Team Telecom's primary objective is to assist the FCC in reviewing any potential national security and law enforcement concerns raised by foreign investment in broadcast licenses. Team Telecom comprises the Attorney General and the Secretaries of Defense and Homeland Security, and its advisors include the Secretaries of State, Treasury, and Commerce and the Directors of the Office of Management and Budget, the Office of National Intelligence, and the Office of Science and Technology Policy, among others.

72.     When transactions involve a certain amount of offshore funding or affiliates, Team Telecom often will review the transaction, even when those funds are controlled by U.S. companies and even if broadcast licenses will be owned and controlled by U.S. citizens. For example, the inclusion of Cayman Islands companies upstream in the ownership chain of a company seeking to acquire an ownership interest in a broadcast license ordinarily would trigger Team Telecom's review. The U.S.-owned parent company of the broadcast licensee files what is called a "petition for declaratory ruling"

explaining the proposed ownership structure, and Team Telecom reviews any offshore interests.

73.     At the end of its review period, Team Telecom may (1) advise the FCC that it has no objections, (2) recommend that the FCC deny the petition for declaratory ruling, or (3) recommend that the FCC grant the declaratory ruling (and associated applications, if any) contingent on negotiated mitigation measures.

74.     Because investment funds of all types often use offshore funds to pool investor money, Team Telecom review is common for large transactions. Funding for the Standard General-TEGNA transaction was no exception. Team Telecom would review this deal because some of Standard General's equity and some of the investment funds' equity were held through Cayman Islands and British Virgin Islands investment funds.

75.     Team Telecom timely completed its review of the Standard General-TEGNA transaction with no surprises. In November 2022, Team Telecom reported "no objection" to the merger.[14]

### B.     DOJ Antitrust Review

76.     DOJ's antitrust review focuses on how a proposed transaction might affect the market, including prices. When reviewing deals in the broadcast industry, for example, DOJ considers whether the new company would have the power to raise

---

[14] Letter from Andrew Coley to Tom Sullivan, *In re Tegna Inc.*, MB Nos. 22-162, 22-166 (Nov. 17, 2022), https://perma.cc/C3YT-ZRLL.

retransmission fees above competitive rates. Retransmission fees are charged to cable and satellite companies like Comcast or DISH to retransmit (and thereby resell) broadcast stations' programming to their cable and satellite customers.

77.     When mergers exceed a certain dollar value, parties notify DOJ under the HSR Act and provide information for DOJ's review. DOJ begins its review during a waiting period and determines whether to extend the waiting period and launch a more in-depth investigation (what's called a "second request"). The HSR waiting period depends on the extent of the review DOJ undertakes. If the HSR waiting period expires without DOJ taking action, HSR requirements are satisfied and the parties can close the transaction.

78.     DOJ conducted an extensive review of the Standard General-TEGNA transaction. Standard General, TEGNA, and Cox Media Group disclosed 13 million pages of documents, participated in various interviews and meetings, and agreed to depositions of Standard General's Mr. Kim and others.

79.     DOJ examined Apollo's role as one funder (of many) of the transaction. DOJ carefully considered any possible anticompetitive effect that could result from the contemplated transfer of some television stations to Apollo's affiliate, Cox Media Group, as part of the transaction.

80.     DOJ also took a close look at pricing issues. It examined the acquisition's effect on retransmission fees to DISH and others and whether such fees would rise above

competitive rates. The retransmission contracts generally contained typical "after-acquired" provisions, which had been fully negotiated by the broadcast stations and distributors. Under these self-executing provisions, Standard General's pre-merger retransmission agreements with companies like DISH would apply to the TEGNA stations, potentially resulting in greater retransmission fees than what such companies were currently paying to rebroadcast the TEGNA stations' programming.

81.     Retransmission fees are regularly renegotiated between station owners and distributors. Periodically raising retransmission fees is necessary to overcome rising program costs and other effects of inflation, to keep newsroom jobs, and to maintain high-quality local programming, among other legitimate purposes.

82.     To remove any possible objection from DOJ, in December 2022, Standard General voluntarily and irrevocably waived its right to enforce "after-acquired" clauses and any other contractual clauses that, by reason of the transaction, could increase retransmission fees.[15]

83.     In February 2023, DOJ confirmed that the HSR waiting period had expired, allowing the Standard General-TEGNA transaction to close under the HSR Act.

---

[15] Letter from Soohyung Kim to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Dec. 16, 2022), https://perma.cc/C542-9WLS.

84.     That left only the FCC's approval of the license-transfer applications, which Standard General had filed nearly a year earlier and which the FCC knew it had to approve by May 2023 for the deal to close.

### C.     FCC License-Transfer Application Review

85.     Created under the Communications Act of 1934, the FCC is an independent agency overseen by Congress and responsible for implementing and overseeing federal communications laws and regulations. The FCC has five commissioners, including a chairperson, each appointed by the president and confirmed by the Senate. Only three commissioners can be of the same political party at any given time.

86.     Serving under the commissioners are several administrative offices or "Bureaus." One is the Media Bureau, which has day-to-day responsibility for developing, recommending, and administering rules relating to the media industry, including radio and television stations.

### *Rules and Standards for Approving License Transfers*

87.     The FCC must approve any sale or transfer of a broadcast license. Federal law requires the FCC to review each license-transfer application and determine whether granting it serves "the public interest, convenience, and necessity." 47 U.S.C. §309(a). If so, the FCC "shall grant such application." *Id.* Specifically, the FCC:

> *shall determine*, in the case of each application filed with it to which section 308 of this title applies, *whether the public interest, convenience, and necessity will be served by the granting of such application,* and, *if the Commission,* upon examination of such application and upon

consideration of such other matters as the Commission may offi-
cially notice, *shall find that public interest, convenience, and necessity
would be served by the granting thereof, it shall grant such application.*

*Id.* (emphasis added).

88.     As part of that "public interest" review, the Communications Act specifi-
cally prohibits the FCC from considering other possible buyers—*i.e.*, "consider[ing]
whether the public interest, convenience, and necessity might be served by the trans-
fer . . . of the . . . license to a person other than the proposed transferee." 47 U.S.C. §310(d);
*see In re Adelphia Commc'ns Corp.*, 21 FCC Rcd. 8203, 8314 (2006) (observing that
"measur[ing] the proposed benefits of a pending transaction against the potential harms
and benefits resulting from an alternative transaction . . . would be inconsistent with sec-
tion 310"). So here, for example, federal law prohibited the FCC from considering other
failed bidders, such as the Allen Group, when reviewing Standard General's applications.

89.     The FCC generally coordinates its antitrust review with DOJ to avoid du-
plicating work and increasing burdens on the parties and defers to Team Telecom for any
potential issues arising from offshore funds or affiliates connected to the transaction.

90.     Separate from the FCC's "public interest" review, some transactions require
a "waiver" of FCC rules before the FCC will approve them or require a buyer's divesti-
tures of television stations if the number of stations the buyer will own exceeds FCC lim-
its. *See, e.g.*, 47 C.F.R. §73.3555(b), (e). The Standard General-TEGNA transaction did *not*
require any such divestitures or waivers. It was "rule compliant."

91.    The FCC's review operates on a "shot clock." The FCC aims to review license-transfer applications in 180 days or less. For at least 30 years, all major rule-compliant broadcast transactions—the category Standard General was in—have been granted within that timeframe.[16] So have many more complicated broadcast transactions that were not rule compliant and required waivers and divestitures. Companies rely on the FCC's 180-day "shot clock" as a guidepost when negotiating mergers and acquisitions, particularly when negotiating financing terms.

92.    The 180-day shot clock begins once the FCC formally accepts a license-transfer application for filing. For the Standard General-TEGNA transaction, that happened on April 21, 2022. So in the ordinary course, the FCC would have acted on the license-transfer applications by October 18, 2022.

93.    The FCC may delegate its review of a broadcast license-transfer application to its Media Bureau. *See* 47 U.S.C. §155. The Media Bureau is the day-to-day administrator for broadcast television and radio licensing issues. But unlike the FCC commissioners, those at the Media Bureau are not appointed by the president and confirmed by the Senate. Accordingly, the Media Bureau has limited authority. For example, the FCC's rules prohibit the Media Bureau from taking any action that conflicts with prior rulings of the full Commission. *See* 47 C.F.R. §§0.5(a)(15), (b)-(c), 0.61(a), (h), (k), 0.283(c).

---

[16] As used in this Complaint, "major" means any transaction that the FCC deems important enough to establish a public docket for the related applications.

*Objecting to License Transfers*

94.     As part of the license-transfer review process, any "party in interest" may file a "petition to deny" the license-transfer applications. Such objectors must have standing: they must show that (1) they have suffered or will suffer an injury in fact (2) caused by the proposed transaction and (3) redressable by denial of the application.[17] Furthermore, objectors' petitions must contain "specific allegations of fact" supported by affidavits based on personal knowledge or noticeable facts showing that granting an application would be "prima facie inconsistent" with the public interest. 47 U.S.C. §309(d)(1).

95.     Some objectors have become standard fare in FCC proceedings. News-Guild, NABET, UCC, and Common Cause (collectively, the "straw objectors") routinely file petitions to deny license-transfer applications and express concerns over job losses and increased retransmission fees, among other things[18]—though they have been noticeably absent in deals involving the Allen Group. The FCC had never credited—and indeed had expressly rejected—their prior objections. *See infra* ¶108. But for the Standard

---

[17] *In re Tribune Media Co.*, MB No. 19-30, 2019 WL 4440126, at *7 ¶23 (FCC Sept. 16, 2019).

[18] *See, e.g.*, Petition to Deny of Communications Workers of America, National Association of Broadcast Employees and Technicians – CWA, and The NewsGuild – CWA, *In re Sinclair Broad. Grp.*, MB No. 17-179 (June 20, 2018), https://perma.cc/R246-YW33; Petition to Deny of National Hispanic Media Coalition, Common Cause, and United Church of Christ, OC Inc., *In re Sinclair Broad. Grp.*, MB No. 17-179 (June 20, 2018), https://perma.cc/W9AP-PHPK; Petition to Deny of Common Cause, Public Knowledge, United Church of Christ, OC Inc., and Sports Fans Coalition, *In re Tribune Media Co.*, MB No. 19-30 (Mar. 18, 2019), https://perma.cc/TFK8-7FD2; Petition to Deny, *In re Belo Corp.*, MB No. 13-189 (July 24, 2013), https://perma.cc/XZS4-TK6R.

General-TEGNA deal, these straw objectors became a pretext for the unlawful interference and race discrimination that ultimately killed the transaction.

### Hearing Designation Orders for License Transfers

96.     As a last step, the FCC may designate a license-transfer application for a hearing before an administrative law judge—through a hearing designation order, or HDO. The purpose of the HDO is to provide a forum for a trial of facts, where the FCC's Enforcement Bureau prosecutes typically some allegation of misconduct or misrepresentation and conducts discovery, with documents or witness testimony, and an ALJ resolves the question of fact. An HDO should issue only if there is a "substantial and material question of fact" to be determined or if the FCC is "unable to find" that the license transfer serves the public interest. 47 U.S.C. §309(d)(2), (e).

97.     An HDO typically will delay a final vote on license-transfer applications by at least a year. As a practical matter, for large mergers an HDO is a pocket veto because it will kill any such deal with typical financing windows.

98.     HDOs for license transfers like those Standard General sought are extremely rare, triggered only by extraordinary circumstances to resolve factual questions arising in licensing applications, such as allegations of fraud or questions of a license holder's character and fitness.

99.     For three decades (at least), only one major broadcast television transaction has been referred for a hearing. That weighty decision to issue an HDO was made by the

full Commission. In 2018, the FCC issued an HDO for Sinclair Broadcast Group's proposed acquisition of Tribune Media after concerns of Sinclair's "misrepresentation and/or lack of candor in its applications."[19] Sinclair and the FCC later reached a $48 million settlement for what then-FCC Chairman Ajit Pai said was "completely unacceptable" conduct.[20] Nexstar stepped in and acquired Tribune in a $4.1 billion deal, becoming the nation's largest broadcast television station group. The FCC approved that merger in 211 days, even though it was not "rule compliant"—and so required divestitures and waivers—and involved job losses, after-acquired clauses, and increases in retransmission fees.[21]

100.    The Media Bureau, acting without the full Commission, has issued an HDO for broadcast license-transfer applications *only twice*—one for a $1,000 FM radio translator facility and another for four AM radio stations with an initial average value of $675,000 each.[22] Both involved the question of whether prior felony convictions connected to the buyer were disqualifying.

---

[19] *In re Tribune Media Co.*, 33 FCC Rcd. 6830 (2018).

[20] David Shepardson, S*inclair agrees to pay record-setting $48 million FCC civil penalty*, Reuters (May 6, 2020), https://reut.rs/4bB27mN.

[21] *See Tribune Media*, 2019 WL 4440126, at *2-6, *20-21.

[22] *See In re Ent. Media Tr.*, 34 FCC Rcd. 4351 (2019); *In re Sullivan*, 29 FCC Rcd. 5421 (2014).

*The Role Race Plays in License-Transfer Applications*

101.    When the FCC reviews license-transfer applications, it considers the race of applicants as part of its "public interest" analysis. The FCC has determined that minority and female broadcast ownership is a priority and is in the public interest.

102.    The FCC's latest strategic plan says that "[a]dvancing equity is core to the agency's management and policymaking processes."[23] FCC policies track and encourage minority and female ownership of broadcast media outlets—at least of certain minorities.[24] And the FCC's Communications Equity and Diversity Council provides recommendations for "media ownership diversity,"[25] including initiatives "to increase minority broadcast ownership" by "motivat[ing] big companies to sell to minorities and women when divesting stations."[26]

103.    Chairwoman Rosenworcel has publicly advocated for the FCC's diversity efforts to focus on minority and female ownership. She has decried "the shameful lack of

---

[23] FCC, *Strategic Plan Fiscal Years 2022-2026* 1 (2022), https://perma.cc/GQW9-89H6.

[24] *See, e.g.*, FCC, Media Bureau & Off. of Econ. & Analytics, *Sixth Report on Ownership of Broadcast Stations* 3-4 (2023), https://perma.cc/8J79-BHWY; *see also* FCC, *Strategic Plan, supra* n.23, at 4.

[25] *Charter of the FCC's Communications Equity and Diversity Council* 1 (2021), https://perma.cc/EVK2-7QL3.

[26] FCC, Commc'ns Equity & Diversity Council, *Enhancing Media Ownership and Entrepreneurial Opportunities for Minorities and Women* 12 (June 15, 2023), https://perma.cc/GPP8-9QD2.

racial and gender diversity in broadcast station ownership" and argued that "[w]omen and minorities have struggled for too long to take the reins at media outlets."[27]

104.    In February 2023—just weeks before the FCC killed the Standard General-TEGNA transaction via an HDO—the FCC's diversity council held a symposium called "Expanding Digital and Media Ownership Opportunities for Women and Minorities."[28] At the symposium, FCC Commissioner Geoffrey Starks decried that "women," "Black individuals," and "Asian individuals" majority-own only 5%, 3%, and 1% of broadcast television stations, respectively, and said it was important that the "media ecosystem accurately reflects our American society" because female and minority ownership "directly impacts what stories are told, and who gets to tell them."[29] FCC officials invited diverse broadcast owners and leaders to speak and participate in the symposium—but not Mr. Kim or Ms. McDermott.

### License Transfers for Comparable Major Transactions

105.    The license-transfer application processes of four recent major transactions provide a benchmark against which to judge the Standard General-TEGNA deal. None

---

[27] *In re Rules & Policies to Promote New Entry & Ownership Diversity in the Broad. Servs.*, 33 FCC Rcd. 7911, 7963 (2018) (Rosenworcel, dissenting).

[28] *Media Ownership Diversity Symposium*, FCC (Feb. 7, 2023), https://perma.cc/5MLS-SSR4.

[29] *Remarks of Commissioner Geoffrey Starks at the FCC Communications Equity and Diversity Council's Media Ownership Diversity Symposium* 1 (Feb. 7, 2023), https://perma.cc/X2FZ-KTW9.

of them offered the extensive diversity benefits that the Standard General-TEGNA deal did.

106.    First, in 2019, the Media Bureau, on delegated authority, approved license-transfer applications associated with the $3.1 billion acquisition of Cox Media Group's television stations by an affiliate of Apollo. The deal was not "rule compliant." Among other things, it required divestiture of several radio broadcast licenses. There were several amended applications to restructure the transaction in response to ongoing litigation over the FCC's ownership rules. The transaction also consolidated ownership of television stations (meaning more stations would be owned by fewer owners) and was likely to increase pricing for distributors like Comcast or DISH.

107.    Months after the Media Bureau accepted the license-transfer applications for filing, Apollo disclosed in a petition for declaratory ruling that it would have foreign investors "because the voting interests of its U.S. owners are held through a Cayman Islands entity,"[30] which regulators approved without fanfare. While there were objectors to Apollo's acquisition of Cox, none objected to the use of funds located in the Cayman Islands.

---

[30] Media Bureau Announces Filing of Petition for Declaratory Ruling by Terrier Media Buyer, Inc., and Permit-but-Disclose *Ex Parte* Status for the Proceeding, *In re Terrier Media Buyer, Inc.*, MB No. 19-196 (July 11, 2019), https://perma.cc/U3JZ-MT3C.

108.    UCC and Common Cause, frequent objectors at the FCC, filed a petition to deny.[31] They argued that the merger was not in the public interest because it would raise retransmission fees. The Media Bureau rejected this objection. In the Media Bureau's own words: "the Commission is not the appropriate forum for addressing private contractual matters, such as after-acquired station clauses in retransmission consent agreements." The Media Bureau also rejected their complaints about localism, explaining that the FCC has "repeatedly" recognized that "increased access to a Washington, DC, news bureau is a legitimate public interest benefit at the local level." And the Media Bureau gave "no weight" to UCC and Common Cause's claim that Apollo's "involvement in the transaction, as a private equity firm, casts doubt that the Transaction would benefit localism and viewpoint diversity, on the basis that private equity firms typically impose cost-cutting measures that 'gut newsrooms' in an attempt to generate profits before re-selling the stations after a few years." The Media Bureau noted that the FCC "has previously approved transactions involving private equity firms." The Media Bureau issued its decision 226 days after accepting the original applications for filing.

109.    Second, in 2020, the Media Bureau granted the license-transfer applications connected with Scripps Media, Inc.'s $2.65 billion acquisition of ION Media Networks, Inc. The deal was not "rule compliant." It required the divestiture of 23 stations in 21 markets to comply with local ownership rules, in addition to reauthorization of three

---

[31] *In re Terrier Media Buyer, Inc.*, 34 FCC Rcd. 10554, 10566-67 (2019).

satellite waivers.[32] No objector opposed the deal. The FCC approved the license transfers to Scripps 39 days after the Media Bureau accepted the applications for filing.[33]

110. Third, in 2021, the Media Bureau granted the license-transfer applications in connection with Gray Television's $925 million acquisition of Quincy Media. The transaction was not "rule compliant." It required multiple waivers and the divestiture of nine stations to comply with local ownership rules.[34] The transaction also prompted an antitrust consent decree with DOJ, which required the divestiture of an additional station.[35] The ten divested stations all went to the Allen Group.[36] No objector opposed the deal at the FCC. The Media Bureau approved the license transfers, including those for the 10 stations to the Allen Group, 140 days after it accepted the original applications for filing.[37]

---

[32] Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of ION Media Networks, Inc., to Scripps Media, Inc., and Divestiture Applications to Assign Licenses to INYO Broadcast Holdings, LLC, and Establishes Permit-but-Disclose *Ex Parte* Status for the Proceeding, *In re ION Media Networks, Inc.*, MB No. 20-369 (Nov. 6, 2020), https://perma.cc/BNR8-D4Q3.

[33] FCC, *Public Notice* 2 (Dec. 18, 2020), https://perma.cc/YEK8-8JJZ.

[34] Media Bureau Establishes Pleading Cycle for Applications Filed for the Transfer of Control and Assignment of Broadcast Licenses from Quincy Media, Inc., to Gray Television, Inc., and Designates Proceedings as Permit-but-Disclose for *Ex Parte* Purposes, *In re Quincy Media, Inc.*, MB No. 21-87 (Mar. 12, 2021), https://perma.cc/5H8U-M2TL.

[35] Final Judgment, *United States v. Gray Television, Inc.*, No. 21-cv-2041 (D.D.C. Oct. 25, 2021), ECF No. 11.

[36] *Allen Media Group Completes $380 Million Cash Acquisition Of 10 Broadcast Television Stations From Gray Television*, PR Newswire (Aug. 2, 2021), https://perma.cc/4ELK-K48E.

[37] *See generally* FCC, *Public Notice* (July 30, 2021), https://perma.cc/RGT6-XUAY.

111.    Fourth, in 2021, the Media Bureau granted the license-transfer applications connected with Gray Television's $2.8 billion dollar acquisition of Meredith Corp.'s local media group of 17 television stations.[38] To comply with local ownership rules, Gray had to divest one station. Gray divested the station to the Allen Group.[39] The Media Bureau rejected two informal objections expressing concerns about consolidation and retransmission fees. None of the usual objectors, such as UCC or Common Cause, opposed the deal. The Media Bureau approved the license transfers, including the transfer of the station divested to the Allen Group, 170 days after accepting the applications for filing.

112.    In addition to the two Gray Television deals where Mr. Allen acquired divested stations, the FCC has granted Mr. Allen's own applications surprisingly quickly, even when they involve a significant number of stations. In 2019, the Allen Group acquired four broadcast television stations from Bayou City Broadcasting for $165 million, and the FCC approved the license transfers 37 days after accepting the applications for filing.[40] Also in 2019, the Allen Group acquired 10 broadcast television stations from Heartland Media for $290 million, and the FCC approved the license transfers in 41

---

[38] *In re Meredith Corp.*, 36 FCC Rcd. 15879 (2021).

[39] Jon Lafayette, *Allen Media Group Closes $70 Million Purchase of WJRT-TV from Gray TV*, Next|TV (Sept. 23, 2021), https://perma.cc/TLA2-YTHJ.

[40] *See* FCC, *Public Notice: Broadcast Applications* 10-11 (May 10, 2019), https://perma.cc/V7LW-X4B5 (accepting applications for filing); FCC, *Public Notice: Broadcast Applications* 2, 13 (June 20, 2019), https://perma.cc/2BNA-CVYS (granting applications); *see also FCC Formally Approves Byron Allen's Acquisition Of Bayou City Broadcasting For $165 Million*, PR Newswire (July 31, 2019), https://perma.cc/M4AU-FNVA.

days.[41] In 2020, the Allen Group acquired one broadcast television station from SJL Broadcasting for $30 million, and the FCC approved the license transfer in 51 days.[42] And in 2022, the FCC approved the Allen Group's $28.5 million acquisition of three broadcast television stations from Woods Communications Corp. in 59 days.[43]

### III. *The Unprecedented Path of the Standard General-TEGNA License-Transfer Applications*

113. Given the FCC's established practice, Standard General reasonably expected that the FCC would approve the license-transfer applications within the parties' 450-day financing window. The deal was "rule compliant" and so required no divestitures, waivers, or other adjustments. It had broad support from state and local policymakers, civil rights organizations, and industry groups. And Standard General, along with TEGNA and Cox, retained highly experienced counsel to shepherd the deal through the approval process.

---

[41] *See* FCC, *Public Notice: Broadcast Applications* 5-11 (Oct. 11, 2019), https://perma.cc/Q6UK-7SF8 (accepting applications for filing); FCC, *Public Notice: Broadcast Actions* 2-4, 8-13 (Nov. 27, 2019), https://perma.cc/G6AG-F5WN (granting applications).

[42] *See Application Search Details*, FCC, https://perma.cc/M3TT-XMAP (File No. BTCCDT-20200817AAV).

[43] *See* FCC, *Public Notice: Applications* 1-6, 8-13 (Dec. 30, 2021), https://perma.cc/RUJ4-Q8YN (accepting applications for filing); *Assignments: Lead File No. 0000178039*, FCC, https://perma.cc/FWY3-EU42 (granting applications); *see also* Brad Harper, *FCC approves Byron Allen's purchase of WCOV-TV in Montgomery*, Montgomery Adviser (Mar. 3, 2022), https://perma.cc/U83Y-HEXR.

114.    The deal boiled down to a mere change in ownership; at bottom, the only question for the FCC was whether Mr. Kim was a credible owner capable of taking control of TEGNA. There was no mystery what Mr. Kim's control, together with Ms. McDermott's leadership, could do for TEGNA. As explained, Mr. Kim and Ms. McDermott have a wealth of experience in the industry and a record of successful broadcasting turnaround. *Supra* ¶¶53-58. They planned to employ their proven "move-the-needle" approach to lead TEGNA's struggling stations back to financial success. *Supra* ¶54. And the FCC had approved without issue license-transfer applications in two major broadcast television deals involving Mr. Kim's media companies.[44]

115.    The change of control of TEGNA offered many public interest benefits. It would have provided local news with much-needed investment. It would have saved local news jobs. It would have reduced industry consolidation, given the spin-off of several TEGNA stations to Cox. And it would have furthered the FCC's professed diversity goals like no other deal. It would have increased the number of Asian American-owned network-affiliated television stations in the Top 50 television markets from *zero to 27*. It would have created the largest-ever minority-owned and female-led television station group in the United States—and the only group in the top 10, based on total revenue,

---

[44] *See In re Media Gen. Commc'ns Holdings, LLC*, 28 FCC Rcd. 15509 (2013); *In re Media Gen., Inc.*, 29 FCC Rcd. 14798 (2014).

with either attribute.[45] It would have brought equally diverse board membership. And it would have expanded opportunities for minority and female journalists and media professionals nationwide.

116.    Despite Mr. Kim's and Ms. McDermott's track records and the historic advancements offered by the transaction, and contrary to the FCC's long-established practices, the Standard General-TEGNA transaction unraveled at the FCC on an unprecedented timeline.

*March 2022*

117.    Standard General, TEGNA, and Cox Media Group (which would acquire eight stations as part of the deal) filed the required license-transfer applications in March 2022. During that month, the FCC asked for more information, and the applicants provided it. At the time, one of the five commissioner posts was vacant, leaving the Commission split 2-2—Chairwoman Rosenworcel and Commissioner Geoffrey Starks of the Democratic Party and Commissioners Brendan Carr and Nathan Simington of the Republican Party.

118.    Meanwhile, the Senate was considering President Biden's nomination of Gigi Sohn to fill the fifth commissioner spot. Ms. Sohn's nomination was praised by more

---

[45] Harry A. Jessell & Mark K. Miller, *Top 30 Station Groups: Standard General Leaps Into Second Place With Tegna Acquisition*, TVNewsCheck (June 29, 2022), https://perma.cc/3VZF-KUGP.

progressive Democrats, including Senator Elizabeth Warren.[46] And many wanted to see her serve as the new chair of the FCC, instead of Chairwoman Rosenworcel.[47] Ms. Sohn had a history of racially charged tweets, calling now-Justice Kavanaugh an "angry white man"[48] and then-President Trump a "raggedy white supremacist" who would "rather kill everybody than stop killing black people."[49] Among Ms. Sohn's strong supporters was Byron Allen and the Allen Group, who noted that "Black Americans. . . . own a majority interest in less than 2% of full-power broadcast TV stations" and that "Gigi Sohn understands and is a champion against this inequity."[50]

119. The possibility that Ms. Sohn could replace Chairwoman Rosenworcel was front and center during Ms. Sohn's confirmation process.[51] Ms. Sohn's nomination was pending before the Senate when Standard General filed its license-transfer application in March 2022. And Ms. Sohn withdrew her nomination in March 2023—right after the

---

[46] Luke Goldstein, *Democratic Majority at the FCC Still Blocked*, Am. Prospect (Dec. 15, 2022), https://perma.cc/4P5P-ZJED; @SenWarren, X (July 11, 2022, 7:38 PM), https://perma.cc/PTA7-GRE6.

[47] Editorial Board, Opinion, *A Media Censor for the FCC?*, Wall St. J. (Nov. 8, 2021), https://on.wsj.com/3OD8XOU.

[48] Editorial Board, Opinion, *Watch Out, Gigi Sohn Is Back*, Wall St. J. (Feb. 12, 2023), https://on.wsj.com/3SSQHn8.

[49] Thomas Catenacci, *Biden's FCC nominee Gigi Sohn shared tweet calling Trump a 'raggedy white supremacist president,'* Fox News (Jan. 8, 2023), https://perma.cc/SK85-J5DR.

[50] *Allen Media Group's Open Letter to the U.S. Senate: Confirm Gigi Sohn to the FCC*, PR Newswire (Nov. 29, 2021), https://perma.cc/36WA-8PRL.

[51] Lydia Moynihan, *FCC hopeful Gigi Sohn could be named chair by White House, sources say*, N.Y. Post (Feb. 16, 2023), https://perma.cc/NFR7-YNE7.

Media Bureau, led by Chairwoman Rosenworcel's staffer, issued the HDO and killed the Standard General-TEGNA deal.

*April 2022*

120.    The FCC's 180-day "shot clock" began on April 21, 2022, when the Media Bureau deemed Standard General's license-transfer applications complete.[52] The FCC's review thus should have been complete around October 2022. The FCC had never taken longer than the 180-day shot clock to approve a license-transfer application associated with a major rule-compliant broadcast television transaction.

*May 2022*

121.    On May 8, 2022, after the regulatory process had begun, a reporter asked Mr. Allen about his efforts to buy TEGNA and whether he had "given up on that deal."[53] This was an odd question to begin with. The deal was already done. TEGNA had already rejected Mr. Allen's bids and decided to merge with Standard General. Undeterred, Mr. Allen responded, "I never give up on anything, never." He added, "I always have a shot." And, "We're always in the fight. And I'll say it this way, we're in round one, and I haven't broken [a] sweat."

---

[52] Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of Tegna, Inc., to Standard General, L.P., and Permit-but-Disclose *Ex Parte* Status for the Proceeding, *In re Tegna Inc.*, MB No. 22-162 (Apr. 21, 2022), https://perma.cc/QW6K-LGWL.

[53] *Entertainment Studios CEO on Streaming, Tegna, Nielsen Lawsuit, Advertising*, at 5:00-5:49, Bloomberg (May 8, 2022), https://bloom.bg/3uvrp5c.

122.     Days after Mr. Allen said he was still "in the fight" for TEGNA, NewsGuild and Common Cause—frequent objectors—appeared in the FCC proceedings. They asked the Media Bureau to order Standard General to produce additional information about the transaction and to extend the public comment cycle.[54] They surmised that Standard General's retransmission fees would be too high and that Standard General would collude on pricing with Apollo's Cox Media Group. Standard General opposed the request, disputed the wild collusion allegations, and noted that the FCC had rejected nearly identical requests in connection with prior transactions.[55] Standard General expected the Media Bureau to follow FCC precedent.

123.     But the Media Bureau ignored that precedent—one of several precedents the Media Bureau would flout in these proceedings. As the first of many steps to prolong the regulatory process, the Media Bureau extended the initial public comment period, giving straw objectors until late June to submit petitions to deny Standard General's license-transfer applications.[56]

---

[54] Motion of the Public Interest Parties for Additional Information and Documents and an Extension of Time, *In re Tegna Inc.*, MB No. 22-162 (May 12, 2022), https://perma.cc/6JE5-6C7Q.

[55] Applicants' Joint Opposition to Motion for Additional Information and Documents and Extension of Time, *In re Tegna Inc.*, MB No. 22-162 (May 17, 2022), https://perma.cc/J8BF-WLKZ.

[56] Media Bureau Extends Pleading Cycle for Applications to Transfer Control of Tegna Inc., to Standard General, L.P., *In re Tegna Inc.* MB No. 22-162 (May 20, 2022), https://perma.cc/JX8V-P44K.

*June 2022*

124.     Then, on June 3, 2022, the Media Bureau ordered Standard General to produce highly sensitive commercial documents and answer requests for information, including confidential information regarding "negotiating strategy" and other financial terms.[57]

125.     On or about June 4, 2022, Mr. Allen called Mr. Kim unsolicited about the Standard General-TEGNA transaction. Mr. Allen said he heard that Mr. Kim was having a hard time at the FCC. Mr. Allen proposed that Mr. Kim include him on the deal by selling some of the TEGNA stations to the Allen Group, suggesting that doing so would smooth things over at the FCC. This puzzled Mr. Kim, who at that point had no inkling of any trouble afoot at the FCC. Mr. Kim also had no interest in unwinding the deal and including more buyers; nor could he, as all the stations and financing were tied up in the existing agreements. Mr. Kim advised Mr. Allen that the deal was already done and that it did not require divestitures of any stations. At the time, Mr. Kim could not make sense of the call. In retrospect, Mr. Kim understood Mr. Allen's call as a threat and as the first indication that the fix was in—the FCC would not approve the transaction unless it came to include Mr. Allen and *his* black-owned media company as one of the new station owners.

---

[57] Letter from Holly Saurer to Scott R. Flick et al. 3, *In re Tegna Inc.*, MB No. 22-162 (June 3, 2022), https://perma.cc/963P-HA35.

126.    Later in June, Standard General complied with the Media Bureau's request for more information and explained all the ways in which the transaction was "indisputably in the public interest," especially given "Commission policies regarding diversity, equity, and inclusion," and how the deal "will lead to more and better local news service, including increased newsroom employment."[58]

127.    At the end of June, the straw objectors filed petitions to deny the license-transfer applications, raising two primary objections: (1) Standard General would cut newsroom jobs, and (2) Standard General would increase retransmission fees, resulting in higher prices to DISH and other distributors and, ultimately, to their customers.[59]

128.    The straw objectors had minimal, if any, interest in the transaction. UCC and Common Cause claimed their members would have to pay more for television. Of TEGNA's 6,300 employees, only a handful were NewsGuild members and only a few score were NABET members.

129.    On information and belief, the straw objectors filed their petitions to deny at the behest of some combination of the Goodfriend Group and Mr. Goodfriend's long-time clients, Byron Allen at the Allen Group and Charlie Ergen, chairman and majority

---

[58] Applicants' Response to Request for Documents and Information 1, *In re Tegna Inc.*, MB No. 22-162 (June 13, 2022), https://perma.cc/ZML8-N63P.

[59] Petition to Deny of Common Cause and United Church of Christ Media Justice Ministry 19-25, *In re Tegna Inc.*, MB No. 22-162 (June 22, 2022), https://perma.cc/D7VM-LXNR; Petition to Dismiss or Deny of the NewsGuild-CWA and National Association of Broadcast Employees and Technicians-CWA 3-4, 20-23, *In re Tegna Inc.*, MB No. 22-162 (June 22, 2022), https://perma.cc/9X6F-999T.

shareholder of DISH. The Goodfriend Group later formally appeared in the FCC proceedings on behalf of NewsGuild and NABET.

130.    The positions taken by the straw objectors would further the interests of the Allen Group and DISH, both represented at the time by Mr. Goodfriend at the Goodfriend Group. Mr. Allen's interest in the Standard General-TEGNA deal was no secret. He was still "in the fight" for TEGNA stations and stood to benefit from any changes to the transaction—or by killing it altogether. And DISH, led by chairman Charlie Ergen, had a direct interest in the Standard General-TEGNA retransmission fees it would pay to carry the TEGNA stations. If DISH could get commitments to drive retransmission fees down—or if DISH could kill the deal altogether and continue to pay the (presumably cheaper) existing retransmission fees with TEGNA—then DISH would make more money by paying less to rebroadcast the stations' programming.

131.    The positions taken by the straw objectors also conflicted with their own professed interests. Squeezing the stations on retransmission fees would decrease revenue, put newsroom jobs in jeopardy, and make it more difficult to maintain high-quality local programming. The fight over retransmission fees was one to advance DISH's commercial agenda, not the public's.

132.    The same straw objectors did not oppose either of Gray's major broadcast television transactions—approved less than a year before by the FCC under Chairwoman

Rosenworcel. *Supra* ¶¶110-11. The difference? Mr. Allen benefited from both of Gray's acquisitions—where he took 10 stations from Quincy and one station from Meredith.

### July 2022

133.    Standard General responded to the objections in early July. Standard General described the objections as "surprising" given the straw objectors' historical positions supporting "the substantial diversity, competition, and localism-related benefits that would result from Standard General's acquisition of TEGNA."[60] Absent from the straw objectors' petitions was an acknowledgment that "the [t]ransactions would create the largest minority-owned and female-led television station group in U.S. history." Indeed, the deal would make Standard General the only top 10 broadcast television station group in the country with a minority owner or a female CEO. The straw objectors were instead "fear-mongering about 'private equity'" and crying foul about Mr. Kim's access to capital—something they had long claimed was missing in the industry for minority buyers.

134.    Standard General contested the straw objectors' standing, explaining that none of them had shown any "cognizable harm" from the deal. Their assertions of reduced news and jobs as a byproduct of media consolidation were "conjectural" since TEGNA would shrink in size and no new station combinations would be created in any market. Standard General pledged, under penalty of perjury, "that the [t]ransactions will

---

[60] Applicants' Consolidated Opposition and Response to Comments 2, 8-10, 23, 30-31, 36, *In re Tegna Inc.*, MB No. 22-162 (July 7, 2022), https://perma.cc/YAD5-54KP.

not result in station-level layoffs." Standard General highlighted that it had *increased* newsroom staffing at the four stations owned by its affiliates. As to potential increased costs for television, Standard General argued that was "not a cognizable harm" because the broadcast programming is available to viewers for free over the air and the fees are charged by distributors like DISH. Further, the FCC had "consistently and categorically declined to find that an increase in [distributor] programming costs is a public interest harm."

135.    As for the objectors' arguments about retransmission agreements, Standard General quoted, verbatim, FCC orders explaining that there is no basis for the FCC to meddle in "private contract law questions" over retransmission fees between major broadcast companies and distributors like DISH.[61]

136.    Standard General also said more about Apollo's involvement in the transaction, which the straw objectors lamented. Standard General implored the FCC to reject

---

[61] *See, e.g., id.* at 36 n.104 ("with regard to DISH's allegations of prospective price increases stemming from marketplace negotiations, it does not show whether, on balance, they would reduce consumer welfare or, rather, just shift surplus between DISH and broadcast stations" (quoting *Tribune Media*, 2019 WL 4440126, at *10)); *id.* at 36 n.105 ("finding that petitioners' claims 'fail to raise substantial and material questions of fact as to why the public interest would not be served by grant of the applications, because [they] do not provide any basis for the assertion that the merged entity will have "market power" vis-à-vis MVPDs with national or at least broad coverage of their own'" (quoting *In re Media Gen., Inc.*, 32 FCC Rcd. 183, 196 (2017))); *id.* at 36 n.106 ("The Commission has neither the authority nor the machinery to adjudicate claims arising out of private contractual agreements between parties." (quoting *Transcon. Television Corp. (WROC-TV)*, 21 RR 945, 956 (1961))).

the straw objectors' specious "conjecture" about Apollo. The straw objectors now had "access to highly confidential ancillary documents" submitted to DOJ and the FCC and could see for themselves that Apollo affiliates were one among seventeen different entities funding the transaction, and there was not "a scintilla of evidence" that Apollo would have influence over the new company. The opposition explained at length how Apollo's interest in the transaction was nowhere near the thresholds in the FCC's rules meant to limit consolidation, even factoring in Apollo's interest in Cox Media Group, which would acquire eight stations as part of the transaction.

137.     The objectors' replies were due at the end of July. They asked for an extension, which Standard General opposed as contrary to the FCC's standard practice.[62] But the Media Bureau granted the extension, further delaying the transfer-approval process.[63]

*August 2022*

138.     The straw objectors took a new tack when they filed their consolidated reply. They asserted that granting the applications "will do nothing to create a more . . . diverse . . . media."[64] They asserted that the transaction "does not promote ownership diversity as it is understood by the public interest and civil rights community, and by

---

[62] Applicants' Joint Opposition to Motion for Extension of Time Within Which to File Replies, *In re Tegna Inc.*, MB No. 22-162 (July 11, 2022), https://perma.cc/S8UV-K8B5.

[63] Order, *In re Tegna Inc.*, MB No. 22-162 (July 12, 2022), https://perma.cc/SJQ8-D2W3.

[64] Reply to Applicants' Consolidated Opposition and Response to Comments 4-6, 20, 24, *In re Tegna Inc.*, MB No. 22-162 (Aug. 1, 2022), https://perma.cc/QY5N-HPB3.

commission policy," "does nothing to increase ownership opportunities for women and people of color to enter the marketplace," and "is not likely to provide additional members of historically excluded groups the opportunity to gain wealth and influence in society." The reply baselessly asserted that Mr. Kim and Ms. McDermott have not been "barred by his race" or "her gender" in achieving their successes, bizarrely contrasting the experiences of an Asian-American man and a woman to "historically excluded groups" and those that have suffered "long-standing inequities produced by structural racism, xenophobia or misogyny."

139.    The straw objectors peddled the very xenophobia they claimed to oppose. They urged the FCC to investigate "the involvement of shadowy foreign investors." They couched their criticism as one about Standard General's offshore funding sources—funding sources in the Cayman Islands and the British Virgin Islands that are ubiquitous for multi-billion-dollar transactions.

140.    The straw objectors never referred to "shadowy foreign investors" in public filings for the multi-billion-dollar Apollo-Cox transaction using offshore funds a few years earlier. What was different this time around? The new owner of the TEGNA stations would be an Asian American with a foreign-sounding last name.

141.    For Mr. Kim's transaction, the straw objectors warned that "the Commission has been much too willing to bless excessive foreign ownership interests" in broadcasting. Mr. Kim is not a foreign owner. The straw objectors remarked, apropos of

nothing, that "recent . . . events have demonstrated the downside of the non-citizens potentially having the ability to influence domestic elections." Mr. Kim is a U.S. citizen.

142.    Despite being an American, Mr. Kim personally was maligned as a "shadowy foreign investor" because of his Asian race. The straw objectors knew that the offshore funds were to be expected in the multi-billion-dollar transactions, that they are located in the Cayman Islands and the British Virgin Islands, and that Team Telecom would approve them. They used Mr. Kim's race for fearmongering, pretending as though he, an American, was an Asian foreign owner poised to take over America's newsrooms.

143.    In a normal review, the Media Bureau would have followed its precedent and approved the applications over the straw objections. But the Media Bureau did not do so here. They used the straw objectors—organized by the Goodfriend Group and Mr. Goodfriend's longtime clients at the Allen Group and DISH—as a pretext for prolonging the license approval process for months, well beyond the 180-day shot clock.

144.    Later in August 2022, the Goodfriend Group, led by Mr. Goodfriend, publicly appeared in the FCC proceedings on behalf of NewsGuild and later also on behalf of NABET.[65]

---

[65] Letter from David R. Goodfriend to Holly Saurer, *In re Tegna Inc.*, MB No. 22-162 (Aug. 26, 2022), https://perma.cc/4ZF2-LRTR; *see also* Letter from David R. Goodfriend to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Nov. 14, 2022), https://perma.cc/F6Y4-Y7CQ ("Counsel to TNG-CWA/NABET-CWA").

145.    On information and belief, Mr. Goodfriend had been working behind the scenes for some time before formally appearing in August.

146.    And on information and belief, Mr. Goodfriend was working behind the scenes not only for NewsGuild and NABET but also for his longtime clients at the Allen Group and DISH. Both were also his clients during the FCC's review of the Standard General-TEGNA transaction.[66]

147.    Mr. Goodfriend has long lobbied on behalf of the Allen Group. Each of Mr. Goodfriend's quarterly lobbying reports for the Allen Group from 2017 to 2023 show lobbying before Congress and the FCC regarding "media diversity policy; civil rights."[67] In 2021, for example, Mr. Goodfriend filed comments on behalf of the Allen Group urging the FCC "to address the absence of minority ownership of media outlets in the United States."[68]

148.    Mr. Goodfriend and DISH also have a long history. From 2001 to 2008, Mr. Goodfriend was Vice President of Law and Public Policy at DISH (then known as

---

[66] Emily Birnbaum, *Union Lawyer's Fight Against Tegna Deal Helps Its Corporate Foes*, Bloomberg (Jan. 13, 2023), https://bloom.bg/3HYXkxW.

[67] *E.g.*, Emmer Consulting, Inc. on behalf of Entertainment Studios Networks, Inc., Q4 2022 Lobbying Report (Jan. 24, 2023), https://perma.cc/LKT4-DJQ4; Emmer Consulting, Inc. on behalf of Entertainment Studios Networks, Inc., Q1 2017 Lobbying Report (Apr. 17, 2017), https://perma.cc/KFV6-7SDX.

[68] Comments of Allen Media Grp. 1, *In re 2018 Quadrennial Regul. Review*, MB No. 18-349 (Sept. 2, 2021), https://perma.cc/FAB4-A8HD.

EchoStar Communications).[69] When he left, Mr. Goodfriend registered as DISH's lobby-ist.[70] Mr. Goodfriend has since lobbied Congress and the FCC on behalf of DISH regarding "support for/opposition to various FCC license acquisitions" and "retransmission consent reform," among other things.[71]

149.    And Mr. Goodfriend also has significant ties to FCC Chairwoman Rosenworcel. They both worked at the FCC during the Clinton administration—Mr. Goodfriend as a media legal advisor to Commissioner Susan Ness and Chairwoman Rosenworcel as an attorney advisor in the Common Carrier Bureau (now called the Wireline Competition Bureau). Mr. Goodfriend had long supported Chairwoman Rosenworcel's advancement at the FCC by touting her leadership capabilities and holding out what he called the "Jessica Principles" as a "model for good governing everywhere."[72]

150.    The same week that Mr. Goodfriend publicly surfaced in the Standard General-TEGNA proceedings, the straw objectors disclosed that Mr. Goodfriend and other counsel had an *ex parte* meeting with the Media Bureau about the deal.[73] The disclosure

---

[69] *See* Echostar Communications Corp., 2007 Midyear Lobbying Report (Aug. 14, 2007), https://perma.cc/6PKG-KWYT; Echostar Communications Corp., 2006 Year End Lobbying Report (Feb. 13, 2007), https://perma.cc/9SUC-WNFZ.

[70] Lobbying Registration, Emmer Consulting, Inc. on behalf of DISH Network (Feb. 11, 2009), https://perma.cc/G2XX-HMPE.

[71] *E.g.*, Emmer Consulting, Inc. on behalf of DISH Network LLC, Q1 2015 Lobbying Report (Apr. 10, 2015), https://perma.cc/8DYZ-FVA8.

[72] David Goodfriend, *7 principles for good governing*, Politico (June 9, 2013), https://perma.cc/6D7J-UQMF.

[73] Letter from Andrew Jay Schwartzman to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Aug. 26, 2022), https://perma.cc/2QWE-RYLM.

stated that they pressed for more confidential documents from Standard General and lobbed allegations of bad faith.

*September 2022*

151.    At the beginning of September, when the 180-day review period was coming to a close, Mr. Goodfriend disclosed another *ex parte* meeting where he asked the FCC to order Standard General to produce additional documents. Mr. Goodfriend emphasized that "the Commission must not feel pressure to complete its review by any artificial deadlines established by the shot clock or the applicants' desire for final Commission action."[74]

152.    On September 27, 2022, Mr. Goodfriend had another *ex parte* discussion, this time with Ms. Saurer, where he asked the FCC "to suspend its voluntary 'shot clock'" and order Standard General to produce more documents to assess his speculation that "there *may be* substantial and material questions of fact as to whether the applicants made material misrepresentations to the Commission."[75] The FCC already had access to millions of pages of documents produced in connection with DOJ's antitrust review.

153.    On September 29, 2022, with only days left on the FCC's shot clock, the Media Bureau did as Mr. Goodfriend asked. The Media Bureau ordered a *second round* of

---

[74] Letter from Andrew Jay Schwartzman to Marlene H. Dortch 2, *In re Tegna Inc.*, MB No. 22-162 (Sept. 2, 2022), https://perma.cc/V7PL-C6VF.

[75] Letter from David R. Goodfriend to Marlene H. Dortch 2, *In re Tegna Inc.*, MB No. 22-162 (Sept. 29, 2022), https://perma.cc/3TTV-PAJN (emphasis added).

public comments and demanded that Standard General, TEGNA, and Cox Media Group produce more documents. The ordered document productions largely mirrored the list initially proposed by the straw objectors. *See supra* ¶122.[76] The additional document requests covered "alternative transactions considered" by TEGNA—*i.e.*, Mr. Allen's failed bid.

154.    Standard General and TEGNA had calls with the Media Bureau to try to clarify the extraordinary request for information about "alternative transactions."[77] The Media Bureau confirmed that it wanted information about other possible buyers for TEGNA—but only Mr. Allen's failed bid and not unsuccessful bids by others, such as Gray Television.

155.    When counsel for Standard General raised the Communications Act restriction on considering other buyers, 47 U.S.C. §310(d); *supra* ¶88, Ms. Saurer told the parties to just turn over the information because the Media Bureau wanted it and, later, the straw objectors wanted it.

156.    A few days after the Media Bureau ordered the document production, Media Bureau staff also engaged in *ex parte* discussions with Mr. Goodfriend, on behalf of

---

[76] *Compare* Motion of the Public Interest Parties (May 12, 2022), *supra* n.54, *with* Letter from Holly Saurer to Scott R. Flick et al. 3-4, *In re Tegna Inc.*, MB No. 22-162 (Sept. 29, 2022), https://perma.cc/259X-NKD6.

[77] *See* Letter from Scott R. Flick to Marlene H. Dortch, *In re Tegna, Inc.*, MB No. 22-162 (Oct. 5, 2022), https://perma.cc/QD5C-S3VD.

NewsGuild, "regarding the scope of documents to be produced."[78] Of course, it made no sense for NewsGuild or any of the straw objectors to want such information for themselves. On information and belief, the request for failed bidders came from the Goodfriend Group to instead be used by his other clients, the Allen Group and DISH—in violation of the FCC's protective order.

157.   On information and belief, Defendants were fishing for information on TEGNA's handling of the Allen Group's bid to be used in a potential discrimination lawsuit by Mr. Allen, like discrimination lawsuits he had filed before when the FCC or private companies failed to steer business opportunities to *Mr. Allen's* black-owned media company. *Infra* ¶¶254-57.

158.   Standard General, TEGNA, and Cox Media Group complied with the request by the FCC's deadline.[79] But they warned of the extraordinary nature of the FCC's eleventh-hour demands. They explained that the three most recent major transactions (Scripps-ION, Gray-Quincy, and Gray-Meredith, *supra* ¶¶109-11) had been approved in less time and without the unprecedented and illegal demands for highly confidential documents relating to "alternative transactions." They highlighted that the Commission already had access to the documents requested by virtue of earlier productions to DOJ. The

---

[78] Letter from David R. Goodfriend to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Oct. 5, 2022), https://perma.cc/MN74-HL8G.

[79] Applicants' Joint Response to the Media Bureau's Request for Information 3-6, *In re Tegna Inc.*, MB No. 22-162 (Oct. 13, 2022), https://perma.cc/5ZC9-KJGY.

request for more documents therefore did nothing to aid the Commission's review; it merely gave Mr. Goodfriend and friends access to Standard General's and TEGNA's "most competitively sensitive data." They said they were "astonished that this Transaction, with all of the benefits that it offers to the public interest, is at the receiving end of unrelenting and baseless attacks and delay tactics" and that objectors "have taken the inexplicable position that neither Soo Kim nor Deborah McDermott fit within [objectors'] own definition of diversity."

159.    Beginning in mid-September, the Goodfriend Group made a series of disclosures of *ex parte* presentations about the "foreign" nature of the transaction.[80] The Goodfriend Group offered a bizarre rationale connected to world events: that the deal, benefiting an Asian American, deserved extra scrutiny given "China['s] increased tensions in the Taiwan Strait." Mr. Goodfriend claimed that "we are living in unusual times when it comes to foreign investment issues" and that given the "changing geopolitical environment," "anonymous foreign investment in American newsrooms" poses "risks to localism, diversity, and by extension journalism and democracy itself." He urged the

---

[80] Letter from David R. Goodfriend to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Sept. 21, 2022), https://perma.cc/AR9L-WFPG; Letter from David R. Goodfriend (Sept. 29, 2022), *supra* n.75; Letter from Andrew Jay Schwartzman to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Oct. 6, 2022), https://perma.cc/LT45-F99L; Letter from Andrew Jay Schwartzman to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Oct. 13, 2022), https://perma.cc/N5QQ-6S96.

Media Bureau to assume "responsib[ility] for the implications of anonymous foreign investment."

*October 2022*

160.    In October, pressure to kill the Standard General-TEGNA deal reached Congress. Mr. Allen, with the help of Mr. Goodfriend, courted Democratic politicians to chime in against the transaction.

161.    Mr. Allen is a major donor of the Democratic Party. According to Federal Election Commission disclosures, from 2021 to 2022, Mr. Allen donated over $1 million to Democratic campaigns and PACs, over $250,000 of which went to then-Speaker of the House Nancy Pelosi.[81]

162.    On October 6, 2022, Speaker Pelosi sent a lengthy letter to Chairwoman Rosenworcel opposing the Standard General-TEGNA deal. The letter parroted the same concerns raised by the straw objectors and urged that "further scrutiny is appropriate."[82]

163.    That day, NewsGuild President Jon Schleuss publicly thanked Speaker Pelosi, noting that she "rarely weigh[s] in on cases like this."[83]

---

[81] *Individual Contributions: Byron Allen 2021-2022*, FEC, https://perma.cc/54K7-NFND.

[82] Letter from Nancy Pelosi and Scott Pellone to Jessica Rosenworcel 2 (Oct. 6, 2022), https://perma.cc/F3LX-8UEQ.

[83] Press Release, NewsGuild-CWA, *Statement on Pelosi's call for tougher scrutiny of TEGNA takeover* (Oct. 6, 2022), https://perma.cc/6JZF-LCYX.

164.    Days after Speaker Pelosi sent the letter, Mr. Allen donated $250,000 to the House Majority PAC and $100,000 to the Senate Majority PAC.[84] Given Mr. Allen's desire to block the deal, it was clear the letter came in return for his donations.[85] And Mr. Good-friend later claimed credit for his role in "generat[ing]" the letter. *Infra* ¶242.

165.    On information and belief, Chairwoman Rosenworcel and Ms. Saurer received a heads-up about the Speaker's letter from House staff, Mr. Goodfriend, or both. When the Media Bureau issued its September 29 order, including the document demands concerning the Allen Group's bid for TEGNA, they knew the Speaker's letter was forthcoming.

166.    Standard General had no advance notice of the letter. When those working on the transaction called the Speaker's staff to alert her to errors in her letter after it issued, the Speaker's staff remarked that the letter was a favor for a donor and she would not be weighing in further.

167.    Months later, when Speaker Pelosi was asked about her unusual opposition to the Standard General-TEGNA transaction, she remembered it as the deal involving a "foreigner" and retorted along the lines, "we can't have foreign people owning broadcast TV stations."

---

[84] *Individual Contributions*, FEC, *supra* n.81.

[85] *See* Josh Kosman, *Nancy Pelosi attacks media merger — after getting big campaign donation*, N.Y. Post (Oct. 26, 2022), https://perma.cc/KM6Z-RXSK.

*November 2022*

168.   On November 10, 2022—weeks after the 180-day shot clock expired—Standard General received its one and only in-person meeting with Chairwoman Rosenworcel during the application-review process.[86] Mr. Kim raised the issue of objectors' race-laden rhetoric, expressed that it had no place in the FCC review process, and inquired what the FCC could do about it.[87] Mr. Kim asked Chairwoman Rosenworcel to strike these objections from the record because the race-laden allegations were personal and insulting and should not, in any way, inform how the FCC evaluates the deal. But Chairwoman Rosenworcel started to get up, laughed, and told Mr. Kim he should hear what was said about him behind closed doors. She did not say that she or Ms. Saurer would address the race-based allegations. Nor did she explain to Mr. Kim what was wrong with the deal. That's because she and Ms. Saurer were doing the bidding of Mr. Allen and his allies. And Mr. Allen pulled out all the stops, even getting the Speaker of the House to weigh in, at a time when Chairwoman Rosenworcel's future as the FCC chair remained in jeopardy because of progressive support for Ms. Sohn.

---

[86] *See* Letter from Scott R. Flick to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Nov. 15, 2022), https://perma.cc/DQ27-DFM4.

[87] *See Standard General's Soo Kim Responds to Ad Hominem Attacks in Federal Communications Commission's TEGNA Proceeding*, Bus. Wire (Oct. 17, 2022), https://perma.cc/P493-RERE; *see also* John Eggerton, *Standard General's Soo Kim Brands Tegna Deal Criticism as Racist, Sexist*, Next|TV (Oct. 17, 2022), https://perma.cc/9FTZ-2ND6.

169.    Standard General continued to press the Media Bureau to disclose what concerns, if any, it had so that the transaction could be amended to address them. Through November, Media Bureau staff never indicated that anything about the deal needed to change and said it would take only two to three weeks to complete the FCC's review after DOJ's HSR waiting period expired.

170.    On information and belief, Chairwoman Rosenworcel and Ms. Saurer assumed (and hoped) that either DOJ would bring an action to block the Standard General-TEGNA deal and the transaction would fall apart or TEGNA would elect to terminate the transaction at the "outside date." So through November, they continued to wait.

171.    In mid-November 2022, DISH stopped retransmission consent negotiations with Standard General's affiliates' stations to extend their distribution agreements. DISH insisted that the stations significantly reduce retransmission fees, well below market rates. When the stations declined, DISH unilaterally dropped them from its service and refused to extend the current agreement to allow more time to negotiate.[88] A few weeks later, DISH unilaterally blacked out Cox Media Group's television stations after they failed to reach a new retransmission deal.[89]

---

[88] *Standard Media Group Issues Statement Regarding Expiration of Distribution Agreement with DISH Network,* Bus. Wire (Nov. 11, 2022), https://perma.cc/F8AU-6BK6.

[89] George Winslow, *Cox Stations Dropped From Dish TV*, TV Tech (Nov. 28, 2022), https://perma.cc/XLE8-XMVH.

172.     On November 17, 2022, Team Telecom told the FCC that it had no objection to the deal.[90] Team Telecom's approval—as the experts on the matter—should have silenced any legitimate concern the FCC could have had about foreign investment in the transaction. No different than for the 2019 Apollo-Cox deal and others, *supra* ¶¶74, 107, offshore funding located in the Cayman Islands and the British Virgin Islands should have been no obstacle to Americans Soo Kim and Deborah McDermott stepping in to own and lead the TEGNA stations.

173.     The Media Bureau then went quiet. It no longer had any legitimate basis to keep prolonging the review. It was clear that the allegation of increased consumer prices was unsubstantiated, irrelevant, and insufficient to satisfy the FCC's evidentiary standards. It was also clear that the allegation that Standard General planned to cut newsroom jobs was false. The extensive record—the most complete record ever developed by the FCC regarding any major television deal—supported neither objection.

174.     Team Telecom's approval increased the pressure at the FCC to move forward with approving the deal, and opponents ratcheted up their opposition.

175.     On November 21, 2022, Mr. Goodfriend submitted another letter to the Media Bureau. He claimed that Standard General had plans to illegally collude with other broadcast companies, increase retransmission fees, and engage in "price-fixing" and that

---

[90] Letter from Andrew Coley (Nov. 17, 2022), *supra* n.14.

"the Commission should scrutinize the anticompetitive aspects of this transaction,"[91] despite ongoing DOJ antitrust review. Mr. Goodfriend was ostensibly representing News-Guild and NABET, but his stated concerns served DISH, the Goodfriend Group's other client.

176.    Mr. Goodfriend's repeat objections were directed to the wrong audience. DOJ (not the FCC) was actively investigating whether contractual provisions about re-transmission fees and "after-acquired" clauses would have an anticompetitive effect.

177.    On November 22, 2022, the initial outside date, TEGNA elected not to terminate the deal but to extend the outside date to February 22, 2023.[92]

*December 2022*

178.    After its months of extensive cooperation with DOJ and the FCC, Standard General voluntarily agreed to waive enforcement of after-acquired clauses from existing contracts with distributors—those that had drawn ire from objectors at the FCC because of the alleged potential for price increases to distributors like DISH. Neither the FCC nor DOJ asked for that waiver as a condition of approving the deal, but Standard General was willing to do whatever it took to close the deal. Eliminating the after-acquired clauses took any possible antitrust objections off the table.

---

[91] Letter from David R. Goodfriend to Marlene H. Dortch 2, *In re Tegna Inc.*, MB No. 22-162 (Nov. 21, 2022), https://perma.cc/YS5J-NYKN.

[92] Tegna, Inc., Current Report (Form 8-K) (Nov. 22, 2022), https://perma.cc/W4VV-8S9F.

179.    On December 16, 2023, Standard General committed in a letter filed at the FCC to permit any retransmission agreement with TEGNA "in effect as of the time immediately prior to the Closing to continue to apply to the TEGNA Stations as of and following the Closing."[93] In other words, DISH or other distributors could pick their pricing. Standard General also sent individual letters to each distributor waiving the after-acquired clauses; these commitments were absolutely binding.

180.    Later that month, Standard General also submitted to the FCC two letters with further commitments about what it had been saying all along. On December 22, 2023, Standard General committed that it would not conduct any news staffing or other station-level layoffs for a minimum of two years following the transactions and reemphasized that Standard General planned to *increase* newsroom staffing.[94] And on December 23, 2023, Standard General again averred that it would not share information about retransmission fees or otherwise enter into joint agreements with Cox Media Group, which objectors had repeatedly invoked given Apollo's interest in the company.[95]

181.    The Media Bureau did not approve the transactions in light of Standard General's voluntary commitments. It instead used the commitments to prolong the approval process even more. On December 23, 2022, the Media Bureau opened an

---

[93] Letter from Soohyung Kim (Dec. 16, 2022), *supra* n.15, at 1.

[94] Letter from Soohyung Kim to Marlene H. Dortch 1, *In re Tegna Inc.*, MB No. 22-162 (Dec. 22, 2022), https://perma.cc/4LKN-NKG3.

[95] Letter from Soohyung Kim to Marlene H. Dortch 2, *In re Tegna Inc.*, MB No. 22-162 (Dec. 23, 2022), https://perma.cc/2QBS-RQ26.

unprecedented *third round* of public comments, giving objectors until January 13, 2023, to say (again) that they wanted the deal killed and further prolonging the proceedings.[96]

182.    Then on December 28, 2022—after blacking out Standard General's affiliates' stations the month before—DISH publicly appeared in the FCC proceedings. Earlier that year, a DISH executive attended earlier meetings with other distributors opposing the deal.[97] Now, DISH wanted access to all confidential information that had been disclosed.[98] Standard General, TEGNA, and Cox Media Group objected, stating that "DISH's late efforts to gain access to [confidential and highly confidential information] appear to be designed to gain some commercial advantage in an unrelated matter rather than a good faith effort to participate in this proceeding" and would "generat[e] yet further distraction and delay."[99]

*January 2023*

183.    On January 11, 2023, another member of Congress chimed in for Mr. Goodfriend and his allies. Senator Elizabeth Warren filed a letter with the FCC expressing

---

[96] Media Bureau Seeks Comment on Letters Filed by SGCI Holdings III LLC and Standard General L.P. Regarding Applications to Transfer Control of Tegna, Inc., *In re Tegna Inc.* MB No. 22-162 (Dec. 23, 2022), https://perma.cc/R6CM-QBTY.

[97] Letter from Michael Nilsson to Marlene H. Dortch 1, *In re Tegna Inc.*, MB No. 22-162 (Aug. 30, 2022), https://perma.cc/XBZ6-AF93; Letter from Michael Nilsson to Marlene H. Dortch 1, *In re Tegna Inc.*, MB No. 22-162 (Dec. 2, 2022), https://perma.cc/97MN-HJDR.

[98] Letter from Pantelis Michalopoulos to Marlene Dortch 1, *In re Tegna Inc.*, MB No. 22-162 (Dec. 28, 2022), https://perma.cc/LHB6-PSCY.

[99] Joint Objection to Disclosure of Confidential and Highly Confidential Information 3, *In re Tegna Inc.*, MB No. 22-162 (Jan. 3, 2023), https://perma.cc/S8D2-8U89.

"serious concerns" about the deal and urging Chairwoman Rosenworcel to use the FCC's "full statutory authority to block this acquisition."[100] Her letter tracked the straw objectors' arguments—price increases, jobs, and collusion—and dismissed Standard General's commitments as "historically ineffective" and "inherently flawed."

184.    Mr. Goodfriend—on information and belief at the behest of Mr. Allen and Mr. Ergen—communicated and coordinated with Senator Warren or her staff to send the letter, just as he had with Speaker Pelosi and her staff. Mr. Goodfriend later claimed credit for his role in "generat[ing]" Senator Warren's "outright opposition" to the deal. *Infra* ¶242.

185.    Mr. Kim sent Senator Warren a letter in response, requesting a meeting to discuss her concerns and offering a few responses. As to jobs, Mr. Kim highlighted how Standard General "added more than 40,000 hours of local news in just seven years at the stations we operated."[101] As to retransmission rates, Mr. Kim pointed out how Standard General waived any contractual right to alter TEGNA's current retransmission-fee agreements. He also illustrated how allowing distributors to pick their pricing "has the potential to *improve* their rates relative to the status quo"—highlighting as an example Comcast, which "ha[d] already availed itself of the favorable terms [that were] offered." And as to

---

[100] Letter from Elizabeth Warren to Jessica Rosenworcel 1, 5, *In re Tegna Inc.*, MB No. 22-162 (Jan. 11, 2023), https://perma.cc/AVF4-DA4R.

[101] Letter from Soohyung Kim to Elizabeth Warren 1-2 (Jan. 13, 2023) (available at @MisterSoo1, X (May 18, 2023, 5:10 PM), https://perma.cc/Q34C-USG4).

collusion, Mr. Kim affirmed that Standard General owns no stake in Cox and the commitment not to enter into any joint agreements was a "'belt-and-suspenders' effort" to allay "any conceivable concerns regarding Apollo's role as one of the smaller sources of financing." Mr. Kim emphasized that the deal "would create America's largest minority-owned and woman-led broadcaster," and "if the goal posts are moved to make approval far harder than any previously proposed transaction," that would "only diminish[] the chances of other minority entrepreneurs entering" the media industry. Senator Warren never responded.

186.    Days later, DISH and the straw objectors filed another round of comments. DISH argued that Standard General's December commitments about pricing were not good enough.[102] The straw objectors dismissed Standard General's commitments as "meaningless."[103]

187.    In response, Standard General stressed it had addressed every concern raised by the objectors in its binding commitments to the FCC. Standard General also explained that the straw objectors violated the protective order and FCC rules, as their joint filing discussed and quoted highly confidential documents that UCC and Common

---

[102] Comments and Opposition of Dish Network Corp. 2-3, *In re Tegna Inc.*, MB No. 22-162 (Jan. 13, 2023), https://perma.cc/Z9Y5-5MAS.

[103] Comments of the NewsGuild-CWA, NABET-CWA, UCC, and Common Cause 8-9, 12, *In re Tegna Inc.*, MB No. 22-162 (Jan. 13, 2023), https://perma.cc/2D73-4LRX.

Cause were not permitted to access.[104] The Goodfriend Group later claimed that it had

neglected to qualify that UCC and Common Cause did not join the parts of the comments

containing confidential information and had not been given access to confidential docu-

ments.[105]

188.    In late January 2023, as reports circulated that DOJ was "within days of po-

tentially clearing" the Standard General-TEGNA deal, Mr. Allen hosted an event orga-

nized by the Democratic Congressional Campaign Committee at his Los Angeles home.[106]

Former Speaker Pelosi, House Minority Leader Hakeem Jefferies, Minority Whip Kathe-

rine Clark, and other prominent Democratic politicians attended. Reports recognized that

Mr. Allen was "courting major Democratic politicians once again as he attempt[ed] to

stop" the Standard General-TEGNA deal, describing him as "the 'Forrest Gump' of the

proposed merger, seemingly making an appearance at every turn of events in this deal's

cycle."

189.    Now nearly 100 days beyond the FCC's ordinary 180-day shot clock, Stand-

ard General tried to prompt the Media Bureau to discuss any concerns it might have. But

the Media Bureau refused to engage.

---

[104] Applicants' Joint Reply Comments 9-10, *In re Tegna Inc.*, MB No. 22-162 (Jan. 20, 2023), https://perma.cc/69KN-QDH8.

[105] Letter from David R. Goodfriend and Andrew Jay Schwartzman to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Jan. 23, 2023), https://perma.cc/GQ6T-WQ92.

[106] Josh Kosman, *Byron Allen reportedly courting Democrats to derail TV-station Tegna buyout*, N.Y. Post (Jan. 25, 2023), https://perma.cc/4QJ6-CKRR.

190.    From the end of November 2022 to February 2023, Standard General asked the Media Bureau and Chairwoman Rosenworcel at least 16 times for the status of the review and for the chance to meet to address any concerns the FCC might have. Each request was either ignored or declined. During the same time period, the Media Bureau spoke with DirecTV and other distributors,[107] and Chairwoman Rosenworcel spoke directly with Jon Schleuss, president of straw objector NewsGuild.[108]

*February 2023*

191.    Everything came to a head in February—nearly a year after Standard General submitted its license-transfer applications.

192.    On or around February 20, 2023, DOJ confirmed that the HSR waiting period had ended, after months of baseless speculation by Mr. Goodfriend, then-Speaker Pelosi, Senator Warren, and others at the FCC that the deal was anticompetitive. The parties could proceed to closing under the HSR Act.

193.    The only obstacle left was Chairwoman Rosenworcel, Ms. Saurer, and the Media Bureau.

194.    On information and belief, Chairwoman Rosenworcel and Ms. Saurer were still holding out hope that TEGNA would elect to terminate the deal at the February 22

---

[107] Letter from Stacy Fuller to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Feb. 23, 2023), https://perma.cc/AG3R-YGYA; Letter from Michael Nilsson (Dec. 2, 2022), *supra* n.97, at 1-2.

[108] Letter from Andrew Jay Schwartzman to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Feb. 23, 2023), https://perma.cc/4WSG-UH75.

outside date. But their hopes were dashed when, on February 21, 2023, TEGNA elected to extend the outside date a second time for another three months to May 22, 2023.[109]

195. At this time, Gigi Sohn's possible confirmation to the FCC was still hanging over Chairwoman Rosenworcel and Ms. Saurer. Ms. Sohn reportedly had "privately told friends that the only reason she has weathered her year-and-a-half candidacy is because she has been assured by White House officials that they plan to make her chair."[110]

196. On information and belief, Chairwoman Rosenworcel and Ms. Saurer knew they had to kill the deal to placate Ms. Sohn's supporters, including Mr. Allen. Otherwise, Chairwoman Rosenworcel would be out as chair. And given Team Telecom approval, the expiration of the HSR waiting period, and TEGNA's extending the outside date (again), the only way left to kill the deal would be to run out the clock on Standard General's financing.

197. Throughout this period, the Media Bureau maintained its lack of transparency. On February 21, 2023, Chairwoman Rosenworcel had a call with Jon Schleuss, president of straw objector NewsGuild.[111] At or around that time, on information and belief, the Media Bureau told the straw objectors that it would issue the HDO, even though it had not yet delivered that bombshell to Standard General.

---

[109] Tegna, Inc., Current Report (Form 8-K) (Feb. 21, 2022), https://perma.cc/H6XT-8ZBW.

[110] Moynihan, *FCC hopeful Gigi Sohn could be named chair by White House, sources say*, N.Y. Post, *supra* n.51.

[111] Letter from Andrew Jay Schwartzman (Feb. 23, 2023), *supra* n.108.

198.    On February 24, 2023—day 309 of the FCC's 180-day shot clock—Ms. Saurer and the Media Bureau abruptly issued the HDO.[112] Standard General learned of the HDO only minutes before its release. Worse, earlier that *same day*, the Media Bureau had once again ignored a request by Standard General to meet to discuss the process and timetable for bringing the proceeding to a conclusion.

199.    Contrary to standard FCC practice, the Media Bureau did not give the commissioners 48 hours' notice of this major action. Also contrary to standard FCC practice, the Media Bureau did not meet with Standard General to discuss purported concerns, much less provide an opportunity to address them, before issuing the HDO.

200.    Never had the Media Bureau issued an HDO in connection with a broadcast television license-transfer application—let alone for a multi-billion-dollar transaction. The only two HDOs the Media Bureau had ever issued regarding a broadcast license transfer concerned radio station license transferees' prior felony convictions. *Supra* ¶100.

201.    The HDO had no basis in law and made no sense. There was no issue of fact to be tried. The Media Bureau had access to millions of pages of documents produced to DOJ and had taken the unusual step of granting objectors' multiple requests for more information to be produced. There was no more discovery or trial of fact that could possibly be had before an ALJ that the Media Bureau could not have already considered.

---

[112] Hearing Designation Order, *In re Tegna Inc.*, MB No. 22-162 (Feb. 24, 2023), https://perma.cc/N7U5-LQ57.

202.    The HDO also violated FCC rules, which prohibit the Media Bureau from taking any action that conflicts with prior rulings of the full Commission. The Media Bureau did exactly that in issuing the HDO because the FCC had always rejected the objections based on retransmission fees and staffing lodged here—matters outside the FCC's authority over broadcasters. In approving the Apollo-Cox deal, the FCC held that "the Commission is not the appropriate forum for addressing private contractual matters, such as after-acquired station clauses in retransmission consent agreements," and rejected arguments "that private equity firms typically impose cost-cutting measures that 'gut newsrooms.'" *Supra* ¶108.

203.    The content of the HDO further revealed the influence of the Allen Group, DISH, and the Goodfriend Group. It ordered the ALJ to examine what Standard General had already taken off the table with its binding commitments—that was, whether "(1) the Transactions are structured in a way that is likely to trigger a rate increase harmful to consumers, as a result of contractual clauses that take immediate effect after the consummation of the Transactions, and (2) the Transactions will reduce or impair localism, including whether they will result in labor reductions at local stations."

204.    But tellingly, despite noting abstractly that "diversity[] is a longstanding core Commission broadcast policy objective," the HDO never mentioned how the deal would serve the public interest given its substantial improvements to the diversity of broadcast owners and CEOs. By not even weighing the diversity benefits against the

purported concerns over retransmission fees and labor reductions in considering the public interest, the HDO implicitly took the position that the deal offered no diversity benefits at all.

205.   When the Media Bureau issued its HDO, only 87 days remained until Standard General's financing commitments would expire. In the past 30 years, no ALJ hearing related to a broadcast license-transfer application had been completed in fewer than 358 days, and on average such a hearing takes 799 days. The HDO sounded the death knell for the Standard General-TEGNA transaction.

206.   TEGNA's share price plunged from $22/share to $17/share after news of the HDO hit the financial markets. Shareholders lost approximately $1.2 billion in value.

207.   Commissioners Carr and Simington—neither of whom had yet had a chance to vote on the deal—criticized the HDO the day it issued. Given the "decline in the investments necessary to sustain the journalists and reporters that are vital to communities across the country," they stated, "the FCC should be working to encourage more of the investment necessary for these local broadcasters to innovate and thrive. It does the opposite today. After a protracted, nearly yearlong review, the Commission should be providing the parties with a decision on the merits—not an uncertain future."[113]

---

[113] *Joint Statement of Commissioner Carr and Commissioner Simington: On TEGNA Hearing Designation Order*, FCC (Feb. 24, 2023), https://perma.cc/E3MW-QEC9.

208.    Their comments were echoed by former FCC commissioners. Former Commissioner Michael O'Rielly (2013–2020) called the FCC's behavior "extremely troubling" and said that the FCC's actions showed that "the agency intends to bleed away any financing options for Standard General and crush the transaction without a Commission vote."[114] He added, "Silence from many entities that traditionally clamor for added minority ownership suggests they were told to take a pass or didn't find sympathy with Standard General's minority supporters." Similarly, former Commissioner Harold Furchtgott-Roth (1997–2001) stated that the HDO "effectively blocked the deal," called it "bureaucratic doublespeak," and pointed out that the two issues it set forth—higher retransmission fees and less localism—even if true, are not violations of any statute or FCC rule.[115] Former FCC Chairman Mark Fowler (1981–1987) offered a particularly scathing reaction:

> [A]fter more than 300 days of inactivity, the agency kills this major business transaction by ordering a lengthy evidentiary hearing on its "concerns"—concerns which had been satisfied. The hearing is overkill on two simple issues that could have been addressed with conditions. The hearing assures that the transaction will fail to close by the contract closing date, triggering a $130 million breakup fee. What? The commission bureaucrats have toiled for 300 days and produced bureaucratic madness that they put people in asylums for. An observer must ask, what in the world is going on here?[116]

---

[114] Michael O'Rielly, *The FCC Takes a Hatchet to Standard Process with Media Deal Delay*, Bloomberg (May 2, 2023), https://perma.cc/XHA4-UJZM.

[115] Harold Furchtgott-Roth, *Tegna and Standard General Must Challenge FCC*, RealClearMarkets (Mar. 5, 2023), https://perma.cc/J83K-P27C.

[116] Mark Fowler, *FCC's Blow To Standard General-Tegna Deal Is Runaway Regulation*, TVNewsCheck (Mar. 2, 2023), https://perma.cc/Z3M6-6L2N.

209.    The National Association of Broadcasters, one of the major trade groups in Washington, D.C., issued a rare comment concerning the FCC, saying that it was "alarmed by the FCC Media Bureau's decision," all "after a needlessly prolonged process and on the basis of issues outside the Commission's purview."[117] The HDO "deprives the commissioners, who are nominated by the President and confirmed by the Senate, the opportunity to participate in decisions of this magnitude and leaves the parties to the transaction with no practical legal recourse."

*March 2023*

210.    Shortly after the Media Bureau's HDO, Gigi Sohn withdrew her nomination to serve as an FCC commissioner.

211.    Meanwhile, outcry over the FCC's unprecedented HDO continued. Hazel Dukes, President of the New York NAACP, said it was "unacceptable" that "Chairwoman Rosenworcel has bowed to the pressure of those who accuse Soo Kim of not being the 'right type of minority.'"[118] She said the HDO "was deliberate and malicious and only happened because some deemed Soo Kim not to be the 'right type of minority.'"

---

[117] Press Release, Nat'l Ass'n of Broads., *NAB Statement on FCC's Hearing Designation Order* (Feb. 28, 2023), https://perma.cc/R9HW-65A3.

[118] Letter from Hazel N. Dukes to Jessica Rosenworcel and Geoffrey Starks 1-2, *In re Tegna Inc.*, MB No. 22-162 (Mar. 1, 2023), https://perma.cc/99AE-9ACV.

212.    Reverend Al Sharpton also weighed in, asking "Who determines who is the 'right minority' and who is the 'wrong minority'?"[119] He noted that the Standard General-TEGNA transaction would have resulted in "a 300 pct increase in minority owned tv stations."

213.    Senior advisor to the Democratic National Committee Cedric Richmond criticized the straw objectors for "resort[ing] to the ugliest of rhetoric," "mistakenly believ[ing] that the civil rights community does not view Asian-Americans as contributing to diversity."[120] He described the "FCC's failure to seize this opportunity to advance minority media ownership" as "beyond disappointing," adding that Ms. McDermott "would also be a historic addition to the field—bringing female leadership to a traditionally male-dominated industry." He emphasized that "[u]ndermining the attempt by a minority business leader to acquire a major media property, and doing so in a way that is totally unprecedented, is, on its face, at odds with the [Biden-Harris] administration's approach and core values."

214.    Back at the FCC, Standard General made multiple attempts to save the deal by trying to expedite the hearing or to get the license-transfer applications before the full Commission for a vote.

---

[119] @TheRevAl, X (Mar. 3, 2023, 11:23 AM), https://perma.cc/GUA5-9EGZ.

[120] Cedric Richmond, Opinion, *The FCC missed its big chance to diversify media ownership; it's not too late to change course.*, Balt. Sun (Mar. 29, 2023), https://perma.cc/U54E-3JHJ.

215.    Standard General promptly asked the ALJ assigned to conduct the hearing to certify the Media Bureau's HDO for immediate review by the full Commission.[121] The ALJ refused.[122]

216.    Standard General also asked the ALJ to accelerate the hearing, with the hope that the proceedings could finish before the May financing deadline.[123] In response, the Enforcement Bureau, which serves as the FCC's in-house hearings counsel, proposed a 19-month hearing schedule, guaranteeing the full Commission would never vote on the license-transfer applications before Standard General's financing expired.[124] The ALJ then tabled the issue of the hearing schedule. She wanted to wait because "the underlying transactions might not survive past May 22, 2023"[125]—a self-fulfilling prophecy.

217.    Standard General tried appealing directly to the Commission. Standard General asked the full Commission to exercise its authority to reverse, rescind, or vacate the Media Bureau's HDO and grant the applications.[126] As chair, Chairwoman

---

[121] Motion to Certify Application for Review of Hearing Designation Order, *In re Tegna Inc.*, MB No. 22-162 (Mar. 3, 2023), https://perma.cc/M7WV-KWX4.

[122] Order re Motion for Certification, *In re Tegna Inc.*, MB No. 22-162 (Mar. 16, 2023), https://perma.cc/3468-TZ2A.

[123] Proposed Schedule 2-3, *In re Tegna Inc.*, MB No. 22-162 (Apr. 19, 2023), https://perma.cc/NWD2-QUG4.

[124] Enforcement Bureau's Response to Initial Case Order, FCC 23M-08, at 5-7, *In re Tegna Inc.*, MB No. 22-162 (Apr. 19, 2023), https://perma.cc/EF58-5ES5.

[125] Order Summarizing Initial Conference 3, *In re Tegna Inc.*, MB No. 22-162 (Apr. 27, 2023), https://perma.cc/A33M-M56R.

[126] Motion for Waiver of Sections 1.115(E) and 1.115(F) of the Commission's Rules and Expedited Review, *In re Tegna Inc.*, MB No. 22-162 (Mar. 17, 2023), https://perma.cc/53Y5-6M9G.

Rosenworcel could call a vote on these requests to get the HDO and applications before the full Commission. She refused to take any action on that request, which remains pending today. The other commissioners had been stonewalled all along, and there was nothing they could do to bring the HDO to a full Commission vote without Chairwoman Rosenworcel calling the vote.

218.    FCC staff falsely told Congress, after some members inquired, that there was no way to reverse the HDO. In truth, two FCC rules permit the Commission to immediately reverse an HDO by the Media Bureau, and Chairwoman Rosenworcel could have brought it to a vote at any time.[127] *See* 47 C.F.R. §§1.115, 1.117; *see also id.* §0.3(a)(4). FCC staff either knowingly misinformed Congress or were unaware of the agency's basic rules.

219.    Having exhausted its options at the FCC, Standard General appealed the HDO to the D.C. Circuit and petitioned for mandamus at the end of March.[128] The D.C. Circuit ultimately dismissed the appeal as premature and denied the mandamus petition. The D.C. Circuit said there was no jurisdiction for an appeal because there had been no "resolution   by   the   full   Commission"   of   Standard   General's   license-transfer

---

[127] Letter from Sen. Ted Cruz and Rep. Kathy McMorris Rodgers to Sharon Diskin 2 (May 16, 2023), https://perma.cc/H3E3-EY4Z.

[128] Notice of Appeal, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Mar. 27, 2023); Conditional Petition for a Writ of Mandamus to the FCC, *In re SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir. Mar. 27, 2023).

applications.[129] And in an unpublished, per curiam, one-paragraph order, the court also denied the petition for writ of mandamus, stating it was not "crystal clear" that the Commission should have ruled before a hearing.[130] The D.C. Circuit's ruling was based on the limited administrative record before it.

*April 2023*

220.    Senator Ted Cruz, Ranking Member on the U.S. Senate Committee on Commerce, Science, and Transportation, and Congresswoman Cathy McMorris Rodgers, Chair of the U.S. House Committee on Energy and Commerce, sent Chairwoman Rosenworcel a letter about the Media Bureau's various departures from FCC precedent.[131] They expressed concerns about the FCC's "fairness," including that the Media Bureau "may be abandoning its rules and precedents based on the color of someone's skin," *i.e.*, because of Mr. Kim's race, so that Mr. Allen could have TEGNA instead.

221.    Chairwoman Rosenworcel refused to respond to the Congressmembers' inquiries while Standard General's D.C. Circuit appeal was pending. She did not address

---

[129] Order, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (Apr. 3, 2023) (per curiam) (quoting *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999)).

[130] Order, *In re SGCI Holdings III LLC*, No. 23-1084 (Apr. 21, 2023) (per curiam) (quoting *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022)).

[131] Letter from Sen. Ted Cruz and Rep. Cathy McMorris Rogers to Jessica Rosenworcel 1-2 (Apr. 5, 2023), https://perma.cc/7NRV-J3G9.

their concerns that the FCC impermissibly used race in its decision-making; nor did she offer any response about communications with Mr. Allen or others acting on his behalf.[132]

222.    Meanwhile, Standard General offered to meet with unions. NewsGuild and NABET refused. NewsGuild gave a most curious reason: it said it would meet only on the condition that Standard General release NewsGuild, the Goodfriend Group, and all "contributors" from any and all liability in connection with the Standard General-TEGNA deal.[133]

223.    Standard General also tried to meet with DISH to see if they could reach some agreement. By that time, it was no secret that DISH was a driving force behind the objectors. But DISH refused to meet.

224.    Standard General also tried to meet with straw objectors UCC and Common Cause. They, too, refused.

225.    All of this confirmed that the only interest Defendants had in the Standard General-TEGNA deal was killing it.

226.    In late April 2023, Commissioners Carr and Simington issued a joint statement demanding from the Commission a "long-overdue vote on the merits" for the

---

[132] Letter from Jessica Rosenworcel to Sen. Ted Cruz and Rep. Cathy McMorris Rogers 1-8 (Apr. 19, 2023), https://perma.cc/36YL-3Q8W.

[133] Letter from Scott R. Flick to Marlene H. Dortch 4 n.2, *In re Tegna Inc.*, MB No. 22-162 (May 11, 2023), https://perma.cc/P5XF-XDZP.

Standard General-TEGNA transaction.[134] "The FCC owes America's entrepreneurs, its in-novators, and the everyday people they serve a regulatory process that is fair, transparent, and evenly applied," they said. "The agency is falling short of that here, as we made clear the moment the FCC opted to designate this matter for hearing, rather than providing the parties with an up or down vote."

*May 2023*

227.    As a last gasp before its financing expired, Standard General volunteered additional assurances at the FCC. Standard General executed a memorandum of understanding with interested unions (other than NewsGuild and NABET, which refused to participate), extending its guarantee not to cut newsroom jobs from two years to three, committing to 20% increases in newsroom budgets and news programming hours, and pledging $5 million in annual grants to support emerging journalists.[135] Standard General also repeated its commitment to waive any right resulting from the transaction to increase retransmission fees. Still, Chairwoman Rosenworcel refused to change course.

228.    On May 2, 2023, a reporter asked Mr. Allen whether he was "interested in rebidding" for TEGNA now that the Media Bureau had all but killed Standard General's acquisition.[136] Mr. Allen responded that the Allen Group was "very interested."

---

[134] *FCC widely criticized for refusal to vote on Standard-General TEGNA Deal*, Bus. Wire (Apr. 28, 2023), https://perma.cc/TZW9-XTM5.

[135] Letter from Scott R. Flick (May 11, 2023), *supra* n.133, at 3-4.

[136] *Byron Allen Says BET Should Be Black-Owned*, at 1:17-2:15, Bloomberg (May 2, 2023), https://bloom.bg/49dhT5Z.

229.    On May 4, 2023, Standard General, TEGNA, and Cox Media Group requested non-*ex parte* meetings with Chairwoman Rosenworcel and each commissioner. Chairwoman Rosenworcel never responded, and Commissioner Starks declined.[137]

230.    On May 10, 2023, Standard General, TEGNA, and Cox Media Group met with Commissioners Carr and Simington, Mr. Goodfriend, and other representatives of the straw objectors. Standard General discussed the immense public interest benefits of the transaction, including diversity benefits, Standard General's commitments before and after the HDO, and the unprecedented and unequal treatment of Standard General's applications.[138]

231.    That same day Senator Warren tweeted, "@FCC under the leadership of @JRosenworcelFCC is rightfully conducting a review of the Standard General-Tegna deal as part of the Biden admin's commitment to promote competition."[139] Similarly, Democratic Congresswoman Jan Schakowsky applauded Chairwoman Rosenworcel for her "decision to block the proposed takeover of TEGNA."[140]

232.    On May 16, 2023, Senator Cruz and Congresswoman McMorris Rodgers called for the FCC's acting inspector general to investigate whether Chairwoman Rosenworcel's unprecedented actions were "motivated by a biased desire to defeat the

---

[137] Letter from Scott R. Flick (May 11, 2023), *supra* n.133, at 2, 6-7.

[138] *See generally id.* at 1-8.

[139] @SenWarren, X (May 10, 2023, 9:25 AM), https://perma.cc/ESG4-NZN6.

[140] Press Release, U.S. Congresswoman Jan Schakowsky, *Schakowsky Statement on FCC's Tegna Decision* (May 10, 2023), https://perma.cc/65ZR-NZ4Y.

Standard General-TEGNA transaction."[141] Among other issues, they demanded an investigation into the misleading statements of Chairwoman Rosenworcel's staff to Congress that there was no way to reverse the HDO when, in fact, Chairwoman Rosenworcel could have brought it up for a Commission vote at any time.

233.    On May 17, 2023, Senator Warren sent a second letter to Chairwoman Rosenworcel. Senator Warren "express[ed] [her] continued support" for the FCC's actions and urged the FCC to "use its statutory authority to block" the deal.[142] The letter completely ignored Standard General's response to Senator Warren's first letter. Furthermore, Senator Warren surmised that "media mergers and acquisitions can result in less diversity and inclusion in the industry, perpetuating harmful stereotypes and eliminating competition for marginalized workers." She added that federal agencies should "review proposed mergers and acquisitions with an eye towards these effects on diversity."

234.    Mr. Kim responded on Twitter, asking "why [do] you continuously write letters" opposing the deal "when you turn down our requests to sit with you to discuss our successful track record in local broadcasting[?]"[143] As to Senator Warren's comments about diversity, Mr. Kim noted, "I want to understand why you . . . deny that my being

---

[141] Letter from Sen. Ted Cruz and Rep. Kathy McMorris Rodgers (May 16, 2023), *supra* n.127, at 1-3.

[142] Letter from Elizabeth Warren to Jessica Rosenworcel 1, 4 (May 17, 2023), https://perma.cc/EPE8-MHDF.

[143] @MisterSoo1, X (May 18, 2023, 4:50 PM), https://perma.cc/K7J5-536H.

Asian American would increase Minority Ownership of Broadcast Stations by the @FCC['s] own definitions by 300%."

235.    On May 22, 2023, the twice-extended outside date, Standard General's financing expired. TEGNA terminated the merger agreement.

236.    There was no hope for extending the financing or obtaining replacement financing. Since executing the financing agreements 450 days earlier, the financial market had rapidly changed. Standard General's financing agreements were signed just before Russia invaded Ukraine. Interest rates soared and inflation reached record levels. And TEGNA's stock price had plummeted. No bank would lend Standard General billions of dollars to try again at a transaction that the FCC had just killed in such unprecedented fashion.

237.    Standard General was left to pay a $136 million breakup fee to TEGNA, in addition to roughly $70 million in its own transaction costs. The financial harms extended beyond Standard General. The FCC's actions caused TEGNA shares to nosedive from $22/share immediately before the HDO to $16/share when the deal died. TEGNA's shareholders lost nearly $2 billion in the expected gains from a successful merger, including $85 million from Standard General's 10.6 million shares owned. Given TEGNA's prominence in mutual funds held by countless Americans, that loss reverberated throughout the American investing public.

238.    The day after the deal died, Mr. Allen publicly reiterated that the Allen Group remained "very interested in" acquiring TEGNA.[144] Mr. Allen said there was still a way to get such a large deal done by being clear with the FCC about what he wants to do. He stated, "I don't think we will have an issue there whatsoever."[145]

239.    The straw objectors quickly claimed credit for killing the Standard General-TEGNA deal, while praising Chairwoman Rosenworcel's actions. NewsGuild declared a "major victory" when "TEGNA announced it was terminating its merger agreement with Standard General and st[ood] to receive a $136 million breakup fee."[146] On Twitter, News-Guild president Jon Schleuss stated that "we just killed a multi-billion dollar" deal[147] and urged TEGNA to "invest the breakup fee we helped you get into your journalists."[148] UCC stated that it "defeat[ed]" the merger and "thank[ed] FCC Chair Rosenworcel,"[149] while Common Cause claimed a "HUGE victory."[150]

---

[144] *Allen Wants to Expand in Local News, Streaming*, at 0:00-0:41, 1:08-1:18, Bloomberg (May 23, 2023), https://bloom.bg/3uwfXpU; *see also Byron Allen on the future of Black-owned media*, NPR (June 4, 2023), https://perma.cc/Z6FP-A64U.

[145] Richard Abbey & Sonali Basak, *Byron Allen Says He's Interested in Tegna, Sees No Financing Issues*, Bloomberg (May 23, 2023), https://bloom.bg/3HV9urR.

[146] *Unions, public interest advocates thwart hedge fund's attempted takeover of local news and set groundbreaking FCC precedent*, NewsGuild-CWA (May 22, 2023), https://perma.cc/5LYT-NBXT.

[147] @gaufre, X (May 22, 2023, 5:35 PM), https://perma.cc/58WP-8VTS.

[148] @gaufre, X (May 22, 2023, 7:13 PM), https://perma.cc/9N67-CSWQ.

[149] Cheryl Leanza, *UCC Media Justice Finally Defeats Hedge Fund TV Deal*, UCC: Media Just. Ministry (May 23, 2023), https://perma.cc/B6MJ-SB4G.

[150] Kathay Feng, *Common Cause's Work in Stopping the TEGNA/Standard General Merger*, Common Cause (May 23, 2023), https://perma.cc/XXA2-BRJH.

240.    On May 23, 2023, Senator Warren tweeted, "I commend the @FCC under @JRosenworcelFCC for putting anticompetitive deals under the microscope."[151]

*June 2023*

241.    With the deal dead, and having failed to give Standard General a chance to receive a decision on its license-transfer applications before its financing expired, the ALJ terminated the hearing proceedings as moot on June 1, 2023. The ALJ rid Chairwoman Rosenworcel of the political pressures associated with the deal. *Supra* ¶¶118-19, 160, 162, 183, 195-96.

242.    The Goodfriend Group issued a statement outlining how it "won" and "beat" the proposed merger.[152] It explained how it "assembled a coalition" of objectors and "generated unusually strong statements of concern or outright opposition" from then-Speaker Pelosi and Senator Warren. "Most important, the Chairwoman of the FCC remained resolute and did not back away from her bureau's [hearing designation] order."

## IV.   *Defendants' Conspiracy*

243.    At a Senate hearing on June 22, 2023, Senator Cruz said this of Chairwoman Rosenworcel and her unprecedented conduct at the FCC:

> Faced with a 2-2 Commission and a lawful transaction that she wanted to kill, she skipped a Commission-level vote on the Standard General-TEGNA transaction and instead directed the FCC's Media Bureau to do her bidding. And to top it off, there is widespread

---

[151] @SenWarren, X (May 23, 2023, 10:51 AM), https://perma.cc/C627-UQZS.
[152] *Journalists Beat Wall Street*, Goodfriend Grp. (June 11, 2023), https://perma.cc/CS2W-8MV2.

suspicion that the Chairwoman chose to quash the deal specifically to benefit a longtime Democrat donor. Her actions seriously damaged the FCC's reputation. And they impaired the ability of broadcasters to compete against big tech companies and provide local journalism.[153]

244.    Mr. Allen was that "longtime Democrat donor." And he was at the center of Defendants' conspiracy, connected to all other Defendants through Mr. Goodfriend and Mr. Goodfriend's political connections.

### Byron Allen & Allen Media Group

245.    Mr. Allen was the "Forest Gump" of the Standard General-TEGNA deal—showing up at every turn to derail it. *Supra* ¶188. After all, Mr. Allen was "the most likely beneficiary if the Standard General deal f[ell] through"[154] because it would give him another chance to buy TEGNA.

246.    On information and belief, Mr. Allen's prominence as a major Democratic donor enhanced his ability to have Chairwoman Rosenworcel, a longtime Washington Democrat, and Ms. Saurer adopt his view of the role race should play in the FCC's decisions. Race was a negative for Korean American Soo Kim, but it always seemed to work as a positive for Byron Allen.

---

[153] *Nominations Hearing: FCC*, at 22:35-23:21, U.S. Senate Comm. on Com., Sci. & Transp. (June 22, 2023), https://bit.ly/3SWucha.

[154] Editorial Board, Opinion, *A Big Donor, Nancy Pelosi and the FCC*, Wall St. J. (Mar. 21, 2023), https://on.wsj.com/3unPuen.

247.    Mr. Allen knows that as a black American and the owner of the largest black-owned media company, he has tremendous leverage over the race-conscious FCC, which actively seeks to expand minority ownership. *Supra* ¶¶101-04. Mr. Allen has confidently declared that he can get large deals through the FCC without issue, unlike other owners in the media industry (including other minority owners like Mr. Kim).

248.    As noted, when asked about pursuing TEGNA immediately after the Standard General-TEGNA deal died at the FCC, Mr. Allen remarked, "I don't think we will have an issue there whatsoever." *Supra* ¶238.

249.    Months later when Mr. Allen was asked about plans to acquire ABC and other Disney television assets, Mr. Allen told reporters, "Capital is not the problem" for these large media deals. "The real commodity is certainty of close, approval of the deal" by regulators. "Not that many people can get that deal through."[155] "That's the magic trick."[156] According to Allen, regulators are "going to be really careful with who they approve and it's going to be an owner-operator like me."[157] And a few weeks later, Allen remarked, "It's not about the money; it's about certainty of close. And very few people

---

[155] Aisha Counts, *Byron Allen Says Regulators, Not Money Are Issue With Disney Offer*, Bloomberg (Sept. 27, 2023), https://bloom.bg/3STt4ej.

[156] Dade Haynes, *Byron Allen On His $10B Offer For ABC And Other Disney Networks: "Capital's Not An Issue", But Bob Iger "Is Not Ready" Yet To Pursue Linear Sale*, Deadline (Sept. 27, 2023), https://perma.cc/98C3-QGJ8.

[157] John Lafayette, *Byron Allen Says: I'm Ready To Buy ABC When Disney's Ready To Sell*, Next|TV (Sept. 27, 2023), https://perma.cc/4XS5-LVA3.

can get a deal like that—ABC News—get that approved in Washington, DC." "I'm going to get it approved. I'm going to get it approved. We're going to get that done."[158]

250.    And just recently, when Mr. Allen was asked about plans to acquire Paramount, he remarked, "We have more than enough capital available to us. The real challenge is certainty of close." "This deal lives or dies at the [FCC]."[159] And after a conversation with Mr. Allen, industry insiders reported that, despite many doubting his financial backing, he "may have sway in Washington, where the F.C.C. could make life difficult for [his] rivals":

> Allen believes he holds one big card: the Federal Communications Commission, which must approve any change in control of CBS. Democrats dominate the F.C.C., and they just finished a review of media ownership rules that included a push for minority ownership. Allen, as a TV station owner, has strong relationships with these commissioners; many believe his behind-the-scenes maneuvering eventually killed the $8.6 billion buyout of station owner Tegna by Standard General. That deal appeared poised for a thumbs-up until Democratic politicians, reportedly influenced by Allen, raised concerns about Apollo assuming control and potentially impacting local news and jobs. . . .
>
> [T]he Dems don't even need to vote the proposed deal down, they just need to maim it by designating the issue for a hearing. Speaking with a couple F.C.C. experts this week, they agreed that the agency could become an impediment to the Paramount sale and that Allen might be a factor. "I could see Byron Allen causing them to slow-walk this," one said.[160]

---

[158] *Byron Allen Discusses ABC Bid and Opportunities Across New Media*, at 13:03-13:13, 14:21-14:25, Bloomberg (Oct. 12, 2023), https://bloom.bg/3OLefb5.

[159] Ryan Anastasio, *Byron Allen, offering $14 billion for Paramount, has a long history of media bids that haven't materialized*, CNBC (Jan. 31, 2024), https://perma.cc/3CJJ-TKC3.

[160] Matthew Belloni & Eriq Gardner, *Lord Byron and the Courtship of Shari*, Puck (Feb. 1, 2024), https://perma.cc/633M-55CP.

251.    Mr. Allen's statements and observations like this are well-founded. He is a "longtime Democrat donor." *See supra* ¶161. And as explained, the FCC routinely has granted the Allen Group's license-transfer applications quickly, even when they involve a significant number of stations. *Supra* ¶112. It also quickly approved the two major Gray Television deals, which both benefited the Allen Group through station divestitures. *Supra* ¶¶110-11.

252.    On information and belief, after losing the bidding auction for TEGNA, Mr. Allen deployed his longtime lobbyist, Mr. Goodfriend, to gather straw objectors, who succeeded in getting the FCC to delay deadlines and repeatedly demand more information and documents from Standard General. Mr. Allen orchestrated those early speed bumps so that he could then leverage them to try to get a piece of the Standard General-TEGNA deal, just as he had acquired for the Allen Group divested stations in the multi-billion-dollar Gray Television deals. To that end, Mr. Allen called Mr. Kim in June 2022, commented that things had not been smooth early on at the FCC, and suggested that things would go better if Mr. Kim would include the Allen Group in the deal. When Mr. Kim refused those overtures, the fix was in. If no part of TEGNA could go to the black-owned Allen Group, then no part of TEGNA could go to Mr. Kim. Mr. Allen would use all possible means—including six-figure political donations—to get the then-highest-ranking member of Congress involved, to influence the FCC's decision-making, and to destroy the Standard General-TEGNA deal. And Mr. Allen leveraged Mr. Kim's race to

do so; he deployed race-based opposition to the deal and maligned Mr. Kim as a foreigner. Mr. Allen used Mr. Kim's race as a negative.

253.    Such race-based tactics are part of a well-known pattern of behavior by Mr. Allen. According to *The Wall Street Journal*, Mr. Allen owns approximately 90% of all black-owned media in the U.S., and he "plays the race card as a business strategy," routinely threatening allegations of racism unless the targets of his threats agree to steer business opportunities to black Americans, namely Mr. Allen himself.[161] In Mr. Allen's view, diversity efforts that do not deliver business opportunities to *his* 100% black-owned media company are a "sham."

254.    According to *The Wall Street Journal*, Mr. Allen's business model, "shaking down companies by playing the race card," has been very successful. In 2021, he threatened to sue major brands if they did not allocate more advertising dollars to black-owned media (again, 90% owned by Mr. Allen in the U.S.). GM, Verizon, Walmart, Procter & Gamble, and AT&T all acquiesced. McDonald's, on the other hand, refused and the Allen Group filed a $10-billion lawsuit for alleged racial discrimination[162] and a second lawsuit for fraud.[163] Come December 2022, the S&P Global Ratings stated that the Allen Group

---

[161] Editorial Board, Opinion, *Byron Allen's Big Mac Attack*, Wall St. J. (June 15, 2023), https://on.wsj.com/4bBbDX3.

[162] Notice of Removal Exhibit B – Complaint, *Ent. Studios Networks, Inc. v. McDonald's USA, LLC*, No. 2:21-cv-4972 (C.D. Cal. June 18, 2021), ECF No. 1-2.

[163] Complaint, *Weather Grp., LLC v. McDonald's USA, LLC*, No. 23STCV10045 (Cal. Super. Ct. L.A. Cnty. May 4, 2023). The court dismissed this case after finding Plaintiffs

"drastically outperformed the broader media industry in advertising revenue growth largely due to the success of its Black-owned media initiative."[164]

255.    The Allen Group's lawsuits have also targeted cable television providers. In 2014, Mr. Allen used the National Association of African American Owned Media (NAAAOM)—a "coalition" he personally leads[165]—to file a $10 billion lawsuit against AT&T and DirecTV for racial discrimination. The suit alleged that AT&T and DirecTV denied channel carriage license agreements to "100% African American-owned media companies," which NAAAOM admitted really was *only the Allen Group*.[166] The lawsuit settled, with AT&T and DirecTV agreeing to carry the Allen Group's cable channels.[167]

256.    In 2015, the Allen Group and NAAAOM sued Comcast, the NAACP, Reverend Al Sharpton, former FCC Commissioner Meredith Baker, and others for $20 billion, alleging that Comcast had mistreated black-owned media companies (again, really just the Allen Group) and that the NAACP and Rev. Sharpton conspired with Comcast by "entering into sham 'diversity' agreements" so Comcast could claim it "met its 'diversity

---

failed to show "a probability of prevailing on the merits of their claim." *Weather Grp., LLC v. McDonald's USA, LLC*, No. 23STCV10045, slip op. at 21 (Cal. Super. Ct. L.A. Cnty. Feb. 2, 2024).

[164] Editorial Board, *Byron Allen's Big Mac Attack*, Wall St. J., *supra* n.161.

[165] *About NAAAOM*, NAAAOM, https://perma.cc/V2EG-NZAZ.

[166] Complaint ¶¶11, 17, *Nat'l Ass'n of African-Am. Owned Media v. AT&T, Inc.*, No. 2:14-cv-9256 (C.D. Cal. Dec. 2, 2014), ECF No. 1.

[167] Cynthia Littleton, *AT&T Settles Byron Allen Racial Discrimination Lawsuit, Picks Up 7 Channels*, Variety (Dec. 28, 2015), https://perma.cc/2UFV-QQBM.

obligations.'"[168] Mr. Allen publicly claimed that Rev. Sharpton was "the least-expensive negro," bought off by Comcast as racial "cover."[169] The case eventually settled with Comcast agreeing to carry the Allen Group's cable channels.[170]

257.    Again in 2016, the Allen Group and NAAAOM sued Charter Communications and the FCC for racial discrimination. They sought $10 billion from Charter for allegedly denying business opportunities to black-owned media companies—*i.e.*, Mr. Allen's companies—and criticized Charter's "sham diversity agreements" as giving the "false impression that the FCC has taken diversity considerations into account" in assessing whether the public interest would be served by a merger involving Charter.[171] Mr. Allen publicly stated that the lawsuit "seeks to stop Charter Communications' 'Jim Crow' policies and . . . its exclusion of 100% African American-owned media," and Mr. Allen vowed "to stop these corporate racist atrocities and the resulting African American financial genocide."[172] The Allen Group dropped the claim against the FCC[173] and

---

[168] Complaint ¶18, *Nat'l Ass'n of African-Am. Owned Media v. Comcast Corp.*, No. 2:15-cv-1239 (C.D. Cal. Feb. 20, 2015), ECF No. 1.

[169] Evan McMurry, *Plaintiff: Comcast Treats Sharpton as 'Least Expensive Negro,'* Mediaite (Feb. 28, 2015), https://perma.cc/74HU-3SP5.

[170] Cynthia Littleton, *Byron Allen and Comcast Settle Racial Discrimination Lawsuit, Set Carriage Deal for 3 Channels*, Variety (June 11, 2020), https://perma.cc/N9TB-PRJA.

[171] Complaint ¶¶24, 110, *Nat'l Ass'n of African Am.-Owned Media v. Charter Comm'cns, Inc.*, No. 2:16-cv-609 (C.D. Cal. Jan. 27, 2016), ECF No. 1.

[172] R. Thomas Umstead, *Byron Allen Files $10 Billion Discrimination Suit Against Charter*, Next|TV (Jan. 27, 2016), https://perma.cc/6GT3-99G7.

[173] Notice of Voluntary Dismissal, *Charter*, No. 2:16-cv-609 (C.D. Cal. July 29, 2016), ECF No. 42.

later reached a settlement with Charter, the terms of which were not disclosed.[174] Spectrum, Charter's cable television brand, now carries several of the Allen Group's cable channels.

258.   Mr. Allen's approach has been the same for other FCC regulatory approvals. He has long advocated that the FCC make blatantly unlawful race-based decisions to steer more business opportunities to black-owned media (which are almost all Mr. Allen's companies) to the exclusion of others.

259.   In 2010, the Allen Group opposed the Comcast/NBC-Universal merger before the FCC, citing potential harm to black-owned companies. The Allen Group urged the FCC to condition its approval of the merger on a requirement that Comcast specifically allocate cable channels to "wholly-owned African American media companies."[175] In the Allen Group's words, that was "[t]he *only way* to promote diversity and protect African American owned programming networks and the viewing public." The National Coalition of African American Owned Media, with its connections to the Allen Group,[176]

---

[174] Meg James, *TV mogul Byron Allen, cable giant Charter settle long-running race discrimination lawsuit*, L.A. Times (Feb. 4, 2021), https://perma.cc/9PDJ-C99G.

[175] Comments of Entertainment Studios, Inc. 2-3, 17, *In re Comcast Corp.*, MB No. 10-56 (June 21, 2010), https://perma.cc/F6EZ-MKRP (emphasis added).

[176] Joe Flint, *Protester of Comcast-NBC deal has interesting friends*, L.A. Times: Co. Town Blog (July 1, 2010), https://perma.cc/X9Q2-4CUV.

opposed the transaction on the same grounds.[177] The FCC approved the merger and declined to impose such racial "quotas" as unlawful.[178]

260.    Years later, the Allen Group and NAAAOM petitioned the FCC to investigate and sanction Comcast for failing to provide opportunities to black-owned media. They claimed that the networks Comcast had added—Earvin "Magic" Johnson's Aspire and Sean "Diddy" Combs's Revolt—were "nothing but a front" "with two prominent African Americans serving as window dressing" since both networks "are financed by substantial, white-owned sources."[179] The Allen Group and NAAAOM complained that Comcast "pass[ed] over" the Allen Group. The FCC declined to intervene.

261.    Mr. Allen does not engage in such shakedowns for the benefit of nonblack minorities in broadcasting or even black-owned broadcasting companies not owned by Mr. Allen. Just the opposite—Mr. Allen conspired to kill the Standard General-TEGNA deal because it would have created the largest minority-owned set of television stations in the country, but none would be black-owned television stations owned by Mr. Allen. Mr. Allen was not about to let a Korean American (or any minority other than himself) own the TEGNA stations.

---

[177] Petition to Deny, *In re Comcast Corp.*, MB No. 10-56 (June 21, 2010), https://perma.cc/A7L4-EHMG.

[178] *In re Comcast Corp.*, 26 FCC Rcd. 4238, 4317-18 (2011).

[179] Petition for Immediate Investigation and Imposition of Conditions, Monetary Forfeitures, Revocation and/or Non-Renewal of Licenses ¶¶1, 15, 35-37, *In re Comcast Corp.*, MB No. 10-56 (Mar. 24, 2016), https://perma.cc/2NAW-YLWB.

262.    Chairwoman Rosenworcel knew that if Mr. Allen took the same tack here as he had with Charter and Comcast—suing her and others involved in the Standard General-TEGNA transaction for discriminating against Mr. Allen over his failed bid to buy TEGNA—then there would be serious political fallout from progressives and, in particular, those in the White House and in Congress who wanted to see Gigi Sohn replace her as chairwoman of the Commission.

### *David Goodfriend & the Goodfriend Group*

263.    Publicly, Mr. Goodfriend at the Goodfriend Group was representing straw objectors who disparaged Mr. Kim as a foreigner in the FCC proceedings, at times linking Mr. Kim with geopolitical events in Asia and warning about foreign outsiders controlling U.S. news organizations. But Mr. Goodfriend was also doing the bidding of the Allen Group and DISH, his longtime clients.

264.    Playing the race card for the benefit of the Allen Group was not new to Mr. Goodfriend. As the longtime lobbyist of the Allen Group, he'd lobbied on Mr. Allen's behalf for years to steer more opportunities to black-owned (*i.e.*, Allen-owned) media companies. *Supra* ¶147. And that lobbying work continued all through the FCC proceedings that killed the Standard General-TEGNA deal.

265.    At the same time, Mr. Goodfriend was making arguments for DISH and Mr. Ergen. Discussed above, Mr. Goodfriend had worked for DISH years earlier and had since lobbied on DISH's behalf. *Supra* ¶148.

266.    Mr. Goodfriend and DISH had engaged in questionable business practices before. DISH reportedly supported a questionable venture launched by Mr. Goodfriend called Locast.[180] Locast was an ostensible nonprofit in the business of retransmitting broadcast television station signals without permission and without paying for them—purportedly under a narrow legal exception that governs local retransmitting by non-profits.[181] After being sued by major television networks, Locast agreed to a judgment that required it to stop stealing broadcast television signals and to pay $32 million in copyright damages.[182]

267.    FCC nominee Gigi Sohn was a member of Locast's board. And Mr. Goodfriend and Ms. Sohn signed a settlement with the television networks for a fraction of the copyright damages—one day after Ms. Sohn was nominated to serve as an FCC commissioner.[183] Locast no longer exists.

268.    On information and belief, Mr. Goodfriend and DISH teamed up again during the Standard General-TEGNA proceedings. Mr. Goodfriend's obsession with the transaction's provisions about retransmission fees was entirely to the benefit of DISH

---

[180] *E.g.*, Edmund Lee, *Locast, a Free App Streaming Network TV, Would Love to Get Sued*, N.Y. Times (Jan. 31, 2019), https://nyti.ms/3uBaLBm.

[181] Joe Flint & Drew FitzGerald, *Networks Sue to Stop Streaming Service Offering Free TV Feeds*, Wall St. J. (July 31, 2019), https://on.wsj.com/3SDeOF1.

[182] Dade Hayes, *Locast Founder To Pay $32 Million To Settle Lawsuit By Big Four Broadcasters*, Deadline (Oct. 28, 2021), https://perma.cc/Y7AH-Y88J.

[183] Charles Gasparino, Opinion, *Leftist FCC nominee Gigi Sohn faces another 'conflict' hurdle*, N.Y. Post (Jan. 29, 2022), https://perma.cc/EM2W-6QJJ; Editorial Board, Opinion, *Gigi Sohn's Business Model*, Wall St. J. (Jan. 28, 2022), https://on.wsj.com/49uCXEw.

and, in turn, its largest shareholder, Mr. Ergen. And Mr. Goodfriend ultimately prevailed for them. Standard General waived enforcement of those provisions, meaning DISH would pay the same retransmission fees for TEGNA stations after the deal as it was paying before. But even that wasn't enough; the Media Bureau killed the deal under the pretext that it needed a whole hearing about retransmission rates—an issue that the FCC has repeatedly refused to consider as part of its public interest analysis.

269.    In April 2023, Mr. Goodfriend confirmed to an associate of Mr. Kim's that it was Mr. Ergen specifically who wanted the deal killed.

270.    Mr. Goodfriend was also the perfect person to play the part. Noted above, his ties to Chairwoman Rosenworcel were significant. They worked at the FCC together and he had long supported her advancement at the FCC. *Supra* ¶149.

***Charlie Ergen & DISH***

271.    DISH is a major player in the telecom industry, and it had every incentive to support the Allen Group's race-based opposition to Standard General's license-transfer application.

272.    In the telecom ecosystem, DISH is a multichannel video programming distributor, which means it must obtain consent from broadcasters to retransmit their programming. In exchange for such consent, DISH pays retransmission fees, explained above, to companies like Standard General that own broadcast stations. *Supra* ¶¶76, 80.

273.   In early February 2022, as Standard General and TEGNA were finalizing the terms of the acquisition, DISH and TEGNA reached a new retransmission fee deal, ending a months-long blackout of TEGNA stations on DISH.[184] But retransmission consent agreements that Standard General was set to acquire as part of the transaction could have increased the retransmission fees for the TEGNA stations to match fees charged under those other retransmission consent agreements (the "after-acquired" clauses that Standard General eventually agreed to waive).

274.   In November 2022, with the conspiracy to kill the Standard General-TEGNA deal well underway, DISH walked away from negotiations about retransmission fees for Mr. Kim's existing stations. *Supra* ¶171.

275.   On information and belief, DISH knew that it could save potentially millions if the TEGNA deal did not close or that it could score a better deal if Mr. Allen, whom on information and belief Mr. Ergen had come to know through Mr. Goodfriend, became the owner of the TEGNA stations. On information and belief, Mr. Allen and Mr. Ergen worked well together. For example, despite DISH being a hardline negotiator over retransmission fees leading to countless station blackouts, that has never been an issue for the Allen Group, as DISH has never blacked out the Allen Group's stations.

---

[184] Kelly Tyko, *Tegna TV stations back on Dish Network ahead of Super Bowl after 4-month dispute*, USA Today (Feb. 4, 2022), https://perma.cc/H48F-JYFN.

276.     Multiple sources confirmed Mr. Ergen's personal desire to kill the deal. According to one of Mr. Kim's acquaintances, "Charlie cares."

**Chairwoman Rosenworcel & Ms. Saurer**

277.     As explained, the FCC has long used race in its decision-making processes, including tracking minority ownership data and determining that minority ownership is in the public interest. And Chairwoman Rosenworcel has publicly advocated for increased minority ownership. *Supra* ¶103. Yet, as one commissioner recently observed, "[m]inority ownership and participation in broadcast has been dismal for years and remains so, not least of which due to Commission leadership's recent scuttling of the largest proposed minority-led purchase of a broadcast station group in history."[185]

278.     Chairwoman Rosenworcel ensured Standard General's $8.6-billion transaction would be handled exclusively by the FCC's Media Bureau, led by her own personal staff member, Ms. Saurer. The move left the fate of the Standard General deal entirely in Chairwoman Rosenworcel's and Ms. Saurer's control. Together, they exercised a pocket-veto of the transaction, insulating it from a vote by the Commission or judicial review of a final agency action at the D.C. Circuit.

279.     Chairwoman Rosenworcel used her control over the Media Bureau to set the stage for the unlawful interference by principals of the Goodfriend Group, the Allen

---

[185] *In re Rev. of the Comm'n's Broad. & Cable Equal Emp. Opportunity Rules & Policies*, MB No. 98-204, 2024 WL 770889, at *35 (FCC Feb. 22, 2024) (Simington, dissenting).

Group, DISH, and the straw objectors in the Standard General-TEGNA deal. And the FCC officials became complicit in all of it, condoning race discrimination that would kill the transaction.

280.    The Media Bureau Chief, Ms. Saurer, doubled as Chairwoman Rosenworcel's personal legal advisor, a role she filled as early as 2012. Chairwoman Rosenworcel tapped Ms. Saurer to head the Media Bureau in January 2022. Ms. Saurer's holding these two positions at once was unprecedented and created a serious conflict of interest. Ms. Saurer's role at the Media Bureau was compromised by her special duties owed simultaneously to Chairwoman Rosenworcel.

281.    The Media Bureau subjected Mr. Kim's transaction to an entirely different set of rules than other major broadcast license transfers. The Apollo-Cox deal involved private equity, offshore funding, and the same straw objectors making the same objections, and the Media Bureau approved it without an HDO. *Supra* ¶¶106-08. The Scripps-ION, Gray-Quincy, and Gray-Meredith deals required waivers or divestitures, involved consolidated ownership, and carried the potential to increase retransmission fees—and still, the Media Bureau approved all of them within 180 days without an HDO. *Supra* ¶¶109-11. Indeed, the Media Bureau had never issued an HDO for a broadcast license transfer absent allegations of misconduct—specifically, misrepresentations or license holders' prior felony convictions. *Supra* ¶100. All other broadcast license-transfer applications referred for a hearing were referred by a vote of the full Commission.

282.    The difference between those transactions and the Standard General-TE-GNA deal was the presence of Mr. Kim as the beneficiary and Mr. Allen as the failed bidder who would not get stations for his black-owned media company in the deal. Objectors said the deal did "nothing" to promote diversity. *Supra* ¶138. The FCC demanded documents about "alternative transactions"—specifically, Mr. Allen's failed bid—violating the Communications Act. *Supra* ¶¶153-55. And the HDO was silent on the diversity benefits of Mr. Kim's acquisition of TEGNA. *Supra* ¶204.

283.    An agency so committed to diversity heeded siren calls of "shadowy foreign" investment and other race-laden and xenophobic rhetoric about Mr. Kim in public filings and behind closed doors. As a result of his race, Mr. Kim was maligned as a "shadowy foreign investor." *Supra* ¶¶138-42. His race was unconstitutionally used as a strike *against* him by the FCC and co-conspirator Defendants to kill the Standard General-TE-GNA transaction.

284.    Chairwoman Rosenworcel and Ms. Saurer also had to placate high-ranking Democratic members of Congress, including former Speaker Pelosi and Senator Warren, where Gigi Sohn's nomination to the FCC was pending. On information and belief, promises of large contributions to Democratic Super PACs from Mr. Allen, orchestrated by Mr. Goodfriend, prompted Speaker Pelosi and Senator Warren to submit letters to Chairwoman Rosenworcel opposing the deal and parroting the same arguments that Mr. Goodfriend peddled on behalf of the straw objectors. *Supra* ¶¶160-64, 183-84, 231,

233, 240, 242. When Speaker Pelosi was later asked about the transaction, she described Mr. Kim as the "foreigner." *Supra* ¶167.

285.    On information and belief, Mr. Allen and Mr. Goodfriend exploited Chairwoman Rosenworcel's concerns that she would be replaced as FCC Chair by nominee Gigi Sohn by having prominent progressive Democrats pressure Chairwoman Rosenworcel to kill the Standard General-TEGNA deal.

286.    The Media Bureau also departed from longstanding FCC practice by not giving the FCC commissioners 48 hours' notice of the HDO and not meeting with Standard General to inform it of the Media Bureau's concerns before issuing the HDO. The Media Bureau repeatedly told Standard General it had no issues to discuss regarding the deal, and the Media Bureau and Chairwoman Rosenworcel denied at least 16 requests between November 2022 and February 2023 to meet or discuss any possible concerns with Standard General. *Supra* ¶190.

287.    The Media Bureau's reasoning in the HDO was entirely pretextual and a sham to cover the racial discrimination against Mr. Kim. The straw objectors' objections lacked sufficient evidentiary support, and the HDO's reasoning impermissibly conflicted with prior rulings of the FCC and the FCC's professed diversity goals. *Supra* ¶¶173, 201-04.

*NewsGuild, NABET, UCC & Common Cause*

288.    On information and belief, the four straw objectors appeared in the Stand-ard General proceedings at the behest of some combination of the Allen Group and Mr. Allen, DISH and Mr. Ergen, and the Goodfriend Group and Mr. Goodfriend.

289.    On information and belief, the Allen Group, DISH, Mr. Allen, or Mr. Ergen exercised complete control over the straw objectors and the substance of their filings through the Goodfriend Group and Mr. Goodfriend, even before the Goodfriend Group and Mr. Goodfriend publicly appeared in the proceedings.

290.    The straw objectors' arguments advanced Mr. Allen's race-based motiva-tions and DISH's commercial agenda. *Supra* ¶¶130-32, 156-57, 175.

291.    Tellingly, the straw objectors did not raise those arguments to oppose the Gray-Quincy and Gray-Meredith license transfers, where Mr. Allen would benefit by tak-ing some divested stations, even though those mergers would have implicated their same purported concerns of industry consolidation and job losses. And in other proceedings not benefiting Mr. Allen where the straw objectors appeared, they had never attacked an applicant as a "shadowy foreign investor" as they did with Mr. Kim.

292.    As for their substance, the objections were objectively baseless. They ob-jected to private equity generally, while ignoring Mr. Kim's and Ms. McDermott's per-sonal track records in broadcast-media turnaround, including the tens of millions of dol-lars invested in local newsrooms. *Supra* ¶¶53-58. There was no reasonable or realistic

expectation that the FCC would rely on the objections to deny the license-transfer applications. The FCC had expressly rejected objections about retransmission fees and job cuts in prior transactions, including in the recent approval for Apollo's acquisition of Cox Media Group. *Supra* ¶¶106-08, 111. And the FCC had never announced that it was even considering a change in its position on these issues, and such a change would have required a vote by the full Commission.

293.    Further, the objections did not satisfy the statutory requirements necessary for the Media Bureau to find that granting the applications would be "prima facie inconsistent" with the public interest. They were based on pure speculation that was contradicted by Standard General's binding commitments in public filings. *Supra* ¶¶178-80.

294.    On information and belief, the Goodfriend Group and Mr. Goodfriend coordinated the straw objectors' strategy. That strategy was not to genuinely influence the FCC to deny the license-transfer applications but to impose inordinate delay with repeated extension and document requests, to request further document productions specifically to gain information on TEGNA's handling of the Allen Group's bids, and ultimately to drag out the proceedings until Standard General's funding expired. In other words, the objections were merely a pretext to cover Defendants' race-based reasons and efforts to interfere directly with Standard General's business relationships through the license-transfer application process.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Equal Protection, U.S. Const. Amend. V
### Against the FCC, Chairwoman Rosenworcel, and Ms. Saurer

295.    Plaintiffs repeat and reallege each of their prior allegations.

296.    The Constitution prohibits the government from denying any person equal protection of the laws. *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The "equal protection obligations imposed by the Fifth and the Fourteenth Amendments" are "indistinguishable." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995).

297.    "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Id.* at 229-30.

298.    The government violates the equal protection guarantee if "a discriminatory purpose has been a motivating factor in the decision." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

299.    The government must "justify any racial classification subjecting [a] person to unequal treatment under the strictest judicial scrutiny." *Adarand*, 515 U.S. at 224.

300.    The FCC, Chairwoman Rosenworcel, and Ms. Saurer intentionally discriminated against Standard General and Mr. Kim based on race in its treatment of the Standard General license-transfer applications.

301.    The FCC, Chairwoman Rosenworcel, and Ms. Saurer treated Standard General and Mr. Kim differently than similarly situated license-transfer applicants and major television broadcast deal parties because of race.

302.    Because of the FCC's racial discrimination, Standard General and Mr. Kim were denied equal treatment and an equal opportunity to have the license-transfer applications processed fairly and voted on in a reasonable time.

303.    The FCC's actions were not narrowly tailored to achieve a compelling government interest and thus fail strict scrutiny.

304.    The FCC's explanation for the differing treatment of Standard General and Mr. Kim versus similarly situated applicants was pretextual and a sham and, in any event, does not satisfy strict scrutiny.

305.    Standard General (or its affiliates) and Mr. Kim will appear before the FCC again soon. They currently hold several broadcast television licenses and are actively seeking to acquire new broadcast television stations. Renewal of the licenses they hold and the transfer of licenses from any newly acquired stations will require FCC approval.

306.    Standard General and Mr. Kim have suffered and will suffer irreparable harm absent injunctive and declaratory relief against the FCC, Chairwoman Rosenworcel, and Ms. Saurer.

**COUNT II**

**Violation of the Civil Rights Act of 1866, 42 U.S.C. §1981 (Contract)**
**Against the Allen Group, DISH, the Goodfriend Group, NewsGuild, NABET,**
**UCC, Common Cause, Mr. Allen, Mr. Ergen, and Mr. Goodfriend**

307.    Plaintiffs repeat and reallege each of their prior allegations.

308.    Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. §1981(a). The term "make and enforce contracts" includes the "making, performance, [and] modification . . . of contracts." *Id.* §1981(b). "The rights protected by this section are protected against impairment by nongovernmental discrimination . . . ." *Id.* §1981(c).

309.    Section 1981 "protects the equal right of all persons . . . to make and enforce contracts without respect to race." *Domino's Pizza, Inc v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976).

310.    Section 1981 protects "against third parties who interfere with [contract] rights, even if they were not party to the contract." *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 755 n.7 (6th Cir. 2023); *see also Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 477 (S.D.N.Y. 2013) ("§1981 protects against the actions of third parties, as well as the actions of a directly contracting party").

311.    "[T]ortious interference with contract rights violates section 1981 when the motivation for the interference is racial." *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) (collecting cases).

312.    The defendant is liable for his discrimination "[s]o long as the plaintiff's [race] was one but-for cause of that decision." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020); *accord Newman v. Amazon.com, Inc.*, 2022 WL 971297, at *7 (D.D.C. Mar. 31, 2022).

313.    Section 1981 authorizes both equitable and legal relief, including compensatory and punitive damages. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975).

314.    Mr. Kim is Asian American and thus a member of a racial minority group.

315.    Spurred by Mr. Allen, Defendants weaponized Mr. Kim's race to block the TEGNA deal. Defendants intended to discriminate against Standard General in its performance of contracts because Mr. Kim is Asian American.

316.    But for Mr. Kim being Asian American, Defendants would not have discriminated against Standard General and sought to block its acquisition of TEGNA. But for Mr. Kim's race, he would not have been subjected to these Defendants' race-based tactics that sunk the TEGNA deal. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

317.    The discrimination by Defendants concerned Standard General's right to make and enforce contracts—specifically, Standard General's performance under its merger agreement with TEGNA and its financing agreements with the banks.

318.    Defendants knew that under the merger and financing agreements, Standard General needed FCC approval to transfer the broadcast licenses by May 22, 2023, to

consummate its acquisition of TEGNA or else Standard General's financing would expire.

319.    Defendants interfered with Standard General's contractual rights and inhibited Standard General's performance under the merger and financing agreements through their efforts to kill the Standard General-TEGNA deal—violating Standard General's right to make and enforce contracts free of racial discrimination.

320.    Defendants acted maliciously, intending to cause Standard General harm because of Mr. Kim's race.

321.    As a result of Defendants' unlawful conduct, Standard General wasted tens of millions of dollars in legal and advisory fees, had to pay TEGNA a break-up fee of $136 million, and lost billions of dollars in benefits that would have accrued had it completed the transaction.

## COUNT III
### Violation of the Enforcement Act of 1871, 42 U.S.C. §1985(3) (Conspiracy) Against Chairwoman Rosenworcel, Ms. Saurer, the Allen Group, DISH, the Goodfriend Group, NewsGuild, NABET, UCC, Common Cause, Mr. Allen, Mr. Ergen, and Mr. Goodfriend

322.    Plaintiffs repeat and reallege each of their prior allegations.

323.    Section 1985 provides "an action for the recovery of damages" against anyone who conspires "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. §1985(3).

324.     Defendants expressly or tacitly entered into an agreement to work together to thwart the Standard General-TEGNA deal. Specifically, they aimed to deprive Standard General and Mr. Kim, both directly and indirectly, of equal protection of the laws and of privileges and immunities under the laws because of race, as Mr. Kim is Asian American—and not the "right type of minority."

325.     Defendants intentionally committed multiple acts in furtherance of their agreement and common scheme, as alleged above.

326.     Defendants acted maliciously, intending to cause Standard General and Mr. Kim harm because of Mr. Kim's race.

327.     As a result of Defendants' unlawful conduct, Standard General wasted tens of millions of dollars in legal and advisory fees, had to pay TEGNA a break fee of $136 million, and lost billions of dollars in benefits that would have accrued had it completed the transaction.

**COUNT IV**
**Violation of the Enforcement Act of 1871, 42 U.S.C. §1986 (Neglect to Prevent)**
**Against Chairwoman Rosenworcel, Ms. Saurer, the Allen Group,**
**DISH, the Goodfriend Group, NewsGuild, NABET, UCC,**
**Common Cause, Mr. Allen, Mr. Ergen, and Mr. Goodfriend**

328.     Plaintiffs repeat and reallege each of their prior allegations.

329.     Section 1986 provides a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 . . . , are about to be committed, and having power to prevent or aid in preventing

the commission of the same, neglects or refuses so to do." 42 U.S.C. §1986. Such persons "shall be liable to the party injured . . . for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented." *Id.*

330.    Defendants knew of the racially motivated conspiracy to thwart the Standard General/TEGNA deal—specifically, for the FCC to delay review of the license-transfer applications until Standard General's financing expired. They knew that each action of the straw objectors in opposing the deal and of the FCC in dragging out the proceeding was in furtherance of the conspiracy.

331.    Defendants had the power to prevent or to aid in preventing, and by reasonable diligence could have prevented or aided in preventing, the racial discrimination against Standard General and Mr. Kim and the FCC's delaying review of the license-transfer applications to kill the Standard General-TEGNA deal, but they neglected or refused to take any action to do so.

332.    The conspired acts to deprive Standard General and Mr. Kim of equal protection of the laws or of equal privileges and immunities under the law were committed.

333.    Defendants acted maliciously, intending to cause Standard General and Mr. Kim harm because of Mr. Kim's race.

334.    As a result of Defendants' unlawful conduct, Standard General wasted tens of millions of dollars in legal and advisory fees, had to pay TEGNA a break fee of $136

million, and lost billions of dollars in benefits that would have accrued had it completed the transaction.

**COUNT V**
**Tortious Interference with Contract**
**Against the Allen Group, DISH, the Goodfriend Group, NewsGuild, NABET, UCC, Common Cause, Mr. Allen, Mr. Ergen, and Mr. Goodfriend**

335.     Plaintiffs repeat and reallege each of their prior allegations.

336.     Standard General had a merger agreement with TEGNA and financing agreements with several banks. These agreements were valid and binding contracts.

337.     Defendants knew about Standard General's merger and financing agreements.

338.     Defendants knew that under the merger and financing agreements, Standard General needed FCC approval to transfer the broadcast licenses by May 22, 2023, to consummate its acquisition of TEGNA or else Standard General's financing would expire.

339.     Defendants intended to disrupt, interfere with, and prevent Standard General's performance of the merger and financing agreements' condition to obtain FCC approval of the transfer of the broadcast licenses by May 22, 2023.

340.     Defendants intended to, and did in fact, interfere with Standard General's performance under the merger and financing agreements and cause TEGNA to terminate the merger by delaying FCC review of the license-transfer applications and ensuring the

applications were sent to an ALJ for a hearing so that there was no way they could be approved by the FCC by May 22, 2023.

341.    Defendants worked with the FCC, through Chairwoman Rosenworcel and Ms. Saurer, to accomplish their common goal of interfering with the deal. Part of their interference was accomplished through the FCC illegally acting outside of its statutory authority, ignoring well-established FCC precedent and evidentiary standards, and violating Standard General's and Mr. Kim's equal protection rights.

342.    But for Defendants' actions, the Standard General-TEGNA deal would have been consummated pursuant to the merger and financing agreements.

343.    Defendants acted maliciously, intending to cause Standard General harm because of Mr. Kim's race.

344.    As a result of Defendants' unlawful conduct, Standard General wasted tens of millions of dollars in legal and advisory fees, had to pay TEGNA a break fee of $136 million, and lost billions of dollars in benefits that would have accrued had it completed the transaction.

## COUNT VI
**Tortious Interference with Prospective Business Opportunity**
**Against the Allen Group, DISH, the Goodfriend Group, NewsGuild, NABET, UCC, Common Cause, Mr. Allen, Mr. Ergen, and Mr. Goodfriend**

345.    Plaintiffs repeat and reallege each of their prior allegations.

346.    Standard General had a valid business relationship with TEGNA and the banks providing financing, as well as a reasonable expectation of economic benefit from the consummation of its transactions with TEGNA and the financing banks.

347.    Defendants knew about Standard General's business relationship with TEGNA and the banks, including the merger and financing agreements, and business expectations associated with its acquisition of TEGNA.

348.    Defendants intended to disrupt and interfere with Standard General's business relationships with TEGNA and the banks and reasonable expectation of economic benefit from the consummation of the merger and financing agreements.

349.    Defendants interfered with Standard General's business relationships with TEGNA and the banks and reasonable expectation of economic benefit from the consummation of its merger and financing agreements by, among other things, delaying the process for FCC approval of the transfer of broadcast licenses and causing the applications to be referred for a hearing so that there was no way there could be FCC approval by May 22, 2023, when Standard General's financing expired. They acted in coordination with the FCC, which illegally acted outside of its statutory authority, ignored well-established FCC precedent and evidentiary standards, and violated Standard General's and Mr. Kim's equal protection rights.

350.    Defendants' wrongful conduct caused the termination of Standard General's business relationships with TEGNA and the banks and deprived Standard General

of the reasonable expectation of economic benefit from the consummation of the merger and financing agreements. But for Defendants' actions, the Standard General-TEGNA deal would have been consummated pursuant to the merger and financing agreements and Standard General would have benefitted economically.

351.    Defendants acted maliciously, intending to cause Standard General harm because of Mr. Kim's race.

352.    As a result of Defendants' unlawful conduct, Standard General wasted tens of millions of dollars in legal and advisory fees, had to pay TEGNA a break fee of $136 million, and lost billions of dollars in benefits that would have accrued had it completed the transaction.

## COUNT VII
## Civil Conspiracy
### Against the Allen Group, DISH, the Goodfriend Group, NewsGuild, NABET, UCC, Common Cause, Mr. Allen, Mr. Ergen, and Mr. Goodfriend

353.    Plaintiffs repeat and reallege each of their prior allegations.

354.    Defendants expressly or tacitly entered into an agreement to work with each other and with Chairwoman Rosenworcel and Ms. Saurer to thwart the Standard General-TEGNA deal. Specifically, they sought to disrupt, interfere with, and prevent Standard General's performance of the merger and financing agreements' condition to obtain FCC approval of the transfer of the broadcast licenses no later than May 22, 2023.

355.    Defendants intentionally committed multiple acts in furtherance of their agreement and common scheme, as alleged above.

356.    Defendants' acts were unlawful.

357.    Defendants acted maliciously, intending to cause Standard General harm because of Mr. Kim's race.

358.    As a result of Defendants' unlawful conduct, Standard General wasted tens of millions of dollars in legal and advisory fees, had to pay TEGNA a break fee of $136 million, and lost billions of dollars in benefits that would have accrued had it completed the transaction.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs ask the Court to enter judgment in their favor and against Defendants and to provide relief as follows:

A.      A declaration that the FCC, Chairwoman Rosenworcel, and Ms. Saurer violated the equal protection guarantee of the Fifth Amendment in their handling of Standard General's license-transfer applications because of Mr. Kim's race—namely, by not approving Standard General's applications; by subjecting Standard General to an unprecedented, unjustified, and unexplained delay culminating in the pretextual HDO; and by not considering and ruling on the applications in good faith;

B.      A permanent injunction ordering the FCC, Chairwoman Rosenworcel, and Ms. Saurer to refrain from discriminating on the basis of race, from treating certain applicants less favorably than others because of race, and using race as a stereotype or negative consideration against any applicant;

C.      Damages in an amount to be proven at trial, including but not limited to the $136 million breakup fee paid to TEGNA;

D.      Punitive damages to the fullest extent permitted by law;

E.      Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable law; and

F.      Any other relief that the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial for each claim alleged and all issues so triable.

DATED:  April 24, 2024

Jeffrey M. Harris
   (DC Bar No. 994058)
Taylor A.R. Meehan*
   (DC Bar No. 106377)
Frank H. Chang
   (DC Bar No. 1686578)
Daniel M. Vitagliano**
   (DC Bar No. 90019860)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
taylor@consovoymccarthy.com
frank@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

Respectfully submitted,

*/s/ Tyler R. Green*
Tyler R. Green
   (DC Bar No. 982312)
CONSOVOY MCCARTHY PLLC
222 S. Main St., 5th Fl.
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com

Patrick Strawbridge*
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*\* Pro hac vice applications forthcoming*
*\*\* Supervised by principals of the firm admitted to practice in VA*

*Counsel for Plaintiffs SGCI Holdings III LLC and Soohyung Kim*

120