**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SGCI HOLDINGS III LLC AND SOOHYUNG KIM, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL COMMUNICATIONS COMMISSION; JESSICA ROSENWORCEL, in her official capacity as Chairwoman of the FCC; HOLLY SAURER, in her official capacity as Chief of the Media Bureau; ALLEN MEDIA GROUP, LLC, d/b/a Allen Media Group; DISH NETWORK CORPORATION; EMMER CONSULTING, INC., d/b/a I Street Advocates f/k/a The Goodfriend Group; THE NEWSGUILD-CWA; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA; UNITED CHURCH OF CHRIST, OC INC., d/b/a United Church of Christ Media Justice Ministry; COMMON CAUSE; BYRON ALLEN; CHARLES ERGEN; and DAVID GOODFRIEND, <br><br> Defendants. | Case No. 1:24-cv-1204-RC |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS BY DEFENDANTS THE NEWSGUILD-CWA AND
NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-
CWA**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF FACTS .................................................................................. 3

I. The Parties ............................................................................................ 3

II. Transaction Structure ........................................................................... 3

III. FCC Proceedings ................................................................................. 4

    A. Request for Additional Time and Information ............................. 4

    B. Petition to Dismiss or Deny ........................................................ 5

    C. Opposition to Petition to Dismiss or Deny ................................. 6

    D. Reply in Support of Petitions to Dismiss or Deny ...................... 7

    E. Production of Documents and Supplemental Briefing ................ 9

    F. The Media Bureau's Decision .................................................... 9

IV. The Lawsuit ......................................................................................... 10

ARGUMENT ..................................................................................................... 10

    I. First Amendment immunity bars Plaintiffs' claims against the Unions. .............. 11

        A. *Noerr-Pennington* immunity protects the Unions from Plaintiffs' claims. ...... 11

        B. The *Noerr-Pennington* doctrine applies beyond antitrust claims. ............... 12

        C. The *Noerr-Pennington* doctrine's "sham petition" exception does not apply. 14

    II. "Information and belief" cannot carry Plaintiffs' claims against the Unions. ........ 16

    III. Plaintiffs otherwise fail to state a claim for each cause of action. .................... 19

        A. Plaintiffs fail to state a claim for a violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981). ................................................................ 19

        B. Plaintiffs fail to state a claim for a violation of the Civil Rights Act of 1866 (42 U.S.C. § 1985(3)). ............................................................. 21

C. Plaintiffs fail to state a claim for a violation of the Enforcement Act of 1871 (42 U.S.C. § 1986). …………………………………………………… 24

D. Plaintiffs fail to state a claim for tortious interference with contract or tortious interference with prospective business opportunity. …………... 26

E. Plaintiffs fail to state a conspiracy claim against the Unions. …………... 27

F. Plaintiffs' claims are preempted. …………………………………… 28

CONCLUSION …………………………………………………………… 29

CERTIFICATE OF SERVICE …………………………………………… 30

# TABLE OF AUTHORITIES

## Cases

*Alarm Detection Sys., Inc. v. Village of Schaumburg,*
930 F.3d 812 (7th Cir. 2019) ............................................................... 13

*Am. Liberty Ass'n v. FCC,*
406 F.3d 689 (D.C. Cir. 2005) ............................................................... 8

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................... 10, 11

*BE & K Const. Co. v. N.L.R.B.,*
536 U.S. 516 (2002) ............................................................... 12, 14

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................... 11

*Bowie v. Maddox,*
642 F.3d 1122 (D.C. Cir. 2011) ............................................................... 25

*Brown v. Hill,*
No. 14-0140 (TSC), 2021 WL 4262464 (D.D.C. Sept. 20, 2021) ............................................................... 27

*Bush v. Butler,*
521 F. Supp. 2d 63 (D.D.C. 2007) ............................................................... 22

*Campbell v. PMI Food Equip. Grp., Inc.,*
509 F.3d 776 (6th Cir. 2007) ............................................................... 13

*Casco Marina Dev., LLC v. D.C. Redevelop. Land Agency,*
834 A.2d 77 (D.C. 2003) ............................................................... 26

*Cheminor Drugs, Ltd. v. Ethyl Corp.,*
168 F.3d 119 (3d Cir. 1999) ............................................................... 13

*Connecticut v. U.S. Dept. of Interior,*
344 F. Supp. 3d 279 (D.D.C. 2018) ............................................................... 4

*Doe #1 v. Am. Fed. of Gov. Emps.,*
554 F. Supp. 3d 75 (D.D.C. 2021) ............................................................... 20

* *Eastern R.R. Pres. Conf. v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ............................................................... *passim*

*Eastex v. NLRB,*
437 U.S. 556 (1978) ........................................................................................ 16, 28

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ............................................................................................ 15

*\* Fischer v. Estate of Flax,*
816 A.2d 1 (D.C. 2003) ................................................................................. 19, 23

*Geomatric, LLC v. NSF Intern.,*
82 F.4th 466 (6th Cir. 2023) ............................................................................... 13

*\* Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Ctd.,*
935 A.2d 362 (D.C. 2007) ............................................................................. 19, 23

*Graves v. United States,*
961 F. Supp. 314 (D.D.C. 1997) .................................................................. 21, 24

*Hinton v. Corr. Corp. of Am.,*
624 F. Supp. 2d 45 (D.D.C. 2009) ....................................................................... 4

*Hufsmith v. Weaver,*
817 F.2d 455 (8th Cir. 1987) ............................................................................... 13

*IGEN Intern., Inc. v. Roche Diagnostics GmbH,*
335 F.3d 303 (4th Cir. 2003) ............................................................................... 13

*Kareem v. Haspel,*
986 F.3d 859 (D.C. Cir. 2021) ............................................................................. 16

*\* Kowal v. MCI Comm'ns Corp.,*
16 F.3d 1271 (D.C. Cir. 1994) ................................................................. 16, 17, 18

*Middlebrooks v. Godwin Corp.,*
722 F. Supp. 2d 82 (D.D.C. 2010) ...................................................................... 20

*Nader v. Democratic Nat'l Comm.,*
555 F. Supp. 2d 137 (D.D.C. 2008) ......................................................... 12, 14, 15

*Nader v. Democratic Nat'l Comm.,*
567 F.3d 692 (D.C. Cir. 2009) ...................................................................... 14, 27

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.,*
957 A.2d 890 (D.C. 2008) ................................................................................... 26

*Neumann v. Reinforced Earth Co.*,
594 F. Supp. 139 (D.D.C. 1984), *aff'd*, 786 F.2d 424 (D.C. Cir. 1986) .............................................. 14

*New West, L.P. v. City of Joliet*,
491 F.3d 717 (7th Cir. 2007) ................................................................................. 13

*Onyeoziri v. Spivok*,
44 A.3d 279 (D.C. 2012) ........................................................................................ 26

*Paul v. Howard Univ.*,
754 A.2d 297 (D.C. 2000) ...................................................................................... 26

*Paul v. Howard Univ.*,
754 A.2d 297 (D.C. 2000) ...................................................................................... 27

*Professional Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) .......................................................................................... 14, 15

*Robledo v. Bond No. 9*,
965 F. Supp. 2d 470 (S.D.N.Y. 2013) ...................................................................... 20

*San Diego Bldg. Trades Council v. Garmon*,
359 U.S. 236 (1959) ........................................................................................ 16, 28

*SSI Techs., LLC v. Dongguan Zhengyang Elect. Mech. Ltd.*,
59 F.4th 1328 (Fed. Cir. 2023) ............................................................................... 13

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023) .............................................................................................. 21

*Suburban Restoration Co., Inc. v. ACMAT Corp.*,
700 F.2d 98 (2d Cir. 1983) ..................................................................................... 13

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009) .............................................................................. 14

* *Venetian Casino Resort, LLC v. NLRB*,
793 F.3d 85 (D.C. Cir. 2015) ..................................................................... 11, 12, 13, 14

*Video Intern. Prod., Inc. v. Warner-Amex Cable Comms., Inc.*,
858 F.2d 1075 (5th Cir. 1988) ................................................................................ 13

*Warth v. Seldin*,
422 U.S. 490 (1975) ................................................................................................ 8

*Whelan v. Abell,*
48 F.3d 1247 (D.C. Cir. 1995) ........................................................................................ 12

*White v. Lee,*
227 F.3d 1214 (9th Cir. 2000) ...................................................................................... 13

*Young v. Lord & Taylor, LLC,*
937 F. Supp. 2d 246 (E.D.N.Y. 2013) .......................................................................... 25

**Statutes**

29 U.S.C. § 157 ............................................................................................................ 28

42 U.S.C. § 1981 ......................................................................................... 2, 10, 19, 20

* 42 U.S.C. § 1985(3) ............................................................................................ *passim*

42 U.S.C. § 1986 ............................................................................................. 2, 10, 24, 25

47 U.S.C. § 310(d) ...................................................................................................... 14

U.S. Const. Amend. I ....................................................................................................11

**Rules**

Fed. R. Civ. P. 12 ........................................................................................................... 1

Defendants The NewsGuild-CWA ("NewsGuild") and National Association of Broadcast Employees and Technicians-CWA ("NABET," and together with NewsGuild, the "Unions"), move to dismiss Plaintiffs SGCI Holdings III LLC ("SGCI") and Soohyung Kim's claims against them under Federal Rule of Civil Procedure 12(b)(6) because the First Amended Complaint ("Complaint") does not articulate any viable claim against the Unions.

## PRELIMINARY STATEMENT

NewsGuild is a labor union representing thousands of journalists and media professionals in an industry rife with change. Likewise, NABET is a labor union that represents the interests of thousands of other broadcast professionals. Both are part of the Communications Workers of America Union ("CWA") and boast tens of thousands of members. First Am. Compl. ("Compl.") ¶¶ 39–40. The Unions regularly petition government agencies such as the FCC to advance the interests of their members and their industry. And they did so here: The Unions viewed Mr. Kim's proposed purchase of TEGNA, Inc. and its network of television stations as a threat to its members' jobs, the quality of local broadcast news, and the Unions' other organizational priorities. As they had in other situations involving media consolidation, the Unions petitioned the FCC to oppose that sale.

Plaintiffs downplay the Unions' interest in advancing their members' interests, and that some of their members could have been adversely affected by the proposed sale. As far as Plaintiffs are concerned, the Unions were motivated solely by: racial animus for Mr. Kim and slavish devotion to others who objected to the TEGNA acquisition for their own reasons. But Plaintiffs make that inflammatory accusation without offering any proper allegation that the Unions' opposition to Mr. Kim's purchase had anything to do with his race; the Complaint is instead riddled with improper "information and belief" allegations. On top of that, Plaintiffs selectively quote and mischaracterize the Unions' FCC filings to shore up their alleged racist conspiracy. Be that as it may, Plaintiffs'

1

allegations fall apart under the slightest scrutiny, and there is no shortage of reasons to dismiss the Complaint.

*First*, the Unions, like any individual American, enjoy a First Amendment right to petition the government to advance their priorities. And they exercised that fundamental right by opposing Mr. Kim's purchase of TEGNA, given their concern that the transaction and consequent consolidation of media ownership could harm the Union members' interests. Undeterred by constitutional obstacles, Plaintiffs are seeking their revenge through racially-tinged litigation. The currency of print and broadcast journalism is the public perception of fairness and objectivity. Yet Plaintiffs now have publicly branded the Unions as racist institutions—a harm that cannot soon be undone.

Plaintiffs' litigation tactics demean First Amendment principles and are meant to chill political speech. Not only that, those tactics collide headlong with the venerable *Noerr-Pennington* doctrine, which immunizes political speech and absolves the Unions of liability on all of Plaintiffs' claims.

*Second*, Plaintiffs try to skirt their pleading requirements with over a dozen allegations made upon "information and belief" (upon which many of their other allegations depend). But Plaintiffs cannot fill the holes in their Complaint with "information and belief" allegations. And without the improper "information and belief" allegations, Plaintiffs do not state any cognizable claim.

*Third*, setting aside the foregoing threshold defects, Plaintiffs have not pleaded a single viable claim against the Unions. Plaintiffs fail to state a claim for a violation of 42 U.S.C. § 1981 because they fail to allege a discriminatory intent and because the Unions did not have the power to stop the Standard General-TEGNA deal—they could only voice their opposition to it. Plaintiffs fail to allege a § 1985(3) conspiracy claim because that claim is based entirely on conclusory statements, supported by no proper factual allegations. Plaintiffs also fail to state tortious interference claims because the Unions' opposition was constitutionally privileged and consistent with their collective mission to support the interests of journalists and their industry. And finally, Plaintiffs' § 1986 "neglect-to-

prevent" claim and state law civil conspiracy claim collapse along with the failure of the other federal and state law claims.

STATEMENT OF FACTS

## I.    The Parties

Mr. Kim is the founder and Chief Investment Officer of Standard General, L.P.—a hedge fund that invests in various mid-sized industries.  Compl. ¶ 29.  Standard General won a public bid in 2022 to buy broadcast and media company TEGNA and its 60+ television stations.[1]  *Id.* ¶¶ 3, 7, 59. Standard General's financing for the deal set a 450-day timeline for Mr. Kim to clear the regulatory hurdles imposed by the Federal Communications Commission and the Department of Justice for such transactions.  *Id.* ¶ 8.  Relevant here is that Standard General had to obtain the FCC's approval of the transfer of more than 60 broadcast television licenses.  *Id.* ¶ 70.  When Standard General won the bid and the FCC invited public comment on the proposed transaction, NewsGuild registered its opposition to the proposed transaction based on the anticipated impact on its members and the industry, with NABET not far behind.

## II.    Transaction Structure

The TEGNA acquisition posed complex issues for the FCC's review.  Standard General would end up with more than 60 televisions stations and had secured billions to finance the purchase.  *Id.* ¶¶ 7–8, 64.  Twelve banks lent money, and various investment funds contributed.  *Id.* ¶¶ 64–65. Affiliates of Ares Capital Corporation and Apollo Global Management ("Apollo") counted themselves among the investors.  *Id.* ¶ 65.  They planned to contribute $463 million and $255 million, respectively, and received nonvoting preferred shares in exchange.  *Id.*  As part of the deal, Standard General was

---

[1] Standard General's affiliate, SGCI Holdings III, would acquire TEGNA, but for ease of reference, the Unions refer generally to Standard General throughout.  Compl. ¶¶ 29, 63.

to transfer some television stations to Cox Media Group, which Apollo had acquired a few years before, leaving Apollo with a stake in even more broadcast outlets. *Id.*

## III.    FCC Proceedings

The FCC employs a 180-day "shot clock" for its review of the assignment and transfer of broadcast licenses. *Id.* ¶ 8. That review includes soliciting public comment on proposed transfers. MB No. 22-162, Public Notice (Apr. 21, 2022), DA-22-443A1.pdf (fcc.gov). Standard General's successful bid triggered this 180-day review period. Because the Unions had concerns about the effects of the deal on its members, they participated in the FCC proceedings by voicing their opposition to Standard General's planned acquisition of TEGNA.

### A.    Request for Additional Information and Time[2]

For its part, NewsGuild expressed its concern that the TEGNA acquisition would prompt: (1) a loss of local broadcast news jobs, (2) increased subscription prices for consumers, and (3) control by one investor (Apollo's affiliate) over some of the stations. NewsGuild thus sought more information about the transaction, so that it could object further if its concerns proved true. MB No. 22-162, Motion of the Public Interest Parties for Additional Information and Documents and an Extension of Time, at 7 (May 12, 2022), https://perma.cc/6JE5-6C7Q. NewsGuild also sought an extension of time to file a petition urging denial of the license transfers. *Id.* In seeking the extension, NewsGuild explained that Standard General had seemingly structured the deal to maximize broadcast retransmission fees and voiced its concern that Standard General would neglect local newsrooms in favor of centralized news content focusing on stories other than matters of interest to local audiences.

---

[2] The Court may take notice of public records at the motion to dismiss stage. *Connecticut v. U.S. Dept. of Interior*, 344 F. Supp. 3d 279, 313 n.30 (D.D.C. 2018). The same is true for documents incorporated by reference into the complaint. *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009). And Plaintiffs incorporated the FCC filings by reference here.

*Id.* at 6–13.  The FCC granted NewsGuild's request for more information and an extension of time, and requested additional information from Standard General.

### B.    Petition to Dismiss or Deny

Less than a month later, the Unions filed their Petition to Dismiss or Deny Standard General's license-transfer applications.  MB No. 22-162, Petition to Dismiss or Deny, at 15–16 (June 22, 2022).  The Unions warned that: (1) Apollo would be positioned to improperly exercise some level of control over the stations that were to be transferred to Cox Media, (2) the deal's peculiar structure would lead to higher retransmission fees, which would be passed onto consumers through higher subscription fees, and (3) the deal could harm local television stations and journalists.

*First*, the Unions pointed out that Apollo's affiliate could exert an inappropriate level of control over Cox Media, which was set to receive several television stations as a result of the deal.  *See id.* at 10–13.  More information was necessary to clarify this potential issue.  *Id.*

*Second*, the Unions underscored that Standard General focused on national news coverage at the expense of local news coverage.  *Id.* at 14–15.  The Unions pointed to several studies that showed "consolidation" and national ownership reduce local television content.  *Id.* at 16–17.  Thus, the deal would threaten local jobs and replace local news with centrally produced, homogenized content.

*Third*, the Unions explained their concerns about how the transaction was structured to maximize profits for Mr. Kim, to the detriment of subscribers to multichannel video programming distributors ("MVPDs").  The TEGNA transaction would have triggered "after acquisition" clauses in certain retransmission consent contracts.  *Id.* at 18–19.  These clauses would have enabled the purchaser (Standard General) "to substitute their higher retransmission fee arrangements" for cheaper ones that the seller (TEGNA) currently had.  *Id.* at 19.  The purchaser would then charge higher retransmission fees to MVPDs, who would pass the increased costs on to consumers in the form of

higher prices.  *Id.* at 20–22.  From the Unions' perspective, all of these were important reasons why the license transfers should not be permitted by the FCC.

### C.    Opposition to Petition to Dismiss or Deny

In his inflammatory response to the Unions' petition, Mr. Kim claimed that the Unions' opposition was racially motivated, based on his Korean heritage.  MB No. 22-162, Consolidated Opp. and Response to Comments (July 7, 2022), https://www.fcc.gov/ecfs/document/10708099699930/1.   He argued that NewsGuild had concerned itself with FCC's diversity goals in previous matters, but chose to ignore that as a minority business owner he would increase diversity in broadcasting if this deal went through.  *Id.* at 16.

Mr. Kim offered vague assurances that he would protect local broadcasters.  *Id.* at 30–32.  In particular, he claimed that cutting newsroom staff was *at that time* "not part of Standard General's plan" for the newly-acquired stations.  *Id.* at 31.  Mr. Kim did not deny that the new TEGNA (post-deal) would use more centrally-produced content.  *Id.* at 33–34.  But he insisted that the use of national correspondents based in Washington would benefit local stations across the country, because locals could hear from their elected representatives.  *Id.* at 35.

In addition, Mr. Kim insisted that Apollo, as an investor, would not be in a position to exercise improper influence over any television stations transferred to Cox Media Group.  *Id.* at 26.  Apollo's affiliate had an ownership interest in Cox Media Group, which would acquire multiple news stations as a part of the deal.  *Id.*  Mr. Kim argued that the ownership percentages and degree of control fell below a level that should raise concerns.  *Id.* at 27–28.  Eschewing transparency, he acknowledged that he had withheld documents and redacted others that the Unions thought might shed light on these claims.  *Id.* at 28.  He insisted nothing damaging existed in those undisclosed records.  *Id.* at 29.

Finally, Mr. Kim argued that the deal would not *necessarily* raise subscription prices.  He argued that the FCC should ignore after-acquired stations clauses and their effects on retransmission

costs, because private parties had negotiated them. *Id.* at 36–37. And Mr. Kim made light of the Unions' concern about increased costs to consumers, arguing scornfully that consumers could simply cancel services if they did not want to pay more for them. *Id.* at 39–41.

### D.    Reply in Support of Petitions to Dismiss or Deny

Less than two weeks later, the Unions replied that the FCC's focus on diversity is not simply based on an owner's ethnicity, but also viewpoint diversity. Thus, the diversity lost by the Standard General-TEGNA deal was not racial diversity, but diversity of **viewpoints**. MB No. 22-162, Reply to Applicants' Consolidated Opp. and Response to Comments, at 4–7 (Aug. 1, 2022), https://www.fcc.gov/ecfs/document/1080192954689/1. By concentrating ownership, for example, a "vibrant marketplace of ideas" would wither and be replaced to some extent with standardized non-local content. *Id.* at 5. A "single large LLP or corporation of the type proposed here is not going to ameliorate or address long-standing inequities produced by structural racism, xenophobia, or misogyny—and is not likely to provide additional members of historically excluded groups the opportunity to gain wealth and influence in society." *Id.* at 6. "Conflating the identity [of] one or two business leaders with the achievement of civil rights objectives is a serious error." *Id.* at 7.[3] The Unions criticized Mr. Kim's claim that the Unions' previous "support for ownership diversity means that they should automatically support a transaction as long as a woman or person of color is at the helm of a transaction." *Id.* at 4.[4]

---

[3] Plaintiffs mischaracterize the Unions' Reply in Support by misquoting their filings. The Unions never said that "Mr. Kim and Ms. McDermott have not been 'barred by his race' or 'her gender' in achieving their successes." Compl. ¶ 147. The Unions rather emphasized that it "is certainly a good thing that Mr. Kim *is not* barred by his race" and "Ms. McDermott *is not* barred by her gender" from holding their important positions now. MB No. 22-162, Reply in Support, at 6. The Unions never said their race or gender did not present obstacles to them along the way.

[4] The Unions also explained their standing to challenge the action. For example, the Unions explained how they had organizational standing based on their objectives as labor unions. *Id.* at 10–12. And the Unions explained that they held associational standing, even if the Standard General-TEGNA deal

The Unions next stressed the need for further documentation from Standard General and other parties to address their concerns that Apollo might be in a position to exercise improper influence over the stations to be transferred to Cox Media. *Id.* at 16–26. The Unions explained how even the few documents that Mr. Kim had provided only added to their concerns about the transaction. *Id.* at 21.[5] The Unions also criticized Mr. Kim's vague assertions that he would protect local news. *Id.* at 26–27.

Finally, the Unions refuted Mr. Kim's explanations of how increased retransmission fees would not affect prices for subscribers. *See id.* at 28–35. The Unions explained that the "otherwise meaningless sequencing of the license transfers" in the deal enabled Standard General to increase its charges to MVPDs, which would then pass on the price increases to consumers. *Id.* at 28. What is more, Mr. Kim's flippant observation that the customers could just cancel their subscriptions and view broadcasts using technologically obsolete antennas ignores the point: that customers would feel the effect of the price increase, with no recourse but to forgo the service and rely instead on obsolete antennas for reception. *Id.* at 31.

---

only harmed some of the Unions' members. *Id.* at 13-16 (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (noting that even one member's concrete injury sufficed for associational standing); *Am. Liberty Ass'n v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005) (same)); *see also* MB No. 22-162, Petition to Dismiss or Deny, at 7–10.

[5] For example, a Term Sheet limited Apollo's affiliate's leaders from obtaining confidential access, but did not limit other Apollo affiliate employees from gaining such access. *Id.* at 21–22. The Unions explained: "a carefully circumscribed provision of the Term Sheet states that, 'for the avoidance of doubt, … employees of Apollo or any Apollo affiliate who are members of the Board of Directors of CMG Holdings, Inc. or who otherwise participate in the management of any Apollo affiliate's investment in CMG Holdings, Inc. shall not have access to any Competitively Sensitive Information.' But what about all other Apollo employees? The implication is that they may have access to Competitively Sensitive information about Standard General's retransmission negotiations." *Id.* at 21.

### E.    Production of Documents and Supplemental Briefing

In October 2022, the Media Bureau ordered Standard General to produce more documents to address the Unions' concerns, leading the Unions to supplement their Petition to Dismiss or Deny. MB No. 22-162, Supplement to Petition to Dismiss or Deny, at 3–10 (Oct. 27, 2022), https://www.fcc.gov/ecfs/document/1028172206998/1.    Reaffirming their points about race and diversity, the Unions explained (1) how the new documents revealed threatened job losses, and (2) how Apollo would be in a position to control the broadcast outlets that were to be transferred to Cox Media.  *Id.* at iii, 3–10.  In particular, the Unions highlighted email correspondence with an investor and presentations that implied projections of future job cuts.  *Id.* at 3–10.[6]

### F.    The Media Bureau's Decision

Because of the byzantine transaction structure, the FCC's Media Bureau recommended extra scrutiny.  In Spring 2023, the Media Bureau issued a Hearing Designation Order ("HDO"), sending the case to a judge to determine questions of fact:  (1) whether Plaintiffs structured the transactions to increase prices and (2) whether the transactions would hurt localism, such as by reducing jobs and local content at local television stations.    Compl. ¶¶ 11, 222, 227.    The HDO highlighted, as NewsGuild had pointed out, that "during a period of high inflation and rising costs, the prospect of increased rates for pay television as a result of machinations or manipulation, rather than market forces, would be extremely problematic." MB No. 22-162, Hearing Designation Order, at 2 (Feb. 23, 2023), https://docs.fcc.gov/public/attachments/DA-23-149A1.pdf.  And again, as the Unions had explained previously, the Media Bureau determined that the unusual structure of the transaction made it difficult to determine whether the transaction was structured to maximize Mr. Kim's retransmission

---

[6] Besides the petition and supplement, the Unions and their attorneys submitted letters and engaged in *ex parte* communications throughout the FCC proceedings.  Such communications are summarized in notices on the FCC docket and largely support the points explained here.

revenue.  *Id.*  After the Media Bureau issued the HDO, Standard General filed a report advising the Bureau that the transaction had been terminated.  MB No. 22-162, Termination Order (June 1, 2023), https://www.fcc.gov/document/tegnasgci-termination-order.

## IV.    The Lawsuit

Eleven months later, Plaintiffs sued the FCC, the FCC Commissioner Jessica Rosenworcel, and many others, including the Unions.  Plaintiffs allege that racial animus—not problematic aspects of the proposed transaction—killed the Standard General-TEGNA deal.   Another prominent broadcast company owner—Byron Allen of The Allen Group—had hoped to purchase TEGNA.  Plaintiffs contend that Mr. Allen, along with the FCC and others, had conspired to undermine the deal by exploiting anti-Korean animus.  *See generally* Compl.  The idea of a conspiracy involving the highest levels of government, private sector unions, lawyers, competitors, and a host of others—all orchestrated by Mr. Allen—is preposterous.

Not only is the underlying claim of a vast racist conspiracy preposterous on its face, the allegations in the Complaint fall woefully short of stating cognizable claims against the Unions (or, for that matter, any Defendant).  Plaintiffs' Complaint includes six causes of action against the Unions: (1) Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count II); (2) Violation of the Enforcement Act of 1871, 42 U.S.C. § 1985(3) (Count III); (3) Violation of the Enforcement Act of 1871, 42 U.S.C. § 1986 (Count IV); (4) Tortious Interference with Contract (Count V); (5) Tortious Interference with Prospective Business Opportunity (Count VI); and (6) Civil Conspiracy (Count VII). *See* Compl. ¶ 336–87.  For the reasons explained below, none of those claims is viable.  The Court should dismiss all claims against the Unions.

## ARGUMENT

A complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  On a

motion to dismiss, the Court should construe a plaintiff's alleged facts as true. But a court need not accept a complaint's legal conclusions, speculation on "information and belief," and unwarranted factual inferences. To satisfy this standard, a complaint may not rely on conclusory statements without factual support. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Similarly, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (citations omitted). In short, Plaintiffs' Complaint must contain "**factual content** that allows the court to draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *Id.* (emphasis added).

The Complaint is insufficient to support the racially-charged inferences on which Plaintiffs rely to support their claims, but it does illustrate with perfect clarity the incurable defects in the Complaint, which are fatal to Plaintiffs' claims: (1) the First Amendment and the *Noerr-Pennington* immunity doctrine prohibit all claims against the Unions, (2) Plaintiffs' key allegations are based only on "information and belief" allegations, and (3) the Unions' FCC filings underscore the economic reasons driving the Unions' objections to the Standard General-TEGNA deal.

## I.    First Amendment immunity bars Plaintiffs' claims against the Unions.

### A.    *Noerr-Pennington* immunity protects the Unions from Plaintiffs' claims.

Just like any other individual or organization, the Unions have a First Amendment right to petition the government to take actions they determine are in their interests, the interests of their members, and the interests of the broadcast industry. The Petition Clause guarantees "the right of the people … to petition the Government for a redress of grievances." U.S. Const. amend. I. And when a speaker exercises that right in good faith, "the First Amendment prohibits any sanction on that action." *Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 89 (D.C. Cir. 2015) (citation omitted). The fundamental right permits speakers to "advocate their causes and points of view respecting

resolution of their business and economic interests or attempt to influence the passage or enforcement of laws." *Id.* at 90.

It was long ago settled that the Petition Clause does not just protect speech by natural persons. Individuals may associate "to persuade the [government] to take particular action with respect to a law that would produce a restraint or monopoly." *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002) (quoting *Eastern R.R. Pres. Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961)). This First Amendment protection is commonly known as the *Noerr-Pennington* doctrine and immunizes individuals and organizations from liability for lawful petitions to the government.

Plaintiffs' claims run headlong into the Petition Clause and the *Noerr-Pennington* doctrine, given that the Unions stand accused of no more than exercising their First Amendment right to persuade the government to block a transaction they viewed as detrimental to their interests and those of the public. Accordingly, the Unions petitioned the FCC to deny the license-transfer applications for the TEGNA deal because of the Unions' concerns with union jobs, localism, and after-acquired retransmission clauses. Compl. ¶ 98. The Unions "advocated their causes," which were economic, lawful viewpoints that did not involve Mr. Kim's ethnicity. *Venetian*, 793 F.3d at 90.

### B. The *Noerr-Pennington* doctrine applies beyond antitrust claims.

Although *Noerr-Pennington* immunity originated in the antitrust context, this Court and the D.C. Circuit routinely apply the doctrine in other contexts. "The doctrine's … reach has since then been extended to include common-law torts." *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 157 (D.D.C. 2008) (citing *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995)). And in *Venetian Casino Resort*, for example, the D.C. Circuit noted that while the "*Noerr-Pennington* doctrine originated in the antitrust context," it "has also been applied in labor cases." 793 F.3d 85, 87 (D.C. Cir. 2015) (Kavanaugh, J.). The court held that a hotel enjoyed *Noerr-Pennington* immunity for asking police to arrest union protestors outside the hotel. *Id.* at 88, 90. "[S]ummoning the police to enforce state trespass law"

constituted a "petition to government subject to protection," even though the union members permissibly protested outside the hotel. *Id.* at 90. And "everyday attempts to influence government action," like reaching out to police, fall under the *Noerr-Pennington* doctrine. *Id.* at 91. The D.C. Circuit is not the only circuit to apply the *Noerr-Pennington* doctrine beyond antitrust law. As it turns out, **nine** other federal circuits have extended *Noerr-Pennington* to other circumstances.[7]

*Noerr-Pennington* has gradually been extended beyond the antitrust context because the Supreme Court's reasoning in that case was not narrowly confined. In *Noerr*, the Supreme Court held that the Sherman Act did not prevent associations from influencing the passage or enforcement of laws. *Noerr Motor Freight*, 365 U.S. at 137. The Court reasoned that "[i]n a representative democracy such as this, [the legislature and executive] act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their

---

[7] *See, e.g.*, *Suburban Restoration Co., Inc. v. ACMAT Corp.*, 700 F.2d 98, 99, 101–02 (2d Cir. 1983) (extending the doctrine to claims beyond "the ambit of the Sherman Act"); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128–29 (3d Cir. 1999) (finding that the doctrine extends to common law claims like tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition); *IGEN Intern., Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310, 312 (4th Cir. 2003) (finding that *Noerr-Pennington* immunity extends to business torts); *Video Intern. Prod., Inc. v. Warner-Amex Cable Comms., Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) (expanding the doctrine to state-law claims such as tortious interference with contractual relations); *Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (citing favorably "cases applying *Noerr-Pennington*'s protection to state common law claims sounding in tortious interference"); *Geomatric, LLC v. NSF Intern.*, 82 F.4th 466, 487 (6th Cir. 2023) (applying Michigan courts' interpretations to find that *Noerr-Pennington* barred the fraud and interference with a prospective economic advantage claims); *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) (noting that "*Noerr-Pennington* has been extended beyond antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses" and holding that the doctrine applies to Fair Housing Act claims); *Alarm Detection Sys., Inc. v. Village of Schaumburg*, 930 F.3d 812, 824–25 (7th Cir. 2019) (holding that the doctrine barred a Contract Clause claim); *Hufsmith v. Weaver*, 817 F.2d 455, 458 (8th Cir. 1987) (affirming doctrine's application to tortious interference with contract claim and noting that "Although the Supreme Court has never decided whether the *Noerr-Pennington* doctrine is applicable outside the antitrust area, this court has long indicated that the doctrine may be so extended" (citing cases)); *White v. Lee*, 227 F.3d 1214, 1236 (9th Cir. 2000) ("As we have discussed, this court has applied the First Amendment rationale of the *Noerr-Pennington* doctrine broadly to claims not involving antitrust laws." (cleaned up)); *SSI Techs., LLC v. Dongguan Zhengyang Elect. Mech. Ltd.*, 59 F.4th 1328, 1337–38 (Fed. Cir. 2023) (finding that the doctrine barred state-law tort claims).

representatives." *Id.* "To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity." *Id.* The Court also highlighted the "important constitutional questions," such as the right to petition, and declined to "impute to Congress an intent to invade these freedoms." *Id.* at 138.

The same principles hold true here. Broadcast license transfers must be in the best interests of the public. *See* 47 U.S.C. § 310(d). But Plaintiffs do not want the Unions—or apparently anyone else—to express their views about this particular matter of undeniable public concern. Mr. Kim's wealth does not confer upon him the right to deprive the Unions of their constitutional right to express their opinions about a proposed transaction that posed a potential threat to several of the Unions' priorities as described above. *See Venetian Casino Resort*, 793 F.3d at 89 ("When a person petitions the government in good faith, 'the First Amendment prohibits any sanction on that action.'").

### C. The *Noerr-Pennington* doctrine's "sham petition" exception does not apply.

The narrow "sham petition" exception to the *Noerr-Pennington* doctrine does not apply here. *See BE & K Constr.*, 536 U.S. at 526; *see also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009). This exception "excludes from First Amendment immunity litigation or other petitioning activity that is frivolous, baseless, or otherwise improper." *Neumann v. Reinforced Earth Co.*, 594 F. Supp. 139, 142 (D.D.C. 1984), *aff'd*, 786 F.2d 424 (D.C. Cir. 1986). A petition is a sham if it is: (1) "objectively baseless" and (2) "brought with the specific intent to further wrongful conduct through the use of governmental process." *Venetian Casino Resort*, 793 F.3d at 92 (citing *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009)). "Objectively baseless" means that "no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc. ("PRE")*, 508 U.S. 49, 60 (1993). A court reaches the second prong only if a petition satisfies the first prong. *Nader*, 555 F. Supp. 2d at 157. At bottom, "[t]he sham exception

does not extend to genuine attempts to secure governmental action even though the defendant harbors a wrongful motive." *Id.*

Far from engaging in objectively baseless activity, the Unions petitioned the FCC to protect the interests of their members (e.g., jobs, localism), some of whom were employed by TEGNA, as well as the public interest (increased retransmission costs). Compl. ¶¶ 135–36. The Complaint *itself* acknowledges that the Unions petitioned the FCC to deny license-transfer applications because of "concerns over job losses and increased retransmission fees." *Id.* ¶ 98.

As the Unions explained in their Petition, Standard General's past transactions led to national newscasters serving local communities from hundreds of miles away. MB No. 22-162, Petition to Dismiss or Deny, at 15–16 (June 22, 2022). The Unions cited studies describing the hampering effects on localism when controlled by national presences. *Id.* at 16–18. And the Unions highlighted the elaborate transaction scheme that Standard General had concocted to increase retransmission fees. *Id.* at 18–22. These are not "objectively baseless" grounds to oppose the transaction. Localism, job losses, and retransmission fees are genuine matters of concern, particularly for the Unions. *See* Compl. ¶ 98; *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417–24 (2021). Some "reasonable litigant could realistically expect success on the merits" of these arguments. *PRE*, 508 U.S. at 60.

Finally, just because the FCC allegedly has not always accepted the Unions' arguments objecting to different transactions does not mean their concerns were ever objectively baseless. *See* Compl. ¶ 98. That a public body has rejected an argument in one situation does not preclude an individual or entity from raising similar points in different circumstances. Indeed, the Union's concerns were viewed as sufficiently important in this matter to justify an HDO.

And to be sure, circumstances were certainly different in 2022, a time of inflation not seen in half a century. NewsGuild explained: "[t]he Commission has declined to consider and condemn this instant wealth transfer before but in today's time of hyperinflation, should certainly do so now." MB

No. 22-162, Motion of the Public Interest Parties for Additional Information and Documents and an Extension of Time, at 7. When worrying about the price increases that this deal threatened, NewsGuild cautioned: "Price increases exceeding inflation *supercharge* inflation." *Id.* at 4. The changed economy provided a different environment under which the Unions' renewed objections might hold greater clout with the FCC. So, even if the rejection of an argument in the past is relevant at all, the situation in 2022 presented a set of economic circumstances that had not been seen in a generation.[8]

All of this confirms that the sham petition exception to *Noerr-Pennington* does not apply here. The Unions enjoy immunity for exercising their First Amendment rights.[9]

## II. "Information and belief" cannot carry Plaintiffs' claims against the Unions.

Virtually all of Plaintiffs' claims against the Unions rest directly or indirectly on speculative "information and belief" allegations. But in the D.C. Circuit, information and belief allegations are generally held to be insufficient to support a valid claim. *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021); *Kowal v. MCI Comm'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) ("information and

---

[8] Other circumstances had changed as well. In 2022, the Biden Administration released an Executive Order that adopted new approaches for the Committee on Foreign Investment in the United States ("CFIUS") and noted the extra caution necessary when looking at foreign investment, because of the changing political and economic environment internationally. MB No. 22-162, Notice of Ex Parte, at 2–3 (Sept. 21, 2022), https://www.fcc.gov/ecfs/document/10922029244613/1. Mr. Kim had lined up many foreign investors for his deal. Greater scrutiny of those investments was necessary compared to prior transactions involving non-foreign investors.

[9] Americans' entitlement to petition the government and act collectively to influence policy is firmly embedded in tradition and settled federal law. By way of example, the National Labor Relations Act preempts unions and their employees from state common law liability, when those unions and their employees engage in protected speech. *See generally San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959); *Eastex v. NLRB*, 437 U.S. 556, 566-67 (1978) ("[A]ppeals to legislators to protect [employee] interests as employees are within the scope of" mutual aid and protection under Section 7 [of the Act]" … "To hold that activity of this nature is entirely unprotected—irrespective of location or the means employed—would leave employees open to retaliation for much legitimate activity that could improve their lot as employees."). A union's exercise of protected speech in support of what it determines are in the best interests of its stakeholders is a bedrock principle of our jurisprudence. There is no reason why this basic and non-controversial principle would not be applied here as well.

belief allegations require an allegation that the necessary information lies within the defendant's control, and that such allegations must also be accompanied by a statement of the facts upon which the allegations are based").

To be sure, "information and belief" allegations may be sometimes be appropriate, but only when the necessary information is in the defendant's possession and the plaintiff alleges facts that establish that this is the case. *Id.* But here, none of Plaintiffs' information and belief allegations state that the necessary information is in the Unions' control. Nor have Plaintiffs accompanied their allegations with a statement of the facts on which the allegations are based. For example, just with respect to the Unions, Plaintiffs allege the following on information and belief:

- "*On information and belief*, the conspiracy to kill the Standard General deal reached as high as the halls of Congress and as far as the Allen Group and Mr. Allen, DISH Network and its chairman and majority shareholder Charlie Ergen, their lobbyist David Goodfriend at the Goodfriend Group, labor unions, public interest groups, and FCC Chairwoman Rosenworcel and Ms Saurer, her personal staffer and Media Bureau Chief." Compl. ¶ 24 (emphasis added).

- "And *on information and belief*, Mr. Goodfriend had been working behind the scenes for some time before formally appearing in August, not only for the objectors but also for his longtime clients at the Allen Group and DISH. Both were also his clients during the FCC's review of the Standard General-TEGNA transaction. Mr. Goodfriend and Ms. Saurer scheduled a meeting to occur just days after Mr. Allen said he was 'still in the fight' for TEGNA, and it just so happened to be on the same day that objectors filed their first shots at the Standard General-TEGNA transaction." *Id.* ¶ 158 (emphasis added).

- "A few days after the Media Bureau ordered the document production, Media Bureau staff also engaged in *ex parte* discussion with Mr. Goodfriend, on behalf of NewsGuild, 'regarding the scope of documents to be produced.' Of course, it made no sense for NewsGuild or any of the straw objectors to want such information for themselves. *On information and belief*, the request for failed bidders came from the Goodfriend Group to instead be used by his other clients, the Allen Group and DISH—in violation of the FCC's protective order." *Id.* ¶ 171 (emphasis added).

- "Throughout this period, the Media Bureau maintained its lack of transparency. On February 21, 2023, Chairwoman Rosenworcel had a call with Jon Schleuss, president of straw objector NewsGuild. At or around that time, on *information and belief*, the Media Bureau told the straw objectors that it would issue the HDO, even though it had not yet delivered that bombshell to Standard General." *Id.* ¶ 221 (emphasis added).

- "*On information and belief*, after losing the bidding auction for TEGNA, Mr. Allen conspired with and deployed his longtime lobbyist, Mr. Goodfriend, to derail the Standard General-TEGNA merger sometime between February 2022 and May 2022. In February 2022, TEGNA accepted Standard General's bid to acquire TEGNA, over Mr. Allen's. But in May 2022, Mr. Allen publicly announced that he was 'still in the fight' for TEGNA and this was just 'in round one.' Days later, straw objectors made their first filings opposing the deal and demanded information about 'alternative transactions considered' by TEGNA…." *Id.* ¶ 278 (emphasis added).

- "*On information and belief*, the Goodfriend Group and Mr. Goodfriend coordinated the straw objectors' strategy … the objections were intentionally made to deceive and serve as a pretext to cover Defendants' race-based reasons and efforts to interfere directly with Standard General's business relationships through the license-transfer application process." *Id.* ¶ 323 (emphasis added).

Plaintiffs' information and belief[10] allegations—on which many of their other allegations are based—go to the heart of their claims against the Unions. Without these unsubstantiated allegations, Plaintiffs fail to offer any factual allegations about how the Unions did anything wrong. Disregarding Plaintiffs' recitations of their "beliefs," they have at most alleged that the Unions, of their own accord, did not want the transaction to occur. That hardly reaches the threshold of alleging the Unions' involvement in a complex racist conspiracy. And what is more, Plaintiffs fail to allege that the necessary information to prove "the beliefs" lies within the Unions' control. *See Kowal*, 16 F.3d at 1279 n.3. For this reason alone, the Court should dismiss the claims against the Unions.

But even worse, Plaintiffs fail to accompany their allegations with "a statement of the facts upon which the allegations are based." *Id.* For example, for the second and last information and belief allegations above, Plaintiffs offer no factual allegation to support their key assertion that, before representing the Unions, Mr. Goodfriend was improperly influencing their strategy behind the scenes. Compl. ¶¶ 158, 323. What provides Plaintiffs with the basis to claim that Mr. Goodfriend had such

---

[10] Plaintiffs add one allegation still not based in fact, but only on the "obvious inference to be drawn from this timeline of events." Compl. ¶ 137. This type of allegation is no different from "information and belief" and is improper for the same reasons. An objective reader can interpret the timeline him or herself. An "obvious inference to be drawn" allegation adds nothing but conclusory suspicion.

all-encompassing "control" over the Unions, even when he was not representing the Unions? A different attorney—Andrew Schwartzman—represented the Unions when they submitted their Reply in Support of the Petition to Dismiss or Deny—not Mr. Goodfriend. Plaintiffs have not alleged that Mr. Goodfriend forced Mr. Schwartzman to represent the Unions or that Mr. Schwartzman was involved in the conspiracy. Nor could they. One cannot conspire with one's attorney on matters within the scope of the representation. *Fischer v. Estate of Flax*, 816 A.2d 1, 5 (D.C. 2003); *see also Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Ctd.*, 935 A.2d 362, 387 (D.C. 2007).

Plaintiffs never properly plead how or under what circumstances the Unions connected with Mr. Goodfriend, the Goodfriend Group, Mr. Allen, the Allen Group, Mr. Ergen, and DISH—to say nothing of the "halls of Congress"—in order to hatch a racist conspiracy against Mr. Kim. The most they say as a matter of fact is that Mr. Goodfriend met with the head of the Media Bureau, on a *different matter* in the afternoon on the day that NewsGuild appeared in the FCC proceedings. Compl. ¶¶ 11, 129. This falls woefully short of being sufficient to support an inference of a racist conspiracy involving the government, private parties, and industry unions.

At bottom, Plaintiffs allege no concrete facts that connect the Unions with any of the other Defendants in a way that would suggest the Unions acted in a conspiracy with them—racial or otherwise. Ignoring the improper information and belief allegations leaves only conclusory allegations which cannot sustain any of the claims against the Unions.

## III.    Plaintiffs otherwise fail to state a claim for each cause of action.

Plaintiffs' Complaint includes six causes of action against the Unions. Each claim collapses under scrutiny.

### A.    Plaintiffs fail to state a claim for a violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981).

Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as enjoyed by white citizens." 42 U.S.C. § 1981(a). To state a Section 1981 claim,

Plaintiffs must allege that: (1) "the plaintiff is a member of a racial minority," (2) "the defendant intended to discriminate against the plaintiff on the basis of race," and (3) "the discrimination concerned an activity enumerated in § 1981." *Middlebrooks v. Godwin Corp.*, 722 F. Supp. 2d 82, 88 (D.D.C. 2010). "Simply invoking race in the course of a claim's narrative … is insufficient to state a section 1981 claim." *Doe #1 v. Am. Fed. of Gov. Emps.*, 554 F. Supp. 3d 75, 105 (D.D.C. 2021). What's more, § 1981 liability "only attaches to persons who actually had the power or authority to prevent the plaintiff from entering into a contract with a third party." *Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 477 (S.D.N.Y. 2013).

First off, the Unions held no power to stop the Standard General-TEGNA deal from moving forward. That power rested with the FCC alone. So the § 1981 claim fails against the Unions for that simple reason.

But moreover, Plaintiffs do not allege any facts suggesting that the Unions intended to discriminate against Mr. Kim because of his race. Nothing in the Unions' FCC petitions reference Mr. Kim's race to argue that the FCC should deny the petition because the deal would not further the FCC's "diversity goals." Compl. ¶ 5. The Unions never "disparaged Mr. Kim and maligned him as a foreigner." *Id.* ¶ 19. Mr. Kim even acknowledged that the Unions said nothing about race in their petition. *See* MB No. 22-162, Response to Petition, at 16. As the Unions explained in their Reply in Support of their Petition to Dismiss, their previous support for ownership diversity does not automatically mean that they must support any transaction "as long as a woman or person of color is at the helm." MB No. 22-162, Reply to Applicants' Consolidated Opp. and Response to Comments, at 4. The economic ramifications of the proposed transaction—job losses, concentrated ownership, localism, and increased retransmission and subscription costs—are exactly the sort of things that would be of concern to a union of journalists and media professionals. And the Unions emphasized

diversity of **viewpoints**, which would be lost by Mr. Kim using his wealth to consolidate media ownership.

What's more, the Unions' concerns about foreign investment focused on the foreign **companies** that Mr. Kim had lined up for financing the deal—not any money he, an American citizen, was providing. *See supra* n.8. As Plaintiffs acknowledge, the Unions highlighted the financers *in the Cayman Islands and British Virgin Islands.* Compl. ¶¶ 71, 148, 151; *see also* MB No. 22-162, Notice of Ex Parte, at 2–3. The Unions never said that Mr. Kim was a foreigner. *See generally* MB No. 22-162, Notice of Ex Parte, at 2–3; MB No. 22-162, Unions' Petition to Dismiss; MB No. 22-162, Unions' Reply in Support; MB No. 22-162, Supplement to Petition. In fact, the Unions **preferred that** Mr. Kim control the company, **rather than** anonymous foreign investors. MB No. 22-162, Reply in Support, at 26. Plaintiffs' allegations that the Unions painted Mr. Kim as a "shadowy foreign investor" and engaged in "fearmongering" are objectively false based on the FCC's public records. Compl. ¶¶ 5, 148, 151, 290.[11]

### B.    Plaintiffs fail to state a claim for a violation of the Civil Rights Act of 1866 (42 U.S.C. § 1985(3)).

Section 1985(3) protects against "conspiracies to deprive any person of equal protection of the laws." For a § 1985(3) claim, a plaintiff must allege: (1) a conspiracy, (2) "for the purpose of depriving any person or class of persons of the equal protection of the laws, or of the privileges and immunities under the law," (3) "motivated by some class based, invidiously discriminatory animus," and (4) "whereby a person is either injured in his person or property, or is deprived of any right or privilege of a citizen of the United States." *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997).

---

[11] Ironically, Mr. Kim's arguments that the FCC should have favored him based on his race would violate the Equal Protection Clause. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* rejected the idea that "government actors may intentionally allocate preference" based on race. 600 U.S. 181, 206–07 (2023). For Mr. Kim to cry out that the transaction should have gone through because of his race would itself have presented an equal protection violation.

"[C]onclusory allegations of an agreement" do not suffice. *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007). "To state sufficient facts to support an agreement" for a viable § 1985 claim, a "plaintiff should allege the existence of any events, conversations, or documents indicating there was an agreement between the defendants to violate his rights." *Id.* Plaintiffs' claims fall short because they do not allege an improper agreement, let alone an agreement to discriminate based on race.

*First*, Plaintiffs do not allege **any** agreement between the Unions and any other Defendant. To be sure, Plaintiffs allege each Defendant's opposition to the proposed transaction. But Plaintiffs allege nothing to support an inference that their opposition arose from anything other than each Defendant's independent interests. At no point in the Complaint do Plaintiffs allege how the Unions got involved with the other objectors, let alone made some corrupt agreement with them. What Defendant contacted the Unions? When? Under what circumstances? Plaintiffs have not alleged how the Unions got involved in this vast, albeit fanciful and unlikely, conspiracy.[12]

The most Plaintiffs can say that Mr. Goodfriend met with Ms. Saurer, the head of the Media Bureau, on a *different matter* in the afternoon on May 12, 2022—the day that NewsGuild appeared in the FCC proceedings. Compl. ¶¶ 11, 129. No improper agreement can be inferred from that. On April 21, 2022, the Media Bureau set a petition to dismiss deadline of May 23, 2022. NewsGuild and two other petitioners then drafted a *16-page motion* for more documents, which it filed on May 12, 2022. Plaintiffs allege that somehow this meeting induced Mr. Goodfriend and NewsGuild to conspire to appear in the proceeding—and magically draft a 16-page motion that two other objectors

---

[12] Plaintiffs claim that the Unions refused to enter a memorandum of understanding with Standard General that would supposedly have addressed some of their concerns. Compl. ¶ 253. Yet that has nothing to do with race or a conspiracy—only the Unions' concerns that a memorandum of understanding was not adequate to address their concerns. Without the information and belief allegations, Plaintiffs cannot explain why the Unions' objections, based on sound economic principles rather than racial animus, are actionable.

approved and filed the same day following the afternoon meeting. *Id.* ¶ 129. Plaintiffs fail to even allege that the motion was drafted and filed after the afternoon meeting with Ms. Saurer, thereby showing that the meeting meant nothing. If any "inference is to be drawn," it is that the Unions were acting of their own, independent accord, not conspiring with Mr. Goodfriend or Ms. Saurer.[13]

For the same reason, there is no way to accept an inference that the Media Bureau was using the Unions "as a pretext." *Id.* ¶¶ 156, 192. Plaintiffs have provided no "events, conversations, or documents" providing a scintilla of fact that the Unions agreed to a conspiracy to dismantle the Standard General-TEGNA deal with Mr. Goodfriend, so that he was prepared to somehow meaningfully discuss it with Ms. Saurer at his May 12, 2022 meeting. *Id.*

Consider also the allegation that Mr. Goodfriend was acting on behalf of other clients he represented in different circumstances (Mr. Allen and DISH) rather than his clients in the FCC proceedings (the Unions). *Id.* ¶¶ 138, 192. No "conspiracy" can exist between an attorney and his client if the attorney is acting "within the scope of his employment as an advisor to, or an advocate on behalf of, the client." *Fischer*, 816 A.2d at 5; *see also Goldschmidt*, 935 A.2d at 387. The Unions' filings, signed by Mr. Goodfriend, supported the Unions' objective of blocking the TEGNA deal for economic and policy reasons. There is nothing wrong with the Unions' objectives largely aligning with positions of Mr. Goodfriend's other clients too. No conspiracy can exist between attorney Mr. Goodfriend, the Goodfriend Group, and the Unions when he did exactly as he should as their counsel.

Even so, the Plaintiffs do not allege that the Unions **agreed**, even implicitly, to object to the TEGNA deal on the basis of Mr. Kim's race. There are no facts supporting the contention that Mr.

---

[13] This is further supported by Plaintiffs' allegation that in September 2022, Mr. Goodfriend "waited to make an issue of old documents now—several months after Standard General produced them with a written explanation." Compl. ¶ 167. Mr. Goodfriend was not the Unions' attorney "several months" before. He became the Unions' attorney just before September. To have him "make an issue of old documents" was exactly what he ought to have done as their attorney. Mr. Goodfriend's lack of action before that point shows that he was not in fact the master of the Unions' earlier filings and arguments.

Goodfriend acted in the interests of DISH or Mr. Allen instead of the Unions in opposing the transaction. Compl. ¶¶ 138, 192. Assume the Media Bureau used the "straw objectors" filings as a pretext, *id.* ¶¶ 156, 192, and assume that Mr. Goodfriend wanted documents for his other clients, *id.* ¶ 171. Even crediting such speculation, there is no factual allegation that the Unions **knew** any of this was happening, let alone agreed to it, to block the transaction based on Mr. Kim's ethnicity. None of this provides any basis for "an obvious inference" that there was any improper agreement between the Unions and any other Defendant.

*Second*, even assuming the Unions had an agreement with some other Defendant to oppose the Standard General-TEGNA transaction, Plaintiffs do not allege that that agreement was to oppose the deal **based on Mr. Kim's race**. There is no factual allegation that points to an agreement or a conspiracy among the Defendants that was "motivated by some class based, invidiously discriminatory animus." *Graves*, 961 F. Supp. at 320. Plaintiffs never allege (nor could they) that any Defendant approached the Unions and asked them for help in derailing the transaction because Mr. Kim was of Korean ancestry. Plaintiffs have merely alleged that the Unions did not want this deal to happen—a permissible perspective shared by other Defendants.[14] *See also supra* § III.A.

> **C.    Plaintiffs fail to state a claim for a violation of the Enforcement Act of 1871 (42 U.S.C. § 1986).**

A "neglect to prevent" claim under § 1986 can only survive if a person "having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects

---

[14] Plaintiffs claim that the positions the Unions took "would further the interest of the Allen Group and DISH." Compl. ¶ 138. Even if this were true, there is nothing illegal about the Unions and other Defendants having mutual interests. Having mutual interests, however, does not mean Defendants (1) conspired to try to terminate the TEGNA deal, **let alone** (2) based on Mr. Kim's race.

or refuses so to do." 42 U.S.C. § 1986. If no viable claim exists under § 1985(3), then there can be no viable claim under § 1986. *Id.*; *Bowie v. Maddox*, 642 F.3d 1122, 1128 (D.C. Cir. 2011).

Plaintiffs have failed to allege how the Unions held any "power to prevent or aid in preventing" a purported conspiracy that went as "high as the halls of Congress." Compl. ¶ 24. The Unions' lack of control over the government is perhaps best illustrated by Plaintiffs' observation that the FCC had not accepted the Unions' arguments on localism and after-acquired covenants in the past. *Id.* ¶ 98. If the Unions were in a position to control the FCC or members of Congress, then surely their track record with objections would be an unbroken string of successes.

Finally, section § 1986 claims are subject to a one-year statute of limitations. *See* 42 U.S.C. § 1986 ("But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action accrued."). Plaintiffs filed their original complaint on April 24, 2024. Plaintiffs allege no improper act by the Unions after April 24, 2023. Moreover, a § 1986 cause of action accrues "when the plaintiff knows or has reason to know of the harm or injury that is the basis of his action." *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 246, 354 (E.D.N.Y. 2013). Plaintiffs themselves said, "[a]s a practical matter, an HDO is a pocket veto for large mergers with typical finance windows." Compl. ¶ 100; *see also id.* ¶¶ 11, 22. Plaintiffs alleged that an HDO extends applications by "at least *another year*," meaning Plaintiffs knew on February 24, 2023, when the HDO was issued, that the transaction would not occur. *Id.* ¶ 11 ("It was a move that ensured the deal would not close on time."); MB No. 22-162, Hearing Designation Order (Feb. 24, 2023). Or, alternatively, Plaintiffs knew the deal was dead when the D.C. Circuit denied their writ of mandamus on April 21, 2023. *See* Compl. ¶ 245 n.168. This action was not commenced until April 24, 2024. So the § 1986 is untimely, no matter how the Court looks at it.

**D.    Plaintiffs fail to state a claim for tortious interference with contract or tortious interference with prospective business opportunity.**

To state a claim for tortious interference with contract, a plaintiff must allege: (1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach. *Casco Marina Dev., LLC v. D.C. Redevelop. Land Agency*, 834 A.2d 77, 83 (D.C. 2003). The elements for tortious interference with a prospective business opportunity align with the elements for tortious interference with a contract. *Paul v. Howard Univ.*, 754 A.2d 297, 308-09 (D.C. 2000). A plaintiff must allege "that the interference was intentional and that there was resulting damage." *Id.* at 309 (citation omitted).

Once a plaintiff establishes a prima facie case of tortious interference, the burden shifts to the defendant "to produce evidence that their interference was 'legally justified or privileged.'" *Onyeoziri v. Spivok*, 44 A.3d 279, 288 (D.C. 2012) (citation omitted) (tortious interference with contract); *see NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 901 (D.C. 2008) (citation omitted) (tortious interference with prospective business opportunity). But a defendant "does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." *Onyeoziri*, 44 A.3d at 288 (citation omitted). Protecting one's own "existing economic interests" is a permissible justification for interfering. *NCRIC*, 957 A.2d at 901. So even if the burden had shifted to the Unions, they easily clear the hurdle of establishing the legitimate motivation of their opposition to the transaction.

In other words, even assuming Plaintiffs made out a *prima facie* case for either tort, the Unions legitimately believed their members' interests would "be impaired or destroyed by" the Standard General-TEGNA deal. *Onyeoziri*, 44 A.3d at 288. Plaintiffs' allegations show that the Unions articulated their concerns with how the Standard General-TEGNA deal could harm their members, their industry, and the public in general. Time and again in the filings, the Unions outlined the

potentially harmful effects that the proposed acquisition of TEGNA would have on jobs, localism, and already high prices.  Thus, the Unions justifiably spoke out at the FCC proceedings.

Under Plaintiffs' theory, if the FCC rejects a proposed transaction, and a party had objected during the public comment period, then that party has tortiously interfered with a contract.  Not so.  Citizens can voice their concerns to the FCC; they may petition the FCC to deny (or grant) a license transfer.  Disgruntled network owners cannot drag objectors into court any time the FCC denies such a transfer.  If disappointed investors could put objectors through such ordeals, the free exchange of opinion and argument would surely come to an abrupt halt, as those with concerns about a transaction would cautiously avoid courting litigation with disappointed investors, by remaining silent.  In fact, that basic premise is exactly why *Noerr-Pennington* applies beyond the antitrust context.

Finally, the Unions were not the cause of Plaintiffs' purported injuries.  No matter what the Unions said in filings, the FCC was the ultimate decisionmaker, *i.e.*, the intervening or superseding cause of Plaintiffs' purported damage.  *See Brown v. Hill*, No. 14-0140 (TSC), 2021 WL 4262464, at *5 (D.D.C. Sept. 20, 2021) (applying causation principles to intentional torts).  The tortious interference claims fail.

### E.    Plaintiffs fail to state a conspiracy claim against the Unions.

An actionable conspiracy can exist when there is: (1) "an agreement with two or more persons," (2) "to participate in an unlawful act," and (3) "an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme."  *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000).  Civil conspiracy is not a standalone claim, without an underlying tort.  *Nader*, 567 F.3d at 697.  Because Plaintiffs' other state-law claims fail, the civil conspiracy claim necessarily fail as well.

Even so, Plaintiffs' conspiracy claim also fails against the Unions because Plaintiffs have not described the supposed agreement between the Unions and any other Defendant. As discussed above,

Plaintiffs offer no facts beyond conclusory statements based on "information and belief" that would suggest the Unions agreed with any other Defendant to contest the Standard General-TEGNA deal, let alone agreed to contest the deal based on *Mr. Kim's race. See supra* § III.A–B.

### F.    **Plaintiffs' claims are preempted**.

Plaintiffs' claims for tortious interference with contract, tortious interference with prospective business opportunity, and civil conspiracy are preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157.  The Supreme Court's decision in *San Diego Bldg. Trades Council v. Garmon*, explains that if the challenged conduct is "arguably subject to § 7 or § 8 of the Act, the states and the federal courts must defer to the exclusive competence of the National Labor Relations Board."  359 U.S. 236, 245 (1959).  And in *Eastex, Inc. v. NLRB*, the Supreme Court held that Section 7 of the of the NLRA protects unions' "appeals to legislators to protect [employee] interests as employees are within the scope of" mutual aid and protection under Section 7.  437 U.S. 556, 565 (1978).[15]

Thus, under *Garmon* and *Eastex*, the Unions' conduct is protected, insofar as the Unions were petitioning the government on a matter that they concluded was injurious to both the public and the employees in the industries they represent.  Because the Unions' conduct is protected by Section 7, Plaintiffs' common law claims based on this conduct—*i.e.*, tortious interference with contract, tortious interference with prospective business opportunity, and civil conspiracy—are preempted under *Garmon* and should be dismissed.

---

[15] The Court further explained that "to hold that activity of this nature is entirely unprotected— irrespective of location or the means employed—would leave employees open to retaliation for much legitimate activity that could improve their lot as employees." *Eastex*, 437 U.S. at 566–67.

## CONCLUSION

Along with the reasons argued above, the Unions join all other arguments of any Defendants here, as they may apply to the Unions as well.  For the above reasons, and any reasons argued by the other Defendants, the Court should dismiss all claims against the Unions with prejudice.

Respectfully submitted,

*/s/ Jason M. Covert*
Jason M. Covert (1016632)
Taft Stettinius & Hollister LLP
200 Massachusetts Ave. NW, Suite 500
Washington, D.C. 20001
Phone: (202) 664-1537
Fax: (202) 664-1586
jcovert@taftlaw.com

Russell S. Sayre (*admitted pro hac vice*)
Spencer S. Cowan (*admitted pro hac vice*)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
sayre@taftlaw.com
scowan@taftlaw.com

*Attorneys For Defendants The*
*NewsGuild-CWA and National Association of*
*Broadcast Employees and Technicians-CWA*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was filed this 9th day of September, 2024, through the Court's CM/ECF system, which will send notice of the filing to all parties of record.

*/s/ Jason M. Covert*