UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SGCI HOLDINGS III LLC, et al.,

        Plaintiffs,

    v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,

        Defendants.

Civil Action No. 24-1204 (RC)

**MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS'**
**MOTION TO DISMISS AMENDED COMPLAINT**

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 5

LEGAL STANDARD ................................................................................................... 9

    I.      Rule 12(b)(1) Standard ................................................................................. 9

    II.     Rule 12(b)(6) Standard ............................................................................... 10

ARGUMENT .............................................................................................................. 11

    I.      The Court Lacks Jurisdiction Over Counts I, III, IV, and VIII As Pled Against The Federal Defendants. ....................................................................... 11

          A.     The Government Has Not Waived Its Sovereign Immunity For Any Claim Under Sections 1985 or 1986 Or That Otherwise Seeks Monetary Damages. ........................................................................................ 11

          B.     Plaintiffs' Claims Against The Federal Defendants Should Be Dismissed For Lack Of Standing. ................................................................... 13

          C.     Plaintiffs Have Failed To Exhaust Administrative Remedies And, In Any Event, The Claims Are Subject To The Exclusive Jurisdiction Of The D.C. Circuit. ...................................................................................... 21

          D.     The *Leedom* Exception Does Not Confer Jurisdiction Over Count VIII. . 26

    II.     Plaintiffs Have Failed To Plausibly Plead That The Federal Defendants Acted With Discriminatory Animus Or Conspired Against Plaintiffs. ........................... 28

          A.     The Amended Complaint And Hearing Designation Order Incorporated Therein by Reference Establish The Legitimate Reasons For The Referral. ....................................................................................... 30

          B.     The Allegations In The Complaint Fail To Raise Any Inference That The Reasons Stated In The Hearing Designation Order Were Pretextual ....... 33

Conclusion ................................................................................................................. 39

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*3883 Conn. LLC v. Dist. of Columbia,*
   336 F.3d 1068 (D.C. Cir. 2003) ................................................................. 32

*Aeronautical Radio, Inc. v. FCC,*
   983 F.2d 275 (D.C. Cir. 1993) ................................................................... 18

*Air Excursions v. Yellen,*
   66 F. 4th 272 (D.C. Cir. 2023) ................................................. 17, 18, 20, 21

*American Bird Conservancy v. FCC,*
   545 F.3d 1190 (9th Cir. 2008) ................................................................... 25

*Ariz. Christian Sch. Tuition Org. v. Winn,*
   563 U.S. 125 (2011) .................................................................................... 13

*Ashcroft v. Iqbal,*
   556 U.S. 678 (2009) ................................................................. 10, 28, 37, 38

*Atchison v. United States Dist. Courts,*
   190 F. Supp. 3d 78 (D.D.C. 2016) ............................................................ 13

*Atherton v. Dist. of Columbia Office of the Mayor,*
   567 F.3d 672 (D.C. Cir. 2009) .............................................................. 29, 32

*Bazzi v. Gacki,*
   468 F. Supp. 3d 70 (D.D.C. 2020) .............................................................. 9

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 555 (2007) .................................................................................... 10

*Best v. Kelly,*
   39 F.3d 328–31 (D.C. Cir. 1994) .............................................................. 32

*Boling v. U.S. Parole Comm'n,*
   290 F. Supp. 3d (D.D.C. 2017) ................................................................. 12

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) .................................................................................... 24

*Boyd v. Browner,*
   897 F. Supp. 590 (D.D.C. 1995) .......................................................... 34, 35

*Bryan v. City of Madison,*
   213 F.3d 267 (5th Cir. 2000) ..................................................................... 32

*Burley v. Nat'l Passenger Rail Corp.,*
   801 F.3d 290 (D.C. Cir. 2015) ................................................................... 33

*California v. Texas,*
   593 U.S. 659 (2021) .................................................................................... 19

*Carmichael v. Blinken,*
  Civ. A. No. 19-2316, 2022 U.S. Dist. LEXIS 54571 (D.D.C. Mar. 25, 2022) .................................. 12

*Changji Esquel Textile Co. v. Raimondo,*
  40 F. 4th 716 (D.C. Cir. 2022) ................................................................................................ 26, 27

*Chaplaincy of Full Gospel Churches v. Navy,*
  697 F.3d 1171 (D.C. Cir. 2012) ...................................................................................................... 18

*Citizens for Jazz on WRVR, Inc. v. FCC,*
  775 F.2d 392 (D.C. Cir. 1985) ....................................................................................................... 32

*Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Homeland Sec.,*
  527 F. Supp. 2d 101 (D.D.C. 2007) .......................................................................................... 18-19

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ................................................................................................................... 16, 18

*Clapper v. Amnesty Int'l,*
  568 U.S. 398 (2013) ........................................................................................................................ 14

*Clark v. Library of Congress,*
  750 F.2d 89 (D.C. Cir. 1984) ................................................................................................... 12, 13

*Coal. For Pres. of Hisp. Broad. v. FCC,*
  931 F.2d 73 (D.C. Cir. 1991) ......................................................................................................... 23

*Comm. in Solidarity with People of El Salvador v. Sessions,*
  929 F.2d 742 (D.C. Cir. 1991) ....................................................................................................... 16

*Crockett v. Mayor of the District of Columbia,*
  561 Fed. Appx. 3 (D.C. Cir. 2014) ................................................................................................. 12

*Curran v. Holder,*
  626 F. Supp. 2d 30 (D.D.C. 2009) ................................................................................................... 9

*Davis v. FEC,*
  554 U.S. 724 (2008) ........................................................................................................................ 14

*Dominguez v. UAL Corp.,*
  666 F.3d 1359 (D.C. Cir. 2012) ..................................................................................................... 13

*Ekwem v. Fenty,*
  666 F.Supp.2d 71 (D.D.C. 2009) ................................................................................................... 33

*Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.,*
  28 F.3d 1268 (D.C. Cir. 1994) ....................................................................................................... 19

*FCC v. ITT World Communications, Inc.,*
  466 U.S. 463 (1984) ................................................................................................................. 23, 24

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ................................................................................................................. 30, 37

*FDIC v. Meyer*,
510 U.S. 471 (1994) ................................................................................................... 11

*Frederick Douglass Found. v. Dist. of Columbia*,
82 F.4th 1122 (D.C. Cir. 2023) ............................................................................... 29, 37

*Herbert v. Nat'l Acad. of Sci.*,
974 F.2d 192 (D.C. Cir. 1992) ...................................................................................... 9

*Hollingsworth v. Duff*,
444 F. Supp. 2d 61 (D.D.C. 2006) ............................................................................... 9

*In re Off. of Pers. Mgmt. Data Sec. Breach Litig. ("OPM")*,
928 F.3d 42 (D.C. Cir. 2019) ................................................................................. 16, 19

*Jackson v. Bush*,
448 F. Supp. 2d 198 (D.D.C. 2006) ............................................................................ 11

*Jean-Baptiste v. U.S. Dep't of Just.*,
Civ. A. No. 23-432 (RC), 2024 WL 1253858 (D.D.C. Mar. 25, 2024) ....................... 11, 12

*Johnson v. FCC*,
Civ. A. No. 21-2050 (CKK), 2022 WL 17262173 (D.D.C. Nov. 29, 2022) ..................... 23

*Jovanovic v. U.S.-Algeria Bus. Council*,
561 F. Supp. 2d 103 (D.D.C. 2008) ............................................................................ 10

*Kabakova v. Off. of the Architect of the Capitol*,
Civ. A. No. 19-1276, 2020 U.S. Dist. LEXIS 65101 (D.D.C. Apr. 14, 2020) ................. 29

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) ............................................................................. 16-17, 17

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994) ..................................................................................................... 9

*Leedom v. Kyne*,
358 U.S. 184 (1958) ..................................................................................................... 26

*Lipton v. MCI Worldcom, Inc.*,
135 F. Supp. 2d 182 (D.D.C. 2001) ............................................................................ 10

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..................................................................................................... 14

*Mobilfone Serv. v. FCC*,
No. 02-1197, 2003 U.S. App. LEXIS 27280 (D.C. Cir. Oct. 24, 2003) ......................... 23

*Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*,
437 F.3d 1256 (D.C. Cir. 2006) ................................................................................... 27

*Nurriddin v. Bolden*,
818 F. 3d 751 (D.C. Cir. 2016) .................................................................................... 29

*Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. United States Army*,
    570 F.3d 327 (D.C. Cir. 2009) ........................................................................ 16

*Orff v. United States*,
    545 U.S. 596–02 (2005) ................................................................................. 11

*Perry v. Clinton*,
    831 F. Supp. 2d 1 (D.D.C. 2011) ................................................................... 30

*Radio Station Transmission Equipment*,
    207 F.3d 458 (8th Cir. 2000) ......................................................................... 25

*Sandwich Isles Communs., Inc. v. Nat'l Exch. Carrier Ass'n*,
    799 F. Supp. 2d 44 (D.D.C. 2011) ................................................................. 25

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) .................................................................. 35-36

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ....................................................................................... 21

*Steel Co. v. Citizens for a Better Env't.*,
    523 U.S. 83 (1998) ............................................................................ 14, 17, 19

*Stoddard v. Wynn*,
    68 F. Supp. 3d 104 (D.D.C. 2014) ................................................................. 11

*Telecommunications Research and Action Center v. FCC*,
    750 F.2d 70 (D.C. Cir. 1984) ......................................................................... 24

*Townsend v. United States*,
    236 F. Supp. 3d 280 (D.C. Cir. 2017) ........................................................... 29

*United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer*,
    778 F. Supp. 2d 37 (D.D.C. 2011) ................................................................... 9

*United States v. Mitchell*,
    463 U.S. 206 (1983) ....................................................................................... 11

*United States v. Nordic Vill., Inc.*,
    503 U.S. 30–34 (1992) ................................................................................... 11

*Uzuegbunam v. Preczewski*,
    592 U.S. 279 (2021) ....................................................................................... 16

*Women Prisoners of D.C. Dep't. of Corrections v. Dist. of Columbia*,
    93 F.3d 910 (D.C. Cir. 1996) ......................................................................... 33

*Worth v. Jackson*,
    451 F.3d 854 (D.C. Cir. 2006) ....................................................................... 18

**Statutes**

5 U.S.C. § 703 ................................................................................................. 24

5 U.S.C. § 704 ........................................................................................... 13, 24

28 U.S.C. § 1331 .............................................................................................. 24

28 U.S.C. § 2342(1).  Section 402(a) ......................................................... 24, 27

42 U.S.C. § 1985(3) ....................................................................................... 3, 12

42 U.S.C. § 1986 ............................................................................................ 3, 12

47 U.S.C. § 155(c)(4) ........................................................................................... 9

47 U.S.C. § 155(c)(7) ................................................................................... 22, 23

47 U.S.C. § 155(d)(7) ....................................................................................... 27

47 U.S.C. § 310(d) ................................... 3, 4, 5, 13, 14, 19, 21, 23, 25, 26, 27, 28

47 U.S.C. § 402(a). Section 402(b) ................................................................... 24

47 U.S.C. § 402(b)(1) ....................................................................................... 24

47 U.S.C. § 402(b)(1), (3) ............................................................................ 23-24

47 U.S.C. §§ 309(d)(2) & (e) .................................................... 1, 2, 3, 6, 7, 8, 31, 36

**Other**

47 C.F.R. § 0.61(a) ....................................................................................... 5, 21

47 C.F.R. § 1.115(e)(1) ..................................................................................... 22

47 C.F.R. § 1.115(k) .......................................................................................... 23

Rule 12(b)(1) ................................................................................ 5, 6, 9, 11, 21

Rule 12(b)(6) ................................................................................... 4, 10, 28

Defendants Federal Communications Commission ("FCC" or "Commission"), Jessica Rosenworcel, in her official capacity as Chairwoman of the FCC, and Holly Saurer, in her official capacity as Chief of the FCC's Media Bureau (hereinafter, the "Federal Defendants"), by and through undersigned counsel, file this memorandum in support of their motion to dismiss the claims asserted against them in the Amended Complaint in this action.  Plaintiffs in this case sought FCC approval of broadcast license transfers through a complex set of interrelated transactions. After conducting a detailed review of the record, the FCC's Media Bureau found that further investigation was necessary to determine the potential impact and possible harm to consumers, in the form of higher prices and job losses, if the transactions were approved.  The Bureau accordingly referred the applications to a hearing before an administrative law judge, as required by statute where substantial questions of fact prevent a finding that a broadcast transaction subject to the FCC's approval would be in the public interest.  47 U.S.C. §§ 309(d)(2), (e), 310(d).

Plaintiffs' central allegation is that the Media Bureau's referral was "entirely pretextual" and rooted in racial animus against them.  ECF No. 36 (Am. Compl.) ¶ 317.  But so far as the Federal Defendants are concerned, that allegation is almost entirely based on speculation or statements that others made to the Commission, or amongst themselves, and ignores the FCC's legitimate, non-discriminatory reason for its decision to refer the matter for a hearing.  Particularly in light of the Media Bureau's explanation for its referral, Plaintiffs plead no facts that would support a plausible inference of racial discrimination by the Federal Defendants.  In any event, the Amended Complaint is a thinly veiled attempt to impermissibly challenge agency action in District Court, which lacks jurisdiction over such claims.

This case arises from a potential $8.6 billion deal—never consummated—in which a company affiliated with Plaintiffs (Standard General) would purchase a media company (TEGNA,

Inc. ("TEGNA")) and its television stations. The deal required the FCC's approval of applications to transfer numerous broadcast licenses, and under the deal's terms and financing arrangements, Standard General needed to obtain the Commission's approval of those license-transfer applications by May 22, 2023. Am. Compl. ¶¶ 66, 347. But because of the FCC's need for further inquiry, that approval was not obtained by that deadline, and in the absence of replacement financing to extend the merger agreement (allegedly due to unfavorable market conditions), TEGNA terminated the deal. *Id.* ¶¶ 261-62.

Plaintiff Soohyung Kim is a managing member of Plaintiff SGCI Holdings III LLC ("SGCI Holdings"), which is an affiliate of Standard General. *Id.* ¶¶ 29, 52. After SGCI Holdings and TEGNA unsuccessfully sought to expedite the FCC's review of the license-transfer applications in the D.C. Circuit, Plaintiffs filed the instant lawsuit in this Court, which now comprises an eight-count Amended Complaint asserting various claims against the Federal Defendants, as well as against certain private individuals and companies that Plaintiffs contend interfered with the deal. Of the eight counts, only four (Counts I, III, IV and VIII) are directed at the Federal Defendants. The crux of those claims is that the decision by the FCC's Media Bureau to refer the license transfer applications to an administrative judge for a hearing was motivated by race discrimination. In Plaintiffs' (wholly implausible) view, the Federal Defendants were part of "a racially motivated conspiracy" with the private individuals and entities also named in this case "to thwart the . . . deal—specifically, for the FCC to delay review of the license-transfer applications until Standard General's financing and merger agreements expired." *Id.* ¶ 359.

In Count I, Plaintiffs assert a claim against the Federal Defendants for an alleged violation of the Equal Protection Clause of the Fifth Amendment, asserting that, because of Mr. Kim's race, he and Standard General were "denied equal treatment and an equal opportunity to have the

license-transfer applications processed fairly and voted on in a reasonable time." *Id.* ¶ 331.  As relief, Plaintiffs seek a declaration that their rights were violated by the hearing referral order and seek an injunction directing the Federal Defendants not to discriminate against them or other applicants in the future.  *Id*. at 139. It is not clear from the Amended Complaint whether Plaintiffs seek monetary damages from this alleged constitutional violation.

In Count III, Plaintiffs assert a claim of conspiracy under 42 U.S.C. § 1985(3) against Chairwoman Rosenworcel and Ms. Saurer and the private party defendants, and in Count IV, Plaintiffs assert a claim against those same parties under 42 U.S.C. § 1986.  Am. Compl. ¶¶ 351-63. Those claims are predicated on the allegation made in Count I that the Media Bureau's referral of the applications to a hearing before an administrative judge was racially motivated.  *Id*. ¶ 359.  As relief in these counts, Plaintiffs seek an unspecified amount of monetary damages, including the $136 million breakup fee that Plaintiffs paid TEGNA after the transaction was terminated.  *Id.* ¶¶ 356, 363; *id*. at 140.

In Count VIII, Plaintiffs assert a claim against the Federal Defendants for violating 47 U.S.C. § 310(d) by allegedly failing to limit their "review of Standard General's license-transfer application to Standard General, not other possible buyers."  *Id*. ¶ 394.  Section 310(d) provides, in relevant part, that the "Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee."  47 U.S.C. § 310(d).  Plaintiffs, however, do not plausibly allege that the Commission conducted such an analysis with respect to other possible buyers, only that FCC's Media Bureau requested "TEGNA to produce information about 'alternative transactions' that TEGNA considered" as part of the Media Bureau's public interest

analysis of Standard General's license-transfer application, Am. Compl. ¶¶ 168, 395, something which section 310(d) does not prohibit.

Plaintiffs characterize the Media Bureau's request for information about alternative transactions as "ultra vires agency action" and assert that "Mr. Kim has had to alter Standard General's immediate broadcast strategy so that he is not subject to the same ultra vires agency action with respect to unspecified potential future transactions and that "without declaratory or injunctive relief, he cannot pursue" unspecified "larger deals that he would otherwise be pursuing and that require the FCC's pre-approval." *Id.* ¶¶ 398-99. Plaintiffs seek a "permanent injunction ordering the [Federal Defendants] to refrain from considering alternative license transactions in any license-transfer proceedings involving Mr. Kim and his companies." *Id.* at 140.

As a threshold matter, the Court lacks jurisdiction to hear these claims against the Federal Defendants, and Counts I, III, IV and VIII should be dismissed under Federal Rule of Civil Procedure ("Rule") 12(b)(1). Sovereign immunity bars claims under sections 1985(3) and 1986 as well as for monetary damages for alleged constitutional and ultra vires violations brought against the United States and its officers acting in their official capacity. Plaintiffs, moreover, have not demonstrated that they have standing with respect to their claims against the Federal Defendants. Plaintiffs also have failed to exhaust their administrative remedies before seeking judicial review, and exclusive jurisdiction to challenge the FCC's actions lies with the D.C. Circuit. Finally, were this Court to nevertheless determine that it has jurisdiction, Count I and VIII, and Counts III and IV with respect to the Federal Defendants, should be dismissed under Rule 12(b)(6) for failure to plausibly plead a claim for relief. Accordingly, all claims against the Federal Defendants should be dismissed and the Federal Defendants should be dismissed as parties to this litigation.

## BACKGROUND

Under the Communications Act, no "station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, except . . . upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d). The Commission has delegated authority to rule on such applications in the first instance to its Media Bureau. 47 C.F.R. § 0.61(a).

In March 2022, SGCI Holdings, along with the other entities to the TEGNA merger deal (TEGNA and Cox Media Group ("Cox")), submitted applications to the FCC for approval of broadcast license transfers in connection with a complex set of four interrelated transactions. Am. Compl. ¶¶ 69, 120. The principal effect of the deal would be for Standard General to acquire TEGNA, a publicly traded media company that controls 64 licensed television stations and several other FCC licenses. *Id.* ¶¶ 1, 7. In addition, Standard General would acquire WFXT(TV), a Boston-based television station, from Cox, a media company principally owned by Apollo Global Management. *See id.* ¶ 65; *see also* Hearing Designation Order, DA 23-149 (Med. Bur. Feb. 24, 2023), available at https://docs.fcc.gov/public/attachments/DA-23-149A1.pdf (last visited Aug. 28, 2024), ¶ 1.[1] Standard General would in turn transfer to Cox four television stations that it previously owned and four of the television stations it would acquire from TEGNA. *See* Hearing Designation Order ¶ 1. Finally, Apollo and another private-equity firm would acquire a $925 million stake in New TEGNA, while Apollo would retain control of Cox, so all the stations would share a partial owner in common. *See id.* ¶¶ 5-10.

---

[1]    The Hearing Designation Order is incorporated by reference in the Amended Complaint (Am. Compl. ¶ 222) and thus can be considered by the Court in ruling on this motion to dismiss. Regardless, it also may be considered by the Court under Rule 12(b)(1).

In April 2022, the FCC Media Bureau accepted the applications for filing and established a pleading cycle whereby interested parties could raise objections to the deal as part of the FCC approval process. *Id.* Various commenters filed petitions to dismiss or deny the transactions citing alleged harm to the public. *Id.* ¶¶ 11-13. The FCC's Media Bureau also issued requests for documents to the applicants in June 2022 and September 2022 to assist in conducting the public interest analysis. *Id.* The information request regarding "alternative transactions" on which Plaintiffs base Count VIII was part of the September 2022 document request, Am. Compl. ¶ 168, specifically a portion of the first of eleven requests. *See* Applicants' Joint Response to the Media Bureau's Request for Information at 1, 9, available at https://www.fcc.gov/ecfs/document/1013637929421/1 (last visited Aug. 28, 2024); *see also* Letter of September 29, 2022, available at https://docs.fcc.gov/public/attachments/DOC-387725A1.pdf (last visited Aug. 30, 2024). In December 2022, the applicants filed a series of letters making new commitments purporting to address the objections that had been made to the transaction, and the FCC's Media Bureau sought public comment on those new commitments. *See* Hearing Designation Order ¶ 14.

Under the Communications Act, if the FCC is unable to find that a transfer of a broadcast license would serve the public interest, or if it finds that substantial and material questions of fact are presented, it is required to refer the matter to a hearing. *See* 47 U.S.C. §§ 309(d)(2), (e), 310(d). In this case, the FCC's Media Bureau found that further inquiry was warranted into at least two areas, and on February 24, 2023, the Media Bureau issued a Hearing Designation Order referring those issues to an administrative judge for a full hearing. *See* Hearing Designation Order ¶¶ 19-50. The issues identified for hearing were as follows:

(a) "Whether in light of the record presented retransmission consent fees will rise as a result of the Transactions, and if so, whether such an increase is the result of a properly functioning competitive marketplace . . . and further, whether [any non-market-driven increase] would be mitigated by the commitments offered by the Applicants;" and

(b) "Whether, and to what extent, in light of the record presented, local content and programming in the affected communities would be adversely affected" by the transactions "and the potential effectiveness of the commitments offered by the Applicants."

*Id*. ¶ 51; *see also* Am. Compl. ¶ 79 ("Retransmission fees are charged to cable and satellite companies like Comcast or DISH to retransmit (and thereby resell) broadcast stations' programming to their cable and satellite customers.").

On March 27, 2023, SGCI Holdings and the other parties to the deal filed an appeal of the Hearing Designation Order to the D.C. Circuit, *see SGCI Holding III LLC v. FCC*, No. 23-1083 (D.C. Cir.), and separately filed a petition for mandamus that sought an order compelling the Commission to rule on the applications by April 28, 2023, *In re SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir.) [Doc. #1991974], Conditional Petition for Mandamus.  By order dated April 3, 2023, the D.C. Circuit dismissed the appeal, determining it to be premature because the matter had not yet reached the full Commission for a decision. *SGCI Holding III LLC v. FCC*, No. 23-1083 (D.C. Cir.) [Doc. #1993081], Order.  By order dated April 21, 2023, the D.C. Circuit also denied the petition for mandamus, ruling that the petitioners had failed to show that the FCC "has unreasonably delayed in acting on their applications" or "that [the FCC] has a 'crystal clear' duty to rule on their applications without resort to a hearing." *In re: SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir.) [Doc. #1995758], Order.

On April 27, 2023, the FCC administrative judge presiding over the hearing proceedings determined that various preliminary matters, including discovery, would "take the duration of [the] hearing beyond the May 22, 2023, deadline that Applicants deem necessary to preserve their

merger agreement" and directed the parties to that proceeding to file a status report "regarding the continued viability of their merger agreement on or before June 1, 2023."  Order Summarizing Initial Conference, available at https://docs.fcc.gov/public/attachments/FCC-23M-09A1.pdf (last visited Aug. 29, 2024).

In their separate status reports, all parties to the deal confirmed that the deal had been terminated on May 22, 2023.  See https://www.fcc.gov/ecfs/document/10524565816599/1 (last visited Aug 29, 2024); https://www.fcc.gov/ecfs/document/10525827223299/1 (last visited Aug. 29, 2024); https://www.fcc.gov/ecfs/document/105250655413137/1 (last visited Aug. 29, 2024). While the other parties stated in their status reports that they were withdrawing their applications and their participation as parties to the hearing in light of the deal's termination, SGCI Holdings maintained in its status report that "the applications were unlawfully designated for a hearing" and stated that it "remains prepared to vindicate its rights as necessary, including through participation in the hearing and attendant discovery process." *See id.*

On June 1, 2023, the administrative judge issued an order terminating the hearing proceeding.  Am. Compl. ¶ 267.  Noting that SGCI Holdings had indicated in its status report "its willingness to continue participating in the hearing," the administrative judge nevertheless determined that "[b]ecause the merger agreement has been dissolved and the underlying FCC applications are being withdrawn to the extent technically possible, the issues designated for hearing are moot."  *See* https://docs.fcc.gov/public/attachments/FCC-23M-10A1.pdf (last visited Aug. 29, 2024).

Plaintiffs do not allege that they filed an application for review of that order by the full Commission.  *See* 47 U.S.C. § 155(c)(4) ("Any person aggrieved by any such order, decision, report or action may file an application for review by the Commission[.]")  Plaintiffs instead filed

this lawsuit on April 26, 2024, in which they assert—as they did before the FCC administrative judge—that the applications were unlawfully designated for a hearing by the FCC's Media Bureau.

**LEGAL STANDARD**

### I.   Rule 12(b)(1) Standard

A motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted). "[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction. *See, e.g.*, *United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011) (citing *Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 63 (D.D.C. 2006)). Thus, the "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'" *Id.* (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (internal citation and quotation marks omitted)).

In determining whether jurisdiction exists, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. *See Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992). Motions to dismiss based on a lack of standing are properly considered under Rule 12(b)(1) because standing is a "predicate[] to jurisdiction." *Bazzi v. Gacki,* 468 F. Supp. 3d 70, 75 (D.D.C. 2020).

II.    **Rule 12(b)(6) Standard**

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint.  In ruling on a motion to dismiss, the Court "must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Jovanovic v. U.S.-Algeria Bus. Council*, 561 F. Supp. 2d 103, 110 (D.D.C. 2008).

Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 555 (2007).  The facts alleged "must be enough to raise a right to relief above the speculative level," *id*. at 555, or must be sufficient to "state a claim for relief that is plausible on its face," *id*. at 570.  The plausibility standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 678 (2009).

On a motion to dismiss under Rule 12(b)(6), the Court may consider, in addition to the facts alleged in the complaint, documents either attached to, or incorporated into the complaint by reference, as well as matters of which it may take judicial notice.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *see also Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001) ("[T]he court may consider the defendants' supplementary material without converting the motion to dismiss into one for summary judgment. This Court has held that where a document is referred to in the complaint and is central to the plaintiff's claims, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.")

**ARGUMENT**

I.    **The Court Lacks Jurisdiction Over Counts I, III, IV, and VIII As Pled Against The**
      **Federal Defendants.**

    A.    **The Government Has Not Waived Its Sovereign Immunity For Any Claim**
      **Under Sections 1985 or 1986 Or That Otherwise Seeks Monetary Damages.**

"[T]he United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983); s*ee also Jean-Baptiste v. Dep't of Just.*, Civ. A. No. 23-0432 (RC), 2024 WL 1253858, at *4 (D.D.C. Mar. 25, 2024). The doctrine of sovereign immunity provides that the United States can be sued only insofar as it has agreed to be sued; absent a waiver, sovereign immunity shields the federal government and its agencies from suit.  *See Stoddard v. Wynn*, 68 F. Supp. 3d 104, 112 (D.D.C. 2014); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  The government's consent to be sued may not be implied; it must be "unequivocally expressed."  *United States v. Nordic Vill., Inc*., 503 U.S. 30, 33–34 (1992). A waiver of immunity is strictly construed in favor of the sovereign. *Orff v. United States*, 545 U.S. 596, 601–02 (2005).  Plaintiffs bear the burden of establishing that sovereign immunity has been abrogated and "must overcome the defense of sovereign immunity in order to establish the jurisdiction necessary to survive a Rule 12(b)(1) motion to dismiss." *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006) (citing *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003)).  "[T]he United States's sovereign immunity extends to federal "agencies … and to [federal] employees where such employees are sued in their official capacities." *Jean-Baptiste*, 2024 WL 1253858, at *4 (quoting *Harris v. Holder*, 885 F. Supp. 2d 390, 397 (D.D.C. 2012)).

"There is nothing in the text of Sections . . . 1985(3)[] or 1986 that suggests the United States has waived its immunity to suit under these statutes. *Id.*  On the contrary, "as many previous courts have explained, neither statute includes a waiver of the United States's sovereign

immunity." *Id.* (citing *Boling v. U.S. Parole Comm'n*, 290 F. Supp. 3d 37, 46 (D.D.C. 2017) ("'[Section] 1985 does not waive the federal government's sovereign immunity, so federal employees acting in their official capacities are immune from liability for alleged violations of § 1985,' and any other provision of the Civil Rights Act." (quoting *Roum v. Bush*, 461 F. Supp. 2d 40, 46 (D.D.C. 2006))); *In re Rodriguez*, No. 05-5130, 2005 WL 3843612, at *3 (D.C. Cir. Oct. 14, 2005) (per curiam) (Congress has not waived the United States's sovereign immunity for claims under 42 U.S.C. §§ 1985(3) and 1986)).

In Count III, Plaintiffs purport to assert a claim of conspiracy under 42 U.S.C. § 1985(3) against Chairwoman Rosenworcel and Ms. Saurer and the private party defendants, and in Count IV, Plaintiffs purport to assert a claim against those same parties under 42 U.S.C. § 1986.  Am. Compl. ¶¶ 351-63.  As relief for both counts, Plaintiffs appear to seek monetary damages.  *Id*.  This Court, however, lacks jurisdiction over Counts III and IV as it relates to the Federal Defendants because the United States has not waived its sovereign immunity for claims brought under sections 1985 and 1986. *See Boling,* 290 F. Supp. 3d at 46.

Moreover, the United States, has not waived sovereign immunity for a claim of monetary damages against a government agency based on an alleged constitutional violation. *Clark v. Library of Congress*, 750 F.2d 89, 103 (D.C. Cir. 1984); *Crockett v. Mayor of D.C.*, 561 F. App'x 3, 4 (D.C. Cir. 2014) ("Because sovereign immunity shields the Federal Government from suits for money damages based on alleged constitutional violations, those claims were properly dismissed."); *Carmichael v. Blinken*, Civ. A. No. 19-2316 (RC), 2022 U.S. Dist. LEXIS 54571, at *45 (D.D.C. Mar. 25, 2022) (dismissing plaintiff's damage claims under the Fifth Amendment because sovereign immunity was not waived for those claims).  The United States likewise has not waived its sovereign immunity for a claim of monetary damages based on alleged ultra vires action.

*Clark*, 750 F.2d at 104 ("Even if the Librarian's actions were both ultra vires and unconstitutional, sovereign immunity would still bar Clark's claims for monetary relief because these two exceptions are only applicable to suits for specific, non-monetary relief.")

Thus, to the extent Plaintiffs seek monetary damages in Count I for the alleged violation of the Fifth Amendment Equal Protection clause and Count VIII for the Media Bureau's alleged ultra vires action related to 47 U.S.C. § 310(d), this Court lacks jurisdiction as the United States has not waived its sovereign immunity for monetary damages for such claims. Similarly, although Plaintiffs do not cite to the Administrative Procedure Act ("APA") as a basis for their claims against the Federal Defendants,[2] they reference that statute as a basis for claiming a waiver of sovereign immunity.  Am. Compl. ¶ 45.  The APA's waiver of sovereign immunity, however, does not extend to monetary damages.  *Atchison v. U.S. Dist. Cts.*, 190 F. Supp. 3d 78, 89 n.12 (D.D.C. 2016).

**B.  Plaintiffs' Claims Against The Federal Defendants Should Be Dismissed For Lack Of Standing.**

This Court lacks jurisdiction over all of Plaintiffs' claims against the Federal Defendants based on a lack of standing.  Standing is a necessary predicate to any exercise of federal jurisdiction and, when it is lacking, the dispute fails to present a concrete case or controversy under Article III. *Ariz. Christian Sch. Tuition Org. v. Winn,* 563 U.S. 125, 133-34 (2011); *Dominguez v. UAL Corp.,* 666 F.3d 1359, 1361 (D.C. Cir. 2012).  To establish standing, Plaintiffs each must demonstrate that they individually suffered an injury-in-fact, specifically an injury that is "'concrete,

---

[2]     Not only have Plaintiffs failed to cite the APA, but they are not challenging a final agency decision in this lawsuit as would be required for APA review under 5 U.S.C. § 704, and their prior petition for mandamus to the D.C. Circuit challenging alleged agency inaction was resolved against them due to the absence of any mandatory duty.  That decision would be dispositive of any claim to compel agency action under section 706(1) had one been asserted.

particularized, and actual or imminent;'" that the injury is "'fairly traceable to the challenged action;'" and that it is "likely," not speculative, that the injury is "'redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l,* 568 U.S. 398, 409 (2013); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).  Plaintiffs bear the burden of establishing each element. *Lujan,* 504 U.S. at 561.

Standing is "'not dispensed in gross.'" *Davis v. FEC*, 554 U.S. 724, 734 (2008).  "Rather, 'a plaintiff must demonstrate standing for each claim he seeks to press and 'for each form of relief' that is sought." *Id.*  Plaintiffs lack standing to pursue their claims against the Federal Defendants because they cannot establish that their alleged statutory or constitutional injury is redressable. *See Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 109-110 (1998).

As relief for their constitutional claim, Count I, Plaintiffs seek: (1) "[a] declaration that the FCC, Chairwoman Rosenworcel, and Ms. Saurer violated the equal protection guarantee of the Fifth Amendment in their handling of Standard General's license-transfer applications" and (2) "[a] permanent injunction ordering the FCC, Chairwoman Rosenworcel, and Ms. Saurer to refrain from discriminating on the basis of race, from treating certain applicants less favorably than others because of race, and using race as a stereotype or negative consideration against any applicant."  Am. Compl. at 139.  Plaintiffs seek similar relief with respect to their statutory violation or ultra vires claim, Count VIII, namely, a declaration that the Federal Defendants "violated 47 U.S.C. §310(d) by considering alternative license transferees during the Standard General-TEGNA license-transfer proceedings" and a "permanent injunction" ordering the Federal Defendants "to refrain from considering alternative license transferees in any license-transfer proceedings involving Mr. Kim and his companies."  Am. Compl. at 140.  The remaining counts against the Federal Defendants are under sections 1985 and 1986 (Counts III to IV) and Plaintiffs

appear to seek only monetary damages for those claims.  It is unclear from the Amended Complaint whether Plaintiffs also seek monetary damages for the constitutional and statutory or ultra vires claims.  Am. Compl. at 139-40.

Whether Plaintiffs seek monetary or non-monetary relief, standing is lacking for these claims because Plaintiffs have failed to plausibly plead that their alleged past injuries are redressable or that they face imminent future harm that could confer standing for the requested prospective relief.  Standing also is lacking for the statutory violation or ultra vires claim (Count VIII) for the independent reason that Plaintiffs have not plausibly pled how their alleged injury—a failure to obtain Commission approval by May 2023 resulting in the termination of the merger—is fairly traceable to the Media Bureau's alleged violation of that statute.  To the contrary, Plaintiffs expressly attribute that alleged injury to the Media Bureau's Hearing Designation Order, which Plaintiffs characterize as a "pocket veto."  Am. Compl. ¶ 11.

> 1.     Plaintiffs Lack Standing With Respect To All Claims Asserted Against
>         The Federal Defendants

Plaintiffs have failed to establish that their alleged past injury (the termination of the merger deal) is redressable, or that they face imminent future harm to support standing for their requested prospective relief, for the following reasons.

*First,* Plaintiffs' allegations concern an alleged past injury, namely, the alleged unlawful February 2023 decision by the Media Bureau to refer the license-approval applications to a hearing before an administrative judge that Plaintiffs contend resulted in a delay that had the effect of "kill[ing] the deal."  Am. Compl. ¶ 11.  For that alleged past injury, Plaintiffs seek an award of monetary damages.  As discussed in Section I.A., Plaintiffs have not established a waiver of sovereign immunity as to monetary damages against the Federal Defendants, whether under

sections 1985 or 1986 or on their constitutional and statutory or ultra vires claims (to the extent monetary damages are even sought for those claims).

Accordingly, because the lack of a waiver of sovereign immunity is well-established, Plaintiffs' claimed injury cannot be redressed through monetary relief in connection with the claims they have asserted against the Federal Defendants. *See Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. U.S. Army,* 570 F.3d 327, 335 (D.C. Cir. 2009) (when a claim is "transparently 'frivolous'" a court "needn't assume its merit for purposes of evaluating standing"). Plaintiffs' claim for attorneys' fees (Am. Compl. at 140) also is insufficient. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292 (2021) ("A request for attorney's fees or costs cannot establish standing because those awards are merely a 'byproduct' of a suit that already succeeded, not a form of redressability.")

*Second*, under *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), a plaintiff has standing to seek prospective relief such as an injunction or declaratory judgment only if the plaintiff has sufficiently alleged that it is threatened with future illegality. *See id.* at 105, 109; *see also Comm. in Solidarity with People of El Salvador v. Sessions*, 929 F.2d 742, 744 (D.C. Cir. 1991) ("In injunction suits, plaintiffs usually must establish that the allegedly illegal actions of the past are causing or threatening to cause them present injuries."); *In re Off. of Pers. Mgmt. Data Sec. Breach Litig. ("OPM")*, 928 F.3d 42, 54 (D.C. Cir. 2019) ("'[a]n allegation of future injury'" to support the injury-in-fact element of standing "passes Article III muster only if it 'is 'certainly impending,' or there is a 'substantial risk' that the harm will occur'"); *Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021) ("Because Kareem's complaint 'seeks prospective declaratory and injunctive relief, he must establish an ongoing or future injury that is 'certainly impending'; he may not rest

- 16 -

on past injury.'")   In addition to being "'certainly impending,'" *Kareem*, 986 F.3d at 865, allegations of future injury, moreover, must be "particular and concrete." *Steel,* 523 U.S. at 109.

But no "certainly impending" future injury has been alleged here.   At best, Plaintiffs have alleged the potential for future injury but only in the most vague and conclusory manner, which is insufficient.   *See Air Excursions v. Yellen*, 66 F. 4th 272, 277 (D.C. Cir. 2023) (conclusory statements are insufficient to establish standing).   In assessing whether a Complaint has adequately pled standing, the Court must set "'mere conclusory statements' aside" and determine whether the Complaint contains "'sufficient factual matter, accepted as true,' to support an inference of standing" that is "'plausible on its face.'" *Id.*   This "requires 'more than a sheer possibility' that the plaintiff has standing to sue."   *Id*. at 278.

Plaintiffs have not asserted any specific facts from which a plausible inference of imminent future harm can arise.   They assert that "Standard General (or its affiliates) and Mr. Kim will appear before the FCC again soon" but do not identify when those appearances are expected to occur, the reason for them, or whether they will involve applications for approval of a license transfer. Am.  Compl. ¶ 334.  To the contrary, Plaintiffs allege only that they "are actively seeking to acquire new broadcast television stations," not that they have reached an agreement to acquire such stations under terms in which an application for a license transfer would be necessary.  *Id.* Plaintiffs' allegation that "Mr. Kim was able to structure a much smaller acquisition to avoid FCC pre-approval," *id*., negates rather than supports a plausible inference of imminent harm.  Although Plaintiffs allege that Mr. Kim "cannot avoid the FCC for larger deals that he would be pursuing but for the FCC's unprecedented killing of the TEGNA deal" they have not identified those "larger deals" nor have they plausibly alleged whether their consummation would have been likely had Mr. Kim pursued them.  *Id.*

Plaintiffs also allege that "renewal of the licenses they hold" may come before the FCC in the future, but they do not allege that any such renewals are imminent.  *Id.*  Plaintiffs' licenses (and those of others that operate television broadcast stations) in fact are not "scheduled to expire [until] between 2028 and 2031."  License Renewal Applications for Television Broadcast Stations, https://www.fcc.gov/media/television/broadcast-television-license-renewal (last visited Aug. 29, 2024).  Notably, Chairwoman Rosenworcel's five-year term expires June 30, 2025, several years before the earliest license renewal date.  See https://www.congress.gov/nomination/117th-congress/1322?q=%7B%22search%22%3A%22Rosenworcel%22%7D (last visited Aug. 29, 2024).  Accordingly, to the extent Plaintiffs seek an injunction directed towards the Chairwoman, her current term will have expired long before those renewal applications are filed.

Plaintiffs' allegations thus amount to speculation about the potential for alleged discriminatory or ultra vires treatment at some unspecified point in the future regarding unspecified transactions and at a time when the FCC could be under new leadership.  Such allegations are insufficient.  *Lyons*, 461 U.S. at 105-06; *Chaplaincy of Full Gospel Churches v. Navy*, 697 F.3d 1171, 1176 (D.C. Cir. 2012) ("vague predictions of future discriminatory conduct are insufficient to demonstrate the imminent threat of future injury necessary to support standing to seek injunctive relief"); *Worth v. Jackson,* 451 F.3d 854, 860 (D.C. Cir. 2006) (plaintiff failed to demonstrate likely future injury where he "challenge[d] no statute, regulation, or written policy committing HUD to favoring minorities or women, resting his claim instead on speculation, untethered to any written directive, about how HUD is likely to make future employment decisions"); *Aeronautical Radio, Inc. v. FCC*, 983 F.2d 275, 281 (D.C. Cir. 1993) ("potential applicant" for license had no standing where its original application had been dismissed and it had not submitted another application); *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Homeland Sec.*, 527 F.

Supp. 2d 101, 106 (D.D.C. 2007) ("Most notably, [the requester] does not allege anywhere in its complaint or opposition brief that it has a FOIA request pending with the [agency] or that it intends to file a specific FOIA request with the [agency] for [the] records in the near future. . . . That [the requester] may one day file another FOIA request with the [agency] does not represent a cognizable, palpable injury which presents a case or controversy for the Court to consider.").

Ultimately, Plaintiffs' conclusory allegations of imminent harm rest on their "generalized interest in deterrence, which is insufficient for purposes of Article III." *Steel,* 523 U.S. at 108-109.  Because Plaintiffs are not entitled to any monetary relief to remedy their alleged past injury, whether framed as a constitutional, statutory, or ultra vires claim, and have failed to demonstrate likely future injury that could support prospective relief,[3] they lack standing to maintain any of the asserted claims against the Federal Defendants.

  2. Plaintiffs Lack Standing As To Count VIII Because They Have Failed To Plausibly Connect The Alleged Statutory Violation To Their Asserted Injury

Plaintiffs also lack standing with respect to Count VIII for the additional reason that they have failed to plausibly allege that their injury was "fairly traceable" to the alleged violation of 47 U.S.C. § 310(d).  Plaintiffs contend that they were harmed when the Media Bureau issued the Hearing Designation Order in February 2023, which they characterize as a "pocket veto" because

---

[3] Although *Lyons* addressed only standing to seek injunctive relief, the D.C. Circuit Court has held that the "same rationale . . . would also have kept [plaintiff in *Lyons*] from bringing a suit for declaratory relief." *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1273 (D.C. Cir. 1994).  The D.C. Circuit later suggested that an injury could be redressable by "a declaration that the agency's failure to protect plaintiffs' personal information is unconstitutional," *OPM*, 928 F.3d at 61, but the Supreme Court subsequently has held that the possibility of declaratory relief "cannot alone supply jurisdiction otherwise absent." *California v. Texas*, 593 U.S. 659, 673 (2021).

it had the effect of delaying the approval process beyond the May 2023 deadline.  Am. Compl.

¶11.  The issues identified for hearing in that order were as follows:

> (a) "Whether in light of the record presented retransmission consent fees will rise as a result of the Transactions, and if so, whether such an increase is the result of a properly functioning competitive marketplace . . . and further, whether [any non-market-driven increase] would be mitigated by the commitments offered by the Applicants;" and

> (b) "Whether, and to what extent, in light of the record presented, local content and programming in the affected communities would be adversely affected" by the transactions "and the potential effectiveness of the commitments offered by the Applicants."

*See* Hearing Designation Order ¶ 51.

Plaintiffs contend that "[t]he consideration of Mr. Allen as an alternative licensee, including the demand for information about his failed bid, was patently unlawful, gave Mr. Goodfriend and objectors highly confidential information, and prolonged the license-transfer review until Standard General's merger agreement expired."  Am. Compl. ¶ 397.  But Plaintiffs have not alleged any harm to them based on the objectors' access to "highly confidential information"—and certainly not harm for which they seek redress in the Amended Complaint[4]— and the assertion that the "consideration of Mr. Allen as an alternative licensee, including the demand for information" about his bid "prolonged the license-transfer review until Standard General's merger agreement expired" is a conclusory allegation that the Court need not consider in assessing standing at the pleading stage.  *Air Excursions*, 66 F.4th at 277.

Instead, the Court must "set[] 'mere conclusory statements' aside" and assess whether the Complaint "contain[s] 'sufficient factual matter, accepted as true,' to support an inference of

---

[4]    The Commission had issued a Protective Order that restricted the use and disclosure of information designated as Confidential or Highly Confidential by the submitting party.  *See* Protective Order, available at https://docs.fcc.gov/public/attachments/DA-22-604A1.pdf (last visited Aug. 30, 2024)

standing 'that is plausible on its face.'"  *Id.*  Setting Plaintiffs' conclusory allegations aside, Plaintiffs have failed to plausibly plead how the request for information about alternative bidders in September 2022, and alleged consideration of alternative bidders, "prolonged the license-transfer review until Standard General's merger agreement expired."  According to their own pleading, what "prolonged" the review was not an information request made in September 2022 (among numerous other requests made at that time) but the Hearing Designation Order.  Am. Compl. ¶ 11.  That order, moreover, makes no reference to the consideration of any alternative bidder.

Thus, even if the Court accepts Plaintiffs' conclusory allegation that the Media Bureau used the requested information to consider alternate transactions in violation of section 310(d), Plaintiffs have failed to plausibly plead facts that could connect that alleged statutory violation to the Media Bureau's decision in February 2023 to refer the license-transfer application to a hearing, which Plaintiffs identify as the cause of the merger's failure. "Article III standing requires a concrete injury even in the context of a statutory violation," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016), and Plaintiffs have failed to identify a concrete injury to them caused by the alleged violation of section 310(d) for which they seek redress in this case.  Accordingly, Count VIII should be dismissed under Rule 12(b)(1) for lack of standing for this additional reason.

C.     **Plaintiffs Have Failed To Exhaust Administrative Remedies And, In Any Event, The Claims Are Subject To The Exclusive Jurisdiction Of The D.C. Circuit.**

Plaintiffs' claims against the Federal Defendants, which are predicated on the allegation that the Hearing Designation Order was discriminatory, should be dismissed for the additional reasons that Plaintiffs have failed to exhaust administrative remedies, and in any event, the claims are subject to the exclusive jurisdiction of the D.C. Circuit.

The Commission has delegated authority to rule on license transfer applications in the first instance to its Media Bureau, 47 C.F.R. § 0.61(a), and the Hearing Designation Order was issued by the Media Bureau pursuant to that delegated authority.  If a party objects to action taken on delegated authority, it must file an application for review by the full Commission as "a condition precedent to judicial review." 47 U.S.C. § 155(c)(7).  Although SGCI Holdings asserted in the administrative process that the Hearing Designation Order was unlawful, Plaintiffs have not alleged that they filed an application for review by the full Commission, nor does the public record reflect any such application.

The Commission's regulations provide that an application for Commission review of an order designating a matter for a hearing "shall be deferred until [after the hearing], unless the presiding officer certifies such an application for review to the Commission." 47 C.F.R. § 1.115(e)(1).  In March 2023, SGCI Holdings requested that the administrative judge presiding over the hearing certify the Hearing Designation Order for immediate Commission review but the administrative judge refused that request. Am. Compl. ¶ 241.  An administrative judge's "refus[al] to certify a matter to the Commission" is "not appealable." 47 C.F.R. § 1.115(e)(1).

Thereafter, in June 2023, the administrative judge issued an order terminating the hearing proceeding as moot. Am. Compl. ¶ 267; *see also* https://docs.fcc.gov/public/attachments/FCC-23M-10A1.pdf (last visited July 24, 2024). That decision was issued over SGCI Holdings' objection; it had maintained in its submission to the administrative judge that "the applications were unlawfully designated for a hearing" and it "remain[ed] prepared to vindicate its rights as necessary, including through participation in the hearing and attendant discovery process." Status Report, https://www.fcc.gov/ecfs/document/10524565816599/1 (last visited Aug. 29, 2024)

SGCI Holdings' recourse at that time was not to file a lawsuit setting forth its basis for claiming that "the applications were unlawfully designated for a hearing" but to seek review by the full Commission of the administrative judge's order terminating the hearing proceeding, as well as the Hearing Designation Order that led to the hearing in the first instance and which SGCI Holdings claims to have been unlawful.  47 U.S.C. § 155(c)(7); 47 C.F.R. § 1.115(k).  That includes any claim that the information requests that preceded the issuance of that order exceeded the Media Bureau's authority under 47 U.S.C. § 310(d), or that the Media Bureau conducted a separate public interest analysis regarding alternative bids in violation of that section.  Because review by the full Commission is a "condition precedent to judicial review," *id.*, and no such review by the Commission occurred, Plaintiffs have failed to exhaust administrative remedies for their claims against the Federal Defendants, all of which are based on the Hearing Designation Order or, in the case of Count VIII, information gathering that preceded that order that Plaintiffs contend (albeit implausibly) contributed to the issuance of that order.  *See Coal. for Pres. of Hisp. Broad. v. FCC*, 931 F.2d 73, 76-77 (D.C. Cir. 1991) ("In general, failure to exhaust administrative remedies bars judicial review of FCC orders."); *Mobilfone Serv. v. FCC*, No. 02-1197, 2003 U.S. App. LEXIS 27280, at *2-3 (D.C. Cir. Oct. 24, 2003) ("Mobilfone seeks review not of a Commission order but instead of the WTB's decision. Moreover, as Mobilfone has not sought Commission review of the WTB's decision, section 155(c)(7) of the Communications Act precludes us from exercising jurisdiction because that provision makes the filing of an application for review by the Commission 'a condition precedent to judicial review' of an action taken pursuant to delegated authority."); *Johnson v. FCC*, No. 21-2050 (CKK), 2022 WL 17262173, at *4 (D.D.C. Nov. 29, 2022).

Moreover, had Plaintiffs exhausted their administrative remedies (which they did not), judicial review would have to have occurred in the D.C. Circuit, which has exclusive jurisdiction for challenges to Commission orders related to licensing matters. *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984) ("Exclusive jurisdiction for review of final FCC orders . . . lies in the Court of Appeals."); *see also* 47 U.S.C. § 402(b)(1), (3) (vesting exclusive jurisdiction in cases "[b]y any party to an application for authority to transfer, assign, or dispose of any" "station license" in the D.C. Circuit).

Although district courts retain residual jurisdiction to review agency action under 28 U.S.C. § 1331 and the APA, they may exercise such jurisdiction only "in the absence or inadequacy" of a special statutory review proceeding.  5 U.S.C. § 703; *see id.* § 704 (permitting district court review of agency action only where "there is no other adequate remedy in a court").  Here, Congress has provided "special and adequate review procedures" in the Hobbs Act.  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988).[5]  Moreover, because Plaintiffs never sought review by the Commission, they are not challenging a final agency decision in this lawsuit as would be required for APA review under 5 U.S.C. § 704, and their prior petition for mandamus to the D.C. Circuit challenging alleged agency inaction also already has been resolved against them in a

---

[5]     The Hobbs Act provides that courts of appeals shall have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of [] all final orders of the [FCC] made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1).  Section 402(a) of the Communications Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28." 47 U.S.C. § 402(a). Section 402(b), in turn, vests exclusive jurisdiction in cases, *inter alia*, "[b]y any party to an application for authority to transfer, assign, or dispose of any" "station license" in the United States Court of Appeals for the District of Columbia Circuit. *Id.* § 402(b)(1), (3).  That Plaintiffs' claims do not involve a "final" FCC order, 28 U.S.C. § 2342(1), does not defeat exclusive jurisdiction. *Telecomms. Resch. & Action Ctr. ("TRAC") v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) (the D.C. Circuit had exclusive jurisdiction over a claim of unreasonable delay by the FCC even though the claim did not involve a "final" action).

manner that would preclude a claim under section 706(1). *See SGCI Holding III LLC v. FCC*, No. 23-1083 (D.C. Cir.) [Doc. #1993081], Order; *In re: SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir.) [Doc. #1995758], Order.

Plaintiffs cannot "evade these provisions" setting forth an exclusive avenue for judicial review through artful pleading. *ITT World*, 466 U.S. at 468. For instance, in *American Bird Conservancy v. FCC*, 545 F.3d 1190 (9th Cir. 2008), the Ninth Circuit rejected the plaintiff's characterization of its suit as a challenge to the agency's compliance with federal environmental laws, reasoning that such compliance was "inextricably intertwined with" tower registrations granted by the Commission. *Id.* at 1193; *see also United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000) (that plaintiff's district court claims were based in part on constitutional grounds did not permit plaintiff to "attempt[] an end run blocked by the statutory channels"); *Sandwich Isles Commc'ncs, Inc. v. Nat'l Exch. Carrier Ass'n,* 799 F. Supp. 2d 44, 49 (D.D.C. 2011) ("Plaintiffs cannot bypass the jurisdictional statute by asserting that their complaint seeks a form of relief not available in the FCC proceeding.")

Here, Plaintiffs' claims against the Federal Defendants are "inextricably intertwined" with the Hearing Designation Order, which Plaintiffs refer to as a "pocket veto" that was intended to "kill[] the deal." Am. Compl. ¶¶ 11-12. Plaintiffs' Equal Protection claim is premised on the allegation that the hearing referral was racially motivated and that its issuance denied Plaintiffs "equal treatment" to have the "license-transfer applications processed . . . in a reasonable time," and their section 1985 and 1986 claims assert the hearing referral was part of a "racially motivated conspiracy" that "aimed to deprive Standard General and Mr. Kim . . . of equal protection of laws" by "delaying review of the license-transfer applications to kill" the deal. *Id.* ¶¶ 302, 324, 330-31. Similarly, Plaintiffs claim in Count VIII asserts that certain information requests, and the alleged

consideration of alternative bids, "prolonged the license-transfer review until Standard General's merger agreement expired" (*id.* ¶ 397), thereby implying that these alleged violations of 47 U.S.C. § 310(d) contributed to the Hearing Designation Order.  All claims against the Federal Defendants, therefore, necessarily implicate the validity of the Hearing Designation Order under the FCC's standards for processing and evaluating broadcast license applications.

Plaintiffs likewise argued to the administrative judge that the Hearing Designation Order was "unlawful[]" and that the lawfulness of the order should be litigated even though the merger had been terminated.  *See* SGCI Status Report, https://www.fcc.gov/ecfs/document/ 10524565816599/1.  To the extent Plaintiffs sought to "vindicate [their] rights" regarding the Hearing Designation Order, *id.*, as they purport to do in this litigation by asserting constitutional and statutory ultra vires claims against the Federal Defendants, they cannot do so without first exhausting their administrative remedies.  Because they failed to do so, and in any event would need to seek judicial review in the D.C. Circuit and not this Court, their claims against the Federal Defendants should be dismissed.

### D.    The *Leedom* Exception Does Not Confer Jurisdiction Over Count VIII.

In Count VIII, Plaintiffs contend that the Media Bureau exceeded its authority under 47 U.S.C. § 310(d) by allegedly failing to limit their "review of Standard General's license-transfer application to Standard General, not other possible buyers," which Plaintiffs allege amounts to ultra vires agency action.  Am. Compl. ¶¶ 389, 394.  By making a purported ultra vires claim, Plaintiffs appear to be attempting to fall within the so-called *Leedom* exception.  *See id.* ¶ 389.   In *Leedom v. Kyne*, 358 U.S. 184 (1958), the Court held that district courts may exercise non-statutory jurisdiction to hear certain claims that an agency acted ultra vires.  To state a cognizable ultra vires claim, "essentially a Hail Mary pass," a plaintiff must establish that "(i) the statutory preclusion of

review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Changji Esquel Textile Co. v. Raimondo*, 40 F. 4th 716, 722 (D.C. Cir. 2022). The Amended Complaint does not meet any of these requirements.

*First, Leedom* is inapplicable because the statutory preclusion of review in district court is express, not implied. The Hobbs Act provides that courts of appeals shall have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of [] all final orders of the [FCC] made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342(1); *see also supra* n. 5. Moreover, 47 U.S.C. § 155(d)(7) states that "[t]he filing of an application for review [by the full Commission] under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection." These provisions establish an express statutory bar to a District Court exercising jurisdiction over any claim, as here, that is related to the validity of an order of the Media Bureau such as the Hearing Designation Order at issue here. The *Leedom* exception is therefore unavailable for this reason alone. *Changji*, 40 F. 4th at 722.

*Second*, Plaintiffs had an alternative available procedure for review of any claim that the Media Bureau violated section 310(d) in connection with its review of their license-transfer application. Specifically, they had the opportunity to raise the issue with the administrative judge assigned to the matter and, when the administrative judge dismissed the hearing proceeding as moot, Am. Compl. ¶ 267, they could have filed an application for review by the Commission. Their failure to do so does not mean that an alternative review procedure was unavailable. *See*

*Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel,* 437 F.3d 1256, 1265 (D.C. Cir. 2006).

*Finally*, as already established, Plaintiffs have failed to plausibly plead that the Media Bureau acted contrary to a "specific prohibition" in section 310(d) that was "clear and mandatory." As the Amended Complaint reflects, Plaintiffs have specifically pled only that the Media Bureau submitted an information request in September 2022 for information about alternative transactions. Am. Compl. ¶¶ 168, 395.  Because section 310(d) does not prohibit such an information request, that allegation is "consistent with" lawful conduct and thus "'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678.

Plaintiffs' other allegations regarding section 310(d) are entirely conclusory.  They speculate that the Media Bureau also used that information request to conduct a public interest assessment regarding an alternative transaction, namely "[t]he consideration of Mr. Allen as an alternative licensee," rather than for the Standard General license-transfer applications before it, and on that conclusory basis also allege a violation section 310(d). Am. Compl. ¶ 397.  But such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Accordingly, Plaintiffs have failed to plausibly plead the third element necessary to assert an ultra vires claim and avail themselves of the *Leemon* exception.[6]

## II.    Plaintiffs Have Failed To Plausibly Plead That The Federal Defendants Acted With Discriminatory Animus Or Conspired Against Plaintiffs.

Plaintiffs allege that the Federal Defendants intentionally discriminated against them by issuing the Hearing Designation Order and did so in conspiracy with private entities that submitted

---

[6]    For the same reason, Count VIII should be dismissed in the alternative under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

objections to the deal as part of the license transfer approval process.  Because Plaintiffs' claims of discrimination against the Federal Defendants are not supported by well-pleaded facts but instead rest on speculation and implausible inferences, those claims also should be dismissed under Rule 12(b)(6).

In considering whether Plaintiffs have pled a plausible claim for relief against the Federal Defendants—that is, factual content that is "more than merely consistent" with liability but that actually crosses the line from possible to plausible, *Frederick Douglass Found. v. District of Columbia*, 82 F.4th 1122, 1147 (D.C. Cir. 2023)—the Court must assess whether the Amended Complaint has pled facts that "permit the court to infer more than the mere possibility of misconduct."  *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (affirming dismissal of equal protection claims where plaintiff's "spare facts and allegations" did "'not permit the court to infer more than the mere possibility of misconduct.'")

In a discrimination case, while a plaintiff is not required to plead every fact necessary to establish a *prima facie* case in order to survive a motion to dismiss, "at the motion-to-dismiss stage, the guiding lodestar is, [] assuming the truth of the factual allegations, taken collectively, whether the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported." *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.C. Cir. 2017) (citing *Nurriddin v. Bolden*, 818 F. 3d 751, 756 (D.C. Cir. 2016) (noting that the court "need not, however accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint.") (internal quotations omitted)).

Although the threshold for pleading facts in support of an inference of discriminatory intent may not be high, Plaintiffs still must plead facts that make such an inference plausible. *Kabakova v. Off. of the Architect of the Capitol*, Civ. A. No. 19-1276 (BAH), 2020 U.S. Dist. LEXIS 65101,

at *43 (D.D.C. Apr. 14, 2020).  In *Kabakova*, for instance, the Court dismissed a claim for an allegedly discriminatory termination because the plaintiff acknowledged in her complaint that she had been absent from work for one year and alleged that the stated reason for her termination was her absence from work.  *Id.*  Because the complaint failed to plead any facts that could support an inference that her absence from work was not the real reason for her termination, the Court held that the plaintiff there had failed to plausibly plead a discrimination claim.  *Id*. at *45.  Similarly, the Amended Complaint here has failed to plead facts sufficient to raise a plausible inference that the referral of the applications to a hearing before an administrative judge was due to race discrimination rather than the legitimate reasons stated in the Hearing Designation Order.

A. **The Amended Complaint And Hearing Designation Order Incorporated Therein by Reference Establish The Legitimate Reasons For The Referral.**

As an initial matter, "a presumption of regularity attaches to agency actions, and courts must presume that public officers have properly discharged their official duties absent clear evidence to the contrary."  *Perry v. Clinton*, 831 F. Supp. 2d 1, 19 (D.D.C. 2011).  Here, the FCC's Media Bureau reviewed the complex transaction presented by the license transfer applications, the information provided by the applicants in response to information requests, and objections and comments received from the public and interested parties, and, following that review, identified two substantial and material questions of fact that required further inquiry for it to assess whether the transaction was in the public interest.  *See* Hearing Designation Order ¶¶ 4-10, 11-12, 19-50.

The FCC's Media Bureau explained in detail the basis for the concerns that it designated for hearing regarding potential harm to consumer welfare from artificial increases in retransmission consent fees, and to broadcast localism through cuts to local journalism and newsroom staffing, examining the record adduced so far and the competing narratives set forth in the numerous submissions received from interested parties.  *See id*. ¶¶ 19–50.  Those concerns fell

comfortably within the FCC's established "public interest goals" of "competition, localism, and viewpoint diversity" for assessing broadcast license applications. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 418 (2021). Although the Amended Complaint asserts the opinion that Plaintiffs' commitment letters resolved any possible concerns, Am. Compl. ¶¶ 195-97, the Hearing Designation Order explained that significant concerns remained. *See* Hearing Designation Order ¶¶ 28-32.

After making that determination, the Media Bureau was required by statute to refer the matter to a hearing. *See* 47 U.S.C. §§ 309(d)(2), (e), 310(d). Accordingly, given the presumption of regularity afforded to such decisions and this statutory requirement, Plaintiffs must do far more than make conclusory allegations to raise a plausible inference that the Media Bureau acted other than through a proper discharge of its duties in referring the applications to a hearing before an administrative judge.

The FCC's Media Bureau also was not alone in questioning whether the transactions were in the public interest based on the information that had been gathered during the approval process. In January 2023, prior to the Hearing Designation Order, "Senator Elizabeth Warren filed a letter with the FCC expressing 'serious concerns' about the deal and urging Chairwoman Rosenworcel to use the FCC's 'full statutory authority to block this acquisition.'" Am. Compl. ¶ 205. According to the Amended Complaint, the Senator's letter "tracked the straw objectors' arguments—price increases, jobs, and collusion—and dismissed Standard General's commitments as 'historically ineffective' and 'inherently flawed.'" *Id.* But that Senator Warren also had concerns about the transaction based on objections made by the public undercuts Plaintiffs' allegation that the Hearing Designation Order was a pretext for discrimination.

Apparently recognizing this, Plaintiffs extend their theory of a wide-ranging conspiracy to encompass members of Congress, alleging that Chairwoman Rosenworcel, "under the thumb of high-ranking Democrats . . . went along with" objections that members of the public made to the transaction and "had her staffer kill the deal with a pocket veto," the term that Plaintiffs use to refer to the Hearing Designation Order. Am. Compl. ¶¶ 4, 11.  Rather than salvage their claim, that "fanciful" assertion renders their theory of discrimination so "patently insubstantial" as to "present[] no federal question suitable for decision." *Best v. Kelly*, 39 F.3d 328, 330–31 (D.C. Cir. 1994).

A plausible inference from these allegations might be that the FCC's Media Bureau was responsive to concerns about the deal raised by members of the public and Congress.  And "there is nothing unusual or untoward" about a government official being responsive to public comments in such an approval process.  S*ee 3883 Conn. LLC v. District of Columbia,* 336 F.3d 1068, 1075 (D.C. Cir. 2003); *see also Bryan v. City of Madison,* 213 F.3d 267, 276 (5th Cir. 2000) ("In a democratic republic, responding to the voice of the public is expected and is not, standing alone, a malevolent motive for selective enforcement purposes.").  In contrast, the inference of a wide-ranging "racially motivated conspiracy" is wholly implausible.

Plaintiffs' central allegation is that the FCC "Media Bureau's reasoning in the [Hearing Order] was entirely pretextual and a sham to cover the racial discrimination against Mr. Kim." Am. Compl. ¶ 317. That conclusory allegation ignores much of the relevant evidence outlined in the Hearing Designation Order, which is incorporated by reference into the Amended Complaint. Am. Compl. ¶ 222.  The Hearing Designation Order revealed "a good deal of smoke" supporting the Media Bureau's decision to require a full hearing to "look into the possible existence of a fire." *Citizens for Jazz on WRVR, Inc. v. FCC*, 775 F.2d 392, 397 (D.C. Cir. 1985).

**B.      The Allegations In The Complaint Fail To Raise Any Inference That The Reasons Stated In The Hearing Designation Order Were Pretextual**

Given the amount of "smoke" raised by the complex transactions proposed in the applications, Plaintiffs must do more than plead facts "merely consistent" with liability but instead must plead facts that cross the "line between possibility and plausibility." *Atherton*, 567 F.3d at 688.  Their attempt to do so in the Amended Complaint fails.

One method by which a plaintiff may attempt to raise a plausible inference that the stated basis for a challenged decision was pretextual and instead motivated by discrimination is to point to alleged comparator evidence.  But for comparator evidence to be relevant, the circumstances between the alleged comparator and plaintiff must be similar.  "[T]he [d]issimilar treatment of dissimilarly situated persons does not violate equal protection. The threshold inquiry in evaluating an equal protection claim is, therefore, to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996); *see also Ekwem v. Fenty*, 666 F. Supp. 2d 71, 78-79 (D.D.C. 2009) (holding that the court could not reasonably infer that defendants were "motivated by discriminatory intent or purpose" where plaintiff's only factual support was the conclusory allegation that "[o]lder supervisors and caseworkers, particularly those of a different national origin," were "general[ly]" assigned "inordinate" numbers of cases and threatened with disciplinary action" but presented no evidence of the caseloads, national origins, or ages of other supervisors or caseworkers to support his claim); *cf. Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (for comparator evidence to raise an inference of discrimination, all relevant aspects of the employment situation between the plaintiff and the individual outside her protected group allegedly treated more favorably must be "nearly identical").

The Amended Complaint generally alleges that the agency departed from normal practice by referring the applications to a hearing.  *E.g.,* Am. Compl. ¶ 11, 101-103.  However, the Amended Complaint fails to identify other transactions involving applicants of a different race than Mr. Kim, and involving the same level of scope and complexity, the same market conditions, the same issues identified through the public objection and comment process, and the same level of Congressional concern, that were not referred to a hearing that would allow a reasonable inference of selective treatment to be drawn from those conclusory allegations. *Boyd v. Browner*, 897 F. Supp. 590, 594 (D.D.C. 1995) ("The naked assertion that Carver Terrace is an African-American community and that residents of Times Beach, Missouri, and Forest Glen, New York, were 'almost entirely white,' . . . does not begin to establish the requirement of 'similar circumstances,' to establish an Equal Protection violation.).

To the extent the Amended Complaint refers to specific transactions to raise an inference that Mr. Kim and his company were treated differently based on racial animus, that effort likewise fails. The Amended Complaint cites "four recent major transactions." Am. Compl. ¶ 108. The "four recent major transactions" are: (1) a 2019 license transfer approval by the Media Bureau for a $3.1 billion acquisition of Cox Media Group's television station; (2) a 2020 Media Bureau grant of license transfer applications for a $2.65 billion acquisition of ION Media Network; (3) a 2021 Media Bureau license transfer approval of a $925 million acquisition of Quincy Media; and (4) a 2021 Media Bureau grant of license transfer application for a $2.8 billion acquisition of Meredith Corp.'s local media group of 17 television stations. *Id*. ¶¶ 109-115.  The first two, in 2019 and 2020, are not similarly situated because FCC leadership was different—Commissioner Rosenworcel did not become Acting Chairwoman until January 2021 and Ms. Sauer was not the Chief of the Media Bureau until January 2022. *Id*. ¶¶ 109-112; *see also* Ex. A hereto (Jan. 31, 2022

FCC      Press      Release);      https://www.fcc.gov/document/acting-chairwoman-rosenworcel-designation-lead-fcc (last visited Aug. 30, 2024).   Additionally, the third and fourth alleged comparator transactions are not similarly situated as Ms. Saurer was not the Chief of Media when the transactions were approved.  Am. Compl. ¶¶ 113-14.  Consequently, Plaintiffs fail to raise an inference of discrimination because the cited transactions do not demonstrate that Chairwoman Rosenworcel and Ms. Saurer treated similarly situated transactions more favorably than they treated Plaintiffs' transaction.

Further, the third and fourth alleged comparator transactions (Am. Compl. ¶¶ 113-14) are not similarly situated because, as the Amended Complaint alleges, the transactions did not involve similar public opposition to the transfers.  Although the Amended Complaint alleges that there were two informal objections to the fourth comparator's application, *id*. ¶ 114, Plaintiffs do not allege that the applications involved similarly structured transactions. *See* Hearing Designation Order ¶ 32 (citing "the unique structure of the Transactions in which the various assignments and/or transfers of control are closed sequentially in order to take advantage of after-acquired station clauses and maximize retransmission revenue").

The Amended Complaint further alleges that the FCC "has granted [Defendant] Allen's own applications surprisingly quickly, even when they involve a significant number of stations." Am. Compl. ¶ 115. But three of the four applications the Amended Complaint identifies were approved before the Chairwoman took office in 2021, and before Ms. Saurer became Media Bureau chief.  *See id*. The fourth (also before Ms. Saurer became Media Bureau chief) involved the acquisition of three stations for a total of $28.5 million, a far cry from the $8.6 billion dollar acquisition of over 60 stations involved in this case.  *Id*. ¶¶ 1, 109-115.

The Amended Complaint emphasizes that Plaintiffs' financing commitments were scheduled to expire on May 22, 2023.  Am. Compl. ¶ 63.  But that was a deadline of their own making, which did not render unreasonable the time the agency found necessary to complete the required statutory public interest inquiry.  Plaintiffs sought approval of a complex set of four interrelated transactions, Hearing Order ¶¶ 5-10, which by virtue of their complexity could reasonably be expected to require longer to review than the mine-run applications.  *See Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987) (for matters presenting "complex . . . policy questions" an agency "must be afforded the amount of time necessary to analyze such questions.").  The Amended Complaint (e.g., ¶ 63) emphasizes the FCC's "informal" "goal" of deciding transfer applications within six months, but the FCC's "statutory obligation to determine that an assignment or transfer serves the public interest takes precedence over the informal timeline."  FCC, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses*, https://tinyurl.com/3785adh8; *see also* 47 U.S.C. §§ 309(d)(2), (e), 310(d) (if the FCC is unable to find that a transfer of a broadcast license would serve the public interest, or if it finds that substantial and material questions of fact are presented, it is required to refer the matter to a hearing).  Parties who fail to allow sufficient time to accommodate a longer process thus do so at their own risk.

In addition to alleging that the Hearing Designation Order was a pretext for discrimination, the Amended Complaint cites statements related to Mr. Kim by private individuals and entities and members of Congress that Plaintiffs suggest relate to his race but either do not do so or are at most ambiguous in that regard.  Am. Compl. ¶¶ 124, 147-51, 174, 182.  But, regardless, the Amended Complaint does not allege race-related comments by the Federal Defendants.  The closest it comes is the Chairwoman's alleged statement, in response to Mr. Kim's request to strike

race-related objections from the record, that "he should hear what was said about him behind closed doors." *Id.* ¶ 184.  The Federal Defendants dispute that such a statement was made but, even if that allegation is accepted as true for purposes of this motion, nothing in that alleged statement suggests a racial aspect to any closed door conversations, or provides any basis beyond sheer speculation for inferring that the Chairwoman was motivated by discriminatory animus rather than the concerns regarding the applications identified in the Hearing Designation Order. *See Iqbal*, 556 U.S. at 682 (a plaintiff alleging discriminatory animus must plead facts that would plausibly exclude an "obvious alternative explanation" for adverse action).

The Amended Complaint also alleges generally that "[r]ace is a factor in deciding whether to approve broadcast license transfers." Am. Compl. ¶ 104.  That is not so.  The FCC considers *overall* minority ownership levels in connection with its rules limiting the number of stations an entity may own in a given market, *see Prometheus Radio Project*, 592 U.S. at 417, but it does not identify race as part of its "public interest" analysis of individual applications, as demonstrated by the fact that the FCC's forms do not request information about race.  *See* FCC Form 314 (Application for Consent to Assignment of Broadcast Station License), https://transition.fcc.gov/Forms/Form314/314.pdf; FCC Form 315 (Application for Consent to Transfer Control of Entity Holding Broadcast Station License), https://transition.fcc.gov/Forms/Form315/315.pdf; *See also In the Matter of Ann. Assessment of the Status of Competition in the Mkt. for the Delivery of Video Programming*, 32 FCC Rcd 568 (2017) (explaining that the FCC has rejected regulations "that would expressly recognize the race and ethnicity of applicants").

Ultimately, to plausibly plead a claim of discrimination under the Equal Protection clause, Plaintiffs must plausibly plead that the Federal Defendants' alleged "unequal treatment" of their application was because of their race, not merely that it had an adverse impact on them.  *Frederick*

*Douglass Found.*, 82 F.4th at 1147.  "Where the claim is invidious discrimination in contravention of the … Fifth Amendment[], … the plaintiff must plead and prove that the defendant acted with discriminatory purpose… [P]urposeful discrimination requires more than intent as volition or intent as awareness of consequences.  It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, [the action's] adverse effects upon an identifiable group."  *Iqbal*, 556 U.S. at 676-77 (quotation marks omitted).  The Amended Complaint, however, pleads no facts that would support a plausible inference that the actions of the Federal Defendants "were rooted in 'animus' against" Mr. Kim, or the companies in which he had a management interest, because he is Asian American, as opposed to the entirely legitimate, non-discriminatory reasons identified in the Hearing Designation Order.  *See id.*

Accordingly, because Plaintiffs have failed to plead facts that could raise a plausible inference that the Hearing Designation Order was based not on the legitimate concerns identified in the order but racial animus towards Mr. Kim, and that the Federal Defendants engaged in a racially-motivated conspiracy with the private defendants, Count I should be dismissed, and Counts III and IV should be dismissed to the extent asserted against the Federal Defendants.

\*   \*   \*

## CONCLUSION

For the foregoing reasons, the Federal Defendants' motion should be granted, Counts I and VIII should be dismissed in their entirety and Counts III and IV should be dismissed against the Federal Defendants.  The Federal Defendants, moreover, should be dismissed as parties to this action.

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division

By:   _/s/ Jeremy S. Simon_
      JEREMY S. SIMON, D.C. Bar #447956
      Assistant United States Attorney
      601 D. Street, N.W.
      Washington, D.C. 20530
      (202) 252-2528
      Jeremy.Simon@usdoj.gov

*Attorneys for the United States of America*
