# EXHIBIT 2

Case No. 1:24-cv-01204-RC

Before the
Federal Communications Commission
Washington, DC 20554

| | |
|---|---|
| In the Matter of )<br>)<br>Applications of Tegna Inc., to Standard )<br>General, L.P. )<br>) | MB Docket No. 22-162 |

**MOTION OF THE PUBLIC INTEREST PARTIES FOR ADDITIONAL INFORMATION AND DOCUMENTS AND AN EXTENSION OF TIME**

I.  INTRODUCTION AND SUMMARY

Pursuant to Sections 1.46(b) and 73.3584(a) of the Commission's Rules,[1] Common Cause, The NewsGuild-CWA, and Public Knowledge (collectively, the "Public Interest Parties") respectfully request that the Commission require all Applicants in this proceeding[2] to furnish additional information and documents necessary for the Commission and the public to meaningfully assess whether the proposed transactions are in the public interest.

"The bottom line is this – my top priority is fighting inflation and lowering prices for families on things they need," said President Biden at a Rose Garden ceremony this week announcing implementation of the Affordable Connectivity Program.[3]  Contrast that with the

---

[1] 47 C.F.R. §§ 1.46(b), 73.3584(a).

[2] Public Notice, MB Docket No. 22-162, Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of Tegna Inc., to Standard General, L.P., and Permit-But-Disclose Ex Parte Status for the Proceeding, DA 22-443 (Apr. 21, 2022) ("Public Notice"); Comprehensive Exhibit of TEGNA Broadcast Holdings, LLC et al., File No 0000186435 (Apr. 4, 2022) ("Narrative")  The Applicants in this proceeding appear to include, at least,  TEGNA, Inc. ("Tegna"); Soohyung Kim, SGCI Holdings III LLC ("SGCI Holdings") and its affiliates, including Standard General L.P., and Community News Media LLC (collectively, "Standard General"); CMG Media Corporation ("CMG") and Apollo Global Management, Inc. (collectively, "Apollo").

[3] Judd, Donald, Biden Announces Partnership with Internet Providers to Lower Costs for Low-

1

proposed transaction, apparently designed by Wall Street hedge funds to jack up consumer prices through a series of station swaps.

Congress and the Biden Administration extended billions of dollars in taxpayer money last year to ensure the survival of local journalism during the COVID-19 pandemic.[4]  Contrast that with the proposed transaction, apparently financed on the back of local journalism job cuts and centralized news operations.

The applications leave many – if not most – of the factual questions necessary for the Commission's public interest evaluation unanswered.  What did the Applicants tell their bankers about how the new company would pay for increased financing costs?  Did they say that there would be increased retransmission consent fees and massive layoffs of journalists?  What has been the pattern and practice of Apollo Global Management, Inc. and Standard General L.P. when they buy local television stations?  Do they invest in local news or slash newsroom payrolls?  What will be the real powers obtained by Apollo through its nearly $2 billion in financing for this deal, not just over the stations it acquires, but over those it will purportedly not control, too?

The proposed transactions would further enlarge two large television group conglomerates – Apollo and Standard General – which have already been swallowing smaller groups for years, marking one more giant step in what has been a relentless march towards ever

---

Income Households, CNN (May 9, 2022) (available at https://www.cnn.com/2022/05/09/politics/white-house-partnership-internet-low-income-households/index.html).  See Also, "Fact Sheet:  President Biden and Vice President Harris Reduce High-Speed Internet Costs for Millions of Americans," The White House, May 9, 2022 (available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/05/09/fact-sheet-president-biden-and-vice-president-harris-reduce-high-speed-internet-costs-for-millions-of-americans/) ("Lowering prices . . . is President Biden's top priority").

[4] Tracy, Marc, Local News Outlets Could Reap $1.7 Billion in Build Back Better Aid, The New York Times (Nov. 28, 2021) (available at https://www.nytimes.com/2021/11/28/business/media/build-back-better-local-news.html).

greater consolidation in the industry. The increasing size alone would ratchet up their bargaining power in retransmission negotiations with cable and satellite distributors and the extraction of sharply higher prices in the never-ending spiral of rising retransmission fees – increases that will be passed on to consumers. It also portends less local journalism and more commoditized national news, meaning of course less focus on the stations' local communities.

But there is also more, and worse, here. The transactions' incredibly complex choreography has been contrived by a New York finance firm, Apollo, that, by its own admission, has been engineering its broadcast acquisitions to achieve above-inflation automatic retransmission fee increases, simply by replacing the lower fees of one group with the higher fees of the group it is acquiring. In fact, Apollo has apparently been boasting to its investors about this shell game, and has parlayed it into one of the key reasons why they should fund these acquisitions.[5] Again by the Applicants' admission, the proposal will also allow Apollo to increase the use of a national news desk – the notorious device by which the large TV conglomerates cut cost but also cut local newsroom staff and destroy localism in the process.[6]

And third, the two groups are connected to one another by means of Apollo's stake in Standard General. While the Applicants have structured the transactions in an effort to insulate the two acquiring groups and avoid attribution of the Standard General stations to Apollo, they also provide for two large loopholes through which Apollo can obtain access to competitively sensitive Standard General price information and influence Standard General by threatening to exercise its investor protections.

---

[5] Peter Jessell, Musing About Apollo-Cox-Northwest, TVN (Feb. 25, 2019), https://tvnewscheck.com/business/article/musings-apollo-cox-northwest-nexstar/ ("According to multiple sources, Apollo is going to use the "after-acquired" clauses in its retrans contracts to immediately boost retrans fees for all the Cox stations.").

[6] Narrative at 7.

All of these are red flags. Under the prior administration, the Commission tolerated mergers engineered to achieve price increases.[7] That was wrong then; during the worst inflation in four decades, it is wrong many times over now. Price increases exceeding inflation *supercharge* inflation. They are not a boon to the public interest, but a lethal threat to it. The proposed transfer of TV stations back and forth between the Applicants seems like the weaving of a crazy quilt. Apollo's WFXT station would go to Standard General, four Tegna stations would go to Apollo, four Apollo stations would go to Standard General. The Applicants provide no rhyme or reason for these swaps, and certainly do not discuss any efficiencies or benefits.

If the Applicants are trying to gerrymander their TV station ownership with the sole or primary goal of retransmission fee increases, these transactions should be stopped without further ado. Distributors are already under tremendous pressure to increase their prices to consumers. By 2023, retransmission fees are projected to increase to $12.82 billion, or a 5,880% increase since 2006.[8] Enough is enough.

The same holds true for the Applicants' local journalism plans. If they plan to cut local staff, especially local newsroom staff, and replace local programming with national

---

[7] *See* Consent to Transfer Control and Assign Licenses to Terrier Media Buyer, Inc., *Memorandum Opinion and Order*, 24 FCC Rcd. 10554 ¶ 31 (2019) ("*Apollo/Cox/Terrier Order*") ("The Commission also declined to find 'that an increase in retransmission consent rates, by itself, is necessarily a public interest harm.'"); Local TV Finance, LLC and Local TV Virginia License, LLC and Scripps Broadcasting Holdings, LLC for Transfer of Control of Tribune Media Company to Nexstar Media Group, Inc., and Assignment of Certain Broadcast Licenses and Transfer of Control of Certain Entities Holding Broadcast Licenses, *Memorandum Opinion and Order*, 34 FCC Rcd. 8436 ¶ 29 (2019) ("*Nexstar-Tribune Order*") ("Moreover, with regard to DISH's allegations of prospective price increases stemming from marketplace negotiations, it does not show whether, on balance, they would reduce consumer welfare or, rather, just shift surplus between DISH and broadcast stations."); Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc. to Nexstar Media Group, Inc., *Memorandum Opinion and Order*, 32 FCC Rcd. 183 ¶¶ 35-36 (2017) (rejecting arguments about retransmission fee increases and use of after-acquired clauses).

[8] Justin Nielson, Retrans Projections Update: $12.8B by 2023, SNL Kagan (June 14, 2017).

4

programming, the deal should be denied, no further questions asked. If the Applicants want to launch national networks, they are free to give up their spectrum, and allow the U.S. to auction it for part of the billions of dollars at which broadcast spectrum has been valued.[9] But the spectrum has been entrusted to them for free in exchange for their commitment to localism.[10]

In short, these transactions appear to be nothing more than financial engineering and sophisticated price-gouging. They create the potential to raise prices to consumers during an inflationary period and slash journalism jobs right when we need them most. And worse, that outcome may be, not simply their unintentional side effect, but rather the central goal all along. It is therefore imperative to ask searching questions about the Applicants' plans.

For the convenience of the Commission, Petitioners have included a list of information and documents that they recommend be produced, pursuant to an appropriate protective order. Petitioners further request that the Commission require a new, more detailed, filing from the Applicants, setting forth specific information that might substantiate their claims that the transaction is in the public interest, and also extend the time for parties in interest to submit Petitions in Opposition and for the public to submit comments.

---

[9] Richard Hanford, FCC: Spectrum for TV Broadcasts Worth Hefty $86.4B, Mobile World Live (June 30, 2016), https://www.mobileworldlive.com/featured-content/home-banner/fcc-spectrum-from-tv-broadcasters-worth-hefty-86-4b (estimating value of spectrum in broadcast incentive auction). Pre-transaction Tegna alone values its television and radio station broadcast licenses at 2.1 billion dollars according to its latest 10-K. *See* Tegna Inc., Form 10-K, at 57 (Mar. 1, 2022), https://investors.tegna.com/static-files/c246e7a0-6d1f-428a-8e7f-f438c83a58da.

[10] *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388 (1969) (The Commission has obligations and jurisdiction under the Communications Act to require broadcasters "to share [their] frequency with others and to conduct [themselves] as a proxy or fiduciary with obligations to present those views and voices which are representative of [their] communit[ies] and which would otherwise, by necessity, be barred from the airwaves."). The broadcast industry often cites localism to justify any number of Commission regulations, from network non-duplication and syndicated exclusivity rules, to subsidizing broadcast licensees' repacking expenses after the incentive auction. *See* Broadcast Localism, *Report on Broadcast Localism and Notice of Proposed Rulemaking*, 23 FCC Rcd. 1324, 1327 ¶ 5 (2008).

## II. THE APPLICANTS HAVE WITHHELD KEY INFORMATION ABOUT THE REASONS FOR, AND EFFECTS OF, THE TRANSACTIONS

The applications are characterized by unexplained complexity. They involve a transfer of five Standard General stations to Apollo; a transfer of one station, Boston's WFXT, from Apollo to Standard General; the merger of Tegna with all of its stations into Standard General; the transfer of four Tegna stations to Apollo; and equity and debt stakes of Apollo in Standard General.[11]

The back-and-forth swaps do not seem necessary to resolve any regulatory "duopoly" problem, which is the usual rationale for similar barter exchanges of TV stations. And yet the Applicants surely did not roll the dice to come up with this structure. A telling glimpse into their possible motives is provided by the objectives to which Apollo has previously admitted when purchasing other groups of stations. In the simultaneously contracted-for, applied-for, and approved purchase of the Northwest and Cox stations, Apollo sought to sequence artificially the timing of the two purchases so as to claim automatic retransmission fee increases, to the tune of tens of millions of dollars, by invoking the after-acquired station clauses of the relevant retransmission agreements.[12] That fiction was necessary because the

---

[11] Public Notice at 1-2; Narrative at 3-5.

[12] William Cohan, "Television Is What Gets Senators Elected": Private-Equity Mogul Leon Black Is Building a Local TV Empire to Rival Sinclair and Fox, Vanity Fair (Apr. 15, 2019), https://www.vanityfair.com/news/2019/04/leon-black-is-building-a-local-tv-empire-to-rival-sinclair-and-fox ("Many industry observers believe that the key to Apollo's strategy for making money in the local television industry is the Northwest transaction. Brady, at Northwest, was able to cut lucrative, above-market re-transmission deals with the big cable television players such as Comcast, Charter, and AT&T, and apparently those contracts contain an "after acquired" clause, which in effect allows any additional television stations acquired to also get the same, higher re-transmission rates. That remains to be seen, of course, since Apollo was the acquirer of the Cox stations, not Northwest. "I spoke to two friends of mine at Comcast and Spectrum," the Wall Street banker said, "and they said, 'Look, unless Northwest Broadcasting is the one that has the contract here, if they think we're going to respect that after-acquired clause just because they bought both assets at the same time, they're smoking crack.'").

6

agreement with the lower rates allowed termination only when the stations were acquired by an existing broadcaster.[13] While Apollo won the bidding for the Northwest and Cox stations, there was another bidder seeking to deploy the same retransmission tactics – Soohyung Kim, the sole managing member of Applicant SGCI Holdings.[14]

This financial manipulation creates money from nothing and puts it straight into the pockets of one of New York's wealthiest money managers at the expense of television viewers and journalists. Apollo does not intend to create higher-quality programming to make that money. All it creates is a financial shell game that helps its bottom line and hurts everyone else. The Commission has declined to consider and condemn this instant wealth transfer before[15] but in today's time of hyperinflation, should certainly do so now.

The automatic price increases are separate and apart from the higher fees that the merged companies' greater heft and bargaining power will allow them to exact when negotiating retransmission agreement renewals in the ordinary course. In addition, given the history of service disruptions during the course of negotiations over retransmission consent, consumers could be additionally harmed by being deprived of their local programming, in the wake of a two-year-long global pandemic, and at a time when access to local information and connectivity is more vital than ever before. The Applicants have not furnished any expert economic testimony to substantiate their claims of a public interest benefit or demonstrate a

---

[13] *Id.*

[14] Peter Jessell, Musing About Apollo-Cox-Northwest, TVN (Feb. 25, 2019), https://tvnewscheck.com/business/article/musings-apollo-cox-northwest-nexstar/ ("I should say that none of the principals of Apollo-Cox-Northwest spoke to me last week, but I heard the retrans scenario from several people, including former Media General owner Soo Kim, who was working on a deal to buy Northwest and its retrans contracts until Apollo showed up with a better offer.")

[15] *See Apollo/Cox/Terrier Order*, 24 FCC Rcd. at 10567 ¶ 32; *Nexstar-Tribune Order*, 34 FCC Rcd. at 8452-53, ¶ 29.

lack of consumer harm from their increased bargaining power.

Unanswered questions also hover over the Applicants' plans for local content, or its absence. While the Applicants portray Apollo as "another model of localism," the only support they offer (and only vague support at that) dates from the days prior to the acquisition of Cox by Apollo.[16] After that acquisition, we are told that [t]his identity [the "identity of the communities" Cox served] has been "maintained and even bolstered."[17] But we are not told how. And a dark window into the Applicants' true plans is provided by this phrase: "CMG [Apollo] stations not only produce their own market-leading local newscast but they also gain access to national content provided by CMG's Washington, D.C. Bureau. Access to this programming will improve the local service provided by the acquired stations on day one."[18] Does this mean that national content will displace local content? Is "improve" a euphemism for "supplant"? Does it mean that retransmission fees will automatically increase *and* localism will suffer "on day one"?

Another issue is that of Apollo's influence over the affairs of Standard General. While the Applicants structured Apollo's supposedly non-voting stake in Standard General so that it does not trigger attribution under the Commission's rules,[19] the reality may be different. First of all, a carefully circumscribed provision of the Term Sheet states that, "for the avoidance of doubt, … employees of Apollo or any Apollo affiliate who are members of the Board of Directors of CMG Holdings, Inc. or who otherwise participate in the management of any Apollo affiliate's investment in CMG Holdings, Inc. shall not have access to any

---

[16] *See* Narrative at 7.

[17] *Id.*

[18] *Id.*

[19] *Id.* at 4.

8

Competitively Sensitive Information."[20] But what about all other Apollo employees? The implication is that they may be afforded access to Competitively Sensitive information about Standard General's retransmission fee negotiations.

Second, even if the rights given Apollo were viewed as within the realm of legitimate minority rights, they should be viewed through the lens of these transactions' circumstances. Each of Standard General and Apollo periodically negotiates retransmission deals with cable, satellite, and over-the-top distributors. There is no guarantee that Apollo will not use the leverage of rights it is given to exact outcomes it wants in the retransmission fee area.[21] While the Communications Act prohibits coordination of negotiations or negotiation on a joint basis by two or more television broadcast stations in the same local market,[22] there is no guarantee that such indirect influence can even be detected and, even if it is, that it will be viewed as implicating that prohibition. In any event, coordination, direct or indirect, of retransmission fee tactics is even more insidious if it happens across local markets.

Finally, what happens in the event of a default, which in a period of economic uncertainty, inflation, market fluctuations, and rising interest rates, is a possibility not to be ignored? Would the Commission be approving these transactions only to be faced with a request for Apollo to exercise its security interests and acquire control of yet more stations, a request structured once more with artifice in order to avoid the national ownership cap? Just as a mortgage lender may seize the home of a borrower who fails to make monthly payments, could Apollo seize control of broadcast TV stations in the event of a default by Standard General? And if so, how would that impact the Applicants' compliance with broadcast TV

---

[20] Term Sheet § 9.

[21] *See* Term Sheet § 10.

[22] 47 U.S.C. § 325(b)(3)(C)(ii); 47 C.F.R. § 76.65(b)(1)(viii).

9

station ownership rules?

What *do* the Applicants state to bear their burden of proving that their transaction is in the public interest?[23] Very little. Their submission contains three superficial pages of advocacy on putative public interest benefits that fail to come close to meeting this statutory burden. The submission is especially lacking in light of the public interest concerns raised by the large-scale of this potential transaction that would affect a substantial consolidation of local station ownership. For the Commission to fulfill its obligations under Section 310(d) of the Communications Act, and for Petitioners and other commenters to meaningfully evaluate and comment on the proposed transaction, the Commission should require the Applicants to supplement their applications with additional information, both to support their asserted public interest benefits and to address the potential harms of the transaction.[24]

Moreover, the Applicants provide no information by which the Commission or interested parties might quantify the claimed public interest benefits.[25] The SGCI and CMG Applicants, for example, are held up as "models of localism."[26] Yet, absent evidence about how Tegna already scores on these categories, and how the merger might improve on Tegna's performance, these claims provide no basis to conclude that the proposed transaction itself

---

[23] 47 U.S.C. § 310(d).

[24] *See* Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations, *Protective Order*, 30 FCC Rcd. 10360 (2015) ("Petitioners to deny generally must be afforded access to all information submitted by licensees that bear upon their applications.").

[25] Applications of AT&T Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations, *Memorandum Opinion and Order*, 30 FCC Rcd. 9131, 9237 ¶ 274 (2015) ("[A] claimed [merger] benefit must be verifiable. Because much of the information relating to the potential benefits of a transaction is in the sole possession of the Applicants, they have the burden of providing sufficient evidence to support each claimed benefit to enable the Commission to verify its likelihood and magnitude.").

[26] Application Narrative at 6-7.

will serve the public interest.  These questions are critical to understanding the public interest implications of this multi-billion-dollar merger.

### III.     INFORMATION REQUESTS – THE APPLICANTS SHOULD SUPPLY THE MISSING INFORMATION

To cure these failings, the Applicants should, at a minimum, be required to produce:

- All documents, including presentations to Apollo and any other financial lending or investment institutions, addressing each company's evaluation of this transaction (as well as alternative transactions considered among the companies), the motivating reasons for each company joining in the transaction, the reasons why the transaction would be advantageous to each company, and, specifically, any documents discussing the prospect that the transaction could affect the going-forward rate of fees charged to MVPDs or OVDs and availability of streaming video services and any documents discussing the cutting of staff, the diminution or displacement of local content, and the expansion of national content;
- All documents submitted to the Department of Justice in connection with required clearance of the proposed transactions, including without limitations all documents called for by [4(c) of the HSR Notice.]
- All documents, including without limitation offering memoranda or prospectuses, used to market the proposed transactions to prospective investors or to secure funding.
- Analyses to support and quantify the Applicants' contention that the transaction will facilitate investment in local content and production capabilities, including specific business synergies and efficiencies that will facilitate such investment or otherwise aid the operation of Standard General, CMG, and their affiliates, were the transaction to be consummated;
- All analyses and documents relating to historic and projected future capital expenditures, personnel headcounts, and programming plans for each of the broadcast stations included in the applications;
- Documentation and data with respect to recently acquired stations (i.e., within the last five years) and the addition of local and news programming, specifically breaking out, for each station, the weekly addition (or loss) of hours of (1) local news, (2) other local programming, and (3) news or interest segments not originated by the station;
- A description of the relationship between centrally originated programming by Standard General, CMG and their affiliates and any requirements for local stations to air such programming, including without limitation any written agreements or correspondence between Standard General, CMG and their affiliates and the stations with respect to such programming;
- All documents concerning any actual or potential consolidation of news operations or services, including impacts on personnel headcounts;
- All documents related to any shared services or local marketing agreements between Standard General, CMG and their affiliates and Tegna stations and third-

11

- party stations;
- All documents or analyses addressing or relating to the use of "most-favored nation" ("MFN") or "after-acquired" clauses in retransmission consent agreements to establish pricing floors for retransmission rates in retransmission negotiations with other MVPDs;
- Monthly data for 2015 to present on advertising revenues earned, sharing payments for advertising paid to station affiliates, and subscriber and/or viewer bases for advertising fees, by MVPD, by station;
- All retransmission consent agreements with MVPDs and network affiliation agreements since 2015; monthly data (including both total fees and per-subscriber fees) for 2015 to the present on: (i) retransmission fee revenues earned, (ii) reverse retransmission fees paid (retransmission fees remitted to affiliated networks), and (iii) subscriber bases for retransmission fees, by MVPD, by station;
- All documents relating or pertaining to retransmission consent strategy and negotiations with MVPDs and affiliated networks, including without limitation all documents relating to strategy and negotiations in connection with all blackouts of local programming in which Applicants have been involved since 2010;
- All documents and data with respect to the effects on advertising revenues of any blackouts of local programming in which Applicants' stations have been involved;
- A description of the economic value of each Series A investor, including a comparison with the total debt and equity of New Tegna;
- A list of all Series A investors and the economic value of their investments, including a comparison with the total debt and equity of New Tegna;
- A list of all restrictions on the rights of Series A and B investors; and
- A list of all rights held by Series A and B investors.

Specifically with respect to the retransmission consent agreements, the precedent set in the D.C. Circuit decision in *CBS Corp. v. FCC*, establishes that these agreements may be produced pursuant to a protective order designating them as "highly confidential."[27] In *CBS*, the court found that to "make the persuasive showing necessary to disclose petitioners' confidential documents, the Commission must explain (i) why disclosure is in the public interest, (2) why it is a good idea on balance and (3) why the information serves as a *necessary* link in a chain of evidence."[28]

With respect to the first two prongs, the standard is satisfied here for the same reason

---

[27] 785 F.3d 699 (D.C. Cir. 2015).

[28] *Id.* at 705.

12

the *CBS* court found it satisfied there. Disclosure serves the public interest here because "disclosure would serve the public's interest in a thorough review process, and the benefits outweigh the harms."[29] Third-party review of the highly confidential documents would "ensure a sounder decision."[30] The Court emphasized that, if "a large number of documents were excluded from review…it would deprive commenters of the opportunity to argue that the documents have significance in ways that are not apparent to the Commission," thus facilitating "informed decision making."[31] Second, the Court concluded that the use of the Commission's standards for limiting disclosure of highly confidential information to outside counsel and outside consultants not involved in competitive decision-making ensures that "[t]he risks involved in disclosure thus appear minimal."[32]

The standard set by the *CBS* court also requires a showing that review of the agreements is "necessary," such that other information would not suffice.[33] Here, there can be little doubt about the "necessity" of this information. The Applicants' retransmission consent agreements are necessary to the analysis of whether the proposed transaction creates or enhances the Applicants' market power. If the transaction facilitates the exercise of outsize power in the retransmission consent market, then it puts consumers at risk for blackouts and higher prices. Where, as here, the outcome of the central issue in a merger must be predicted from precisely the same negotiations conducted in the past by the very same companies, there is no alternative source that can help the Commission and interested parties determine

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.* at 707.

whether this transaction would serve, or harm, the public interest.

## IV. AN EXTENSION OF TIME IS WARRANTED DUE TO UNUSUAL CIRCUMSTANCES

While an extension of time for petitions and comments on such applications may only be granted under "unusual circumstances,"[34] such circumstances are present here.  The information requested is necessary for meaningful public comment on the proposed transaction, and its absence constitutes a compelling unusual circumstance that warrants an extension of the May 23, 2022 due date for petitions against, or any comments on, the applications.  Petitioners request that the Commission extend the pleading cycle in this proceeding so that individuals and entities considering Petitions to Deny and other filings may be fully informed on the relevant facts, and therefore most helpful to the Commission as it evaluates the issues raised by this transaction.  In similar circumstances, the Commission has routinely previously granted extensions of time precisely so that commenters would have the information they need to be able to comment.[35]

---

[34] 47 C.F.R. § 73.3584(a).

[35] *See, e.g.*, Public Notice, Media Bureau Seeks Comment on Issues Raised By Certain Programmers & Broadcasters Regarding the Production of Certain Documents in Comcast-Time Warner Cable- Charter & AT&T-DIRECTV Transaction Proceedings, 29 FCC Rcd. 11519 (2014); Application of Cellco Partnership d/b/a Verizon Wireless and SpectrumCo LLC for Consent to Assign Licenses, *Order*, 27 FCC Rcd. 2368, 2369 ¶¶ 3-4 (2012) (granting an extension of time because several commenters "had not been able to fully review the Applicants' Opposition due to delays associated with obtaining access to the confidential version of the Opposition."); Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. for Consent to Assign Licenses or Transfer Control of Licensees, *Order*, 25 FCC Rcd. 10201, 10202 ¶ 5 (2010) (granting an extension of time because it would "enable interested parties to fully review the filings and submit their views in their replies," given the Applicants' voluminous material submitted); Consolidated Application for Consent to Transfer Control of Stratos Global Corporation's FCC-Authorized Subsidiaries and Petition for Declaratory Ruling, *Order*, 22 FCC Rcd. 13072, 13073 ¶¶ 4-5 (2007) (granting an extension of time for commenters to "review and respond to the [confidential] material" filed by Applicants after their Oppositions); Implementation of the Pay telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, *Order*, 22 FCC Rcd. 2547, 2548 ¶ 3 (2007)

Specifically, Petitioners ask that the initial Comments and Petitions to Deny be due no earlier than 30 days following participating parties' access to confidential material already filed or made available to the Commission by the Applicants; and that Replies to Oppositions or Comments be due no earlier than 30 days following participating parties' access to Applicants' completed responses to the requests for additional information.

In the alternative, the Commission should reconsider the requirement stated in its *Public Notice* that all issues must be raised in the initial pleading or within 15 days of discovery of newly-discovered facts.[36] When the Applicants submit information requested by the Commission, interested parties will need to analyze that information and comment on it. If the Commission sets the comment cycle to give parties time after Applicants respond to the Commission's information request, as the Public Interest Parties request, such a "use it or lose it" rule might make sense. If the Commission insists that pleadings be filed before Applicants have submitted their information, such a rule would both preclude the public's right to comment on the proposed transaction and the Commission's ability to reasonably analyze it.

## V. CONCLUSION

For all of the foregoing reasons, Petitioners respectfully request that the Commission

---

(granting an extension of time because, considering the Applicants' delay in filing initial comments and other filing irregularities, "providing additional time to file reply comments [would] facilitate the development of a more accurate and complete record in this proceeding"); Application of Media General Broadcasting of South Carolina Holdings, Inc. for Renewal of License for Station WMBB(TV), Panama City, FL, *Order*, 20 FCC Rcd. 5176, 5176 ¶¶ 2-3 (2005) (granting an extension of time because the Applicant's Opposition was received late by the commenters and "contain[ed] a substantial number of new facts that must be reviewed," and an extension "[would] allow for the submission of a more thorough response to the matters raised."); Letter from W. Kenneth Ferree, Chief, Media Bureau, to Pantelis Michalopoulos, Counsel for EchoStar Communications Corporation, and Gary M. Epstein, Counsel for General Motors Corporation and Hughes Electronics Corporation, CS Docket No. 01-348 (July 23, 2002) (restarting the merger clock review due to, inter alia, the "substantial amount of information submitted in response to [the Commission's Initial Information and Document Request].").

[36] Public Notice at 3.

15

require the Applicants to provide additional information and data, and extend the pleading cycle in this proceeding, both as set forth herein.

                                             Respectfully submitted,

/s/
Yosef Getachew
Director of Media and Democracy Program
Common Cause
805 15th St
Washington DC 20005

/s/
Jon Schleuss
President
The NewsGuild-CWA
501 Third St. NW 6th Floor
Washington, DC 20001

/s/
John Bergmayer
Legal Director
Public Knowledge
1818 N Street NW Suite 410
Washington DC 20036

May 12, 2022

16