# EXHIBIT 5

Case No. 1:24-cv-01204-RC

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | |
| | ) | |
| Applications of Tegna Inc., to Standard | ) | MB Docket No. 22-162 |
| General, L.P. | ) | |
| | ) | |
| | ) | |

**PETITION TO DENY OF COMMON CAUSE AND UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY**

Yosef Getachew
Jonathan Walter
Common Cause
805 15th St NW, Suite 800
Washington, DC 20005

Cheryl A. Leanza
United Church of Christ Media Justice Ministry
100 Maryland Ave, NE
Washington, DC 20002

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY……………………………………………1

II.     THE PUBLIC INTEREST PARTIES HAVE STANDING……………………...2

    A.  The Commission May Not Reject Petitioners with Article III Standing…….2

    B.  The Commission Should Grant Broader Participation Than the Minimum
    Required by Article III……………………………………………………5

    C.  Common Cause Has Direct Organizational Standing………………………7

    D.  Common Cause and the UCC Have Associational Standing………………..10

III.    STANDARD OF REVIEW………………………………………………………12

IV.     THE APPLICANTS HAVE FAILED TO MEET THEIR BURDEN……………...15

V.      THE PROPOSED TRANSACTION WOULD UNDERMINE LOCALISM………16

    A.  The Commission has Established Localism is Important to the Public
    Interest……………………………………………………………………16

    B.  The Applicants' Stated Business Intentions Would Reduce the Amount and
    Scope of Local News Coverage…………………………………………...19

VI.     THE PROPOSED TRANSACTION WOULD LEAD TO HIGHER PRICES FOR
    CONSUMERS………………………………………………………………...21

    A.  Retransmission Prices Will Rise Because of After-acquired Clauses and Upon
    Renewal of Retransmission Contracts……………………………………...22

    B.  The Transactions Will Cause Price Increases for Pay TV Consumers and
    More Blackouts……………………………………………………………24

VII.    THE SCOPE OF THE TRANSACTION CAUSES NATIONAL HARMS………...25

    A.  The Size and Scale of This Merger Poses National Harms Regardless of the
    Applicants' Compliance with Ownership Limits……………………………25

    B.  Apollo's Rights to Standard General May Not Be in Compliance With
    Ownership Limits…………………………………………………………28

VIII.   CONCLUSION…………………………………………………………………29

    APPENDIX

## I.    INTRODUCTION AND SUMMARY

Common Cause and United Church of Christ, OC., Inc. doing business as United Church of Christ Media Justice Ministry (collectively, "Petitioners"), file this Petition to Deny in response to the Federal Communications Commission's ("FCC" or "Commission") Public Notice regarding the applications of Tegna, Inc. ("Tegna"), Standard General, L.P., ("Standard General"), CMG Media Corporation ("CMG"), and Apollo Global Management ("Apollo") (collectively, "Applicants")[1], and the Applicants' response to the Commission's request for documents and information.[2]  The applications should be denied or referred to an administrative law judge for a hearing. Because the Applicants have not demonstrated that the transaction will serve the public interest, they have not met the requisite burden of proof. In fact, in neither their application nor response to the Commission's request for information do the applicants make a convincing case that the transaction will provide meaningful public interest benefits. To the contrary, the transaction would bring about significant public interest harms, including harms to localism, diversity and competition including increasing retransmission consent fee leverage, which will cost consumers money. The large scope of the transaction would cause national in addition to local harms.

---

[1] *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of Tegna Inc. to Standard General, L.P., and Permit-But-Disclose Ex Parte Status For The Proceeding*, MB Docket No. 22-162, Public Notice, DA 22-442 (rel April 21, 2022); *see also* Amended Comprehensive Exhibit of TEGNA Broadcast Holdings, LLC et al., File No 0000186355 (filed Apr. 1, 2022) ("Comprehensive Exhibit").

[2] Letter from Soohyung Kim, Managing Member, SGCI Holdings III LLC, Akin Harrison, Senior Vice President and General Counsel, Tegna Inc., and Houston McCurry, Principal, Private Equity, Apollo Global Management, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 22-162 (filed June 13, 2022) ("Applicants June 13 Letter").

## II.     THE PUBLIC INTEREST PARTIES HAVE STANDING

Petitioners meet the Communications Act's requirements to file a petition to deny as "parties in interest."[3] As Petitioners demonstrate below, we have standing to file this petition for several reasons. Petitioners have standing as organizations themselves and as associations of individual members who possess standing. The Commission's analysis of standing to participate in broadcast license transactions has often been truncated and incomplete at best.  Moreover, the Commission recently adopted an impermissible and narrow analysis of associational standing in the Nexstar-Tribune transaction--characterized by now-Chair Rosenworcel as "brutal."[4]  Whether or not the Petitioners submit affidavits from viewers in each of the more than 50 markets impacted by this transaction, the Commission may not deny our right to participate in this docket as parties in interest. As explained in detail below, petitioners possess standing based on organizational harms and nationwide harms, in addition to local harms. Moreover, the Commission should further overturn the *Nexstar-Tribune* Order by exercising its greater latitude over its own procedures to permit participation as a party-in-interest in a Commission proceeding when a party may lack Article III standing.

Common Cause demonstrates it has organizational standing because the transaction will harm their missions and require them to divert resources. Petitioners also possess associational standing through their members.

### A.  The Commission May Not Reject Petitioners with Article III Standing

The Commission implied in *Nexstar-Tribune*, with little consideration, that any organization filing a petition to deny a transaction qualifies as a party in interest only in the

---

[3] 47 U.S.C. § 309(d)(1).
[4] *Applications of Tribune Media Company, Nexstar Media Group, Inc. et al*, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8471 (2019) ("*Nexstar-Tribune Order*") (Rosenworcel dissenting).

markets where it files declarations from members who are viewers in the markets impacted by that transaction.[5] That decision is wrong and must be explicitly rejected by the Commission. Although the Commission has at times been unclear and overly narrow in its analysis of standing to participate in Commission proceedings, it may not exclude parties that meet the obligations of a party-in-interest under Section 309(d)(1) as long as they possess Article III standing even if they do not file declarations in local markets impacted by the transaction. Consequently, it must overrule its standing decision in the *Nexstar-Tribune* Order and grant Petitioners standing here.

The right to seek judicial review and to file in a license proceeding at the FCC both originate in the Communications Act itself. Congress has directly granted parties in interest the right to challenge broadcast license assignments in the D.C. Circuit, given to "any other person aggrieved or whose interests are adversely affected by any decision of the Commission granting or refusing any such application."[6] And Congress also granted parties in interest a right to challenge a license approval at the FCC.[7] The Supreme Court held that Congress' decision to grant the right to appeal an FCC decision was broad, finding the Commission could not deny standing to a party adversely affected even if the harm alleged by the party was not a harm the Commission would necessarily take into account in considering the licensing decision.[8] Similarly, the D.C. Circuit held that the plain language of Section 309 worked to "insure that persons having the right to appeal from Commission decisions 'can make this complaint first before the Commission….'"[9]

Article III standing applies more broadly than the Commission's ruling in *Nexstar*. The Supreme Court's test for standing pursuant to Article III of the constitution for parties to invoke

---

[5] *Nexstar-Tribune Order*, 34 FCC Rcd 8436, 8449 ¶ 25, n.112.
[6] 47 USC § 402(b)(6).
[7] 47 USC § 309(d)(1).
[8] *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 476-77 (1940).
[9] *Elm City Broadcasting Corp. v. U.S.*, 235 F.2d 811, 816 (D.C. Cir. 1956).

the jurisdiction of federal courts requires: (1) injury-in-fact (2) fairly traceable to the challenged conduct (3) likely to be redressed by a favorable judicial decision.[10] An organization "can assert standing on its own behalf, on behalf of its members or both."[11] Representational or associational standing on behalf of members results when (a) members would have standing in their own right; (b) the interests they seek to protect are germane to the organization's purpose; and (c) neither the claim nor relief require participation of individual members.[12] Organizations themselves, on the other hand, have standing (not through their members) if the challenged actions that "perceptibly impair" the organization's mission, which can be demonstrated through a diversion of resources injurious to its mission.[13] For example, unions can show standing via harm to their organizing capacity.[14] This standing is similar to that of a business competitor--the corporate entity is harmed. Such an organizational harm does not require harm to individual members nor does it require viewers in any market.

While the vast majority of public interest participants in broadcast license transfer matters rely upon the status of an entity's members to assert associational standing, the Commission may not assume that every non-corporate petition to deny is based on "viewer" standing which "must allege that he or she is a resident of the station's service area or a regular viewer of the station."[15] Parties in interest must articulate harm caused by the transaction, but that harm could be derived from the national impact, the potential harm from transactions is not confined to geographically-based harm to viewers.

---

[10] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[11] *PETA v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1093 (2015).

[12] *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

[13] *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378-79 (1982); *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998); *PETA v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

[14] *AFGE Local 1 v. Stone*, 502 F.3d 1027, 1032-33 (9th Cir. 2007); *EEOC v. AT&T*, 556 F.2d 167, 173 (3d Cir. 1977).

[15] *E.g.*, *Nexstar-Tribune Order*, 34 FCC Rcd. at 8448, ¶ 23.

Furthermore, the harm giving rise to organizational or representational standing is not limited to localized geographic markets. As explained below, a transaction such as the one proposed here causes nationwide impact on many residents and consumers and it is not dependent upon the residence of the consumer. The Commission's decision, therefore, prohibiting participation at the agency level to parties with Congressional permission and Article III standing to participate in Commission proceedings would violate the statute, impair rights given to parties by Congress and at common last and also cause administrative burden on both the agencies and the courts.[16]

### B. The Commission Should Grant Broader Participation Than the Minimum Required by Article III.

Commissioner Starks's powerful and cogent dissent in *Nexstar-Tribune* explained the importance of public participation in FCC license transfers:

> Since 1966, when the seminal case on standing was decided, the Commission has relied upon members of the public to present evidence of whether the licenses we grant or transactions we approve square with our public interest standard and better serve local communities. Indeed, even during the broadcast deregulatory era of the 1980s, the Commission noted that input from the public would be crucial to allowing the agency to exercise its core licensing functions. As we said in another matter, the Commission "relies on members of the public to act as private attorneys general to assist in overseeing the conduct of applicants and licensees and in fulfilling our statutory functions."[17]

The D.C. Circuit similarly observed in the seminal *United Church of Christ v. FCC*, "[u]nless the Commission is to be given staff and resources to perform the enormously complex and

---

[16] Moreover, the Commission must correct the implication of its decision in *Nexstar-Tribune* that the failure of an organization party-in-interest that is asserting associational standing to file affidavits in every market impacted by a transaction somehow impairs its rights to file in the markets where it does submit affidavits. As Commissioner Starks' dissent explained, the decision was unclear and likely to thereby discourage parties from filing to the detriment of the Commission's processes. *Nexstar-Tribune Order*, 34 FCC Rcd at 8473 (Starks dissenting). Where a party establishes its right to participate as a party-in-interest the Commission may not block that participation, whether the status is obtained in 1 market or 100 markets.

[17] *Nexstar-Tribune Order*, 34 FCC Rcd at 8473 (Starks dissenting) (citations omitted).

prohibitively expensive task of maintaining constant surveillance over every licensee, some mechanism must be developed so that the legitimate interests of listeners can be made a part of the record which the Commission evaluates."[18] As now-Chair Rosenworcel explained, "We should be encouraging the public and individual citizens to take an active interest in the scope and quality of broadcasting in their communities.  It plays a special role in providing local news and information—and our process should honor this essential truth rather than diminish it."[19]  In fact, in indecency and other enforcement matters, the Commission has often relied upon the fact that the federal government is not affirmatively monitoring stations around the country, it relies upon the public to draw to its attention problems with federal licensees.[20]

To pursue these ends, the FCC has the freedom to permit the participation of parties even without Article III standing:

> Within their legislative mandates, agencies are free to hear actions brought by parties who might be without party standing if the same issues happened to be before a federal court. The agencies' responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the [C]onstitution or the common law.[21]

Not only should the FCC adopt permissive participation standards, but it may not arbitrarily limit who may participate. "Courts willingly overturn" agency decisions to reject requests to participate under their authorizing statutes "when the responsible agency, either by failing to

---

[18] *Office of Communication of United Church of Christ v. F.C.C.*, 359 F.2d 994, 1005 (D.C. Cir. 1966). We note that the seminal work of the United Church of Christ was led by Rev. Everett C. Parker, and his son, Rev. Truman E. Parker, has filed a declaration attached to this Petition.
[19] *Nexstar-Tribune Order*, 34 FCC Rcd at 8472 (Rosenworcel dissenting).
[20] Federal Communications Commission, *Obscene, Indecent and Profane Broadcasts*, https://www.fcc.gov/consumers/guides/obscene-indecent-and-profane-broadcasts; *see FCC v. Pacifica Foundation*, 438 U.S. 726, 734-37 (1978).
[21] *Gardner v. FCC*, 530 F.2d 1086, 1090 (D.C. Cir. 1976); see also *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) ("Because agencies are not constrained by Article III, they may permit persons to intervene in the agency proceedings who would not have standing to seek judicial review of the agency action.").

fashion equitable procedures or by employing its power in an unreasonably overbroad or otherwise arbitrary manner, has not acted to preserve the participation opportunities of interested persons."[22]

As the D.C. Circuit once said, "Some consumers need bread; others need Shakespeare; others need their rightful place in the national society—what they all need is processors of law who will consider the people's needs more significant than administrative convenience.'"[23]

### C.  Common Cause Has Direct Organizational Standing

Common Cause has organizational standing based on the harm to responsive democracy caused by media consolidation. Common Cause describes its mission as follows, "Common Cause is a nonpartisan, grassroots organization dedicated to upholding the core values of American democracy. We work to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process.[24] Common Cause has over 1.5 million members and 30 state chapters with an average of 50 total staff in those chapters. The transaction will cause injury-in-fact to its mission and its organization by substantially injuring its efforts to provide accountable democracy. In recent years, Common Cause and its chapters have expended an annual budget of over $8,000,000 to ensure that politicians are accountable to the voters who elect them and to work for political rules that encourage responsive democracy.[25] For example, Common Cause' state chapters have developed state and local campaigns to advance democratic reforms that modernize elections, make government more transparent, and amplify the voices of

---

[22] *Nichols v. Board of Trustees of Asbestos Workers Local 24 Pension Plan*, 835 F.2d 881, 897 (D.C. Cir. 1987).
[23] *Office of Communication of United Church of Christ v. FCC*, 359 F.2d 994, 1005 (D.C. Cir. 1966).
[24] About Common Cause, https://www.commoncause.org/about-us/ (June 16, 2022).
[25] Littlewood Declaration, para. 4.

small-donor donors with citizen-funded election programs.[26] Studies show that local voters are less engaged in their elections with less robust or less targeted news coverage. With less localized and targeted news coverage, fewer voters will participate by voting and fewer small-donors are likely to be persuaded to contribute to candidate campaigns. Additionally, with fewer local journalists and companies with less incentive to cover local news because their corporate success is less dependent upon providing local news, Common Cause's work to make government more transparent will be less effective.[27] Political coverage that is less in-depth is less likely to cover who contributes to political campaigns. Therefore the reforms ensuring that the identities of campaign contributors are made public are less likely to have their intended effect--to permit voters to make informed decisions about their exercise of the franchise. Common Cause's work as an organization will be harmed by transaction.

Common Cause's Stop Cyber Suppression Project also works to combat election disinformation by tracking the spread of voter suppression content and developing rapid response techniques. As part of this work, Common Cause works with local journalists to make them aware of disinformation campaigns, ensure voters have access to accurate voting information, and inoculate communities who have been exposed to election disinformation. If journalist layoffs occur, as Common Cause reasonably fears, the journalists Common Cause educated with regard to disinformation and inoculation against disinformation will be less effective. Reduced expertise, reduced tenures in their jobs or in a particular local community means that mainstream broadcast television journalists are less able to provide the sophisticated understanding and coverage which is urgently needed at this time in our country's history when those journalists are

---

[26] *Id.*
[27] *Id.*

the most trusted and when widespread misunderstandings as to fact and fiction are becoming a danger to the electorate's participation and trust in responsive democracy.[28]

Robust media coverage of state lawmaking is an essential element of a responsive democracy. The founding fathers placed the right to a free press at the heart of the First Amendment to the U.S. because of that role. The FCC's public interest standard, under which this transaction is evaluated, centers on competition, localism and diversity—including robust access to local news and information, which is recognized as a First Amendment right.[29] Damage to this access is a cognizable injury recognized by the courts.[30]

Common Cause staff and leadership reasonably fear consolidation means fewer journalists and less local news coverage.[31] Moreover, Common Cause staff who are unable to rely on paltry or non-existent news coverage of legislation passing in state capitols or local cities must do more work themselves to uncover non-responsive legislators or proposals that will harm democratic processes. The harm to Common Cause directly impairs its mission of responsive democracy and forces the organization to spend more staff time and more financial resources promoting democracy and democratic reforms. The harms are directly attributable to the transaction and not occur but for the transaction. Therefore, Common Cause possesses Article III standing as an organization and must be permitted to participate as a party-in-interest in this docket opposing this transaction, regardless of whether its members are viewers in any particular local market.

---

[28] *Id.*, paras. 5-6.
[29] *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969).
[30] *See, e.g., Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013); *see Spokeo*, 136 S. Ct. at 1549 (First Amendment "intangible injuries can…be concrete.").
[31] Littlewood, paras. 5-6.

### D.  Common Cause and the UCC Have Associational Standing

1.  *Associational standing based on local impact.*

Common Cause and United Church of Christ members submitting affidavits fear that

their local stations will not cover local news after the transaction. Because of the business model

set forth by Standard General, UCC and Common Cause local members reasonably fear that

their local TV stations will cover more national news and hire fewer journalists than under

ownership by Tegna.[32] UCC and Common Cause members reasonably fear their pay television

costs will increase because of this transaction.[33] They are also concerned about an increased

harm of programming blackouts.[34]

Several declarants explain they are harmed even if they do not watch television because

when "elected leaders are not held accountable" studies show that taxpayers are more likely to

"shoulder the burden of corruption."[35] Less local news also produces less competition and in turn

incentivizes even less local news.[36]

Common Cause and UCC Media Justice presented declarations from local markets in:

Atlanta, GA, Boise/Twin Falls, ID, Boston, MA, Cleveland, OH, Columbia, SC,  Denver, CO,

Hartford, CT, Indianapolis, IN, Jacksonville, FL, Lincoln, NE, New Orleans, LA, Portland, OR,

Seattle, WA, St. Louis, MO and Washington, DC.[37] Therefore, the Commission cannot deny their

---

[32]  Bilton, paras. 4-6; Classick, paras. 4-6; Guthrie, paras. 4-6; Dennis, paras 4-6; Hill, paras 4-6; Littleton, paras. 10, 12-15; Denton, para. 9; Fitzgerald, para. 9; Nelson, para. 9; Parker, para. 9, Williams, para.10; Weston, para. 10.

[33] *E.g.*, Swenson, para. 13; Glover, para. 12; Fitzgerald, para. 15.

[34] *E.g.,* Bilton, para. 10; Classick, para. 10; Guthrie, para. 10; Parker, para. 14.

[35] *E.g.*, Nelson Declaration, para. 11; Weston Declaration, para. 12.

[36] Joshua Darr, "Local News Coverage Is Declining — And That Could Be Bad For American Politics," FiveThirtyEight (June 2, 2021), https://fivethirtyeight.com/features/local-news-coverage-is-declining-and-that-could-be-bad-for-american-politics/.

[37] Declarations of: Bilton; Classick; Dennis; Denton; Farrow; Glover; Guthrie; Hill; Fitzgerald; Littlewood; Nelson; Parker; Swenson; Weston and Williams.

participation in this docket because those markets are impacted by this transaction. The

Commission should also grant Common Cause and UCC Media Justice status as

parties-in-interest in the other markets to serve its institutional needs regardless of whether they

have submitted declarations from every market. To the extent that the issues are the same in each

market, the harm is not conjectural and should provide the basis for associational standing

regardless of whether a declaration is filed for each and every market in the transaction. The

members who have filed have established their standing to file as parties-in-interest.

### 2. Associational standing based on national impact

Several UCC members explain that they fear they will be harmed by this transaction

regardless of whether they live in markets directly impacted by the transaction.  For example:

> many good and bad policy proposals begin in other states or cities, or, are part of an
> intentional nationwide strategy to alter local laws around the country. When news
> gathering is poor in those places, local people are less likely to adequately vet those
> policies and poor policies are more likely to be adopted. Moreover, I am less likely to
> know about those policies and their impacts before they are adopted because there is less
> newsgathering locally in those communities. I monitor developments in other states in
> order to anticipate likely policy initiatives in my own state or in my own local area.[38]

Increased prices for pay television nationwide cause harm regardless of where individual

members live.[39]

---

[38] Nelson, paras. 12, 14; Williams, para. 12; Weston, paras. 13, 15.

[39] For example, charges for increased retransmission costs are set nationwide, not differentiated among markets. Jon Brodkin, "Charter's nationwide price hike could cost you another $91 a year," Ars Technica (Oct. 23, 2018), https://arstechnica.com/information-technology/2018/10/charters-nationwide-price-hike-could-cost-you-another-91-a-year/; David Lazarus, *When Companies Say a Merger Will Result in Lower Prices, Try Laughing in Their Face*, LA Times (July 10, 2018), https://www.latimes.com/business/lazarus/la-fi-lazarus-att-time-warner-price-hike-20180710-story.html (discussing the increase in price of "DirecTV Now" after DirecTV was acquired by AT&T).

In addition, consolidation of media ownership lessens employment opportunities for traditionally underrepresented groups, harming the UCC's mission of racial and gender equity and diversity. UCC members are not only concerned with fairness and equity in hiring in their local communities. The harm occurs regardless of whether UCC members watch television and occurs nationally and locally.[40]

## III.    STANDARD OF REVIEW

The Applicants have the burden of proving the proposed merger serves "the public interest, convenience, and necessity."[41]  This public interest determination encompasses the "broad aims of the Communications Act"[42] and requires an evaluation of whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Communications Act of 1934, as amended ("the Act"). Particularly in the context of a broadcast merger, the Commission must take special consideration of the effects on the core tenets of diversity and localism as expressed in the Act.[43] The Commission is not confined to determining whether the proposed transaction complies with existing rules.[44] It must consider "whether it could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes." In its review, the Commission employs a balancing process, weighing claimed benefits of the proposed transaction against any

---

[40] Nelson, paras. 12, 14; Williams, para. 12; Weston, paras. 13, 15.

[41] 47 U.S.C. § 310(d).

[42] *Id*.

[43] *Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd. 183, 196 ¶ 35 (2017) ("*Nexstar/Media General Order*").

[44] Applications For Consent To Transfer Control of Certain License Subsidiaries of Raycom Media, Inc. To Gray Television, Inc., 2018 WL 6722650, at *5; Univision Holdings, Inc. - Searchlight and Grupo Televisa, Petition For Declaratory Ruling, 35 FCC Rcd. 14835, ¶18 (2020); Consent to Transfer Control of Certain License Subsidiaries of NBI Holdings, LLC To Terrier Media Buyer, Inc. Consent to Transfer Control of Certain License Subsidiaries of Cox Enterprises, Inc. to Terrier Media Buyer, Inc. Consent T, 34 FCC Rcd. 10554, 10561 (2019).

potential public interest harms.[45] Therefore, it is not enough for the Applicants to assert or even prove that the transaction will not be harmful to consumers and competition, rather, they must prove that it would provide affirmative benefits to the public.[46] Any claimed benefits must be: (1) transaction specific – likely to occur as a result of the transaction but unlikely to be realized by other practical means having fewer anti-competitive effects; (2) verifiable – both in likelihood and magnitude; and (3) for the benefit of consumers, and not solely for the benefit of the Applicants.[47]

The Commission's public interest analysis also embodies a "deeply rooted preference for preserving and enhancing competition in relevant markets … and ensuring a diversity of information sources to the public."[48] Thus, the Commission must examine the competitive effects of the transaction with special "reference to diversity, localism, [and] other public interest considerations."[49]  Particularly in the context of a broadcast merger, the Commission must take special consideration of the effects on diversity and localism when reviewing the proposed acquisition.[50]

The Commission calculates the magnitude of the claimed benefits and the net cost of achieving them, and then employs a "sliding scale approach," under which the Applicants'

---

[45] *Nexstar-Media General Order*, 32 FCC Rcd. at 191-92 ¶ 19.

[46] *Applications of Comcast Corporation, General Electric Co. & NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees,* Memorandum Opinion and Order, 26 FCC Rcd. 4238, 4248 ¶ 24 (2011) ("*Comcast/NBCU Order*").

[47] *Nexstar/Media General Order*, 32 FCC Rcd. at 192-93 ¶¶ 22-24.

[48] *Comcast/NBCU Order*, 26 FCC Rcd at ¶ 23.

[49] *Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership; for Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 31 FCC Rcd. 6327, 6338 ¶ 29 (2016) ("*Charter/TWC Order*").

[50] *See Nexstar/Media General Order*, 32 FCC Rcd. at 196 ¶ 35 (citing 2013 *Gannett/Belo Order*, 28 FCC Rcd. at 16879 ¶ 30) ("[W]e must giv[e] careful attention to the economic effects of, and incentives created by, a proposed transaction taken as a whole and its consistency with the Commission's policies under the Act, including our policies in favor of competition, diversity, and localism.").

demonstration of benefits must reveal a higher degree of magnitude and likelihood than the Commission would otherwise demand where, as here, the potential harms are both substantial and likely. If the Commission is unable to find that the alleged benefits do in fact outweigh the harms, or if there remain substantial and material questions of fact outstanding, the Commission must designate the application for a hearing.[51]

In addition, in the broadcast context, the public interest can only be served by a transaction that advances localism. A broadcaster's connection to, and coverage of, its local community is a bedrock principle of broadcast television public policy. Indeed, Section 307(b) of the Communications Act requires the Commission to "make such distribution of licenses, frequencies, hours of operation, and of power among the several states and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."[52] And the Commission licenses television broadcast stations "to the principal community or other political subdivision which it primarily serves."[53]

While the *how* of the pursuit of localism over the years may vary in part – from the Commission's "Blue Book" in the 1940s, to the 1960 Programming Policy Statement and the focus on market mechanisms under the 1996 Telecommunications Act – the *what* has remained the same: coverage, content, and news responsive to the local community's particular needs. And localism is also the reason why the broadcast licenses for "waterfront" spectrum in each local community are granted and renewed for free, even as most other communications licenses are granted by auction.[54] Rather than dollars, service to the local community is the currency paid by broadcasters for these valuable rights. The public interest analysis for any broadcast transfer

---

[51] 47 U.S.C. § 309(e); *see also Nexstar/Media General Order*, 32 FCC Rcd. at 191-92 ¶ 19.
[52] 47 U.S.C. § 307(b).
[53] 47 C.F.R. § 73.1120.
[54] 47 U.S.C. § 309(j).

of control proceeding must therefore consider whether the proposed transaction advances (or conversely, undermines) this core principle.[55]

## IV.    THE APPLICANTS HAVE FAILED TO MEET THEIR BURDEN

Based on their application, the Applicants have not met the above-stated burden of proof. The proposed merger presents harms to the public interest in localism, diversity and competition including increasing retransmission consent leverage.  In their initial application, the Applicants make no effort to address these public interest harms. They say nothing about the transaction's competitive effects.  All they offer is a few pages of rhetoric asserting that the Applicants support localism, a remarkably weak justification for a multi-billion dollar acquisition.

The Applicants' response to the Commission's request for documents and information also fails to meet this burden. Rather than providing specific details of how Standard General will invest and increase local news in Tegna's stations post-transaction, the Applicants primarily provide 'management-speak' regarding its business decisions. Further, the Applicants fail to address the transaction's potential public interest harms as it relates to undermining localism, higher prices for consumers, and national reach. As discussed below the potential for public interest harms are substantial and likely and should therefore result in the dismissal of the applications or referral to a hearing.

## V.    THE PROPOSED TRANSACTION WOULD UNDERMINE LOCALISM

Localism is the main reason why broadcasters have received free access to the nation's airwaves, and it remains a critical component of the Commission's public interest analysis. As discussed below, localism is important for its influence on civic engagement and elections and still remains a critical source of news and information for marginalized communities. It is no

---

[55] *See, e.g., Comcast/NBCU Order*, 26 FCC Rcd. at 4240-42 ¶¶ 3, 5, 6.

surprise that further consolidation of groups of local stations acts as a centripetal force pulling broadcasters away from their local roots.  Recent empirical research confirms that media consolidation has been bad for localism, as the larger broadcast conglomerates *do not* invest freed resources into local content and coverage.[56] The Applicants' prior broadcast acquisitions and stated goals demonstrate that this transaction would undermine localism.

### A.  The Commission Has Established Localism is Important to the Public Interest

The Commission has long-established that broadcasters must meet the needs of the communities to which they are licensed.[57] Today, when the FCC awards licenses to provide broadcast service, it does so using local licenses relating "to the principal community or other political subdivision which it primarily serves."[58] The Commission requires broadcasters to provide service within certain technical parameters to ensure that members of its community can receive the service.[59] Further, the Commission adopted numerous pro-localism principles in its *2008 Declaratory Ruling*.[60] These policies grant broadcasters increased autonomy and control over programming and other critical decisions pertaining to serving the community.[61]

The Commission's rules and policies promote localism because broadcast programming continues to remain a critical source for news and local information for communities. A recent Pew study found that television remains a common place for Americans to get their news with

---

[56] *See e.g.,* Sandra Braman, *The Ideal v. the Real in Media Localism: Regulatory Implications*, 12 Comm. L. & Policy 231, 273 (2007) (citing Ronald Bishop and Ernest A. Hakanen, *In the Public Interest? The State of Local Television Programming Fifteen Years after Deregulation*, 26 J. of Comm. Inquiry 261 (2002)); Steven T. Barry and Joel Waldfogel, *Do Mergers Increase Product Variety? Evidence from Radio Broadcasting*, 116 Q.J. Econ. 1009 (2001).
[57] *See* FCC, Broadcasting and Localism: FCC Consumer Facts, https://transition.fcc.gov/localism/Localism_Fact_Sheet.pdf.
[58] *See* 47 C.F.R. § 73.1120.
[59] *See* 47 C.F.R. § 73.1125(a)(1), (e).
[60] *See Network Affiliated Stations Alliance (NASA) Petition for Inquiry into Network Practices and Motion for Declaratory Ruling*, Declaratory Ruling, 23 FCC Rcd 13610 (2008).
[61] *See id.*, ¶¶ 6, 8-9.

local TV on par with or outpacing cable and network TV.[62] Further, another report indicates that nearly half of Americans say local news outlets have been a major source of news about the COVID-19 pandemic.[63] Local news still remains the most trusted in keeping Americans informed about their communities,[64] and broadcast stations are uniquely situated to provide coverage regarding local weather reports, traffic reports, school closings, local elections, and town hall events.

Local broadcasting is particularly important for communities of color and low-income communities. Black Americans are "more likely to be interested in local news and to trust information from local news organizations more generally."[65] Low-income residents rely more on over-the-air television than digital media.[66] And communities with particularly high shares of Hispanic and Black residents "are more likely to say [that] most key local news topics are important for their daily lives than those in higher-proportion white areas."[67] Hispanic immigrants living outside of metro areas and Native Americans living on reservations rely strongly on radio for news.[68]

---

[62] *Local TV News Fact Sheet*, Pew Research Center (July 13, 2021), https://www.pewresearch.org/journalism/fact-sheet/local-tv-news/.

[63] Elisa Shearer, *Local News Is Playing an Important Role for Americans During COVID-19 Outbreak*, Pew Research Center (July 2, 2020), https://www.pewresearch.org/fact-tank/2020/07/02/local-news-is-playing-an-important-role-for-americans-during-covid-19-outbreak/.

[64] *Local News Most Trusted in Keeping Americans Informed About Their Communities,* Knight Foundation (May 19, 2022), https://knightfoundation.org/articles/local-news-most-trusted-in-keeping-americans-informed-about-their-communities/.

[65] Elisa Shearer, Local News is Playing an Important Role for Americans During COVID-19 Outbreak, Pew Rsch. Ctr. (July 2, 2020).

[66] Pew Rsch. Ctr., For Local News, supra, at 65.

[67] Pew Rsch. Ctr., For Local News, Americans Embrace Digital but Still Want Strong Community Connection 65 (Mar. 26, 2019).

[68] Penelope Muse Abernathy, U.N.C. Hussman Sch. of Journalism & Media, News Deserts and Ghost Newspapers: Will Local News Survive? 44 (2020).

Local broadcasting is also important for its influence on civic engagement and elections. For example, a recent Gallup study found that 81 percent of people who follow local news very closely are likely to vote.[69] Good evidence demonstrates that stations that serve audiences of color also correlate with increased voting by those communities.[70] Local news also plays an important role in shaping voters' opinion of political candidates and informing the electorate. Indeed, campaigns and other political organizations spent approximately $5.3 billion on local broadcast television during the 2020 presidential election.[71] Tegna alone generated $445.5 million in political advertising revenue in 2020.[72] Analysts predict broadcasters will generate $4.5 billion in political advertising revenue during the 2022 election cycle.[73] The close link

---

[69] Elise Goldstein, *A New Gallup/Knight Foundation Study Shows the Connection Between Local News and Civic Engagement. Here's How We're Working to Address its Key Findings*, The Lenfest Institute (Aug. 24, 2020), https://www.lenfestinstitute.org/local-journalism/knight-foundation-gallup-local-news-survey/.

[70] Lisa M. George and Felix Oberholzer-Gee, Media Ownership 2016 Quadrennial Review Study 8B, Diversity in Local Television News at 18 (2011); Berry, S., J. Waldfogel. Do Mergers Increase Product Variety? Evidence from Radio Broadcasting. Quarterly Journal of Economics, 116, 1009-1025 (2001); Gentzkow, Matthew. "Television and Voter Turnout." Quarterly Journal of Economics 121, no. 3(2006): 931-72; George, Lisa M. and Joel Waldfogel, "National Media and Local Political Participation: The Case of the New York Times" in Roumeen Islam, ed., Information and Public Choice: From Media Markets to Policymaking. Washington, DC: World Bank Publications, pp. 33-48 (2008); Oberholzer-Gee, Felix, and Joel Waldfogel. "Media Markets and Localism: Does Local News En Español Boost Hispanic Voter Turnout?" American Economic Review, 99, no. 5 (2009): 2120-28.

[71] Alex Werpin & Caitlin Huston, *Midterm Moolah: TV Stations Cash in on Primary Season*, The Hollywood Reporter (May 25, 2022), https://www.hollywoodreporter.com/business/business-news/midterm-moolah-tv-stations-cash-in-on-primary-season-1235153514/.

[72] Mike Reynolds & Stefen Joshua Rasay, *Following Record 2020, TV Groups Eye Robust Political Ad Revenues from Mid-Term*, S&P Global (March 4, 2021), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/following-record-2020-tv-groups-eye-robust-political-ad-revenues-from-mid-term-63007545.

[73] Alex Werpin & Caitlin Huston, *Midterm Moolah: TV Stations Cash in on Primary Season*, The Hollywood Reporter (May 25, 2022), https://www.hollywoodreporter.com/business/business-news/midterm-moolah-tv-stations-cash-in-on-primary-season-1235153514/.

between local news viewership and voting patterns supports the Commission's public interest

mandate of promoting localism.

### B. The Applicants' Stated Business Intentions Would Reduce the Amount and Scope of Local News Coverage

The Applicants' stated business intentions reveal how localism would be undermined

post-transaction. Specifically, their business intentions would lead to a reduction in the amount

and scope of local news coverage through reporter layoffs and a displacement of local

programming with national programming. While the Applicants portray Standard General,

CMG, and Apollo as "model[s] of localism," the only support they offer in their initial

application dates from the days prior to the acquisition of CMG by Apollo.[74] After that

acquisition, we are told that "[t]his identity [the "identity of the communities" Cox served] has

been maintained and even bolstered.[75] But the Applicants provide very little information as to

how these stations were bolstered post-transaction. Even in their June 13 Letter, the Applicants

primarily provide information related to equipment upgrades CMG has made to its stations after

the deal but very little information regarding hiring and retaining journalists and providing

programming coverage that meets the information needs of the communities they serve.[76]

Further, the Applicants' fail to mention the layoffs that took place at CMG stations after Apollo's

acquisition. After its purchase of CMG, Apollo laid off reporters and on-air personalities in

stations across multiple markets.[77] Further, CMG laid off 87 employees as it prepared for its

acquisition by Apollo.[78] Rather than address these harms, the Applicants' true plans is provided

---

[74] *See* Comprehensive Exhibit at 7.

[75] *See id.*

[76] *See* Applicants June 13 Letter at 7-8.

[77] *More Names Affected By Last Week's Cox Media Group Layoffs*, Radio Insight (Sept. 29, 2021),

https://radioinsight.com/headlines/213217/large-round-of-layoffs-hit-cox-media-group-stations/.

[78] *Report: Layoffs Loom as Apollo Readies Purchase of Cox Media Group*, Inside Radio (Sept. 10, 2019),

by this phrase: "CMG [Apollo] stations not only produce their own market-leading local newscasts, but they also gain access to national content generated by CMG's Washington D.C. Bureau.  Access to this programming will improve the local service provided by the acquired stations on day one."[79] Investments in a Washington, D.C. News Bureau do not enhance programming at the local level based on the needs and interests of the communities the Applicants currently serve. There are multiple vectors for communities to access national news content, but as explained in the prior section, broadcasting's unique role is to provide local information and locally responsive content. The emphasis the Applicants place in establishing a Washington, D.C. News Bureau raises questions as to whether national content will supplant or displace local content. Indeed, by the Applicants own admission, they intend to increase the use of a national news desk from which their acquired stations would broadcast information.[80] This is a central component of their application, which should give the Commission pause for concern.

Standard General has been even more outspoken regarding its business intentions in its proxy statement to Tegna shareholders about what it thinks of localism: "TEGNA has 2x the number of employees per station compared to peers, and lags its closest local broadcasting peers on EBITDA margin."[81] The "per station" says it all. It is the local stations' jobs that Standard General is after.  Nor is this the typical kind of efficiency claimed made in other merger proceedings – Standard General is not saying that the transaction will eliminate the need for two national managers as one will suffice for the new and larger jointly managed group. What

---

https://www.insideradio.com/free/report-layoffs-loom-as-apollo-readies-purchase-of-cox-media-group/article_36fc2cf0-d391-11e9-9914-6f8a0243aaa0.html.

[79] Comprehensive Exhibit at 7; *see also* Applicants June 13 Letter at 9.

[80] Comprehensive Exhibit at 7.

[81] Tegna Inc. & Standard General L.P., Additional Definitive Proxy Soliciting Materials Filed by Non-Management and Rule 14(a)(12) Material (Form DFAN14A), at 21 (Apr. 13, 2020) ("Proxy Statement"), https://sec.report/Document/0001104659-20-045933/tm2015782-1_dfan14a.htm. https://investors.tegna.com/static-files/064251d9-7c52-4b76-b7b6-739e3af7a7a2.

Standard General says is more blatant: in its view, Tegna just employs too many people at each local station. Indeed, it is telling that in the midst of the Commission's review of this acquisition, Standard General's CEO sent a memo to Tegna workers stating they have no intention of reducing staff post-transaction in response to Tegna's employees' rightful concern about the potential for massive layoffs as Standard General made its business intentions clear.[82] The cutting of potentially half the resources available to local stations cannot possibly enhance the Commission's goals to promote localism.

While the Applicants claim localism as an advantage, their prior actions and stated intentions tell a different tale -- one that would lead to significant reductions in local news should the Commission approve the transaction.

## VI.    THE PROPOSED TRANSACTION WOULD LEAD TO HIGHER PRICES FOR CONSUMERS.

The current retransmission consent regime, where cable operators must negotiate in good faith with broadcasters to carry their programming, already gives undue power to large broadcasters. The proposed transaction would further exacerbate this framework as the Applicants have structured the deal to take advantage of after-acquired clauses in retransmission consent negotiations. This will allow the Applicants to exert greater leverage and charge higher retransmission rates which will undoubtedly get passed down to consumers in the form of higher cable prices. In the event that retransmission negotiations breakdown, consumers may experience programming blackouts.

---

[82] Al Tompkins, *Standard General tells Tegna employees 'no intention to reduce staff,'* Poynter (June 17, 2022), https://www.poynter.org/business-work/2022/standard-general-memo-tegna-layoffs-staff-cuts/.

### A. Retransmission Prices Will Rise Because of After-acquired Clauses and Upon Renewal of Retransmission Contracts

By 2023, retransmission fees are projected to increase to $12.9 billion, or 5,915% of 2006 revenues.[83] Put simply, retransmission prices next year will be 60 times what they were in 2006. The reason for this? The power wielded by the broadcast groups as they become larger through mergers such as this one.

Typically, these fees are negotiated in three-year cycles. However, increases in retransmission consent fees will come much sooner than the next three-year negotiation cycle if these transactions are approved. In fact, the effect may be immediate, thanks to twin clauses – the "change-in-control" and "after-acquired station" clauses" – customarily found in the contracts between broadcasters and distributors.[84]

The Applicants intentionally structured this deal to take advantage of such clauses, just as they have done so in the past. In the simultaneously contracted-for, applied-for, and approved purchase of the Northwest and Cox stations, Apollo sought to sequence artificially the timing of the two purchases so as to claim automatic retransmission fee increases, to the tune of tens of millions of dollars, by invoking the after-acquired station clauses of the relevant retransmission agreements.[85] This will lead to a drastic increase in cable TV subscription rates for consumers at

---

[83] *Retransmission Fee Revenue for U.S. Local TV Stations*, Pew Research Center (July 13, 2021), https://www.pewresearch.org/journalism/chart/sotnm-local-tv-u-s-local-tv-station-retransmission-fee-revenue/.

[84] RBR-TVBR, *Kagan Sees Retrans More than Doubling by 2019,* Radio + Television Business Report (Nov. 22, 2013), https://www.rbr.com/kagan-sees-retrans-more-than-doubling-by-2019/; Jon Eggerton, *Cable Operators Complain of Retrans 'Arbitrage,'* Next TV (May 28, 2012), https://www.nexttv.com/news/cable-operators-complain-retrans-arbitrage-263853.

[85] William Cohan, *"Television Is What Gets Senators Elected": Private-Equity Mogul Leon Black Is Building a Local TV Empire to Rival Sinclair and Fox*, Vanity Fair (Apr. 15, 2019), https://www.vanityfair.com/news/2019/04/leon-black-is-building-a-local-tv-empire-to-rival-sinclair-and-fox.

a time when many Americans are living paycheck to paycheck as inflation reaches its greatest point in 40 years.[86]

Standard General, for its part, candidly avows that it has set for itself the same objective, emphatically complaining to shareholders in connection with this deal that Tegna's prices "have historically lagged Nexstar, Sinclair and Gray."[87]  And higher prices to distributors eventually find their way, in whole or in part, to the consumer's bill, translating into inflationary pressure at the wholesale and retail levels alike. Further, automatic rate hikes are hardly the only price increases regarding this transaction.  By improving Standard General's and Apollo's bargaining position, the deal will likely result in higher prices in renewal retransmission negotiations, too. Distributors have already shown that broadcast mergers increase the merging groups' bargaining power, and not only when their stations operate in the same local market.  As Federal Trade Commission Chair Khan has emphasized in her seminal article, Amazon's Antitrust Paradox, with respect to cable franchise areas, access of distributors to interconnected markets matters, too.[88]  The union of two broadcast groups means higher rates even though the merging stations may operate in separate local markets.  The Commission has not examined this phenomenon of interconnected local broadcast markets in detail and should urgently take that examination now.

---

[86] Jeff Cox, "Inflation Barreled Ahead at 8.3% in April from a Year Ago, Remaining Near 40-Year Highs," CNBC (May 11, 2022), https://www.cnbc.com/2022/05/11/cpi-april-2022.html.
[87] Proxy Statement at 20.
[88] Lina Khan, Amazon's Antitrust Paradox, 126 The Yale Journal 710, 721 (2017) ("Notably, the Obama Administration's opposition to one of the largest mergers proposed on its watch—Comcast/Time Warner—stemmed from a concern about market access, not prices.")

### B. The Transactions Will Cause Price Increases for Pay TV Consumers and More Blackouts.

The automatic price increases are separate and apart from the higher fees that the merged companies' greater market dominance and bargaining power will allow them to extract when negotiating retransmission agreement renewals in the ordinary course of business.

Today, retransmission fees are a substantial non-advertising revenue source for the owners of broadcast TV stations.[89] In 2014, the Commission reported that the average cost for basic cable plan increased 6.5% in 2012, and the average cost per-channel for cable consumers increased 2.1% that same year, which coincided with an increase in retransmission fees.[90] As retransmission fees continue to increase, it can be expected that more of these costs will be passed down to consumers.

In addition, given the history of service disruptions during the course of negotiations over retransmission consent, all indications are that more consumers will suffer longer blackouts, in the wake of a two-year-long global pandemic, and at a time when access to local information and connectivity is more vital than ever before.

None of the Applicants is a stranger to blackouts on distributors.  In the short time since Apollo acquired CMG, it has imposed blackouts on DISH, AT&T/DIRECTV, Buckland Telephone Co., CableOne, Charter Spectrum, Frontier Communications, Suddenlink, and Verizon Fios.[91] In previous incarnations, the Standard General leadership was a champion of

---

[89] Media Bureau, Report on Cable Industry Prices, Federal Communications Commission (May 16, 2014), https://transition.fcc.gov/Daily_Releases/Daily_Business/2014/db0516/DA-14-672A1.pdf

[90] *Id.*

[91] Rodney Ho, "WSB-TV Back on Air After Fives Days for AT&T/DirecTV Subscribers," Atlanta Journal-Constitution (Feb. 7, 2021), https://www.ajc.com/life/radiotvtalk-blog/wsb-tv-back-on-air-after-five-days-for-attdirectv-subscribers/HKVKTKO5VJC6DHE5V4M3PNF6NI/; Michael Balderston, "Cox Media Stations Go Dark on DirecTV in 20 Markets," TV Tech (Feb. 2, 2021), https://www.tvtechnology.com/news/cox-media-stations-go-dark-on-directv-in-20-markets

blackouts as a retransmission leverage tool as well, imposing them on several distributors over the years.[92] And Tegna itself has imposed blackouts on AT&T/DIRECTV, Mediacom, DISH, and Verizon in the last few years, including during the period right before or during the NFL playoffs or World Series.[93] Given Standard General's complaints that Tegna has not been negotiating hard enough for higher retransmission fees, one can only imagine that the Tegna stations will become even more likely to be used as pawns in more hold-the-consumers-hostage service disruptions.

## VII.    THE SCOPE OF THE TRANSACTION CAUSES NATIONAL HARMS

### A. The Size and Scale of This Merger Poses National Harms Regardless of The Applicants' Compliance With Ownership Limits

If completed, the proposed merger would give Standard General control of 61 full-power television stations and two radio stations across 50 television markets and CMG 31 full-power television stations in 26 markets and 54 radio stations in 11 radio markets.[94] This level of ownership poses significant national harms given the transaction's negative impact to localism

---

("Apollo-owned stations have an extremely long and disreputable history of either threatening or pulling the Super Bowl and other important events from Buckland Telephone Co., CableOne, Charter Spectrum, DISH Network, Frontier Communications, Suddenlink, Verizon Fios and our own [AT&T] customers.")

[92] *See, e.g.,* Daniel Frankel, "Nashville ABC Station Issues Blackout Threat to Mediacom," Fierce Video (Jul. 6, 2015) https://www.fiercevideo.com/cable/nashville-abc-station-issues-blackout-threat-to-mediacom.

[93] Mike Snider, *TV tussle: DirecTV, Tegna dispute turns TV channels dark in 51 markets including Houston, Seattle*, USA Today (Dec. 2, 2020), https://www.usatoday.com/story/tech/2020/12/02/tv-directv-tegna-dispute-results-channel-outages-51-markets/3794473001/ ; Mike Farrell, *Tegna Stations Go Dark to Mediacom*, Next TV (Jan. 4, 2021), https://www.nexttv.com/news/tegna-stations-go-dark-to-mediacom; Ben Munson, *Dish Network dispute with Tegna begins yet another channel blackout*, Fierce Video (Oct. 7, 2021), https://www.fiercevideo.com/video/dish-network-dispute-tegna-begins-yet-another-channel-blackout; Jeff Clabaugh, *Tegna TV stations, including DC's Channel 9, go dark on FIOS*, WTOP News (Jan. 5, 2022), https://wtop.com/business-finance/2022/01/tegna-tv-stations-including-dcs-channel-9-go-dark-on-fios/ ("This is not the first time that Tegna has removed their content from a TV provider. Tegna has a track record of removing their content when a TV provider refuses to accept their demands for unreasonable rate increases…").

[94] Comprehensive Exhibit at 2-3.

and the higher cable prices consumers would have to pay. Stories and issues of significance that arise in one market can appear in other markets. As explained in several Common Cause declarations, without robust local news across multiple markets, providing coverage of issues impacting our democracy, harmful proposals are more likely to spread. Further, an increase in pay television prices nationwide harms consumers regardless of what market they reside.

The Applicants report that Tegna would have a national audience reach of 28.46% of U.S. households post-transaction with the UHF discount taken into account.[95] Without the UHF discount, Tegna would have a national audience reach of 38.46% post transaction, a few decimal places below the 39% cap.[96] The UHF discount is a relic of a long past time, as technological change in the marketplace has eliminated the justification for the discount.[97] When the Commission created the UHF discount, Ultra High Frequency channels were viewed as a lesser counterpart to Very High Frequency channels.[98] This was no longer the case when the Commission repealed the UHF Discount in 2016, as the DTV transition and other innovations made UHF channels as desirable, if not more so, than its counterparts.[99] Nothing has changed since 2016, and there is no reason for the UHF discount to continue to exist. The fact that the Applicants barely fall under the 39% cap without the UHF discount demonstrates how it can be used as a vehicle for circumventing compliance with the national cap.

---

[95] Comprehensive Exhibit at 13.
[96] *Id.*, n.22.
[97] Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, Report and Order, 31 FCC Rcd 10213 (2016).
[98] Bill Durdach, The UHF Discount and the National Television Ownership Rule: "This I Tell You Brother: You Can't Change One Without the Other," The CommLaw Conspectus: Journal of Communications Law and Technology Policy (2014),
https://scholarship.law.edu/cgi/viewcontent.cgi?article=1554&context=commlaw
[99] Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, Report and Order, 31 FCC Rcd 10213 (2016).

Although the parties claim compliance with the National Television Ownership rule, nominal consistency with the cap is not a greenlight to complete the transaction, and it does not mean there are no harms present. The FCC does not approve transactions simply because they comply with ownership limits.[100] Rather, the Applicants have the burden of proving the transaction is in the public interest. Not only have the Applicants failed to show any public interest benefits but they have also not demonstrated how the transaction would not result in the harms animated by the national cap despite falling slightly under it.

The Commission has not considered the rationale for the National Television Ownership Rule in many years. The last time the FCC considered the question and substantially increased that limit,[101] Congress has stepped in to bring the cap down.[102] Then-Senate Majority Leader Tom Daschle spoke on the Senate floor about the concern many Senators held about "the concentration of media ownership,"[103] and Senator Jon Corzine questioned whether or not an increased cap would enable people to "fulfill their civic duty and gather information" amidst increasing levels of media consolidation.[104] There was near-unanimous consent in Congress that

---

[100] Applications For Consent To Transfer Control of Certain License Subsidiaries of Raycom Media, Inc. To Gray Television, Inc., 2018 WL 6722650, at *5; Univision Holdings, Inc. - Searchlight and Grupo Televisa, Petition For Declaratory Ruling, 35 FCC Rcd. 14835, ¶18 (2020); Consent to Transfer Control of Certain License Subsidiaries of NBI Holdings, LLC To Terrier Media Buyer, Inc. Consent to Transfer Control of Certain License Subsidiaries of Cox Enterprises, Inc. to Terrier Media Buyer, Inc. Consent T, 34 FCC Rcd. 10554, 10561 (2019).

[101] 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202
of the Telecommunications Act of 1996, 18 FCC Rcd 13620, ¶ ¶ 501-584(2003).

[102] A Joint Resolution Disapproving the Rule Submitted by the Federal Communications Commission with Respect to Broadcast Media Ownership, S.J. Res. 17, 108th Cong. (2003) (available at https://www.congress.gov/bill/108th-congress/senate-joint-resolution/17).

[103] Tom Daschle (SD), "Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2004—Conference Report," 150 Congressional Record 263 (2004),
https://www.govinfo.gov/content/pkg/CRECB-2004-pt1/pdf/CRECB-2004-pt1-Pg263.pdf.

[104] Jon Corzine (NJ), "Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2004—Conference Report," 150 Congressional Record

the cap should not be raised, yet it still was. Over time, Senator Daschle and Senator Corzine's concerns have only become more prescient, and now the Commission should revisit the rationale behind the National Television Ownership rule and heed the Senators' warnings. The Commission should reconsider its 2003 reasoning in light of Congress' rejection of the FCC's most recent full treatment of the Rule and, regardless of the Rule, look carefully at the national harms caused by this transaction.

### B. Apollo's Rights to Standard General May Not Be in Compliance With Ownership Limits

While the Applicants have structured Apollo's supposedly non-voting stake in Standard General so that it does not trigger attribution under the Commission's rules, the reality may be different. First of all, a carefully crafted provision of the Term Sheet states that,

> for the avoidance of doubt, … employees of Apollo or any Apollo affiliate who are members of the Board of Directors of CMG Holdings, Inc. or who otherwise participate in the management of any Apollo affiliate's investment in CMG Holdings, Inc. shall not have access to any Competitively Sensitive Information.[105]

But what about all other Apollo employees? The implication is that they may be afforded access to Competitively Sensitive information about Standard General's retransmission fee negotiations. In addition, even if the rights given Apollo were viewed as within the realm of legitimate minority rights, they should be viewed through the lens of these transactions' circumstances. Each of Standard General and Apollo periodically negotiates retransmission deals with cable, satellite, and over-the-top distributors. There is no guarantee that Apollo will not use the leverage of rights it is given to exact outcomes it wants in the retransmission fee area, especially since

---

264 (2004),
https://www.govinfo.gov/content/pkg/CRECB-2004-pt1/pdf/CRECB-2004-pt1-Pg263.pdf.
[105] Term Sheet at 9.

Standard General may not act against Apollo's preferences – and there is no guarantee that Apollo would not state its preferences regarding retransmission consent to Standard General.[106] While the Communications Act prohibits coordination of negotiations or negotiation on a joint basis by two or more television broadcast stations not under common de jure control in the same local market,[107] there is no guarantee that such indirect influence can even be detected and, even if it is, that it will be viewed as implicating that prohibition.

If Apollo would have de facto control of Standard General's stations despite its non-voting stake, the transaction would undoubtedly exceed ownership limits. The Commission must carefully evaluate the structure of this transaction and at a minimum designate for a hearing to determine whether or not it is in actual compliance with ownership rules.

## VIII.    CONCLUSION

For the foregoing reasons, the Petitioners respectfully request that the Commission deny the Applicants' proposed transaction or designate the applications for a hearing. The Applicants fail to meet their affirmative burden to demonstrate the contemplated merger will serve the public interest.

Respectfully submitted,

/s/ Yosef Getachew
/s/ Jonathan Walter

Yosef Getachew
Jonathan Walter
Common Cause
805 15th St NW Suite 800
Washington DC 20005

---

[106] Term Sheet at 10.
[107] 47 U.S.C. § 325(b)(3)(C)(iv); 47 C.F.R. § 76.65(b)(1)(viii).

/s/ Cheryl A. Leanza

Cheryl A. Leanza
United Church of Christ Media Justice Ministry
100 Maryland Ave, NE
Washington, DC 20002

## DECLARATION

Common Cause and United Church of Christ OC, Inc.'s (d/b/a United Church of Christ Ministry) Petition to Deny was prepared using facts of which I have personal knowledge or upon information provided to me. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed:

/s/ Yosef Getachew

Yosef Getachew
Common Cause

31

## CERTIFICATE OF SERVICE

I, Jonathan Walter, hereby certify that on the 22nd day of June, 2022, I caused a true and correct copy of the foregoing Petition to Deny via electronic mail to the following:

Jennifer A. Johnson
Hannah Lepow
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
hlepow@cov.com
*Counsel for Tegna Inc.*

Michael Basile
Cooley LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington D.C. 20004
mdbasile@cooley.com
*Counsel to Apollo Global Management, Inc.*

Scott Flick
Lee Petro
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, D.C. 20036
scott.flick@pillsburylaw.com
lee.petro@pillsburylaw.com
*Counsel for Standard General Inc.*

David Brown
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
David.Brown@fcc.gov

Jeremy Miller
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
Jeremy.Miller@fcc.gov

Chris Robbins
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
Chris.Robbins@fcc.gov

Jim Baird
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
Jim.Baird@fcc.gov

/s/ Jonathan Walter

Jonathan Walter
Media & Democracy Program Fellow
Common Cause