# EXHIBIT 6

Case No. 1:24-cv-01204-RC

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| *In the Matter of* ) | |
| ) | |
| Applications to Transfer Control of TEGNA ) | MB Docket No. 22-162 |
| Inc. to Standard General L.P. ) | |
| ) | |

**APPLICANTS' CONSOLIDATED**
**OPPOSITION AND RESPONSE TO COMMENTS**

Scott R. Flick
Jessica T. Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com
*Counsel for SGCI Holdings III LLC*

Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
jjezierny@cov.com
*Counsel for TEGNA Inc.*

Michael D. Basile
Jason Rademacher
Cooley LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
mdbasile@cooley.com
jrademacher@cooley.com
*Counsel for CMG Media Corporation*

July 7, 2022

## SUMMARY

Standard General's proposed acquisition of TEGNA and the related transactions, including Standard General's sale of eight TV stations to CMG, will yield significant public interest benefits without any countervailing public interest harms. Soohyung Kim and Deborah McDermott have a proven track record of enhancing stations' service to their local communities, increasing local news output, and investing in the resources that stations need to compete successfully. They are committed to bringing that same dedication to competition and localism to the TEGNA stations, creating the largest minority-owned and female-led television station group in U.S. history and dramatically increasing minority broadcast ownership and viewpoint diversity. Notably, the Transactions comply with the Commission's national ownership cap even without application of the UHF Discount, do not require any waivers of the Commission's local ownership rules, and do not involve the creation of any time brokerage, joint sales, or shared services agreements.

The two petitions to deny and various comments filed in this proceeding should be dismissed, denied, or otherwise rejected. To the extent they oppose grant of the Applications, the Petitioners and Commenters present principally three lines of attack, alleging that: (a) the Transactions will result in a reduction of local news and loss of journalism jobs; (b) MVPD programming costs will go up, "automatically" increasing MVPD subscriber rates; and (c) Apollo Global Management, Inc. will have an attributable level of influence in post-Transactions TEGNA.[i]

---

[i] While Petitioners indiscriminately use the terms "Apollo" and "AGM" to denote the holder of an interest in post-Transactions TEGNA, Apollo Global Management, Inc. ("Apollo") will not hold any stock interest in post-Transactions TEGNA. Non-voting, non-attributable preferred shares in post-Transactions TEGNA will be held by AP IX Teton Holdings, L.P. ("Fund IX-

The first two arguments have been repeatedly found legally irrelevant to the Commission's review of transactions under the Communications Act, and as demonstrated herein, the premises of those arguments are factually incorrect as well. The Transactions are not about "consolidation" at the local or national level, as TEGNA will actually be smaller after the Transactions and no new local duopolies will be created. Nor will the Transactions involve a "consolidation" of local news operations for any of the stations, because the Applicants have no intention of reducing the amount or quality of local news or newsroom staffing. Any increases in retransmission consent rates (which, it should be noted, yield a stable revenue stream that enables stations to produce local news, air other locally responsive programming, and pay employees) would occur as a result of privately negotiated contracts with MVPDs, and the Commission has consistently declined to interfere in private contractual matters or recognize potential retransmission consent rate increases as a public interest harm.

As to AGM, it is clear under the Commission's rules that it is non-attributable in TEGNA *three times over*: (1) post-Transactions TEGNA will have a single majority shareholder, making all other shareholders (even voting shareholders, if there were any besides Standard General) non-attributable, (2) AGM will, in fact, have only non-voting preferred shares, with no board rights and only usual and customary minority shareholder rights, making it non-attributable even in the absence of a single majority shareholder, and (3) under the Commission's EDP Rule, the aggregate interest in post-Transactions TEGNA held by AGM would have to be nearly *ten times* larger before it could even theoretically trigger attribution, and even then, attribution could only

---

Teton"), a fund managed by affiliates of Apollo. Another fund managed by affiliates of Apollo—AP IX Titan Holdings, L.P. ("Fund IX – Titan")—owns approximately 71% of CMG Media Corporation d/b/a Cox Media Group ("CMG"). For purposes of simplicity, as used in this Opposition, the term "AGM" refers to Fund IX – Teton and/or Fund IX – Titan, as applicable.

be found in TEGNA stations in the four designated market areas ("DMAs") in which CMG also operates stations, not in all of TEGNA. AGM is merely one of seventeen entities facilitating the funding of the TEGNA acquisition, with no rights to anything but a fixed rate of return until its shares are redeemed at Standard General's election, at which point AGM will no longer be even a preferred shareholder.

As a result, the Petitioners have failed to present the *prima facie* case required under the Communications Act demonstrating that grant of the Applications is not in the public interest, and the Commenters have presented no valid reason to impede or impose conditions on grant of the respective Applications. The Commission should therefore promptly grant the Applications, creating a historic increase in minority ownership in the television broadcasting industry, and launching a renaissance in TEGNA's ability to compete on all fronts through Standard General's historically demonstrated dedication to serving local audiences.

## TABLE OF CONTENTS

I.   Introduction ............................................................................................................... 1

II.  Approval of the Applications Is Mandated by the Communications Act ........................ 5

     A.  Standard of Review .................................................................................................. 5

     B.  None of the Parties Challenging the Transactions Has Standing to File a
         Petition to Deny ................................................................................................... 7

     C.  Standard General's Acquisition of TEGNA and the Associated Transactions
         Are Overwhelmingly in the Public Interest ............................................................ 11

     D.  AGM Will Have No Attributable Interest in, nor Influence or Control Over,
         Post-Transactions TEGNA ..................................................................................... 22

     E.  While Staffing Decisions Are Exclusively Reserved to the Discretion of Licensees
         Under the Communications Act and Commission Precedent, Petitioners'
         Presumption That Standard General Will Eliminate Journalist Jobs and
         Newscasts Is Entirely Unsupported and Simply Wrong .......................................... 29

     F.  Petitioners' and Commenters' Retransmission Consent Claims Offer No
         Basis for Denying or Conditioning Grant of the Applications ................................. 35

         i.   *The Commission has previously considered and consistently rejected
              Petitioners' and Commenters' arguments regarding potential rate increases
              and after-acquired clauses* ............................................................................ 36

         ii.  *The Commission should reject the MVPD Commenters' entreaties for
              unwarranted conditions* ................................................................................. 42

III. Conclusion ............................................................................................................... 47

iv

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| *In the Matter of* | ) | |
| | ) | |
| Applications to Transfer Control of TEGNA | ) | MB Docket No. 22-162 |
| Inc. to Standard General L.P. | ) | |
| | ) | |

**APPLICANTS' CONSOLIDATED**
**OPPOSITION AND RESPONSE TO COMMENTS**

## I.    Introduction

SGCI Holdings III LLC ("Standard General"), TEGNA Inc. ("TEGNA"), and CMG

Media Corporation ("CMG", and together with Standard General and TEGNA, the "Applicants")

hereby oppose the two petitions to deny[1] and respond to the four comments[2] submitted in the

above-captioned docket.[3]  As explained below, the transactions and assumptions described in the

---

[1] Petition to Dismiss or Deny of the NewsGuild-CWA and National Association of Broadcast Employees and Technicians-CWA (together, "NewsGuild"), MB Docket 22-162 (filed June 22, 2022) ("NewsGuild Petition"); Petition to Deny of Common Cause and United Church of Christ Media Justice Ministry ("UCC"), MB Docket 22-162 (filed June 22, 2022) ("Common Cause/UCC Petition").  While NewsGuild, Common Cause and UCC are collectively referred to herein as "Petitioners," they lack standing to file petitions to deny, as discussed in Section II.B.

[2] Comments of the American Television Alliance ("ATVA"), MB Docket 22-162 (filed June 22, 2022) ("ATVA Comments"); Letter from NCTA – The Internet & Television Association ("NCTA") to Marlene H. Dortch, MB Docket No. 22-162 (filed June 22, 2022) ("NCTA Comments"); Comments of Altice USA, Inc., MB Docket 22-162 (filed June 22, 2022) ("Altice Comments"); and Comments of Graham Media Group, Inc., MB Docket 22-162 (filed June 22, 2022) ("Graham Comments").  ATVA, NCTA, and Altice are collectively referred to herein as "MVPD Commenters" and, together with Graham, as "Commenters."

[3] Two parties filed comments in the docket pertaining to pending or dismissed judicial actions involving TEGNA that have no bearing on the Applications, or the FCC's public interest review thereof.  These comments refer to a private contractual dispute currently pending in state court and an employment lawsuit that was ultimately dropped by the former employee.  The FCC should disregard these comments due to the fact that they are irrelevant to the Applications and

petitions and comments bear no resemblance to the actual Transactions being proposed in the applications in this proceeding (the "Applications").  And while it has become routine for MVPDs and their trade groups to repeat their speculative claims about retransmission consent in an effort to achieve a private financial advantage—arguments that the Commission has consistently rejected in evaluating proposed transactions—the opposition from NewsGuild, Common Cause, and UCC is surprising given their mission statements and the substantial diversity, competition, and localism-related benefits that would result from Standard General's acquisition of TEGNA (together with the related transactions, including Standard General's acquisition of WFXT(TV) and sale of eight stations to CMG, the "Transactions").

Petitioners simply ignore the details of the Transactions before the Commission and instead offer generalized fear-mongering about "private equity" companies and the supposed consequences of large station transactions.  Consequently, they ignore the material facts that the Commission must consider in reviewing the Transactions and instead offer nothing but speculative, unsupported and false claims regarding the Transactions, many of which are logically inconsistent.  Specifically:

- The Petitioners have always claimed to value diversity, but fail to even mention that the Transactions would create the largest minority-owned and female-led television station group in U.S. history.

- After years of advocating for providing access to capital to minority buyers, Petitioners now oppose both a minority buyer and his avenue for accessing capital.

---

the Commission's "longstanding policy of refusing to adjudicate private contract law questions for which a forum exists in the state courts."  *Listeners' Guild, Inc. v. F.C.C.*, 813 F.2d 465, 469 (D.C. Cir. 1987) (citing *Agreements Between Broadcast Licensees and the Public*, 57 FCC2d 42 (1975); *Carnegie Broadcasting Co.*, 5 FCC2d 882, 884 (1966); *Transcontinent Television Corp.*, 44 FCC 2451, 2461 (1961)); *see also Consent to Transfer Control of Certain License Subsidiaries of NBI Holdings, LLC to Terrier Media Buyer, Inc. et al.*, Memorandum Opinion and Order, 34 FCC Rcd 10554, 10566 (MB 2019) ("*Terrier Order*"); *Applications of Tribune Media Company and Nexstar Media Group, Inc. et al.*, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8463 (2019) ("*Nexstar-Tribune Order*").

The Petitioners repeatedly make unsubstantiated and unsupportable claims that AGM will control the TEGNA stations following the Transactions, but AGM and CMG will not have an attributable interest in the TEGNA stations acquired by Standard General under any interpretation of the relevant documents or the Commission's rules. Petitioners ignore these facts and merely engage in an irrelevant generic diatribe about all the ways that "private equity" companies damage local television stations.

- Despite their claimed dedication to expanding diversity, the Petitioners attack Standard General for "hav[ing] no journalistic traditions whatsoever,"[4] suggesting that only existing major media companies should be allowed to buy stations. Ironically (and again, entirely ignored by the Petitioners), Standard General was the largest shareholder, Soohyung Kim a board member, and Deb McDermott the COO, of Media General, a publicly traded media company *exactly like TEGNA* in that it was a newspaper company which later acquired TV stations and ultimately spun off its newspapers to become a pure-play broadcaster. It would be difficult to find a closer analogue to TEGNA than Media General, yet the Petitioners have chosen to entirely ignore Standard General's and Deb McDermott's Media General background and experience, including their role in substantially expanding Media General's news operations. It is also worth noting that Deb McDermott is one of a very small number of broadcast CEOs whose college degree *is actually in journalism*. When it comes to "journalistic traditions," the FCC would be hard-pressed to find a buyer and executive team more thoroughly steeped in journalistic traditions and experienced in running a former broadcast/newspaper company than the Standard General team. All of this is conveniently ignored by the Petitioners.

- The Petitioners repeatedly criticize existing TEGNA,[5] but reflexively reject the possibility that even with Standard General's extensive broadcast experience, it could improve TEGNA, citing nothing other than the fact that Standard General affiliates also invest in non-media enterprises.[6]

- The Petitioners say they want to preserve local jobs and local news, but they (a) reject a buyer with a history of investing in local news and employees who has said publicly that its business plans do not include cuts to news or news jobs at TEGNA stations; and (b) align with MVPD Commenters to attack the primary revenue stream that

---

[4] NewsGuild Petition, Exhibit B, Declaration of Charlie Braico, President of the National Association of Broadcast Employees and Technicians and Vice President of the Communications Workers of America, at 1 ("While TEGNA has been a flawed media company, it would be replaced by investment companies that have no journalistic traditions whatsoever."); *see also* NewsGuild Petition at 3 ("Unlike Gannett/TEGNA, which are media companies, Standard General and its financier AGM come out of a different tradition. Media and journalism are simply lines of business to them.").

[5] *See, e.g.*, NewsGuild Petition at 3 (claiming "TEGNA has not been among the very best of group owners ….").

[6] *See id*.

makes it possible for broadcasters to pay employees and produce quality local programming that stations provide to viewers *for free over the air*.[7]

- The Petitioners repeatedly berate the respective buyers in the Transactions for their ability as private investors to effectively deploy capital to build a variety of resilient and profitable businesses, asserting that the buyers will have "a relentless focus on satisfying their investment partners."[8]  However, publicly traded companies are obligated to demonstrate profits on a quarterly basis to demanding public shareholders, and may be pressed to lay off employees to demonstrate to the markets that they are taking proactive steps to maintain their stock value.  In contrast, as a private company under Standard General, TEGNA can make longer-term investments in its stations, won't have to expend its financial resources buying back its public stock, and can be far more agile than a public company in pursuing innovation and adopting new technologies like ATSC 3.0 and multi-platform content delivery without having to reveal its plans to competitors through mandatory SEC filings.

- The Petitioners acknowledge that MVPDs negotiated retransmission consent rates and after-acquired clauses with the Applicants but argue that a transaction triggering those clauses in the very circumstances for which they were negotiated would be "abuse of contract" (without regard to whether those clauses might also provide affected MVPDs with corresponding additional rights or benefits, including an extended contract term).

- The Petitioners criticize privately negotiated "after-acquired" clauses whose primary purpose is to ensure a smooth transition for MVPD subscribers during a station or cable system sale, but then bemoan blackouts, which are precisely what after-acquired clauses are designed to prevent when a station/system is sold.  In the absence of after-acquired and related clauses, new retransmission consent agreements would need to be negotiated every time a station or cable system is sold, markedly increasing the risk of blackouts.  Petitioners ignore that MVPDs are also often the beneficiary of after-acquired provisions in retransmission consent agreements when they purchase and sell cable systems.

The Petitioners ignore all of these factual and logical disconnects, disregard the facts in the record, present only baseless speculation, and take all of the conflicting positions described above without batting an eye.  They then relentlessly attack the alleged harms of "consolidation" while failing to acknowledge that TEGNA will actually be smaller (with more diverse ownership and leadership) after the Transactions than it is today.  Similarly, they spend pages challenging

---

[7] *See infra* Section II.F.i.

[8] NewsGuild Petition at 3.

4

the UHF Discount, which has no relevance to this proceeding.  With no discernable rationale, they are yelling "fire" in a crowded theater while being unable to demonstrate the presence of even a wisp of smoke.

Moving beyond their inconsistent arguments and misplaced attacks, none of the Petitioners or Commenters have presented any legitimate basis for the FCC to deny the Applications or set them for an evidentiary hearing.  Grant of the Applications would serve the public interest to a degree rarely, if ever, seen in any broadcast proceeding, and Petitioners and Commenters have utterly failed to raise any substantial question of fact as to whether grant of the Applications is consistent with the Commission's public interest mandate.  The Transactions more than satisfy the letter and spirit of the Commission's Rules.  Grant of the Applications requires no waivers of the local or national ownership limits, and would further the Commission's longstanding goals of localism, diversity, and competition.  The Commission should therefore promptly dismiss or deny the Petitioners' and Commenters' requests to block or otherwise impede the Transactions, and grant the Applications, implementing the single largest increase in minority broadcast ownership in FCC history.

## II.    Approval of the Applications Is Mandated by the Communications Act

### A.  Standard of Review

The Commission's standard for review of broadcast transactions is well settled:  A station license may be transferred or assigned if the Commission, on application, determines that the public interest, convenience, and necessity will be served thereby.[9]  When evaluating a proposed transfer or assignment, "the Commission must first determine whether the proposed transaction would comply with the specific provisions of the Act, other applicable statutes, and the

---

[9] 47 U.S.C. § 310(d).

Commission's rules."[10]  If the transaction complies with applicable statutes and rules, "the Commission considers whether it could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes" and weighs any potential public interest benefits against any potential public interest harms.[11]  Petitions to deny an assignment or transfer must "contain[] specific allegations of fact sufficient to show that granting the application would be *prima facie* inconsistent with the public interest," and the Commission must then determine whether, "on the basis of the application, the pleadings filed, or other materials which [the Commission] may officially notice," the petitioner has raised a "substantial and material question of fact … as to whether the application would serve the public interest."[12]

As detailed below and in the Applicants' previous submissions in this proceeding, including the Applications, the Transactions will not violate any statute or rule, nor would they frustrate or impair the objectives of the Communications Act or related statutes.  The Transactions will not create any new local station combinations and do not involve transferring any existing Top-Four combinations or the creation of any joint sales, option, or time brokerage agreements.  Nor will the Transactions result in the post-Transactions companies exceeding the 39% national ownership limit, as Standard General will have a national audience reach of

---

[10] *See In the Matter of Applications for Consent to Transfer Control of License Subsidiaries of Media Gen., Inc., from Shareholders of Media Gen., Inc. to Nexstar Media Grp., Inc.*, 32 FCC Rcd 183 (MB 2017) ("*MG-Nexstar Order*") (citing 47 U.S.C. § 310(d)).

[11] *Id.*; *see also Astroline Communications Co., Ltd. Partnership v. FCC*, 857 F.2d 1556, 1561 (D.C. Cir. 1988).

[12] *MG-Nexstar Order* at 192.

28.46% (or 38.46% without application of the UHF Discount), and CMG will have a national audience reach of 10.43% (or 14.97% without the UHF discount).[13]

Nothing in the Applications, pleadings, or other materials of which the Commission may officially take notice provides any evidence at all of the harms Petitioners or Commenters allege, let alone raises a substantial and material question of fact as to whether grant of the Applications would serve the public interest. While Petitioners repeatedly request a hearing regarding the Applications, they have utterly failed to raise any issue that would justify a hearing under the rules or Commission precedent. As set forth in more detail below, the Transactions are completely aligned with the Commission's core public interest goals of increasing diversity (by, among other things, creating the largest minority-owned, female-managed television station group in U.S. history), competition (by, among other things, making TEGNA a smaller, more agile privately held company with greater flexibility and resources to make long-term investments in the stations), and localism (by, among other things, strengthening the affected stations' local news operations).

**B. None of the Parties Challenging the Transactions Has Standing to File a Petition to Deny**

Under the Communications Act, only a "party in interest" has standing to file a petition to deny.[14] A petition to deny must, "[i]n addition to containing the necessary factual allegations to support a *prima facie* case that grant of the application would be inconsistent with the public

---

[13] *See* Applications, Comprehensive Exhibit at 13-14.

[14] *Nexstar-Tribune Order* at 8448 (citing 47 USC § 309(d)). The Common Cause/UCC arguments regarding the right to seek judicial appeal under 47 USC § 402(b)(6) are inapposite, and the cases they cite confirm that only a "party in interest" has standing to petition against a licensing decision. *See* Common Cause/UCC Petition at 3 (citing *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 476-77 (1940) (holding that an existing licensee that alleges he may be economically injured by Commission action in a pending proceeding is a party in interest)); *Elm City Broadcasting Corp. v. U.S.*, 235 F.2d 811, 816 (D.C. Cir. 1956) (same).

interest, convenience, and necessity, … contain specific allegations of fact demonstrating that the petitioner is a party in interest."[15]  To have "party in interest" standing, a prospective petitioner must prove that (1) it has suffered or will suffer an injury in fact (i.e., "a concrete and particularized, actual or imminent invasion of a legally protected interest"[16]); (2) there is a causal link between the proposed transaction and the injury in fact; and (3) denying the application would remedy or prevent the injury in fact.[17] All factual allegations must be supported with one or more affidavits submitted under penalty of perjury from persons with personal knowledge of those facts.  To establish viewer standing, "the petitioner must allege that he or she is a resident of the station's service area or a regular viewer of the station."[18]  An organization seeking to establish standing on behalf of its members must provide an affidavit or declaration "of one or more individuals entitled to standing indicating that the group represents local residents and that the petition is filed on their behalf."[19]

Common Cause/UCC and NewsGuild have styled their pleadings as "Petitions to Deny," but each has failed to establish standing as a party in interest.  The "Petitions" suffer from a fatal lack of personal knowledge of any relevant facts and fail to demonstrate with any specificity or

---

[15] *Nexstar-Tribune Order* at 8448.

[16] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("*Lujan*").

[17] *Nexstar-Tribune Order* at 8448 (citing *Lujan*; *MCI Communications Corp.*, Memorandum Opinion and Order, 12 FCC Rcd 7790 (1997); *Saga Communications of North Carolina, LLC and Library Productions, a Limited Partnership, re: WOXL-FM, Letter Order*, 20 FCC Rcd 11987 (MB 2005)).

[18] *Nexstar-Tribune Order* at 8448.

[19] *Id.* at 8449 (finding that the single declaration submitted by Common Cause and its co-petitioners only supported Common Cause's standing in Chicago and treating UCC as an informal objector and Common Cause as an informal objector in all markets other than Chicago).

credible support that the Transactions would result in any cognizable harm to Common Cause, UCC, or NewsGuild as organizations or to any of their members.

Instead, Common Cause and UCC baselessly assert that the Transactions will result in "media consolidation" and cause "harm to responsive democracy," which they claim will result in a lack of accountability for elected leaders and leave taxpayers to "shoulder the burden of corruption."[20] They spend pages attempting to draw a line from the conjectural harms of media consolidation (which, again, is not occurring here) and an ongoing trend of reductions in local news to Common Cause, UCC, and their members—whether or not they live in a market impacted by the Transactions or even watch television at all. Even setting aside the fact that their members cannot have "viewer standing" if they do not reside in an affected market or regularly watch the affected stations (and their allusion to "taxpayer standing" is even more attenuated), Common Cause and UCC completely fail to draw a line between their fear that "consolidation means fewer journalists and less local news coverage"[21] and the Transactions. The alleged harms claimed by NewsGuild are similarly tied to a theoretical "loss of job opportunities throughout the journalism industry resulting from the anti-competitive impact of the consolidation that would take place if these transactions were approved" and "loss of access to local journalism."

Common Cause/UCC and NewsGuild do not offer a shred of evidence to support their assertions that the Transactions will result in reduced news and jobs as a byproduct of media consolidation. Nor can they. As detailed below, these Transactions are not about consolidation—post-Transactions TEGNA will be smaller than it is today, and no new station

---

[20] Common Cause/UCC Petition at 7-10.

[21] *Id.*

combinations are being created in any local market.  As reflected in their *June 13 Response*[22] and as discussed further below, neither Standard General nor CMG has any intention of reducing local news or station-level staffing at the stations each is respectively proposing to acquire.

Common Cause/UCC and NewsGuild also claim to have standing based on their theories that the Transaction will result in "increased costs for pay-TV subscriptions."[23] Among the flaws with this line of reasoning: (1) increased pay-TV subscription costs are not a cognizable harm resulting from a broadcast transaction, particularly because (a) the broadcast programming is available to viewers for free over the air, and (b) the fees are being charged by a third-party—the MVPD that chooses to pass any programming costs through to subscribers to protect its profit margins; (2) as even NewsGuild acknowledges, the Commission has consistently and categorically declined to find that an increase in MVPD programming costs is a public interest harm;[24] (3) retransmission consent fees are the primary stable revenue source funding stations' ability to produce local news and other programming to better serve their communities, hire employees, and provide competitive salaries and benefits; and (4) the *majority* of the Petitioners' declarants claiming that they will be harmed by retransmission consent rate increases state that they watch the stations *over the air or via OTT services* (and thus would be completely unaffected by any theoretical increase in MVPD retransmission consent rates while still benefitting from the news and other programming those fees support).[25]  As a result, these

---

[22] Applicants' Response to Request for Documents and Information, MB Docket No. 22-162 (filed June 13, 2022) ("*June 13 Response*").

[23] *See, e.g.*, NewsGuild Petition at 8; Common Cause/UCC Petition at 24-25.

[24] NewsGuild Petition at 19-20.

[25] *See, e.g.*, Declaration of NewsGuild member Michael Cabanatuan (claiming that "as a customer of YouTube TV], [*sic*] I will incur increased costs attributable to the higher retransmission consent fees that Standard General intends to impose on pay TV providers.").  Of

entities have failed to demonstrate any "concrete and particularized" injury in fact, much less one that would be remedied by denial of the Applications.

ATVA, Altice, NCTA, and Graham did not attempt to demonstrate standing and do not purport to be petitioners.  Thus, to the extent the Commission considers the pleadings submitted by Common Cause/UCC, NewsGuild, or the Commenters at all, they should be treated as informal objectors rather than parties in interest.

### C.  Standard General's Acquisition of TEGNA and the Associated Transactions Are Overwhelmingly in the Public Interest

If there is any consistent theme to the Petitions and Comments, it is that while they do not particularly favor TEGNA as a broadcast company, it's just safer to maintain the status quo— paradoxically, a status quo that Petitioners have repeatedly criticized for lack of ownership diversity—and not risk the numerous speculative harms Petitioners and Commenters conjure. That very position, however, has been found by the Commission to be contrary to the public interest.  In a case in which the Commission rejected UCC's bid to reinstate the broadcast station anti-trafficking rule, the Commission stated:

> In broadcasting, like any other business, important services can be performed by people who trade in broadcast properties; for example, they can rehabilitate ailing stations with new capital and ideas or relieve unwilling licensees of the responsibility of running a station they no longer want. All these activities make broadcasting more responsive to viewers thereby promoting the public interest.[26]

The Commission proceeded to note that:

---

the 13 declarations Common Cause submitted, 10 said they watch over the air and/or via OTT and one did not specify.  Of the six declarations UCC submitted, one said they watch over the air and three did not specify.  Of the 14 declarations NewsGuild submitted, six said they watch over the air and/or via OTT and two did not specify.  As discussed below, OTT agreements are negotiated by television networks and therefore unaffected by station sales.

[26] *In the Matter of Amend. of Section 73.3597 of the Commission's Rules (Applications for Voluntary Assignments or Transfers of Control)*, 4 FCC Rcd 1710, 1711 (1989).

> In the absence of such evidence, the [petitioners] have not met their burden of showing that the value of "stability" in principle outweighs the value of allowing new buyers to reinvigorate ailing or lackluster stations. If our rules and policies concerning program obligations are inadequate, we should address them directly instead of adopting the indirect remedy of an anti-trafficking rule.[27]

The Petitioners and Commenters resort to all that is left to them in the absence of any facts suggesting that grant of the Applications is not in the public interest: trying to shift the burden of proof by asserting that the Applicants' public interest showing is fundamentally inadequate. In seeking to accomplish this, the Petitioners incorrectly describe the standard of review for broadcast assignment and transfer applications,[28] with a goal of setting the bar so high that no application could ever surmount it. The Applications, however, clearly would satisfy even the artificially heightened standard of review Petitioners propose. Granting the Applications would promote diversity, competition, and localism—the three "core agency objectives" that "guide [the Commission's] actions in regulating media ownership."[29] Denying the Applications would thwart those objectives. Extensive discussion of the public interest

---

[27] *Id.* at 1712.

[28] *See, e.g.*, NewsGuild Petition at 5-6 (suggesting that even where a transaction complies with all applicable law, the Commission must "explore" *any* "issues that implicate the public interest," when the actual question (which is even cited by NewsGuild) is whether a transaction would result in "public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.").

[29] *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order, 18 FCC Rcd 13620, 13627, ¶ 17 (2003) ("2002 Biennial"); *see also* Kim Makuch & Jonathan Levy, Office of Economics and Analytics, Federal Communications Commission, Market Size and Local Television News, OEA Working Paper 52 (Jan. 15, 2021) (citing *2018 Quadrennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Notice of Proposed Rulemaking, 33 FCC Rcd 12111, ¶¶ 24, 39, 43, 44, 46, and 61 (2018).

benefits that will result from the Transactions can be found in the Applications and the Applicants' *June 13 Response*, and Applicants provide additional details below.

**Diversity**:  As NewsGuild, Common Cause, and UCC explained to the U.S. Supreme Court in December 2020, the Commission "has consistently recognized that 'the public interest is served by increasing economic opportunities for minorities and women to own communications facilities.'"[30]  With Soohyung Kim as Standard General's sole Managing Member and Deborah McDermott as post-Transactions TEGNA's CEO, Standard General's acquisition of TEGNA would substantially increase the number of minority-owned commercial TV stations, with the total number being over 300% of what it is today,[31] and create the largest minority-owned and female-led television station group in U.S. history.[32]

Additionally, acquisition of TEGNA would enable Standard General to achieve (and exceed) the level of board member diversity that it has sought for TEGNA since 2020 as one of the company's largest shareholders:  half of the board members of post-Transactions TEGNA's parent company, Teton Parent Corp. ("TPC"), will be members of minority groups and more than half will be women.[33]

The Transactions would also increase opportunities for minority and female journalists and other media professionals, as Standard General is committed to increasing diversity in news

---

[30] *FCC v. Prometheus Radio Project*, Brief for Respondents Prometheus Radio Project, et al. (including NABET-CWA, Common Cause, and UCC), Case Nos. 19-1231, 19-1241 (DC Cir.) (citing *Policies and Rules Regarding Minority and Female Ownership of Mass Media Facilities*, 10 FCC Rcd 2788, 2788-90 (1995)).

[31] *See June 13 Response* at 4 (citing Fifth Report on Ownership of Broadcast Stations, DA 21-1101 (MB Sept. 3, 2021)).

[32] *See* Applications, Comprehensive Exhibit at 1 and 5; *June 13 Response* at 3.

[33] *See* Applications, Comprehensive Exhibit at Exhibit C-3.

reporting and programming matters to be more reflective of the increasingly diverse U.S.

population.  As Mr. Kim recently explained,

> One of our key initiatives is to give our communities a voice....  We want to
> partner with community journalism groups to amplify the work they're doing
> and the communities they represent.  We're open to exploring new partnership
> models to get diverse viewpoints and perspectives on the air and to make sure
> people have the resources to do it.…  More diversity is needed throughout the
> broadcast industry, and now I find myself in a position where I can make an
> impact.[34]

Mr. Kim and the Standard General leadership team understand that investments in racial and

gender inclusivity and viewpoint diversity are not mutually exclusive with—and indeed,

contribute to—running a successful broadcast enterprise.[35]

The Petitioners' response to these undisputed facts is simply to ignore them.  Rather than

acknowledge these powerful public interest benefits and try to then meet their burden as

petitioners to overcome them through proven countervailing harms, the NewsGuild Petition

instead asserts that "the Applicants do not demonstrate *any* public interest benefits that would

accrue from the transactions,"[36] with the Common Cause/UCC Petition stating that "in neither

---

[34] Hazel Trice Edney, *With Pending Transaction: Media Mogul Envisions Escalated Voices of African-Americans in Broadcast Media*, Washington Informer (June 22, 2022), https://www.washingtoninformer.com/with-pending-transaction-media-mogul-envisions-escalated-voices-of-african-americans-in-broadcast-media/ ("The acquisition will also benefit aspiring minority journalists by creating new jobs with a company that has a proven track record of inclusivity and a commitment to wages and benefits, Kim said.  They will be able to do this not by creating a nationally driven monolith of national news, but instead, by creating a bottom-up model where local news is prioritized so that it can continue to meet the needs of local communities that rely on broadcast news, he says.").

[35] *Id.* (quoting Mr. Kim: "Bringing these diverse voices to the forefront not only will better reflect the communities we serve, it will also be good for business.").

[36] NewsGuild Petition at 4 (emphasis added).

14

their application nor response to the Commission's request for information do the applicants

make a convincing case that the transaction will provide *meaningful* public interest benefits."[37]

These hardly sound like the responses of organizations that have in the past told the

Commission:

- "The Commission should clearly and unquestionably adopt ownership diversity as part of the public interest standard."[38] (*UCC, Common Cause, and NABET-CWA*)

- "[T]he FCC must be clear that the public interest standard includes ownership diversity, including race and gender ownership diversity."[39] (*UCC, Common Cause, and NABET-CWA*)

- "UCC et al. oppose the Commission's proposal to adopt an incubator program as it will not fulfill the Commission's obligation to promote gender and racial diversity of media ownership."[40] (*UCC, Common Cause, and NewsGuild*)

- "In so doing, the Commission exacerbates a long-standing problem—the lack of station ownership by minorities and women.  Congress has mandated that the Commission review and eliminate barriers to entry for underrepresented groups and 'promot[e] economic opportunity and competition … [and] disseminate[e] licenses among a wide variety of applicants, including small businesses … and businesses owned by members of minority groups and women.'"[41] (*UCC*)

---

[37] Common Cause/UCC Petition at 1 (emphasis added).

[38] Comments of United Church of Christ, OC Inc., Common Cause, and National Association of Broadcast Employees and Technicians—Communications Workers of America, *2018 Quadrennial Regulatory Review*, MB Docket 18-349 (filed Sept. 2, 2021), at 11.

[39] *Id.*

[40] Comments of Office of Communication, Inc. of the United Church of Christ, Media Alliance, National Organization for Women Foundation, Communications Workers of America, Common Cause, Benton Foundation, Media Council Hawaii, Prometheus Radio Project, and Media Mobilizing Project, *2014 Quadrennial Regulatory Review*, MB Docket No. 14-50 (filed Mar. 9, 2018), at 2.

[41] Comments of the Office of Communications of the United Church of Christ, Inc., Media Alliance, National Organization for Women, the Benton Foundation, and Campaign Legal Center, *Innovation in the Broadcast Television Bands: Allocations, Channel Sharing and Improvements to VHF*, ET Docket No. 10-235 (filed Mar. 18, 2011), at 4 (ellipses, brackets and interior quotation marks in original).

- "Not only does the Martin Proposal fail to cure the lack of adequate notice given by the August 2006 FNPRM, it fails to address our repeatedly-voiced concerns about the lack of minority and female ownership."[42] (*UCC and Common Cause*)

- "The Commission should make increasing opportunities for minorities and women to own broadcast stations a central focus of this proceeding."[43] (*UCC and Common Cause*)

- "Increasing minority and female broadcast station ownership would serve the public interest in many ways. First, it would benefit the public by increasing the diversity of programming. Second, it would help to break down racial and gender stereotypes. Third, increasing the number of minority or women-owned stations would result in better service for underserved segments of the population. Finally, it would help remedy the past discrimination against both women and minorities in which the Commission has been at least a passive participant."[44] (*UCC and Common Cause*)

- "Adopting rules to increase minority and female ownership of broadcast stations would further [Congress's goal of making communications service available to all Americans on a non-discriminatory basis] and would also serve the public interest in assuring that all segments of society have the information they need to be active participants in our democratic form of government."[45] (*UCC and Common Cause*)

After decades of proclaiming the critical public interest importance of the Commission supporting increased minority and female broadcast station ownership, both Petitioners *fail to make a single mention* in their Petitions of this overriding public interest objective—an objective that no other transaction or policy in all of Commission history has achieved to such a degree.

---

[42] Comments of United Church of Christ, Inc., National Organization for Women, Media Alliance, Common Cause, Benton Foundation, Consumers Action, Massachusetts Consumers' Coalition, NYC Wireless, Democracy Now!, Wayne Caswell, and James J. Elekes, *2006 Quadrennial Regulatory Review*, MB Docket Nos. 06-21, 02-277; MM Docket Nos. 01-235, 01-317, 00-244 (filed Dec. 11, 2007) at 2.

[43] *Id.* at i.

[44] *Id.* at 3.

[45] *Id.* at 23.

The Petitioners' silence demonstrates that they know—even without considering all of the other public interest benefits presented by the Applicants, including those discussed below—the Applicants have irrefutably met their burden to demonstrate that grant of the Applications is in the public interest.[46]  The Petitioners' sole response to that proof is to offer speculation about phantom station layoffs and suppositions that the Transactions will inexorably lead to higher subscription fees for consumers who receive their broadcast content through MVPDs.  As discussed below, neither of these conjectures is true (or relevant), and the fact that none of the Petitioners even attempted to present any balancing of this unrefuted public benefit against their speculative harms reveals that it is an easy call for the Commission to find that grant of the Applications is in the public interest.[47]

*Competition*:  Notwithstanding the many pages Petitioners devote to "the anti-competitive impact of the consolidation that would take place if these transactions were approved,"[48] the Transactions would not result in consolidation.  In fact, the Transactions will result in TEGNA being smaller than it is today and preserve competition in each of the affected local markets.  Additionally, by taking TEGNA private, Standard General will free TEGNA from the constraints of quarterly profit-reporting and pressure to generate short-term profits, and enable TEGNA to be more nimble and flexible as it makes long-term investments that allow the company to adapt rapidly to a changing technical and competitive environment.  This includes,

---

[46] Notably, the Commenters were equally disinterested in this vital fact, with only Graham mentioning it in a single sentence in the penultimate paragraph of its filing.  *See* Graham Comments at 9.

[47] *See* NewsGuild Petition at 1 (claiming that "Applicants have not even attempted to meet their affirmative burden of establishing that there are public interest benefits that can possibly outweigh … the cost of pay-TV services that would result from grant of the applications.").

[48] *Id.* at 8.

for example, having greater flexibility to retain employees and continue hiring during national economic downturns, to devote more resources to local news where TEGNA may have been unable as a public company to justify such costs to its shareholders, and to invest in the new ATSC 3.0 broadcast standard, where economic returns are not yet proven and may not materialize for years. Such investments will yield competitive benefits that inure to TEGNA's stations and employees, the broadcast industry, and the public at large, and the Commission has affirmed that "invest[ing] more heavily in employees, programming and equipment . . . includ[ing] investments in ATSC 3.0…constitute public interest benefits."[49]

*Localism*: Mr. Kim and Ms. McDermott have deep roots in the broadcast industry and have worked together to invest in and improve station operations since they led Young Broadcasting, Inc. out of bankruptcy in 2010. Both have been approved in numerous FCC applications as qualified to own and hold attributable interests in other broadcast stations.[50] Ms. McDermott, who will be CEO of post-Transactions TEGNA, has more than 20 years of experience leading broadcast groups, having served as President and CEO of post-bankruptcy Young Broadcasting, COO of Media General, and President and CEO of the four stations currently owned by Standard General affiliate Community News Media. She is the first female leader of a television broadcast group to be inducted into the Broadcasting & Cable Hall of Fame

---

[49] *See Nexstar-Tribune Order* at 8450.

[50] *See, e.g.*, Application for Transfer of Control of Young Broadcasting, Inc. and Media General, Inc. to Post-Merger Shareholders of Media General, Inc., FCC File No. BTCCDT – 20130703AFF (granted Nov. 8, 2013); Application for Transfer of Control of Lin Media LLC to Media General, Inc., FCC File No. BTCCDT – 20140509AIO (granted Dec. 17, 2014); Applications for Assignment of Licenses of Citadel Communications, LLC to Standard Media LLC, FCC File Nos. BALCDT – 20190516AAE and BALCDT – 20190516AAF (granted July 3, 2019); Applications for Assignment of Licenses of Sinclair Television Group, Inc. to Community News Media LLC, BALCDT – 20201113AAS and BALCDT – 20201113AAZ (granted Jan. 15, 2021).

and has served as Chair of the National Association of Television Program Executives, Chair of the ABC Affiliate Board of Governors, and as a member of the Boards of the National Association of Broadcasters and the Television Bureau of Advertising.

Mr. Kim, Ms. McDermott, and the Standard General management team place a high value on local news and tailoring programming to meet the needs and interests of stations' local communities. And they have the track records to prove it. With Ms. McDermott at the helm and Mr. Kim as the controlling/largest shareholder, Young Broadcasting and Media General **added over 40,000 hours of local news** during their tenure. **When the Media General stations were sold to Nexstar in 2017, they were *annually* airing more than 11,500 hours of news *above and beyond* what they were airing prior to Mr. Kim's involvement**.

Indeed, within 18 months of Young Broadcasting's emergence from bankruptcy and the arrival of Mr. Kim as a shareholder and director, the company invested $25 million in Young Broadcasting's 14 stations for newsroom upgrades (including new field cameras, editing and production gear, news sets, and new master control facilities). Specific examples are described in the Applications and *June 13 Response*. Yet more examples include KOIN(TV) (Portland, OR), where Media General worked with station leadership and began a campaign to better understand the station's audiences, leading KOIN(TV) to restructure much of its content initiatives and enhance its focus on community journalism and extended daily coverage for neighborhoods that had previously been underserved, and WSPA-TV (Greenville-Spartanburg, SC), where daily weather and news coverage were refocused to include the underserved areas of the market, and the station added a 7 p.m. newscast five days a week to serve commuters who were not home in time for the 6 p.m. news.

More recently, when KLKN(TV) (Lincoln, NE) learned that local schools were having difficulty managing remote learning during the pandemic, the station cleared the programming on one of its digital channels and instead ran local school lessons *every hour* of the school day for the remainder of the school year and, when parents couldn't attend their kids' games in the fall, the station put those on the digital channel as well.[51]  As Ms. McDermott has explained: "We're not being paid for any of this.  This is just the right thing to do."[52]  And, as discussed in the *June 13 Response*, Standard General hired six local reporters in Cape Girardeau, Missouri **(part of a 28% newsroom staff increase across its four stations in just the past 16 months)** to provide local content for the launch of KBSI(TV)'s first local newscast.

NewsGuild challenges this expansion of local news and news staff, questioning Standard General's commitment to localism because KBSI(TV)'s newscasts are supported both by local reporters in Cape Girardeau and, "as of March, 2022," anchors and production staff located in Lincoln, Nebraska.[53]  But NewsGuild conveniently fails to note that KBSI(TV) did not produce *any* news prior to March 2022—when Standard General acquired the station in 2021, it was

---

[51] *See* Jim Carr, Lincoln Public Schools – Remote Learning (Apr. 8, 2020) https://www.klkntv.com/lincoln-public-schools-remote-learning ("KLKN-TV is proud to partner with Lincoln Public Schools (LPS) in order to broadcast LPS Early Childhood through Fifth Grade Remote Learning Lessons on channel 8.3.  The videos will air Monday through Friday from 8:30 a.m. to 4:00 p.m.").

Additionally, in the winter of 2020, Gray Television's tower in Lincoln collapsed, forcing Gray's NBC and CBS-affiliated stations off the air.  Rather than taking competitive advantage of this tragedy and leaving its community deprived of these stations' programming, Deb McDermott and KLKN(TV) determined it would be better to serve the Lincoln community by providing a temporary home for Gray's stations.  As a result, KLKN(TV) permitted Gray to broadcast from its tower and antenna for free for a year, while Gray rebuilt its facilities.

[52] Jon Lafayette, *Standard Media's Deb McDermott Cites Track Record Amid Challenges to Tegna Deal,* Broadcasting+Cable (June 24, 2022), https://www.nexttv.com/news/standard-medias-deb-mcdermott-cites-track-record-amid-challenges-to-tegna-deal.

[53] NewsGuild Petition at 15-16.

rebroadcasting a competitors' newscast pursuant to a news share agreement. More importantly, NewsGuild offers nothing to support its suggestion that KBSI(TV) is anything less than responsive to its community's needs or that Standard General's Cape Girardeau newscasts are having any negative impact on the local labor market about which they profess so much concern. NewsGuild cannot support its claims, because they aren't true.

Given the cumulative increase in local news hours at Young and Media General, as well as the many specific station examples discussed in the Applications and subsequent submissions by the Applicants, and as set forth in more detail in Section II.E below, there is simply no foundation for Petitioners' assertions that Standard General intends to "reduc[e] labor costs through cutting jobs, reorganizing and limiting salaries"[54] of journalists or that the Transactions "would lead to a reduction in the amount and scope of local news coverage through reporter layoffs and a displacement of local programming with national programming."[55] That is purely

---

[54] NewsGuild Petition at 3. Further, NewsGuild's claim that this "translates, among other things, to reducing jobs by taking advantage of monopsonistic power in the local and national labor market for journalism . . . allowing them to squeeze employees' salaries" is logically incoherent and ignores that "the dramatic reduction in daily newspapers and increased focus on national digital distribution" has absolutely nothing to do with the Transactions. *Id.*

[55] Common Cause/UCC Petition at 19. Common Cause/UCC's efforts to link an alleged decreased focus on local markets following Terrier Media Buyer's ("Terrier") acquisition of CMG to Standard General's TEGNA plans for local content fails for two reasons. *See id.* at 19-20. First, AGM and CMG will have no input regarding Standard General's programming decisions for the post-Transactions TEGNA stations, so CMG's localism efforts can provide no basis for questioning Standard General's exemplary approach to localism. Second, CMG's own focus on localism has never waned. Since Terrier's investment in CMG, several CMG stations have increased local news output, and CMG has continued to provide exemplary service to its communities. In just one example, CMG recently added award-winning programming as part of *CMG Gets Real*, which facilitates difficult local conversations about race, equality, trust, and transparency and won a National Association of Broadcasters Service to America Award in 2022 for providing outstanding public service to CMG's markets along with other regional and national recognitions.

unsupported speculation that is inconsistent with the stated intentions of Mr. Kim and Ms.

McDermott and the history of every broadcast company in which they have been involved. [56]

### D. AGM Will Have No Attributable Interest in, nor Influence or Control Over, Post-Transactions TEGNA

Common Cause/UCC, NewsGuild, ATVA, and Graham (the latter focusing solely on the

Jacksonville DMA) each postulate that the Transactions may "link" TEGNA to AGM,[57] and

proceed to make arguments that might apply "if" AGM had *de facto* control of the post-

Transactions TEGNA stations.[58]  Notably, these parties have had ample access to the relevant

---

[56] Common Cause/UCC offer Internet-reported staff cuts at CMG following Terrier's acquisition of CMG in 2019 as evidence that Standard General will cut staff at TEGNA stations following the Transactions.  Common Cause/UCC Petition at 21.  But the employment actions of AGM and CMG are irrelevant to staffing decisions at post-Transactions TEGNA because AGM and CMG will have no input into Standard General's TEGNA staffing decisions.  Moreover, like most of Common Cause/UCC's assertions, this one is based on a mischaracterization of events of which Common Cause/UCC have no personal knowledge.  For example, the "87 layoffs" reported by website Radio Insight in September of 2019 did not touch any of CMG's local television stations and were instead part of a corporate-level staff restructuring initiated by CMG's former owner.  AGM had no role in that process, which occurred months before Terrier closed on its acquisition of CMG.

[57] *See, e.g.*, ATVA Comments at i (claiming that "Applicants thus propose to link two of the largest broadcast groups…"); Graham Comments at 1 (claiming that, "if approved, the Transaction would align the financial interests of the four major network affiliates in Jacksonville ….").  Notably, Graham's concerns are limited to the Jacksonville DMA, where it owns two stations and, according to Graham, one of those stations currently commands a 58% share of the total viewing audience.  *See* Graham Comments at 3.

[58] Common Cause/UCC Petition at 29 ("If Apollo *would* have de facto control of Standard General's stations despite its non-voting stake, the transaction would undoubtedly exceed ownership limits.") (emphasis added); *see also* ATVA Comments at i ("If Cox *does* hold an attributable interest in New TEGNA, then the transaction cannot proceed because it would create new duopolies in six markets (four if Cox divests two stations in an unrelated transaction), including control or operation of all four major networks in Jacksonville.") (emphasis in original); Graham Comments at 7 ("*if* the Commission *were to determine* that Cox's interests should be attributed to the new company, the Transaction would plainly be problematic.") (emphases added).  As noted in the Applications (Comprehensive Exhibit at 4, n.12), neither AGM nor CMG hold any interest in Standard General, the single majority shareholder of TPC, nor will they have any right to appoint TPC or TEGNA board members, participate in the

transaction documents from the Applications, as well as (in the case of NewsGuild, ATVA, and

Graham) access to highly confidential ancillary documents previously submitted to the

Department of Justice and filed with the FCC in response to the June 3 Request[59] more than a

week before the petition deadline,[60] and none provide a scintilla of evidence that AGM will have

any influence over post-Transactions TEGNA, let alone anything approaching *de facto* control.

Petitioners resort to arguing that, regardless of what the Applications and transaction documents

say, "there is no guarantee" that AGM won't have some improper influence or that such

"influence [could] even be detected …."[61]  The Commission should dismiss such conjecture out

of hand because, "[i]n the absence of properly supported specific allegations of fact to support a

contrary conclusion," the Commission "do[es] not assume that any applicant 'will not faithfully

---

operations of the post-Transactions TEGNA stations, or view competitively sensitive
information.

[59] The Media Bureau's June 3 Request asked for "all documents submitted to the Department of
Justice and Federal Trade Commission and designated as either 4(c), 4(d), or V documents, in
connection with required clearance of the Transactions under the Hart-Scott-Rodino Antitrust
Improvements Act ("HSR") and related regulations and instructions."  For HSR purposes, these
items include "all studies surveys, analyses and reports which were prepared … for the purpose
of evaluating or analyzing the acquisition," third party consultants' materials and synergies
documents including, in some circumstances, draft documents.  As such, documents submitted
for HSR purposes may include information relating to earlier iterations of a deal or to
transactions that never materialized and are not the subject of the HSR filing.

[60] In this regard, Applicants note that they cumulatively submitted a combined total of 16 non-
duplicative documents in response to the June 3 Request, very little of which bore any relation to
the issues raised by the Petitioners or Commenters, and the majority of which were simply
presentation decks or spreadsheets.  Other Confidential Information provided to these parties
consisted merely of redacted Application exhibits containing viewership or BIA data required by
the FCC to demonstrate compliance with the multiple ownership rules.  Reviewing parties had
ample time to review this handful of documents prior to the petition deadline, yet none of their
filings cite any of these documents in support of their speculative arguments.

[61] Common Cause/UCC Petition at 28-29.

carry out its representations or that [an applicant] will be operated or controlled in a manner that differs from the [transaction] under consideration.'"[62]

Contrary to Petitioners' unsubstantiated assertions, the Transactions do not involve any "attempts to game" the Commission's ownership rules.[63]  Indeed, if the Applicants' goal had been to push the envelope on how big an interest AGM could hold in TEGNA while remaining non-attributable, it is worth noting that since post-Transactions TEGNA will have Standard General as a 100% single majority shareholder, the Commission's multiple ownership rules would allow AGM to hold up to a 49.99% *voting* interest in post-Transactions TEGNA without triggering attribution.[64]  Instead, AGM has nothing more than a non-voting preferred interest, entirely consistent with its role as a funding source rather than as an owner.

Nor is AGM a particularly large investor in post-Transactions TEGNA.  AGM is merely one of the **seventeen** entities providing funding for Standard General's acquisition of TEGNA, five of which (including AGM and a Standard General fund) are providing funds for preferred shares that pay a fixed rate of return and convey no voting or control rights.[65]  In fact, of the

---

[62] *Univision Holdings, Inc.*, Memorandum Opinion and Order, 7 FCC Rcd 6672, 6675 (1992) (rejecting unsupported "asserti[ons] that in the future the Buyer will be operated or controlled in a manner inconsistent with [the Commission's] requirements or with the representations made by the Buyer in the applications and in affidavits.").

[63] NewsGuild Petition at 1.  Moreover, NewsGuild alleges that if AGM were deemed to hold an attributable interest in post-Transactions TEGNA stations, then the combined company would exceed the national ownership cap.  NewsGuild Petition at 10-11.  This is false.  Adding the two post-Transactions companies' stations together would amount to a national audience reach of 34.42%, which would comply with the current national ownership cap.

[64] This is true regardless of the Equity-Debt Plus Rule, as even a 49.99% voting interest would not cross the 33% EDP threshold in the present case.  Moreover, even if the Equity-Debt Plus Rule could be triggered here, it would not create attribution in TEGNA, but merely in the TEGNA stations located in the four DMAs where CMG stations also operate.

[65] ATVA in its Comments makes the nonsensical arguments that despite the fixed rate of return, (1) because AGM can sell its preferred shares to a third party, it has a vested interest in the

seventeen entities providing funding for the acquisition of the TEGNA stations, AGM ranks **14ᵗʰ** in terms of size of funding.  Moreover, its preferred shares can be eliminated at Standard General's election at any time by redeeming them at a set price, and Standard General anticipates redeeming such shares over the next few years, eliminating AGM as a holder of even non-voting preferred shares.

Some of the Petitioners and Commenters insinuate that something greater than this simple lender relationship will exist by exaggerating AGM's role,[66] or by using dark phrases like "a web of interlocking interests among the companies."[67]  However, they fail to demonstrate *any* such "interlocking interests" or method by which AGM could actually exercise influence over TEGNA's stations or any transaction-specific circumstance that would "increas[e] both the incentives for and ability of the parties to collude"[68]—in Jacksonville or any other market.[69]

---

financial performance of TEGNA on the theory that it can then sell its shares at a premium, and (2) that this is confirmed by a provision in the preferred shares term sheets prohibiting the sale of preferred shares in quantities of less than $25M face value.  As to the first point, since the shares have a fixed rate of return, TEGNA's financial performance is irrelevant to the value a buyer would pay for them, and as to the second point, the sole purpose of such a provision is to ensure blocks of preferred shares sold are of sufficient size to ensure the issuer does not find itself dealing with a thousand small preferred shareholders that it then has to individually issue interest payments to.  It has nothing to do with the price at which shares can be sold.

[66] *See* NewsGuild Petition at 1 (incorrectly describing AGM as "*the* party actually supplying funding for this deal" (emphasis added) and the entity "providing *the* funds for the purchase" (emphasis added)); *see also* ATVA Comments at i ("In this transaction, Apollo seeks to finance Standard General's acquisition of TEGNA.").  These mischaracterizations ignore the large consortium of bank lenders and other preferred shareholders contributing funding for the transaction, including Standard General affiliate SG Media Investment LLC.).

[67] NCTA Comments at 2.

[68] ATVA Comments at ii.

[69] *See* Graham Comments at 7.  Notably, Graham boasts that its independent station "was by far the most-watched station" in April 2022 "with a market-leading 58% share of the total viewing audience" as compared to TEGNA's NBC and ABC stations "*together* capturing just 12% of the local news audience."  Thus, at bottom, Graham's complaint is not that the Transactions will *reduce* competition, but rather that Standard General's acquisition of the TEGNA stations may

Once the Transactions are closed, Standard General will have a borrower/lender relationship with AGM, just like it will have with the numerous other lenders, including a Standard General fund, and that is a relationship pretty much every major broadcaster in America has with one or more lenders. Like the other preferred shareholders, AGM will possess standard minority investor protections consistent with those that have been approved countless times by the Commission in other transactions, and none of the Petitioners or Commenters has even attempted to demonstrate otherwise.[70]

Those who suggest that this situation is unique because AGM has an interest in CMG and CMG has broadcast stations are simply incorrect. The Commission has had, since 1999, a specific rule *the sole purpose of which* is to assess whether an entity with an attributable interest in one or more broadcast stations may also hold debt or equity interests in stations owned by another broadcaster—the Equity-Debt Plus ("EDP") Rule. Note 2(i) to Section 73.3555 of the Commission's Rules provides that the holder of an equity or debt interest in a broadcast licensee

shall have that interest attributed if

---

make them *more* competitive—perhaps because the Jacksonville DMA was identified in presentation slides that Standard General submitted in connection with the *June 13 Response*. *See* Standard General February 28, 2022 Presentation Slides, New TEGNA Performance Improvement Opportunities, SGCI Holdings III LLC Item 4(c)-2 ("*Improvement Opportunities Document*").

[70] For example, in *Paxson Management Corporation and Lowell W. Paxson*, 22 FCC Rcd 22224 (2007), the Commission approved NBC's substantial non-voting preferred stock investment in ION Media Networks ("ION"). At the time, NBC, one of the most powerful companies in the broadcast industry, owned the NBC and Telemundo networks as well as nearly two dozen major market television stations and ION owned 59 television stations, again including stations in most of the largest markets in the U.S. The Commission found NBC's investment non-attributable despite the fact that it offered substantially more minority investor protections than AGM or CMG enjoy under their investor agreements with TPC. NBC enjoyed the right to convert its non-voting preferred stock to voting common stock and the right to appoint directors to the ION board if it exercised its conversion rights. NBC also obtained options to purchase ION. The Commission found none of these rights—rights that are not present in the Transactions— indicated the existence of either attribution or *de facto* control.

(A) the equity (including all stockholdings, whether voting or nonvoting, common or preferred) and debt interest or interests, in the aggregate, exceed **33 percent** of the total asset value, defined as the aggregate of all equity plus all debt, of that broadcast licensee; and

(B)(i) The interest holder also holds an interest in a broadcast licensee in the same market that is subject to the broadcast multiple ownership rules and is attributable under [provisions other than the EDP Rule]; or (ii) The interest holder supplies over fifteen percent of the total weekly broadcast programming hours of the station in which the interest is held.[71]

In adopting the EDP Rule, the Commission noted that attribution "is not limited to relationships that permit control, but also extends to relationships that permit sufficient influence over core operations of the licensee such that they should be subject to the multiple ownership rules."[72]  The Commission determined that the 33% threshold would address "such relationships that may inappropriately avoid attribution" in the absence of the EDP Rule.[73]  In doing so, the Commission specifically considered and rejected suggestions to adopt any thresholds lower than 33% "to be cautious not to set the limit so low as to unduly disrupt capital flow to broadcasting."[74]

AGM will have an EDP interest in post-Transactions TEGNA of 2.16%.[75]  Even if combined with CMG's EDP interest (1.86%),[76] AGM's interest would fall far short of the 33%

---

[71] 47 C.F.R. § 73.3555, Note 2(i) (emphasis added).

[72] *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests, Review of the Commission's Regulations and Policies Affecting Investment in the Broadcast Industry, Reexamination of the Commission's Cross-Interest Policy*, 14 FCC Rcd 12559, 12579 (1999).

[73] *Id.* at 12579-80.

[74] *Id.* at 12590 ("[W]e believe that the threshold for attribution of nonvoting interests should be substantially higher than the attribution level for voting interests, which give the holder a ready means to influence the company.").

[75] *See* Applications, Comprehensive Exhibit at 4, n.12.

[76] *Id.*

EDP attribution threshold.  Further, even if AGM and CMG's combined debt-equity interest were *ten times* greater than it is, AGM would be deemed to have an attributable interest *only* in the TEGNA stations in the four DMAs where both TEGNA and CMG will own stations, not in TEGNA itself.  ATVA attempts to cast doubt on Applicants' EDP calculation, but its only "evidence" is a February 22, 2022 New York Post article[77] that, among other things, pre-dates AGM's syndication of a portion of the preferred securities originally reserved for it to a Standard General fund and a PIMCO fund (which ATVA conveniently ignores).[78]  Like every other Commission Rule, the Transactions comply with the EDP Rule by a wide margin, directly addressing any concerns of AGM being able to exercise influence over TEGNA merely because of the supposed size of its holdings.

Lastly, Applicants have not, as ATVA falsely asserts, "failed to disclose" any required transaction documents.[79]  Applicants submitted with the Applications "all agreements for the transfer of the station(s), [which] documents embody the complete and final understanding between Transferor and Transferee" with standard redactions (as noted in the Comprehensive Exhibit).  As the Commission knows, agreement exhibits and schedules are routinely excluded from assignment and transfer applications pursuant to *LUJ, Inc. and Long Nine, Inc.*[80] and, as stated in the Applications and consistent with *Long Nine*, "will be provided to the Commission upon request."[81]  And while ATVA hints there could be undisclosed "arrangements between the

---

[77] ATVA Comments at 9 and n.9 (citing Josh Kosman, *Soo Kim's Standard General Partners With Apollo to Buy Tegna for $8.6B,* New York Post (Feb. 22, 2022), https://nypost.com/2022/02/22/soo-kims-standard-general-partners-with-apollo-to-buy-tegna-tv/).

[78] *See* Applications, Comprehensive Exhibit at 4, n.12.

[79] ATVA Comments at 1.

[80] 17 FCC Rcd 16980 (2002).

[81] Applications, Comprehensive Exhibit at 11.

parties" hidden in redacted schedules, including those "dealing with programming distribution and MVPDs,"[82] they are wrong. The underlying agreements (copies of which were publicly filed with the Applications), describe with specificity the matters that are contained within those schedules.[83] Further, as Applicants made clear in the Applications and the *June 13 Response*, there are no time brokerage, joint sales, or shared services agreements between post-Transactions TEGNA and CMG and, as competitors, the companies have no plans to jointly negotiate for retransmission consent (nor could they under the Commission's rules in markets where each owns a station).[84]

### E. While Staffing Decisions Are Exclusively Reserved to the Discretion of Licensees Under the Communications Act and Commission Precedent, Petitioners' Presumption That Standard General Will Eliminate Journalist Jobs and Newscasts Is Entirely Unsupported and Simply Wrong

Common Cause/UCC and NewsGuild have attempted to manufacture controversy in the trade press, on their websites, in *ex parte* presentations,[85] and in their pleadings with speculation

---

[82] ATVA Comments at i.

[83] *See* Merger Agreement Section 4.20 and Contribution Agreement Schedules 3.04 and 4.05. The schedules simply set forth lists of FCC licenses being conveyed and lists of existing retransmission consent agreements with MVPDs that reported more than 25,000 subscribers (in the case of the Merger Agreement) or 50,000 subscribers (in the case of the Contribution Agreement) and any material disclosures related thereto. Such provisions and schedules are typical and not at all unique to the Transactions. And, as ATVA surely knows, broadcasters are typically prohibited by the confidentiality provisions of their retransmission consent agreements from publicizing information relating to MVPD agreements (including term start and end dates).

[84] *See* Applications, Comprehensive Exhibit at 2; *June 13 Response* at 2-3.

[85] *See* June 2, 2022 Letter from NewsGuild to President Biden with a copy to each of the Commissioners, the Commission itself, and the DOJ's Assistant Attorney General for Antitrust which, notably, has not been filed in the docket by NewsGuild as required by the Commission's *ex parte* rules and the Public Notice establishing the pleading cycle in this proceeding. *See* 47 C.F.R. § 1.1200 *et seq.*; *see also Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA Inc. to Standard General L.P. and Permit-But-Disclose Ex Parte Status for the Proceeding*, Public Notice, MB Docket No. 22-162, DA 22-443 (Apr. 21, 2022).

that the Transactions will lead to massive reductions in local news coverage and journalist jobs.[86]

Applicants note as a preliminary matter that broadcast station staffing decisions are exclusively

reserved to the discretion of licensees under the Communications Act and Commission

precedent.  Section 303 of the Communications Act does not give the Commission authority to

interfere with non-discriminatory employment decisions, and the Commission has "never

suggested that a reduction in a station's staff is contrary to the public interest, if conducted in a

nondiscriminatory manner."[87]

But equally important, Petitioners' hyperbolic accusations are entirely baseless and false.

While Petitioners may not believe that localism is good for business, the Standard General

leadership team does.  Indeed, from the day the deal was inked, Mr. Kim has touted the

importance of local news and sales forces,[88] and Ms. McDermott has made clear Standard

General's plan to build on TEGNA's commitment to local markets and "look for opportunities to

make it even better."[89]  They have also consistently and repeatedly confirmed that the

Transactions will not result in station-level layoffs,[90] including in the Applicants' *June 13*

---

[86] *See, e.g.*, NewsGuild Petition at 3 and 15; Common Cause Petition at 19.

[87] *Univision Holdings, Inc.*, 7 FCC Rcd at 6683 n.45; *see also* 47 U.S.C. § 303.

[88] Jon Lafayette, *Standard General Says Change Will Be Good for TEGNA*, Broadcasting+Cable, (Feb. 23, 2022), https://www.nexttv.com/news/standard-general-says-change-will-be-good-for-tegna#:~:text=Change%20is%20coming%20to%20Tegna.%20Standard%20General%2C%20which,most%20of%20the%20television%20industry%20pivots%20to%20streaming (quoting Mr. Kim: "Delivering professional local news, having a local ad sales force, we think that's still quite relevant.  If anything, COVID and natural disasters prove regularly that people go to their local news to get that information.  We need to evolve the way we deliver it.").

[89] Jon Lafayette, *Standard Media CEO Deb McDermott Tells TEGNA Staff News Jobs Won't Be Cut*, Broadcasting+Cable, (June 24, 2022), https://www.nexttv.com/news/standard-media-ceo-deb-mcdermott-tells-tegna-staff-news-jobs-wont-be-cut (citing June 16 Letter from Deb McDermott to TEGNA employees ("McDermott Letter")).

[90] *Id.* ("While many acquisitions quickly result in layoffs, Kim and McDermott said they don't have a list of cuts in mind. 'They're doing a lot of good things at that company and we're

*Response*, and that they "expect to compete vigorously in all markets, which will require continued investment in local journalism and newsgathering operations."[91]  This point bears repeating: newsroom staff cuts are not part of Standard General's plan for the post-transaction TEGNA stations.  Documents produced with the Applicants' *June 13 Response* detail opportunities Standard General had earlier identified to improve TEGNA's local station performance, all of which focused on improving service to those stations' local audiences and communities, and absolutely none of which was premised on a reduction in localism.[92]

And, as explained in the *June 13 Response*, Standard General has increased newsroom staffing at its four stations by 28% since acquiring them in February 2021, while, in comparison, TEGNA's employee headcount at its stations dropped by 4% over approximately the same time period (December 2020 – April 2022) and by 9.5% between December 2019 and April 2022 in light of the pandemic.  Each broadcaster must necessarily have the flexibility to adapt to changing conditions in its own way, and Standard General's expansion in this period was in part facilitated by being able to hire talented employees that other broadcasters were laying off, making an investment in the future of its stations despite the tough economic times for all.

---

looking for areas where we can improve and operate even better,' McDermott said.  'It could be in programming.  There's also opportunities outside the television stations in content, digital and streaming.  We'll take a look at everything.  Our plan is really about how do we grow the company.'"); *see also June 13 Response* at 9-10; McDermott Letter.

[91] Jon Lafayette, *Standard Media CEO Deb McDermott Tells TEGNA Staff News Jobs Won't Be Cut,* Broadcasting+Cable, (June 24, 2022), https://www.nexttv.com/news/standard-media-ceo-deb-mcdermott-tells-tegna-staff-news-jobs-wont-be-cut (citing McDermott Letter).  Ms. McDermott has a longstanding reputation as a broadcaster committed to localism. *See, e.g.*, Michael Malone, *Deborah McDermott,* Broadcasting+Cable, (Oct. 27, 2013), https://www.nexttv.com/news/deborah-mcdermott-127689 (quoting George Mahoney, President and CEO at Media General:  "Deb has gotten Young through very difficult times to a very sound financial position today. . . . She's hired terrific people who reflect her passion for localism and community.").

[92] *See June 13 Response* at 5 (citing *Improvement Opportunities Document*).

Petitioners nevertheless cling to their false narrative, going so far as to claim—wrongly— that "ruthlessly cutting costs" through "cutbacks in head count and local programming" is Standard General's "stated" business model.[93]  In reality, Standard General has never stated or implied that its business plan for post-Transactions TEGNA involved any of the actions claimed by Petitioners.  As Graham points out at length, local news is key to successful local television stations,[94] so taking the actions Petitioners suggest would actually run contrary to Standard General's financial best interests.

NewsGuild claims, for example, that its members would be injured by "expansion of TEGNA's existing Washington 'news desk'" and posits (with nothing more than a citation to a 2019 Pew Research Report about the proportion of newsroom employees from a variety of industries living in New York, LA, and DC) that "the real goal of this 'expansion' at the national level is to cut coverage—and jobs—at the local level."[95]  Despite being stated as fact rather than opinion, the Petitioners obviously have no insight into Standard General's "real goals," and

---

[93] *See, e.g.*, NewsGuild Petition at 13 (asserting that Standard General's "stated business model is to favor investors' private interests rather than the public interest by ruthlessly cutting costs," but not providing any source for this "statement"); Common Cause Petition at 20 ("The Applicants' stated business intentions . . . would lead to a reduction in the amount and scope of local news coverage through reporter layoffs and a displacement of local programming with national programming.").  In fact, Standard General has stated just the opposite in this very proceeding.  *See June 13 Response* at 7 and 9.

[94] *See, e.g.*, Graham Comments at 4 (noting that its station was the most-watched television station in the Jacksonville market for the 2020-2021 broadcast season and that its "commitment to original reporting, breaking news and weather coverage—with news anchors viewers know and trust—and the station's deep commitment to the local community drives the success of its broadcasts.").

[95] NewsGuild Petition at 14-15 (citing Pew Research Center, "One-in-five U.S. newsroom employees live in New York, Los Angeles or D.C." (October 24, 2019), https://pewrsr.ch/2oc2MZf).  Notably, the cited Pew Research Center report says nothing in support of NewsGuild's contention that "the overemphasis on national news coverage is, to many, one of the most serious challenges faced by the journalism profession."

provide no evidence to support this "fact."  Common Cause and UCC similarly speculate that investments in a DC news bureau "would lead to a reduction in the amount and scope of local news coverage through reporter layoffs and a displacement of local programming with national news programming."[96]

Of course, Petitioners' arguments on this point are entirely contrary to common sense, as the Commission itself has recognized repeatedly; that is, concerns about what elected representatives are doing in Washington, DC, as well as national legislation and policies, are not limited to viewers residing in DC.  The Commission previously rejected the argument that national news coverage is contrary to the public interest when Common Cause raised it before, and it should do the same here:

> We further reject Common Cause's contentions that Nexstar's investments in news and local programming are focused on its Washington, DC, and state news bureaus and will not enhance programming at the local level.  As discussed above, the Commission has previously found that expanded access to Washington, DC, and state news bureaus can produce transaction-specific public interest benefits to viewers and give stations access to new resources, even when it is a shared resource.  Indeed, we find it bizarre to suggest that giving stations greater access to information from our nation's capital or state capitals is somehow harmful.  It is understandable that viewers would be interested in how what is going on at the federal or state level impacts them and their local communities.[97]

Standard General's intentions to improve coverage from TEGNA's existing DC news operation would unequivocally fall on the public interest benefits side of the scale.  Standard General has no intention of replacing stations' locally produced news with centrally produced

---

[96] Common Cause Petition at 19.

[97] Nexstar-Tribune Order at 8453, n.138 (dismissing Common Cause arguments as speculative and unsupported by precedent, and explaining that "the fundamental public interest obligation of a television broadcaster is to air programming that is responsive to the needs and interests of its community of license, but editorial discretion in the selection of that programming is the core concept underlying the regulation of broadcasting pursuant to the Act.").

newscasts.  Rather, a DC news bureau—like the one Mr. Kim and Ms. McDermott established in

2015 with Media General—is a tool that stations can use to enhance their local newscasts.  For

example, if a member of Congress from Oregon became available on a moment's notice to

discuss a breaking news issue of importance to viewers in Portland, it would be impractical—if

not impossible—for the local station to fly a reporter and all necessary equipment across the

country for a 5-10 minute interview.  But the company could deploy a DC news bureau team to

ask the station's questions, empowering the station to deliver this locally responsive content to

its viewers.[98]  Mr. Kim and Ms. McDermott are uniquely qualified to implement and cultivate

such a resource, as the Commission specifically cited access to their Media General-created news

bureau as one of the principal public interest benefits of Nexstar's 2017 acquisition of Media

General.[99]

Common Cause/UCC and NewsGuild also attempt to seize on a slide Standard General

utilized in connection with its 2020 proxy contest seeking to place at least some Standard

General nominees on the TEGNA Board.[100]  Not only is a proxy contest that occurred more than

two years ago completely irrelevant to the Transactions at issue, but Petitioners are incorrectly

interpreting a slide comparing TEGNA's staffing and EBITDA margins to those of its peers  as

meaning that Standard General intends to "cut[] potentially half the resources available to local

stations …."[101]

---

[98] While TEGNA's D.C. Bureau will have nothing to do with CMG's existing D.C. New Bureau, CMG's efforts in this regard are instructive for how D.C. News Bureaus can enhance local news broadcasts.  In 2021, CMG's D.C. New Bureau provided a total of 343 interviews with local lawmakers to its individual stations.

[99] *MG-Nexstar Order*, 32 FCC Rcd 183, 195-196.

[100] *See* NewsGuild Petition at 13-14 (confusing a proxy battle with "an earlier effort to buy TEGNA"); Common Cause/UCC Petition at 20-21.

[101] Common Cause/UCC Petition at 21.

Petitioners' interpretation is wrong and underscores the fundamental problem with their lack of personal knowledge of any aspect of the Transactions or of Standard General.  While making a case to elect its nominees to the board, Standard General's position was that the current TEGNA board could not blame stations' underperformance on a lack of resources.  In other words, the slide was a statement about performance, not about TEGNA having "too many" employees.[102]  As explained in detail in Section II.C above, Standard General has consistently represented that the Transactions will not result in a reduction of station-level staff at TEGNA. The Petitioners fail to present any facts to the contrary, much less make the *prima facie* case required under the Communications Act, and their claims must be rejected as legally irrelevant and factually wrong.

### F.  Petitioners' and Commenters' Retransmission Consent Claims Offer No Basis for Denying or Conditioning Grant of the Applications

The MVPD Commenters and Petitioners also urge the Commission to abandon decades of precedent and deny or place conditions on the Transactions based on allegations that approval could result in retransmission consent rate increases due to Applicants' "interlocking relationships" or after-acquired clauses in negotiated retransmission agreements.[103]  As detailed in Section II.E above, there are no "interlocking relationships."  Further, the Commission has consistently declined to consider the potential for increased retransmission consent rates to be a

---

[102] To the extent TEGNA has made staffing changes since then, such changes were made irrespective of the Transactions and without any input from Standard General.  *See June 13 Response* at 9-10 (noting that Standard General's mid-2021 estimates of operating costs reflected personnel measures that TEGNA management was already planning to implement (and has since implemented) and that "Standard General does not intend to reduce station-level staffing following the Transaction.").

[103] *See, e.g.*, NCTA Comments at 2; ATVA Comments at 1; Altice Comments at 1; NewsGuild Petition at 18-22; Common Cause/UCC Petition at 21-23.

public interest harm,[104] and has specifically acknowledged that "after-acquired station clauses are negotiated by the parties outside of this transaction, and there is no apparent reason for the Commission to step in and deny one party the benefit of the negotiated bargain absent evidence of anticompetitive practices or other wrongdoing not apparent here."[105]  The Commission has a "long-standing policy of refusing to adjudicate private contract law questions,"[106] and there is no basis to depart from that policy in its review of these Applications.

i. ***The Commission has previously considered and consistently rejected Petitioners' and Commenters' arguments regarding potential rate increases and after-acquired clauses***

The arguments made by MVPD Commenters and Petitioners are virtually identical to those that ATVA advanced in opposition to the *Northwest/Terrier* transaction.  There, ATVA asserted that Northwest would be "able to achieve higher retransmission consent rates" in certain markets, that "those higher rates would extend to more stations across a larger geographic footprint once the station portfolios of Northwest and Cox are combined," and that the

---

[104] *See* NewsGuild Petition at 19-20 (citing *Terrier Media Buyer, Inc.*, 34 FCC Rcd 10544, 10565-66 (2019); *Applications of Tribune Media Company et al. for Transfer of Control of Tribune Media Company to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 34 FCC Rcd 8436 (2019), ¶ 29 ("Moreover, with regard to DISH's allegations of prospective price increases stemming from marketplace negotiations, it does not show whether, on balance, they would reduce consumer welfare or, rather, just shift surplus between DISH and broadcast stations.").

[105] *MG-Nexstar Order*, 32 FCC Rcd 183 at 197, ¶ 36; *see also Must Carry and Retransmission Consent Requirements*, Report and Order, 8 FCC Rcd 2965, 2988, ¶ 89 (Mar. 29, 1993) (finding that Petitioners' claims "fail to raise substantial and material questions of fact as to why the public interest would not be served by grant of the applications, because [they] do not provide any basis for the assertion that the merged entity will have 'market power' vis-à-vis MVPDs with national or at least broad coverage of their own.").

[106] *Listeners' Guild, Inc. v. FCC*, 813 F.2d 465, 469 (D.C. Cir. 1987); *see also Transcontinental Television Corp. (WROC-TV)*, 21 RR 945, 956 (1961) ("The Commission has neither the authority nor the machinery to adjudicate claims arising out of private contractual agreements between parties.").

sequencing of the transactions "would drive up prices . . . by virtue of the after-acquired clauses in Northwest's contracts."[107]  The Media Bureau rejected that line of argument then, just as the Commission did when ATVA argued in opposition to the *Nexstar-Tribune* merger that "many of the claimed synergies and efficiencies in the transaction 'will come from "applying Nexstar rates to Tribune subscriber counts."'"[108]  The Commission should again reject those tired arguments here.[109]

Sound policy demands that the Commission adhere to its precedent in this case. Retransmission consent agreements are complex and heavily negotiated.  Rates and after-acquired clauses (for both stations and MVPD systems) are just two parts of negotiations that frequently involve give-and-take on scores of issues.  As Altice notes in its Comments, the benefits of after-acquired station clauses flow both ways—sometimes retransmission consent rates go up because of them, and sometimes they go down because of them.[110]  Altice and the Petitioners conveniently ignore the fact that after-acquired stations clauses are typically paralleled by after-acquired systems clauses that afford similar rights to MVPDs when they acquire new systems.  An MVPD should be embarrassed to come before the Commission asking for special government relief from one specific effect of after-acquired clauses they freely negotiated (aware of all the risks and benefits those contracts entail) while simultaneously trying to maintain the benefits (including service continuity and a potential extended term at locked-in rates) from the exact same after-acquired clauses they are complaining about.  What Altice is

---

[107] *Terrier Order*, 34 FCC Rcd at 10565-66.

[108] *Id.*

[109] Moreover, higher consumer multichannel video rates are simply not a consumer harm that can be attributed to this Transaction, because Applicants do not control MVPD prices to end users.

[110] Altice Comments at 2.

asking is for the Commission to turn these provisions into a one-way ratchet so that rates can

never increase as a result of a transaction, but they can go down, while MVPDs can freely apply

those same clauses to their own system sales and acquisitions without facing the restrictions they

seek to apply here to broadcasters.  If MVPDs want that result, the place to achieve it is at the

bargaining table, not before the Commission.

It is particularly inappropriate in this case for any MVPD to complain of the impact of

after-acquired clauses that it negotiated.[111]  It was widely reported as early as 2019 that TEGNA

was considering purchase offers (including, at that time, from AGM),[112] and news of Standard

General's proposed acquisition of TEGNA leaked to the newspapers starting in September 2021.

Since most retransmission agreements have a three-year term, most, if not all, of the Applicants'

retransmission contracts currently in effect were negotiated in the shadow of the potential (or

actual) sale of TEGNA.  An MVPD that wasn't focused in its negotiations on provisions that

could be implicated in such a sale can hardly complain to the Commission about the contract it

---

[111] While the Petitioners (and some of the Commenters) describe after-acquired clauses as some form of diabolical device, they have become relatively standard in retransmission agreements because they benefit all parties, *including* an MVPD's subscribers, by preserving continuity of service when stations are sold.  Without them, existing agreements would terminate upon consummation of a transfer or assignment, and MVPDs would need to engage in new retransmission consent negotiations with the buyer to continue carriage of the station, increasing the MVPD's costs and increasing the risk of potentially higher rates and negotiating stalemates causing blackouts (i.e., because program costs have been steadily rising, a rate negotiated in 2022 for 2022 carriage is typically going to be higher than a 2022 carriage rate negotiated in 2020).

[112] *See, e.g.*, Cara Lombardo & Miriam Gottfried, *Apollo Approached TEGNA About a Sale Earlier This Year,* The Wall Street Journal (Aug. 16, 2019), https://www.wsj.com/articles/apollo-approached-tegna-about-a-sale-earlier-this-year-11565985568; Andy Medici, *Tegna confirms it rejected acquisition offer from private equity giant,* Washington Business Journal, (Aug. 21, 2019), https://www.bizjournals.com/washington/news/2019/08/21/tegna-confirms-it-rejected-acquisition-offer-from.html (quoting TEGNA press release: "Subsequently, in June 2019, Apollo made a different proposal, to combine Tegna with broadcasting assets Apollo is in the process of buying, in a transaction that would not have constituted a change of control of Tegna.").

negotiated and the results it is generating for that MVPD.  Conversely, TEGNA may have ceded points in such negotiations that it normally would not have in return for more favorable "after-acquired" terms.

Indeed, **nearly 70%** of MVPD subscribers receiving a TEGNA station subscribe to an MVPD that has negotiated (or will negotiate) a new retransmission agreement with TEGNA between September 20, 2021 (when news of Standard General's TEGNA deal first publicly leaked)[113] and the end of this year.  MVPDs have therefore had ample opportunity to address any concerns about the sale of TEGNA at the negotiating table, and should not be presenting (yet again) their "heads I win, tails you lose" arguments about bilateral after-acquired clauses to the FCC.  Applicants and MVPD Commenters alike must, under Commission precedent, accept the results of their own negotiations.

Petitioners concede this precedent exists, but urge the FCC to reach a different result this time, citing the inflationary pressures currently faced by consumers.[114]  Not only is this obviously irrelevant to the Commission's review of broadcast transactions under the Communications Act, but it is also a logically flawed argument because it ignores that broadcasters *are facing the same inflationary pressures*.  One of a broadcaster's greatest individual expenses is the electricity that powers its million watt transmitter, and the cost of energy has far outpaced overall inflation levels.  Similarly, broadcasters' programming[115] and

---

[113] Josh Kosman, *Apollo, Standard General make $8B bid for Tegna TV stations: sources*, New York Post, https://nypost.com/2021/09/20/apollo-standard-general-make-8b-bid-for-tegna-tv-stations-sources/ (describing an earlier iteration of the deal that ultimately did not materialize).

[114] NewsGuild Petition at 21; Common Cause/UCC Petition at 23.

[115] That program costs for broadcasters and others are also rising is acknowledged by NewsGuild in its Petition.  NewsGuild Petition at 22 (quoting language that "[t]he TV companies say that prices must rise to offset the escalating cost of program acquisition.").

personnel costs in a tight job market are rising quickly as well. Broadcasters have to cover these costs regardless of how much higher inflation drives them.

And while Applicants do not gainsay the important challenges consumers face due to today's rate of inflation, that temporary economic condition provides no basis for abandoning many years of sound policy. The Commission has refrained from meddling in the individual terms of negotiated retransmission consent negotiations because Congress gave it no authority to do so (and has made clear its belief that the free market provides consumers' best hope for improved services at competitive prices).[116] Trying to influence consumer video prices by regulating one small facet of negotiated retransmission consent agreements in the course of reviewing individual broadcast transactions would be destined to fail even if it were a legitimate policy option (which it is not).[117]

Even if the Commission were inclined to revisit its precedent that precludes Petitioners' and Commenters' arguments in this proceeding, their arguments are doomed for two related reasons. First, they assume without question that any increase in an MVPD's retransmission fees must "automatically" be passed on to consumers, which is the sole source of their claimed public interest harm.[118] Second, they argue that consumers are helpless, suggesting that they are stuck

---

[116] *See, e.g.*, Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat 1460 (1992).

[117] There is also a severe logical disconnect between the Petitioners' and Commenters' assumption that every increase in an MVPD's retransmission consent costs must automatically be passed on to subscribers, but broadcasters should be prohibited from meeting their own rapidly rising costs through any increase in their retransmission rates. That is a particularly tortured argument for Petitioners to make while simultaneously demanding broadcasters provide more and better local broadcast news and employment in inflationary times, while foreswearing any increase in revenue to fund those expenditures.

[118] *See* NewsGuild Petition at 21 ("The harm to consumer welfare here is unquestionable. Increased retransmission fees are directly passed on to consumers."); Common Cause/UCC Petition at 24 ("higher retransmission rates … will undoubtedly get passed down to consumers in

between paying higher MVPD fees or losing access to station programming.  But the assertion that consumers' "only choice is to pay the increased prices or cancel their service"[119] ignores the many options available to them in today's media landscape.

As has always been the case, a viewer can avoid pay-TV costs entirely by watching the broadcaster's signal for free over the air.  And today, if they don't like the subscriber pricing from their MVPD, they can obtain their local broadcast stations Over The Top via a virtual MVPD and be completely immune from *any* impact, good or bad, related to broadcaster/MVPD after-acquired clauses.  This is because virtual MVPD contracts for local station carriage are negotiated by the television networks, not by individual station owners.  The networks negotiate virtual MVPD contracts on a nationwide basis and frequently collect the payments thereunder, remitting a uniform portion of them to the affiliated stations.  As a result, station sales would not alter a virtual MVPD's program costs at all, or even be likely to affect who the virtual MVPD sends the payment to every month (the network).

So not only is it entirely false that consumers have no option but to pay more or stop watching local TV, the fact that virtual MVPDs' program costs by and large do not change in a station sale means that MVPDs who negotiated a retransmission agreement under which their program costs may rise upon a station sale should be competitively constrained from passing such costs on to consumers who can access the content through virtual MVPDs.  If the MVPD "automatically" passes on increases in its program costs rather than finding ways to operate more

---

the form of higher cable prices."); Altice Comments at 4 ("This harms the MVPDs that must pay higher retransmission consent fees, and ultimately hurts consumers, who will likely see higher bills as a result."); ATVA Comments at i ("high retransmission consent fees … ultimately get passed to consumers.").

[119] NewsGuild Petition at 21.

efficiently or accept lower profit margins, it will steadily lose subscribers to those virtual MVPDs, which are multiplying in number.

As a result, the fundamental premise underlying Petitioners' and Commenters' retransmission fee-related arguments—that (a) after-acquired clauses in this or any other transaction inexorably lead to higher subscriber costs for consumers wishing to watch their local stations, and (b) there is no competitive check on such increases—is simply not true. Notably, of the 27 declarants whose statements are attached to the Petitions and who indicated how they view their local TV stations, **18 (over 66%)** indicated they receive their stations over the air or through a virtual MVPD.[120]

Thus, the Commission has repeatedly found in prior transactions that retransmission consent fee arguments are *legally* irrelevant to the aims of the Communications Act, and the Petitioners' and Commenters' arguments are *factually* baseless given advances in technology. Their claims of retransmission fee-related public interest harms from the Transactions must therefore be rejected out of hand.

ii.    ***The Commission should reject the MVPD Commenters' entreaties for unwarranted conditions***

MVPD Commenters do not necessarily oppose the Transactions but ask the Commission to impose a number of retransmission consent-related conditions on the grant. The Commission should deny each of their requests. There is no need to "condition" grant of a transaction on adherence to existing Commission Rules, as all licensees are already required to comply with

---

[120] *See* Declarations of Jesse Littlewood, Joanne M. Classick, David Guthrie, Walter Bircher, William Bilton, Samuel Cameron Hill, Gavin Geis, Ethan Farrow, Daniel E Livingston, Treaunna C. Dennis, Rev. Mary W. Nelson, Martha P. Weston, Jon Schleuss, Michael Cabanatuan, Dave Roknic, Aaron Besecker, Juliette Beaulieu, and Kayla Dwyer.

such rules.  And, with respect to MVPD Commenters' requests to enjoin behavior that is

perfectly legal, the Supreme Court has observed that "rulemaking is generally a 'better, fairer,

and more effective' method of implementing new industry-wide policy than is the uneven

application of conditions in isolated" transactions.[121]  Consistent with this, the FCC has a long

practice of rejecting arguments or requests for conditions in individual licensing decisions that

are better suited to a rulemaking proceeding of general applicability.[122]

---

[121] *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983).

[122] *Application of Sunburst Media L.P. (Assignor), and Clear Channel Broad. Licenses, Inc. (Assignee) for Assignment of Licenses of Station KSLI(AM), Abilene, Texas et al.*, Memorandum Opinion and Order, 17 FCC Rcd 1366, 1368, ¶ 6 (2002); *see, e.g.*, *Applications of Nextel Partners, Inc., Transferor, and Nextel WIP Corp. and Sprint Nextel Corporation, Transferees*, Memorandum Opinion and Order, 21 FCC Rcd 7358, 7364-65, ¶ 15 (2006) (stating that "concerns" raised by petitioner "are more properly addressed in the Commission's pending . . . rulemaking proceeding," in which the petitioner "ha[d] raised its concerns and public interest arguments in support of changes to the Commission's rules and policies."); *Application of EchoStar Commc'ns Corp., Transferor, and EchoStar Commc'ns Corp., Transferee*, Memorandum Opinion and Order, 17 FCC Rcd 20559, 20583, ¶ 48 (2002) (in transfer of license proceeding, declining to consider conditions requested by a commenter "that have application on an industrywide basis."); *Applications for Consent to the Transfer of Control of Licenses from Comcast Corporation and AT&T Corp., Transferors, to AT&T Comcast Corporation, Transferee*, Memorandum Opinion and Order, 17 FCC Rcd 23246, 23257, ¶ 31 (2002) ("The Commission's pending rulemaking on cable horizontal ownership is the more appropriate forum for consideration of the potential effects of industry-wide clustering on the distribution of programming by MVPDs to consumers."); *Applications for Consent to the Transfer of Control of Licenses and Section 214 Authorizations from Telecomms., Inc. to AT&T Corp.*, Memorandum Opinion and Order, 14 FCC Rcd 3160, 3183, ¶ 43 (1999) ("We find that digital broadcast signal carriage requirements should be addressed in the Commission's pending rulemaking proceeding and not here. . . . [T]his is like other cases where the Commission has declined to consider, in merger proceedings, matters that are the subject of rulemaking proceedings before the Commission[.]"); *Application for Transfer of Control of Certain Licenses of Spanish Radio Network*, 10 FCC Rcd 9954, 9956, ¶ 9 (1995) (citing *Patteson Bros., Inc., Assignor, and Duke Radio Broadcasting, Inc., Assignee, For Assignment of License of KBTM(AM)/KJBR-FM Jonesboro, Arkansas*, 8 FCC Rcd 7595, 7596, ¶ 6 (1993)) ("Insofar as Miami Petitioners would have the rule recast so as to prohibit broadcast concentration in a market defined by language comprehension, the appropriate course of action is to request[] that the Commission institute a generic rule making proceeding to change its multiple ownership rules and policies."); *Morton Jerome Victorson, Bankruptcy Trustee, and West Virginia Radio Corporation of Clarksburg, For Assignment of License of WKKW(FM), Clarksburg, West Virginia*, 10 FCC Rcd 9499, 9500, ¶ 6

Altice requests that the Commission "condition grant of the Application on Applicants' not enforcing any contractual clauses purporting to raise retransmission consent rate prices."[123] This request is blatantly self-serving (and would actually block even normal annual fee increases), and Altice does not attempt to explain how the structure of the Transactions or application of after-acquired clauses would violate any Commission rule or precedent or otherwise constitute a public interest harm.  In fact, Altice acknowledges that the Commission has never endorsed this line of argument, states that Altice "does not know" why the Transactions are structured the way they are, and concedes that "[t]here may, of course, be legitimate business reasons" for the structure.[124]

ATVA's and NCTA's requests for conditions are rooted in their completely speculative concern that post-Transactions TEGNA and CMG might seek to negotiate jointly for retransmission consent.  But, as detailed above, AGM will not hold an attributable, much less a controlling, interest in any of the post-Transactions TEGNA stations.  Existing Commission rules therefore already prohibit post-Transactions TEGNA from jointly negotiating or coordinating retransmission consent agreements with CMG in any market where both TEGNA and CMG own

---

(1995) ("Insofar as Mills is requesting that the Commission consider alternative definitions for determining the relevant market for audience share purposes, the appropriate course of action would be a request for rulemaking."); *WANV(AM), Waynesboro, VA and WANV-FM, Staunton, VA*, 8 FCC Rcd 8474, 8477 (1993) ("Petitioners' arguments as to the validity of this procedure amount[] to a request to reconsider the radio ownership rulemaking proceeding and is not appropriate in the context of this case."); *see also Competitive Enterprise Institute et al. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020) (quoting the Supreme Court's description from *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 827 (1987) of "non-germane" conditions as "an out-and-out plan of extortion").

[123] Altice Comments at 1.

[124] *Id.* at 2-3.

stations, and "[a]bsent specific factual support to the contrary, the Commission 'should not speculate that an applicant will act illegally.'"[125]

Further, Applicants have made clear that neither AGM nor CMG will have any role in post-Transactions TEGNA's operations or retransmission consent negotiations, that neither AGM nor CMG will have any knowledge of post-Transactions TEGNA's retransmission consent agreements or negotiations, and that Standard General and AGM have never considered jointly negotiating and will not jointly negotiate retransmission consent.[126] Given the practical reality that most deals are negotiated on a national basis, the companies would be precluded from jointly negotiating in most cases anyway because the agreements would typically cover both "overlap" and "non-overlap" markets.

Lastly, ATVA's and NCTA's attempts to adapt conditions from another broadcaster's consent decree make no sense here. Those conditions appear to have been negotiated between the Commission and the broadcaster (who was already "operating under a compliance plan arising from a previous investigation into possible violations of the requirement to negotiate in good faith") as a means to limit that broadcaster's potential access to agreements negotiated by third-party stations for which the broadcaster provides accounting services but is not permitted to jointly negotiate retransmission consent.[127] Not only have Applicants given the Commission no cause to believe they would, in the future, violate the Commission's prohibitions on jointly negotiating or coordinating retransmission consent, but there are no existing or planned joint sales or shared services agreements between TEGNA and CMG stations, and neither company's

---

[125] *Univision Holdings, Inc.*, 7 FCC Rcd at 6674, ¶ 12.

[126] *June 13 Response* at 1-2.

[127] *Sinclair Broadcast Group*, Consent Decree, 35 FCC Rcd 5877, 5884, ¶ 9 (2020).

"accounting personnel or auditors" would have access to the other company's retransmission consent agreements.  As explained in Section II.D above, TEGNA's and CMG's operations would not be any more "economically intertwined" after the Transactions than they are today—which is not at all.  The Commission should reject "asserti[ons] that in the future the [Applicants] will be operated or controlled in a manner inconsistent with [the Commission's] requirements or with the representations made by the [Applicants] in the applications and in affidavits,"[128] and decline to impose ATVA's and NCTA's requested conditions.

*****

---

[128] *Univision Holdings, Inc.*, 7 FCC Rcd at 6675.

**III.     Conclusion**

The Applicants have amply demonstrated that the Transactions comply with all

Commission rules and precedent, require no waivers, and will result in numerous and substantial

public interest benefits, including creating the single largest minority owned and female led

broadcast television company in U.S. history.  Nothing in the Petitions or Comments gives rise to

any substantial and material question of fact as to whether grant of the Applications is in the

public interest.  The Commission should therefore promptly dismiss, deny, or otherwise reject

the Petitions and Comments and unconditionally grant the Applications.

Respectfully submitted,

*/s/ Scott R. Flick*
Scott R. Flick
Jessica T. Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com
*Counsel for SGCI Holdings III LLC*

Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
jjezierny@cov.com
*Counsel for TEGNA Inc.*

Michael D. Basile
Jason Rademacher
Cooley LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
mdbasile@cooley.com
jrademacher@cooley.com
*Counsel for CMG Media Corporation*

**DECLARATION OF SOOHYUNG KIM**

I, Soohyung Kim, do hereby declare under penalty of perjury that the following is true and correct:

1.  I am the Sole Managing Member of SGCI Holdings III LLC ("Standard General").

2.  I am authorized to make this Declaration on behalf of Standard General in connection with the attached Consolidated Opposition and Response to Comments (the "Opposition") being filed in MB Docket No. 22-162 (*Applications to Transfer TEGNA Inc. to Standard General L.P.*).

3.  I have reviewed the attached Opposition and have personal knowledge of the Standard General representations made therein.  To the best of my information and belief, all statements of fact contained in the Opposition made on behalf of Standard General are true and accurate.

Executed on July 7, 2022.

_____
Soohyung Kim
Managing Member, SGCI Holdings III LLC

## DECLARATION OF AKIN HARRISON

I, Akin Harrison, do hereby declare under penalty of perjury that the following is true and correct:

    1.  I am the Senior Vice President and General Counsel of TEGNA Inc. ("TEGNA").

    2.  I am authorized to make this Declaration on behalf of TEGNA with respect to representations made on behalf of TEGNA in the attached Consolidated Opposition and Response to Comments (the "Opposition") being filed in MB Docket No. 22-162 (*Applications to Transfer TEGNA Inc. to Standard General L.P.*).

    3.  I have reviewed the attached Opposition and have personal knowledge of the TEGNA representations made therein.  To the best of my information and belief, all statements of fact contained in the Opposition made on behalf of TEGNA are true and accurate.

                Executed on July 7, 2022.

                _____
                Akin Harrison
                Senior Vice President and General Counsel, TEGNA Inc.

## DECLARATION OF ERIC D. GREENBERG

1.  My name is Eric D. Greenberg, and I am an Executive Vice President and the General Counsel & Corporate Secretary of CMG Media Corporation ("CMG").

2.  I have reviewed the attached Consolidated Opposition and Response to Comments (the "Opposition") being filed in MB Docket No. 22-162 (*Applications to Transfer TEGNA Inc. to Standard General L.P.*) and have personal knowledge of the CMG representations made therein.  To the best of my information and belief, all statements of fact contained in the Opposition made on behalf of CMG are true and accurate.

3.  I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 7, 2022


Eric D. Greenberg
Executive Vice President, General
Counsel & Corporate Secretary
CMG Media Corporation

## <u>CERTIFICATE OF SERVICE</u>

I, Jessica Nyman, hereby certify that on July 7, 2022, copies of the foregoing *Applicants'*

*Consolidated Opposition and Response to Comments* were sent by electronic mail to the

following:

David Brown
Video Division, Media Bureau
Federal Communications Commission
David.Brown@fcc.gov

Jeremy Miller
Video Division, Media Bureau
Federal Communications Commission
Jeremy.Miller@fcc.gov

Chris Robbins
Video Division, Media Bureau
Federal Communications Commission
Chris.Robbins@fcc.gov

Jim Bird
Transaction Team, Office of General Counsel
Federal Communications Commission
Jim.Bird@fcc.gov

Yosef Gettachew
Jonathan Walter
*Common Cause*
YGetachew@commoncause.org
JWalter@commoncause.org

Cheryl Leanza
*United Church of Christ Media Justice Ministry*
CLeanza@alhmail.com

Andrew J. Schwartzman
AndySchwartzman@gmail.com
*Counsel to the NewsGuild-CWA and NABET-CWA*

Stephanie Weiner
Harris Wiltshire & Grannis LLP
SWeiner@hwglaw.com
*Counsel to Graham Media Group, Inc.*

Cristina Chou
Vice President, Federal Affairs
*Altice USA, Inc.*
Cristina.Chou@alticeusa.com

Radhika Bhat
Vice President and Associate General Counsel
*NCTA*
RBhat@ncta.com

Kristine Laudadio Devine
Michael Nilsson
Harris Wiltshire & Grannis LLP
KDevine@hwglaw.com
MNilsson@hwglaw.com
*Counsel to ATVA*

*/s/ Jessica T. Nyman*