# EXHIBIT 7

Case No. 1:24-cv-01204-RC

BEFORE THE
**FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC  20554**

In the Matter of )
Applications of TEGNA Inc., for Transfer ) MB Docket 22-162
of Control to Standard General, L.P. )

**REPLY TO APPLICANTS' CONSOLIDATED
OPPOSITION AND RESPONSE TO COMMENTS OF**

**THE NEWSGUILD-CWA**

**NATIONAL ASSOCIATION OF BROADCAST
EMPLOYEES AND TECHNICIANS-CWA**

**UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY**

**and**

**COMMON CAUSE**

Cheryl A. Leanza
United Church of Christ
Media Justice Ministry
100 Maryland Ave, NE
Suite 330
Washington, D.C. 20002
*Counsel for UCC*

Yosef Getachew
Jonathan Walter
Common Cause
805 15th Street, NW
Suite 800
Washington, DC 20005
*Counsel for Common
Cause*

Andrew Jay Schwartzman
1341 G Street, NW
Fifth Floor
Washington, DC 20005
(202) 241-2408
andyschwartzman@gmail.
com
*Counsel for TNG-
CWA/NABET-CWA*

August 1, 2022

## TABLE OF CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    THIS TRANSACTION DOES NOT PROMOTE OWNERSHIP DIVERSITY AS IT IS UNDERSTOOD BY THE PUBLIC INTEREST AND CIVIL RIGHTS COMMUNITY, AND BY COMMISSION POLICY . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   ALL PETITIONERS HAVE STANDING IN ALL AFFECTED MARKETS AND NATIONALLY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Petitioners have met their burden to establish harm. . . . . . . . . . . . . . . . . . . . 8

      B.    Harms giving rise to standing need not be the same as harms which go to the merits of the transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    Petitioners demonstrated organizational and associational standing-each under their own standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            1.    Direct organizational standing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.    Associational or representational standing . . . . . . . . . . . . . . . . . . . . 11
            3.    "Viewer Standing" is just one form of associational standing . . . . . . 15

III.  BASED ON THE CURRENT RECORD, THERE ARE SUBSTANTIAL AND MATERIAL QUESTIONS OF FACT AS TO WHETHER AGM WILL HAVE A POST-TRANSACTION ATTRIBUTABLE INTEREST . . . . . . . . . . . . . . . . . . . . . . . 16

IV.   APPROVAL OF THE APPLICATIONS WILL CAUSE GRIEVOUS HARM TO LOCAL PROGRAMMING AND THE LOCAL JOB MARKET . . . . . . . . . . . . . . . 26

V.    THE INCREASED RETRANSMISSION FEES THAT WOULD RESULT FROM GRANT OF THE APPLICATIONS WILL BE PASSED ON TO SUBSCRIBERS AND IS THUS CONTRARY TO THE PUBLIC INTEREST . . . . . . . . . . . . . . . . . . . 28

      A.    Loss of access to non-broadcast channels . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      B.    Challenges to receiving over the air signals . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      C.    Increased subscriber fees are traceable to the applicants' practices . . . . . . . 32

      D.    Increased fees incurred by pay-TV subscribers is a cognizable public interest harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

BEFORE THE
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, DC   20554**

In the Matter of                              )
Applications of TEGNA Inc., for Transfer     )          MB Docket 22-162
of Control to Standard General, L.P.         )

**REPLY TO APPLICANTS' CONSOLIDATED**
**OPPOSITION AND RESPONSE TO COMMENTS OF**
**THE NEWSGUILD-CWA, NATIONAL ASSOCIATION OF BROADCAST**
**EMPLOYEES AND TECHNICIANS-CWA, UNITED CHURCH OF CHRIST**
**MEDIAJUSTICE MINISTRY AND COMMON CAUSE**

The NewsGuild-CWA ("TNG-CWA"), the National Association of Broadcast Employees and Technicians-CWA (NABET-CWA"), United Church of Christ, OC., Inc. doing business as United Church of Christ Media Justice Ministry and Common Cause (collectively, "Petitioners") respectfully reply to Applicants' Consolidated Opposition and Response to Comments, filed in this docket on July 7, 2022.

**SUMMARY**

The Applicants and their anonymous funders located in the Cayman and British Virgin Islands have proposed a complex series of transactions designed to weaken local journalism and jack up cable subscriber fees.   Grant of their pending applications will do nothing to create a more accurate, diverse or independent media.

The Applicants ignore the principle that, for purposes of the standing inquiry, factual assertions are assumed to be true, and that the merits of the claims are assessed only after standing questions are resolved.   In arguing that hardworking people in the journalism industries and civil rights and democracy activists have no right to participate in FCC proceedings, the Applicants do not even recognize, much

1

less discuss, established legal principles giving labor unions and voters' organizations standing to challenge each of the proposed station sales to protect their institutional interests throughout the country.   They then contort the entirely separate legal framework governing associations' ability to represent their members to suggest that the possibility of decreased coverage of local news and information and the prospect of increased pay-TV bills do not give the members the right to challenge the harms that would result from grant of each of these pending applications throughout the country.

In their petitions to deny, TNG-CWA/NABET-CWA, UCC and Common Cause discussed how the Applicants had failed to meet their burden of proving that grant of the applications is in the public interest.   The Applicants failed to give the Commission or the public access to all the documents necessary to assess whether Standard General would in fact control TEGNA post-transaction.   Despite the Applicants' claims to the contrary, Petitioners showed that, even after the Commission required the submission of some additional documents, many others that were sought in the still-pending motion filed on May 12, 2022 must be submitted to the Commission and the parties for review.   Assessment of whether an investor or a nominally passive shareholder or partner has de facto control is a case-by-case determination.   Without action on the May 12, 2022 motion, it is impossible to

2

know if there are covenants, options or other arrangements that would mean that Apollo Global Management or other entities with undisclosed interests would have control over TEGNA's stations.   This concern is only exacerbated by the fact that a companion Petition for Declaratory Ruling seeks a waiver of Commission rules to permit foreign ownership interests of up to 100% of the aggregate of the ultimate licensee's equity and voting interests.

Petitioners demonstrated that increased consolidation at the national level will adversely affect local markets throughout the nation, including in TEGNA markets. The Applicants defend   Standard General's stated plans to increase cookie-cutter, nationally distributed content from a Washington "news desk," disregarding the inevitable reduction in locally-originated programming.   In the face of clear indications that the claimed financial "synergies" arising from these transactions depend on job reductions at the local level, the Applicants merely reiterate Standard General's vague and utterly unenforceable assurance that it has "no intention" to reduce local employment headcounts across TEGNA's footprint.

The Applicants' silence confirms that Petitioners are correct that a driving force behind the complex financial maneuvering in this case is Standard General's desire to manipulate so-called after acquired station clauses to jack up retransmission fees for pay-TV operators.   They make no effort to respond to Petitioners' showing

3

that this is a novel issue for the Commission, and that prior case law involving challenges brought by private party MVPDs is not on point.   And, although Petitioners conclusively establish that these increased fees are invariably passed on to customers as specific line items on their monthly bills, the Applicants callously disregard this public interest harm, saying that consumers can always avoid paying increased cable bills by cancelling their service and using over the air antennas. Leaving aside the fact that many viewers cannot receive local TV stations, including TEGNA's over the air, this would force subscribers to choose between watching over the air local TV and accessing all the other nationally distributed news and entertainment channels.

## I.   THIS TRANSACTION DOES NOT PROMOTE OWNERSHIP DIVERSITY AS IT IS UNDERSTOOD BY THE PUBLIC INTEREST AND CIVIL RIGHTS COMMUNITY, AND BY COMMISSION POLICY.

The Applicants express concern that the Petitioners' long-standing support for ownership diversity means that they should automatically support a transaction as long as a woman or person of color is at the helm of a transaction.[1] As the civil rights community often explains, "meaningful protection of civil rights and advancement of key policy objectives rely in great measure on an accurate, diverse, and independent media that serves our constituencies."[2] The proposed transactions will do nothing to create a more accurate, diverse or independent media.

---

[1] Opposition at 13-17.
[2] Leadership Conference on Civil and Human Rights, MB Docket No. 18-349, 2018 Quadrennial Regulatory Review Comments at 1 (filed April 29, 2019). ("Leadership Conference 2018 Quadrennial Regulatory Review Comments").

Just as the Commission and the Supreme Court have consistently found, the Commission's public interest goals are not focused on promoting one kind of owner over another.   Rather, it is promoting antagonistic and competing viewpoints in a vibrant marketplace of ideas.[3]   One reason the civil rights community and Petitioners oppose media concentration is that it results in fewer owners, fewer points of view and fewer opportunities for smaller entrepreneurs, including historically excluded entrepreneurs, to enter into the marketplace and compete against large companies.[4]   Indeed, petitioners have consistently called on the Commission not to relax media ownership limits in order to create more ownership opportunities for people of color and women.[5] Therefore, the Commission's media ownership diversity objectives are grounded in creating pathways for multiple owners with multiple viewpoints and backgrounds to enter the marketplace. A single owner controlling numerous stations throughout the country, producing news often far from the local communities those stations serve and likely reducing the number of journalists (who could be women, people of color, people with disabilities, members of the LGBTQ community to name a few) would not produce diversity or advance the Communications Act's public interest standard.   Under the Applicants' theory of diversity, the U.S. could achieve ownership diversity through a single owner of all television and radio stations in the country as long as that owner is a person of color or a woman.   Further, this transaction does nothing to increase ownership opportunities for women and people of color to enter the marketplace.   To the contrary, the

---

[3] *Associated Press v. United States,* 326 U.S. 1, 20 (1945) ("the widest dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society").

[4] *See* Leadership Conference Quadrennial Review Comments at 9 ("Media concentration leads to fewer owners and fewer entrepreneurial opportunities, while actions to tighten media ownership rules will lead to more owners and more such opportunities for people of color, people with disabilities, and women.")..

[5] *Id.*

5

applicants' business model of laying off reporters and reducing local news coverage creates a race to the bottom approach that would pose significant challenges for any new entrants to meaningfully compete with TEGNA post-transaction and provide robust local programming.

Petitioners, as well as the progressive and civil rights communities also support economic success for all people, counteracting centuries of policies that exclude people of certain backgrounds or with particular attributes from the opportunity to acquire and pass down wealth.[6] Broad participation by members of historically excluded groups is not only just, but also a sign that a market is robustly competitive.[7]    It is certainly a good thing that Mr. Kim is not barred by his race from becoming a successful entrepreneur with the acumen and business relationships giving him access to capital such that he is at the lead of this transaction.    It is certainly a good thing that Ms. McDermott is not barred by her gender to be selected to run a large corporation. Unfortunately, it *is* rare for members of either of these groups to be in such a position.    But a single large LLP or corporation of the type proposed here is not going to ameliorate or address long-standing inequities produced by structural racism, xenophobia or misogyny - and is not likely to provide additional members of historically excluded groups the opportunity to gain wealth and influence in society. The identity of the executives leading these companies should not and does not insulate a transaction of this scope from a thorough and searching review by federal regulators.    The Commission should not conflate the identity of one or two business leaders regarding a transaction that would further consolidate the marketplace with advancing its goals to promote ownership

---

[6] Center for American Progress, *Eliminating the Black-White Wealth Gap Is a Generational Challenge* (Mar. 19, 2021), https://www.americanprogress.org/article/eliminating-black-white-wealth-gap-generational-challenge/.
[7] *See* Fuse Media; et al., Petition for Rulemaking to Establish a Content Vendor Diversity Report, MB Docket No. 22-209 at 7 (filed May 5, 2022).

diversity.    Conflating the identity or one or two business leaders with the achievement of civil

rights objectives is a serious error.

## II.    ALL PETITIONERS HAVE STANDING IN ALL AFFECTED MARKETS AND NATIONALLY.

The Applicants' challenge to Petitioners' standing has more bluster than substance, and does

not accurately address the law on standing or Petitioners' claims. Applicants make no persuasive

case what-so-ever against Petitioners' standing. They incorrectly:

- describe petitioners' burden of proof to establish harm giving rise to standing;

- claim that a harm giving rise to standing must be a factor relating to the transaction's merits;

- assume that "viewer" standing is the only kind of standing available at the FCC; and

- disregard the binding caselaw with respect to organizational and associational standing and the differences between them.

Further, the Applicants' claim that all information submitted to the Commission must be

within the personal knowledge of the filers - without reliance on news reporting or information

communicated by colleagues or through research - completely ignores the text of Section 309(d)(1)

and would essentially end public participation by any petitioner in the non-profit or business

communities.[8] The Commission should also firmly reject such claims because Section 309(d)(1)

explicitly permits facts "of which official notice may be taken," need not be supported by affidavit

of a person with personal knowledge. 47 U.S.C. § 309(d)(1).

The failure of such sophisticated parties with experienced and sophisticated counsel to

understand core standing doctrine and the relevant law underscores the need for the Commission to

---

[8] Opposition at 8-9 ("The 'Petitions' suffer from a fatal lack of personal knowledge of any relevant facts …"); Opposition at 22 n. 56 (allegations about 87 layoffs is not based on personal knowledge but were based on website Radio Insight).

clarify its standing rules and overturn the erroneous *Nexstar* precedent,[9] as Petitioners have requested.

### A. Petitioners have met their burden to establish harm

The Applicants say that Petitioners "do not offer a shred of evidence to support their assertions that the transactions will result in reduced news and jobs as a byproduct of media consolidation."[10]  However, even if the Applicants were right - and they are not - that is of no moment in the Commission's assessment of Petitioners' standing:

> [I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims.[11]

The burden to establish standing to challenge an administrative proceeding in a court of appeals is the same as that of a plaintiff moving for summary judgment.[12]  Moreover, "Article III standing requirements do not apply to agency proceedings, and thus there is no reason for the facts supporting standing to be a part of the administrative record."[13]

Affidavits and declarations are more than sufficient.[14] And because the ramifications of the transaction are substantial and material to the Commission's public interest determination, the

---

[9] *Nexstar Media Group, Inc*., 34 FCCRcd 8436 (2019).

[10] Opposition at 9.

[11] *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *Am. Fed'n of Gov't Employees v. Pierce*, 697 F.2d 303, 305 (D.C.Cir.1982)).

[12] *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Administration*, No. 20-1370 (D.C, Cir. July 26, 2022) (slip op. at 11), 2202 WL 2920537 (citing *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002)).

[13] *Prometheus Radio Project v. FCC*, 939 F.3d 567, 578 (3d Cir. 2019), rev'd on other grounds sub nom. *FCC v. Prometheus Project*, 141 S.Ct. 750 (2021) (citing *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012)).

[14] *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Administration*, supra, (slip op. at 13).

proper place to explore them is at hearing, where an Administrative Law Judge can consider the questions in depth with the benefit of discovery.

### A. Harms giving rise to standing need not be the same as harms which go to the merits of the transaction

Applicants dispute Petitioners' standing, *inter alia*, because the harms alleged are not public interest harms cognizable by the Commission in its review.[15] But as UCC and Common Cause explained in their Petition,[16] the Supreme Court has held that the Commission cannot deny standing to a party adversely affected even if the harm alleged by the party was not a harm the Commission takes into account in considering the licensing decision.[17]   Standing establishes that parties have a "stake in the outcome" of a proceeding or case,[18] but the harms giving a party standing need not be the same harms that the Commission evaluates in a transaction.

### B. Petitioners demonstrated organizational and associational standing—each under their own standard

Applicants contest Petitioners' standing without acknowledging the basic caselaw for establishing standing. "An organization…can assert standing on its own behalf, on behalf of its members or both."[19] There are two different claims at issue here.   First, direct organizational

---

[15] Opposition at 10.

[16] UCC/Common Cause Petition at 3.

[17] *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 476-77 (1940).   In *Prometheus Radio Project v. Fed. Commc'ns Comm'n*, supra, 939 F.3d at 580 (3d Cir. 2019), the Third Circuit held that, even under the higher bar of Article III, "there is no requirement that the harm alleged be closely tied to a challenger's legal argument in order to have Article III standing.")

[18] *See Baker v. Carr*, 369 U.S. 186, 204 (1962) ("The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'")

[19] *Equal Rights Center v. Post Properties, Inc.,* 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quoting *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006)).   See also *Humane Society of the United States v. U.S. Department of Agriculture*, No.

standing can be conferred even when - in the example of corporations -the entity has no members at all. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 261-63 (1977). Second, associational standing (sometimes called representational standing) is standing established on behalf of members who have standing individually but instead pursue their interests collectively through the organization.   Viewer-based standing for organizations is but one form of associational standing that can be shown under the Communications Act - members who are viewers can show standing. But, as UCC and Common Cause explained, the Commission cannot limit public participation to viewer standing alone, and therefore must overrule language suggesting the contrary in *Nexstar-Tribune*.[20]

Notably, the Applicants do not even discuss Petitioners' assertion of direct organizational standing to challenge all of the station assignments throughout the nation, effectively conceding its validity.   While Applicants do attempt to rebut Petitioners' associational standing based on the harm to their members, they largely do so by challenging the validity of the factual and legal issues raised in the petition to deny which, as explained above, is irrelevant.

### 1.  Direct organizational standing

Supported by sworn declarations, TNG-CWA/NABET-CWA demonstrated that they have direct organizational standing.[21]  They described how their ability to function as a labor union would be harmed by grant of the applications.[22]  They also showed how TNG-CWA/NABET

---

20-5291, (D.C. Cir., July 22, 2022), 2022 WL 2898893 (slip op. at 6)(petitioner and members have organizational and associational standing because "[e]ach alleges a concrete, pecuniary injury").
[20] UCC/Common Cause Petition at 4.
[21] TNG-CWA/NABET at 8. ("TNG-CWA and NABET-CWA also have standing as organizations.")
[22] TNG-CWA/NABET-CWA Petition at 7-10.   The declarations showed, inter alia, that TNG-CWA/NABET-CWA members have skillsets that allow them to work at local broadcasting stations and that consolidation reduces job opportunities for them.   *Id.*

expend resources lobbying to preserve jobs, and undertake other activities to promote job opportunities in local journalism and broadcasting, including the creation and operation of TNG-CWA's Save the News Campaign,[23] and that further loss of jobs will require them to expend additional resources in such efforts.[24] The injuries alleged are concrete and specific, and TNG-CWA/NABET-CWA will be forced to redouble their resource investment in promoting local journalism and local jobs in broadcasting to address them.[25] These showings amply demonstrate that their ability to fulfill their institutional functions will be "perceptibly impair[ed]" if the applications are granted.[26] Petitioner organizations themselves would be harmed by approval of the applications without regard to any specific members.

Common Cause discussed how the transaction would harm the ability of its staff and leadership to advance democracy reforms.[27] Common Cause staff who are unable to rely on paltry or non-existent news coverage of legislation passing in state capitols or local cities must do more work themselves to uncover non-responsive legislators or proposals that will harm democratic

---

[23] In a member survey launched with the Save The News campaign in 2020, 84% of respondent NewsGuild-CWA members said they agreed or strongly agreed that public policy should discourage or bar hedge fund ownership of news outlets. Further, for years The NewsGuild-CWA has actively supported reporting on the financialization of news through its websites, See dfmworkers.org; https://newsguild.org/save-the-news/. When members were asked what needs to happen for journalism to thrive, one respondent said a focus should be "kicking the hedge funds and banks out of the news industry." Another said, "hedge funds have got to go." Yet another said the priority needs to "oust the hedge owners, invest in the newsrooms and pay a living wage to a diverse workforce." Standard General is a hedge fund and The NewsGuild-CWA's members are overwhelmingly against hedge fund ownership of local news.

[24] Declaration of Jon Schleuss, Exhibit A to Petition. ("The diminution of journalistic values and the loss of journalistic jobs that would accompany grant of the pending applications would force TNG-CWA to divert personnel and financial resources to its campaigns to protect and promote local journalism. This in turn would interfere with TNG-CWA's organizing efforts and its ability to protect the welfare of its existing members.")

[25] *PETA v. U.S. Department of Agriculture*, 797 F.3d 1087, 1084 (D.C. Cir. 2015)(

[26] *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

[27] UCC/Common Cause Petition at 7-9.

11

processes.[28]  The harm to Common Cause directly impairs its mission of responsive democracy and forces the organization to spend more staff time and more financial resources promoting democracy and democratic reforms.[29]  The harms are directly attributable to the transaction and would not occur but for the transaction.[30]

The Applicants say absolutely nothing in response.   They do not even use the words "organizational" or "institutional" in their pleading.   Other than an unelaborated assertion that the Petitioners' "members cannot have 'viewer standing' if they do not reside in an affected market,"[31] and an extremely puzzling reference to 'taxpayer standing'"[32] (something to which Petitioners never alluded), the Applicants do not address Petitioners' direct organizational standing. Instead, they limit themselves to a few words claiming that the asserted harms asserted are "theoretical."[33]

Petitioners' undisputed direct organizational standing means that Petitioners have standing which is nationwide in scope, and applies to all the station assignments here at issue.   It does not depend on whether Petitioners are membership organizations (although they are), let alone members who are viewers in the TEGNA markets.   This is one key reason, as UCC Media and Common Cause explained in their Petition, why *Nexstar-Tribune* is wrongly decided - the Commission may not prohibit parties from asserting standing on bases other than viewership of local stations.[34] Here, too, Applicants fail entirely to respond or otherwise defend the applicability and viability of the *Nexstar* case.

---

[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] Opposition at 9.
[32] *Id*.
[33] *Id.*
[34] UCC/Common Cause Petition at 2-5.

In short, the Applicants conceded that Petitioners have met all the requirements to establish institutional standing, and that they are entitled to participate in this proceeding to challenge all of the proposed assignments in this docket.

### 2. Associational or representational standing

Entirely separate from TNG-CWA/NABET-CWA's and Common Cause's organizational standing, Petitioners have also shown that their members will incur harm as concerned citizens, journalists and viewers, both because of the adverse impact of the proposed transactions on localism and competition, and also because they face increased costs for pay-TV service as increased retransmission fees are passed on to them as MVPD subscribers.   Petitioners submitted numerous declarations describing the harms to Petitioners' members and how those harms relate to their missions in accordance with *Washington Apple*.[35]

Ignoring that the factual allegations supporting standing must be assumed to be true, Applicants say that Petitioners' members, and thus Petitioners, lack standing based on their interest arising from the adverse effect of media consolidation, including loss of diversity in local news coverage, even though the Commission has afforded standing on that basis for decades.[36]   In the case of TNG-CWA/NABET-CWA) they say that the loss of job opportunities for journalists is merely "theoretical."[37]   But that, too, is an argument on the merits, not a reason to deny standing.

Applicants also claim that Petitioners lack standing to seek redress for the likely increase in cable subscription fees because increased pay-TV subscription costs are not a cognizable harm or a

---

[35] *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).
[36] See, e.g., *Tribune Company,* 22 FCCRcd 21266, 21269 (2007) ("The cross-ownership rules were adopted to promote diversity of ownership and, thereby, viewpoints, for the benefit of the public. Accordingly, a…viewer...has standing to present an argument that he or she would be harmed if the cross-ownership rules were waived."),
[37] Opposition at 9.

public interest harm.    Yet again, these are merits arguments; they are also wrong, as shown in Petitioners' merits argument in Section V, infra.    They also say that, because many of Petitioners' declarants do not subscribe to an MVPD and (as if it mattered) that vMVPD subscribers are not harmed because networks typically negotiate program licenses for their affiliates rather than directly with the vMVPDs.[38]  For what it is worth, the latter assertion may well be incorrect, or at least incomplete.[39]  But much more fundamentally, this simply does not matter.    Even excluding vMVPDs, by Applicants' own count Petitioners presented at least a dozen viewers' declarations averring that they have MVPD subscriptions,[40]  But as standing jurisprudence clearly shows, harm to even one member of an organization is sufficient to demonstrate standing.[41]  In fact, a new decision of the D.C. Circuit emphasizes the breadth of associational standing.  In *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Administration*, the court found that an anonymous survey of petitioner's members was sufficient to demonstrate standing.    The Court said that this showing was "more than unsubstantiated generalizations," because it "evidence[d] the concrete injuries that individual members expected the rule would cause them to suffer."    It explained that:

> To be sure, it is not enough to merely "aver that unidentified members have been injured."    But here we do not need to "speculat[e]" whether "one individual will meet all of the[ ] [standing] criteria[.]" The Teamsters submitted survey responses with direct quotations from individual members affected by the proposed changes to the short-haul requirement.[42]

---

[38] Opposition at 10.
[39] See p. 39 n. 84, infra.
[40] Opposition at 10-11, n. 25.
[41] *Warth v. Seldin*, 422 U. S. 490, 498-499 (1975). See also *American Library Association v. FCC*. 406 F.3d 689. 696 (D.C. Cir. 2005).
[42] *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Administration*, supra (slip op. at 14).

Finally, and amazingly, Applicants also say that forcing subscribers to pay more for pay-TV service to the public is a benefit, not a harm and, evidently, is thus not actionable.[43] Putting aside how preposterous it is for the holder of an exclusive license, obtained free of charge, to say that extracting monopoly rent is a feature, not a bug, and even accepting this statement of opinion as a fact, this is a policy argument far outside the scope of any discussion of standing.

### 3.  "Viewer standing" is just one form of associational standing

Throughout their opposition, Applicants conflate "viewer standing" with associational standing.   It is thus very important to for the Commission to be clear in recognizing that there are many other forms of injury that can be the basis of associational standing.[44]   For example, while demonstrating that a viewer watches television may be the simplest way to make a showing in support of standing, Common Cause's members are harmed by a lack of government accountability even if they do not watch television.   If many fewer people have access to much less local news holding state and local governments accountable, those governments are less likely to be responsive to citizens.   They need not watch television to suffer harm.   So, too, for TNG-CWA and NABET-CWA members need access to local news and public affairs programming to function as professionals in the

---

[43]  Opposition at 10.

[44]  The Commission and the courts routinely afford associational standing in both rulemakings, see, e.g., *Children's Health Defense v/ FCC*, 25 F.4th 1045, 1049 (D.C. Cir. 2022); *Covad Communications Company v. FCC*, 450 F.3d 528, 547 n. 9 (D.C. Cir. 2006); *American Library Association v. FCC*, supra, 406 F.2d at 696;*Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1316 (D.C. Cir. 1995) and adjudications, see, e.g., *Living Way Ministries, Inc.*, 23 FCCRcd. 15070, 15073 (2008) (petition to deny); *Panhandle Eastern Pipeline*, 4 FCCRcd 8087 (1989)(petition to deny).   See also *United States Telecom Association v. FCC*, 295 F.3d 1326, 1330. (D.C. Cir. 2002)(declaratory ruling).

journalism industries.   But not all of them can access the news and information they need

via over-the-air television as Applicants seem to believe.[45]   Applicants make wide-ranging

attempts to undermine standing based on increased retransmission fees and the increased

costs of pay television.   As explained above, most of these are irrelevant to standing

because Petitioners need not demonstrate that their harms are cognizable reasons for the

Commission to deny the application.   Nonetheless, these harms are also directly related to

TNG-CWA's members' ability to perform their jobs.   Moreover, for the members of each

of the Petitioner organizations, these harms are pecuniary in nature, and in that regard do not

depend on members actually being viewers of TEGNA stations, or any over the air stations

at all.   Rather, it is because they pay more for their subscriptions so they can watch

television at all, including other channels carried by the MVPD.

Petitioners have amply shown that they possess standing and that the Commission

should make clear that members of the public may demonstrate standing using multiple

techniques and that the Commission must reject Nexstar-Tribune as inconsistent with

current law.

### III.    BASED ON THE CURRENT RECORD, THERE ARE SUBSTANTIAL AND MATERIAL QUESTIONS OF FACT AS TO WHETHER AGM WILL HAVE A POST-TRANSACTION ATTRIBUTABLE INTEREST.

The Applicants have not met their burden of establishing that Apollo Global Media

("AGM") would not have an attributable interest in Standard General LP ("Standard General"), that

it otherwise will exercise excessive control over the TEGNA properties, or that it is otherwise in the

public interest.   And, pending the outcome of final Commission action on the public interest

parties' May 12, 2022 motion for seeking certain additional information not yet on the record, it is

---

[45] As discussed in Section V infra, many viewers cannot receive local over the air television
without an MVPD subscription.

not possible for the Commission to make the requisite public interest finding as to the true ownership interests in this case.

In their opposition, the Applicants respond to challenges with respect to the questionable ownership structure that purports to confer full control of the TEGNA stations, denying that "the Transactions...involve any 'attempts to game' the Commission's ownership rules.[46] They say that the challenges

> fail to demonstrate *any* such "interlocking interests" or method by which AGM could actually exercise influence over TEGNA's stations or any transaction-specific circumstance that would "increas[e] both the incentive for and ability of the parties to collude'...."[47]

They maintain that "Standard General will have a borrower/lender relationship with AGM"[48] and that "AGM will possess standard minority investor protections consistent with those that have been approved countless times by the Commission,…"[49]

The Applicants claim that the record is complete and that the petitioners and commenters have

> had ample access to the transaction documents from the Applications, as well as (in the case of NewsGuild,..) access to highly confidential ancillary documents previously submitted to the Department of Justice and filed with the FCC in response to the June 3 Request, more than a week before the petition deadline,..."[50]

To the contrary, the public, and even those parties that are signatories to the Protective Order have **not** had "ample access to the transaction documents...."   The Commission's test for assessing *de facto* control involves multiple elements.[51]   It is not possible to apply these

---

[46]  Opposition at 24 (footnote citing TNG-CWA/NABET-CWA petition at 1 is omitted).
[47]  Opposition at 25 (emphasis in the original)(footnote omitted).
[48]  Opposition at 26.
[49]  *Id.*
[50]  Opposition at 22-23 (footnote omitted).
[51]  See, e.g., *Entertainment Media Trust*, 34 FCCRcd 4351, 4663 (2019)/

factors to assess the validity of the Applicants' claims and to assess the degree of influence that AGM will have over Standard General, LP ('Standard General') without access to many more documents that will show what kind of covenants, options[52] and other provisions have been embedded in the documents that have not been submitted to the Commission, much less shared with the public.   Assurances that everything in these arrangements are "standard" notwithstanding, the highly unusual nature of these transactions requires deeper scrutiny than has been possible to date.   Thus, in In *SNR Wireless LicenseCo, LLP v. FCC,* 868 F.3d 1021, 1033 (D.C. Cir. 2017), the Court held that the Commission correctly found that there was de facto control, saying that

> petitioners wrote into their contracts general terms that formally spoke to the six factors in ways that seemed to promise independence...but at the same time functionally belied those promises with specific contract terms empowering...[financiers]...to control and benefit from virtually all critical aspects...."

Because of the many gaps in the record, on May 12, 2022, TNG-CWA joined with Common Cause and Public Knowledge in filing a motion seeking additional information of the Applicants and an extension of time for parties to evaluate such additional information.   The staff took an interim step on the motion, in a *Public Notice* dated May 20, 2022,[53] stating that "While the Motion remains pending and in light of the questions raised therein, we will grant a limited extension of the petition to deny deadline for the underlying transaction."[54]

---

[52] "[P]ut options in combination with other terms to an agreement deprive an otherwise qualified control group of de facto control over the applicant. Thus, a "put" in combination with other terms to an agreement may result in an applicant not retaining de facto control." *Fifth Memorandum Opinion and Order*, 10 FCCRcd. 403, 455 (1994).

[53] *Media Bureau Extends Pleading Cycle for Applications to Transfer Control of TEGNA, Inc. To Standard General, L.P.*, *Public Notice*, MB Docket No. 22-162. DA 22-603 (MB May 20, 2022).

[54] *Id.* at 1.

By letter to counsel dated June 3, 2022, the staff took another interim step on the motion, directing the filing of some, but by no means all, of the information requested in the May 12, 2022 motion.[55]   The *Letter Order* does not mention, much less take final action, on the motion.

It is clear from the Applicants' response to the June 3, 2022 *Letter Order*, and their opposition, that the information now on the record is insufficient to permit the requisite public interest findings, including most particularly, resolution of the issues relating to the degree of control that AGM and other unnamed investors may have over the operations of Standard General, and whether they are in fact attributable owners or parties of interest.

The Applicants maintain that they believe that these elaborately structured transactions fall within the Commission's definitions of attribution and control.   However, without access to some of the information which is requested in the pending motion, it is not possible to so conclude. And, even more importantly, even if the proposed transaction falls within the Commission's guidelines, the requested information may reveal other elements establishing AGM's control. Staying within the Commission's bright line attribution and other ownership rules set upper limits, but that does not mean that grant of an application within those guidelines is necessarily in the public interest.[56]   It is sometimes the case that a party in interest nominally within the Commission's guidelines can exercise effective ownership.

> W]hile certain provisions benefitting non-majority investors may not give rise to a transfer of control when considered individually, the aggregate effect of multiple provisions could be sufficient to deprive the control group of de facto control, particularly if the terms of such provisions vary from recognized standards."[57]

---

[55] *Letter to Scott R. Flick*, DA 22-603 (June 3, 2022)("*Letter Order*").
[56] Assessing attribution involves "identify[ing] those interests in or relationships to licensees that confer...a degree of influence or control such that the holders had a potential to affect the programming decisions of licensees or other core operating functions."   *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, 14 FCCRcd 12559 (1999).
[57] *Fifth Memorandum Opinion and Order*, supra, 10 FCCRcd.at 449

As a recent broadcast ownership report explains, "The attribution rules represent the Commission's best judgment concerning when an interest is sufficient to confer on the owner a potential degree of influence over a licensee...."[58]   However, the report also stresses that "Attribution of an ownership interest to an individual or entity...in some instances, requires a detailed case-by-case determination.[59]

As TNG-CWA has pointed out in letters to President Biden, involvement of large hedge funds headquartered in the Cayman Islands and the British Virgin Islands, thus necessitating a waiver of the Commission's foreign ownership limits, are flashing red lights that cry out for further inquiry.[60]   Standard General and its financiers have failed to produce the documents detailing whose money they invest and whether they agreed to cut costs at the expense of hardworking Americans in order to pay the interest on.   Transparency is a core tenet of good journalistic ethics; the involvement of shadowy foreign investors must be explored at hearing.In this case, TNG-CWA/NABET-CWA and other petitioners and commenters have raised significant questions about

---

[58] *Fourth Report on Ownership of Broadcast Stations*, 5 FCCRcd 1217, 1219 (MB 2020).

[59] *Id.* (citing notes to 47 CFR 73.3555).   47 CFR 73.3555 note 1 provides that "The words 'cognizable interest' as used herein include any interest, direct or indirect, that allows a person or entity to own, operate or control, or that otherwise provides an attributable interest in, a broadcast station."

[60] TNG-CWA has called upon CFIUS and the Department of Justice to take on the serious questions raised by this transaction and withhold their approval.   See, *Letter to President Biden* (July 25, 2022)(Exhibit B].   However, and quite separately, the Commission's public interest obligations require it to dismiss the applications or set them for hearing,   TNG-CWA earlier sent a somewhat similar letter to President Biden.   See, *Letter to President Biden* (June 2, 2022)(Exhibit C).   As verified in the declaration of Jon Schleuss, Exhibit A hereto, the letter as posted on TNG-CWA's website erroneously indicated that the letter was also transmitted to the Commission and the four sitting Commissioners.   As the Applicants point out in their Opposition at 29, n. 85, the failure to place such a letter in this docket would not have been consistent with the ex parte rules.   But since the letter was never sent to the Commission or anyone at the Commission, there has been no transgression of the ex parte rules.

the relationships between Standard General, AGM and other investors.[61]   As the May 12, 2022

motion argued, AGM and Standard General

> have structured the transactions in an effort to insulate the two acquiring groups and
> avoid attribution of the Standard General stations to Apollo, they also provide for
> two large loopholes through which Apollo can obtain access to competitively
> sensitive Standard General price information and influence Standard General by
> threatening to exercise its investor protections.[62]

To be more specific, and because of the relevance of what the pending motion says with respect to

ownership, TNG-CWA/NABET-CWA will quote from it at length:

> Another issue is that of Apollo's influence over the affairs of Standard General.
> While the Applicants structured Apollo's supposedly non-voting stake in Standard General
> so that it does not trigger attribution under the Commission's rules,   the reality may be
> different.   First of all, a carefully circumscribed provision of the Term Sheet states that,
> "for the avoidance of doubt, … employees of Apollo or any Apollo affiliate who are
> members of the Board of Directors of CMG Holdings, Inc. or who otherwise participate in
> the management of any Apollo affiliate's investment in CMG Holdings, Inc. shall not have
> access to any Competitively Sensitive Information."    But what about all other Apollo
> employees?   The implication is that they may be afforded access to Competitively
> Sensitive information about Standard General's retransmission fee negotiations.
>
> Second, even if the rights given Apollo were viewed as within the realm of
> legitimate minority rights, they should be viewed through the lens of these
> transactions' circumstances.   Each of Standard General and Apollo periodically
> negotiates retransmission deals with cable, satellite, and over-the-top distributors.
> There is no guarantee that Apollo will not use the leverage of rights it is given to
> exact outcomes it wants in the retransmission fee area.    While the
> Communications Act prohibits coordination of negotiations or negotiation on a joint
> basis by two or more television broadcast stations in the same local market, there is
> no guarantee that such indirect influence can even be detected and, even if it is, that
> it will be viewed as implicating that prohibition.   In any event, coordination, direct
> or indirect, of retransmission fee tactics is even more insidious if it happens across
> local markets.
>
> Finally, what happens in the event of a default, which in a period of
> economic uncertainty, inflation, market fluctuations, and rising interest rates, is a
> possibility not to be ignored?   Would the Commission be approving these
> transactions only to be faced with a request for Apollo to exercise its security
> interests and acquire control of yet more stations, a request structured once more

---

[61] See TNG-CWA/NABET-CWA Petition to Deny at 29; UCC/Common Cause Petition to Deny at
28-29; ATVA Comments at 8; Graham Media Comments at 7.
[62] May 12, 2022 Motion at 3.

with artifice in order to avoid the national ownership cap?  Just as a mortgage
lender may seize the home of a borrower who fails to make monthly payments, could
Apollo seize control of broadcast TV stations in the event of a default by Standard
General?  And if so, how would that impact the Applicants' compliance with
broadcast TV station ownership rules?[63]

The scope of what has not been provided to the Commission is far greater than what has
been provided.  The Commission's Form 315 contemplates that both transferors[64] and
transferees[65] must certify that they must submit all transaction documents and that "these
documents embody the complete and final understanding between Transferor and Transferee;..."

Rather than submit the necessary - and in this case, very material - information that would
permit a genuine evaluation of the proposed ownership structure, the Applicants did not provide the
certification asked for in Form 315.  Following what is, unfortunately, normal practice in response
to the Form 315 question asking if the Applicant certifies that full documentation has been
provided, the Applicants answered "No."  Instead, citing the staff decision in *LUJ, Inc.,* 17
FCCRcd 16980 (2002), they explained the "No" answer with standard language which appears,
more or less in this form, in countless transfer and assignment applications:

> The excluded documents and redactions contain proprietary information, duplicate
> information already included in the application or in the possession of the Commission or

---

[63]  *Id.* at 8-10.  See also Comments of ATVA at 9 (footnotes omitted). ("[T]he sheer complexity of
the transaction...makes it especially difficult for the Commission and the public to evaluate
Applicants' claims.  To take one example, Applicants assert that Cox will hold only 1.86 percent of
the combined equity and debt of New TEGNA, and entities otherwise affiliated with Apollo will
separately hold only 2.16 percent. Yet Applicants state that Cox and Apollo will hold roughly 25
percent of New TEGNA's equity, and press reports indicate that these entities will hold 8.5 percent
of New TEGNA's debt.")

[64]"Transferor certifies that:
    (i) it has placed in Transferor's public inspection file(s) and submitted to the Commission as
    an Exhibit to this application copies of all agreements for the assignment/transfer of the
    station(s); (ii) these documents embody the complete and final understanding between
    Transferor and Transferee; and (iii) these agreements comply fully with the Commission's
    rules and policies."

[65]    Transferee certifies that:
    (a) the written agreements in the Transferee's public inspection file and submitted to the
    Commission embody the complete and final agreement for the sale or transfer of the
    station(s);;;;

> are not germane to the Commission's consideration of this application.    Copies of excluded documents will be provided to the Commission upon request, subject to the right of the parties to ask that the material submitted be held in confidence and not be made available for public inspection pursuant to applicable rules and policies of the Commission that restrict public access to confidential and proprietary information.[66]

The Media Bureau always, or at least nearly always, accepts such representations without question. Counsel is not aware of any decisions in which the staff or the full Commission has found that material claimed not to be germane in this manner should be submitted.[67]   Because these matters are invariably handled at the staff level, the full Commission has never had occasion to contemplate the adverse impact of the *LUJ* precedent.[68]

The use - and abuse - of the *LUJ* precedent facilitates and enables an outrageous lack of transparency as to the Commission's regulation of broadcast ownership; it should be overruled, or at the least, clarified.   However, for immediate purposes, that is not necessary since, as is shown here, there is no way to find that the entirety of the material that the Applicants have withheld from the Commission is not essential to full consideration of the unusual practices indicated in what material is available for public review.

In this case, the excluded material covers many important materials relating to retransmission consent, as well as documentation of certain agreements among the parties, the subject and contents of which are not identified, that the Applicants have themselves deemed as "non-germane."[69]   Notwithstanding these gaps and shortcomings, the Commission's June 3, 2022 *Letter Order* does not ask for sufficient information to establish that there are no issues with respect to AGM's influence over Standard General.

---

[66] Applicants' Comprehensive Exhibit at 11 (footnote omitted).

[67] It is possible that there have been uncontested applications in which the staff has informally requested submission of allegedly non-germane information, but it is not possible to know that since, in the absence of opposition, such actions would have gone unreported.

[68] For but one example, applicants rarely, if ever, submit the sales price of a broadcast property to the Commission, a very important piece of information that used to be routinely reported and in trade publications.

[69] See FCC Form 315, Worksheet 2.

The need for greater disclosure is amplified in this case by the fact that the applications cannot be granted without the benefit of a declaratory ruling that permits foreign ownership interests of up to 100% of the aggregate of the ultimate licensee's equity and voting interests. This is far in excess of the ordinary 5%/10% limits.

Petitioners are of the view that the Commission has been much too willing to bless excessive foreign ownership interests in general, and in broadcast licensees in particular.   In recent years, events have demonstrated the downside of the non-citizens potentially having the ability to influence domestic elections.   Over the air broadcasting continues to be the most important source of local news and information.   Moreover, unlike all other media, Congress has integrated broadcasters into the electoral process itself, mandating broadcasters to ensure that they afford equal opportunities for all legally qualified candidates,[70] provide the lowest unit charge for federal candidates' purchase of air time,[71] and document their sales of air time to candidates and federal issue advertisers.[72]

However, whether or not recent Commission foreign ownership decisions were properly decided, it is clear that grant of the pending applications as facilitated by grant to the requested declaratory ruling would be a gross abuse of discretion in this case.   The uncertainty of the sources of funding in this case and the convoluted ownership structure makes it necessary to explore at hearing who will actually be in control of TEGNA's destiny.   Vague descriptions saying that "[a]pproximately 50% of the equity in Standard General will be held by three Cayman Islands investment funds…and one British Virgin Islands investment fund…,"[73] only raises more questions.   Absent access to the various covenants and other materials that have not been filed with the Commission, it is scant assurance that, on paper, according to the Applicants, voting control will be held by Mr. Kim.

---

[70] 47 U.S.C. §315.
[71] 47 U.S.C. §312(a)(7).
[72] 47 U.S.C. §317.
[73] Amended Petition for Declaratory Ruling of Teton Parent Corp. at 3.

Thus far, the scope of what has not been provided to the Commission is far greater than what has been provided.   While the *Letter Order* did, in effect, grant the May 12, 2022 motion in part, the interim document requests it does contain are far more circumscribed than what is called for in the pending motion, and it did not act on several other categories of information essential to determining whether the proposed transactions are in the public interest.   Thus, neither the Applicants' June 13, 2022 response to the *Letter Order* nor their Opposition come close to resolving the issues that remain open.

In addition to various items pertaining to the retransmission consent issues, among the document requests specified in the May 12, 2022 motion, the Commission cannot determine the exact nature of AGM's relationship to Standard General without the following:

•All documents, including presentations to Apollo and any other financial lending or investment institutions, (including, without limitation, apparent lenders to Standard General in this transaction, such as Goldman Sachs, Bank of America, Royal Bank of Scotland, Credit Suisse, and others) addressing each company's evaluation of this transaction (as well as alternative transactions considered among the companies), the motivating reasons for each company joining in the transaction, the reasons why the transaction would be advantageous to each company, and, specifically, any documents discussing the prospect that the transaction could affect the going-forward rate of fees charged to MVPDs or OVDs and availability of streaming video services and any documents discussing the cutting of staff, the diminution or displacement of local content, and the expansion of national content

•All documents, including without limitation offering memoranda or prospectuses, used to market the proposed transactions to prospective investors or to secure funding

•All analyses and documents relating to historic and projected future capital expenditures, personnel headcounts, and programming plans for each of the broadcast stations included in the applications

•All documents concerning any actual or potential consolidation of news operations or services, including impacts on personnel headcounts

•All documents or analyses addressing or relating to the use of "most-favored nation" ("MFN") or "after-acquired" clauses in retransmission consent agreements to establish pricing floors for retransmission rates in retransmission negotiations with other MVPDs

•A description of the economic value of each Series A investor, including a comparison with the total debt and equity of New TEGNA.

•A list of all Series A investors and the economic value of their investments, including a comparison with the total debt and equity of New TEGNA.

•A list of all restrictions on the rights of Series A and B investors;

and

•A list of all rights held by Series A and B investors.

The latter four items are especially important here, as the record thus far has obscured the relationship between Standard General and its funders.   The Applicants stress in boldface that "AGM is merely one of the **seventeen** entities providing funding for Standard General's acquisition of TEGNA.,..."[74]   Far from proving that there are no public interest issues here, this actually demonstrates the need for far more disclosure of the identity and nature of those parties, as well as any covenants, options or other provisions that any of them may be able to employ to gain control of Standard General now, or in the event of a possible default.

The Applicants have not met their burden of demonstrating that grant of their applications is in the public interest because they have not submitted information sufficient for the Commission to make that finding.   Unless the Commission grants the pending May 12, 2022 motion, requires submission of the requested documentation and then, after review by the parties and the Commission, finds that the burden has been met, the applications must be dismissed or designated for hearing.

## IV.    APPROVAL OF THE APPLICATIONS WILL CAUSE GRIEVOUS HARM TO LOCAL PROGRAMMING AND THE LOCAL JOB MARKET.

Petitioners demonstrated that increased consolidation at the national level will adversely affect local markets throughout the nation, including its TEGNA markets.   They pointed to Standard General's stated plans to increase cookie-cutter, nationally distributed content from a

---

[74] Opposition at 24 (emphasis in the original).

Washington "news desk," thereby enabling it to reduce the amount of locally-originated programming giving it the consequential ability to reduce levels of employment at the local stations. As to the only example that Standard General can cite in its years-long involvement in local broadcasting to show its commitment to local news is the fact that it introduced a local newscast at its station in Cape Girardeau, MO, but Petitioners demonstrated that this newscast is in fact produced and managed from Standard General's Lincoln, NE station, more than 500 miles away.

Notwithstanding the Commission's policy making localism a central component of its public interest analysis, Standard General responds that increasing the proportion of imported news content in their local newscasts is a good thing.   It reiterates that it has invested resources to produce. Notably, it adds nothing new beyond its vague and utterly unenforceable assurance that it has "no intention" to reduce local employment headcounts across TEGNA's footprint, much less amending its application to provide specific - and enforceable - employment commitments.

It defies credulity to claim that news reported from around the country by reporters who likely have little or no knowledge of the problems, needs and interests of the residents of the various TEGNA markets is superior to what can be produced by a locally situated news department.   It is equally problematic to claim that news directors, editors and production staff situated many hundreds of miles away can create a local newscast that is responsive to the needs of Cape Girardeau.   Nor is the net cost of creating that newscast especially substantial given that Standard General had to share the cost of producing the KFVS-TV newscast that it previously simulcast. Given that the KFVS-TV newscast is entirely locally produced, the addition of a few local reporters receiving direction from Lincoln, NE the incremental local diversity benefit is modest.   And, of immediate relevance, as the only example to which Standard General can point to for showing its commitment to localism, it is thin gruel, indeed.

**V.  THE INCREASED RETRANSMISSION FEES THAT WOULD RESULT FROM GRANT OF THE APPLICATIONS WILL BE PASSED ON TO SUBSCRIBERS AND IS THUS CONTRARY TO THE PUBLIC INTEREST.**

Petitioners have shown that the transaction before the Commission would employ a carefully designed and otherwise meaningless sequencing of the license transfers for the sole purpose of allowing Standard General to escalate its charges for MVPD and vMVPD program carriage, and that such increased fees are almost invariably passed on to customers, most commonly through separate line item fees expressly stated to be attributable to the passthrough of broadcast program costs.

In response, Applicants maintain that these are not cognizable harms because "broadcast programming is available to viewers for free over the air," and that MVPDs must "choose" to pass on increased programming costs.[75]   They observe that, as Petitioners discussed, the Commission has previously ruled that increased MVPD programming costs is a public interest harm, but they do not mention, much less rebut, Petitioners' explanation that those prior decisions arose from challenges mounted by MVPDs alleging business harm or that the Commission has never previously considered, or ruled upon, the pecuniary public interest harm that subscribers incur from subscriber fee increases resulting from approval of transactions that trigger after-acquired station and similar clauses.

The most important thing about the Applicants' discussion of retransmission consent is what they do not say: they do not offer a word to deny or otherwise disclaim Standard General's ability or expectation to extract additional revenue by exercising after-acquired station and other

---

[75] Applicants' irrelevant suggestion that the retransmission mandate in the Communications Act is a good policy, and that pay-TV customers therefore should be happy to incur increased retransmission fees to enhance broadcasters' ability "to better serve their communities," Opposition at 10, is based on the flawed premise that broadcasters reinvest those revenues

contractual clauses.   Nor do they, or can they, claim that these fees are not passed on to subscribers.   Rather than address that, the Applicants devote a great deal of verbiage to attacking their captive MVPD customers, saying that "there is no apparent reason for the Commission to step in and deny one party the benefit of the negotiated bargain absent evidence of anticompetitive practices or other wrongdoing.[76]

The Commission surely will ignore this effort at misdirection.   Petitioners base their opposition on an entirely different harm to the public interest - increased customer subscription fees. They are not asking the Commission to meddle in contractual negotiations; rather, they are asking the Commission to protect Standard General from victimizing the public for the benefit of their investors, regardless of how that comes to pass.   The Cable Act's retransmission consent regime is designed to address the broadcasters' inherent monopoly right to use publicly-owned spectrum, which Standard General seeks to exploit to the next level.   While this may well be characterized as an anticompetitive practice, and what Standard General seeks to do is not necessarily unlawful, Petitioners do not have to allege that there is "wrongdoing" to establish a public interest harm.

It is easy to see what the Applicants seek to elide.   Many lawful practices are contrary to the public interest, as is what would result from grant of these applications.   The remedy that TNG-CWA/NABET-CWA seek is not reformulating contracts or the redress of any wrongdoing; it is denial of the applications.   That relief would leave all existing contracts in place exactly as they have been negotiated.

With respect to the harms that TNG-CWA/NABET-CWA members will incur through increased pay-TV subscriptions, the Applicants maintain that these are not cognizable harms

---

[76] Opposition at 36.

because "broadcast programming is available to viewers for free over the air," and that MVPDs must choose to pass on increased programming costs. They say that the Commission has previously ruled that increased MVPD programming costs is a public interest harm, but they do not mention, much less rebut, Petitioners' explanation that prior decisions arose from challenges mounted by MVPDs alleging business harm. What is relevant here is that the Commission has never previously considered, or ruled upon, the pecuniary harm that subscribers incur from subscriber fee increases. That is unquestionably a public interest harm which would arise only if the Commission blesses this maneuver. It is one thing not to meddle in a private contractual dispute, but quite another to function as an active enabler in allowing consumers to pay more for the same thing. Petitioners do not dispute that private parties can negotiate to include after-acquired station clauses and similar provisions in their contracts; rather, they say that it is contrary to the public interest for the Commission to approve applications where the result is to increase prices for consumers, especially where, as here, it is being asked to bless a convoluted series of transactions clearly designed for the exclusive purpose of triggering such contractual provisions.

It is of particular importance to note that at no point do the Applicants even try to dispute that the petitions to deny and comments have established that the complicated transactions here at issue, especially the odd transfer and retransfer of Boston station WFXT, were designed to exercise contractual clauses that will jack up Standard General's retransmission fees, or that Standard General will in fact collect such revenues. Indeed, by arguing that the decision to pass on increased retransmission fees to customers is a decision made by MVPDs, not Standard General, the Applicants essentially confirm its intention to extract increased retransmission revenues as has been alleged.

**A**      **Loss of access to non-broadcast channels**

The notion that viewers can avoid incurring increased retransmission fees by cancelling their MVPD subscriptions ignores the fact that the MVPD bundle includes many cable channels not available over the air.   Because the Commission has not adopted mandatory a la carte requirements, viewers would be forced to choose between avoiding retransmission costs by cancelling MVPD service and losing access to all non-broadcast channels, including popular news, sports and entertainment channels.[77]   Thus, cutting the cord would create a different, but no less significant, harm.

**B**.      **Challenges to receiving over the air signals**

Even if viewers were willing to sacrifice access to non-broadcast channels to avoid paying increased retransmission fees passed on to them, Applicants are wrong that this would allow them to watch TEGNA and other over the air stations in their community.

While it is true that most viewers in a service area can receive free over the air signals from most stations, that is not true for all viewers.   It is well documented that a not insignificant number of viewers are unable to receive over the air TV signals, even where in theory they ought to be able to do so.[78]   The Commission itself is very familiar with this fact, as it regularly allows for the substitution of channels precisely to help mitigate this problem when possible.[79]

---

[77]Even the handful of sub-basic subscribers have access to PEG and local origination channels that cannot be obtained over the air.

[78]Indeed, since moving to Washington, DC in 2019, TNG-CWA President Jon Schleuss has been unable to receive several area over-the-air stations with his antenna, including TEGNA's WUSA-TV, licensed to Washington, DC.   As he explains in his Declaration (Exhibit A hereto), although he lives within a few miles of the WUSA=TV transmitter in Washington, DC, and uses a high-quality antenna affixed to his window, Mr. Schleuss often cannot receive the WUSA-TV signal. For purposes of standing, Mr. Schleuss' experience alone is sufficient to demonstrate that not all viewers in the Washington, DC area can receive WUSA-TV over the air.

[79]See, e.g., Amendment of Section 73.632(j), Post-Transition Table of DTV Allotments, Television

There are many reasons why some viewers within a DMA and nominally considered to be able to view an over the air (OTA) signal are in practice unable to do so.[80]   These include range, antenna issues, topography, trees, certain kinds of building construction materials, nearly cell towers and power lines and weather degradation.

### C.    Increased subscriber fees are traceable to the applicants' practices

The Applicants also argue that harm from increased retransmission fees is speculative, and that it only happens when MVPDs "choose" to pass on these costs.[81]    Petitioners' members, they say, will not be harmed by approval of the applications because the decision to pass through increased retransmission fees is made by MVPDs, not the broadcasters.

The harm viewers incur is the direct consequence of broadcasters insisting on payment of increased retransmission fees.   Contrary to Applicants' misstatement that Petitioners "assume without question" that increased fees are passed on to subscribers, [82]the undisputed evidence in the record is that increased retransmission fees are, indeed, directly passed on to customers through specific line item fees assessed by almost all MVPDs.   It is beyond question that almost all

---

Broadcast Stations (Toledo, Ohio), 36 FCCRcd 4808 ("WLMB has regularly received complaints from viewers unable to receive the station's over-the-air signal on digital channel 5").   See also, Amendment of Section 73.632(j), Post-Transition Table of DTV Allotments, Television Broadcast Stations (Butte, Montana), 36 FCCRcd 11183 (2021)(similar);   Amendment of Section 73.632(j), Post-Transition Table of DTV Allotments, Television Broadcast Stations (Schenectady, New York), 36 FCCRcd 9849 (2021); Amendment of Section 73.632(j), Post-Transition Table of DTV Allotments, Television Broadcast Stations (Redding, CA), 36 FCCRcd 7437 (2021)(similar).
[80]See, e.g., A Downside to Digital TV, The New York Times (Apr. 24, 2008), https://www.nytimes.com/2008/04/24/technology/personaltech/24basics.html; "Many Obstacles to Digital TV Reception, Study Says," The New York Times (Feb. 11, 2008), https://www.nytimes.com/2008/02/11/technology/11analog.html.
[81]  It is equally true that the Applicants need not extract the highest possible rate from MVPDs; they are perfectly capable to "choose" to charge less than the fully-contracted price.   They can also "choose" not to exercise retransmission rights at all and instead claim must-carry rights.   See 47 U.S.C. §325(b) and 47 U.S.C. §534.
[82]  Opposition at 40.

MVPDs pass on these costs, and typically do so with a specific line item tied to the cost of retransmission fees.   Exhibit D has numerous examples of news articles, customer communications and website notices from large and small MVPDs that expressly tie these fees to increased retransmission fees.   To quote but one example, Home Telecom's website says that

> This fee is called the Broadcast TV Surcharge and is a direct pass-through of what the local broadcast stations charge Home Telecom to retransmit their station signals.[83]

The Applicants also argue that the fact that some of Petitioners' declarants subscribe to vMPVD, that vMVPD program fees are negotiated by networks and not individual licensees, "and thus [they] would be completely unaffected" retransmission fees imposed by Standard General. Leaving aside the fact that this applies, at most, to only some of Petitioners' members, Petitioners' understanding is to the contrary.[84]

### C.  Increased fees incurred by pay-TV subscribers is a cognizable public interest harm

The Applicants make much of the fact that in prior cases involving challenges brought by MVPDs, the Commission has failed to find that increases in retransmission fees is not a cognizable public interest harm.   In their petition to deny, TNG-CWA/NABET-CWA discussed those decisions, saying that

> TNG-CWA and NABET-CWA believe those decisions were wrongly

---

[83] https://www.homesc.com/blog/346677/your-cable-costs-explained
[84] While the details of various broadcast programming license arrangements with vMVPDs are private contractual matters not available to non-parties, it is Petitioners' understanding that applicable after-acquired station clauses would be affected by grant of the applications.   DirecTV and Dish have retransmission consent agreements for their DBS services; Petitioners believe   these agreements also cover their companion vMVPD services, DirecTV Stream and SlingTV.   As such, if those contracts contain after-acquired station clauses, any increased retransmission fees would be applicable to those services as well.   While it may be the case that networks negotiate retransmission licenses for other vMVPDs such as YouTube TV, apparently affiliates can choose to opt out of the network negotiated arrangements and negotiate separately with vMVPDs.   This is but one more factual issue that can be explored at hearing.

decided and should be overruled.   However, it is not even necessary to overrule the earlier cases to reach a different result here, as there are two material differences. First, based on material submitted to the Commission by the Applicants, the record clearly establishes that the sequenced transactions here were explicitly designed to exploit existing contracts in a manner which was not within the scope of what was contemplated by the MVPD parties.   Second, it is clear from the text of the decisions that the Commission, and then the staff, were addressing a different harm alleged by parties to arms-length contracts with the broadcasters.   They had no occasion to reach the issue as it is presented here. TNG-CWA and NABET-CWA are not asking the Commission to intrude into a private contract dispute about allocation of revenues.   Regardless of how those revenues are divided between those parties, the damage that the Commission must assess here is the cost to consumers, however they arise.[85]

The Applicants' lengthy discussion of the retransmission issues here do not address either of these points.   They pointedly fail to dispute that these transactions have been structured to extract higher retransmission fees.   And, despite TNG-CWA/NABET-CWA's showing that increased retransmission fees are almost always passed on to pay-TV customers, they do attempt to rebut TNG-CWA/NABET-CWA's argument distinguishing earlier cases because in none of them did the Commission address the public interest implications of increased retransmission fees on pay-TV customers.[86]

**CONCLUSION**

As Petitioners showed in their petitions to deny the Applicants have failed to meet their affirmative burden of demonstrating that grant of their applications is in the public interest. Far from rebutting this showing the opposition evidences an even stronger case as to why the proposed

---

[85]  TNG-CWA/NABET-CWA Petition to Deny at 20;

[86] Overlooking these arguments, Applicants say that the only basis Petitioners advance to distinguish prior decisions is that consumers currently face inflationary pressure.   Opposition. at 39.   But the passages to which they cite are not the legal basis for the asserted distinction; rather, they merely emphasize the importance of finding that there is a public interest harm.   The Applicants also whine that their electric bills are also going up, but unlike petitioners they can recover those costs by further jacking up retransmission fees or by increasing their advertising rates.

transactions are not in the public interest and presents numerous very substantial and very material issues of fact which must be explored at hearing.   Accordingly, Petitioners ask that the Commission dismiss the applications or designate them for an evidentiary hearing.

Respectfully submitted,

/s Cheryl A. Leanza
United Church of Christ
Media Justice Ministry
100 Maryland Ave, NE
Suite 330
Washington, D.C. 20002
*Counsel for UCC*

/s Yosef Getachew
Jonathan Walter
Common Cause
805 15th Street, NW
Suite 800
Washington, DC 20005
*Counsel for Common Cause*

/s Andrew Jay Schwartzman
1341 G Street, NW
Fifth Floor
Washington, DC 20005
(202) 241-2408
andyschwartzman@gmail.com
*Counsel for TNG-CWA, NABET-CWA*

August 1, 2022

## CERTIFICATE OF SERVICE

I, Andrew Jay Schwartzman, certify that on August 1, 2022, a copy of the foregoing was served by electronic mail upon the following:

Jennifer A. Johnson
Jocelyn Jezierny
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
Jjezierny@cov.com,

Scott R. Flick
Jessica Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC 20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com

Michael D. Basile
Jason Radermacher
Henry Wendel
Cooley LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
mdbasile@cooley.com
jrademacher@cooley.com
hwendel@cooley.com

Barbara Kreisman
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Barbara.Kreisman@fcc.gov

David Brown
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, D.C. 20554
David.Brown@fcc.gov

Jeremy Miller
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Jeremy.Miller@fcc.gov

Chris Robbins
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Chris.Robbins@fcc.gov

Jim Bird
Transaction Team
Office of the General Counsel
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Jim.Bird@fcc.gov

/s/ Andrew Jay Schwartzman