# EXHIBIT 9

Case No. 1:24-cv-01204-RC

REDACTED – FOR PUBLIC INSPECTION

BEFORE THE
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, DC  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| Applications of TEGNA Inc., for Transfer | ) | MB Docket 22-162 |
| of Control to | ) | MB Docket 22-166 |
| Standard General, L.P. | ) | |

**COMMENTS OF**

**THE NEWSGUILD-CWA**

**NATIONAL ASSOCIATION OF BROADCAST
EMPLOYEES AND TECHNICIANS-CWA**

**UNITED CHURCH OF CHRIST, OC., INC. DOING BUSINESS AS
UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY**

**and**

**COMMON CAUSE**

Yosef Getachew
Common Cause
805 15th St NW Suite 800
Washington DC 2000
    *Counsel for Common Cause*

Cheryl A. Leanza
United Church of Christ Media Justice Ministry
100 Maryland Ave, NE
Washington, DC 20002
United Church of Christ Media Justice Ministry
    *Counsel for United Church of Christ
    Media Justice Ministry*

David R. Goodfriend
The Goodfriend Group
208 I Street, NE
Washington, DC 20002
(202) 549-5612
david@dcgoodfriend.com

Andrew Jay Schwartzman
1341 G Street, NW
Fifth Floor
Washington, DC 20005
(202) 241-2408
andyschwartzman@gmail.com

    *Counsel for TNG- CWA/NABET-CWA*

January 13, 2023

REDACTED – FOR PUBLIC INSPECTION

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   BEHAVIORAL REMEDIES ARE INSUFFICIENT TO PROTECT THE PUBLIC
     INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

.    A.   Bloomberg v. Comcast . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.   Comcast v. Mission and Nexstar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     C.   DIRECTV v. Deerfield Media, et al. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.  STANDARD GENERAL'S NARROWED COMMITMENTS ON JOBS ARE
     MEANINGLESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     A.   "Journalism or Newsroom Staffing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     B.   Transparency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     C.   Labor Recognition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. RETRANSMISSION CONSENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     A.   Standard General's December 16 Letter, Signed by Mr. Kim, Materially
          Misrepresents the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     B.   Transparency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C.   Other Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

REDACTED – FOR PUBLIC INSPECTION

Public Interest Petitioners The NewsGuild-CWA ("TNG-CWA"), the National Association of Broadcast Employees and Technicians-CWA ("NABET-CWA"), Common Cause and United Church of Christ, OC., Inc. doing business as United Church of Christ Media Justice Ministry ("UCC") (collectively, respectfully submit these comments in response to the Media Bureau's request for comments on three letters the Applicants have recently placed into the record.[1]

## INTRODUCTION AND SUMMARY

The ultimate question in this proceeding is whether the applicants have met their burden of establishing that grant of the pending applications is in the public interest. The subsidiary question raised by the latest request for comments is whether the applicants' recent concessions are sufficient to establish what they have failed to do over the last 11 months. They are not; accordingly, the Commission should designate the applications for hearing.

Neither behavioral nor structural remedies are available to salvage these applications. As Senator Warren told the Chair in her January 11, 2023 letter, "behavioral remedies like those offered by the parties are historically ineffective,..."[2] Because of the "admitted threats to competition and known futility of behavioral remedies,"[3] she called upon the Commission not to approve the pending applications. Then-Speaker Pelosi and then-Chair Pallone have expressed similar concerns.[4]

---

[1] Public Notice, Docket 22-162, DA-22-1368 (December 23, 2022).
[2] Letter from Senator Elizabeth Warren to Chair Rosenworcel (December 11, 2023, p. 1 (footnote omitted).
https://www.warren.senate.gov/download/20230111-letter-to-fcc-re-standard-general_-tegna
[3] *Id.*
[4] Letter from Representatives Nancy Pelosi and Frank Pallone to Chair Rosenworcel (October 6, 2022)

REDACTED – FOR PUBLIC INSPECTION

Petitioners believe that the record does not support applicants' request for approval of an

extraordinary and unprecedented ownership structure that will facilitate information sharing and

other practices that would allow the two largest TV group owners to collude in developing

negotiation tactics for various kinds of programming, and increased retransmission fees that will

be passed on to consumers, and even aid coordination of labor/management activities.  Even if

the new promises were susceptible to meaningful and timely enforcement procedures, such

behavioral remedies would not be sufficient to remediate the harms that would arise from grant

of the applications.

Structural remedies are not possible in this case.  The parties contrived an unusual and

unprecedented scheme that is not amenable to repair.  Even assuming the parties were willing to

remove Apollo Global Media's ("AGM") prospective ownership of a substantial amount of

nominally non-voting equity in post-transaction Standard General, LP ("Standard General") this

cannot be fixed without dismissal of the current applications and the filing of new applications in

a different docket.   Similarly, the applicants have plotted to transfer control of TEGNA in two

steps, so that its stations are sold to Teton (AGM's Boston TV subsidiary LCC) and then Teton

(now including the TEGNA stations) is sold to Standard General.  The result is that this also

renders any possible structural remedy, such as changing AGM's ownership interest or divesting

certain stations, impossible without submission of an entirely new application.

The three newly-filed letters on which the Commission seeks comment cannot hide the

---

https://newsguild.org/wp-content/uploads/2022/10/Pelosi-Pallone-Letter-to-FCC-on-TENGA-10.6.22.pdf

REDACTED – FOR PUBLIC INSPECTION

stark reality that the initial applications fell far short of meeting their public interest burden.  If

that were not so, they would not have filed these new submissions.  These letters must be seen

for what they are: a desperate last-ditch attempt to salvage the applicants' ill-fated quest.

Whether because the applicants and their advisors were tone deaf as to the shortcomings of their

arrangement or because they thought they could push their plan to completion through the use of

high-priced lobbyists and public relations counsel, the fact remains that these newly-proffered

changes fall far short of repairing the manifest defects in these transactions.

Before addressing the specific proposals and their irremediable shortcomings, Petitioners

will explain why behavioral remedies cannot adequately protect the public interest in the face of

an ownership structure that would allow the two parties together to control about 70 television

stations, with overlapping ownership in six major markets, including Top Four stations in

Atlanta, Seattle and Charlotte.  Moreover, Standard General and AGM would own or have JSAs

with all four major broadcast network affiliates in Jacksonville.   These comments then address

the inadequacies of the what Standard General now plans to do about jobs and shows that their

December 23, 2022 letter actually amounts to a narrowing of its prior commitments.  Finally, as

to retransmission consent, the Public Interest Petitioners discuss how Standard General has yet

again misrepresented to the Commission, this time in claiming that enhanced retransmission

revenues were never part of their "thesis" (i.e., their financial protections) for the transaction.

Truthfulness aside, they also show the shortcomings of the parties' new position on

retransmission consent and explain the significance of their continuing failure to make

commitments about collusion on information sharing as to other contractual negotiations and,

REDACTED – FOR PUBLIC INSPECTION

especially, coordination on labor/management negotiations.

# I.    BEHAVIORAL REMEDIES ARE INSUFFICIENT TO PROTECT THE PUBLIC INTEREST

Even leaving aside the unusual commingling of ownership interests in this case, experience over many years demonstrates the ineffectiveness of behavioral remedies and retransmission rights in the face of anti-competitive practices, collusive behavior and compliance with ownership rules.  Even meritorious efforts to enforce broken promises take months and generally years of litigation; going toe to toe with the deep pockets of Standard General and AGM, most potential litigants are likely to give up instead.  As Senator Warren (a prominent antitrust scholar long before she entered public office) said in her new letter,

> Studies have noted that behavioral remedies are "difficult to craft" and "eas[y]…to circumvent," and they also require the government "to expend resources on monitoring and enforcement," in large part because behavioral remedies are designed to "require a merged firm to operate in a manner inconsistent with its own profit-maximizing incentives."[5]

.    ## A.    Bloomberg v. Comcast

One of the most egregious demonstrations of the futility of obtaining prompt relief from non-compliance with FCC behavioral conditions arose from so-called "neighborhooding" conditions adopted in January, 2011,  as part of the Commission's approval of Comcast's

---

[5]Letter from Senator Elizabeth Warren to Chair Rosenworcel, supra at p.4 (citing American Antitrust Institute, "Behavioral Merger Remedies: Evaluation and Implications for Antitrust Enforcement," John Kwoka and Diana Moss, November 2021, https://www.antitrustinstitute.org/wpcontent/uploads/2011/11/AAI_wp_behavioral-remedies_fin al.pdf; see also Writers Guild of America West, Broken Promises: Media Mega-Mergers and the Case for Antitrust Reform, December 2021, https://www.wga.org/uploadedfiles/news_and_events/public_policy/broken-promises-merger-rep ort.pdf).

REDACTED – FOR PUBLIC INSPECTION

acquisition of NBC-Universal.[6]  Bloomberg, LLC, owned by Michael Bloomberg, whose net

worth is estimated by Forbes as over $5 billion dollars, clearly had the financial resources to

litigate to enforce those conditions, which it had aggressively sought.  Even so, it incurred four

years of intense battle obtain compliance with those conditions.  While Bloomberg ultimately

obtained much of the relief it sought, what matters here is not the specific outcome, but the fact

that it took some four years for a wealthy and well-represented  aggrieved party to litigate the

dispute.

Exploiting what proved to be ambiguities in the conditions, Comcast refused to fulfill

Bloomberg's insistence on cable channel placements consistent with the conditions.

Accordingly, after unsuccessfully seeking Comcast's cooperation for some five months, in June,

2011, Bloomberg filed a complaint with the Media Bureau.  Implementation was stayed, and

action on Comcast's administrative appeal was initially stalled for some two months, until the

Bureau was able to issue an additional order clarifying issues.[7]   In May, 2012, almost a year

after the complaint was filed, the Bureau substantially granted the complaint.[8]  Comcast then

filed an application for review with the full Commission.  The Commission's order affirming the

Media Bureau was not issued until September 25, 2013, two years after the initial order and a

year and a half after the complaint was filed.[9]  Thereafter, both parties filed petitions for judicial

review.  Evidently wishing to end the ordeal, Bloomberg then agreed to a settlement, which

---

[6]Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. For Consent to Assign Licenses and Transfer Control of Licensees, 26 FCCRcd 4238 (2011).
[7]Bloomberg L.P. v. Comcast Cable Communications, 27 FCCRcd 9488 (MB 2012).
[8]Bloomberg L.P. v. Comcast Cable Communications, 27 FCCRcd 4891 (MB 2012).
[9]Bloomberg L.P. v. Comcast Cable Communications, 28  FCCRcd 14346 (2013);.

REDACTED – FOR PUBLIC INSPECTION

necessitated a joint wavier request that was not granted until January, 2015.[10]

Thus, it took four years for an entity with massive financial power to take advantage of behavioral conditions to which it was entitled.

### B.    Comcast v. Mission and Nexstar

While Comcast flouted its behavioral conditions for some four years, the shoe has been on the other foot in its own effort to exercise retransmission rights from Mission Broadcasting, a "sidecar" for its de facto partner Nexstar Broadcasting.  In July, 2021, Comcast filed a petition for declaratory ruling that is being treated as an informal complaint.  That petition, which arose in the context of Nexstar's purchase Tribune Media Company, remains unresolved, as is a related December 12, 2022 complaint alleging a failure to negotiate retransmission consent in good faith. The controversy raises numerous issues showing the difficulty of obtaining enforcement of FCC structural remedies as well as behavioral conditions established by Commission rules.   Several are pertinent here, but the most direct example arises from Nexstar's obligatory divestiture of its New York City station WPIX so as to remain in compliance with the national ownership cap after the Tribune purchase.   Comcast has alleged that Nexstar continues to have de facto control of WPIX in violation of condition in the Nexstar/Tribune decision.  The July, 2021 pleading claims that

> Despite its representations to the Commission, Nexstar quickly executed a multi-step scheme to circumvent its ordered divestiture of WPIX and its commitment not to provide ongoing services "to any of the stations that it is divesting." **** It is now evident that Nexstar used the guise of an option agreement to temporarily "park" WPIX with Scripps before assigning the option

---

[10]Bloomberg L.P. v. Comcast Cable Communications, 30 FCCRcd 73 (2013).

REDACTED – FOR PUBLIC INSPECTION

to Mission to exercise for the benefit of Nexstar.  Within a little over a year from "divesting" WPIX, Nexstar is back programming "all" of WPIX's airtime, extracting all of the economic value of the station, and using its expanded negotiating leverage in an attempt to force Comcast to pay significantly higher retransmission consent fees in derogation of the Mission Agreement.[11]

As with the Bloomberg dispute, what matters here is not how the Commission ultimately rules.  Rather, it is that this ongoing litigation brought by one of the largest media companies in the nation, remains unresolved more than a year and a half later.

### C.    DIRECTV v. Deerfield Media, et al.

In 2014, the FCC approved Sinclair Television Group's purchase of Albritton Communications Co.'s TV stations.[12]  Sinclair's relationship with its sidecar companies, including Deerfield Media, was a central element of the FCC's consideration of the applications. By early 2019, DIRECTV and Sinclair's sidecar companies were at an impasse in retransmission negotiations.  DIRECTV filed a complaint with the Media Bureau in June, 2019.  After the licensees withdrew their initial opposition, the Bureau afforded the matters expedited consideration.  Even so, it was not until November, 2019 that the Bureau found pervasive failure of licensees' obligation to bargain in good faith.[13]  The licensees' Application for Review was not ruled upon by the full Commission until September, 2020.[14]  At that time, the Commission issued a Notice of Apparent Liability pertaining to the egregious misconduct that had been found,

---

[11]July, 2021 Comcast complaint, pp. 30-31.

[12]Albritton Communications Co., 29 FCCRcd 9116 (2014).

[13]DIRECTV and AT&T Services v. Deerfield Media, Inc., et al., 34 FC C 10367 (2019).

[14]DIRECTV and AT&T Services v. Deerfield Media, Inc., et al., 35 FCCRcd 10695 (2020).

REDACTED – FOR PUBLIC INSPECTION

and thereafter, in July, 2021, issued forfeitures to each of the eight licensees of about $500.000.[15]

The licensees sought reconsideration, which the Commission denied in July, 2021, more than

two years after this nominally expedited proceeding was initiated.[16]

Central to this litigation was the fact that what the defendants had in common was their

relationship to Sinclair.  As the Commission explained,

> Each of the Defendants has one or more agreements with Sinclair Broadcast
> Group (Sinclair), pursuant to which Sinclair "operates, programs [and/]or
> provides sales services" to the Defendant Stations.

Because of this, and finding what they believed was latitude in the FCC's retransmission rules,

the broadcasters believed that they could collude in their negotiations through the employment of

an "agent" to develop a common negotiation strategy.  These defendants were able to drag out

the proceeding for two years.  The facts were not in dispute, but the defendants insisted all along

that their conduct was permissible as a matter of law.  Thus, this case shows that behavioral

conditions (in this case imposed by FCC rules) were insufficient to forestall improper

collaboration.

## II.    STANDARD GENERAL'S NARROWED COMMITMENTS ON JOBS ARE MEANINGLESS

Standard General's December 22, 2022 ex parte letter purports to offer solutions that

address job force concerns that Petitioners have raised.  It does not; in fact it is more

parsimonious than the non-binding claims it has made throughout this proceeding, as it would

---

[15]DIRECTV and AT&T Services v. Deerfield Media, Inc., et al., 36 FCCRcd 12078
(2021)

[16]DIRECTV and AT&T Services v. Deerfield Media, Inc., et al., FCC 22-19 (March 14,
2022).

REDACTED – FOR PUBLIC INSPECTION

apply to many fewer employees and leaves ample room for Standard General to cut jobs at

TEGNA.  Moreover, its claimed willingness to honor existing collective bargaining agreements

is something already mandated by law, and thereby adds nothing at all.

### A.    "Journalism or Newsroom Staffing"

Standard General's letter to the Commission professes "to address any concerns raised

regarding reduction of station-level staffing after consummation of the transactions...."[17]  It starts

by saying that Standard General "has repeatedly stated in the record that it has no intention of

reducing local news or newsroom staff (or station-level staffing more generally) as a result of the

Transactions."[18] It then says

> To further remove any doubt about station news staffing matters, Standard
> General commits that it will not conduct any journalism or newsroom staffing
> layoffs or similar reductions at the stations for a minimum of two years following
> the Transactions.[19]

Far from "removing doubt," the new letter actually amounts to much less than the

inadequate and precatory promises that Standard General previously made.   As TNG-

CWA/NABET-CWA have just as "repeatedly" pointed out, Standard General's vague reference

to its present "intention" is practically meaningless, as it is nothing more than a statement of what

it says was its state of mind.   Standard General still has full latitude to decide that circumstances

have changed, and it therefore would no longer "intend" to protect "station-level jobs."

Moreover, even these representations are belied by confidential documents in the record showing

---

[17]Standard General Notice of Written Ex Parte Communication, December 22, 2022 at p. 1.

[18]*Id.* (footnote omitted)

[19]*Id.*

REDACTED – FOR PUBLIC INSPECTION

that Standard General has not had such an "intent."[20]

While the new letter moves from a reference to its state of mind to an actual commitment of sorts, there is a huge difference between what Standard General has tried to claim - keeping all current "station-level staffing"[21] - and what is willing to offer as an actual condition - "it will not conduct any journalism or newsroom staffing layoffs...."

First, whatever the vague and undefined term "journalism or newsroom staffing" may mean, it does not extend to most "station level staffing."  In fact, most "station level" job positions are not "journalism or newsroom" positions.[22]  Thus, the specific if not effectively enforceable commitment that replaces the precatory statement of an "intention" is much, much narrower.

Second, rather than referring to the headcount for "station level-staffing," the new letter is limited to merely promising no layoffs.  This is another major pullback, as it allows "station-level staffing" to be reduced through attrition, and would not provide for needed new hires, thus allowing for possibly substantial reductions in headcount.

Even if formally adopted as conditions in a Commission order, the new pledges fall woefully short of what would be needed to protect locally originated news and other

---

[20]See, e.g., TNG-CWA/NABET-CWA Notice of Written Ex Parte Presentation, November 15, 2022.

[21]See, e.g., Standard General Notice of Written Ex Parte Presentation, September 22, 2022, p. 1.  ("Standard General has no intention, and has not had any intention, of reducing news or news staff") (quoting June 13, 2022 Response to Requests for Documents and Information)

[22]A listing of just a handful of the many non-journalism/non-newsroom positions filled by the members of Petitioner NABET-CWA would includes Director, Technical Director, Automated Control Room Technicians and Master Control Technicians.

REDACTED – FOR PUBLIC INSPECTION

programming at TEGNA.  Among other things, the two year time frame set forth is far too short; the term should cover the entire current license period for each TEGNA station.   Morever, Standard General seems to use the future closing date as its baseline rather than the date of the sales agreement (February 22, 2022).  As Standard General has itself pointed out, there has been significant attrition at TEGNA stations in the past year, and levels would not revert to the higher job count that was in place as of a year ago.[23]

### B.    Transparency

Finally Standard General's offer lacks even a modicum of transparency that might permit any effort to try to assess its performance.  The December 22 letter simply offers to submit reports "providing the amount of new investments it has made at the local station level."  This statement is so ambiguous that it might permit reporting a total company-wide number aggregating all "investments" supposedly made in that quarter.  Beyond the fact that this utterly vague term has little if any correlation to job levels, Standard General's self-serving reports will be completely unverifiable, and indeed, there is no indication that they would have to be made available to any party except the Commission.  What would be needed, at the very least, would be monthly reports based on a third party audit of headcounts by department for each TEGNA station that would be placed in the stations' online public files.  In addition, the Commission would have to establish an expedited enforcement process to assess allegations of non-compliance.

---

[23]See TNG-CWA/NABET-CWA Notice of Written Ex Parte Presentation, November 14, 2022, p. 8 fn 18.  (Citing to data showing variation in TEGNA employment numbers over time).

REDACTED – FOR PUBLIC INSPECTION

### C.  Labor Recognition

Standard General's December 22 letter also says that it will;

> cause TEGNA to recognize each of the labor unions currently covered by a
> collective bargaining agreement with TEGNA as the exclusive collective
> bargaining representatives of those collective bargaining unit employees and will cause
> TEGNA to honor such collective bargaining agreements. Standard General would
> also be happy to engage with the labor unions to discuss any existing or
> outstanding grievances they may have with their respective collective bargaining
> agreements.

These guarantees are meaningless, as such recognition is mandated by the National Labor

Relations Act, as is the duty to address grievances.[24]  Moreover, and in any event, these promises

are silent as to whether Standard General agrees to remain neutral on future labor organizing

activities at TEGNA stations, or even not to fight any future employee organizing activities.

### III.  RETRANSMISSION CONSENT

In its December 16, 2022 letter, Standard General disclaimed the right to exercise its

after-acquired station clauses.  However, among other shortcomings, the letter materially

misrepresents the role that enhanced retransmission consent revenues played in its financial

projections for the transactions.

Evidently having become aware that this waiver offer was immediately seen as paper-

thin, Standard General and AGM followed up with a December 23, 2022 letter in which they

jointly represent that they will take steps they seem to suggest would minimize their

---

[24]See Labor Plus, LLC, 366 NLRB No. 109, slip op. at 7 (June 14, 2018) ("A new
employer assumes an obligation to bargain with the union representing employees of its
predecessor if the new employer is a legal successor to the old employer, and hires a majority of
the predecessor's work force.  Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43-46
(1987); Empire Janitorial Sales & Service, LLC., 364 NLRB No. 138, slip op. at 10-11 (2016).)"

REDACTED – FOR PUBLIC INSPECTION

opportunities to engage in concerted action in connection with retransmission consent

agreements.  These provisions are largely based on an overview of the retransmission consent

issues that NCTA submitted in its original June 22. 2022 comments.  There, NCTA set forth a

very general and non-inclusive list of areas for discussion about retransmission consent remedies.

The NCTA letter does not suggest that this general language be expressly incorporated into a

Commission order without refining the concepts and drafting clear, effective and enforceable

language suitable for that purpose.   Notably, even if drafted into formal language, these

suggestions are far less comprehensive than the extensive proposed conditions that ATVA

submitted to the Commission in its December 2, 2022 Notice of Ex Parte Presentation.   But

even if Standard General's new promises could be effectively enforced, the assurances they

contain are far from sufficient to satisfy the public interest and preclude adverse effects on

consumer prices.

### A.    Standard General's December 16 Letter, Signed by Mr. Kim, Materially Misrepresents the Facts

Standard General's December 16, 2022 written ex parte notice, signed by Standard

General's principal Mr. Kim, stated on its first page that

> any impact of the Transactions on the retransmission consent fees payable by
> multichannel video programming distributors ('MVPDs') is not central to
> Standard General's thesis for the proposed Transactions."

Confidential documents in the record belie Mr. Kim's representation.  Contrary to Mr.

Kim's latest assertion, Applicants Apollo Global Management (AGM) and Standard General

placed great reliance on designing the TEGNA transaction with the explicit goal of yielding

substantial increased post-transaction retransmission revenues.  These revenue projections were

REDACTED – FOR PUBLIC INSPECTION

provided to the banks providing debt financing in promotional documents that repeatedly used the terms "Deal Thesis" and "Investment Thesis."  These revenue projections were material to the financial projections and to the way in which they were promoted.

It is clear that from the earliest phases of structuring the TEGNA transaction, Standard General relied on the prospect of enhanced retransmission revenues that would come from exercise of the after-acquired station clause made available by including AGM's Boston TV station in the deal.  There are too many documents referring to that aspect of the deal to be listed and discussed here, but one of the most critical - and telling - instances occurs in an email thread that began on the morning of September 17, 2021.  In the exchange, AGM and Standard General dealmakers and their discussed how to draft their pitch for "Project Teton."[25]  At 12:52 pm that day, responding to an email sending information that could be used for that proposal, John Giliberto of RBC proposed language saying

**[[BEGIN REDACTION]]**


**[[END REDACTION]]** [26]

Standard General's Amit Thrakar thought this might be beefed up by breaking out the projected retransmission revenue to identify the portion attributable to the use of the Boston after-acquired station clause.  He suggested that they:

---

[25]The project name itself is probative of the importance of Boston TV station to the deal. AGM's subsidiary LLC that is the vehicle for the first step of the two-step transfer of the TEGNA stations is "Teton, LLC."  The name "Project Teton" thus implies how the transaction was designed.

[26]SG-THA-00007605

REDACTED – FOR PUBLIC INSPECTION

**[[BEGIN REDACTION]]**


**[[END REDACTION]]** [27]

Mr. Giliberto's proposed language does not appear to have to have been adopted in the groups' sales personations.  Instead, they used the following language:

**[[BEGIN REDACTION]]**


**[[END REDACTION]]**

This language appears in far too many of the produced documents for all of them to be enumerated here.  It proves beyond doubt that the parties contemplated leveraging the Boston TV station to realize enhanced revenues as Mr. Thrakar calculated them.

But one might still wonder if repeated reference to the after-acquired clause bump-up demonstrates that the parties considered it to be part of their "investment thesis," something Mr. Kim has now denied.  The answer is not hard to find.  The first appearance of the language appears to be in an undated document, perhaps a draft, produced by Houston McCurry of AGM.[28] And what was the title of the document?  It was "Deal Thesis."  In addition, page one of the document consists of a chart which has the heading "Apollo & Standard General Investment Thesis."  Apollo's logo is at the bottom.

Judging by the closeness in the page numbering, this language reappears very shortly thereafter in a presentation document titled "Project Teton Overview Standard General and

---

[27]SG-THA-00007602
[28]AGM-Spec-01-118204

REDACTED – FOR PUBLIC INSPECTION

Apollo" and date labeled  "September 2021."[29]  Page two of that document appears to be

identical to its one page predecessor, but for one notable change: that Standard General's logo

has been added alongside Apollo's.[30]  Given the titles and the use of the logos, this was a joint

presentation.

What would appear to be the final version of the presentation, including a substantially

identical version of the chart and the same after-acquired station language, appears as page two in

another document date labeled "September 2021."  The only pertinent difference is that the title

simply reads "Project Teton Overview," and the title on the chart has been modified to read

"Overview of Investment Thesis & Key Credit Highlights."[31]  The parties have also produced

two more substantially identical documents, one date labeled "January 2022"[32] and the other date

labeled "February 2022."[33]

There is at least one more relevant document  Titled "TEGNA Opportunity Overview"

and date labeled "February 2022,"[34] it is clearly directed to attract potential investors.  The

Executive Summary on page three contains the following language:

**[[BEGIN REDACTION]]**

**[[END REDACTION]]**                              [35]

The only conclusion that can be drawn from this review is that anticipated enhanced

---

[29]AGM-Spec01-118270.
[30]AGM-Spec01-118271.
[31]AGM-Spec01-118290-118291.
[32]AGM-Spec01-101211-212.
[33]AGM-Spec01-112744-112745.
[34]AGM-Spec01-101615.
[35]AGM-Spec01-101617.

REDACTED – FOR PUBLIC INSPECTION

revenues from using the Boston TV station as the acquisition vehicle was central to the development of the transactions and the presentations to investors. That alone supports a finding that the increased retransmission revenues were very much part of the parties' "investment thesis." But, of course, one does not have to speculate, as the cited documents repeatedly include these revenues as part of their "investment thesis" and the "deal thesis."

To summarize, Standard General's December 16, 2022 letter, signed by Mr. Kim, states that:

> any impact of the Transactions on the retransmission consent fees payable by multichannel video programming distributors ("MVPDs") is not central to Standard General's thesis for the proposed Transactions.

The documents reviewed above show that Standard General discussed with AGM and their banker how best to promote the enhanced revenues that they anticipated would be generated by employing the higher fees associated with including AGM's Boston station in purchasing TEGNA. They jointly produced documents bearing their names to pitch their deal. Using the labels "Deal Thesis" and "Investment Thesis," these documents repeatedly touted their ability to employ "CMG's valuable retransmission contracts."

There is no way to reconcile this history with Mr. Kim's statement to the Commission. It is a material misrepresentation.

## B.    The failure to address collusion in future retransmission negotiations

The commitments in the December 23 letter focus on information sharing with respect to currently operative retransmission agreements. Those assurances provide scant assurance that the two entities will not be able to coordinate their activities. In particular, they allow unlimited

REDACTED – FOR PUBLIC INSPECTION

discussion of ongoing or future retransmission consent negotiations, so long as their employees or agents do not share information about contracts that have previously been negotiated and are in effect.  Specifically, Standard General and AGM agree that they may not share "a copy of a station retransmission consent agreement"; this clearly applies only to active, previously negotiated agreements.  Similarly, as to their promise not to share "non-public information regarding such agreement," the term "such agreement" applies only to "a station retransmission consent agreement" and not to "a copy" of documents used in negotiations for future agreements that do not presently exist.  Thus, even if the Commission were to adopt the Standard General/AGM language as a condition, they would still be able to freely discuss their future plans and negotiation tactics, including non-public information, for future retransmission agreements.

### C.    Other Contracts

The most glaring omission in the December 23 letter is its failure to address the myriad ways in which Standard General and AGM can collude with respect to other kinds of contractual negotiations.  This is not a hypothetical concern, given that there are six major markets in which Standard General and AGM would each have TV licenses, including Top Four stations in Atlanta, Seattle and Charlotte, and that Standard General and AGM would own or have JSAs with all four major broadcast network affiliates in Jacksonville.

What differentiates this case from some others is that AGM will hold a substantial equity interest in post-transaction Standard General.  Thus, it has a powerful motivation, and the opportunity to make sure that Standard General's operation of its newly-acquired stations is maximally profitable.  As a consequence, the parties are quite likely to want to take advantage of

REDACTED – FOR PUBLIC INSPECTION

the fact that there would be no FCC-imposed limitations on their ability to share information and develop joint negotiation strategies for syndicated programming and the numerous specialized vendors that serve local TV stations.

There is one area of contractual negotiations of special concern to Petitioner TNG-CWA/NABET-CWA: labor management negotiations. The same motives and the same freedoms would empower Standard General and AGM to collaborate on wages, benefits, job conditions, labor/management and other policies relating to employment.

In some cases, such conduct might transgress the Sherman Act. Indeed, just a few months ago, the Department of Justice entered into a consent degree with poultry producers that had improperly communicated with each other on wages and benefits. See United States v. Cargill Meat Solutions Corp., et al.; Proposed Final Judgments and Competitive Impact Statement, 87 Fed. Reg. 7028 (September 16, 2022). However, even if the Department of Justice and private parties had the resources to challenge such practices, antitrust enforcement is retrospective, and invoking those statutes much more difficult than the ponderous FCC proceedings discussed in Section I above. That is fundamentally different from the FCC's forward-looking public interest review of broadcast applications, and why the FCC has power to designate problematic applications for hearing.

## CONCLUSION

Standard General's increasingly desperate efforts to earn FCC approval of its unusal and dangerous scheme are to no avail. Approval of the applications would imperil broadcast localism by threatening to reduce employment, evade the Commission's ownership rules and game

REDACTED – FOR PUBLIC INSPECTION

retransmission consent requirements would be manifestly contrary to the public interest.  The

Commission should designate the applications for an evidentiary hearing.

Respectfully submitted,

| | |
|---|---|
| _____/s/_____ | _____/s/_____ |
| Yosef Getachew | David R. Goodfriend |
| Common Cause | The Goodfriend Group |
| 805 15th St NW Suite 800 | 208 I Street, NE |
| Washington DC 2000 | Washington, DC 20002 |
| *Counsel for Common Cause* | (202) 549-5612 |
| | david@dcgoodfriend.com |
| _____/s/_____ | |
| Cheryl A. Leanza | _____/s/_____ |
| United Church of Christ Media Justice Ministry | Andrew Jay Schwartzman |
| 100 Maryland Ave, NE | 1341 G Street, NW |
| Washington, DC 20002 | Fifth Floor |
| United Church of Christ Media Justice Ministry | Washington, DC 20005 |
| *Counsel for United Church of Christ* | (202) 241-2408 |
| *Media Justice Ministry* | andyschwartzman@gmail.com |

*Counsel for TNG- CWA/NABET-CWA*

January 13. 2023

-20-