# EXHIBIT 14

Case No. 1:24-cv-01204-RC

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Consent to Transfer Control of Certain Subsidiaries of TEGNA Inc. to SGCI Holdings III LLC | ) ) | MB Docket No. 22-162 |
| | ) | LMS File Nos. 0000186355 et al. |
| Consent to Transfer Control of Certain Subsidiaries of Community News Media LLC to CMG Media Operating Company, LLC | ) ) ) | LMS File Nos. 0000186354 et al. |
| | ) | |
| Consent to Transfer Control of Television Station WFXT(TV), Boston, MA, from a Subsidiary of CMG Media Operating Company, LLC to SGCI Holdings III LLC | ) ) ) ) | LMS File No. 0000186353 |
| | ) | |
| Consent to Assign Licenses from Certain Subsidiaries of TEGNA Inc. to Subsidiaries of CMG Media Corporation | ) ) ) | LMS File Nos. 0000186458 et al. |
| | ) | |

## HEARING DESIGNATION ORDER

**Adopted:  February 24, 2023**                                 **Released:  February 24, 2023**

By the Chief, Media Bureau:

        1.        In this Order, we consider the applications in the Attachment seeking consent to transfer control of TEGNA Inc. (TEGNA) to SGCI Holdings III LLC (SGCI Holdings), as well as three other sets of applications filed contemporaneously seeking consent for a series of related transactions:  (1) the transfer of control of the four full-power television stations[1] of Community News Media LLC (CNM), an affiliate of Standard General L.P. (Standard General), to CMG Media Operating Company, LLC, a wholly-owned subsidiary of CMG Media Corporation (CMG), which the Media Bureau (Bureau) has previously determined to be under the *de facto* control of Apollo Global Management, Inc. (AGM);[2] (2) the transfer of control of Teton Parent Corp. (TPC), the parent company of licensee WFXT(TV), Boston, Massachusetts, from a wholly-owned subsidiary of CMG to SGCI Holdings (the WFXT Transfer); and (3) immediately upon consummation of the merger of TEGNA with TPC, the assignment of the licenses of four full-power television stations[3] from subsidiaries of post-merger TEGNA (New TEGNA) to indirect, wholly-owned subsidiaries of CMG (collectively, the Transactions).[4]  The Applications are being held in abeyance pending the resolution of this proceeding.[5]

---

[1] KBSI(TV), Cape Girardeau, MO; KLKN(TV), Lincoln, NE; WDKA(TV), Paducah, KY; and WLNE-TV, New Bedford, MA (collectively, the CNM Stations).

[2] *Terrier Media Buyer, Inc.*, Declaratory Ruling, 34 FCC Rcd 10544, 10549, paras. 14-15 (MB 2019).  CMG was formerly known as Terrier Media Buyer, Inc.

[3] KVUE(TV), Austin, Texas; KMPX(TV), Decatur, Texas; KHOU(TV), Houston, Texas; and KTBU(TV), Conroe, Texas (collectively, the Texas Stations).

[4] A list of the Applications can be found in the Attachment.  The parties amended the Applications on March 23 and April 1, 2022.  *See Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA, Inc.,*

(continued....)

2.        We have conducted a detailed review of the record in this proceeding, including the Applications, pleadings, and supplemental information submitted by SGCI Holdings, TEGNA, and CMG (collectively, the Applicants), and based on the record before us, we are unable to find that grant of the applications would be consistent with the public interest, as required by Sections 309(a), 309(e), and 310(d) of the Communications Act of 1934, as amended (the Act).[6]  As discussed in more detail below, we find that substantial and material questions of fact exist regarding whether:  (1) the Transactions are structured in a way that is likely to trigger a rate increase harmful to consumers, as a result of contractual clauses that take immediate effect after the consummation of the Transactions, and (2) the Transactions will reduce or impair localism, including whether they will result in labor reductions at local stations.  Accordingly, in this Hearing Designation Order, we commence a hearing before the Administrative Law Judge upon these questions.[7]

3.        A transaction of this magnitude has great potential to affect viewers, consumers, and local communities, and it is incumbent upon the Bureau to fully understand the impact of the transaction before it decides whether to approve the Applications.  Indeed, as dictated by statute, the Commission may only approve the transfer of control of a broadcast license if it determines that the grant will serve the public interest.  With respect to the applications before us, however, there remain significant concerns that warrant further investigation.  In particular, substantial and material questions remain as to both the potential impact, and possible harm, to consumers through higher retransmission consent fees, and the effect on localism through potential reductions in local jobs.

4.        Accordingly, in order to properly assess the Applications, it is necessary to understand the extent to which retransmission consent fees will likely rise as a result of the unique structure and timing of the license transfers involved, and the impact of any such rise on competition and on service to the viewing public.  Further, it is important that we understand whether such an increase is the result of a properly functioning, competitive marketplace, or something more worrisome.  Particularly during a period of high inflation and rising costs, the prospect of increased rates for pay television as a result of machinations or manipulation, rather than market forces, would be extremely problematic.  Equally as critical is that we understand the impact the transaction will likely have on localism and specifically on local jobs at the stations involved.  Broadcast television remains an essential source of local news, information, and service for local communities, but based on the record before us, questions remain as to

(Continued from previous page) ───────────────────

*to Standard General, L.P., and Permit-But-Disclose Ex Parte Status for the Proceeding*, Public Notice, MB Docket No. 22-162, DA 22-443 (MB 2022).  Copies of the Applications are available in the Commission's Licensing and Management System (LMS).

[5] In connection with the Applications, TPC, as a subsidiary of SGCI Holdings and the proposed indirect parent of the TEGNA stations, also filed a Petition for Declaratory Ruling (PDR) requesting that the Commission, pursuant to its authority under section 310(b)(4) of the Communications Act of 1934, as amended (the Act), allow it to exceed the 25% foreign ownership benchmark in section 310(b)(4) of the Act and section 1.5000(a)(1) of the Commission's rules, related to certain Cayman Island and British Virgin Islands investment funds.  Amended Petition for Declaratory Ruling of Teton Parent Corp., MB Docket No. 22-166 (filed Apr. 1, 2022).  TPC had previously filed its initial petition on March 10, 2022, and then filed its first amendment on March 23, 2022.  *See Media Bureau Establishes Filing of Petition for Declaratory Ruling by Teton Parent Corp.*, Public Notice, MB Docket No. 22-166, DA 22-446 (MB Apr. 21, 2022); *see also*, 47 U.S.C. § 310(b)(4); 47 CFR § 1.5000(a)(1).  Consideration of the PDR will similarly be held in abeyance pending the resolution of this proceeding.

[6] 47 U.S.C. § 309(d)(2) ("If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent [with the public interest, convenience, and necessity]," it must formally designate the application for a hearing in accordance with Section 309(e) of the Act).  *See also* 47 U.S.C § 310(d) ("No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly . . . except upon application to the Commission.").

[7] This proceeding will be restricted under our *ex parte* rules.  *See* 47 CFR § 1.1208.

whether local communities would be harmed by the Applicants' plans and commitments. We therefore find that a hearing is necessary and issue this Hearing Designation Order pursuant to sections 309(d) and 309(e) of the Act[8] and the delegated authority of the Media Bureau.[9] We emphasize that the scope of designation of this order is limited to the issues set forth below. Upon resolution of this hearing, the Media Bureau will then determine the appropriate next steps in consideration of the Applications.

## I.    BACKGROUND

### A.    Proposed Transactions

5.    Today TEGNA is the ultimate parent of the licensees of 64 full-power television stations, two full-power radio stations, and other related Commission licenses.[10] As set forth in the Comprehensive Exhibit to the Applications and the related PDR filed by TPC, at the conclusion of the proposed Transactions an indirect subsidiary of SGCI Holdings will hold all outstanding equity interests in TEGNA. The subsidiary, TPC, will be the indirect controlling parent of 38 licensee subsidiaries holding 61 full-power television stations, two full-power radio stations, and other Commission licenses.[11] The proposed Transactions will also result in the transfer of WFXT(TV) from CMG to SGGI Holdings. The Transactions consist of a series of four related, sequential transactions:

6.    First, Standard General's affiliate CNM will transfer the four television stations it currently owns to a wholly-owned subsidiary of CMG.[12]

7.    Second, to accomplish the WFXT Transfer, CMG will transfer control of its indirect, wholly-owned subsidiary TPC to SGCI Holdings, through a recapitalization of TPC.[13] Following the recapitalization, SGCI Holdings will hold 100% of the voting shares of TPC and control of the WFXT licensee, and CMG will hold only preferred, non-voting shares in TPC.[14]

8.    Third, TEGNA will then merge into an indirect subsidiary of TPC, with New TEGNA being the surviving entity and controlled by SGCI Holdings, a Delaware LLC whose sole Managing Member is Soohyung Kim. Mr. Kim is also the Managing Partner of Standard General L.P. (Standard General). As single majority shareholder of SGCI holdings, Mr. Kim holds 100% of the votes of SGCI Holdings, and therefore will have ultimate control of New TEGNA.[15] All other members of SGCI Holdings are insulated pursuant to the Commission's rules, and SGCI Holdings certifies that such insulation is permitted under Delaware state law.[16]

9.    SGCI Holdings will fund the purchase price for the TEGNA stock in part by loan proceeds from a consortium of 12 bank lenders; the sale of senior secured notes; and the sale of Series A non-voting preferred shares of stock in TPC to five sets of entities: (1) certain entities affiliated with Ares Management Corporation (Ares) (50% of Series A shares); (2) certain entities affiliated with AGM

---

[8] *See* 47 U.S.C. §§ 309(d), 309(e).

[9] *See* 47 CFR §§ 0.61, 0.283.

[10] Comprehensive Exhibit at 1.

[11] *Id.* at 1 n.3.

[12] *Id.* at 3.

[13] *Id.* at 3-4.

[14] Specifically, CMG will be issued shares of Series B preferred non-voting stock, which carry a fixed rate of return without the right for CMG to appoint board members, participate in the operations of the TPC stations, or realize any additional economic benefits from improved TPC financial performance. These preferred shares will include only limited minority investor protections. *See id.* at 3-4 & n.10.

[15] *Id.* at 4.

[16] *Id.* at 4 n.11; 47 CFR § 73.3555 note 2.

**Federal Communications Commission**                      **DA 23-149**

(22.64%); (3) SG Media Investment LLC (14.39%); (4) OC III LFE III LP, an entity affiliated with Pacific Investment Management Company LLC (8.11%); and (5) Cox Enterprises, Inc. (CEI) (4.86%).[17]

10.     Fourth, immediately upon consummation of the TEGNA acquisition, New TEGNA will assign the broadcast licenses and other assets of its Texas Stations to indirect wholly-owned subsidiaries of CMG.[18]

### B.    Transaction Review Process

11.     *Applications*.  On April 21, 2022, the Bureau accepted the Applications for filing and established a pleading cycle.[19]  On May 12, 2022, Common Cause, The NewsGuild-CWA (TNG-CWA), and Public Knowledge filed a pleading entitled Motion of the Public Interest Parties for Additional Information and Documents and an Extension of Time (Motion) related to the transaction.[20]  In light of the questions raised in the Motion, on May 20, 2022, the Bureau extended the pleading cycle, requiring petitions to deny the transaction to be filed by June 22, 2022, oppositions to be filed by July 7, 2022, and replies to be filed by July 18, 2022.[21]  On June 3, 2022, the Bureau requested additional documents and information from the Applicants to assist the Commission in performing its section 310(d) public interest analysis.[22]  On June 3, 2022, the Bureau also adopted and released a Protective Order to allow interested parties to review that information,[23] and the Applicants submitted a responsive filing on June 13, 2022.[24]  The *First Information Request Public Notice* permitted parties to supplement any filed pleadings by the July 18, 2022, reply deadline.[25]

---

[17] Comprehensive Exhibit at 4 n.12; Applicants' Consolidated Opposition and Response to Comments (filed Jul. 7, 2022) (Applicants' Consolidated Opposition) at 24.  The Series A shares carry a fixed rate of return and provide no right or opportunity for the Preferred Investors to appoint board members, participate in New TEGNA station operations, or realize any additional economic benefits from New TEGNA's improved performance.  Comprehensive Exhibit at 4 n.12.  Certain Ares-managed funds will collectively hold the contractual right to have a TPC board observer.  *Id.* (identifying ASOF Holdings I, L.P.; ASOF II Holdings I, L.P.; ASOF II Holdings A (DE) Holdings I, L.P.; and ASME Holdings I, L.P.).

[18] Comprehensive Exhibit  at 5; *see supra* note 3.

[19] *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA, Inc., to Standard General, L.P., and Permit-but-Disclose Ex Parte Status for the Proceeding,* Public Notice, MB Docket No. 22-162, DA 22-443 (MB Apr. 21, 2022).

[20] TEGNA and SGCI Holdings filed a Joint Opposition to that motion on May 17, 2022.

[21] *Media Bureau Extends Pleading Cycle for Applications to Transfer Control of TEGNA, Inc., to Standard General, L.P.*, Public Notice, MB Docket No. 22-162, DA 22-562 (MB May 20, 2022).

[22] *Media Bureau Issues Information Request and Protective Order for Applications to Transfer Control of TEGNA, Inc., to Standard General, L.P.*, Public Notice, MB Docket No. 22-162, DA 22-605 (MB Jun. 3, 2022) (*First Information Request Public Notice*); 47 U.S.C. § 310(d).  The Information Request sought documents submitted to the Department of Justice and Federal Trade Commission in connection with required clearance of the proposed transactions under the Hart-Scott-Rodino Antitrust Improvements Act, as well as:  (1) a description of TEGNA's post-transaction retransmission negotiation strategy; (2) an answer regarding whether TEGNA and AGM intend to enter into sharing agreements; (3) an explanation of how the transaction would serve the public interest, specifically local programming; (4) a description of any changes to the rights of the preferred shareholders; and (5) an accounting of how the Transaction would impact staffing reductions.  Letter from Holly Saurer, Chief, Media Bureau, FCC to Scott R. Flick, Counsel to SGCI Holdings, et al., MB Dkt. No. 22-162 (Jun. 3, 2022) (*First Information Request*).

[23] *Applications of TEGNA, Inc. (Transferor) and Standard General, L.P and SGCI Holdings III, LLC (Transferee)*, Protective Order, MB Docket No. 22-162, DA 22-604 (MB Jun. 3, 2002) (*Protective Order*).

[24] Letter from Scott R. Flick, et al., to Marlene H. Dortch, Secretary, FCC, File No. MB 22-162 (filed Jun. 13, 2022) (Applicants First Response Letter).

[25] *First Information Request Public Notice* at 1 (citing 47 CFR § 1.41).

12.     On June 22, 2022, TNG-CWA and the National Association of Broadcast Employees and Technicians-CWA (NABET-CWA) (collectively, CWA) filed a petition to dismiss or deny the Transactions, objecting on a number of bases, including that (1) the structure of the Transactions would unfairly harm subscribers through increased MVPD subscription prices, and (2) the Transactions would undermine localism as the parties cut costs and reduce local jobs.[26]  Common Cause and United Church of Christ, OC, Inc. (collectively, Common Cause/UCC) also filed a petition to deny, arguing, among other things, that the Transactions would (1) lead to higher prices for consumers through the triggering of after-acquired clauses in retransmission contracts, and (2) undermine localism by reducing the amount and scope of local news coverage because the Applicants' business intentions include reporter layoffs.[27]  In addition, ATV Broadcast, LLC; Andrea Morehead Allen; American Television Alliance (ATVA); Altice USA, Inc. (Altice); and NCTA – The Internet & Television Association (NCTA); and Graham Media Group, Inc. (Graham) all filed comments.[28]  In particular, ATVA, Altice, and NCTA raise concerns with the structure and sequencing of the Transactions and the perceived exploitation of contractual provisions in the retransmission consent agreements held by the stations, which the commenters allege would result in the imposition of higher retransmission fees in a manner inconsistent with a functioning, competitive marketplace.  On July 7, 2022, SGCI Holdings, TEGNA, and CMG jointly filed an Opposition to the petitions to deny and several of the comments,[29] and on August 1, 2022, CWA and Common Cause/UCC together filed a late-filed pleading styled as a joint reply.[30]

13.     On September 29, 2022, the Bureau issued a second request for documents and information from the Applicants to assist the Commission in performing its section 310(d) public interest analysis.[31]  The Applicants filed a joint response on October 13, 2022,[32] and separately filed responsive documents on that same date.  CWA filed a Supplement to Petition to Dismiss or Deny on October 27, 2022.[33]  On November 4, 2022, the Applicants filed a Joint Response to the Supplement to Petition to Dismiss or Deny.[34]

---

[26] CWA Petition to Dismiss or Deny (filed. Jun. 22, 2022) (CWA Petition) at 13-18.

[27] Common Cause/UCC Petition to Dismiss or Deny (filed Jun. 22, 2022) (Common Cause/UCC Petition) at 16-25.

[28] ATV Broadcast, LLC Comment (filed May 6, 2022); Andrea Morehead Allen Comment (filed May 24, 2022); ATVA Comments (filed June 22, 2022); Altice Comments (filed Jun. 22, 2022); NTCA Comments (filed Jun. 22, 2022); Graham Comments (filed Jun. 22, 2022).

[29] Applicants' Consolidated Opposition.

[30] TNG-CWA, NABET-CWA, UCC, and Common Cause Reply (filed Aug. 1, 2022) (Joint Reply).

[31] Letter from Holly Saurer, Chief, Media Bureau, FCC to Scott R. Flick, Counsel for SGCI Holdings III LLC, et al., MB Dkt. No. 22-162 (MB Sep. 29, 2022) (*Second Information Request*); *Media Bureau Issues Second Information Request for Applications to Transfer Control of TEGNA, Inc., to Standard General, L.P.*, Public Notice, MB Dkt. No. 22-162, DA 22-1068 (MB Oct. 6, 2022) (*Second Information Request Public Notice*).  Among other documents requested, the Bureau sought presentations to investment institutions addressing each company's evaluation of the Transactions, the motivating reasons for each company's participation in the Transactions, the reasons why the Transactions would be advantageous to each company, as well as documents discussing the reduction of staff, the diminution or displacement of local content, and the expansion of national content.

The Applicants' responses to the Second Information Request were due by October 13, 2022.  Parties could supplement any filed pleadings by October 27, 2022, and the Applicants could respond to those pleadings by November 3, 2022.

[32] Applicants' Joint Response to the Media Bureau's Request for Information (Applicants October 13, 2022 Joint Response) (filed Oct. 13, 2022).

[33] CWA Supplement to Petition to Dismiss or Deny (CWA Oct. 27, 2022 Supplement) (filed Oct. 27, 2022).

[34] Joint Response to the Supplement to Petition to Dismiss or Deny (Applicants Joint Response to Supplement) (filed Nov. 4, 2022).

14.    On December 23, 2022, the Bureau issued a public notice seeking comment on three letters putting forth commitments by the Applicants and affiliated entities:[35] (1) a December 16, 2022 letter from SGCI Holdings and Standard General, L.P. addressing "the applicability of retransmission consent agreements to the TEGNA stations that will be controlled by Standard General L.P. and SGCI Holdings . . . following the [Transactions]";[36] (2) a December 22, 2022 letter from SGCI Holdings and Standard General, L.P. addressing concerns raised regarding reduction of local jobs after consummation of the Transactions;[37] and (3) a December 23, 2022 letter filed by filed by SGCI Holdings, Standard General, L.P., AGM, and CMG addressing concerns regarding potential coordination between (a) SGCI Holdings, Standard General L.P., and TEGNA on the one hand and (b) AGM and investment funds managed by its affiliates CMG and its subsidiaries on the other hand after consummation of the Transactions.[38]

## II.    DISCUSSION

15.    Section 310(d) of the Act provides that no station license shall be transferred or assigned unless the Commission, on application, determines that the public interest, convenience, and necessity will be served thereby.[39] If the transaction would not violate a statute or rule, the Commission considers whether it could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes.[40] Under Section 309(d) of the Act, "[i]f a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent [with the public interest, convenience, and necessity]," it must formally designate the application for a hearing in accordance with Section 309(e) of the Act.[41] Courts have stated that, in reviewing the record, the Commission must designate an application for hearing if "the totality of the evidence arouses a sufficient doubt" as to whether grant of the application would serve the public interest.[42]

16.    Applying these principles to the transaction at issue, we designate for hearing the above-captioned applications because there exists a substantial and material question of fact as to:  (1) whether retransmission consent fees will rise as a result of the Transactions, and if so, whether such an increase is the result of a properly functioning, competitive marketplace, or, alternatively, whether such rate increases would be the result of the unique structure of the Transactions in which the various assignments and/or transfers of control are closed sequentially in order to take advantage of after-acquired station clauses and maximize retransmission revenue; and (2) whether and if so, to what extent, the proposed transaction will harm localism, including through the reduction of station-level staffing.

---

[35] *Media Bureau Seeks Comment on Letters filed by SGCI Holdings III LLC and Standard General L.P. Regarding Applications to Transfer Control of TEGNA, Inc.*, MB Dkt. No. 22-162, DA No. 22-1368 (re. Dec. 23, 2022).

[36] Letter from Soohyung Kim, SGCI Holdings and Standard General, L.P., to Marlene H. Dortch, FCC, Dkt. No. 22-162 (filed Dec. 16, 2022) (SG Retransmission Waiver Letter)).

[37] Letter from Soohyung Kim, SGCI Holdings and Standard General, L.P., to Marlene H. Dortch, FCC, Dkt. No. 22-162 (filed Dec. 22, 2022) (SG Staffing Letter)).

[38] Letter from Soohyung Kim, SGCI Holdings and Standard General, L.P., et al. to Marlene H. Dortch, FCC, Dkt. No. 22-162 (filed Dec. 23, 2022).

[39] Section 310(d) of the Act requires that the Commission consider an application as if the proposed assignee/transferee were applying for the license directly. 47 U.S.C. § 310(d); *see also SBC Commc'ns Inc., and AT&T Corp. Applications for Approval of Transfer of Control*, Memorandum Opinion and Order, 20 FCC Rcd 18290, 18300, para. 16 (2005) (*SBC-AT&T Order*).

[40] *Id.*

[41] 47 U.S.C. §§ 309(d) and (e) (emphasis added).

[42] *Serafyn v. FCC*. 149 F.3d 1213, 1216 (D.C. Cir. 1998) (quoting *Citizens for Jazz on WRVR Inc. v. FCC*, 775 F.2d 392, 395 (D.C. Cir. 1985)).

**Federal Communications Commission**                                      **DA 23-149**

17.    Although the parties to this proceeding at the Bureau's direction have developed a record that is not insubstantial, for the reasons set forth below there remain substantial and material questions of fact and based upon the record before us, we are unable to find that grant of these Transactions would be consistent with the public interest and therefore must investigate these issues further at hearing.

18.    As described above, two sets of entities have filed petitions to deny the Applications, CWA and Common Cause/UCC.[43]  We note that while these entities have filed petitions to deny, the Applicants have challenged whether the parties have standing as "parties in interest."[44]  Therefore, as an initial matter, we will address briefly the standing of these entities.  Both sets of entities included with their respective petition affidavits from various members residing in markets in which TEGNA stations operate.  These affidavits attest to the fact that the members are regular viewers and/or MVPD subscribers of the stations involved in the transaction and assert that they will be harmed by the proposed transaction, including by the potential effect it could have on jobs, local journalism, and the cost of cable and satellite subscription fees.[45]  Under both the Commission's long-standing precedent[46] and its more recent decisions,[47] entities that have submitted such affidavits from members in at least one market involved in the transactions—which each of the parties have done here—qualify as parties in interest with standing to file a petition to deny with at least respect to those markets.[48]  Accordingly, we find that these parties have standing to file petitions to deny the Applications.[49]  Further, as indicated below, we designate these petitioners as parties in interest to this hearing.

---

[43] *See supra* at para. 11.

[44] TEGNA Consolidated Opposition at 7-11.  Under Section 309(d) of the Act, only a "party in interest" has standing to file a petition to deny but the Act neither defines the term nor explains to which class of persons and/or entities it applies.  Section 309(d) provides, in part, "[t]he petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a) of this section […].   Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof."  47 U.S.C. § 309(d).

[45] CWA Petition at 7-10 and Exhibits A-N; Common Cause/UCC Petition at 10–11 and Appendix at 2–59.

[46] In the broadcast regulatory context, standing is generally shown in one of three ways: (1) as a competitor in the market subject to signal interference; (2) as a competitor in the market subject to economic harm; or (3) as a resident of the station's service area or regular listener of the station.  *See*, *e.g.*, *Entercom License, LLC,* Hearing Designation Order, 31 FCC Rcd 12196, 12205-06 (2016); *Melodie Virtue, Esq.,* Letter Decision, 30 FCC Rcd 6045 (MB 2015).  For viewer standing, the petitioner must allege that he or she is a resident of the station's service area or a regular viewer of the station.  *See Rainbow/PUSH Coalition v. FCC*, 330 F.3d 539, 542-43 (D.C. Cir. 2003).  Further, the Commission has held that "an association may establish standing as the representative of its members, as long as it alleges that one or more of its members has standing."  *Petition for Rulemaking to Establish Standards for Determining the Standing of a Party to Petition to Deny a Broadcast Application*, Memorandum Opinion and Order, 82 F.C.C.2d 89, 96, para. 20 (1980).

[47] *Applications of Tribune Media Company, Nexstar Media Group, Inc. et al*, MB Docket No. 19-30, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8449, para. 25, n.112 (2019) (*Nexstar/Tribune*) (finding that an organization had standing to file a petition to deny in a multi-market transaction in the affected markets for which the organization had provided affidavits from member viewers).

[48] Furthermore, as the Commission has noted previously, "[v]iewed as a whole, the legislative history of section 309(d)(1) makes plain that Congress's unwavering goal has been to ensure that petitions advancing interests legitimately related to the purposes of the Act should be considered by the Commission."  *Petition for Rulemaking to Establish Standards for Determining the Standing of a Party to Petition to Deny a Broadcast Application*, 82 F.C.C.2d 89, 95, para. 18 (1980).

[49] Because we find that the entities are parties in interest on this basis, we need not and do not decide whether they would also qualify as parties in interest based on any of the other theories of standing that they advance.

A.       **Potential Public Interest Harm from Increased Retransmission Consent Fees**

19.       Pursuant to section 325 of the Communications Act, multichannel video programming distributors (MVPDs) may retransmit the signal of a local broadcast television station on a cable or satellite television system only with the station's permission.[50]  To facilitate the carriage of local stations, the Act permits licensees of commercial television stations to elect to either require the MVPDs to carry their signals automatically but without compensation, or to negotiate with MVPDs for the right to retransmit the station's signal in exchange for remuneration.[51]  If a station elects transmission consent, the station and MVPD negotiate a carriage agreement, known as retransmission consent agreement, which typically involves a fee paid to the local broadcast station calculated on a per-subscriber, per-month basis.[52]  If the parties are unable to negotiate such a carriage agreement, the MVPD must stop retransmitting the station's broadcast signal and viewers lose access to the station on the MVPD's cable or satellite television system in what is known as a blackout.[53]

20.       Many broadcast television stations, particularly large station groups, generate significant revenue in exchange for granting MVPDs the right to rebroadcast their stations' signals.  As the Commission detailed in its recent *Communications Marketplace Report*, across the broadcasting industry, revenue from the retransmission of local broadcast signals has increased by 42% over a period of five years, growing from $9.5 billion in 2017 to $13.5 billion in 2021.[54]  Over the last decade, the fees obtained from retransmission consent agreements have become an increasingly significant source of revenue for broadcast stations even while revenue from the sale of advertising time has stagnated or declined.  Such retransmission consent fees have been estimated to account for approximately 40% of broadcast station revenue, with the remainder derived primarily from the sale of advertising.[55]  Retransmission consent fees paid by the MVPD to the broadcast stations are essentially passed on to consumers as part of the service fees paid by subscribers for the MVPD service.[56]

---

[50] 47 U.S.C. § 325(b).

[51] Section 325(b) of the statute affords commercial television stations the right to elect every three years whether to receive mandatory carriage by MVPDs in their relevant geographic market or to negotiate with those MVPDs to retransmit the station's signal in exchange for compensation.  47 U.S.C. § 325(b)(3)(B); 47 CFR §§ 76.56(b), 76.64.

[52] *Communications Marketplace Report*, GN Docket No. 22-203, FCC 22-103, Report, at 167, para. 275 (2022) (*2022 Communications Marketplace Report*).

[53] *Id.*  The Act and the Commission's rules require that MVPDs and the licensees of television broadcast stations negotiate retransmission consent in good faith.  47 U.S.C. § 325(b).  The Commission established a list of objective negotiating standards, the violation of which constitutes a per se failure to negotiate in good faith.  47 CFR § 76.65.  Even if those specific standards are met, the Commission may consider whether, based on the totality of the circumstances, a party has failed to negotiate retransmission consent in good faith.  47 CFR § 76.65(b)(4).

[54] *Id.*

[55] *2022 Communications Marketplace Report* at 140, para. 215.

[56] *See, e.g., id.* at 24, para. 66 ("In response to increased programming costs, many MVPDs have added 'broadcast fees' and 'regional sports fees' to monthly billing statements to pass those costs through directly to consumers and cover a portion of the increased programming costs without appearing to raise the rate of the television service."); *Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming*, Eighteenth Report, 32 FCC Rcd 568, 608-609, para. 120 (2017) (noting that most consumers indirectly pay for broadcast stations as part of their MVPD service fees, which are calculated, in part, to cover retransmission consent fees that the MVPD pays to local stations); *see also, Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992*, First Order on Reconsideration, Second Report and Order, and Third Notice of Proposed Rulemaking, 9 FCC Rcd 1164, 1209, para. 87 (1993) (noting in the context of implementation of rate regulation, that cable operators may pass through to subscribers increases in certain categories of external costs including the costs of retransmission consent fees).

**Federal Communications Commission**                                  **DA 23-149**

21.     Consistent with the retransmission consent regime adopted by Congress, the Commission has looked to a properly functioning marketplace, and the good-faith negotiations between the parties, to determine the rate, if any, to be paid by an MVPD for the carriage of a local broadcast station.[57]  The Commission has recognized, however, that supra-competitive increases in retransmission consent fees can result in pressure for retail price increases for subscription video services to the detriment of consumers, and therefore, the public interest.[58]  As such, the Commission has been alert to the potential for public interest harms arising from retransmission consent rates, particularly in the context of transactions involving large broadcast television companies or MVPDs.[59]  And, in previous transactions, the Commission has found that such increases and the resulting increased retail rates are not in the public interest.[60]

22.     Even decisions that have not found a public interest harm related to alleged increases in retransmission consent fees in connection with a transaction have acknowledged the potential for such harms.  For example, in *Nexstar/Media General*, the Bureau and the Wireless Telecommunications Bureau addressed concerns that a merger between two large broadcast television companies would increase retransmission consent fees and trigger after-acquired station clauses to the detriment of consumers and the public interest.[61]  While *Nexstar/Media General* did not find that the transaction would result in undue leverage in the negotiation of retransmission consent fees, it noted that the Bureaus did "not foreclose the possibility, in the future, of looking at rising retransmission fees, black outs, and other related issues in a context broader than local markets," emphasizing that "such harms must be demonstrably transaction-specific and not industry-wide in nature to be addressed in the context of a transfer of control proceeding."[62]

---

[57] *See Amendment of Commission's Rules Related to Retransmission Consent*, Report and Order and Further Notice of Proposed Rulemaking, 29 FCC Rcd 3351, 3352-3, para. 2 (2014) (citing S. Rep. No. 92, 102nd Cong., 1st Sess. (1991), reprinted in 1992 U.S.C.C.A.N. 1133, 1169) (*Retransmission Consent Report and Order*).

[58] *See id.* at 3363, para. 17 (adopting a rule barring the joint negotiation of retransmission consent fees for stations in a local market in certain circumstances in an effort to protect consumers and prevent supra-competitive price increases in retransmission consent fees).

[59] *See, e.g.*, *Applications of AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 30 FCC Rcd 9131, 9217-23 para. 225-238 (2015); *Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership for Consent to Assign or Transfer Control of Licenses and Authorizations,* Memorandum Opinion and Order, 31 FCC Rcd 6327, 6463-64 para. 276-279 (2016); *Consent to Transfer Control of Certain License Subsidiaries of NBI Holdings, LLC to Terrier Media Buyer, Inc.; Consent to Transfer Control of Certain License Subsidiaries of Cox Enterprises, Inc. to Terrier Media Buyer, Inc., et al.*, Memorandum Opinion and Order, 34 FCC Rcd 10554, 10565-67 para. 30-34 (MB 2019); and *Nexstar/Tribune*, 34 FCC Rcd at 8450-52, paras. 27-31 (2019) (each analyzing concerns raised by petitioners and commenters in the respective transactions regarding the potential impact on retransmission consent fees and the public interest).

[60] *See, e.g., EchoStar Commc'ns Corp., Gen. Motors Corp., and Hughes Elec. Corp*., Hearing Designation Order, 17 FCC Rcd. 20559, 20624, para. 169 (2002) ("[The evidence] strongly suggests that, in the absence of any significant savings in marginal cost, the merger will result in a large increase in post-merger equilibrium prices. Given this likelihood, we cannot find that the Applicants have met their burden of demonstrating that the proposed merger will produce merger-specific public interest benefits of the magnitude the Applicants allege."); *Adelphia Commc'ns Corp., Time Warner Cable Inc., and Comcast Corp.*, Memorandum Opinion and Order, 21 FCC Rcd. 8203, 8261, para. 116 (2006) ("[W]e find that the transactions may increase the likelihood of harm in markets in which Comcast or Time Warner now hold, or may in the future hold, an ownership interest in RSNs, which ultimately could increase retail prices for consumers and limit consumer MVPD choice.  We impose remedial conditions to mitigate these potential harms.").

[61] *Applications to Transfer Control of License Subsidiaries of Media General, Inc., to Nexstar Broadcasting, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd 183 (MB/WTB 2017) (*Nexstar/Media General*).

[62] *Nexstar/Media General*, *id.* at 196-197, para. 35.

23.     More recently, in *Nexstar/Tribune*, the Commission expressed concern about increases in retransmission consent fees that are not the result of "competitive marketplace considerations."[63]  In that case, the Commission addressed allegations that a proposed merger would harm MVPDs and consumers by causing increases in retransmission consent fees, thereby harming the public interest.  While the Commission ultimately held in that case that an increase in retransmission consent rates, by itself, was not necessarily a public interest harm, it was careful to qualify its holding.[64]  There, the Commission noted that a public interest harm would be more likely if a rise in rates was *not* the result of a functioning retransmission consent marketplace or was the product of market power.[65]  Further, the Commission specifically discussed after-acquired station clauses, which allow a broadcaster to bring newly acquired stations under its existing retransmission consent agreement, substituting the acquiring broadcaster's retransmission consent fee for the rate previously negotiated by the MVPDs for the broadcast stations in question.[66]  While the Commission found that there was no apparent reason to step in and deny one party the benefit of the negotiated bargain of after-acquired clauses in that case, it suggested that such intervention would be appropriate if there was "evidence of anticompetitive practices or other wrongdoing."[67]

24.     Thus, the caselaw makes clear that increases in retransmission consent rates can constitute a public interest harm if such increases are not simply the product of a properly functioning competitive marketplace.  In particular, evidence that anticompetitive practices or other wrongdoing could distinguish what would perhaps constitute a market-driven rate increase from one that is anti-competitive, unwarranted, and harmful to consumers and the public interest.  In the instant matter, we find that there is a substantial and material question of fact as to whether any increase in retransmission fees as a result of this transaction is the result of a properly functioning, competitive marketplace, or, alternatively, whether such rate increases would be the result of: (1) the unique structure of the Transactions in which the various assignments and/or transfers of control are closed sequentially in order to take advantage of after-acquired station clauses and maximize retransmission revenue, or (2) some other anticompetitive practices or other wrongdoing, and accordingly, the impact of any such rate increases on the viewing public, including MVPD subscribers.

25.     Numerous opponents of the Transactions suggest that the Applications in the instant proceeding are carefully sequenced in order to increase retransmission consent fees through the triggering of after-acquired station clauses resulting in instant fee increases that will be passed along to consumers as a price increase for MVPD service.[68]  Under the proposed deal structure, the Transactions begin with CMG selling a single station, Boston station WFXT(TV), via the transfer of control of that station's parent company, TPC.  Then, CMG's former Boston station effectively acquires the current TEGNA stations, seemingly in an effort to ensure that the CMG retransmission consent agreement governing WFXT will then apply to all of New TEGNA –as those stations are theoretically "after-acquired stations" of TPC—thereby achieving an immediate rate increase for those stations as if CMG had acquired those stations.  The Petitioners argue that this structure and careful sequencing of the Transactions would allow the Applicants to charge higher retransmission consent rates, which in turn will be passed on to consumers in the form of higher retail subscriber prices.[69]  The Petitioners and commenters assert further

---

[63] *Nexstar/Tribune*, 34 FCC Rcd at 8451-52, para. 29.

[64] *Id*.

[65] *Id*.

[66] *Id*. at 8445, para. 16.

[67] *Id*. at 8462-63, para. 59; *see, also*, *Nexstar/Media General*, 32 FCC Rcd 182, 197, para. 35.

[68] *See*, *e.g.*, CWA Petition at 19 ("After a number of intermediate steps, the end result would be that Standard General would buy a Boston TV station from Apollo's CMG, sell four Texas stations to CMG and buy most of TEGNA's stations."); Common Cause/UCC Petition at 22-23; Altice Comments at 2-5.

[69] Common Cause/UCC Petition at 22-23.

that there is no claimed, or valid, public interest benefit from these orchestrated transfers,[70] nor is there any "retransmission consent" exception to such consumer harm.[71] In addition, the Petitioners assert that the current period of historic inflation heightens the harm to consumer welfare in this context,[72] and that it is axiomatic that increased transmission fees will certainly be directly passed on to consumers.[73]

26.    Petitioners and several commenters acknowledge the Commission's precedent regarding intervention in retransmission consent fees, but argue that the qualifying language of *Nexstar/Tribune* renders that holding inapplicable here, as the expected price increase would not result from competitive marketplace considerations.[74] Rather than the result of a functioning competitive marketplace, they argue that the proposed sequencing of the Transactions was designed to exploit existing contracts in a manner beyond the scope of what was contemplated by the MVPD party to those agreements (two of which are commenters here).[75] Commenters further assert that the Applicants wrongly seek to "commandeer" the provisions in the CMG retransmission consent agreements (held by Boston station WFXT(TV)) and achieve terms of contracts that were negotiated in an unrelated transaction.[76] Structuring the entire transaction around these clauses, the Petitioners and commenters argue, would increase prices *without negotiating* for such increases, and effectively lead to the application of the CMG retransmission consent agreements to the New TEGNA stations.[77] Although some parties assert that any increase in the price of retransmission consent fees could constitute a harm, others assert that the current situation is consistent with Commission precedent, which allows for a finding of harm where the parties have artificially constructed a deal intending to raise retransmission fees.[78]

27.    The Applicants argue that such criticisms are deficient for multiple reasons. Specifically, they argue that the Commission has consistently declined to consider the potential for increased retransmission consent rates to be a public interest harm and that, consistent with its precedent, the Commission should not step in to alter negotiated agreements. Further, they argue that MVPDs' complaints of the impact of after-acquired clauses are inappropriate here, as most of the Applicants' retransmission agreements currently in effect have a three-year term agreement, and were negotiated in the shadow of the potential (or actual) sale of TEGNA that was widely reported as news since early 2019.[79] The Applicants explain that "nearly 70% of MVPD subscribers receiving a TEGNA station subscribe to an MVPD that has negotiated (or will negotiate) a new transmission agreement with TEGNA between September 20, 2021 (when news of Standard General's TEGNA deal first publicly leaked) and

---

[70] *See*, *e.g.*, CWA Petition at 21.

[71] Altice October 20, 2022 *Ex Parte* Letter at 1-2.

[72] CWA Petition at 21; Common Cause/UCC Petition at 22-23.

[73] CWA Petition at 21; Common Cause/UCC Petition at 24.

[74] *See, e.g.*, CWA Petition at 19-21.

[75] *See, e.g.*, CWA Petition at 20; DISH Comments at 5 (stating such a rate increase would be attributable to the "artificial manipulation of retransmission consent negotiations, not of a competitive marketplace"); Altice Oct. 20, 2022 *Ex Parte* Letter at 2.

[76] ATVA Comments at 4; Letter from Christina Chou, Altice USA, Inc. to Marlene H. Dortch, FCC, MB Docket No. 22-162 (filed Oct. 20, 2022) at 1; *see also* ATVA Comments at 4.

[77] Altice Comments at 6.

[78] *E.g.* Altice Reply at 2 ("[W]hen parties artificially 'engineer' a transaction for the purpose of raising retransmission consent prices, as opposed to such increases being merely a consequence of a transaction, the Commission should take action."). In addition, some argue that *Nexstar/Tribune* is limited only to arms-length contracts with broadcasters. *See*, *e.g.*, CWA Petition at 20.

[79] Applicants' Consolidated Opposition at 38.

the end of [2022]."[80]  Further, they contend that the Petitioners' arguments regarding inflationary pressures are logically flawed, because broadcasters face the same pressures,[81] and that consumers need not pay increased prices because of the many alternative video programming options available to them.[82]

28.     In addition, the Applicants assert that the recent commitments it has offered obviate the potential for any harm arising from the application of after-acquired station clauses.  In filing the SG Waiver Letter, Standard General L.P. and SGCI Holdings preface their commitment by stating that "any impact of the Transactions on the retransmission consent fees payable by [MVPDs] is not central to Standard General's thesis" for the proposed Transactions, and they then commit to:

> (1) voluntarily and irrevocably waive[] enforcement or other application of any term or condition of [a retransmission consent agreement] that would, by reason of any of the Transactions, result in [a retransmission consent agreement] between [CMG] and any MVPD applying to any current TEGNA station that will be controlled by [Standard General L.P. and SGCI Holdings] after the Closing (such stations, the "TEGNA Stations"); and

> (2) acknowledge[] and agree[] that the intent and effect of such waiver is to permit [a retransmission consent agreement] with TEGNA in effect as of the time immediately prior to the Closing to continue to apply to the TEGNA Stations as of and following the Closing.[83]

29.     Petitioners and commenting parties raise multiple objections to the adequacy of these commitments to remedy any harm caused by the triggering of the after-acquired station clauses.  For example, they argue that TEGNA and CMG already have knowledge of the expiration date of each other's contracts that creates additional leverage in retransmission negotiations, and no waiver can undo that anticompetitive advantage.[84]  They also contend that while the proffered commitment would waive application of CMG's existing after-acquired station clauses to TEGNA's stations, it would not prevent them from using information previously acquired to manipulate Cox's after-acquired station clauses such that TEGNA could benefit from clauses negotiated by Cox.[85]  In addition, CWA and Common Cause/UCC argue that Mr. Kim's statement in the SG Waiver Letter that the impact of the retransmission consent fees is not "central to the thesis" of the Transactions is belied by the multitude of revenue projections that the Standard General entities and AGM consistently presented to prospective investing banks, which are contained in the record of this proceeding.[86]

---

[80] *Id.* at 39 (citation omitted).

[81] *Id.* at 39-40.

[82] *Id.* at 40-42.

[83] SG Waiver Letter at 1.

[84] *See* Letter from Michael Nilsson, Counsel to ATVA, Marlene H. Dortch, FCC (filed Jan. 13, 2023) at 5-6 (ATVA Jan. 13, 2003 *Ex Parte* Letter); DISH January 13, 2023 Comments at 6; *see also* Letter from Michael Nilsson to Marlene Dortch, MB Docket No. 22-162 (filed Dec. 2, 2022) at 2.

[85] *See* ATVA Jan. 13, 2003 *Ex Parte* Letter at 6.  Further, while the proposal nominally applies to Standard General L.P., SGCI Holdings III, and CMG, commenters note that it does not explicitly provide any assurance that another affiliated entity might seek to enforce any of CMG's after-acquired station clauses, or otherwise seek to apply CMG's rates to TEGNA stations.  *See, e.g.*, ATVA Jan. 13, 2003 *Ex Parte* Letter at 6-7; DISH January 13, 2023 Comments at 7-8.  For example, ATVA seeks confirmation that when Standard General "voluntarily and irrevocably" waives enforcement of such clauses, so too will subsidiaries Teton Parent, Teton Midco, Teton Opco, TEGNA, and the individual Tegna Stations.  ATVA Jan. 13, 2003 *Ex Parte* Letter at 6-7.

[86] CWA and Common Cause/UCC Jan. 13, 2023 Comments at 13-17 ("It is clear that from the earliest phases of structuring the TEGNA transaction, Standard General relied on the prospect of enhanced retransmission revenues that would come from exercise of the after-acquired station clause made available by including AGM's Boston TV station in the deal.  There are too many documents referring to that aspect of the deal to be listed and discussed here,

(continued....)

30.    Opponents of the Transactions further assert that the Commission recognized in *Nexstar/Tribune* that there could be circumstances that would justify Commission action to address rising retransmission consent rates.  The Opponents assert that anticompetitive wrongdoing of the sort they allege exists in this case is precisely such a circumstance to warrant Commission intervention and constitutes a public interest harm to MVPDs and consumers.  Specifically, ATVA asserts that the "unprecedented" structure of this transaction could not have happened without the sharing of information between TEGNA and CMG with respect to markets in which they overlap, in violation of the Commission rules prohibiting such information sharing.[87]

31.    The Applicants respond that the commitment they have offered to waive after-acquired clauses addresses any concerns about downstream subscriber rate increases, and that this action is not just a proposal or behavioral remedy, but a "fact" because the irrevocable waiver letters were signed and sent to the relevant MVPDs in December, 2022.[88]  They counter that increasing retransmission consent fees cannot be the main purpose of the Transactions, where SGCI Holdings voluntarily waived its contractual rights and yet is still seeking approval to consummate the Transactions.[89]  With regard to ATVA's earlier-stated concern that any such waiver should apply without time restriction,[90] the Applicants counter that increased retransmission consent rates are not at standalone cognizable public interest harm, and that the Commission has limited authority over retransmission consent negotiations.[91]  In addition, the Commission has already determined that the proper forum for the reconsideration of its longstanding position that an increase in MVPD programming costs is not in and of itself a public interest harm is a rulemaking proceeding.[92]

32.    Based on the record before us, we are unable to find, due to the unique structure of the Transactions in which the various assignments and/or transfers of control are closed sequentially in order to take advantage of after-acquired station clauses and maximize retransmission revenue, that rates to MVPD subscribers would not rise beyond that which would occur in a properly functioning competitive market.  In addition, especially given questions about the intended scope of the commitments relating to enforcement of such clauses, we are unable to find that the commitments offered by the Applicants would adequately mitigate such a result.  Accordingly, we designate the Applications for a hearing to determine: whether the sequencing of the Transactions was intended primarily to increase retransmission fees; whether consummation of the Transactions will likely cause an increase in rates for the retail subscribers of the MVPDs that currently hold, or will in the future negotiate, retransmission agreements with the Applicants; whether the sequencing of the Transactions constitutes anticompetitive activity; what the extent of harm to viewers and the public interest would be as a result, whether any such harm would be adequately mitigated by the commitments offered by the Applicants in the SG Waiver Letter; and/or

(Continued from previous page) ────────────────────────
but one of the most critical - and telling - instances occurs in an email thread that began on the morning of September 17, 2021. . . .").

[87] Letter from Michael Nilsson, Counsel for ATVA, to Marlene H. Dortch, FCC (filed Jan. 13, 2023) at 4-5, n.19 (tracing that the Commission's adoption of section 76.65(b)(1)(viii) of the Commission's rules, which bars such activity).

[88] Applicants January 20, 2023 Joint Reply Comments at 6-7.

[89] *Id*. at 8.

[90] *See* ATVA Comments at 6.

[91] Applicants January 20, 2023 Joint Reply Comments at 18 (citations omitted).

[92] *Id*. at 18-19 (citations omitted).

whether any of the Applicants violated any Commission rules or committed other wrongdoing in constructing the Transactions.[93]

**B.        Potential Public Interest Harm to Localism, Including Due to Labor Reductions**

33.        Localism, along with competition and diversity, is a longstanding core Commission broadcast policy objective, which together forms the cornerstone of broadcasting.[94]  The Commission has consistently interpreted the localism obligation to require that broadcasters air material that is responsive to the needs and interests of the communities that their stations are licensed to serve, including local news, information, and public affairs programming.[95]

34.        In discussing its localism goal, the Commission has emphasized that "[b]roadcasters, who are temporary trustees of the public's airwaves, must use the medium to serve the public interest, and the Commission has consistently interpreted this to mean that licensees must air programming that is responsive to the interests and needs of their communities of license."[96]  This principle, that a "broadcast licensee's authorization to use radio spectrum in the public interest carries with it the obligation that the station serve its community, providing programming responsive to local needs and interests"[97] is a crucial and oft-stated maxim aimed at ensuring that licensees use the broadcast spectrum consistent with the intent of Congress and to the benefit of local communities.[98]

35.        In reiterating the importance of localism and its primacy to the Commission's ownership rules, the Commission has explained previously that it typically looks to two measures when seeking to

---

[93] *See, e.g.*, Letter from Michael Nilsson, Counsel for ATVA, to Marlene H. Dortch, FCC, MB Dkt. No. 22-162 (filed Jan. 13, 2022) (alleging that "the 'unprecedented' structure of this transaction could not have happened without information sharing among the parties, including with respect to markets in which TEGNA and Cox overlap. The FCC rules, of course, prohibit such information sharing.").

[94] *2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996*, Report and Order and Notice of Proposed Rulemaking, 18 FCC Rcd 13620, 13643-13644, paras. 73-76 (2003) (subsequent history omitted) (*2002 Biennial Review*); *Broadcast Localism*, Notice of Inquiry, 19 FCC Rcd 12425 at para. 1 (2004) (*Broadcast Localism NOI*). In the *Broadcast Localism NOI*, the Commission summarized a number of Commission rules, policies, and procedures, past and present, that reflected the Commission's goal of establishing and maintaining a system of local broadcasting that is responsive to the unique interests and needs of individual communities.  *Id*. at 12426-7, paras. 2-4.  Following the *Broadcast Localism NOI*, the Commission subsequently adopted a report on broadcast localism focused in part on analyzing the efforts of broadcasters "to provide community responsive programming such as news and public affairs, and programming targeted to the particular needs or interests of certain segments of the public."  *Broadcast Localism*, Report on Broadcast Localism and Notice of Proposed Rulemaking, 23 FCC Rcd 1324, 1325 (2007).

[95] *See, e.g.*, *Applications of Comcast Corporation, General Electric Company and NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees*, Memorandum Opinion and Order, 26 FCC Rcd. 4238, 4320, para. 197 (2011) (*Comcast/NBCU Order*) (citation omitted).  As the Supreme Court recently recognized, "[t]he FCC has long explained that the ownership rules seek to promote competition, localism, and viewpoint diversity by ensuring that a small number of entities do not dominate a particular media market."  *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S.Ct. 1150, 1155 (2021).

[96] *Broadcast Localism NOI* at 12425, para. 1 (citing *Revision of FM Assignment Policies and Procedures*, 90 F.C.C.2d 88, 92, para. 11 (1982), *on recon*., 56 Rad. Reg. 2d (P&F) 448 (1984); *Amendment of Section 3.606 of the Commission's Rules and Regulations*, 41 F.C.C. 148, 167 (1952)); *see also*, *2002 Biennial Review*, 18 FCC Rcd at 13643, para. 74 ("Federal regulation of broadcasting has historically placed significant emphasis on ensuring that local television and radio stations are responsive to the needs and interests of their local communities.").

[97] *Birach Broadcasting Corp.*, Hearing Designation Order, 33 FCC Rcd 852, 852, para. 1 (2018).

[98] As the Commission explained in the *Broadcast Localism NOI*, the concept of localism derives from Title III of the Communications Act and is reflected in and supported by an array of Commission policies and rules.  *Broadcast Localism NOI* at 12426-7, paras. 2-4.

assess localism:  the selection of programming responsive to local needs and interests, and local news quantity and quality.[99]  In particular, the Commission has noted that the airing of local news and public affairs programming by local television stations is an important and useful measure of a station's effectiveness in serving the needs and interests of its local community.[100]  Given the First Amendment concerns with any form of content regulation, the Commission has not attempted to define with exact precision the programming that a broadcaster should air to serve the needs and interests of its local community.  The Commission has also noted that localism includes political programming aired by the station, as well as an obligation to seek to serve all significant groups within the community of license when airing community-responsive programming.[101]

36.      *Plans and Commitments Regarding Jobs*.  The Commission has found that, as a general matter, labor matters are handled and enforced by federal agencies other than the Commission.[102]  We do not depart from that precedent here.  Rather, we recognize that local journalism is the heart of local news and community-responsive programming, and in that context we take seriously concerns that a diminution in the employment of local journalists and other local staff poses a threat to localism.

37.      Petitioners and critics of the proposed transactions have identified a series of statements and commitments by SGCI Holdings and Standard General L.P. in the record that seek to demonstrate that consummation of the proposed transactions will reduce local jobs and, as a consequence, local service.  Petitioners argue that Standard General L.P. has had longstanding plans to reduce station-level resources since its earlier efforts to acquire TEGNA,[103] and that the documentary evidence disclosed in this proceeding points to a longstanding and ongoing campaign to effect this plan.

38.      In particular, in the Applicants' submissions in response to the *First Information Request*, TNG-CWA identifies two documents in particular that Standard General L.P. gave to investors, lenders, or other third parties that flesh out and commit to this business plan.[104]  First, TNG-CWA points to a response from Standard General's HSR Question 4(c)-1 production titled {[

]} in which Standard General and Apollo state that they "have

---

[99] *2002 Biennial Review*, 18 FCC Rcd at 13644, para. 78.

[100] *Id.* at 13644-5, para. 79.

[101] *See, e.g.*, *Broadcast Localism LOI* at 12432-35, paras. 19-25.  In discussing localism and a licensee's obligation to serve the needs and interests of its local community, the Commission has also discussed issues such as the provision of disaster warnings, ensuring that audiences are aware when material aired has been sponsored by someone other than the licensee, and the use of national playlists of songs.  *Id.* at 12435-40, paras. 27-39.

[102] *See, e.g.*, *Comcast/NBCU Order* at 4329-30, para. 223 -24 (2011) (declining to impose employment conditions that the Commission found were not related to the transaction and that are enforced by agencies other than the Commission).  The Applicants defend their right to lay off staff, arguing that broadcast station staffing matters are reserved exclusively to the discretion of the licensees because section 303 of the Communications Act does not authorize the Commission to interfere with non-discriminatory employment decisions, and "the Commission has 'never suggested that a reduction in a station's staff is contrary to the public interest, if conducted in a nondiscriminatory manner.'"  Applicants' Consolidated Opposition at 30 (citing *Univision Holdings, Inc.*, Memorandum Opinion and Order, 7 FCC Rcd 6672, 6683 n.45 (1992); 47 U.S.C. § 303).

[103] Common Cause/UCC quotes a 2020 proxy statement from Standard General to TEGNA shareholders which states:  "TEGNA has 2x the number of employees per station compared to peers, and lags its closest local broadcasting person EBITDA margin."  Common Cause/UCC Petition at 21 (quoting Tegna Inc. & Standard General L.P., Additional Definitive Proxy Soliciting Materials Filed by Non-Management and Rule 14(a)(12) Material (Form DFAN14A), at 21 (Apr. 13, 2020), https://sec.report/Document/0001104659-20-045933/tm2015782-1_dfan14a.htm. https://investors.tegna.com/static-files/064251d9-7c52-4b76-b7b6-739e3af7a7a2)).

[104] Letter from David Goodfriend, Counsel for TNG-CWA, to Marlene H. Dortch, Secretary, FCC, MB Dkt No. 22-162 (filed Sep. 29, 2022) (TNG-CWA Sep. 29, 2022 *Ex Parte* Letter) at 2-3.

conservatively identified {[                          ]} of station-level cost savings," including {[
                                    ]}[105]   Based on this document, TNG-CWA asserts that the
number of job cuts presented was a floor, not a ceiling.[106]  TNG-CWA next cites to further information
provided in Standard General's HSR Question 4(d)-1 document production titled {[

                         .]}[107]  TNG-CWA argues that these documents refer to "synergies" that are
necessarily post-closing job cuts, and which undercuts the Applicants' previous assertions that Standard
General's purported cuts were actually "mid-2021 estimates of operating costs reflected personnel
measures that TEGNA management was already planning to implement (and has since
implemented) . . . ."[108]

       39.     In addition, CWA identifies three presentations prepared by SGCI Holdings and AGM
from the *Second Information Request* that it asserts indicate SGCI Holdings' intent and commitment to
cut jobs post-closing.[109]  First, CWA points to an email from the lead bank in the Transactions, Royal
Bank of Canada (RBC), to Apollo and Standard General, which CWA asserts that "it appears that as of
September, 2021, RBC not only was aware of the planned station-level staffing cuts but wanted to
promote those cost savings as a feature of the proposed transaction and use those projected synergies to
encourage other banks to extend credit to Standard General for the proposed transaction."[110]  Second, all
12 of the bank lenders involved in the Transactions signed a formal commitment letter on February 22,
2022, coinciding with financial projections made that same month by Standard General {[
                                         ]} and
highlighted in the RBC email.[111]  CWA concludes that the banks' representations apparently contemplated
*prospective* cost savings rather than cuts that had previously been made by TEGNA, and that there is no
indication in the documents that even suggests that TEGNA had already eliminated costs, including
through job cuts, since September, 2021.[112]  Third, CWA cites to a document produced by SGCI Holdings
in May, 2022, listing again the same cost savings - from its February, 2022 and September, 2021
presentations, and suggesting that there could be more employment cuts following closing of the
Transactions.[113]

---

[105] *Id.*  Material set off by double brackets {[ ]} is business-confidential information and is redacted from the public
version of this document.

[106] *Id.* at 3.

[107] *Id.* at 4.

[108] *Id.* at 2 (citing Applicants' Consolidated Opposition and Response to Comments at n.102 (citing June 13
Response at 9-10)).

[109] CWA Oct. 27, 2022 Supplement at 1.

[110] *Id.* at 5.  That email {[

                                    ]}

[111] CWA points out that {[

                                         ]}  *Id.* at 5-6.

[112] *Id.* at 7.

[113] *Id.* at 8-9 (citing {[ "

                              ]})

40.     The Applicants provide a competing narrative.  They argue that SGCI Holdings' statements under oath that it does not have, and has never had, any intention of reducing station news or journalism jobs, or, indeed, station staffing more generally upon consummation of the Transactions,[114] outweigh the suppositions drawn by the Petitioners from these documents.

41.     Further, SGCI Holdings explains that the mid-2021 estimate of operating costs "reflected personnel measures that TEGNA management was already planning to implement (and has since implemented)."[115]  According to SGCI Holdings, logic dictates that it cannot have an intent to eliminate these positions after closing, because they no longer exist where either (1) the reference in the document to employee reduction was simply the incorporation of then-existing TEGNA plans that have since been implemented, or (2) if Standard General believed TEGNA's stations were overstaffed by a certain number of employees (which CWA has not demonstrated were news employees in any event), then "TEGNA's subsequent reduction in headcount would have already made that change, and there would be no reason for further station-level staffing reductions."[116]  Moreover, SGCI Holdings asserts that the financial modeling document highlighted by CWA was a tool for price negotiations with TEGNA rather than a business plan and was not binding.[117]  Further, according to SGCI Holdings, it could not have made such staffing decisions with the limited information available to it at that time, and the lack of due diligence documents necessary to support such a reduction further proves that such decisions were not made.[118]

42.     More specifically, in their Joint Response, the Applicants assert that the September 2021 email to RBC does not provide any evidentiary support for planned job reductions and was not relied on by bankers for four reasons.  First, RBC is an advisor to Standard General that assisted with drafting Transaction-related materials in addition to being a lender, and thus, RBC would not have had any role in Standard General's operational decision-making.[119]  Second, the bracketing of the {{      }}in the document indicates that it was merely placeholder text and that the RBC representative drafter did not know when Standard General expected the actions underlying the various station-level synergies to be completed.[120]  Third, {{               }} of syndication synergies from the end of the Ellen DeGeneres Show contained in the document comprised part of the estimated {{               }} in station-level synergies which was unquestionably tied to the end of the Ellen DeGeneres Show, so this draft statement cannot possibly demonstrate that all of the projected station-level savings were expected to be achieved post-closing or that any other lender understood the synergies analysis to mean that.[121]  Fourth, the subsequent version of the draft of the document (circulated the next business day) no longer included the

---

[114] These statements include the June 16, 2022, letter from Deborah McDermott to TEGNA employees affirming its intent to preserve local jobs following the Transaction to be probative of SGCI Holdings' intent, as well as statements submitted to the Commission.  *See, e.g.,* Applicants' June 13 Response at 9 ("Standard General has always placed a high value on local journalism and has no intention, and has not had any intention, of reducing news or news staff at WFXT(TV) or the TEGNA stations."); Applicants Oct. 13, 2022 Joint Response at 7; *id*. at 16 ("Standard General does not have any actual or potential plans to consolidate news operations or services following the Transaction and has repeatedly affirmed — to the public, the Commission, TEGNA's employees, and its own advisors — that it is not interested in reducing local station staffing.").

[115] *See, e.g.*, Letter from Scott R. Flick, Counsel for SGCI Holdings III LLC, to Marlene H. Dortch, Secretary, FCC, MB Dkt No. 22-162 (filed Oct. 13, 2022) (SGCI Holdings Oct. 13, 2022 *Ex Parte* Letter) at 2.

[116] *Id.*

[117] *Id.*

[118] *Id.* (citing SGCI Holdings' document production accompanying the response to the *First Information Request*).

[119] Applicants Joint Response to Supplement at 13.

[120] *Id*. at 13-14.

[121] *Id*. at 14.

phrase {[                                                                              ]} nor did it appear in the final version of the September 2021 presentation.[122]

43.     The conflicting evidence on the record before us about SGCI Holdings' intentions and commitments with regard to local staffing at the TEGNA stations, leaves us with substantial and material questions of fact, unresolved by Applicants' filings, that require further investigation to determine the ultimate effects on localism.  Central to this determination would be reconciling the accuracy and legitimacy of the Applicants' explanations for the documents seeming to indicate intent and commitments to reduce station-level staff, including whether the "synergies" of job cuts have already taken place;[123] evaluation of SGCI Holdings' explanations that station-level savings have already been achieved[124] and that the financial model is distinguishable from a financial plan; identification of any such jobs that would likely be cut as a result of the proposed transaction and their impact on the Commission's localism policies; and resolution of apparent timeline inconsistencies about representations on staffing.[125]

44.     Additionally, the Applicants have offered certain commitments regarding staffing at the TEGNA stations if the Commission were to approve the Transactions.  That letter states in relevant part:

> To further remove any doubt about station news staffing matters, Standard General commits that it will not conduct any journalism or newsroom staffing layoffs or similar reductions at the stations for a minimum of two years following the Transactions.  To be clear, Standard General does not have plans for any future station staffing reductions, but cannot predict how future economic conditions or changes in the broadcast industry may require broadcasters to make adjustments in the composition or size of station staffing to best serve the needs of the public.  In that regard, Standard General expects that implementation of its plans to increase station news content at TEGNA will actually

---

[122] *Id.*

[123] TNG-CWA asserts that "the Applicants appear to be contradicting themselves when they say that post-closing job cuts ('synergies') already have happened," because the word "synergy" refers to financial effects that occur after, not before, a transaction closes.  TNG-CWA Sep. 29 *Ex Parte* Letter at 2 (citing the definition for "synergy" from Investopedia.com as "'Synergy is the concept that the value and performance of two companies combined will be greater than the sum of the separate individual parts.'") (further citations omitted).  SGCI Holdings responds that TNG-CWA's assumption that a cost-savings "synergy" necessarily means actions taken after closing to improve profitability is misguided and inappropriate here, where there are no "synergies" that result from a combination in the proposed transaction because there are no station combinations being created in this transaction and therefore no station-level jobs or assets are being made redundant.  SGCI Holdings Oct. 13, 2022 *Ex Parte* Letter at 3.

[124] For example, TEGNA explains that the staffing reduction resulted from two primary factors: (1) the execution of a longstanding technology efficiency initiative consolidating back-office master control duties to a centralized operation that eliminated approximately {[     ]} positions; and (2) due to economic uncertainty, TEGNA pulled back on hiring to protect its existing workforce while continuing to experience attrition through departures.  Applicants Oct. 13, 2022 Joint Response.  CWA criticizes that explanation because the reduction in TEGNA jobs from {[
     ]} cannot be dismissed as some organic headcount reduction at TEGNA between December, 2020 and June, 2022, without addressing the multiple references on the confidential record to future job cuts.  CWA Nov. 14, 2022 *Ex Parte* Letter at 8 (citations omitted).  Similarly, CWA asserts that that SGCI Holdings' bracketing of a number in the September 2021 email from RBC cannot be explained away on the basis that it was a placeholder only; the email itself "demonstrates an expectation of future actions."  *Id.* at 4.

[125] CWA claims that SGCI Holdings made presentations to the lenders (or received e-mail correspondence from the lenders) regarding post-closing job and financial reductions that purport to contradict Standard General's position that the staff reductions have been implemented.  *See, e.g.*, Letter from David R. Goodfriend, Counsel to TNG-CWA/NABET-CWA, to Marlene H. Dortch, FCC, Dkt Nos. 22-162, 22-166 (filed Nov. 14, 2022) (CWA Nov. 14, 2022 *Ex Parte* Letter) at 2-4; Letter from David R. Goodfriend, Counsel to TNG-CWA/NABET-CWA, to Marlene H. Dortch, FCC, Dkt Nos. 22-162, 22-166 (filed Nov. 15, 2022) (CWA Nov. 15, 2022 *Ex Parte* Letter), Attach.

increase the number of journalists and newsroom employees at the stations. To provide further assurances to the Commission, Standard General is willing to file quarterly (or if the Commission prefers, annual) reports providing the amount of new investments it has made at the local station level at TEGNA, as well as, after the conclusion of the two-year period referenced above, information regarding any layoffs in the newsrooms of the TEGNA stations.[126]

Petitioners identify what they allege are multiple shortcomings of this proposed commitment, including that the vague and undefined term "journalism or newsroom staffing" does not extend to most "station-level staffing"; that the commitment is limited to merely promising no layoffs rather than referring to the headcount for "station-level staffing;" that the term should cover the entire current license period for each TEGNA station; that the date of the sales agreement (February 22, 2022) appears to be the baseline, and does not reflect the significant attrition at TEGNA stations in the past year; and the offer to file reports lacks transparency and the reports would be unverifiable.[127] The Applicants respond that the SG Staffing Letter fully addresses the Petitioners' allegations regarding local news and journalists.[128] However, the specific deficiencies highlighted by the Petitioners, including the practicality and sufficiency of the SG Staffing Letter, remain unaddressed and unresolved, leaving substantial and material questions of fact as to whether and how station-level staffing might be reduced and the effect of any such reduction on localism.

45.    *Structure of Ownership*.  The record indicates that two aspects of the ultimate ownership proposed for New TEGNA also warrant further investigation in order to determine the potential impact on localism.  First, the parties present sharply divergent cases as to whether the organizational form of SGCI Holdings as an investment fund benefits or harms the ability of the TEGNA Stations to provide local service going forward.  As a central component of its public interest showing, the Applicants assert that a primary public interest benefit of the Transactions is shifting TEGNA from a publicly-traded company, tethered to quarterly profit reporting, to a more agile privately-held company that can make longer-term plans and investments without being punished by the markets when those actions reduce short-term profitability.[129]  In contrast, opponents argue that the operating model of private equity funds like Standard General is to reduce operating costs by cutting jobs and limiting salaries, unlike a media company such as TEGNA.[130]  Although four years ago the Bureau gave no weight to a similar

---

[126] SG Staffing Letter at 1.  That letter includes a qualifying footnote:  "This commitment is not intended to preclude case-by-case employment decisions 'for cause' that are unrelated to or which could otherwise arise regardless of the Transactions."  *Id*. at 1 n.2.

[127] Comments of CWA, UCC, and Common Cause at 9-11 (filed Jan. 13, 2023).

[128] Applicants January 20, 2023 Joint Reply Comments at 6-7.

[129] Applicants' Nov. 3, 2022 Joint Response to Supplement at 5-6; Applicants' Consolidated Opposition at 4 ("Publicly traded companies are obligated to demonstrate profits on a quarterly basis to demanding public shareholders, and may be pressed to lay off employees to demonstrate to the markets that they are taking proactive steps to maintain their stock value.  In contrast, as a private company under Standard General, TEGNA can make longer-term investments in its stations, won't have to expend its financial resources buying back its public stock, and can be far more agile than a public company in pursuing innovation and adopting new technologies like ATSC 3.0 and multi-platform content delivery without having to reveal its plans to competitors through mandatory SEC filings.").

[130] *See*, *e.g.*, Common Cause/UCC Petition at 10 ("Because of the business model set forth by Standard General, UCC and Common Cause local members reasonably fear that their local TV stations will cover more national news and hire fewer journalists than under ownership by TEGNA."); CWA Nov. 14, 2022 *Ex Parte* Letter at 1 (articulating CWA's "well-founded fear that approval would become a template for Standard General, [AGM] and other private equity and hedge funds to replicate the business model that such investment vehicles have used in decimating the newspaper industry:  cutting jobs, selling off real estate and other assets, and reducing service to the public along the way").

allegation,[131] the centrality of the issue as a claimed public interest benefit combined with real-world experience since then leads us to revisit that conclusion.[132]  A material question remains whether the specific change in ownership in this transaction from a publicly traded corporation to a private company owned by an investment fund would promote, hinder, or indeed, have no effect on localism.

46.     Second, any assessment of localism would also benefit from a determination of the role of Standard General L.P. in the past as a station owner and, more importantly, its role going forward. Although the Applicants, on occasion, refer to the role of Standard General L.P. going forward in an apparent ownership or control capacity, most notably in the recent commitment letters filed in December, it is not clear that this entity is involved in the Transactions.[133]  In the Applications and supporting ownership exhibits, SGCI Holdings is the proposed ultimate parent company, with only a passing reference to Standard General L.P. which would appear to have no role in management, ownership, or control in any capacity.  There is a material question how relevant the experience under different, unidentified Standard General L.P. ownership would be compared to that of SGCI Holdings.[134]

47.     *Programming Production*.  We also find two issues related to the production of community-responsive programming to raise substantial and material questions of fact as to whether SGCI Holdings' acquisition of the TEGNA stations will harm localism.  First, questions have been raised in the record regarding how New TEGNA's creation and use of a Washington, D.C., news bureau will impact localism, and, in particular, whether it would increase or reduce the Stations' local journalism and coverage of local issues.  While the Applicants tout the use of a Washington, D.C. news bureau as a public interest benefit of the Transactions, and pledge to improve coverage from TEGNA's existing D.C. news operation,[135] Petitioners argue that greater reliance on programming from a national news bureau will come at the expense of local news investment and coverage.[136]

48.     In prior transactions, the Commission has found the use of such a Washington, D.C. news desk to be a public benefit.[137]  For example, in the 2019 *Nexstar/Tribune* transaction, the Commission found that such a news bureau would be a public benefit in its own right.  However, the Commission in that case did not specifically evaluate the impact of such a news bureau on localism.[138]  Moreover, that

---

[131] *Terrier Media*, 34 FCC Rcd at 10567, para. 35 ("[W]e give no weight to [Common Cause's] allegation that AGM's involvement in the transaction, as a private equity firm, casts doubt that the Transaction would benefit localism and viewpoint diversity, on the basis that private equity firms typically impose cost-cutting measures that 'gut newsrooms' in an attempt to generate profits before re-selling the stations after a few years.")

[132] For example, Common Cause/UCC indicates that its prior fears about AGM's cost-cutting were justified.  *See* Common Cause/UCC Petition at 19 ("Further, the Applicants fail to mention the layoffs that took place at CMG stations after Apollo's acquisition.  After its purchase of CMG, Apollo laid off reporters and on-air personalities in stations across multiple markets.").

[133] Two of the commitment letters on "Standard General" letterhead define "Standard General" to include both SGCI *and* Standard General L.P, and then go on to describe Standard General's commitments and plans.  *See* SG Retransmission Waiver Letter at 1; SG Staffing Letter at 1.

[134] This issue is complicated by the fact that Standard General L.P. negotiated the Transactions as it was seeking funding for SGCI Holdings.

[135] Applicants' Consolidated Opposition at 34.

[136] *See*, *e.g.*, CWA Petition at 14-15.

[137] *Nexstar-Tribune* at 8453, para. 32 (citing *Gray-Raycom Order*, 33 FCC Rcd at 12361-62, para. 31) (finding that expanded access to Washington, DC news bureaus can produce transaction-specific public interest benefits to viewers and give stations access to new resources).

[138] *Nexstar/Tribune* at 8449, para. 26 (finding that "the Tribune stations' new access to reporting from Nexstar's Washington, DC, news bureau and state news bureaus provides transaction-specific, public interest benefits to Nexstar's and Tribune's viewers").

decision involved the impact of the *creation* of a Washington news desk.[139]  Here, such a Washington, D.C. News bureau already exists under TEGNA's current management.  Thus, the Applicants do not propose to create such a news bureau, but rather to improve and expand the Stations' use of that programming source.[140]  CWA challenges the Applicants' unsupported assertions that the Transactions will improve the Stations' local programming,[141] and notes that SGCI Holdings does not argue, much less prove, that TEGNA's current Washington, D.C.-originated news coverage is somehow deficient or inadequate.  Therefore, CWA contests the validity of this claimed benefit, or whether SGCI Holding's commitment will yield any value.[142]

49.    Second, questions have been raised in the record regarding whether SGCI Holding's apparent intent to provide local news services remotely will promote or harm localism.  In explaining its plan for the proposed operation of New TEGNA, the Applicants cite as an example Standard General's past local news improvement and that it increased newsroom staff by 28% following its acquisition of its current four television stations in February 2021.[143]  CWA counters that Standard General does not indicate *where* this new staff is located, which, it argues, matters because Standard General has been producing a faux "local" Cape Girardeau newscast with anchors, editors and other staff piped in from Lincoln, Nebraska, more than 500 miles away.[144]

50.    The Commission has previously rejected an objection to the use of "regional hubs" in news production and other functions at stations in the same or nearby markets.  In that case, the Commission found that allegations that the proposed use of regional hubs would lead to a loss of local news production was speculative, and that it had previously recognized the benefits to licensees of consolidating administrative functions.[145]  Here, however, the Applicants have not provided any

---

[139] *Id.*

[140] SGCI Holdings explains that its concept for a DC-based news bureau serving TEGNA stations is a team that works with local station journalists to facilitate interviews with congresspeople and policymakers relevant to those stations' local communities.  Applicants' Joint Response at 15.

[141] *See, e.g.*, Applicants June 13, 2022 Response at 6 ("Standard General also intends to improve coverage from TEGNA's current DC newsroom to improve local station performance, enabling better coverage of national events, including breaking news, political news, and in-depth and investigative reporting from the nation's capital.").

[142] CWA Petition at 15-16.  Common Cause/UCC and CWA question Standard General's plans "to increase cookie-cutter, nationally distributed content" from a D.C. news desk, which will just enable it to reduce locally-originated programming and consequently the levels of employment at local stations.  Joint Reply at 26-27.

[143] Applicants June 13, 2022 Response at 6.  In particular, the Applicants note the addition of six local journalists to KBSI(TV), Cape Girardeau, Missouri, that it asserts were employed to produce unique local news stories from that community.  *Id.*  The Applicants assert further that future management by Mr. Kim and Ms. McDermott is one of the primary public interest benefits of the Transactions, cite improvements to local news at stations owned by Standard General, and assert that the duo will continue their record "of investing in and improving local station operations—with an emphasis on local news and other community-specific initiatives—following its acquisition of the TEGNA stations."  *See, e.g.*, Comprehensive Exh. at 5-6; Applicants June 13, 2022 Response at 7.  The Applications highlight the improvements that Mr. Kim and Ms. McDermott brought to the local news and station capabilities when they previously operated Young Broadcasting and Media General.  The Applications emphasize that these two executives who would lead New TEGNA have successful histories of improving television broadcast companies, investing in infrastructure, and airing thousands of hours more local news programming at those stations than was airing prior to their involvement.  Comprehensive Exh. at 6; Applicants' Consolidated Opposition at 18-22.

[144] CWA Petition at 15-16 (citations omitted).  *But see* Applicants' Consolidated Opposition at 20-21 (submitting that KBSI(TV) did not produce any news prior to Standard General's acquisition of it in 2021, because it was rebroadcasting a competitors' newscast pursuant to a news share agreement).

[145] *See Nexstar/Tribune* at 8453, para. 32 (citing *2002 Biennial Regulatory Review – Review of Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of Telecommunications Act of 1996 et al.*, Notice of Proposed Rulemaking, 17 FCC Rcd 18503, 18528, para. 74 (2002)).

indication that New TEGNA would rely on regional hubbing or any such strategy, or that SGCI Holdings has any plan to consolidate administrative activity. In order to assess the impact of SGCI Holdings' planned operations on the TEGNA Stations' ability to serve the needs and interests of their local communities, further examination of New TEGNA's evident plans to gather and broadcast local news remotely is necessary.

## III.    ORDERING CLAUSES

51.       Accordingly, **IT IS ORDERED**, That, pursuant to Sections 309(e) of the Act, 47 U.S.C. § 309(e), and section 1.254 of the Commission's rules, 47 CFR § 1.254, the above-captioned applications **ARE DESIGNATED FOR HEARING** to be held at a time and location specified in a subsequent Order by the Administrative Law Judge, upon the following questions:

(a) Whether, in light of the record presented, retransmission consent fees will rise as a result of the Transactions, and if so, whether such an increase is the result of a properly functioning, competitive marketplace, or, alternatively, whether such rate increases would be the result of the unique structure of the Transactions in which the various assignments and/or transfers of control are closed sequentially in order to take advantage of after-acquired station clauses and maximize retransmission revenue, and further, whether such a result would be mitigated by the commitments offered by the Applicants; and

(b) Whether, and to what extent, in light of the record presented, local content and programming in the affected communities would be adversely affected due to the proposed plans and commitments of SGCI Holdings for station-level staff; its intentions for investments in the stations; the potential financial pressures connected with the acquisition and ownership structure; and the potential effectiveness of the commitments offered by the Applicants.

52.       **IT IS FURTHER ORDERED**, That, pursuant to Section 309(e) of the Act, 47 U.S.C. § 309(e), and section 1.254 of the Commission's rules, 47 CFR § 1.254, both the **BURDEN OF PROCEEDING** with the introduction of evidence and the **BURDEN OF PROOF** with respect to issues specified above shall be upon SGCI Holdings, CNM, CMG, TEGNA, and TPC.  We are assigning the burdens in this manner because SGCI Holdings, CNM, CMG, TEGNA, and TPC have the particular knowledge of the specific facts at issue in this proceeding, as well as the statutory obligation to demonstrate that grant of the Transaction is in the public interest.

53.       **IT IS FURTHER ORDERED**, That to avail itself of the opportunity to be heard, SGCI Holdings, CNM, CMG, TEGNA, and TPC pursuant to Section 1.221(c) and 1.221(e) of the Commission's Rules, 47 CFR § 1.221(c) and 1.221(e), in person or by their respective attorneys, **SHALL FILE**, a **WRITTEN APPEARANCE**, stating an intention to appear on the date fixed for the hearing and present evidence on the issues specified in the Order.  Such written appearance shall be filed within 20 days of the mailing of this Order pursuant to Paragraph 60 below.  Pursuant to Section 1.221(c) of the Commission's rules, if the applicants fail to file an appearance within the specified time period, or have not filed prior to the expiration of that time a petition to dismiss without prejudice, or a petition to accept, for good cause shown, such written appearance beyond expiration of said 20 days, the assignment application will be dismissed with prejudice for failure to prosecute.

54.       **IT IS FURTHER ORDERED**, that, having filed petitions to deny, TNG-CWA and the National Association of Broadcast Employees and Technicians-CWA (NABET-CWA) (collectively, CWA) and Common Cause and United Church of Christ, OC, Inc. (collectively, Common Cause/UCC) are made parties to the proceeding pursuant to Section 1.221(d) of the Commission's rules, 47 CFR § 1.221(d).  To avail themselves of the opportunity to be heard, pursuant to Sections 1.221(e) of the Commission's rules, each of these parties, in person or by its attorneys, **SHALL FILE**, a **WRITTEN APPEARANCE**, stating its intention to appear on the date fixed for the hearing and present evidence on the issues specified in this Order.  Such written appearance shall be filed within 20 days of the mailing of

**Federal Communications Commission** DA 23-149

this Order pursuant to Paragraph 60 below. If any of these parties fails to file an appearance within the time specified, it shall, unless good cause for such failure is shown, forfeit its hearing rights.

55.    **IT IS FURTHER ORDERED**, That the Chief, Enforcement Bureau, shall be made a party to this proceeding without the need to file a written appearance.

56.    **IT IS FURTHER ORDERED**, That a copy of each document filed in this proceeding subsequent to the date of adoption of this document **SHALL BE SERVED** on the counsel of record appearing on behalf of the Chief, Enforcement Bureau.  Parties may inquire as to the identity of such counsel by calling the Investigations & Hearings Division of the Enforcement Bureau at (202) 418-1420. Such service copy **SHALL BE ADDRESSED** to the named counsel of record, Investigations & Hearings Division, Enforcement Bureau, Federal Communications Commission, 45 L Street NE, Washington, DC 20554.

57.    **IT IS FURTHER ORDERED**, That SGCI Holdings, pursuant to Section 311(a)(2) of the Act, 47 U.S.C. § 311(a)(2), and Section 73.3594 of the Commission's Rules, 47 CFR § 73.3594, **SHALL GIVE NOTICE** of the hearing within the time and in the manner prescribed in such Rules, and **SHALL ADVISE** the Commission of the publication of such notice as required by Section 73.3594(b) of the Rules, 47 CFR § 73.3594(b).

58.    **IT IS FURTHER ORDERED**, That a copy of this document, or a summary thereof, shall be published in the Federal Register.

59.    **IT IS FURTHER ORDERED**, That, within fifteen (15) days of the date that **WRITTEN APPEARANCES** are due, the Administrative Law Judge shall issue a Scheduling Order that includes a set date for resolution.

60.    **IT IS FURTHER ORDERED**, That the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center **SHALL SEND** a copy of this Order by certified mail/return receipt requested to:

**TEGNA, Inc.**

> Michael Beder
> TEGNA Inc.
> 8350 Broad Street, Suite 2000
> Tysons, VA 22102

> Jennifer A. Johnson
> Covington & Burling LLP
> One CityCenter
> 850 Tenth Street, NW
> Washington, DC 20001

**SGCI Holdings III LLC / Community News Media LLC**

> Soohyung Kim
> SGCI Holdings III LLC
> 767 Fifth Avenue
> 12th Floor
> New York, NY 10153

> Scott R. Flick
> Pillsbury Winthrop Shaw Pittman LLP
> 1200 Seventeenth Street NW
> Washington, DC 20036

**Federal Communications Commission**                                         **DA 23-149**

**CMG Media Corporation / Teton Parent Corp.**

> CMG Legal Dept.
> 1601 W. Peachtree Street, NE
> Atlanta, GA 30309
> United States
>
> Michael Basile
> Cooley LLP
> 1299 Pennsylvania Avenue, NW
> Suite 700
> Washington, DC 20004

**Common Cause**

> Yosef Getachew
> Common Cause
> 805 15th Street NW, Suite 800
> Washington, DC  20005

**United Church of Christ Media Justice Ministry**

> Cheryl A. Leanza
> United Church of Christ Media Justice Ministry
> 100 Maryland Avenue, NE
> Washington,, DC  20002

**The Newsguild – CWA / National Association of Broadcast Employees and Technicians – CWA**

> Andrew Jay Schwartzman
> 1341 G Street, NW
> Fifth Floor
> Washington, DC 20005
>
> David R. Goodfriend
> The Goodfriend Group
> 208 I Street, NE
> Washington, DC 20002

FEDERAL COMMUNICATIONS COMMISSION

Holly Saurer
Chief, Media Bureau

Federal Communications Commission                                    DA 23-149

**Attachment**

**TEGNA Merger Applications**

| Call Sign | Community of License | Application File Nos. | Licensee | Facility ID |
|-----------|---------------------|---------------------|----------|-------------|
| WUPL(TV) | Slidell, LA | 0000186355 | Belo TV, Inc. | 13938 |
| WBXN-CD | New Orleans, LA | 0000186356 | Belo TV, Inc. | 70419 |
| KTHV(TV) | Little Rock, AR | 0000186358 | Cape Publications, Inc. | 2787 |
| KFSM-TV | Fort Smith, AR | 0000186359 | Cape Publications, Inc. | 66469 |
| WZZM(TV) | Grand Rapids, MI | 0000186369 | Combined Communications of Oklahoma, LLC | 49713 |
| KENS(TV) | San Antonio, TX | 0000186371 | KENS-TV, Inc. | 26304 |
| KFMB-TV | San Diego, CA | 0000186372 | KFMB-TV, LLC | 42122 |
| KING-TV | Seattle, WA | 0000186389 | KING Broadcasting Company | 34847 |
| KREM(TV) | Spokane, WA | 0000186391 | KING Broadcasting Company | 34868 |
| KTVB(TV) | Boise, ID | 0000186394 | KING Broadcasting Company | 34858 |
| K15IO-D | McCall & New Meadows, ID | 0000186397 | KING Broadcasting Company | 34869 |
| K16JE-D | Glenns Ferry, ID | 0000186393 | KING Broadcasting Company | 188132 |
| K17KF-D | Cambridge, ID | 0000186392 | KING Broadcasting Company | 188131 |
| K21CC-D | Lewiston, ID | 0000186390 | KING Broadcasting Company | 50532 |
| K23KY-D | Council, ID | 0000186399 | KING Broadcasting Company | 11446 |
| K29NB-D | Cascade, ID | 0000186396 | KING Broadcasting Company | 34884 |
| K30QA-D | Coeur D'Alene, ID | 0000186398 | KING Broadcasting Company | 34861 |

**Federal Communications Commission**                              **DA 23-149**

| KTFT-LD | Twin Falls, ID | 0000186395 | KING Broadcasting Company | 167056 |
|---|---|---|---|---|
| KONG(TV) | Everett , WA | 0000186373 | KONG-TV, Inc. | 35396 |
| KSKN(TV) | Spokane, WA | 0000186387 | KSKN Television, Inc. | 35606 |
| KTTU(TV) | Tucson, AZ | 0000186400 | KTTU-TV, Inc. | 11908 |
| KWES-TV | Odessa, TX | 0000186401 | KWES Television, LLC | 42007 |
| KXTV(TV) | Sacramento, CA | 0000186403 | KXTV, LLC | 25048 |
| KBMT(TV) | Beaumont, TX | 0000186374 | LSB Broadcasting, Inc. | 10150 |
| KCEN-TV | Temple, TX | 0000186384 | LSB Broadcasting, Inc. | 10245 |
| KIDY(TV) | San Angelo, TX | 0000186376 | LSB Broadcasting, Inc. | 58560 |
| KIII(TV) | Corpus Christi, TX | 0000186379 | LSB Broadcasting, Inc. | 10188 |
| KXVA(TV) | Abilene, TX | 0000186377 | LSB Broadcasting, Inc. | 62293 |
| KYTX(TV) | Nacogdoches, TX | 0000186385 | LSB Broadcasting, Inc. | 55644 |
| KUIL-D | Beaumont, TX | 0000186380 | LSB Broadcasting, Inc. | 168234 |
| KAGS-LD | Bryan, TX | 0000186378 | LSB Broadcasting, Inc. | 10246 |
| KIDB-LD | Sweetwater, TX | 0000186375 | LSB Broadcasting, Inc. | 53545 |
| KIDU-LD | Brownwood, TX | 0000186383 | LSB Broadcasting, Inc. | 58559 |
| KIDV-LD | Albany, TX | 0000186381 | LSB Broadcasting, Inc. | 58571 |
| KVHP-LD | Jasper, TX | 0000186382 | LSB Broadcasting, Inc. | 168235 |
| WGRZ(TV) | Buffalo, NY | 0000186402 | Multimedia Entertainment, LLC | 64547 |
| KARE(TV) | Minneapolis, MN | 0000186415 | Multimedia Holdings Corporation | 23079 |
| KNAZ-TV | Flagstaff, AZ | 0000186416 | Multimedia Holdings Corporation | 24749 |
| KPNX(TV) | Mesa, AZ | 0000186424 | Multimedia Holdings Corporation | 35486 |
| K06AE-D | Prescott, AZ | 0000186422 | Multimedia Holdings Corporation | 35274 |

**Federal Communications Commission** DA 23-149

| K26OD-D | Globe, AZ | 0000186421 | Multimedia Holdings Corporation | 35487 |
|---|---|---|---|---|
| KPSN-LD | Payson, AZ | 0000186417 | Multimedia Holdings Corporation | 63396 |
| KTVD(TV) | Denver, CO | 0000186423 | Multimedia Holdings Corporation | 68581 |
| KUSA(TV) | Denver, CO | 0000186419 | Multimedia Holdings Corporation | 23074 |
| WJXX(TV) | Orange Park, FL | 0000186420 | Multimedia Holdings Corporation | 11893 |
| WTLV(TV) | Jacksonville, FL | 0000186418 | Multimedia Holdings Corporation | 65046 |
| KSDK(TV) | St. Louis, MO | 0000186404 | Multimedia KSDK, LLC | 46981 |
| WATL(TV) | Atlanta, GA | 0000186406 | Pacific and Southern, LLC | 22819 |
| WLTX(TV) | Columbia, SC | 0000186407 | Pacific and Southern, LLC | 37176 |
| WMAZ-TV | Macon, GA | 0000186409 | Pacific and Southern, LLC | 46991 |
| WXIA-TV | Atlanta, GA | 0000186408 | Pacific and Southern, LLC | 51163 |
| WBNS(AM) | Columbus, OH | 0000186364 | RadiOhio, Incorporated | 54901 |
| WBNS-FM | Columbus, OH | 0000186363 | RadiOhio, Incorporated | 54701 |
| WHAS-TV | Louisville, KY | 0000186405 | Sander Operating Co. I LLC D/B/A WHAS Television | 32327 |
| KGW(TV) | Portland, OR | 0000186444 | Sander Operating Co. III LLC D/B/A KGW Television | 34874 |
| K16ML-D | Corvallis, OR | 0000186450 | Sander Operating Co. III LLC D/B/A KGW Television | 34851 |
| K17HA-D | Astoria, OR | 0000186449 | Sander Operating Co. III LLC D/B/A KGW Television | 130923 |
| K19LT-D | Prineville, etc., OR | 0000186445 | Sander Operating Co. III LLC D/B/A KGW Television | 34864 |

| K25KS-D | The Dalles, OR | 0000186452 | Sander Operating Co. III LLC D/B/A KGW Television | 34844 |
|---------|---------------|------------|--------------------------------------------------|-------|
| K28MJ-D | Tillamook, OR | 0000186446 | Sander Operating Co. III LLC D/B/A KGW Television | 189303 |
| K29AZ-D | Newport, OR | 0000186448 | Sander Operating Co. III LLC D/B/A KGW Television | 34865 |
| K35HU-D | Grays River, WA | 0000186451 | Sander Operating Co. III LLC D/B/A KGW Television | 34870 |
| KGWZ-LD | Portland, OR | 0000186447 | Sander Operating Co. III LLC D/B/A KGW Television | 30810 |
| KMSB(TV) | Tucson, AZ | 0000186388 | Sander Operating Co. V LLC D/B/A KMSB Television | 44052 |
| KCWI-TV | Ames, IA | 0000186425 | TEGNA Broadcast Holdings, LLC | 51502 |
| WCCT-TV | Waterbury, CT | 0000186430 | TEGNA Broadcast Holdings, LLC | 14050 |
| WNEP-TV | Scranton, PA | 0000186427 | TEGNA Broadcast Holdings, LLC | 73318 |
| WOI-DT | Ames, IA | 0000186435 | TEGNA Broadcast Holdings, LLC | 8661 |
| WPMT | York, PA | 0000186439 | TEGNA Broadcast Holdings, LLC | 10213 |
| WQAD-TV | Moline, IL | 0000186438 | TEGNA Broadcast Holdings, LLC | 73319 |
| WTIC-TV | Hartford, CT | 0000186428 | TEGNA Broadcast Holdings, LLC | 147 |
| WZDX(TV) | Huntsville, AL | 0000186429 | TEGNA Broadcast Holdings, LLC | 28119 |
| W07DC-D | Allentown/ Bethlehem, PA | 0000186437 | TEGNA Broadcast Holdings, LLC | 73325 |

**Federal Communications Commission** DA 23-149

| W10CP-D | Towanda, PA | 0000186431 | TEGNA Broadcast Holdings, LLC | 73320 |
|---|---|---|---|---|
| W14CO-D | Clarks Summit, etc., PA | 0000186432 | TEGNA Broadcast Holdings, LLC | 73326 |
| W15CO-D | Towanda, PA | 0000186436 | TEGNA Broadcast Holdings, LLC | 73324 |
| W20AD-D | Williamsport, PA | 0000186433 | TEGNA Broadcast Holdings, LLC | 73321 |
| W26CV-D | Mansfield, PA | 0000186426 | TEGNA Broadcast Holdings, LLC | 129499 |
| W29FQ-D | Pottsville, PA | 0000186434 | TEGNA Broadcast Holdings, LLC | 73327 |
| WTSP(TV) | St. Petersburg, FL | 0000186365 | Tegna East Coast Broadcasting, LLC | 11290 |
| WLBZ(TV) | Bangor, ME | 0000186368 | Tegna East Coast Broadcasting, LLC | 39644 |
| WCSH(TV) | Portland, ME | 0000186366 | Tegna East Coast Broadcasting, LLC | 39664 |
| WGCI-LD | Skowhegan, ME | 0000186367 | Tegna East Coast Broadcasting, LLC | 39642 |
| WATN-TV | Memphis, TN | 0000186411 | TEGNA Memphis Broadcasting, Inc. | 11907 |
| WLMT(TV) | Memphis, TN | 0000186412 | TEGNA Memphis Broadcasting, Inc. | 68518 |
| WTHR(TV) | Indianapolis, IN | 0000186414 | VideoIndiana, Inc. | 70162 |
| WALV-CD | Indianapolis, IN | 0000186413 | VideOhio, Inc. | 70161 |
| WBIR-TV | Knoxville, TN | 0000186443 | WBIR-TV, LLC | 46984 |
| WBNS-TV | Columbus, OH | 0000186362 | WBNS-TV, Inc. | 71217 |
| WCNC-TV | Charlotte, NC | 0000186440 | WCNC-TV, Inc. | 32326 |
| W17EE-D | Lilesville/ Wadesboro, NC | 0000186441 | WCNC-TV, Inc. | 32316 |
| W36FB-D | Briscoe, NC | 0000186442 | WCNC-TV, Inc. | 32317 |

**Federal Communications Commission**                    **DA 23-149**

| WFAA(TV) | Dallas, TX | 0000186453 | WFAA-TV, Inc. | 72054 |
| WFMY-TV | Greensboro, NC | 0000186454 | WFMY Television, LLC | 72064 |
| WKYC(TV) | Cleveland, OH | 0000186455 | WKYC-TV, LLC | 73195 |
| WTOL(TV) | Toledo, OH | 0000186456 | WTOL Television, LLC | 13992 |
| WUSA(TV) | Washington, D.C. | 0000186457 | WUSA-TV, Inc. | 65593 |
| WVEC(TV) | Hampton, VA | 0000186459 | WVEC Television, LLC | 74167 |
| WJHJ-LP[146] | Newport News, Etc., VA | ** | WVEC Television, LLC | 35137 |
| WYSJ-CD[147] | Yorktown, VA | ** | WVEC Television, LLC | 35134 |
| WWL-TV | New Orleans, LA | 0000186352 | WWL-TV, Inc. | 74192 |

**Texas Stations to Be Acquired by CMG**

| Call Sign | Community of License | Application File Nos. | Licensee | Facility ID |
|---|---|---|---|---|
| KHOU(TV) | Houston, TX | 0000186461 | KHOU-TV, Inc. | 34529 |
| KTBU(TV) | Conroe, TX | 0000186460 | KHOU-TV, Inc. | 28324 |
| KMPX(TV) | Decatur, TX | 0000186462 | WFAA-TV, Inc. | 73701 |
| KVUE(TV) | Austin, TX | 0000186458 | KVUE Television, Inc. | 35867 |

**Community News Media Transfers**

| Call Sign | Community of License | Application File Nos. | Licensee | Facility ID |
|---|---|---|---|---|
| KLKN(TV) | Lincoln, NE | 0000186354 | KLKN Lincoln License LLC | 11264 |

---

[146] Currently in the process of being acquired by TEGNA licensee WVEC Television, LLC. *See* LMS File No. 0000187978

[147] Currently in the process of being acquired by TEGNA licensee WVEC Television, LLC. *See* LMS File No. 0000187977

**Federal Communications Commission**                                    **DA 23-149**

| | | | | |
|---|---|---|---|---|
| WLNE-TV | New Bedford, MA | 0000186357 | WLNE Providence License LLC | 22591 |
| WDKA(TV) | Paducah, KY | 0000186361 | Paducah Television License LLC | 39561 |
| KBSI(TV) | Cape Girardeau, MO | 0000186360 | Paducah Television License LLC | 19593 |

**WFXT Sale**

| Call Sign | Community of License | Application File Nos. | Licensee | Facility ID |
|---|---|---|---|---|
| WFXT(TV) | Boston, MA | 0000186353 | Teton Opco Corp. | 6463 |