# EXHIBIT 3

**Case No. 24-1204**

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Applications to Transfer Control of | ) | MB Docket No. 22-162 |
| TEGNA Inc. to Standard General, L.P. | ) | |
| | ) | |

## COMMENTS OF ALTICE USA, INC.

Altice USA, Inc. ("Altice") hereby briefly comments on applications to transfer TEGNA Inc. ("TEGNA") to Standard General L.P. ("Standard General"), a transaction to be financed by CMG Media Corporation ("Cox") and its owner Apollo Global Management, Inc. ("Apollo").[1] Altice incorporates the comments of the American Television Alliance, of which it is a member. We write separately, however, to address one additional issue. Applicants may be engineering this transaction to raise retransmission consent prices through a complicated deployment of so-called "after-acquired" and/or "divested" station clauses. The Commission should require Applicants to better explain the complicated structure of the proposed transaction and what role after-acquired and divested station clauses play in it. Ultimately, it should not permit Applicants to raise retransmission consent prices through financial engineering and should condition any approval accordingly.

By way of background, many retransmission consent agreements contain "after-acquired station clauses." These differ—and sometimes differ greatly—depending on the contract. The gist, however, is that, typically, where one station buys another, the acquiring station gets to replace

---

[1] Public Notice, *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA, Inc. to Standard General, L.P. and Permit-But-Disclose Ex Parte Status for the Proceeding*, DA No. 22-443, MB Docket No. 22-162 (rel. Apr. 21, 2022) ("*Notice*").

EXHIBIT 3 - Page 001

the *acquired* station's retransmission consent agreements with its own, at least with MVPDs that were parties to agreements with both stations. So, if the acquiring station's retransmission consent agreement with Altice has higher rates than did the selling station's agreement, Altice automatically pays more in fees for the acquired station upon consummation of the transaction. Less commonly, if the acquiring station's retransmission consent with Altice has *lower* rates than did the selling station's agreement, Altice automatically pays less. Similarly, many retransmission consent agreements contain "divested station clauses." These also differ depending on the contract but generally reflect one of two variations: where a station is sold, (1) the retransmission consent agreement applicable to the station prior to the sale continues to apply, or (2) the retransmission consent agreement applicable to the station prior to the sale ceases to apply.

MVPDs have suggested that automatic price increases due to after-acquired station clauses should be considered a "harm" of a proposed transaction, to be weighed against alleged benefits.[2] We agree with this view. To date, however, the Commission has not endorsed it.[3]

Here, however, there may be more going on than a straightforward application of a contractual provision. Others have already pointed out the exceedingly complicated nature of this transaction, the reasons for which Applicants have yet to explain. Applicants list four steps of the transaction. Simplifying greatly, here is how Applicants describe the steps.[4]

---

[2]   *See, e.g.*, Letter from Ross Lieberman to Marlene Dortch, MB Docket No. 16-57 (filed Nov. 25, 2016) (arguing that in the context of Nexstar-Media General transaction: "[A]fter-acquired station clauses thus permit Nexstar to acquire stations in new markets and replace lower retransmission consent rates and less onerous terms and conditions an MVPD had previously negotiated in good faith with the station's owner prior to its acquisition with Nexstar's own much higher rates and more onerous terms and conditions. . . . As a direct result of the merger, MVPDs who have retransmission consent agreements with Media General, and who have been forced to accept after-acquired station clauses in their retransmission consent agreements with Nexstar, will see the retransmission consent fees they are paying for former Media General stations increase from between 11 percent to 125 percent as rates automatically reset at Nexstar agreement levels over the remaining life of the agreements.")

[3]   *Trib. Media Co. and Nexstar Media Grp., Inc.*, 34 FCC Rcd. 8436, ¶ 59 (2019)

[4]   Amended Comprehensive Exhibit, File No. 0000186355, at 3–5 (filed April 1, 2022) ("Comprehensive Exhibit").

EXHIBIT 3 - Page 002

1. Standard General sells all four of its stations to Cox.
2. Cox sells "Teton", the intermediate parent corporation of single Cox station—its Boston Fox affiliate—to Standard General.
3. TEGNA merges into a subsidiary of Teton, creating New-TEGNA, which will then be controlled by Standard General *through* the Teton subsidiary.
4. New TEGNA sells four of its Texas stations to Cox.

At the end of the transaction, Standard General controls Teton, which owns New TEGNA.

Why would Applicants go through this many hoops? Again, we do not know. One possibility, however, is that they seek to apply *Cox* retransmission consent rates to *New TEGNA* stations—even though Cox isn't buying TEGNA. The argument might be that, technically, Cox's former Boston *station* is buying TEGNA. That is, Cox's former station—which is party to Cox's retransmission consent agreements—is "acquiring" 97 TEGNA stations, so the Cox retransmission consent agreement will "flow through" to all of New TEGNA. So, even though Cox itself hasn't "acquired" TEGNA stations, those 97 stations will be priced as if it had. Also, through steps 1 and 4 above, Cox's retransmission consent rates would be applied to the stations that Standard General and Tegna are transferring to Cox.

There may, of course, be legitimate business reasons for Applicants to have engaged in such a complicated transaction. It seems at least plausible, however, that Applicants have designed their entire transaction to raise consumer rates by artificially architecting the structure to apply agreement(s) with the highest rates. Indeed, it is not unreasonable to speculate that Applicants have entered into this transaction primarily to accomplish these price increases. As a group of

EXHIBIT 3 - Page 003

public interest groups have pointed out, this has become part of private equity firm Apollo's playbook.[5]

We understand that, typically, after-acquired and divested station clauses are negotiated between the parties and the Commission will not interfere with them.  These, however, are not "typical" circumstances.  If our concerns are correct, Applicants have structured this entire transaction around these clauses, in an effort to increase prices for stations that are not being acquired by the party that set the higher rates, *without negotiating* for such increases.  This harms the MVPDs that must pay higher retransmission consent fees, and ultimately hurts consumers, who will likely see higher bills as a result.

If this indeed is what Applicants are trying to do, the Commission should not permit it.  It should, first of all, require Applicants to describe fully the relationship between the transaction's structure and retransmission consent pricing.  The Commission should then condition grant of the Application on Applicants' not enforcing any contractual clauses purporting to raise retransmission consent rates prices, both for the Texas stations actually acquired by Cox and for the TEGNA stations *not* acquired by Cox.

\*       \*       \*

For the reasons discussed above, the Commission should closely examine the structure of the proposed transaction as it relates to after-acquired and divested station clauses.  It should not allow the parties to engineer the transaction to raise prices, especially for stations that are not, in fact, being "acquired."

---

[5] Motion of the Public Interest Parties for Additional Information and Documents and an Extension of Time, MB Docket No. 22-162, at 3 (filed May 12, 2022) (describing the Transaction's "incredibly complex choreography").

EXHIBIT 3 - Page 004

        Respectfully submitted,

        /s/ Cristina Chou

        Cristina Chou
        Vice President, Federal Affairs
        Altice USA, Inc.
        1600 K Street, NW
        Suite 803
        Washington, DC  20006
        (202) 684-5574
        Cristina.chou@alticeusa.com

June 22, 2022

EXHIBIT 3 - Page 005

## CERTIFICATE OF SERVICE

      I, Cristina Chou, hereby certify that on June 22, 2022, I caused true and correct copies of the foregoing to be served by first-class mail upon the following:

Michael Beder, Esq.
Associate General Counsel
TEGNA Inc.
8350 Broad Street, Suite 2000
Tysons, VA 22102
+1 (703) 873-6902
mbeder@tegna.com

Jennifer A Johnson
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
United States
+1 (202) 662-5552
jjohnson@cov.com

Scott R. Flick
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW
Washington, DC 20036
+1 (202) 663-8167
scott.flick@pillsburylaw.com

                                                            /s/ Cristina Chou

                                                            Cristina Chou

EXHIBIT 3 - Page 006