# EXHIBIT 4

**Case No. 24-1204**

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | |
|---|---|
| In the Matter of<br><br>Applications to Transfer Control of<br>TEGNA Inc. to Standard General, L.P. | MB Docket No. 22-162 |

**COMMENTS OF THE AMERICAN TELEVISION ALLIANCE**

Mike Chappell
THE AMERICAN
 TELEVISION ALLIANCE
1155 F Street, N.W.
Suite 950
Washington, DC 20004
(202) 333-8667

Michael Nilsson
Kristine Laudadio Devine
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W.
The Eighth Floor
Washington, DC 20036
(202) 730-1300
*Counsel for the*
 *American Television Alliance*

June 22, 2022

EXHIBIT 4 - Page 001

## SUMMARY

In this transaction, Apollo seeks to finance Standard General's acquisition of TEGNA. In exchange for nearly $680 million in loans, Apollo and its broadcast subsidiary Cox will receive roughly 25 percent of New TEGNA's equity. Applicants thus propose to link two of the largest broadcast groups—and two of the most aggressive seekers of high retransmission consent fees, which ultimately get passed to consumers.

Applicants claim, however, that Cox will not hold an "attributable interest" in New TEGNA under the Commission's rules because it (and Apollo) will hold only non-voting shares. This claim sets the bounds for the Commission's review of the transaction. If Cox *does* hold an attributable interest in New TEGNA, then the transaction cannot proceed because it would create new duopolies in six markets (four if Cox divests two stations in an unrelated transaction), including control or operation of all four major networks in Jacksonville. It would also raise questions under the Commission's national ownership cap, especially if the Commission once again repeals the UHF Discount. On the other hand, if Cox *does not* hold an attributable interest in New TEGNA, then the parties may neither jointly negotiate retransmission consent in markets where they both hold stations nor share information about such negotiations.

With this in mind, the Commission should do three things. First, it should closely examine Applicants' claims of non-attribution by seeking documentation of all arrangements between the parties—not just those Applicants have unilaterally chosen to deem "germane." For example, Applicants initially chose not to share with the Commission or the public most of the schedules and appendices of their transaction documents, including ones dealing with programming distribution and MVPDs. They also initially failed to disclose what other arrangements—written or otherwise—might exist that the parties think irrelevant for one reason

i

EXHIBIT 4 - Page 002

or another.  We continue to review non-public documents submitted last week in response to the Commission's information request, and may provide additional comments at a later date.  In light of recent broadcaster behavior (Sinclair and Nexstar arguably misleading the Commission about the nature of "non-attributable" relationships) and possible discrepancies in the application (equity/debt plus numbers that do not match public accounts of the transaction), the Commission cannot leave unexamined Applicants' claims of non-attribution.  Understanding the nature of the post-transaction relationship between Cox and New TEGNA is critical to evaluating the impact of this transaction, and the Commission should require Applicants to disclose all information regarding the relationship between the parties.

Second, the Commission should put teeth into enforcement of the joint-negotiation prohibition applicable to Cox and New TEGNA.  This transaction would intertwine the two broadcasters economically, increasing both the incentives for and the ability of the parties to collude—notwithstanding Applicants' narrowly-drafted assurances to the contrary.  The Commission should take the approach it used the last time it faced heightened joint negotiation concerns with Sinclair, using language from the consent decree imposed in that case.  Here, however, this enhanced enforcement should be tailored in light of the circumstances presented by Cox and New TEGNA, each of which is a large station group.

Our proposal would, among other things, prohibit Cox and New TEGNA from sharing information with one another related to retransmission consent deals involving *any* of their stations, not just those in overlapping markets (which the parties have already acknowledged is impermissible).  Such a formulation is necessary with respect to this transaction.  Cox and TEGNA, like most broadcasters, negotiate retransmission consent agreements that cover all markets in which an MVPD carries their respective stations.  Under these circumstances, any

EXHIBIT 4 - Page 003

communication between Cox and New TEGNA with respect to retransmission consent is in effect a communication between or among stations serving the same DMA.  This transaction, moreover, gives Cox a nearly 25 percent share in New TEGNA, greatly heightening the parties' incentive and ability to coordinate, especially in this particular manner—notwithstanding the parties' claims to the contrary.  And each of Cox and New TEGNA will control major network stations in at least four local markets, including all such stations in Jacksonville.  Both Congress and the Commission have explicitly recognized that allowing top-four stations in the same market to engage in joint retransmission consent negotiations creates an unacceptable level of market power that raises price for consumers.

In sum, the Commission must first scrutinize the parties' claim that the proposed transaction will not give Cox an attributable interest in New Tegna.  If the Commission is able to confirm that claim, it must then ensure that the parties' new relationship does not enable improper conduct.  Because of both the significant threat to competition posed by collusion between top-four broadcasters in the same market, and in light of the new incentives and opportunities for collusion created by Cox's significant ownership interest in New TEGNA, adopting the protections we propose in these comments is the only way in which the Commission can effectively enforce its joint-negotiation prohibition with respect to these applicants.

iii

EXHIBIT 4 - Page 004

## TABLE OF CONTENTS

I.     Background. ................................................................................................................ 2

II.    Whether Cox's Interest Is or Is Not Attributable to New TEGNA Will Lead to
       Different Outcomes for This Transaction. ............................................................ 5

III.   The Commission Should Request Additional Information to Validate Applicants'
       Non-Attribution Claims. ....................................................................................... 7

IV.    The Commission Should Enforce the Prohibition Against Joint Negotiation Using
       Language From the Sinclair Consent Decree. ................................................... 11

EXHIBIT 4 - Page 005

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC  20554**

| | |
|---|---|
| In the Matter of | |
| Applications to Transfer Control of<br>TEGNA Inc. to Standard General, L.P. | MB Docket No. 22-162 |

### COMMENTS OF THE AMERICAN TELEVISION ALLIANCE

The American Television Alliance ("ATVA") hereby comments on the applications to transfer control of TEGNA Inc. ("TEGNA") to Standard General L.P. ("Standard General").[1] CMG Media Corporation ("Cox") and its owner Apollo Global Management, Inc. ("Apollo"), will finance this transaction in exchange for non-voting equity.[2]  This will intertwine two of the nation's largest broadcast station groups, raising concerns about the ability of the parties to coordinate activities and share information regarding retransmission consent.

As discussed further below, the Commission should address these concerns as follows:

- First, it should test Applicants' claims that Cox will not be attributable to post-transaction TEGNA ("New TEGNA") by requiring the parties to disclose all arrangements among the interested parties, not just those Applicants have unilaterally chosen to characterize as "germane" to the transaction.

- Assuming the Commission can confirm non-attribution for Cox, it should then use the approach it took in the Sinclair consent decree to enforce the existing prohibition on jointly negotiating retransmission consent by unaffiliated broadcasters (here, Cox and New TEGNA), particularly through collusive practices.

---

[1]  Public Notice, *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of TEGNA, Inc. to Standard General, L.P. and Permit-But-Disclose Ex Parte Status for the Proceeding*, DA No. 22-443, MB Docket No. 22-162 (rel. Apr. 21, 2022) ("*Notice*").

[2]  *Terrier Media Buyer, Inc.*, 34 FCC Rcd. 10544, ¶¶ 14–15 (Med. Bur. 2019).

EXHIBIT 4 - Page 006

## I.    BACKGROUND.

In this transaction, Cox and Apollo propose to finance Standard General's acquisition of

TEGNA.  Today, the parties own television stations as follows[3]:

- Standard General owns four full power television stations.

- TEGNA owns 64 full power television stations.  This includes four television stations in
  Texas.  It also includes affiliates of the "Big Four" networks in Jacksonville (NBC and
  ABC), Atlanta (NBC), Charlotte (NBC), Memphis (ABC), Seattle (ABC), and Spokane
  (CBS).

- Cox owns 23 full power television stations.  This includes Big-Four affiliates in
  Jacksonville (FOX), Atlanta (ABC), Memphis (FOX), Charlotte (ABC), Seattle (CBS),
  and Spokane (FOX).  Cox also operates a Jacksonville Big-Four affiliate (CBS) pursuant
  to a "broadcast services agreement"[4] and lists this station as one of its own "brands" on
  its website.[5]  Cox apparently does not, however, negotiate retransmission consent on
  behalf of this station.

Reduced to its essence, this transaction involves the following steps (in no particular

order[6]):

---

[3]    We take these figures from the Comprehensive Exhibit.  There appears to be a discrepancy in the Cox
       figures.  Applicants state that, after the transaction, Cox will have 31 stations.  Amended
       Comprehensive Exhibit, File No. 0000186355, at 3 (filed April 1, 2022) ("Comprehensive Exhibit").
       By our count, however, Cox starts with 23 stations, loses one (Boston FOX), and gains eight, for a
       total of 30 stations.

[4]    WJAX-TV, *Shared Service Agreements*, FCC Public Inspection File, https://publicfiles.fcc.gov/tv-
       profile/WJAX-TV/Shared%20Service%20Agreements/07d95d66-6855-f59f-82e8-d3967c53f6d4.

[5]    *Our Brands,* Cox Media Group, https://www.cmg.com/brands/.

[6]    Applicants describe the steps "in the order they will occur," Comprehensive Exhibit at 1, but also
       suggest that they will occur simultaneously.  *Id.* at 5 n.13.

2

EXHIBIT 4 - Page 007

- Standard General will transfer all four of its stations to Cox.[7]

- TEGNA will transfer four Texas stations to Cox.[8]

- Cox will transfer its Boston station to TEGNA.

- Standard General (less its four stations) will acquire TEGNA (less the four Texas stations, but including the former Cox Boston station), forming New TEGNA.

---

[7]   The parties claim that the proposed transaction would result in New TEGNA having a national audience reach of 28.46% of U.S. television households if one includes the UHF discount, an ownership share in compliance with the national cap.

[8]   This appears to have a wrinkle.  TEGNA is selling its Houston DMA Estrella affiliate (KMPX) to Cox. TEGNA is not selling its Houston ABC affiliate (WFAA) to Cox.  But it appears to be transferring the ABC affiliation, the primary stream, the right to use the "WFAA" call letters, and the right to use virtual Channel 8.  *See* Amended and Restated Dallas Houston APA, File No. 0000186355, § 1.5(r) (filed April 1, 2022) ("Teton-CMG APA"); *id.* § 4.18.  We do not understand why Applicants would engage in such a complex series of transactions rather than simply selling TEGNA's Houston ABC affiliate to Cox.

3

EXHIBIT 4 - Page 008

**Figure 1:  Simplified Chart of Proposed Transaction**



\* Operated by COX pursuant to sharing agreement.

Cox/Apollo will help finance the transaction, providing roughly $680 million in loans, according to press reports.[9]  In exchange, it will obtain roughly 25 percent of New TEGNA's equity.[10]  Cox/Apollo's equity in New TEGNA, however, will take the form of preferred, *non-*

---

[9]  Josh Kosman, *Soo Kim's Standard General Partners With Apollo to Buy Tegna for $8.6B,* New York Post (Feb. 22, 2022), https://nypost.com/2022/02/22/soo-kims-standard-general-partners-with-apollo-to-buy-tegna-tv/ ("Apollo is loaning $450 million in junior debt at a 14 percent interest rate to fund the TEGNA buyout that rises over time.  The private equity firm is also providing another $230 million more senior loan at a lower rate, a source said.").

[10]  Specifically, CMG Newco 2 will hold approximately 11.26% of New TEGNA's equity, and Fund IX – Teton will hold approximately 13.05%.  Amended Petition for Declaratory Ruling, File No.

4

EXHIBIT 4 - Page 009

*voting* securities with certain minority investor protections.[11]  Thus, Applicants argue, neither

Cox nor Apollo will hold an attributable interest in New TEGNA.[12]

## II.    WHETHER COX'S INTEREST IS OR IS NOT ATTRIBUTABLE TO NEW TEGNA WILL LEAD TO DIFFERENT OUTCOMES FOR THIS TRANSACTION.

A threshold issue in this transaction is Applicants' claims regarding attribution.  If Cox

were attributable to New TEGNA, the proposed transaction would violate the local television

ownership rule.[13]  In such circumstances, the transaction would result in new top-four

combinations in six markets and would place the combined entity in charge of all four major

networks in Jacksonville (if one includes Cox's "sidecar" CBS affiliate, which Cox itself appears

to do).

| City | Cox | TEGNA |
|------|-----|-------|
| Atlanta | ABC | NBC |
| Charlotte | ABC | NBC |
| Jacksonville | CBS*[14] FOX | ABC[15] NBC |
| Seattle | CBS | NBC |
| Memphis | FOX | ABC |
| Spokane | FOX | CBS |

---

0000186355, at 13–14 (filed April 1, 2022) ("Pet. Decl. R.").  Each of these funds is "associated with" Apollo.

[11]   Comprehensive Exhibit at 4

[12]   *Id.*

[13]   The Local Television Ownership Rule allows an entity to own two television stations licensed in the same Designated Market Area (DMA) if: (1) the digital noise limited service contours of the stations (as determined by § 73.622(e) of the Commission's rules) do not overlap; or (2) at the time the application to acquire or construct the station(s) is filed, at least one of the stations is not ranked among the top-four stations in the DMA, based on the most recent all-day (9 a.m.-midnight) audience share, as measured by Nielsen Media Research or by any comparable professional, accepted audience ratings service.  47 C.F.R. § 73.3555(b)(1).

[14]   Operated by Cox under a broadcast services agreement.

[15]   WJXX (ABC) in Jacksonville is not one of the top-four ranked stations in Jacksonville.

EXHIBIT 4 - Page 010

Cox, however, intends to sell its Memphis and Spokane stations to Imagicomm, an affiliate of the INSP cable network, in a separate transaction pending before the Commission.[16] If approved, this would leave potential duopolies in Atlanta, Charlotte, and Seattle and a quadropoly in Jacksonville—again, if Cox were attributable to New TEGNA.

Were Cox attributable to New TEGNA, moreover, the proposed transaction would also require considerable analysis under the National Television Ownership Rule's 39 percent cap.[17] The parties report that New TEGNA would serve 28.46 percent of U.S. television households when the UHF discount is factored in, and that Cox would have a national audience reach of 10.43 percent of such households with the UHF discount.[18] Combined, this equals 38.89 percent (just under the cap). But this does not account for the Imagicomm sale, which would reduce Cox's national audience reach to 8.67 percent (according to Cox),[19] leaving a combined 37.13 percent. Nor does it account for the overlap among New TEGNA and Cox stations. As Applicants themselves seem to recognize, if the FCC were to eliminate the UHF Discount once again, this analysis would change dramatically.[20] The Commission should, in any event, apply to *this* transaction any rules it may adopt in *that* proceeding.

---

[16] *See* Application for Assignment of Authorization, File No. 0000189171 (filed Apr. 8, 2022), https://enterpriseefiling.fcc.gov/dataentry/views/public/assignmentDraftCopy?displayType=html&appKey=25076ff37fc69b3c017fe18c70e732aa&id=25076ff37fc69b3c017fe18c70e732aa&goBack=N.

[17] The National Television Ownership Rule prohibits a single entity from owning television stations that, in the aggregate, reach more than 39% of the total television households in the United States after taking into account the 50% discount applied to UHF stations. 47 C.F.R. § 73.3555(e).

[18] We have not independently verified Applicants' national cap calculations.

[19] Comprehensive Exhibit at 3 n.6.

[20] Applicants state that, without the UHF Discount, New TEGNA would have a national audience reach of 38.46%, while Cox would have a national audience reach of 14.972%. Comprehensive Exhibit at 13–14 nn.22–23.

EXHIBIT 4 - Page 011

On the other hand, if Applicants are correct and Cox is *not* attributable to New TEGNA, then Cox and New TEGNA by rule cannot jointly negotiate for retransmission consent in the markets in which they would overlap—including in markets involving combinations of top-four and non top-four rated stations.[21]  This prohibition was "crafted broadly enough to target collusive behavior effectively," such as "where broadcasters communicate with each other and follow a collective course of action that maximizes their joint profits, but where the arrangement is not enforceable through a legally binding agreement."[22]  It thus includes "any informal, formal, tacit or other agreement and/or conduct that signals or is designed to facilitate collusion regarding retransmission terms or agreements between or among . . . broadcast television stations that are not commonly owned and that serve the same DMA."[23]

## III.    THE COMMISSION SHOULD REQUEST ADDITIONAL INFORMATION TO VALIDATE APPLICANTS' NON-ATTRIBUTION CLAIMS.

The first task before the Commission, then, is to test Applicants' claim that Cox is not attributable to New TEGNA.  We note at the outset that the transaction documents themselves

---

[21]  *See* 47 C.F.R. § 76.65(b)(1)(viii) (prohibiting "Coordination of negotiations or negotiation on a joint basis by two or more television broadcast stations in the same local market to grant retransmission consent to a multichannel video programming distributor, unless such stations are directly or indirectly under common de jure control permitted under the regulations of the Commission").

[22]  *Amendment of the Commission's Rules Related to Retransmission Consent*, 29 FCC Rcd. 3351, ¶ 27 (2014) ("*Joint Negotiation Order*").

[23]  *Id.* The Commission replaced its original joint negotiation rules after Congress enacted its own version of the rule in STELAR, which is not limited to top-four combinations. 47 C.F.R. § 76.65(b)(1)(viii) (prohibiting joint negotiation among non-common broadcasters within a single local market). The Commission described the new version as "broader than, and thus supersed[ing], the Commission's [then-] existing prohibition.*"  Implementation of Sections 101, 103 and 105 of the STELA Reauthorization Act of 2014*, 30 FCC Rcd. 2380, ¶ 4 (2015). We thus understand the new rule to encompass the prior rule's prohibition on covert collaboration.

EXHIBIT 4 - Page 012

treat Cox as an "affiliate" of New TEGNA.[24]  On the other hand, it is also true that non-voting securities typically do not "count" for media-ownership attribution purposes.

This, however, is not the end of the story.  The Attribution Rules are designed "to identify those interests in or relationships to licensees that confer . . . a degree of influence or control such that the holders have a realistic potential to affect the programming decisions of licensees or other core operating functions."[25]  And yet, as has become standard in broadcast transactions, Applicants declined to describe their "interests in or relationships to" one another in their initial application.  Here, Applicants excluded essentially all exhibits and schedules to their documents.  This, Applicants claim, is because these documents contain proprietary information, duplicate information, or materials that Applicants assert "are not germane to the Commission's consideration of this application."[26]  These excluded materials address, among other things, "MVPD Matters" (in the Merger Agreement), "FCC and Programming Distribution Matters" (in the Contribution Agreement), and the "Conduct of Business" (in the Contribution Agreement).  In addition, while the Commission directs Applicants to include all written and unwritten arrangements "between the transferor and the transferee,"[27] we already know that Applicants have withheld certain arrangements as "non-germane" and have no way of knowing if other such arrangements exist.  Last week, Applicants provided additional confidential documents in

---

[24]  Comprehensive Exhibit at Exhibit F: Minority Investor Protections, Series A ¶ (j) (prohibiting New TEGNA's parent from entering into transactions with affiliates "treating CMG Holdings, Inc. and its subsidiaries as affiliates").

[25]  *Review of the Commission's Regulations Governing Attribution of Broadcast and Cable/MDS Interests*, 14 FCC Rcd. 12559, ¶ 1 (1999).

[26]  Comprehensive Exhibit at 11.

[27]  *See* FCC Form 315, Worksheet #2.

EXHIBIT 4 - Page 013

response to an information request from the Commission.  ATVA's outside counsel continue to review these documents, and may have additional comment at a later date.

It is particularly important here for the Commission to ensure that, subject to appropriate protective orders, it and the public have access to *all* arrangements and understandings among the parties—written or unwritten, formal or informal, nominally related to the transaction or not. This, first of all, is because of the sheer complexity of the transaction and the number of moving parts it involves.  This complexity makes it especially difficult for the Commission and the public to evaluate Applicants' claims.  To take one example, Applicants assert that Cox will hold only 1.86 percent of the combined equity and debt of New TEGNA, and entities otherwise affiliated with Apollo will separately hold only 2.16 percent.[28]  Yet Applicants state that Cox and Apollo will hold roughly 25 percent of New TEGNA's equity, and press reports indicate that these entities will hold 8.5 percent of New TEGNA's debt.[29]

Perhaps more importantly, the history of recent broadcast transactions is littered with attempts by applicants to conceal interactions among nominally non-attributed broadcasters. Two of the largest broadcast mergers in recent years involved Sinclair's failed attempt to purchase Tribune and Nexstar's successful purchase of Tribune.  In the first, Sinclair claimed that it would divest stations to non-attributable parties to avoid local and national ownership concerns.  Yet Tribune later described Sinclair's "divestitures" as follows:

> Sinclair would effectively control all aspects of station operations, including advertising sales and the negotiation of retransmission agreements with cable and satellite operators.[30]  Under these proposed arrangements, Sinclair would continue

---

[28]  Comprehensive Exhibit at 4 n.12.

[29]  *See* note 9, above.

[30]  Verified Complaint ¶ 18, *Tribune Media Co. v. Sinclair Broad. Grp., Inc.*, Hearing Designation Order, No. 2018-0593 (Del. Ch. Aug. 9, 2018); *see also id.* ¶ 105.

EXHIBIT 4 - Page 014

to reap the lion's share of the economic benefits of the stations it was purportedly "divesting" and would have an option to repurchase the stations in the future.[31]

The Commission, for its part, found "significant questions as to whether those proposed divestitures were in fact 'sham' transactions."[32]

Nexstar, too, claimed that it would divest Tribune stations to address ownership concerns. It even told the Commission that "Nexstar will not be providing ongoing services under sharing agreements . . . to any of the stations that it is divesting" and "no JSA, LMA or SSA is being assumed by Nexstar in the Transaction,"[33] which the Commission found rendered "moot" requests for a condition prohibiting future sharing arrangements.[34]  Once it received Commission approval to purchase Tribune, however, Nexstar (1) received a purchase option to acquire WPIX (one of the divested stations); (2) assigned that purchase option to Mission Broadcasting; and (3) entered into a variety of agreements with Mission giving Nexstar the rights to supply all of WPIX's programming, to sell all of WPIX's advertising time, and to receive 100 percent of WPIX's revenues.[35]  Nexstar then used this control over WPIX to demand higher retransmission

---

[31] *Id.* ¶ 18.

[32] *Tribune Media Co. and Sinclair Broad. Grp., Inc.*, 33 FCC Rcd. 6830, ¶ 2 (2018); *see id.* ¶ 3 (finding "substantial and material questions of fact exist regarding whether:  (1) Sinclair was the real party in interest to the sale of WGN-TV, KDAF (a Dallas station), and KIAH (a Houston station); (2) if so, whether Sinclair engaged in misrepresentation and/or lack of candor in its applications with the Commission; and (3) whether consummation of the overall transaction would be in the public interest, including whether it would comply with Section 73.3555 of the Commission's rules, the broadcast ownership rules").

[33] Consolidated Opposition of Nexstar and Tribune, MB Docket No. 19-30, at 20 (filed Apr. 2, 2019).

[34] *Tribune Media Company and Nexstar Media Group, Inc.* 34 FCC Rcd. 8436, ¶ 13 n.65 (2019).

[35] *Petition for Declaratory Ruling that Nexstar Media Group, Inc.'s Relationship with WPIX-TV Violates 47 C.F.R. § 73.3555(e) and the Nexstar/Tribune Order*, (filed July 1, 2021) ("Comcast PDR"), *available at* https://ecfsapi.fcc.gov/file/10702278919219/2021.07.01%20AS-FILED%20PUBLIC%20WPIX%20Petition%20for%20Declaratory%20Ruling.pdf.  Informal Complaint of Spectrum Management Holding Company, LLC Against Nexstar Media Group Inc. for Violation of the Commission's Media Ownership Rules and Nexstar/Tribune Order (filed Apr. 12, 2022) (on file with author).

EXHIBIT 4 - Page 015

consent rates from Comcast and Charter, as reflected in Nexstar's retransmission consent agreements with those two MVPDs.[36]

Neither Sinclair nor Nexstar is a party to this application, of course. Given this history, however, it would be unreasonable for the Commission to simply accept non-attribution claims at face value rather than seeking additional information to evaluate such claims. The Commission can no longer—if it ever could—rely on broadcast applicants' bare assertions about what arrangements among the parties are or are not germane to this proceeding.

## IV.   THE COMMISSION SHOULD ENFORCE THE PROHIBITION AGAINST JOINT NEGOTIATION USING LANGUAGE FROM THE SINCLAIR CONSENT DECREE.

Assuming that Cox would hold no attributable interest in New TEGNA, the parties may not, either by agreement or covert collaboration, negotiate retransmission consent jointly in markets in which they overlap. Indeed, the parties acknowledge that retransmission consent coordination between New TEGNA and Cox in overlapping markets after the transaction closes "would . . . violate the Commission's rule against joint negotiation of retransmission consent by non-commonly owned stations in the same market," and assert that neither Standard General nor Apollo will violate that rule.[37] As the Commission has found previously, however, the existence of these prohibitions alone have not been sufficient to prevent parties from violating the rules,[38] a history the parties do not acknowledge.

---

[36]   *Id.*

[37]   Applicants' Response to Requests for Documents and Information, MB Docket No. 22-162, at 2 (filed June 13, 2022) ("June 13 Response").

[38]   *Sinclair Broad. Grp.*, Order, 31 FCC Rcd. 8576 (Med. Bur. 2016); *Sinclair Broad. Grp.,* Consent Decree (joint negotiation and coordination); *Sinclair Broad. Grp.,* Consent Decree, 35 FCC Rcd. 5877, ¶ 9 (2020) (Sinclair informed the Media Bureau under prior consent decree, that it had access to certain retransmission consent agreements executed by certain Non-Sinclair Stations.).

EXHIBIT 4 - Page 016

This transaction creates a new corporate structure in which Cox/Apollo will hold nearly 25 percent of New TEGNA's equity.  This cannot help but create new incentives for "maximiz[ing] their joint profits" through collusion,[39] as Cox and Apollo will receive at least some of the gains New TEGNA might accrue from any covert collaboration, notwithstanding Applicants' claim to the contrary.  Applicants state the non-voting securities that Cox and Apollo will hold will "carry a fixed rate of return" and will not permit Cox and Apollo to "realize any additional economic benefits from improved financial performance of [New] TEGNA."[40]  This, however, is not entirely correct.  *Dividends* are fixed.[41]  And the redemption value of the shares is fixed.[42]  But that does not mean the value of the non-voting securities is fixed in all circumstances.  Indeed, Apollo and Cox have the explicit right to transfer the securities under certain conditions[43] and nothing restricts them from receiving "additional economic benefits"[44] if they transfer the securities of a higher-performing New TEGNA.  The transfer provisions appear to expressly contemplate that a transferor of the non-voting shares would receive a premium over the redemption value by prohibiting a transfer where the redemption value of the shares is below

---

[39]  *Joint Negotiation Order* ¶ 27.

[40]  Comprehensive Exhibit at 4 nn.10, 12.

[41]  *See* Contribution, Exchange and Merger Agreement Exhibit B, File No. 0000186355, § 5 (filed April 1, 2022) ("Series A Terms"); Contribution, Exchange and Merger Agreement Exhibit C, File No. 0000186355, § 4 (filed April 1, 2022) ("Series B Terms").

[42]  *See* Series A Terms § 6; Series B Terms § 5.

[43]  Series A Terms § 12(a) (permitting Apollo and affiliates to transfer up to 80% of its non-voting stock); Series B Terms § 10 (permitting all holders to transfer non-voting stock subject to a minimum value).  Cox also has the ability to engage in a "forced exist" of the Series A Securities starting ten years after the closing Date.  Series A Terms § 8.

[44]  Indeed, the contrast between Applicants' unequivocal statements in the Comprehensive Exhibit and the more nuanced picture painted by the transaction documents themselves illustrates why it is so important for the Commission and the Public to review all arrangements among the parties. Comprehensive Exhibit at 4 nn.10, 12.

EXHIBIT 4 - Page 017

a certain amount.[45]  And, of course, to the extent collusion helps Cox achieve higher

retransmission consent rates, Cox will enjoy the benefit of such higher prices.

The transaction will also create increased opportunities for collusion, as the two

putatively independent concerns manage their joint business—even if Cox has no voting shares

in New TEGNA.  Here, again, Applicant's assertions to the contrary provide little comfort.  The

terms and conditions associated with the Series A and Series B Preferred Securities provide

Apollo and Cox with "customary information rights" and "customary inspection rights."[46]  In

addition, the Asset Purchase Agreement between New TEGNA's Parent and Cox provides for

access to information between the parties, including access to "books" and "records" in order to

"determine any matter" regarding rights and obligations under the contract or to satisfy

"financial reporting" obligations.[47]  Parties receiving this information are required to hold it in

confidence, but the provision does not restrict the information sharing in the first place.[48]

Applicants now say that these rights will not extend to New TEGNA's retransmission

consent agreements.[49]  These, however, are merely information-sharing *rights* owed to the holder

of the Series A and Series B Preferred Securities under the various agreements.  Even if New

TEGNA and Cox were to determine these provisions did not *require* sharing information

regarding retransmission consent deals, at least with respect to the Series B Preferred Securities,

nothing in these agreements would stop the parties from doing so, using the structures created in

the agreements or otherwise.  Holders of Series B Preferred Securities "will not be *entitled* to

---

[45]    Series A Terms § 12; Series B Terms § 10.

[46]    Series A Terms § 9; Series B Terms § 7.

[47]    Teton-CMG APA § 4.13.

[48]    *Id.*

[49]    June 13 Response at 2 n.1.

13

EXHIBIT 4 - Page 018

any Competitively Sensitive Information of the Preferred Issuer"[50] but New TEGNA is not expressly prohibited from sharing that information.  The Series A terms, on the other hand, do expressly restrict access to competitively sensitive information—but only for employees of Apollo who have specific management rights and duties with respect to CMG.[51]  Indeed, the parties appear to confirm this assessment in their public information response, noting that the preferred securities "do not give either company any *right*" to review competitively sensitive information, without acknowledging that the Series A and Series B Terms do not prohibit sharing of such information.[52]  The parties also assert that the preferred securities "do not give either company any . . . *ability*"[53] to review such information, but this is incomplete.  Nothing in the Series A or Series B Terms would *prevent* either party from sharing information with the other if the parties agreed.[54]

As for Applicants' more general assertions about information sharing in response to the Commission's information request, they are carefully and quite narrowly crafted.  To take just a few examples, Applicants assert that Standard General and Apollo did not consider post-transaction coordination "in negotiating the Transaction."[55]  This, however, does not include coordination other than that negotiated "in the Transaction"—or negotiated *after* the transaction,

---

[50]    Series B Terms § 7 (emphasis added).

[51]    Series A Terms § 9.

[52]    June 13 Response at 2 n.1.

[53]    *Id.* (emphasis added).

[54]    The parties limit their discussion of such information rights to what is set out in the Series A and Series B Terms.  They do not speak to whether any other agreements might provide either one with mutually agreed access to information.

[55]    June 13 Response at 2

14

EXHIBIT 4 - Page 019

as apparently occurred with Nexstar and Tribune.[56]  Likewise, Applicants claim that, other than the Series A and Series B Terms, "there is no other aspect *of the Transaction* that would allow [Apollo] or [Cox] to gain access to Post-Transaction TEGNA's competitively sensitive confidential information."[57]  Again, however, we are not concerned solely about arrangements Applicants unilaterally deem to be "part of the transaction."[58]

Despite Applicants' narrowly drafted assurances, the new corporate structure in this transaction—in particular Cox's significant ownership share in New TEGNA—requires explicit prohibitions and additional Commission vigilance to ensure the prohibition on joint negotiation is enforced.  The Commission might begin by making the Applicants' assurances conditions of the transaction.  In light of the limitations on those assurances, however, we suggest the approach the Commission took with Sinclair, another case in which the Commission determined that additional safeguards were appropriate.  The language below tracks language from the Sinclair consent decree but replaces "Sinclair" with "New TEGNA" and "Non-Sinclair Station" with "Cox Station."  It also makes the prohibitions apply to both New TEGNA and Cox as opposed to only one party (in that case, Sinclair).

***For New TEGNA.***

1. *no New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA may possess, receive, access, accept, or review any retransmission consent agreement to which a Cox Station is a party, or non-public information related to such an agreement;*

---

[56]  *See* Part III, above.

[57]  June 13 Response at 2 (emphasis added).

[58]  Applicants also claim that "[n]either [Standard General] nor [Apollo] will violate [the Commission's rule against joint negotiation]."  *Id.*  On its face, this would not apply to Standard General's and Apollo's broadcast subsidiaries.  Applicants appear, however, to have incorporated definitions from the Commission's information request, in which each such entity is defined to include its subsidiaries. *Id.* at 1.

EXHIBIT 4 - Page 020

2. *no New TEGNA employee or agent may provide a copy of any retransmission consent agreement to which a Cox Station is a party, or non-public information related to such an agreement, to any New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA;*

3. *no New TEGNA employee or agent may provide any retransmission consent agreement, or non-public information related to such an agreement, to any third party unless the third party is a signatory of the agreement in question; and*

4. *information controls shall be established that*

    a. *prevent any New TEGNA employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement to which a Cox Station is a party, or any document containing non-public information related to such an agreement, with any New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA,*

    b. *prevent any New TEGNA employee or agent who is involved in any way in retransmission consent negotiations on behalf of New TEGNA from, intentionally or unintentionally, accessing physical or electronic copies of any retransmission consent agreement to which a Cox Station is a party, or any document containing non-public information related to such an agreement, and*

    c. *prevent any New TEGNA employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement, or any document containing non-public information related to such an agreement, with any third party unless the third party is a signatory of the agreement in question.*

*For purposes of clarity, (i) the foregoing provisions limiting access to Cox Station retransmission consent agreements or non-public information shall not preclude access by New TEGNA employees or agents who are not in any way involved in retransmission consent negotiations on behalf of New TEGNA (who may include accounting personnel and auditors), and (ii) the foregoing provisions limiting the provision of retransmission consent agreements or non-public information to third parties shall not preclude provision of retransmission consent agreements to which New TEGNA is a signatory, or non-public information related to such agreements, to prospective third-party buyers or other third parties conducting audits arising from a New TEGNA retransmission consent agreement who affirm in writing that the information will be used solely in connection with due diligence or such audit purposes, or to other parties as may be specifically approved by the Commission.*

16

EXHIBIT 4 - Page 021

*For Cox*

1.  *no Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox may possess, receive, access, accept, or review any retransmission consent agreement to which a New TEGNA Station is a party, or non-public information related to such an agreement;*

2.  *no Cox employee or agent may provide a copy of any retransmission consent agreement to which a New TEGNA Station is a party, or non-public information related to such an agreement, to Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox;*

3.  *no Cox employee or agent may provide any retransmission consent agreement, or non-public information related to such an agreement, to any third party unless the third party is a signatory of the agreement in question; and*

4.  *information controls shall be established that*

    a.  *prevent any Cox employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement to which a New TEGNA Station is a party, or any document containing non-public information related to such an agreement, with any Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox,*

    b.  *prevent any Cox employee or agent who is involved in any way in retransmission consent negotiations on behalf of Cox from, intentionally or unintentionally, accessing physical or electronic copies of any retransmission consent agreement to which a New TEGNA Station is a party, or any document containing non-public information related to such an agreement, and*

    c.  *prevent any Cox employee or agent from, intentionally or unintentionally, sharing physical or electronic copies of any retransmission consent agreement, or any document containing non-public information related to such an agreement, with any third party unless the third party is a signatory of the agreement in question.*

*For purposes of clarity, (i) the foregoing provisions limiting access to New TEGNA Station retransmission consent agreements or non-public information shall not preclude access by Cox employees or agents who are not in any way involved in retransmission consent negotiations on behalf of Cox (who may include accounting personnel and auditors), and (ii) the foregoing provisions limiting the provision of retransmission consent agreements or non-public information to third parties shall not preclude provision of retransmission consent agreements to which Cox is a signatory, or non-public information related to such agreements, to prospective third-party buyers or other third parties conducting audits arising*

17

EXHIBIT 4 - Page 022

*from a Cox retransmission consent agreement who affirm in writing that the information will be used solely in connection with due diligence or such audit purposes, or to other parties as may be specifically approved by the Commission.*

The Commission should define "New TEGNA Stations" as stations "under the *de jure* or *de facto* control of New TEGNA."  Likewise, it should define "Cox Stations" as those "under the *de jure* or *de facto* control of Cox."

Our proposal would, among other things, prohibit Cox and New TEGNA from sharing information with one another related to retransmission consent deals involving *any* of their stations, not just those in overlapping markets.  With respect to this transaction, such a formulation is necessary.  Cox and TEGNA, like most broadcasters, negotiate retransmission consent agreements that cover all markets in which an MVPD carries their respective stations.  Under these circumstances, any communication between Cox and New TEGNA with respect to retransmission consent is in effect a communication between or among stations serving the same DMA.  This transaction, moreover, gives Cox a nearly 25 percent share in New TEGNA, greatly heightening the parties' incentive and ability to coordinate, especially in this particular manner.  And each of Cox and New TEGNA will control major network stations at least four local markets, including all such stations in Jacksonville.  Both Congress and the Commission have explicitly recognized that allowing top-four stations in the same market to engage in joint retransmission consent negotiations creates an unacceptable level of market power that raises price for consumers.

In sum, because of both the significant threat to competition posed by collusion between top-four broadcasters in the same market, and in light of the new incentives and opportunities for collusion created by Cox's significant ownership interest in New TEGNA, adopting the

EXHIBIT 4 - Page 023

protections we propose in these comments is the only way in which the Commission can effectively enforce its joint-negotiation prohibition with respect to these applicants.

*    *    *

Applicants have not yet submitted information sufficient for the Commission to determine whether Apollo and Cox will hold an attributable interest in New TEGNA.  Even if they do not, the corporate structure proposed here will intertwine the parties considerably, raising the prospect of anticompetitive collusion and increased consumer prices.  Accordingly, if the Commission determines that the transaction does not violate the local ownership rules, it should thus condition the proposed transaction as described above.

Respectfully Submitted,

Mike Chappell
THE AMERICAN
  TELEVISION ALLIANCE
1155 F Street, N.W.
Suite 950
Washington, DC  20004
(202) 333-8667

Michael Nilsson
Kristine Laudadio Devine
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W.
The Eighth Floor
Washington, DC  20036
(202) 730-1300
*Counsel for the*
  *American Television Alliance*

June 22, 2022

EXHIBIT 4 - Page 024

## CERTIFICATE OF SERVICE

I, Michael Nilsson, hereby certify that on June 22, 2022, I caused true and correct copies of the foregoing to be served by first-class mail upon the following:

Michael Beder, Esq.
Associate General Counsel
TEGNA Inc.
8350 Broad Street, Suite 2000
Tysons, VA 22102
+1 (703) 873-6902
mbeder@tegna.com

Jennifer A Johnson
Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
United States
+1 (202) 662-5552
jjohnson@cov.com

Scott R. Flick
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street NW
Washington, DC 20036
+1 (202) 663-8167
scott.flick@pillsburylaw.com

                                    /s/Michael Nilsson_____
                                    Harris, Wiltshire & Grannis LLP

EXHIBIT 4 - Page 025