# Exhibit 14

**Case No. 24-1204**

**Public Copy – Sealed Material Deleted**

No. 23-1084

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

In re SGCI HOLDINGS III LLC; TEGNA INC.;
CMG MEDIA CORPORATION,

*Petitioners.*

---

On Petition for Writ of Mandamus

---

## RESPONDENT FEDERAL COMMUNICATIONS COMMISSION'S
## OPPOSITION TO PETITION FOR WRIT OF MANDAMUS

---

The Federal Communications Commission respectfully opposes petitioners' request for a writ of mandamus. Petitioners have failed to demonstrate their entitlement to such extraordinary relief.

### INTRODUCTION

The petitioners here ("Applicants" in the underlying proceeding) seek the FCC's approval of broadcast license transfers in connection with a complex set of four interrelated transactions. The principal effect would be for Standard General, a private-equity firm, to acquire Tegna, a publicly-traded media company that controls 64 licensed television stations and several other FCC licenses. In addition, Standard General

Exhibit 14 - Page 001

would acquire WFXT(TV), a Boston-based television station, from Cox Media Group, a media company principally owned by Apollo Global Management.  Standard General would in turn transfer to Cox four television stations that it previously owned and four of the television stations it would acquire from Tegna.  Finally, Apollo and another private-equity firm would acquire a $925 million stake in New Tegna, while Apollo would retain control of Cox, so all of the stations would share a partial owner in common.[1]

Under the Communications Act, if the FCC is unable to find that a transfer of a broadcast license would serve the public interest, or if it finds that substantial and material questions of fact are presented, it is required to refer the matter to a hearing.  47 U.S.C. §§ 309(d)(2) & (e), 310(d).  In this case, the FCC's Media Bureau found that further inquiry

---

[1]  *See* Comprehensive Exh. at 3–5 & Exh. A, https://tinyurl.com/5e3pt78n. In the proceeding below, Standard General variously included Standard General L.P., SGCI Holdings III LLC, their affiliates, and their Managing Member Soohyung Kim; Tegna was styled as TEGNA Inc.; Cox was known as CMG Media Corporation or CMG; and Apollo was sometimes known as AGM.  Apollo's interest in New Tegna is described in Tegna's April 13, 2022 proxy statement filed with the SEC, https://tinyurl.com/4hvaz89p; *see also* Comprehensive Exh. at 4 n.12; ATVA 6/22/22 Comments at 12–13, https://tinyurl.com/dpv632x3; ATVA 8/1/22 Comments at 9–10, https://tinyurl.com/y9u9nwxv.

Exhibit 14 - Page 002

is warranted into at least two issues. *See Hearing Designation Order*, DA 23-149, 38 FCC Rcd. --- (Media Bur. Feb. 24, 2023) (*Hearing Order*).[2]

- First, in response to evidence and concerns that the structure of the transactions would allow Applicants to artificially increase retransmission fees they charge cable and satellite providers, which are ultimately passed on to consumers, the Bureau asked an Administrative Law Judge (ALJ) to further investigate the effect of the transactions on retransmission fees and whether that effect is the result of a properly functioning competitive marketplace. *See id.* ¶¶ 19–32.

- Second, in response to evidence suggesting that Applicants plan to cut local station staffing and investment, including potential cuts to local journalism and newsroom staffing, the Bureau asked the ALJ to further investigate whether the transaction will impair broadcast localism by adversely impacting local news and public-affairs programming. *See id.* ¶¶ 33–50.

---

[2]    The unredacted, confidential version of the *Hearing Order* is reproduced in a Sealed Addendum accompanying this filing. *See* Sealed Add. 1–34.

Exhibit 14 - Page 003

Under the FCC's rules, the *Hearing Order* is not subject to interlocutory appeal (unless certified by the hearing officer, who refused to do so here). 47 C.F.R. § 1.115(e)(1). Instead, "review of an order designating a matter for hearing * * * shall be deferred until [after] the [hearing officer's] initial decision in the case." *Ibid.*

To be entitled to a writ of mandamus, a party must show "a clear and indisputable right to relief." *In re Flyers Rights Educ. Fund, Inc.,* 61 F.4th 166, 167 (D.C. Cir. 2023) (quoting *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005)). Given the record before it, the Media Bureau's conclusion that the proposed license transfers raise questions warranting further inquiry before an Administrative Law Judge was entirely reasonable. And even if there were room for doubt, Applicants come nowhere close to showing that the Media Bureau's decision to seek the benefit of a hearing to flesh out the relevant factual disputes is "'plainly and palpably wrong as [a] matter of law.'" *Illinois v. Ferriero*, 60 F.4th 707, 714 (D.C. Cir. 2023).

Equally meritless are Applicants' claims of unreasonable delay, for which mandamus is warranted "only when agency delay is egregious." *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988).

- 4 -

Exhibit 14 - Page 004

Applicants sought the Commission's approval of a novel and complex set of four interrelated transactions, which attracted numerous objections raising significant issues. In response, in mid-December—nine months after the applications were originally filed—Applicants filed several commitment letters intended to address, among other things, the retransmission fee and local news staffing concerns that had been raised. After an expedited comment cycle on those letters closed on January 20, the Media Bureau promptly issued its *Hearing Order* on February 24.

As to Applicants' request for Commission review of the *Hearing Order*—a request pending for all of ten days before they sought mandamus relief—FCC regulations state that review "shall be deferred" until after completion of the hearing, 47 C.F.R. § 1.115(e)(1), so the application for review has yet to properly come before the Commission for consideration or decision.[3] Finally, Applicants do not contend that the ALJ has engaged in any undue delay; rather, Applicants themselves have repeatedly sought to enjoin the hearing rather than allow it to proceed.

The petition for writ of mandamus should be denied.

---

[3]    Applicants have filed a motion to waive the regulation deferring consideration of their application for review. That motion remains pending, and absent any waiver the regulation continues to govern.

- 5 -

Exhibit 14 - Page 005

## BACKGROUND

### A.    Statutory And Regulatory Background

Since the early days of radio, Congress has recognized that the broadcast airwaves are a vital but finite public resource.  To ensure that scarce public spectrum is put to its highest use, Congress directed the FCC "to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof," via "licenses granted by Federal authority."  47 U.S.C. § 301; *see id.* § 303.  The Commission may grant a broadcast license only if it finds that the license would promote the public interest, convenience, and necessity.  *Id.* §§ 307(a), 309(a).

Because a licensee receives only limited usage rights, not ownership or property rights in the underlying spectrum, the licensee may not freely sell or transfer a broadcast license as if it were personal property.[4] Instead, the Communications Act provides that "No construction permit

---

[4]  *See FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940) ("The Communications Act is not designed primarily as a new code for the adjustment of conflicting private rights through adjudication.  Rather it expresses a desire on the part of Congress to maintain, through appropriate administrative control, a grip on the dynamic aspects of radio transmission.").

Exhibit 14 - Page 006

or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer or control of any corporation holding such permit or license, to any person except * * * upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." *Id.* § 310(d). "Any such application shall be disposed of as if the proposed transferee or assignee were making [an initial] application * * * for the permit or license in question * * *." *Ibid.*

The Commission has delegated authority to rule on such applications in the first instance to its Media Bureau. 47 C.F.R. § 0.61(a). If a party objects to action taken on delegated authority, it must seek and await review by the full Commission as "a condition precedent to judicial review." 47 U.S.C. § 155(c)(7); *see Int'l Telecard Ass'n v. FCC*, 166 F.3d 387 (1999) (per curiam). "Applications for [Commission] review of an order designating a matter for hearing * * * shall be deferred until [after the hearing], unless the presiding officer certifies such an application for review to the Commission." 47 C.F.R. § 1.115(e)(1). An ALJ's "refus[al] to certify a matter to the Commission" is "not appealable." *Ibid.*

Exhibit 14 - Page 007

## B.     Proceedings Below

**1.**     The underlying applications were filed with the FCC in March 2022.  As described above, the applications seek approval of a complicated set of four interrelated transactions involving multiple parent entities. *See Hearing Order* ¶¶ 5–10; Comprehensive Exh., *supra* note 1, at 3–5.

**2.**     Once the applications were deemed complete, the Media Bureau established a pleading cycle for public comment.  After commenters voiced need for additional information, the Media Bureau issued two initial information requests.  *See Hearing Order* ¶¶ 11, 13.  Those requests uncovered internal documents reflecting that Applicants expected the transactions to enable them to substantially increase the retransmission fees the stations charge cable and satellite providers, which those providers then pass on to consumers.  *See infra* Part I.B.1.  The requests also uncovered internal documents suggesting that Applicants plan to reduce local station staffing and investment, including potential cuts to local journalism and newsroom jobs.  *See infra* Part I.B.2.

Several commenters "raise[d] concerns [that the transactions] would result in the imposition of higher retransmission fees in a manner inconsistent with a functioning, competitive marketplace." *Hearing Order* ¶ 12.  Commenters also argued that the transactions would "undermine

Exhibit 14 - Page 008

localism by reducing the amount and scope of local news coverage because the Applicants' business intentions include reporter layoffs." *Ibid.* Two sets of objectors filed formal petitions to deny the license transfers under 47 U.S.C. § 309(d)(1), *see Hearing Order* ¶ 12, and were later granted full party status in the ongoing agency proceeding, *id.* ¶ 54.

For months, Applicants resisted these concerns. Then in December, Applicants filed a series of letters making new commitments purporting to address the objections. The Media Bureau sought comment on those commitments. *Id.* ¶ 14. Some commenters supported the commitments but said that they did not go far enough and that changes or additions were needed; others argued that the narrow commitments offered could not resolve the underlying issues.[5]

**3.**  On February 24—barely a month after the pleading cycle on Applicants' commitment letters closed—the Media Bureau issued its *Hearing Order*. The Media Bureau found that "substantial and material questions remain" that "warrant further investigation" as to (1) whether the proposed transactions would cause "possible harm[] to consumers

---

[5]  *See* ATVA 1/13/23 Comments, https://tinyurl.com/22y5es55; CWA et al. 1/13/23 Comments, https://tinyurl.com/3w9947z9; NCTA 1/13/23 Comments, https://tinyurl.com/yckmhsyh.

Exhibit 14 - Page 009

through higher retransmission consent fees" and (2) whether they would undermine "localism" through "reductions in local jobs." *Hearing Order* ¶ 3.

As the Media Bureau explained, "in order to properly assess the Applications, it is necessary to understand the extent to which retransmission consent fees will likely rise as a result of [the transactions] and the impact of any such rise on competition and * * * the viewing public," as well as "the impact the transaction will likely have on localism and specifically on local jobs at the stations involved." *Id.* ¶ 4. The *Hearing Order* explained in great detail the basis for these concerns, examining the partial record adduced so far and the competing narratives set forth in the numerous submissions received from interested parties. *See id.* ¶¶ 19–32 (concerns about transaction-driven increases in retransmission fees); *id.* ¶¶ 33–50 (concerns about harm to localism due to reductions in local journalism and newsroom jobs and investment).

Accordingly, the Media Bureau referred the transactions to a full hearing before an Administrative Law Judge to address the following two questions:

Exhibit 14 - Page 010

(a) "Whether * * * retransmission consent fees will rise as a result of the Transactions, and if so, whether such an increase is the result of a properly functioning competitive marketplace * * * and further, whether [any non-market-driven increase] would be mitigated by the commitments offered by the Applicants;" and

(b) "Whether, and to what extent, * * * local content and programming in the affected communities would be adversely affected" by the transactions "and the potential effectiveness of the commitments offered by the Applicants."

*Id.* ¶ 51 (ordering clauses).

**4.** Under longstanding FCC regulations, the *Hearing Order* is not subject to interlocutory review "unless the presiding officer certifies such an application for review to the Commission." 47 C.F.R. § 1.115(e)(1). The decision whether to certify an interlocutory appeal is governed by the same standard that district judges apply under 28 U.S.C. § 1292(b): "[whether] the matter involves a controlling question of law as to which there is substantial ground for difference of opinion and * * * immediate consideration * * * would materially expedite the ultimate resolution of the litigation." *Ibid.* And like under Section 1292(b), "[a] ruling refusing to certify a matter to the Commission is not appealable." *Ibid.*

- 11 -

Exhibit 14 - Page 011

Applicants moved on March 3 to certify the Media Bureau's *Hearing Order* for immediate review.[6] The Administrative Law Judge denied certification, finding that Applicants failed to raise the types of questions that would more appropriately be reviewed before the hearing than after. FCC 23M-06, 2023 WL 2560036 (ALJ Mar. 16, 2023).

Applicants then proceeded to file an application for Commission review of the *Hearing Order*.[7] Absent certification by the Administrative Law Judge, however, FCC regulations state that review "shall be deferred" until after completion of the hearing. 47 C.F.R. § 1.115(e)(1). Applicants requested a waiver of those regulations insofar as they preclude interlocutory review of the *Hearing Order*.[8] Such "waiver requests in general face an adverse presumption" and "'face[] a high hurdle even at the starting gate,'" *WAIT Radio v. FCC*, 459 F.2d 1203, 1207 (D.C. Cir. 1972); *see NetworkIP, LLC v. FCC*, 548 F.3d 116, 126–28 (D.C. Cir. 2008), and to date no waiver has been granted. The application for review therefore has not yet come before the full Commission for

---

[6]    Mot. to Certify (Mar. 3, 2023), https://tinyurl.com/3j5bh7we.

[7]    App'n for Review of Hr'g Designation Order (Mar. 17. 2023), https://tinyurl.com/4uupws6e.

[8]    Mot. for Waiver (Mar. 17, 2023), https://tinyurl.com/bdzbn3k2.

Exhibit 14 - Page 012

consideration or decision. Ten days after submitting their application for full Commission review, Applicants filed this mandamus action.

## ARGUMENT

A writ of mandamus "is 'drastic'; it is available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief; and even if the [petitioner] overcomes all these hurdles, whether mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). To obtain mandamus relief, "the petitioner must satisfy the burden of showing that [its] right to issuance of the writ is 'clear and indisputable.'" *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 381 (2004) (some internal quotation marks omitted). And "even if the [essential] prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Ibid.*

At the outset, Applicants are wrong to suggest (Pet. 23, 32–33) that, by referring the applications to a hearing, the FCC is somehow failing to carry out its duty to review the applications. To be sure, the Communications Act provides that if the Commission affirmatively "finds on the basis of the application, the pleadings filed, or other matters which

- 13 -

Exhibit 14 - Page 013

it may officially notice" that a license transfer application is in the public interest, it will summarily grant the application. But the Act then provides that if the Commission "for any reason is unable to make th[at] finding" on the existing record, or if there are substantial and material questions of fact presented, then it "shall formally designate the application for hearing." 47 U.S.C. § 309(d)(2) & (e). The statute thus requires that when—as here—the FCC cannot determine based on the record so far that the proposed transfers are in the public interest, the matter *must* go to a hearing prior to any final decision.

Applicants' real complaint appears to be that the statutorily required hearing cannot be completed within their desired timeframe. But nothing allows Applicants to unilaterally limit, through their private contractual agreements, the time allowed for the government to complete all necessary review; nor have they shown any unreasonable delay warranting the extraordinary remedy of mandamus.

## I.    APPLICANTS FAIL TO SHOW ANY CLEAR AND INDISPUTABLE ERROR.

"To meet the 'clear and indisputable' requirement, [Applicants] must show that the [*Hearing Order*] is 'plainly and palpably wrong as [a] matter of law.'" *Illinois v. Ferriero*, 60 F.4th 707, 714 (D.C. Cir. 2023).

- 14 -

Exhibit 14 - Page 014

Insofar as Applicants contend that the Media Bureau erred in referring the transactions to a full hearing, they do not come close to "meet[ing] the high threshold" of this "exacting" and "austere" standard. *Id.* at 710, 714–15.

### A.    Applicants Misapprehend The Relevant Legal Standard.

To begin with, Applicants misapprehend the legal standard governing the FCC's determination whether to proceed to a full hearing. Applicants seek to rely (Pet. 10, 28–30) on Section 309(d)(1) of the Communications Act, which sets forth procedural requirements for petitions to deny filed by third parties. But Section 309(d)(1) is inapposite here because the Media Bureau made its own determination that it was not able to make the affirmative public-interest finding required to approve the transactions without a hearing.

Sections 309(d)(2), 309(e), and 310(d) of the Act independently require the agency to designate an application for hearing—irrespective of whether any parties have filed petitions to deny—if the agency "for any reason is unable to find that grant of the application would be consistent with" the public interest, convenience, and necessity.   47 U.S.C. §§ 309(d)(2) & (e), 310(d); *see Citizens Comm. to Save WEFM v. FCC*, 506

F.2d 246, 259 (D.C. Cir. 1973) (en banc) (discussing "two situations in which a hearing is required"—either when required by a petition to deny *or* "when the Commission is 'for any reason' unable * * * to make the requisite finding that the public interest would be served").  Section 309(d)(1) might come into play if the Commission were otherwise satisfied that it could approve the transactions based on the pleadings alone and third parties were seeking to compel a hearing nonetheless, but it has no bearing on cases where the agency is unable to make the threshold findings required to approve the transactions without proceeding to a hearing.

> **B.     Applicants' Substantive Objections To The *Hearing Order* Are Unfounded.**

Applicants' contention that there can be no possible basis for further inquiry into the issues raised in the *Hearing Order* ignores much of the relevant evidence in the record that has been developed so far, including Applicants' own internal documents that they nowhere acknowledge or address.  That evidence reveals "a good deal of smoke" supporting the Media Bureau's decision to conduct a full hearing to "look into the possible existence of a fire." *Citizens for Jazz on WRVR, Inc. v. FCC*, 775 F.2d 392, 397 (D.C. Cir. 1985).

Exhibit 14 - Page 016

Applicants fare no better in arguing that the Media Bureau's concerns somehow lie outside the Commission's broad mandate to assess whether the transactions would serve "the public interest, convenience, and necessity," 47 U.S.C. § 310(d). The Supreme Court has described the public-interest standard as "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy," *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940), that confers "expansive powers," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 219 (1943). To that end, the Court "ha[s] repeatedly emphasized that the Commission's judgment regarding how the public interest is best served is entitled to substantial deference." *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981). The two concerns raised by the Media Bureau here—harm to consumer welfare from artificial increases in retransmission fees, and harm to broadcast localism through cuts to local journalism and newsroom staffing—fall comfortably within the Commission's established "public interest goals" of "competition, localism, and viewpoint diversity." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1155, 1156, 1157, 1158, 1160 (2021).

- 17 -

Exhibit 14 - Page 017

## 1.    Questions remain about the transactions' effect on retransmission fees

**a.**    Applicants' contention that the Media Bureau had no basis to be concerned that the transactions could enable them to increase the retransmission fees their stations charge cable and satellite providers—a cost that would ultimately be borne by consumers in the form of higher retail prices—is belied by their own internal documents.[9]    Numerous internal documents describe Standard General and Apollo's plans to increase the retransmission fees charged by the Tegna stations post-acquisition by ███████████████████████.[10]    Sealed Add. 37 n.2, 38, 39, 42, 47–48, 55 n.2, 56, 61.    Internal emails between the companies and their financial advisers describe ████████████████████████████████ ██████████████████████████████████████.    Sealed Add. 44–45; *see* Sealed Add. 103–08 (CWA et al. 1/13/23 Comments at

---

[9]    Retransmission fees are one of two main sources of revenue for broadcast stations, along with sales of local advertising.    *Hearing Order* ¶ 20; *see* Sealed Add. 40–41, 57–58, 62–63.    "Over the last decade, the fees obtained from retransmission consent agreements have become an increasingly significant source of revenue for broadcast stations," while "revenue from the sale of advertising time has stagnated or declined."    *Hearing Order* ¶ 20.

[10]    Material in ████████████████    concerns business-confidential information that was filed with the agency under seal and is redacted from the public version of this filing.

12–17).[11]  And the companies expected the transactions to enable them to impose these substantial rate hikes even though other internal documents recognize that ███████████████████████████████ ███████████████████████████████████████████████ ████████████████████████. Sealed Add. 52.  The documents sometimes refer to these planned price increases as ████████████ ███████████, but these aren't typical synergies achieved through increased efficiency or cost savings.  Instead, these appear to be projected revenue increases from price hikes that do not result from any improvement in the underlying product.

    **b.**  Applicants contend (Pet. 30) that a hearing is unwarranted because, nine months into the FCC's review of the applications, Standard General issued a commitment letter purporting to address one possible mechanism of increasing retransmission fees, known as "after-acquired clauses."[12]  As the Media Bureau explained, however, that remains

---

[11]  A redacted public copy of the CWA et al. 1/13/23 Comments is available at https://tinyurl.com/3w9947z9.

[12]  First Commitment Letter (Dec. 16, 2022), https://tinyurl.com/yc8fna5j. "The gist" of these clauses is that "where one station buys another, the acquiring station gets to replace the *acquired* station's retransmission consent agreement with its own, at least with [distributors] that were parties to agreements with both stations." Altice 6/22/22 Comments at 1–2, https://tinyurl.com/yw6psjj8.

Exhibit 14 - Page 019

unclear. *See Hearing Order* ¶¶ 28–32. For instance, the promise not to enforce these clauses was issued by and in the name of only "Standard General" itself, so there remain questions—unresolved by the current record—about whether other entities in the ownership chain might nonetheless still assert the right to enforce those clauses. *Id.* ¶ 29 n.85; *see* ATVA 1/13/23 Comments, *supra* note 5, at 2, 6–7 (identifying the need to "ensure that all conditions apply to all entities affiliated with Applicants"). The commitment letter thus raises additional questions for the ALJ to investigate about the nature and scope of the Applicants' belated undertakings. Accordingly, the Media Bureau directed the Administrative Law Judge to consider whether any increase in retransmission fees as a result of the transactions "would be mitigated by the commitments offered by the Applicants." *Hearing Order* ¶ 51(a).

Nor does the commitment letter address other possible mechanisms by which the transactions could allow Applicants to increase retransmission fees. *See Hearing Order* ¶ 24 (directing the ALJ to consider "whether such rate increases would be the result of: (1) * * * after-acquired station clauses * * * or (2) some other anticompetitive practices or wrongdoing"). For example, the transaction would result in Apollo possessing a common ownership interest in both the New Tegna

Exhibit 14 - Page 020

stations and the Cox stations, which include competing "Top Four" stations in several major markets.[13]  Apollo would therefore have powerful structural incentives to use the information it obtains as a partial owner of both sets of stations to help guide or inform the stations' future negotiations over retransmission fees (as well as other negotiations, including over advertising, syndicated programming, and labor agreements).  Applicants purported to address these concerns through yet another belated commitment letter on December 23, this time pledging that certain employees associated with New Tegna and Cox, or with their owners, would not share non-public information about retransmission fees with their counterparts.[14]  But it is not evident how that pledge could be monitored or enforced,[15] and commenters flagged a number of potential loopholes or shortcomings for further inquiry.[16]

---

[13]  *See* NCTA 6/22/22 Comments at 1–3, https://tinyurl.com/mr2b46e7; ATVA 6/22/22 Comments at 12–15, https://tinyurl.com/dpv632x3.

[14]  Third Commitment Letter (Dec. 23, 2022), https://tinyurl.com/5hxj8tpw.

[15]  *See* ATVA 1/13/23 Comments at 2, 4, https://tinyurl.com/22y5es55 (noting the lack of effective "enforcement or monitoring" provisions); Sen. Elizabeth Warren 1/11/23 Letter at 4–5, https://tinyurl.com/499926wn (discussing the monitoring and enforcement problems with such behavioral remedies); CWA et al. 1/13/23 Comments at 4–8, https://tinyurl.com/3w9947z9 (similar).

[16]  NCTA 1/13/23 Comments, https://tinyurl.com/yckmhsyh; *accord* ATVA 1/13/23 Comments at 3, https://tinyurl.com/22y5es55.

Exhibit 14 - Page 021

If anything, the commitment letters only tend to show that the transactions as originally proposed, and as pursued by Applicants for more than nine months, raised real and substantial concerns worthy of further examination. Given that prior course of conduct and the late stage at which Applicants submitted their narrowly crafted concessions, it was reasonable for the Media Bureau to conclude that the agency should undertake a full hearing to give the transactions a close look, rather than summarily approve them without further scrutiny.

c. There is no merit to Applicants' contention (Pet. 27–28) that the Commission somehow lacks authority, in assessing whether the transactions are in the public interest, to examine whether the transactions would harm consumer welfare by allowing Applicants to artificially increase retransmission fees. On the contrary, this Court has affirmed that "competitive considerations are an important element of the 'public interest,'" and that the Commission may consider "pertinent antitrust policies * * * along with other public interest considerations." *N. Nat'l Gas Co. v. FPC*, 399 F.2d 953, 961 (D.C. Cir. 1968); *see United States v. FCC*, 652 F.2d 72, 81–82 (D.C. Cir. 1980) (en banc).

Exhibit 14 - Page 022

As the *Hearing Order* explains, "supra-competitive increases in retransmission consent fees can result in pressure for retail price increases * * * to the detriment of consumers, and therefore, the public interest." *Hearing Order* ¶ 21. Applicants thus are wrong to characterize retransmission agreements as purely a matter of "private contract[s]" (Pet. 27) between broadcasters and the distributors who pay to carry their stations, since the resulting retransmission fees are effectively passed on to consumers who are not parties to those contracts. *Id.* ¶¶ 20–21 & n.56. Nothing in the *Hearing Order* seeks to regulate or restrict permissible retransmission fee rates or to preclude market-driven fee increases; it instead seeks only to examine whether such negotiations would occur on a level playing field in order to ensure that any resulting agreements are "the result of a properly functioning, competitive marketplace." *See id.* ¶¶ 21–24.[17]

Applicants likewise err in arguing (Pet. 28) that any inquiry into the transactions' effect on retransmission fees is foreclosed by

---

[17] Applicants are wrong to suggest (Pet. 9) that the transactions have been found to pose no competition issues simply because the Department of Justice did not object during the Hart-Scott-Rodino Act waiting period. *See* 15 U.S.C. § 18a(*i*)(1) ("any failure * * * to take any action" during the waiting period "shall not bar any proceeding or any action with respect to such acquisition at any time").

Exhibit 14 - Page 023

Commission precedent. The cited order declined to find that "an increase in retransmission consent rates, by itself, is necessarily a public interest harm," but then added that it *would* be a cognizable harm "where an increase is not the product of 'competitive market considerations'"—for example, if a transaction would empower the acquirer to increase rates "as a product of market power." *In re Tribune Media Co.*, 34 FCC Rcd. 8436, 8451 ¶ 29 (2019); *see Hearing Order* ¶ 23 ("the Commission noted that a public interest harm would be more likely if a rise in rates was *not* the result of a functioning retransmission consent marketplace").

Thus, as the Media Bureau explained, Commission precedent recognizes that "evidence [of] anticompetitive practices or other wrongdoing could distinguish what would perhaps constitute a market-driven rate increase from one that is anti-competitive, unwarranted, and harmful to consumers and the public interest." *Hearing Order* ¶ 24. The statements in Applicants' internal documents, reflecting their belief that the transactions will allow them to substantially increase retransmission fees without any evident change or improvement in the underlying product, support the Media Bureau's determination that further inquiry is needed to determine on which side of that line the transactions here fall.

Exhibit 14 - Page 024

> **2.    Questions remain about the transactions'
> effect on local journalism and newsroom
> staffing**

The Media Bureau also identified significant concerns about whether the transactions could harm broadcast localism through reductions in local newsroom staffing and investment. *See Hearing Order* ¶¶ 33–50. The Bureau's concerns over localism reflect "a longstanding core Commission broadcast policy objective" of ensuring that broadcast licensees are "responsive to the needs and interests of the communities that their stations are licensed to serve, including local news, information, and public affairs programming." *Id.* ¶ 33; *see id.* ¶¶ 34–35. "[L]ocal journalism is the heart of local news and community responsive programming," so the FCC "take[s] seriously concerns that a diminution in the employment of local journalists and other local staff poses a threat to localism." *Id.* ¶ 36.

**a.** The Media Bureau observed that Applicants' internal documents contain "a series of statements" indicating that Standard General "has had longstanding plans to reduce station-level resources" at Tegna, including potential cuts to local journalism and newsroom staffing. *Hearing Order* ¶ 37; *see id.* ¶¶ 38–39.

- 25 -

Exhibit 14 - Page 025

Standard General and Apollo ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████. Sealed Add. 36, 39, 54, 56, 60,

61; *see Hearing Order* ¶ 39 & n.113.  These figures specifically included

███████████████████████████████████████. Sealed Add. 39,

56, 61; *see* Sealed Add. 83–88 (CWA 11/14/22 Letter at 3–8);[18] *Hearing*

*Order* ¶ 38 & 105.  Detailed financial-modeling spreadsheets reflect plans

to ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████. Sealed Add. 64; *see* Sealed Add. 79 (CWA

9/29/22 Letter at 4);[19] *Hearing Order* ¶ 38 & n.107.  Meanwhile, Tegna

represented to the federal government in a Spring 2022 legal filing that

████████████████████████████████████████████████████████

███████████████, Sealed Add. 74, indicating that the job cuts

contemplated by Standard General stem from its own acquisition plans.

---

[18]  A redacted public copy of the CWA 11/14/22 Letter is available at
https://tinyurl.com/bdfk5awf.

[19]  A redacted public copy of the CWA 9/29/22 Letter is available at
https://tinyurl.com/3cpzcbxf.

**b.**  The Media Bureau also noted evidence raising questions whether Standard General would seek to replace local news staff with remote operations that may be less responsive to local community concerns.  For example, in operating its current stations, "Standard General has been producing a faux 'local' Cape Girardeau newscast with anchors, editors, and other staff piped in from Lincoln, Nebraska, more than 500 miles away."  *Hearing Order* ¶ 49.  Similarly, "questions have been raised in the record regarding [whether] New TEGNA's creation and use of a Washington, D.C., news bureau * * * would increase or reduce the Stations' local journalism and coverage of local issues."  *Id.* ¶ 47.

**c.**  The Media Bureau further recognized the existence of questions as to whether the transactions would create structural pressures to reduce investment in local news and public-affairs programming. Commenters opposing the transactions "argue that the operating model of private equity funds like Standard General is to reduce operating costs by cutting jobs and limiting salaries."  *Hearing Order* ¶ 45.  Applicants, by contrast, "assert that * * * shifting TEGNA from a publicly-traded company, tethered to quarterly profit reporting, to a more agile privately-held company" would allow it to "make longer-term plans and investments without being punished by the markets."  *Ibid.*  These

Exhibit 14 - Page 027

"competing narrative[s]," *id.* ¶ 40, support the case for holding a hearing to further explore these issues. At the least, "conflicting evidence [in] the record" about Applicants' plans "with regard to local staffing at the TEGNA stations" demonstrate "substantial and material questions of fact, unresolved by Applicants' filings, that require further investigation" through a full hearing. *Id.* ¶ 43.

**d.** Applicants responded to these concerns with yet another commitment letter (Pet. 30), promising to "not conduct any journalism or newsroom staffing layoffs or similar reductions at the stations for a minimum of two years following the Transactions." *Hearing Order* ¶ 44. Not only have commenters identified a series of alleged "deficiencies" in the commitment letter, *see ibid.*, but that narrow two-year commitment offers no assurance as to what will happen after two years. A modest time-limited behavioral remedy does nothing to alleviate any underlying structural pressures to reduce local investment and staffing, which would persist after Applicants' commitment expires.

**e.** Applicants' contention that the FCC lacks authority even to consider whether the transactions would undermine broadcast localism through planned cuts to local journalism and newsroom staffing (Pet. 27–

Exhibit 14 - Page 028

28) is unfounded.  The Supreme Court has explained that it is "vital" that

broadcast licensees "serve the needs of the local community," *Nat'l Broad.*

*Co.*, 319 U.S. at 203, and this Court likewise has recognized the need for

the FCC "'to assure [that licensees have] familiarity with community

problems and then develop programming responsive to those needs,'" *see*

*Citizens Comm. to Save WEFM*, 506 F.2d at 267–68.[20]

Applicants cite (Pet. 27) a decision reasoning that the Commission's

public-interest analysis may not scrutinize licensees' employment

practices as an independent criterion, but that it may do so when relevant

to "the purposes of its regulatory legislation" in the Communications Act.

*Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*, 595 F.2d 621, 628

(D.C. Cir. 1978) (en banc).  Here, the *Hearing Order* makes clear that the

---

[20] *See also*, *e.g.*, *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 808 (1978) (upholding the Commission's consideration of local ownership based on "[local] owners' knowledge of their local communities and concern for local affairs"); *Am. Family Ass'n v. FCC*, 365 F.3d 1156 (D.C. Cir. 2004) (upholding the Commission's preference for awarding noncommercial licenses to established local entities); *Fidelity Television, Inc. v. FCC*, 515 F.2d 684, 701 (D.C. Cir. 1975) (upholding finding that an applicant "had acquired the kind of interest in local affairs which made [its] station[s] responsive to the community," which was one of the agency's "ultimate goal[s]"); *Ky. Broad. Corp. v. FCC*, 174 F.2d 38, 40–41 (D.C. Cir. 1949) (upholding licensing decision that was based on "superior local programming" and "staff assigned to gathering local news").

Exhibit 14 - Page 029

Bureau was permissibly concerned with the effect of post-acquisition staffing plans on broadcast localism, which the Commission has long recognized as one of the Communications Act's core regulatory objectives.

## C. Applicants' Objections To The ALJ's For-Cause Removal Protection Are Unavailing.

Applicants come nowhere close to showing a "clear and indisputable right to relief" on their challenges to the ALJ's removal protections.

Applicants rely (Pet. 24–25) on *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), which held that members of a regulatory oversight board that engaged in policymaking and enforcement functions could not be subject to multiple levels of removal protection. The Court reasoned that multilevel protection from removal for policymaking officials would effectively impede the President's duty to "take Care that the laws be faithfully executed." *See* U.S. Const. art. II, § 3. But the Court then *expressly declined* to decide whether the same conclusion follows for "that subset of independent agency employees who serve as administrative law judges," noting that "unlike members of" the regulatory oversight board in *Free Enterprise Fund*, "many administrative law judges of course perform adjudicative rather than enforcement or policymaking functions." 561 U.S. at 507 n.10.

- 30 -

Exhibit 14 - Page 030

Given the very different nature of the adjudicatory—rather than policymaking—functions of administrative law judges, the President's constitutional duties may not be equally impaired by admitting a somewhat greater degree of decisional independence for administrative law judges. *See Morrison v. Olson*, 487 U.S. 654, 691 (1988) (asking "whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty [in light of] the functions of the officials in question"); *cf. Collins v. Yellen*, 141 S. Ct. 1761, 1783 n.18 (2021) (recognizing that removal restrictions may be justified "on the rationale that [officers serve on] an adjudicatory body, and, as such, [have] a unique need for 'absolute freedom from Executive interference'"). *Free Enterprise Fund* thus does not speak to the situation Applicants face here.

Applicants then seek to rely (Pet. 26) on *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), in which a divided panel of the Fifth Circuit held that the same bar on multilevel removal protection should apply to ALJs.[21] But Applicants neglect to mention that two other Circuits have reached the opposite conclusion. *Decker Coal Co. v. Pehringer*, 8 F.4th 1123,

---

[21] The government has filed a petition for certiorari in *Jarkesy*, which the Supreme Court has docketed as No. 22-859 (filed Mar. 8, 2023).

Exhibit 14 - Page 031

1133–36 (9th Cir. 2021) (holding that multilevel removal protections for ALJs are permissible in light of their narrow adjudicatory functions); *Calcutt v. FDIC*, 37 F.4th 293, 319–20 (6th Cir. 2022) (same); *see also Jarkesy*, 34 F.4th at 477–78 (Davis, J., dissenting).    Given these conflicting decisions, Applicants' claim that the ALJ's removal protections are unlawful is anything but "clear and indisputable."

Moreover, even if the ALJ's removal protections were later held to be unlawful, that still would not entitle Applicants to any material relief. Unlike with an officer who is improperly *appointed*, an "unconstitutional[] limit[] [on] the President's authority to *remove*" an officer by itself provides "no reason to regard any of the actions taken by [the officer] as void." *Collins*, 141 S. Ct. at 1787; *see id.* at 1787–89.  Instead, actions taken by such an officer remain valid unless an aggrieved party shows that the officer would not have reached the same conclusion *but for* the improper removal protections.  *CFPB v. Law Offices of Crystal Moroney, P.C.*, --- F.4th ---, 2023 WL 2604254, at *2–3 (2d Cir. 2023); *Cmty. Fin. Servs. Ass'n of Am. v. CFPB*, 51 F.4th 616, 632–33 (5th Cir. 2022), *cert. granted on other grounds*, 2023 WL 2227658 (U.S. Feb. 27, 2023); *Integrity Adv., LLC v. CFPB*, 48 F.4th 1161, 1170–71 (10th Cir. 2022);

Exhibit 14 - Page 032

*CFPB v. CashCall, Inc.*, 35 F.4th 734, 742–43 (9th Cir. 2022).  Applicants make no such showing here.[22]

## II.   APPLICANTS FAIL TO SHOW ANY UNREASONABLE DELAY.

For claims of unreasonable delay, mandamus is available "only when agency delay is egregious." *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988).  "Any discussion * * * must begin with recognition that an administrative agency is entitled to considerable deference in establishing a timetable for completing its proceedings," *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987), and for matters presenting "complex * * * policy questions" the agency "must be afforded the amount of time necessary to analyze such questions." *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987).

Applicants' claims of unreasonable delay by the Media Bureau are baseless.  Applicants sought approval of a complex set of four interrelated transactions, which by virtue of their complexity can reasonably be

---

[22]  It also is unclear in any event what benefit the Applicants would obtain by disqualifying the Administrative Law Judge from presiding over the hearing, since the hearing could still continue with the Commission itself or an individual Commissioner presiding.  *See* 5 U.S.C. § 556(b); 47 C.F.R. § 1.241(a); *see also* 47 C.F.R. § 1.242 (when the Commission presides directly over a hearing, it may appoint a staff attorney as case manager to develop the record).

Exhibit 14 - Page 033

expected to require longer to review than the mine-run of past applications. The requisite notice-and-comment process attracted scores of filings raising significant issues. Applicants complain (Pet. 34) that the Media Bureau conducted multiple pleading cycles, but those were necessitated by Applicants' own submissions—including their decision in December 2022, nine months after first seeking approval, to issue three new commitment letters purporting to materially alter matters under consideration. Upon receipt of the commitment letters, the Media Bureau conducted an expedited pleading cycle that concluded on January 20, then issued its *Hearing Order* barely a month later on February 24. The record here does not show any delay, much less unreasonable or egregious delay.

Moreover, if Applicants indeed believed that the Media Bureau was taking too long to act, they should have raised the issue at that time, rather than wait until after it issued the *Hearing Order*. And any complaints about the time taken by the Media Bureau to conduct its initial review are now moot, since the Media Bureau has now completed that review. *See*, *e.g.*, *Am. Bird Conservancy v. FCC*, 516 F.3d 1027, 1030 (D.C. Cir. 2008) (per curiam) (mandamus petition seeking to compel FCC

action was rendered moot by issuance of an order denying in part, dismissing in part, and deferring in part the underlying request); *In re NTCH, Inc.*, No. 18-1122 (D.C. Cir. Oct. 11, 2018) (mandamus moot as to Bureau proceedings).

Applicants likewise fail to show any unreasonable delay in any pending proceedings before the Administrative Law Judge or the Commission itself. With respect to the ALJ hearing, it is the Applicants themselves who have repeatedly sought to enjoin that proceeding rather than allow it to proceed expeditiously. With respect to the Commission, Applicants sought mandamus relief in this Court just *ten days* after filing their application for full Commission review of the *Hearing Order*. Moreover, because FCC regulations state that review "shall be deferred" until after completion of the hearing, 47 C.F.R. § 1.115(e)(1), the application for review has not yet been properly before the Commission for consideration and decision for any period of time.

To support their claim of agency delay, Applicants emphasize (Pet. 31) that their negotiated financing commitments are currently scheduled to expire on May 22. But that is a deadline of their own making, which does not render unreasonable—much less "egregious"—the time the agency has found necessary to complete the required public interest

- 35 -

Exhibit 14 - Page 035

inquiry.  While Applicants may have their own reasons to wish that these processes could move more quickly, their private interest in receiving a decision sooner does not mean that the agency has somehow "delayed" action on their applications.  Nor can Applicants' preferred timeline deprive the government of the power to take the time needed to complete its statutory obligation to determine whether grant of the applications would be in the public interest.

Finally, Applicants cite (Pet. 10, 34, 35–36) an FCC webpage stating that the agency has an "informal" "goal" of deciding transfer applications within six months.[23]  But that same webpage warns that, "[a]lthough the Commission will endeavor to meet its 180-day goal in all cases, several factors could cause the Commission's review of a particular application to exceed" that time.[24]  It further emphasizes that the

---

[23]  Fed. Commc'ns Comm'n, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses*, https://tinyurl.com/3785adh8.

[24]  In fact, it would have been impossible in this case to approve the transactions within six months.  Because portions of the transactions involve foreign investment, the transactions required review by a separate governmental body, the Committee for the Assessment of Foreign Participation in the United States Telecommunications Sector, before the Commission could act.  *See* Committee 5/2/22 Letter, https://tinyurl.com/3yjpcv46.  Not until November 17 did the
(cont'd)

- 36 -

Exhibit 14 - Page 036

Commission's "statutory obligation to determine that an assignment or transfer serves the public interest takes precedence over the informal timeline."  Parties who fail to allow sufficient time to accommodate a longer process thus do so at their own risk.  As this case illustrates, the determination of the public interest, especially in complex and highly disputed cases, can sometimes take longer and necessitate further inquiry.

---

Committee notify the Commission that it had completed its review and that the Commission could proceed.  *See* Committee 11/17/22 Letter, https://tinyurl.com/mrx5r7jv.

- 37 -

Exhibit 14 - Page 037

## CONCLUSION

The petition for writ of mandamus should be denied.

Dated:  April 11, 2023

Respectfully submitted,

/s/ *Scott M. Noveck*

P. Michele Ellison
   *General Counsel*

Jacob M. Lewis
   *Deputy General Counsel*

Scott M. Noveck
   *Counsel*

FEDERAL COMMUNICATIONS
   COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

Exhibit 14 - Page 038

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.    This document complies with the type-volume limit of Fed. R. App.
      P. 21(d) because, excluding the parts of the document exempted by
      Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

      ☒    this document contains <u>7,433</u> words, *or*

      ☐    this document uses a monospaced typeface and contains ____
           lines of text.

2.    This document complies with the typeface requirements of Fed. R.
      App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
      32(a)(6) because:

      ☒    this document has been prepared in a proportionally spaced
           typeface using <u>Microsoft Word for Office 365</u> in <u>14-point
           Century Schoolbook</u>, *or*

      ☐    this document has been prepared in a monospaced spaced
           typeface using _____ with _____.


                         <u>/s/  *Scott M. Noveck*                    </u>
                         Scott M. Noveck
                         *Counsel for Respondent*
                         *Federal Communications Commission*

Exhibit 14 - Page 039

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on April 11, 2023, I caused the foregoing Opposition to Petition for Writ of Mandamus to be filed with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by submitting a redacted public filing using the electronic CM/ECF system and by e-mailing the sealed filing to the Clerk's Office pursuant to D.C. Circuit Standing Order No. 20-2, and by causing five paper copies of the redacted public filing and five paper copies of the sealed filing to be delivered to the Clerk of Court.

I further certify that all participants in the case are registered CM/ECF users and will be served electronically with the redacted public filing by the CM/ECF system, and that I have caused copies of the sealed filing to be served by e-mail on all participants entitled to receive the material under seal.

/s/ *Scott M. Noveck*
Scott M. Noveck
*Counsel for Respondent*
*Federal Communications Commission*

- 40 -

Exhibit 14 - Page 040