IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| SGCI HOLDINGS III LLC and SOOHYUNG KIM, | |
| Plaintiff, | |
| v. | |
| FEDERAL COMMUNICATIONS COMMISSION; JESSICA ROSENWORCEL, in her official capacity as Chairwoman of the FCC; HOLLY SAURER, in her official capacity as Chief of the FCC Media Bureau; ALLEN MEDIA, LLC d/b/a Allen Media Group; DISH NETWORK CORPORATION; EMMER CONSULTING, INC., d/b/a I Street Advocates f/k/a/ The Goodfriend Group; THE NEWSGUILD-CWA; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA; UNITED CHURCH OF CHRIST, OC INC., d/b/a United Church of Christ Media Justice Ministry; COMMON CAUSE; BYRON ALLEN; CHARLES ERGEN; and DAVID GOODFRIEND, | CASE NO. 1:24-cv-01204-RC |
| Defendants. | |

**DEFENDANTS BYRON ALLEN AND ALLEN MEDIA, LLC'S MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................. 1

SUMMARY OF FACTUAL ALLEGATIONS .......................................... 4

    A.    Plaintiffs' Proposed Merger Generates Significant Objections ................................................................. 4

    B.    After The FCC's Media Bureau Issues A Hearing Order, TEGNA Exercises Its Contractual Right To Terminate The Deal ............................................................... 7

    C.    Plaintiffs Allege a Far-Fetched Conspiracy That Allen Media Was the Puppet Master Behind The Scenes Controlling Prominent Members of Congress and an Entire Federal Agency ........................................... 10

LEGAL STANDARD ......................................................................... 13

ARGUMENT ................................................................................... 14

    I.    The FAC Should Be Dismissed For Lack Of Subject Matter Jurisdiction ........................................................ 14

        A.    Exclusive Statutory Review Mechanisms Bar Collateral Attack Of An FCC Order In Civil Litigation ................ 15

        B.    Plaintiffs' Claims Are Brought In The Wrong Court ................ 17

        C.    The Doctrine Of Primary Jurisdiction Is A Separate And Independent Basis To Dismiss The FAC .................. 19

    II.    Plaintiffs Are Estopped From Pursuing This Case .............................. 21

    III.    Plaintiffs' Claims Are Barred By The First Amendment .................... 23

        A.    Allen Media's Alleged Conduct Is Protected By The First Amendment ................................................. 24

        B.    *Noerr-Pennington* Immunity Bars Plaintiffs' Claims ................ 26

        C.    The Alleged Conduct Is Not Subject To *Noerr-Pennington's* Sham Exception ...................................... 28

    IV.    Plaintiffs' Section 1981 Claim Fails To State A Claim For Intentional Racial Discrimination ........................................ 29

    V.    Plaintiffs' Generalized Allegations Of Conspiracy Fail To State A Claim Under Federal Or State Law ..................................... 32

    VI.    This Court Should Decline To Extend Supplemental Jurisdiction Over Plaintiffs' Remaining State Law Claims, Which Also Independently Fail ............................................... 36

VII.   Leave to Amend Should Be Denied ........................................................ 37

CONCLUSION............................................................................................................ 38

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023). .................................................................................. 25

*Adetoro v. King Abdullah Acad.,*
    585 F. Supp. 3d 78 (D.D.C. 2020) ............................................................... 32

*\*Allen v. McCurry,*
    449 U.S. 90 (1980) ....................................................................................... 21

*\*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
    486 U.S. 492 (1988) ..................................................................................... 28

*Alltel Tenn. v. Tenn. Pub. Serv. Comm'n,*
    913 F.2d 305 (6th Cir. 1990) ....................................................................... 19

*Am. Bird Conservancy v. F.C.C.,*
    408 F. Supp. 2d 987 (D. Haw. 2006) ........................................................... 16

*Am. Farm Bureau v. U.S. E.P.A.,*
    121 F. Supp. 2d 84 (D.D.C. 2000) ............................................................... 14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................... 13

*\*Associated Bodywork & Massage Prof'ls v. Am. Massage Therapy Ass'n,*
    897 F. Supp. 1116 (N.D. Ill. 1995) ......................................................... 29, 30

*Atherton v. D.C. Office of Mayor,*
    567 F.3d 672 (D.C. Cir. 2009) ..................................................................... 33

*Barnes Found. v. Twp. of Lower Merion,*
    927 F. Supp. 874 (E.D. Pa. 1996) ............................................................... 27

*Bayou Fleet, Inc. v. Alexander,*
    234 F.3d 852 (5th Cir. 2000) ....................................................................... 29

*\*Benzinger v. NYSARC, Inc. N.Y. City Chapter,*
    385 F. Supp. 3d 224 (S.D.N.Y. 2019) ..................................................... 32, 34

*Brewer v. District of Columbia,*
    891 F. Supp. 2d 126 (D.D.C. 2012) ............................................................. 13

*Bush v. Butler,*
    521 F. Supp. 2d 63 (D.D.C. 2007) ........................................................... 33, 34

*City of Columbia v. Omni Outdoor Advert., Inc.,*
499 U.S. 365 (1991) ................................................................................. 28

*\*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985) ................................................................................. 24

*Daniels v. Union Pac. R.R.,*
530 F.3d 936 (D.C. Cir. 2008) ................................................................ 17

*De La Fuente v. DNC Servs. Corp.,*
2019 WL 1778948 (D.D.C. Apr. 23, 2019) ...................................... 33, 34

*Drake v. F.A.A.,*
291 F.3d 59 (D.C. Cir. 2002) .................................................................. 21

*\*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ................................................................................. 26

*Econ. Research Servs., Inc. v. Resolution Econ., LLC,*
208 F. Supp. 3d 219 (D.D.C. 2016) ........................................................ 37

*\*Ellis v. Tribune Television Co.,*
443 F.3d 71 (2d Cir. 2006) ....................................................... 18, 19, 20

*\*Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,*
663 F.2d 253 (D.C. Cir. 1981) ................................................................ 25

*Ginx, Inc. v. Soho All.,*
720 F. Supp. 2d 342 (S.D.N.Y 2010) ................................................ 27, 31

*Halberstam v. Welch,*
705 F.2d 472 (D.C. Cir. 1983) ................................................................ 33

*Harris v. Allstate Ins. Co.,*
300 F.3d 1183 (10th Cir. 2002) .............................................................. 30

*Hemp Indus. Ass'n v. Drug Enf't Admin.,*
36 F.4th 278 (D.C. Cir. 2022) ................................................................ 15

*Himmelman v. MCI Commc'ns Corp.,*
104 F. Supp. 2d 1 (D.D.C. 2000) ........................................................... 20

*\*In re Ctr. for Biological Diversity,*
53 F.4th 665 (D.C. Cir. 2022) ................................................................ 10

*In re NextWave Personal Commc'ns, Inc.,*
200 F.3d 43 (2d Cir. 1999) ..................................................................... 20

*Israel v. Baxter Labs., Inc.,*
466 F.2d 272 (D.C. Cir. 1972) ................................................................ 26

*Johnson v. F.C.C.,*
2022 WL 17262173 (D.D.C. Nov. 29, 2022) .......................................... 16

*Johnson v. Metro. Direct Prop. & Cas. Ins. Co.,*
2019 WL 176851 (D.D.C. Jan. 11, 2019) ........................................ 34

*Jones v. La. State Bar Ass'n,*
738 F. Supp. 2d 74 (D.D.C. 2010) ........................................... 28, 29

*Kanam v. Haaland,*
2022 WL 2315552 (D.D.C. June 28, 2022) ................................... 38

*Kim v. United States,*
632 F.3d 713 (D.C. Cir. 2011) ................................................ 23

*Kurd v. Republic of Turkey,*
374 F. Supp. 3d 37 (D.D.C. 2019) ........................................... 32

*Lacey v. Maricopa County,*
693 F.3d 896 (9th Cir. 2012) .................................................. 30

*Lemon v. Kramer,*
270 F. Supp. 3d 125 (D.D.C. 2017) ................................. 33, 34, 36

*Liberty Lobby, Inc. v. Pearson,*
390 F.2d 489 (D.C. Cir. 1967) ................................................ 25

*London v. Coopers & Lybrand,*
644 F.2d 811 (9th Cir. 1981) .................................................. 30

*Mais v. Gulf Coast Bureau Inc.,*
768 F.3d 1110 (11th Cir. 2014) .............................................. 16

*McCord v. Bailey,*
636 F.2d 606 (D.C. Cir. 1980) ................................................ 23

*\*McCutcheon v. Fed. Election Comm'n,*
572 U.S. 185 (2014) .............................................................. 24

*McIntyre v. Fulwood,*
892 F. Supp. 2d 209 (D.D.C. 2012) ......................................... 21

*Mesumbe v. Howard Univ.,*
706 F. Supp. 2d 86 (D.D.C. 2010) ..................................... 14, 36

*Mills v. Alabama,*
384 U.S. 214 (1966) .............................................................. 25

*Modis, Inc. v. InfoTran Sys., Inc.,*
893 F. Supp. 2d 237 (D.D.C. 2012) ......................................... 37

*\*N.A.A.C.P. v. Claiborne Hardware Co.,*
458 U.S. 886 (1982) .............................................................. 27

*N.Y. Times v. Sullivan,*
376 U.S. 254 (1964) .............................................................. 25

*Nader v. Democratic Nat'l Comm.*,
   555 F. Supp. 2d 137 (D.D.C. 2008) .................................................................. 26

*Nader v. Democratic Nat'l Comm.*,
   567 F.3d 692 (D.C. Cir. 2009) ............................................................... 26, 32

*Nat'l Commc'n Ass'n, Inc. v. AT&T*,
   46 F.3d 220 (2d Cir. 1995) ......................................................................... 19

*Nazir v. United Air Lines, Inc.*,
   2009 WL 2912518 (N.D. Cal. Sept. 9, 2009) ................................................... 27

*NextWave Personal Commc'ns, Inc. v. F.C.C.*,
   254 F.3d 130 (D.C. Cir. 2001) ..................................................................... 21

*\*Patton Boggs, LLP v. Chevron Corp.*,
   791 F. Supp. 2d 13 (D.D.C. 2011) ................................................................ 37

*Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,
   400 U.S. 62 (1970) .................................................................................. 16

*Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*,
   415 F. Supp. 3d 113 (D.D.C. 2019) ............................................................... 37

*Prof'l Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) .................................................................................. 29

*Pub. Watchdogs v. S. Cal. Edison Co.*,
   984 F.3d 744 (9th Cir. 2020) ...................................................................... 18

*Schurz Commc'ns, Inc. v. F.C.C.*,
   982 F.2d 1043 (7th Cir. 1992) ..................................................................... 18

*Self v. Bellsouth Mobility, Inc.*,
   700 F.3d 453 (11th Cir. 2012) ..................................................................... 16

*\*Shaikh v. City of Chicago*,
   341 F.3d 627 (7th Cir. 2003) ...................................................................... 31

*Smith-Haynie v. District of Columbia*,
   155 F.3d 575 (D.C. Cir. 1998) ..................................................................... 23

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ................................................................................. 25

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ................................................................................. 26

*Tanner-Brown v. Jewell*,
   153 F. Supp. 3d 102 (D.D.C. 2016) ............................................................... 14

*\*Telecomms. Research & Action Ctr. v. F.C.C.*,
   750 F.2d 70 (D.C. Cir. 1984) .............................................................. 9, 15, 18

*Thompson v. Tex. Mexican Ry. Co.,*
    328 U.S. 134 (1946) ............................................................... 20

*U.S. Tour Operators Ass'n v. Trans World Airlines, Inc.,*
    556 F.2d 126 (2d Cir. 1977) ............................................. 19

*\*United Mine Workers v. Pennington,*
    381 U.S. 657 (1965) ............................................................... 26

*Walker v. Seldman,*
    471 F. Supp. 2d 106 (D.D.C. 2007) ............................... 36

*Whelan v. Abell,*
    48 F. 3d 1247 (D.C. Cir. 1995) ....................................... 27

*Wilson v. A.H. Belo Corp.,*
    87 F.3d 393 (9th Cir. 1996) ............................................. 15

## STATE CASES

*Griva v. Davison,*
    637 A.2d 830 (D.C. 1994) ................................................. 33

*Higgs v. Higgs,*
    472 A.2d 875 (D.C. 1984) ................................................. 34

## FEDERAL STATUTES

28 U.S.C. § 1367 .......................................................................... 36

28 U.S.C. § 2342 .......................................................................... 15

28 U.S.C. § 2344 .......................................................................... 15

42 U.S.C. § 1981 ........................................................ 11, 27, 29, 30, 31, 32

42 U.S.C. § 1985 ........................................................ 11, 27, 32, 33, 34, 36

42 U.S.C. § 1986 .......................................................................... 11

47 U.S.C. § 402 ...................................................................... 2, 15

## FEDERAL RULES

Fed. R. Civ. P. 11 ....................................................................... 11

**INTRODUCTION**

Plaintiffs' FAC describes a farfetched conspiracy by and between FCC officials, high-ranking politicians, two unions that represent journalists, a church, a nonpartisan grassroots organization, a lobbying firm, and two media companies to allegedly thwart Plaintiffs' multi-billion-dollar acquisition of several dozen broadcast television stations from TEGNA.  Plaintiffs, a Korean-American media owner and his holding company, own media assets all over the country and are known for their ruthless approach to "auditing underperforming stations" in partnership with one of the largest private equity funds in the country.  (FAC, ¶ 54.)

Because this approach increases consumer costs, results in lost jobs, and undermines local journalism, many were not happy about the proposed deal.  After multiple parties objected to the transaction as against the public interest, the FCC's Media Bureau referred Plaintiffs' applications to transfer broadcast licenses to an administrative law judge for a hearing.  Plaintiffs' financing commitments expired before the hearing could take place, and TEGNA chose to exercise its contractual right to terminate the deal.

Plaintiffs now blame Allen Media, the FCC, and ten other defendants for the deal's demise.  They allege that anyone who objected to the transaction was secretly doing the bidding of Allen Media because the FCC prefers Black media owners over Asian ones.  And they specifically fault Mr. Allen and/or Allen Media for donating money to politicians; holding a political fundraiser; expressing interest in a partnership with Plaintiffs; speaking to the press about Mr. Allen's ability to work

effectively with the FCC on other transactions; and purportedly orchestrating objectors to petition the FCC from behind the scenes.  Plaintiffs do not allege that any of this First Amendment-protected conduct was motivated by hatred for Asian-Americans or any intention to discriminate against them, but because Allen Media was a competing bidder for the stations and purportedly wanted the TEGNA assets for itself.

Plaintiffs bring six causes of action against Allen Media for allegedly interfering with the FCC's regulatory review process and tortiously interfering with their merger and financing agreements.  For the reasons below, none of Plaintiffs' federal civil rights or state tort law causes of action articulate a cognizable claim.

*First*, this Court lacks subject matter jurisdiction over the claims because they collaterally attack FCC decisions.  Each and every claim asserted by Plaintiffs necessarily depends on a finding that the FCC acted improperly in not promptly granting Plaintiffs' license transfer applications.  Pursuant to the Communications Act, 47 U.S.C. § 402, the D.C. Circuit Court of Appeals is the exclusive forum for judicial challenges to FCC decisions like those at issue here.  It is well established that federal district courts lack jurisdiction to adjudicate any claims that depend on a determination as to whether the FCC was right or wrong not to approve license applications.  Federal district courts likewise lack jurisdiction to determine whether the FCC engaged in unreasonable delay in issuing a formal decision or otherwise engaged in *ultra vires* conduct.  Indeed, Standard General knows this because it has already appealed the FCC decisions to the D.C. Circuit and lost.  In its appeal,

Standard General admitted that appeal to the D.C. Circuit was its sole judicial remedy.   This entire case is an end run around the Court of Appeals' exclusive jurisdiction.

*Second*, Plaintiffs' claims are barred by res judicata and collateral estoppel. The D.C. Circuit has already held that the FCC did not engage in unreasonable delay in acting on Plaintiffs' license transfer applications.  Plaintiffs did not appeal that decision to the U.S. Supreme Court.  The D.C. Circuit's decision is final and binding on Plaintiffs.  Plaintiffs cannot collaterally attack that decision in any court, let alone a court that lacks subject matter jurisdiction in the first place.

*Third*, even if Plaintiffs were in the right court (which they are not), dismissal would still be required because all of Allen Media's actionable conduct constitutes legitimate petitioning activity and speech that is protected by the First Amendment.  Plaintiffs' attempt to leverage federal civil rights laws to suppress Allen Media's expressive activity is impermissible.

*Finally*, Plaintiffs' claims must be dismissed because they rest upon entirely speculative and conclusory allegations, which are directly contradicted by the administrative pleadings incorporated by reference into the FAC.  Those documents tell a far more prosaic story as to why the Standard General-TEGNA deal fell apart that has absolutely nothing to do with Plaintiffs' race.

To put it bluntly, Plaintiffs have brought the wrong suit, in the wrong court, at the wrong time.  Because this Court lacks subject matter jurisdiction to adjudicate Plaintiffs' claims, Allen Media moves for dismissal with prejudice.

## SUMMARY OF FACTUAL ALLEGATIONS[1]

### A.    Plaintiffs' Proposed Merger Generates Significant Objections

After entering into a merger agreement, Standard General filed license-transfer applications with the FCC seeking approval to transfer over sixty broadcast licenses from TEGNA to a holding company, plaintiff SGCI Holdings III LLC.  (FAC, ¶ 69.)  The applications were part of four related, sequential transactions involving CMG Media Corporation ("Cox") and Apollo Global Management ("Apollo"), whereby (1) a Standard General affiliate first transferred its four television stations to a Cox subsidiary, under Apollo's *de facto* control; (2) Cox then transferred control of the stations from a different wholly-owned subsidiary, Teton Parent Corporation ("Teton"), to Standard General; (3) TEGNA, with its several dozen stations, merged into Teton, with Standard General funding the purchase price with, among other funds, loan proceeds from a consortium of twelve banks and the sale of stock to several foreign entities; and (4) Standard General would then spin off several stations back to Cox.  (*Id.*, ¶ 222 n.143 [¶¶ 1, 5-9].)

Under the parties' agreement, Standard General had up to 450 days to obtain approval from the FCC for the license transfers, after which TEGNA had the contractual right to terminate the deal and Standard General lost its financing commitments.  (*Id.*, ¶¶ 63-64, 66.)  That approval process requires the FCC to

---

[1] The factual summary directly relies upon several documents from the *Standard General and TEGNA, MB Docket* 22-162, incorporated by reference into the FAC, rather than Standard General's mischaracterization of their content.

assess whether the transaction would serve the public interest, among other factors. (*Id.*, ¶ 90.)  The FCC has an informal 180-day benchmark to conduct its review, but that timeline "carries with it no procedural or substantive rights or obligations," and the FCC's "statutory obligation to determine that an assignment or transfer serves the public interest takes precedence over the informal timeline."  (*Id.*, ¶ 63 n.12.)

Other parties in interest may file public comments or petitions to deny a license-transfer application, advocating that a particular application is inconsistent with the public interest.  (*Id.*, ¶ 97.)  Frequent objectors, defendants NewsGuild and Common Cause, were the first to appear in the Standard General-TEGNA proceedings, raising concerns about the transaction.  They asked the FCC's Media Bureau to order Standard General to produce more information and extend the public comment period.  (*Id.*, ¶¶ 129-130.)  The FCC did so.  (*Id.*, ¶¶ 131-132 & n.71 [requesting, *inter alia,* information regarding "anticipated retransmission negotiating strategy"; a "detailed explanation with supporting data" how the transaction would "serve the public interest" and "improve local programming"; and an accounting of "anticipated staffing reductions"].)

Defendants Common Cause, United Church of Christ Media Justice Ministry, NewsGuild, and the National Association of Broadcast Employees and Technicians ("NABET") (collectively, "Objectors") later filed petitions to deny Standard General's license transfer applications.  (*Id.*, ¶¶ 135 n.73, 147 n.78.)  The Objectors asserted, among other objections, that (1) the transaction would undermine the FCC's goal of

promoting localism by reducing jobs and the amount and scope of local news coverage, (2) the deal would lead to higher prices for consumers, and (3) if Apollo had *de facto* control over Standard General's stations, the transaction could exceed the FCC's ownership limits.  (*Id.*)  DISH Network Corporation later publicly appeared in the proceedings, and objected that the transaction would enable Standard General to exploit existing agreements to increase retransmission fees for multichannel video programming services and leverage its market dominance to extract higher fees.  (*Id.*, ¶ 208 n.133.)

In response to these and other concerns, the FCC issued a second request for information.  (*Id.*, ¶ 168 n.101.)  Standard General responded with unsolicited commitments regarding retransmission consent fees and reductions in local jobs, but also took the position that its "employment and programming decisions" were "in the discretion of licensees, not the government."  (*Id.*, ¶ 173 n.104.)  Standard General also pointed to other commenters in the record, including members of the Senate and House of Representatives, and minority advocacy groups who had spoken out in support of the transaction.  (*Id.*)

Other politicians were less sanguine about the deal.  Speaker Nancy Pelosi and Senator Elizabeth Warren filed letters with the FCC, expressing concerns about the transaction.  Pelosi stated that "further scrutiny" was appropriate to address Standard General's "specific plans for local news, the complex ownership structure, and calculations of post-transaction retransmission" rates, among other issues.  (*Id.*, ¶ 177 n.107.)  Warren expressed concern about "increasing consolidation in the

media industry"—noting that Standard General's significant stake in another media conglomerate, Cox, would reduce competition and lead to higher prices for consumers.  (*Id.*, ¶ 205 n.131.)  In addition, Warren cited media reports, noting Standard General had told investors it planned to eliminate jobs at TEGNA, and rejected that the conditions—proposed by Standard General to salvage the deal— would be effective.  (*Id.*)

### B.   After The FCC's Media Bureau Issues A Hearing Order, TEGNA Exercises Its Contractual Right To Terminate The Deal

In February 2023, the FCC's Media Bureau issued a Hearing Order, stating that "substantial and material questions of fact exist" regarding whether the transactions are "likely to trigger a rate increase harmful to consumers" and "will reduce or impair localism, including whether they will result in labor reductions at local stations."  (*Id.*, ¶ 222 n.143 [*see* ¶¶ 2-3, 16, 23-25].)

In support of the Media Bureau's concerns regarding consumer harms, the Hearing Order cites caselaw supporting that retransmission rate increases can "constitute a public interest harm if such increases are not simply the product of a properly functioning competitive marketplace."  (*Id.*, ¶ 222 n.143 [¶ 24].)  The Order also flags the highly orchestrated structure of the Standard General transaction— under "which the various assignments and/or transfers of control" were artificially sequenced "to take advantage of after-acquired station clauses" that would instantly increase rates—as raising questions about anticompetitive practices.  (*Id.*, ¶ 222 n.143 [¶¶23-26, 32].)

The Order goes on to identify the following issues for hearing: (1) "whether

the sequencing of the Transactions was intended primarily to increase retransmission fees" and would "likely cause an increase in rates" for retail subscribers; (2) whether the sequencing "constitutes anticompetitive activity"; (3) what "harm to viewers and the public interest" could result and whether it could "be adequately mitigated" by Standard General's voluntary commitments; and (4) whether the applicants violated FCC rules or committed other wrongdoing in structuring the deal. (*Id.*, ¶ 222 n.143 [¶32].)

As to the Media Bureau's concerns regarding localism, the Hearing Order noted its concerns "that a diminution in the employment of local journalists and other local staff poses a threat to localism," and cited to Standard General's internal documents and other documentary evidence revealing its plans to substantially "reduce local jobs." (*Id.*, ¶ 222 n.143 [¶¶ 33-39].) Although Standard General disputed this evidence, the Hearing Order determined the "conflicting evidence on the record" created unresolved material issues of fact, including "reconciling the accuracy and legitimacy" of Standard General's various explanations for the documents; whether a voluntary two-year staffing commitment was adequate to mitigate the FCC's concerns; whether the structure of Standard General's ownership would benefit or harm the public interest in localism; and how the creation of a Washington, D.C. news bureau would impact localism. (*Id.*, ¶ 222 n.143 [¶¶ 43-50].)

The FAC rejects the substantiality and materiality of the Hearing Order's stated concerns, labeling them "entirely pretextual and a sham to cover the racial

discrimination against Mr. Kim." (*Id.*, ¶ 317.)  As support for its allegations of sham and pretext, Standard General points to its own disagreement with the Objectors' concerns, alleging they "lacked sufficient evidentiary support" and were "objectively baseless." (*Id.*, ¶¶ 317, 321.)

Because Standard General was worried its financing commitments would expire before a hearing could take place, it tried to expedite the hearing and requested that the Administrative Law Judge ("ALJ") certify the Hearing Order for immediate review by the full Commission. (*Id.*, ¶¶ 67, 229, 241.)  After the ALJ declined to do so and the FCC rebuffed demands that the full Commission rescind the Media Bureau's order, Standard General filed a Notice of Appeal of the Hearing Order in the D.C. Circuit, (Allen Media's Request for Judicial Notice ("RJN") Ex. 1), and a separate petition for writ of mandamus with the D.C. Circuit challenging the FCC's "unreasonable delay" in ruling on the license-transfer applications and demanding that the Commission rule on the applications by April 28, 2023.  (*Id.*, ¶¶ 241-243, 245; Allen Media's RJN Ex. 2 at i-ii.)

In April 2023, the D.C. Circuit dismissed the appeal as premature (*id.* Ex. 3), and denied the petition for a writ of mandamus on the merits because Standard General had not "demonstrated that [the FCC] has unreasonably delayed in acting on their applications," "[n]or have they shown that [the FCC] has a 'crystal clear' duty to rule on their applications without resort to a hearing." (FAC ¶ 245; Allen Media's RJN Ex. 4 (quoting *Telecomms. Research & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*); *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670

(D.C. Cir. 2022).)  Plaintiffs did not seek certiorari.

Two months later, Standard General's financing agreements expired, and TEGNA terminated the merger agreement.  (FAC ¶ 261.)  Standard General alleges it was unable to obtain replacement financing because the lending environment had "rapidly changed" during the intervening period.  (*Id.*, ¶ 262.)

### C. Plaintiffs Allege a Far-Fetched Conspiracy That Allen Media Was the Puppet Master Behind The Scenes Controlling Prominent Members of Congress and an Entire Federal Agency

The FAC does not allege that Allen Media appeared in the FCC proceedings or petitioned the FCC to deny the license transfer applications.  (FAC ¶ 3.) Standard General instead alleges—on information and belief—that Allen Media acted as a puppet master behind the scenes, and manipulated the Objectors, politicians, and the FCC to derail the deal.  (*Id.*, ¶¶ 271-289.)  Standard General avers that Allen Media's motivation was to give Mr. Allen "another chance to buy TEGNA."  (*Id.*, ¶ 271.)   Notwithstanding this purported motivation, the FAC does not allege Allen Media made any effort do so after the demise of Plaintiffs' deal.

Standard General alleges that Allen Media engaged in the following actionable conduct:

- Byron Allen donated $350,000 to two Democratic congressional Super PACs in October 2022, after Speaker Nancy Pelosi expressed her concerns about the deal.  (*Id.*, ¶¶ 26, 175-177, 179.)  Standard General alleges in conclusory fashion that "it was clear" Ms. Pelosi's letter, which predated the donation, "came in return" for the donations.[2]  (*Id.*, ¶ 179.)

- Standard General alleges in conclusory fashion and on "information and

---

[2] Standard General intentionally omits facts that undermine its theory, such as that Byron Allen donated to politicians who spoke out in favor of Plaintiff's deal to acquire TEGNA.

belief" that Senator Elizabeth Warren spoke out against the deal "at the behest" of Mr. Allen.  (*Id.*, ¶¶ 205-206.)

- Mr. Allen hosted a fundraiser, which many high-ranking Democratic politicians attended, when Standard General's license transfer applications were still pending.  (*Id.*, ¶ 210.)

- Both before and after the Standard General deal fell apart, media reports quoted Mr. Allen as expressing interest in buying TEGNA.  At one point Mr. Allen proposed to Plaintiff Soohyung Kim, that he should include Allen Media in the deal.  (*Id.*, ¶¶ 22, 128, 133, 278-279.)

- "On information and belief," the lobbyist, David Goodfriend and the Goodfriend Group—who appeared in the FCC proceedings on behalf of NewsGuild and NABET—were covertly acting at the behest of Allen Media. (*Id.*, ¶¶ 137, 158-159, 278-279.)

- Standard General alleges that the FCC's license-transfer review was really "always about" making Mr. Allen "TEGNA's rightful owner."  (*Id.*, ¶ 397.)  To this end, the FCC chairwoman and Media Bureau chief allegedly condoned Mr. Allen's "race discrimination" and adopted "his view of the role race should play in the FCC's decisions."  (*Id.*, ¶¶ 184, 272, 280, 309.)

In response to the original Complaint, several defendants served Plaintiffs with Rule 11 letters and draft sanctions motions on the grounds that the Complaint is factually and legally frivolous and brought for an improper purpose.  (Declaration of David W. Schecter ("Schecter Decl.") ¶ 7.)  In response, Plaintiffs agreed to amend their complaint and filed an unopposed motion for leave to amend.  (*Id.*; Dkt. 35.) The FAC, however, is nearly identical to the original Complaint, except it includes an additional claim that the FCC engaged in *ultra vires* conduct.  (*Compare* Dkt. 1 *with* Dkt. 36.)

The FAC asserts six causes of action against Allen Media.  The federal civil rights claims—brought under 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and 42 U.S.C. § 1986—allege that Allen Media: (1) "weaponized Mr. Kim's race to block the

TEGNA deal"; (2) "inhibited" Standard General's "performance under the merger and financing agreements" through its efforts "to kill" the deal; (3) worked together with the other defendants to "thwart" the deal, purportedly because Mr. Kim was "not the 'right type of minority'"; and (4) neglected to prevent a "racially motivated conspiracy" to "delay review" of Standard General's license transfer applications. (*Id.*, ¶¶ 336-363.)

Plaintiffs' common law claims—for tortious interference with contract, tortious interference with prospective business opportunity, and civil conspiracy— rest on similar allegations.  Plaintiffs allege Allen Media knew that Standard General's financing commitments would expire by May 2023, and that it allegedly interfered with the approval process—behind the scenes—by influencing the Objectors during the public comment and petition process.  (*Id.*, ¶¶ 11, 364-387.)

The FAC's prayer for relief asks, among other relief, that this Court enter a "permanent injunction" ordering the FCC not to discriminate on the basis of race, or use race "as a stereotype or negative consideration" for future license transfer applications by any party; and demands that defendants cover the $136 million breakup fee it paid to TEGNA, among other monetary and punitive damages. (Prayer for Relief, §§ B-F.)  Plaintiffs demand a jury trial for each claim.

There is almost no difference between the Complaint and the FAC as to the allegations against Allen Media.  Plaintiffs added allegations that Mr. Allen has boasted he is FCC-approved; Mr. Goodfriend did unspecified lobbying work on behalf of Mr. Allen with the FCC during the same period he represented the

Objectors; and Mr. Goodfriend currently represents Allen Media in connection with the FCC's diversity initiative.  (FAC ¶¶ 9, 25, 129, 159, 276, 291.)

The FAC also alleges for the first time that an "obvious inference" can be drawn from "the timeline of events" that Mr. Goodfriend through his lobbying firm was conspiring and working "in concert with" Allen Media between February and May 2022 because (1) Mr. Allen called Mr. Kim "the day after the FCC ordered Standard General to produce highly sensitive documents"; (2) media reports quoted Mr. Allen as still "in the fight" for TEGNA in May 2022; (3) the Objectors demanded information about "alternative transactions" considered by TEGNA; and (4) Mr. Goodfriend had a scheduled meeting with the FCC chairwoman on the same day the Objectors made this request.  (*Id.* ¶ 137, 278.)

## LEGAL STANDARD

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Brewer v. District of Columbia*, 891 F. Supp. 2d 126, 130-31 (D.D.C. 2012) (Contreras, J.).  The plausibility standard "'asks for more than a sheer possibility that a defendant has acted unlawfully.'"  *Id.* at 131 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The court "need not accept as true inferences unsupported by facts set out in the complaint," "legal conclusions cast as factual allegations," *id.*, or "naked assertions devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).   The court may consider documents incorporated by reference in the FAC, and matters subject to judicial notice.

*Mesumbe v. Howard Univ.*, 706 F. Supp. 2d 86, 91-92 (D.D.C. 2010).

A claim may also be dismissed under Rule 12(b)(1) based on challenges to a court's subject matter jurisdiction. *Tanner-Brown v. Jewell*, 153 F. Supp. 3d 102, 107-08 (D.D.C. 2016) (Contreras, J.).  It is a plaintiff's burden to prove jurisdiction upon commencement of an action. *Am. Farm Bureau v. U.S. E.P.A.*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).  Because a court must give a plaintiff's factual allegations "'closer scrutiny'" when resolving a Rule 12(b)(1) motion, compared to one brought under Rule 12(b)(6), this Court "is not limited to the allegations contained in the Complaint" and may also consider "'undisputed facts plus the court's resolution of disputed facts.'" *Jewell*, 153 F. Supp. 3d at 108.

## ARGUMENT

### I.   The FAC Should Be Dismissed For Lack Of Subject Matter Jurisdiction

This Court lacks jurisdiction to consider the causes of action in Plaintiffs' FAC because they directly challenge the FCC's Hearing Order.  The linchpin of their entire case is that the Hearing Order was tantamount to an improper denial of their license transfer applications and that the FCC engaged in *ultra vires* agency action.  If the FCC's order was justified, Plaintiffs have no case at all.

But this Court does not have jurisdiction to review the FCC's orders or decide whether the FCC's conduct was or was not justified.  Asking a jury to decide the propriety of the FCC's alleged constructive denial of Standard General's license transfer applications directly conflicts with, and would undermine, the statutory review procedures that Congress has mandated for review of FCC decision making,

which vests exclusive jurisdiction to review such orders in the D.C. Circuit.

**A.    Exclusive Statutory Review Mechanisms Bar Collateral Attack Of An FCC Order In Civil Litigation**

Congress reserved to the Courts of Appeals the "exclusive jurisdiction" to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the FCC's final orders.  28 U.S.C. §§ 2342, 2344 ("Hobbs Act"); 47 U.S.C. § 402(a); *TRAC*, 750 F.2d at 75, 77.  Exclusive jurisdiction encompasses claims that an administrative agency has engaged in "unreasonable delay" in issuing a final order. *TRAC*, 750 F.2d at 79.  In addition, exclusive jurisdiction lies solely with the D.C. Circuit for FCC "decisions and orders" regarding applications to transfer, assign or dispose of station licenses.  47 U.S.C. § 402(b).  Reserving exclusive jurisdiction to the appellate courts is intended to promote "judicial economy and fairness to the litigants by taking advantage of [agency] expertise," and prevent "duplicative and potentially conflicting review and the delay and expense incidental thereto." *TRAC*, 750 F.2d at 78 (citation omitted).

These exclusive judicial review mechanisms divest district courts of jurisdiction to pass on issues that would require them to decide whether they "agreed" or "disagreed" with the FCC's administrative decisions. *Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 400 (9th Cir. 1996).  Litigants cannot avoid these exclusive review mechanisms "'by requesting the District Court to enjoin action that is the outcome'" of an agency's order, or by claiming that the order was outside the agency's jurisdictional authority. *Hemp Indus. Ass'n v. Drug Enf't Admin.*, 36 F.4th 278, 288 (D.C. Cir. 2022); *see also Johnson v. F.C.C.*, 2022 WL 17262173, at *3

(D.D.C. Nov. 29, 2022) ("By statute, the federal district courts lack jurisdiction to review FCC administrative decisions," "even if the agency order is allegedly *ultra vires*"); *Self v. Bellsouth Mobility, Inc.*, 700 F.3d 453, 464 (11th Cir. 2012) ("To pin the tail on the donkey: a court without jurisdiction to review agency actions lacks jurisdiction to decide whether the agency had jurisdiction to act as it did").

Federal trial courts lack jurisdiction even if a particular litigant fails to satisfy the statutory prerequisites for invoking the judicial review mechanism prescribed by Congress. *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 66-70 (1970) (litigant's collateral attack was precluded even where passage of time made Hobbs Act review unavailable); *Am. Bird Conservancy v. F.C.C.*, 408 F. Supp. 2d 987, 996-97 (D. Haw. 2006) (plaintiffs could not "rely on their failure to take the appropriate measures to create an administrative record, and then assert that the lack thereof compels jurisdiction in the district court"; the remedy to challenge delayed FCC action was a "petition for mandamus in the court of appeals").

Exclusive review mechanisms also cannot be circumvented where a litigant *tries* but fails to obtain a writ of mandamus compelling the agency to act on a different timeline. Indeed, Standard General recognized this itself when it petitioned the D.C. Circuit for a writ of mandamus, calling mandamus "the appropriate—indeed, the only—judicial remedy." (Allen Media's RJN Ex. 2 at 41.)

Litigation between private parties is not exempt from these jurisdictional rules. *Mais v. Gulf Coast Bureau Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014)

(whether challenge to an "FCC order 'arises in a dispute between private parties makes no difference'").  What matters is whether a plaintiff's claims "depend on establishing that all or part of an FCC order subject to the Hobbs Act is 'wrong as a matter of law' or is 'otherwise invalid.'"  *Id.* at 1119-21 (looking to the "practical effect of a proceeding" to impose jurisdictional bar even though plaintiff "did not sue with the primary intent" to challenge an FCC order, and claim "did not necessarily depend on invalidation of the agency ruling"); *see also Daniels v. Union Pac. R.R.*, 530 F.3d 936, 940-41 (D.C. Cir. 2008) (affirming dismissal of complaint against private railroad company alleging due process violations where claims of bias, once reflected in a final agency action, were subject to the Court of Appeal's exclusive jurisdiction).

### B.    Plaintiffs' Claims Are Brought In The Wrong Court

According to Plaintiffs' appellate filings in the D.C. Circuit, the Hearing Order is a final FCC order that constructively denied their license transfer applications.  (Allen Media's RJN Ex. 5 at 10-21.)  Taking Standard General at its word, that means this Court lacks jurisdiction over its claims.  The result is the same, even if Plaintiffs change position, and claim the Hearing Order is a non-final order and the FCC unduly delayed issuing a final order.  Standard General was obligated to challenge that order in the D.C. Circuit regardless.

The factual predicates of Plaintiffs' allegations that Allen Media purportedly weaponized race to block the TEGNA deal are that (1) the FCC's stated reasons for the Hearing Order were false and pretextual; and (2) but for the FCC's *ultra vires*

and racially discriminatory conduct, the applications would have been approved. (*See* FAC, ¶¶ 3-4, 11, 16, 317, 388-399.)  To prevail, Plaintiffs would need the jury to "disagree" with the Hearing Order's constructive denial of the license transfer applications, and agree with Standard General that the Order was pretextual, "objectively baseless"  and without "evidentiary support."  (*Id.*, ¶¶ 317, 321.)  Such allegations are a direct challenge to "conduct that is expressly licensed, certified, and regulated by" the FCC, and as such, necessarily "falls within the scope of the Hobbs Act."  *Pub. Watchdogs v. S. Cal. Edison Co.*, 984 F.3d 744, 766 (9th Cir. 2020).

Plaintiffs' claims also require a factfinder to determine whether the FCC was correct in (implicitly) concluding that the license transfers were against the public interest.  That determination is uniquely within the FCC's expertise and discretion, and involves its most sensitive and discretionary regulatory policymaking functions. *Schurz Commc'ns, Inc. v. F.C.C.*, 982 F.2d 1043, 1048 (7th Cir. 1992) (noting "nebulous" public interest mandate "invests the Commission with an enormous discretion and correspondingly limits the practical scope of responsible judicial review"); *Ellis v. Tribune Television Co.*, 443 F.3d 71, 84 (2d Cir. 2006) (FCC's "weighing of the 'public interest'" in broadcasting licensure matters requires "administrative—rather than judicial—review").

Because Plaintiffs' claims ask this Court to review and overrule the FCC, they are jurisdictionally barred.  *TRAC*, 750 F.2d at 75, 77.  The Prayer for Relief, which requests a declaratory judgment that the Hearing Order was "pretextual"

and was issued "because of Mr. Kim's race," makes this plain.  (*See* FAC, Prayer for Relief, ¶ A.)  This Court must reject Plaintiffs' baseless invitation to determine the validity of an FCC order.

### C.     The Doctrine Of Primary Jurisdiction Is A Separate And Independent Basis To Dismiss The FAC

Primary jurisdiction is an abstention doctrine that applies where a claim "'requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'"  *Ellis*, 443 F.3d at 81.  The principal reasons for the doctrine are (1) to obtain the benefits of the responsible administrative agency's expertise and experience, and (2) to achieve uniformity, particularly in the specialized areas that have been committed to agency expertise.  *Alltel Tenn. v. Tenn. Pub. Serv. Comm'n*, 913 F.2d 305, 309 (6th Cir. 1990); *U.S. Tour Operators Ass'n v. Trans World Airlines, Inc.*, 556 F.2d 126, 130 (2d Cir. 1977) ("rationale of the doctrine of primary jurisdiction is not concern for specific litigants, but rather the notion that the agencies, with their special expertise, should have the initial opportunity to develop and administer their policies consistently").

The primary jurisdiction analysis centers on four factors:  (1) whether the matter involves technical or policy considerations within the agency's particular expertise; (2) whether the question is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings, and (4) whether a prior application has been made to the agency.  *Nat'l Commcn's Ass'n, Inc. v. AT&T*, 46 F.3d 220, 222-23 (2d Cir. 1995).

These factors require dismissal here.  Congress delegated to the FCC exclusive jurisdiction over broadcast licenses, which is uniquely within the agency's expertise and discretion.  *In re NextWave Personal Commc'ns, Inc.*, 200 F.3d 43, 55 (2d Cir. 1999) (FCC's exercise of its licensing authority "'is a task that Congress has delegated to the Commission in the first instance'" with "deferential judicial review to the courts of appeals").  In particular, the public interest determination raises "'issues of fact not within the conventional experience of judges,'" which courts have held are especially subject to the primary jurisdiction doctrine.  *Himmelman v. MCI Commc'n Corp.*, 104 F. Supp. 2d 1, 4 (D.D.C. 2000); *Ellis*, 443 F.3d at 83-84 (applying primary jurisdiction doctrine to dismiss action challenging FCC licensing determination, which required a delicate balancing of the public interest and other "difficult and unique" policy questions); *see also Thompson v. Tex. Mexican Ry. Co.*, 328 U.S. 134, 148 (1946) (agency's function "to protect the public interest" would be undermined if "jury verdict or settlements would take the place of the expert and informed judgment of the Commission").

There is also a substantial risk of inconsistent rulings.  Standard General represents that it "will appear before the FCC again soon" to obtain the renewal and transfer of station licenses, and is transparently using this litigation to obtain and leverage a ruling that it can use to its benefit in those proceedings, demanding that the FCC conduct its public interest inquiry differently in the future.  (FAC, ¶¶ 334-335.)  A prior application to the agency also clearly existed, in the form of Standard General's license transfer applications, which were still pending before the FCC

when TEGNA chose to exercise its contractual right to terminate the deal.  In these circumstances, abstention is warranted.

## II.     <u>Plaintiffs Are Estopped From Pursuing This Case</u>

The doctrines of res judicata and collateral estoppel also preclude Plaintiffs' claims.  "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Id.*  Both doctrines serve to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."  *Id.*

Res judicata "prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim."  *NextWave Personal Commc'ns, Inc. v. F.C.C.*, 254 F.3d 130, 143 (D.C. Cir. 2001); *accord Drake v. F.A.A.*, 291 F.3d 59, 66 (D.C. Cir. 2002).  Courts apply a three-part test to determine whether res judicata applies:  (1) whether the claim was adjudicated finally in the first action on the merits; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case.  *McIntyre v. Fulwood*, 892 F. Supp. 2d 209, 214 (D.D.C. 2012).

Those factors compel dismissal here.  Plaintiffs' claim that the FCC engaged

in unreasonable delay and acted improperly was adjudicated by the D.C. Circuit on the merits.  (Allen Media's RJN Exs. 2, 4.)  Standard General presented its arguments to the D.C. Circuit through a writ of mandamus, and the D.C. Circuit held that Standard General failed to demonstrate that the FCC "unreasonably delayed in acting on their applications" and failed to show that the FCC "has a 'crystal clear' duty to rule on their applications without resort to a hearing."  (*Id.* Ex. 4.)  Standard General did not appeal that decision to the U.S. Supreme Court and let it stand as a final decision.[3]

This case and the prior D.C. Circuit appeal involve the same nucleus of facts and the same claims and issues that were raised or could have been raised in the D.C. Circuit.  (*Id.* Ex. 2.)  And this case involves the same parties or those in privity with the same parties, as Plaintiff SGCI Holdings III LLC was an appellant/ petitioner in the appeals and Soohyung Kim is in privity with SGCI Holdings III LLC.  (FAC ¶ 29 (alleging that Mr. Kim is the "founder and chief investment officer of Standard General and managing member of SGCI Holdings III, an affiliate of Standard General")).

In addition, Plaintiffs are collaterally estopped from arguing that the FCC engaged in unreasonable delay or otherwise acted improperly in issuing the Hearing Order.  For collateral estoppel to apply, "the same issue must be at stake in

---

[3] Standard General also filed a notice of appeal of the FCC's Hearing Order in the D.C. Circuit in *SGCI Holdings III LLC, et al. v. FCC*, Appeal No. 23-1083, but the D.C. Circuit granted the FCC's motion to dismiss that appeal as premature.  (Allen Media's RJN Exs. 1, 3.)

both cases, and the issue must have been litigated and decided in the first suit."
*McCord v. Bailey*, 636 F.2d 606, 609 (D.C. Cir. 1980).   Here, Plaintiffs allege that
the FCC engaged in unreasonable delay and *ultra vires* conduct by not promptly
granting Plaintiffs' license transfer application and by instead using a "pocket veto"
by setting the matter for an administrative hearing.  (FAC, ¶¶ 308, 388-399.)
Plaintiffs had a full and fair opportunity to present these same arguments—and in
fact did present these same arguments—to the D.C. Circuit.  (Allen Media's RJN
Ex. 4.)  The D.C. Circuit rejected them.  (*Id.*)  Plaintiff SGCI Holdings III LLC was a
party to that prior action and is also a plaintiff here asserting the same arguments.
(*Id.* Exs. 2, 4.)

     Res judicata and collateral estoppel bar Plaintiffs from pursuing this case
any further because all of their claims necessarily depend on a finding that the FCC
engaged in unreasonable delay and acted improperly in setting their transfer
application for an administrative hearing.

## III.   **Plaintiffs' Claims Are Barred By The First Amendment**

     Separately, all of Allen Media's alleged wrongful conduct is expressive speech
and political activity that is protected by the First Amendment.  Based on the
judicial admissions set forth in the FAC, dismissal is required.  *Kim v. United
States*, 632 F.3d 713, 719 (D.C. Cir. 2011) ("[A] complaint may be subject to
dismissal under Rule 12(b)(6) when an affirmative defense . . . appears on its face.");
*Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("an
affirmative defense may be raised by pre-answer motion under Rule 12(b) when the

facts that give rise to the defense are clear from the face of the complaint").

**A.** **Allen Media's Alleged Conduct Is Protected By The First Amendment**

All the activities concerning Allen Media described in the FAC[4] are protected by the First Amendment:

*Political donations and influence.*  Byron Allen's donations to two Democratic congressional Super PACs is expressive conduct that is protected under the First Amendment. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985) (donating money "functions as a general expression of support for the recipient and its views").  It does not matter if these donations, or the political fundraiser that Mr. Allen later hosted, afforded him political access, or generally ingratiated him with influential politicians.  (FAC, ¶¶ 205-206, 210.)  To the contrary, such political speech embodies a "central feature of democracy" that the First Amendment zealously protects—e.g., "that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192 (2014).

*Speaking to the press*.  Mr. Allen's statements to the press regarding the TEGNA transaction, and discussing Allen Media's confidence in its own business prospects and ability to navigate FCC approval processes, is likewise quintessential protected speech, regardless as to whether Mr. Allen was attempting to secure

---

[4] Allen Media vigorously disputes the veracity of Standard General's allegations, and only "accepts" them as required for purposes of its motion to dismiss.

government action.  (FAC, ¶¶ 22, 128, 133, 275-276, 278-279); *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 257, 262 (D.C. Cir. 1981) ("a genuine attempt to secure government action," via advocacy in the media, has First Amendment protections).

**_Orchestrating Objectors._**  The only other conduct alleged—Allen Media's purported machinations to drive the Objectors' participation in the administrative process and influence its outcome—is likewise classic First Amendment-protected petitioning activity.  (FAC, ¶¶ 24-25, 158-159, 278-289; *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967) ("every person or group engaged … in trying to persuade Congressional action is exercising the First Amendment right of petition"); *Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("there is practically universal agreement that a major purpose of [the First] Amendment was to protect free discussion of governmental affairs").

The First Amendment shields such protected speech from private litigation. *See N.Y. Times v. Sullivan*, 376 U.S. 254, 270 (1964) (noting "debate on public issues should be uninhibited, robust, and wide-open"); *Snyder v. Phelps*, 562 U.S. 443, 451 (2011) ("The Free Speech Clause of the First Amendment … can serve as a defense in state tort suits….").  Antidiscrimination statutes are not a license to "interfere with" Allen Media's "desired message" and cannot be used to compel it "to include other ideas with [its] own speech that [it] would prefer not to include." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586, 596 (2023).

Standard General's efforts to use antidiscrimination laws to suppress

different viewpoints on issues of public concern must be rejected.[5]

### B.   *Noerr-Pennington* Immunity Bars Plaintiffs' Claims

The *Noerr-Pennington* doctrine provides a separate and independent basis to dismiss Plaintiffs' claims.  The doctrine, named for two Supreme Court cases, provides that "defendants who petition the government for redress of grievances, 'whether by efforts to influence legislative or executive action or by seeking redress in court,' are immune from liability for such activity under the First Amendment." *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 156 (D.D.C. 2008); *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *see also Israel v. Baxter Labs., Inc.*, 466 F.2d 272, 277 (D.C. Cir. 1972) ("For the political process itself to be effective there must be freedom of access, regardless of motive, to ensure the 'right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws'").

The *Noerr-Pennington* doctrine confers immunity on citizens exercising their First Amendment right to petition the government.  *See Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) ("when a person petitions the government for redress, the First Amendment prohibits any sanction on that action").  Both the Supreme Court and D.C. Circuit have invoked its principles

---

[5] The FAC touts the rollback of affirmative action in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023), a lawsuit instigated by the same Plaintiffs' counsel, which is engaged in similar agenda-driven litigation in federal courts throughout the country.  (FAC, ¶ 1.)  This agenda has nothing to do with this case.

outside of antitrust.  *See, e.g., N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 912-14 (1982) (applying First Amendment protections to plaintiffs' boycott of white merchants, noting "the right of people to petition their representatives in government 'cannot properly be made to depend on their intent in doing so'" (citing *Noerr*, 365 U.S. at 139)); *Whelan v. Abell*, 48 F. 3d 1247, 1254 (D.C. Cir. 1995) (recognizing common law torts of malicious prosecution and abuse of process could violate First Amendment to the extent they implicated parties' protected right to petition before courts and administrative agencies).

Courts have expressly recognized that the doctrine applies to the types of claims that Plaintiffs allege.  *See, e.g., Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 362-63 (S.D.N.Y 2010) (*Noerr-Pennington* doctrine barred § 1981 claim); *Nazir v. United Air Lines, Inc.*, 2009 WL 2912518, at *3 (N.D. Cal. Sept. 9, 2009) (same, holding "courts must construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause"); *Barnes Found. v. Twp. of Lower Merion*, 927 F. Supp. 874, 875-77 (E.D. Pa. 1996) (*Noerr-Pennington* doctrine barred § 1985(3) claim, noting it was irrelevant that petitioning activity was selfish and "may have been motivated by racism").

Here, all of Plaintiffs' allegations against Allen Media arise from petitioning activity protected by the First Amendment.  There is alleged direct petitioning activity, such as Allen Media purportedly deploying Goodfriend to enlist "straw objectors" to meet with the Media Bureau about the deal, which is immunized under the doctrine.  (FAC, ¶¶ 162; 278-279; *see Jones v. La. State Bar Ass'n*, 738 F. Supp.

2d 74, 80-81 (D.D.C. 2010) (*Noerr-Pennington* immunity applied to claims that defendant attorneys misused their legal licenses and violated civil rights laws by lobbying Congress and other governmental agencies to secure various types of relief for their clients).

There is also alleged indirect petitioning activity—organizing objectors, holding fundraisers, donating to politicians, and talking with the press—which is equally subject to the doctrine. (*See* FAC, ¶¶ 26, 128, 175-181, 278-289.) Both are protected. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499, 503 (1988) (*Noerr-Pennington* protects efforts to influence government through, *inter alia*, "publicity campaigns, and other traditional avenues of political expression" including those "directed at the general public").

### C.    The Alleged Conduct Is Not Subject To *Noerr-Pennington's* Sham Exception

There is a narrow exception to *Noerr-Pennington* immunity for "objectively baseless" attempts to petition the government through improper means, e.g., by using the administrative "*process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (cleaned up) (original italics) (noting a "classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay").

The sham exception is narrow and does not apply, as a matter of law, under the facts alleged in the FAC. Allen Media's alleged petitioning efforts, even according to Plaintiffs, were successful. (*See* FAC, ¶¶ 267-268.) By definition,

*successful* petitioning conduct is not a sham, and cannot be construed as such. *Prof'l Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 58 (1993) ("a successful effort to influence government action certainly cannot be characterized as a sham") (cleaned up); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 862 (5th Cir. 2000) (lobbying activity can only be objectively baseless only if "a reasonable private citizen could not expect to secure favorable government action"). Plaintiffs also have not pled *facts* demonstrating the Hearing Order was objectively baseless, and this Court has no obligation to accept their empty legal conclusions to the contrary.

Under these circumstances, this Court can and should reject the sham exception as a matter of law. *See, e.g.*, *Associated Bodywork & Massage Prof'ls v. Am. Massage Therapy Ass'n*, 897 F. Supp. 1116, 1120 (N.D. Ill. 1995) (granting motion to dismiss where plaintiff failed to allege plausibly that defendant "had no reasonable expectation of obtaining the favorable legislation"); *Jones*, 738 F. Supp. 2d at 81 (granting motion to dismiss where "none of the allegations even remotely suggest that [defendants] used that petitioning activity as a 'sham' for the purpose of intimidating or harassing plaintiff or otherwise discriminating against him").

## IV.   **Plaintiffs' Section 1981 Claim Fails To State A Claim For Intentional Racial Discrimination**

Even if the Court were to look to the merits of the claims—which it need not do since Plaintiffs are relitigating invalid claims in the wrong court—the FAC fails to state a claim under § 1981.

Plaintiffs do not have a contract with Allen Media and are not seeking one.

Therefore, their § 1981 claim relies on the allegation that Allen Media somehow caused them to not obtain a contract through conduct which is racially discriminatory.

Plaintiffs' claim is entirely inconsistent with case law that narrowly construes liability under § 1981 for third-party interference with another's contractual or prospective contractual rights.  Courts have recognized such claims only in a few circumstances, such as when (1) a former employer, motivated by racial resentment, provides an adverse reference to a potential future employer, (2) a defendant is so intertwined with a contracting party, that its discriminatory actions may be directly attributed to that party, or (3) a defendant possesses "sufficient authority to significantly interfere" with another party's contractual rights and "actually exercise[s]" that authority.  *London v. Coopers & Lybrand*, 644 F.2d 811, 818 (9th Cir. 1981), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012).

None of these exceptions applies here.  While Standard General ostensibly tries to wedge Allen Media into the third exception, the effort fails.  The FCC Media Bureau's decision—even if it was in some way influenced by Allen Media—was an "independent governmental choice" made in the FCC's sole discretion that broke the causal link between Allen Media's actions and any injury Plaintiffs may have suffered.  *Associated Bodywork*, 897 F. Supp. at 1120 (where "alleged injury stems from a competitor's success in influencing legislation, that injury is caused by the state legislatures' political decisions, not by the competitor itself").

In addition, the event that ultimately unraveled the deal—the Media Bureau's decision to schedule a hearing—was both in the FCC's sole discretion and "always a risk" that Standard General voluntarily bore. *Shaikh v. City of Chicago*, 341 F.3d 627, 631 (7th Cir. 2003). In *Shaikh*, after the plaintiff purchased property through a public auction, the City allegedly tried to persuade him to back out of purchase, which plaintiff did after the City threatened to condemn the property. *Id.* at 628-29. The property then went to the second-highest bidders, who were Caucasian, and the City elected not to use its powers of eminent domain. *Id.* at 629. The Seventh Circuit affirmed dismissal of plaintiff's § 1981 discrimination suit, noting the City's conduct was not actionable under § 1981 because the City had "no power directly" to affect the sale of the property, and the possibility of eminent domain "was always a risk [plaintiff] bore." *Id.* at 630-31.

The same is true here. Only the FCC had the power and ability to schedule a hearing, and the risk that the Media Bureau would exercise the FCC's statutory authority to do so—and thereby delay the approval process beyond the financing window that Standard General negotiated—was always a risk, and one Standard General voluntarily assumed. That is not actionable under § 1981. *Ginx*, 720 F. Supp. 2d at 359 (dismissing § 1981 claim alleging defendants interfered with plaintiffs' efforts to obtain a liquor license; defendant's "constitutionally protected" attempt to "influence that decision" was not actionable, because only the State Liquor Authority had the power to issue the license).

Plaintiffs' § 1981 claim should be dismissed with prejudice. Stripped of bald

accusations and rank speculation, the *factual* allegations in the FAC come nowhere close to stating a claim.  These defects are not fixable under the law or the facts already alleged.  *Adetoro v. King Abdullah Acad.*, 585 F. Supp. 3d 78, 85 (D.D.C. 2020) (dismissal with prejudice warranted when "'the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency'").

## V.   Plaintiffs' Generalized Allegations Of Conspiracy Fail To State A Claim Under Federal Or State Law

Plaintiffs' conspiracy claims also must be dismissed.  The claims are all derivative and fail for the same reasons as the § 1981 claim.  In addition, the FAC's vague and conclusory allegations of an improbable conspiracy—that do not allege when any agreement took place, how it was brokered, or describe any specific events, conversations, or relevant documents evidencing the parties' shared efforts to undermine the Standard General transaction—are insufficient to survive a motion to dismiss.

***The claims are derivative.***  That Plaintiffs' § 1981 cause of action fails to state a claim is all this Court needs to know to dismiss their federal conspiracy claims.  "Section 1985(3) is remedial and provides no substantive rights on its own." *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 60 (D.D.C. 2019).  In the absence of an underlying violation of a federal constitutional or statutory right, the claim necessarily fails.  *Benzinger v. NYSARC, Inc. N.Y. City Chapter*, 385 F. Supp. 3d 224, 236 (S.D.N.Y. 2019) (dismissing § 1985(3) claim where plaintiff failed to plead the denial of a right protected by § 1981).  The same is true for civil conspiracy claims under D.C. law.  *Nader*, 567 F.3d at 697 (civil conspiracy "is not an

independent tort but only a means for establishing vicarious liability for an underlying tort"); *accord Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983); *Griva v. Davison*, 637 A.2d 830, 848-49 (D.C. 1994).

    ***The allegations of a conspiracy are deficient.***  The conspiracy claims also independently fail.  There are no plausible allegations in the FAC that Allen Media was involved in any conspiracy, much less one that could satisfy the required elements of the § 1985(3) or common law civil conspiracy.  Those elements are "'(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the Untied States.'"  *De La Fuente v. DNC Servs. Corp.*, 2019 WL 1778948, at *9 (D.D.C. Apr. 23, 2019).[6]

    Section 1985(3) "'does not apply to *all* conspiratorial tortious interferences with the rights of others, but only those motivated by some class-based, invidiously discriminatory animus.'"  *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (original italics); *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007) (requirement that § 1985(3) "only applies to conspiracies motivated by some class-based, invidiously discriminatory animus" is "'read narrowly to avoid converting

---

[6] The elements for common law conspiracy are similar.  There must be: "'(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.'"  *Lemon v. Kramer*, 270 F. Supp. 3d 125, 142 (D.D.C. 2017) (quoting *Halberstam*, 705 F.2d at 477).

Section 1985 into general federal tort law'").  There must be an "agreement"
between the defendants described in the FAC that sets forth "'more than just
conclusory allegations.'"  *De La Fuente*, 2019 WL 1778948, at *9.

In the absence of allegations describing "the persons involved in the
agreement, the nature of the agreement, what particular acts were taken to form
the conspiracy, or what overt acts were taken in furtherance of the conspiracy," a
§ 1985(3) cause of action fails to state a claim.  *De La Fuente*, 2019 WL 1778948, at
*9 (rejecting "'conclusory allegations of an agreement,'" noting a complaint "must
allege 'when or how such an agreement was brokered'"); *Lemon*, 270 F. Supp. 3d at
143 (dismissing § 1985(3) claim where ex-husband did not plead any facts
demonstrating there was an agreement among state court judges, attorney general,
and others to cause him harm in connection with a custody dispute); *Bush*, 521 F.
Supp. 2d at 68 (rejecting conclusory allegations that "there was an agreement
among the defendants to deprive him of access to the courts"); *Benzinger*, 385 F.
Supp. 3d at 236 (dismissing § 1985(3) claim where "allegations fail to demonstrate
any meeting of the minds to further an unlawful end").[7]

The FAC utterly fails to meet these standards.  Plaintiffs do not describe
when Allen Media purportedly entered into an agreement with the FCC, its

---

[7] Specificity for a civil conspiracy claim is similarly required under D.C. law.
*Johnson v. Metro. Direct Prop. & Cas. Ins. Co.*, 2019 WL 176851, at *4 (D.D.C. Jan.
11, 2019) ("'parties must allege facts showing the existence or establishment of an
agreement'"); *Higgs v. Higgs*, 472 A.2d 875, 877 (D.C. 1984) (plaintiff "must allege
the formation and operation of the conspiracy [and] wrongful acts done in
furtherance of the common scheme").

Chairwoman, the head of the FCC's Media Bureau, Mr. Goodfriend, DISH, and/or any of the Objectors, or what they agreed to do.  Instead, Plaintiffs vaguely allege—on information and belief, no less—that, at some point, Mr. Goodfriend started working behind the scenes for Allen Media to undermine Standard General's deal, using the Objectors as a purported front.  (FAC ¶¶ 158-159, 278-279, 292 ("On information and belief," Mr. Allen "conspired with and deployed" Goodfriend, who knew how to play "the race card" for the benefit of Allen Media).)

Plaintiffs then allege on "information and belief" that Allen Media entered into a conspiracy with FCC Chairwoman and Media Bureau chief "to kill the deal" because that was supposedly necessary to placate Mr. Allen and preserve the Chairwoman's job.  (*Id.*, ¶¶ 220, 269-270, 272 ("On information and belief, Mr. Allen's prominence as a major Democratic donor enhanced his ability" to have Rosenworcel and Saurer "adopt his view of the role race should play in the FCC's decisions").)

The FAC tries to shore up its conspiracy claims, by arguing the timeline of events supports an "obvious inference" of conspiracy.  (*Id.*, ¶ 278.)  But the alleged facts—Mr. Allen calling Plaintiff "the day after the FCC ordered Standard General to produce highly sensitive documents"; media reports quoting Mr. Allen as "still in the fight" for the TEGNA assets in May 2022; the Objectors' request for information about "alternative transactions"; and Goodfriend's meetings, on the Objectors' behalf around the same period—establish nothing of the sort.  (*Id.*, ¶¶ 137, 278.)  They do not establish any agreement between the alleged co-conspirators, let alone

an agreement to further unlawful conduct.

At bottom, the best the FAC can do is characterize Byron Allen as the "Forest Gump" of the deal, blow hot air, and call a series of anodyne, disconnected events a conspiracy. (FAC, ¶ 271.) That is not enough. *Lemon*, 270 F. Supp. 3d at 142-43 ("mere repetition of a conclusory statement that a conspiracy exists and that all alleged events occurred as a result of a conspiracy are insufficient as a matter of law" to establish a § 1985(3) claim).

## VI.    This Court Should Decline To Extend Supplemental Jurisdiction Over Plaintiffs' Remaining State Law Claims, Which Also Independently Fail

Where, as here, there is no diversity jurisdiction and federal claims forming the basis for original jurisdiction are subject to dismissal, this Court can and should dismiss the remaining state law claims. *Walker v. Seldman*, 471 F. Supp. 2d 106, 114 (D.D.C. 2007); 28 U.S.C. § 1367(c); FAC, ¶¶ 33, 38, 43-44 (asserting pendent jurisdiction over state-law claims). The remaining claims raise "local law issues, appropriate for local courts to decide." *Mesumbe*, 706 F. Supp. 2d at 93.

None of the state law claims are cognizable in any event. The civil conspiracy irremediably fails, as set forth in Section V, *ante*. The tortious interference claims are no better. Both claims fail, and for simple reasons.

The tortious interference with contract claim collapses because there is no underlying contract breach or failure to perform contract obligations. Rather, Plaintiffs admit that TEGNA elected to terminate the merger agreement, according to its terms. (FAC, ¶ 261.) Plaintiffs' counterparties for the financing agreements

similarly did not breach any contractual obligations or fail to perform; their commitments simply expired according to a mutually agreed timeline.  (*Id.*, ¶ 367.) The lack of a breach—which is an essential element of a tortious interference claim under District of Columbia law—is fatal to Plaintiffs' claim.  *Patton Boggs, LLP v. Chevron Corp.*, 791 F. Supp. 2d 13, 20-21 (D.D.C. 2011), *aff'd*, 683 F.3d 397 (D.C. Cir. 2012) (in the absence of facts alleging a breach occurred, there could be no reasonable inference that defendant was liable for misconduct alleged); *Econ. Research Servs., Inc. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 229 (D.D.C. 2016) (dismissing tortious interference claim where complaint did not allege customer "breached or failed to perform a contractual duty owed to [plaintiff]").

The tortious interference with prospective advantage claim similarly has no foundation based on the alleged facts.  Plaintiffs' allegations that Allen Media worked with the other defendants to allegedly delay "the process for FCC approval" by participating in the administrative process is not tortious; it is legitimate petitioning activity.  (FAC, ¶ 378; § II, *ante*.)  Such First-Amendment protected activity does not—and cannot—state a claim for tortious interference.  *Modis, Inc. v. InfoTran Sys., Inc.*, 893 F. Supp. 2d 237, 241 (D.D.C. 2012) (interference that is "not improper" is not actionable); *accord Precision Contracting Sols., LP v. ANGI Homeservices, Inc.*, 415 F. Supp. 3d 113, 123-24 (D.D.C. 2019) (same).

The state law claims should be dismissed.

## VII.   Leave to Amend Should Be Denied

Plaintiffs are sophisticated and well-financed parties represented by

experienced counsel.  This dispute has gone on for several years, and there is already a record of what happened in the FCC and D.C. Circuit.  Plaintiffs know that this case is a dead letter, but they brought suit in the hopes of creating some sort of leverage to put pressure on the FCC and to gin up some form of extortionate monetary settlement.

On this record, the Court need not give Plaintiffs yet another opportunity to concoct a cognizable claim.  They are in the wrong court, on claims that have already been adjudicated and that necessarily rely on Allen Media and others' First Amendment-protected conduct.  There is no way to fix these problems through a second amended complaint.  Leave to amend should be denied.  *See, e.g., Kanam v. Haaland*, 2022 WL 2315552, at * 5 (D.D.C. June 28, 2022) ("leave to amend may be denied if amendment would be futile or in bad faith").

## CONCLUSION

The FAC should be dismissed with prejudice.

Dated: September 9, 2024          Respectfully submitted,

*/s/ Louis R. Miller*

Louis R. Miller (admitted *pro hac vice*)
David W. Schecter (admitted *pro hac vice*)
Nadia A. Sarkis (admitted *pro hac vice*)
MILLER BARONDESS, LLP
2121 Avenue of the Stars, Suite 2600
Los Angeles, California 90067
smiller@millerbarondess.com
dschecter@millerbarondess.com
nsarkis@millerbarondess.com
(310) 552-4400

*Attorneys for Allen Media, LLC  d/b/a Allen*
*Media Group and Byron Allen*

675613.8                             39