**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SGCI HOLDINGS III LLC, et al.,

            *Plaintiffs,*

    v.

FEDERAL COMMUNICATIONS
COMMISSION, *et al.*

            *Defendants.*

Case No. 1:24-cv-01204 RC

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT UNITED CHURCH OF CHRIST, OC. INC. D/B/A UNITED CHURCH OF**
**CHRIST MEDIA JUSTICE MINISTRY'S MOTION TO DISMISS**

Respectfully submitted,

*/s/ Paul M. Finamore*
Paul M. Finamore (# 423410)
Pessin Katz Law, P.A.
5950 Symphony Woods Road, Suite 510
Columbia, Maryland 21044
T: (410) 740-3170
pfinamore@pklaw.com
*Counsel for Defendant,*
*United Church Of Christ, OC Inc.,*
*D/B/A United Church Of Christ Media*
*Justice Ministry*

# TABLE OF CONTENTS

I.    **INTRODUCTION** ................................................................7

II.   **THE PROCEEDINGS BEFORE THE FCC AND D.C. CIRCUIT** ..................10

    a.  The Underlying Transaction ...............................................10

    b.  D.C. Circuit Filings ......................................................13

    c.  UCC Media Justice and Common Cause's Petition to Deny............................ 14

    d.  SGCI's Opposition to UCC Media Justice and Common Cause's Petition......... 16

    e.  UCC Media Justice, Common Cause, The Newsguild-CWA, National Association
        of Broadcast Employees and Technicians-CWA Filed a Joint Reply ................17

    f.  Many Non-Profits and Individuals Voice Their Views to the FCC ...................19

    g.  The Hearing Designation Order Echoed UCC Media Justice's Concerns .......... 23

    h.  Plaintiffs' Specific Allegations Against UCC Media Justice ........................... 24

III.  **STANDARD OF REVIEW** ........................................................ 26

IV.   **ARGUMENT** ................................................................ 29

    A.  Plaintiffs Failed to Exhaust Administrative Remedies..................................... 29

    B.  UCC's Objections are Protected by the First Amendment............................... 30

    C.  UCC Media Justice Did Not Violate 42 U.S.C. § 1981 (Contract) ................... 34

    D.  UCC Media Justice Did Not Violate 42. U.S.C. § 1985(3) (Conspiracy)........... 36

    E.  UCC Media Justice Did not Violate 42 U.S.C. § 1986 (Neglect to Prevent)....... 37

    F.  UCC Media Justice Did Not Tortiously Interfere with Existing Contractual
        Relationships ................................................................ 37

    G.  UCC Media Justice Dis Not Tortiously Interfere with Prospective Business
        Opportunity ................................................................ 38

    H.  Conspiracy is not an Independent Tort ........................................ 40

**CONCLUSION** ................................................................ 41

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abbas v. Foreign Pol'y Grp., LLC,*
  783 F.3d 1328 (D.C. Cir. 2015) ........................................................................... 27

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
  486 U.S. 492 ................................................................................................... 32, 33

*Applied Rsch. Invs., LLC v. Mark Lin,*
  2023 U.S. Dist. LEXIS 173027, at *14 (S.D.N.Y. 2023) ..................................... 28

*Arista Recs., LLC v. Doe 3,*
  604 F.3d 110 (2d Cir. 2010) ................................................................................. 28

* *Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... 26, 27

* *Bell Atl. Corp.,*
  398 F.3d 666 (D.C. Cir. 2005) ............................................................................. 31

* *Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................... 26, 27, 35, 40

* *Bennett Enters. v. Domino's Pizza,*
  45 F.3d 493 (D.D.C. 1995) .................................................................................. 39

*Boling v. United States Parole Comm'n,*
  290 F. Supp. 3d 37 (D.D.C. 2017) ......................................................................... 9

*Borough of Duryea, Pa. v. Guarnieri,*
  564 U.S. 379 (2011) ............................................................................................ 30

* *Burnett v. Sharma,*
  511 F.Supp.2d 136 (D.D.C. 2007) ....................................................................... 37

* *Bush v. Butler,*
  521 F.Supp.2d 63 (D.D.C 2007) .......................................................................... 36

*Burtch v. Milberg Factors,*
  2009 U.S. Dist. LEXIS 48431 (D. De. 2009)……………………………………27

* *Cal. Motor Transport Co. v. Trucking Unlimited,*
  404 U.S. 508 (1972) ...................................................................................... 30, 32

*Carr v. Brown,*
  395 A.2d 79 ......................................................................................................... 39

* *Chadmoore Communs. v. FCC,*
  113 F.3d 235 (D.C. Cir. 1997) ....................................................................... 28, 29

* *Citizens United v. Schneiderman,*
  882 F.3d 374 (2d Cir. 2018) .......................................................................... 28, 34

*City of Columbia v. Omni Outdoor Advertising,*
  499 U.S. 365 (1991) ...................................................................................... 32, 33

* *Covad Communs. Co. v. Bell Atl. Corp.,*
  398 F.3d 666, 677 (D.C. Cir. 2005)……............................................................31

*Crawford v. Margabandhu (*In re *Maya Rests., Inc.),*
  585 B.R. 761 ....................................................................................................... 31

*Delacruz v. Ruby Tuesday, Inc.,*
  2020 U.S. Dist. LEXIS 163969, at *17 (S.D.N.Y. 2020) ..................................... 28

*Domino's Pizza Inc. v. McDonald,*
  546 U.S. 470, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006)........................34
*E. Sav. Bank, FSB v. Papageorge,*
  31 F. Supp. 3d 1 (D.D.C. 2014)........................................................32
* *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,*
  749 A.2d 724 (D.C. 2000)...............................................................40
*FCC v. ITT World Commc'ns, Inc.,*
  466 U.S. 463 (1984).......................................................................30
* *Graves v. United States,*
  961 F. Supp. 314 (D.D.C 1997)........................................................36
* *Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983)..........................................................40
* *Harris v. Allstate Ins. Co.,*
  300 F.3d 1183 (10th Cir. 2002).......................................................35
*Hill v. Barnacle,*
  509 F. Supp. 3d 380 (W.D. Pa. 2020)................................................27
*Hustler Mag., Inc. v. Falwell,*
  458 U.S. 46 (1988).........................................................................31
* *Jefferson-11th St., LLC v. District of Columbia,*
  2020 U.S. Dist. LEXIS 99020 (D.D.C. June 5, 2020)....................39,40
*Kurd v. Republic of Turkey,*
  374 F.Supp. 3d 37 (D.D.C. 2019)......................................................36
*Matal v. Tam,*
  582 U.S. 218 (2017).......................................................................31
*Miller v. Imaging On Call, LLC,*
  2015 U.S. Dist. LEXIS 2892 (D. Ct. 2015)........................................27
* *Moini v. Leblanc,*
  456 F.Supp.3d 34 (D.D.C 2020)...................................................34, 35
*Moretti v. Luxury Cars of Westchester LLC,*
  2024 U.S. Dist. LEXIS 74823 (S.D.N.Y. 2024)..................................28
* *Murray v. Wells Fargo Home Mortg.,*
  935 A.2d 308 (D.C. 2008)................................................................37
*NAACP v. Claiborne Hardware Co.,*
  458 U.S. 866 (1982).......................................................................30
*Nader v. Democratic Nat'l Comm.,*
  567 F.3d 692 .............................................................................30,33
* *Neumann v. Reinforced Earth Co.,*
  594 F. Supp. 139 (D.D.C. 1984).......................................................32
*Office of Communication of the United Church of Christ v. FCC,*
  359 F.2d 994 (1966).........................................................................7
* *Patton Boggs, LLP v. Chevron Corp.,*
  825 F.Supp. 2d 35 (D.D.C. 2011).....................................................37
*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.,*
  508 U.S. 49 (1993) ....................................................................31, 33
*Robledo v. Bond No. 9,*
  965 F. Supp. 2d 470 (S.D.N.Y. 2013) ..............................................35

*Rosenfeld v. Lenich*,
  370 F. Supp. 3d 335 (E.D.N.Y. 2019) .................................................................. 28
*Russo v. New Jersey*,
  2018 U.S. Dist. LEXIS 12467, *11 (D. N.J. Jan. 25, 2018) .................................. 30
*Salu v. Miranda*,
  830 Fed. Appx. 341 (2d Cir. 2020) ...................................................................... 28
* *Smith v. Rubicon Advisors, LLC*,
  254 F. Supp. 3d. 245 (D.D.C. 2017) .................................................................... 39
*Smith v. Trump*,
  2023 WL 417952 (D.D.C. Jan. 26, 2023) ............................................................. 37
*Texas v. Johnson*,
  491 U.S. 397 (1989) ............................................................................................. 31
*Time Warner Entm't v. FCC*,
  144 F.3d 75, 330 U.S. App. 126 (D.C. Cir. 1998) ............................................... 29
* *Trump v. Secretary, Commonwealth of Pennsylvania*,
  830 F. App'x 377 (3d. Cir. 2020) ................................................................... 27, 28
*United Mine Workers v. Pennington*,
  381 U.S. 657 (1965*)* .......................................................................................... 31
*United States v. Lloyds TSB Bank PLC*,
  639 F. Supp. 2d 326 (S.D.N.Y. 2009) .................................................................. 26
*Venetian Casino Resort, L.L.C. v. N.L.R.B.*,
  793 F.3d 85 (D.C. Cir. 2015) ............................................................................... 30
* *Viasat, Inc. v. FCC*,
  47 F.4th 769 (D.C.Cir. 2022) ............................................................................... 29
*Ward v. D.C. Dep't of Youth Rehab. Servs.*,
  768 F.Supp.2d 117 (D.D.C 2011) ........................................................................ 26
* *Wiggins v. Hitchens*,
  853 F. Supp. 505 (D.D.C 1994) ........................................................................... 36

## Statutes

28 U.S.C. §§ 2342, 2344 ........................................................................................ 30
42 U.S.C. § 1981 .................................................................................. 2, 34, 35, 36
42 U.S.C. § 1985(3) ........................................................................................ 35, 36
42 U.S.C. § 1986 ...................................................................................... 2, 36, 37
47 U.S.C. §301(d) .................................................................................................... 6
47 U.S.C. § 352(b) ................................................................................................. 15
47 U.S.C. § 402(a), (b) .......................................................................................... 30
47 U.S.C. § 405(a) ................................................................................................. 30
* U.S. Const. amend. I ........................................................................................... 30

## Rules

Fed.R.Civ.P. 10(c) ................................................................................................. 26
Federal Rule of Civil Procedure 12(b)(6) ................................................................ 6

**<u>Regulations</u>**

47 C.F.R. §1.939 ........................................................................................................... 12

**<u>Other Authorities</u>**

*Applications of Tribune Media Company, Nexstar Media Group, Inc., et al.,*
   34 FCC Rcd 8436, 8471 (2019)…………………………………………………. 14, 15

Defendant, United Church of Christ, OC. Inc. d/b/a United Church of Christ Media Justice Ministry (hereinafter "UCC Media Justice"), by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 12(b)(6), hereby moves to dismiss the Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted and in support of, submits the following memorandum.

## I.    INTRODUCTION

UCC Media Justice files this Motion to Dismiss because Plaintiffs fail to state a claim upon which relief can be granted.  Putting aside the pejorative title of "straw objectors," Plaintiffs acknowledge that UCC Media Justice has been a champion of social and racial justice for decades.  As recognized in the Amended Complaint, UCC Media Justice has regularly opposed transactions before the Federal Communications Commission (FCC) that it believed did not support the public interest consistent with Section 310(d) of the Communications Act of 1934. *See* 47 U.S.C. §301(d).  In fact, dating back almost a half century ago, it was UCC Media Justice that fought and won the right of members of local communities to have standing to oppose action before the FCC in the seminal case of *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994 (1966) decided by Judge Warren Burger, then of the United States Court of Appeals for the District of Columbia.  Consistent with that precedent, UCC Media Justice exercised its First Amendment right to petition the government, in this case the FCC, to address whether the transaction at issue was in the public interest.  Recognizing that the facts before the agency were not developed sufficiently to answer this question, the FCC in its Hearing Designation Order (HDO) set the case for further fact-finding.  In the HDO, the FCC found that UCC Media Justice had standing to oppose this transaction and to appear as a party in interest to the hearing.  In the HDO, the FCC identified the areas of inquiry for the hearing,

including the issues raised by UCC Media Justice in its Petition to Deny. Plaintiffs' claims in the Complaint and Amended Complaint fail to state a claim upon which relief can be granted because UCC Media Justice's action in filing a Petition to Deny the transaction at issue is protected by the First Amendment and because the different causes of action fail to set forth the required elements to state plausible claims.

Once stripped of the unsupported allegations made upon information and belief, Plaintiffs offer nothing to establish that they have any plausible cause of action against UCC Media Justice whatsoever. Many of Plaintiffs' allegations belie the plausibility of their own causes of action while others tacitly admit that UCC Media Justice exercised its First Amendment Right to petition to government, not just in this instance, but in many others over a span of decades where UCC Media Justice sought to protect the public interest based on similar concerns regarding localism and consumer costs, just as it did as to this transaction. After acknowledging that UCC Media Justice championed these same causes, Plaintiffs then concocted a fantasy conspiracy between many of the defendants without factual support. Simply because many parties, including Asian Americans Advancing Justice | AAJC, which is not named in this lawsuit, opposed the transaction, Plaintiffs somehow believe that they all must have conspired together based on the race of Mr. Kim when there is absolutely no factual support for it, even after a careful review of the substantial record before the FCC detailed below.

Plaintiffs' Amended Complaint ignores the unprecedented complexity of their transaction, which will be described in more detail herein, that was contingent upon FCC approval within a fixed timeframe selected by Plaintiffs in their negotiations with third-party lenders. The transaction was so complex that the FCC required three paragraphs to provide a high-level description of the carefully sequenced transactions of the numerous interrelated

applications for TV station transfers between and among the three companies. Based on Plaintiffs' Complaint and Amended Complaint, Plaintiffs are highly sophisticated businesspersons with highly experienced counsel who negotiated their financing arrangements with full knowledge and appreciation of the FCC application process. The length of the approval process, the active public participation and the significant opposition and factual questions raised by participants and the FCC in this process should have been no surprise to Plaintiffs. And yet Plaintiffs express surprise and outrage with respect to a public approval process established in the Communications Act dating back to 1934.

Plaintiffs obfuscate the facts when they assert that UCC Media Justice opposed the transaction based on Mr. Kim's race. TEGNA and Mr. Kim, not UCC Media Justice, injected race and gender into the proposed transaction in what they seemingly believed was an unassailable reason requiring Commission approval. In fact, UCC Media Justice's position on the merger was largely adopted by the leading Asian American civil rights organizations in the country, Asian Americans Advancing Justice | AAJC. Both UCC Media Justice and Asian Americans Advancing Justice | AAJC urged the FCC to fully vet the proposed transaction to ensure it would benefit the public interest, while at the same time recognizing it was a "good thing" that Mr. Kim was able to succeed in the broadcasting industry. Neither party bore any racial animus toward Mr. Kim. The absence of Asian Americans Advancing Justice | AAJC as a defendant speaks volumes regarding the viability of the causes of action asserted against UCC Media Justice. To be clear, however, even a person with racially biased motives, a motive that clearly does not apply to UCC Media Justice, is protected by the First Amendment when exercising such party's First Amendment right to petition the government as the right to petition the government is not dependent upon a party's motives in doing so.

## II.    PROCEEDINGS BEFORE THE FCC AND D.C. CIRCUIT

### a.  The Underlying Transaction

This lawsuit arises out of a unique and highly complicated series of transactions proposed by Plaintiffs before the FCC, followed by two expedited appeals to the U.S. Court of Appeals for the D.C. Circuit. Plaintiffs, as outlined in their Amended Complaint, *see* Am. Compl., Section I, set themselves a significant hurdle of securing FCC approval before their financing deal expired for a deal they failed to realize—or chose to ignore—that presented vastly complex interrelationships following an unusual sequence of transactions that raised many valid concerns under FCC rules and precedent. [1] It, therefore, should not have been surprising to the Plaintiffs that the transactions would raise many questions of fact about their plan that would require resolution. Such a complex and unconventional transaction would necessarily take longer than most applications, and approval was never a forgone conclusion.

The Plaintiffs did not propose a simple or standard deal as alleged, instead, Plaintiffs filed applications proposing to transfer all 64 full-power televisions, two full-power radio stations, and other related FCC licenses, to an indirect subsidiary of SCGI.[2] The proposal also required approval of three additional applications filed contemporaneously, including a structure that would allow one of the largest private equity firms in the country to acquire a substantial, nominally non-voting, interest in the post-TEGNA transaction.  Apollo Management Group

---

[1] The proceedings before the FCC are all part of the public record, including UCC Media Justice's petition to deny the planned merger, and they are included in the Amended Complaint. The Court may take judicial notice of them. *See Boling v. United States Parole Comm'n*, 290 F. Supp. 3d 37, 45 (D.D.C. 2017) ("[A] court may take judicial notice of its own record, public records from other proceedings, and documents attached as exhibits or incorporated by reference in the complaint, including administrative complaints and orders."), *aff'd*, No. 15-5285, 2018 WL 6721354 (D.C. Cir. Dec. 19, 2018). *See* Public Notice, *In re Tegna Inc.*, MB Nos. 22-162, 22-166 (April 21, 2022), https://docs.fcc.gov/public/attachments/DA-22-443A1_Rcd.pdf.

[2] The Public Notice included information that affiliates of Apollo were providing a portion of the financing for the Standard General Transaction ("Public Notice"), *In re Tegna Inc.*, MB Nos. 22-162, 22-166 (April 21, 2022), https://docs.fcc.gov/public/attachments/DA-22-443A1_Rcd.pdf

would still hold *de facto* control of CMG's 13 stations, six of which are in the markets that overlap TEGNA holdings. Standard General would then be able to take advantage of a unique after-acquired clause in the Boston station's agreements governing payment for retransmission of local broadcast signals, forcing all stations to pay more for transmission of all local broadcast signals controlled by the new owner. Plaintiffs also sought an exception to existing law that set a cap on the total amount of foreign investment.[3] The transaction was so complex that the FCC required three paragraphs in its HDO to provide a high-level description of the carefully sequenced transactions of the numerous interrelated applications for TV station transfers between and among the three companies.[4]

On March 23, 2022, it was Plaintiffs who first raised the issue of race and gender when they filed an Amended Petition for Declaratory Ruling of Teton Parent Corp. The Petition stated the following: "[t]he transactions will therefore create the largest minority-controlled and female-operated U.S. broadcast station group in history."[5] The Petition also stated:

> The Commission has recognized that repeatedly that access to capital is a key hurdle to overcoming history deficiencies in minority and female control of broadcast television and radio stations. The Commission has also recognized that liberalizing foreign ownership restrictions could help historically disfavored market participants surmount this hurdle and gain ownership of broadcast properties. This case presents precisely that opportunity for the Commission. Grant of this Petition will enable TPC, which will be majority owned by Soohyung Kim, an American citizen of Korean descent, to complete this momentous transaction, exponentially increasing minority television station ownership in the United States.[6]

---

[3] In connection with the Applications, TPC, a subsidiary of SGCI Holdings and the proposed indirect parent of the TEGNA stations, also filed a Petition for Declaratory Ruling (PDR) requesting that the Commission, pursuant to its authority under section 310(b)(4) of the Communications Act of 1934, as amended (the Act), allow is to exceed the 25% foreign ownership benchmark in section 310(b)(4) of the Act and section 1.5000(a)(1) of the Commission's rules, related to certain Cayman Island and British Virgin Islands investment funds. *See* Hearing Designation Order, *In re Tegna Inc.*, MB Nos. 22-162, 22-166 (February 24, 2023), https://docs.fcc.gov/public/attachments/DA-23-149A1.pdf, at n. 5.

[4] Hearing Designation Order ("Hearing Designation Order"), *In re Tegna Inc.*, MB Nos. 22-162, 22-166 (February 24, 2023), https://docs.fcc.gov/public/attachments/DA-23-149A1.pdf, at ¶ 1

[5] Amended Petition for Declaratory Ruling of Teton Parent Corp. ("Amended Petition"), *In re Tegna, Inc.*, MB No. 22-162 (March 10, 2022), https://perma.cc/H6FU-9HGR, at pg. 2.

[6] *Id*. at pgs. 8-9.

This series of transactions could potentially violate FCC rules and the public interest standard under which the FCC must evaluate every license transfer. The transaction review process started with the filing by Plaintiffs of their Application with the FCC Media Bureau. In response to the Application, the FCC issued a Public Notice disclosed that "applications were filed proposing to transfer all outstanding equity interests in TEGNA, Inc., the ultimate parent of the licensees of 64 full-power television stations... to an indirect subsidiary" of SGCI Holdings III LLC (hereinafter "SGCI"), whose managing member was Plaintiff Kim, the Managing Partner of Standard General, L.P. *See* Public Notice. The Public Notice invited petitioners and commenters to raise all "issues in their initial filings" to allow the Commission to fully consider all substantive issues. *Id*.

Following the Public Notice, a number of Petitions to Deny, Oppositions (to be discussed more fully below), requests by the Media Bureau for additional information and documents from the Plaintiffs, extensions of the pleading cycle, entry of a protective order, and responsive pleadings by petitioners and by the Plaintiffs to the Media Bureau's requests were filed. *See* 47 C.F.R. §1.939. In December, apparently recognizing that the questions surrounding the transaction were not abating, Plaintiffs made a series of commitments in three separate letters attempting to address the concerns raised on the record, and on December 23, 2022, the Media Bureau issued a public notice seeking comments on those commitments.

After consideration of the entire transaction, the FCC issued its HDO on February 24, 2023. In the HDO, the Media Bureau explained its reasons for sending the application for a hearing:

> 15. Section 310(d) of the Act provides that no station license shall be transferred or assigned unless the Commission, on application, determines that the public interest, convenience, and necessity will be served thereby. If the transaction would not violate a statute or rule, the Commission considers whether it could result in public interest harms

by substantially frustrating or impairing the objectives or implementation of the Act or related statutes. Under Section 309(d) of the Act, "[i]f a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent [with the public interest, convenience, and necessity]," it must formally designate the application for a hearing in accordance with Section 309(e) of the Act. Courts have stated that, in reviewing the record, the Commission must designate an application for hearing if "the totality of the evidence arouses a sufficient doubt" as to whether grant of the application would serve the public interest.

16. Applying these principles to the transaction at issue, we designate for hearing the above-captioned applications because there exists a substantial and material question of fact as to: (1) whether retransmission consent fees will rise as a result of the Transactions, and if so, whether such an increase is the result of a properly functioning, competitive marketplace, or, alternatively, whether such rate increases would be the result of the unique structure of the Transactions in which the various assignments and/or transfers of control are closed sequentially in order to take advantage of after-acquired station clauses and maximize retransmission revenue; and (2) whether and if so, to what extent, the proposed transaction will harm localism, including through the reduction of station-level staffing.

*See* Hearing Designation Order. (Internal citations omitted, but appear on Exhibit). The issues designated for hearing were the issues raised by UCC Media Justice in its Petition to Deny, discussed in more detail below.

On May 24, 2023, SGCI notified the FCC that the merger was terminated,[7] and on June 1, 2023, the FCC issued an order terminating the hearing proceeding.[8] Plaintiffs failed to request reconsideration of the administrative law judge's ruling that the HDO was moot based on Plaintiffs' self-imposed financing deadline. There is no allegation that UCC Media Justice had any involvement in the negotiation or selection of the termination date for financing.

**b. D.C. Circuit Filings**

Prior to Plaintiffs' voluntary termination of the Media Bureau proceeding, Plaintiffs filed not one, but two, separate actions in the United States Court Of Appeals for the District of

---

[7] Status Report, *In re Tegna Inc.*, MB Nos. 22-162, 22-166 (May 25, 2023), https://www.fcc.gov/ecfs/document/10524565816599/1.

[8] Order Terminating Proceeding, Federal Communications Commission, https://docs.fcc.gov/public/attachments/FCC-23M-06A1.pdf (June 1, 2023).

Columbia Circuit seeking appeal of the FCC's HDO (Civil Action 23-1083) and mandamus based on the FCC's "unreasonable delay" (Civil Action 23-1084).   In Civil Action 23-1083, Plaintiffs argued that the HDO was contrary to law because it set a hearing before an ALJ who was insulated from Presidential control, that the Media Bureau relied on grounds outside of its statutory authority, and that the HDO was arbitrary and capricious.   In Civil Action 23-1084, Plaintiffs argued that the FCC should be compelled to grant their petition because the Media Bureau failed to meet its legal duty to act on the application, based on many of the same arguments, but adding that the Media Bureau considered allegations that were either unsupported by affidavit or were general allegations.   Both the appeal of the HDO in Civil Action 23-1083 and the request for mandamus in Civil Action 23-104 reviewed the alleged behavior by the FCC and both were dismissed.   Notably, neither action raised race as the basis for the appeal.

### c.   UCC Media Justice and Common Cause's Petition to Deny.

In response to the Public Notice, Common Cause and UCC Media Justice filed a joint Petition to Deny the applications.[9] *See* Am. Compl. at ¶¶ 98, 135. The Petition to Deny never raised the issues of race or gender.  As Plaintiffs recognize, UCC Media Justice has a history of opposing transactions not in the public interest or which undermine localism.

### *Standing*

As part of the Petition to Deny, UCC Media Justice raised standing. In the petition, UCC Media Justice argued that it had standing, taking issue with the FCC's recent decision in the *Nexstar-Tribune* matter, *Applications of Tribune Media Company, Nexstar Media Group, Inc., et al.,* 34 FCC Rcd 8436, 8471 (2019), explaining how that decision impermissibly restricted standing.  Notwithstanding, in support of its claim, UCC Media Justice supplied affidavits from

---

[9] Common Cause and UCC Media Justice are non-profit entities.

individuals in affected markets in support of its arguments. In the HDO, the FCC determined that UCC Media Justice had standing and could participate as a party in interest, though it failed to address UCC Media Justice's arguments regarding *Nexstar Media*.

### *Localism*

UCC Media Justice correctly and properly raised the issue of localism.  It is the responsibility of the FCC to address this issue pursuant to Sections 309(a), (e) and 310(d) of the Communications Act of 1934.  Localism is a critical component of the Commission's public interest analysis because "broadcast programming continues to remain a critical source for news and local information for communities."[10] Communities are provided coverage regarding local news, emergency conditions, local elections, and more by their local broadcasting station. Local broadcasting is especially important for low-income communities and communities of color. *Id*. at 17. Marginalized communities often do not rely on digital media, instead, these communities rely on over-the-air television and radio stations. Local broadcasting serves a particularly important role in elections, because the more local coverage a community is provided, the more likely residents are to vote and the more news coverage is framed in terms relevant to a voter, the more likely they are to vote. *Id*. at 18. Further, after the previous acquisition of CMG by Apollo, layoffs of reporters and on-air personalities commenced immediately. *Id*. at 19. Before it began the transaction, Standard General, parent company of SGCI, stated, "TEGNA has 2x the number of employees per station compared to peers, and lags its closest local broadcasting peers on EBITDA margin." *Id*. at 20. It was clear that Standard General believed TEGNA employed too many at each local station, as such, layoffs would occur. The layoffs would significantly cut the available resources to produce original local news, which would harm the more than sixty

---

[10] Petition to Deny of Common Cause and United Church of Christ Media Justice Ministry ("Petition to Deny"), *In re Tegna Inc.*, MB Nos. 22-162, 22-166 (June 22, 2022), https://perma.cc/D7VM-LXNR, at pg. 16.

communities served by TEGNA stations in contravention of the Commission's pro-localism policies. *Id.*

### Retransmission Fees

UCC Media Justice also properly raised costs to consumers in the form of retransmission fees.  The FCC must consider the competitive and economic impact of transactions under its jurisdiction pursuant to Sections 309(a), (e) and 310(d) of the Communications Act of 1934. Under the retransmission regime, cable and satellite television operators ("multichannel video programming distributors" under the statute) must negotiate with broadcasters to carry their programming. *See* Petition to Deny, at pg. 21; *see also* 47 U.S.C. § 352(b). The proposed transaction here was structured to allow SGCI to take advantage of after-acquired clauses in the existing retransmission agreement with the single Boston station to permit SGCI to force cable and satellite television operators for all stations acquired by SGCI in the transaction to pay higher retransmission rates, which would be passed down to consumers in the form of higher cable prices. *See* Petition to Deny, at pg. 21. Not only would price increases occur, but Standard General and Apollo's ability to bargain for higher prices in renewal retransmission negotiations would increase with the significant leverage of owning such a large number of stations. During negotiations over retransmission consent, service disruptions occur, including blackouts. *Id*. at 24. UCC Media Justice and Common Cause expressed their well-founded concern that the proposed transactions would cause more blackouts depriving consumers of essential programming and increased costs for consumers.[11]

### d.    SGCI's Opposition to UCC Media Justice and Common Cause's Petition

---

[11] Apollo, Standard General, and TEGNA had a history of imposing blackouts on distributors during retransmission negotiations. *See* Petition to Deny, at pgs. 24-25.

On July 7, 2022, SGCI filed its opposition to UCC Media Justice and Common Cause's petition. SGCI challenged both UCC Media Justice and Common Cause's standing to object to the transaction because they were not "parties in interest."[12] *See* Am. Compl. ¶ 142. Further, SGCI did not dispute that the new company may raise retransmission fees but claimed that issue was not relevant to the FCC's determination whether the transaction was in the public interest. *Id.* at ¶ 143. As explained more fully below, SGCI also alleged that UCC Media Justice's arguments that localism would be harmed by the transaction were also not relevant. *Id.*

### SGCI Re-Interjects Race in its Opposition

To this point, the only mention of race was in Plaintiffs' Amended Petition for Declaratory Ruling of Teton Parent Corp. *See* Amended Petition. Race was not mentioned again until SGCI attacked UCC Media Justice and Common Cause because they did not support the transaction, stating the merger opponents "valued diversity, but failed to even mention that the Transaction would create the largest minority-owned and female-led television group in U.S. history."[13] The Opposition insisted that the identity of key executives were a reason for the Commission to grant its application.[14] Plaintiffs conflate diversity of its owners with the importance of diversity of ownership.

e.    **UCC Media Justice, Common Cause, The Newsguild-CWA, National Association of Broadcast Employees and Technicians-CWA Filed a Joint Reply.**

As evidenced by its Petition to Deny, not a single filing by UCC Media Justice referenced Mr. Kim's race as a basis for opposing the transaction. Instead, responding to Plaintiffs' attack, UCC Media Justice and the other public interest defendants stressed that the public interest is

---

[12] Applicants' Consolidated Opposition and Response to Comments ("Opposition"), *In re Tegna Inc.*, MB No. 22-162 (July 7, 2022), https://perma.cc/YAD5-54KP, at pg. 7.
[13] Applicants' Consolidated Opposition and Response to Comments ("Opposition"), *In re Tegna Inc.*, MB No. 22-162 (July 7, 2022), https://perma.cc/YAD5-54KP, at pg. 2.
[14] *Id*. at pgs. 2-4, 13-17.

served by diversity of **owners**, not consolidation under a single company—even if that company

is owned by a woman or person of color:

> One reason the civil rights community and Petitioners oppose media concentration is that
> it results in fewer owners, fewer points of view and fewer opportunities for smaller
> entrepreneurs, including historically excluded entrepreneurs, to enter into the marketplace
> and compete against large companies. Indeed, petitioners have consistently called on the
> Commission not to relax media ownership limits in order to create more ownership
> opportunities for people of color and women. . . . A single owner controlling numerous
> stations throughout the country, producing news often far from the local communities
> those stations serve and likely reducing the number of journalists . . . would not produce
> diversity or advance the Communications Act's public interest standard. Under
> Applicants' theory of diversity, the U.S. could achieve ownership diversity through a
> single owner of all television and radio stations in the country as long as that owner is a
> person of color or a woman.[15]

Indeed, UCC Media Justice and the other public interest defendants agreed it was "certainly a

good thing" that Standard General was led by a woman and a person of color but urged that the

FCC "should not conflate the identity of one or two business leaders regarding a transaction that

would further consolidate the marketplace with advancing its goals to promote ownership

diversity." *See* Joint Reply, at pg. 6.

The joint reply raised concerns about the request for waivers of the FCC's foreign

investment cap and the undisclosed foreign investors from the Cayman Islands and the British

Virgin Islands, which was also subject to review by the Committee on Foreign Investment in the

United States (CFIUS).[16] Foreign investment concerns were not directed at Mr. Kim:  he was

neither foreign nor undisclosed. The joint response, in fact, distinguished Mr. Kim from the

undisclosed foreign investors causing concern,

---

[15] Reply to Applicants' Consolidated Opposition and Response to Commons of The Newsguild-CW, National
Association of Broadcast Employees and Technicians -CWA, United Church of Christ Media Justice Ministry and
Common Cause ("Joint Reply"), *In re Tegna, Inc.*, MB No. 22-162 (August 1, 2022), https://perma.cc/QY5N-HPB3,
at pg. 5. *See* Am. Compl. ¶ 141 n. 74.

[16] On August 3, 2022, the U.S. Department of Justice issued a letter advising that it would be conducting a review of
whether approval of the proposed transaction would pose a risk to national security. *See* Letter from the U.S.
Department of Justice, *In re Tegna, Inc.*, MB 22-162 (August 3, 2022),
https://www.fcc.gov/ecfs/document/10803175231735/1.

> [v]ague descriptions saying that '[a]pproximately 50% of the equity in Standard General will be held by three Cayman Islands investment funds…and one British Virgin Islands investment fund…,' only raises more questions. Absent access to the various covenants and other materials that have not been filed with the Commission, it is scant assurance that, on paper, according to the Applicants, voting control will be held by Mr. Kim.[17]

An inquiry into these unknown offshore investors was legitimate. Plaintiffs' attempt to manipulate this inquiry by asserting that UCC Media Justice "used Mr. Kim's race for fearmongering, pretending as though he, an American, was an Asian foreign owner poised to take over America's newsroom." Am. Compl. at ¶ 151. These allegations mischaracterize the record, and, therefore, are not plausible. Regardless, once the transaction was cleared, the question whether the Commission should consider undisclosed foreign investors was dropped.[18]

### f.    Many Non-Profits and Individuals Voice Their Views to the FCC.

The typical FCC proceeding is an open and transparent process. For significant mergers such as the one in question here, the FCC permits any member of the public to file its views in writing before the agency. Both opponents and supporters of this transaction presented filings. Participation by many organizations with an interest in the transaction is not evidence of a conspiracy against—or in support of—Mr. Kim. It is the product of a robust and open public comment process appropriate for the impact of such a large and complex transaction.

As discussed above, Asian Americans Advancing Justice |AAJC submitted a letter to the FCC on December 20, 2022, which raised similar concerns to those raised by UCC Media Justice and Common Cause. While expressing "excitement for potential greater diversity in broadcast ownership and leadership," AAJC also stated:

> Advancing Justice | AAJC believes that Standard General's acquisition, led by Mr. Soo Kim, has the potential to be a milestone for the Asian American and Pacific Islander

---

[17] *See* Joint Reply at pg. 24.

[18] On November 17, 2022, CFIUS issued a letter that it did not have an objection to the Commission granting the application. *See* CFIUS Letter, *In re Tegna, Inc.*, MB 22-162 (November 17, 2022), https://www.fcc.gov/ecfs/document/1118226245494/1.

(AAPI) community in diversifying media ownership. *At the same time we'd like to raise concerns that this merger could result in less ethnic media coverage and on-air representation that would negatively impact the AAPI community.*[19]

AAJC noted that "representation and diversity at the executive leadership level alone does not necessarily guarantee diverse representation on air." *Id*. at 2. In-language channels have been removed from broadcasting platforms, which resulted in "community members who rely on in-language media" to "resort to international media outlets that report on American news as their source of information, as they are no longer able to access in-language media through their local channels." *Id*. at 2. AAJC requested that the FCC: (1) "practice due diligence and require Standard General to show how this transaction is in the best interest of the public, particularly when it comes to diversity and representation in broadcasting," (2) "take action to ensure that this merger does not result in newsroom layoffs," and (3) "require that local news coverage is not reduced as a result of this merger." *Id.* at 1-3. "While diversity at the ownership and leadership level is worth celebrating, it is critical that the FCC ensures that this merger is in the best interest of all consumers." *Id.* at 3.

Further, organizations representing the civil rights and interests of various groups also filed letters and/or comments, some of them supporting the transaction and others opposing it. For example, some non-profit organizations representing the interests of the African-American community urged approval.[20] Others merely urged the Commission to rapidly conduct a vote on the matter.[21] To the extent race was raised in the record, the views among varying communities of color, as would be expected, were not monolithic.

---

[19] Letter from Asian Americans Advancing Justice | AAJC ("AAJC Letter"), *In re Tegna Inc.*, MB No. 22-162 (Dec. 20, 2022), at 1, https://www.fcc.gov/ecfs/document/122060402285/1. (Emphasis added) AAJC is a national organization, "dedicated to civil and human rights for Asian Americans and to promoting a fair and equitable society for all." *Id.*

[20] Letter from NAACP New York State Conference (March 1, 2023), https://www.fcc.gov/ecfs/document/1030673878330/1.

[21] Letter for Immediate Release (May 18, 2022), https://www.fcc.gov/ecfs/document/1051847484880/1.

*SGCI's Response to Views Submitted by Non-Profits and Individuals*

In December 2022, Standard General attempted to allay concerns about the transaction by offering voluntary commitments related to retransmission fees, newsroom staffing, and layoffs. These concessions irrefutably prove that the concerns raised by UCC Media General were valid, and Plaintiffs' actions in attempting to ameliorate the concerns undermine every allegation in their Amended Complaint. If the concerns had no merit, indeed, one might ask why Plaintiffs would attempt to change the terms of its proposed transaction in an effort to resolve the very real concerns. These efforts by Plaintiff absolutely demonstrate the lack of merit of their allegations in this case.

In response to the FCC's request for comment on the voluntary commitments, on January 13, 2023, UCC Media Justice and other public interest petitioners filed detailed comments explaining why Standard General's proposed commitments were insufficient and failed to address concerns about layoffs, local newsroom investment, and retransmission fees.[22] Commenters made no reference to Mr. Kim's race. The proposal before the FCC would result in, "an ownership structure that would allow the two parties together to control about 70 television stations, with overlapping ownership in six major markets, including Top Four stations in Atlanta, Seattle and Charlotte. Moreover, Standard General and AGM would own or have [Joint Sales Agreements] with all four major broadcast network affiliates in Jacksonville." *See* Joint Comments, at 3. The comments explained that structural remedies are preferable to the behavioral remedies proffered by Standard General, but that structural remedies were not possible without restructuring the deal and applying anew because behavioral commitments,

---

[22] Comments of the NewsGuild-CWA, NABET-CWA, UCC Media Justice, and Common Cause ("Joint Comments"), *In re Tegna Inc.*, MB No. 22-162 (Jan. 13, 2023), https://perma.cc/2D73-4LRX. *See* Am. Compl. ¶ 208, n.134.

such as those offered, were impossible to enforce. When broken, they take "months and generally years of litigation … most potential litigants are likely to give up instead." *Id*. at 4.

UCC Media Justice and petitioners explained why Standard General's journalism commitments were insufficient. The commitment was for only two years, it did not commit to any particular level of staffing, nor any particular level of journalism jobs, as opposed to other staff positions. Its commitment not to engage in layoffs would not prevent Standard General from reducing staffing through attrition. The commitment on staffing took, as a given, all of the staff losses at TEGNA stations in the previous year, because it pegged its staffing commitment to a future date when the merger ultimately closed, but did not address the level of staffing when the merger deal was originally struck. The commitment would result in a net loss from the very start – Standard General had acknowledged staff losses continued while the merger review was pending.[23] Standard General offered no means to hold itself accountable, and its labor commitments were nothing more than what was already required of it under the National Labor Relations Act. *See* Joint Comments, at 9-12.

Commenters explained, "the most glaring omission in the December 23 letter is its failure to address the myriad ways in which Standard General and AGM can collude with respect to other kinds of contractual negotiations." *Id*. at 18. Petitioners explained this ability to collude regarding labor management negotiations was of particular concern to Petitioner TNGCWA/NABET-CWA. *Id*. at 19. Additionally, the comments explained the commitments on retransmission consent fell short: "even if the Commission were to adopt the Standard General/AGM language as a condition, they would still be able to freely discuss their future plans and negotiation tactics, including non-public information, for future retransmission

---

[23] Letter from SGCI (Dec. 22, 2022), https://www.fcc.gov/ecfs/document/1223777911564/1.

agreements." *Id*. at 18. Petitioners also expressed concern that Mr. Kim had made a material

misrepresentation to the Commission with respect to a core fact regarding the transaction: "the

role that enhanced retransmission consent revenues played in [Standard General's] financial

projections for the transactions." *Id*. at 12.[24] The record, to the contrary, demonstrated that a key

part of the "investment thesis" was "the prospect of enhanced retransmission revenues … from

the exercise of the after-acquired station clause made available by including AGM's Boston TV

station in the deal." *Id*. at 14.  Because Plaintiffs failed to build a sufficient record on these

issues, the FCC issued its HDO on February 24, 2023.

> **g.      The Hearing Designation Order Echoed UCC Media Justice's Concerns.**

The Media Bureau found the following substantial and material questions of fact existed:

whether (1) "the Transactions are structured in a way that is likely to trigger a rate increase

harmful to consumers, as a result of the contractual clauses that take immediate effect after the

consummation of the Transactions, and (2) the Transactions will reduce or impair localism,

including whether they will result in labor reductions at local stations." *See* Hearing Designation

Order, at ¶ 2. The HDO continued,

> [a] transaction of this magnitude has great potential to affect viewers, consumers, and
> local communities, and it is incumbent upon the Bureau to fully understand the impact
> of the transaction before it decides whether to approve the Applications. . . substantial and
> material questions remain as to both the potential impact, and possible harm, to
> consumers through higher retransmission consent fees, and the effect on localism through
> potential reductions in local jobs.

*Id*. at ¶ 3.

The Bureau continued that "due to the unique structure of the Transactions in which the

various assignments and/or transfer of control are closed sequentially in order to take advantage

---

[24] Representatives of UCC Media Justice did not sign the protective order relating to confidential materials before
the Commission and therefore did not participate in preparing the portions of the filings related to protected
materials.

of the after-acquired station clauses and maximize retransmission revenue, that rates to [pay television] subscribers would not rise beyond that which would occur in a properly functions competitive market. . . given questions about the intended scope of the commitments relating to enforcement of such clauses, we are unable to find that the commitments offered by Applicants would adequately mitigate such a result." *Id*. at ¶ 32; *see also* ¶ 43. The concern about the effects of retransmission fees was not taken lightly because it could have a significant cost impact on consumers.

Despite the Bureau's acknowledgment that labor matters were to be handled by other federal agencies, it recognized that "local journalism is the heart of local news and community-responsive programming, and in that context, we take seriously concerns that a diminution in the employment of local journalists and other local staff poses a threat to localism." *Id*. at ¶ 36. Upon review of the record, the HDO stated "[t]he conflicting evidence on the record before us about SGCI Holdings' intentions and commitments with regard to local staffing at the TEGNA stations, leaves us with substantial and material questions of fact, unresolved by Applicants' filings, that require further investigation to determine the ultimate effects on localism." *Id*. at ¶ 43. These issues were at the core of UCC Media Justice's concerns regarding public interest. According to Plaintiffs Amended Complaint at ¶ 98, UCC Media Justice raised its "standard" objections in its Petition to Deny, which belies Plaintiffs' assertion that UCC Media Justice acted with racial animus. UCC Media Justice has fought for the right of members of local communities to have standing to oppose action before the FCC for nearly a half century, and it has the First Amendment right to do so.

      **h.**      **Plaintiffs' Specific Allegations Against UCC Media Justice.**

The Amended Complaint pejoratively designates UCC Medica Justice as a "straw objector" but admits that UCC Media Justice routinely files petitions expressing concerns "over job losses and increased retransmission fees, among other things," which were the exact objections raised here. Am. Compl. at ¶ 98 & n.22. This admission refutes their allegations that the same concerns raised in this case were based on race. UCC Media Justice has a long history of opposing consolidation of media companies, and its opposition raised the same issues it routinely does – damage to localism and local news production, loss of jobs, and increased costs to consumers. Plaintiffs' conspiracy theory is far-fetched and based on "information and belief."

In June of 2022, UCC Media Justice filed a petition to deny the license-transfer application.[25] The Amended Complaint acknowledges that the petition set forth two primary objections: (1) loss of journalism jobs, and (2) an increase in retransmission fees. Am. Compl. at ¶¶ 111, 135. Despite this admission, Plaintiffs assert that UCC Media Justice was involved in an alleged "conspiracy" to discriminate against Mr. Kim based on race. Plaintiffs set forth no facts to support these bald assertions.

After labeling UCC Media Justice as a "straw objector" and claiming that it asserted its "standard objections" in this matter, Plaintiffs then attempt to subvert UCC Media Justice's intent by asserting an astounding alternative theory that UCC Media Justice worked "in concert with Mr. Goodfriend at the Goodfriend Group and his longtime clients, Mr. Allen at the Allen Group and Mr. Ergen at DISH." Am. Compl. at ¶ 137. Further, the "positions taken by the straw objectors would further the interests of the Allen Group and DISH. . ." Am. Compl. at ¶ 138. The Amended Complaint continues, "[t]he positions taken by the straw objectors also conflicted with

---

[25] *See* Petition to Deny, at 19-25. *See also* Am. Compl. at ¶ 135 n.73.

their own professed interests. . . The fight over retransmission fees was one that helped DISH, not the viewing public." Am. Compl. at ¶ 139. Plaintiffs ignore that higher retransmission fees would be passed along to the consumer. Plaintiffs' conspiracy allegations are without merit, which is evidenced by the edits between the original complaint and amended complaint. The original complaint alleged that UCC Media Justice appeared at the proceedings "at the behest of some combination of the Allen Group . . .," *see* ECF No. 10-1 at ¶ 288, and exercised "complete control over the straw objectors and the substance of their filings." *Id*. at 289. The Plaintiffs walked away from these allegations in their Amended Complaint, evidencing that they lack factual support. Whether DISH had a commercial agenda, UCC Media Justice had its own legitimate concerns regarding whether these fees would be passed on to consumers, again part of its "standard objections" according to Plaintiffs. UCC Media Justice has a longstanding concern, raised here, about the ability of low-income people and communities of color to access news and information. *E.g.*, Petition to Deny, at pgs. 17-18. Plaintiffs cannot have it both ways, notwithstanding the fantastic theories that they have attempted to string together. These alleged theories are not remotely plausible.

## III.    STANDARD OF REVIEW[26]

Under the Supreme Court's twin decisions in *Twombly* and *Iqbal*, a complaint must be dismissed unless it contains a plausible claim for relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

---

[26] "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to pleading is part of the pleading for all purposes." *See* Fed.R.Civ.P. 10(c). "In deciding a motion brought under Rule 12(b)(6), a court does not consider matters outside the pleadings, but a court may consider on a motion to dismiss the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. D.C. Dep't of Youth Rehab. Servs.,* 768 F.Supp.2d 117, 119 (D.D.C 2011).

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Thus, a court must undertake a two-step analysis in assessing motions to dismiss. First, the court must presume the truth of a well-pleaded factual allegation. In doing so, the court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Second, the court must determine whether the remaining facts plausibly give rise to the claim for relief. *Id.* at 680. If the allegations are more likely explained by a lawful, as opposed to an unlawful, action, then the plaintiff's claim will be dismissed. *Id.*

*Twombly* is illustrative. As described by the *Iqbal* Court, *Twombly* was an antitrust case that featured a "well-pleaded, nonconclusory factual allegation of parallel behavior" and the question before the Court was whether that parallel behavior "gave rise to a 'plausible suggestion of conspiracy.'" *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 565-66); *see also United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 326, 338 (S.D.N.Y. 2009) (same). "Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." *Iqbal*, 556 U.S. at 680.  The plaintiff's case in *Iqbal* was dismissed because the allegations were more likely explained by a lawful action, and the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement. *Id.* at 687; *Miller v. Imaging On Call, LLC*, 2015 U.S. Dist. LEXIS 2892 (D. Ct. 2015) (dismissing plaintiff's seven causes of action because plaintiff failed to allege a plausible violation of a legal duty and failed to alleged that any such violation plausibly caused the harm that she sustained); *Burtch v. Milberg Factors*, 2009 U.S. Dist. LEXIS 48431 (D. De. 2009) (noting that "flat" or "bare" pleadings are not entitled to a presumption of truth as they are insufficient under the pleading

requirements of Rule 8). In applying the plausibility standard, the Supreme Court instructs that a "reviewing court [must] draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The complaint must contain sufficient well-pleaded facts to "nudge . . . their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.[27]

Further, the Supreme Court has held that when a plaintiff bases allegations on "information and belief," such allegations alone are insufficient as they are no more than "a lawyerly way of saying that [the plaintiff] does not know that something is a fact but just suspects it or has heard it." *Trump v. Secretary, Commonwealth of Pennsylvania*, 830 F. App'x 377, 387 (3d. Cir. 2020); *Hill v. Barnacle*, 509 F. Supp. 3d 380 (W.D. Pa. 2020) ("Ultimate or conclusory facts . . . as well as statements made on belief or on 'information and belief,' cannot be utilized on a summary judgement motion."); *Delacruz v. Ruby Tuesday, Inc.*, 2020 U.S. Dist. LEXIS 163969, at *17 (S.D.N.Y. 2020) (finding the plaintiff's allegations were conclusory and thus insufficient). A plaintiff is required to offer "specific facts to back [their] claims." *Trump*, 830 F. App'x at 387. "A litigant cannot merely plop 'upon information and belief in front of a conclusory allegation and thereby render it non-conclusory." *Citizens United v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018); *see also Applied Rsch. Invs., LLC v. Mark Lin*, 2023 U.S. Dist. LEXIS 173027, at *14 (S.D.N.Y. 2023) ("Allegations made upon information and belief must be 'based on factual information that makes the inference of culpability plausible.'" (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010))); *Moretti v. Luxury Cars of Westchester LLC*, 2024 U.S. Dist. LEXIS 74823 (S.D.N.Y. 2024) ("Without additional factual allegations, 'Plaintiff's conclusory statement 'upon information and belief' . . . does not cross the line from

---

[27] The Amended Complaint did not cure the deficient allegations against UCC Media Justice. *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015). Any further amendment would not do so, as such dismissal with prejudice is necessary. *Id.*

conceivable to plausible." (quoting *Rosenfeld v. Lenich*, 370 F. Supp. 3d 335, 348 (E.D.N.Y. 2019))); *Salu v. Miranda*, 830 Fed. Appx. 341, 346 (2d Cir. 2020) ("As the district court correctly held, these conclusory assertions repeatedly made 'upon information and belief' are insufficient to provide a basis to conclude that the race discrimination claim is plausible.").

## IV.    ARUGMENT

### A. Plaintiffs Failed to Exhaust Administrative Remedies.

Plaintiffs failed to exhaust all administrative remedies before pursuing litigation. Here, Plaintiffs chose to terminate the merger due to their own negotiated funding termination date with lenders. They did not await a final decision before the full five-commissioner FCC. Section 405 of the Communications Act "codifies the judicially-created doctrine of exhaustion of remedies." *Chadmoore Communs. v. FCC*, 113 F.3d 235, 239 (D.C. Cir. 1997). "[S]ection 405(a) requires all claims to be flagged or teed up before the Commission, whether by the appellant or some other party, before they may be pursued in court." *Viasat, Inc. v. FCC*, 47 F.4th 769, 778 (D.C.Cir. 2022) (*quoting Time Warner Entm't v. FCC*, 144 F.3d 75, 79-81, 330 U.S. App. 126 (D.C. Cir. 1998)). Plaintiffs failed to exhaust all administrative remedies before pursuing litigation. Here, the merger was terminated because Plaintiffs' own negotiated funding deadline with its lenders passed.  Although Plaintiffs acknowledged that their funding had expired, they continued to object to the HDO and expressed interest in continuing with the process.[28] The administrative law judge reviewed the status reports and determined that the issues were moot in light of the expiration of the funding for the transactions and that it would not in the public interest to engage in an academic exercise. *Id*. Plaintiffs never appealed this ruling. As a result, a final decision before the full five-commissioner FCC did not occur. Section 405 of the

---

[28] Order Terminating Proceeding, *In re Tegna Inc.*, MB No. 22-162, (June 1, 2023), https://docs.fcc.gov/public/attachments/FCC-23M-10A1.pdf.

Communications Act "codifies the judicially-created doctrine of exhaustion of remedies." *Chadmoore Communs. v. FCC*, 113 F.3d 235, 239 (D.C. Cir. 1997). "[S]ection 405(a) requires all claims to be flagged or teed up before the Commission, whether by the appellant or some other party, before they may be pursued in court." *Viasat, Inc. v. FCC*, 47 F.4th 769, 778 (D.C.Cir. 2022) (*quoting Time Warner Entm't v. FCC*, 144 F.3d 75, 79-81, 330 U.S. App. 126 (D.C. Cir. 1998)). The Plaintiffs failed to "tee up" their claims before the Commission prior to seeking this Court's intervention. *Viasat, Inc.*, 47 F.4th at 778. Plaintiffs cannot argue that efforts to file for a reconsideration would have been futile because no decision was issued by the FCC. The HDO cancelled the hearing and deemed it moot. Plaintiffs had the ability to file for a reconsideration within thirty days to present evidence at a hearing to address all of the issues raised in the HDO as well as the opportunity to raise all of their arguments during the hearing. *See* 47 U.S.C. § 405(a). Having failed to exhaust the administrative remedies before the FCC, Plaintiffs' Amended Complaint must be dismissed. [29]

### B. UCC Media Justice's Objections are Protected by the First Amendment.

The First Amendment of the United States Constitution protects the right "to petition the Government for a redress of grievances." U.S. CONST. amend. I. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011); *see also Russo v.*

---

[29] Further, to the extent that Plaintiffs would be contending that the HDO represented a final order, then this Court would lack subject matter jurisdiction. The Court of Appeals has exclusive jurisdiction to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" final orders. 28 U.S.C. §§ 2342, 2344 ("Hobbs Act"); 47 U.S.C. § 402(a), (b); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984). As outlined *supra* in Section II(b), Plaintiffs' Amended Complaint does not appear to assert that the FCC entered a final order via its HDO (Plaintiffs failed to request reconsideration of the administrative law judge's ruling that the HDO was moot based on Plaintiffs' self-imposed financing deadline) but to the extent that Plaintiffs were to now so contend, Plaintiffs' actions demonstrate that they are well aware that any challenges to the FCC proceedings and/or final orders are within the exclusive jurisdiction of the D.C. Circuit based on their prior filings there and would apparently concede that this Court lacks subject matter jurisdiction to address those concerns upon which the D.C. Circuit already ruled.

*New Jersey*, 2018 U.S. Dist. LEXIS 12467, *11 (D. N.J. Jan. 25, 2018) ("The right . . . under the Petition Clause is a right to participate as a citizen, through petitioning activity, in the democratic process."). This right "extends to [petitioning] all departments of the Government," including administrative agencies. *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). Accordingly, "[w]hen 'a person petitions the government' in good faith, 'the First Amendment prohibits any sanction on that action.'" *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 793 F.3d 85 (D.C. Cir. 2015) (Kavanaugh, J.) (quoting *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692. 696 (D.C. Cir. 2009)).

People exercising their right to petition the government is not dependent on their intent for doing so. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 866, 913 (1982) (internal citations omitted). "[I]n the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment." *Hustler Mag., Inc. v. Falwell*, 458 U.S. 46, 53 (1988). Under the First Amendment, "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express 'the thought that we hate.'" *Matal v. Tam*, 582 U.S. 218, 246 (2017).

The First Amendment's protections reinforce the *Noerr-Pennigton* Doctrine, "under which petitioning the Government for redress of grievances, whether by efforts to influence legislative or executive action or by seeking redress in court, is immune from liability under the antitrust laws." *Covad Commns. Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005). In other words, the *Noerr-Pennington* Doctrine eliminates liability resulting from petitioning

conduct, and the doctrine's analysis can be modified to address statements made in administrative complaints rather than in lawsuits. *United Mine Workers v. Pennington*, 381 U.S. 657 (1965*); Covad Communs. Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005). Under such analysis, a plaintiff must prove that petitions were objectively baseless to the extent that no reasonable complainant could realistically expect success on the merits; only if the challenged complaint is objectively meritless may a court then examine the complainant's subjective motivation. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993); *see also Crawford v. Margabandhu (*In re *Maya Rests., Inc.)*, 585 B.R. 761, 773 (Bankr. W.D. Pa. (2018) ("[U]nder the 'sham' exception . . . the action must be 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.' If the action is objectively meritless, then the second part [of the 'sham' exception test] requires the Court to examine the subjective motivation of the petitioning party.").

In the context of petitions to an administrative agency like the FCC, so long as the petitioner's actions were objectively legitimate and genuinely aimed at procuring favorable FCC action, then the petitioner's allegedly wrongful motive in pursuing relief is irrelevant. *See Neumann v. Reinforced Earth Co.*, 594 F. Supp. 139, 142 (D.D.C. 1984) ("The sham exception does not extend to genuine attempts to secure governmental action even though the defendant harbors a wrongful motive."). If the petitioned administrative body—whether the FCC or otherwise—finds a petitioner's complaint sufficient to warrant a hearing, that fact in and of itself demonstrates that the petitioner's claims were not objectively baseless. *See, e.g.*, *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 20 (D.D.C. 2014) (observing that suit was not objectively baseless because it had survived a motion to dismiss).

Even if a petitioner's claims were objectively baseless, the subjective-prong under *Noerr-Pennington* clarifies that "[a] 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, not one 'who genuinely seeks to achieve his governmental result, but does so *through improper means*.'" *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 380 (1991) (first quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n. 4 (1988) and then quoting *id.* at 508 n. 10) (emphasis in original). In other words, to pierce *Noerr-Pennington* immunity, a plaintiff must show that the petitioner-defendant's entire purpose in petitioning was illegitimate—objectively *and* subjectively—such that the petition itself was a "sham," the sole purpose of which was to weaponize the administrative process against the opposing party, and not for any genuinely sought governmental results.

Here, UCC Media Justice raised two issues: whether "(1) the Transactions are structured in a way that is likely to trigger a rate increase harmful to consumers, as a result of contractual clauses that take immediate effect after the consummation of the Transactions, and (2) the Transactions will reduce or impair localism, including whether they will result in labor reductions at local stations."[30] UCC Media Justice's petition was not a "sham." UCC Media Justice raised the same objections it routinely asserts in connection with the proposed transaction that would consolidate ownership of local media outlets, as acknowledged in the Amended Complaint. Am. Compl. ¶ 98. The FCC's Hearing Determination Order is sufficient, in and of itself, to demonstrate that UCC Media Justice's petition was not a sham. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 58 (1993) ("[A] successful 'effort to influence governmental action ... certainly cannot be characterized as a sham.'" (quoting *Allied Tube &*

---

[30] Hearing Designation Order, *In re Tegna Inc.*, MB No. 22-162 (Feb. 24, 2023) at ¶¶ 2, 18.

*Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988))); *Nader*, 555 F. Supp. 2d at 157 ("One cannot come before a court and argue that litigation that terminated in one's opponent's favor is "objectively baseless' ...."). Because all of Plaintiffs' claims arise from UCC Media Justice's constitutionally protected speech and petitioning activity, they will fail as a matter of law.

For the purposes of this Motion, UCC Media Justice will address the subjective prong, even though the first prong has not been met. Plaintiffs cannot meet the subjective standard under *Noerr-Pennington*. UCC Media Justice genuinely sought to defeat Plaintiffs' proposed acquisition of the TEGNA stations, just as it "routinely" opposes large mergers that result in media consolidation and threaten job losses and increased costs. Am. Compl. at ¶ 98; *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 380 (1991) ("A 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all."). Plaintiffs controlled more than fourteen television stations and were "actively seeking to acquire additional stations in major markets." Am. Compl. at ¶ 52. As a result of this proposed transaction, Plaintiffs would stand to own network-affiliated stations in twenty-seven of the top fifty television markets. Am. Compl. at ¶ 118. Standard General intended to reduce jobs at the newly-acquired stations. This is the exact media consolidation that UCC Media Justice has routinely opposed as a "straw objector." Plaintiffs' claims arise from UCC Media Justice's constitutionally protected speech and petitioning activity, these claims fail as a matter of law and must be dismissed.

**C.  UCC Media Justice Did Not Violate 42 U.S.C. § 1981 (Contract).**

"Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so

long as the plaintiff has or would have the rights under the existing or proposed contractual relations." *Domino's Pizza Inc. v. McDonald*, 546 U.S. 470, 476, 126 S.Ct. 1246, 1250, 163 L.Ed.2d 1069 (2006). To assert a viable claim under this statute, "the plaintiff must allege that (1) he is a member of a racial minority; (2) the defendant intended to discriminate against him on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981." *Moini v. Leblanc*, 456 F.Supp.3d 34, 46 (D.D.C 2020). Plaintiffs cannot rely on the phrase "upon information and belief" to convert a conclusory allegation into a non-conclusory allegation. *Citizens Untied v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018). Here, Plaintiffs only offering of "facts" is that "Common Cause and UCC were co-petitioners to Mr. Goodfriend's petition." Am. Compl. at ¶ 129. However, the Amended Complaint fails to set forth how this simple fact equates to a conspiracy.

Under Section 1981, "liability only attaches to persons who actually had the power or authority to prevent the plaintiff from entering into a contract with the third party." *Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 477 (S.D.N.Y. 2013) (*citing Harris v. Allstate Ins. Co.,* 300 F.3d 1183, 1197 (10th Cir. 2002) ("requiring a showing that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment"). It is important to note that Plaintiffs did enter into a contract with their lenders, which was subject to FCC approval. Here, UCC Media Justice did not have the authority to approve the proposed TEGNA transaction, that power belonged to the FCC. *See Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002). Without the authority to approve the proposed TEGNA transaction, UCC Media Justice cannot be held liable. As such, Plaintiffs' claim under §1981 fails.

Regardless, there is no evidence that UCC Media Justice "intended to discriminate against [them] on the basis of race," which is a necessary element of the claim. *Moini,* 456 F. Supp. at 46. UCC Media Justice raised concerns that were echoed by Asian Americans Advancing Justice | AAJC, which was not named in this case and also not motivated by anti-Asian bias. The Amended Complaint lacks any well-pleaded facts to "nudge . . . their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. As such, Plaintiffs' claim must be dismissed as a matter of law.

### D.  UCC Media Justice Did Not Violate 42 U.S.C. § 1985(3) (Conspiracy).

For much the same reasons, Plaintiffs' Conspiracy claim fails.  In order to prevail on a claim pursuant to 42 U.S.C. § 1985(3), the plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws, or of privileges and immunities under the law; (3) motivated by some class based, invidiously discriminatory animus exists; and (4) whereby a person is either injured in his person or property, or is deprived of any right or privilege of a citizen of the United States." *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C 1997). To pursue a § 1985(3) claim, there must be a violation of a substantive federal right. *Wiggins v. Hitchens*, 853 F. Supp. 505, 511 (D.D.C 1994). A court "must determine whether violations of the federal laws asserted in this case equate to a deprivation of the equal protection of the laws, or of equal privileges and immunities under the laws' meaning with of § 1985(3)." *Wiggins*, 853 F. Supp. At 511. Further, "Defendants must have formed an agreement with the purpose of violating the civil rights of Plaintiffs." *Kurd v. Republic of Turkey*, 374 F.Supp.3d 37, 61 (D.D.C. 2019).

Here, the Plaintiff was not deprived "of any right or privilege of a citizen in the United States," because Plaintiff failed to meet the elements of 42 U.S.C. § 1981. As such, Plaintiff

cannot pursue this cause of action. Additionally, to survive a motion to dismiss, a plaintiff needs

to allege "the existence of any events, conversations, or documents indicating there was an

agreement between the defendants to violate his rights." *Bush v. Butler*, 521 F.Supp.2d 63, 68

(D.D.C 2007).[31] Plaintiffs allegations are based "upon information and belief," more accurately

described as fantasy and conjecture.  Plaintiffs' Amended Complaint is nothing more than

repetitive conclusory statements that fail to set forth any "events, conversations, or documents

indicating there was an agreement between the defendants to violate his rights." *Bush v. Butler*,

521 F.Supp.2d 63, 68 (D.D.C 2007). This claim must be dismissed as a matter of law.

### E.  UCC Media Justice Did Not Violate 42 U.S.C. § 1986 (Neglect to Prevent).

"Generally, § 1986 holds civilly accountable those who have knowledge of a conspiracy,

as delineated in § 1985, and failed to prevent such wrongdoing." *Burnett v. Sharma*, 511

F.Supp.2d 136, 145 (D.D.C. 2007). A claim under § 1985 is a prerequisite "to stating an adequate

claim for negligent to prevent under § 1986." *Burnett*, 511 F.Supp.2d at 145. Here, Plaintiffs

failed to set forth a colorable claim under §1985, therefore, they cannot maintain a claim under

§1986. UCC Media Justice did not have "actual authority" over the FCC's decisions, which is

required to hold a private individual responsible under § 1986. *Smith v. Trump*, No. 21-CV-

02265, 2023 WL 417952, at *7 (D.D.C. Jan. 26, 2023). Further, Plaintiffs Amended Complaint

fails to allege facts that UCC Media Justice had the ability to prevent the alleged conspiracy or

neglected or refused to do so. As such, this claim fails as a matter of law.

### F.  UCC Media Justice Did Not Tortiously Interfere with Existing Contractual Relationships.

---

[31] In *Bush*, the Plaintiff alleged that there was an agreement between the defendants. *Bush*, 521 F.Supp.2d at 68. The Plaintiff failed to provide a "description of the persons involved in the agreement, the nature of the agreement, where particular acts were taken to form the conspiracy, or what overt acts were taken in furtherance of the conspiracy."  *Id*. The Court held that repetition of a conclusory statement failed to plead sufficient facts. *Id*.

To prevail on tortious interference with a contract, the plaintiff must establish: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) defendant's intentional procurement of the contract's breach; and (4) resulting damages. *Patton Boggs, LLP v. Chevron Corp.*, 825 F.Supp. 2d 35, 42 (D.D.C. 2011). The interference must be intentional and improper. *Murray v. Wells Fargo Home Mortg.*, 935 A.2d 308, 326 (D.C. 2008) Further, "[a] defendant can avoid liability for tortious interference with contract after the plaintiff establishes a *prima facie* case if the defendant can establish that his conduct was legally justified or privileged." *Murray*, 953 A.2d at 326.

A binding contract did not exist, Plaintiffs admit that "Standard General secured billions of dollars in funding to buy TEGNA, *contingent* on clearing regulatory hurdles at the Department of Justice and the FCC." *See* Am. Compl. at ¶ 8 (emphasis added). As part of the license-transfer process, the FCC issued a Public Notice allowing petitioners and commenters to weigh in on the applications.[32] UCC Media Justice filed its petition to deny, which it was legally entitled to do pursuant to the Public Notice. Plaintiffs simply made a bad deal with their prospective lenders wherein they failed to give themselves sufficient time to allow their unique and complex transaction to make it through the regulatory review process. Plaintiffs' allegations that UCC Media Justice was a "but for" cause of the termination of the deal, while at the same time alleging that 11 other defendants were the proximate cause of the termination of the deal cannot be possible. Am. Compl., at ¶ 317.

In their appeal to the United States Court of Appeals for the District of Columbia, Plaintiffs made a failed attempt to force the court to order the FCC to approve the transaction, but they failed to advise this court in their Complaint and Amended Complaint that the prior

---

[32] *See* Underlying Transaction, *supra*.

effort failed.  Plaintiffs also fail to recognize that they dismissed their own Application, thus ending the process of their own accord.  When they did so, they precluded the FCC from taking any further action on the application.  The FCC was the only entity that had legal authority to approve the transactions until Plaintiffs chose to dismiss their application.  After that, no one could approve it, as confirmed by the United States Court of Appeals for the District of Columbia. Plaintiffs' claim fails to state a claim for relief and must be dismissed.

### G.  UCC Media Justice Did Not Tortiously Interfere with Prospective Business Opportunity.

Plaintiffs negotiated agreement with their prospective lenders was the reason that they withdrew their application.  UCC Media Justice had no involvement in those negotiations.  The fact that Plaintiffs made a bad deal is not the fault of UCC Media Justice and it cannot be liable for it.  UCC Media Justice filed a Petition to Deny.  After that, it was in Plaintiffs and the FCC's hands as to the remainder of the regulatory process. It was the Plaintiff's choice to present a unique and highly complex phased transaction to the FCC as was the deadline they chose to negotiate with their lenders.

In order to prevail on a claim for interference with prospective business opportunities, a plaintiff must plead: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach of termination of the relationship or expectancy; and (4) resultant damage. *Smith v. Rubicon Advisors, LLC*, 254 F. Supp. 3d. 245, 251 (D.D.C. 2017). Intentional interference requires the specific element of intent, "a general intent to interfere or knowledge that conduct will injure plaintiff's business dealings is insufficient to impose liability." *Bennett Enters. v. Domino's Pizza*, 45 F.3d 493, 499 (D.D.C. 1995).

Plaintiffs' expectations of economic benefit from the merger were contingent on approval from the FCC. The Court has distinguished between "interference with prospective contractual or business relations, which revolve around specific relationships with other contractual partners that can be disrupted, and expectations of profit that [are] wholly contingent upon the decisions of... governmental bodies." *Jefferson-11th St., LLC v. District of Columbia*, 2020 U.S. Dist. LEXIS 99020, *23 (D.D.C. June 5, 2020) *relying on Carr v. Brown*, 395 A.2d 79, 395 A.2s 79 (D.C. 1978). Although *Jefferson-11th St., LLC* differs factually, the underlying analysis regarding government approval applies,

> An applicant . . . cannot expect upon the basis of any experience that his application will be automatically approved within a specified period of time. Appellant cannot contend that because he encounters opposition to his application, some of which may be malicious, that the opponent is thereby interfering with his "expectancies" so as to constitute a tort. Rather the person who is "interfering" with the applicant's petition for an alley closing and a zoning exception is participating in procedures fixed by statute which specifically invite opposition. Accordingly, we conclude that appellant's "expectancies" of approval by the [administrative bodies] are not of the character that may be protected by this cause of action for the tort of interference with property.

*Jefferson-11th St., LLC*, 2020 U.S. Dist. LEXIS 99020, *23 (D.D.C. June 5, 2020). The Plaintiffs created their own timeline to negotiate with their financiers, allegedly based on prior experience, which expired while the FCC continued to consider their application. In fact, it was the Plaintiffs that notified the FCC that the merger was terminated. Plaintiffs' business expectations were completely contingent on FCC approval, over which UCC Media Justice had no control. UCC Media Justice did not induce the entities in the business relationship to set a deadline with Plaintiffs to withdraw financing. As such, this count must be dismissed with prejudice.

## H. Conspiracy is not an Independent Tort.

Civil conspiracy is not recognized as an independent tort in the District of Columbia. *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000). Liability

for civil conspiracy "depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather is a means for establishing vicarious liability for the underlying tort." *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983).

Plaintiffs' claims all fail as a matter law, as such, there is no underlying tortious act to support a claim of conspiracy. As explained above, Plaintiffs conclusory statements of an alleged agreement of the Defendants is nothing more than speculation and fails to even come close to suggesting an agreement was made. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant, United Church of Christ, OC. Inc. d/b/a United Church of Christ Media Justice Ministry, respectfully requests that this Court grant its Motion to Dismiss the Amended Complaint and dismiss all claims against United Church of Christ, OC. Inc. d/b/a United Church of Christ Media Justice Ministry with prejudice, along with such other and further relief the Court deems appropriate.

<div style="margin-left:40%;">

Respectfully submitted,

*/s/ Paul M. Finamore*
Paul M. Finamore (# 423410)
Pessin Katz Law, P.A.
5950 Symphony Woods Road, Suite 510
Columbia, Maryland 21044
T: (410) 740-3170
pfinamore@pklaw.com
*Counsel for Defendant,*
*United Church Of Christ, OC Inc.,*
*D/B/A United Church Of Christ Media*
*Justice Ministry*

</div>

41

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of September, 2024, a copy of the foregoing

Motion was served via ECF upon all counsel of record.

> ***/s/ Paul M. Finamore***
> Paul M. Finamore