**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SGCI HOLDINGS III LLC AND SOOHYUNG KIM,<br><br>                Plaintiffs,<br><br>      v.<br><br>FEDERAL COMMUNICATIONS COMMISSION; JESSICA ROSENWORCEL, in her official capacity as Chairwoman of the FCC; HOLLY SAURER, in her official capacity as Chief of the Media Bureau; THE ALLEN MEDIA GROUP, INC. f/k/a Entertainment Studios, Inc.; DISH NETWORK CORPORATION; THE GOODFRIEND GROUP, INC.; THE NEWSGUILD-CWA; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA; UNITED CHURCH OF CHRIST, OC INC., d/b/a United Church of Christ Media Justice Ministry; COMMON CAUSE; BYRON ALLEN; CHARLES ERGEN; and DAVID GOODFRIEND,<br><br>              Defendants. | Case No. 24-1204-RC |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR RULE 11 SANCTIONS BY DEFENDANTS
DISH NETWORK CORPORATION AND CHARLES ERGEN**

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ........................................................................... 1

II.   FACTUAL BACKGROUND.............................................................................. 2

   A.   THE PETITIONS TO DENY THE APPLICATIONS ..................................... 4

   B.   DISCUSSIONS OF MR. KIM'S RACE AND NATIONALITY................................... 7

   C.   DISH'S FILINGS ON THE FCC DOCKET ..................................... 9

   D.   THE HEARING DESIGNATION ORDER .................................... 12

III.  THE AMENDED COMPLAINT'S ALLEGATIONS ......................................... 15

   A.   PLAINTIFFS CONCEDE THAT DISH'S CONCERNS WERE ECONOMIC .......... 15

   B.   PLAINTIFFS' ALLEGATIONS OF AN UNLAWFUL RACE-BASED CONSPIRACY
       LACK ANY BASIS IN FACT ..................................... 17

IV.   ARGUMENT .......................................................................................... 23

   A.   THE CLAIMS ALLEGED AGAINST DISH AND ERGEN VIOLATE RULE 11 ..... 24

      1.   The Amended Complaint's Purported "Factual" Allegations are Utterly Lacking in
          Evidentiary Support ..................................... 24

      2.   The Amended Complaint's Legal Claims Against DISH and Ergen are Frivolous ... 27

      3.   The Amended Complaint's Allegations Show that it is Presented for the Improper
          Purpose of Harassing DISH and Ergen....................................... 35

   B.   THE COURT SHOULD IMPOSE SANCTIONS ON PLAINTIFFS AND THEIR
       COUNSEL ..................................... 36

V.    CONCLUSION......................................................................................... 38

## **TABLE OF AUTHORITIES**

**Cases**

*Alemu v. Dep't of For-Hire Vehicles*,
  327 F. Supp. 3d 29 (D.D.C. 2018) ........................................................................... 29

*ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*,
  961 F. Supp. 2d 245 (D.D.C. 2013) ......................................................................... 24

*Bayou Fleet, Inc. v. Alexander*,
  234 F.3d 852 (5th Cir. 2000) .................................................................................... 29

* *Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................................ 32, 36

*Blassingame v. Trump*,
  87 F.4th 1 (D.C. Cir. 2023)....................................................................................... 31

*Bowhead Information Technology Svcs, LLC v. Catapult*,
  377 F. Supp. 2d 166 (D.D.C. 2005).......................................................................... 34

* *Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972).................................................................................................. 29

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
  168 F.3d 119 (3d Cir. 1999)...................................................................................... 29

*Cobell v. Norton*,
  211 F.R.D. 7 (D.D.C. 2002)...................................................................................... 36

*Covad Comms. Co. v. Bell Atlantic Corp.*,
  407 F.3d 1220 (D.C. Cir. 2005).................................................................................. 2

*CSMN Investments, LLC v. Cordillera Metropolitan District*,
  956 F.3d 1276 (10th Cir. 2020) ........................................................................... 29, 30

* *E. Sav. Bank, FSB v. Papageorge*,
  31 F. Supp. 3d 1 (D.D.C. 2014) .......................................................................... 29, 34

*Eaton v. Newport Board of Education*,
  975 F.2d 292 (6th Cir. 1992) .................................................................................... 30

*Garrison v. Louisiana*,
  379 U.S. 64 (1964).................................................................................................... 28

*Ginx, Inc. v. Soho Alliance*,
    720 F. Supp.2d 342 (S.D.N.Y. 2010) ........................................................ 30

*Graves v. United States*,
    961 F. Supp. 314 (D.D.C. 1997) ............................................................... 32

*Havoco of Am., Ltd. v. Hollobow*,
    702 F.2d 643 (7th Cir. 1983) ................................................................... 29

*Hilton Hotels Corp. v. Banov*,
    899 F.2d 40 (D.C. Cir. 1990) ................................................................... 24

*Hollister v. Soetero*,
    601 F. Supp. 2d 179 (D.D.C. 2009) .......................................................... 35

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015) ..................................................................... 24

*Igen Int'l, Inc. v. Roche Diagnostics GMBH*,
    335 F.3d 303 (4th Cir. 2003) ................................................................... 29

*In re: SCGI Holdings III LLC, et al.*,
    No. 23-1084 (D.C. Cir. April 21, 2023) .................................................... 15

* *Intelsat USA Sales LLC v. Juch-Tech, Inc.*,
    No. 10-cv-2095, 2014 WL 12787643 (D.D.C. Oct. 15, 2014) .............. 25, 26, 36, 37

*John Akridge Co. v. Travelers Cos.*,
    944 F. Supp. 33 (D.D.C. 1996) ................................................................ 37

*Jones v. Louisiana State Bar Ass'n*,
    738 F. Supp. 2d 74 (D.D.C. 2010) ........................................................... 32

*Manistee Town Center v. City of Glendale*,
    227 F.3d 1090 (9th Cir. 2000) ................................................................. 30

*Marina Mgt Svces, Inc. v. Vessel My Girls*,
    202 F.3d 315 (D.C. Cir. 2000) ................................................................. 38

* *NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ..................................................................... 28, 31, 34

* *Nader v. The Democratic Nat'l Comm.*,
    555 F. Supp. 2d 137 (D.D.C. 2008), *aff'd*, 567 F.3d 692 (D.C. Cir. 2009) ........ 30, 31

\* *New West, L.P. v. City of Joliet,*
  491 F.3d 717 (7th Cir. 2007) ............................................................ 30

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ...................................................................... 28-29

*Patton Boggs, LLP v. Chevron Corp.,*
  825 F. Supp. 2d 35 (D.D.C. 2011) .................................................. 34

*Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
  508 U.S. 49 (1993) ........................................................................... 30

\* *Saltany v. Reagan,*
  886 F.2d 438 (D.C. Cir. 1989) ......................................................... 27

*Sherman Treaters Ltd. v. Ahlbrandt,*
  115 F.R.D. 519 (D.D.C. 1987) ......................................................... 37

*Smith v. Rubicon Advisers, LLC,*
  254 F. Supp. 3d 245 (D.D.C. 2017) ................................................. 34

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,*
  600 U.S. 181 (2023) ................................................................... 8, 20

\* *Thompson v. Trump,*
  590 F. Supp. 3d 46 (D.D.C. 2022) ............................................ 31, 33

*Video-Int'l Prod., Inc. v. Warner-Amex Cable Comms., Inc.,*
  858 F.2d 1075 (5th Cir. 1988) ......................................................... 30

*White v. Lee,*
  227 F.3d 1214 (9th Cir. 2000) ......................................................... 29

\* *Zhao v. Li,*
  No. 20-3138, 2022 WL 6727338 (D.D.C. Oct. 11, 2022) ............ 27, 35

**Statutes**

42 U.S.C. § 1985 ................................................................... 31, 32, 33

42 U.S.C. § 1986 ................................................................... 31, 32, 33

47 U.S.C. § 310(d) ...................................................................... 3

**Other Authorities**

Fed. R. Civ. P. 11, Advisory Committee's Note (1993) .................................................. 36

*Nexstar-Media General Order*,
  32 FCC Rcd. 183 (Jan. 11, 2017) ............................................................................... 3

**Rules**

Fed. R. Civ. P. 11 ............………………………………………………………...*passim*

Defendants DISH Network Corporation ("DISH") and Charles Ergen ("Ergen"), by and through their undersigned attorneys, hereby move for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure against Plaintiffs SGCI Holdings III LLC ("SGCI") and Soohyung Kim ("Kim") as well as Plaintiffs' counsel. The sanctions sought include, but are not limited to, dismissal of all claims asserted against DISH and Ergen in the First Amended Complaint ("Amended Complaint") dated August 9, 2024 and payment of attorneys' fees and expenses.

This motion was served on Plaintiffs on August 30, 2024, more than 21 days prior to filing. Defendants DISH and Ergen served a prior Rule 11 motion on July 3, 2024, which was directed at the original complaint. After Plaintiffs sought to file an amended pleading, DISH and Ergen agreed to withdraw the earlier motion. Because the Amended Complaint contains the same fundamental defects as the original complaint, DISH and Ergen again move for Rule 11 sanctions.

## I.     PRELIMINARY STATEMENT

This action is nothing more than an expensive temper tantrum thrown by an entitled entrepreneur who is irate over the fact that the Federal Communications Commission ("FCC") did not give him exactly what he wanted exactly when he wanted it. Through the Amended Complaint, Plaintiff Soohyung Kim ("Kim" or "Mr. Kim") lashes out at the parties he blames for the FCC's election to hold a hearing on Plaintiff SGCI's application to the FCC for transfer of control of TEGNA, Inc. ("TEGNA"), the owner of more than 60 broadcast television stations, to SGCI. Frustrated that SGCI's transaction financing expired and the merger agreement terminated, Plaintiffs have concocted a false narrative that the FCC's actions must have been caused by a vast racist conspiracy against Mr. Kim. Not only do the claims asserted against

Defendants DISH and Ergen lack any reasonable basis in fact or law, the Amended Complaint wrongfully retaliates against both DISH and DISH's Chairman for DISH's legitimate exercise of its First Amendment right to petition the government on matters of public interest.

The Amended Complaint violates Rule 11(b) in at least three ways.  First, it was filed for an improper purpose—to harass DISH and Ergen—in violation of Rule 11(b)(1).  Second, the wildly irresponsible, scurrilous assertions concerning an alleged wrongful conspiracy to racially discriminate against Plaintiffs have no basis in fact, in violation of Rule 11(b)(3).  Third, the claims alleged against DISH and Ergen in the Amended Complaint lack any basis in law, in violation of Rule 11(b)(2).  DISH and Ergen enjoy broad First Amendment protection for communicating with the FCC concerning SGCI's application and for associating with others who opposed the application at the FCC.

## II.    FACTUAL BACKGROUND

On April 21, 2022, the FCC's Media Bureau issued a "Public Notice" that established a pleading cycle for "Applications to Transfer Control of TEGNA Inc., to Standard General, L.P.," which was assigned Docket No. 22-162.  A copy of the Public Notice is attached hereto as Exhibit 1.[1]  The Public Notice disclosed that, on March 10, 2022, applications were filed proposing to transfer all outstanding equity interests in TEGNA Inc., which controls 64 full-power television stations, to an indirect subsidiary of SGCI, whose Managing Member is Plaintiff Kim, the Managing Partner of Standard General, L.P.  *See* Ex. 1.

According to the FCC's Public Notice, three additional applications were filed contemporaneously for a series of related transactions.  *Id.* at 1.  A Standard General affiliate

---

[1] This Court may take judicial notice of public records filed on the FCC docket.  *Covad Comms. Co. v. Bell Atlantic Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (a court may take judicial notice of facts on the public record).

proposed to transfer control of its four full-power television stations to a subsidiary of CMG Media Corporation ("Cox"), which is under the *de facto* control of Apollo Global Management, Inc. ("Apollo"), a hedge fund.  *Id.*  Cox, in turn, sought to transfer control of one television station to SGCI.  *Id.*  Upon consummation of the merger, the new TEGNA entity ("New TEGNA") proposed to assign four full-power television stations to wholly-owned subsidiaries of Cox.  *Id.*  The Public Notice included information that Apollo affiliates (associated with Cox) were providing some of the financing for the transaction to Standard General.  *Id.* at 1–2.

The Public Notice invited petitioners and commenters to weigh in on the applications in order to allow the Commission to consider all relevant substantive issues.  *Id.* at 3.

Pursuant to 47 U.S.C. § 310(d), applicants seeking permission from the FCC for a transfer of control of broadcast television stations have the burden of proving to the FCC that the proposed transaction serves "the public interest, convenience, and necessity."  *See* 47 U.S.C. § 310(d) ("No . . . station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, … to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby."); *see also Nexstar-Media General Order*, 32 FCC Rcd. 183, 191–92 ¶ 19 (Jan. 11, 2017) ("The applicants bear the burden of proving, by a preponderance of the evidence, that the proposed transaction, on balance, would serve the public interest.").  The FCC employs a balancing process, weighing potential public interest benefits against potential public interest harms.  *Nexstar-Media General Order*, 322 FCC Rcd. at ¶ 19.  "If the [FCC] is unable to find that the proposed transaction serves the public interest, or if the record presents a substantial and material question of fact as to whether the transaction serves the public interest, Section 309(e) of the Act requires that the applications be designated for hearing."  *Id.*

A.      **THE PETITIONS TO DENY THE APPLICATIONS**

Four non-profit entities filed petitions to deny the applications: (1) Common Cause;

(2) United Church of Christ Media Justice Ministry; (3) The Newsguild-CWA; and (4) National

Association of Broadcast Employees and Technicians-CWA ("NABET-CWA") (collectively,

"Petitioners").  Those petitions are attached hereto as Exhibit 2.  These four entities are known to

object to station transfer applications.  Am. Compl. ¶ 98 (Petitioners "routinely file petitions to

deny license-transfer applications and express concerns over job losses and increased

retransmission fees, among other things").  All four Petitioners are Defendants in this action.

Neither DISH nor Ergen filed a petition to deny.

The petitions to deny advanced two primary arguments.  First, Petitioners argued that the

transfer harmed the public interest, because it threatened to undermine local news coverage (also

known as "localism").  Ex. 2 at 021-23, 050-55.  Standard General, SGCI's parent company,

made known that it intended to consolidate news coverage at the TEGNA local stations with a

national news desk located in Washington D.C.  *Id.* at 051-52.  Prior to the transaction, Standard

General also had telegraphed an intent to fire half of TEGNA's local news employees.  It stated

in a 2020 "Proxy Statement" filed with the SEC that, in Standard General's view, "TEGNA has

2x the number of employees per station compared to peers, and lags its closest local broadcasting

peers on EBITDA margin."  *Id.* at 022–23.

Second, the Petitioners argued that the transfer would harm the public interest, because

the sequencing of the transaction appeared designed to immediately increase the fees SGCI

might charge pay-television providers for distribution of TEGNA's local television stations.  *Id.*

at 023-27, 055–59.  The Petitioners asserted that consumers would suffer the impact of increased

pay-television costs, which are passed along to consumers by their cable and satellite companies.

*Id.* at 023–27, 058–59.  In addition, Petitioners argued that future fee disputes between SGCI and cable or satellite companies might lead to content blackouts.  *Id.* at 026–27.

In connection with this second argument, Petitioners pointed out that the transaction seemed designed to exploit standard "after-acquired station" clauses in retransmission consent agreements[2] between broadcasters and pay-television distributors.  *Id*. at 023–25, 055–56.  These "after-acquired station" clauses allow an acquirer to substitute a pre-existing retransmission consent agreement with a pay-television provider, governing the broadcast television stations it already owns, in place of the agreement that the acquired station had in effect with that same pay-television provider.  *Id*. at 056 ("These 'after-acquired station' and 'change-in-control' provisions allow a purchaser to substitute their higher retransmission fee arrangements for those less remunerative deals that the seller may have had.").  In Standard General's deal, instead of seeking to substitute its own agreements for TEGNA's agreements for these "after-acquired" stations, the parties engineered a series of station transfers that appeared calculated to substitute more lucrative retransmission agreements held by Cox for *all* Standard General and TEGNA television stations.

In comments submitted to the FCC, pay-television distributor (and non-defendant) Altice explained that the proposed transaction was artificially sequenced in four choreographed steps taking place in quick succession.  A copy of Altice's filing is attached hereto as Exhibit 3.  Those steps are as follows: (i) Standard General divests itself of all its existing broadcast television

---

[2] "The Communications Act (Act) requires that a television station give its consent to a cable system or other multichannel video programming distributor (MVPD) to carry its broadcast signal.  Television stations and cable systems, as well as satellite carriers, negotiate for this 'retransmission consent' and money or other consideration is generally exchanged between the parties in these private negotiations."  https://www.fcc.gov/media/policy/retransmission-consent These agreements for a pay-television provider's carriage of a broadcast television station are referred to as "retransmission consent agreements."

stations, transferring them to an entity controlled by Cox; (ii) Cox sells a subsidiary owning a single Cox television station, "Teton," to Standard General; (iii) TEGNA merges into Teton, which Standard General controls; and (iv) New TEGNA sells four stations to Cox. *See* Ex. 3 at 02–04.

Altice cautioned that it seems "Applicants have designed their entire transaction to raise consumer rates by artificially architecting the structure to apply agreement(s) with the highest rates. Indeed, it is not unreasonable to speculate that Applicants have entered into this transaction primarily to accomplish these price increases." *Id.* at 03. Altice, for its part, did not ask the FCC to deny the applications. Instead, Altice requested that the FCC: "require Applicants to describe fully the relationship between the transaction's structure and retransmission consent pricing. The Commission should then condition grant of the Application on Applicants' not enforcing any contractual clauses purporting to raise retransmission consent rates prices." *Id.* at 04.

The American Television Alliance ("ATVA") trade group[3] (and non-defendant) also submitted comments. A copy of ATVA's filing is attached hereto as Exhibit 4. ATVA's concerns, *inter alia*, centered around the post-transaction relationship between Standard General and Cox. *See* Ex. 4. Cox, an owner of 23 broadcast television stations, was helping to finance the transaction. *Id.* at 07. In exchange, Cox stood to obtain approximately 25% of New TEGNA equity. *Id.* Among other things, ATVA asked that the FCC meaningfully enforce the prohibition against joint negotiation of retransmission consent agreements, to prevent improper collusion between New TEGNA and Cox, which would collectively own more than 80 broadcast television stations. *Id.* at 020–23.

---

[3] DISH is a member of the ATVA. Ex. 9 at 07.

**B.      DISCUSSIONS OF MR. KIM'S RACE AND NATIONALITY**

The FCC record shows that Plaintiffs were responsible for injecting race as an issue in the FCC proceedings.  By filing dated July 7, 2022, Plaintiffs argued to the FCC that, historically, these Petitioners "claimed to value diversity, but fail to even mention that the Transactions would create the largest minority-owned and female-led television group in U.S. history."  *See* Applicants' Consolidated Opposition and Response to Comments dated July 7, 2022 at 07, attached hereto as Exhibit 5.  Plaintiffs advocated that the interests of diversity weigh in favor of granting the application.  *Id.* at 07–10, 016–22.

In response to that argument, Petitioners countered that Mr. Kim's status as a minority did not provide a basis to approve the transaction.  *See* Petitioners' Reply dated August 1, 2022 at 06–09, attached hereto as Exhibit 6.  The relevant filing shows that Petitioners did not malign Plaintiff Kim or his race.  *Id.*  They argued that the transaction would increase ownership concentration in media in a way that did not promote diversity of *viewpoints*.  Petitioners expressly characterized Mr. Kim's racial diversity as a positive.  Specifically, they stated: "It is certainly a *good thing* that Mr. Kim is not barred by his race from becoming a successful entrepreneur with the acumen and business relationships giving him access to capital such that he is at the lead of this transaction."  *Id.* at 08 (emphasis added).  Petitioners added the caveat that "a single large LLP or corporation of the type proposed here is not going to ameliorate or address long-standing inequities produced by structural racism, xenophobia or misogyny."  *Id.*  In sum, Petitioners took the position that the FCC "should not conflate the identity of one or two business leaders regarding a transaction that would further consolidate the marketplace with advancing its goals to promote ownership diversity."  *Id.* at 08–09.

7

The position that Petitioners took in 2022 – that Mr. Kim's race should not weigh in favor of SGCI's application at the FCC – is fully consistent with the Supreme Court's 2023 decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), which Plaintiffs cite prominently in the Amended Complaint. *See* Am. Compl. ¶¶ 1, 5. Plaintiffs' counsel here, Consovoy McCarthy PLLC, represented the plaintiff in that action. In that case, the Supreme Court held that racial preferences used by Harvard and the University of North Carolina in connection with undergraduate admissions violate the Equal Protection Clause of the 14th Amendment. *Students for Fair Admissions*, 600 U.S. at 206-207, 220 ("We have time and again forcefully rejected the notion that government actors may intentionally allocate preference" based on skin color). Pursuant to this Supreme Court precedent, any preference to Mr. Kim's application at the FCC based on his race would risk an equal protection violation.

Petitioners did raise concerns about anonymous foreign investment. Those concerns were not directed at Mr. Kim. Instead, the issues Petitioners raised related to undisclosed financing sources, identified only as Cayman Island and British Virgin Islands investment funds. Exhibit 6 at 026. Petitioners expressly distinguished the anonymous foreign investors from Mr. Kim, stating: "[a]bsent access to the various covenants and other materials that have not been filed with the [FCC], it is scant assurance that, on paper, according to the Applicants, voting control will be held by Mr. Kim." *Id.*

In later filings where Petitioners referenced concerns about "anonymous foreign investment," they plainly referenced these off-shore investment funds. *See* Letter dated September 21, 2022 from The Goodfriend Group to Marlene H. Dortch, Secretary, FCC ("The undersigned reiterated concerns expressed in this proceeding, and by TNG in multiple other

contexts, regarding the risks to localism, diversity, and by extension journalism and democracy itself, posed by anonymous foreign investment in American newsrooms"); Letter dated September 29, 2022 from The Goodfriend Group to Marlene H. Dortch, Secretary, FCC ("President Biden's recent Executive Order regarding CFIUS enforcement should encourage the Commission to scrutinize the impact on localism, diversity, and thus to local news coverage generally posed by anonymous foreign investment in a major U.S. local broadcast TV station group."); Letter dated October 6, 2022 from Andrew Jay Schwartzman to Marlene H. Dortch, Secretary, FCC ("[C]ounsel discussed . . . the applicants' failure to disclose details about the proposed ownership and financing structure for the transactions.  They observed that the matter reaches the Commission in the context of a changing geopolitical environment in which there is a recognition that, in addition to posing threats to national security, undisclosed or excessive foreign ownership and investment implicates other public interest issues, including localism, diversity and maintaining a robust market for news"); Letter dated October 13, 2022 from Andrew Jay Schwartzman to Marlene H. Dortch, Secretary, FCC ("Counsel then discussed the applicants' failure to disclose details about the proposed ownership and financing structure for the transactions.") (collectively attached hereto as Exhibit 7 at 02–03, 07–08, 09, 014–15).

Petitioners did not malign Mr. Kim, whom everyone understood is neither anonymous nor foreign.

## C.    DISH'S FILINGS ON THE FCC DOCKET

DISH owns DISH Network L.L.C., a pay-television provider that distributes television content to consumers.  DISH made its first filing in the FCC proceeding in December 2022, after the applications had been pending for approximately eight months, and long after the June 22, 2022 deadline for a petition to deny.  On December 28, 2022, DISH filed a letter for the stated

purpose of providing the FCC with facts relevant to a dispute between Petitioners (as defined

above) and Cox.  The December 28, 2022 letter is attached hereto as Exhibit 8.  Cox had denied

a news report that it sought to negotiate with DISH on future fees for television stations owned

by Standard General and TEGNA that Cox intended to acquire, but did not yet own.  *See* Ex. 8.

Cox represented to the FCC that "it has not sought and will never seek to negotiate

retransmission consent for another company's stations."  *Id.* at 01 (internal quotation marks

omitted).  DISH provided the FCC with the relevant demand from Cox relating to stations that

Cox did not own.  *Id.*

      DISH made another filing on January 13, 2023, which requested that the FCC put

conditions in place to insure against manipulation of after-acquired station clauses by New

TEGNA and Cox.  The January 13, 2023 filing is attached hereto as Exhibit 9.  DISH followed

up with a filing on February 6, 2023, discussing evidence that Cox sought to raise prices and

impose other unfavorable terms on pay-television providers after the transaction closed.  The

February 6, 2023 filing is attached hereto as Exhibit 10.  In that filing, DISH acknowledged that

Standard General had at that point waived the benefit of after-acquired stations clauses.  DISH

noted that Cox had not done so: "Unlike Standard General, Cox has not proposed or otherwise

assented to conditions preventing it from immediately raising retransmission consent fees or

imposing other terms through after-acquired station clauses. . . . Cox's refusal to assent even to

these conditions, combined with DISH's evidence of Cox seeking price increases for TEGNA's

stations, reveals Cox's true motives."  Ex. 10 at 02.  Notwithstanding that DISH questioned

whether the conditions Standard General accepted were "bulletproof in their current form,"

DISH advocated that Cox, at a minimum, be subject to those same conditions – that Cox take the

four TEGNA stations it proposed to acquire subject to TEGNA's existing agreements and rates. *Id.* at 02, 06.

DISH's filings were made by Pantelis Michalopoulos, DISH's counsel at Steptoe LLP, who regularly represents DISH before the FCC.  *See* Exs. 8–10.  None of DISH's filings asked the FCC to deny the applications.

The FCC record does not show any communication between Defendant Ergen and the FCC in connection with the applications.  *See* https://www.fcc.gov/ecfs/search/search-filings/results?sort=date_disseminated,ASC&proceedings_name=22-162&page=0&limit=5.

Plaintiffs allege that Chairwoman Rosenworcel had scheduled meetings with Defendant Ergen on April 27, 2022 and January 23, 2023.  Am. Compl. ¶¶ 127, 211, 305.  Plaintiffs omit important context for DISH's interactions with the FCC – specifically that DISH has been building out a wireless network to compete with AT&T, Verizon and T-Mobile. https://www.denverpost.com/2023/08/08/englewood-dish-wireless-new-cellular-network/. DISH's business concerns at the FCC are much broader than those implicated in SGCI's application.

If Defendant Ergen had discussed the FCC proceeding concerning SGCI's application, or any other open proceeding, during a meeting with Chairwoman Rosenworcel, DISH would have filed an *ex parte* disclosure on the docket.  DISH regularly files these disclosures.  In fact, DISH filed an *ex parte* disclosure on April 29, 2022, which summarizes a meeting held on April 27, 2022 with Commissioner Brendan Carr and Greg Watson that Defendant Ergen attended.  At that April 27, 2022 meeting, DISH "urged the Commission to adopt rules" in the proceeding on "Expanding Flexible Use of the 12.2-12.7 GHz Band, WT Docket No. 20-443" that would "maximize the use of the 12.2-12.7 GHz band."  DISH advocated that the "Commission should

act expeditiously to unlock the power of 5G-ready spectrum in this band."  A copy of DISH's

filing dated April 29, 2022 is attached hereto as Exhibit 13.

**D.      THE HEARING DESIGNATION ORDER**

On February 24, 2023, the FCC Media Bureau entered a Hearing Designation Order.  A

copy of the Hearing Designation Order (or "HDO") is attached hereto as Exhibit 11.  The Media

Bureau found that substantial and material fact questions exist concerning whether: (1) the

transactions are structured to trigger a rate increase harmful to consumers; and (2) the

transactions will reduce or impair localism, including whether they will result in labor reductions

at local stations.  *See* Ex. 11 (HDO, ¶ 2).

The Order states that "substantial and material questions remain as to both the potential

impact, and possible harm, to consumers through higher retransmission consent fees, and the

effect on localism through potential reductions in local jobs."  *Id.*, ¶ 3.  The Media Bureau noted,

"[p]articularly during a period of high inflation and rising costs, the prospect of increased rates

for pay television *as a result of machinations or manipulation, rather than market forces*, would

be extremely problematic."  *Id.*, ¶ 4 (emphasis added).  It continued, "[e]qually as critical is that

we understand the impact the transaction will likely have on localism and specifically on local

jobs at the stations involved.  Broadcast television remains an essential source of local news,

information, and service for local communities, but based on the record before us, questions

remain as to whether local communities would be harmed by the Applicants' plans and

commitments."  *Id.*

The Hearing Designation Order further states, *inter alia*:

- "we are unable to find, due to the unique structure of the Transactions in which
  the various assignments and/or transfer of control are closed sequentially in order
  to take advantage of after-acquired station clauses and maximize retransmission
  revenue, that rates to [pay-television] subscribers would not rise beyond that

which would occur in a properly functioning competitive market." *Id.*, ¶ 32.

- "In addition, especially given questions about the intended scope of the commitments relating to enforcement of such clauses, we are unable to find that the commitments offered by the Applicants would adequately mitigate such a result." *Id.*

- "The conflicting evidence on the record before us about SGCI Holdings' intentions and commitments with regard to local staffing at the TEGNA stations, leaves us with substantial and material questions of fact, unresolved by Applicants' filings, that require further investigation to determine the ultimate effects on localism." *Id.*, ¶ 43.

Notably, the Hearing Designation Order raises numerous concerns about the applicants' candor in their representations to the FCC:

- "CWA and Common Cause/UCC argue that Mr. Kim's statement in the SG Waiver Letter that the impact of the retransmission consent fees is not 'central to the thesis' of the Transactions is belied by the multitude of revenue projections that the Standard General entities and AGM consistently presented to prospective investing banks, which are contained in the record of this proceeding." *Id.*, ¶ 29.

- "ATVA asserts that the 'unprecedented' structure of this transaction could not have happened without the sharing of information between TEGNA and CMG with respect to markets in which they overlap, in violation of the Commission rules prohibiting such information sharing." *Id.*, ¶ 30.

- There is a need to "reconcil[e] the accuracy and legitimacy of the Applicants' explanations for the documents seeming to indicate intent and commitments to reduce station-level staff, including whether the 'synergies' of job cuts have already taken place; evaluation of SGCI Holdings' explanation that station-level savings have already been achieved and that the financial model is distinguishable from a financial plan; identification of any such jobs that would likely be cut as a result of the proposed transaction and their impact on the Commission's localism policies; and resolution of apparent timeline inconsistencies about representations on staffing." *Id.*, ¶ 43.

- According to CWA, "Standard General has been producing a faux 'local' Cape Girardeau newscast with anchors, editors and other staff piped in from Lincoln, Nebraska, more than 500 miles away." *Id.*, ¶ 49.

The Hearing Designation Order furthermore addresses prior FCC precedent concerning consideration of retransmission consent fees as part of the public interest inquiry:

- "the Commission has been alert to the potential for public interest harms arising from retransmission consent rates, particularly in the context of transactions involving large broadcast television companies or MVPDs.  And, in previous transactions, the Commission has found that such increases and the resulting increased retail rates are not in the public interest."  *Id.*, ¶ 21 (footnotes omitted).

- "Even decisions that have not found a public interest harm related to alleged increases in retransmission consent fees in connection with a transaction have acknowledged the potential for such harms."  *Id.*, ¶ 22.

- "the caselaw makes clear that increases in retransmission consent rates can constitute a public interest harm if such increases are not simply the product of a properly functioning competitive marketplace.  In particular, evidence that anticompetitive practices or other wrongdoing could distinguish what would perhaps constitute a market-driven rate increase from one that is anti-competitive, unwarranted, and harmful to consumers and the public interest."  *Id.*, ¶ 24.

Plaintiffs sought relief from the HDO, through various means, including a petition for a writ of mandamus to the United States Court of Appeals for the District of Columbia Circuit filed on March 27, 2023, Case No. 23-1084.  In that petition, Plaintiffs argued that the HDO was "unlawful and futile."  A copy of the petition is attached hereto as Exhibit 14.

The FCC opposed the petition, defending the propriety of the HDO.  A copy of Respondent Federal Communications Commissions' Opposition to Petition for Writ of Mandamus is attached hereto as Exhibit 15.  Among other things, the FCC disclosed in its opposition that Plaintiffs' "internal documents reflect[] that Applicants expected the transactions to enable them to substantially increase the retransmission fees the stations charge cable and satellite providers, which those providers then pass on to consumers" and "suggest[] that Applicants plan to reduce local station staffing and investment, including potential cuts to local journalism and newsroom jobs."  *Id.* at 8, 16 (Applicants "ignore[] much of the relevant evidence in the record that has been developed so far, including Applicants' own internal documents that they nowhere acknowledge or address.  That evidence reveals a 'good deal of smoke' supporting the Media Bureau's decision to conduct a full hearing."), 18-22, 25-27.

The D.C. Circuit denied the petition by *per curiam* order dated April 21, 2023.  The court found that Plaintiffs "have not demonstrated that respondent has unreasonably delayed in acting on their applications . . . Nor have they shown that respondent has a 'crystal clear' duty to rule on their applications without resort to a hearing."  *In re: SGCI Holdings III LLC, et al.*, No. 23-1084 (D.C. Cir. April 21, 2023).

On May 24, 2023, SGCI filed a status report informing the FCC that the merger had been terminated on May 22, 2023.  On June 1, 2023, the FCC issued an Order Terminating the Proceeding.

### III.    THE AMENDED COMPLAINT'S ALLEGATIONS

Plaintiffs seek to assert five causes of action against Defendants DISH and Ergen for alleged violation of Plaintiffs' civil rights and wrongful interference with Plaintiffs' business relationships.  They allege claims for:  (1) Violation of the Enforcement Act of 1871, 42 U.S.C. § 1985 (3) (Count III); (2) Violation of the Enforcement Act of 1871, 42 U.S.C. § 1986 (Count IV); (4) Tortious Interference with Contract (Count V); (4) Tortious Interference with Prospective Business Opportunity (Count VI); and (5) Civil Conspiracy (Count VII).

### A.    PLAINTIFFS CONCEDE THAT DISH'S CONCERNS WERE ECONOMIC

In the Amended Complaint, Plaintiffs make the outrageous allegation that the FCC's actions with respect to SGCI's application to acquire TEGNA were motivated by racial animus against Plaintiff Kim, a Korean American.  Am. Compl. ¶ 1.  Those race discrimination claims are belied by the extensive FCC record.  Even so, with respect to Defendants DISH and Ergen, Plaintiffs concede in paragraph after paragraph that DISH's concerns with the transaction were *purely economic*—based on a threat of increased fees for the right to distribute the TEGNA television stations to DISH subscribers.

15

SGCI recounts that DISH had engaged in a contentious contract negotiation with TEGNA that included a "months-long blackout of TEGNA stations on DISH." Am. Compl. ¶ 301. In February 2022, DISH and TEGNA reached a new retransmission fee deal. *Id.* *At the very same time,* "Standard General and TEGNA were finalizing the terms of the acquisition." *Id.* Plaintiffs allege that the Standard General deal immediately "could have increased the retransmission fees for the TEGNA stations." *Id.* According to Plaintiffs' own allegations, their transaction threatened to upend a newly-minted hard-fought deal between DISH and TEGNA.

Plaintiffs acknowledge multiple times in their pleadings that, under "after-acquired" station provisions, "Standard General's pre-merger retransmission agreements with companies like DISH would apply to the TEGNA stations, potentially resulting in greater retransmission fees than what such companies were currently paying." Am. Compl. ¶ 83. Plaintiffs continue:

> DISH, led by chairman Charlie Ergen, had a direct interest in the Standard General-TEGNA retransmission fees it would pay to carry the TEGNA stations. If DISH could get commitments to drive retransmission fees down or if DISH could kill the merger and pay cheaper retransmission fees to TEGNA or a different buyer like Mr. Allen, then DISH would make more money by paying less to rebroadcast the stations' programming.

Am. Compl. ¶ 138. Plaintiffs add: "On information and belief, DISH knew that it could potentially save millions if the TEGNA deal did not close." Am. Compl. ¶ 304.

Plaintiffs allege that DISH had a commercial agenda. *See generally* Am. Compl. ¶ 304. Plaintiffs plead that "[t]he fight over retransmission fees was one that helped DISH." Am. Compl. ¶ 139. "The straw objectors' arguments advanced . . . DISH's commercial agenda." Am. Compl. ¶ 319. There are no genuine allegations that Defendants DISH or Ergen harbored any race-based animus against Plaintiffs.

Plaintiffs allege that DISH's commercial concerns were fully satisfied, yet it continued to push back on the transaction.  Am. Compl. ¶ 303 ("even after Standard General gave DISH everything it could have wanted through its binding commitment to waive after-acquired clauses, DISH continued to opposed Standard General's acquisition of TEGNA.")  But, this assertion is demonstrably wrong.  As set forth above, DISH's filings focused on the fact that Cox, which stood to acquire four TEGNA television stations in the transaction, *did not* waive after-acquired clauses.  *See* Exs. 8-10.  DISH also questioned the enforceability and effectiveness of Standard General's commitments and raised concerns of improper collusion between SGCI and Cox.  *Id.* The HDO shows that the FCC shared those concerns.

**B.     PLAINTIFFS' ALLEGATIONS OF AN UNLAWFUL RACE-BASED CONSPIRACY LACK ANY BASIS IN FACT**

Plaintiffs claim "on information and belief" that there was an unlawful racially motivated "conspiracy" to have the FCC kill the deal involving Byron Allen, the Allen Group, DISH Network, DISH's chairman Charlie Ergen, David Goodfriend, members of Congress, labor unions, public interest groups, FCC Chairwoman Rosenworcel and Media Bureau Chief Holly Saurer.  Am. Compl. ¶ 24.  The Amended Complaint contains not a single factual allegation to support that outlandish assertion nor make it the least bit plausible.

Pursuant to a reasonable reading, the Amended Complaint alleges nothing more than a common dislike for the transaction, albeit for varying reasons.  For DISH, as set forth above, Plaintiffs allege a concern that the deal would unfairly increase its fees.  For Byron Allen, Plaintiffs allege that he wanted to purchase TEGNA for himself.  Am. Compl. ¶ 18 ("Mr. Allen wanted the TEGNA stations for his company.").  The Petitioners raised concerns about price increases and cuts to local news that they've raised in numerous other proceedings.  Am. Compl. ¶ 98.

### 1. Plaintiffs Lack any Evidence of Racial Animus

While Plaintiffs assert that Mr. Kim was the victim of racial discrimination, there is no genuine evidence of racism in the pleadings or in the record at the FCC.  The pleadings distort the publicly available FCC record in claiming that racist attacks were made on Plaintiff Kim. While the Amended Complaint cites numerous statements by politicians and activists that parrot Mr. Kim's views (*see, e.g.*, Am. Compl. ¶¶ 152-55, 235-239, 307), those statements only serve to show that Mr. Kim engaged in a concerted lobbying and public relations effort, not that there were any "racially charged comments" in the FCC record.

Plaintiffs assert, for example, that "straw objectors disparaged Mr. Kim and maligned him as a foreigner."  Am. Compl.  ¶ 19.  They assert that the "straw objectors" engaged in "race-based attacks."  *Id.*, ¶ 22.  The cited FCC filings (*see* Am. Compl. ¶¶ 135, 147, 150, 162, 163, 164), attached as Exhibits 2, 6 and 7, show that Petitioners did not, in fact, characterize Mr. Kim as a foreigner nor did they engage in race-based attacks on Mr. Kim.  Petitioners' concerns about anonymous foreign investment were not directed at Plaintiff Kim, who is neither anonymous nor foreign.  *Id.*  Those concerns were about financing provided by undisclosed investment funds in the Cayman Islands and British Virgin Islands.  *See* Exs. 6 and 7.  Plaintiffs otherwise admit that the Petitioners' concerns centered on private equity and undisclosed financing sources.  *See* Am. Compl. ¶ 141 ("The straw objectors were . . . 'fear-mongering about "private equity" and crying foul about how Mr. Kim was able to finance the transaction'").

Plaintiffs make numerous misleading assertions about the FCC record, including but not limited to:

- Alleging that "Objectors . . . parroted Mr. Allen's widely publicized views that diversity for an Asian American-owned company like Mr. Kim's was 'sham' diversity."  Am. Compl. ¶¶ 4, 147.

    o  No such statements appear in the Petitioners' filings.  *See* Exs. 2, 6 and 7.  Petitioners emphasized the need for diversity of viewpoints, as opposed to racial diversity, and also argued against ownership consolidation.

- Alleging that "Mr. Kim – an Asian-American raised in Queens – and his company were maligned as 'shadowy foreign investors.'"  Am. Compl. ¶¶ 5, 148, 151.

    o  As set forth above, Petitioners took issue with financing from anonymous investment funds located in the Cayman Islands and British Virgin Islands.  Plaintiffs acknowledge in the Amended Complaint that they financed "the multi-billion-dollar deal with equity held in Cayman Islands and British Virgin Islands investment funds."  Am. Compl. ¶ 71.  Neither Mr. Kim nor his company was referred to as a "shadowy foreign investor".  *See* Exs. 6 and 7.  All references to foreign investors were directed at these anonymous off-shore investment funds.  *See, e.g.* Am. Compl. ¶¶ 148, 151 (taking issue with Petitioners' accurate description of funding sources in the Cayman Islands and British Virgin Islands as "foreign" and "offshore," and asserting that these sources should not be questioned because they are "ubiquitous for multi-billion-dollar transactions").

- Alleging that the "objectors disparaged Mr. Kim and maligned him as a foreigner," and that they "used Mr. Kim's race for fearmongering, pretending as though he, an American, was an Asian foreign owner poised to take over America's newsrooms."  Am. Compl. ¶¶ 19, 151, 290.

    o  Petitioners did not once refer to Mr. Kim as a "foreigner."  *See* Exs. 2, 6 and 7.

- Alleging that Petitioners cited as a reason "to keep Mr. Kim and his company out of local news" that there were "increased tensions in the Taiwan Strait" and they "link[ed] Mr. Kim with geopolitical events in Asia."  Am. Compl. ¶ 19, 290.

    o  In the context of encouraging FCC scrutiny of "anonymous foreign investment in a major U.S. local broadcast TV group" (i.e., investment by unidentified off-shore funds), the Petitioners stated "we are living in unusual times when it comes to foreign investment issues.  Since the announcement of the proposed transaction in this proceeding, Russia invaded Ukraine and China increased tensions in the Taiwan Strait.  The Commission should not assume that CFIUS [The Committee on Foreign Investment in the United States] alone is responsible for the implications of anonymous foreign investment."  *See, e.g.*, Ex. 7 at 02-03.

    o  The Petitioners did not link Mr. Kim to the geopolitical unrest in Russia, Ukraine or Asia.  They expressly distinguished the anonymous off-shore investment funds from Mr. Kim:  "it is scant assurance that, on paper, according to the Applicants, voting control will be held by Mr. Kim."  Ex.

19

6 at 026.

- Alleging that the Petitioners' objections were "twenty-first-century race-baiting." Am. Compl. ¶ 20.

    o The FCC filings evidence no "race-baiting."  *See* Exs. 2, 6 and 7.

- Alleging that "FCC Chairwoman Rosenworcel put the imprimatur of the federal government on Mr. Allen and his straw objectors' race-based attacks."  Am. Compl. ¶ 22.

    o The FCC filings evidence no "race-based attacks."  *See* Exs. 2, 6 and 7.

The pleadings show that Mr. Kim expected that his race should have weighed heavily in his favor at the FCC, and pushed his transaction over the finish line.  Plaintiffs are bitter that Mr. Kim failed to receive preferential treatment based on his status as an Asian-American, lamenting over and over again that Mr. Kim's race was not decisive in the granting of his application.  *See, e.g.*, Am. Compl. ¶ 119 ("Despite . . . the historic advancements of diversity offered by the transaction . . . the Standard General-TEGNA transaction unraveled at the FCC."); *see also id.* ¶¶ 108, 118, 122, 141, 272.  Plaintiffs allege that "Mr. Allen and his longtime lobbyist orchestrated straw objectors at the FCC, who challenged the deal by amplifying Mr. Allen's views" that the deal did not promote diversity.  *Id.* ¶ 19.  But, any racial preferences at the FCC risked violating equal protection.  *See Students for Fair Admissions*, 600 U.S. at 206-207, 220.

Plaintiffs misguidedly claim that a lack of preferential treatment based on race constitutes racial discrimination that violates equal protection.  *See, e.g.*, Am. Compl. ¶ 228 ("[T]he HDO never mentioned how the deal would serve the FCC's stated policy of increasing ownership diversity.  The HDO simply ignored the historic increase in minority ownership that the deal would bring.  *And by ignoring it, the Media Bureau joined the pernicious narrative peddled by straw objectors: an Asian-American buyer did 'nothing' to promote ownership diversity*.") (emphasis added).  That cannot be so.

20

2.      **There is no Evidence of a Conspiracy**

In terms of an alleged "conspiracy" among the Defendants, nearly every allegation is made "on information and belief," and is based on nothing more than conjecture, supposition, rumor, and multiple layers of irrelevant hearsay.  For example, the Amended Complaint alleges:

- "*On information and belief*, the conspiracy to kill the Standard General deal reached as high as the halls of Congress and as far as the Allen Group and Mr. Allen, DISH Network and its chairman and majority shareholder Charlie Ergen, their lobbyist David Goodfriend at the Goodfriend Group, labor unions, public interest groups, and FCC Chairwoman Rosenworcel and her personal staffer and Media Bureau Chief, Ms. Sauer."  Am. Compl. ¶ 24 (emphasis added);

- "David Goodfriend at the Goodfriend Group orchestrated objections to the Standard General-TEGNA transaction by labor unions and public interest groups at the FCC.  At the same time, Mr. Goodfriend was lobbying the FCC on behalf of Mr. Allen and another longtime client: DISH, led by its Chairman Charlie Ergen.  And they also wanted the deal dead."  Am. Compl. ¶ 25;

- "Mr. Allen's conspiracy also included high-ranking members of Congress."  Am. Compl. ¶ 26.

- "these straw objectors became a pretext for the unlawful interference and race discrimination that ultimately killed the transaction."  Am. Compl. ¶ 98;

- "*The obvious inference to be drawn* from this timeline of events is that the straw objectors maintained their objections . . . in concert with Mr. Goodfriend at the Goodfriend Group and his longtime clients, Mr. Allen at the Allen Group and Mr. Ergen at DISH."  Am. Compl. ¶ 137 (emphasis added);

- "*On information and belief*, Mr. Goodfriend had been working behind the scenes for some time before appearing in August, not only for the objectors but also for his longtime clients at the Allen Group and DISH."  Am. Compl. ¶ 158 (emphasis added);

- "*On information and belief*, the request for failed bidders came from the Goodfriend Group to instead be used for his other clients, the Allen Group and DISH—in violation of the FCC's protective order."  Am. Compl. ¶ 171 (emphasis added);

- "Mr. Goodfriend was ostensibly representing NewsGuild and NABET, but his stated concerns served DISH, the Goodfriend Group's other client."  Am. Compl. ¶ 192;

- "Mr. Goodfriend—*on information and belief* at the behest of Mr. Allen and Mr. Ergen—communicated and coordinated with Senator Warren or her staff to send the letter, just as he had with Speaker Pelosi and her staff." Am. Compl. ¶ 206 (emphasis added);

- "it was no secret that DISH was a driving force behind the objectors." Am. Compl. ¶ 249;

- Mr. Allen "was at the center of Defendants' conspiracy, connected to all other Defendants through Mr. Goodfriend and Mr. Goodfriend's political connections." Am. Compl. ¶ 270;

- "sometime between February 2022 and early May 2022, Mr. Goodfriend also began doing the bidding of the Allen Group and DISH, his longtime clients." Am. Compl. ¶ 291;

- "*On information and belief*, Mr. Goodfriend and DISH teamed up again during the Standard General-TEGNA proceedings." Am. Compl. ¶ 296 (emphasis added);

- "*On information and belief*, DISH knew that it could potentially save millions if the TEGNA deal did not close or a different buyer like Mr. Allen was chosen. *On information and belief* Mr. Allen and Mr. Ergen were connected through Mr. Goodfriend and worked well together." Am. Compl. ¶ 304 (emphases added);

- Alleging that "multiple sources" purportedly confirmed Defendant Ergen's unspecified "involvement." Am. Compl. ¶ 306

- "According to one of Mr. Kim's acquaintances, 'Charlie cares.'" Am. Compl. ¶ 306.

Plaintiffs repeatedly allege that Mr. Goodfriend was acting for DISH, notwithstanding that Mr. Goodfriend did not enter a single appearance for DISH in the FCC proceedings. Plaintiffs argue, based on services that Mr. Goodfriend has performed for DISH, that DISH bears responsibility for Mr. Goodfriend's work in his representation of other clients. *See, e.g.* Am. Compl. ¶¶ 158, 160. These threadbare allegations made "on information and belief" do not make out a conspiracy to discriminate against Plaintiffs on the basis of race.

Plaintiffs disingenuously plead that this was a simple "rule compliant" deal "that boiled down to a mere change in ownership." Am. Compl. ¶¶ 116–17. They glaringly fail to take

responsibility for the shenanigans inherent in the transaction that caught the FCC's attention, including the complex choreography of the deal's structure that was calculated to launder retransmission consent agreements through Cox affiliates to artificially raise retransmission consent fees and Standard General's intentions to slash local jobs and consolidate the news function in Washington, D.C.  *See* Ex. 11 (HDO), Ex. 15 (FCC Opposition to Petition for a Writ of Mandamus).  Those shenanigans precipitated the Hearing Designation Order; not any race-based animus or conspiracy.

## IV.    ARGUMENT

Plaintiffs' claims against Defendants DISH and Ergen violate Rule 11 of the Federal Rules of Civil Procedure.  The pleadings of the Amended Complaint show that Plaintiffs blame DISH and Ergen, among others, for the failure of their proposed TEGNA acquisition.  This action was filed in retaliation for DISH's public comments on the transaction, in order to wrongfully harass DISH and its Chairman, Defendant Ergen, who never personally even weighed in at the FCC.

The purported allegations of an unlawful conspiracy, racially charged misconduct, and tortious interference lack any basis in real-life events, rendering the claims factually frivolous. Moreover, the First Amendment rights of free expression, to petition the government and association immunize DISH and Ergen from the legal claims pleaded against them, rendering the action frivolous as a matter of law.

Plaintiffs and their counsel should be sanctioned for these multiple Rule 11 violations. Defendants DISH and Ergen respectfully submit that those sanctions should include dismissal of the Amended Complaint's claims against them and payment of all attorneys' fees and costs incurred in connection with this frivolous action.

A.      **THE CLAIMS ALLEGED AGAINST DISH AND ERGEN VIOLATE RULE 11**

Rule 11(b) of the Federal Rules of Civil Procedure provides that, in presenting a

pleading, such as a complaint, to the district court, an attorney certifies that (1) it is not being

presented for any improper purpose, such as to harass the defendants; (2) the claims and other

legal contentions are warranted by existing law or by a nonfrivolous argument for modifying

existing law; and (3) the factual contentions have evidentiary support or will likely have

evidentiary support after a reasonable opportunity for further investigation or discovery.  The

Amended Complaint in this action violates each one of these prongs of Rule 11(b).

### 1.  The Amended Complaint's Purported "Factual" Allegations are Utterly Lacking in Evidentiary Support

The Amended Complaint's purported factual allegations are frivolous, in violation of

Rule 11(b)(3).  Rule 11 imposes a duty to conduct a pre-filing inquiry into the facts alleged.

*Hilton Hotels Corp. v. Banov*, 899 F.2d 40, 235 (D.C. Cir. 1990).  "A party's representations are

'frivolous and thus worthy of sanctions when they are utterly lacking in . . . evidentiary

support.'"  *Intelsat USA Sales LLC v. Juch-Tech, Inc.*, No. 10-cv-2095, 2014 WL 12787643, at

*3 (D.D.C. Oct. 15, 2014) (*quoting ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F. Supp. 2d

245, 271 (D.D.C. 2013)).  A Rule 11 violation does not require that the attorneys act in bad faith.

An "objective standard of reasonableness" determines "whether there has been a violation" of

Rule 11(b).  *Hourani v. Mirtchev*, 796 F.3d 1, 17 (D.C. Cir. 2015).  Here, the factual allegations

are objectively unreasonable, in violation of Rule 11(b)(3).

The factual basis for a claim cannot "rest[ ] on nothing more than speculation,

unsubstantiated industry rumors, and multilayered hearsay."  *Intelsat USA Sales*, 2014 WL

12787643, at *6.  In *Intelsat*, this Court found that a "theory of tortious interference" that

"rel[ied] exclusively on conjecture, rather than any legitimate evidentiary basis," violated Rule

11(b)(3).  *Id.*  "Rule 11 was drafted to prevent parties from asserting claims that rely on such a flimsy pre-filing factual basis."  *Id.* at *8.  The facts alleged in a pleading cannot be based on rumor, hunch, speculation, supposition or surmise.  *Id.*

In this action, Plaintiffs do exactly what Rule 11 prohibits.  The Amended Complaint's purported "factual" allegations against DISH and Ergen are based exclusively on conjecture, rumor, hunch, speculation, supposition and surmise.

The crux of the Amended Complaint is an assertion that there was a race-based conspiracy against Plaintiffs to prevent an Asian-American from purchasing TEGNA and its 60-plus television stations.  There is not a single plausible fact alleged to support that assertion, especially not with respect to Defendants DISH and Ergen.  As to Defendants DISH and Ergen, Plaintiffs allege that they opposed the transaction for economic reasons.  Based only on those economic concerns, Plaintiffs surmise that DISH and Ergen "participated in a racially motivated conspiracy to thwart the Standard General / TEGNA deal."  Am. Compl. ¶ 359.  Plaintiffs assert that all "Defendants acted maliciously, intending to cause Standard General harm because of Mr. Kim's race."  Am. Compl. ¶¶ 372, 380, 386.  The allegations are absurd.

Moreover, the FCC record does not evidence any "race-based" opposition to SGCI's application.  The publicly available filings show that Plaintiffs argued that Mr. Kim's minority status should support a grant of the application.  Petitioners disagreed, arguing that the FCC should be promoting diversity of viewpoints, not consolidation of media ownership.  Plaintiffs mischaracterize this disagreement as racism.  *See, e.g.,* Am. Compl. ¶ 345 (alleging that it was a "race-based tactic" for Petitioners to say "Mr. Kim's acquisition did 'nothing' for ownership diversity.")  Petitioners also took issue with reliance on undisclosed foreign investment funds.  They did not characterize Mr. Kim as a foreigner nor did they assert that he was "shadowy."  The

Amended Complaint twists and mischaracterizes the FCC filings to fit them to Mr. Kim's false narrative that he was racially discriminated against.

Plaintiffs conjure up a scenario where Petitioners are acting as puppets (or "straw objectors") for all of the other Defendants, orchestrated by "Mr. Goodfriend at the Goodfriend Group and his longtime clients, Mr. Allen at the Allen Group and Mr. Ergen at DISH."  Am. Compl. ¶ 137.  Relying on the mere fact that DISH and the Allen Group both have had business relationships with Mr. Goodfriend, Plaintiffs repeatedly aver "on information and belief" that the Defendants formed an illegal conspiracy with Mr. Allen at the hub.  *See, e.g.*, Am. Compl. ¶¶ 24, 25, 158, 171, 175, 206, 220, 249, 270, 272, 278, 291, 296.  They claim, based on some unspecified industry rumor that, "it was no secret that DISH was a driving force behind the objectors."  Am. Compl. ¶ 249.  And, they speculate that the lack of public squabbles between DISH and the Allen Group means that they must be in cahoots.  *See* Am. Compl. ¶ 304 ("On information and belief, . . . Mr. Allen and Mr. Ergen worked well together.  For example, despite DISH being a hardline negotiator over retransmission fees leading to countless station blackouts, that has never been an issue for the Allen Group, as DISH has never blacked out the Allen Group's stations.").

The objective facts that derailed Plaintiffs' deal are detailed in the FCC's HDO and its filing with the D.C. Circuit.  The FCC explained that "[n]umerous internal documents describe Standard General and Apollo's plans to increase the retransmission fees charged by the Tegna stations post-acquisition" by manipulative means.  Ex. 15 at 18-19.  In addition, "the transaction would result in Apollo possessing a common ownership interest in both the New Tegna stations and Cox stations" resulting in "powerful structural incentives" for collusion.  *Id.* at 20-21.  With respect to localism, "Applicants' internal documents contain 'a series of statements' indicating

that Standard General 'has had longstanding plants to reduce station-level resources' at Tegna, including potential cuts to local journalism and newsroom staffing." *Id.* at 25. The commitments that Plaintiffs offered (and not Cox) did not alleviate the FCC's concerns. *Id.* at 22 ("If anything, the commitment letters only tend to show that the transactions as originally proposed, and as pursued by Applicants for more than nine months, raised real and substantive concerns worthy of further examination.")

Because the purported "factual" allegations against Defendants DISH and Ergen are utterly lacking in evidentiary support and constitute nothing more than unreasonable conjecture, rumor, hunch, speculation, supposition and surmise, the Amended Complaint violates Rule 11(b)(3).

### 2. The Amended Complaint's Legal Claims Against DISH and Ergen are Frivolous

Most significantly, Plaintiffs' claims against DISH and Ergen lack any legal merit, in violation of Rule 11(b)(2). A filing that advances "frivolous legal contentions" with no reasonable prospect of success violates Rule 11(b)(2). *Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir. 1989); *Zhao v. Li*, No. 20-3138, 2022 WL 6727338, at *5 (D.D.C. Oct. 11, 2022).

Every one of the claims alleged in the Amended Complaint against Defendants DISH and Ergen fail, because DISH and Ergen are immunized from liability for speech before the FCC (whether by themselves or purported "straw objectors"), pursuant to the First Amendment of the United States Constitution. Even if DISH and Ergen did not enjoy First Amendment protection related to advocacy before the FCC on a matter of public interest, the Amended Complaint still would fail to state viable claims against them for racial discrimination, tortious interference, and conspiracy.

a) **The First Amendment bars all claims against Defendants DISH and Ergen.**

The Amended Complaint in this action improperly seeks to hold the non-FCC Defendants liable for speech on a matter of public interest before the FCC in connection with the FCC's consideration of SGCI's application. This speech enjoys First Amendment protection, and cannot serve as a basis for any statutory or tort liability.

Speech concerning public affairs is "the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). There is a profound national commitment to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Here, there was a public debate on whether the applications pending before the FCC for station transfers served the public interest. All of the speech that Plaintiffs take issue with in the Amended Complaint, by Petitioners and DISH, is speech on a matter of public interest.

The Supreme Court has recognized that "expression on public issues" rests "on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (holding that nonviolent elements of boycott organizers' activities are entitled to First Amendment protection, and reversing damages award). "[T]he presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–17. According to the Supreme Court, the government "may not award compensation for the consequences of nonviolent, protected activity." *Id.* at 918.

Consistent with these First Amendment rights, "[t]he Noerr-Pennington doctrine holds that defendants who petition the government for redress of grievances . . . are immune from liability for such activity under the First Amendment." *Nader v. The Democratic Nat'l Comm.*,

555 F. Supp. 2d 137, 156 (D.D.C. 2008), *affirmed on other grounds*, 567 F.3d 692 (D.C. Cir.

2009).  Regardless of the defendant's motives, the doctrine "immunizes the concerted efforts of

individuals" to persuade the government to take legislative or other action.  *Alemu v. Dep't of*

*For-Hire Vehicles*, 327 F. Supp. 3d 29, 51 (D.D.C. 2018).  The protected activity includes efforts

to influence legislative or executive action, and includes speech to administrative agencies.  *Id.;*

*see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (extending

*Noerr* to speech to administrative agencies).

      While the doctrine originates in antitrust law, its underpinnings and its reach extend

beyond antitrust and include other types of claims, inclusive of common law torts.  *Nader*, 555 F.

Supp. 2d at 157; *see also E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 19 (D.D.C. 2014)

(dismissing claims for tortious interference with contract and abuse of process), *aff'd*, 629 F.

App'x 1 (D.C. Cir. 2015); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128-29 (3d Cir.

1999) (affirming dismissal of state common-law tort claims, because the same First Amendment

immunity principles apply); *Igen Int'l, Inc. v. Roche Diagnostics GMBH*, 335 F.3d 303, 310 (4th

Cir. 2003) ("although originally developed in the antitrust context, the doctrine has now

universally been applied to business torts"); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859

(5th Cir. 2000)("this Court has extended the *Noerr-Pennington* doctrine to include claims under

section 1983"); *Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 650 (7th Cir. 1983) (affirming

summary judgment dismissing tortious interference claims related to petitioning at the SEC);

*White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("While the Noerr-Pennington doctrine

originally arose in the antitrust context, it is based on and implements the First Amendment right

to petition and therefore . . . applies equally in all contexts"); *CSMN Investments, LLC v.*

*Cordillera Metropolitan District*, 956 F.3d 1276, 1283 (10th Cir. 2020) (immunity for petitioning activity "extends beyond antitrust situations").

The doctrine is recognized to apply to civil rights claims.  *See New West, L.P. v. City of Joliet*, 491 F.3d 717 (7th Cir. 2007) (Noerr-Pennington "is today understood as an application of the first amendment's speech and petitioning clauses" and protects against the plaintiff's claims of biased litigation or lobbying); *Eaton v. Newport Board of Education*, 975 F.2d 292, 298 (6th Cir. 1992) (liability may not be assessed under section 1983 for petitioning authorities to take official action); *Manistee Town Center v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) (the "immunity applies to claims under 42 U.S.C. § 1983 that are based on the petitioning of public authorities"); *Video-Int'l Prod., Inc. v. Warner-Amex Cable Comms., Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) (behavior by a private party that is protected from antitrust liability is also outside the scope of section 1983 liability).  Citizens "have a right to petition the Government, even if their motive is despicable."  *Ginx, Inc. v. Soho Alliance*, 720 F. Supp.2d 342, 363 (S.D.N.Y. 2010) (dismissing section 1981 claims); *see also Jones v. Louisiana State Bar Ass'n*, 738 F. Supp. 2d 74, 80-81 (D.D.C. 2010) (dismissing civil rights claims against attorneys).

While there is a "sham" exception to the *Noerr-Pennington* doctrine, it has no application to this case.  The sham exception requires that the prior litigation be (i) objectively baseless; and (ii) conceal an attempt to interfere directly with a competitor's business relationships.  *Prof. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993).  "A winning lawsuit is by definition . . . not a sham."  *Id.* at 61 n. 5.  The "sham" exception cannot apply here, given that the FCC found in the HDO that Petitioners' objections and DISH's comments had merit.  The D.C. Circuit similarly rejected Plaintiffs' assertion that the HDO was a sham.

In addition, speech on a matter of public concern "cannot be deemed unprotected merely because Plaintiffs have alleged it to be part of a conspiratorial agreement to violate a civil statute." *Thompson v. Trump*, 590 F. Supp. 3d 46, 110 (D.D.C. 2022), *aff'd in part sub nom Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023).  Speech on matters of public concern only loses First Amendment protection if it is directed at inciting imminent lawless action.  *Id.* at 110–11, 118 (finding that speeches by Rudy Giuliani and Donald Trump, Jr. on January 6 were protected expression that did not call for imminent use of violence or lawless action, and dismissing claims asserted against them under 42 U.S.C. §§ 1985 and 1986).

Here, Petitioners' advocacy before the FCC is immunized from liability under the First Amendment, regardless of whether Petitioners spoke only for themselves or might possibly have addressed issues important to other Defendants as purported "straw objectors."  Similarly, Defendant DISH's filings with the FCC represent protected speech (and Plaintiffs do not allege that any of DISH's own speech was erroneous or wrongful).  All of Plaintiffs' civil rights and tort claims take issue with advocacy on a matter of public interest before the FCC.  For these reasons, the First Amendment bars all causes of action pleaded in the Amended Complaint.

In addition to seeking redress for protected speech before the FCC, the Amended Complaint seeks to hold the Defendants liable based on their degrees of connection to each other. Plaintiffs' conspiracy allegations rest on the mere fact that Defendants Goodfriend, Allen and Ergen know each other, and Goodfriend has worked with both Allen and DISH.  This "conspiracy" theory offends the First Amendment's right to association.  "The First Amendment similarly restricts the ability of the State to impose liability on an individual solely because of his association with another." *Claiborne Hardware*, 458 U.S. at 918–19.  Accordingly, Plaintiffs

may not seek to hold Defendants DISH and Ergen liable based on their association with other

Defendants.

> **b)** **The Amended Complaint otherwise fails to state a claim upon which relief may be granted against Defendants DISH and Ergen.**

> *(1)* *Civil Rights Counts (Counts III and IV)*

Plaintiffs seek to assert claims against Defendants DISH and Ergen for violation of

Plaintiffs' civil rights, pursuant to 42 U.S.C. §§ 1985(3) and 1986. These are not cognizable

claims.

A Section 1985(3) claim requires that the plaintiff plead and prove (1) a conspiracy;

(2) for the purpose of depriving a person or class of persons of the equal protection of the laws;

(3) motivated by some class-based, invidiously discriminatory animus; and (4) causing damage.

*Graves v. United States*, 961 F. Supp. 314, 319 (D.D.C. 1997). This claim fails, *inter alia*,

because Plaintiffs have neither pleaded a conspiracy nor that the Defendants were motivated by

invidiously discriminatory animus.

Pursuant to the Supreme Court precedent in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544

(2007), a pleading of a conspiracy requires "enough factual matter (taken as true) to suggest that

an agreement was made." *Id.* at 556. It "calls for enough fact to raise a reasonable expectation

that discovery will reveal evidence of illegal agreement." *Id.* A conclusory allegation of

agreement at some unidentified point in time will not suffice to plead an illegal conspiracy. *Id.*

at 556-57. "[W]hen allegations of parallel conduct are set out in order to make a [conspiracy]

claim, they must be placed in a context that raises a suggestion of a preceding agreement, not

merely parallel conduct that could just as well be independent action." *Id.* at 557.

At the pleading stage, for a conspiracy claim, there is a need for allegations "plausibly

suggesting (not merely consistent with) agreement." *Id*. at 557. "Without a circumstance

pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. *Id; see also Thompson v. Trump*, 590 F. Supp. 3d at 97 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.") (*quoting Twombly*, 550 U.S. at 556).

The Amended Complaint in this action contains no circumstances pointing toward an illegal meeting of the minds. It barely even asserts parallel conduct. It alleges only a common desire by Defendants Allen, DISH and the Petitioners to see the merger fail for legitimate business reasons. The Amended Complaint therefore fails to plead any plausible conspiracy claim.

A Section 1986 claim requires an underlying Section 1985 violation and holds a party liable who knew of the wrong, had the power to prevent it, yet neglects or refuses to do so. 42 U.S.C. § 1986; *see also Thompson v. Trump*, 590 F. Supp. 3d at 84 (This "statutory provision is unique. It requires persons with knowledge of a conspiracy proscribed in § 1985 and with the means to prevent the conspiracy to take affirmative action[ ] to do so."). Because the Amended Complaint does not allege a § 1985 conspiracy, it also fails to allege a claim under § 1986. Moreover, the Amended Complaint fails to allege any facts that might show that Defendants DISH or Ergen had the power to prevent the purported conspiracy or control the outcome of the applications at the FCC.

For these reasons, all of the civil rights claims alleged in Counts III and IV of the Amended Complaint fail to state a claim against Defendants DISH and Ergen.

### *(2)    Tortious Interference Counts (Counts V, VI)*

Counts V and VI of the Amended Complaint purport to allege claims against Defendants DISH and Ergen for tortious interference with contract and prospective business opportunity.

Neither DISH nor Ergen interfered with Plaintiffs' business relationships.  The Amended
Complaint alleges that the merger failed because SGCI's financing commitments expired, not
because of any wrongful interference.  Counts V and VI fail to state a claim upon which relief
may be granted.

A tortious interference with contract claim requires (1) existence of a contract; (2) the
defendant's knowledge of the contract; (3) the defendant's intentional procurement of the
contract's breach; and (4) resulting damages.  *Patton Boggs, LLP v. Chevron Corp.*, 825 F. Supp.
2d 35 (D.D.C. 2011).

A tortious interference with prospective business opportunity claim requires (1) a valid
business relationship or expectancy; (2) the defendant's knowledge of the relationship or
expectancy; (3) intentional interference inducing or causing a breach or termination of the
relationship or expectancy; and (4) resulting damages.  *Smith v. Rubicon Advisers, LLC*, 254 F.
Supp. 3d 245, 251 (D.D.C. 2017).

For both of these claims, the interference must be "improper."  *Eastern Savings Bank,
FSB v. Papageorge*, 31 F. Supp. 3d 1, 19 (D.D.C. 2014). Competitive activity will not support a
tortious interference claim, unless it involves wrongful means, such as fraud or violence.
*Bowhead Information Technology Svcs, LLC v. Catapult*, 377 F. Supp. 2d 166, 174 (D.D.C.
2005).

The Amended Complaint does not plead any wrongful interference in Plaintiffs' contracts
or business relationships by Defendants DISH or Ergen.  The merger agreement terminated after
financing commitments expired while the FCC continued to consider SGCI's application.  No
contract was breached and no one in a business relationship with Plaintiffs was wrongfully
induced to end that relationship.

### (3)   Civil Conspiracy Count (Count VII)

In Count VII, Plaintiffs seek to assert a civil conspiracy claim against all Defendants. They allege that the conspiracy involved not only Petitioners, Goodfriend, the Goodfriend Group, Allen, the Allen Group, DISH, and Ergen, but also FCC Chairwoman Rosenworcel and Media Bureau Chief Sauer.  Am. Compl. ¶ 383.  As set forth above, the Amended Complaint fails to allege a plausible conspiracy, let alone any wrongful conduct.  For that reason, the Civil Conspiracy Count fails to state a claim.

### 3.   The Amended Complaint's Allegations Show that it is Presented for the Improper Purpose of Harassing DISH and Ergen

The pleadings of the Amended Complaint, which are both legally and factually frivolous, show that it is being presented for the improper purpose of harassing Defendants DISH and Ergen, in violation of Rule 11(b)(1).  Plaintiffs make plain that they blame Defendants DISH and Ergen, among others, for not getting what they wanted at the FCC in the time frame that they wanted it.  This action was commenced in retaliation, as a rich man's manifestation of a temper tantrum, in order to harass the parties that Plaintiffs hold responsible for the failure of their merger deal.  *See, e.g.*, *Hollister v. Soetero*, 601 F. Supp. 2d 179, 181 (D.D.C. 2009) (ordering that plaintiff show cause why he should not be sanctioned for violation of Rule 11(b)(1) "[b]ecause it appears that the complaint in this case may have been presented for an improper purpose such as to harass."); *Zhao*, 2022 WL 6727338 at *5 (finding that the plaintiffs "violated Rule 11(b)(1) by submitting filings for the improper purpose of harassing others.").

Plaintiffs allege in the Amended Complaint that Mr. Kim heard through the media industry grapevine that Defendant Ergen disliked the transaction, and wished to see it fail.  *See* Am. Compl. ¶¶ 306 ("Multiple sources confirmed Mr. Ergen's . . . personal desire to kill the deal.  According to one of Mr. Kim's acquaintances, 'Charlie cares.'"), 297 ("In April 2023,

Mr. Goodfriend confirmed to an associate of Mr. Kim's that Mr. Ergen . . . wanted the deal killed.").  But there is absolutely nothing actionable about a desire to see a deal fail, especially a deal that was artificially engineered to raise DISH's costs.  The claims against DISH and Ergen were brought to harass them and cause them to incur legal fees, in retaliation for the industry rumors that they wanted the merger to fail.  For that reason, the Amended Complaint violates Rule 11(b)(1).

## B.     THE COURT SHOULD IMPOSE SANCTIONS ON PLAINTIFFS AND THEIR COUNSEL

This Court should impose sanctions on Plaintiffs and their counsel for their violations of Rule 11(b)(1), (2) and (3).  Defendants DISH and Ergen respectfully submit that sanctions in the form of dismissal of the Amended Complaint and an award of attorneys' fees and costs would properly serve the interests of deterrence.

When a Rule 11(b) violation occurs, the district court has discretion to determine what sanction should be imposed pursuant to Rule 11(c).  *Cobell v. Norton*, 211 F.R.D. 7, 10 (D.D.C. 2002).  Sanctions may be imposed on those responsible for the failure to comply with Rule 11, including both the party and the attorney.  *Intelsat USA Sales LLC*, 2014 WL 12787643 at *8. The sanction should suffice to deter repetition of the sanctionable conduct or comparable conduct by others similarly situated.  Rule 11(c)(4).

In crafting a sanctions order, district courts may consider (i) the willfulness of the violation; (ii) whether the whole pleading or only a minor part has violated the rule; (iii) the litigant's prior sanctions history; and (iv) the financial resources of the target of the sanctions motion.  *See* Fed. R. Civ. P. 11, Advisory Committee's Note (1993).

Here, the entire Amended Complaint against DISH and Ergen violates Rule 11(b). Plaintiffs are represented by a highly sophisticated law firm, Consovoy McCarthy PLLC, which

advertises that it works closely with a "Free Speech Clinic" at the Antonin Scalia Law School at George Mason University (*see, e.g.,* https://consovoymccarthy.com/practice-areas/#open-overlay) and is home to multiple former Supreme Court clerks. https://consovoymccarthy.com/news/.  Based on the knowledge and experience of that law firm, it is reasonable to conclude that these Rule 11 violations are willful.  The Consovoy McCarthy attorneys should be fully versed in the relevant pre-filing investigation requirements as well as the First Amendment free speech protections that doom all legal claims.  In addition, Plaintiffs have vast resources.  Publicly available sources estimate Plaintiff Kim's net wealth at more than $500 million.  https://www.benzinga.com/sec/insider-trades/0001418202/soohyung-kim.  The sanctions imposed in this case must be substantial in order to have a deterrent effect.

The sanctions should include all attorneys' fees and expenses that DISH and Ergen incurred in connection with this action.  Sanctions may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  Rule 11(c)(4).  When the claims asserted against a defendant in a complaint violate Rule 11, all of the defendants' defense costs in the district court directly result from the violation.  *See, e.g., Sherman Treaters Ltd. v. Ahlbrandt*, 115 F.R.D. 519, 525 (D.D.C. 1987) (granting reimbursement of all fees and expenses incurred between the date that the plaintiff's first deficient complaint was filed through to the date that summary judgment was granted); *John Akridge Co. v. Travelers Cos.*, 944 F. Supp. 33, 34 (D.D.C. 1996) (sanctions granted for the full cost of defending against a bad faith action).  Monetary sanctions may include attorneys' fees and costs for both the Rule 11 motion and the overall defense of the frivolous claims.  *Intelsat USA Sales LLC*, 2014 WL 12787643 at *8.

In addition, "[d]ismissal is a legitimate sanction under Rule 11." *Marina Mgt Svces, Inc. v. Vessel My Girls*, 202 F.3d 315, 325 (D.C. Cir. 2000) (affirming district court's sanction of dismissal of frivolous counterclaim).  Because the entire Amended Complaint violates Rule 11(b), dismissal is an appropriate sanction in this case.

## V.    CONCLUSION

For all of the foregoing reasons, Defendants DISH and Ergen respectfully request that this Court impose sanctions on Plaintiffs, pursuant to Rule 11(c), for violations of Rule 11(b)(1), (2) and (3).

Dated:  August 30, 2024 [service date]

Respectfully submitted,

STEPTOE LLP

By: *s/ Elyse D. Echtman*
     Elyse D. Echtman
     D.D.C. Bar No. NY0583
     1114 Avenue of the Americas
     New York, New York 10036
     (212) 378-7551
     eechtman@steptoe.com

*Counsel for Defendants DISH Network Corporation and Charles Ergen*