# EXHIBIT 2

**Case No. 24-1204**

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

|  |  |  |
|---|---|---|
| In the matter of | ) | |
| | ) | |
| Applications of Tegna Inc., to Standard General, L.P. | ) | MB Docket No. 22-162 |
| | ) | |
| | ) | |

## PETITION TO DENY OF COMMON CAUSE AND UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY

Yosef Getachew
Jonathan Walter
Common Cause
805 15th St NW, Suite 800
Washington, DC 20005

Cheryl A. Leanza
United Church of Christ Media Justice Ministry
100 Maryland Ave, NE
Washington, DC 20002

EXHIBIT 2 - Page 001

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY……………………………………………1

II.     THE PUBLIC INTEREST PARTIES HAVE STANDING………………………...2

     A.   The Commission May Not Reject Petitioners with Article III Standing…….2

     B.   The Commission Should Grant Broader Participation Than the Minimum
        Required by Article III…………………………………………………………5

     C.   Common Cause Has Direct Organizational Standing…………………………7

     D.   Common Cause and the UCC Have Associational Standing………………..10

III.    STANDARD OF REVIEW……………………………………………………12

IV.     THE APPLICANTS HAVE FAILED TO MEET THEIR BURDEN……………….15

V.      THE PROPOSED TRANSACTION WOULD UNDERMINE LOCALISM………16

     A.   The Commission has Established Localism is Important to the Public
        Interest……………………………………………………………………….16

     B.   The Applicants' Stated Business Intentions Would Reduce the Amount and
        Scope of Local News Coverage…………………………………………...19

VI.     THE PROPOSED TRANSACTION WOULD LEAD TO HIGHER PRICES FOR
     CONSUMERS………………………………………………………………...21

     A.   Retransmission Prices Will Rise Because of After-acquired Clauses and Upon
        Renewal of Retransmission Contracts…………………………………...22

     B.   The Transactions Will Cause Price Increases for Pay TV Consumers and
        More Blackouts…………………………………………………………24

VII.    THE SCOPE OF THE TRANSACTION CAUSES NATIONAL HARMS………...25

     A.   The Size and Scale of This Merger Poses National Harms Regardless of the
        Applicants' Compliance with Ownership Limits……………………………25

     B.   Apollo's Rights to Standard General May Not Be in Compliance With
        Ownership Limits……………………………………………………………28

VIII.   CONCLUSION………………………………………………………………29
     APPENDIX

EXHIBIT 2 - Page 002

## I.    INTRODUCTION AND SUMMARY

Common Cause and United Church of Christ, OC., Inc. doing business as United Church of Christ Media Justice Ministry (collectively, "Petitioners"), file this Petition to Deny in response to the Federal Communications Commission's ("FCC" or "Commission") Public Notice regarding the applications of Tegna, Inc. ("Tegna"), Standard General, L.P., ("Standard General"), CMG Media Corporation ("CMG"), and Apollo Global Management ("Apollo") (collectively, "Applicants")[1], and the Applicants' response to the Commission's request for documents and information.[2]  The applications should be denied or referred to an administrative law judge for a hearing. Because the Applicants have not demonstrated that the transaction will serve the public interest, they have not met the requisite burden of proof. In fact, in neither their application nor response to the Commission's request for information do the applicants make a convincing case that the transaction will provide meaningful public interest benefits. To the contrary, the transaction would bring about significant public interest harms, including harms to localism, diversity and competition including increasing retransmission consent fee leverage, which will cost consumers money. The large scope of the transaction would cause national in addition to local harms.

---

[1] *Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of Tegna Inc. to Standard General, L.P., and Permit-But-Disclose Ex Parte Status For The Proceeding*, MB Docket No. 22-162, Public Notice, DA 22-442 (rel April 21, 2022); *see also* Amended Comprehensive Exhibit of TEGNA Broadcast Holdings, LLC et al., File No 0000186355 (filed Apr. 1, 2022) ("Comprehensive Exhibit").
[2] Letter from Soohyung Kim, Managing Member, SGCI Holdings III LLC, Akin Harrison, Senior Vice President and General Counsel, Tegna Inc., and Houston McCurry, Principal, Private Equity, Apollo Global Management, Inc. to Marlene H. Dortch, Secretary, FCC, MB Docket No. 22-162 (filed June 13, 2022) ("Applicants June 13 Letter").

EXHIBIT 2 - Page 003

## II.    THE PUBLIC INTEREST PARTIES HAVE STANDING

Petitioners meet the Communications Act's requirements to file a petition to deny as "parties in interest."[3] As Petitioners demonstrate below, we have standing to file this petition for several reasons. Petitioners have standing as organizations themselves and as associations of individual members who possess standing. The Commission's analysis of standing to participate in broadcast license transactions has often been truncated and incomplete at best.  Moreover, the Commission recently adopted an impermissible and narrow analysis of associational standing in the Nexstar-Tribune transaction--characterized by now-Chair Rosenworcel as "brutal."[4]  Whether or not the Petitioners submit affidavits from viewers in each of the more than 50 markets impacted by this transaction, the Commission may not deny our right to participate in this docket as parties in interest. As explained in detail below, petitioners possess standing based on organizational harms and nationwide harms, in addition to local harms. Moreover, the Commission should further overturn the *Nexstar-Tribune* Order by exercising its greater latitude over its own procedures to permit participation as a party-in-interest in a Commission proceeding when a party may lack Article III standing.

Common Cause demonstrates it has organizational standing because the transaction will harm their missions and require them to divert resources. Petitioners also possess associational standing through their members.

### A.  The Commission May Not Reject Petitioners with Article III Standing

The Commission implied in *Nexstar-Tribune*, with little consideration, that any organization filing a petition to deny a transaction qualifies as a party in interest only in the

---

[3] 47 U.S.C. § 309(d)(1).

[4] *Applications of Tribune Media Company, Nexstar Media Group, Inc.et al*, Memorandum Opinion and Order, 34 FCC Rcd 8436, 8471 (2019) ("*Nexstar-Tribune Order*") (Rosenworcel dissenting).

markets where it files declarations from members who are viewers in the markets impacted by that transaction.[5] That decision is wrong and must be explicitly rejected by the Commission. Although the Commission has at times been unclear and overly narrow in its analysis of standing to participate in Commission proceedings, it may not exclude parties that meet the obligations of a party-in-interest under Section 309(d)(1) as long as they possess Article III standing even if they do not file declarations in local markets impacted by the transaction. Consequently, it must overrule its standing decision in the *Nexstar-Tribune* Order and grant Petitioners standing here.

The right to seek judicial review and to file in a license proceeding at the FCC both originate in the Communications Act itself. Congress has directly granted parties in interest the right to challenge broadcast license assignments in the D.C. Circuit, given to "any other person aggrieved or whose interests are adversely affected by any decision of the Commission granting or refusing any such application."[6] And Congress also granted parties in interest a right to challenge a license approval at the FCC.[7] The Supreme Court held that Congress' decision to grant the right to appeal an FCC decision was broad, finding the Commission could not deny standing to a party adversely affected even if the harm alleged by the party was not a harm the Commission would necessarily take into account in considering the licensing decision.[8] Similarly, the D.C. Circuit held that the plain language of Section 309 worked to "insure that persons having the right to appeal from Commission decisions 'can make this complaint first before the Commission….'"[9]

Article III standing applies more broadly than the Commission's ruling in *Nexstar*. The Supreme Court's test for standing pursuant to Article III of the constitution for parties to invoke

---

[5] *Nexstar-Tribune Order*, 34 FCC Rcd 8436, 8449 ¶ 25, n.112.

[6] 47 USC § 402(b)(6).

[7] 47 USC § 309(d)(1).

[8] *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 476-77 (1940).

[9] *Elm City Broadcasting Corp. v. U.S.*, 235 F.2d 811, 816 (D.C. Cir. 1956).

3

EXHIBIT 2 - Page 005

the jurisdiction of federal courts requires: (1) injury-in-fact (2) fairly traceable to the challenged conduct (3) likely to be redressed by a favorable judicial decision.[10] An organization "can assert standing on its own behalf, on behalf of its members or both."[11] Representational or associational standing on behalf of members results when (a) members would have standing in their own right; (b) the interests they seek to protect are germane to the organization's purpose; and (c) neither the claim nor relief require participation of individual members.[12] Organizations themselves, on the other hand, have standing (not through their members) if the challenged actions that "perceptibly impair" the organization's mission, which can be demonstrated through a diversion of resources injurious to its mission.[13] For example, unions can show standing via harm to their organizing capacity.[14] This standing is similar to that of a business competitor--the corporate entity is harmed. Such an organizational harm does not require harm to individual members nor does it require viewers in any market.

While the vast majority of public interest participants in broadcast license transfer matters rely upon the status of an entity's members to assert associational standing, the Commission may not assume that every non-corporate petition to deny is based on "viewer" standing which "must allege that he or she is a resident of the station's service area or a regular viewer of the station."[15] Parties in interest must articulate harm caused by the transaction, but that harm could be derived from the national impact, the potential harm from transactions is not confined to geographically-based harm to viewers.

---

[10] *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).
[11] *PETA v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1093 (2015).
[12] *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).
[13] *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378-79 (1982); *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998); *PETA v. U.S. Dept. of Agriculture*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).
[14] *AFGE Local 1 v. Stone*, 502 F.3d 1027, 1032-33 (9th Cir. 2007); *EEOC v. AT&T*, 556 F.2d 167, 173 (3d Cir. 1977).
[15] *E.g.*, *Nexstar-Tribune Order*, 34 FCC Rcd. at 8448, ¶ 23.

Furthermore, the harm giving rise to organizational or representational standing is not limited to localized geographic markets. As explained below, a transaction such as the one proposed here causes nationwide impact on many residents and consumers and it is not dependent upon the residence of the consumer. The Commission's decision, therefore, prohibiting participation at the agency level to parties with Congressional permission and Article III standing to participate in Commission proceedings would violate the statute, impair rights given to parties by Congress and at common last and also cause administrative burden on both the agencies and the courts.[16]

### B. The Commission Should Grant Broader Participation Than the Minimum Required by Article III.

Commissioner Starks's powerful and cogent dissent in *Nexstar-Tribune* explained the importance of public participation in FCC license transfers:

> Since 1966, when the seminal case on standing was decided, the Commission has relied upon members of the public to present evidence of whether the licenses we grant or transactions we approve square with our public interest standard and better serve local communities. Indeed, even during the broadcast deregulatory era of the 1980s, the Commission noted that input from the public would be crucial to allowing the agency to exercise its core licensing functions. As we said in another matter, the Commission "relies on members of the public to act as private attorneys general to assist in overseeing the conduct of applicants and licensees and in fulfilling our statutory functions."[17]

The D.C. Circuit similarly observed in the seminal *United Church of Christ v. FCC*, "[u]nless the Commission is to be given staff and resources to perform the enormously complex and

---

[16] Moreover, the Commission must correct the implication of its decision in *Nexstar-Tribune* that the failure of an organization party-in-interest that is asserting associational standing to file affidavits in every market impacted by a transaction somehow impairs its rights to file in the markets where it does submit affidavits. As Commissioner Starks' dissent explained, the decision was unclear and likely to thereby discourage parties from filing to the detriment of the Commission's processes. *Nexstar-Tribune Order*, 34 FCC Rcd at 8473 (Starks dissenting). Where a party establishes its right to participate as a party-in-interest the Commission may not block that participation, whether the status is obtained in 1 market or 100 markets.

[17] *Nexstar-Tribune Order*, 34 FCC Rcd at 8473 (Starks dissenting) (citations omitted).

EXHIBIT 2 - Page 007

prohibitively expensive task of maintaining constant surveillance over every licensee, some mechanism must be developed so that the legitimate interests of listeners can be made a part of the record which the Commission evaluates."[18] As now-Chair Rosenworcel explained, "We should be encouraging the public and individual citizens to take an active interest in the scope and quality of broadcasting in their communities.  It plays a special role in providing local news and information—and our process should honor this essential truth rather than diminish it."[19]  In fact, in indecency and other enforcement matters, the Commission has often relied upon the fact that the federal government is not affirmatively monitoring stations around the country, it relies upon the public to draw to its attention problems with federal licensees.[20]

To pursue these ends, the FCC has the freedom to permit the participation of parties even without Article III standing:

> Within their legislative mandates, agencies are free to hear actions brought by parties who might be without party standing if the same issues happened to be before a federal court. The agencies' responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the [C]onstitution or the common law.[21]

Not only should the FCC adopt permissive participation standards, but it may not arbitrarily limit who may participate. "Courts willingly overturn" agency decisions to reject requests to participate under their authorizing statutes "when the responsible agency, either by failing to

---

[18] *Office of Communication of United Church of Christ v. F.C.C.*, 359 F.2d 994, 1005 (D.C. Cir. 1966). We note that the seminal work of the United Church of Christ was led by Rev. Everett C. Parker, and his son, Rev. Truman E. Parker, has filed a declaration attached to this Petition.
[19] *Nexstar-Tribune Order*, 34 FCC Rcd at 8472 (Rosenworcel dissenting).
[20] Federal Communications Commission, *Obscene, Indecent and Profane Broadcasts*, https://www.fcc.gov/consumers/guides/obscene-indecent-and-profane-broadcasts; *see FCC v. Pacifica Foundation*, 438 U.S. 726, 734-37 (1978).
[21] *Gardner v. FCC*, 530 F.2d 1086, 1090 (D.C. Cir. 1976); see also *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) ("Because agencies are not constrained by Article III, they may permit persons to intervene in the agency proceedings who would not have standing to seek judicial review of the agency action.").

fashion equitable procedures or by employing its power in an unreasonably overbroad or otherwise arbitrary manner, has not acted to preserve the participation opportunities of interested persons."[22]

As the D.C. Circuit once said, "Some consumers need bread; others need Shakespeare; others need their rightful place in the national society—what they all need is processors of law who will consider the people's needs more significant than administrative convenience.'"[23]

### C.  Common Cause Has Direct Organizational Standing

Common Cause has organizational standing based on the harm to responsive democracy caused by media consolidation. Common Cause describes its mission as follows, "Common Cause is a nonpartisan, grassroots organization dedicated to upholding the core values of American democracy. We work to create open, honest, and accountable government that serves the public interest; promote equal rights, opportunity, and representation for all; and empower all people to make their voices heard in the political process.[24] Common Cause has over 1.5 million members and 30 state chapters with an average of 50 total staff in those chapters. The transaction will cause injury-in-fact to its mission and its organization by substantially injuring its efforts to provide accountable democracy. In recent years, Common Cause and its chapters have expended an annual budget of over $8,000,000 to ensure that politicians are accountable to the voters who elect them and to work for political rules that encourage responsive democracy.[25] For example, Common Cause' state chapters have developed state and local campaigns to advance democratic reforms that modernize elections, make government more transparent, and amplify the voices of

---

[22] *Nichols v. Board of Trustees of Asbestos Workers Local 24 Pension Plan*, 835 F.2d 881, 897 (D.C. Cir. 1987).

[23] *Office of Communication of United Church of Christ v. FCC*, 359 F.2d 994, 1005 (D.C. Cir. 1966).

[24] About Common Cause, https://www.commoncause.org/about-us/ (June 16, 2022).

[25] Littlewood Declaration, para. 4.

7

EXHIBIT 2 - Page 009

small-donor donors with citizen-funded election programs.[26] Studies show that local voters are less engaged in their elections with less robust or less targeted news coverage. With less localized and targeted news coverage, fewer voters will participate by voting and fewer small-donors are likely to be persuaded to contribute to candidate campaigns. Additionally, with fewer local journalists and companies with less incentive to cover local news because their corporate success is less dependent upon providing local news, Common Cause's work to make government more transparent will be less effective.[27] Political coverage that is less in-depth is less likely to cover who contributes to political campaigns. Therefore the reforms ensuring that the identities of campaign contributors are made public are less likely to have their intended effect--to permit voters to make informed decisions about their exercise of the franchise. Common Cause's work as an organization will be harmed by transaction.

Common Cause's Stop Cyber Suppression Project also works to combat election disinformation by tracking the spread of voter suppression content and developing rapid response techniques. As part of this work, Common Cause works with local journalists to make them aware of disinformation campaigns, ensure voters have access to accurate voting information, and inoculate communities who have been exposed to election disinformation. If journalist layoffs occur, as Common Cause reasonably fears, the journalists Common Cause educated with regard to disinformation and inoculation against disinformation will be less effective. Reduced expertise, reduced tenures in their jobs or in a particular local community means that mainstream broadcast television journalists are less able to provide the sophisticated understanding and coverage which is urgently needed at this time in our country's history when those journalists are

---

[26] *Id.*
[27] *Id.*

the most trusted and when widespread misunderstandings as to fact and fiction are becoming a danger to the electorate's participation and trust in responsive democracy.[28]

Robust media coverage of state lawmaking is an essential element of a responsive democracy. The founding fathers placed the right to a free press at the heart of the First Amendment to the U.S. because of that role. The FCC's public interest standard, under which this transaction is evaluated, centers on competition, localism and diversity—including robust access to local news and information, which is recognized as a First Amendment right.[29] Damage to this access is a cognizable injury recognized by the courts.[30]

Common Cause staff and leadership reasonably fear consolidation means fewer journalists and less local news coverage.[31] Moreover, Common Cause staff who are unable to rely on paltry or non-existent news coverage of legislation passing in state capitols or local cities must do more work themselves to uncover non-responsive legislators or proposals that will harm democratic processes. The harm to Common Cause directly impairs its mission of responsive democracy and forces the organization to spend more staff time and more financial resources promoting democracy and democratic reforms. The harms are directly attributable to the transaction and not occur but for the transaction. Therefore, Common Cause possesses Article III standing as an organization and must be permitted to participate as a party-in-interest in this docket opposing this transaction, regardless of whether its members are viewers in any particular local market.

---

[28] *Id.*, paras. 5-6.
[29] *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969).
[30] *See, e.g., Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013); *see Spokeo*, 136 S. Ct. at 1549 (First Amendment "intangible injuries can…be concrete.").
[31] Littlewood, paras. 5-6.

### D.  Common Cause and the UCC Have Associational Standing

1.  *Associational standing based on local impact.*

Common Cause and United Church of Christ members submitting affidavits fear that their local stations will not cover local news after the transaction. Because of the business model set forth by Standard General, UCC and Common Cause local members reasonably fear that their local TV stations will cover more national news and hire fewer journalists than under ownership by Tegna.[32] UCC and Common Cause members reasonably fear their pay television costs will increase because of this transaction.[33] They are also concerned about an increased harm of programming blackouts.[34]

Several declarants explain they are harmed even if they do not watch television because when "elected leaders are not held accountable" studies show that taxpayers are more likely to "shoulder the burden of corruption."[35] Less local news also produces less competition and in turn incentivizes even less local news.[36]

Common Cause and UCC Media Justice presented declarations from local markets in: Atlanta, GA, Boise/Twin Falls, ID, Boston, MA, Cleveland, OH, Columbia, SC,  Denver, CO, Hartford, CT, Indianapolis, IN, Jacksonville, FL, Lincoln, NE, New Orleans, LA, Portland, OR, Seattle, WA, St. Louis, MO and Washington, DC.[37] Therefore, the Commission cannot deny their

---

[32]  Bilton, paras. 4-6; Classick, paras. 4-6; Guthrie, paras. 4-6; Dennis, paras 4-6; Hill, paras 4-6; Littleton, paras. 10, 12-15; Denton, para. 9; Fitzgerald, para. 9; Nelson, para. 9; Parker, para. 9, Williams, para.10; Weston, para. 10.

[33] *E.g.*, Swenson, para. 13; Glover, para. 12; Fitzgerald, para. 15.

[34] *E.g.,* Bilton, para. 10; Classick, para. 10; Guthrie, para. 10; Parker, para. 14.

[35] *E.g.*, Nelson Declaration, para. 11; Weston Declaration, para. 12.

[36] Joshua Darr, "Local News Coverage Is Declining — And That Could Be Bad For American Politics," FiveThirtyEight (June 2, 2021), https://fivethirtyeight.com/features/local-news-coverage-is-declining-and-that-could-be-bad-for-american-politics/.

[37] Declarations of: Bilton; Classick; Dennis; Denton; Farrow; Glover; Guthrie; Hill; Fitzgerald; Littlewood; Nelson; Parker; Swenson; Weston and Williams.

participation in this docket because those markets are impacted by this transaction. The Commission should also grant Common Cause and UCC Media Justice status as parties-in-interest in the other markets to serve its institutional needs regardless of whether they have submitted declarations from every market. To the extent that the issues are the same in each market, the harm is not conjectural and should provide the basis for associational standing regardless of whether a declaration is filed for each and every market in the transaction. The members who have filed have established their standing to file as parties-in-interest.

### *2. Associational standing based on national impact*

Several UCC members explain that they fear they will be harmed by this transaction regardless of whether they live in markets directly impacted by the transaction.  For example:

> many good and bad policy proposals begin in other states or cities, or, are part of an intentional nationwide strategy to alter local laws around the country. When news gathering is poor in those places, local people are less likely to adequately vet those policies and poor policies are more likely to be adopted. Moreover, I am less likely to know about those policies and their impacts before they are adopted because there is less newsgathering locally in those communities. I monitor developments in other states in order to anticipate likely policy initiatives in my own state or in my own local area.[38]

Increased prices for pay television nationwide cause harm regardless of where individual members live.[39]

---

[38] Nelson, paras. 12, 14; Williams, para. 12; Weston, paras. 13, 15.

[39] For example, charges for increased retransmission costs are set nationwide, not differentiated among markets. Jon Brodkin, "Charter's nationwide price hike could cost you another $91 a year," Ars Technica (Oct. 23, 2018), https://arstechnica.com/information-technology/2018/10/charters-nationwide-price-hike-could-cost-you-another-91-a-year/; David Lazarus, *When Companies Say a Merger Will Result in Lower Prices, Try Laughing in Their Face*, LA Times (July 10, 2018), https://www.latimes.com/business/lazarus/la-fi-lazarus-att-time-warner-price-hike-20180710-story.html (discussing the increase in price of "DirecTV Now" after DirecTV was acquired by AT&T).

In addition, consolidation of media ownership lessens employment opportunities for traditionally underrepresented groups, harming the UCC's mission of racial and gender equity and diversity. UCC members are not only concerned with fairness and equity in hiring in their local communities. The harm occurs regardless of whether UCC members watch television and occurs nationally and locally.[40]

## III.    STANDARD OF REVIEW

The Applicants have the burden of proving the proposed merger serves "the public interest, convenience, and necessity."[41]  This public interest determination encompasses the "broad aims of the Communications Act"[42] and requires an evaluation of whether the transaction could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Communications Act of 1934, as amended ("the Act"). Particularly in the context of a broadcast merger, the Commission must take special consideration of the effects on the core tenets of diversity and localism as expressed in the Act.[43] The Commission is not confined to determining whether the proposed transaction complies with existing rules.[44] It must consider "whether it could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes." In its review, the Commission employs a balancing process, weighing claimed benefits of the proposed transaction against any

---

[40] Nelson, paras. 12, 14; Williams, para. 12; Weston, paras. 13, 15.

[41] 47 U.S.C. § 310(d).

[42] *Id*.

[43] *Applications for Consent to Transfer Control of License Subsidiaries of Media General, Inc., from Shareholders of Media General, Inc., to Nexstar Media Group, Inc.*, Memorandum Opinion and Order, 32 FCC Rcd. 183, 196 ¶ 35 (2017) ("*Nexstar/Media General Order*").

[44] Applications For Consent To Transfer Control of Certain License Subsidiaries of Raycom Media, Inc. To Gray Television, Inc., 2018 WL 6722650, at *5; Univision Holdings, Inc. - Searchlight and Grupo Televisa, Petition For Declaratory Ruling, 35 FCC Rcd. 14835, ¶18 (2020); Consent to Transfer Control of Certain License Subsidiaries of NBI Holdings, LLC To Terrier Media Buyer, Inc. Consent to Transfer Control of Certain License Subsidiaries of Cox Enterprises, Inc. to Terrier Media Buyer, Inc. Consent T, 34 FCC Rcd. 10554, 10561 (2019).

potential public interest harms.[45] Therefore,  it is not enough for the Applicants to assert or even prove that the transaction will not be harmful to consumers and competition, rather, they must prove that it would provide affirmative benefits to the public.[46] Any claimed benefits must be: (1) transaction specific – likely to occur as a result of the transaction but unlikely to be realized by other practical means having fewer anti-competitive effects; (2) verifiable – both in likelihood and magnitude; and (3) for the benefit of consumers, and not solely for the benefit of the Applicants.[47]

The Commission's public interest analysis also embodies a "deeply rooted preference for preserving and enhancing competition in relevant markets … and ensuring a diversity of information sources to the public."[48] Thus, the Commission must examine the competitive effects of the transaction with special "reference to diversity, localism, [and] other public interest considerations."[49]  Particularly in the context of a broadcast merger, the Commission must take special consideration of the effects on diversity and localism when reviewing the proposed acquisition.[50]

The Commission calculates the magnitude of the claimed benefits and the net cost of achieving them, and then employs a "sliding scale approach," under which the Applicants'

---

[45] *Nexstar-Media General Order*, 32 FCC Rcd. at 191-92 ¶ 19.

[46] *Applications of Comcast Corporation, General Electric Co. & NBC Universal, Inc. for Consent to Assign Licenses and Transfer Control of Licensees,* Memorandum Opinion and Order, 26 FCC Rcd. 4238, 4248 ¶ 24 (2011) ("*Comcast/NBCU Order*").

[47] *Nexstar/Media General Order*, 32 FCC Rcd. at 192-93 ¶¶ 22-24.

[48] *Comcast/NBCU Order*, 26 FCC Rcd at ¶ 23.

[49] *Applications of Charter Communications, Inc., Time Warner Cable Inc., and Advance/Newhouse Partnership; for Consent to Assign or Transfer Control of Licenses and Authorizations*, Memorandum Opinion and Order, 31 FCC Rcd. 6327, 6338 ¶ 29 (2016) ("*Charter/TWC Order*").

[50] *See Nexstar/Media General Order*, 32 FCC Rcd. at 196 ¶ 35 (citing 2013 *Gannett/Belo Order*, 28 FCC Rcd. at 16879 ¶ 30) ("[W]e must giv[e] careful attention to the economic effects of, and incentives created by, a proposed transaction taken as a whole and its consistency with the Commission's policies under the Act, including our policies in favor of competition, diversity, and localism.").

demonstration of benefits must reveal a higher degree of magnitude and likelihood than the Commission would otherwise demand where, as here, the potential harms are both substantial and likely. If the Commission is unable to find that the alleged benefits do in fact outweigh the harms, or if there remain substantial and material questions of fact outstanding, the Commission must designate the application for a hearing.[51]

In addition, in the broadcast context, the public interest can only be served by a transaction that advances localism. A broadcaster's connection to, and coverage of, its local community is a bedrock principle of broadcast television public policy. Indeed, Section 307(b) of the Communications Act requires the Commission to "make such distribution of licenses, frequencies, hours of operation, and of power among the several states and communities as to provide a fair, efficient, and equitable distribution of radio service to each of the same."[52] And the Commission licenses television broadcast stations "to the principal community or other political subdivision which it primarily serves."[53]

While the *how* of the pursuit of localism over the years may vary in part – from the Commission's "Blue Book" in the 1940s, to the 1960 Programming Policy Statement and the focus on market mechanisms under the 1996 Telecommunications Act – the *what* has remained the same: coverage, content, and news responsive to the local community's particular needs. And localism is also the reason why the broadcast licenses for "waterfront" spectrum in each local community are granted and renewed for free, even as most other communications licenses are granted by auction.[54] Rather than dollars, service to the local community is the currency paid by broadcasters for these valuable rights. The public interest analysis for any broadcast transfer

---

[51] 47 U.S.C. § 309(e); *see also Nexstar/Media General Order*, 32 FCC Rcd. at 191-92 ¶ 19.
[52] 47 U.S.C. § 307(b).
[53] 47 C.F.R. § 73.1120.
[54] 47 U.S.C. § 309(j).

14

EXHIBIT 2 - Page 016

of control proceeding must therefore consider whether the proposed transaction advances (or

conversely, undermines) this core principle.[55]

## IV.    THE APPLICANTS HAVE FAILED TO MEET THEIR BURDEN

Based on their application, the Applicants have not met the above-stated burden of proof.

The proposed merger presents harms to the public interest in localism, diversity and competition

including increasing retransmission consent leverage.  In their initial application, the Applicants

make no effort to address these public interest harms. They say nothing about the transaction's

competitive effects.  All they offer is a few pages of rhetoric asserting that the Applicants support

localism, a remarkably weak justification for a multi-billion dollar acquisition.

The Applicants' response to the Commission's request for documents and information

also fails to meet this burden. Rather than providing specific details of how Standard General

will invest and increase local news in Tegna's stations post-transaction, the Applicants primarily

provide 'management-speak' regarding its business decisions. Further, the Applicants fail to

address the transaction's potential public interest harms as it relates to undermining localism,

higher prices for consumers, and national reach. As discussed below the potential for public

interest harms are substantial and likely and should therefore result in the dismissal of the

applications or referral to a hearing.

## V.    THE PROPOSED TRANSACTION WOULD UNDERMINE LOCALISM

Localism is the main reason why broadcasters have received free access to the nation's

airwaves, and it remains a critical component of the Commission's public interest analysis. As

discussed below, localism is important for its influence on civic engagement and elections and

still remains a critical source of news and information for marginalized communities. It is no

---

[55] *See, e.g., Comcast/NBCU Order*, 26 FCC Rcd. at 4240-42 ¶¶ 3, 5, 6.

surprise that further consolidation of groups of local stations acts as a centripetal force pulling broadcasters away from their local roots. Recent empirical research confirms that media consolidation has been bad for localism, as the larger broadcast conglomerates *do not* invest freed resources into local content and coverage.[56] The Applicants' prior broadcast acquisitions and stated goals demonstrate that this transaction would undermine localism.

### A. The Commission Has Established Localism is Important to the Public Interest

The Commission has long-established that broadcasters must meet the needs of the communities to which they are licensed.[57] Today, when the FCC awards licenses to provide broadcast service, it does so using local licenses relating "to the principal community or other political subdivision which it primarily serves."[58] The Commission requires broadcasters to provide service within certain technical parameters to ensure that members of its community can receive the service.[59] Further, the Commission adopted numerous pro-localism principles in its *2008 Declaratory Ruling*.[60] These policies grant broadcasters increased autonomy and control over programming and other critical decisions pertaining to serving the community.[61]

The Commission's rules and policies promote localism because broadcast programming continues to remain a critical source for news and local information for communities. A recent Pew study found that television remains a common place for Americans to get their news with

---

[56] *See e.g.,* Sandra Braman, *The Ideal v. the Real in Media Localism: Regulatory Implications*, 12 Comm. L. & Policy 231, 273 (2007) (citing Ronald Bishop and Ernest A. Hakanen, *In the Public Interest? The State of Local Television Programming Fifteen Years after Deregulation*, 26 J. of Comm. Inquiry 261 (2002)); Steven T. Barry and Joel Waldfogel, *Do Mergers Increase Product Variety? Evidence from Radio Broadcasting*, 116 Q.J. Econ. 1009 (2001).
[57] *See* FCC, Broadcasting and Localism: FCC Consumer Facts, https://transition.fcc.gov/localism/Localism_Fact_Sheet.pdf.
[58] *See* 47 C.F.R. § 73.1120.
[59] *See* 47 C.F.R. § 73.1125(a)(1), (e).
[60] *See Network Affiliated Stations Alliance (NASA) Petition for Inquiry into Network Practices and Motion for Declaratory Ruling*, Declaratory Ruling, 23 FCC Rcd 13610 (2008).
[61] *See id.*, ¶¶ 6, 8-9.

EXHIBIT 2 - Page 018

local TV on par with or outpacing cable and network TV.[62] Further, another report indicates that nearly half of Americans say local news outlets have been a major source of news about the COVID-19 pandemic.[63] Local news still remains the most trusted in keeping Americans informed about their communities,[64] and broadcast stations are uniquely situated to provide coverage regarding local weather reports, traffic reports, school closings, local elections, and town hall events.

Local broadcasting is particularly important for communities of color and low-income communities. Black Americans are "more likely to be interested in local news and to trust information from local news organizations more generally."[65] Low-income residents rely more on over-the-air television than digital media.[66] And communities with particularly high shares of Hispanic and Black residents "are more likely to say [that] most key local news topics are important for their daily lives than those in higher-proportion white areas."[67] Hispanic immigrants living outside of metro areas and Native Americans living on reservations rely strongly on radio for news.[68]

---

[62] *Local TV News Fact Sheet*, Pew Research Center (July 13, 2021), https://www.pewresearch.org/journalism/fact-sheet/local-tv-news/.

[63] Elisa Shearer, *Local News Is Playing an Important Role for Americans During COVID-19 Outbreak*, Pew Research Center (July 2, 2020), https://www.pewresearch.org/fact-tank/2020/07/02/local-news-is-playing-an-important-role-for-americans-during-covid-19-outbreak/.

[64] *Local News Most Trusted in Keeping Americans Informed About Their Communities,* Knight Foundation (May 19, 2022), https://knightfoundation.org/articles/local-news-most-trusted-in-keeping-americans-informed-about-their-communities/.

[65] Elisa Shearer, Local News is Playing an Important Role for Americans During COVID-19 Outbreak, Pew Rsch. Ctr. (July 2, 2020).

[66] Pew Rsch. Ctr., For Local News, supra, at 65.

[67] Pew Rsch. Ctr., For Local News, Americans Embrace Digital but Still Want Strong Community Connection 65 (Mar. 26, 2019).

[68] Penelope Muse Abernathy, U.N.C. Hussman Sch. of Journalism & Media, News Deserts and Ghost Newspapers: Will Local News Survive? 44 (2020).

17

EXHIBIT 2 - Page 019

Local broadcasting is also important for its influence on civic engagement and elections. For example, a recent Gallup study found that 81 percent of people who follow local news very closely are likely to vote.[69] Good evidence demonstrates that stations that serve audiences of color also correlate with increased voting by those communities.[70] Local news also plays an important role in shaping voters' opinion of political candidates and informing the electorate. Indeed, campaigns and other political organizations spent approximately $5.3 billion on local broadcast television during the 2020 presidential election.[71] Tegna alone generated $445.5 million in political advertising revenue in 2020.[72] Analysts predict broadcasters will generate $4.5 billion in political advertising revenue during the 2022 election cycle.[73] The close link

---

[69] Elise Goldstein, *A New Gallup/Knight Foundation Study Shows the Connection Between Local News and Civic Engagement. Here's How We're Working to Address its Key Findings*, The Lenfest Institute (Aug.  24, 2020), https://www.lenfestinstitute.org/local-journalism/knight-foundation-gallup-local-news-survey/.

[70] Lisa M. George and Felix Oberholzer-Gee, Media Ownership 2016 Quadrennial Review Study 8B, Diversity in Local Television News at 18 (2011); Berry, S., J. Waldfogel. Do Mergers Increase Product Variety? Evidence from Radio Broadcasting. Quarterly Journal of Economics, 116, 1009-1025 (2001); Gentzkow, Matthew. "Television and Voter Turnout." Quarterly Journal of Economics 121, no. 3(2006): 931-72; George, Lisa M. and Joel Waldfogel, "National Media and Local Political Participation: The Case of the New York Times" in Roumeen Islam, ed., Information and Public Choice: From Media Markets to Policymaking. Washington, DC: World Bank Publications, pp. 33-48 (2008); Oberholzer-Gee, Felix, and Joel Waldfogel. "Media Markets and Localism: Does Local News En Español Boost Hispanic Voter Turnout?" American Economic Review, 99, no. 5 (2009): 2120-28.

[71] Alex Werpin & Caitlin Huston, *Midterm Moolah: TV Stations Cash in on Primary Season*, The Hollywood Reporter (May 25, 2022), https://www.hollywoodreporter.com/business/business-news/midterm-moolah-tv-stations-cash-in-on-primary-season-1235153514/.

[72] Mike Reynolds & Stefen Joshua Rasay, *Following Record 2020, TV Groups Eye Robust Political Ad Revenues from Mid-Term*, S&P Global (March 4, 2021), https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/following-record-2020-tv-groups-eye-robust-political-ad-revenues-from-mid-term-63007545.

[73] Alex Werpin & Caitlin Huston, *Midterm Moolah: TV Stations Cash in on Primary Season*, The Hollywood Reporter (May 25, 2022), https://www.hollywoodreporter.com/business/business-news/midterm-moolah-tv-stations-cash-in-on-primary-season-1235153514/.

between local news viewership and voting patterns supports the Commission's public interest mandate of promoting localism.

### B. The Applicants' Stated Business Intentions Would Reduce the Amount and Scope of Local News Coverage

The Applicants' stated business intentions reveal how localism would be undermined post-transaction. Specifically, their business intentions would lead to a reduction in the amount and scope of local news coverage through reporter layoffs and a displacement of local programming with national programming. While the Applicants portray Standard General, CMG, and Apollo as "model[s] of localism," the only support they offer in their initial application dates from the days prior to the acquisition of CMG by Apollo.[74] After that acquisition, we are told that "[t]his identity [the "identity of the communities" Cox served] has been maintained and even bolstered.[75] But the Applicants provide very little information as to how these stations were bolstered post-transaction. Even in their June 13 Letter, the Applicants primarily provide information related to equipment upgrades CMG has made to its stations after the deal but very little information regarding hiring and retaining journalists and providing programming coverage that meets the information needs of the communities they serve.[76] Further, the Applicants' fail to mention the layoffs that took place at CMG stations after Apollo's acquisition. After its purchase of CMG, Apollo laid off reporters and on-air personalities in stations across multiple markets.[77] Further, CMG laid off 87 employees as it prepared for its acquisition by Apollo.[78] Rather than address these harms, the Applicants' true plans is provided

---

[74] *See* Comprehensive Exhibit at 7.

[75] *See id.*

[76] *See* Applicants June 13 Letter at 7-8.

[77] *More Names Affected By Last Week's Cox Media Group Layoffs*, Radio Insight (Sept. 29, 2021), https://radioinsight.com/headlines/213217/large-round-of-layoffs-hit-cox-media-group-stations/.

[78] *Report: Layoffs Loom as Apollo Readies Purchase of Cox Media Group*, Inside Radio (Sept. 10, 2019),

19

EXHIBIT 2 - Page 021

by this phrase: "CMG [Apollo] stations not only produce their own market-leading local newscasts, but they also gain access to national content generated by CMG's Washington D.C. Bureau.  Access to this programming will improve the local service provided by the acquired stations on day one."[79] Investments in a Washington, D.C. News Bureau do not enhance programming at the local level based on the needs and interests of the communities the Applicants currently serve. There are multiple vectors for communities to access national news content, but as explained in the prior section, broadcasting's unique role is to provide local information and locally responsive content. The emphasis the Applicants place in establishing a Washington, D.C. News Bureau raises questions as to whether national content will supplant or displace local content. Indeed, by the Applicants own admission, they intend to increase the use of a national news desk from which their acquired stations would broadcast information.[80] This is a central component of their application, which should give the Commission pause for concern.

Standard General has been even more outspoken regarding its business intentions in its proxy statement to Tegna shareholders about what it thinks of localism: "TEGNA has 2x the number of employees per station compared to peers, and lags its closest local broadcasting peers on EBITDA margin."[81] The "per station" says it all. It is the local stations' jobs that Standard General is after.  Nor is this the typical kind of efficiency claimed made in other merger proceedings – Standard General is not saying that the transaction will eliminate the need for two national managers as one will suffice for the new and larger jointly managed group. What

---

https://www.insideradio.com/free/report-layoffs-loom-as-apollo-readies-purchase-of-cox-media-group/article_36fc2cf0-d391-11e9-9914-6f8a0243aaa0.html.

[79] Comprehensive Exhibit at 7; *see also* Applicants June 13 Letter at 9.

[80] Comprehensive Exhibit at 7.

[81] Tegna Inc. & Standard General L.P., Additional Definitive Proxy Soliciting Materials Filed by Non-Management and Rule 14(a)(12) Material (Form DFAN14A), at 21 (Apr. 13, 2020) ("Proxy Statement"), https://sec.report/Document/0001104659-20-045933/tm2015782-1_dfan14a.htm. https://investors.tegna.com/static-files/064251d9-7c52-4b76-b7b6-739e3af7a7a2.

EXHIBIT 2 - Page 022

Standard General says is more blatant: in its view, Tegna just employs too many people at each local station. Indeed, it is telling that in the midst of the Commission's review of this acquisition, Standard General's CEO sent a memo to Tegna workers stating they have no intention of reducing staff post-transaction in response to Tegna's employees' rightful concern about the potential for massive layoffs as Standard General made its business intentions clear.[82] The cutting of potentially half the resources available to local stations cannot possibly enhance the Commission's goals to promote localism.

While the Applicants claim localism as an advantage, their prior actions and stated intentions tell a different tale -- one that would lead to significant reductions in local news should the Commission approve the transaction.

## VI.    THE PROPOSED TRANSACTION WOULD LEAD TO HIGHER PRICES FOR CONSUMERS.

The current retransmission consent regime, where cable operators must negotiate in good faith with broadcasters to carry their programming, already gives undue power to large broadcasters. The proposed transaction would further exacerbate this framework as the Applicants have structured the deal to take advantage of after-acquired clauses in retransmission consent negotiations. This will allow the Applicants to exert greater leverage and charge higher retransmission rates which will undoubtedly get passed down to consumers in the form of higher cable prices. In the event that retransmission negotiations breakdown, consumers may experience programming blackouts.

---

[82] Al Tompkins, *Standard General tells Tegna employees 'no intention to reduce staff*,' Poynter (June 17, 2022), https://www.poynter.org/business-work/2022/standard-general-memo-tegna-layoffs-staff-cuts/.

**A. Retransmission Prices Will Rise Because of After-acquired Clauses and Upon Renewal of Retransmission Contracts**

By 2023, retransmission fees are projected to increase to $12.9 billion, or 5,915% of 2006 revenues.[83] Put simply, retransmission prices next year will be 60 times what they were in 2006. The reason for this? The power wielded by the broadcast groups as they become larger through mergers such as this one.

Typically, these fees are negotiated in three-year cycles. However, increases in retransmission consent fees will come much sooner than the next three-year negotiation cycle if these transactions are approved. In fact, the effect may be immediate, thanks to twin clauses – the "change-in-control" and "after-acquired station" clauses" – customarily found in the contracts between broadcasters and distributors.[84]

The Applicants intentionally structured this deal to take advantage of such clauses, just as they have done so in the past. In the simultaneously contracted-for, applied-for, and approved purchase of the Northwest and Cox stations, Apollo sought to sequence artificially the timing of the two purchases so as to claim automatic retransmission fee increases, to the tune of tens of millions of dollars, by invoking the after-acquired station clauses of the relevant retransmission agreements.[85] This will lead to a drastic increase in cable TV subscription rates for consumers at

---

[83] *Retransmission Fee Revenue for U.S. Local TV Stations*, Pew Research Center (July 13, 2021), https://www.pewresearch.org/journalism/chart/sotnm-local-tv-u-s-local-tv-station-retransmission-fee-revenue/.
[84] RBR-TVBR, *Kagan Sees Retrans More than Doubling by 2019*, Radio + Television Business Report (Nov. 22, 2013), https://www.rbr.com/kagan-sees-retrans-more-than-doubling-by-2019/; Jon Eggerton, *Cable Operators Complain of Retrans 'Arbitrage,'* Next TV (May 28, 2012), https://www.nexttv.com/news/cable-operators-complain-retrans-arbitrage-263853.
[85] William Cohan, *"Television Is What Gets Senators Elected": Private-Equity Mogul Leon Black Is Building a Local TV Empire to Rival Sinclair and Fox*, Vanity Fair (Apr. 15, 2019), https://www.vanityfair.com/news/2019/04/leon-black-is-building-a-local-tv-empire-to-rival-sinclair-and-fox.

22

EXHIBIT 2 - Page 024

a time when many Americans are living paycheck to paycheck as inflation reaches its greatest point in 40 years.[86]

Standard General, for its part, candidly avows that it has set for itself the same objective, emphatically complaining to shareholders in connection with this deal that Tegna's prices "have historically lagged Nexstar, Sinclair and Gray."[87]  And higher prices to distributors eventually find their way, in whole or in part, to the consumer's bill, translating into inflationary pressure at the wholesale and retail levels alike. Further, automatic rate hikes are hardly the only price increases regarding this transaction.  By improving Standard General's and Apollo's bargaining position, the deal will likely result in higher prices in renewal retransmission negotiations, too. Distributors have already shown that broadcast mergers increase the merging groups' bargaining power, and not only when their stations operate in the same local market.  As Federal Trade Commission Chair Khan has emphasized in her seminal article, Amazon's Antitrust Paradox, with respect to cable franchise areas, access of distributors to interconnected markets matters, too.[88]  The union of two broadcast groups means higher rates even though the merging stations may operate in separate local markets.  The Commission has not examined this phenomenon of interconnected local broadcast markets in detail and should urgently take that examination now.

---

[86] Jeff Cox, "Inflation Barreled Ahead at 8.3% in April from a Year Ago, Remaining Near 40-Year Highs," CNBC (May 11, 2022), https://www.cnbc.com/2022/05/11/cpi-april-2022.html.
[87] Proxy Statement at 20.
[88] Lina Khan, Amazon's Antitrust Paradox, 126 The Yale Journal 710, 721 (2017) ("Notably, the Obama Administration's opposition to one of the largest mergers proposed on its watch—Comcast/Time Warner—stemmed from a concern about market access, not prices.")

23

EXHIBIT 2 - Page 025

### B.  The Transactions Will Cause Price Increases for Pay TV Consumers and More Blackouts.

The automatic price increases are separate and apart from the higher fees that the merged companies' greater market dominance and bargaining power will allow them to extract when negotiating retransmission agreement renewals in the ordinary course of business.

Today, retransmission fees are a substantial non-advertising revenue source for the owners of broadcast TV stations.[89] In 2014, the Commission reported that the average cost for basic cable plan increased 6.5% in 2012, and the average cost per-channel for cable consumers increased 2.1% that same year, which coincided with an increase in retransmission fees.[90] As retransmission fees continue to increase, it can be expected that more of these costs will be passed down to consumers.

In addition, given the history of service disruptions during the course of negotiations over retransmission consent, all indications are that more consumers will suffer longer blackouts, in the wake of a two-year-long global pandemic, and at a time when access to local information and connectivity is more vital than ever before.

None of the Applicants is a stranger to blackouts on distributors.  In the short time since Apollo acquired CMG, it has imposed blackouts on DISH, AT&T/DIRECTV, Buckland Telephone Co., CableOne, Charter Spectrum, Frontier Communications, Suddenlink, and Verizon Fios.[91] In previous incarnations, the Standard General leadership was a champion of

---

[89] Media Bureau, Report on Cable Industry Prices, Federal Communications Commission (May 16, 2014), https://transition.fcc.gov/Daily_Releases/Daily_Business/2014/db0516/DA-14-672A1.pdf
[90] *Id.*
[91] Rodney Ho, "WSB-TV Back on Air After Fives Days for AT&T/DirecTV Subscribers," Atlanta Journal-Constitution (Feb. 7, 2021), https://www.ajc.com/life/radiotvtalk-blog/wsb-tv-back-on-air-after-five-days-for-attdirectv-subscribers/HKVKTKO5VJC6DHE5V4M3PNF6NI/; Michael Balderston, "Cox Media Stations Go Dark on DirecTV in 20 Markets," TV Tech (Feb. 2, 2021), https://www.tvtechnology.com/news/cox-media-stations-go-dark-on-directv-in-20-markets

EXHIBIT 2 - Page 026

blackouts as a retransmission leverage tool as well, imposing them on several distributors over the years.[92] And Tegna itself has imposed blackouts on AT&T/DIRECTV, Mediacom, DISH, and Verizon in the last few years, including during the period right before or during the NFL playoffs or World Series.[93] Given Standard General's complaints that Tegna has not been negotiating hard enough for higher retransmission fees, one can only imagine that the Tegna stations will become even more likely to be used as pawns in more hold-the-consumers-hostage service disruptions.

## VII.    THE SCOPE OF THE TRANSACTION CAUSES NATIONAL HARMS

### A.  The Size and Scale of This Merger Poses National Harms Regardless of The Applicants' Compliance With Ownership Limits

If completed, the proposed merger would give Standard General control of 61 full-power television stations and two radio stations across 50 television markets and CMG 31 full-power television stations in 26 markets and 54 radio stations in 11 radio markets.[94] This level of ownership poses significant national harms given the transaction's negative impact to localism

---

("Apollo-owned stations have an extremely long and disreputable history of either threatening or pulling the Super Bowl and other important events from Buckland Telephone Co., CableOne, Charter Spectrum, DISH Network, Frontier Communications, Suddenlink, Verizon Fios and our own [AT&T] customers.")

[92] *See, e.g.,* Daniel Frankel, "Nashville ABC Station Issues Blackout Threat to Mediacom," Fierce Video (Jul. 6, 2015) https://www.fiercevideo.com/cable/nashville-abc-station-issues-blackout-threat-to-mediacom.

[93] Mike Snider, *TV tussle: DirecTV, Tegna dispute turns TV channels dark in 51 markets including Houston, Seattle*, USA Today (Dec. 2, 2020), https://www.usatoday.com/story/tech/2020/12/02/tv-directv-tegna-dispute-results-channel-outages-51-markets/3794473001/ ; Mike Farrell, *Tegna Stations Go Dark to Mediacom*, Next TV (Jan. 4, 2021), https://www.nexttv.com/news/tegna-stations-go-dark-to-mediacom; Ben Munson, *Dish Network dispute with Tegna begins yet another channel blackout*, Fierce Video (Oct. 7, 2021), https://www.fiercevideo.com/video/dish-network-dispute-tegna-begins-yet-another-channel-blackout; Jeff Clabaugh, *Tegna TV stations, including DC's Channel 9, go dark on FIOS*, WTOP News (Jan. 5, 2022), https://wtop.com/business-finance/2022/01/tegna-tv-stations-including-dcs-channel-9-go-dark-on-fios/ ("This is not the first time that Tegna has removed their content from a TV provider. Tegna has a track record of removing their content when a TV provider refuses to accept their demands for unreasonable rate increases…").

[94] Comprehensive Exhibit at 2-3.

and the higher cable prices consumers would have to pay. Stories and issues of significance that arise in one market can appear in other markets. As explained in several Common Cause declarations, without robust local news across multiple markets, providing coverage of issues impacting our democracy, harmful proposals are more likely to spread. Further, an increase in pay television prices nationwide harms consumers regardless of what market they reside.

The Applicants report that Tegna would have a national audience reach of 28.46% of U.S. households post-transaction with the UHF discount taken into account.[95] Without the UHF discount, Tegna would have a national audience reach of 38.46% post transaction, a few decimal places below the 39% cap.[96] The UHF discount is a relic of a long past time, as technological change in the marketplace has eliminated the justification for the discount.[97] When the Commission created the UHF discount, Ultra High Frequency channels were viewed as a lesser counterpart to Very High Frequency channels.[98] This was no longer the case when the Commission repealed the UHF Discount in 2016, as the DTV transition and other innovations made UHF channels as desirable, if not more so, than its counterparts.[99] Nothing has changed since 2016, and there is no reason for the UHF discount to continue to exist. The fact that the Applicants barely fall under the 39% cap without the UHF discount demonstrates how it can be used as a vehicle for circumventing compliance with the national cap.

---

[95] Comprehensive Exhibit at 13.
[96] *Id.*, n.22.
[97] Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, Report and Order, 31 FCC Rcd 10213 (2016).
[98] Bill Durdach, The UHF Discount and the National Television Ownership Rule: "This I Tell You Brother: You Can't Change One Without the Other," The CommLaw Conspectus: Journal of Communications Law and Technology Policy (2014), https://scholarship.law.edu/cgi/viewcontent.cgi?article=1554&context=commlaw
[99] Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, Report and Order, 31 FCC Rcd 10213 (2016).

Although the parties claim compliance with the National Television Ownership rule, nominal consistency with the cap is not a greenlight to complete the transaction, and it does not mean there are no harms present. The FCC does not approve transactions simply because they comply with ownership limits.[100] Rather, the Applicants have the burden of proving the transaction is in the public interest. Not only have the Applicants failed to show any public interest benefits but they have also not demonstrated how the transaction would not result in the harms animated by the national cap despite falling slightly under it.

The Commission has not considered the rationale for the National Television Ownership Rule in many years. The last time the FCC considered the question and substantially increased that limit,[101] Congress has stepped in to bring the cap down.[102] Then-Senate Majority Leader Tom Daschle spoke on the Senate floor about the concern many Senators held about "the concentration of media ownership,"[103] and Senator Jon Corzine questioned whether or not an increased cap would enable people to "fulfill their civic duty and gather information" amidst increasing levels of media consolidation.[104] There was near-unanimous consent in Congress that

---

[100] Applications For Consent To Transfer Control of Certain License Subsidiaries of Raycom Media, Inc. To Gray Television, Inc., 2018 WL 6722650, at *5; Univision Holdings, Inc. - Searchlight and Grupo Televisa, Petition For Declaratory Ruling, 35 FCC Rcd. 14835, ¶18 (2020); Consent to Transfer Control of Certain License Subsidiaries of NBI Holdings, LLC To Terrier Media Buyer, Inc. Consent to Transfer Control of Certain License Subsidiaries of Cox Enterprises, Inc. to Terrier Media Buyer, Inc. Consent T, 34 FCC Rcd. 10554, 10561 (2019).

[101] 2002 Biennial Regulatory Review – Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202
 of the Telecommunications Act of 1996, 18 FCC Rcd 13620, ¶ ¶ 501-584(2003).

[102] A Joint Resolution Disapproving the Rule Submitted by the Federal Communications Commission with Respect to Broadcast Media Ownership, S.J. Res. 17, 108th Cong. (2003) (available at https://www.congress.gov/bill/108th-congress/senate-joint-resolution/17).

[103] Tom Daschle (SD), "Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2004—Conference Report," 150 Congressional Record 263 (2004),
https://www.govinfo.gov/content/pkg/CRECB-2004-pt1/pdf/CRECB-2004-pt1-Pg263.pdf.

[104] Jon Corzine (NJ), "Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2004—Conference Report," 150 Congressional Record

EXHIBIT 2 - Page 029

the cap should not be raised, yet it still was. Over time, Senator Daschle and Senator Corzine's concerns have only become more prescient, and now the Commission should revisit the rationale behind the National Television Ownership rule and heed the Senators' warnings. The Commission should reconsider its 2003 reasoning in light of Congress' rejection of the FCC's most recent full treatment of the Rule and, regardless of the Rule, look carefully at the national harms caused by this transaction.

### B.  Apollo's Rights to Standard General May Not Be in Compliance With Ownership Limits

While the Applicants have structured Apollo's supposedly non-voting stake in Standard General so that it does not trigger attribution under the Commission's rules, the reality may be different. First of all, a carefully crafted provision of the Term Sheet states that,

> for the avoidance of doubt, … employees of Apollo or any Apollo affiliate who are members of the Board of Directors of CMG Holdings, Inc. or who otherwise participate in the management of any Apollo affiliate's investment in CMG Holdings, Inc. shall not have access to any Competitively Sensitive Information.[105]

But what about all other Apollo employees? The implication is that they may be afforded access to Competitively Sensitive information about Standard General's retransmission fee negotiations. In addition, even if the rights given Apollo were viewed as within the realm of legitimate minority rights, they should be viewed through the lens of these transactions' circumstances. Each of Standard General and Apollo periodically negotiates retransmission deals with cable, satellite, and over-the-top distributors. There is no guarantee that Apollo will not use the leverage of rights it is given to exact outcomes it wants in the retransmission fee area, especially since

---

264 (2004),
https://www.govinfo.gov/content/pkg/CRECB-2004-pt1/pdf/CRECB-2004-pt1-Pg263.pdf.
[105] Term Sheet at 9.

Standard General may not act against Apollo's preferences – and there is no guarantee that Apollo would not state its preferences regarding retransmission consent to Standard General.[106] While the Communications Act prohibits coordination of negotiations or negotiation on a joint basis by two or more television broadcast stations not under common de jure control in the same local market,[107] there is no guarantee that such indirect influence can even be detected and, even if it is, that it will be viewed as implicating that prohibition.

If Apollo would have de facto control of Standard General's stations despite its non-voting stake, the transaction would undoubtedly exceed ownership limits. The Commission must carefully evaluate the structure of this transaction and at a minimum designate for a hearing to determine whether or not it is in actual compliance with ownership rules.

## VIII.   CONCLUSION

For the foregoing reasons, the Petitioners respectfully request that the Commission deny the Applicants' proposed transaction or designate the applications for a hearing. The Applicants fail to meet their affirmative burden to demonstrate the contemplated merger will serve the public interest.

Respectfully submitted,

/s/ Yosef Getachew
/s/ Jonathan Walter

Yosef Getachew
Jonathan Walter
Common Cause
805 15th St NW Suite 800
Washington DC 20005

---

[106] Term Sheet at 10.
[107] 47 U.S.C. § 325(b)(3)(C)(iv); 47 C.F.R. § 76.65(b)(1)(viii).

29

EXHIBIT 2 - Page 031

/s/ Cheryl A. Leanza

Cheryl A. Leanza
United Church of Christ Media Justice Ministry
100 Maryland Ave, NE
Washington, DC 20002

**DECLARATION**

Common Cause and United Church of Christ OC, Inc.'s (d/b/a United Church of Christ Ministry) Petition to Deny was prepared using facts of which I have personal knowledge or upon information provided to me. I declare, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed:

/s/ Yosef Getachew

Yosef Getachew
Common Cause

## CERTIFICATE OF SERVICE

I, Jonathan Walter, hereby certify that on the 22nd day of June, 2022, I caused a true and correct

copy of the foregoing Petition to Deny via electronic mail to the following:

Jennifer A. Johnson
Hannah Lepow
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001
jjohnson@cov.com
hlepow@cov.com
*Counsel for Tegna Inc.*

Scott Flick
Lee Petro
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, D.C. 20036
scott.flick@pillsburylaw.com
lee.petro@pillsburylaw.com
*Counsel for Standard General Inc.*

Michael Basile
Cooley LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington D.C. 20004
mdbasile@cooley.com
*Counsel to Apollo Global Management, Inc.*

David Brown
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
David.Brown@fcc.gov

Chris Robbins
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
Chris.Robbins@fcc.gov

Jeremy Miller
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
Jeremy.Miller@fcc.gov

Jim Baird
Video Division
Media Bureau
Federal Communications Commission
45 L Street NE
Washington, D.C. 20554
Jim.Baird@fcc.gov

/s/ Jonathan Walter

Jonathan Walter
Media & Democracy Program Fellow
Common Cause

32

EXHIBIT 2 - Page 034

**APPENDIX REMOVED**

EXHIBIT 2 - Page 035

BEFORE THE
## FEDERAL COMMUNICATIONS COMMISSION
### WASHINGTON, DC  20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| Applications of Tegna Inc., for Transfer | ) | MB Docket 22-162 |
| of Control to Standard General, L.P. | ) | |

## PETITION TO DISMISS OR DENY OF

## THE NEWSGUILD-CWA

## AND

## NATIONAL ASSOCIATION OF BROADCAST
## EMPLOYEES AND TECHNICIANS-CWA

Andrew Jay Schwartzman
1341 G Street, NW
Fifth Floor
Washington, DC 20005
(202) 241-2408
andyschwartzman@gmail.com
*Counsel for Petitioners*

June 22, 2022

EXHIBIT 2 - Page 036

# TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**I.    THE STANDARD OF REVIEW.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**II.    TNG-CWA AND NABET-CWA HAVE STANDING TO CONTEST THE ALL OF THE PROPOSED TRANSFERS BOTH AS ASSOCIATIONS ACTING ON BEHALF OF THEIR MEMBERS AND AS LABOR UNIONS WITH ORGANIZATIONAL STANDING.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**III.    IF APPROVED, THE PROPOSED TRANSACTIONS WOULD LIKELY RESULT IN AGM EXCEEDING THE 39% NATIONAL AUDIENCE REACH CAP, AND IN ANY EVENT THE LEVEL OF CONCENTRATION THEREBY ATTAINED WOULD BE CONTRARY TO THE PUBLIC INTEREST.** . . . . . . . . . . . . . . . . . . . 10

**IV.    THE PROPOSED TRANSACTIONS WOULD UNDERMINE THE COMMISSION'S CORE GOAL OF PROMOTING LOCALISM.** . . . . . . . . . . . . . 13

**V.    THE APPLICANTS' ATTEMPT TO EXPLOIT "AFTER-ACQUISITION" CLAUSES IN RETRANSMISSION CONSENT CONTRACTS WILL INEVITABLY RESULT IN INCREASED MVPD SUBSCRIPTION PRICES THAT WILL HARM PETITIONERS' MEMBERS AND ALL OTHER SUBSCRIBERS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

EXHIBIT 2 - Page 037

BEFORE THE
### FEDERAL COMMUNICATIONS COMMISSION
### WASHINGTON, DC  20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| Applications of Tegna Inc., for Transfer | ) | MB Docket 22-162 |
| of Control to Standard General, L.P. | ) | |

### PETITION TO DISMISS OR DENY OF THE NEWSGUILD-CWA AND NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA

The NewsGuild-CWA ("TNG-CWA") and the National Association of Broadcast Employees and Technicians-CWA ("NABET-CWA") respectfully petition the Commission to dismiss or deny the proposed transfer of control of TEGNA, Inc. ("TEGNA").  The applicant parties seek approval of an extremely complex series of related transactions involving, among others, SGCI Holdings III LLC ("SGCI Holdings"), Standard General L.P. ,[1] Community News Media LLC, CMG Media Corporation and Apollo Global Management, Inc.  ("AGM").  As explained below that complexity merits special scrutiny because it turns out to be in large part due to the parties' attempts to game the Commission's ownership and retransmission consent rules in ways that contravene the Commission's public interest standard.

### INTRODUCTION AND SUMMARY

Allowing the proposed transactions to proceed would be manifestly contrary to the public interest.  In their initial public interest statement, and even as supplemented at the direction of the Commission staff, the Applicants have not even attempted to meet their affirmative burden of establishing that there are public interest benefits that can possibly outweigh the significant losses to ownership diversity, to the health and capacity of local journalism, and to the cost of pay-TV services that would result from grant of the applications.  Nor have they demonstrated

---

[1] For convenience, SGCI Holdings and Standard General L.P. are referred to here, individually or collectively as "Standard General."

EXHIBIT 2 - Page 038

that AGM - the party actually supplying the funding for this deal - will not in fact be obtaining an attributable ownership interest in the newly configured TEGNA, thereby likely busting the FCC's national TV ownership cap.[2]

The applications presented seek approval of an unprecedented array of sequenced transactions and swaps. These machinations allow the Applicants to argue that they remain under the caps established by the Commission's ownership rules, so that their grant without waivers of those rules would be possible, at least in theory. AGM, which would provide the funds for the purchase, would be given non-voting stock so that it can claim not to have an attributable ownership interest in the newly-configured TEGNA. However, there is serious doubt as to whether conditions and covenants associated with the transaction will in fact afford it de facto control, which would place AGM over the Commission's national multiple ownership audience reach cap. This is a matter which must be explored at hearing, but even if these assertions were true, it does not mean that the applications can, or should, be granted. Indeed, as shown below, their grant would be contrary to the public interest.

Approval of the proposed transactions would create excessive concentration of control, nationally and locally, in the affected markets. While the deals are constructed to make it appear that AGM does not attain de facto control of Standard General and thus violate the Commission's national ownership rules, that arrangement is highly dubious, to say the least. Moreover, the continued existence of the UHF discount means that the 39% audience reach cap is not a meaningful standard. It has always been the case that nominal compliance with

---

[2]Notably, under similar circumstances, the Commission has previously determined that AGM has de facto control of former Cox Enterprise stations. Terrier Media Buyer, Inc., 34 FCC Rcd 10544, 10549 (2019).

-2-

EXHIBIT 2 - Page 039

ownership limits does not alone justify a public interest finding, and the Commission can and should find that the transactions proposed here are unacceptable.

The damage to localism is no less harmful, and not just in the TEGNA markets. TNG-CWA and NABET-CWA call upon the Commission to pay particular attention to the damage that grant of these applications would cause to the labor market in TEGNA cities as well as throughout the country. While TEGNA has not been among the very best of group owners, it operated under the umbrella of Gannett, an historic newspaper/broadcast operator which focused entirely on its media products in its operation of more than 75 daily newspapers throughout the country. Gannett also has a history of philanthropic endeavors to protect journalists and journalism and their First Amendment rights. Unlike Gannett/TEGNA, which are media companies, Standard General and its financier AGM come out of a different tradition. Media and journalism are simply lines of business to them. Standard General has owned and operated hotels, casinos, online sports betting and retailers like American Apparel.[3] Its focus is making money, not journalism.

The operating model of hedge funds like Standard General and AGM is to cut operating costs, and sell off underperforming assets, with a relentless focus on satisfying their investment partners. Reducing labor costs through cutting jobs, reorganizing and limiting salaries is a central element of that model. In this instance, it translates, among other things, to reducing jobs by taking advantage of monopsonistic power in the local and national labor market for

---

[3]AGM, which is much larger, has owned and/or operated or invested in countless companies, few of which are involved in journalism. With the exception of the stations AGM recently acquired from Cox, these portfolio companies include properties such as cruise lines, financial services, supermarkets, defense contractors, and restaurants, among many other properties.

-3-

EXHIBIT 2 - Page 040

journalism, where the dramatic reduction in daily newspapers and increased focus on national

digital distribution has reduced job openings for journalists, allowing them to squeeze

employees' salaries.  By this means, they

> can reduce production costs, perhaps dramatically, by substituting nationally
> focused and ideologically unified content produced in a single studio for locally
> focused and ideologically diverse content produced by many local journalists.

Martin and McCrain, Local News and National Politics, 113 American Political Science Review,
372, 373 (2019).

In fact, Standard General itself cites as an example of its operating methods its newscast at a

station in Cape Girardeau, MO which is presented by news staff, on air anchors, weather

forecasters and sports announcers located in Lincoln, NE, more than 500 miles away.  While this

may be good for the investors' bottom line, it harms the vitality of the labor market in Cape

Girardeau and elsewhere in the country.

Even after supplementation at the request of the Commission staff, the Applicants do not

demonstrate any public interest benefits that would accrue from the transactions, much less

benefits that would counteract the significant detrimental impacts that would accompany grant of

these applications.

Beyond that, this case presents to the Commission a special circumstance that absolutely

precludes grant of the applications without further exploration in an evidentiary hearing.  It is

clear from the party's tactics in an earlier transaction, and from the materials that have been filed

with the Commission, that the sole reason for some of these station transfers, and immediate

retransfers in a precise sequence, is to trigger so-called after acquired station clauses in

retransmission consent arrangements with Multichannel Video Programming Distributors

EXHIBIT 2 - Page 041

("MVPDs".[4]   There is no claimed, or valid, ***public interest*** benefit from those extra transfers. To the contrary, they are designed to benefit the Applicants' ***private interests*** of increasing retransmission consent revenue.  Rather, these otherwise needless transfers will, inevitably, increase the cost of pay-TV subscriptions, something that harms TNG-CWA's and NABET-CWA's members and all other MVPD customers and thus harms the public interest, especially at a time when the economy is being buffered with high inflation.  Balancing the public's interest against the Applicants' desire to advance their private financial interests is enough, in and of itself, to render these applications contrary to the public interest.

## I.    THE STANDARD OF REVIEW.

As is set forth more fully below, and in the other petitions to deny and other pleadings being submitted in opposition to the grant of these applications, there are numerous very substantial, and very material, issues of fact as to whether their grant is in the public interest. Accordingly, the Commission must dismiss the applications or designate them for hearing.

Processing of these applications is governed by Sections 309 and 310 of the Communications Act.  Under section 309(d)(2), the Commission must determine whether there are substantial and material questions of fact that preclude immediate grant of an application to transfer control of a broadcasting station.  In reviewing the record, the Commission must designate an application for hearing if

> "the totality of the evidence arouses a sufficient doubt" as to whether grant of the application would serve the public interest.  Section 310(d) of the Act prohibits the transfer of control of a license, either de jure or de facto, without prior Commission consent.

---

[4]See, "What the Hell Is a vMVPD? The Modern Streaming Market Explained," The Wrap, April 2, 2019.
https://www.thewrap.com/vmvpd-svod-avod-tvod-streaming-market-explained/

EXHIBIT 2 - Page 042

Tribune Media Company, 33 FCCRcd 3630, 3634 (2018) (footnotes with citations omitted). Pursuant to Section 309(e), if the Commission makes such a finding, or "if for any reason" it believes that grant may not be in the public interest, it "shall" designate a hearing so that an Administrative Law Judge can review the case with the benefit of the rules of evidence and make appropriate findings of fact and conclusions of law.

Section 310(d) sets out the stringent requirements for grant of an application for transfer of control of a broadcast license. Applicants have an affirmative duty to establish that grant of each application will serve "the public interest, convenience and necessity." Even if - as is not the case here - proposed transactions likely do not transgress specific Commission rules or policies, the Commission must still balance the harm and benefits, if any, of a transaction in making its public interest determination. As the Commission has explained,

> If the transaction would not violate a statute or rule, we consider whether it could result in public interest harms by substantially frustrating or impairing the objectives or implementation of the Act or related statutes. We then employ a balancing test weighing any potential public interest harms of the proposed transaction against any potential public interest benefits. The Applicants bear the burden of proving, by a preponderance of the evidence, that the proposed transaction, on balance, serves the public interest. If we are unable to find that the proposed transaction serves the public interest for any reason, or if the record presents a substantial and material question of fact, we must designate the Application for hearing.

Charter Communications, Inc. 31 FCCRcd 6327, 6336-37 (2016)(footnotes omitted).

The Commission's public interest mandate requires it to explore, not ignore, issues that implicate the public interest. As the D.C. Circuit has said,

> [T]he Federal Communications Commission was intended by Congress to function as far more than a mere referee between conflicting parties. Regardless of the formal status of a party, or the technical merits of a particular petition, the FCC "should not close its eyes to the public interest factors" raised by material in its files. ... [A]s a general matter, the federal regulatory agencies should construe pleadings filed before them so as to raise rather than avoid important questions.

-6-

EXHIBIT 2 - Page 043

They "should not adopt procedures that foreclose full inquiry into broad public
interest questions, either patent or latent."

Retail Store Employees Union, Local 880 v. FCC, 436 F.2d 248, 254 (D.C. Cir. 1970)(citations
omitted).

As initially filed, the Applicants fell grievously short of the bare minimum showing upon

which the Commission could base the requisite public interest finding.  This was made

demonstrably clear when the Commission directed the Applicants to supplement their

presentations and answer a number of questions left unresolved on the basis of the record then

available.  See, Media Bureau Information Request, Docket 22-162 (June 3, 2022).   However,

initial review of the new submissions, presented to the Commission on June 13, do not resolve

these questions.  To the contrary, they raise even more doubt as to how the applications can be

granted consistent with the public interest standard and make an even stronger case for a hearing

designation.

## II.    TNG-CWA AND NABET-CWA HAVE STANDING TO CONTEST THE ALL OF THE PROPOSED TRANSFERS BOTH AS ASSOCIATIONS ACTING ON BEHALF OF THEIR MEMBERS AND AS LABOR UNIONS WITH ORGANIZATIONAL STANDING.

TNG-CWA and NABET-CWA have standing to bring this petition both as associations

on behalf of their members and as organizations that would incur direct harm if the Commission

were to grant the pending applications.

First, as established by the declarations from TNG-CWA and NABET-CWA members,

TNG-CWA and NABET-CWA have associational standing to challenge each of these

transactions in their entirety.  The harms they each identify as facing them include at least five

independent bases:

1.    The loss of job opportunities resulting from the likely reduction in job openings at

EXHIBIT 2 - Page 044

TEGNA stations in all markets affected by these applications. This harm affects every TNG-CWA and NABET-CWA member, as it deprives them of job mobility that would allow them to move to a different market. Most TNG-CWA and NABET-CWA members have skill sets that would permit them to work at newspapers, digital platforms or television stations in TEGNA markets and elsewhere. Such positions include, but are not limited to, reporters, editors, photographers, videographers, directors, camera operators, graphics artists, data journalists, sound technicians, copy editors, page designers, ad sales, and support teams.

2. The loss of job opportunities throughout the journalism industry resulting from the anti-competitive impact of the consolidation that would take place if these transactions were approved.

3. Loss of access to local journalism coverage in their communities. Like many viewers of local television stations, TNG-CWA and NABET-CWA members regularly view television programming and rely on it for information about elections and other local issues of importance so that they can engage in civic discourse. However, they also have a professional need to be aware of local news and issues and how they are covered widely and effectively.

4. Reduced wages created by Standard General's need to cut costs to meet its substantial debt service obligations.

5. Increased costs for pay-TV subscriptions as a result of artificially inflated retransmission consent fees that will be passed on to customers;

Second, TNG-CWA and NABET-CWA also have standing as organizations. As

-8-

EXHIBIT 2 - Page 045

established in the declaration of TNG-CWA President Jon Schleuss, Exhibit A, TNG-CWA's mission includes promoting the welfare of its membership throughout the country, maintaining a well-paid professional environment with good working conditions, and protecting and promoting the health of local journalism.[5]  To fulfill that goal, TNG-CWA has expended considerable resources in advocating federal and state legislation and regulations that will preserve and expand local journalism resources.[6]  The declaration of  NABET-CWA's President Charlie Braico, Exhibit B, describes NABET-CWA's similar mission.   NABET-CWA's objectives, as set forth in its by-laws, include "advanc[ing] the science of broadcasting...and allied industries...and to advance the trade union cause both nationally and internationally."[7]

_____

[5]TNG-CWA's constitution provides that "The purpose of the Guild shall be to advance the economic interests and to improve the working conditions of its members; to guarantee, as far as it is able, equal employment and advancement opportunity in the industry and constant honesty in news, editorials, advertising, and business practices; to raise the standards of journalism and ethics of the industry; to foster friendly cooperation with all other workers; and to promote industrial unionism in the jurisdiction of the Guild." https://newsguild.org/the-newsguild-cwa-constitution/#A1

[6]As vice presidents of the Communications Workers of America, Mr. Schleuss and Mr. Braico also have the responsibility to represent the interests of all CWA members, including but not limited to, at three unionized TEGNA stations in Hartford, Waterbury and Cleveland.

[7]Section 1.3 of the bylaws provides as follows:
**1.3 Objectives and Principles**

The objectives and principles of the Sector shall be to aid workers employed in the broadcasting, distributing, telecasting, recording, filming and allied industries; to secure improved wages, hours and working conditions; to promote the organization of the unorganized in these industries into this Sector; to encourage all workers without regard to race, creed, age, sex, sexual orientation, color or national origin to share in the full benefits of this Sector; to advance the science of broadcasting, distributing, telecasting, recording, filming and allied industries; to publicize the international importance of these industries and to advance the trade union cause both nationally and internationally.

EXHIBIT 2 - Page 046

TNG-CWA's commitment to promoting local journalism is embodied in its Save The News campaign, a fight for long-term solutions to the crisis facing the news industry, by advocating for public policy that will:

- Breakup corporate ownership of news organizations;

- Provide incentives for financial investors to sell news organizations to civic-minded, local investors;

- Provide grants, tax credits and new revenue for news organizations, and ensure that additional money is spent in newsrooms and not padding a corporate bottom line;

- Increase public access to government records; and

- Protect journalists and their sources from prosecution.

Grant of the applications at issue in this proceeding would exacerbate the threat to local journalism in many ways. In particular, TNG-CWA as an institution and TNG-CWA's members will be injured by an FCC decision accepting Applicants' argument that expansion of TEGNA's existing Washington "news desk" and increasing its output somehow benefits localism when in fact, it will reduce the quality and quality of local news coverage.

### III.    IF APPROVED, THE PROPOSED TRANSACTIONS WOULD LIKELY RESULT IN AGM EXCEEDING THE 39% NATIONAL AUDIENCE REACH CAP, AND IN ANY EVENT THE LEVEL OF CONCENTRATION THEREBY ATTAINED WOULD BE CONTRARY TO THE PUBLIC INTEREST.

The level of national ownership that Standard General would attain by grant of the applications is contrary to the public interest. While the Applicants state that ownership levels post-transaction would not be in excess of the 39% audience reach cap as presently constituted, that may well not be the case. It appears that the complicated financial arrangements and

-10-

EXHIBIT 2 - Page 047

covenants associated with AGM's financing of these transactions would make AGM's interests attributable, which would, in combination with its current de facto ownership interests in Cox Media Group, place it over the 39% limit.

In any event, the level of national ownership Standard General would attain would be contrary to the public interest even if the Commission had no national ownership audience reach cap.

First, and most importantly, even if a transaction does not result in an owner breaching the 39% benchmark set out in 47 CFR §73.3555(e) that would not mean the Applicants have met their burden of establishing that their proposals are in the public interest.   The Commission's rules merely establish a line over which an application would be ungrantable absent a waiver. However, this does ***not*** mean that grant of applications resulting in audience reach below 39% is presumptively in the public interest.  To the contrary, as discussed above, the burden is at all times on the Applicants to establish that favorable action advances the public interest.

TNG-CWA and NABET-CWA note in this regard that the Commission currently employs the widely discredited UHF Discount in calculating compliance with the 39% cap set forth at 47 CFR 73.3555(e)(2)(I).  However, since the UHF Discount was adopted in 1985, the vast majority of viewers have subscribed to newly-available MVPDs, and thus have no impediment accessing UHF stations.  Indeed, the digital television transition and the consequent repacking proceedings have in many cases made UHF frequencies more, not less advantageous to licensees.  Thus, in 2016, the Commission repealed the UHF discount, finding that

> The record is absolutely clear: UHF stations are no longer technically inferior in any way to VHF stations. Therefore, we find that the DTV transition has rendered the UHF discount technically obsolete, and we hereby eliminate it from the calculation of the national audience reach cap. The UHF discount was forged in an analog world to address an analog coverage deficiency.  Today, in a digital world, there is no remaining technical

-11-

EXHIBIT 2 - Page 048

justification for the UHF discount. Rather than offsetting an actual service limitation or reflecting a disparity in signal coverage, the UHF discount serves only to confer a factually unwarranted benefit on owners of UHF television stations that undermines the purpose of the national audience reach cap. Furthermore, the Commission's ongoing experience reviewing media transactions after the DTV transition date indicates that failure to correct the distortion that the UHF discount causes in the calculation of the national audience reach as a result of the DTV transition creates an ongoing potential that additional transactions could undermine the national audience reach cap.

Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, 31 FCCRcd 10213, 10226 (2016), reconsideration granted in part, 32 FCCRcd 3390 (2017), appeal dismissed sub nom. Free Press v. FCC, 735 Fed.Appx. 731 (Mem) (D.C. Cir. 2018).

Subsequently, a newly-constituted Commission voted 2-1 to reverse that determination, a decision that was never judicially reviewed on the merits because the D.C. Circuit dismissed objectors' petition for review on jurisdictional grounds. Amendment of Section 73.3555(e) of the Commission's Rules, National Television Multiple Ownership Rule, 32 FCCRcd 3390 (2017). There is nothing in the 2017 decision reinstating the UHF discount that undermines or rejects the findings with respect to the obsolescence of the UHF discount. Rather, that action was based on the view that the Commission should not have reviewed the UHF discount in isolation from the rest of Section 73.3555(e).[8] Thus, while the UHF discount remains on the books, the Commission should afford no persuasive weight to whether ownership below 39% as calculated under the current rules might somehow be less problematic than ownership over that limit so calculated.

---

[8]Commissioner Clyburn dissented, saying that "Although repeatedly stating, that the UHF discount and national audience reach cap are "inextricably linked," and must be examined in tandem, the Commission here fails to cite a single legal authority that limits review or modification of the UHF discount to simultaneous review of the national audience reach cap. Instead, the majority relies on a selective history of the UHF discount, and unsupported arguments of petitioners, that "the FCC has no authority to change one without at least reviewing the impact the change will have on the other." Id., at 3407 (Commissioner Clyburn dissenting)(footnote omitted).

EXHIBIT 2 - Page 049

Third, with or without consideration of the national ownership cap, and with or without applying the UHF discount, the national ownership concentration that would result from approval of these applications is inconsistent with the public interest both in absolute terms and because of Standard General's plans to leverage this ownership for its own benefit at the detriment of the needs of the public.  Rather than breathing life into localism, grant of these applications would maintain national ownership concentration at undesirable levels.

## IV.    THE PROPOSED TRANSACTIONS WOULD UNDERMINE THE COMMISSION'S CORE GOAL OF PROMOTING LOCALISM.

Standard General's protestations to the contrary notwithstanding, its financial plans cannot be accomplished without cutting the amount and quality of local programming and substitution of nationally distributed and oriented content and other cheaper programming, such as nationally syndicated shows.

It is hard to overstate the importance of maintaining the quantity of local news provided in a market.  As Professor Danilo Yanich has explained,

> In a democracy, there is an explicit expectation that informed citizenship is a crucial and necessary condition for the functioning of the body politic. That informed citizenry depends on the existence of reliable and responsible methods of political communication. As the scale of modern society has increased, it has reduced the opportunities for more than a relatively small number of citizens to physically gather in the same place at the same time to engage the public sphere-"that realm of social life where the exchange of information and views on questions of common concern can take place so that public opinion can be formed."

Yanich, Does Ownership Matter?  Localism, Content, and the Federal Communications Commission, 23 Journal of Media Economics 51, 53 (2010)(citation omitted).

If the current applications are granted, TEGNA will be supplanted by an operator whose stated business model is to favor its investors' private interests rather than the public interest by ruthlessly cutting costs.  Indeed, as shown by its 2020 pitch deck from its earlier effort to buy

-13-

EXHIBIT 2 - Page 050

TEGNA,[9] and elsewhere in the record, Standard General regards cutbacks in head count and local programming as a feature, not a bug.

With respect to resources devoted to local programming, TEGNA (including its operations under its predecessor name, Gannett) has been far from perfect. Nonetheless it has run towards the front of an admittedly slow field, as a better than average custodian of its public trust. Investment pitches from Standard General (backed by its financier, AGM) show that their focus is on increasing returns by identifying properties where they can cut costs.

Standard General's principal assertion of any public interest benefit with respect to local programming fails at the beginning. It brags that it is going to rely on company-wide national content from a "DC news desk," ostensibly to improve news programming. But TEGNA already has such a "DC news desk." Standard General does not argue, much less prove, that TEGNA's DC-originated news coverage, which was created by, and has provided national coverage under the umbrella of, its former parent Gannett - one of largest journalism organizations in America - is somehow deficient or inadequate. Thus, especially since national news coverage is readily available from the existing TV network news department, Standard General's takeover of it will provide little, if any, incremental value, and certainly not enough to outweigh the detrimental impacts of the proposed transactions. Commissioner Starks has questioned whether treating "increased access to a Washington, DC news bureau as a significant public interest benefit" is arbitrary and capricious, adding that "it is not at all clear to me why this is considered a 'benefit'

---

[9]One slide reads: "TEGNA has 2x the number of employees per station compared to peers, and lags its closest local broadasting peers on EBITDA margin." See SEC Form DFAN 14A, Tegna, Inc. and Standard General, L.P., April 13, 2020, p. 21: https://www.sec.gov/Archives/edgar/data/39899/000110465920045933/tm2015782-1_dfan14a.htm

EXHIBIT 2 - Page 051

at all,..." Tribune Media Company, 33 FCCRcd at 8481. In fact, Standard General's desire to "expand" reliance on the national news desk would have the primary function of increasing existing national news coverage at the expense of local news investment and coverage.[10] Thus, it is a very real, substantial and material factual issue of fact as to whether the real goal of this "expansion" at the national level is to cut coverage - and jobs - at the local level. This is a bug, not a feature; and to make a case to the contrary, Standard General will have to prove this "benefit" exists at an evidentiary hearing.

Beyond the claimed benefit of increasing national news coverage, the application and SG's June 13, 2022 responses to the Commission's inquiry are devoid of specifics and are completely unenforceable. They are precisely what Standard General claims them not to be: "just management speak." Applicants' Response to Request for Documents and Information, June 13, 2022 at 5. Several pages of generic word salad, using jargon such as "'Move-the-Needle' process," "more extensive review," and "holistic analysis." id., cannot obscure the reality that Standard General commits to nothing that TEGNA does not already do. It is especially telling that Standard General attempts to demonstrate its commitment to localism in its existing station by citing just one example: they claim that Standard General "increased newsroom staff by **28% overall,** including the addition of six local journalists to KBSI(TV), Cape Girardeau, MO...." Id., at 6 (emphasis in the original). But Standard General does not say *where* this new staff is located. That matters because, what Standard General does not say is,

---

[10]The overemphasis on national news coverage is, to many, one of the most serious challenges faced by the journalism profession. A recent Pew analysis showed that more than one in five U.S. newsroom employees is located in New York, Los Angeles and Washington. Pew Research Center, "One-in-five U.S. newsroom employees live in New York, Los Angeles or D.C." (October 24, 2019), https://pewrsr.ch/2oc2MZf

EXHIBIT 2 - Page 052

that as of March, 2022, Standard General has been producing its "local" Cape Girardeau,
Missouri newscast with anchors, production staff and editors located in Lincoln, Nebraska.[11]
Even if there are some reporters actually based in Cape Girardeau, there is no way that news
directors, assignment and other editors without local roots and contacts, can properly serve a
community while located more than 500 miles away.[12]

It is, of course, possible to produce a newscast in the community of license, but it is
much cheaper to produce what is necessarily an inferior product.  That is a powerful
demonstration of Standard General's operating methods, and offers scant assurance to the
hundreds of TEGNA journalists and production staff that their jobs are safe, much less that they
can continue to produce truly local content rather than faux newscasts that are, literally, piped
from far across the country.

A recent and growing body of empirical research establishes the adverse consequences of
multiple television ownership on localism and the health of local journalism.  These studies
support a finding that the Commission should find that this and similar transactions are contrary
to the public interest and should not be accommodated.

While there is some data showing that when nationally distributed newspapers enter local
markets, local newspapers respond competitively by giving greater attention to local coverage,
this is not the case for television.  Noting the powerful economies of scale in group TV

---

[11]https://en.wikipedia.org/wiki/KBSI ("The news and weather anchors are based in
Lincoln while the reporters work out of the KBSI studios in Cape Girardeau."  See also,
https://www.youtube.com/watch?v=ZJwn2y4cqPA (comments).

[12]The fact that Standard General intends to dump both KBSI(TV) and KLKN(TV),
Lincoln, NE to AGM-controlled CMG offers scant hope for the resumption of a locally-
produced newscast.

-16-

EXHIBIT 2 - Page 053

ownership, Professors Martin and McCrain found that

> Acquisition of the existing local outlets by a national conglomerate produces the opposite impact on coverage relative to entry by a new, separately owned national outlet. A conglomerate owner can reduce production costs, perhaps dramatically, by substituting nationally focused and ideologically unified content produced in a single studio for locally focused and ideologically diverse content produced by many local journalists.

Martin and McCrain, Local News and National Politics, 113 American Political Science Review, 372, 373 (2019).

"Consolidation," they found, "changes the incentives of news providers, shifting coverage towards the topics that can be distributed in multiple markets rather than those - such as local politics - that are market-specific." Id. Their detailed analysis of a TV group owner's acquisition showed that there was "a 25% increase relative to the average level in the sample." Id., at 379.

These findings are consistent with the results of a new and very careful analysis of corporate ownership concentration: "corporate acquisition is associated with a reduction in locally focused content;..." LeBrun, Todd, and Piper, "Buying the News: A Quantitative Study of the Effects of Corporate Acquisition on Local News," 24 New Media & Society 1, 20 (2022). Looking at staffing reductions after corporate acquisitions by hedge funds like AGM and Standard General's parent, they concluded that "it is not only declines in staff which reduces locality following acquisition, but also that the structure of content distribution brought about by corporate acquisition can have a detrimental effect on the local information environment of affected communities." Id.

> The United States has a labor monopsony problem. A labor monopsony exists when lack of competition in the labor market enables employers to suppress the wages of their workers. Labor monopsony harms the economy: the low wages force workers out of the workforce, suppressing economic growth. Labor monopsony harms workers, whose wages and employment opportunities are reduced. Because monopsonists can artificially restrict labor mobility, monopsony can block entry into markets, and harm companies who need to hire

-17-

EXHIBIT 2 - Page 054

workers.

Marinescu and Posner, "A Proposal to Enhance Antitrust Protection Against Labor Market Monopsony," Roosevelt Institute Working Paper (2018). See also, Marinescu and Posner, "Why Has Antitrust Law Failed Workers?", 105 Cornell L. Rev. 1343, 1355 (2020).

Any baseball fan understands the power that employers can wield in a market where they are free to collude to restrict employees' salaries and job mobility, and how unionization can help level the metaphoric (and even literal) playing field. See, McFall and Tatich, "Federal Baseball Turns 100: The Long Legal Game of Athletes Gaining Economic Rights in the United States," 22 Wake Forest J. Bus. & Intell. Prop. L. 314 (2022).

TNG-CWA and NABET-CWA thus urge the Commission to recognize the need to examine the impact of its decisions on the labor market:

> For too long, competition scholars have overlooked the labor market as a site of market concentration and anticompetitive practices and have also overlooked wages as prices. Instead, following Bork, antitrust policy has focused on the product market and consumers. The growing evidence about the harms of anticompetitive labor market practices is increasingly exposing this oversight in the past decade. ...[N]ew research shows that the labor market is likely more concentrated than the product market and that the harms are substantial. Economists have studied labor market monopsonies and have demonstrated how market concentration and noncompetes are correlated with wage-setting and wage discrimination. In 2016, the Council of Economic Advisers warned that "employers may be better able to exercise monopsony power today than they were in past decades" and "forces that undermine competition tend to reduce efficiency, and can lead to lower output, employment, and social welfare."

Lobel, "Boilerplate Collusion: Clause Aggregation, Antitrust Law & Contract Governance, 106 Minn. L. Rev. 877, 916-917 (2021) (citations omitted).

## V.    THE APPLICANTS' ATTEMPT TO EXPLOIT "AFTER-ACQUISITION" CLAUSES IN RETRANSMISSION CONSENT CONTRACTS WILL INEVITABLY RESULT IN INCREASED MVPD SUBSCRIPTION PRICES THAT WILL HARM PETITIONERS' MEMBERS AND ALL OTHER SUBSCRIBERS.

The applications seek FCC approval for a complex and precisely sequenced series of

-18-

EXHIBIT 2 - Page 055

transactions.  After a number of intermediate steps, the end result would be that Standard General would buy a Boston TV station from Apollo's CMG, sell four Texas stations to CMG and buy most of TEGNA's stations.  The details are complicated, but the underlying reason for these maneuvers is not.

To uninitiated, and even to very sophisticated, observers, there seems to be no need for these transactions to be sequenced so carefully.  However, as the record now before the Commission clearly shows, the transactions have been designed to exploit standard clauses in retransmission consent contracts between broadcasters like TEGNA and subscription TV companies that resell the broadcasters' program feed to their subscribers.  These "after-acquired station" and "change-in-control" provisions allow a purchaser to substitute their higher retransmission fee arrangements for those less remunerative deals that the seller may have had.

Under somewhat similar circumstances, a stratagem of this kind has been employed before, and was not found to be contrary to the public interest by the Commission.  In 2019, the Commission approved the transfer of stations from Tribune to Nexstar over the objections of DISH (a satellite MVPD) and ATVA, a cable industry trade association.  Tribune Media Company, 34 FCCRcd 8436 (2019).

Soon afterwards, in Terrier Media Buyer, Inc., supra, the Media Bureau rejected similar arguments from ATVA based on the Nexstar precedent.  It explained the Nexstar holding as follows:

> The Commission also declined to find "that an increase in retransmission consent rates, by itself, is necessarily a public interest harm."  Instead, the Commission noted the lack of evidence in the record to establish whether, on balance, an increase in retransmission consent rates would reduce consumer welfare or rather just shift surplus between MVPDs and broadcast stations, Here, ATVA similarly fails to provide such evidence demonstrating consumer harm. Ultimately, we find that ATVA provides no basis to depart from the

-19-

EXHIBIT 2 - Page 056

Commission's prior conclusions, and therefore we decline to do so based on the record before us here.

In addition, the Nexstar-Tribune Order reaffirmed that the Commission is not the appropriate forum for addressing private contractual matters, such as after-acquired station clauses in retransmission consent agreements. As the Commission stated in Nexstar-Tribune Order "after-acquired station clauses were negotiated by the parties outside of this transaction, and there is no apparent reason to step in and deny one party the benefit of the negotiated bargain absent evidence of anticompetitive practices or other wrongdoing not apparent here."

Id., at 10565-66.

TNG-CWA and NABET-CWA believe those decisions were wrongly decided and should be overruled. However, it is not even necessary to overrule the earlier cases to reach a different result here, as there are two material differences. First, based on material submitted to the Commission by the Applicants, the record clearly establishes that the sequenced transactions here were explicitly designed to exploit existing contracts in a manner which was not within the scope of what was contemplated by the MVPD parties. Second, it is clear from the text of the decisions that the Commission, and then the staff, were addressing a different harm alleged by parties to arms-length contracts with the broadcasters. They had no occasion to reach the issue as it is presented here. TNG-CWA and NABET-CWA are not asking the Commission to intrude into a private contract dispute about allocation of revenues. Regardless of how those revenues are divided between those parties, the damage that the Commission must assess here is the cost to consumers, however they arise.

In its past decisions, the Commission said there was insufficient evidence on the record before it that manipulation of the retransmission agreements causes harm to consumer welfare, Rather, the Commission said that, as between the sellers (broadcasters) and the immediate buyers (the MVPDs), the contracts seemed only "to just shift surplus between MVPDs and

-20-

EXHIBIT 2 - Page 057

broadcast stations,..." Tribune Media Company, supra at 8452. Whether or not that is a correct analysis of the business arrangement, TNG-CWA's and NABET-CWA's members and other consumers are victims of, not parties to, those contracts, being forced to pay more for the same product based on abuse of contractual power.

Here, there is direct and unambiguous evidence of harm to consumer welfare. The challenge in this case is not about whether it is in the public interest for MVPDs to be obligated to pay more for programming. Rather, it is brought for redress of a different, clearly cognizable, harm - increased prices to TNG-CWA and NABET-CWA members and other subscribers that result from the way in which this transaction was structured. This is entirely different than asking the Commission to referee the private business dispute that was presented to it in the earlier cases. Thus, the Commission needs to look at the damage from abuse of these contracts through a different lens. Especially in an inflationary economic environment, increased prices for end users manifestly implicates the public interest and causes significant and measurable harm to consumer welfare. These customers never have the opportunity or the power to negotiate with broadcasters over the fees. Their only choice is to pay the increased prices or cancel their service.

The harm to consumer welfare here is unquestionable. Increased retransmission fees are directly passed on to customers. It is not necessary to conduct an extensive economic analysis to determine that these fees are actually passed on, or that price increases are actually due to other factors. That is because most MVPDs do not generally include increased retransmission costs in their basic subscription pricing. Rather, probably because they prefer to advertise a lower "teaser" price, they opt to recover retransmission costs through separate fees above the nominal basic price, along with taxes, franchise fees, etc. Moreover, they are

-21-

EXHIBIT 2 - Page 058

very explicit about the reason for these increasing fees.  Here is how one consumer website

explained Comcast's recent action:

> Comcast will raise the price of the average monthly bill, including video, Internet and voice, by an average of three percent nationwide in January 2022 as well as raise the regional sports channel fee and Broadcast TV fee by as much as $7 a month combined.  The cable operator last January raised prices by an average of 3.2 percent and raised the sports and broadcast fees by as much as $6.50 a month combined.
>
> The 2022 price boost, which is now being communicated to Comcast's subscribers, will follow *similar recent increases by satcaster Dish, and streaming services such as Hulu Live, The TV companies say that prices must rise to offset the escalating cost of program acquisition. Pay TV operators must pay the networks and other content providers to carry their programming.* (Hulu Live is adding Disney+ and ESPN+ with its price increase.)
>
> *Content providers continue to increase the costs they charge us to carry their content, with broadcast TV and sports being the biggest drivers of price increases,"* a Comcast spokesperson told The TV Answer Man.

"Comcast to Hike Prices, Fees In January 2022," TV Answerman (November 29, 2021) https://tvanswerman.com/2021/11/29/comcast-to-hike-prices-fees-in-january-2022/ (emphasis added).[13]

 The increased retransmission fees that would result will be passed on to consumers

who have no other source of redress are a paradigmatic instance of  harm to consumer welfare.

The record shows that the invocation of the "after-acquired station" and "change-in-control"

clauses benefit the *private interests* of the Applicants, but harm consumers.  Thus, even were

the Commission's precedents properly decided, the facts of this case compel a finding that

---

[13]See also, "Charter Spectrum will raise cable TV, home phone prices for many customers in June," Palm Springs Desert Sun, May 29, 2021, https://www.desertsun.com/story/news/2021/05/29/charter-spectrum-raise-cable-tv-home-phone-prices-june/5257738001/ ("TV programmers annually raise fees to carry their content, driving higher costs across the entire industry," a Spectrum spokesperson said. "As a direct result of the growing cost of programming from the TV networks we carry, we are passing through these increased fees to viewers.")

EXHIBIT 2 - Page 059

approval of the proposed applications is contrary to the ***public interest***.

## CONCLUSION

The Applicants have failed to meet their affirmative burden of demonstrating that grant of their applications is in the public interest.  There are numerous very substantial and very material issues of fact which must be explored at hearing.  Accordingly, TNG-CWA and NABET-CWA ask that the Commission dismiss the applications or designate them for an evidentiary hearing.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman
1341 G Street, NW
Fifth Floor
Washington, DC 20005
(202) 241-2408
andyschwartzman@gmail.com
*Counsel for Petitioners*

June 22, 2022

-23-

EXHIBIT 2 - Page 060

# EXHIBITS REMOVED

EXHIBIT 2 - Page 061

## CERTIFICATE OF SERVICE

I, Andrew Jay Schwartzman, certify that on June 22, 2022, a copy of the foregoing was served by electronic mail upon the following:

Jennifer A. Johnson
Hannah Lepow
Jocelyn Jezierny
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC  20001
jjohnson@cov.com
hlepow@cov.com
Jjezierny@cov.com,

Scott R. Flick
Jessica Nyman
Pillsbury Winthrop Shaw Pittman LLP
1200 Seventeenth Street, NW
Washington, DC  20036
scott.flick@pillsburylaw.com
jessica.nyman@pillsburylaw.com

Michael D. Basile
Jason Radermacher
Henry Wendel
Cooley LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
mdbasile@cooley.com
jrademacher@cooley.com
hwendel@cooley.com

Barbara Kreisman
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Barbara.Kreisman@fcc.gov

David Brown
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, D.C.  20554
David.Brown@fcc.gov

Jeremy Miller
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Jeremy.Miller@fcc.gov

Chris Robbins
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Chris.Robbins@fcc.gov

Jim Bird
Transaction Team
Office of the General Counsel
Federal Communications Commission
Video Division, Media Bureau
45 L Street, Street, NE
Washington, DC 20554
Jim.Bird@fcc.gov

/s/ Andrew Jay Schwartzman

EXHIBIT 2 - Page 062