# EXHIBIT 7

**Case No. 24-1204**

**David R. Goodfriend**
**The Goodfriend Group**
**208 I Street NE**
**Washington, D.C. 20002**

September 21, 2022

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, D.C. 20554

        RE:    Report of Oral Ex Parte Presentation

                Applications of TEGNA Inc., for Transfer of Control to Standard General, L.P.
                Docket No. 22-162

                Teton Parent Corp., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended
                Docket No. 22-166

Dear Ms. Dortch:

      On September 19, 2022, the undersigned counsel to TheNewsGuild-CWA ("TNG"), which together with the National Association of Broadcast Employees and Technicians ("NABET") filed a Petition to Deny in this proceeding, spoke by telephone with Sarah Whitesell, Deputy Chief of the Media Bureau, regarding the above-captioned matters. The undersigned raised three issues:

1. <u>Applicants may have raised potential issues of material misrepresentation when they claimed that they "do not intend" to cut jobs.</u>  There is considerable information in the record indicating that if the applications are granted, Standard General intends to cut jobs at TEGNA in its local as well as its national units, including what could be media worker jobs.  These documents appear to directly contradict Applicants' statements and explanations to the contrary made to the Commission.  Moreover, this underscores concerns about the likely impact of this transaction on localism and viewpoint diversity.

EXHIBIT 7 - Page 001

This is a matter that must be explored thoroughly, and if there remain substantial and material questions as to whether misrepresentations were made, the applications must be promptly designated for hearing.

TNG and NABET intend to file a further notice elaborating on this issue with specific examples (redacted in the public filing) from the confidential record.

2. <u>The Bureau should grant the pending May 12, 2022 motion regarding additional document production or, in the alternative, instruct the Applicants to submit all the documents produced to the Department of Justice pursuant to what has been reported as a "second request" for douments under the Hart/Scott/Rodino Act.</u>  The undersigned suggested that a more robust document production could clarify whether Applicants' statements raise substantial and material issues of fact.  There is ample precedent for placing all such documents in an FCC application proceeding, including in the following two transactions:

   - <u>Sprint/T-Mobile from 2018</u>:  Parties provided "custodial documents provided to the Department of Justice ("DOJ") under the Second Request (or targeted items subject to certain prior requests by the DOJ) [including] all non-privileged custodial documents that were identified as responsive to the Second Request."[1]

   - <u>T-Mobile/MetroPCS from 2012</u>: The Bureau instructed parties to "[p]rovide copies of the . . . T-Mobile USA documents that were provided to the Department of Justice . . . DOJ Submission on December 11, 2012 (T-Mobile USA's response on that date to DOJ's second information request)."[2]

3. <u>President Biden's recent Executive Order regarding CFIUS enforcement should encourage the Bureau to scrutinize the impact on localism, diversity, and journalism generally under the public interest standard posed by anonymous foreign investment in a major U.S. local broadcast TV station group</u>. The undersigned reiterated concerns expressed in this proceeding, and by TNG in multiple other contexts, regarding the risks to localism, diversity, and by extension journalism and democracy itself, posed by anonymous foreign investment in American newsrooms.  President Biden's recent

---

[1] Letter from Nancy Victory, Counsel, Applications of T-Mobile US, Inc. and Sprint Corporation for Consent to Assign Licenses, WT Doc. No. 18-197 (Sept. 5, 2018) (available at https://www.fcc.gov/ecfs/file/download/DOC-596ae3dfff800000-A.pdf?file_name=2018-09-05%20FCC%20Information%20Request%20vFINAL--REDACTED.pdf).

[2]  Applications of Deutsche Telekom AG, T-Mobile USA, Inc. and MetroPCS Communications, Inc., for Consent to Transfer of Control of Licenses and Authorizations, WT Docket No. 12-301, Information and Discovery Request For Deutsche Telekom AG at 4 (Dec. 20, 2012).

EXHIBIT 7 - Page 002

Executive Order[3] regarding enforcement practices of the Committee on Foreign Investment in the U.S. ("CFIUS"), the first of its kind in about 50 years, underscores that we are living in unusual times when it comes to foreign investment issues.  Since the announcement of the proposed transaction in this proceeding, Russia invaded Ukraine and China increased tensions in the Taiwan Strait. The Commission should not assume that CFIUS alone is responsible for the implications of anonymous foreign investment. Notably, while CFIUS focuses on national security, the Commission has a broader mandate that also encompasses public interest considerations, including maintaining localism, diversity, and a robust free market for news.

Sincerely,

__/s/_____
David Goodfriend
Counsel to The NewsGuild-CWA (with NABET)

---

[3] Ensuring Robust Consideration of Evolving National Security Risks by the Committee on Foreign Investment in the United States, Executive Order 14083, 87 FR 57369 (September 15, 2022).  See also, Fact Sheet:  President Biden Signs Executive Order to Ensure Robust Reviews of Evolving National Security Risks by the Committee on Foreign Investment in the U.S., The White House (Sept. 15, 2022) (available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/15/fact-sheet-president biden-signs-executive-order-to-ensure-robust-reviews-of-evolving-national-security-risks-by-the -committee-on-foreign-investment-in-the-united-states/).

EXHIBIT 7 - Page 003

HIGHLY CONFIDENTIAL INFORMATION–-SUBJECT TO PROTECTIVE ORDER IN MB DOCKET NO. 22-162 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

**David R. Goodfriend**
**The Goodfriend Group**
**208 I Street NE**
**Washington, D.C. 20002**
david@dcgoodfriend.com

September 29, 2022

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, D.C. 20554

        RE:    Report of Oral Ex Parte Presentation

               Applications of TEGNA Inc., for Transfer of
               Control to Standard General, L.P.
               Docket No. 22-162

               Teton Parent Corp. , Petition for Declaratory
               Ruling Under Section 310(b)(4) of the
               Communications Act of 1934, as Amended
               Docket No. 22-166

Dear Ms. Dortch:

      On Tuesday, September 27, Andrew Jay Schwartzman and the undersigned, co-counsels to TheNewsGuild-CWA ("TNG"), which together with the National Association of Broadcast Employees and Technicians ("NABET") filed a Petition to Deny in this proceeding, spoke in person separately with (1) Holly Saurer, Chief, and Sarah Whitesell, Deputy Chief, of the Media Bureau, and (2) David Strickland, Media Legal Advisor to Chairwoman Rosenworcel.   (Mr. Schwartzman participated in the conversation with Mr. Strickland by telephone).

      The undersigned and co-counsel provided detailed information from the confidential record, as previewed in the undersigned *ex parte* filing dated September 21, 2022, demonstrating why on the present record there may be substantial and material questions of fact as to whether the applicants made material misrepresentations to the Commission.  Without additional documents, such as those already requested in the still-pending May 12, 2022 motion, the Commission cannot find that the grant of applications is in the public interest.  Moreover, they argued that on the present record, the aforementioned issue may raise questions that go to

1

EXHIBIT 7 - Page 004

HIGHLY CONFIDENTIAL INFORMATION–-SUBJECT TO PROTECTIVE ORDER IN MB DOCKET NO. 22-162 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

transferee Standard General's qualifications to be a Commission licensee. No conditions can remedy a finding on qualifications; accordingly, the Commission should not entertain any discussion of conditions unless and until the threshold qualifications question has been resolved.

Finally, as detailed in prior filings to the Commission, the undersigned and co-counsel asserted that on the present record, there are other substantial and material questions of fact as to whether the proposed transaction is in the public interest. These issues are especially important in light of the grave threat posed to localism and diversity –including the threat to journalism and democracy in the U.S. Applicants have failed to meet their burden. Given the need for supplementation of the record, counsel and co-counsel called on the Commission to suspend its voluntary "shot clock" until such time as a minimally adequate record is established.

Counsel and co-counsel identified considerable information in the record indicating that if the applications are granted, transferee Standard General intends to cut jobs at TEGNA in its local as well as its national units, including what could be media worker jobs. These documents appear to directly contradict Applicants' statements and often-repeated explanation to the contrary made to the Commission. Applicants stated in filings in this docket that they "do not intend" to eliminate station-level jobs at TEGNA post-closing, and tried to explain apparently contradictory documents by saying that any job cuts listed therein already have been made. Specifically, they said:

> "Standard General *does not intend to reduce station-level staffing following the Transaction*."[1]

Applicants attempt to rebut Petitioners' claims that Applicants intend to cut station-level jobs post-closing by explaining that "Standard General's mid-2021 estimates of operating costs reflected personnel measures that TEGNA management was already planning to implement (and has since implemented) . . . ."[2] However, "synergies" necessarily define actions that would be taken post-closing. The word "synergy" refers to financial effects that occur after, not before, a transaction closes.[3] The Applicants appear to be contradicting themselves when they say that post-closing job cuts ("synergies") already have happened. Based on an examination of the confidential record, it appears that Applicants did and likely still do intend to cut station-level jobs, including what could be journalism and news-gathering related jobs. In Standard General's HSR Question 4(c)-1 production titled **[[BEGIN REDATION]]**

---

[1] Applicants' Consolidated Opposition and Response to Comments, MB Doc. No. 22-162 (July 7, 2022) at n.102 (citing June 13 Response at 9-10) (emphasis added).
[2] Id.
[3] "Synergy is the concept that the value and performance of two companies combined *will be* greater than the sum of the separate individual parts." Investopedia (www.investopedia.com, visited September 28, 2022) (emphasis added).

2

EXHIBIT 7 - Page 005

HIGHLY CONFIDENTIAL INFORMATION–-SUBJECT TO PROTECTIVE ORDER IN MB DOCKET NO. 22-162 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

**[[END REDACTION]]**

Thus, it appears that in late 2021, the transferee Standard General intended to cut TEGNA jobs post-closing, and that the number of job cuts presented was a floor, not a ceiling, on what would occur. The Commission will have to determine if that was also their state of mind on June 13, 2022 and July 7, 2022. Indeed, as recently as last week, in response to an *ex parte* notice filed by the undersigned, counsel for Standard General reiterated the same arguments and filings cited herein (see supra n.1) and asserted that Standard General "does not intend to reduce station-level staffing" post-closing.[4] Did Standard General's "intent" in late 2021 still exist when it told the Commission that they "do not intend" (present tense) to cut station-level jobs? Counsel and co-counsel stated that if the answer to that question is yes, then a material misrepresentation may have been made. This is a matter that must be explored thoroughly, and if there remain substantial and material questions as to whether misrepresentations were made, the applications must be designated for hearing.

Counsel and co-counsel stated that the documents also underscore concerns expressed in the petitions to deny about the likely impact of this transaction on localism and viewpoint diversity. There is ambiguity as to whether the job cuts described in the aforementioned document include journalists and other news-gathering related positions. Additional details

---

[4] Letter from Scott R. Flick, Counsel for SGCI Holdings III LLC, Notice of *Ex Parte* Communication, MB Doc. No. 22-162 (Sept. 22, 2022).

3

EXHIBIT 7 - Page 006

HIGHLY CONFIDENTIAL INFORMATION–-SUBJECT TO PROTECTIVE ORDER IN MB DOCKET NO. 22-162 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

regarding the line items described above are provided in Standard General's HSR Question 4(d)-1 document production titled, **[[BEGIN REDACTION]]**

**[[END REDACTION]]**

Based on the above-referenced documents, the undersigned raised concerns about statements made by Applicants regarding their "intent" to not cut station-level jobs. The seeming contradiction between the representations the Applicants made to the Commission and the versio they told investors, lenders, or other third parties raises serious questions regarding whether the Applicants have been truthful and forthcoming. It also underscores the proposed transaction's potential harm to localism and viewpoint diversity that have been described in prior filings.

In the meeting with Mr. Strickland, in addition to the above points, counsel and co-counsel also explained that President Biden's recent Executive Order regarding CFIUS enforcement should encourage the Commission to scrutinize the impact on localism, diversity, and thus to local news coverage generally posed by anonymous foreign investment in a major U.S. local broadcast TV station group. They reiterated concerns expressed in this proceeding, and by TNG in multiple other contexts, regarding the risks to localism, diversity, and by extension journalism and democracy itself, posed by anonymous foreign investment in American

4

EXHIBIT 7 - Page 007

HIGHLY CONFIDENTIAL INFORMATION–-SUBJECT TO PROTECTIVE ORDER IN MB DOCKET NO. 22-162 BEFORE THE FEDERAL COMMUNICATIONS COMMISSION

newsrooms. President Biden's recent Executive Order[5] regarding enforcement practices of the Committee on Foreign Investment in the U.S. ("CFIUS"), the first of its kind in about 50 years, underscores that we are living in unusual times when it comes to foreign investment issues. Since the announcement of the proposed transaction in this proceeding, Russia invaded Ukraine and China increased tensions in the Taiwan Strait. The Commission should not assume that CFIUS alone is responsible for the implications of anonymous foreign investment. Notably, while CFIUS focuses on national security, the Commission has a broader mandate that also encompasses public interest considerations, including maintaining localism, diversity, and a robust free market for news.

Finally, the undersigned and co-counsel referred Mr. Strickland to the filings made in the above-cited dockets by Graham Media Group for a detailed analysis of why the ownership of stations in Jacksonville, FL by Apollo's Cox Broadcasting and post-transaction TEGNA poses threats to localism, diversity, and the public interest in that market.

Sincerely,

__/s/_____
David Goodfriend
Counsel to The NewsGuild-CWA

---

[5] Ensuring Robust Consideration of Evolving National Security Risks by the Committee on Foreign Investment in the United States, Executive Order 14083, 87 FR 57369 (September 15, 2022).  See also, Fact Sheet:  President Biden Signs Executive Order to Ensure Robust Reviews of Evolving National Security Risks by the Committee on Foreign Investment in the U.S., The White House (Sept. 15, 2022) (available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/15/fact-sheet-presidentbiden-signs-executive-order-to-ensure-robust-reviews-of-evolving-national-security-risks-by-the-committee-on-foreign-investment-in-the-united-states/).

**Andrew Jay Schwartzman**
**1341 G Street, NW**
**Fifth Floor**
**Washington, DC 20005**
**andyschwartzman@gmail.com**
**(202) 241-2408**

October 6, 2022

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, D.C. 20554

                RE:    Report of Oral Ex Parte Presentation

                        Applications of TEGNA Inc., for Transfer of
                        Control to Standard General, L.P.
                        Docket No. 22-162

                        Teton Parent Corp. , Petition for Declaratory
                        Ruling Under Section 310(b)(4) of the
                        Communications Act of 1934, as Amended
                        Docket No. 22-166

Dear Ms. Dortch:

      Pursuant to 47 CFR §1.1206(b), David Goodfriend and Andrew Jay Schwartzman, counsel for The NewsGuild-CWA and The National Association of Broadcast Employees and Technicians-CWA (collectively, "TNG-CWA/NABET-CWA") met by telephone conference with Ben Arden, Chief of Staff and Legal Advisor to Commissioner Carr, to discuss the above-captioned matters.

      During the call, counsel discussed the issues they have raised in this proceeding concerning the applicants' failure to disclose details about the proposed ownership and financing structure for the transactions.  They observed that the matter reaches the Commission in the context of a changing geopolitical environment in which there is a recognition that. in addition to posing potential threats to national security, undisclosed or excessive foreign ownership and investment implicates other public interest issues, including localism, diversity and maintaining a robust market for news.

      In discussing the specifics of this case, counsel pointed out that on the present record, the applicants have not provided  information sufficient to establish even a prima facie case that

EXHIBIT 7 - Page 009

grant of the applications would be in the public interest. They explained that, while the Commission generally relies on applicants' representations about the identify and nature of funding sources that do not meet certain thresholds, the unusually complex arrangements in this docket merit further scrutiny.

To provide elaboration on the kinds of factual issues that remain unresolved, counsel referred to the notice of oral ex parte presentation they filed on September 29, 2022. They also referred to the passage beginning at the bottom of page 4 and ends at the top of page of 6 of the Reply Comments of American Television Alliance (Docket 22-162, filed August 1, 2022) as providing a useful summary of open questions on the current record. A copy of that passage is attached as an exhibit to this notice.

With respect to the labor market/jobs issues that TNG-CWA/NABET-CWA has raised, counsel also referred to the September 29 ex parte notice for an elaboration on what may be material misrepresentation that have been made to the Commission.

Finally, counsel briefly discussed why they believe that grant of these applications would not advance the Commission's diversity goals, referring to the discussion of that question on pages 4-7 of their August 1, 2022 reply pleading.

Respectfully submitted,

Andrew Jay Schwartzman

cc.   Ben Arden

# Exhibit

EXHIBIT 7 - Page 011

it does not show whether, on balance, they would reduce consumer welfare or, rather, just shift surplus between DISH and broadcast stations.[11]

This means merely that retransmission consent price increases *caused by a transaction* and *likely to be passed along to consumers* constitute a public interest harm, while price increases caused by a "fluctuating retransmission consent marketplace" do not. That is the principle the Commission should apply in assessing this proposed transaction.

## II.  APPLICANTS FAIL TO ADDRESS CONCERNS ABOUT ATTRIBUTION.

In our initial comments, we stated that, in light of the particular circumstances and corporate structure of this transaction, the Commission should "closely examine" claims of non-attribution because Applicants had not disclosed the entire universe of agreements and arrangements among the parties.[12]  We urged the Commission to require Applicants to submit documentation regarding all such agreements and arrangements, not just those Applicants unilaterally deemed "germane."[13]

Applicants could have addressed this concern categorically by stating that there are no arrangements among the parties (or their affiliates) other than those set forth in documents filed with the Commission. Or they could have stated that there are such arrangements and explained why they are not germane. Applicants instead responded with the following statement,[14] annotated in footnotes to illustrate some of the potential loopholes it contains:

> Lastly, Applicants have not, as ATVA falsely asserts, "failed to disclose" any required transaction documents. Applicants submitted with the Applications "all agreements for the transfer of the station(s), [which] documents embody the

---

[11]  *Id.* ¶ 29 (citations omitted).

[12]  Comments of the American Television Alliance at i,9, MB Docket No. 22-162 (filed June 22, 2022) ("ATVA Comments").

[13]  *Id.*

[14]  Opposition at 28-29.

4

EXHIBIT 7 - Page 012

complete and final understanding between Transferor and Transferee"[15] with standard redactions (as noted in the Comprehensive Exhibit). As the Commission knows, agreement exhibits and schedules are routinely excluded from assignment and transfer applications pursuant to *LUJ, Inc. and Long Nine, Inc.* and, as stated in the Applications and consistent with *Long Nine*, "will be provided to the Commission upon request."[16] And while ATVA hints there could be undisclosed "arrangements between the parties" hidden in redacted schedules, including those "dealing with programming distribution and MVPDs," they are wrong. The underlying agreements (copies of which were publicly filed with the Applications), describe with specificity the matters that are contained within those schedules.[17] Further, as Applicants made clear in the Applications and the *June 13 Response*, there are no time brokerage, joint sales, or shared services agreements[18] between post-Transactions TEGNA and CMG[19] and, as competitors, the companies have no plans[20] to jointly negotiate for retransmission consent (nor could they under the Commission's rules in markets where each owns a station).

What this lengthy statement *doesn't* provide is a response to our basic question: are there any arrangements outside of the "transaction" itself that the Commission (not Applicants) might

---

[15] This, by its terms, reflects the "complete and final understanding" among Applicants *about the transfer of stations*. It does not necessarily reflect any such understanding about matters that the Applicants unilaterally decide are not related to this transfer. Suppose, for example, Cox agreed with Standard General to serve as its agent for non-overlapping market retransmission consent negotiations in a document separate from and not dependent upon the transaction itself. A party might characterize this as "not germane" to the transfer application—and yet the Commission might think it important with respect to attribution issues.

[16] We do not dispute that this has become routine in broadcast cases and have not accused the parties of wrongdoing. We are merely suggesting that, in the particular circumstances of this case, the Commission should require disclosure of all arrangements among the parties.

[17] We agree that the Agreements submitted contain the "subject matter" of the schedules. The question here, however, is whether the schedules themselves contain material relevant to attribution. If the Commission and the public cannot examine them, we cannot know. This does not mean that ATVA or its Member Companies want or need to review information from Applicants' retransmission consent agreements. If this is all a particular schedule contains, Applicants could certify to that effect.

[18] This refers simply to three specific named arrangements. Yet parties do not need call their contracts by any specific name; it is the substance of the terms that counts. More importantly, any number of arrangements other than the three listed here could be relevant to attribution.

[19] This refers to two specific parties: Apollo Global Management and Cox Media Group. Applicants seem to make clear, in footnote one of their Opposition, that it would not apply to related parties.

[20] This, of course, does not state that the parties will not do so.

5

EXHIBIT 7 - Page 013

**Andrew Jay Schwartzman**
**1341 G Street, NW**
**Fifth Floor**
**Washington, DC 20005**
**andyschwartzman@gmail.com**
**(202) 241-2408**

October 13, 2022

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, D.C. 20554

                      RE:    Report of Oral Ex Parte Presentation

                              Applications of TEGNA Inc., for Transfer of
                              Control to Standard General, L.P.
                              Docket No. 22-162

                              Teton Parent Corp. , Petition for Declaratory
                              Ruling Under Section 310(b)(4) of the
                              Communications Act of 1934, as Amended
                              Docket No. 22-166

Dear Ms. Dortch:

      Pursuant to 47 CFR §1.1206(b), on October 11, 2022, David Goodfriend and Andrew Jay Schwartzman, counsel for The NewsGuild-CWA and The National Association of Broadcast Employees and Technicians-CWA (collectively, "TNG-CWA/NABET-CWA") met by telephone conference with Justin Faulb, Chief of Staff and Legal Advisor to Commissioner Starks, to discuss the above-captioned matters.

      During the call, counsel went over the major issues in the proceeding. They discussed the need to address and clarify the FCC's jurisprudence for both associational and institutional standing. They also described how the transaction is designed to increase retransmission rates artificially, and how those additional costs are passed on to the members of TNG-CWA/NABET-CWA in the form of increased MVPD bills.

      Counsel then discussed the applicants' failure to disclose details about the proposed ownership and financing structure for the transactions. They observed that the matter reaches the Commission in the context of a changing geopolitical environment in which there is a recognition that. in addition to posing potential threats to national security, undisclosed or

EXHIBIT 7 - Page 014

excessive foreign ownership and investment implicates other public interest issues, including localism, diversity and maintaining a robust market for news. To provide elaboration on the kinds of factual issues that remain unresolved, counsel referred to the notice of oral ex parte presentation they filed on September 29, 2022. They stated that there are important unresolved questions about the applicants' stated "intent" not to cut station-level jobs, which may or may not be clarified by the forthcoming responses to the Media Bureau's outstanding document request.

For all these reasons, cousnel stated that on the present record, no conditions can be crafted that would permit grant of the application consistent with the public interest.

Respectfully submitted,

Andrew Jay Schwartzman

cc.     Justin Faulb