# EXHIBIT 9

**Case No. 24-1204**

REDACTED – FOR PUBLIC INSPECTION

Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, DC 20554

|  |  |
|---|---|
| In the Matter of | ) <br> ) |
| Applications of TEGNA, Inc. (Transferor) <br> and Standard General, L.P. and <br> SCGI Holdings III, LLC (Transferee) | ) ) MB Docket No. 22-162 <br> ) <br> ) <br> ) |

## COMMENTS AND OPPOSITION OF DISH NETWORK CORPORATION

DISH Network Corporation ("DISH") submits these comments in response to the Media Bureau's Public Notice[1] seeking comment on letters filed by Standard General L.P. ("Standard General") proposing conditions to its applications seeking consent to transfer control of subsidiaries of TEGNA, Inc. ("TEGNA"). DISH also writes to oppose the public version of Cox Media Group's ("Cox") December 30, 2022 letter, which requests that the Commission strike from the record certain information about Cox's demands in negotiations with DISH.[2] Information about Cox's conduct in recent negotiations is relevant to the Commission's review

---

[1] *See* Public Notice, *Media Bureau Seeks Comment on Letters Filed by SGCI Holdings III LLC and Standard General L.P. Regarding Applications to Transfer Control of TEGNA, Inc.*, MB Docket No. 22-162 (Dec. 23, 2022).

[2] Letter from Michael D. Basile, Counsel for Cox, to Marlene Dortch, FCC, MB Docket No. 22-162 (Dec. 30, 2022) ("Cox Dec. 30, 2022 Letter"). Portions of this letter are redacted by Cox in the public version. DISH's outside counsel has requested access to the Highly Confidential version, pursuant to the Protective Order in this proceeding. Cox and other applicants objected to this request. *See* Joint Objection to Disclosure of Confidential and Highly Confidential Information, MB Docket No. 22-162 (Jan. 3, 2023). DISH replied to those objections. *See* Letter from Pantelis Michalopoulos, Counsel for DISH, to Marlene Dortch, FCC, MB Docket No. 22-162 (Jan. 6, 2023). DISH can only reply to the public version in light of Cox's unreasonable position that DISH's counsel cannot fully access Cox's response. DISH has denoted with **{{BEGIN HCI}}** and **{{END HCI}}** information that is deemed to be Highly Confidential Information pursuant to the Protective Order in this docket. A public, redacted version of this filing is being filed with the Commission.

EXHIBIT 9 - Page 001

**REDACTED – FOR PUBLIC INSPECTION**

of the applications, as it highlights an important component of these transactions: in the form presented to the Commission, the transactions appear to be structured to permit the applicants' use of change-in-control and after-acquired-station clauses in their retransmission consent agreements with multichannel video programming distributors ("MVPDs") like DISH will increase retransmission consent prices and/or impose other terms that may harm consumers.

In other words, the applicants seem to be primarily seeking approval for the purchase of valuable retransmission contracts—a license to print money for their investors. By contrast, the main public interest objectives of such transactions—improvement in content quality and advancement of localism—seem to be a secondary consideration if they are a factor at all. The automatic price increases and the imposition of other terms more advantageous to the applicants, on which these transactions appear focused, are a debit in the ledger of the Commission's public interest analysis, as they likely will harm consumers.

While the commitments offered by Standard General are a first step towards averting these harms, they contain significant deficiencies that undermine their effectiveness. To ensure that the conditions offered actually prevent the manipulation of after-acquired station clauses and change in control provisions, they should be broadened and expanded to cover all of the applicants, including Cox. The conditions should also foreclose the pernicious practice of the applicants' comparing confidential retransmission agreements for the purpose of contracting future mergers that would achieve future automatic price increases under these retransmission agreements. That practice helps the applicants, but harms the public.

To be sure, such conditions hardly remedy all of the harms of the transactions, and, in that respect, DISH agrees with the comments offered in this proceeding by the American

REDACTED – FOR PUBLIC INSPECTION

Television Alliance.[3] Given the applicants' objection to DISH's access to Highly Confidential Information, DISH reserves the right to expand upon this filing once its counsel can obtain access to Highly Confidential information under the Protective Order in this proceeding.

### I.     The Transaction Would Allow New TEGNA to Raise Rates or Impose Other Onerous Terms

The proposed transaction would lead to at least two substantial harms for MVPDs like DISH.  <u>First</u>, the proposed transaction would enable both of the post-transaction surviving entities (Standard General and Cox) to exploit provisions in their existing retransmission consent agreements with MVPDs that would allow them to immediately receive higher fees upon consummation of the transaction, propose other harmful non-price terms, and or artificially create coterminous expiration dates that increase the pressure on MVPDs.

<u>Second</u>, these companies' accumulation of stations, albeit in different markets, would increase the harms resulting from blackouts for distributors with a wide or national footprint, giving the companies significantly more leverage during retransmission consent negotiations to negotiate for higher fees.  DISH does not comment on that second harm here, but incorporates by reference its submissions in other proceedings, which are equally applicable.[4] In light of that public interest harm, conditions to prohibit coordination between the applicants, both in the same market and across markets, are important.  In that regard, DISH fully supports the ATVA's proposed conditions, which would prohibit joint negotiations.

---

[3] *See* Comments of the American Television Alliance, MB Docket No. 22-162 (June 22, 2022).

[4] *See* Applications for Consent to Transfer Control of Tribune Media Company and Nexstar Media Group, Inc., Petition to Deny of DISH Network Corp., MB Docket No. 19-30 (Mar. 18, 2019); Reply of DISH Network Corp., MB Docket No. 19-30 (Apr. 9, 2019); Letter from Pantelis Michalopoulos, Counsel for DISH, to Marlene Dortch, FCC, MB Docket No. 19-30 (July 15, 2019), attaching Reply Declaration of William Zarakas and Jeremy Verlinda.

*Effect of retransmission consent contract provisions.* As opponents to the transaction have explained, the applications are highly complex and are carefully sequenced: "After a number of intermediate steps, the end result would be that Standard General would buy a Boston TV station from Apollo's CMG, sell four Texas stations to CMG and buy most of TEGNA's stations."[5] This sequence seems designed to achieve the goal of allowing the applicants to purchase valuable rights under retransmission agreements—rights they otherwise would not have. The applicants would specifically be able to take advantage of after-acquired station and change-in-control provisions that are common in retransmission consent agreements, substituting the bigger broadcaster's higher rate for the rate actually negotiated by the MVPDs for the broadcast stations in question.

This "rate reset"—which happens without any concomitant increase in the value of the acquired stations and their programming for the MVPD or consumers—is nothing but profit for the acquiring broadcaster. This kind of rate increase typically happens immediately upon consummation, rather than awaiting negotiation of a renewal agreement. And, "[e]specially in an inflationary economic environment, increased prices for end users manifestly implicates the public interest and causes significant and measurable harm to consumer welfare."[6]

The proposed transaction is thus distinguishable from the 2019 Nexstar-Tribune merger, where the Commission found that: "[W]e do not believe that an increase in retransmission consent rates, by itself, is necessarily a public interest harm. Rather, such harm exists only

---

[5] Petition to Dismiss or Deny of NewsGuild-CWA, MB Docket No. 22-162, at 19 (June 22, 2022) ("NewsGuild Petition to Deny").

[6] *Id.* at 21.

where an increase is not the product of competitive marketplace considerations."[7]  As the American Television Alliance observed, "this means merely that retransmission consent price increases caused by a transaction and likely to be passed along to consumers constitute a public interest harm, while price increases caused by a fluctuating retransmission consent marketplace do not."[8]  Indeed, in the Gray/Raycom transaction, the Commission relied on the applicants' representations that they would *not* structure their divestitures in such a manner.[9]  Here, the carefully sequenced series of transactions "were explicitly designed to exploit existing contracts in a manner which was not within the scope of what was contemplated by the MVPD parties."[10]  Cox, for its part, has already shown its intent to raise prices immediately upon closing the transaction.[11]  Such a result would be the product of Cox's artificial manipulation of retransmission consent negotiations, not of a competitive marketplace.

---

[7] *Tribune Media Co. et al.*, Memorandum Opinion and Order, 34 FCC Rcd. 8436, 8451 ¶ 29 (2019).

[8] Reply Comments of the American Television Alliance, MB Docket No. 22-162 (Aug. 1, 2022) (internal quotations omitted) (emphasis omitted).

[9] *Consent to Transfer Control of Certain License Subsidiaries of Raycom Media, Inc. to Gray Television, Inc.*, Memorandum Opinion and Order, 33 FCC Rcd. 12349, 12357 ¶ 17 (2018) ("The Applicants state that Gray will not acquire the stations to be divested and the after-acquired clauses therefore will not apply to those stations . . . given the Applicants' statement that Gray will not acquire the stations, ACA's concerns about the application of after-acquired station clauses to Raycom stations to be divested are unfounded.").

[10] NewsGuild Petition to Deny at 20.

[11] *See* Letter from Pantelis Michalopoulos, Counsel for DISH, to Marlene Dortch, FCC, MB Docket No. 22-162, Exhibit 1, at 3-4 (Dec. 28, 2022) ("DISH Dec. 28, 2022 Letter"); *See also* Motion of Public Interest Parties for Additional Information and Documents and Extension of Time, MB Docket No. 22-162, at 3, 6 (May 12, 2022), citing Harry Jessell, *Musing About Apollo-Cox-Northwest*, TVNewsCheck (Feb. 25, 2019), https://tvnewscheck.com/business/article/musings-apollo-cox-northwest-nexstar ("According to multiple sources, Apollo is going to use the "after-acquired" clauses in its retrans contracts to immediately boost retrans fees for all the Cox stations."); William Cohan, *"Television Is What Gets Senators Elected": Private-Equity Mogul Leon Black Is Building a Local TV Empire to Rival Sinclair and Fox*, Vanity Fair (Apr. 15, 2019), https://www.vanityfair.com/news/2019/04/leon-black-is-building-a-local-tv-empire-to-rival-sinclair-and-fox ("Many industry observers believe that the key to Apollo's strategy for making money in the local television industry is the Northwest transaction . . . "I

**REDACTED – FOR PUBLIC INSPECTION**

Equally as important, these clauses enable broadcasters to pull stations that are subject to separately negotiated, long-term agreements and subject them to other contracts that may expire much sooner. In addition to automatic rate increases, grouping otherwise separate contracts into a coterminous agreement has the potential to accelerate expirations for station groups that would have otherwise remained on an MVPD's system for many years. The practical effect? Higher rates earlier, and a heightened risk of blackouts in an artificially accelerated timeline. Indeed, even without the combination of such agreements by virtue of after acquired clauses, the applicants here appear to have shared valuable information about confidential contract expirations that can be weaponized against MVPDs in negotiations.[12]

## II. Appropriate Conditions Are Necessary to Prevent the Automatic Imposition of Price Increases or Other Onerous Terms

Merger conditions are necessary, at a minimum, to avert the automatic price increases and coterminous expirations that the transfers appear designed to achieve. DISH proposes the following conditions to that end:

> Standard General L.P. and SGCI Holdings III LLC (collectively, "Standard General") and/or Cox Media Group ("CMG"), each on behalf of itself and any subsidiary, affiliate, or other entity it directly or indirectly owns and/or controls (each, an "Entity" and collectively, "Entities"), should commit to not enforce or seek to enforce any clause of

---

spoke to two friends of mine at Comcast and Spectrum," the Wall Street banker said, "and they said, 'Look, unless Northwest Broadcasting is the one that has the contract here, if they think we're going to respect that after-acquired clause just because they bought both assets at the same time, they're smoking crack.'"").

[12] The applicants have asserted that "the Protective Order Signatories have intentionally not requested access to the other Applicants' CI/HCI document production sets." Applicants Responses Regarding Reply to Joint Objection to Disclosure of Confidential and Highly Confidential Information, MB Docket No. 22-162, at 3 (Jan. 10, 2023). But the same letter states that there have been "limited circumstances" where they have done so. *Id.* Equally important, what the applicants do not say is whether the applicants themselves have seen each others' Highly Confidential documents, including retransmission consent agreements. Review of the Highly Confidential information by DISH's outside counsel may well shed light on this question of access to retransmission agreements.

any retransmission consent agreement (an "RCA") to achieve higher retransmission consent prices or other more favorable terms as a result of the transfer of control or assignments approved in this proceeding. Specifically, without limitation, each applicant should:

1) voluntarily and irrevocably waive enforcement or other application of any term or condition of an RCA between any Entity and a Multichannel Video Programming Distributor ("MVPD") that would, by reason of any of the transactions that may be approved in this proceeding, result in such RCA applying to any station that is, immediately prior to the closing of such transaction, a party to another RCA with the MVPD, which term or condition would result in a higher retransmission fee or more favorable terms for that station;

2) voluntarily and irrevocably waive the right to assign any portion of an RCA between any Entity and an MVPD that would, by reason of any of the transactions that may be approved in this proceeding, result in such RCA governing any stations not then-currently governed by such RCA, to any third party, which right would result in a higher retransmission fee or more favorable terms for such stations;

3) agree to undertake all acts necessary to effectuate or otherwise demonstrate the intent of the waivers set forth in (1) and (2) above (including without limitation, assuming, or requiring a third party to assume, any applicable RCA), at all times without condition or delay; and

4) agree not to share confidential retransmission agreements with another Entity or broadcast station owner or manager, including without limitation in the process of negotiating or contracting future mergers, acquisitions, or similar transactions.

Furthermore, DISH endorses all of the conditions proposed by ATVA, of which DISH is a member.[13]

### III.   Cox Media Group Must Be Included in All Conditions

Any conditions regarding retransmission consent must include Cox in addition to Standard General/TEGNA. While increasing retransmission consent fees is ostensibly "not central to Standard General's thesis for the proposed transaction,"[14] raising prices may be the

---

[13] *See* Letter from Michael Nilsson, Counsel for ATVA, to Marlene Dortch, FCC, MB Docket No. 22-162 (Dec. 2, 2022).

[14] Letter from Soohyung Kim, Standard General, to Marlene Dortch, FCC, MB Docket No. 22-162 (Dec. 16, 2022) ("Standard General Dec. 16, 2022 Letter").

entire reason for Cox's involvement in the transaction. Indeed, Cox's recent attempt to negotiate retransmission consent for TEGNA's stations before the Commission's approval of the transaction may reflect this motivation. Typically, predicting future effects of a merger can be like "peering into a crystal ball,"[15] but there is no need for fortune telling here because Cox has already shown it will raise prices if left unrestrained. The Commission should take Cox for its word, and apply to it the same prohibition on increasing retransmission consent fees proposed by Standard General.[16] Any price increase that takes immediate effect upon closing of the transaction would harm the public interest because that increase would not be derived from competitive forces.

    **IV.    Evidence of Cox's Behavior Highlights the Need for the Conditions, and Should Not be Struck From the Record**

In objecting to DISH's December 28 Letter, Cox is trying to remove from the record evidence showing that its prior statements to the Commission were at best misleading, and at worst false. DISH's recent submission shows Cox's attempts to negotiate retransmission consent for TEGNA's stations, contrary to Cox's statement that it "has not sought and will never seek to negotiate retransmission consent for another company's stations."[17] In its December 30 letter responding to DISH's submission, Cox tried to save face against this incontrovertible evidence, claiming the "plain language" of the retransmission negotiation provision referenced by DISH supports Cox's position.[18] But the provision specifically **{{BEGIN HCI**

---

[15] *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 188 (S.D.N.Y. 2020).

[16] *See* Standard General Dec. 16, 2022 Letter.

[17] Letter from Michael D. Basile, Counsel for Cox, to Marlene Dortch, FCC, MB Docket No. 22-162 (Dec. 14, 2022) ("Cox Dec. 14, 2022 Letter").

[18] Cox Dec. 30, 2022 Letter at 1.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ **END HCI}}**[19] The TEGNA stations currently belong to TEGNA, and that is tantamount to negotiating retransmission consent for another company's stations. There is no basis to strike DISH's submission from the record.

The factual dispute arose when NewsGuild-CWA, relying on a press report, stated that Cox was engaging "in coordinated pricing behavior" by "link[ing] the calculation of a proposed CMG rate to rates that have been or may be negotiated by Standard General or TEGNA."[20] Cox denied this unequivocally, stating that it "has not sought and will never seek to negotiate retransmission consent for another company's stations."[21] To provide the Commission with information to resolve this dispute, DISH submitted the relevant portion of a term sheet that DISH received from Cox.[22] DISH believes that this document speaks for itself and thus did not further characterize it in the December 28 letter. But Cox has doubled down, resorting to a tortured construction to reconcile the facts with its hard-to-justify previous statement.[23]

The language proposed by Cox states in relevant part: **{{BEGIN HCI** ▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[19] DISH Dec. 28, 2022 Letter, Exhibit 1 at 3-4.

[20] Letter from Andrew Jay Schwartzman, Counsel for the NewsGuild-CWA, to Marlene Dortch, FCC, MB Docket No. 22-162, at 2 (Dec. 9. 2022).

[21] Cox Dec. 14, 2022 Letter.

[22] *See* DISH Dec. 28, 2022 Letter, Exhibit 1.

[23] *See* Cox Dec. 30, 2022 Letter at 2 ("The CMG November Proposal does not purport, in any manner whatsoever, to establish rates or terms for any station owned by TEGNA or any other company. It simply states, by its express and unequivocal terms, how stations currently owned by TEGNA that are proposed to be acquired by CMG would be treated upon such acquisition.").

{{BEGIN HCI ▮▮▮▮▮ END HCI}}[24]  The {{BEGIN HCI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ END HCI}}[25]

Cox dismisses this language as merely relating to stations that are "*proposed* to be acquired by CMG."[26]  But every retransmission contract sets rates for the future.  And this is not about some hypothetical future stations that Cox may acquire one day.  Unlike a standard after-acquired station clause, which lays out in general terms what will happen when a station changes ownership, Cox's proposal {{BEGIN HCI ▮▮▮▮▮▮▮▮▮ END HCI}}[27] Cox also downplays the fact that the stations that it plans to acquire from TEGNA—KVUE-TV, KHOU-TV, KMPX-TV and KTBU-TV—are *already subject to an asset purchase agreement*.[28]  The applicants' Public Interest Statement describes various purported public interest benefits of Cox acquiring the stations, with Cox already having plans "to identify other opportunities for local service improvements for the stations it will acquire."[29]  The Cox

---

[24] DISH Dec. 28, 2022 Letter, Exhibit 1 at 4.

[25] *Id.* at 3.

[26] Cox Dec. 30, 2022 Letter at 2 (emphasis added).

[27] DISH Dec. 28, 2022 Letter, Exhibit 1 at 4.

[28] *See* Teton Merger Corp. and CMG Media Corp., Amended and Restated Asset Purchase Agreement (Mar. 10, 2022); Teton Parent Corp. and CMG Farnsworth Television Operating Co., Asset Purchase Agreement (Feb. 22, 2022).  Cox is party to the merger agreement between TEGNA and Standard General.  Tegna Inc. et al., Agreement and Plan of Merger (Feb. 22, 2022).  That agreement, in turn, references various "Post-Closing Transfer Agreements" including the Asset Purchase Agreements.  *See id.* at Annex A.  All agreements available at https://www.fcc.gov/transaction/standard-general-tegna.

[29] Amended Comprehensive Exhibit, at 7 (Mar. 23, 2022); *see also* Applicants' Response to Request for Documents and Information, MB Docket No. 22-162, at 8 (June 13, 2022) ("[U]pon the closing of the Transaction following FCC approval, [CMG] will identify opportunities to invest in the creation of local content, including local news, and the infrastructure needed for innovative broadcasting for its eight acquired stations.").

term sheet therefore does not cover some hypothetical eventuality. If things went Cox's way, the Commission would immediately approve this transaction, and the rates proposed by Cox would immediately kick in. Cox's actions can therefore only be described as negotiating retransmission consent for another company's stations.

Cox's remaining arguments contradict themselves. Cox claims that DISH's submission "reveal[s] CMG's retransmission consent negotiating positions and strategies," but then dismisses the substance of that provision at issue as "commonplace" and "routine."[30] Further, Cox states that "placing such information in the record . . . threaten[s] to cause CMG significant commercial harm."[31] It does nothing of the sort. The exhibit to DISH's letter was submitted under a Highly Confidential designation pursuant to the Protective Order in this proceeding. This means, of course, that no one involved in "Competitive Decision-Making" can view the document.[32] DISH also submitted the exhibit in heavily redacted form, even in the Highly Confidential version, leaving only the relevant portion visible. Cox does not explain how commercial harm can befall it given these protections.

Cox is inconvenienced by evidence that casts serious doubt on the accuracy of its representations to the Commission. But Cox's displeasure does not approach the heavy burden that it must bear to plausibly request that the evidence be struck from the record.[33] The Commission should not entertain this request.

---

[30] Cox Dec. 30, 2022 Letter at 2, 2 n.2, and 3.

[31] *Id.* at 3.

[32] *See Applications of TEGNA, Inc. and Standard General, L.P. and SCGI Holdings III, LLC*, MB Docket No. 22-162, Protective Order, DA 22-604 (June 3, 2022).

[33] *See Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Order, 32 FCC Rcd. 5569, 5570 n.6 (2017) ("The Commission is able to evaluate the extent to which

11

EXHIBIT 9 - Page 011

**REDACTED – FOR PUBLIC INSPECTION**

\* \* \*

Conditions must be put in place to ensure that TEGNA and Cox cannot impose an existing retransmission consent agreement on newly-acquired stations that are subject to an agreement already in force.

|  | /s/ |
|---|---|
| Jeff Blum, Executive Vice President, External & Legislative Affairs <br> Hadass Kogan, Director & Senior Counsel <br> **DISH NETWORK CORPORATION** <br> 1110 Vermont Avenue, N.W., Suite 450 <br> Washington, D.C.  20005 <br> (202) 463-3702 | Pantelis Michalopoulos <br> Andrew Golodny <br> Alicia Loh <br> **STEPTOE & JOHNSON LLP** <br> 1330 Connecticut Avenue, N.W. <br> Washington, D.C.  20036 <br> (202) 429-3000 |
|  | *Counsel for DISH Network Corporation* |

January 13, 2023

---

arguments submitted into the record are sufficiently supported and credible for purposes of decisional reliance, and therefore it need not strike the claims at issue from the record.").