# Exhibit 14

**Case No. 24-1204**

No. 23-<u>1084</u>

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

IN RE SGCI HOLDINGS III LLC, TEGNA INC.,
AND CMG MEDIA CORPORATION, PETITIONERS

———————————

## CONDITIONAL PETITION FOR A WRIT OF MANDAMUS TO
## THE FEDERAL COMMUNICATIONS COMMISSION

———————————

Kevin F. King
Jennifer A. Johnson
Jocelyn G. Jezierny
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
(202) 662-6000

*Counsel for Petitioner*
*TEGNA Inc.*


David E. Mills
Michael D. Basile
Henry H. Wendel
COOLEY LLP
1299 Pennsylvania Avenue,
N.W. Suite 700
Washington, D.C.  20004
(202) 842-7800

*Counsel for Petitioner*
*CMG Media Corporation*

Miguel A. Estrada
   *Counsel of Record*
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Scott R. Flick
Jessica T. Nyman
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C.  20036
(202) 663-8000

*Counsel for Petitioner*
*SGCI Holdings III LLC*

Exhibit 14 - Page 001

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), petitioners certify as follows:

### A.    Parties

**Petitioners:**  SGCI Holdings III LLC; TEGNA Inc.; CMG Media Corporation

**Respondent:**  Federal Communications Commission

**Other Parties Before Agency:**  The NewsGuild-CWA; National Association of Broadcast Employees and Technicians-CWA; Common Cause; United Church of Christ, OC Inc.

### B.    Rulings Under Review

This is an original action challenging the Commission's unreasonable delay in ruling on petitioners' applications to transfer broadcast licenses and its order that they participate in an illegal proceeding that, if allowed to continue, effectively denies the applications without any merits inquiry.  Hearing Designation Order, *Consent to Transfer Control of Certain Subsidiaries of TEGNA, Inc. to SGCI Holdings III LLC*, MB Docket No. 22-162, DA 23-149 (FCC Feb. 24, 2023).  Petitioners seek a

i

Exhibit 14 - Page 002

writ of mandamus compelling the Commission to rule on those applications by April 28, 2023.

## C.    Related Cases

This case is related to the appeal in *SGCI Holdings III LLC* v. *FCC*, No. 23-___ (D.C. Cir. filed Mar. 27, 2023), commenced concurrently with this mandamus petition.

ii

Exhibit 14 - Page 003

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, appellants disclose the following corporate parents:

SGCI Holdings III LLC is a Delaware limited-liability company that serves as an investment vehicle.[1] Soohyung Kim is the sole managing member of SGCI Holdings III LLC. Standard General Master Fund II L.P., a Cayman Islands limited partnership, owns 20.4% of the equity of SGCI Holdings III LLC. Standard General Master Fund II L.P. is wholly controlled by Standard General L.P., a Delaware limited partnership. Standard General L.P. is wholly controlled by Standard General Holdings L.P., a Delaware limited-liability company, which is in turn wholly controlled by Standard General S. Corp., a Delaware corporation. Standard General S. Corp. is wholly controlled by Acme Amalgamated Holdings LLC, a Delaware limited-liability company. No corporation owns more than 10% of Acme Amalgamated Holdings LLC. SGCI Holdings LLC, a Delaware limited-liability company, owns 23.90% of the eq-

---

[1] This certificate represents the ownership status of SGCI Holdings III LLC as it currently stands. It therefore deviates from the ownership structure described in the applications to the Commission, which show the company's post-closing owners.

Exhibit 14 - Page 004

uity of SGCI Holdings III LLC.  SGCI Holdings LLC, is wholly controlled by Standard General L.P.  EPSG Master SPC Ltd., a Cayman Islands limited corporation, owns 39.1% of the equity of SGCI Holdings III LLC. EPSG Master SPC Ltd. is wholly controlled by EPSG SPC Ltd., a Cayman Islands limited corporation.  EPSG SPC Ltd. is wholly controlled by Standard General L.P.  No other corporation owns more than 10% of the equity of SGCI Holdings III LLC.

TEGNA Inc. is a publicly traded Delaware corporation that provides media services.  The Vanguard Group owns 10.52% of the stock of TEGNA Inc.  BlackRock, Inc. owns 12.2% of the stock of TEGNA Inc.  No other corporation owns more than 10% of the stock of TEGNA Inc.

CMG Media Corporation is a Delaware corporation that provides media services.  CMG Media Corporation is wholly owned by CMG Media Holdings II, Inc., a Delaware corporation.  CMG Media Holdings II, Inc., in turn, is wholly owned by CMG Holdings, Inc., a Delaware corporation. AP IX Titan Holdings, L.P., a Delaware limited partnership, owns 71% of CMG Holdings, Inc.  AP IX Titan Holdings, L.P. is owned by funds managed by affiliates of Apollo Global Management, Inc. (AGM) and ultimately is controlled by AP IX (PMC) VoteCo, LLC (VoteCo), a Delaware

iv

Exhibit 14 - Page 005

limited liability company.  AGM's common shares are publicly traded on the New York Stock Exchange (NYSE: APO).  Neither VoteCo nor AGM have any parent companies, and no corporation owns more than 10% of either VoteCo or AGM.  Cox Enterprises, Inc., a Delaware corporation, owns 19.8% of CMG Holdings, Inc.  No publicly traded company owns more than 10% of the stock of Cox Enterprises, Inc.  No other corporation owns more than 10% of CMG Holdings, Inc.

Exhibit 14 - Page 006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. vii

GLOSSARY OF ACRONYMS ............................................................. xi

INTRODUCTION ............................................................................... 1

RELIEF SOUGHT ............................................................................. 6

STATEMENT OF JURISDICTION ..................................................... 6

ISSUE PRESENTED ......................................................................... 7

STATEMENT OF THE CASE ............................................................ 7

    A.    The Transaction ..................................................................... 7

    B.    Procedural History ................................................................. 8

ARGUMENT ................................................................................... 18

    I.    The Commission Has Violated Its Clear Legal Duty To Act On The Broadcasters' License-Transfer Applications And Ordered An Unlawful Hearing That Effectively Denies The Applications ........................... 21

    II.    The Commission Has Unreasonably Delayed Action .......... 31

    III.    The Broadcasters Have No Adequate Alternative Remedy ................................................................................. 39

CONCLUSION ................................................................................ 42

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Exhibit 14 - Page 007

# TABLE OF AUTHORITIES

Page(s)

CASES

*Air Line Pilots Ass'n* v. *Civil Aeronautics Board*,
　　750 F.2d 81 (D.C. Cir. 1984).....................................................33

*In re American Rivers & Idaho Rivers United*,
　　372 F.3d 413 (D.C. Cir. 2004).....................................5, 20, 32

*Bilingual Bicultural Coalition on Mass Media, Inc.* v. *FCC*,
　　595 F.2d 621 (D.C. Cir. 1978).....................................................27

*In re Center for Biological Diversity*,
　　53 F.4th 665 (D.C. Cir. 2022) .............................................20, 39

*Citizens for Jazz on WRVR, Inc.* v. *FCC*,
　　775 F.2d 392 (D.C. Cir. 1985).....................................................29

*In re Core Communications, Inc.*,
　　531 F.3d 849 (D.C. Cir. 2008).....................................................40

*FCC* v. *Fox Television Stations, Inc.*,
　　556 U.S. 502 (2009).....................................................................28

* *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*,
　　561 U.S. 477 (2010).....................................................24, 25, 26

*Jarkesy* v. *SEC*,
　　34 F.4th 446 (5th Cir. 2022) .......................................................26

*Lucia* v. *SEC*,
　　138 S. Ct. 2044 (2018)................................................................25

*Myers* v. *United States*,
　　272 U.S. 52 (1926).......................................................................24

*Authorities upon which we chiefly rely are marked with asterisks.*

vii

Exhibit 14 - Page 008

*Oil, Chemical & Atomic Workers Int'l Union* v. *Zegeer*,
768 F.2d 1480 (D.C. Cir. 1985) ........................................................... 35

*Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973) ........................................................................... 37

\* *In re Public Employees for Environmental Responsibility*,
957 F.3d 267 (D.C. Cir. 2020) .................................................. 22, 34, 36

*Sinclair Broadcasting Group, Inc.* v. *FCC*,
284 F.3d 148 (D.C. Cir. 2002) ............................................................ 36

*Stone* v. *FCC*,
466 F.2d 316 (D.C. Cir. 1972) ............................................................ 29

\* *Telecommunications Research & Action Center* v. *FCC*,
750 F.2d 70 (D.C. Cir. 1984) .................................................. 6, 20, 21, 33

*United States* v. *FCC*,
652 F.2d 72 (D.C. Cir. 1980) .............................................................. 38

*West Virginia* v. *EPA*,
142 S. Ct. 2587 (2022) ....................................................................... 28

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Art. II, § 1, Cl. 1 ............................................................... 24

U.S. Const. Art. II, § 3 ....................................................................... 24

**STATUTES**

5 U.S.C. § 706 .................................................................................. 20

5 U.S.C. § 1202 ................................................................................ 26

5 U.S.C. § 3105 ................................................................................ 25

5 U.S.C. § 7521 ................................................................................ 26

15 U.S.C. § 18a .................................................................................. 9

28 U.S.C. § 1651 ............................................................................. 6, 20

Exhibit 14 - Page 009

47 U.S.C. § 151 .................................................................. 2

47 U.S.C. § 154 ................................................................ 26

47 U.S.C. § 307 ................................................................ 35

47 U.S.C. § 309 ........................................ 9, 10, 22, 27, 28, 29, 35

47 U.S.C. § 310 .................................................... 9, 22, 27

47 U.S.C. § 402 .............................................. 5, 6, 17, 21

## REGULATIONS

5 C.F.R. § 1201.137 .......................................................... 26

47 C.F.R. § 0.61 ................................................................ 2

47 C.F.R. § 0.341 ............................................................. 25

47 C.F.R. § 1.46 ............................................................... 34

47 C.F.R. § 1.115 .................................................. 16, 17, 39

47 C.F.R. § 1.117 ............................................................. 17

## ADMINISTRATIVE PROCEEDINGS

*Hicks Broadcasting of Indiana,*
   13 FCC Rcd 10662 (1998) ................................................. 16

*Patrick Sullivan,*
   29 FCC Rcd 5421 (2014) ................................................... 16

*Petroleum V. Nasby Corp.,*
   8 FCC Rcd 4035 (1993) .................................................... 16

*Tribune Media Co.,*
   2019 WL 4440126 (F.C.C. Sept. 16, 2019) ............................. 28

*Univision Holdings, Inc.,*
   7 FCC Rcd 6672 (1992) .................................................... 28

Exhibit 14 - Page 010

*Voice in the Wilderness Broadcasting, Inc.*,
   17 FCC Rcd 17061 (2002) ................................................................ 16

**OTHER AUTHORITIES**

FCC, *Informal Timeline for Consideration of Applications for Transfers
   or Assignments of Licenses or Authorizations Relating to Complex
   Mergers*, bit.ly/3FcxUMe (last visited Mar. 27, 2023) ........ 2, 10, 34, 35

Jon Schleuss, *Thank FCC Chair Rosenworcel for Saving Local News*,
   Newsweek (Mar. 17, 2023), http://bit.ly/3JDFktH ............................ 15

Sablea Ojea, *Tegna Shares Plunge 25% as FCC Seeks Hearing on
   Standard General Deal*, Dow Jones Newswires (Feb. 24, 2023),
   http://bit.ly/3lIYm9P .......................................................................... 15

Standard General and TEGNA Facts, *Supporters*, https://bit.ly/3mI3Lyl
   (last visited Mar. 27, 2023)................................................................. 8

x

Exhibit 14 - Page 011

## GLOSSARY OF ACRONYMS

Administrative Law Judge.......................................................................ALJ

Federal Communications Commission ................................................ FCC

*Public Employees for Environmental Responsibility* .......................*PEER*

Securities and Exchange Commission....................................................SEC

*Telecommunications Research & Action Center* ...............................*TRAC*

xi

Exhibit 14 - Page 012

# INTRODUCTION

At the heart of administrative law is a basic bargain. Agencies get the first crack at matters entrusted to them by Congress. But agencies must decide such matters, and offer their rationales, in the open—so that (among other reasons) federal courts, tasked with authoritatively interpreting federal laws, can conduct meaningful review.

The Federal Communications Commission (Commission or FCC) has defaulted on those obligations here. Petitioners SGCI Holdings III LLC (Standard General), TEGNA Inc., and CMG Media Corporation (collectively, broadcasters) presented the Commission in March 2022 with applications to approve station-license transfers needed to effectuate Standard General's acquisition of TEGNA and its 61 television and two radio broadcast stations. That transaction will increase investment in local news and reduce market concentration. It will also enhance diversity in broadcasting by tripling the number of minority-owned TV stations in the United States and increasing the number of Asian American–owned Top-4 stations in the 50 largest U.S. markets from zero to 27.

1

Exhibit 14 - Page 013

The Communications Act, 47 U.S.C. § 151 *et seq.*, requires the FCC to make a decision on whether to approve the proposed license transfers. And it has had more than ample time to do so. The Commission's policy is to try to resolve license-transfer applications in 180 days, and comparable transactions have been resolved in 62 to 182 days. FCC, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to Complex Mergers*, bit.ly/3FcxUMe (last visited Mar. 27, 2023); Add. 1038. The broadcasters brought the matter to the Commission *14 months* before the financing commitments underlying the transaction run out on May 22, 2023. Their applications made clear that the transaction must close before that date. The license-transfer issues presented, moreover, were quite straightforward. The deal does not require any divestitures or regulatory waivers and complies with all FCC rules and policies. And the rest of the Executive Branch has not objected to the transaction.

The Commission has delegated authority over matters such as this to its Media Bureau. 47 C.F.R. § 0.61(a). Yet after an uncommonly protracted process of public input and discovery, the Media Bureau announced last month that it was setting the matter for hearing, a process

2

Exhibit 14 - Page 014

that has historically consumed years. The FCC has not responded to the broadcasters' urgent pleas to intervene. Rather, it has allowed a bureau chief—who simultaneously serves on the Chairwoman's personal staff—to prevent the full Commission from having its say.

The net effect is that the Commission is now poised to kill a highly beneficial broadcast-market transaction without formally ordering the deal's demise. Critically, that course will frustrate judicial scrutiny of the unstated reasons that have driven the FCC's never-explained opposition. If the transaction is scuttled by the FCC's failure to act, as it well knows, the theoretical availability of back-end judicial review will be a mirage.

Worse still, the procedural device the Commission has used is itself unlawful several times over. The Media Bureau ordered, and the Commission (through inaction on prompt requests for intervention) has chosen to permit, a hearing before an ALJ to resolve purported disputes on two issues: the transaction's potential effects on retransmission fees that cable and satellite carriers pay for broadcast content and hypothetical consequences for local broadcast stations' staffing. But that hearing would lack all of the essential ingredients of a lawful proceeding: the

3

Exhibit 14 - Page 015

adjudicator assigned to oversee it cannot lawfully do so, because the Commission's ALJ is unconstitutionally insulated by *three* layers of for-cause removal restrictions; the issues set for hearing lie outside the agency's statutory authority, as the agency itself has historically recognized; and no material factual disputes on those issues exist that a hearing could resolve.

Moreover, whatever putative factual disputes might once have existed have been mooted by the good-faith efforts of Standard General to resolve lingering concerns with voluntary, binding commitments. Standard General irrevocably waived its right to rely on the contractual provisions that give rise to the agency's concerns about retransmission fees. And Standard General committed to avoiding journalism or newsroom layoffs at stations for two years—a far-reaching commitment in an unpredictable and volatile economic climate. Yet the Commission refused to take yes for an answer and instead set the matter for hearing.

The Commission is entitled—indeed, statutorily obligated—to adjudicate license-transfer applications, subject to judicial review. But federal law does not permit a pocket veto. Whatever decision the FCC

Exhibit 14 - Page 016

reaches on the applications, the agency must own it. More importantly, it cannot obstruct the path for affected parties to seek judicial redress.

As set forth in the broadcasters' filings in the direct appeal they have commenced contemporaneously under 47 U.S.C. § 402(b), the appropriate course is to construe the agency's action setting the matter for a hearing it knows will outlive the transaction as a denial of the license-transfer applications and to reverse that decision on its merits.

If the Court concludes, however, that it cannot review that decision directly under Section 402(b), the alternative course is clear under this Court's precedent: the Court should grant a writ of mandamus to require the Commission to resolve the broadcasters' applications. As this Court has recognized, "the primary purpose of the writ in circumstances like these is to ensure that an agency does not thwart [the Court's] jurisdiction by withholding a reviewable decision." *In re American Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004). And to ensure that the problem is not repeated and that the agency does not attempt to frustrate judicial review of the merits through further delay, the Court should direct the Commission to render a decision by April 28, so that

5

Exhibit 14 - Page 017

any judicial review of its final action may be sought on an expedited basis before the May 22 deadline for the transaction to close.

It is regrettable that this significant but straightforward matter has assumed an emergency posture in this Court. The broadcasters brought it swiftly to the Commission more than a year ago, with more than ample time to complete all conceivably necessary steps. But because the Commission has chosen a path of unlawful inaction, this Court's intervention is urgently needed. The petition should be granted.

## RELIEF SOUGHT

The broadcasters respectfully request that, if the Court dismisses their concurrently filed appeal, the Court issue a writ of mandamus directing the Commission to reach a final decision on their applications by April 28, 2023, to ensure an opportunity to obtain judicial review of that decision before May 22, 2023, when financing essential to the transaction will expire.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this mandamus petition under 47 U.S.C. § 402(b) and the All Writs Act, 28 U.S.C. § 1651(a). *Telecom-*

6

Exhibit 14 - Page 018

*munications Research & Action Center* v. *FCC*, 750 F.2d 70, 75-76 (D.C.

Cir. 1984) (*TRAC*).

## ISSUE PRESENTED

Whether the Court should grant a writ of mandamus to compel the

Commission—which, despite knowing that the deadline to close the

transaction is May 22, 2023, has declined to decide the applications, and

has now diverted the matter to an unlawful and futile hearing—to resolve

the applications in time to facilitate judicial review of the Commission's

action before May 22.

## STATEMENT OF THE CASE

### A.    The Transaction

In February 2022, Standard General agreed to acquire broadcast

company TEGNA in an $8.6 billion transaction.  Add. 6.  The emerging

entity (New TEGNA) would be the largest minority-owned, female-led

broadcast television company in U.S. history—owning 61 full-power tel-

evision stations and two full-power radio stations.  Add. 141, 147.  The

deal would increase diversity while reducing concentration in broadcast

ownership:  after closing, New TEGNA will control less national market

share than existing TEGNA does today.  Add. 592.  And the transaction

Exhibit 14 - Page 019

will triple the number of minority-owned TV stations in the United States and increase the number of Asian American–owned Top-4 stations in the 50 largest U.S. markets from zero to 27.  Add. 373, 933.

The Standard General team has a proven record of and commitment to supporting local control of stations.  Standard General's sole managing member (Soo Kim) and New TEGNA's proposed CEO (Deborah McDermott) have each successfully owned and managed broadcast stations and have a strong history of enhancing stations' service to their local communities.  Add. 612-614.

The proposed transaction's announcement prompted a groundswell of support across the country praising the public benefits it would make possible and the Standard General team's experience.  Legislators and organizations spanning many sectors—civil rights, labor, broadcasting, media, and business—filed more than 50 comments in support.  Standard General and TEGNA Facts, *Supporters*, https://bit.ly/3mI3Lyl (last visited Mar. 27, 2023).

### B.    Procedural History

1.    The broadcasters have worked diligently with regulators to secure approval.  They did not need to secure any waivers under the Com-

8

Exhibit 14 - Page 020

mission's rules, and they did not need to divest any stations because the new entity—which will be *smaller* than TEGNA is today—is under the agency's cap on national television ownership and complies with the FCC's local-ownership limitations as well.  Add. 592.  The rest of the Executive Branch has already allowed the transaction to proceed.  The pre-merger waiting period required by the Hart-Scott-Rodino Act, 15 U.S.C. § 18a(a), (b)(1), expired without the Justice Department challenging the transaction in court.  And the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector has "no objection" to the deal.  Add. 817.

All that remains is the Commission's approval to transfer the corresponding broadcast licenses, which the broadcasters applied for an extraordinary 14 months before the deadline to close the deal.  47 U.S.C. § 310(d); Add. 138.  The Communications Act requires that the Commission "shall grant" a license-transfer application if the agency finds, following public notice and an opportunity to comment, that the transfer will serve "the public interest, convenience, and necessity."  47 U.S.C. § 309(a).

9

Exhibit 14 - Page 021

Third parties interested in the application may petition to deny it. 47 U.S.C. § 309(d).  A petition to deny must contain "specific allegations of fact sufficient to show," *inter alia*, that granting the application would be "prima facie inconsistent" with the public interest.  *Id.* § 309(d)(1). Those "specific allegations" must either be "supported by affidavit of a person or persons with personal knowledge" or suitable for official notice. *Ibid.*  If the Commission finds "that there are no substantial and material questions of fact and that a grant of the application would be consistent with" the public interest, it "shall" grant the application.  *Id.* § 309(d)(2). The Act directs the Commission to designate the matter for a hearing only if a "substantial and material question of fact" is shown or the Commission is otherwise "unable to find" that the transfer is in the public interest.  *Ibid.*; see *id.* § 309(e).

2.    For decades the Commission has committed to try to adjudicate license-transfer applications within 180 days.  FCC, *Informal Timeline*, *supra*.  But it made no pretense of keeping that commitment here.

The broadcasters filed their license-transfer applications with the Commission on March 10, 2022—two weeks after the transaction was announced.  Add. 138.  The applications include all applicable merger

10

Exhibit 14 - Page 022

and purchase agreements, securities term sheets, and 130 pages of exhibits thoroughly describing the transactions, their public-interest benefits, and their compliance with the Communications Act and FCC rules. Add. 138-311.

The Merger Agreement made clear that the final deadline for closing the transaction—after the broadcasters took all possible extensions—is May 22, 2023.  Add. 95.  Financing commitments can never be extended indefinitely, but the broadcasters secured more than enough runway to secure approval and close the transaction.  Today, however, in a markedly different interest-rate environment, those financing commitments cannot be replicated after they expire.  Moreover, if Standard General cannot close the transactions, it will face a $136 million termination fee. Add. 21, 98-99.

After six weeks of review, the Commission determined the applications were complete, accepted them for filing, and invited comments. Add. 312.  The agency also set out a pleading cycle for any third-party petitions to deny, which were initially due on May 23, 2022.  *Ibid.*

Two sets of challengers filed petitions to deny the applications, primarily on two grounds.  First, they contended that the transaction is

11

Exhibit 14 - Page 023

structured to increase retransmission fees—the fees that multichannel video-programming distributors (such as Xfinity or DirecTV) pay stations to retransmit their content. Add. 407-411, 497-502. The challengers' relied on provisions in the contracts between stations and distributors, known as after-acquired clauses, under which a broadcasting group may charge a distributor the same contractually specified fees for retransmitting content from *all* of its stations, even stations acquired after the contract took effect. *Ibid.* The challengers argued that Standard General could exploit after-acquired clauses to demand higher overall retransmission fees from distributors based on the rates charged by one of the stations it was acquiring and that distributors would in turn pass those increased costs on to consumers. *Ibid.* Additionally, several video distributors and affiliated trade groups filed comments suggesting that the Commission impose economic conditions favorable to their interests—but not opposing the deal. Add. 549-584.

Second, the challengers argued that Standard General intended to lay off staff at the stations it was acquiring. Add. 405-407, 496-497. Those hypothesized layoffs, the challengers contended, might diminish the quality of local news coverage. *Ibid.*

Exhibit 14 - Page 024

A flood of supportive comments argued that the deal would improve female and minority representation in media, increase investment in local news coverage, and improve working conditions for journalists. See *Supporters*, *supra*.

Despite the Commission's general commitment to resolving license-transfer matters in six months, its Media Bureau stretched the process to over a year and counting. The Bureau repeatedly acquiesced in requests by the challengers to extend the pleading-cycle deadlines. Add. 348, 663. And instead of a single public-comment period, the Bureau invited an unprecedented three rounds over eight months. Add. 314, 729, 838. In addition, in May 2022, the challengers sought wide-ranging discovery from the broadcasters, including information about advertising revenues, private contracts between the broadcasters and their stations, and proprietary strategy documents. Add. 324-339. The Commission granted part of that request in June and the remainder in September. Add. 351-356, 716-723.

As a result of this extensive process, the record contains detailed information about the broadcasters' commitment to their employees, investments in local news, contractual relationships with stations, and

13

Exhibit 14 - Page 025

business strategies for their operations following the transaction. *E.g.*, Add. 370-384, 730-753. Those materials dispel the challengers' speculative claims that the transaction will increase retransmission fees or reduced staff or coverage in newsrooms. See Add. 623-640.

Included in that record are two commitments that Standard General voluntarily undertook during the proceedings to address any conceivably realistic concerns regarding retransmission fees or staffing. First, Standard General irrevocably waived its right to enforce any after-acquired clauses that, by reason of the transaction, could have increased retransmission fees for the TEGNA stations. Add. 831. Second, Standard General pledged not to conduct any journalism or newsroom layoffs at the stations for at least two years. Add. 832-833. In fact, Standard General plans to increase station-level staffing, as part of its broader investment in increasing news content, and cabined its commitment solely to preserve its ability to respond to changing economic circumstances in the distant future. *Ibid.*

3.    Notwithstanding those proceedings, the comprehensive record, and Standard General's commitments, the Media Bureau determined—more than 11 months after the applications were filed—to order

Exhibit 14 - Page 026

still more administrative process.  On February 24—after an extraordinarily long review and just 88 days before the essential financing for the transaction is set to expire —the Bureau designated the applications for a hearing before an ALJ.  Add. 938-968 (Hearing Order).

The Hearing Order directed the ALJ to examine two issues: (1) whether the transaction's "structur[e] * * * is likely to trigger a rate increase harmful to consumers, as a result of" after-acquired clauses, and (2) whether the transaction "will reduce or impair localism, including whether [it] will result in labor reductions at local stations."  Add. 939. While agreeing with the challengers that the questions merited a hearing, the Media Bureau did not identify any facts supported by affidavits based on personal knowledge or subject to official notice.  The Bureau's order cited only the challengers' own allegations, which in turn relied on magazine articles and the challengers' interpretation of the record.  Add. 947-948 (citing Add. 408-410, 498-500, 549-552, 563, 754-755, 861), 952-953 (citing Add. 407, 725-727, 764-768, 770-772).

4.    The broadcasters, the challengers, and the market alike recognize that the Hearing Order would sound the death knell for the transaction.  Jon Schleuss, *Thank FCC Chair Rosenworcel for Saving Local*

15

Exhibit 14 - Page 027

*News*, Newsweek (Mar. 17, 2023), http://bit.ly/3JDFktH; Sablea Ojea, *Tegna Shares Plunge 25% as FCC Seeks Hearing on Standard General Deal*, Dow Jones Newswires (Feb. 24, 2023), http://bit.ly/3lIYm9P.  For the past 30 years, no broadcast license transfer or assignment application designated for hearing has completed the process in fewer than 358 days; the average such hearing takes 799 days.  See *Hicks Broadcasting of Indiana*, 13 FCC Rcd 10662 (1998) (358 days); *Petroleum V. Nasby Corp.*, 8 FCC Rcd 4035 (1993) (493 days); *Voice in the Wilderness Broadcasting, Inc.*, 17 FCC Rcd 17061 (2002) (512 days); *Patrick Sullivan*, 29 FCC Rcd 5421 (2014) (1,834 days).  The Bureau also bypassed a paper hearing which, though it would still have taken too long, would have accelerated the matter.

The broadcasters moved on March 3, 2023, for the ALJ to certify to the Commission their application for review of the Hearing Order.  Add. 969-994; 47 C.F.R. § 1.115(e)(1).  They argued that immediate Commission review was necessary to consider (1) whether Article II of the Constitution prevents the ALJ from conducting a hearing; (2) whether the Media Bureau had statutory authority to block the transaction on either basis it raised; and (3) whether the Media Bureau erred as a matter of

Exhibit 14 - Page 028

law in concluding that there was an adequate basis to order a hearing. Add. 972-973. The ALJ denied that motion on March 16. Add. 1039-1042.

The next day, the broadcasters applied for review of the Hearing Order with the Commission, raising similar arguments. Add. 1054-1090. The broadcasters asked the FCC to waive its general prohibition on interlocutory review in 47 C.F.R. § 1.115(e) and also urged it to take up the applications *sua sponte* under 47 C.F.R. § 1.117. Add. 1043-1044. They informed the FCC that they would seek review in this Court if it did not act by March 27. Add. 1044. As of the date of this filing, however, the Commission has taken no action on the application for review.

5.    The broadcasters noticed an appeal of the Hearing Order under 47 U.S.C. § 402(b) as an effective denial of the applications. *SGCI Holdings III LLC* v. *FCC*, No. 23-___. In the event this Court determines that the Hearing Order is not a final agency action, the broadcasters file this conditional petition for writ of mandamus seeking to compel the FCC to render a final, reviewable decision on the applications. In order to ensure that both the appeal and petition can be resolved in time for the transaction to close, the broadcasters are also moving to expedite consid-

17

Exhibit 14 - Page 029

eration of both the appeal and this petition and to consolidate the two actions.

## ARGUMENT

The Commission has denied the license-transfer applications in all but name.  For nearly a year, the agency refused to resolve the applications—instead acquiescing to challengers' demands for an unprecedented process entailing multiple pleading cycles and extensive discovery.  Then, having been provided no legal basis for further inquiry and having uncovered none, the Media Bureau nonetheless shunted the matter to a completely indefensible ALJ "hearing"—fully aware that any hearing will extend far beyond the deadline to close the transaction, effectively killing the deal while attempting to evade judicial review.

The "hearing" ordered by the Media Bureau combines multiple fundamental illegalities:  it will be presided over by an officer unconstitutionally insulated from removal; it purports to examine issues that are beyond the Commission's statutory authority to police; and it will adjudicate facts about those issues that the broadcasters *stipulated* in an effort to dispel any possible objection to the transaction.  And the Hearing Order directs the ALJ simply to report findings back to the Media Bu-

18

Exhibit 14 - Page 030

reau, which will then render a decision subject to Commission review. Compounding these problems, because the hearing could never occur before financing expires, the sole purpose for ordering it is to deny the applications without triggering judicial review.

The Commission has pointedly refused to intervene despite the broadcasters' urgent requests for immediate review, content to let the Hearing Order stand. Understood against the backdrop of the proceeding and the impending deadline to close the deal, the Hearing Order's import is unmistakable:  the Commission has chosen to kill the deal through calculated inaction on a procedural maneuver, acting through a bureau chief who simultaneously serves on the Chairwoman's personal staff. That is final agency action in every relevant sense.  That the agency did not formally memorialize its denial of the applications in a proper order does not make its action any less definitive.

If this Court concludes, however, that the Hearing Order is nevertheless not final, the proper course is clear under settled precedent:  this Court should issue a writ of mandamus to the Commission directing it to terminate the unlawful proceeding ordered by the Media Bureau and to adjudicate the applications in time to allow judicial review by May 22.

19

Exhibit 14 - Page 031

The All Writs Act, 28 U.S.C. § 1651, expressly empowers the Court to "issue all writs necessary or appropriate in aid of" its "jurisdiction[ ]." *Ibid.* If the Hearing Order is not final, a writ of mandamus is needed here to "protect" this Court's "future jurisdiction" to review agency action; its review would otherwise be frustrated by "an agency that fails to resolve disputes." *TRAC*, 750 F.2d at 76. "Indeed, the primary purpose of the writ in circumstances like these is to ensure that an agency does not thwart [the Court's] jurisdiction by withholding a reviewable decision." *American Rivers*, 372 F.3d at 419. The APA underscores the Court's authority and duty to grant relief, providing that a court "shall * * * compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

The Court has held that a writ of mandamus should issue where (1) the agency's delay violates a clear legal duty, (2) the delay is "so egregious" as to be unreasonable, and (3) the petitioner has no adequate alternative remedy. *In re Center for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022) (citation omitted). Each of those elements is readily established here.

20

Exhibit 14 - Page 032

The Communications Act by its terms obligates the Commission to grant or deny each license-transfer application it receives. If the Hearing Order does not constitute a denial, then the Commission has indisputably defaulted on its duty to adjudicate the applications.

The Commission's delay in acting is also egregious. After dragging its feet for nearly a year in full view of the known time constraints, the agency has tacked on a legally unwarranted procedural detour that it knows (absent judicial intervention) will end the deal. That delay operates to kill the deal free from judicial scrutiny. The Commission's conduct is the epitome of "impropriety lurking behind agency lassitude." *TRAC*, 750 F.2d at 80 (citation omitted).

Finally, if the broadcasters' direct appeal under 47 U.S.C. § 402(b) cannot go forward, they necessarily have no adequate remedy at law, or indeed any other remedy. In that event, it is mandamus or nothing.

## I. The Commission Has Violated Its Clear Legal Duty To Act On The Broadcasters' License-Transfer Applications And Ordered An Unlawful Hearing That Effectively Denies The Applications

A. The Communications Act gives the Commission a legal duty to act on the broadcaster's license-transfer applications. An application to transfer a station license "*shall* be disposed of" by the Commission "as

21

Exhibit 14 - Page 033

if the proposed transferee" were applying for a new license.  47 U.S.C. § 310(d) (emphasis added).  For new applicants, the Commission, upon the filing of an application, "*shall* determine  * * *  whether the public interest, convenience, and necessity will be served by the granting of such application"—and, if so, the Commission "*shall* grant such application." *Id.* § 309(a) (emphases added).  And where, as here, the Commission receives a petition to deny the application, if the Commission finds that the petition and accompanying submission do not establish "substantial material questions of fact and that a grant would be consistent with" the public interest, then the Commission "*shall*" grant the applications.  *Id.* § 309(d)(2) (emphasis added).

Congress's repeated use of mandatory language in those provisions makes the Commission's legal duty indisputable.  The FCC must consider and decide every license-transfer application it receives.  See *In re Public Employees for Environmental Responsibility*, 957 F.3d 267, 273 (D.C. Cir. 2020) (*PEER*) (agency "may not ignore this clear command" where statute provided that it "shall" perform action).  Ignoring an application is not an option.

22

Exhibit 14 - Page 034

B.    As explained above and in the broadcasters' direct-appeal filings, the best view of the record is that the Commission has denied the applications already by allowing its Media Bureau to route the matter through a further procedural morass.  The Commission declined to overturn or even timely review the Hearing Order, knowing that delay beyond the deadline is the deal's death knell.  But if the Court holds that the order is not final, then the Commission will necessarily have failed to fulfill its legal duty to decide the applications.

The Commission's only conceivable defense is that it is *still* carrying out its duty to adjudicate the applications by allowing the ALJ hearing ordained by the Media Bureau to go forward.  That defense runs aground for the same basic reason:  the Commission knows that the hearing cannot be completed before the critical financing expires.  The fastest license-transfer hearing in the past 30 years took a year, and on average the hearings take 799 days.  See p. 16, *supra*.  The FCC's Enforcement Bureau acknowledged before the ALJ that it would be "impossible" to resolve the applications by May 22.  Add. 1034.  Undertaking—at the last moment, and after an extraordinary delay—a procedure that the agency

23

Exhibit 14 - Page 035

has conceded cannot be completed in time to be relevant hardly satisfies the Commission's nondiscretionary duty to act.

But even setting aside issues of timing, the Commission cannot contend that the ALJ hearing is a permissible (let alone necessary) part of its adjudication of the applications, for three independent reasons. First, the federal officer slated to preside and render the initial decision is unconstitutionally insulated from removal. Second, the issues designated for the hearing lie outside the Commission's authority. And third, no substantial question regarding any material fact has been established.

1.    The Hearing Order is unlawful out of the gate because it assigns responsibility for holding the hearing to a federal officer who is impermissibly protected from Executive control. Article II of the Constitution "vests '[t]he executive Power * * * in a President of the United States of America,' who must 'take Care that the Laws be faithfully executed.'" *Free Enterprise Fund* v. *Public Company Accounting Oversight Board*, 561 U.S. 477, 483 (2010) (quoting U.S. Const. Art. II, § 1, Cl. 1, § 3). The President has the power to hold Executive officers accountable by (among other things) "removing them from office, if necessary." *Id.*; see *Myers* v. *United States*, 272 U.S. 52, 117 (1926).

24

Exhibit 14 - Page 036

The Supreme Court has made clear that, when two layers of for-cause removal protection stand between the President and an inferior officer, the President can no longer "oversee" the officer or "attribute the [officer's] failings to those whom he can oversee." *Free Enterprise Fund*, 561 U.S. at 496 (emphasis omitted). That structure, the Court held, is "incompatible with the Constitution's separation of powers." *Id.* at 498. *A fortiori*, an inferior officer shielded by *three* layers of for-cause removal restrictions is impermissibly beyond the President's control.

That is precisely the position of the ALJ, whom the Commission charged to conduct the hearing in this matter. The ALJ is an inferior officer (not an employee) under the Supreme Court's decision in *Lucia* v. *SEC*, 138 S. Ct. 2044 (2018), which addressed closely analogous ALJs of the Securities and Exchange Commission (SEC). Like those officers, the FCC's ALJ holds a "continuing office established by law" and "exercise[s] significant discretion" in carrying out her "authority * * * to ensure fair and orderly adversarial hearings." *Id.* at 2052-2053 (citation omitted); see 5 U.S.C. § 3105; 47 C.F.R. § 0.341.

The Commission's ALJ is also subject to three levels of for-cause removal restrictions:

25

Exhibit 14 - Page 037

- The Commission may remove the ALJ only if the Merit System Protection Board first finds good cause to do so. 5 U.S.C. § 7521(a); 5 C.F.R. § 1201.137.

- Members of that Board, in turn, "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

- And the FCC Commissioners serve statutorily fixed terms, 47 U.S.C. § 154(c)(1), and thus under Supreme Court precedent are presumed to be removable only for cause, see *Free Enterprise Fund*, 561 U.S. at 487.

To remove an ALJ over the objection of incumbent subordinates, the President thus must overcome three layers of for-cause removal protection.

Those three levels embed the ALJ "within a Matryoshka doll of tenure protections," wholly insulated from presidential oversight in violation of Article II. *Free Enterprise Fund*, 561 U.S. at 497. As the Fifth Circuit recently recognized in invalidating a materially indistinguishable triple-for-cause-removal regime for SEC ALJs, the Supreme Court's decision in *Free Enterprise Fund* forecloses the even greater insulation that Congress has purported to give this officer. *Jarkesy* v. *SEC*, 34 F.4th 446, 464 (5th Cir. 2022), petition for cert. pending, No. 22-859 (filed Mar. 8, 2023). The broadcasters cannot lawfully be made to appear before, and have their applications adjudicated in the first instance by, an inferior

26

Exhibit 14 - Page 038

officer whom the President is unconstitutionally prohibited from supervising.

2.     The Hearing Order is independently unlawful because the Commission lacks *statutory* authority to block a transaction on either of the grounds the hearing is slated to assess:  supposedly increased retransmission fees and decreased station-level employment.  The Commission cannot fulfill its duty to decide the broadcasters' applications by setting for a hearing matters it lacks power to address.

The Communications Act charges the Commission with evaluating whether proposed license transfers will "serv[e]" the "public interest."  47 U.S.C. § 309(a); see *id.* § 310(d).  That directive does not give the Commission its own "broad license to promote the general public welfare"; Congress obligated the agency to pursue "the purposes of the regulatory legislation."  *Bilingual Bicultural Coalition on Mass Media, Inc.* v. *FCC*, 595 F.2d 621, 628 (D.C. Cir. 1978) (en banc) (citation omitted).  Nothing in the statute suggests that the agency can or should intervene in arm's-length private contracts or employment practices.  Indeed, this Court has held that the Communications Act prohibits the Commission from considering nondiscriminatory employment practices.  *Id.* at 628.

27

Exhibit 14 - Page 039

In fact, the Commission has (until now) *disclaimed* power to regulate retransmission consent rates and nondiscriminatory hiring practices, recognizing that neither is an appropriate "public interest" consideration in reviewing an application. *Tribune Media Co.*, 2019 WL 4440126, at \*5 (F.C.C. Sept. 16, 2019); *Univision Holdings, Inc.*, 7 FCC Rcd 6672, 6683 n.45 (1992). That "want of assertion of power by those who presumably would be alert to exercise it" is "significant in determining whether such power was actually conferred." *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2610 (2022) (citation omitted). And if the Commission (not the Media Bureau) wanted to change that position, it would need to do so avowedly while addressing reliance interests engendered by the old policy. See *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

3.    Finally, the Hearing Order further contravenes the Communications Act—and the hearing it directs cannot be deemed to fulfill the Commission's duty to rule on applications—because no evidence was tendered by parties challenging the transaction that could satisfy the statutory threshold to trigger a hearing.

Section 309(d) of the Act makes clear that a hearing is warranted where the challenging party's petition to deny sets forth "specific allega-

28

Exhibit 14 - Page 040

tions of fact" showing that granting the application "would be prima facie inconsistent with" the public interest.  47 U.S.C. § 309(d)(1).  Those allegations must either be "supported by affidavit" by witnesses with "personal knowledge" or concern a proper subject of "official notice."  *Ibid.* And the challengers' allegations and any supporting evidence still do not warrant a hearing unless they establish a "substantial" question of "material" fact.  *Id.* § 309(d)(2); see *Citizens for Jazz on WRVR, Inc.* v. *FCC*, 775 F.2d 392, 394-95 (D.C. Cir. 1985).  If a petition to deny contains only "ultimate, conclusionary" facts or makes "general allegations on information and belief, supported by general affidavits," then no hearing is justified.  *Stone* v. *FCC*, 466 F.2d 316, 322 (D.C. Cir. 1972) (citation omitted).

No colorable basis exists to conduct a hearing because the challengers categorically failed to meet their burden of going forward.  None of the items the Media Bureau identified comes close to establishing a substantial dispute of a material fact based on sworn affidavits or officially noticeable facts.  Each of the documents the Bureau cited as evidence that the transaction would "increase retransmission consent fees," Add. 947, either provided no supporting evidence at all, addressed issues irrel-

Exhibit 14 - Page 041

evant to the broadcasters' intent in agreeing to the transaction, relied on unsworn documents, or expressed concern only that higher fees *might* result from the transaction. Add. 947-948 (citing Add. 408-410, 498-500, 549-552, 563, 754-755, 861). Likewise, none of the sources the Bureau cited as proof that Standard General intends to "reduce local jobs" after the transaction closes points to a single statement supported by an affidavit and personal knowledge. Add. 952-953 (citing Add. 407, 725-727, 764-768, 770-772).

In any event, binding commitments that Standard General has made fully address both issues that the agency invoked to justify setting the matter for hearing. Standard General has irrevocably waived its right to enforce any after-acquired clauses that could have increased retransmission fees for the stations it acquires. Add. 831. And Standard General has made a binding commitment not to conduct any newsroom staffing reductions at TEGNA stations for at least two years after the transactions. Add. 832-833. No record evidence casts any doubt on either commitment. And if the Commission had lingering concerns, it could have approved the transactions while making fulfillment of those self-imposed obligations conditions of approval. The hearing that the Media

30

Exhibit 14 - Page 042

Bureau ordered is thus a procedural solution in search of any problem cognizable under the Communications Act.

*****

The ALJ hearing prescribed by the Hearing Order is legally deficient at every turn: the assigned officer cannot constitutionally preside, the issues set for hearing are not within the agency's authority, and the challengers' threadbare submissions fail as a matter of law to create any legally relevant factual dispute requiring a hearing. The Commission cannot contend that it is complying with its statutory duty to adjudicate the applications by conducting the hearing. That ruse avoids a formal decision on the merits.

## II.    The Commission Has Unreasonably Delayed Action

It follows that, if the Commission has not already effectively denied the applications, its delay in acting is unreasonable and egregious. Although the broadcasters sought the agency's approval with more than ample time for the ordinary process to run its course, their submission also apprised the Commission of the outer temporal limits for consummating the transaction. Add. 95 (transaction document establishing May 22, 2023, as final extension date). And as economic conditions have radically

31

Exhibit 14 - Page 043

changed, the financing underlying the transaction cannot be replicated today. Yet in the face of those time constraints, the Commission's Media Bureau adopted an unprecedented and elongated process with three rounds of public input and extensive discovery. See p. 13, *supra*. And then, after nearly a year—and with the drop-dead deadline to complete the transaction less than three months away—the agency relegated the matter to the administrative backwater of an ALJ hearing. For the past 30 years, it appears that no hearing on a petition to deny has ever concluded in fewer than 300 days, and they typically span more than *two years*. See p. 16, *supra*.

The Commission's knowing acquiescence in this course can be explained only as its acceptance of the outcome the Hearing Order dictated: preventing the transaction. Its attempt to achieve that result while frustrating the broadcasters' right to judicial review on the merits is per se unreasonable. The paradigmatic purpose of mandamus in this context is to ensure that agencies do not frustrate reviewing courts' jurisdiction "by withholding a reviewable decision." *American Rivers*, 372 F.3d at 419. Unless this Court compels the Commission to decide the license-transfer applications in time to seek judicial review of the merits, the Commis-

32

Exhibit 14 - Page 044

sion's inaction and procedural posturing will ultimately oust this Court of jurisdiction to review the substance of what the Commission will have accomplished. Agency foot-dragging that lacks any rational explanation *other* than insulating the agency's determinations from judicial review necessarily constitutes unreasonable, egregious delay.

The factors this Court identified in *TRAC* to guide its assessment of the unreasonableness of agency delays reinforce that conclusion. *TRAC* identified six nonexclusive considerations: (1) evaluating the length of the delay through a "rule of reason"; (2) any statutory deadline or "other indication" of the intended pace; (3) the nature of the agency's action; (4) collateral effects on other agency priorities; (5) the "nature and extent of the interests prejudiced by delay"; and (6) although unnecessary for unreasonable delay, any "impropriety lurking behind agency lassitude." *TRAC,* 750 F.2d at 80 (citations omitted). All six factors support mandamus here.

**Rule of Reason.** Whether a delay is unreasonable is "closely tied to the particular facts of the case," *Air Line Pilots Ass'n* v. *Civil Aeronautics Board*, 750 F.2d 81, 86 (D.C. Cir. 1984), though generally a "reasonable time for agency action is typically counted in weeks or months,

33

Exhibit 14 - Page 045

not years," *PEER*, 957 F.3d at 274 (citation omitted).  The Commission's delay here is unreasonable given the nature and time frame of the transfer applications and underlying transaction.

The broadcasters took pains to give the Commission ample time to adjudicate the matter.  The Commission's decades-old policy is to resolve such matters if possible within six months.  FCC, *Informal Timeline*, *supra*.  The broadcasters filed their applications *14* months before the deadline for the transaction.  Add. 138.  From the outset, the Commission has known of that constraint.  Add. 97.

The agency has protracted the proceeding at every turn without justification.  It afforded the challengers multiple extensions on pleading-cycle deadlines, notwithstanding the Commission's rules, which strongly disfavor extensions.  47 C.F.R. § 1.46(a).  The Bureau also authorized an unprecedented three separate comment periods stretched over eight months, and it sat on the challengers' broad discovery requests for five months before granting them.  Finally, the Bureau (with the Commission's tacit assent) has now directed further delay in the form of an unlawful and unnecessary hearing—which in historical practice has invariably consumed at least 300 additional days.  Under any recognizable

34

Exhibit 14 - Page 046

version of the rule of reason, those delays are irrational, unless their aim was to kill the deal by deliberate indifference.

*Legally Applicable Deadlines.* Congress has provided multiple indications that it expects the Commission to conclude its review promptly, within months. See *Oil, Chemical & Atomic Workers Int'l Union* v. *Zegeer*, 768 F.2d 1480, 1488 (D.C. Cir. 1985) (inferring from legislative history that Congress did not intend agency to "tarry for years"). Several provisions governing the issuance of station licenses are anchored around periods as short as 30 days. See, *e.g.*, 47 U.S.C. § 307(d) (contemplating that license-renewal requests will be decided within 30 days before expiration of original license); *id.* § 309(b) (requiring only 30 days after notice of application before Commission can grant application); *id.* § 309(d)(1) (allowing Commission to shorten window for petitions to deny applications to as short as 30 days if "reasonably related to the time when the applications would normally be reached for processing").

Moreover, the Commission has publicly committed itself to striving to decide transfer applications within 180 days of when they are received "in all cases." FCC, *Informal Timeline*, *supra*. It has invited the public

35

Exhibit 14 - Page 047

to hold it to account by displaying the timelines of pending applications online.

The Commission here, however, has jettisoned any congressional expectation of alacrity and the agency's own public pledge to make its best efforts to adjudicate licensing matters in six months. Indeed, this matter had already been ongoing for more than 11 months *before* the Media Bureau even announced the production's second act.

***Nature of Regulation.*** Although the Commission's delay on these license-transfer matters does not "ris[k] life and limb," the matter entails considerations beyond purely "economic regulation." *PEER*, 957 F.3d at 274 (citation omitted). The Commission's inaction would set back the public-benefit goals of increasing diversity in broadcast ownership, reducing market concentration, and promoting greater investment in local news. Add. 605-616. Indeed, promoting diversity has been the Commission's core justification in retaining its structural ownership rules. *E.g.*, *Sinclair Broadcasting Group, Inc.* v. *FCC*, 284 F.3d 148, 159-60 (D.C. Cir. 2002). But now the FCC turns away a transaction that would create significant diversity without addressing its merits.

Exhibit 14 - Page 048

***Interference With Agency Priorities.*** Compelling the Commission to decide the applications itself will not interfere with higher-priority agency initiatives. The Commission has identified no more time-sensitive or important activities that it must complete before it can resolve the applications. Indeed, subjecting the broadcasters to a prolonged illegal hearing will take up *more* of the Commission's time and resources than simply deciding the applications based on the briefing and comprehensive documentary evidence already in the record.

***Prejudice From Delay.*** Allowing the Commission's inaction to persist and permanently kill the deal would severely and irreparably prejudice the broadcasters, their employees, and the public. The transaction is primed to create the largest-ever minority-owned and female-led television station group in the nation; expand opportunities for minority and female journalists and media professionals; further competition by reducing TEGNA's market share; and substantially invest in local news across the nation. Add. 605-616. And the nation as a whole stands to gain if the deal can be completed because a robust and competitive market for television media allows the press to better "fulfill its essential role in our democracy." *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on*

37

Exhibit 14 - Page 049

*Human Relations*, 413 U.S. 376, 381-382 (1973) (citation and internal quotation marks omitted). All those benefits will be irreversibly lost unless this Court compels the Commission to act.

***Agency Impropriety.*** As discussed above, there is ample indication in this case that the Commission acted through a bureau chief—who simultaneously serves as the Chairwoman's legal advisor—to prevent judicial review by shunting the applications to an unlawful ALJ hearing that will kill the transaction through delay. This Court has recognized for decades that, although "evidentiary hearings and other procedural devices" can be "useful—and sometimes indispensable—they may also be exploited for unworthy purposes," forming a "potent instrument for delay." *United States* v. *FCC*, 652 F.2d 72, 91 (D.C. Cir. 1980) (en banc). If the Commission has any legitimate justification for sending the matter to an unlawful and unnecessary hearing, it should be ready to substantiate it.

*****

Mandamus is an extraordinary writ. But it is tailor-made for extraordinary circumstances like these, in which an agency's refusal to act has the effect of deciding the merits while withholding judicial review.

38

Exhibit 14 - Page 050

## III.   The Broadcasters Have No Adequate Alternative Remedy

Unless the broadcasters' direct appeal goes forward, they will "lack an adequate alternative remedy" to compel the Commission to resolve the applications apart from mandamus. *Center for Biological Diversity*, 53 F.4th at 671.

The broadcasters, moreover, gave the Commission every opportunity to correct the agency's errors and avert the need for relief from this Court.  All of these efforts have been expressly or silently rebuffed.  The broadcasters promptly challenged the Hearing Order as the Commission's procedures prescribe:  by requesting that the ALJ certify that issue for immediate review by the Commission.  47 C.F.R. § 1.115(e)(1).  The ALJ denied that request. Add. 1039-1042. The broadcasters sought Commission review the next day—requesting it either waive the ALJ-certification requirement or invoke its authority to review such actions sua sponte—and informed the Commission that, in light of the urgency, they intended to bring the matter to this Court today (March 27).  Add. 1044.  As of this filing, the Commission has not acted on that request.

The only remaining administrative avenue of review—asking the Commission to reconsider the Hearing Order when it reviews the Media

39

Exhibit 14 - Page 051

Bureau's initial decision, months or (more likely) years from now—is il-lusory. The Commission's Enforcement Bureau has acknowledged that the hearing process and ensuing Commission review cannot be completed before the transaction's deadline. Add. 1034. That back-end review many months hence of a deal that will die in eight weeks is "not an ade-quate means to attain the relief [the broadcasters] see[k]." *In re Core Communications, Inc.*, 531 F.3d 849, 860 (D.C. Cir. 2008).

*****

This license transfer should not have been difficult for the Commis-sion to resolve. The transaction yields significant public benefits with no demonstrated public-interest detriment. The broadcasters approached the agency immediately after the transaction's announcement with ro-bust submissions demonstrating the gains. And besides answering the numerous objections and discovery requests the Media Bureau permit-ted, Standard General made voluntary but binding commitments to put the challengers' concerns definitively to rest.

Yet instead of formally deciding the applications, the Commission has chosen to kill the transaction by withholding a decision—more pre-cisely, by permitting another layer of unlawful procedure that the agency

40

Exhibit 14 - Page 052

knows cannot be completed before the deal dies.  That is not a responsible exercise of congressionally delegated authority.  If the broadcasters' direct appeal is dismissed, the strong medicine of mandamus is the appropriate—indeed, the only—judicial remedy.

41

Exhibit 14 - Page 053

## CONCLUSION

If this Court dismisses the broadcasters' appeal for lack of final agency action, it should grant the petition and issue a writ of mandamus ordering the Commission to rule on the applications by April 28, 2023.

March 27, 2023

Respectfully submitted,

    /s/ Miguel A. Estrada

Kevin F. King
Jennifer A. Johnson
Jocelyn G. Jezierny
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001
(202) 662-6000

*Counsel for Petitioner*
*TEGNA Inc.*

David E. Mills
Michael D. Basile
Henry H. Wendel
COOLEY LLP
1299 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C.  20004
(202) 842-7800

*Counsel for Petitioner*
*CMG Media Corporation*

Miguel A. Estrada
    *Counsel of Record*
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
mestrada@gibsondunn.com

Stephen J. Hammer
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX  75201
(214) 698-3100

Scott R. Flick
Jessica T. Nyman
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C.  20036
(202) 663-8000

*Counsel for Petitioner*
*SGCI Holdings III LLC*

42

Exhibit 14 - Page 054

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this mandamus petition complies with the applicable typeface, type style, and type-volume limitations.  This petition was prepared using a proportionally spaced type (New Century Schoolbook, 14 point).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this petition contains 7,652 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this petition.

March 27, 2023                          Respectfully submitted,

                                        _/s/ Miguel A. Estrada_
                                        Miguel A. Estrada
                                        GIBSON, DUNN & CRUTCHER LLP
                                        1050 Connecticut Avenue, N.W.
                                        Washington, D.C.  20036
                                        (202) 955-8500
                                        mestrada@gibsondunn.com

Exhibit 14 - Page 055

## CERTIFICATE OF SERVICE

I hereby certify that, on March 27, 2023, I electronically filed the foregoing mandamus petition with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that I have caused the foregoing petition to be served by FedEx overnight service and by electronic mail on the Commission and on parties to the proceedings before the Commission as follows:

**Federal Communications Commission**
Attn: General Counsel
45 L Street, N.W.
Washington, D.C.  20554
litigationnotice@fcc.gov

**United Church of Christ Media Justice Ministry**
c/o Cheryl A. Leanza
100 Maryland Avenue, N.E.
Washington, D.C.  20002
cleanza@alhmail.com

**Common Cause**
c/o Yosef Gettachew
Jonathan Walter
805 15th Street N.W., Suite 800
Washington, D.C.  20005
ygetachew@commoncause.org
jwalter@commoncause.org

Exhibit 14 - Page 056

**NewsGuild-CWA and National Association of Broadcast Employees and Technicians-CWA**
c/o Andrew J. Schwartzman
4000 Cathedral Avenue, N.W.
Apt. 617B
Washington, D.C.  20016
andyschwartzman@gmail.com

c/o David Goodfriend
The Goodfriend Group
208 I Street, N.E.
Washington, D.C.  20002
david@dcgoodfriend.com

c/o Arthur Belendiuk
Smithwick & Belendiuk, P.C.
5028 Wisconsin Avenue, N.W.
Suite 301
Washington, D.C.  20016
abelendiuk@fccworld.com

March 27, 2023                    Respectfully submitted,

                                 _/s/ Miguel A. Estrada_
                                 Miguel A. Estrada
                                 GIBSON, DUNN & CRUTCHER LLP
                                 1050 Connecticut Avenue, N.W.
                                 Washington, D.C.  20036
                                 (202) 955-8500
                                 mestrada@gibsondunn.com

Exhibit 14 - Page 057