**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SGCI HOLDINGS III LLC and
SOOHYUNG KIM,

> *Plaintiffs*,

v.

FEDERAL COMMUNICATIONS
COMMISSION et al.,

> *Defendants*.

Case No. 1:24-cv-1204-RC

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTION FOR RULE 11 SANCTIONS
BY DEFENDANTS DISH NETWORK CORP. AND CHARLES ERGEN**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

   I.   Factual background ................................................................................................ 1

   II.   Procedural background ......................................................................................... 8

LEGAL STANDARD .......................................................................................................... 9

ARGUMENT ....................................................................................................................... 10

   I.   DISH's Rule 11 Motion Is an Improper Duplicative Motion to Dismiss. .............. 10

   II.   DISH's Motion Does Not Establish Any Rule 11 Violation. .................................. 14

      A.  The amended complaint's allegations are factually supported. ....................... 15

      B.  The amended complaint's claims are not legally frivolous. ............................ 26

         1.   Plaintiffs plausibly state each claim asserted against DISH
              and Mr. Ergen. ................................................................................. 27

         2.   The First Amendment does not immunize DISH's and Mr.
              Ergen's conduct. ............................................................................. 33

      C.  The amended complaint is not presented for an improper purpose. .............. 41

   III.   DISH's motion itself violates Rule 11 and warrants a sanction of fees
        and costs. ......................................................................................................... 42

CONCLUSION ..................................................................................................................... 45

CERTIFICATE OF SERVICE ............................................................................................. 47

# TABLE OF AUTHORITIES

**Cases**

*A.H.D.C. v. City of Fresno*,
   2000 WL 35810722 (E.D. Cal. Aug. 31, 2000) ...................................................... 35

*Acosta Orellana v. CropLife Int'l*,
   711 F. Supp. 2d 81 (D.D.C. 2010) ......................................................................... 36

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*,
   59 F.4th 948 (8th Cir. 2023) .................................................................................. 19

*Ahuruonye v. U.S. Dep't of Interior*,
   312 F. Supp. 3d 1 (D.D.C. 2018) ...................................................................... 12, 42

*Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*,
   525 F.3d 8 (D.C. Cir. 2008) ................................................................................... 16

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
   486 U.S. 492 (1988) ......................................................................................... 35, 37

*\*Almeida v. Bennet Auto Supply, Inc.*,
   335 F.R.D. 463 (S.D. Fla. 2020) ...................................................................... 12, 13

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
   103 F.4th 765 (11th Cir. 2024) .............................................................................. 34

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   2013 WL 1746062 (S.D.N.Y. Apr. 23, 2013) ........................................................ 13

*Andrx Pharms., Inc. v. Biovail Corp. Int'l*,
   256 F.3d 799 (D.C. Cir. 2001) ............................................................................... 35

*Armstrong v. Thompson*,
   80 A.3d 177 (D.C. 2013) ....................................................................................... 32

*Atherton v. D.C. Off. of Mayor*,
   567 F.3d 672 (D.C. Cir. 2009) ............................................................................... 28

*Banneker Ventures, LLC v. Graham*,
   798 F.3d 1119 (D.C. Cir. 2015) ....................................................................... 31, 35

*Bartronics, Inc. v. Power-One, Inc.*,
    245 F.R.D. 532 (S.D. Ala. 2007) .................................................................. 43, 44

*BE & K Constr. Co. v. NLRB*,
    536 U.S. 516 (2002).......................................................................................... 37

*Bell v. Nat'l Credit Servs. Inc.*,
    2020 WL 8832899 (W.D. Wash. Oct. 14, 2020) ................................................ 45

*\*Betz v. Glob. Telesourcing, LLC*,
    2021 WL 5865384 (D.D.C. Dec. 10, 2021) .............................................. 11, 13, 44

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)..................................................................................... 20, 28

*Brooks v. Rosebar (In re Rosebar)*,
    2014 WL 7403573 (Bankr. D.D.C. Dec. 29, 2014) ........................................ 42, 45

*\*Burns v. George Basilikas Tr.*,
    599 F.3d 673 (D.C. Cir. 2010) ............................................................................ 36

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*,
    498 U.S. 533 (1991)............................................................................................ 14

*\*Cabrera v. Mogoo, Inc.*,
    2024 WL 1212292 (D.D.C. Mar. 21, 2024) ............................................ 10, 43, 45

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)..................................................................................... 37, 39

*Chandler v. Berlin*,
    2020 WL 5593905 (D.D.C. Sept. 18, 2020)....................................................... 42

*Cheeks of N. Am., Inc. v. Fort Myer Constr. Corp.*,
    807 F. Supp. 2d 77 (D.D.C. 2011).................................................................. 40, 44

*City of Columbia v. Omni Outdoor Advert., Inc.*,
    499 U.S. 365 (1991)........................................................................................... 37

*Clark v. Clabaugh*,
    20 F.3d 1290 (3d Cir. 1994) .............................................................................. 29

*Cobell v. Norton,*
   211 F.R.D. 7 (D.D.C. 2002) .......................................................................................... 9

*\*Colella v. Androus,*
   2024 WL 1239697 (D.D.C. Mar. 22, 2024) ...................................... 10, 11, 12, 14

*Coles v. Deltaville Boatyard, LLC,*
   2011 WL 6337619 (E.D. Va. Dec. 19, 2011) ................................................. 44, 45

*Cooter & Gell v. Hartmarx Corp.,*
   496 U.S. 384 (1990) ..................................................................................................... 9

*Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.,*
   1992 WL 68638 (D.D.C. Mar. 4, 1992) ..................................................................... 9

*Doe I v. Exxon Mobil Corp.,*
   2021 WL 1910892 (D.D.C. May 12, 2021) ....................................................... 10, 14

*Doe v. Roman Cath. Diocese of Greensburg,*
   581 F. Supp. 3d 176 (D.D.C. 2022) ....................................................................... 18

*Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC,*
   208 F. Supp. 3d 219 (D.D.C. 2016) ....................................................................... 32

*Emanuel Displaced Persons Ass'n 2 v. City of Portland,*
   704 F. Supp. 3d 1088 (D. Or. 2023) ...................................................................... 21

*Evangelou v. District of Columbia,*
   901 F. Supp. 2d 159 (D.D.C. 2012) ....................................................................... 19

*Freeman v. Giuliani,*
   2022 WL 16551323 (D.D.C. Oct. 31, 2022) ......................................................... 18

*FTC v. AbbVie Inc.,*
   976 F.3d 327 (3d Cir. 2020) ..................................................................................... 39

*Gaiardo v. Ethyl Corp.,*
   835 F.2d 479 (3d Cir. 1987) ..................................................................................... 43

*Gipson v. Wells Fargo N.A.,*
   460 F. Supp. 2d 15 (D.D.C. 2006) ......................................................................... 23

*Goldwater Bank, N.A. v. Elizarov*,
  2023 WL 4295255 (C.D. Cal. May 9, 2023) ......................................................................... 45

*Gonzalez Ramos v. ADR Vantage, Inc.*,
  2021 WL 4462411 (D.D.C. Sept. 29, 2021)........................................................................... 42

*Grimes v. Smith*,
  776 F.2d 1359 (7th Cir. 1985) .............................................................................................. 21

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983)......................................................................................... 17, 18

*Havilah Real Prop. Servs., LLC v. VLK, LLC*,
  108 A.3d 334 (D.C. 2015) .................................................................................................... 31

*Henok v. Chase Home Fin., LLC*,
  922 F. Supp. 2d 110 (D.D.C. 2013)...................................................................................... 14

*Hobson v. Wilson*,
  737 F.2d 1 (D.C. Cir. 1984).................................................................................................. 20

*Hollister v. Soetoro*,
  258 F.R.D. 1 (D.D.C. 2009)............................................................................................ 33, 39

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017) ................................................................................................. 39

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  587 F. Supp. 2d 27 (D.D.C. 2008)........................................................................................ 18

*In re Tesla Motors, Inc. Sec. Litig.*,
  2015 WL 1306490 (N.D. Cal. Mar. 23, 2015)...................................................................... 26

*Indep. Fed. Sav. Bank v. Bender*,
  230 F.R.D. 11 (D.D.C. 2005)................................................................................................ 26

*Int'l Telecard Ass'n v. FCC*,
  166 F.3d 387 (D.C. Cir. 1999).............................................................................................. 40

*Intelsat USA Sales LLC v. Juch–Tech, Inc.*,
  305 F.R.D. 3 (D.D.C. 2014).................................................................................................. 26

*Israel v. Baxter Labs., Inc.,*
   466 F.2d 272 (D.C. Cir. 1972) ................................................................ 40

*Jefferson-11th St., LLC v. District of Columbia,*
   2020 WL 3035038 (D.D.C. June 5, 2020) ............................................. 36

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.,*
   968 F.2d 286 (2d Cir. 1992) ................................................................... 34

*Jordan v. U.S. Dep't of Lab.,*
   273 F. Supp. 3d 214 (D.D.C. 2017) ........................................................ 42

*Kerner v. Cult Awareness Network,*
   843 F. Supp. 748 (D.D.C. 1994) ............................................................. 36

*Kim v. Kimm,*
   884 F.3d 98 (2d Cir. 2018) ..................................................................... 36

*Kornmann v. Johnson,*
   2014 WL 6909887 (D.D.C. Dec. 9, 2014) .............................................. 10

*Kowal v. MCI Commc'ns Corp.,*
   16 F.3d 1271 (D.C. Cir. 1994) ................................................................ 18

*Kreuzer v. Am. Acad. of Periodontology,*
   735 F.2d 1479 (D.C. Cir. 1984) .............................................................. 17

*Kvech v. Holder,*
   2011 WL 4369452 (D.D.C. Sept. 19, 2011) ........................................... 18

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop
   Treaty Abuse-Wis., Inc.,*
   759 F. Supp. 1339 (W.D. Wis. 1991) ..................................................... 29

*Lagayan v. Odeh,*
   199 F. Supp. 3d 21 (D.D.C. 2016) .......................................................... 21

*Lannan Found. v. Gingold,*
   300 F. Supp. 3d 1 (D.D.C. 2017) ............................................................ 32

*Lesane v. Hawaiian Airlines, Inc.,*
   2019 WL 8509486 (D. Haw. Dec. 18, 2019) .......................................... 36

*Lichtenstein v. Consol. Servs. Grp., Inc.,*
    173 F.3d 17 (1st Cir. 1999)........................................................................................ 13

*Litton Sys., Inc. v. AT&T,*
    700 F.2d 785 (2d Cir. 1983) ................................................................................. 38, 39

*Lucas v. Paige,*
    435 F. Supp. 2d 165 (D.D.C. 2006)........................................................................ 22

*Luv N' Care, Ltd. v. Shiboleth LLP,*
    2017 WL 3671039 (S.D.N.Y. Aug. 8, 2017) .................................................... 12, 14

*Mandelkorn v. Patrick,*
    359 F. Supp. 692 (D.D.C. 1973) .............................................................................. 18

*Mapp v. District of Columbia,*
    993 F. Supp. 2d 22 (D.D.C. 2013)........................................................................... 24

*Marina Mgmt. Servs., Inc. v. Vessel My Girls,*
    202 F.3d 315 (D.C. Cir. 2000)................................................................................. 12

*Metricolor, LLC v. L'Oreal S.A.,*
    2018 WL 5099497 (C.D. Cal. Oct. 16, 2018) ......................................................... 26

*Meyer Grp., Ltd. v. Rayborn,*
    2020 WL 5763631 (D.D.C. Sept. 28, 2020).............................................................. 32

*Mount Prospect State Bank v. Grossman,*
    1989 WL 43620 (N.D. Ill. Feb. 24, 1989)............................................................... 26

*Nanko Shipping, Guinea v. Alcoa, Inc.,*
    330 F. Supp. 3d 439 (D.D.C. 2018).......................................................................... 29

*Nat'l Cas. Ins. v. Solomon,*
    502 F. Supp. 3d 401 (D.D.C. 2020).......................................................................... 40

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024).................................................................................................. 16

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.,*
    957 A.2d 890 (D.C. 2008) ........................................................................................ 31

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
   572 U.S. 545 (2014)................................................................................................. 35

*Onyeoziri v. Spivok,*
   44 A.3d 279 (D.C. 2012) ........................................................................................ 32

*Pangburn v. Culbertson,*
   200 F.3d 65 (2d Cir. 1999) ..................................................................................... 18

*Patelco Credit Union v. Sahni,*
   262 F.3d 897 (9th Cir. 2001) .................................................................................. 43

*Patterson v. Harris,*
   2023 WL 346096 (D.D.C. Jan. 20, 2023)............................................................... 29

*PHCDC1, LLC v. Evans & Joyce Willoughby Tr.,*
   257 A.3d 1039 (D.C. 2021) .................................................................................... 32

*Pintro v. Rosenworcel,*
   554 F. Supp. 3d 14 (D.D.C. 2021) .......................................................................... 24

*Primetime 24 Joint Venture v. NBC, Inc.,*
   219 F.3d 92 (2d Cir. 2000) ..................................................................................... 39

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.,*
   508 U.S. 49 (1993)............................................................................................ 35, 37

*Quick v. EduCap, Inc.,*
   2019 WL 95566 (D.D.C. Jan. 3, 2019) ....................................................... 9, 13, 33

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992)................................................................................................ 34

*Rich v. Taser Int'l, Inc.,*
   2012 WL 3155137 (D. Nev. Aug. 2, 2012) ............................................................ 45

*Rondigo, LLC v. Township of Richmond,*
   2012 WL 1021726 (E.D. Mich. Mar. 27, 2012) ..................................................... 36

*Rotella v. Wood,*
   528 U.S. 549 (2000)................................................................................................ 15

*Rumsfeld v. FAIR, Inc.,*
    547 U.S. 47 (2006) .......................................................................................... 34

*Runyon v. McCrary,*
    427 U.S. 160 (1976) ........................................................................................ 34

*Rush v. McDonald's Corp.,*
    966 F.2d 1104 (7th Cir. 1992) ........................................................................ 44

*Saltany v. Reagan,*
    886 F.2d 438 (D.C. Cir. 1989) ....................................................................... 26

*Saucier v. Countrywide Home Loans,*
    64 A.3d 428 (D.C. 2013) ................................................................................ 33

*Sealed Plaintiff 1 v. Front,*
    2024 WL 1395477 (E.D. Va. Mar. 31, 2024) ................................................ 30

*Sheets v. Yamaha Motors Corp., U.S.A.,*
    891 F.2d 533 (5th Cir. 1990) .......................................................................... 41

*Silverman v. Town of Riverhead,*
    2008 WL 11449317 (E.D.N.Y. Sept. 11, 2008) ............................................ 10

*Simu v. Carvalho (In re Carvalho),*
    598 B.R. 356 (D.D.C. 2019) ........................................................................... 42

*Slip-N-Slide Recs., Inc. v. TVT Recs., LLC,*
    2007 WL 473273 (S.D. Fla. Feb. 8, 2007) .................................................... 36

*Smith v. Athena Constr. Grp., Inc.,*
    2023 WL 11914917 (D.D.C. Sept. 18, 2023) ................................................ 14

*Smith v. Psychiatric Sols., Inc.,*
    750 F.3d 1253 (11th Cir. 2014) ...................................................................... 43

*SMJ Grp., Inc. v. 417 Lafayette Rest. LLC,*
    2006 WL 2516519 (S.D.N.Y. Aug. 30, 2006) ............................................... 34

*Soo Park v. Thompson,*
    851 F.3d 910 (9th Cir. 2017) .......................................................................... 19

*Spence v. Daily News,*
    2001 WL 121938 (S.D.N.Y. Feb. 13, 2001) ............................................................. 34

*Students for Fair Admissions, Inc. v. President & Fellows of*
    *Harvard Coll.,*
    600 U.S. 181 (2023) ............................................................................................ 24, 25

*Tahfs v. Proctor,*
    316 F.3d 584 (6th Cir. 2003) ............................................................................. 13, 16

*Thompson v. Trump,*
    590 F. Supp. 3d 46 (D.D.C. 2022) ........................................................................... 29

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,*
    2007 WL 915237 (D.D.C. Mar. 27, 2007) ............................................................... 22

*United States v. AT&T,*
    524 F. Supp. 1336 (D.D.C. 1981) ............................................................................. 38

*US Sprint Commc'ns Co. v. Kaczmarek,*
    121 F.R.D. 414 (D. Kan. 1988) ................................................................................ 15

*Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,*
    518 F. Supp. 993 (S.D. Tex. 1981) .......................................................................... 30

*Weberg v. Franks,*
    229 F.3d 514 (6th Cir. 2000) ................................................................................... 21

*Wells v. Rhodes,*
    928 F. Supp. 2d 920 (S.D. Ohio 2013) .................................................................... 20

*Williams v. Verizon Wash., D.C. Inc.,*
    322 F.R.D. 145 (D.D.C. 2017) ................................................................................. 13

*Wilson v. Cox,*
    753 F.3d 244 (D.C. Cir. 2014) ................................................................................. 22

*Wisconsin v. Mitchell,*
    508 U.S. 476 (1993) ................................................................................................ 34

**Statutes**

28 U.S.C. §1927 ........................................................................................................... 45

42 U.S.C. §1985(3) ...................................................................................... 27, 33

42 U.S.C. §1986 ......................................................................................... 29, 33

47 U.S.C. §310(d) ............................................................................................. 37

## Rules

D.C. Rules of Prof. Conduct 8.4(g) .................................................................. 43

*Fed. R. Civ. P. 11 advisory comm.'s note to 1983 amend. ........................... 13, 14

*Fed. R. Civ. P. 11 advisory comm.'s note to 1993 amend. .................... 10, 42, 43

Fed. R. Civ. P. 11(b)(1) ................................................................................. 15, 43

Fed. R. Civ. P. 11(b)(2) ................................................................................. 15, 26

Fed. R. Civ. P. 11(b)(3) ....................................................................................... 15

Fed. R. Civ. P. 11(c)(2) ........................................................................... 10, 42, 45

## Treatises

2 *Moore's Federal Practice – Civil* §8.04[4], LexisNexis ................................. 18

*5A Wright & Miller, *Federal Practice & Procedure* (4th ed.), Westlaw .................. 10, 13, 44

## Regulatory Authorities

*In re Pol'ys & Rules Regarding Minority & Female Ownership
of Mass Media Facilities,*
10 FCC Rcd. 2788 (1995) ................................................................................. 23

*In re Promoting Diversification of Ownership in the Broad. Servs.,*
31 FCC Rcd. 398 (2016) ................................................................................... 23

*In re Spanish Int'l Commc'ns Corp.,*
1 F.C.C. Rcd. 844 (1986) ................................................................................. 37

*In re Terrier Media Buyer, Inc.,*
34 FCC Rcd. 10554 (2019) .............................................................................. 38

*Statement of Pol'y on Minority Ownership of Broad. Facilities,*
   68 F.C.C.2d 979 (1978) .......................................................................................... 23

**Other Authorities**

Order, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr. 3, 2023) ...................... 40

## INTRODUCTION

This is the second Rule 11 motion DISH and Mr. Ergen have served on Plaintiffs at the pleading stage. But DISH's Rule 11 motion asserts Rule 12 arguments, copied largely verbatim from its pending motion to dismiss. It does not establish any Rule 11 violation. The timing and repetitious nature of the Rule 11 motions shows their improper purpose—to intimidate Plaintiffs to dismiss their claims against DISH and Mr. Ergen, to increase the chances that the Court does so, or to needlessly increase the cost of litigation. Because DISH's motion itself violates Rule 11, Plaintiffs respectfully request a sanction of fees and costs.

## BACKGROUND

### I.    Factual background

**A.** Korean American Soo Kim and his investment company Standard General have a successful record of turning around struggling broadcast television stations. Am. Compl. (Dkt. 36) ¶¶51-52. As one example, in six years they transformed New Young Broadcasting from a 14-station, $300 million company emerging from bankruptcy to the 70-station Media General, acquired by Nexstar Broadcasting for $4.6 billion. *Id.* ¶53. Their success comes from their strategic improvement process of investing in local journalism and local content. *Id.* ¶¶54-57. Standard General has invested millions in the four stations its affiliates currently own to upgrade newsroom and other equipment, to increase news programming and staff, and to improve employee benefits. *Id.* ¶¶52, 57.

In early 2022, Mr. Kim and Standard General won an auction to acquire TEGNA and its 60+ broadcast television stations. *Id.* ¶¶59-62. Another bidder was Byron Allen and his black-owned media company, Allen Media Group. *Id.* ¶¶60-62. Standard General, TEGNA, major banks, and investment funds executed merger and financing contracts to consummate the $8.6 billion deal. *Id.* ¶¶63-67. The contracts left 450 days, through May 2023, to obtain necessary regulatory approvals, including FCC approval of applications to transfer broadcast licenses from TEGNA to Standard General, a process the FCC normally completes within its 180-day "shot clock." *Id.* ¶¶63, 94-95.

Standard General reasonably expected the FCC to approve the transfers within the 450-day window. *Id.* ¶116. The deal complied with FCC rules. *Id.* ¶¶93, 116. For the past 30 years, the FCC approved all major rule-compliant broadcast transactions within 180 days. *Id.* ¶94. And the FCC approved the four most recent major broadcast transactions in well under 450 days, even though they required waivers of FCC rules. *Id.* ¶¶108-14.

**B.** The FCC's 180-day shot clock began in late April 2022. The FCC delegated review of Standard General's license-transfer applications to its Media Bureau. *Id.* ¶¶96, 126. Less than a week later, Charles Ergen, co-founder and chairman of DISH Network, had a scheduled meeting with FCC Chairwoman Jessica Rosenworcel. *Id.* ¶¶36, 127. In early May, Mr. Allen publicly stated that he had not "give[n] up" and was still "in the fight" for TEGNA, even though TEGNA rejected his bid months earlier. *Id.* ¶128. Days later, David Goodfriend, a former vice president of DISH and longtime FCC lobbyist for

the Allen Group and DISH, met with FCC Media Bureau Chief Holly Saurer. *Id.* ¶¶129, 159-60. That same day, NewsGuild and Common Cause asked the Media Bureau to extend the public comment period and order Standard General to produce information on, *inter alia*, "alternative transactions considered" by TEGNA—even though the Communications Act prohibits the FCC from considering alternative buyers. *Id.* ¶¶91, 130. Over Standard General's objection, the Media Bureau extended the public comment period, contrary to FCC precedent, and ordered document productions. *Id.* ¶¶130-32. Mr. Allen then called Mr. Kim unsolicited and asked to acquire some TEGNA stations, suggesting that including him in the deal would make things go smoother at the FCC. *Id.* ¶133. Mr. Kim declined, as the deal agreements were final. *Id.* These events marked the beginning of the alleged conspiracy. *See id.* ¶137.

In late June, NewsGuild, NABET, Common Cause, and UCC filed petitions to deny Standard General's applications, objecting that Standard General would cut newsroom jobs and increase retransmission fees, which distributors like DISH pay to retransmit broadcast stations' programming. *Id.* ¶135. The objections advanced the interests of the Allen Group and DISH and conflicted with objectors' professed interests in ownership diversity and preserving newsroom jobs. *Id.* ¶¶138-39. The objectors did not oppose the two latest major deals, where Mr. Allen acquired stations. *Id.* ¶140. The FCC had rejected the same objections to past deals. *Id.* ¶¶98 & n.24, 111, 114. And DOJ was separately reviewing the deal's impact on retransmission fees for antitrust concerns. *Id.* ¶¶79-87.

In response, Standard General said the objections were "surprising." *Id.* ¶141. It explained that the objections were foreclosed by FCC precedent and that, despite objectors' longstanding positions supporting diversity, their objections ignored how Mr. Kim's deal would mark a historic advance in minority broadcast ownership, furthering the FCC's longstanding diversity goals. *Id.* ¶¶141-43; *see id.* ¶¶104-07, 118.

Objectors replied that the deal did "nothing to create a more … diverse … media" and did "not promote ownership diversity as it is understood by the public interest and civil rights community, and by commission policy." *Id.* ¶147. They raised concerns about "shadowy foreign investors" and "foreign ownership interests," even though everyone knew Standard General's funding sources were in the Cayman and British Virgin Islands, which are common for large deals and had never been an issue to the FCC. *Id.* ¶¶148-51; *see id.* ¶¶71-78. Commentators decried the "racial overtones" suggesting Mr. Kim "must not be the right kind of minority" as well as the "baseless allusions to foreign influence" that "condemn Mr. Kim to a stereotype of a person of Asian descent who cannot be trusted." *Id.* ¶¶152-55.

Come August, Mr. Goodfriend publicly appeared in the proceedings on behalf of NewsGuild and NABET. *Id.* ¶157. Mr. Goodfriend pressed for more information, misrepresented documents about possible layoffs, and urged the Media Bureau to delay its review. *Id.* ¶¶162-68, 171, 174, 187, 192. He said the deal required extra scrutiny given "China['s] increased tensions in the Taiwan Strait" and asserted that "anonymous foreign

investment in American newsrooms" poses "risks to … diversity … and democracy." *Id.* ¶174. In late September, the Media Bureau opened a second public comment cycle and, as objectors requested, ordered productions on "alternative transactions considered" by TEGNA. *Id.* ¶168. The Media Bureau dismissed Standard General's objection under the Communications Act and specified that it only wanted information about Mr. Allen's failed bid. *Id.* ¶¶169-73.

In early October, then-Speaker Nancy Pelosi sent a letter to Chairwoman Rosenworcel repeating objectors' complaints and urging "further scrutiny." *Id.* ¶177. Days later, Mr. Allen donated $250,000 to the House Majority PAC and $100,000 to the Senate Majority PAC. *Id.* ¶179. When asked, Pelosi's office said the letter was a favor for a donor. *Id.* ¶181. A few months later, Senator Elizabeth Warren sent a similar letter. *Id.* ¶205. Mr. Goodfriend later claimed credit for generating the letters. *Id.* ¶¶179, 206, 268.

Through November—weeks after the 180-day shot clock lapsed—Standard General pressed the FCC to address the objectors' race-laden rhetoric and to disclose any concerns it had that were delaying review so Standard General could address them. *Id.* ¶¶184-85. The Media Bureau expressed no concerns and said it would complete its review shortly after the deal cleared DOJ. *Id.* ¶185. At this time, DISH stopped retransmission consent negotiations and blacked out Standard General's affiliates' stations. *Id.* ¶188.

In December, to remove any objections to the deal, Standard General voluntarily made binding commitments not to cut jobs and to waive contractual clauses that could

raise retransmission fees. *Id.* ¶¶195-97, 199. But rather than approve the license transfers, the Media Bureau opened an unprecedented *third* public comment cycle, delaying review for several more weeks. *Id.* ¶201. Ms. Saurer personally contacted Mr. Goodfriend about these developments. *Id.* ¶¶198, 202. DISH then publicly appeared in the proceedings, seeking access to confidential information and objecting about retransmission fees, notwithstanding Standard General's commitments. *Id.* ¶¶204, 208. The straw objectors continued their opposition, dismissing the binding commitments as "meaningless." *Id.* ¶208.

In late January, as reports circulated that DOJ was days away from clearing the deal, Mr. Allen hosted a Friday event for high-ranking Democrats, including former Speaker Pelosi. *Id.* ¶210. Reports recognized that he was "courting major Democratic politicians once again as he attempt[ed] to stop" the deal. *Id.* The following Monday, Mr. Ergen had another scheduled meeting with Chairwoman Rosenworcel. *Id.* ¶211.

Standard General continued to push the Media Bureau to move on its applications. *Id.* ¶¶212-13. From the end of November 2022 to February 2023, Standard General asked the Media Bureau and Chairwoman Rosenworcel at least 16 times for status updates or an opportunity to meet to discuss any concerns that might be delaying FCC review. *Id.* But they would not engage. *Id.* Yet during the same period, they met with the president of objector NewsGuild and DISH's Mr. Ergen, among others. *Id.*

**C.** Everything culminated in February 2023. DOJ approved the deal. *Id.* ¶216. Then, on day 309 of the 180-day shot clock, the Media Bureau without warning entered

an order sending the applications for another year or more of proceedings before an ALJ. *Id.* ¶222. The order was an unprecedented pocket veto. It would delay FCC review well beyond the publicly known expiration of Standard General's contracts. *Id.* ¶¶99-103, 229.

The hearing designation order, or HDO, had no basis in law or FCC precedent. There were no factual issues for an ALJ to resolve; the Media Bureau had access to all relevant information to rule on the applications. *Id.* ¶225. The HDO ordered the ALJ to examine potential retransmission fee increases and job losses—matters Standard General's binding commitments had taken off the table—revealing the influence of the Allen Group, DISH, and Mr. Goodfriend. *Id.* ¶227. The HDO ignored the historic increase in minority ownership that the deal offered, joining the pernicious narrative peddled by objectors that an Asian-American buyer did "nothing" to promote ownership diversity. *Id.* ¶228. The HDO received widespread criticism from current and former FCC Commissioners, former FCC officials, the National Association of Broadcasters, civil rights leaders, and members of Congress. *Id.* ¶¶231-33, 235-39, 246, 252, 258, 269.

With only 87 days left before its contracts expired, Standard General tried everything to obtain FCC approval. It appealed to the full Commission and sought expedited review by the ALJ, to no avail. *Id.* ¶¶240-43. When it tried to meet with objectors, Mr. Ergen personally refused, and Mr. Goodfriend and NewsGuild would not meet without a release of liability. *Id.* ¶¶248-50. Standard General also appealed to the D.C. Circuit, which declined to intervene without final "resolution by the full Commission." *Id.* ¶245.

On May 22, 2023, Standard General's financing contracts expired, forcing TEGNA to terminate the merger agreement. *Id.* ¶261. Standard General was left to pay a $136 million breakup fee to TEGNA, in addition to $70 million it incurred in transaction costs. *Id.* ¶263. TEGNA shareholders lost nearly $2 billion in expected gains from a successful merger, including $85 million from Standard General's shares. *Id.* The day after the deal died, Mr. Allen publicly reiterated his continued interest in TEGNA and suggested that he would have no issue getting FCC approval. *Id.* ¶264. He later boasted that he is "FCC approved"—the "magic trick" for closing large deals. *Id.* ¶¶275-76. Mr. Goodfriend and the straw objectors publicly claimed credit for killing the deal. *Id.* ¶¶265, 268.

## II.    Procedural background

In April 2024, Standard General and Mr. Kim sued the FCC, Chairwoman Rosenworcel and Ms. Saurer, the Allen Group and Mr. Allen, DISH and Mr. Ergen, the Goodfriend Group and Mr. Goodfriend, and straw objectors NewsGuild, NABET, UCC, and Common Cause. Compl. (Dkt. 1). Plaintiffs asserted claims against DISH and Mr. Ergen under 42 U.S.C. §§1985(3) and 1986 and for tortious interference with contract and prospective business opportunity and civil conspiracy. *Id*. ¶¶295-358.

On July 3, DISH and Mr. Ergen's counsel served on Plaintiffs' counsel a Rule 11 motion seeking dismissal of all claims. Green Decl. Ex. A. Plaintiffs' counsel served a response letter, explaining that DISH's Rule 11 threats were procedurally improper, without merit, and fell short of counsel's duty of candor. Green Decl. Ex. B. The response

stated that if DISH proceeded with filing the motion, Plaintiffs would seek appropriate relief, including fees under Rule 11(c)(2). *Id.* at 1, 13. Counsel explained that Plaintiffs already intended to amend their complaint "given recent Supreme Court decisions and new facts" and offered to do so before the motion-to-dismiss deadline, giving DISH more time to put its improper Rule 11 arguments into a Rule 12 motion. *Id.* at 1-2, 13.  DISH withdrew its motion after consenting to Plaintiffs' filing an amended complaint.

In late August, DISH and Mr. Ergen's counsel served a second Rule 11 motion, repeating arguments from their July 3 motion. Mot. (Dkt. 59). A week later, Defendants moved to dismiss, asserting all the arguments from their Rule 11 motion, largely verbatim. MTD (Dkt. 55). Plaintiffs' counsel responded, again addressed DISH's arguments, and reiterated that Plaintiffs would seek appropriate relief, including fees under Rule 11(c)(2). Green Decl. Ex. C.

## LEGAL STANDARD

Rule 11 serves to "protect the court from frivolous and baseless filings that are not well grounded, legally untenable, or brought with the purpose of vexatiously multiplying the proceedings." *Cobell v. Norton*, 211 F.R.D. 7, 10 (D.D.C. 2002); *accord Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Rule 11 "is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.'" *Quick v. EduCap, Inc.*, 2019 WL 95566, at *2 (D.D.C. Jan. 3, 2019). And "it should not be applied so as to inhibit lawyers from representing their clients zealously." *Danielsen v. Burnside-Ott Aviation Training Ctr.,*

*Inc.*, 1992 WL 68638, at *1 (D.D.C. Mar. 4, 1992). A baseless Rule 11 motion or one brought for an improper purpose itself implicates Rule 11 and can warrant an award of fees to the opposing party. *See Cabrera v. Mogoo, Inc.*, 2024 WL 1212292, at *3 (D.D.C. Mar. 21, 2024); Fed. R. Civ. P. 11(c)(2); Fed. R. Civ. P. 11 advisory comm.'s note to 1993 amend.

The party seeking sanctions bears the burden of demonstrating a Rule 11 violation. *Kornmann v. Johnson*, 2014 WL 6909887, at *1 (D.D.C. Dec. 9, 2014) (Contreras, J.). Evidence of a Rule 11 violation "must be 'patently clear.'" *Doe I v. Exxon Mobil Corp.*, 2021 WL 1910892, at *3 (D.D.C. May 12, 2021).

## ARGUMENT

### I.    DISH's Rule 11 Motion Is an Improper Duplicative Motion to Dismiss.

DISH's Rule 11 motion is simply a duplicative motion to dismiss. It asserts Rule 12 arguments, not Rule 11 arguments. The motion should be denied on that ground.

It is well established that a Rule 11 motion "should not be employed … to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes." Fed. R. Civ. P. 11 advisory comm.'s note to 1993 amend. Nor should it "raise issues as to the legal sufficiency of a claim … that more appropriately can be disposed of by a motion to dismiss." 5A Wright & Miller, *Federal Practice & Procedure* §1335 (4th ed.), Westlaw. As this Court and others "have admonished, 'a Rule 11 motion is not a proper substitute for a dispositive motion.'" *Colella v. Androus*, 2024 WL 1239697, at *7 (D.D.C. Mar. 22, 2024) (Contreras, J.) (collecting cases); *see also, e.g., Silverman v. Town of*

*Riverhead*, 2008 WL 11449317, at *6 (E.D.N.Y. Sept. 11, 2008) (observing "the oft-cited principle that a Rule 11 sanctions motion may not properly substitute for a motion to dismiss" (collecting authorities)).

DISH's Rule 11 motion is what this Court and others have admonished against. It is an improperly titled Rule 12 challenge to the sufficiency of the amended complaint's factual allegations and legal theories. A Rule 11 motion is not the place for DISH to air First Amendment defenses or argue that the amended complaint "fails to state a claim upon which relief may be granted against Defendants DISH and Ergen." Mot. 32. It is not the place for "disagree[ing] on the strength of specific" allegations, "the inferences to be drawn from" such allegations, or "the application of the law to various facts." *Colella*, 2024 WL 1239697, at *7. DISH cannot "convert a disagreement over the factual allegations and legal arguments in a plaintiff's complaint into a sanctions dispute." *Betz v. Glob. Tel-esourcing, LLC*, 2021 WL 5865384, at *4 (D.D.C. Dec. 10, 2021) (cleaned up).

DISH's pending motion to dismiss confirms the point. Every argument in DISH's Rule 11 motion is reiterated, largely verbatim, in its motion to dismiss. Both recast the straw objectors' statements about "diversity" and "foreign" investment. Mot. 7-9, 18-20; MTD 7-9, 17-20. Both offer an alternative explanation for Mr. Ergen's meetings with Chairwoman Rosenworcel. Mot. 11; MTD 11. Both emphasize DISH's "commercial agenda." Mot. 16; MTD 16. Both contend the amended complaint and FCC record do not reflect "racial discrimination" in DISH's view. Mot. 18; MTD 17. Both attack the

conspiracy allegations made "on information and belief." Mot. 21-22, 26; MTD 20-21, 31-32. Both raise First Amendment speech and association defenses. Mot. 28, 31-32; MTD 25-26, 28-29. Both assert *Noerr-Pennington* immunity. Mot. 28-30; MTD 26-28. Both dispute application of *Noerr-Pennington*'s "sham" exception. Mot. 30; MTD 28. Both argue Plaintiffs' claims "fail to state a claim upon which relief may be granted." Mot. 34; MTD 35.

Each of those mistitled Rule 11 arguments belongs only in DISH's Rule 12 motion. *See Almeida v. Bennet Auto Supply, Inc.*, 335 F.R.D. 463, 466 (S.D. Fla. 2020) (denying Rule 11 motion where "a motion to dismiss ha[d] been filed that sets forth th[e] same contentions under Rule 12, where they belong"). DISH's Rule 11 motion is merely "another attempt to dispute the legal arguments" that Plaintiffs' "[c]omplaint should be dismissed." *Ahuruonye v. U.S. Dep't of Interior*, 312 F. Supp. 3d 1, 26 (D.D.C. 2018); *see Luv N' Care, Ltd. v. Shiboleth LLP*, 2017 WL 3671039, at *14 (S.D.N.Y. Aug. 8, 2017) (denying Rule 11 motion that "employ[ed] the same arguments advanced in Defendants' motion to dismiss").

DISH's extraordinary request for dismissal of the amended complaint as a sanction further confirms DISH's improper invocation of Rule 11. *See* Mot. 38. There is no basis for seeking dismissal under Rule 11 here. The full quote from the sole case DISH cites for this proposition states that "[d]ismissal is a legitimate sanction under Rule 11 *for serious misconduct when lesser sanctions would be ineffective or are unavailable*." *Marina Mgmt. Servs., Inc. v. Vessel My Girls*, 202 F.3d 315, 325 (D.C. Cir. 2000) (emphasis added) (citations omitted); *see Colella*, 2024 WL 1239697, at *6. Plaintiffs twice advised DISH of this

omission, Green Decl. Exs. B at 2-3, C at 3, yet DISH filed its motion with only the partial quote, misleadingly suggesting that dismissal is a "legitimate sanction" for the asserted Rule 11 violations. It is not. Dismissal under Rule 11 "is reserved for the rare case involving extreme misbehavior by the offending party such as fraud, contempt, and willful bad faith." 5A Wright & Miller §1336.3. Yet DISH asserts no such thing. It does not even assert sanctionable conduct—just that the amended complaint's allegations are not "plausible" and "fail[] to state a claim upon which relief may be granted." Mot. 32-33; *see Almeida*, 335 F.R.D. at 466 (denying motion "pursuing … [dismissal] under the guise of a Rule 11 motion" because arguments that allegations are "implausible" are "properly addressed on a motion to dismiss"); *see also Williams v. Verizon Wash., D.C. Inc.*, 322 F.R.D. 145, 146 (D.D.C. 2017) (denying Rule 11 motion at the outset insofar as it "sought outright dismissal").

Finally, the motion ignores that claims about the Rule 11 bases for pleadings "are ordinarily determined at the *end* of litigation." *Betz*, 2021 WL 5865384, at *5 (emphasis added); *accord* Fed. R. Civ. P. 11 advisory comm.'s note to 1983 amend.; *Lichtenstein v. Consol. Servs. Grp., Inc.*, 173 F.3d 17, 23 (1st Cir. 1999); 5A Wright & Miller §1337.1. Before then, "the court lacks a sufficient evidentiary basis from which to take the serious step of imposing sanctions." *Quick*, 2019 WL 95566, at *2; *see Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003) (reversing sanctions at pleading stage and emphasizing "there is little or no evidence before the court at all"); *Anderson News, L.L.C. v. Am. Media, Inc.,* 2013 WL 1746062, at *5 (S.D.N.Y. Apr. 23, 2013) (observing sanctions for factual assertions are

"premature prior to the end of discovery"). Thus, where a defendant files a Rule 11 motion at the pleading stage challenging factual allegations, the "prevailing approach" is "to deny the motion without prejudice to renewal after discovery." *Luv N' Care*, 2017 WL 3671039, at *13; *see, e.g.*, *Colella*, 2024 WL 1239697, at *7; *Smith v. Athena Constr. Grp., Inc.*, 2023 WL 11914917, at *2 (D.D.C. Sept. 18, 2023). DISH still brought this motion now. At the very least, DISH's motion should be denied as premature. But as explained below, DISH's motion can and should be denied *with prejudice* because Plaintiffs' 140-page amended complaint itself disproves any suggestion of a Rule 11 violation.

## II.    DISH's Motion Does Not Establish Any Rule 11 Violation.

Rule 11 imposes on parties "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551 (1991). The standard is objective: "whether a reasonable inquiry would have revealed that there was no basis in law or fact for the asserted claim." *Henok v. Chase Home Fin., LLC*, 922 F. Supp. 2d 110, 126 (D.D.C. 2013). In assessing the reasonableness of that inquiry, courts consider "complexity, feasibility of additional investigation, accessibility of information, knowledge, reliance on others, notice, and available resources." *Exxon Mobil*, 2021 WL 1910892, at *3; *accord* Fed. R. Civ. P. 11 advisory comm.'s note to 1983 amend.

Here, Plaintiffs filed a 140-page amended complaint after substantial investigation. The amended complaint details an unprecedented and well-publicized series of

events at the FCC that drew criticism from current and former FCC commissioners,[1] former FCC officials,[2] members of Congress,[3] civil rights leaders and organizations,[4] and industry leaders,[5] among others.[6] The amended complaint itself shows that counsel conducted a lengthy, independent investigation of those extraordinary events and applicable law. DISH's motion does not show that Plaintiffs' factual allegations lack evidentiary support, that Plaintiffs' legal claims are frivolous, or that Plaintiffs have pursued this case for an improper purpose. *See* Fed. R. Civ. P. 11(b)(1)-(3).

## A. The amended complaint's allegations are factually supported.

Plaintiffs' factual allegations against DISH and Mr. Ergen are not "utterly lacking in evidentiary support." *Contra* Mot. 27. Rule 11 requires that "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). This standard provides "flexibility," "allowing pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella v. Wood*, 528 U.S. 549,

---

[1] *See* Am. Compl. ¶¶231, 252, 307 (Commissioners Carr and Simington); *id.* ¶232 (former Commissioners Michael O'Rielly, Harold Furchtgott-Roth, and Mark Fowler).

[2] *See id.* ¶155 (former deputy chief of FCC Broadcast Bureau Frank Washington); *id.* ¶238 (former deputy chief of FCC Media Bureau Adonis Hoffman).

[3] *See id.* ¶¶246, 258, 269 (Sen. Ted Cruz and Rep. Cathy McMorris Rodgers).

[4] *See id.* ¶235 (president of N.Y. NAACP Hazel Dukes); *id.* ¶236 (Rev. Al Sharpton).

[5] *See id.* ¶233 (National Association of Broadcasters).

[6] *See id.* ¶237 (senior advisor to Democratic National Committee Cedric Richmond); *id.* ¶¶153, 239 (president of Hispanic Leadership Fund Mario Lopez); *id.* ¶154 (leaders of Korean American associations).

560 (2000). A violation of that standard "must be a flagrant one before sanctions are warranted." *US Sprint Commc'ns Co. v. Kaczmarek*, 121 F.R.D. 414, 417 (D. Kan. 1988).

The amended complaint itself reflects counsel's substantial pre-filing factual inquiry. It is not based on "conjecture," "speculation," or "surmise." *Contra* Mot. 25. It describes well-publicized and unprecedented events at the FCC, derailing an $8.6 billion merger. It provides detailed allegations with a timeline of all relevant events from beginning to end, with substantial attribution to the FCC record, contemporaneous news reports, and commentators. It reflects meticulous review of publicly available documents and accounts from those involved in the FCC proceedings. It goes far beyond what *Rule 8* requires for notice pleading and in no way violates Rule 11. *See, e.g., Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15-16 (D.C. Cir. 2008).

DISH contests Plaintiffs' allegations of a conspiracy and the presence of racial discrimination. Mot. 15-27. These are not Rule 11 arguments. *Supra* Part I. DISH's motion does not deny DISH's and Mr. Ergen's involvement in the killing of the TEGNA deal. *See* Am. Compl. ¶¶204, 208, 249, 297, 306. Nor does it dispute the allegations that Mr. Ergen met with FCC Chairwoman Rosenworcel at critical times—right after the license-transfer applications were publicly filed and right before the FCC issued its pocket-veto HDO. *See id.* ¶¶127, 137, 211. Instead, the motion disputes what inferences should be drawn from their involvement. It asks the Court to conclude that Mr. Ergen met the Chairwoman about something else and to otherwise draw inferences in *Defendants'* favor by ignoring

more than 100 pages of other allegations (*infra* pp.19-25). *See generally* Mot. 11, 15-27. *Contra, e.g., Tahfs*, 316 F.3d at 594; *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 195 (2024) (acknowledging, on a motion to dismiss, that "discovery in this case might show … that certain actions should be understood differently in light of newly disclosed evidence" but "the Court must assume the well-pleaded factual allegations in the complaint are true," and reversing Second Circuit for failing to consider defendant's letters and press release "against the backdrop of other allegations in the complaint").

    **1. *Conspiracy.*** In pleading a conspiracy, "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). "The circumstances of the wrongdoing generally dictate what evidence is relevant or available in deciding whether an agreement exists." *Id.* at 486. Courts consider whether defendants "are pursuing the same goal," whether they "are in contact with one another," "the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity." *Id.* at 481, 486. Courts "easi[ly]" infer agreement where defendants "are on the scene together at the same time performing acts in support of one another." *Id.* at 481. Courts also consider a defendant's "motivation to enter into a conspiracy" and whether he "acted contrary to his own independent interest." *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1488 & n.12 (D.C. Cir. 1984).

    DISH's motion faults Plaintiffs for not including *more* allegations in their 140-page amended complaint to support the alleged conspiracy. *See* Mot. 21-22, 24-27. But courts

have long recognized that many facts required to plead a conspiracy "by their nature would be inaccessible to Plaintiff." *Mandelkorn v. Patrick*, 359 F. Supp. 692, 696 (D.D.C. 1973). Because "conspiracies are by their very nature secretive operations," they often are "proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 34 (D.D.C. 2008) ("[D]irect allegations of conspiracy are not always possible given the secret nature of conspiracies. Nor are direct allegations necessary."). Indeed, "in most civil conspiracy cases" courts must "infer an agreement from indirect evidence." *Halberstam*, 705 F.2d at 486. Thus, "a 'plaintiff's allegations of circumstantial evidence' can survive a motion to dismiss." *Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 212 (D.D.C. 2022); *see, e.g.*, *Freeman v. Giuliani*, 2022 WL 16551323, at *10-11 (D.D.C. Oct. 31, 2022). DISH's motion ignores this established precedent.

Relatedly, that some allegations are made "on information and belief" does not violate Rule 11. *Contra* Mot. 21-22, 26. Rules 8 and 11 plainly contemplate that pleadings based on information and belief are permissible. 2 *Moore's Federal Practice – Civil* §8.04[4], LexisNexis. Allegations based on "information and belief" are permissible where "the necessary information lies within the defendant's control" and the allegations are "accompanied by a statement of the facts upon which the allegations are based." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994). Thus, "making allegations based on information and belief is not necessarily fatal to a plaintiff's claims, particularly

where … 'the belief is based on factual information that makes the inference of culpability plausible.'" *Kvech v. Holder*, 2011 WL 4369452, at *3 n.7 (D.D.C. Sept. 19, 2011); *see also Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012). Conspiracy claims are no exception. *See, e.g., Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 957 (8th Cir. 2023); *Soo Park v. Thompson*, 851 F.3d 910, 916 n.3 (9th Cir. 2017). DISH's motion also ignores this precedent.

In any event, the amended complaint amply supports the alleged conspiracy, detailing circumstantial evidence that warrants an inference of conspiratorial agreement. DISH's motion would require the Court to ignore that evidence. DISH scarcely acknowledges the most obvious explanation for the FCC's unprecedented derailment: Byron Allen, his public statements that he was still "in the fight" for TEGNA, his private attempt to get a piece of TEGNA, and his history of leveraging race in commercial settings. *See* Am. Compl. ¶¶17-19, 22, 128, 133, 168-72, 254, 264, 271-89. DISH's motion similarly downplays that lobbyist David Goodfriend represented both DISH and the Allen Group during the relevant time, Mot. 26; *see* Am. Compl. ¶¶25, 38, 138, 158-60, and it ignores allegations of his involvement throughout the FCC proceedings, *see* Am. Compl. ¶¶129, 137, 162-67, 171, 174, 187, 192, 202-03, 208, 248, 268, 290-98. It ignores that the second of Mr. Ergen's meetings with Chairwoman Rosenworcel was all-too-coincidentally the Monday after a Friday event hosted by Mr. Allen for prominent Democratic politicians as the clock for FCC approval wound down. *Id.* ¶¶210-11. It ignores that Mr. Allen's

acquisitions never faced delays or objections like those made here. *Id*. ¶¶98, 113-15, 277. It ignores that DISH, Mr. Ergen, and Mr. Allen shared a desire to kill the deal. *Id*. ¶¶138, 271, 279, 304. It ignores that objections conflicted with the straw objectors' own professed interests like diversity in ownership, protecting jobs, and consumer pricing. *Id*. ¶¶139, 141-42, 147-48. It ignores that DISH continued objecting even *after* it got everything it could have wanted from Standard General, which waived contractual clauses, alleviating pricing concerns. *Id*. ¶¶195-97, 204, 207-08, 249, 303. What DISH calls a "false narrative," Mot. 1, 25, was really a series of events lambasted in real time by members of Congress, former FCC commissioners, and the press, Am. Compl. ¶¶179 & n.10, 210 & n.137, 232, 246, 258, 269, 276 & n.200; *supra* pp.14-15 & nn.1-6.

**2. *Racial animus*.** DISH's motion argues "[t]here are no genuine allegations that Defendants DISH or Ergen harbored any race-based animus against Plaintiffs." Mot. 16. These are arguments for a motion to dismiss (where they also appear, *see* MTD 16). They also misunderstand what Plaintiffs must allege for their §1985(3) conspiracy claim.

In contending that the alleged race-based conspiracy is factually unsupported given DISH's economic concerns with the merger, Mot. 15-17, DISH ignores binding caselaw. Section 1985(3)'s "'intent to deprive of a right' requirement demands that the defendant … act *at least in part* for the very purpose of producing it." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275-76 (1993) (emphasis added); *see, e.g.*, *Wells v. Rhodes*, 928 F. Supp. 2d 920, 931 (S.D. Ohio 2013). Thus, DISH's (or any other Defendant's)

mixed motives in no way preclude §1985(3) liability. *See Hobson v. Wilson*, 737 F.2d 1, 22-24 (D.C. Cir. 1984) (upholding §1985(3) verdict where conspiracy was "aimed at plaintiffs at least in part on account of their *racial politics*," *i.e.*, "a commingling of racial and political motives"), *abrogated in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993); *see also Grimes v. Smith*, 776 F.2d 1359, 1366 & n.12 (7th Cir. 1985) (holding §1985(3) "does not reach nonracial political conspiracies" but reaches "conspiracies animated by *both* racial and political motives"); *Emanuel Displaced Persons Ass'n 2 v. City of Portland*, 704 F. Supp. 3d 1088, 1107 (D. Or. 2023) (holding plaintiff stated §1985(3) claim given "plausible inference" that defendant "was motivated, at least in part, by racial animus" and not "only … economic or other legitimate motives").

The amended complaint alleges racial animus. *Contra* Mot. 18-20. As a matter of law, DISH's motion ignores that the alleged "openly racial motives" held by members of a conspiracy "can be imputed" to coconspirators. *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000); *cf. Lagayan v. Odeh*, 199 F. Supp. 3d 21, 31-32 (D.D.C. 2016) (recognizing that statements can "be imputed" to coconspirators "for the purpose of establishing *their* racial animus"). As a matter of fact, DISH's motion ignores the amended complaint's allegations about coconspirators' race-based and xenophobic rhetoric. *See* Am. Compl. ¶¶147-55, 174. That includes public filings with, for example, an inexplicable reference to "increased tensions in the Taiwan Strait" as a reason to keep Mr. Kim out of local news. *Id.* ¶¶147-51, 174. Upon entering the alleged conspiracy, DISH and Mr. Ergen became

liable for acts of coconspirators in furtherance of the conspiracy, including those public filings. *See, e.g.*, *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 2007 WL 915237, at *2 (D.D.C. Mar. 27, 2007). DISH's motion does not address that issue.

DISH's alternative interpretation of public filings—all cited in the amended complaint—is again not a proper basis for invoking Rule 11. Plaintiffs do not "distort," "twist[]," or "mischaracterize[]" the public filings. *Contra* Mot. 18-20, 25-26. The public record speaks for itself and at this stage must be viewed in Plaintiffs' favor. Objectors said Plaintiffs' acquisition of TEGNA "will do nothing to create a more … diverse … media" and raised concerns about "shadowy foreign investors." Am. Compl. ¶¶147-48. Prominent voices, including president of the New York NAACP Hazel Dukes, Reverend Al Sharpton, and former chair of the Congressional Black Caucus Cedric Richmond, among others, understood objectors' filings to target Mr. Kim for his Asian race. *See id.* ¶¶147-55, 174, 235-39. While DISH contends those filings should be understood as raising concerns about "diversity of *viewpoints*" and "off-shore investment funds," Mot. 7-9, "alternative interpretation[s] of that kind cannot overcome the need to draw inferences in the non-moving party's favor" under Rule 12 or Rule 56, let alone Rule 11, *Wilson v. Cox*, 753 F.3d 244, 247-48 (D.C. Cir. 2014) (holding statement interpreted and viewed "in the light most favorable to [plaintiff] … manifests discriminatory stereotyping"); *Lucas v. Paige*, 435 F. Supp. 2d 165, 170-71 (D.D.C. 2006) (denying summary judgment because "if, as it must be, the statement is construed in plaintiff's favor, it may be deemed an explicit

reference to plaintiff's age" and thus "proof of a discriminatory intent"); *Gipson v. Wells Fargo N.A.*, 460 F. Supp. 2d 15, 27 (D.D.C. 2006) (similar).

Nor is DISH's alternative interpretation consistent with the amended complaint's allegations and the publicly available materials cited therein. For example, when DISH claims that the straw objectors' statements about diversity were only about "the need for diversity of viewpoints, as opposed to racial diversity," Mot. 18-19, DISH ignores that the FCC "has a long-standing goal of promoting *diversity in ownership* of broadcast stations to ensure that *diverse viewpoints and perspectives* are available to the American people," Am. Compl. ¶104 (emphasis added) (quoting *In re Promoting Diversification of Ownership in the Broad. Servs.*, 31 FCC Rcd. 398, 398-99 (2016)); *see, e.g., Statement of Pol'y on Minority Ownership of Broad. Facilities*, 68 F.C.C.2d 979, 981 (1978) (explaining that "minority participation in the ownership and management of broadcast facilities results in a more diverse selection of programming" and "foster[s] the inclusion of minority views in the area of programming"). The FCC has long explored "new initiatives to increase ownership of … mass media facilities by minorities" for the "purpose" of "maximizing the diversity of points of view available to the public." *In re Pol'ys & Rules Regarding Minority & Female Ownership of Mass Media Facilities*, 10 FCC Rcd. 2788, 2788 (1995). In the FCC's view, minority ownership and viewpoint diversity are one and the same, as the amended complaint alleges. Am. Compl. ¶¶104-07. Mr. Kim's acquiring TEGNA would have created the largest-ever minority-owned station group in the United States—and the only

minority-owned group in the top 10. *Id.* ¶118. The company would have been led by a 50% minority board. *Id.* Yet the straw objectors maintained that the deal "does not promote ownership diversity as it is understood … by commission policy." *Id.* ¶147.

Nor can DISH explain away objectors' references to "shadowy foreign investors" simply as concerns about "off-shore investment funds." Mot. 19. As the amended complaint alleges, Cayman Islands and British Virgin Islands funding sources are common for major acquisitions given their obvious tax advantages. Am. Compl. ¶¶71, 74, 76-77, 148; *see also id.* ¶77 (showing FCC has found that expanded access to capital furthers its stated diversity goals). The amended complaint alleges that references like "shadowy foreign investors" were not used in other deals with the same funding sources. *Id.* ¶¶77, 110, 149-51. Nor were concerns about "non-citizens … influenc[ing] domestic elections" expressed in those other deals. *Id.* Such different treatment of similarly situated applicants further evidences discriminatory intent. *See, e.g.*, *Pintro v. Rosenworcel*, 554 F. Supp. 3d 14, 24 (D.D.C. 2021); *Mapp v. District of Columbia*, 993 F. Supp. 2d 22, 25-26 (D.D.C. 2013).

Finally, DISH challenges the amended complaint's allegations of racial discrimination as inconsistent with *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College* (*SFFA*), 600 U.S. 181 (2023). *See* Mot. 8, 20. Again, this is far afield from a Rule 11 argument. And the argument reveals DISH's failure to read the complaint for what it says. Mr. Kim did not "inject[] race" into the proceedings. *Contra* Mot. 7. Longstanding FCC policy makes race a relevant public-interest criterion. Am. Compl. ¶¶104-07; *supra*

p.23. Nor did Mr. Kim ask for "racial preferences at the FCC." *Contra* Mot. 20. He simply sought to be treated equally. *See SFFA*, 600 U.S. at 218-19. He observed the hypocrisy in objectors opposing his deal while ignoring what the FCC has said it cares about—ownership diversity, including management diversity—among the deal's many other public-interest benefits. Am. Compl. ¶141. And he asked not to be cast aside with pernicious stereotypes, *see SFFA*, 600 U.S. at 220-21, like presumptuous statements that he was not "barred by his race" from becoming a successful businessman, that the deal "will do nothing to create a more … diverse … media," and that his acquiring TEGNA would "not promote ownership diversity as it is understood by the public interest and civil rights community, and by commission policy." Am. Compl. ¶147. Those stereotypes continued when objectors stoked fears over the "risks to … democracy" posed by "anonymous foreign investment in American newsroom" and "China['s] increased tensions in the Taiwan Strait," *id.* ¶174, even though all knew the deal's offshore funding came from the Cayman and British Virgin Islands, *id.* ¶148. The amended complaint plausibly alleges that Mr. Kim's race was used *against* him "as a 'negative'" or "as a stereotype." *SFFA*, 600 U.S. at 218. All the while Mr. Allen, who has a history of leveraging race in commercial settings, was waiting in the wings, still "in the fight" for TEGNA. Am. Compl. ¶¶128, 264, 280-88.

*     *     *

Plaintiffs' lengthy, detailed, and thoroughly cited amended complaint alone reflects counsel's more-than-"reasonable" inquiry into the facts "under the circumstances."

Fed. R. Civ. P. 11(b); *see Metricolor, LLC v. L'Oreal S.A.*, 2018 WL 5099497, at *1 (C.D. Cal. Oct. 16, 2018); *In re Tesla Motors, Inc. Sec. Litig.*, 2015 WL 1306490, at *2 (N.D. Cal. Mar. 23, 2015); *Mount Prospect State Bank v. Grossman*, 1989 WL 43620, at *5 (N.D. Ill. Feb. 24, 1989). If the Court disagrees or requires additional information, Plaintiffs would request the opportunity to submit affidavits explaining their pre-filing investigation, including under seal for *in camera* inspection to prevent any alleged waiver of attorney-client privileges or work product protection. *See Intelsat USA Sales LLC v. Juch–Tech, Inc.*, 305 F.R.D. 3, 9-10 & n.3 (D.D.C. 2014) (Contreras, J.).

## B. The amended complaint's claims are not legally frivolous.

Plaintiffs' claims are amply "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(2). DISH and Mr. Ergen have no basis for asserting that the claims against them are legally frivolous. *Contra* Mot. 27. Claims are legally frivolous if they "offer[] no hope whatsoever of success." *Saltany v. Reagan*, 886 F.2d 438, 440 (D.C. Cir. 1989). It must be "patently clear" that they "had absolutely no chance of success under the existing precedents." *Indep. Fed. Sav. Bank v. Bender*, 230 F.R.D. 11, 16 (D.D.C. 2005).

Plaintiffs assert federal civil rights claims against DISH and Mr. Ergen for conspiring to deprive Plaintiffs of the equal protection of the laws under §1985(3) and for neglecting to prevent or aid in preventing the conspiracy under §1986. Am. Compl. ¶¶351-63. Plaintiffs also assert common-law claims for tortious interference with contract,

tortious interference with prospective business opportunity, and civil conspiracy. *Id.*
¶¶364-87. Plaintiffs have plausibly stated each claim, and the First Amendment does not
immunize DISH and Mr. Ergen from liability. Again, all of DISH's arguments about the
legal plausibility of Plaintiffs' claims are arguments for a motion to dismiss (where they
also appear, *see* MTD 25-36), not a basis for seeking Rule 11 sanctions.

### 1. Plaintiffs plausibly state each claim asserted against DISH and Mr. Ergen.

DISH argues that Plaintiffs' claims "lack any legal merit, in violation of Rule
11(b)(2)," Mot. 27, but DISH then fails to address the Rule 11 standard. DISH cites no
binding precedent that would foreclose relief for Plaintiffs' claims—indeed, not one de-
cision of the Supreme Court or D.C. Circuit addressing any of Plaintiffs' causes of action.
DISH instead frames its Rule 11(b)(2) argument as saying the amended complaint "fails
to state a claim upon which relief may be granted." Mot. 32. As explained, these are Rule
12(b)(6) arguments copied largely verbatim in DISH's pending motion to dismiss. *See*
MTD 33-36; *supra* pp.11-12. In any event, Plaintiffs plausibly state their claims, as will be
further detailed in Plaintiffs' forthcoming response to Defendants' motions to dismiss.

**a. *Count III*.** Section 1985(3) provides "an action for the recovery of damages"
against anyone who conspires "for the purpose of depriving, either directly or indirectly,
any person or class of persons of the equal protection of the laws." 42 U.S.C. §1985(3). A
plaintiff states a §1985(3) claim by alleging (1) a conspiracy (2) for the purpose of depriv-
ing a person of the equal protection of the laws and (3) an act in furtherance of the

conspiracy (4) causing injury. *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009). The plaintiff must show "that some racial … invidiously discriminatory animus lay behind the conspirators' action." *Bray*, 506 U.S. at 267-68 (cleaned up).

Detailed above, *supra* Part II.A.1-2, Plaintiffs have plausibly alleged a conspiracy motivated by racial animus, *contra* Mot. 33. The purpose of Defendants' conspiracy was to deprive Plaintiffs of their equal protection rights—for the FCC to treat them differently than similarly situated applicants because of Mr. Kim's Asian race. Am. Compl. ¶353; *see id.* ¶¶108-15, 311-13. In furtherance of the conspiracy, Defendants, *inter alia*, filed baseless petitions and objections and generated opposition from members of Congress with six-figure political contributions to delay the FCC proceedings and provide a pretext for the pocket-veto HDO. *E.g., id.* ¶¶130, 135, 146-51, 162-68, 171, 174-77, 179-80, 187, 192, 201-06, 208, 222, 268. The amended complaint alleges Defendants' motivations, opportunities for concerted action, and conduct, including impermissible discriminatory animus. *See generally id.* ¶¶269-323. Defendants' acts derailed an $8.6 billion acquisition and caused Plaintiffs hundreds of millions in damages. *Id.* ¶¶13-14, 263, 356.

DISH challenges Plaintiffs' §1983(5) claim as "conclusory" and not "plausible" with general *Twombly* quotes without grappling with the amended complaint's factual allegations. Mot. 32-33. The one other case DISH cites supports Plaintiffs because the court rejected the defendant's "narrow characterization of his conduct" and held that the "pattern of mutually supportive activity … supports a plausible conspiracy" and

"distinguishes this case from *Twombly*." *Thompson v. Trump*, 590 F. Supp. 3d 46, 105 (D.D.C. 2022). Here, Plaintiffs' "allegations of conspiracy are more than just conclusory" and "are sufficient to indicate a plausible specific intent to agree." *Nanko Shipping, Guinea v. Alcoa, Inc.*, 330 F. Supp. 3d 439, 450 (D.D.C. 2018). Plaintiffs have stated a plausible §1985(3) conspiracy claim, and DISH has no basis for asserting that the §1985(3) claim fails Rule 11(b)(2).

**b.** *Count IV.* Section 1986 generally "holds civilly accountable those who have knowledge of a conspiracy, as delineated in § 1985, and failed to prevent such wrongdoing." *Patterson v. Harris*, 2023 WL 346096, at *11 (D.D.C. Jan. 20, 2023). To state a §1986 claim, a plaintiff must allege that the defendant (1) had "knowledge" of a §1985 conspiracy, (2) had the "power to prevent or aid in preventing" the conspiracy, (3) "neglect[ed] or refuse[d]" to do so, and (4) a "wrongful act" was committed. 42 U.S.C. §1986; *see Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).

DISH challenges only the second element, arguing that no facts show DISH and Mr. Ergen "had the power to prevent the purported conspiracy or control the outcome of the applications at the FCC." Mot. 33. But a defendant need only have the power to "*aid in* preventing" the conspiracy. §1986 (emphasis added). This is not a high bar. Courts have sustained §1986 claims against private parties based on a defendant's "leadership role and influence" in a conspirator company, *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 759 F. Supp. 1339, 1352 (W.D. Wis. 1991), where

a defendant "did not attempt to dissuade" others from committing wrongful acts, *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1007 (S.D. Tex. 1981), and where defendants were members of a conspirator association and simply "were present for, and participated in, [a] meeting" where a wrongful act was planned, *Sealed Plaintiff 1 v. Front*, 2024 WL 1395477, at *27 (E.D. Va. Mar. 31, 2024).

DISH's arguments about whether that standard is met are, at best, arguments for a motion to dismiss (where they also appear, *see* MTD 34). And DISH again fails to consider the allegations in the amended complaint. The amended complaint alleges Mr. Ergen's leadership role and influence over DISH, including that he personally refused Standard General's request to meet with DISH. Am. Compl. ¶¶36, 249. It alleges that Mr. Goodfriend previously worked at DISH, has been a client of DISH for more than 15 years, and actively lobbied the FCC on behalf of DISH during the Standard General-TEGNA proceedings. *Id.* ¶160. It alleges that Mr. Ergen personally met with Chairwoman Rosenworcel twice during the FCC proceedings. *Id.* ¶¶127, 211. It is thus plausible that DISH and Mr. Ergen had some power to at least "aid in preventing" the alleged conspiracy, even if only "attempt[ing] to dissuade" Mr. Goodfriend or Chairwoman Rosenworcel. *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1007. Given the amended complaint's allegations and governing law, DISH has no basis for claiming a violation of Rule 11(b)(2).

**c. *Counts V, VI.*** To state a claim for tortious interference with contract and prospective business opportunity under D.C. law, a plaintiff must allege (1) the existence of

a contract or business expectancy, (2) the defendant's knowledge of the contract or business expectancy, (3) intentional interference with the contract or business expectancy, and (4) damages. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015); *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345-46 (D.C. 2015). Plaintiffs' allegations satisfy each element.

Plaintiffs allege that Standard General had a merger contract with TEGNA, financing contracts with banks and investment funds, and a business expectancy from the deal. Am. Compl. ¶¶63-66, 365, 375. Plaintiffs allege that Defendants knew of these contracts, their relevant terms, and the business expectancy, as they were widely reported and included in public FCC filings. *Id.* ¶¶67, 366-67, 376. Plaintiffs allege that Defendants interfered with the contracts and business expectancy through their sham petitions and objections, which delayed FCC review of Plaintiffs' applications and provided a pretext for the pocket-veto HDO. *Id.* ¶¶369-70, 378. And Plaintiffs allege damages, including the $136 million break fee paid to TEGNA, $70 million in incurred transaction costs, and billions of dollars in benefits lost had the deal been completed. *Id.* ¶¶13-14, 263, 373, 381.

DISH is wrong to argue that Plaintiffs must "plead … wrongful interference." Mot. 34. "Wrongful conduct is not an element of a prima facie case of tortious interference under [D.C.] law." *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 893 (D.C. 2008). Rather, the defendant bears the burden "to establish that its intentional interference was legally justified or privileged." *Id.* (explaining "affirmative defense"); *see*

*Armstrong v. Thompson*, 80 A.3d 177, 190 (D.C. 2013). Because "[t]he Federal Rules of Civil Procedure 'do not require a plaintiff to anticipate affirmative defenses which might be raised by a defendant,'" a plaintiff "need not allege wrongful or improper conduct in order to survive a motion to dismiss for failure to state a tortious interference claim under [D.C.] law." *Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 230 n.12 (D.D.C. 2016); *see Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 29 (D.D.C. 2017) (holding plaintiff stated tortious interference claim and rejecting defendant's asserted privilege).

DISH also argues that "[n]o contract was breached." Mot. 34. But "a breach *per se* is not required" to state a claim; "a 'failure of performance' will suffice." *Meyer Grp., Ltd. v. Rayborn*, 2020 WL 5763631, at *6 (D.D.C. Sept. 28, 2020). To state a claim for tortious interference with contract, a plaintiff need only allege "that the defendant interfered with the plaintiff's performance under a contract." *PHCDC1, LLC v. Evans & Joyce Willoughby Tr.*, 257 A.3d 1039, 1046 (D.C. 2021); *see Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012) (explaining interference need only "cause 'merely a failure of performance' by one of the parties"). That is exactly what Plaintiffs allege: Defendants interfered with "Standard General's performance of the merger and financing agreements' condition to obtain FCC approval of the transfer of the broadcast licenses by May 22, 2023." Am. Compl. ¶368. As the foregoing illustrates, DISH's arguments about the tortious interference claims are, at best, arguments for a motion to dismiss. Indeed, DISH made the same arguments there too. MTD 34-36. They are not a basis for seeking Rule 11 sanctions.

**d. *Count VII*.** To state a claim for civil conspiracy under D.C. law, a plaintiff must allege (1) an agreement between two or more persons (2) to participate in an unlawful act and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme. *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 446 (D.C. 2013). Plaintiffs have stated a civil conspiracy claim for the same reasons they have stated a §1985(3) claim. *Supra* Part II.B.1.a.

**2.   The First Amendment does not immunize DISH's and Mr. Ergen's conduct.**

DISH and Mr. Ergen assert blanket immunity from the foregoing claims under the First Amendment. They do not explain how these arguments would satisfy Rule 11's standard, prohibiting frivolous legal claims that "offer[] no hope whatsoever of success" with "no colorable authority" to support them. *Hollister v. Soetoro*, 258 F.R.D. 1, 5 (D.D.C. 2009). In any event, as Plaintiffs will further detail in their forthcoming response to the motions to dismiss, Defendants' First Amendment arguments have no application here.

**a.** DISH's general First Amendment assertions cite "no 'existing law'" that "squarely foreclose[s] Plaintiffs' claims." *Quick*, 2019 WL 95566, at *2. DISH maintains that Defendants' "speech" and "advocacy" concerned "a matter of public interest" and therefore "cannot serve as a basis for any statutory or tort liability." Mot. 27-28. But the amended complaint alleges DISH's and Mr. Ergen's *acts* and *conduct*—not speech—violated federal and state law. *E.g.*, 42 U.S.C. §§1985(3), 1986. Federal civil rights laws, for example, are not "directed at expression (*i.e.*, 'speech' or 'messages')"; they are "aimed at

conduct unprotected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 389-90 (1992) (citing Title VII and §§1981 and 1982 as examples of "statute[s] directed at conduct rather than speech").

As for other Defendants' acts, even if taking the form of public or private speech, "the Supreme Court has clearly held that the First Amendment does *not* protect the very act of discriminating on the basis of race." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024). "[T]he Constitution places no value on discrimination, and while invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment it has never been accorded affirmative constitutional protections." *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (cleaned up). *Contra* Mot. 31-32 (asserting "right to association"). The First Amendment does not immunize *conduct* that violates laws prohibiting race discrimination or constitutes common-law torts. *See, e.g., Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006); *Fearless Fund*, 103 F.4th at 777-79; *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 295-96 (2d Cir. 1992) (rejecting First Amendment defense to §1985(3) and tortious interference claims because the statute is "plainly aimed at conduct, *i.e.*, discrimination, not speech" and the tort "is directed against conduct, not speech"); *SMJ Grp., Inc. v. 417 Lafayette Rest. LLC*, 2006 WL 2516519, at *7 (S.D.N.Y. Aug. 30, 2006) (same for tortious interference with prospective business); *see also, e.g., Spence v. Daily News*, 2001 WL 121938, at *3 (S.D.N.Y. Feb. 13, 2001) ("The First Amendment does not, therefore, prevent

courts from enforcing statutes, such as Section 1981, that prohibit discrimination."); *A.H.D.C. v. City of Fresno*, 2000 WL 35810722, at *4 (E.D. Cal. Aug. 31, 2000) ("Unlawfully discriminatory conduct carried out by speech activities is not immunized by the First Amendment.").

**b.** DISH and Mr. Ergen also invoke the *Noerr-Pennington* antitrust doctrine, suggesting it so clearly shields them from liability that the amended complaint violates Rule 11. Mot. 28-30. It does not. Their motion asserts that the doctrine's "reach extend[s] beyond antitrust" to "common law torts" and "civil rights claims," collecting decisions of district courts and other circuit courts. *Id.* But no decision in the D.C. Circuit or others would foreclose Plaintiffs from arguing that *Noerr-Pennington* does not apply here.

*Noerr-Pennington* is a "doctrine of antitrust law" that immunizes defendants "from antitrust liability." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555-56 (2014). The D.C. Circuit "ha[s] never applied" it "to bar liability for common law torts." *Graham*, 798 F.3d at 1137 n.8. The D.C. Circuit says the doctrine "rests ultimately upon a recognition that *the antitrust laws*, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'" *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001) (emphasis added). Likewise, the Supreme Court describes *Noerr-Pennington* as "the doctrine of antitrust immunity," *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PRE*), 508 U.S. 49, 51 (1993), that "protect[s] from antitrust liability," *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988).

Plaintiffs here assert no antitrust claims. It is thus "unclear whether *Noerr-Penning-ton* has any relevance" to this case. *Jefferson-11th St., LLC v. District of Columbia*, 2020 WL 3035038, at *7 (D.D.C. June 5, 2020); *see also Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109 n.34 (D.D.C. 2010) (concluding "applicability in this jurisdiction with regards to common law torts remains ambiguous" because no "legal authority from this jurisdic-tion stat[es] that the doctrine necessarily applies"). And courts outside this circuit have declined to extend the doctrine beyond antitrust or further than some circuits have. *See, e.g.*, *Lesane v. Hawaiian Airlines, Inc.*, 2019 WL 8509486, at *3 (D. Haw. Dec. 18, 2019) (com-mon-law fraud); *Rondigo, LLC v. Township of Richmond*, 2012 WL 1021726, at *4 (E.D. Mich. Mar. 27, 2012) (§§1985(3) and 1986); *Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*, 2007 WL 473273, at *7 (S.D. Fla. Feb. 8, 2007) (tortious interference). The lack of "preclusive author-ity" from the Supreme Court or D.C. Circuit and the fact that Plaintiffs' "position ha[s] support" in other cases precludes Rule 11 sanctions. *Burns v. George Basilikas Tr.*, 599 F.3d 673, 677 (D.C. Cir. 2010); *see also, e.g.*, *Kim v. Kimm*, 884 F.3d 98, 106-07 (2d Cir. 2018) (af-firming denial of Rule 11 motion given "no binding precedent in this Circuit"); *Kerner v. Cult Awareness Network*, 843 F. Supp. 748, 750 (D.D.C. 1994) (denying Rule 11 motion where plaintiff's "legal theory was an untested proposition in this jurisdiction").

And even if the *Noerr-Pennington* doctrine applied, *Noerr-Pennington* has a well-settled "sham" exception that would apply here. *Noerr-Pennington* does not "cover activ-ity that was not genuinely intended to influence governmental action." *Allied Tube*, 486

U.S. at 507 n.10. In other words, "while genuine petitioning is immune" from liability, "sham petitioning is not." *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525-26 (2002). So when objections are "a mere sham to cover an attempt to interfere directly with the business relationships of a competitor," *Noerr-Pennington* does not apply. *PRE*, 508 U.S. at 51 (cleaned up). The "classic example" of the sham exception "is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)).

DISH's Rule 11 assertions cannot be reconciled with the sham exception, even assuming *Noerr-Pennington* applies. The amended complaint alleges that objectors' filings were "objectively baseless" and used the FCC "*process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *PRE*, 508 U.S. at 60-61; *see, e.g.*, Am. Compl. ¶¶173, 278, 321-23, 378. For instance, objectors insisted on obtaining information about "alternative transactions considered" by TEGNA—*i.e.*, Mr. Allen's failed bid—even though federal law *prohibits* the FCC's consideration of other buyers. Am. Compl. ¶¶130, 168-73; *see* 47 U.S.C. §310(d); *In re Spanish Int'l Commc'ns Corp.*, 1 FCC Rcd. 844, 846-47 (1986) (rejecting argument that public interest would be "better served" if channels "were sold to qualified minority buyers" as "obviously illegal" under the "clear congressional prohibition of Section 310(d)"). Objectors complained about retransmission fees, Am.

Compl. ¶135, even though the FCC rebuked such objections to past deals because "the Commission is not the appropriate forum for addressing private contractual matters," *id.* ¶111 (quoting *In re Terrier Media Buyer, Inc.*, 34 FCC Rcd. 10554, 10566 (2019)); *see id.* ¶¶98 & n.24, 114, 143 & n.75. And objectors, including DISH, continued to complain about re-transmission fees even *after* Mr. Kim made binding commitments waiving contractual clauses that eliminated any conceivable pricing objections. *Id.* ¶¶195-97, 207-09, 249, 303. Objectors also complained that the deal would result in job losses, *id.* ¶135, even though the FCC rejected past arguments "that private equity firms typically impose cost-cutting measures that 'gut newsrooms,'" *id.* ¶111 (quoting *Terrier Media*, 34 FCC Rcd. at 10567); *see id.* ¶98 & n.24, and even though Mr. Kim has a history of investing in local journalism and local content, *id.* ¶¶53-57. And complaints about jobs continued *after* Mr. Kim made binding commitments that no job losses would occur. *Id.* ¶¶199, 208-09, 253.

No precedent precludes Plaintiffs from arguing that, even if *Noerr-Pennington* applies to this case, the doctrine's sham exception is met. Defendants opposed Plaintiffs' application every step of the way, disregarding the limits of the FCC's review and FCC precedent, as part of their impermissible "strategy of delay." *United States v. AT&T*, 524 F. Supp. 1336, 1364 (D.D.C. 1981) (applying sham exception where defendant filed "a petition to the FCC requesting a general inquiry into the public interest aspects" when it "well knew that the positions it took before the FCC were baseless"); *see Litton Sys., Inc. v. AT&T*, 700 F.2d 785, 809-12 (2d Cir. 1983) (applying sham exception where defendant

"consistently maintained" "baseless claims" foreclosed by "FCC's basic position" to "delay and obfuscate" proceedings); *Primetime 24 Joint Venture v. NBC, Inc.*, 219 F.3d 92, 101 (2d Cir. 2000) (holding plaintiff pleaded sham exception where it alleged that defendants in a "coordinated scheme" filed "simultaneous and voluminous challenges" against plaintiff "without regard to whether the challenges had merit"). The First Amendment is no shield when Defendants impermissibly "sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." *Cal. Motor*, 404 U.S. at 512. That the straw objectors knew their objections were meritless under binding FCC precedent further evidences their impermissible motives. *See Litton Sys.*, 700 F.2d at 810; *FTC v. AbbVie Inc.*, 976 F.3d 327, 369-70 (3d Cir. 2020).

Moving even farther afield of their required showing that claims are frivolous under Rule 11, DISH and Mr. Ergen contend that the FCC's HDO and a fleeting D.C. Circuit proceeding absolves them. *See* Mot. 30. That argument is not one about "no colorable authority" to support Plaintiffs' claims. *Hollister*, 258 F.R.D. at 5. The HDO absolves no one. It did not decide the merits of Plaintiffs' license-transfer applications; it was a pocket-veto, Am. Compl. ¶¶225, 227, 308, 391, and the culmination of Defendants' delay-delay-delay strategy, *cf. In re Lipitor Antitrust Litig.*, 868 F.3d 231, 274 (3d Cir. 2017) (reversing rejection of sham exception and faulting district court for "[e]quating delay in consideration of a petition or its complexity with the petition's underlying merits," which "fails to draw inferences in … plaintiffs' favor"). As for the D.C. Circuit appeal during the FCC

proceedings, DISH fails to mention that the D.C. Circuit declined to intervene because there was *no* final "resolution by the full Commission." Am. Compl. ¶245; Order, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr. 3, 2023) (per curiam) (quoting *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999) (per curiam)). The D.C. Circuit has held that similar nonfinal agency action that does not include a "determination on the merits" and even results in plaintiffs' "withdrawal or abandonment of [their] applications before final agency action had taken place" does not insulate petitioning parties from liability under the sham exception. *Israel v. Baxter Labs., Inc.*, 466 F.2d 272, 274, 279-80 (D.C. Cir. 1972). Nor did the D.C. Circuit "reject[] Plaintiffs' assertion that the HDO was a sham," as DISH claims. *Contra* Mot. 30. That issue was not before the D.C. Circuit. *See* Mot. Exs. 14-15.

*    *    *

Plaintiffs' claims are not "without legal support" or "so devoid of reason as to be deemed frivolous." *Nat'l Cas. Ins. v. Solomon*, 502 F. Supp. 3d 401, 410-11 (D.D.C. 2020) (Contreras, J.). They instead plausibly state claims for relief, as Plaintiffs will further detail in their forthcoming response to the motions to dismiss. And even if the Court were to dismiss some claims, despite the amended complaint's detailed allegations and inferences owed to Plaintiffs, that alone would not warrant sanctions. *See, e.g.*, *Cheeks of N. Am., Inc. v. Fort Myer Constr. Corp.*, 807 F. Supp. 2d 77, 99 (D.D.C. 2011), *mot. for summary*

*affirmance granted*, 2012 WL 3068449 (D.C. Cir. July 26, 2012). DISH has not come near the required showing under Rule 11(b)(2); it has only repeated its pending motion to dismiss.

### C. The amended complaint is not presented for an improper purpose.

DISH's motion claims without any basis that Plaintiffs filed the amended complaint only to harass. Mot. 35-36. DISH describes this lawsuit as "a rich man's manifestation of a temper tantrum" and Mr. Kim as "an entitled entrepreneur" who "blame[s] Defendants … for not getting what [he] wanted at the FCC in the time frame that [he] wanted it." Mot. 1, 35. This appears to be DISH's only basis for arguing the amended complaint was "presented for the improper purpose of harassing Defendants DISH and Ergen." Mot. 35. For all the foregoing reasons, this lawsuit was not filed for that purpose.

As the amended complaint shows, this lawsuit challenges an unprecedented series of events at the FCC that drew substantial public attention. *Supra* pp.14-15 & nn.1-6. The killing of the TEGNA acquisition cost Mr. Kim roughly $200 million in fees and costs plus an $85 million hit in his ownership stake in TEGNA. Am. Compl. ¶¶13-14, 263. TEGNA's shareholders lost approximately *$2 billion* in the expected gains from a successful merger. *Id.* ¶13. DISH has no substance behind its assertion that there was no good-faith basis for filing the amended complaint. Plaintiffs' amended complaint is "well grounded in fact," "warranted by existing law," and thus "cannot, as a matter of law, constitute harassment for purposes of rule 11." *Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 538 (5th Cir. 1990) (collecting cases); *see Gonzalez Ramos v. ADR Vantage, Inc.*, 2021 WL 4462411, at *2

(D.D.C. Sept. 29, 2021) ("The fact that Plaintiff's Complaint raised nonfrivolous claims is strong evidence that it was not filed for improper purposes."); *see also Chandler v. Berlin*, 2020 WL 5593905, at *3 (D.D.C. Sept. 18, 2020) (observing that "prevailing in an action is no basis to impute improper motives for the filing of a complaint" and holding plaintiff's contentions "were a far cry from frivolous" given "the parties vigorously debated" issues and plaintiff "advanced colorable (though ultimately unsuccessful) arguments").

## III. DISH's motion itself violates Rule 11 and warrants a sanction of fees and costs.

DISH's improper use of Rule 11 for its Rule 12 arguments in this posture warrants sanctions. A Rule 11 motion "is itself subject to the requirements of the rule and can lead to sanctions." Fed. R. Civ. P. 11 advisory comm.'s note to 1993 amend. Rule 11's mandate that lawyers "think twice before filing … applies with equal force when the filing includes a Rule 11 claim." *Brooks v. Rosebar* (*In re Rosebar*), 2014 WL 7403573, at *2 (Bankr. D.D.C. Dec. 29, 2014). An attorney's "cavalier approach to sanctions motions could result in him being sanctioned himself." *Jordan v. U.S. Dep't of Lab.*, 273 F. Supp. 3d 214, 246 (D.D.C. 2017) (Contreras, J.); *see Simu v. Carvalho* (*In re Carvalho*), 598 B.R. 356, 364 n.7 (D.D.C. 2019) (cautioning counsel "that a frivolous Rule 11 sanction motion may itself be a violation of Rule 11"); *Ahuruonye*, 312 F. Supp. 3d at 26 n.22 (same).

Under Rule 11, "[i]f warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2); *see* Fed. R. Civ. P. 11 advisory comm.'s note to 1993 amend. (including expenses

"the target of the motion" incurred in "opposing the motion"). "[P]revailing party fees are 'available whether or not the motion itself violated Rule 11.'" *Cabrera*, 2024 WL 1212292, at *3. Fees are warranted "when a party files a Rule 11 motion for an improper purpose." *Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014); *see* Fed. R. Civ. P. 11(b)(1) (forbidding motions "presented for any improper purpose, such as to harass … or needlessly increase the cost of litigation"). A party opposing a Rule 11 motion need not serve a cross motion or comply with Rule 11's procedural requirements when counter requesting sanctions. Fed. R. Civ. P. 11 advisory comm.'s note to 1993 amend.; *Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001).

It is well established that Rule 11 should not be invoked "to intimidate an adversary into withdrawing contentions that are fairly debatable." Fed. R. Civ. P. 11 advisory comm.'s note to 1993 amend.; *cf.* D.C. Rules of Prof. Conduct 8.4(g). "Rule 11 is not a weapon for intimidating or browbeating opposing counsel to refrain from filing a pleading that a lawyer disagrees with." *Bartronics, Inc. v. Power-One, Inc.*, 245 F.R.D. 532, 538 (S.D. Ala. 2007). Nor is it a "combative tool[]" to be used "in hopes of securing a strategic advantage." *Id.* Courts have long denounced attempts to leverage Rule 11 as a "tactic of intimidation and harassment" or a "'hardball' litigation technique[]." *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 485 (3d Cir. 1987). Attorneys who do so "invite retribution from courts which are far from enchanted with such abusive conduct." *Id.*

The timing and posture of DISH's motion show its purpose is either to intimidate Plaintiffs and their counsel to dismiss claims against DISH and Mr. Ergen at the infancy of this case or to increase the chances that the Court does so. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1123 (7th Cir. 1992) (instructing district court not to "tolerate turning the Rule 11 motion into a method of intimidation" where defendants invoked Rule 11 "in their very first filing"); *Coles v. Deltaville Boatyard, LLC*, 2011 WL 6337619, at *8 (E.D. Va. Dec. 19, 2011) (emphasizing Rule 11 "should never be employed as a means to achieve some tactical advantage"). In filing its motion, DISH consciously ignored settled case law that claims about the Rule 11 bases for pleadings "are ordinarily determined at the *end* of litigation." *Betz*, 2021 WL 5865384, at *5 (emphasis added); *supra* pp.13-14. If DISH's intent were something other than to intimidate or to obtain a strategic advantage for its pending motion to dismiss, then DISH would have awaited resolution of its pending Rule 12 motion to consider whether it is justified in raising the Rule 11 specter if that motion were granted. 5A Wright & Miller §1336.3. *But cf. Cheeks*, 807 F. Supp. 2d at 99 (declining to "award sanctions under Rule 11 simply because" the complaint "fails to state a claim for relief"). Instead, DISH chose "to hurl Rule 11 accusations" from the moment this case began. *Bartronics*, 245 F.R.D. at 538.

By "us[ing] a Rule 11 motion to legally attack the substance of [Plaintiffs'] entire complaint" and "by asking for a dismissal on the merits of [Plaintiffs'] complaint through a Rule 11 motion," DISH "has unreasonably multiplied the proceedings in this case." *Bell*

44

*v. Nat'l Credit Servs. Inc.*, 2020 WL 8832899, at *7 (W.D. Wash. Oct. 14, 2020) (describing such motion as "ill advised and reckless"); *accord* 28 U.S.C. §1927. "[N]o reasonable attorney" would "misconstrue[] a Rule 11 Motion with … a motion to dismiss." *Goldwater Bank, N.A. v. Elizarov*, 2023 WL 4295255, at *4 (C.D. Cal. May 9, 2023). DISH "should know that Rule 11 is not the vehicle to obtain a judgment on the merits." *Bell*, 2020 WL 8832899, at *7. Plaintiffs twice explained why DISH's motion was procedurally improper and baseless. *See generally* Green Decl. Exs. B-C. Yet DISH proceeded with this motion anyway.

Considering the timing of DISH's Rule 11 motion and its repetition of DISH's Rule 12 arguments, it was brought for the improper purpose to intimidate, gain a strategic advantage, or needlessly increase the cost of litigation. *See Rich v. Taser Int'l, Inc.*, 2012 WL 3155137, at *3 (D. Nev. Aug. 2, 2012) (awarding fees and inferring Rule 11 motion was "brought for an improper purpose" since it was "composed almost entirely of arguments" that "ha[d] already been made" in pending summary judgment motion); *see also Coles*, 2011 WL 6337619, at *8 (noting counsel's "repeated" and "unfounded" Rule 11 threats "served only to needlessly increase the cost of litigation"). An award of Plaintiffs' expenses incurred in opposing DISH's motion is "warranted." Fed. R. Civ. P. 11(c)(2); *see Cabrera*, 2024 WL 1212292, at *3; *Rosebar*, 2014 WL 7403573, at *4.

## CONCLUSION

The Court should deny DISH and Mr. Ergen's Rule 11 motion with prejudice and award Plaintiffs their expenses incurred in opposing the motion.

DATED:  September 25, 2024                Respectfully submitted,

                                          /s/ Tyler R. Green
Jeffrey M. Harris                         Tyler R. Green
   (DC Bar No. 994058)                       (DC Bar No. 982312)
Taylor A.R. Meehan*                       CONSOVOY MCCARTHY PLLC
   (DC Bar No. 106377)                    222 S. Main St., 5th Fl.
Frank H. Chang                            Salt Lake City, UT 84101
   (DC Bar No. 1686578)                   (703) 243-9423
Daniel M. Vitagliano**                    tyler@consovoymccarthy.com
   (DC Bar No. 90019860)
CONSOVOY MCCARTHY PLLC                     Patrick Strawbridge*
1600 Wilson Blvd., Ste. 700               CONSOVOY MCCARTHY PLLC
Arlington, VA 22209                       Ten Post Office Square
(703) 243-9423                            8th Floor South PMB #706
jeff@consovoymccarthy.com                 Boston, MA 02109
taylor@consovoymccarthy.com               (703) 243-9423
frank@consovoymccarthy.com                patrick@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
                                          * Admitted pro hac vice
                                          ** Supervised by principals of the firm
                                          admitted to practice in VA


        Counsel for Plaintiffs SGCI Holdings III LLC and Soohyung Kim

**CERTIFICATE OF SERVICE**

I certify that on September 25, 2024, I filed this memorandum through the Court's

CM/ECF system, which will provide notice to all parties of record.

/s/ Tyler R. Green
*Counsel for Plaintiffs*