# EXHIBIT A

**Case No. 1:24-cv-1204-RC**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SGCI HOLDINGS III LLC AND SOOHYUNG KIM, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL COMMUNICATIONS COMMISSION; JESSICA ROSENWORCEL, in her official capacity as Chairwoman of the FCC; HOLLY SAURER, in her official capacity as Chief of the Media Bureau; THE ALLEN MEDIA GROUP, INC. f/k/a Entertainment Studios, Inc.; DISH NETWORK CORPORATION; THE GOODFRIEND GROUP, INC.; THE NEWSGUILD-CWA; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA; UNITED CHURCH OF CHRIST, OC INC., d/b/a United Church of Christ Media Justice Ministry; COMMON CAUSE; BYRON ALLEN; CHARLES ERGEN; and DAVID GOODFRIEND, <br><br> Defendants. | Case No. 24-1204 <br> Honorable Judge R.C. |

**MOTION FOR RULE 11 SANCTIONS BY DEFENDANTS
DISH NETWORK CORPORATION AND CHARLES ERGEN**

Defendants DISH Network Corporation ("DISH") and Charles Ergen ("Ergen"), by and through their undersigned counsel, hereby move this Court, pursuant to Fed. R. Civ. P. 11, to impose monetary sanctions against Plaintiffs SGCI Holdings III LLC and Soohyung Kim and their counsel. This Motion is supported by the accompanying Statement of Points and Authorities in Support of the Motion for Rule 11 Sanctions By Defendants DISH Network Corporation and Charles Ergen.

Dated:  July 3, 2024 [service date]

Respectfully submitted,

STEPTOE LLP

By:  *s/ Elyse D. Echtman*
Elyse D. Echtman
D.D.C. Bar No. NY0583
1114 Avenue of the Americas
New York, New York 10036
(212) 378-7551
eechtman@steptoe.com

*Counsel for Defendants DISH Network Corporation and Charles Ergen*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SGCI HOLDINGS III LLC AND SOOHYUNG KIM, <br><br><br>Plaintiffs,<br><br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION; JESSICA ROSENWORCEL, in her official capacity as Chairwoman of the FCC; HOLLY SAURER, in her official capacity as Chief of the Media Bureau; THE ALLEN MEDIA GROUP, INC. f/k/a Entertainment Studios, Inc.; DISH NETWORK CORPORATION; THE GOODFRIEND GROUP, INC.; THE NEWSGUILD-CWA; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA; UNITED CHURCH OF CHRIST, OC INC., d/b/a United Church of Christ Media Justice Ministry; COMMON CAUSE; BYRON ALLEN; CHARLES ERGEN; and DAVID GOODFRIEND,<br><br><br>Defendants. | Case No. 24-1204-RC |

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION FOR RULE 11 SANCTIONS BY DEFENDANTS
## DISH NETWORK CORPORATION AND CHARLES ERGEN

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.    FACTUAL BACKGROUND................................................................................. 2

   A.    THE PETITIONS TO DENY THE APPLICATIONS ..................................... 3

   B.    DISCUSSIONS OF MR. KIM'S RACE AND NATIONALITY.................................... 6

   C.    DISH'S FILINGS ON THE FCC DOCKET ..................................... 8

   D.    THE HEARING DESIGNATION ORDER ..................................... 9

III.   THE COMPLAINT'S ALLEGATIONS ................................................................. 10

   A.    PLAINTIFFS CONCEDE THAT DISH'S CONCERNS WERE ECONOMIC ........... 11

   B.    PLAINTIFFS' ALLEGATIONS OF AN UNLAWFUL RACE-BASED CONSPIRACY
         LACK ANY BASIS IN FACT ..................................... 12

IV.   ARGUMENT.......................................................................................................... 15

   A.    THE CLAIMS ALLEGED AGAINST DISH AND ERGEN VIOLATE RULE 11 ..... 16

      1.    The Complaint's Purported "Factual" Allegations are Utterly Lacking in Evidentiary
            Support................................................................................................................. 16

      2.    The Complaint's Legal Claims Against DISH and Ergen are Frivolous.................... 19

      3.    The Complaint's Allegations Show that it is Presented for the Improper Purpose of
            Harassing DISH and Ergen......................................................................................... 25

   B.    THE COURT SHOULD IMPOSE SANCTIONS ON PLAINTIFFS AND THEIR
         COUNSEL ..................................... 26

V.    CONCLUSION...................................................................................................... 28

## **TABLE OF AUTHORITIES**

**Cases**

*Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29 (D.D.C. 2018)...................................22

*ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F. Supp. 2d 245 (D.D.C. 2013)........................17

*\* Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).........................................................24, 25

*Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023).....................................................................22

*Bowhead Information Technology Svcs, LLC v. Catapult*, 377 F. Supp. 2d 166 (D.D.C. 2005) . 27

*Cobell v. Norton*, 211 F.R.D. 7 (D.D.C. 2002)............................................................................29

*Covad Comms. Co. v. Bell Atlantic Corp.*, 407 F.3d 1220 (D.C. Cir. 2005).................................2

*Eastern Savings Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1 (D.D.C. 2014)............................26

*Garrison v. Louisiana*, 379 U.S. 64 (1964) ................................................................................20

*Graves v. United States*, 961 F. Supp. 314 (D.D.C. 1997) .........................................................24

*Hilton Hotels Corp. v. Banov*, 899 F.2d 40 (D.C. Cir. 1990) .....................................................17

*Hollister v. Soetero*, 601 F. Supp. 2d 179 (D.D.C. 2009)...........................................................27

*Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015) .....................................................................17

*Inner City Contracting, LLC v. Charter Township of Northville*, 87 F.4th 743 (6th Cir. 2023)... 23

*\* Intelsat USA Sales LLC v. Juch-Tech, Inc.*, No. 10-cv-2095, 2014 WL 12787643 (D.D.C. Oct.
15, 2014) ................................................................................................ 17, 18, 29, 30

*John Akridge Co. v. Travelers Cos.*, 944 F. Supp. 33 (D.D.C. 1996)..........................................30

*Marina Mgt Svces, Inc. v. Vessel My Girls*, 202 F.3d 315 (D.C. Cir. 2000) ..............................30

*\* NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).......................................................21

*\* Nader v. The Democratic Nat'l Comm.*, 555 F. Supp. 2d 137 (D.D.C. 2008)....................21, 22

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)................................................................21

*Patton Boggs, LLP v. Chevron Corp.*, 825 F. Supp. 2d 35 (D.D.C. 2011)..................................26

*Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir. 1989).....................................................................20

*Sherman Treaters Ltd. v. Ahlbrandt*, 115 F.R.D. 519 (D.D.C. 1987)............................................ 30

*Smith v. Rubicon Advisers, LLC*, 254 F. Supp. 3d 245 (D.D.C. 2017)........................................ 26

* *Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022)..................................................... 22, 25

*Zhao v. Li*, No. 20-3138, 2022 WL 6727338 (D.D.C. Oct. 11, 2022)................................... 20, 28

## Statutes

42 U.S.C. § 1981........................................................................................................... 10, 21, 22

42 U.S.C. § 1985........................................................................................................... 10, 21, 23

42 U.S.C. § 1986........................................................................................................... 10, 21, 23

47 U.S.C. § 310.......................................................................................................................... 3

## Other Authorities

Fed. R. Civ. P. 11, Advisory Committee's Note (1993)................................................................ 26

*Nexstar-Media General Order*, 322 FCC Rcd 183 (Jan. 11, 2017)............................................... 3

## Rules

Fed. R. Civ. P. 11................................................................................................................ passim

Defendants DISH Network Corporation ("DISH") and Charles Ergen ("Ergen"), by and through their undersigned attorneys, hereby move for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure against Plaintiffs SGCI Holdings III LLC ("SGCI") and Soohyung Kim ("Kim") as well as Plaintiffs' counsel. The sanctions sought include, but are not limited to, dismissal of all claims asserted against DISH and Ergen in the Complaint dated April 24, 2024 and payment of attorneys' fees and expenses.

This motion was served on Plaintiffs on July 3, 2024, more than 21 days prior to filing.

## I.    PRELIMINARY STATEMENT

The Complaint in this action is nothing more than an expensive temper tantrum thrown by an entitled entrepreneur who is irate over the fact that the Federal Communications Commission ("FCC") did not give him exactly what he wanted exactly when he wanted it. Through the Complaint, Plaintiff Soohyung Kim ("Kim" or "Mr. Kim") lashes out at the parties he blames for the FCC's election to hold a hearing on Plaintiff SGCI's application to the FCC for transfer of control of TEGNA, Inc. ("TEGNA"), the owner of more than 60 broadcast television stations, to SGCI. Frustrated that SGCI's transaction financing expired and the merger agreement terminated, Plaintiffs have concocted a false narrative that the FCC's actions must have been caused by a vast racist conspiracy against Mr. Kim. Not only do the claims asserted against Defendants DISH and Ergen lack any reasonable basis in fact or law, the Complaint wrongfully retaliates against both DISH and DISH's Chairman for DISH's legitimate exercise of its First Amendment right to petition the government on matters of public interest.

The Complaint violates Rule 11(b) in at least three ways. First, it was filed for an improper purpose—to harass DISH and Ergen—in violation of Rule 11(b)(1). Second, the wildly irresponsible, scurrilous assertions concerning an alleged wrongful conspiracy to racially

discriminate against Plaintiffs have no basis in fact, in violation of Rule 11(b)(3).  Third, the

claims alleged against DISH and Ergen in the Complaint lack any basis in law, in violation of

Rule 11(b)(2).  DISH and Ergen enjoy broad First Amendment protection for communicating

with the FCC concerning SGCI's application and for associating with others who opposed the

application at the FCC.

## II.    FACTUAL BACKGROUND

On April 21, 2022, the FCC's Media Bureau issued a "Public Notice" that established a

pleading cycle for "Applications to Transfer Control of TEGNA Inc., to Standard General, L.P.,"

which was assigned Docket No. 22-162.  A copy of the Public Notice is attached hereto as

Exhibit 1.[1]  The Public Notice disclosed that, on March 10, 2022, applications were filed

proposing to transfer all outstanding equity interests in TEGNA Inc., which controls 64 full-

power television stations, to an indirect subsidiary of SGCI, whose Managing Member is

Plaintiff Kim, the Managing Partner of Standard General, L.P.  *See* Ex. 1.

According to the FCC's Public Notice, three additional applications were filed

contemporaneously for a series of related transactions.  *Id.* at 1.  A Standard General affiliate

proposed to transfer control of its four full-power television stations to a subsidiary of CMG

Media Corporation ("Cox"), which is under the *de facto* control of Apollo Global Management,

Inc. ("Apollo"), a hedge fund.  *Id.*  Cox, in turn, sought to transfer control of one television

station to SGCI.  *Id.*  Upon consummation of the merger, the new TEGNA entity ("New

TEGNA") proposed to assign four full-power television stations to wholly-owned subsidiaries of

---

[1] This Court may take judicial notice of public records filed on the FCC docket.  *Covad Comms. Co. v. Bell Atlantic Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (a court may take judicial notice of facts on the public record).

Cox.  *Id.*  The Public Notice included information that Apollo affiliates (associated with Cox) were providing some of the financing for the transaction to Standard General.  *Id.* at 1–2.

The Public Notice invited petitioners and commenters to weigh in on the applications in order to allow the Commission to consider all relevant substantive issues.  *Id.* at 3.

Pursuant to 47 U.S.C. § 310(d), applicants seeking permission from the FCC for a transfer of control of broadcast television stations have the burden of proving to the FCC that the proposed transaction serves "the public interest, convenience, and necessity."  *See* 47 U.S.C. § 310(d) ("No . . . station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, . . . to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby."); *see also Nexstar-Media General Order*, 32 FCC Rcd. 183, 191–92 ¶ 19 (Jan. 11, 2017) ("The applicants bear the burden of proving, by a preponderance of the evidence, that the proposed transaction, on balance, would serve the public interest.").  The FCC employs a balancing process, weighing potential public interest benefits against potential public interest harms.  *Nexstar-Media General Order*, 322 FCC Rcd. at ¶ 19.  "If the [FCC] is unable to find that the proposed transaction serves the public interest, or if the record presents a substantial and material question of fact as to whether the transaction serves the public interest, Section 309(e) of the Act requires that the applications be designated for hearing."  *Id.*

## A.    THE PETITIONS TO DENY THE APPLICATIONS

Four non-profit entities filed petitions to deny the applications: (1) Common Cause; (2) United Church of Christ Media Justice Ministry; (3) The Newsguild-CWA; and (4) National Association of Broadcast Employees and Technicians-CWA ("NABET-CWA") (collectively,

"Petitioners").  Those petitions are attached hereto as Exhibit 2.  All four Petitioners are

Defendants in this action.  Neither DISH nor Ergen filed a petition to deny.

The petitions to deny advanced two primary arguments.  First, Petitioners argued that the

transfer harmed the public interest, because it threatened to undermine local news coverage (also

known as "localism").  Ex. 2 at 021-23, 050-55.  Standard General, SGCI's parent company,

made known that it intended to consolidate news coverage at the TEGNA local stations with a

national news desk located in Washington D.C.  *Id.* at 051-52.  Prior to the transaction, Standard

General also had telegraphed an intent to fire half of TEGNA's local news employees.  It stated

in a 2020 "Proxy Statement" filed with the SEC that, in Standard General's view, "TEGNA has

2x the number of employees per station compared to peers, and lags its closest local broadcasting

peers on EBITDA margin."  *Id.* at 022–23.

Second, the Petitioners argued that the transfer would harm the public interest, because

the sequencing of the transaction appeared designed to immediately increase the fees SGCI

might charge pay-television providers for distribution of TEGNA's local television stations.  *Id.*

at 023-27, 055–59.  The Petitioners asserted that consumers would suffer the impact of increased

pay-television costs, which are passed along to consumers by their cable and satellite companies.

*Id.* at 023–27, 058–59.  In addition, Petitioners argued that future fee disputes between SGCI and

cable companies might lead to content blackouts.  *Id.* at 026–27.

In connection with this second argument, Petitioners pointed out that the transaction

seemed designed to exploit standard "after-acquired station" clauses in retransmission consent

agreements[2] between broadcasters and pay-television distributors.  *Id*. at 023–25, 055–56.  These "after-acquired station" clauses allow an acquirer to substitute a pre-existing retransmission consent agreement with a pay-television provider, governing the broadcast television stations it already owns, in place of the agreement that the acquired station had in effect with that same pay-television provider.  *Id*. at 056 ("These 'after-acquired station' and 'change-in-control' provisions allow a purchaser to substitute their higher retransmission fee arrangements for those less remunerative deals that the seller may have had.").  In Standard General's deal, instead of seeking to substitute its own agreements for TEGNA's agreements for these "after-acquired" stations, the parties engineered a series of station transfers that appeared calculated to substitute more lucrative retransmission agreements held by Cox for *all* Standard General and TEGNA television stations.

In comments submitted to the FCC, pay-television distributor (and non-defendant) Altice explained that the proposed transaction was artificially sequenced in four choreographed steps taking place in quick succession.  A copy of Altice's filing is attached hereto as Exhibit 3.  Those steps are as follows: (i) Standard General divests itself of all its existing broadcast television stations, transferring them to an entity controlled by Cox; (ii) Cox sells a subsidiary owning a single Cox television station, "Teton," to Standard General; (iii) TEGNA merges into Teton, which Standard General controls; and (iv) New TEGNA sells four stations to Cox.  *See* Ex. 3 at 02–04.

_____

[2] "The Communications Act (Act) requires that a television station give its consent to a cable system or other multichannel video programming distributor (MVPD) to carry its broadcast signal.  Television stations and cable systems, as well as satellite carriers, negotiate for this 'retransmission consent' and money or other consideration is generally exchanged between the parties in these private negotiations."  https://www.fcc.gov/media/policy/retransmission-consent
These agreements for a pay-television provider's carriage of a broadcast television station are referred to as "retransmission consent agreements."

Altice cautioned that it seems "Applicants have designed their entire transaction to raise consumer rates by artificially architecting the structure to apply agreement(s) with the highest rates. Indeed, it is not unreasonable to speculate that Applicants have entered into this transaction primarily to accomplish these price increases." *Id.* at 03. Altice, for its part, did not ask the FCC to deny the applications. Instead, Altice requested that the FCC: "require Applicants to describe fully the relationship between the transaction's structure and retransmission consent pricing. The Commission should then condition grant of the Application on Applicants' not enforcing any contractual clauses purporting to raise retransmission consent rates prices." *Id.* at 04.

The American Television Alliance ("ATVA") trade group[3] (and non-defendant) also submitted comments. A copy of ATVA's filing is attached hereto as Exhibit 4. ATVA's concerns, *inter alia*, centered around the post-transaction relationship between Standard General and Cox. *See* Ex. 4. Cox, an owner of 23 broadcast television stations, was helping to finance the transaction. *Id.* at 07. In exchange, Cox stood to obtain approximately 25% of New TEGNA equity. *Id.* Among other things, ATVA asked that the FCC meaningfully enforce the prohibition against joint negotiation of retransmission consent agreements, to prevent improper collusion between New TEGNA and Cox, which would collectively own more than 80 broadcast television stations. *Id.* at 020–23.

## B.    DISCUSSIONS OF MR. KIM'S RACE AND NATIONALITY

The FCC record shows that Plaintiffs were responsible for injecting race as an issue in the FCC proceedings. By filing dated July 7, 2022, Plaintiffs argued to the FCC that, historically, these Petitioners "claimed to value diversity, but fail to even mention that the

---

[3] DISH is a member of the ATVA. Ex. 9 at 07.

Transactions would create the largest minority-owned and female-led television group in U.S. history."  *See* Applicants' Consolidated Opposition and Response to Comments dated July 7, 2022 at 07, attached hereto as Exhibit 5.  Plaintiffs advocated that the interests of diversity weigh in favor of granting the application.  *Id.* at 07–10, 016–22.

In response to that argument, Petitioners countered that Mr. Kim's status as a minority did not provide a basis to approve the transaction.  *See* Petitioners' Reply dated August 1, 2022 at 06–09, attached hereto as Exhibit 6.  The relevant filing shows that Petitioners did not malign Plaintiff Kim or his race.  *Id.*  They argued that the transaction would increase ownership concentration in media in a way that did not promote diversity of *viewpoints*.  Petitioners expressly characterized Mr. Kim's racial diversity as a positive.  Specifically, they stated: "It is certainly a *good thing* that Mr. Kim is not barred by his race from becoming a successful entrepreneur with the acumen and business relationships giving him access to capital such that he is at the lead of this transaction."  *Id.* at 08 (emphasis added).  Petitioners added the caveat that "a single large LLP or corporation of the type proposed here is not going to ameliorate or address long-standing inequities produced by structural racism, xenophobia or misogyny."  *Id.*  In sum, Petitioners took the position that the FCC "should not conflate the identity of one or two business leaders regarding a transaction that would further consolidate the marketplace with advancing its goals to promote ownership diversity."  *Id.* at 08–09.

Petitioners did raise concerns about anonymous foreign investment.  Those concerns were not directed at Mr. Kim.  Instead, the issues Petitioners raised related to undisclosed financing sources, identified only as Cayman Island and British Virgin Islands investment funds. *Id.* at 026.  Petitioners expressly distinguished the anonymous foreign investors from Mr. Kim, stating: "[a]bsent access to the various covenants and other materials that have not been filed

with the [FCC], it is scant assurance that, on paper, according to the Applicants, voting control will be held by Mr. Kim." *Id.*

In later filings where Petitioners referenced concerns about anonymous foreign investment, they plainly referenced these off-shore investment funds. *See* Letter dated September 21, 2022 from The Goodfriend Group to Marlene H. Dortch, Secretary, FCC; Letter dated September 29, 2022 from The Goodfriend Group to Marlene H. Dortch, Secretary, FCC; Letter dated October 6, 2022 from Andrew Jay Schwartzman to Marlene H. Dortch, Secretary, FCC; Letter dated October 13, 2022 from Andrew Jay Schwartzman to Marlene H. Dortch, Secretary, FCC (collectively attached hereto as Exhibit 7 at 02–03, 07–08, 09, 014–15). They did not malign Mr. Kim, whom everyone understood is neither anonymous nor foreign.

## C.    DISH'S FILINGS ON THE FCC DOCKET

DISH owns DISH Network L.L.C., a pay-television provider that distributes television content to consumers. DISH made its first filing in the FCC proceeding in December 2022, after the applications had been pending for approximately eight months, and long after the June 22, 2022 deadline for a petition to deny. On December 28, 2022, DISH filed a letter for the stated purpose of providing the FCC with facts relevant to a dispute between Petitioners and Cox. The December 28, 2022 letter is attached hereto as Exhibit 8. Cox had denied a news report that it sought to negotiate with DISH on future fees for television stations owned by Standard General and TEGNA that Cox intended to acquire, but did not yet own. *See* Ex. 8. Cox represented to the FCC that "it has not sought and will never seek to negotiate retransmission consent for another company's stations." *Id.* at 01 (internal quotation marks omitted). DISH provided the FCC with the relevant demand from Cox relating to stations that Cox did not own. *Id.*

DISH made another filing on January 13, 2023, which requested that the FCC put conditions in place to insure against manipulation of after-acquired station clauses by New TEGNA and Cox. The January 13, 2023 filing is attached hereto as Exhibit 9. DISH followed up with a filing on February 6, 2023, discussing evidence that Cox sought to raise prices and impose other unfavorable terms on pay-television providers after the transaction closed. The February 6, 2023 filing is attached hereto as Exhibit 10. DISH advocated that Cox be subject to conditions that had been accepted by Standard General – that Cox take the four TEGNA stations it proposed to acquire subject to TEGNA's existing agreements and rates. *Id.*

DISH's filings were made by Pantelis Michalopoulos, DISH's counsel at Steptoe LLP, who regularly represents DISH before the FCC. *See* Exs. 8–10. None of DISH's filings asked the FCC to deny the applications.

The FCC record does not show any communication between Defendant Ergen and the FCC in connection with the applications. *See* https://www.fcc.gov/ecfs/search/search-filings/results?sort=date_disseminated,ASC&proceedings_name=22-162&page=0&limit=5.

## D.    THE HEARING DESIGNATION ORDER

On February 24, 2023, the FCC Media Bureau entered a Hearing Designation Order. A copy of the Hearing Designation Order (or "HDO") is attached hereto as Exhibit 11. The Media Bureau found that substantial and material fact questions exist concerning whether: (1) the transactions are structured to trigger a rate increase harmful to consumers; and (2) the transactions will reduce or impair localism, including whether they will result in labor reductions at local stations. *See* Ex. 11 (HDO, ¶ 2). The Order states that "substantial and material questions remain as to both the potential impact, and possible harm, to consumers through higher retransmission consent fees, and the effect on localism through potential reductions in local

jobs." *Id.*, ¶ 3.  The Media Bureau noted, "[p]articularly during a period of high inflation and rising costs, the prospect of increased rates for pay television as a result of machinations or manipulation, rather than market forces, would be extremely problematic." *Id.*, ¶ 4.  It continued, "[e]qually as critical is that we understand the impact the transaction will likely have on localism and specifically on local jobs at the stations involved.  Broadcast television remains an essential source of local news, information, and service for local communities, but based on the record before us, questions remain as to whether local communities would be harmed by the Applicants' plans and commitments." *Id.*

The Hearing Designation Order further states, *inter alia*:

- "we are unable to find, due to the unique structure of the Transactions in which the various assignments and/or transfer of control are closed sequentially in order to take advantage of after-acquired station clauses and maximize retransmission revenue, that rates to [pay-television] subscribers would not rise beyond that which would occur in a properly functioning competitive market." *Id.*, ¶ 32.

- "In addition, especially given questions about the intended scope of the commitments relating to enforcement of such clauses, we are unable to find that the commitments offered by the Applicants would adequately mitigate such a result." *Id.*

- "The conflicting evidence on the record before us about SGCI Holdings' intentions and commitments with regard to local staffing at the TEGNA stations, leaves us with substantial and material questions of fact, unresolved by Applicants' filings, that require further investigation to determine the ultimate effects on localism." *Id.*, ¶ 43.

On May 24, 2023, SGCI filed a status report informing the FCC that the merger had been terminated on May 22, 2023.  On June 1, 2023, the FCC issued an Order Terminating the Proceeding.

## III.    THE COMPLAINT'S ALLEGATIONS

Plaintiffs seek to assert six causes of action against Defendants DISH and Ergen for alleged violation of Plaintiffs' civil rights and wrongful interference with Plaintiffs' business

relationships. They allege claims for: (1) Violation of the Civil Rights Act of 1866, 42 U.S.C.

§ 1981 (Count II); (2) Violation of the Enforcement Act of 1871, 42 U.S.C. § 1985(3)

(Count III); (3) Violation of the Enforcement Act of 1871, 42 U.S.C. § 1986 (Count IV);

(4) Tortious Interference with Contract (Count V); (5) Tortious Interference with Prospective

Business Opportunity (Count VI); and (6) Civil Conspiracy (Count VII).

## A.    PLAINTIFFS CONCEDE THAT DISH'S CONCERNS WERE ECONOMIC

In the Complaint, Plaintiffs make the outrageous allegation that the FCC's actions with

respect to SGCI's application to acquire TEGNA were motivated by racial animus against

Plaintiff Kim, a Korean American. Compl. ¶ 1. Nonetheless, with respect to Defendants DISH

and Ergen, Plaintiffs concede in paragraph after paragraph that DISH's concerns with the

transaction were *purely economic*—based on a threat of increased fees for the right to distribute

the TEGNA television stations to DISH subscribers.

SGCI recounts that DISH had engaged in a contentious contract negotiation with TEGNA

that included a "months-long blackout of TEGNA stations on DISH." Compl. ¶ 273. In

February 2022, DISH and TEGNA reached a new retransmission fee deal. *Id. At the very same

time,* "Standard General and TEGNA were finalizing the terms of the acquisition." *Id.* Plaintiffs

allege that the Standard General deal immediately "could have increased the retransmission fees

for the TEGNA stations." *Id.* According to Plaintiffs' own allegations, their transaction

threatened to upend a newly-minted hard-fought deal between DISH and TEGNA.

Plaintiffs acknowledge multiple times in their pleadings that, under "after-acquired"

station provisions, "Standard General's pre-merger retransmission agreements with companies

like DISH would apply to the TEGNA stations, potentially resulting in greater retransmission

fees than what such companies were currently paying." Compl. ¶ 80. Plaintiffs continue:

> DISH, led by chairman Charlie Ergen, had a direct interest in the
> Standard General-TEGNA retransmission fees it would pay to
> carry the TEGNA stations.  If DISH could get commitments to
> drive retransmission fees down—or if DISH could kill the deal
> altogether and continue to pay the (presumably cheaper) existing
> retransmission fees with TEGNA—then DISH would make more
> money by paying less to rebroadcast the stations' programming.

Compl. ¶ 130.  Plaintiffs add:  "On information and belief, DISH knew that it could potentially

save millions if the TEGNA deal did not close."  Compl. ¶ 275.

Plaintiffs specifically allege that DISH had a "commercial agenda."  Compl. ¶ 290.

Plaintiffs plead that "[t]he fight over retransmission fees was one to advance DISH's commercial

agenda."  Compl. ¶ 131.  There are no allegations that Defendants DISH or Ergen harbored any

race-based animus against Plaintiffs.

**B.    PLAINTIFFS' ALLEGATIONS OF AN UNLAWFUL RACE-BASED
CONSPIRACY LACK ANY BASIS IN FACT**

Plaintiffs claim "on information and belief" that there was an unlawful racially motivated

"conspiracy" to have the FCC kill the deal involving Byron Allen, the Allen Group, DISH

Network, DISH's chairman Charlie Ergen, David Goodfriend, labor unions, public interest

groups, FCC Chairwoman Rosenworcel and Media Bureau Chief Holly Saurer.  Compl. ¶ 24.

Yet, the Complaint contains not a single factual allegation to support that outlandish assertion

nor make it the least bit plausible.

Pursuant to a reasonable reading, the Complaint alleges nothing more than a common

dislike for the transaction.  For DISH, as set forth above, Plaintiffs allege a concern that the deal

would unfairly increase its fees.  For Byron Allen, Plaintiffs allege that he wanted to purchase

TEGNA for himself.  Compl. ¶ 18 ("Mr. Allen wanted the TEGNA stations for his company.").

While Plaintiffs assert that Mr. Kim was the victim of racial discrimination, there is no

genuine evidence of racism in the pleadings.  The pleadings distort the publicly available FCC

record in claiming that racist attacks were made on Plaintiff Kim. Plaintiffs assert, for example, that "Mr. Allen and his longtime lobbyist orchestrated straw objectors at the FCC, who challenged the deal by amplifying Mr. Allen's views" that the deal did not promote diversity. Compl. ¶ 19. Plaintiffs claim that these "straw objectors disparaged Mr. Kim and maligned him as a foreigner." *Id.* They assert that the "straw objectors" engaged in "race-based attacks." Compl. ¶ 22.

The cited FCC filings (*see* Compl. ¶¶ 138–142, 159), attached as Exhibits 2, 6 and 7, show that Petitioners did not, in fact, characterize Mr. Kim as a foreigner nor did they engage in race-based attacks. *See also, supra.,* pp. 7–8. Petitioners' concerns about anonymous foreign investment were not directed at Plaintiff Kim, who is neither anonymous nor foreign. *Id.* Those concerns were about financing provided by undisclosed investment funds in the Cayman Islands and British Virgin Islands. *See* Exs. 6 and 7.

In terms of an alleged "conspiracy" among the Defendants, nearly every allegation is made "on information and belief," and is based on nothing more than conjecture, supposition, rumor, and multiple layers of irrelevant hearsay. For example, the Complaint alleges:

- "*On information and belief*, the conspiracy to kill the Standard General deal reached as high as the halls of Congress and as far as the Allen Group and Mr. Allen, DISH Network and its chairman and majority shareholder Charlie Ergen, their lobbyist David Goodfriend at the Goodfriend Group, labor unions, public interest groups, and FCC Chairwoman Rosenworcel and her personal staffer and Media Bureau Chief, Ms. Sauer." Compl. ¶ 24 (emphasis added);

- "David Goodfriend at the Goodfriend Group orchestrated objections to the Standard General-TEGNA transaction by labor unions and public interest groups at the FCC. But *on information and belief*, Mr. Goodfriend's real clients were Mr. Allen and his other longtime client DISH and its chairman Charlie Ergen who wanted the deal dead." Compl. ¶ 25 (emphasis added);

- "these straw objectors became a pretext for the unlawful interference and race discrimination that ultimately killed the transaction." Compl. ¶ 95;

- "*On information and belief*, the straw objectors filed their petitions to deny at the behest of some combination of the Goodfriend Group and Mr. Goodfriend's longtime clients, Byron Allen at the Allen Group and Charlie Ergen, chairman and majority shareholder of DISH."  Compl. ¶ 129 (emphasis added);

- "*on information and belief*, Mr. Goodfriend was working behind the scenes not only for Newsguild and NABET but also for his longtime clients at the Allen Group and DISH."  Compl. ¶ 146 (emphasis added);

- "*On information and belief*, the request for failed bidders came from the Goodfriend Group to instead be used for his other clients, the Allen Group and DISH—in violation of the FCC's protective order."  Compl. ¶ 156 (emphasis added);

- "Mr. Goodfriend was ostensibly representing NewsGuild and NABET, but his stated concerns served DISH, the Goodfriend Group's other client."  Compl. ¶ 175;

- "Mr. Goodfriend—*on information and belief* at the behest of Mr. Allen and Mr. Ergen—communicated and coordinated with Senator Warren or her staff to send the letter, just as he had with Speaker Pelosi and her staff."  Compl. ¶ 184 (emphasis added);

- "it was no secret that DISH was a driving force behind the objectors."  Compl. ¶ 223;

- Mr. Allen "was at the center of Defendants' conspiracy, connected to all other Defendants through Mr. Goodfriend and Mr. Goodfriend's political connections." Compl. ¶ 244;

- "Mr. Goodfriend was also doing the bidding of the Allen Group and DISH, his longtime clients."  Compl. ¶ 263;

- "In April 2023, Mr. Goodfriend confirmed to an associate of Mr. Kim's that it was Mr. Ergen specifically who wanted the deal killed."  Compl. ¶ 269;

- "DISH . . . had every incentive to support the Allen Group's race-based opposition to Standard General's license transfer application."  Compl. ¶ 271;

- "*On information and belief*, DISH knew . . . that it could score a better deal if Mr. Allen, whom *on information and belief* Mr. Ergen had come to know through Mr. Goodfriend, became the owner of the TEGNA stations.  *On information and belief*, Mr. Allen and Mr. Ergen worked well together."  Compl. ¶ 275 (emphases added);

14

- "Multiple sources confirmed Mr. Ergen's personal desire to kill the deal." Compl. ¶ 276.

Plaintiffs repeatedly allege that Mr. Goodfriend was acting for DISH, notwithstanding that Mr. Goodfriend did not enter a single appearance for DISH in the FCC proceedings. Based on work that Mr. Goodfriend did for DISH no more recently than 2015, Plaintiffs argue that DISH bears responsibility for Mr. Goodfriend's representation of other clients. *See, e.g.* Compl. ¶ 148 n. 71 (citing an April 10, 2015 lobbying report). These threadbare allegations made "on information and belief" do not make out a conspiracy to discriminate against Plaintiffs on the basis of race.

Plaintiffs disingenuously plead that this was a simple "rule compliant" deal. Compl. ¶¶ 113–14. They glaringly fail to take responsibility for the shenanigans inherent in the transaction that caught the FCC's attention, including the complex choreography of the deal's structure and Standard General's intentions to slash local jobs and consolidate the news function in Washington, D.C. *See* Ex. 11 (HDO). Those shenanigans precipitated the Hearing Designation Order; not any race-based animus or conspiracy.

## IV.    ARGUMENT

Plaintiffs' claims against Defendants DISH and Ergen violate Rule 11 of the Federal Rules of Civil Procedure. The pleadings of the Complaint show that Plaintiffs blame DISH and Ergen, among others, for the failure of their proposed TEGNA acquisition. This action was filed in retaliation for DISH's public comments on the transaction, in order to wrongfully harass DISH and its Chairman, Defendant Ergen, who never even weighed in at the FCC.

The purported allegations of an unlawful conspiracy, racially charged misconduct, and tortious interference lack any basis in real-life events, rendering the claims factually frivolous. Moreover, the First Amendment rights of free expression and association immunize DISH and

Ergen from the legal claims pleaded against them, rendering the action frivolous as a matter of law.

Plaintiffs and their counsel should be sanctioned for these multiple Rule 11 violations. Defendants DISH and Ergen respectfully submit that those sanctions should include dismissal of the Complaint's claims against them and payment of all attorneys' fees and costs incurred in connection with this frivolous action.

## A.    THE CLAIMS ALLEGED AGAINST DISH AND ERGEN VIOLATE RULE 11

Rule 11(b) of the Federal Rules of Civil Procedure provides that, in presenting a pleading, such as a complaint, to the district court, an attorney certifies that (1) it is not being presented for any improper purpose, such as to harass the defendants; (2) the claims and other legal contentions are warranted by existing law or by a nonfrivolous argument for modifying existing law; and (3) the factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. The Complaint in this action violates each one of these prongs of Rule 11(b).

### 1.    The Complaint's Purported "Factual" Allegations are Utterly Lacking in Evidentiary Support

The Complaint's purported factual allegations are frivolous, in violation of Rule 11(b)(3). Rule 11 imposes a duty to conduct a pre-filing inquiry into the facts alleged. *Hilton Hotels Corp. v. Banov*, 899 F.2d 40, 235 (D.C. Cir. 1990). "A party's representations are 'frivolous and thus worthy of sanctions when they are utterly lacking in . . . evidentiary support.'" *Intelsat USA Sales LLC v. Juch-Tech, Inc.*, No. 10-cv-2095, 2014 WL 12787643, at *3 (D.D.C. Oct. 15, 2014) (*quoting ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F. Supp. 2d 245, 271 (D.D.C. 2013)). A Rule 11 violation does not require that the attorneys act in bad faith. An "objective standard of reasonableness" determines "whether there has been a violation" of Rule 11(b). *Hourani v.*

16

*Mirtchev*, 796 F.3d 1, 17 (D.C. Cir. 2015). Here, the factual allegations are objectively unreasonable, in violation of Rule 11(b)(3).

The factual basis for a claim cannot "rest[ ] on nothing more than speculation, unsubstantiated industry rumors, and multilayered hearsay." *Intelsat USA Sales*, 2014 WL 12787643, at *6. In *Intelsat*, this Court found that a "theory of tortious interference" that "rel[ied] exclusively on conjecture rather than any legitimate evidentiary basis," violated Rule 11(b)(3). *Id.* "Rule 11 was drafted to prevent parties from asserting claims that rely on such a flimsy pre-filing factual basis." *Id.* at *8. The facts alleged in a pleading cannot be based on rumor, hunch, speculation, supposition or surmise. *Id.*

In this action, Plaintiffs do exactly what Rule 11 prohibits. The Complaint's purported "factual" allegations against DISH and Ergen are based exclusively on conjecture, rumor, hunch, speculation, supposition and surmise.

The crux of the Complaint is an assertion that there was a race-based conspiracy against Plaintiffs to prevent an Asian-American from purchasing TEGNA and its 60-plus television stations. There is not a single plausible fact alleged to support that assertion, especially not with respect to Defendants DISH and Ergen. As to Defendants DISH and Ergen, Plaintiffs allege that they opposed the transaction for economic reasons. Based only on those economic concerns, Plaintiffs surmise that "DISH . . . had every incentive to support the Allen Group's race-based opposition to Standard General's license transfer application." Compl. ¶ 271. That allegation is absurd.

Moreover, the FCC record does not evidence any "race-based" opposition to SGCI's application. The publicly available filings show that SGCI argued that Mr. Kim's minority status should support a grant of the application. Petitioners disagreed, arguing that the FCC should be

17

promoting diversity of viewpoints, not consolidation of media ownership. Petitioners also took issue with reliance on undisclosed foreign investment funds. They did not characterize Mr. Kim as a foreigner nor did they assert that he was "shadowy." The Complaint twists and mischaracterizes the FCC filings to fit them to Mr. Kim's false narrative that he was racially discriminated against.

Finally, Plaintiffs conjure up a scenario where Petitioners are acting as puppets (or "straw objectors") for all of the other Defendants, orchestrated by "*some combination of* the Goodfriend Group and Mr. Goodfriend's longtime clients, Byron Allen at the Allen Group and Charlie Ergen, chairman and majority shareholder of DISH." Compl. ¶ 129 (emphasis added). Relying on the mere fact that DISH and the Allen Group both have had business relationships with Mr. Goodfriend, Plaintiffs repeatedly aver "on information and belief" that the Defendants formed an illegal conspiracy with Mr. Allen at the hub. *See, e.g.*, Compl. ¶¶ 24, 25, 146, 156, 175, 184, 223, 244, 263, 269, 271, 275, 276. They claim, based on some unspecified industry rumor that, "it was no secret that DISH was a driving force behind the objectors." Compl. ¶ 223. And, they speculate that the lack of public squabbles between DISH and the Allen Group means that they must be in cahoots. *See* Compl. ¶ 275 ("On information and belief, Mr. Allen and Mr. Ergen worked well together. For example, despite DISH being a hardline negotiator over retransmission fees leading to countless station blackouts, that has never been an issue for the Allen Group, as DISH has never blacked out the Allen Group's stations.").

Because the purported "factual" allegations against Defendants DISH and Ergen are utterly lacking in evidentiary support and constitute nothing more than unreasonable conjecture, rumor, hunch, speculation, supposition and surmise, the Complaint violates Rule 11(b)(3).

2.      **The Complaint's Legal Claims Against DISH and Ergen are Frivolous**

Most significantly, Plaintiffs' claims against DISH and Ergen lack any legal merit, in violation of Rule 11(b)(2).  A filing that advances "frivolous legal contentions" with no reasonable prospect of success violates Rule 11(b)(2).  *Saltany v. Reagan*, 886 F.2d 438 (D.C. Cir. 1989); *Zhao v. Li*, No. 20-3138, 2022 WL 6727338, at *5 (D.D.C. Oct. 11, 2022).

Every one of the claims alleged in the Complaint against Defendants DISH and Ergen fail, because DISH and Ergen are immunized from liability for speech before the FCC (whether by themselves or purported "straw objectors"), pursuant to the First Amendment of the United States Constitution.  Even if DISH and Ergen did not enjoy First Amendment protection related to advocacy before the FCC on a matter of public interest, the Complaint still would fail to state viable claims against them for racial discrimination, tortious interference, and conspiracy.

a)      **The First Amendment bars all claims against Defendants DISH and Ergen.**

The Complaint in this action improperly seeks to hold the non-FCC Defendants liable for speech on a matter of public interest before the FCC in connection with the FCC's consideration of SGCI's application.  This speech enjoys First Amendment protection, and cannot serve as a basis for any statutory or tort liability.

Speech concerning public affairs is "the essence of self-government."  *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964).  There is a profound national commitment to the principle that "debate on public issues should be uninhibited, robust, and wide-open."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Here, there was a public debate on whether the applications pending before the FCC for station transfers served the public interest.  All of the speech that Plaintiffs take issue with in the Complaint, by Petitioners and DISH, is speech on a matter of public interest.

19

The Supreme Court has recognized that "expression on public issues" rests "on the highest rung of the hierarchy of First Amendment values." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (holding that nonviolent elements of boycott organizers' activities are entitled to First Amendment protection, and reversing damages award). "[T]he presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability and on the persons who may be held accountable for those damages." *Id.* at 916–17. According to the Supreme Court, the government "may not award compensation for the consequences of nonviolent, protected activity." *Id.* at 918.

Consistent with these First Amendment rights, "[t]he Noerr-Pennington doctrine holds that defendants who petition the government for redress of grievances . . . are immune from liability for such activity under the First Amendment." *Nader v. The Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 156 (D.D.C. 2008). Regardless of the defendant's motives, the doctrine "immunizes the concerted efforts of individuals" to persuade the government to take legislative or other action. *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 50 (D.D.C. 2018). The protected activity includes efforts to influence legislative or executive action, and includes speech to administrative agencies. *Id.* While the doctrine originates in antitrust law, its reach extends beyond antitrust and includes other types of claims, inclusive of common law torts. *Nader*, 555 F. Supp. 2d at 157.

Moreover, speech on a matter of public concern "cannot be deemed unprotected merely because Plaintiffs have alleged it to be part of a conspiratorial agreement to violate a civil statute." *Thompson v. Trump*, 590 F. Supp. 3d 46, 110 (D.D.C. 2022), *aff'd in part sub nom Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023). Speech on matters of public concern only loses First Amendment protection if it is directed at inciting imminent lawless action. *Id.* at 110–

11, 118 (finding that speeches by Rudy Giuliani and Donald Trump, Jr. on January 6 were protected expression that did not call for imminent use of violence or lawless action, and dismissing claims asserted against them under 42 U.S.C. §§ 1985 and 1986).

Here, the advocacy of Petitioners before the FCC is immunized from liability under the First Amendment, regardless of whether Petitioners spoke only for themselves or might possibly have addressed issues important to other Defendants as purported "straw objectors." Similarly, Defendant DISH's filings with the FCC represent protected speech (and Plaintiffs do not allege that any of DISH's own speech was erroneous or wrongful). All of Plaintiffs' civil rights and tort claims take issue with advocacy on a matter of public interest before the FCC. For that reason, the First Amendment bars all causes of action pleaded in the Complaint.

The Complaint also seeks to hold the Defendants liable based on their degrees of connection to each other. Plaintiffs' conspiracy allegations rest on the mere fact that Defendants Goodfriend, Allen and Ergen know each other, and Goodfriend has worked with both Allen and DISH. This "conspiracy" theory offends the First Amendment's right to association. "The First Amendment similarly restricts the ability of the State to impose liability on an individual solely because of his association with another." *Claiborne Hardware*, 458 U.S. at 918–19. Accordingly, Plaintiffs may not seek to hold Defendants DISH and Ergen liable based on their association with other Defendants.

> **b)** **The Complaint otherwise fails to state a claim upon which relief may be granted against Defendants DISH and Ergen.**

> *(1)* *Civil Rights Counts (Count II, III, IV)*

Plaintiffs seek to assert claims against Defendants DISH and Ergen for violation of Plaintiffs civil rights, pursuant to 42 U.S.C. §§ 1981, 1985(3) and 1986. These are not cognizable claims.

A Section 1981 claim requires that the plaintiff plead and prove that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him based on his race; and (3) the defendant's discriminatory conduct abridged a right enumerated in Section 1981(a), such as the right to make and enforce contracts. *Inner City Contracting, LLC v. Charter Township of Northville*, 87 F.4th 743, 754 (6th Cir. 2023). As set forth above, Plaintiffs do not plead that Defendants DISH or Ergen intended to discriminate against them based on race. They plead only that DISH and Ergen wanted SGCI's deal to acquire TEGNA to fail for economic reasons. These pleadings fail to state a claim under 42 U.S.C. § 1981.

A Section 1985(3) claim requires that the plaintiff plead and prove (1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws; (3) motivated by some class-based, invidiously discriminatory animus; and (4) causing damage. *Graves v. United States*, 961 F. Supp. 314, 319 (D.D.C. 1997). This claim fails, *inter alia*, because Plaintiffs have neither pleaded a conspiracy nor that the Defendants were motivated by invidiously discriminatory animus.

Pursuant to the Supreme Court precedent in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a pleading of a conspiracy requires "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. It "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* A conclusory allegation of agreement at some unidentified point in time will not suffice to plead an illegal conspiracy. *Id.* at 556-57. "[W]hen allegations of parallel conduct are set out in order to make a [conspiracy] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557.

22

At the pleading stage, for a conspiracy claim, there is a need for allegations "plausibly suggesting (not merely consistent with) agreement." *Id*. at 557. "Without a circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. *Id; see also Thompson v. Trump*, 590 F. Supp. 3d at 97 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.") (*quoting Twombly*, 550 U.S. at 556).

The Complaint in this action contains no circumstances pointing toward an illegal meeting of the minds. It barely even asserts parallel conduct. It alleges only a common desire by Defendants Allen and DISH to see the merger fail for legitimate business reasons. The Complaint therefore fails to plead any plausible conspiracy claim.

A Section 1986 claim requires an underlying Section 1985 violation and holds a party liable who knew of the wrong, had the power to prevent it, yet neglects or refuses to do so. 42 U.S.C. § 1986; *see also Thompson v. Trump*, 590 F. Supp. 3d at 84 (This "statutory provision is unique. It requires persons with knowledge of a conspiracy proscribed in § 1985 and with the means to prevent the conspiracy to take affirmative action[ ] to do so."). Because the Complaint does not allege a §1985 conspiracy, it also fails to allege a claim under § 1986. Moreover, the Complaint fails to allege any facts that might show that Defendants DISH or Ergen had the power to prevent the purported conspiracy or control the outcome of the applications at the FCC.

For these reasons, all of the civil rights claims alleged in Counts II, III and IV of the Complaint, fail to state a claim against Defendants DISH and Ergen.

### *(2)    Tortious Interference Counts (Counts V, VI)*

Counts V and VI of the Complaint purport to allege claims against Defendants DISH and Ergen for tortious interference with contract and prospective business opportunity. Neither

DISH nor Ergen interfered with Plaintiffs' business relationships. The Complaint alleges that the merger failed because SGCI's financing commitments expired, not because of any wrongful interference. Counts V and VI fail to state a claim upon which relief may be granted.

A tortious interference with contract claim requires (1) existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; and (4) resulting damages. *Patton Boggs, LLP v. Chevron Corp.*, 825 F. Supp. 2d 35 (D.D.C. 2011).

A tortious interference with prospective business opportunity claim requires (1) a valid business relationship or expectancy; (2) the defendant's knowledge of the relationship or expectancy; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damages. *Smith v. Rubicon Advisers, LLC*, 254 F. Supp. 3d 245, 251 (D.D.C. 2017).

For both of these claims, the interference must be "improper." *Eastern Savings Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 19 (D.D.C. 2014). Competitive activity will not support a tortious interference claim, unless it involves wrongful means, such as fraud or violence. *Bowhead Information Technology Svcs, LLC v. Catapult*, 377 F. Supp. 2d 166, 174 (D.D.C. 2005).

The Complaint does not plead any wrongful interference in Plaintiffs' contracts or business relationships by Defendants DISH or Ergen. The merger agreement terminated after financing commitments expired while the FCC continued to consider SGCI's application. No contract was breached and no one in a business relationship with Plaintiffs was wrongfully induced to end that relationship.

### (3)    *Civil Conspiracy Count (Count VII)*

In Count VII, Plaintiffs seek to assert a civil conspiracy claim against all Defendants.
They allege that the conspiracy involved not only Petitioners, Goodfriend, the Goodfriend
Group, Allen, the Allen Group, DISH, and Ergen, but also FCC Chairwoman Rosenworcel and
Media Bureau Chief Sauer.  Compl. ¶ 354.  As set forth above, the Complaint fails to allege a
plausible conspiracy, let alone any wrongful conduct.  For that reason, the Civil Conspiracy
Count fails to state a claim.

### 3.    The Complaint's Allegations Show that it is Presented for the Improper Purpose of Harassing DISH and Ergen

The pleadings of the Complaint, which are both legally and factually frivolous, show that
it is being presented for the improper purpose of harassing Defendants DISH and Ergen, in
violation of Rule 11(b)(1).  Plaintiffs make plain that they blame Defendants DISH and Ergen,
among others, for not getting what they wanted at the FCC in the time frame that they wanted it.
This action was commenced in retaliation, as a rich man's manifestation of a temper tantrum, in
order to harass the parties that Plaintiffs hold responsible for the failure of their merger deal.
*See, e.g.*, *Hollister v. Soetero*, 601 F. Supp. 2d 179, 181 (D.D.C. 2009) (ordering that plaintiff
show cause why he should not be sanctioned for violation of Rule 11(b)(1) "[b]ecause it appears
that the complaint in this case may have been presented for an improper purpose, such as to
harass."); *Zhao*, 2022 WL 6727338 (finding that the plaintiffs "violated Rule 11(b)(1) by
submitting filings for the improper purpose of harassing others.").

Plaintiffs allege in the Complaint that Mr. Kim heard through the media industry
grapevine that Defendant Ergen disliked the transaction, and wished to see it fail.  *See*
Compl. ¶¶ 276 ("Multiple sources confirmed Mr. Ergen's personal desire to kill the deal.
According to one of Mr. Kim's acquaintances, 'Charlie cares.'"), 269 ("In April 2023,

Mr. Goodfriend confirmed to an associate of Mr. Kim's that it was Mr. Ergen specifically who wanted the deal killed."). But there is absolutely nothing actionable about a desire to see a deal fail, especially a deal that was artificially engineered to raise DISH's costs. The claims against DISH and Ergen were brought to harass them and cause them to incur legal fees, in retaliation for the industry rumors that they wanted the merger to fail. For that reason, the Complaint violates Rule 11(b)(1).

## B.    THE COURT SHOULD IMPOSE SANCTIONS ON PLAINTIFFS AND THEIR COUNSEL

This Court should impose sanctions on Plaintiffs and their counsel for their violations of Rule 11(b)(1), (2) and (3). Defendants DISH and Ergen respectfully submit that sanctions in the form of dismissal of the Complaint and an award of attorneys' fees and costs would properly serve the interests of deterrence.

When a Rule 11(b) violation occurs, the district court has discretion to determine what sanction should be imposed pursuant to Rule 11(c). *Cobell v. Norton*, 211 F.R.D. 7, 10 (D.D.C. 2002). Sanctions may be imposed on those responsible for the failure to comply with Rule 11, including both the party and the attorney. *Intelsat USA Sales LLC*, 2014 WL 12787643 at *8. The sanction should suffice to deter repetition of the sanctionable conduct or comparable conduct by others similarly situated. Rule 11(c)(4).

In crafting a sanctions order, district courts may consider (i) the willfulness of the violation; (ii) whether the whole pleading or only a minor part has violated the rule; (iii) the litigant's prior sanctions history; and (iv) the financial resources of the target of the sanctions motion. *See* Fed. R. Civ. P. 11, Advisory Committee's Note (1993).

Here, the entire Complaint against DISH and Ergen violates Rule 11(b). Plaintiffs are represented by a highly sophisticated law firm, Consovoy McCarthy PLLC, which advertises that

it works closely with a "Free Speech Clinic" at the Antonin Scalia Law School at George Mason University (*see, e.g.,* https://consovoymccarthy.com/practice-areas/#open-overlay) and is home to five former Supreme Court clerks.  https://consovoymccarthy.com/news/.  Based on the knowledge and experience of that law firm, it is reasonable to conclude that these Rule 11 violations are willful.  The Consovoy McCarthy attorneys should be fully versed in the relevant pre-filing investigation requirements as well as the First Amendment free speech protections that doom all legal claims.  In addition, Plaintiffs have vast resources.  Publicly available sources estimate Plaintiff Kim's net wealth at more than $500 million.

https://www.benzinga.com/sec/insider-trades/0001418202/soohyung-kim.  The sanctions imposed in this case must be substantial in order to have a deterrent effect.

The sanctions should include all attorneys' fees and expenses that DISH and Ergen incurred in connection with this action.  Sanctions may include "an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."  Rule 11(c)(4).  When the claims asserted against a defendant in a complaint violate Rule 11, all of the defendants' defense costs in the district court directly result from the violation.  *See, e.g., Sherman Treaters Ltd. v. Ahlbrandt*, 115 F.R.D. 519, 525 (D.D.C. 1987) (granting reimbursement of all fees and expenses incurred between the date that the plaintiff's first deficient complaint was filed through to the date that summary judgment was granted); *John Akridge Co. v. Travelers Cos.*, 944 F. Supp. 33, 34 (D.D.C. 1996) (sanctions granted for the full cost of defending against a bad faith action).  Monetary sanctions may include attorneys' fees and costs for both the Rule 11 motion and the overall defense of the frivolous claims.  *Intelsat USA Sales LLC*, 2014 WL 12787643 at *8.

In addition, "[d]ismissal is a legitimate sanction under Rule 11." *Marina Mgt Svces, Inc.
v. Vessel My Girls*, 202 F.3d 315, 325 (D.C. Cir. 2000) (affirming district court's sanction of
dismissal of frivolous counterclaim).  Because the entire Complaint violates Rule 11(b),
dismissal is an appropriate sanction in this case.

## V.    CONCLUSION

For all of the foregoing reasons, Defendants DISH and Ergen respectfully request that
this Court impose sanctions on Plaintiffs, pursuant to Rule 11(c), for violations of Rule 11(b)(1),
(2) and (3).

Dated:  July 3, 2024 [service date]

Respectfully submitted,

STEPTOE LLP

By:  *s/ Elyse D. Echtman*
       Elyse D. Echtman
       D.D.C. Bar No. NY0583
       1114 Avenue of the Americas
       New York, New York 10036
       (212) 378-7551
       eechtman@steptoe.com

       *Counsel for Defendants DISH Network
       Corporation and Charles Ergen*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SGCI HOLDINGS III LLC AND SOOHYUNG KIM,<br><br>            Plaintiffs,<br><br>      v.<br><br>FEDERAL COMMUNICATIONS COMMISSION; JESSICA ROSENWORCEL, in her official capacity as Chairwoman of the FCC; HOLLY SAURER, in her official capacity as Chief of the Media Bureau; THE ALLEN MEDIA GROUP, INC. f/k/a Entertainment Studios, Inc.; DISH NETWORK CORPORATION; THE GOODFRIEND GROUP, INC.; THE NEWSGUILD-CWA; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA; UNITED CHURCH OF CHRIST, OC INC., d/b/a United Church of Christ Media Justice Ministry; COMMON CAUSE; BYRON ALLEN; CHARLES ERGEN; and DAVID GOODFRIEND,<br><br>            Defendants. | Case No. 24-1204<br>Honorable Judge R.C. |

**[PROPOSED] ORDER GRANTING MOTION FOR RULE 11 SANCTIONS BY DEFENDANTS DISH NETWORK CORPORATION AND CHARLES ERGEN**

After considering the Motion for Rule 11 Sanctions By Defendants DISH Network Corporation and Charles Ergen, the Statement of Points and Authorities in Support, the pleadings and papers filed by the parties in connection therewith, and all other matters presented to the Court, and good cause having been shown:

**IT IS HEREBY ORDERED** that the Motion is **GRANTED** in its entirety:

1.      The Complaint filed by Plaintiffs SGCI Holdings III LLC ("SGCI") and

Soohyung Kim ("Kim") as to DISH and Ergen is dismissed with prejudice.

2.      Plaintiff and Plaintiffs' counsel, jointly and severally, shall pay monetary

sanctions to DISH and Ergen in an amount covering all of the attorneys' fees and costs incurred

by DISH and Ergen in connection with this matter, to be determined by agreement of the parties

or by a fee petition filed by DISH and Ergen within 30 days of this Order.


 Entered:                                            _____
                                                     Honorable Judge Rudolph Contreras
                                                     United States District Judge



Prepared and Submitted by:

   Elyse D. Echtman
   D.D.C. Bar No. NY0583
   1114 Avenue of the Americas
   New York, New York 10036
   (212) 378-7551
   eechtman@steptoe.com

   *Counsel for Defendants DISH Network
   Corporation and Charles Ergen*

2