**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SGCI HOLDINGS III LLC and
SOOHYUNG KIM,

*Plaintiffs*,

v.

FEDERAL COMMUNICATIONS
COMMISSION et al.,

*Defendants*.

Case No. 1:24-cv-1204-RC

**ORAL ARGUMENT
REQUESTED**

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF POINTS AND
AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES...................................................................................iii

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................... 2

   I.   Factual Background ................................................................................. 2

   II.   Procedural Background ......................................................................... 22

STANDARD OF REVIEW ................................................................................... 23

ARGUMENT....................................................................................................... 24

   I.   This Court Has Jurisdiction over Plaintiffs' Claims................................. 24

      A.  Sovereign immunity does not bar the relief sought............................ 25

      B.  Plaintiffs have Article III standing...................................................... 28

      C.  Plaintiffs' claims are not subject to the Hobbs Act's provisions vesting exclusive jurisdiction in the D.C. Circuit. ................................ 38

      D.  Plaintiffs' claims are not subject to administrative exhaustion. ........... 43

      E.  Abstention under the doctrine of primary jurisdiction is improper. ............... 44

   II.   The D.C. Circuit Proceedings Do Not Preclude Plaintiffs' Claims. ........................ 45

   III.   The Amended Complaint Plausibly States Claims for Relief.................................. 53

      A.  Count I: Equal Protection.................................................................... 53

      B.  Count II: Racial impairment of contracts, 42 U.S.C. §1981................................. 69

      C.  Count III: Conspiracy to interfere with civil rights, 42 U.S.C. §1985(3) ........... 81

      D.  Count IV: Neglect to prevent conspiracy, 42 U.S.C. §1986 ............................... 96

      E.  Counts V, VI: Tortious interference with contract and prospective business opportunity ............................................................................ 101

F.  Count VII: Civil conspiracy ............................................................. 112

G.  Count VIII: *Ultra vires* consideration of alternative buyer, 47 U.S.C. §310(d) ............................................................................................. 112

H.  Plaintiffs' common-law claims against the Unions are not preempted. ........ 116

IV.  The First Amendment Does Not Immunize the Private Defendants' Conduct. .......................................................................................... 118

A.  Defendants' acts and conduct are not protected by the First Amendment. ................................................................................. 118

B.  The *Noerr-Pennington* doctrine does not bar Plaintiffs' claims. ...................... 124

1.  *Noerr-Pennington* applies only to antitrust claims. ...................... 124

2.  Even if *Noerr-Pennington* applies, Plaintiffs' claims satisfy its sham exception. .......................................................................... 128

3.  Defendants' misrepresentations and misleading statements also preclude application of *Noerr-Pennington*. ........................... 138

LEAVE TO AMEND ............................................................................ 140

CONCLUSION .................................................................................... 140

CERTIFICATE OF SERVICE ............................................................. 142

## TABLE OF AUTHORITIES

**Cases**

*2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*,
  342 F. Supp. 3d 126 (D.D.C. 2018) .................................................................................. 91

*707 G St. Rest., LLC v. Jemal's Mickelson, LLC*,
  2023 WL 2571753 (D.D.C. Mar. 20, 2023) ............................................................. 110, 111

*A.H.D.C. v. City of Fresno*,
  2000 WL 35810722 (E.D. Cal. Aug. 31, 2000) ............................................................. 120

*Abarca Health, LLC v. PharmPix Corp.*,
  915 F. Supp. 2d 210 (D.P.R. 2012) .............................................................................. 129

*Acosta Orellana v. CropLife Int'l*,
  711 F. Supp. 2d 81 (D.D.C. 2010) ............................................................................... 125

*Action v. Gannon*,
  450 F.2d 1227 (8th Cir. 1971) ...................................................................................... 27

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*,
  59 F.4th 948 (8th Cir. 2023) .......................................................................................... 92

*Aka v. Washington Hosp. Ctr.*,
  156 F.3d 1284 (D.C. Cir. 1998) .................................................................................... 66

*Alder v. Columbia Hist. Soc.*,
  690 F. Supp. 9 (D.D.C. 1988) ....................................................................................... 82

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988) ................................................................................. 124, 128, 138

*Alvear-Velez v. Mukasey*,
  540 F.3d 672 (7th Cir. 2008) ......................................................................................... 49

*\*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
  103 F.4th 765 (11th Cir. 2024) .............................................................................. 119, 120

*Aman v. Cort Furniture Rental Corp.*,
  85 F.3d 1074 (3d Cir. 1996) ..................................................................................... 78, 80

*Anderson v. WBMG-42,*
    253 F.3d 561 (11th Cir. 2001) ................................................................ 67

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
    256 F.3d 799 (D.C. Cir. 2001) ............................................................. 124

\*Angelex Ltd. v. United States,*
    123 F. Supp. 3d 66 (D.D.C. 2015) ................................................... 47, 48

*Armstrong v. FAA,*
    296 F. App'x 88 (D.C. Cir. 2008) ....................................................... 121

*Armstrong v. Thompson,*
    80 A.3d 177 (D.C. 2013) .............................................................. 109, 112

*Ash v. Tyson Foods, Inc.,*
    546 U.S. 454 (2006) .............................................................................. 78

*Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.,*
    1985 WL 1635 (D.D.C. May 24, 1985) ............................................... 128

*Athridge v. Aetna Cas. & Sur. Co.,*
    351 F.3d 1166 (D.C. Cir. 2003) ............................................................ 47

*Ave. 6E Invs., LLC v. City of Yuma,*
    818 F.3d 493 (9th Cir. 2016) ......................................................... 60, 80

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) ............................................................................. 40

*Ayissi-Etoh v. Fannie Mae,*
    712 F.3d 572 (D.C. Cir. 2013) ............................................................. 74

*Azurity Pharms., Inc. v. Bionpharma Inc.,*
    650 F. Supp. 3d 269 (D. Del. 2023) .................................................... 131

*B & B Hardware, Inc. v. Hargis Indus., Inc.,*
    575 U.S. 138 (2015) ............................................................................. 51

*B&G Foods N. Am., Inc. v. Embry,*
    29 F.4th 527 (9th Cir. 2022) .............................................................. 127

*Banneker Ventures, LLC v. Graham,
    798 F.3d 1119 (D.C. Cir. 2015)................................................................ 24, 72, 91, 102, 104,
                                                                  107, 108, 109, 125

Banner Health v. Price,
    867 F.3d 1323 (D.C. Cir. 2017).......................................................................................... 29

BE & K Constr. Co. v. NLRB,
    536 U.S. 516 (2002)..................................................................................... 125, 127, 128

Belfast v. Upsilon Chapter of Pi Kappa Alpha Fraternity at
    Auburn Univ.,
    267 F. Supp. 2d 1139 (M.D. Ala. 2003)............................................................................ 94

Bell v. Hood,
    327 U.S. 678 (1946)............................................................................................................ 27

Bennett v. Spear,
    520 U.S. 154 (1997)............................................................................................................ 36

Bergman v. United States,
    551 F. Supp. 407 (W.D. Mich. 1982)................................................................................ 96

Bill Johnson's Rests., Inc. v. NLRB,
    461 U.S. 731 (1983)......................................................................................................... 125

Bio Tech. Gen. Corp. v. Genentech, Inc.,
    267 F.3d 1325 (Fed. Cir. 2001)...................................................................................... 133

Borough of Duryea, Pa. v. Guarnieri,
    564 U.S. 379 (2011)......................................................................................................... 125

Bostock v. Clayton County,
    590 U.S. 644 (2020)......................................................................................................... 106

Boulware v. Nev. Dep't of Hum. Res.,
    960 F.2d 793 (9th Cir. 1992).......................................................................................... 135

Bowman v. Iddon,
    848 F.3d 1034 (D.C. Cir. 2017)........................................................................................ 19

Bray v. Alexandria Women's Health Clinic,
    506 U.S. 263 (1993).................................................................................................. 81, 94

*Brown v. Hartlage,*
456 U.S. 45 (1982) ................................................................................... 122

*Brown v. McDonough,*
2024 WL 1344417 (D.D.C. Mar. 29, 2024) ............................................. 66

*Brown v. Sessoms,*
774 F.3d 1016 (D.C. Cir. 2014) .............................................. 68, 80, 81

*Bryant v. Mil. Dep't of Miss.,*
597 F.3d 678 (5th Cir. 2010) ................................................................ 133

*Cal. Cmtys. Against Toxics v. EPA,*
928 F.3d 1041 (D.C. Cir. 2019) ................................................ 47, 48, 51

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
404 U.S. 508 (1972) ........................................................ 123, 128, 137, 138

*Carr v. Brown,*
395 A.2d 79 (D.C. 1978) ............................................................ 107, 108

*Carter v. Duncan-Huggins, Ltd.,*
727 F.2d 1225 (D.C. Cir. 1984) .............................................................. 73

*Casco Marina Dev., L.L.C. v. D.C. Redev. Land Agency,*
834 A.2d 77 (D.C. 2003) ........................................................... 103, 104

*Chadmoore Commc'ns, Inc. v. FCC,*
113 F.3d 235 (D.C. Cir. 1997) ................................................................ 44

*Chamber of Com. v. Reich,*
74 F.3d 1322 (D.C. Cir. 1996) ............................................................... 26

*Chang v. County of Siskiyou,*
2024 WL 3890000 (E.D. Cal. Aug. 21, 2024) ....................................... 79

*Chinese Am. Citizens All. of Greater N.Y. v. Adams,*
116 F.4th 161 (2d Cir. 2024) .................................................................. 58

*City of Columbia v. Omni Outdoor Advert., Inc.,*
499 U.S. 365 (1991) ............................................................................... 128

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ................................................................................. 31

*Clark v. Clabaugh,*
    20 F.3d 1290 (3d Cir. 1994) ..................................................................... 96

*Cmty. Hous. Tr. v. Dep't of Consumer & Regul. Affs.,*
    257 F. Supp. 2d 208 (D.D.C. 2003) ......................................................... 61

*Coal. for Pres. of Hisp. Broad. v. FCC,*
    931 F.2d 73 (D.C. Cir. 1991) .................................................................... 44

*Coastal States Mktg., Inc. v. Hunt,*
    694 F.2d 1358 (5th Cir. 1983) ................................................................ 126

*Columbus Bd. of Educ. v. Penick,*
    443 U.S. 449 (1979) ................................................................................. 59

*Comput. Assocs. Int'l, Inc. v. Altai, Inc.,*
    126 F.3d 365 (2d Cir. 1997) ..................................................................... 49

*COMSAT Corp. v. FCC,*
    114 F.3d 223 (D.C. Cir. 1997) ................................................................ 114

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona,*
    138 F. Supp. 3d 352 (S.D.N.Y. 2015) ....................................................... 59

*Cook v. Babbitt,*
    819 F. Supp. 1 (D.D.C. 1993) ............................................................ 60, 63

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    144 S. Ct. 2440 (2024) ........................................................................... 100

*Covad Commc'ns Co. v. Bell Atl. Corp.,*
    398 F.3d 666 (D.C. Cir. 2005) ................................................................ 124

*Ctr. for Biological Diversity v. EPA,*
    56 F.4th 55 (D.C. Cir. 2022) .................................................................... 26

*Cutler v. HHS,*
    797 F.3d 1173 (D.C. Cir. 2015) ............................................................... 24

*D'Amore v. Small Bus. Admin.*,
  2021 WL 6753481 (D.D.C. Sept. 16, 2021) ...................................................... 96, 102

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) .......................................................................... 114

*Direct Supply, Inc. v. Specialty Hosps. of Am., LLC*,
  878 F. Supp. 2d 13 (D.D.C. 2012) ...................................................................... 19

*DIRECTV, Inc. v. Cavanaugh*,
  321 F. Supp. 2d 825 (E.D. Mich. 2003) ............................................................ 127

*District of Columbia v. Proud Boys Int'l, LLC*,
  2023 WL 2733767 (D.D.C. Mar. 31, 2023) ........................................................ 46

*Doe #1 v. Am. Fed'n of Gov't Emps.*,
  554 F. Supp. 3d 75 (D.D.C. 2021) ............................................................... 96, 102

*Doe ex rel. Saulsbury v. County of Kankakee*,
  2004 WL 1557970 (N.D. Ill. July 8, 2004) ......................................................... 99

*Doe v. Miami Univ.*,
  882 F.3d 579 (6th Cir. 2018) .............................................................................. 69

*Doe v. Roman Cath. Diocese of Greensburg*,
  581 F. Supp. 3d 176 (D.D.C. 2022) ............................................................... 90, 93

*Does I through III v. District of Columbia*,
  238 F. Supp. 2d 212 (D.D.C. 2002) ............................................................... 47, 48

*Domino's Pizza, Inc. v. McDonald*,
  546 U.S. 470 (2006) ......................................................................................... 69

*Drake v. FAA*,
  291 F.3d 59 (D.C. Cir. 2002) ......................................................................... 46, 48

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ........................................................................................ 126

*Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*,
  208 F. Supp. 3d 219 (D.D.C. 2016) ........................................................... 104, 109

*Edwards v. Ctr. Moriches Union Free Sch. Dist.*,
   2006 WL 8439627 (E.D.N.Y. Aug. 14, 2006) ........................................................ 96

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*,
   894 F.3d 339 (D.C. Cir. 2018) ............................................................... 24, 106

*Elbaum v. Google, Inc.*,
   2024 WL 1329790 (D. Md. Mar. 28, 2024) ............................................................ 52

*Emanuel Displaced Persons Ass'n 2 v. City of Portland*,
   704 F. Supp. 3d 1088 (D. Or. 2023) ................................................................. 94

*Evangelou v. District of Columbia*,
   901 F. Supp. 2d 159 (D.D.C. 2012) ................................................................. 92

*Familias Unidas Por La Educación v. El Paso Indep. Sch. Dist.*,
   633 F. Supp. 3d 888 (W.D. Tex. 2022) ............................................................... 66

*FCC v. ITT World Commc'ns, Inc.*,
   466 U.S. 463 (1984) ............................................................................ 38, 43

*Fed. Express Corp. v. U.S. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ..................................................................... 28

*Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
   873 F. Supp. 2d 288 (D.D.C. 2012) ................................................................ 139

*FilmTec Corp. v. Hydranautics*,
   67 F.3d 931 (Fed. Cir. 1995) .................................................................... 135

*Fisher Sand & Gravel Co. v. FNF Constr., Inc.*,
   2013 WL 12121874 (D.N.M. Mar. 6, 2013) ........................................................... 126

*Foman v. Davis*,
   371 U.S. 178 (1962) .............................................................................. 140

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010) ........................................................................ 41, 42, 45

*Freeman v. Giuliani*,
   2022 WL 16551323 (D.D.C. Oct. 31, 2022) ........................................................... 93

*FTC v. AbbVie Inc.*,
   976 F.3d 327 (3d Cir. 2020) ............................................................... 138

*FTC v. Shire ViroPharma Inc.*,
   2018 WL 1401329 (D. Del. Mar. 20, 2018) ........................................ 129

*GAF Corp. v. United States*,
   818 F.2d 901 (D.C. Cir. 1987) ............................................................. 40

*Garity v. APWU Nat'l Lab. Org.*,
   828 F.3d 848 (9th Cir. 2016) ............................................................... 53

*Gen. Aircraft Corp. v. Air Am., Inc.*,
   482 F. Supp. 3 (D.D.C. 1979) ............................................................ 140

*Gen. Elec. Co. v. Jackson*,
   610 F.3d 110 (D.C. Cir. 2010) ............................................................. 41

*George v. Leavitt*,
   407 F.3d 405 (D.C. Cir. 2005) ............................................................. 68

*Geter v. U.S. Gov't Publ'g Off.*,
   268 F. Supp. 3d 34 (D.D.C. 2017) ....................................................... 47

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949) .......................................................................... 122

*Ginx, Inc. v. Soho All.*,
   720 F. Supp. 2d 342 (S.D.N.Y. 2010) .................................................. 73

*Gipson v. Wells Fargo N.A.*,
   460 F. Supp. 2d 15 (D.D.C. 2006) .................................................. 62, 76

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) ............................................................................ 31

*Grimes v. Smith*,
   776 F.2d 1359 (7th Cir. 1985) ............................................................. 94

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) .............................................. 84, 86, 93, 95

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.,*
   806 F.3d 162 (3d Cir. 2015) ................................................................. 132, 134, 136

*Harris v. Allstate Ins. Co.,*
   300 F.3d 1183 (10th Cir. 2002) ......................................................................... 73

*Havilah Real Prop. Servs., LLC v. VLK, LLC,*
   108 A.3d 334 (D.C. 2015) .............................................................................. 102

*Haymon v. District of Columbia,*
   610 F. Supp. 3d 101 (D.D.C. 2022) ................................................................. 109

*Haynes v. Navy Fed. Credit Union,*
   282 F.R.D. 17 (D.D.C. 2012) ......................................................................... 140

*Hedgeye Risk Mgmt., LLC v. Heldman,*
   271 F. Supp. 3d 181 (D.D.C. 2017) ................................................................. 92

*Ho v. Garland,*
   106 F.4th 47 (D.C. Cir. 2024) ........................................................................ 24

*Hobson v. Wilson,*
   737 F.2d 1 (D.C. Cir. 1984) ........................................................................... 94

*Holman v. City of Warrenton,*
   242 F. Supp. 2d 791 (D. Or. 2002) .................................................................. 50

*Hubbard v. EPA,*
   809 F.2d 1 (D.C. Cir. 1986) ........................................................................... 27

*Hundley v. District of Columbia,*
   494 F.3d 1097 (D.C. Cir. 2007) ..................................................................... 106

*Hurd v. District of Columbia,*
   864 F.3d 671 (D.C. Cir. 2017) .......................................................... 23, 49, 50

*Hutchins v. District of Columbia,*
   188 F.3d 531 (D.C. Cir. 1999) ........................................................................ 45

*I.A.M. Nat'l Pension Fund v. Indus. Gear Mfg. Co.,*
   723 F.2d 944 (D.C. Cir. 1983) ........................................................................ 47

*In re Am. Rivers & Idaho Rivers United,*
    372 F.3d 413 (D.C. Cir. 2004) ............................................................................. 49

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.,*
    336 F. Supp. 3d 1256 (D. Kan. 2018) ....................................................... 105, 131

*In re Lipitor Antitrust Litig.,*
    868 F.3d 231 (3d Cir. 2017) ..................................................................... 132, 134

*In re Nat'l Nurses United,*
    47 F.4th 746 (D.C. Cir. 2022) ...................................................................... 49, 50

*In re Navy Chaplaincy,*
    697 F.3d 1171 (D.C. Cir. 2012) ........................................................... 29, 32, 33

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
    587 F. Supp. 2d 27 (D.D.C. 2008) ......................................................................... 93

*In re Restasis Antitrust Litig.,*
    333 F. Supp. 3d 135 (E.D.N.Y. 2018) ................................................................ 105

*In re Rodriguez,*
    2005 WL 3843612 (D.C. Cir. Oct. 14, 2005) ...................................................... 97

*In re Suboxone Antitrust Litig.,*
    2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) .................................................. 105

*In re Suboxone Antitrust Litig.,*
    2017 WL 3967911 (E.D. Pa. Sept. 8, 2017) ..................................................... 105

*In re Subpoena Duces Tecum Issued to CFTC,*
    439 F.3d 740 (D.C. Cir. 2006) ............................................................................. 51

*In re Tennant,*
    359 F.3d 523 (D.C. Cir. 2004) ...................................................................... 49, 50

*In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.,*
    928 F.3d 42 (D.C. Cir. 2019) ............................................................................... 33

*In re Wellbutrin SR Antitrust Litig.,*
    2006 WL 616292 (E.D. Pa. Mar. 9, 2006) ....................................................... 133

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.,*
  164 F. Supp. 3d 1117 (D. Minn. 2016) ............................................................ 129

*Inner City Contracting, LLC v. Charter Township of Northville,*
  87 F.4th 743 (6th Cir. 2023) ............................................................................ 71

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis,*
  476 U.S. 380 (1986) ........................................................................................ 116

*Israel v. Baxter Labs., Inc.,*
  466 F.2d 272 (D.C. Cir. 1972) ........................................................ 129, 133, 137

*Iyoha v. Architect of the Capitol,*
  927 F.3d 561 (D.C. Cir. 2019) .......................................................................... 76

*Jefferson-11th St., LLC v. District of Columbia,*
  2020 WL 3035038 (D.D.C. June 5, 2020) ................................................ 107, 125

*Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County,*
  915 F.3d 256 (4th Cir. 2019) ............................................................................ 68

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.,*
  968 F.2d 286 (2d Cir. 1992) ....................................................... 119, 120, 123

*Jibril v. Mayorkas,*
  20 F.4th 804 (D.C. Cir. 2021) ..................................................................... 29, 34

*Kaempe v. Myers,*
  367 F.3d 958 (D.C. Cir. 2004) .......................................................................... 19

*Kelleher v. Dream Catcher, L.L.C.,*
  263 F. Supp. 3d 322 (D.D.C. 2017) .................................................................. 92

*Kirschner v. Zoning Bd. of Appeals of Inc. Vill. of Valley Stream,*
  924 F. Supp. 385 (E.D.N.Y. 1996) .................................................................... 67

*Kowal v. MCI Commc'ns Corp.,*
  16 F.3d 1271 (D.C. Cir. 1994) .......................................................................... 91

*Kreuzer v. Am. Acad. of Periodontology,*
  735 F.2d 1479 (D.C. Cir. 1984) ........................................................................ 84

*Kvech v. Holder,*
   2011 WL 4369452 (D.D.C. Sept. 19, 2011)............................................................... 91

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty*
   *Abuse-Wis., Inc.,*
   759 F. Supp. 1339 (W.D. Wis. 1991) ............................................................... 97, 98

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty*
   *Abuse-Wis., Inc.,*
   991 F.2d 1249 (7th Cir. 1993) ........................................................................... 121

*Ladson v. Ulltra E. Parking Corp.,*
   853 F. Supp. 699 (S.D.N.Y. 1994) ...................................................................... 72

*Lagayan v. Odeh,*
   199 F. Supp. 3d 21 (D.D.C. 2016)....................................................................... 95

*Landmarks Holding Corp. v. Bermant,*
   664 F.2d 891 (2d Cir. 1981) ............................................................................. 134

*Lannan Found. v. Gingold,*
   300 F. Supp. 3d 1 (D.D.C. 2017) ...................................................................... 111

*Larsen v. U.S. Navy,*
   486 F. Supp. 2d 11 (D.D.C. 2007) ...................................................................... 31

*Leedom v. Kyne,*
   358 U.S. 184 (1958)............................................................................... 113, 115

*Litton Sys., Inc. v. AT&T,*
   700 F.2d 785 (2d Cir. 1983) ............................................................. 132, 136, 138

*Loc. 1814, Int'l Longshoremen's Ass'n v. NLRB,*
   735 F.2d 1384 (D.C. Cir. 1984)......................................................................... 117

*Lucas v. Paige,*
   435 F. Supp. 2d 165 (D.D.C. 2006).................................................................... 76

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)............................................................................................ 31

*Mace v. Skinner,*
   34 F.3d 854 (9th Cir. 1994) .......................................................................... 41, 42

*Mandelkorn v. Patrick,*
   359 F. Supp. 692 (D.D.C. 1973) ........................................................... 93

*Mazloum v. D.C. Metro. Police Dep't,*
   522 F. Supp. 2d 24 (D.D.C. 2007) ........................................................ 74

*McAlister v. Alaska,*
   2023 WL 3480001 (D. Alaska May 16, 2023) ....................................... 27

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) ............................................................................... 57

*McDonald v. Smith,*
   472 U.S. 479 (1985) ....................................................................... 125, 127

*McLellan v. Miss. Power & Light Co.,*
   545 F.2d 919 (5th Cir. 1977) ................................................................. 27

*McNary v. Haitian Refugee Ctr., Inc.,*
   498 U.S. 479 (1991) ................................................................... 40, 41, 42

*Media Rts. Techs., Inc. v. Microsoft Corp.,*
   922 F.3d 1014 (9th Cir. 2019) ............................................................... 48

*Meijer, Inc. v. Ranbaxy Inc.,*
   2016 WL 4697331 (D. Mass. June 16, 2016) ..................................... 105

*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014) ............................................................ 24

*Mercatus Grp., LLC v. Lake Forest Hosp.,*
   641 F.3d 834 (7th Cir. 2011) ............................................................... 139

*Merritt v. Shuttle,*
   245 F.3d 182 (2d Cir. 2001) .................................................................. 38

*Meyer Grp., Ltd. v. Rayborn,*
   2020 WL 5763631 (D.D.C. Sept. 28, 2020) ...................................... 103

*Mhany Mgmt., Inc. v. County of Nassau,*
   819 F.3d 581 (2d Cir. 2016) ........................................................... 78, 79

*Mitchell v. County of Nassau,*
    2007 WL 1580068 (E.D.N.Y. May 24, 2007) ......................................................... 99

*Mizell v. N. Broward Hosp. Dist.,*
    427 F.2d 468 (5th Cir. 1970) ................................................................................ 27

*Mobile Now, Inc. v. Sprint Corp.,*
    393 F. Supp. 3d 56 (D.D.C. 2019) ........................................................................ 52

*Mobile Satellite Commc'ns, Inc. v. Intelsat USA Sales Corp.,*
    646 F. Supp. 2d 124 (D.D.C. 2009) ..................................................................... 104

*Morris v. Carter Glob. Lee, Inc.,*
    997 F. Supp. 2d 27 (D.D.C. 2013) ........................................................................ 69

*Muhammad v. Oliver,*
    547 F.3d 874 (7th Cir. 2008) .......................................................................... 71, 72

*Murthy v. Missouri,*
    144 S. Ct. 1972 (2024) ........................................................................... 29, 31, 36

*N. Cal. Newspaper Org. Comm. v. Solano Assocs.,*
    193 Cal. App. 3d 1644 (1987) ............................................................................ 118

*Nader v. Democratic Nat'l Comm.,*
    567 F.3d 692 (D.C. Cir. 2009) ........................................................................... 127

*Nanko Shipping, Guinea v. Alcoa, Inc.,*
    330 F. Supp. 3d 439 (D.D.C. 2018) ................................................................ 82, 86

*Nanko Shipping, USA v. Alcoa, Inc.,*
    850 F.3d 461 (D.C. Cir. 2017) ........................................................................ 69, 73

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Servs. Impasses Panel,*
    437 F.3d 1256 (D.C. Cir. 2006) .......................................................................... 115

*Nat'l Ass'n of Postal Supervisors v. USPS,*
    26 F.4th 960 (D.C. Cir. 2022) ............................................................................ 113

*\*Nat'l Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024) ................................................ 2, 24, 25, 34, 62, 75, 76, 78, 80,
                                                                    87, 90, 92, 115, 116, 122, 135

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.,*
  957 A.2d 890 (D.C. 2008) ........................................................................... 104, 109

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City
  of Jacksonville,*
  508 U.S. 656 (1993) .......................................................................................... 31

*Newmyer v. Sidwell Friends Sch.,*
  128 A.3d 1023 (D.C. 2015) .............................................................................. 104

*NextWave Pers. Commc'ns, Inc. v. FCC,*
  254 F.3d 130 (D.C. Cir. 2001) ........................................................................... 51

*Niman v. GPS USA, Inc,*
  2015 WL 1898244 (D. Colo. Apr. 27, 2015) ................................................... 120

*North v. Walsh,*
  881 F.2d 1088 (D.C. Cir. 1989) .................................................................... 48, 51

*O'Donnell Constr. Co. v. District of Columbia,*
  963 F.2d 420 (D.C. Cir. 1992) ........................................................................... 27

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
  572 U.S. 545 (2014) .................................................................... 124, 125, 137

*Olumuyiwa v. Harvard Prot. Servs., Inc.,*
  2000 WL 620202 (E.D.N.Y. May 12, 2000) ..................................................... 71

*Onyeoziri v. Spivok,*
  44 A.3d 279 (D.C. 2012) ...................................................... 103, 110, 111, 112

*Orangeburg v. FERC,*
  862 F.3d 1071 (D.C. Cir. 2017) ......................................................................... 32

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd.,*
  118 F. Supp. 3d 646 (D.N.J. 2015) ........................................................... 131, 132

*Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.,*
  81 F. Supp. 3d 1 (D.D.C. 2015) ......................................................................... 90

*Pac. Shores Props., LLC v. City of Newport Beach,*
  730 F.3d 1142 (9th Cir. 2013) ........................................................................... 63

*Pangburn v. Culbertson,*
    200 F.3d 65 (2d Cir. 1999) ....................................................................................... 93

*Pappas v. Town of Enfield,*
    602 F. App'x 35 (2d Cir. 2015) .......................................................................... 66, 67

*Patterson v. Harris,*
    2023 WL 346096 (D.D.C. Jan. 20, 2023).............................................................. 96

*PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,*
    588 U.S. 1 (2019)........................................................................................................ 39

*Peck v. United States,*
    470 F. Supp. 1003 (S.D.N.Y. 1979) ........................................................................ 99

*PHCDC1, LLC v. Evans & Joyce Willoughby Tr.,*
    257 A.3d 1039 (D.C. 2021) ..................................................................................... 103

*Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal.*
    *of Life Activists,*
    290 F.3d 1058 (9th Cir. 2002).................................................................................. 122

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County,*
    450 F.3d 1295 (11th Cir. 2006)................................................................................. 67

*Primetime 24 Joint Venture v. NBC, Inc.,*
    219 F.3d 92 (2d Cir. 2000) ...................................................................................... 137

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993)............................................................... 106, 124, 125,
    128, 133, 135, 137

*Pub. Citizen, Inc. v. Trump,*
    361 F. Supp. 3d 60 (D.D.C. 2019)........................................................................... 32

*R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin,*
    596 A.2d 530 (D.C. 1991) ...................................................................................... 106

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)................................................................................................. 119

*Radwan v. Manuel,*
    55 F.4th 101 (2d Cir. 2022) ............................................................................... 65, 67

*Reed v. Marshall,*
  2022 WL 799765 (S.D. Tex. Mar. 16, 2022) ........................................................ 129

*Regatta Bay Ltd. v. United States,*
  2008 WL 11301177 (D. Nev. Dec. 5, 2008) ........................................................ 52

*Reno v. Bossier Par. Sch. Bd.,*
  520 U.S. 471 (1997)........................................................................................ 58

*Richards v. Gelsomino,*
  240 F. Supp. 3d 173 (D.D.C. 2017)................................................................... 57

*Richardson v. Kruchko & Fries,*
  966 F.2d 153 (4th Cir. 1992) .......................................................................... 117

*Robison v. Canterbury Vill., Inc.,*
  848 F.2d 424 (3d Cir. 1988) ............................................................................ 90

*Rondigo, LLC v. Township of Richmond,*
  2012 WL 1021726 (E.D. Mich. Mar. 27, 2012) ............................................... 127

*Rumsfeld v. FAIR, Inc.,*
  547 U.S. 47 (2006)......................................................................................... 122

*Runyon v. McCrary,*
  427 U.S. 160 (1976)............................................................................... 119, 122

*San Diego Bldg. Trades Council v. Garmon,*
  395 U.S. 236 (1959)....................................................................................... 116

*Saucier v. Countrywide Home Loans,*
  64 A.3d 428 (D.C. 2013) ................................................................................ 112

*Sealed Plaintiff 1 v. Front,*
  2024 WL 1395477 (E.D. Va. Mar. 31, 2024)....................................... 97, 98, 99

*Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters,*
  436 U.S. 180 (1978)................................................................................ 116, 117

*Settles v. U.S. Parole Comm'n,*
  429 F.3d 1098 (D.C. Cir. 2005)................................................................. 54, 64

*Shaikh v. City of Chicago,*
    341 F.3d 627 (7th Cir. 2003) ................................................................. 73

*Slip-N-Slide Recs., Inc. v. TVT Recs., LLC,*
    2007 WL 473273 (S.D. Fla. Feb. 8, 2007) .................................. 126, 127

*Smith v. Bayer Corp.,*
    564 U.S. 299 (2011) ............................................................................... 52

*Smith v. Henderson,*
    982 F. Supp. 2d 32 (D.D.C. 2013) .................................................. 54, 57

*Smith v. Town of Clarkton,*
    682 F.2d 1055 (4th Cir. 1982) .............................................................. 61

*Smith v. Trump,*
    2023 WL 417952 (D.D.C. Jan. 26, 2023) ....................................... 99, 100

*Smith v. Trump,*
    2023 WL 9016458 (D.C. Cir. Dec. 29, 2023) ........................................ 99

*SMJ Grp., Inc. v. 417 Lafayette Rest. LLC,*
    2006 WL 2516519 (S.D.N.Y. Aug. 30, 2006) ..................................... 120

*Soo Park v. Thompson,*
    851 F.3d 910 (9th Cir. 2017) ................................................................ 92

*Spence v. Daily News,*
    2001 WL 121938 (S.D.N.Y. Feb. 13, 2001) ........................................ 120

*Stanton v. D.C. Ct. of Appeals,*
    127 F.3d 72 (D.C. Cir. 1997) ................................................................ 48

*Stoe v. Garland,*
    2021 WL 4169313 (D.D.C. Sept. 14, 2021) .......................................... 67

*Stout v. Jefferson Cnty. Bd. of Educ.,*
    882 F.3d 988 (11th Cir. 2018) .............................................................. 61

*\*Students for Fair Admissions, Inc. v. President & Fellows of
    Harvard Coll.,*
    600 U.S. 181 (2023) ................................................. 2, 53, 54, 55, 56, 57

*Symkowski v. Miller,*
  294 F. Supp. 1214 (E.D. Wis. 1969) ..................................................... 99

*Telecomms. Rsch. & Action Ctr. v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984) ...................................................... 40, 49

*Third Church of Christ, Scientist, of N.Y.C. v. City of New York,*
  626 F.3d 667 (2d Cir. 2010) .......................................................... 67

*Thompson v. Trump,*
  590 F. Supp. 3d 46 (D.D.C. 2022) ................................................... 121

*Tolton v. Day,*
  2020 WL 2542129 (D.D.C. May 19, 2020) .................................... 65, 68

*Tri-State Hosp. Supply Corp. v. United States,*
  341 F.3d 571 (D.C. Cir. 2003) ....................................................... 26

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) ....................................................... 26

*United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott,*
  463 U.S. 825 (1983) .................................................................... 82

*United States ex rel. Scollick v. Narula,*
  2017 WL 3268857 (D.D.C. July 31, 2017) ........................................ 92

*United States v. Abu Khatallah,*
  151 F. Supp. 3d 116 (D.D.C. 2015) ............................................... 123

*United States v. Any & All Radio Station Transmission Equip.,*
  204 F.3d 658 (6th Cir. 2000) ........................................................ 38

*United States v. AT&T,*
  524 F. Supp. 1336 (D.D.C. 1981) ............................................. 136, 138

*United States v. Chansley,*
  525 F. Supp. 3d 151 (D.D.C. 2021) ............................................... 121

*United States v. Emor,*
  785 F.3d 671 (D.C. Cir. 2015) ....................................................... 24

*United States v. Hewitt,*
   999 F.3d 1141 (8th Cir. 2021) ................................................................. 84

*United States v. Philip Morris USA Inc.,*
   566 F.3d 1095 (D.C. Cir. 2009) ............................................................. 138

*United States v. Philip Morris USA Inc.,*
   686 F.3d 832 (D.C. Cir. 2012) ......................................................... 44, 45

*United States v. W. Pac. R.R. Co.,*
   352 U.S. 59 (1956) ................................................................................. 43

*United States v. Wilson,*
   154 F.3d 658 (7th Cir. 1998) ............................................................... 122

*United States v. Yonkers Bd. of Educ.,*
   837 F.2d 1181 (2d Cir. 1987) ....................................................... 60, 61, 64

*Venetian Casino Resort, L.L.C. v. NLRB,*
   793 F.3d 85 (D.C. Cir. 2015) ............................................................... 125

*Viasat, Inc. v. FCC,*
   47 F.4th 769 (D.C. Cir. 2022) ............................................................... 44

*Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan,*
   543 F. Supp 198 (S.D. Tex. 1982) ........................................ 27, 72, 97, 98

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ................................... 53, 57, 58, 59, 60, 62, 63

*Walker v. Jones,*
   733 F.2d 923 (D.C. Cir. 1984) ............................................................... 24

*Wallace v. Kato,*
   549 U.S. 384 (2007) ............................................................................ 100

*Waller v. Butkovich,*
   584 F. Supp. 909 (M.D.N.C. 1984) ....................................................... 99

*Washington v. Davis,*
   426 U.S. 229 (1976) ............................................................................... 57

*Weberg v. Franks,*
  229 F.3d 514 (6th Cir. 2000) ............................................................. 95

*Wells v. Rhodes,*
  928 F. Supp. 2d 920 (S.D. Ohio 2013) ................................................ 94

*Werthman v. Ill. Dep't of Mental Health & Dev. Disabilities,*
  831 F. Supp. 625 (N.D. Ill. 1993) ....................................................... 27

*Whelan v. Abell,*
  48 F.3d 1247 (D.C. Cir. 1995) ........................................... 126, 127, 138

*Whidbee v. Garzarelli Food Specialties, Inc.,*
  223 F.3d 62 (2d Cir. 2000) .................................................................. 72

*Wiggins v. Philip Morris, Inc.,*
  853 F. Supp. 470 (D.D.C. 1994) ......................................................... 83

*WildEarth Guardians v. Jewell,*
  738 F.3d 298 (D.C. Cir. 2013) ............................................................ 28

*\*Wilson v. Cox,*
  753 F.3d 244 (D.C. Cir. 2014) .............................................. 62, 75, 81

*\*Wilson v. DNC Servs. Corp.,*
  315 F. Supp. 3d 392 (D.D.C. 2018) ................................... 65, 68, 80, 81, 95

*\*Wisconsin v. Mitchell,*
  508 U.S. 476 (1993) ........................................................ 119, 121, 123

*Worth v. Jackson,*
  451 F.3d 854 (D.C. Cir. 2006) ............................................................ 32

*Wright v. Eugene & Agnes E. Meyer Found.,*
  68 F.4th 612 (D.C. Cir. 2023) ............................................................. 24

*Wyly v. Weiss,*
  697 F.3d 131 (2d Cir. 2012) ............................................................... 53

*XP Vehicles, Inc. v. Dep't of Energy,*
  118 F. Supp. 3d 38 (D.D.C. 2015) ...................................................... 68

*Young v. Lord & Taylor, LLC,*
    937 F. Supp. 2d 346 (E.D.N.Y. 2013) .................................................................. 100

*Z St., Inc. v. Koskinen*,
    44 F. Supp. 3d 48 (D.D.C. 2014) ........................................................................ 26

*Zapata v. B. Coleman Flooring, Installation, LLC,*
    2019 WL 13399855 (D.D.C. Jan. 16, 2019) ....................................................... 92

*Zhang Jingrong v. Chinese Anti-Cult World All.,*
    287 F. Supp. 3d 290 (E.D.N.Y. 2018) .............................................................. 121

**Statutes**

28 U.S.C. §1331 ........................................................................................................ 50

28 U.S.C. §1343(a) ................................................................................................... 50

28 U.S.C. §1367(a) ................................................................................................... 50

28 U.S.C. §1651(a) ................................................................................................... 49

28 U.S.C. §2342(1) ........................................................................................ 38, 39, 113

29 U.S.C. §157 ....................................................................................................... 116

42 U.S.C. §1981(a) ................................................................................................... 69

42 U.S.C. §1981(b) ................................................................................................... 69

42 U.S.C. §1985(3) ......................................................................................... 81, 120, 122

42 U.S.C. §1986 ................................................................... i, 23, 96, 97, 99, 100, 120

47 U.S.C. §155(c)(1) ............................................................................................... 114

47 U.S.C. §155(c)(7) ............................................................................................... 113

47 U.S.C. §309(a) ...................................................................................... 4, 5, 47, 51, 54

47 U.S.C. §309(d)(2) ................................................................................... 39, 47, 51

47 U.S.C. §309(e) ..................................................................................................... 39

47 U.S.C. §310(d) ........................................................ 4, 8, 13, 47, 54, 64, 115, 129

47 U.S.C. §402(a) .................................................................................................. 38

47 U.S.C. §402(b) .................................................................................................. 50

5 U.S.C. §702 ......................................................................................................... 26

**Rules**

Fed. R. Civ. P. 15(a)(2) ....................................................................................... 140

**Treatises**

15A C.J.S. *Conspiracy* §10 .................................................................................. 90

15A C.J.S. *Conspiracy* §11 .................................................................................. 90

18 Wright & Miller, *Federal Practice & Procedure* §4412 ................................ 49

18 Wright & Miller, *Federal Practice & Procedure* §4417 ................................ 52

Restatement (Second) of Judgments §26(1)(c) .................................................. 49

**Regulations**

47 C.F.R. §0.283(c) ........................................................................................ 64, 132

47 C.F.R. §0.5(c) ................................................................................................ 132

47 C.F.R. §73.3555, Note 7 .................................................................................... 5

47 C.F.R. §73.3555(b) ............................................................................................. 5

**Regulatory Authorities**

*Charter of the FCC's Communications Equity and Diversity Council* (2021),
    https://perma.cc/EVK2-7QL3 ....................................................................... 55

FCC, *Commc'ns Equity & Diversity Council, Enhancing Media Ownership
    and Entrepreneurial Opportunities for Minorities and Women*
    (June 15, 2023), https://perma.cc/GPP8-9QD2 .......................................... 55

FCC, Media Bureau & Off. of Econ. & Analytics, *Sixth Report on Ownership of Broadcast Stations* (2023), https://perma.cc/8J79-BHWY ............................ 55

FCC, *Strategic Plan Fiscal Years 2022-2026* (2022), https://perma.cc/GQW9-89H6 ...................................................................................................... 55

*In re 2018 Quadrennial Regul. Rev. — Rev. of the Comm'n's Broad. Ownership Rules & Other Rules Adopted Pursuant to Section 202 of the Telecomms. Act of 1996,* 2023 WL 9021989 (FCC Dec. 26, 2023) ................................................................................... 55

*In re Adelphia Commc'ns Corp.,* 21 FCC Rcd. 8203 (2006) ........................................................................................................ 64

*In re Audacy License, LLC,* No. 24-94, 2024 WL 4369711 (FCC Sept. 30, 2024) ...................................................... 19, 20

*In re Geotek Commc'ns, Inc.,* 15 FCC Rcd. 790 (2000) ............................................................................................................ 115

*In re Media Gen., Inc.,* 32 FCC Rcd. 183 (2017) ............................................................................................................ 130

*In re Pandora Radio LLC,* 30 FCC Rcd. 10570 (2015) ...................................................................................................... 54

*In re Pol'ys & Rules Regarding Minority & Female Ownership of Mass Media Facilities,* 10 FCC Rcd. 2788 (1995) ...................................................................................................... 76

*In re Promoting Diversification of Ownership in the Broad. Servs.,* 31 FCC Rcd. 398 (2016) ................................................................................................ 6, 54, 76

*In re Rev. of the Comm'n's Broad. & Cable Equal Emp. Opportunity Rules & Pol'ys,* MB No. 98-204, 2024 WL 770889 (FCC Feb. 22, 2024) ...................................................... 19

*In re Rules & Pol'ys to Promote New Entry & Ownership Diversity in the Broad. Servs.,* 33 FCC Rcd. 7911 (2018) ...................................................................................................... 56

*In re Spanish Int'l Commc'ns Corp.,* 1 FCC Rcd. 844 (1986) ........................................................................................................ 129

*In re Terrier Media Buyer, Inc.*,
  34 FCC Rcd. 10544 (2019) ...................................................................... 10, 130, 131

*In re Tribune Media Co.*,
  MB No. 19-30, 2019 WL 4440126 (FCC Sept. 16, 2019)............................................ 130, 131

*Statement of Pol'y on Minority Ownership of Broad. Facilities*,
  68 F.C.C.2d 979 (1978) .................................................................................... 76

**Standard General-TEGNA Proceedings**

Amended Petition for Declaratory Ruling of Teton Parent Corp.,
  *In re Teton Parent Corp.*, MB No. 22-166 (Mar. 23, 2022),
  https://perma.cc/H6FU-9HGR............................................................................... 77

Applicants' Response to Request for Documents and Information,
  *In re Tegna Inc.*, MB No. 22-162 (June 13, 2022),
  https://perma.cc/ZML8-N63P ............................................................................... 131

Hearing Designation Order, *In re Tegna Inc.*,
  MB No. 22-162 (Feb. 24, 2023), https://perma.cc/N7U5-LQ57 ...................................... 114

Letter from Andrew Jay Schwartzman to Marlene H. Dortch,
  *In re Tegna Inc.*, MB No. 22-162 (Aug. 4, 2022),
  https://perma.cc/SX27-9HSK ................................................................................ 11

Notice of Appeal, *SGCI Holdings III LLC v. FCC*,
  No. 23-1083 (D.C. Cir. Mar. 27, 2023) .................................................................. 46

Order, *In re SGCI Holdings III LLC*,
  No. 23-1084 (D.C. Cir. Apr. 21, 2023) .................................................................. 46

Order, *SCGI Holdings III LLC v. FCC*,
  No. 23-1083 (D.C. Cir. Apr. 3, 2023) ............................................................... 40, 46

Pet. for Mandamus, *In re SGCI Holdings III LLC*,
  No. 23-1084 (D.C. Cir. Mar. 27, 2023) .................................................. 46, 47, 50, 51

## Skydance-Paramount Proceedings

Comments of the International Brotherhood of Teamsters Hollywood
Local 399 et al., *In re Paramount Glob.*, MB No. 24-275 (Oct. 7, 2024),
https://perma.cc/7UEN-6XYK ............................................................................ 21

Media Bureau Establishes Pleading Cycle for Applications to Transfer
Control of Paramount Global and Permit-but-Disclose *Ex Parte* Status
for the Proceeding, *In re Paramount Glob.*, MB No. 24-275 (Sept. 6, 2024),
https://perma.cc/GT9E-37MF .............................................................................. 21

## Other Authorities

Casey Harper, *George Soros' 'unprecedented' purchase of Audacy
radio stations before election investigated by lawmakers: 'New shortcut,'*
N.Y. Post (Sept. 30, 2024), https://perma.cc/3F43-8ASZ .................................... 20

Dade Haynes, *CBS Broadcasting Layoffs, Part Of Broader Paramount
Cuts, Slammed By IBEW As "A Hard Pill To Swallow,"*
Deadline (Sept. 24, 2024), https://perma.cc/K6NB-NR6H................................... 21

Editorial Board, Opinion, *Byron Allen's Big Mac Attack*,
Wall St. J. (June 15, 2023), https://perma.cc/W8DZ-RWCC ............................... 35

Katie Campione, *WGA East Slams "Shameful" CBS Broadcasting
Layoffs As "A Blow To...Already Stretched-Thin Newsrooms,"*
Deadline (Sept. 25, 2024), https://perma.cc/9YGP-DBZS .................................. 21

*Lawmakers investigating George Soros' 'shortcut' to buying radio stations
before election*, Fox News (Oct. 3, 2024), https://fxn.ws/483CGZW ................................. 20

Michael O'Rielly, *Delegated Authority: Serious Objections and
Solutions*, FCC (Feb. 2, 2015), https://perma.cc/TA6W-AATL .......................... 7

Neil G. Ruiz et al., *Asian Americans and the 'forever foreigner' stereotype*,
Pew Rsch. Ctr. (Nov. 30, 2023), https://perma.cc/3CEX-UC53 ......................... 79

Sen. Comm. on Com., Sci. & Transp., *Republican Questions for the Record:
Geoffrey Starks* (June 22, 2023), https://perma.cc/NT6J-KTTA .......................... 63

## INTRODUCTION

This case arises from the unprecedented treatment of Soo Kim at the FCC and the unraveling of his company's acquisition of TEGNA's 60-plus broadcast television stations. Despite the FCC's longstanding goal of promoting diversity by increasing minority media ownership, the FCC pocket-vetoed the largest-ever minority-led purchase of broadcast stations. It was no secret that Byron Allen was at the center of it all. Mr. Allen wanted the TEGNA stations for his black-owned media company. He said he was still "in the fight" for TEGNA well after TEGNA entered into an $8.6 billion binding agreement with Mr. Kim. Am. Compl. (Dkt. 36) ¶128. Unsolicited, Mr. Allen called to ask Mr. Kim to spin off some TEGNA stations to him, suggesting that his involvement would ensure smooth sailing at the FCC. Mr. Kim politely declined. Lo and behold, when Mr. Kim went to the FCC for its stamp of approval, objectors to the deal told the FCC that Mr. Kim, as a Korean American, would "do nothing to create a more … diverse … media" or "promote ownership diversity," *id.* ¶147, echoing Mr. Allen's stated view that "[t]he *only way* to promote diversity" is through "wholly-owned African American media companies," *id.* ¶286. Abandoning the Communications Act's prohibition on considering alternative buyers for TEGNA, FCC officials demanded information about Mr. Allen's failed bid. And Defendants slow-walked the FCC proceedings until the clock ran out, culminating in an unprecedented pocket veto without ever allowing an up or down vote. The proceedings violated federal and state law, including "the twin commands" of the U.S.

1

Constitution's guarantee of equality "that race may never be used as a 'negative' and that it may not operate as a stereotype." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 218 (2023).

All Defendants have moved to dismiss Plaintiffs' amended complaint. The complaint their motions describe is not the complaint Plaintiffs filed. Defendants mischaracterize the nature of Plaintiffs' claims to shoehorn this suit into inapplicable jurisdictional or preclusion doctrines. On the merits, Defendants ignore myriad factual allegations and ask the Court to draw inferences in *their* favor. But the Court must view the allegations "as a whole" and "in context." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 193-95 (2024). Defendants invite this Court to err "by taking the allegations in isolation and failing to draw reasonable inferences in [Plaintiffs'] favor." *Id.* at 194. The extensive and "well-pleaded factual allegations in the complaint" must be taken as "true." *Id.* at 195. Properly considered, Plaintiffs plead plausible claims for relief. Defendants' motions should be denied.

## BACKGROUND

### I.  Factual Background

**A.** Korean American Soo Kim and his investment company, Standard General, have a history of turning around struggling broadcast television stations. Am. Compl. ¶¶51-53; *see, e.g., id.* ¶53 (transforming 14-station, $300 million company into a 70-station company sold for $4.6 billion). Standard General has invested millions in the four stations

its affiliates currently own to upgrade newsroom equipment, increase news programming and staff, and improve employee benefits. *Id.* ¶¶52, 57.

In early 2022, Mr. Kim and Standard General won an auction to acquire struggling TEGNA and its 64 broadcast television stations. *Id.* ¶¶59-62. Among the losing bidders was Byron Allen and his company, Allen Media Group. *Id.* ¶¶60-62. Standard General, TEGNA, major banks, and investment funds executed merger and financing contracts to consummate the $8.6 billion deal. *Id.* ¶¶63-67. The transaction was structured so that Standard General and Mr. Kim would become the owner of 61 stations and, in exchange for some financing assistance, would spin off Standard General's four stations and some TEGNA stations to Cox Media Group. *Id.* ¶¶65, 120. The contracts allowed 450 days—through May 2023—to obtain necessary regulatory approvals. *Id.* ¶63.

**B.** Federal law required the Department of Justice, an inter-agency group called "Team Telecom," and the Federal Communications Commission to clear Standard General's acquisition of TEGNA. *Id.* ¶68. The scope of each of these reviews is summarized below:

*DOJ Review.* Among other things, DOJ's antitrust review would consider whether the new company would have the power to raise retransmission fees—fees paid by DISH and other distributors to retransmit local stations' programming—above competitive rates. *Id.* ¶79. The retransmission contracts contained typical "after-acquired" provisions related to those fee agreements; an "after-acquired" provision would make Standard

3

General's existing agreements with companies like DISH also apply to the new TEGNA stations. *Id.* ¶83. DOJ raised no objections the acquisition. *Id.* ¶¶86, 216.

***Team Telecom Review.*** DOJ would also coordinate through the inter-agency Team Telecom a review of the use of investment funds in the Cayman Islands and British Virgin Islands to finance some of the multi-billion-dollar transaction. *Id.* ¶¶68, 71-78. Offshore financing is common in large deals given obvious tax benefits. *Id.* ¶71. To facilitate Team Telecom review, Standard General filed a "petition for declaratory ruling" with the FCC to disclose and obtain approval of the Cayman and British Virgin Islands financing. *Id.* ¶¶74-75. Team Telecom told the FCC it had no objections to the financing. *Id.* ¶¶78, 189.

***FCC Review.*** Federal law also required the FCC to approve the sale and transfer of TEGNA's existing broadcast licenses. *Id.* ¶¶90-96. The Communications Act tasked the FCC with determining whether transferring ownership served "the public interest, convenience, and necessity." *Id.* ¶90 (quoting 47 U.S.C. §309(a)). The Act specifically prohibited the FCC from considering other possible buyers—*i.e.*, "consider[ing] whether the public interest, convenience, and necessity might be served by the transfer … of the … license to a person other than the proposed transferee." *Id.* ¶91 (quoting 47 U.S.C. §310(d)).

Standard General reasonably expected the FCC to approve the license-transfer applications well within the 450-day financing window. *Id.* ¶116. The FCC typically completes its approval of license transfers within its 180-day "shot clock." *Id.* ¶¶63, 94-95.

Given his experience and successful record, Mr. Kim was a credible owner capable of taking control of TEGNA's stations. *Id.* ¶117. Several years earlier, the FCC timely approved without issue license-transfer applications in two major broadcast television deals involving his media companies. *Id.* The Standard General-TEGNA deal also complied with FCC rules, such as ownership limits. *Id.* ¶¶93, 116; *see, e.g.,* 47 C.F.R. §73.3555(b) (prohibiting ownership of two "top four stations" in a designated market area); *id.* §73.3555, Note 7 (entertaining requests to waive rules). In the past 30 years, the FCC has approved every major rule-compliant broadcast transaction within 180 days, as well as many more deals that were not rule-complaint and thus required a "waiver" of FCC rules or the "divestiture" of stations to get within FCC ownership limits. Am. Compl. ¶94. The FCC approved the four most recent major broadcast transactions in well under 450 days—Apollo-Cox in 226 days, Scripps-ION in 39, Gray-Quincy in 140, and Gray-Meredith in 170—even though they required waivers of FCC rules, station divestitures, or both. *Id.* ¶¶108-14; *see also id.* ¶102 (Nexstar-Tribune in 211 days).

The Standard General-TEGNA deal also offered many "public interest" benefits, the lodestar of the FCC's review. *Id.* ¶118; *see* 47 U.S.C. §309(a). It would have provided local news with much-needed investment and saved local news jobs. Am. Compl. ¶118. It would have *reduced* industry consolidation given the planned spinoff of Standard General's four existing stations and several TEGNA stations to Cox Media Group—ownership of TEGNA's 64 stations would be reduced to 61 owned by Standard General. *Id.*

¶¶65, 118, 120. And it would have furthered the FCC's professed "long-standing goal of promoting diversity in ownership of broadcast stations" like no other deal. *Id.* ¶104 (quoting *In re Promoting Diversification of Ownership in the Broad. Servs.*, 31 FCC Rcd. 398, 398 (2016)); *see id.* ¶¶105-07, 118. It would have created the largest-ever minority-owned television station group in the United States and the only minority-owned group in the top 10; increased the number of Asian American-owned network-affiliated television stations in the top 50 television markets from zero to 27; and been overseen by a proposed board of directors composed of 50% minorities (and 50% women). *Id.* ¶118.

**C.** The FCC's 180-day shot clock began in late April 2022 when it accepted the filing of Standard General's license-transfer applications. *Id.* ¶¶95, 126. Standard General's applications outlined the public interest benefits of the merger. *Id.* ¶121. Its petition for declaratory ruling to facilitate Team Telecom review similarly explained that enabling access to capital to create the largest minority-owned broadcast station group in history served the public interest. *Id.* ¶122; *see id.* ¶¶72 & n.14, 77 & nn.16-17 (discussing FCC's history of granting such petitions, recognizing benefits of increased access to capital). The filings were clear that TEGNA would be "majority-owned by [Mr.] Kim, an American citizen," "will not be under the control of any foreign party," and no investors "will have any role in the operations or management of the TEGNA stations." *Id.* ¶122. Thus, everyone knew Mr. Kim would own TEGNA and there was "no risk that foreign entities will influence programming broadcast on the stations under [TEGNA's] control." *Id.*

The FCC's Media Bureau, not the Senate-confirmed commissioners, was charged with overseeing the approval process for Standard General's acquisition of TEGNA. *Id.* ¶308. Within the FCC, there are several "bureaus" and bureau chiefs to whom commissioners can delegate authority, including the Media Bureau with day-to-day administration of broadcast television and radio licensing matters. *Id.* ¶¶89, 96; *see* Michael O'Rielly, *Delegated Authority: Serious Objections and Solutions*, FCC (Feb. 2, 2015), https://perma.cc/TA6W-AATL. Here, the Media Bureau—led by FCC Chairwoman Jessica Rosenworcel's personal staffer, Holly Saurer—had responsibility over Standard General's license-transfer applications and authority to approve them. Am. Compl. ¶11, 308.

Efforts to derail Mr. Kim's acquisition began immediately. Less than a week after the FCC accepted the license-transfer applications for review, Charles Ergen, co-founder and chairman of DISH Network, had a scheduled meeting with Chairwoman Rosenworcel over breakfast at The Dupont Circle Hotel. *Id.* ¶¶36, 127. Two weeks later, Mr. Allen publicly stated that he had not "give[n] up" on TEGNA, that he was "in the fight," and it was only "round one," even though TEGNA rejected his bid months earlier and the regulatory approval process for Standard General had begun. *Id.* ¶128. Days after Mr. Allen's public statements, Mr. Allen's longtime FCC lobbyist, David Goodfriend of the Goodfriend Group, met with FCC Media Bureau Chief Holly Saurer, ostensibly about a diversity initiative Mr. Goodfriend was spearheading. *Id.* ¶¶129, 159. Mr. Goodfriend was also Mr. Ergen's longtime FCC lobbyist and a former DISH vice president. *Id.* ¶160.

The exact same day as Mr. Goodfriend's meeting with Ms. Saurer, objectors first appeared on the Standard General-TEGNA docket. *Id.* ¶130. Common Cause—a co-peti-tioner for the diversity initiative that was the ostensible subject of Mr. Goodfriend's meet-ing with Ms. Saurer, *id.* ¶129—and NewsGuild—a union Mr. Goodfriend would soon appear on behalf of to oppose the TEGNA acquisition, *id.* ¶157—asked the Media Bureau to extend the public comment period to object to Mr. Kim's transaction. *Id.* ¶130. They asked for an order requiring the disclosure of TEGNA's and Standard General's confi-dential information, including "alternative transactions considered" by TEGNA—*i.e.*, By-ron Allen's rejected bid. *Id.* The Communications Act prohibits the FCC from considering alternative buyers. *See* 47 U.S.C. §310(d). Standard General opposed the request as un-precedented. Am. Compl. ¶130. Nevertheless, the Media Bureau extended the public comment period and ordered Standard General to produce highly sensitive documents and answer requests for information about "negotiating strategy" and other financial terms. *Id.* ¶¶131-32. (Months later, the Media Bureau would also demand information about Mr. Allen's failed bid. *Id.* ¶¶168-70.)

A day or so after the FCC order extending the public comment period, Mr. Allen called Mr. Kim unsolicited about TEGNA. *Id.* ¶133. Mr. Allen said he heard Mr. Kim was having a hard time at the FCC and asked Mr. Kim to spin off some TEGNA stations to him. *Id.* Mr. Allen suggested that including him in the deal would make things go

smoother at the FCC. *Id.* Mr. Kim declined, as the deal agreements were final. *Id.* These all-too-coincidental events marked the beginning of the alleged conspiracy. *See id.* ¶137.

**D.** In late June, NewsGuild, NABET, Common Cause, and UCC formally objected to Standard General's acquisition of TEGNA, filing "petitions to deny." *Id.* ¶135; *see id.* ¶¶97-98. The objectors said Standard General would cut newsroom jobs and increase the retransmission fees that DISH and other distributors would pay to Standard General to rebroadcast the stations' programming. *Id.* ¶135. The objections advanced the interests of the Allen Group and DISH. *Id.* ¶138. Mr. Allen considered himself still "in the fight" for TEGNA and thus stood to benefit from opposition that could thwart the deal. *Id.*; *see id.* ¶271. And DISH, led by Mr. Ergen, risked having to pay millions more in retransmission fees under Standard General's after-acquired clauses and so would benefit from the deal failing, a different buyer like Mr. Allen acquiring TEGNA, or Standard General committing to lower retransmission rates. *Id.* ¶138, 301, 304. The objections also conflicted with objectors' professed interests in ownership diversity and preserving newsroom jobs. *Id.* ¶139. Squeezing stations on retransmission fees, for example, would decrease revenue, jeopardize newsroom jobs, and make it difficult to maintain high-quality local programming. *Id.*; *see id.* ¶84 (explaining periodic increases in retransmission fees are necessary to overcome rising program costs and other effects of inflation, keep newsroom jobs, and maintain high-quality local programming).

The objections about retransmission fees and jobs were baseless under binding FCC precedent. *See id.* ¶¶98 & n.24, 111, 114, 143 & n.75. For example, when Apollo acquired Cox Media Group, the Media Bureau rejected Common Cause and UCC's same objection about retransmission fees, explaining that "the Commission is not the appropriate forum for addressing private contractual matters, such as after-acquired station clauses in retransmission consent agreements." *Id.* ¶111 (quoting *In re Terrier Media Buyer, Inc.*, 34 FCC Rcd. 10544, 10566 (2019)). The Media Bureau also rejected the objection that "private equity firms typically impose cost-cutting measures that 'gut newsrooms.'" *Id.* (quoting *Terrier Media*, 34 FCC Rcd. at 10567). Tellingly, NewsGuild and NABET did not object to the Apollo-Cox deal, despite its consolidation of station ownership and likely price hikes. *See id.* ¶¶109, 111, 311.

Also telling, the four objectors likewise did not oppose other major deals where Mr. Allen benefitted by acquiring stations. *Id.* ¶¶140, 320. For example, Gray had to divest stations when it acquired Quincy Media and Meredith to comply with local ownership limits—all of which went to Mr. Allen's Allen Group. *Id.* ¶¶113-14. Similar to Apollo's acquisition of Cox, these deals also involved consolidated ownership and possible price hikes, yet they were not opposed by the objectors to the Standard General-TEGNA deal. *Id.* ¶¶113-14, 140, 311, 320.

In response to the objections, Standard General noted they were "surprising," given objectors' longstanding positions supporting diversity; the objectors simply

ignored how Mr. Kim's deal would mark a historic advance in minority broadcast ownership. *Id.* ¶141. And even though objectors long advocated for providing access to capital to minority buyers, they now cried foul about Mr. Kim's ability to finance the deal. *Id.* Standard General explained that the objections about retransmission fees were foreclosed by FCC precedent explaining that the FCC would not meddle in such "private contract law questions." *Id.* ¶143. Objections about reduced news and jobs were "conjectural" since the deal would *reduce* industry consolidation and Standard General had a track record of *increasing* newsroom staffing at its affiliates' stations. *Id.* ¶142.

FCC practice allowed the objectors to reply. But contrary to FCC practice and over Standard General's objection, the Media Bureau granted the objectors' request for more time to reply, further delaying the proceedings. *Id.* ¶145. Around that time, Ms. Saurer invited NewsGuild's counsel to meet about his petition. *Id.* ¶146. Acknowledging Chairwoman Rosenworcel's involvement, Ms. Saurer wrote, "The Chairwoman would very much like to get an ex parte in the docket noting that [we] met … at our request." *Id.* They set the meeting for the day after objectors' replies were to be filed. *See* Letter from Andrew Jay Schwartzman to Marlene H. Dortch, *In re Tegna Inc.*, MB No. 22-162 (Aug. 4, 2022), https://perma.cc/SX27-9HSK.

The objectors took a new tack by filing a consolidated reply laden with "racial overtones" and "vitriol." Am. Compl. ¶152. They asserted that Mr. Kim's acquisition of TEGNA would do "nothing to create a more … diverse … media" and did "not promote

ownership diversity as it is understood by the public interest and civil rights community, and by commission policy." *Id.* ¶147. They claimed that Mr. Kim had not been "barred by his race" in his business ventures, contrasting his experience to those from "historically excluded groups" who have suffered "long-standing inequities produced by structural racism, [or] xenophobia." *Id.* The objectors also raised concerns about "shadowy foreign investors," "foreign ownership interests," and "non-citizens potentially having the ability to influence domestic elections," even though everyone knew from Standard General's filings that Mr. Kim would be the owner, the funding sources had been disclosed as common Cayman and British Virgin Islands entities, and investors would have no role in the operations or management of the stations. *Id.* ¶¶148-51; *see id.* ¶122.

Commentators decried the unusual tone of the objections. *Id.* ¶152. They criticized the suggestion that Mr. Kim "must not be the right kind of minority" and the "baseless allusions to foreign influence" that "condemn Mr. Kim to a stereotype of a person of Asian descent who cannot be trusted." *Id.* ¶¶153-54. The notion that Mr. Kim's acquisition would do "nothing" to promote diversity echoed Mr. Allen's past criticisms of "sham diversity agreements," his stated view that "[t]he *only way* to promote diversity" is through "wholly-owned African American media companies," and his history of litigation against the FCC and major companies for not steering enough business opportunities specifically to black-owned media companies. *Id.* ¶¶280-87.

**E.** On the heels of the objectors' arguments that Mr. Kim did "nothing" for diversity, Mr. Goodfriend then publicly appeared in the proceedings on behalf of objector NewsGuild and later on behalf of objector NABET. *Id.* ¶157. He pressed for more information, misrepresented documents about possible layoffs, and urged the Media Bureau to delay its review. *Id.* ¶¶162-68, 171, 187, 192. He said the deal required extra scrutiny given "China['s] increased tensions in the Taiwan Strait" and asserted that "anonymous foreign investment in American newsrooms" poses "risks to … diversity … and democracy." *Id.* ¶174. In response, Standard General repeatedly averred that it was not cutting jobs and protested the straw objectors' "frivolous efforts to delay this proceeding." *Id.* ¶¶165, 167, 187.

In late September, the Media Bureau opened a *second* public comment cycle and issued an extraordinary order granting objectors' request for information about "alternative transactions considered" by TEGNA, *id.* ¶168, despite the Communications Act's prohibition on considering "whether the public interest … might be served by the transfer" of the license "to a person other than the proposed transferee." *Id.* ¶91 (quoting 47 U.S.C. §310(d)). When Standard General asked the Media Bureau for clarification, the Media Bureau specified that it wanted information only about Mr. Allen's failed bid. *Id.* ¶169; *see id.* ¶¶171-72. Ms. Saurer dismissed Standard General's objection about the Communications Act's prohibition on the consideration of other buyers and told it to just produce the information because the Media Bureau wanted it. *Id.* ¶170.

13

In early October, then-Speaker Nancy Pelosi sent a letter to Chairwoman Rosen-worcel that repeated objectors' complaints and urged "further scrutiny." *Id.* ¶177. Days later, Mr. Allen donated $250,000 to the House Majority PAC and $100,000 to the Senate Majority PAC. *Id.* ¶179. The press surmised that Speaker Pelosi's letter came in return for Mr. Allen's donations—"the facts and the timeline certainly smell bad." *Id.* ¶179 & n.110. When asked, Pelosi's office said the letter was a favor for a donor. *Id.* ¶181. A few months later, Senator Elizabeth Warren sent a similar letter. *Id.* ¶205. Mr. Goodfriend later claimed credit for generating the letters. *Id.* ¶¶179, 206, 268.

Through November—weeks after the 180-day shot clock lapsed—Standard General pressed the FCC to move on its applications. *Id.* ¶¶184-85. In the only in-person meeting that Chairwoman Rosenworcel granted to Standard General, Mr. Kim asked her to strike the race-laden objections from the record because they should not inform the FCC's evaluation. *Id.* ¶184. She laughed and told him he should hear what was said about him behind closed doors. *Id.* Standard General urged the Media Bureau to disclose any concerns it had that were delaying review so Standard General could address them. *Id.* ¶185. The Media Bureau expressed no concerns and said it would complete its review shortly after the deal cleared DOJ. *Id.* At this time, DISH stopped retransmission consent negotiations and blacked out Standard General's affiliates' stations. *Id.* ¶188.

In December, to remove any remaining objections, Standard General voluntarily made binding commitments not to cut jobs and to waive contractual clauses that could

raise retransmission fees. *Id.* ¶¶195-97, 199. But rather than approve the license transfers, the Media Bureau opened a *third* public comment cycle about Standard General's voluntarily commitments, even though the commitments simply confirmed what Standard General said all along. *Id.* ¶201. The additional round of comments delayed review for several more weeks. *Id.* Ms. Saurer personally contacted Mr. Goodfriend about these developments, leaving voicemails and following up by email. *Id.* ¶198 ("Just left you a VM… Feel free to call with any questions."); *id.* ¶202 ("I left you a VM earlier, but wanted to make sure you saw this [Public Notice], as it includes additional letters that were submitted by the applicants yesterday and today. Feel free to call if you have any questions."). DISH then publicly appeared in the proceedings, seeking access to confidential information and objecting about retransmission fees, notwithstanding Standard General's commitments. *Id.* ¶¶204, 208. The straw objectors continued their opposition, dismissing the binding commitments as "meaningless." *Id.* ¶208.

In late January, well after Team Telecom had signed off and as reports circulated that DOJ was days away from clearing the deal, Mr. Allen hosted a Friday event for high-ranking Democrats, including former Speaker Pelosi. *Id.* ¶210. Observers recognized that he was "courting major Democratic politicians once again as he attempt[ed] to stop" the deal. *Id.* The following Monday, Mr. Ergen had another scheduled meeting with Chairwoman Rosenworcel. *Id.* ¶211.

Standard General continued to ask the Media Bureau to move on its applications. *Id.* ¶212. From the end of November 2022 to February 2023, Standard General asked the Media Bureau and Chairwoman Rosenworcel at least 16 times for status updates or for an opportunity to meet to discuss any concerns that might be delaying FCC review. *Id.* ¶213. But they would not engage. *Id.* Yet during the same period, they met with the president of objector NewsGuild and DISH's Mr. Ergen, among others. *Id.*

**F.** Everything culminated in February 2023. DOJ cleared the deal. *Id.* ¶216. Then, on day 309 of the 180-day shot clock, the Media Bureau without warning entered an order sending the applications for another year or more of proceedings before an ALJ. *Id.* ¶¶222, 229. The hearing designation order, or HDO, was an unprecedented pocket veto. *Id.* ¶¶11, 229. Everyone knew it could delay FCC review well beyond the publicly known expiration date of Standard General's contracts. *Id.* ¶¶11, 100, 229. And everyone knew it was extremely unusual. Never before had the Media Bureau designated broadcast television license-transfer applications for a hearing. *Id.* ¶224. And contrary to standard FCC practice, the Media Bureau did not give the appointed Commissioners 48 hours' notice of this major action. *Id.* ¶223. Nor did the Media Bureau ever discuss purported concerns with Standard General so it could address them, despite Standard General's repeated requests that it do so. *Id.*

The HDO had no basis in law or FCC precedent. It was pretextual. There were no factual issues for an ALJ to resolve; the Media Bureau had access to millions of pages of

relevant information to rule on the applications. *Id.* ¶225. The HDO told the ALJ to examine potential retransmission fee increases and job losses—matters Standard General's binding commitments had taken off the table—revealing the influence of the baseless objections raised or orchestrated by Defendants. *Id.* ¶227. The HDO violated FCC rules that prohibit the Media Bureau from taking actions that conflict with rulings of the full Commission, which rejected identical objections in approving past deals. *Id.* ¶226. The HDO made no mention of the historic increase in minority ownership that the deal offered, joining the pernicious narrative peddled by objectors that an Asian-American buyer did "nothing" to promote ownership diversity. *Id.* ¶228. The HDO generated widespread criticism from current and former FCC Commissioners, former FCC officials, civil rights leaders, and members of Congress, among others. *Id.* ¶¶231-33, 235-39, 246, 252, 258, 269.

With only 87 days left before its contracts expired, Standard General tried everything to obtain FCC approval. It asked the ALJ to certify the HDO for review by the full Commission and sought expedited review by the ALJ, to no avail. *Id.* ¶¶240-42. It appealed directly to the full Commission, but Chairwoman Rosenworcel refused to consider the request. *Id.* ¶243. It also appealed to the D.C. Circuit and petitioned for mandamus. *Id.* ¶245. The court dismissed the appeal because there was no final "resolution by the full Commission" and denied mandamus, stating it was not "crystal clear" that the FCC should have ruled on the applications before a hearing. *Id.* When Standard General tried to meet with objectors, Mr. Ergen personally refused, UCC and Common Cause declined,

and Mr. Goodfriend and NewsGuild would not meet unless Standard General executed a sweeping release of liability for their actions during the FCC proceedings. *Id.* ¶¶248-50. Standard General volunteered additional assurances, extending its guarantee not to cut newsroom jobs, committing to increase newsroom budgets and news programming hours, and pledging millions in grants to support emerging journalists. *Id.* ¶253. Other interested unions with TEGNA employees accepted the offer, but NewsGuild and NABET still refused to engage. *Id.*

On May 22, 2023, Standard General's financing contracts expired, forcing TEGNA to terminate the merger agreement. *Id.* ¶261. Standard General was left to pay a $136 million breakup fee to TEGNA, on top of $70 million it incurred in transaction costs. *Id.* ¶263. TEGNA shareholders lost nearly $2 billion in expected gains from a successful merger, including $85 million from Standard General's shares. *Id.*

The day after the deal died, Mr. Allen publicly reiterated his continued interest in TEGNA and suggested that he would have no issue getting FCC approval. *Id.* ¶264. He later boasted that he is "FCC approved"—the "magic trick" for closing large deals. *Id.* ¶¶275-76. Mr. Goodfriend and the straw objectors publicly claimed credit for killing the deal. *Id.* ¶¶265, 268.

**G.** The unraveling of the Standard General-TEGNA deal still generates criticism. In February 2024, the FCC reinstated the collection of broadcast workforce diversity data, including race, after the policy was dormant for 22 years. *In re Rev. of the Comm'n's Broad.*

*& Cable Equal Emp. Opportunity Rules & Pol'ys*, MB No. 98-204, 2024 WL 770889, at *1 (FCC Feb. 22, 2024). Commissioner Nathan Simington observed in dissent: "Minority owner-ship and participation in broadcast has been dismal for years and remains so, not least of which due to Commission leadership's recent scuttling of the largest proposed minority-led purchase of a broadcast station group in history." *Id.* at *35; *see* Am. Compl. ¶307.

Two recent actions by the FCC further confirm the unprecedented treatment of Standard General's license-transfer applications.[1] First, on September 30, 2024, the FCC expedited review of and granted license-transfer applications in connection with Au-dacy's bankruptcy reorganization, permitting George Soros's investment fund to take control of 200 radio stations. *In re Audacy License, LLC*, No. 24-94, 2024 WL 4369711, at *1 (FCC Sept. 30, 2024). Over the dissent of two commissioners, the FCC issued an order waiving the rule requiring a petition for declaratory ruling to disclose and seek approval of foreign ownership interests to be filed "at the same time" as the license-transfer appli-cations and approving the transfers without Team Telecom review. *Id.* at *6-8. Despite the known "foreign ownership interests" and potential influence on the 2024 election, none of the straw objectors from the Standard General deal objected. *See id.* at *5-6; Casey

---

[1] These matters post-date the filing of Plaintiffs' amended complaint. The FCC dockets and filings "are public records subject to judicial notice on a motion to dismiss." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). This Court therefore may consider them. *E.g.*, *Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (considering "public records subject to judicial notice" on motion to dismiss); *Direct Supply, Inc. v. Specialty Hosps. of Am., LLC*, 878 F. Supp. 2d 13, 20 n.10 (D.D.C. 2012) ("Public records are matters subject to judicial notice and may [be] considered when deciding motions to dismiss.").

Harper, *George Soros' 'unprecedented' purchase of Audacy radio stations before election investigated by lawmakers: 'New shortcut,'* N.Y. Post (Sept. 30, 2024), https://perma.cc/3F43-8ASZ.

Current and former FCC commissioners highlighted the disparate treatment of Standard General's applications. Commissioner Brendan Carr dissented, writing the decision "cannot be squared" with the FCC's refusal to approve the license transfers in "the Standard General-TEGNA proceeding" over concerns that Standard General would "layoff or cut newsroom and other jobs." 2024 WL 4369711, at *10 (Carr, dissenting). He explained that the Soros applicants "made no jobs showing or commitment at all" even though the record reflected "concerns" about them "cutting jobs once they take the reins at these more than 200 radio stations." *Id.* Commissioner Simington said the Soros deal "would have flummoxed the Commission of just two years ago" because it involved "transferring control to entities tied to a well-known private equity mogul, implicating foreign ownership." *Id.* at *11 (Simington, dissenting). But now the FCC "is ready to rock and roll to get blockbuster media deals back on track!" *Id.* "Provided, naturally, that they are the right *sorts* of deals involving the right *sorts* of owners." *Id.* Former FCC Chairman Ajit Pai observed that the Audacy ruling "raised concerns" and "questions about process," explaining that there was "no discussion at all about th[e] possibility of layoffs" even though the FCC "ding[ed]" the Standard General-TEGNA merger on that ground. *Lawmakers investigating George Soros' 'shortcut' to buying radio stations before election*, at 1:20-1:49, Fox News (Oct. 3, 2024), https://fxn.ws/483CGZW.

Second, on September 6, 2024, the Media Bureau accepted applications to transfer broadcast television licenses of 28 local CBS stations in connection with Skydance's acquisition of Paramount Global.[2] The Media Bureau did so in only eight days, three of which were Labor Day weekend, while it took 42 days to accept Standard General's applications. Am. Compl. ¶¶120, 126. Larry Ellison, who is white, will be the controlling license holder. Like Standard General's deal, the Paramount deal involves private equity and is rule compliant. Unlike Standard General's deal, there has been ample public criticism of Paramount's cost-cutting, including 2,000 job losses, or 15% of its workforce. Dade Haynes, *CBS Broadcasting Layoffs, Part Of Broader Paramount Cuts, Slammed By IBEW As "A Hard Pill To Swallow,"* Deadline (Sept. 24, 2024), https://perma.cc/K6NB-NR6H; Katie Campione, *WGA East Slams "Shameful" CBS Broadcasting Layoffs As "A Blow To…Already Stretched-Thin Newsrooms,"* Deadline (Sept. 25, 2024), https://perma.cc/9YGP-DBZS.

The straw objectors from the Standard General-TEGNA proceedings have not objected to the Paramount deal. And while Mr. Goodfriend has appeared to file comments on behalf of other unions, what he's said is inconsistent with his stonewalling in the TEGNA proceeding. Mr. Goodfriend has expressed concerns about "immediate post-closing job cuts" by Skydance.[3] But he did not ask the FCC to scuttle the deal for that reason; he

---

[2] Media Bureau Establishes Pleading Cycle for Applications to Transfer Control of Paramount Global and Permit-but-Disclose *Ex Parte* Status for the Proceeding, *In re Paramount Glob.*, MB No. 24-275 (Sept. 6, 2024), https://perma.cc/GT9E-37MF.

[3] Comments of the International Brotherhood of Teamsters Hollywood Local 399 et al., *In re Paramount Glob.*, MB No. 24-275 (Oct. 7, 2024), https://perma.cc/7UEN-6XYK.

simply asked the FCC to impose "binding merger conditions addressing workers, jobs, and unions"—exactly what Mr. Kim offered voluntarily for the TEGNA merger and Mr. Goodfriend dismissed as "meaningless," yet other unions with TEGNA employees accepted. Am. Compl. ¶¶199, 208, 248, 253.

## II.    Procedural Background

Standard General and Mr. Kim sued the FCC; Chairwoman Rosenworcel and Ms. Saurer in their official capacities; the Allen Group and Mr. Allen; DISH and Mr. Ergen; the Goodfriend Group and Mr. Goodfriend; and straw objectors NewsGuild and NABET (who refer to themselves collectively as "the Unions"), as well as Common Cause and UCC. Plaintiffs seek declaratory and injunctive relief against the FCC Defendants and damages and other available relief against the private Defendants. Am. Compl. ¶¶A-H. The amended complaint asserts eight causes of action:

    I.    violation of equal protection against the FCC Defendants for discriminating against Plaintiffs based on race in their treatment of Standard General's license-transfer applications, treating them differently than other applicants because of race, and denying them an equal opportunity to have their applications processed fairly and voted on in a reasonable time, *id.* ¶¶324-35;

    II.    violation of 42 U.S.C. §1981 against the Allen Defendants, the Goodfriend Defendants, the Unions, UCC, and Common Cause for discriminating against Standard General in its performance of contracts with race-based tactics that sunk the TEGNA deal because Mr. Kim is Asian American, *id.* ¶¶336-50;

    III.    violation of 42 U.S.C. §1985(3) against all Defendants except the FCC for conspiring to deprive Plaintiffs of equal protection of the laws because of Mr. Kim's race, *id.* ¶¶351-56;

IV.  violation of 42 U.S.C. §1986 against all Defendants except the FCC for neglecting to prevent the racially motivated conspiracy to thwart the TEGNA deal, *id.* ¶¶357-63;

V.  tortious interference with contract against the private Defendants for interfering with Standard General's performance of the merger and financing contracts' condition to obtain FCC approval of the broadcast license transfers by delaying FCC review beyond the expiration of Standard General's contracts, *id.* ¶¶364-73;

VI.  tortious interference with prospective business opportunity against the private Defendants for interfering with Standard General's business relationship with TEGNA and the banks and the business expectations associated with its acquisition of TEGNA by delaying FCC review beyond the expiration of Standard General's contracts, thereby depriving Standard General of the reasonable expectation of economic benefit from a successful merger, *id.* ¶¶374-81;

VII.  civil conspiracy against the private Defendants to tortiously interfere with Standard General's merger and financing contracts and prospective business opportunity, *id.* ¶¶382-87; and

VIII.  violation of the Communications Act, 47 U.S.C. §310(d), against the FCC Defendants for considering a possible alternative buyer of TEGNA—Mr. Allen—which infected the FCC's entire treatment of Standard General's license-transfer applications, *id.* ¶¶388-99.

Defendants moved to dismiss all claims.

## STANDARD OF REVIEW

A complaint survives a Rule 12(b)(6) motion to dismiss "when it contains factual allegations that, if proved, would 'allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017). The Court "must treat the complaint's factual allegations as true, and must grant the plaintiff the benefit of all inferences that can be derived from the facts

alleged." *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 619 (D.C. Cir. 2023) (cleaned up). The Court must also "read the complaint 'as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.'" *Ho v. Garland*, 106 F.4th 47, 50-51 (D.C. Cir. 2024); *see Vullo*, 602 U.S. at 194-95. Plaintiffs state a claim "even if there are two alternative explanations, one advanced by the defendant and the other advanced by the plaintiff, both of which are plausible." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up).

This same 12(b)(6) standard applies to jurisdictional challenges where, as here, defendants "contest[] only the legal sufficiency of the plaintiff's jurisdictional claims." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018); *accord Walker v. Jones*, 733 F.2d 923, 925-26 (D.C. Cir. 1984). The plaintiff "need only make a plausible allegation of facts establishing each element of standing." *Cutler v. HHS*, 797 F.3d 1173, 1179 (D.C. Cir. 2015). In deciding a motion to dismiss on jurisdictional grounds, the Court may consider evidence outside the complaint. *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015); *Mendoza v. Perez*, 754 F.3d 1002, 1016 n.9 (D.C. Cir. 2014).

## ARGUMENT

### I.    This Court Has Jurisdiction over Plaintiffs' Claims.

Several Defendants raise jurisdictional arguments, but those arguments are premised on misunderstanding or oversimplifying the claims against them. Plaintiffs' claims are not simply about the HDO or what the HDO said or didn't say. Plaintiffs' claims are

about the entire course of FCC proceedings, which "subjected Mr. Kim's transaction to an entirely different set of rules than other major broadcast license-transfer applications." Am. Compl. ¶311. When the complaint is read for what it says, "assessed as a whole," and "viewed in context," these jurisdictional arguments fail. *Vullo*, 602 U.S. at 193-94.

### A. Sovereign immunity does not bar the relief sought.

The FCC Defendants claim that the Court "lacks jurisdiction as the United States has not waived its sovereign immunity for monetary damages." FCC (Dkt. 47-1) 13. But Plaintiffs do not seek damages from the FCC Defendants. Plaintiffs seek (1) a declaration that the FCC Defendants violated Mr. Kim's equal protection rights, (2) a permanent injunction ordering the FCC Defendants to refrain from discriminating based on race, (3) a declaration that the FCC Defendants violated §310(d) of the Communications Act, and (4) a permanent injunction ordering the FCC Defendants to refrain from considering alternative buyers in future proceedings involving Mr. Kim. Am. Compl. ¶¶A-D. The request for damages in Plaintiffs' prayer for relief, *id*. ¶E, applies to the private Defendants against whom monetary damage *are* available. The FCC Defendants' sovereign immunity arguments are inapplicable given Plaintiffs' claims and the particular relief sought.

Sovereign immunity does not bar the declaratory and injunctive relief Plaintiffs seek for their claims against the FCC Defendants. The FCC Defendants do not appear to argue otherwise. *See* FCC 12-13. They broadly claim that "the United States has not

waived its sovereign immunity for claims brought under sections 1985 and 1986" but again focus only on monetary damages that Plaintiffs do not seek against them. FCC 12.

To be sure, "[a]bsent waiver, the doctrine of sovereign immunity shields the federal government from suit." *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003). But as the FCC's arguments seemingly acknowledge implicitly, the federal government waived sovereign immunity for injunctive and declaratory relief in §702 of the Administrative Procedure Act. Am. Compl. ¶45 (citing 5 U.S.C. §702). "[T]here is no doubt that §702 'waives the Government's immunity from actions seeking relief other than money damages.'" *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (collecting cases). That "waiver of sovereign immunity applies to any suit whether under the APA or not," *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996), and "regardless of whether the [challenged conduct] constitutes 'final agency action,'" *Trudeau*, 456 F.3d at 187; *see also, e.g., Z St., Inc. v. Koskinen*, 44 F. Supp. 3d 48, 65 (D.D.C. 2014) (noting that "where a plaintiff has a cause of action that is independent of the APA, it may … rely nevertheless on the APA's sovereign immunity waiver"). Applied here, declaratory and injunctive relief are available for each claim Plaintiffs bring against the FCC Defendants.

With respect to Plaintiffs' §1985(3) and §1986 claims, federal "courts retain equitable powers 'unless Congress has expressly restricted their exercise'" by "the clearest command." *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 71 (D.C. Cir. 2022). Neither §1985 nor §1986 expressly restricts declaratory or injunctive relief. And while both provisions

anticipate suits for damages, that "does not, of course, prevent a federal court from fashioning an effective equitable remedy." *Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 473 (5th Cir. 1970). The two circuits to definitively address the question have held that "injunctive relief may be claimed under section 1985(3)." *McLellan v. Miss. Power & Light Co.*, 545 F.2d 919, 923 n.11 (5th Cir. 1977) (citing *Mizell*, 427 F.2d 468); *see Action v. Gannon*, 450 F.2d 1227, 1238 (8th Cir. 1971) ("There is no explicit language in §1985(3) to preclude the District Court from issuing an injunction to protect constitutional rights."). Other courts have likewise granted injunctions or upheld claims for injunctive relief under both §1985 and §1986. *See, e.g.*, *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp 198, 207 & n.7 (S.D. Tex. 1982); *Werthman v. Ill. Dep't of Mental Health & Dev. Disabilities*, 831 F. Supp. 625, 628 (N.D. Ill. 1993); *McAlister v. Alaska*, 2023 WL 3480001, at *8 (D. Alaska May 16, 2023) (collecting cases).

With respect to Plaintiffs' constitutional claims, "it is established practice … to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood,* 327 U.S. 678, 684 (1946). Thus, injunctive relief is available for violations of equal protection under the Fifth Amendment. *See, e.g.*, *O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 421 (D.C. Cir. 1992) (directing grant of preliminary injunction on Fifth Amendment equal protection claim); *see also Hubbard v. EPA*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) ("The court's power to enjoin unconstitutional acts by the government … is inherent in the Constitution itself.").

With respect to the §310(d) claim, "an *ultra vires* challenge" to an agency's action "is available … for the narrow purpose of obtaining injunctive relief against agency action taken 'in excess of its delegated powers and contrary to a specific prohibition' in the law." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). As discussed below, *infra* pp.112-16, the Court has jurisdiction over Plaintiffs' §310(d) claim, and injunctive relief is clearly available for that claim. *Fed. Express*, 39 F.4th at 763.

None of the FCC Defendants' cases is contradictory; all address only the availability of monetary damages. *See* FCC 11-13. Plaintiffs seek non-monetary relief against the FCC Defendants, and this Court has jurisdiction over such claims.

### B. Plaintiffs have Article III standing.

Some Defendants argue Plaintiffs lack Article III standing. The FCC Defendants claim Plaintiffs have not plausibly alleged that their "past injuries are redressable or that they face imminent future harm that could confer standing for the requested prospective relief." FCC 15. And for the §310(d) claim, they argue Plaintiffs' injury is not fairly traceable to the FCC Defendants' actions. *Id.* The Goodfriend Defendants argue Plaintiffs have not established causation for standing. Goodfriend (Dkt. 44-1) 18-19.

To establish Article III standing, a plaintiff "must have suffered an injury in fact" that is "fairly traceable to the challenged action of the defendant" and "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). For claims seeking

28

prospective relief, "plaintiffs must show that they face an imminent threat of future injury." *In re Navy Chaplaincy*, 697 F.3d 1171, 1175 (D.C. Cir. 2012). In considering standing, courts are "to 'assume' that a plaintiff is 'correct on the merits.'" *Banner Health v. Price*, 867 F.3d 1323, 1334 (D.C. Cir. 2017) (per curiam).

**1.** The FCC Defendants first argue that Plaintiffs' claims are not redressable because Plaintiffs allege a "past injury" and "seek an award of monetary damages," which is not available based on sovereign immunity. FCC 15-16. Explained above, Plaintiffs seek prospective injunctive relief and declaratory relief from the FCC Defendants. And explained below, Plaintiffs allege imminent future harm, so their claims are redressable. "Although a plaintiff seeking prospective declaratory and injunctive relief may not rest on past injury alone, past wrongs may serve as evidence bearing on whether there is a real and immediate threat of repeated injury." *Jibril v. Mayorkas*, 20 F.4th 804, 814 (D.C. Cir. 2021) (cleaned up); *see Murthy v. Missouri*, 144 S. Ct. 1972, 1987 (2024) (explaining past injury is "relevant" for its "predictive value"). The FCC Defendants do not dispute that if Plaintiffs show imminent future harm, they have standing.

**2.** The FCC Defendants next argue that Plaintiffs' claimed injuries are not sufficiently imminent because Plaintiffs do not identify when they will next appear before the FCC. FCC 16-19. Plaintiffs satisfy their burden of showing imminent future harm to obtain injunctive relief in three ways.

First, Plaintiffs identify a deal "to acquire … stations under terms in which an application for a license transfer would be necessary." *Contra* FCC 17. As set forth in Mr. Kim's accompanying declaration, in April 2024 a Standard General affiliate, MediaCo Holding Inc., acquired Estrella Media's network, content, digital, and commercial operations. Kim Decl. ¶7; *see* Am. Compl. ¶334 (alleging "Mr. Kim will appear before the FCC again soon"). Through MediaCo, Mr. Kim purchased substantially all of Estrella's assets, except its 11 radio and 10 television stations, because purchasing the stations would have required FCC license-transfer approval. Kim Decl. ¶¶6, 8-9. As part of the acquisition terms, Standard General has the option to acquire the stations, and Estrella also has the option to require Standard General to purchase the stations. *Id.* ¶10. Should Standard General or Estrella exercise the purchase option, which could occur at any time, the transfer of Estrella's broadcast licenses to Mr. Kim as the new controlling license holder will require FCC approval. *Id.* ¶11; *see* Am. Compl. ¶¶29, 90. On the heels of the unprecedented unraveling of the Standard General-TEGNA transaction, Mr. Kim intentionally structured the Estrella deal this way to delay the need for FCC approval, which would risk him and his company being subjected to further discrimination and *ultra vires* action. Kim Decl. ¶9; *see* Am. Compl. ¶334. That said, Mr. Kim would exercise the option to purchase the Estrella stations immediately if not for the discrimination he would face before the FCC. Kim Decl. ¶¶12-13. He is "able and ready" to appear before the FCC with license-transfer applications and would do so if not for the fact that the FCC's

"discriminatory policy prevents" those applications from being considered "on an equal basis." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (holding student denied admission who "was 'able and ready' to apply as a transfer student" had "standing to seek prospective relief with respect to the University's continued use of race in under-graduate admissions"); *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 21 (D.D.C. 2007) (holding "plaintiffs' readiness and willingness to reapply" established standing). And if exercised tomorrow, as Mr. Kim desires, Plaintiffs' applications would be handled by the "same defendant[s]" who previously discriminated against them and remain in control of the Media Bureau, which only makes it "easier for [Plaintiffs] to prove that [they] face[] a continued risk of future" discrimination. *Murthy*, 144 S. Ct. at 1987.

Second, Plaintiffs will need FCC approval to renew the licenses Standard General's affiliates currently hold. Am. Compl. ¶334. These licenses are set to expire in 2029, 2030, and 2031, and Plaintiffs intend to apply to renew each license. Kim Decl. ¶¶4-5. In argu-ing that these license renewals are not "imminent," FCC 18, the FCC Defendants conflate the imminency requirement with temporal proximity. An injury must be "actual or im-minent, not 'conjectural' or 'hypothetical,'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), but the imminency requirement "ensure[s] that the alleged injury is not too spec-ulative for Article III purposes—that the injury is *certainly* impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Put simply, "[s]tanding depends on the *probability* of

harm, not its temporal proximity." *Orangeburg v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017) (emphasis added) (finding standing though current contract "does not expire for another five years"); *see Pub. Citizen, Inc. v. Trump*, 361 F. Supp. 3d 60, 82 (D.D.C. 2019) (holding plaintiffs' "plan to purchase new vehicles in the next five to seven years" established standing). Accordingly, that the renewal timeline is a few years in the future does not defeat standing. Were it otherwise, litigants would be forced to bring (and courts forced to decide) eleventh-hour actions for emergency preliminary relief, denying the time and opportunity to develop a complete record upon which to base a decision.

Mr. Kim's statements that he will be back before the FCC should he exercise his option to purchase Estrella's stations and when his current licenses are due for renewal are not "vague predictions of future discriminatory conduct." *Navy Chaplaincy*, 697 F.3d at 1176. *Contra* FCC 18. Nor are they "'some day' intentions … without any description of concrete plans, or … any specification of *when* the some day will be." *Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006). The FCC Defendants do not suggest that a policy change has thrown the FCC's license-transfer review "practices into some disarray" such that they are unlikely to apply in Plaintiffs' future dealings. *See id.* at 860. All the FCC Defendants say is that Chairwoman Rosenworcel's "current term will have expired long before those renewal applications are filed" so Plaintiffs will appear "at a time when the FCC *could* be under new leadership." FCC 18 (emphasis added). But Mr. Kim could be before the FCC *now* if he or Estrella exercised the option for him to purchase Estrella's

stations. Kim Decl. ¶¶6, 10-11. And even if the FCC were under new leadership when Plaintiffs apply to renew their current licenses, the FCC Defendants have not represented or shown that would lead to any change in practice. *See* Am. Compl. ¶¶104-07 (describing FCC's "long-standing" consideration of race). For instance, in *Navy Chaplaincy*, the D.C. Circuit affirmed standing because "the Navy neither dispute[d] plaintiffs' claims that they will expose themselves to potential injury by applying for promotions nor argue[d] that it has any plans to change the procedures alleged to injure plaintiffs." 697 F.3d at 1178. So too here—the FCC Defendants do not dispute that Mr. Kim "will expose" himself "to potential injury" when he is back before the FCC, and they do not argue the FCC "has any plans to change the procedures alleged to injure plaintiffs." *Id.*

Finally, Plaintiffs have changed their immediate broadcast strategy in response to the FCC's discrimination. Am. Compl. ¶334. For example, discussed above, Mr. Kim structured his latest broadcast deal to delay the need for FCC approval and has not yet exercised his option to purchase Estrella's stations because he fears further discrimination. Kim Decl. ¶¶9, 12-13. The future harm here is certainly impending, so the responsive measures Plaintiffs have taken support standing. *See In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 59 (D.C. Cir. 2019) (recognizing standing "on the basis of costs incurred to mitigate or avoid harm when a substantial risk of harm actually exists"). The FCC Defendants do not dispute that if Mr. Kim were to exercise his option to

purchase Estrella's stations, he "will soon be subjected to the challenged Government actions again." *Jibril*, 20 F.4th at 817. Plaintiffs have shown future harm is sufficiently imminent.

**3.** The FCC Defendants next argue that Plaintiffs have not plausibly pleaded an injury fairly traceable to the alleged §310(d) violation. FCC 19-21. They claim that the HDO prolonged the FCC's review past the merger agreement's expiration date, not "the request for information about alternative bidders." FCC 21. That framing fails to read the amended complaint for what it says. *Contra Vullo*, 602 U.S. at 192-95.

The complaint alleges that the FCC Defendants' unlawful consideration of Mr. Allen as an alternative buyer "infected the agency's entire treatment of Standard General's license-transfer application." Am. Compl. ¶395. The order demanding information about Mr. Allen's failed bid revealed what the FCC thought was wrong with Standard General's acquisition of TEGNA: Mr. Kim was not Mr. Allen. *Id.* ¶397 (alleging approval process was "always about whether Mr. Allen—'still in the fight' for TEGNA—should be TEGNA's rightful owner"). And that consideration of whether Mr. Allen would be a better owner of TEGNA necessarily "prolonged the license-transfer review until Standard General's merger agreement expired"—because running out the clock was the point. *Id.* Tellingly, the day after the agreement expired, Mr. Allen reiterated that his company remained "very interested in" acquiring TEGNA and that he didn't think he would "have an issue … whatsoever" at the FCC. *Id.* ¶264.

The complaint's allegations on this score are not "conclusory." *Contra* FCC 20. Plaintiffs allege how straw objectors' first move was to demand information about alternative buyers, namely Mr. Allen, among other things. *Id*. ¶130. Plaintiffs allege how the Media Bureau granted that request, issuing an extraordinary order to produce information about alternative buyers and clarifying that they wanted information about Mr. Allen's failed bid specifically. *Id.* ¶¶168-70. Plaintiffs allege how Mr. Allen, as the owner of the largest black-owned media company, wields tremendous leverage over the race-conscious FCC, which actively seeks to expand minority ownership. *Id.* ¶¶17, 273. Mr. Allen has acknowledged as much, boasting that he is "FCC approved"—the "magic trick" for closing major deals. *Id.* ¶¶274-76. Rightfully so—the FCC routinely grants his license-transfer applications quickly and timely approved two major deals where he benefited by acquiring divested stations. *Id.* ¶¶113-15, 277. He also has a history of leveraging race for commercial gain, including suing a former FCC commissioner and the FCC for race discrimination and so-called "sham diversity agreements," *id.* ¶¶283-84, suing McDonalds and threatening other major brands for failing to steer advertising toward black-owned media companies, *id.* ¶¶280-81 & nn.201-03, suing DirecTV, Charter, and Comcast for not agreeing to carry his channels at the fees he demanded and alleging race discrimination, *id.* ¶¶282-84, and otherwise "shaking down companies by playing the race card," *id.* ¶281 (quoting Editorial Board, Opinion, *Byron Allen's Big Mac Attack*, Wall St. J. (June 15, 2023), https://perma.cc/W8DZ-RWCC). Finally, Plaintiffs allege Mr. Allen and Mr.

Goodfriend exploited Chairwoman Rosenworcel's concerns that she would be replaced as chair by FCC nominee Gigi Sohn—whose nomination Mr. Allen supported as "a champion against th[e] inequity" in black broadcast television ownership—by having high-ranking Democrats pressure the Chairwoman to kill the deal. *Id.* ¶¶124, 289, 314-15; *see id.* ¶¶175-81, 205, 210, 259, 268. When the FCC proceedings began Mr. Allen maintained that he was still "in the fight" for TEGNA, and when they unraveled, he maintained that he remained "very interested." *Id.* ¶¶128, 254, 264.

In short, consideration of Mr. Allen as an alternative buyer was the driving force behind the unlawful FCC proceedings, culminating in the unprecedented HDO, which was simply a pretextual pocket veto, all to benefit Mr. Allen and in violation of §310(d). *Contra* FCC 21. When Plaintiffs' claim is properly understood and presumed to be correct, Plaintiffs' injury is fairly traceable to the FCC Defendants' violation of §310(d). *See Bennett v. Spear*, 520 U.S. 154, 168-69 (1997) (holding "fairly traceable" does not require "injury as to which the defendant's actions are the very last step in the chain of causation").

**4.** Relying on *Murthy v. Missouri*, the Goodfriend Defendants argue Plaintiffs have not adequately alleged causation for standing. Goodfriend 18-19. As *Murthy* explains, "it is a bedrock principle that a federal court cannot redress 'injury that results from the *independent* action of some third party *not before the court*.'" 144 S. Ct. at 1986 (emphasis added). But standing can arise from "injury produced by determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169. Plaintiffs allege a conspiracy

between the Goodfriend Defendants and the FCC Defendants (among others), all of whom *are* before the Court. And more importantly, Plaintiffs *do* make plausible allegations "that the FCC acted because of pressure from the Goodfriend Defendants." *Contra* Goodfriend 19. Plaintiffs allege that the Goodfriend Defendants "orchestrated" the objections the Media Bureau used "as a pretext for prolonging the license approval process for months." Am. Compl. ¶156. Mr. Goodfriend met with Ms. Saurer ostensibly about "content vendor diversity report[s]" the same day objectors first appeared on the Standard General docket to oppose Mr. Kim. *Id.* ¶¶129-30. Mr. Goodfriend then formally appeared on behalf of the Unions to oppose Mr. Kim. *Id.* ¶¶137, 157. The Goodfriend Defendants lobbed allegations of bad faith and misrepresented the record to argue Standard General would cut jobs, pushed for additional document productions, and urged the FCC to "suspend its voluntary 'shot clock'" and designate a hearing. *Id.* ¶¶162-67, 171, 187. At every step, the FCC simply "did as Mr. Goodfriend asked." *Id*. ¶168. The pretextual reasons in the HDO simply repeated the misstatements Mr. Goodfriend peddled throughout the proceedings. *Id.* ¶227. And Mr. Goodfriend publicly claimed credit for his role in generating letters from then-Speaker Pelosi and Senator Warren and how he "won" to "beat" the proposed merger. *Id.* ¶¶179, 206, 257, 268. Plaintiffs plausibly allege that the Goodfriend Defendants caused Plaintiffs' injuries, as explained further below. *See infra* pp.71-73, 104-06.

**C. Plaintiffs' claims are not subject to the Hobbs Act's provisions vesting exclusive jurisdiction in the D.C. Circuit.**

The FCC, Allen, DISH, and Common Cause Defendants argue this Court lacks jurisdiction under the Hobbs Act. FCC 24-26 & n.5; Allen (Dkt. 56-1) 15-19; DISH (Dkt. 55) 22-24; Common Cause (Dkt. 49-1) 17-19. Trying to fit this case within the Hobbs Act, these Defendants mischaracterize and oversimplify Plaintiffs' claims as solely challenging the HDO. But Plaintiffs' challenge is to the whole course of unprecedented, unlawful, and discriminatory FCC proceedings. The Hobbs Act does not apply here.

The Hobbs Act gives "[t]he court of appeals … exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the [FCC] made reviewable by section 402(a) of title 47." 28 U.S.C. §2342(1); *see* 47 U.S.C. §402(a) (specifying challenges to "any order" of the FCC); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984). But the Act does not give the courts of appeals exclusive jurisdiction over any lawsuit involving agency proceedings. "[T]he mere overlap of findings made by an [agency] and by a district court judge are insufficient to preclude the district court from hearing a given claim." *Merritt v. Shuttle*, 245 F.3d 182, 189 (2d Cir. 2001) (Sotomayor, J.). The question is whether Plaintiffs' "claim attacks the matters decided by the administrative *order*." *Id.* (emphasis added).

Here, Plaintiffs do not challenge an FCC "order" as that term is used in the Hobbs Act. *See, e.g.*, *United States v. Any & All Radio Station Transmission Equip.*, 204 F.3d 658, 667 (6th Cir. 2000) (holding district court had jurisdiction to consider constitutionality of FCC

regulations "for the simple reason that no FCC order is being challenged"); *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 8-9 (2019) (Thomas, J., concurring). This case is not a "collateral attack" on the HDO. *Contra* Common Cause 16-17; DISH 21-22; Allen 15-16. The HDO is not the "crux" or "foundation" of Plaintiffs' claims. *Contra* FCC 2; Common Cause 17. Plaintiffs do not "challenge" the "validity" of the HDO *per se*. *Contra* FCC 26; Allen 14; DISH 23, 25; Common Cause 19. Plaintiffs' claims are not about whether there were "substantial and material questions of fact" about retransmission fees or jobs precluding a decision on the applications or whether the Media Bureau was "unable to find that grant of the application[s]" were in the public interest—the Communications Act's standard for an HDO. 47 U.S.C. §309(d)(2), (e); *see* Am. Compl. ¶99. Plaintiffs' claims are instead about the entire course of the FCC proceedings and Defendants' unlawful and unconstitutional treatment of Plaintiffs. *See* Am. Compl. ¶¶324-99. The HDO was simply the final pretext for that unlawful unraveling of the Standard General-TEGNA merger.

Even if Plaintiffs were challenging the HDO, the Hobbs Act still would not apply because the HDO is not a "*final* order" as the Act requires. 28 U.S.C. §2342(1) (emphasis added). While the Allen Defendants cite Plaintiffs' D.C. Circuit appeal where they argued the HDO "is a final FCC order that constructively denied their license transfer applications," Allen 17, the D.C. Circuit rejected that argument and dismissed the appeal for lack of final agency action, *see* Order, *SCGI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr.

3, 2023) (per curiam). That determination cannot now be relitigated because a "judgment ordering dismissal … preclude[s] relitigation of the precise issue of jurisdiction that led to the initial dismissal." *GAF Corp. v. United States*, 818 F.2d 901, 912 (D.C. Cir. 1987).

The FCC Defendants acknowledge the HDO is not a final order but still insist that the Hobbs Act applies, citing *Telecommunications Research & Action Center v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984). FCC 13 n.2, 24 n.5. But *TRAC* arose in the context of a petition for mandamus under the All Writs Act, which "empowers a federal court to issue writs of mandamus necessary to protect its prospective jurisdiction." 750 F.2d at 76. The D.C. Circuit held that "[b]ecause the statutory obligation of a Court of Appeals to review on the merits may be defeated by an agency that fails to resolve disputes, a Circuit Court may resolve claims of unreasonable delay in order to protect its future jurisdiction." *Id.*; *infra* pp.49-50. In other words, the case was "within" the D.C. Circuit's "appellate jurisdiction"; the appeal just had not yet "been perfected." 750 F.2d at 76. *TRAC* acknowledged the Hobbs Act only "cuts off original jurisdiction in other courts in all cases covered by that statute." *Id.* at 77. Because Plaintiffs' claims do not challenge an FCC order, let alone a final order, they are not "covered by" the Hobbs Act. In other words, Plaintiffs' claims are not "'of the type' Congress thought belonged within [the Hobbs Act's] statutory scheme." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 188-89 (2023).

Plaintiffs' challenge is analogous to that in *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991). There, immigration laws limited judicial review of the denial of

certain adjustment of status petitions to the courts of appeals. *Id.* at 485-86. Yet the Court held that the plaintiffs' "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications" were reviewable in district court. *Id.* at 492. The Court explained that the plaintiffs "do not seek a substantive declaration that they are entitled to [lawful] status" and their prevailing would not "have the effect of establishing their entitlement to [lawful] status." *Id.* at 495. Similarly, Plaintiffs here do not ask the Court to declare them the rightful owner of TEGNA's broadcast licenses. Instead, they challenge the "unconstitutional practices and policies used by" the FCC Defendants, in concert with the private Defendants, in reviewing Plaintiffs' applications, including the overt consideration of Byron Allen as an alternative buyer. *Id.* at 492. Plaintiffs simply want declaratory and injunctive relief that the FCC Defendants acted unlawfully, unconstitutionally, and cannot do so again and compensatory damages (and other relief) from the private Defendants. *See id.* at 495. It is not a challenge to invalidate the HDO. *See Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 126 (D.C. Cir. 2010) ("[B]ecause a ruling in [plaintiff's] favor would invalidate not a single [agency order], section 113(h) presents no bar to the company's pattern and practice claim."). It is "'collateral' to any Commission orders … from which relief might be sought." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 490 (2010) (quoting *McNary*, 498 U.S. at 492).

Plaintiffs' challenge is also like *Mace v. Skinner*, 34 F.3d 854 (9th Cir. 1994). There, the FAA issued a final order revoking the plaintiff's aircraft mechanic certificate, and the

plaintiff challenged that order before the NTSB and appealed to the circuit court, which had exclusive jurisdiction over final orders. *Id.* at 856. While that appeal was pending, the plaintiff also sued agency officials in district court and argued that the agencies' review processes violated his Fifth and Sixth Amendment rights. *Id.* The Ninth Circuit held that his constitutional challenges to the procedure were properly before the district court because although the "claims stem from the revocation of his certificate, they constitute a broad challenge to the unconstitutional actions of the [defendants]" and "were not based on the merits of any particular revocation order." *Id.* at 858. Same here. Although Plaintiffs' claims stem from the FCC's review of their license-transfer applications, Plaintiffs do not seek to unwind the denial of their applications (nor could they, because they were not denied). Instead, they bring a "broad challenge" to the unlawful and "unconstitutional actions of" Defendants over the whole course of the FCC proceedings. *Id.*

Importantly, were the Court to determine that the Hobbs Act applied to Plaintiffs' claims, "meaningful judicial review of their statutory and constitutional claims would be foreclosed." *McNary*, 498 U.S. at 484; *accord Free Enter. Fund*, 561 U.S. at 490-91. If Plaintiffs cannot challenge the unconstitutional race discrimination and delay tactics committed by Defendants here, they would be unable to challenge them at all. Plaintiffs made every effort before the FCC and D.C. Circuit to obtain timely review of their license-transfer applications. But Defendants' pocket-veto HDO was designed specifically to ensure that such review would never come. If Plaintiffs cannot challenge the FCC's unconstitutional

race discrimination and Defendants' federal civil rights conspiracy here, those claims can never be subject to judicial review.

Cases cited by Defendants only confirm that the Hobbs Act's exclusive jurisdiction applies to final FCC orders and requests "to enjoin action that is the outcome of the agency's order." *ITT*, 466 U.S. at 468. No case cited by Defendants applies to the situation here, where the FCC did not issue a final order and the complaint neither raises the same issues presented to the FCC nor calls into question an order of the FCC. The Hobbs Act does not divest this Court of jurisdiction over Plaintiffs' claims.

**D. Plaintiffs' claims are not subject to administrative exhaustion.**

The FCC Defendants and UCC argue Plaintiffs' claims should be dismissed because Plaintiffs did not exhaust their administrative remedies. FCC 21-23; UCC (Dkt. 57-1) 29-30. But for the same reasons the Hobbs Act does not apply, Plaintiffs' claims are not subject to administrative exhaustion. "'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course." *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956). Plaintiffs' claims are not of this type, so exhaustion is not required.

The FCC Defendants and UCC again mischaracterize Plaintiffs' suit as challenging the HDO or the ALJ's order terminating the hearing as moot. *See* FCC 22-23 (describing process to exhaust challenge to HDO and ALJ's order), UCC 29 (arguing Plaintiffs never appealed ALJ's mootness ruling). And their cited cases concern the exhaustion of agency

*orders. See, e.g., Coal. for Pres. of Hisp. Broad. v. FCC*, 931 F.2d 73, 76-77 (D.C. Cir. 1991)

("failure to exhaust administrative remedies bars judicial review of FCC *orders*" (empha-

sis added)); *Chadmoore Commc'ns, Inc. v. FCC*, 113 F.3d 235, 239 (D.C. Cir. 1997) (discussing

exhaustion before review of "*denial* of its application" (emphasis added)); *Viasat, Inc. v.

FCC*, 47 F.4th 769, 776, 778 (D.C. Cir. 2022) (declining to consider arguments not presented

to the FCC in "appeal [of] the FCC's *order*" (emphasis added)). But, again, Plaintiffs do

not appeal or otherwise challenge any FCC orders. They seek review of the entire course

of the FCC proceedings, culminating in the unprecedented pocket veto *via* HDO. Accord-

ingly, Plaintiffs' claims are not subject to administrative exhaustion.

### E.  Abstention under the doctrine of primary jurisdiction is improper.

The Allen Defendants argue this Court should abstain under the doctrine of pri-

mary jurisdiction. Allen 19-21. But this argument is again premised on a mischaracteri-

zation of Plaintiffs' claims as challenging an FCC order. The primary-jurisdiction doctrine

can apply where "adjudicating a claim would require the resolution of issues which, un-

der a regulatory scheme, have been placed within the special competence of an administra-

tive body." *United States v. Philip Morris USA Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012)

(cleaned up). "Although no fixed formula exists for applying the doctrine of primary ju-

risdiction," relevant principles include "a concern for uniform outcomes" and "the ad-

vantages of allowing an agency to apply its expert judgment." *Id.* (cleaned up). Neither

principle requires abstention here.

Consider what exactly the FCC would decide if this Court abstained and referred it to the Commission. The Allen Defendants don't say. Nor do they identify what questions should be referred to FCC. All they say is that "Congress delegated to the FCC exclusive jurisdiction over broadcast licenses, which is uniquely within the agency's expertise and discretion." Allen 20. But Plaintiffs do not try to relitigate the underlying license transfer or ask the Court to apply the public interest analysis as though it were the FCC. That ship has sailed. The thrust of the complaint is instead that the FCC proceedings were unlawfully infected by consideration of an alternative buyer, Mr. Allen, and that Defendants discriminated against Plaintiffs because of Mr. Kim's race. That "precise question" of the legality and constitutionality of the FCC proceedings is not "within the particular competence of an agency," *Philip Morris*, 686 F.3d at 837, and this Court is "at no disadvantage in answering" it, *Free Enter. Fund*, 561 U.S. at 491. The Court should not abstain.

## II.    The D.C. Circuit Proceedings Do Not Preclude Plaintiffs' Claims.

The Allen Defendants argue that Plaintiffs' claims are precluded by the D.C. Circuit mandamus proceeding. Allen 21-23. The DISH Defendants argue only issue preclusion. DISH 24-25. Common Cause raises issue preclusion only in a footnote and so has not sufficiently developed the argument. Common Cause 17 n.29; *see, e.g., Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc) (courts "need not consider cursory arguments made only in a footnote"); *District of Columbia v. Proud Boys Int'l,*

*LLC*, 2023 WL 2733767, at *4 n.6 (D.D.C. Mar. 31, 2023) (declining to address "undeveloped argument raised in only a footnote"). No other Defendant argues preclusion.

The mandamus proceeding has no preclusive effect. Standard General sought review of the HDO specifically in the D.C. Circuit as an "effective denial" of its applications. Notice of Appeal 3-4, 7, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Mar. 27, 2023). It also contemporaneously filed a "conditional petition for writ of mandamus seeking to compel the FCC to render a final, reviewable decision on the applications" if the court determined the HDO was "not a final agency action." Pet. for Mandamus 17, *In re SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir. Mar. 27, 2023). The D.C. Circuit dismissed the appeal as "premature" because there was no "resolution by the full Commission." Order, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr. 3, 2023) (per curiam). And it denied the mandamus petition because Standard General did not show that the FCC "unreasonably delayed in acting on [its] applications" or that the FCC "has a 'crystal clear' duty to rule on [its] applications without resort to a hearing." Order, *In re SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir. Apr. 21, 2023) (per curiam).

**A.** Claim preclusion generally provides that "a judgment on the merits in a prior suit bars a second suit involving the same parties … based on the same cause of action." *Drake v. FAA*, 291 F.3d 59, 66 (D.C. Cir. 2002). Whether two cases are based on the same cause of action turns on "whether they share the same 'nucleus of facts,'" *id.*, that is, "whether the facts are related in time, space, origin, or motivation," *I.A.M. Nat'l Pension*

*Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 949 n.5 (D.C. Cir. 1983). Thus, claim preclusion bars parties "from relitigating issues that were or could have been raised in that action." *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1051 (D.C. Cir. 2019). The party invoking claim preclusion bears the burden of showing it applies. *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1171 (D.C. Cir. 2003). The Allen Defendants have not met their burden.

The D.C. Circuit mandamus proceeding and this case do not involve the same cause of action because they "are based on different factual occurrences." *Geter v. U.S. Gov't Publ'g Off.*, 268 F. Supp. 3d 34, 42 (D.D.C. 2017) (Contreras, J.). The mandamus petition concerned the FCC's "legal duty to act on [Standard General's] license-transfer applications" under the Communications Act, Pet. for Mandamus 21-22 (citing 47 U.S.C. §§309(a), (d)(2), 310(d)), while this case concerns Defendants' conduct under the Constitution, federal civil rights laws, common-law torts, and a different provision in §310(d) of the Communications Act prohibiting consideration of an alternative buyer, Am. Compl. ¶¶324-99. The "entire thrust" of the mandamus proceeding, filed before the FCC proceedings ended, "is different from the instant litigation," which demonstrates "different motivations animating the two disputes." *Does I through III v. District of Columbia*, 238 F. Supp. 2d 212, 218 (D.D.C. 2002). Nor did Plaintiffs have the opportunity to "seek compensation or otherwise invoke" their claims raised in the complaint. *Angelex Ltd. v. United States*, 123 F. Supp. 3d 66, 77 (D.D.C. 2015) (Contreras, J.) (holding emergency petition for

injunctive relief in court of appeals did not preclude later action "seeking compensation as an after-the-fact remedy"); *infra* pp.49-50.

Moreover, claim preclusion does not bar claims "based on facts not yet in existence at the time of the original action." *Drake*, 291 F.3d at 66; *see Cal. Cmtys. Against Toxics*, 928 F.3d at 1051. Many complaint allegations occurred *after* the mandamus proceedings. *See* Am. Compl. ¶¶246-69, 274-76, 297; *supra* pp.19-22 (detailing some Defendants' inconsistent actions in later proceedings); *see also Stanton v. D.C. Ct. of Appeals*, 127 F.3d 72, 78 (D.C. Cir. 1997) ("post-judgment *events* give rise to new claims, so that claim preclusion is no bar"). And Plaintiffs' damages claims accrued only once the deal died, also *after* the mandamus proceedings, Am. Compl. ¶263; *infra* pp.100-01; *see Angelex*, 123 F. Supp. 3d at 77 (holding plaintiff "could not have pursued" claim for "after-the-fact damages remedy" in prior litigation that "took place *during*" the government's action); *Does*, 238 F. Supp. 2d at 218-19 (rejecting claim preclusion where "plaintiffs' injuries were sustained after [first suit] was filed"); *see also Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1021 (9th Cir. 2019) (holding claim preclusion does not bar claims that "were not legally cognizable … when the allegedly preclusive action was initiated"). Plaintiffs accordingly could not have asserted their current claims "*in* the earlier action." *North v. Walsh*, 881 F.2d 1088, 1095 (D.C. Cir. 1989) (R.B. Ginsburg, J.).

Finally, even if the cases could be deemed to be based on the same causes of action, the inherently limited character of the mandamus proceeding independently forecloses

application of claim preclusion. Claim preclusion "does not apply where the plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts." *Hurd*, 864 F.3d at 679 (cleaned up). Thus, "if formal jurisdictional or statutory barriers precluded the plaintiff from asserting its claims," then claim preclusion "is inapplicable." *Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997); *see Alvear-Velez v. Mukasey*, 540 F.3d 672, 678 & n.4 (7th Cir. 2008) (collecting cases); *accord* Restatement (Second) of Judgments §26(1)(c), Westlaw; 18 Wright & Miller, *Federal Practice & Procedure* §4412, Westlaw.

Jurisdictional barriers prevented Plaintiffs from asserting their current claims before the D.C. Circuit. The mandamus proceeding arose under the All Writs Act, which enables courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. §1651(a). The Act "is not itself a grant of jurisdiction," *In re Tennant*, 359 F.3d 523, 527 (D.C. Cir. 2004) (Roberts, J.), and it "does not expand the jurisdiction of a court," *In re Nat'l Nurses United*, 47 F.4th 746, 752, 755 (D.C. Cir. 2022). Rather, the Act allows "a Circuit Court [to] resolve claims of unreasonable delay in order to protect its future jurisdiction." *TRAC*, 750 F.2d at 76; *see In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (noting writ in that context "ensure[s] that an agency does not thwart [the circuit court's] jurisdiction by withholding a reviewable decision" (citing *TRAC*, 750 F.2d at 76)).

Plaintiffs sought mandamus "to 'protect' [the D.C. Circuit's] 'future jurisdiction' to review agency action"—hoping "to ensure an opportunity to obtain judicial review" of "a final decision on their applications." Pet. for Mandamus 6, 20; *see* 47 U.S.C. §402(b). The D.C. Circuit "only ha[d] jurisdiction to compel [the FCC] to take an action [the court] would ultimately have jurisdiction to review," *i.e.*, a final order resolving Standard General's license-transfer applications. *Nat'l Nurses*, 47 F.4th at 755. But Standard General never got that final order. So now, Plaintiffs seek this Court's review of the entire course of the FCC proceedings. Plaintiffs' claims for declaratory, injunctive, and monetary relief "would not [have] aid[ed]" the D.C. Circuit's "prospective jurisdiction." *Id.* at 756. The district courts have "original jurisdiction" over such claims, 28 U.S.C. §§1331, 1343(a), 1367(a), not the D.C. Circuit, *see Tennant*, 359 F.3d at 531 (holding court lacked jurisdiction to review "in the first instance" claims for declaratory and injunctive relief against private parties asserted in petition for mandamus against FCC under All Writs Act). Because Plaintiffs could not have asserted their claims in the D.C. Circuit mandamus proceeding, claim preclusion does not apply. *See Hurd*, 864 F.3d at 679-80 (holding habeas proceeding did not preclude later §1983 claim for damages); *see also Holman v. City of Warrenton*, 242 F. Supp. 2d 791, 801 (D. Or. 2002) (holding claim preclusion inapplicable where "Plaintiff could not have pursued his claim for lost profits during the mandamus proceeding").

**B.** Issue preclusion applies when a prior final judgment on the merits "precludes subsequent relitigation of issues actually litigated and determined in the prior suit."

*NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130, 147 (D.C. Cir. 2001); *see Cal. Cmtys. Against Toxics*, 928 F.3d at 1051-52. Issue preclusion applies only if "the issues in the two cases are indeed identical." *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 153 (2015). The party asserting issue preclusion bears the burden of showing it applies. *In re Subpoena Duces Tecum Issued to CFTC*, 439 F.3d 740, 743 (D.C. Cir. 2006).

Issue preclusion does not apply here because the mandamus proceeding and this case do not present identical issues. The Allen, DISH, and Common Cause Defendants invoke issue preclusion with respect to whether "the FCC engaged in unreasonable delay or otherwise acted improperly in issuing the [HDO]." Allen 22; *see* DISH 25; Common Cause 17 n.29. That inaccurately describes the actual issues resolved in the prior action.

"[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." *B & B Hardware*, 575 U.S. at 154; *accord North*, 881 F.2d at 1095. Standard General's mandamus petition argued the FCC violated its legal duty to act on the license-transfer applications based on the Communications Act's charge that the agency "shall determine" whether the transfer is in the public interest and, if so, "shall" grant the applications. Pet. for Mandamus 21-22; *see* 47 U.S.C. §§309(a), (d)(2). But here, Plaintiffs' claims against the Allen, DISH, and Common Cause Defendants arise under federal civil rights laws and common-law torts. *See* Am. Compl. ¶¶324-99. Plaintiffs' claims against the FCC Defendants arise under the Equal Protection Clause, federal civil rights laws, and a separate prohibition in

the Communications Act that should have precluded the FCC Defendants from considering Mr. Allen as an alternative buyer. *Id.* ¶¶324-35, 351-63, 388-99. Tellingly, the FCC Defendants do not raise preclusion defenses given those distinct questions.

The mandamus action thus raised "distinct questions" under "different law," *Smith v. Bayer Corp.*, 564 U.S. 299, 312 (2011), "requir[ing] consideration of different factors" under a "markedly different" legal standard than those governing Plaintiffs' claims, *Elbaum v. Google, Inc.*, 2024 WL 1329790, at *5 (D. Md. Mar. 28, 2024). Such "clear distinctions of applicable law generate different issues, free from preclusion." 18 Wright & Miller, §4417; *see Mobile Now, Inc. v. Sprint Corp.*, 393 F. Supp. 3d 56, 66 n.5 (D.D.C. 2019) (holding issue preclusion inapplicable to second case involving "different legal issues").

Even if the mandamus ruling could have preclusive effect, the Allen, DISH, and Common Cause Defendants have not shown that it forecloses Plaintiffs' claims. They argue Plaintiffs are barred "from pursuing this case any further because all of their claims necessarily depend on a finding that the FCC engaged in unreasonable delay and acted improperly in [issuing the HDO]." Allen 23; *see* DISH 25; Common Cause 17 n.29. But "[w]hether [an] issue precludes any of Plaintiff[s'] claims depends on the elements of each cause of action." *Regatta Bay Ltd. v. United States*, 2008 WL 11301177, at *7 (D. Nev. Dec. 5, 2008). Whether the Communications Act allowed the FCC's delay or the HDO is not an element of any of Plaintiffs' claims. The current claims turn on the existence of a conspiracy, racial animus, and interference with Plaintiffs' contracts and prospective

business opportunities, among other things. *Infra* pp.69-70, 81-82, 96, 101-02, 112. Even if the mandamus decision had preclusive effect for claims raised in the mandamus petition, the claims raised here are different and so that prior proceeding does not bar Plaintiffs' claims against the Allen, DISH, and Common Cause Defendants. *See Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848, 851 (9th Cir. 2016) (reversing dismissal because precluded issue was not an element of a prima facie claim); *cf. Wyly v. Weiss*, 697 F.3d 131, 141 (2d Cir. 2012) (applying issue preclusion where first court "resolved one of the *elements*" of plaintiff's claim, "prevent[ing] [second] court from finding this *element* satisfied").

### III.   The Amended Complaint Plausibly States Claims for Relief.

#### A.   Count I: Equal Protection

Count I asserts a claim for violation of equal protection against the FCC Defendants. Am. Compl. ¶¶324-35. The amended complaint states an equal protection claim in three ways. First, the FCC considers race of broadcast owners in reviewing license-transfer applications, and in Plaintiffs' case, it used Mr. Kim's race as a negative and a stereotype given its preference for Mr. Allen as an alternative buyer. *See SFFA*, 600 U.S. at 218. The FCC Defendants do not address *SFFA*. Second, even if considered facially neutral, the FCC's license-transfer review resulted in racially disproportionate impact and was motivated by a discriminatory purpose. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-68 (1977). The FCC Defendants do not address *Arlington Heights*.

Third, the FCC treated Plaintiffs differently than similarly situated applicants. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1102 (D.C. Cir. 2005).

**1.** A plaintiff pleads an equal protection violation by alleging that a policy "explicitly classifies citizens on the basis of race." *Smith v. Henderson*, 982 F. Supp. 2d 32, 49 (D.D.C. 2013). The "twin commands" of the Constitution's equal protection guarantee are "that race may never be used as a 'negative' and that it may not operate as a stereotype." *SFFA*, 600 U.S. at 218.

Relevant here, when the FCC considers whether the transfer of a broadcast license will serve "the public interest, convenience, and necessity," 47 U.S.C. §§309(a), 310(d), the FCC interprets that statutory directive to require review "focuse[d] on the essential goals of diversity, competition, and localism," *In re Pandora Radio LLC*, 30 FCC Rcd. 10570, 10574 (2015). As part of that review, the FCC expressly considers race of broadcast owners as part of its "long-standing goal of promoting diversity in ownership" because that is how "to ensure that diverse viewpoints and perspectives are available to the American people." Am. Compl. ¶104 (quoting *Promoting Diversification*, 31 FCC Rcd. at 398); *see id.* ¶¶105-07. The FCC presumes that only minority owners can bring "diverse viewpoints and perspectives" to "broadcast airwaves." *Id.* ¶104. If the FCC is going to operate under that presumption, it cannot further presume that one racial group is superior to another, or that only certain minority owners are qualified to bring diverse views. *See SFFA*, 600

U.S. at 220 ("Harvard's admissions process rests on the pernicious stereotype that 'a black student can usually bring something that a white person cannot offer.'").

The FCC Defendants' argument that race is not considered in the "'public interest' analysis of individual applications" because application "forms do not request information about race," FCC 37, is defied by the FCC's own stated diversity goal. Am. Compl. ¶104. In the FCC's words, "the impact … on broadcast ownership by minorities … remains an important part of our multi-factor public interest inquiry." *In re 2018 Quadrennial Regul. Rev. — Rev. of the Comm'n's Broad. Ownership Rules & Other Rules Adopted Pursuant to Section 202 of the Telecomms. Act of 1996*, 2023 WL 9021989, at *9 (FCC Dec. 26, 2023); *accord* Am. Compl. ¶104 nn.29-30. FCC policies track and encourage minority ownership of broadcast media outlets. *Id.* ¶105 (citing FCC, Media Bureau & Off. of Econ. & Analytics, *Sixth Report on Ownership of Broadcast Stations* 3-4 (2023), https://perma.cc/8J79-BHWY, and FCC, *Strategic Plan Fiscal Years 2022-2026* 7 (2022), https://perma.cc/GQW9-89H6). The FCC's Communications Equity and Diversity Counsel provides recommendations for "media ownership diversity," including initiatives "to increase minority broadcast ownership" by "motivat[ing] big companies to sell to minorities … when divesting stations." *Id.* (first quoting *Charter of the FCC's Communications Equity and Diversity Council* 1 (2021), https://perma.cc/EVK2-7QL3, and then quoting FCC, *Commc'ns Equity & Diversity Council, Enhancing Media Ownership and Entrepreneurial Opportunities for Minorities and Women* 12 (June 15, 2023), https://perma.cc/GPP8-9QD2). And Chairwoman

Rosenworcel personally has decried "the shameful lack of racial … diversity in broadcast station ownership." *Id.* ¶106 (quoting *In re Rules & Pol'ys to Promote New Entry & Ownership Diversity in the Broad. Servs.*, 33 FCC Rcd. 7911, 7963 (2018) (Rosenworcel, dissenting)).

Regardless of whether the FCC's open consideration of race in prior license-transfer proceedings violated equal protection, it unquestionably did in Plaintiffs' case. Objectors declared that Mr. Kim's deal did "nothing" for ownership diversity and presumed he was unlike others in "historically excluded groups" who had suffered "inequities produced by structural racism," *id.* ¶147—all evidence of impermissible racial stereotyping. *See SFFA*, 600 U.S. at 219-21. The FCC Defendants' overt comparison of Mr. Allen as an alternative buyer, moreover, is evidence of the agency's impermissible use of Mr. Kim's race as a negative. *Id.* at 218-19. Mr. Allen has a long history of suing the FCC and companies for failing to steer opportunities to black-owned media companies. *Id.* ¶¶280-88. Today, the FCC views Mr. Allen as a favored owner, always quickly approving his deals. *Id.* ¶115. Mr. Allen even boasts that he is "FCC approved." *Id.* ¶276. While the Gray-Quincy and Gray-Meredith deals implicated concerns of retransmission fees and job losses, that was no issue to the FCC because Mr. Allen benefitted by acquiring divested stations. *Id.* ¶¶113-14, 311-12. As the complaint alleges, the FCC thwarted Plaintiffs' license-transfer applications because Mr. Allen wanted TEGNA for his black-owned company. *See id.* ¶¶3-4, 16-19, 22, 70, 271-73, 279, 288-89, 312. The Media Bureau issued an unprecedented order demanding production of information about Mr. Allen's failed bid.

*Id.* ¶¶168-73. In killing Plaintiffs' deal, the FCC was "motivated by the belief that Mr. Allen's black-owned company deserved greater solicitude than Mr. Kim's Asian American-owned company." *Id.* ¶70. Comparing Mr. Kim to Mr. Allen made the FCC's review "zero-sum"—because race was a positive for Mr. Allen, it necessarily was a "negative" for Mr. Kim. *SFFA*, 600 U.S. at 218-19 ("A benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter."). An agency that openly considers race in decision-making must show that race hasn't been deployed "as a stereotype" or "as a 'negative.'" *Id.* at 218. The amended complaint sets forth a cause of action for differential treatment based on race.

**2.** Plaintiffs independently plead an equal protection violation by alleging that the FCC Defendants' license-transfer review was, "in fact, motivated by discriminatory intent and has a racially discriminatory impact." *Smith*, 982 F. Supp. 2d at 49-50 (citing *Arlington Heights*, 429 U.S. at 265-66). To state an equal protection claim, a plaintiff must allege that "the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *see Richards v. Gelsomino*, 240 F. Supp. 3d 173, 181 (D.D.C. 2017). In assessing discriminatory purpose, the Court must engage in "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. The discriminatory purpose behind government action need not be "express" and "may often be inferred from the totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 241-42 (1976). The challenged government action, moreover,

need not have "rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265. Rarely will an "administrative body operating under a broad mandate ma[k]e a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Id.* A plaintiff thus need only allege that "a discriminatory purpose has been a motivating factor in the decision." *Id.* at 265-66.

The FCC Defendants do not dispute that Plaintiffs have alleged discriminatory impact, nor could they. *See, e.g., Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 173 (2d Cir. 2024). The FCC Defendants challenge only whether the complaint adequately alleges "[d]iscriminatory [a]nimus." FCC 28. But the amended complaint plausibly alleges that a racially discriminatory purpose was a motivating factor behind the FCC Defendants' actions, in numerous ways.

*First*, the "impact" of the FCC Defendants' action "bears more heavily on one race than another" and so "provide[s] an important starting point." *Arlington Heights*, 429 U.S. at 266. The FCC has bemoaned the lack of ownership diversity. Am. Compl. ¶106. As for Asian Americans, they majority-own only 1% of broadcast television stations. *Id.* ¶107. Plaintiffs' deal would have dramatically changed that, increasing Asian American-owned network-affiliated television stations in the Top 50 markets from zero to 27 and creating the only minority-owned station group in the top 10. *Id.* ¶118, 121-22. And still, the FCC killed Plaintiffs' deal. That impact of the decision is probative of Defendants' discriminatory intent. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997) ("[T]he

impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions."); *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 464 (1979) ("actions having foreseeable and anticipated disparate impact are relevant evidence to prove … forbidden purpose").

*Second*, "[t]he historical background" of the FCC's license-transfer review "reveals a series of official actions" that reflect discriminatory purpose. *Arlington Heights*, 429 U.S. at 267. The FCC has a "long-standing goal" of increasing minority broadcast ownership, having determined that minority ownership is in the public interest. Am. Compl. ¶104. The FCC tracks minority ownership and advances initiatives to increase minority ownership, including encouraging large companies to sell to minorities when divesting stations. *Id.* ¶¶104-05 & nn.29-34. Consistent with its goal and initiatives, the FCC quickly approved applications to transfer broadcast licenses to Mr. Allen's black-owned company and license-transfer applications in major deals where the Allen Group benefited by acquiring divested stations. *Id.* ¶¶113-15. And the FCC approved two other recent major deals without delays or an HDO, overruling the same concerns the straw objectors raised. *Id.* ¶¶109-12. Yet Plaintiffs' deal, where an Asian American would take ownership of stations, did not receive equal treatment. *Id.* ¶¶10, 312; *see, e.g.*, *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 138 F. Supp. 3d 352, 413 (S.D.N.Y. 2015) (finding "Village's behavior with respect to other proposed projects is suggestive" of discriminatory purpose).

*Third*, "[t]he specific sequence of events leading up to" the FCC Defendants' treatment of Plaintiffs' applications, including race-based and xenophobic rhetoric in FCC filings, also shows discriminatory purpose. *Arlington Heights*, 429 U.S. at 267. Mr. Allen lost the bid for TEGNA yet publicly maintained that he was still "in the fight." Am. Compl. ¶¶60-62, 128. He then orchestrated early speed bumps at the FCC to leverage them against Mr. Kim to acquire a piece of TEGNA. *Id.* ¶¶133, 278-79. And when Mr. Kim declined, Mr. Allen, who has a history of leveraging race for commercial gain, leveraged Mr. Kim's race as a negative to kill the deal, courting Democratic politicians with six-figure political donations and, through Mr. Goodfriend, having straw objectors espouse his widely known view that "[t]he *only way* to promote diversity" in media is to support his black-owned company and anything else is "sham" diversity. *Id.* ¶¶279, 283-84, 286.

Regarding that series of events, the FCC Defendants respond that the amended complaint "does not allege race-related comments by the Federal Defendants." FCC 36. Plaintiffs don't need to. *See, e.g.*, *Cook v. Babbitt*, 819 F. Supp. 1, 24 (D.D.C. 1993). Yet still, the FCC Defendants' action "following discriminatory statements by members of the public supports a claim of discriminatory intent." *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 505 (9th Cir. 2016). Equal protection "does not permit [responsive] actions where racial animus is a significant factor in the community position to which the [government] is responding." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224 (2d Cir. 1987) (collecting cases). Accordingly, "a decision made in the context of strong, discriminatory

opposition becomes tainted with discriminatory intent even if the decision-makers personally have no strong views on the matter." *Cmty. Hous. Tr. v. Dep't of Consumer & Regul. Affs.*, 257 F. Supp. 2d 208, 227 (D.D.C. 2003) (collecting cases).

Applied here, the straw objectors claimed an Asian American buyer did "nothing to create a more … diverse … media" and did "not promote ownership diversity." Am. Compl. ¶147. They stoked fears about "shadowy foreign investors," *id.* ¶148, the "risks to … democracy" posed by "anonymous foreign investment in American newsrooms," and "China['s] increased tensions in the Taiwan Strait," *id.* ¶174. Plaintiffs plausibly allege the FCC Defendants adopted these views in their treatment of Plaintiffs' applications. *Id.* ¶¶22, 228, 272, 309, 312-13. "There can be no doubt that the [FCC] [D]efendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition." *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982); *see Stout v. Jefferson Cnty. Bd. of Educ.*, 882 F.3d 988, 1007-08 (11th Cir. 2018) (holding racially discriminatory statements of lobbyists who "spearheaded the referendum initiative" and "translate[d] their grassroots effort into official action" "directly bear on the purpose of" the government); *Yonkers Bd. of Educ.*, 837 F.2d at 1225-26 (collecting cases).

Regarding that rhetoric, the FCC Defendants respond that straw objectors' filings "either do not" "relate to [Mr. Kim's] race" "or are at most ambiguous in that regard." FCC 36. But at the motion-to-dismiss stage, these filings must be viewed in Plaintiffs'

favor and "against the backdrop of other allegations in the complaint." *Vullo*, 602 U.S. at 194-95; *see Wilson v. Cox*, 753 F.3d 244, 248 (D.C. Cir. 2014) (holding statement interpreted and viewed "in the light most favorable to [plaintiff] … manifests discriminatory stereo-typing"). As explained further below, filings reflect racial animus, *infra* pp.74-80, as several commentators recognized at the time, Am. Compl. ¶¶147-55, 174, 235-39. In any event, "[t]he very ambiguity" of filings "warrants a jury determination as to [their] meaning." *Gipson v. Wells Fargo N.A.*, 460 F. Supp. 2d 15, 27 (D.D.C. 2006).

*Fourth*, "[d]epartures from the normal procedural sequence" of FCC license-transfer review "afford[s] evidence that improper purposes [we]re playing a role." *Arlington Heights*, 429 U.S. at 267. Plaintiffs' deal was the only major rule-compliant deal in the last 30 years not to be granted within the FCC's 180-day shot clock. Am. Compl. ¶¶10, 63, 94-95, 126, 156. The FCC granted multiple extensions, contrary to precedent, *id.* ¶¶130-31, 145, and opened an unprecedented second and third public comment period, *id.* ¶¶168, 201. Throughout this time, the Media Bureau and Chairwoman Rosenworcel met with interested parties but refused to meet with Plaintiffs, and they declined to disclose any concerns with the deal. *Id.* ¶¶185, 212-13, 221-23. Then the Media Bureau issued the HDO—something it had never done in connection with a broadcast television license-transfer application, let alone a major, multi-billion-dollar deal. *Id.* ¶¶11, 103, 224. And contrary to standard FCC practice, the Media Bureau issued the HDO without giving the commissioners 48 hours' notice. *Id.* ¶223; *see* Sen. Comm. on Com., Sci. & Transp.,

62

*Republican Questions for the Record: Geoffrey Starks* 1 ¶2 (June 22, 2023), https://perma.cc/NT6J-KTTA (Commissioner Starks: "Chairwoman Rosenworcel notified me the day the [HDO] was released … several hours before its release."). These "unexplained procedural irregularit[ies]" plausibly support an allegation of discriminatory intent. *Cook*, 819 F. Supp. at 24; *see Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013).

*Fifth*, "[s]ubstantive departures" also evidence discriminatory purpose. *Arlington Heights*, 429 U.S. at 267. Start with the FCC's emphasis on diversity and increasing minority ownership—"factors usually considered important by the decisionmaker [that] strongly favor a decision contrary to the one reached." *Id.* The FCC Defendants' actions to kill Plaintiffs' deal are antithetical to the FCC's "long-standing goal of promoting diversity in ownership of broadcast stations," its initiatives in furtherance of that goal, and Chairwoman Rosenworcel's views on the need for increased minority ownership. Am. Compl. ¶¶104-07, 236-39, 312-13. Although the FCC has determined that minority ownership is in the public interest, the HDO's public-interest discussion ignored the historic increase in minority ownership that Plaintiffs' deal offered, implicitly taking the position that an Asian American did "nothing" to promote ownership diversity, as the straw objectors claimed. *Id.* ¶228; *see id.* ¶¶104, 118, 121, 141.

Moreover, the Media Bureau's order requiring production of documents about "alternative transactions considered" by TEGNA violated the Communications Act's

prohibition on the FCC considering other possible buyers. *Id.* ¶¶91, 130, 168-73; *see* 47 U.S.C. §310(d); *In re Adelphia Commc'ns Corp.*, 21 FCC Rcd. 8203, 8314 (2006). The Media Bureau overruled Standard General's objection and specified that it wanted information on Mr. Allen's failed bid. Am. Compl. ¶¶169-70. Such an order was "unprecedented for a broadcast transaction." *Id.* ¶173.

The notion that an HDO was required is also evidence of substantive departures. HDOs provide a forum for factfinding, but there was no more discovery or trial of fact that the Media Bureau could not have already considered given the extensive record and the millions of pages of documents produced to DOJ. *Id.* ¶¶99, 225. The Media Bureau's pretextual reasoning in the HDO contradicted FCC precedent rejecting nearly identical pricing and job loss objections, thereby conflicting with prior rulings of the full Commission. *Id.* ¶¶96, 98 & n.24, 111, 114, 143 & n.75, 226; *see* 47 C.F.R. §0.283(c). The FCC Defendants' "convenient disregard of substantive standards" plausibly shows discriminatory intent. *Yonkers Bd. of Educ.*, 837 F.2d at 1222.

The FCC Defendants do not address the *Arlington Heights* factors and still declare that the complaint "pleads no facts that would support a plausible inference" of discriminatory purpose. FCC 38. Applying *Arlington Heights* and viewing the allegations and drawing inferences in Plaintiffs' favor, discriminatory purpose is plausibly alleged.

**3.** Plaintiffs also plead an equal protection violation by alleging they were "treated differently than similarly situated individuals." *Settles*, 429 F.3d at 1102. A plaintiff can

plead "that race was the reason for the defendant's action" by "alleg[ing] facts showing that he was treated less favorably than another similarly situated person of a different race." *Wilson v. DNC Servs. Corp.*, 315 F. Supp. 3d 392, 400 (D.D.C. 2018). A plaintiff "need not plead her similarity to alleged comparators with fine detail" to state a claim. *Tolton v. Day*, 2020 WL 2542129, at *15 (D.D.C. May 19, 2020) (surveying cases). The "similarly situated" standard requires only "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022).

Plaintiffs allege that the FCC Defendants treated them differently than similarly situated license-transfer applicants in the four most recent major broadcast television transactions. Am. Compl. ¶¶108, 330. The FCC approved license transfers for these deals in far less time than the 450-day Standard General-TEGNA rigmarole: 39 days for Scripps-ION, 140 days for Gray-Quincy, 170 days for Gray-Meredith, and 226 days for Apollo-Cox. *Id.* ¶¶9, 109-14. None of the license-transferee companies in these deals was Asian-American owned, and no Asian American benefitted by acquiring divested stations. *Id.* ¶¶9, 108, 113-14. The Apollo-Cox deal, like Standard General's deal, carried the potential to increase retransmission fees, involved private equity, offshore funding, and the same straw objectors making the same objections, yet the Media Bureau approved it without an HDO. *Id.* ¶¶109-111, 311. The Scripps-ION, Gray-Quincy, and Gray-Meredith deals also carried the potential to increase retransmission fees and implicated concerns

of job losses—and still, the Media Bureau approved them within 180 days without an HDO. *Id.* ¶¶112-14, 311, 320. Unlike those other deals, Standard General's deal was "rule compliant" (*i.e.*, required no rule waivers or divestitures) and would have *reduced* industry consolidation. *Id.* ¶¶7, 93, 109, 111-14, 116, 118, 311. In other words, Standard General's deal was *better situated* than the others yet, remarkably, was subjected to unprecedented delays, not approved, and referred for a hearing. *See, e.g., Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc) (explaining inference of discrimination arises if plaintiff is "significantly better qualified" than candidate selected by defendant); *Brown v. McDonough*, 2024 WL 1344417, at *8 (D.D.C. Mar. 29, 2024) (Contreras, J.) (inferring that plaintiff, the top-ranked interviewee, "was similarly—or better—situated" than the candidate selected and "who can serve as a comparator").

The FCC Defendants argue, without a single supporting case citation, that the applicants in those four most recent transactions "are not similarly situated because FCC leadership was different"—Chairwoman Rosenworcel was not chair for the Apollo-Cox and the Scripps-ION deals and Ms. Saurer was not chief of the Media Bureau for any of the deals. FCC 34-35. But where government agencies adjudicate applications, the similarly situated analysis focuses "not on a different … decisionmaker, but on the differences between the businesses that were being compared." *Familias Unidas Por La Educación v. El Paso Indep. Sch. Dist.*, 633 F. Supp. 3d 888, 896 (W.D. Tex. 2022); *see Pappas v. Town of Enfield*, 602 F. App'x 35, 36 (2d Cir. 2015) (explaining plaintiff must "identify comparators

who are similarly situated to her with regard to the zoning board's 'principal reasons' for denying the application").[4] What matters is not individual officials but "the governmental body … making [the] determination." *Third Church of Christ, Scientist, of N.Y.C. v. City of New York*, 626 F.3d 667, 670 (2d Cir. 2010); *cf. Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1311-12 (11th Cir. 2006) (holding plaintiff not similarly situated to comparator because they sought "relief[] from different decision-making bodies"). Any difference in individual agency officials "does not render [a plaintiff] and [comparators] any less similarly situated." *Kirschner v. Zoning Bd. of Appeals of Inc. Vill. of Valley Stream*, 924 F. Supp. 385, 392 (E.D.N.Y. 1996) (holding comparator similarly situated despite board's recomposition with majority of new members).

The FCC Defendants also argue the Gray-Quincy and Gray-Meredith deals are not similarly situated because they were not "similarly structured transactions" and "did not involve similar public opposition." FCC 35. But those deals were similarly structured in that they "carried the potential to increase retransmission fees," Am. Compl. ¶311, and "implicated th[e] same purported concerns of … job losses," *id.* ¶320—the "principal reasons" why the Media Bureau purportedly could not decide Standard General's applications, *Pappas*, 602 F. App'x at 36. As Plaintiffs allege, the unprecedented level of public

---

[4] Cases that consider whether comparators had the same decisionmakers arise in the employment context, *e.g.*, *Stoe v. Garland*, 2021 WL 4169313, at *6 (D.D.C. Sept. 14, 2021), and even there "the lack of identical decisionmakers is not necessarily dispositive," *Radwan*, 55 F.4th at 136; *see also, e.g., Anderson v. WBMG-42*, 253 F.3d 561, 566 (11th Cir. 2001) ("not determinative").

opposition was part of Defendants' conspiracy to provide a pretext to cover the FCC's discrimination, *e.g.*, Am. Compl. ¶¶4, 22, 137, 203, 278-79, 290, and straw objectors were noticeably absent in the Gray-Quincy and Gray-Meredith deals, where Mr. Allen benefitted by acquiring divested stations, *id.* ¶¶113-14, 140, 320. As explained, Standard General's deal was *better situated* than those deals because it was rule compliant and would have reduced consolidation. In any event, Plaintiffs need not "flesh[] out" all "the exact relative characteristics of those comparators" to "giv[e] rise to an inference of discrimination" to state a claim. *Tolton*, 2020 WL 2542129, at *15; *see George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005) (noting whether comparators "are similarly situated ordinarily presents a question of fact for the jury"). Plaintiffs' allegations are far more specific than others that stated claims. *See, e.g.*, *Brown v. Sessoms*, 774 F.3d 1016, 1023 (D.C. Cir. 2014) ("similar records"); *Wilson*, 315 F. Supp. 3d at 400 ("candidate who … also registered with the [FEC] and contacted the DNC"); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 76 (D.D.C. 2015) ("application was equally as meritorious").

**4.** The FCC Defendants generally argue the HDO establishes "the legitimate reasons" for their actions. FCC 30. But such proffered justifications are no basis to dismiss Plaintiffs' well-pleaded equal protection claim. *See, e.g.*, *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County*, 915 F.3d 256, 263 (4th Cir. 2019) ("So long as a plaintiff alleges a plausible prima facie claim of discrimination, a court may not dismiss that claim—even if the defendant advances a nondiscriminatory alternative explanation for its

decision, and even if that alternative appears more probable."); *Doe v. Miami Univ.*, 882 F.3d 579, 594 (6th Cir. 2018) ("At the pleading stage, [plaintiff's] allegations need only create the plausible inference of intentional … discrimination; although alternative non-discriminatory explanations for the defendants' behavior may exist, that possibility does not [warrant dismissal]."). Plaintiffs' equal protection claim should proceed.

## B. Count II: Racial impairment of contracts, 42 U.S.C. §1981

Count II asserts a claim under 42 U.S.C. §1981 against the Allen Defendants, the Goodfriend Defendants, the Unions, UCC, and Common Cause. Am. Compl. ¶¶336-50. "Section 1981 protects the right 'to make and enforce contracts' free from racial discrimination … ." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017) (quoting §1981(a)). This right includes "performance … of contracts." §1981(b). Thus, §1981 offers relief "when racial discrimination impairs an existing contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). To state a claim under §1981, a plaintiff must allege that (1) he "is a member of a racial minority," (2) "the defendant intended to discriminate against [him] on the basis of race," and (3) "the discrimination concerned an activity enumerated in §1981." *Morris v. Carter Glob. Lee, Inc.*, 997 F. Supp. 2d 27, 37 (D.D.C. 2013).

The complaint alleges that Mr. Kim is Asian American and thus a member of a racial minority group. Am. Compl. ¶¶3, 343; *see Nanko Shipping*, 850 F.3d at 467 (explaining "discrimination against a business based on the race of its owner violates section

1981"). The complaint alleges the Allen Defendants, the Goodfriend Defendants, the Unions, UCC, and Common Cause intentionally discriminated against Plaintiffs based on race. Am. Compl. ¶¶344-45. Echoing Mr. Allen's position in past lawsuits over "sham" diversity, *id.* ¶¶280-87, objectors publicly said Mr. Kim's acquisition of TEGNA did "nothing" for ownership diversity; they demanded information about Mr. Allen's failed bid; they disparaged and maligned Mr. Kim as a foreigner, saying his deal poses "risks to … diversity … and democracy itself" and inexplicably invoking "increased tensions in the Taiwan Strait," *id.* ¶¶19-20, 147-51, 174. And at every step of the proceedings, Mr. Allen was present—described as the "Forrest Gump" of the Standard General-TEGNA deal. *Id.* ¶¶210, 271. He was a failed bidder for TEGNA; he declared he was still "in the fight" for TEGNA after regulatory proceedings began; he called Mr. Kim to spin off TEGNA stations, suggesting it would smooth over the regulatory process; he made a major political donation within days of then-Speaker Pelosi's letter opposing the deal; he hosted a political event within days of Mr. Ergen's meeting with Chairwoman Rosenworcel; he was the subject of the FCC's order to disclose information about alternative buyers; and he announced he remained "very interested" in TEGNA when the deal unraveled for Mr. Kim. *Id.* ¶¶61, 128, 168-69, 179, 210-11, 254, 264, 278-79. Defendants impaired Plaintiffs' right to make and enforce contracts, namely Standard General's merger contract with TEGNA and financing contracts with the banks. *Id.* ¶¶346-48.

Defendants argue that Plaintiffs' §1981 claim fails on two grounds: first, the private Defendants did not have any "power" or "authority" over Plaintiffs' contracts, *i.e.*, causation, Unions (Dkt. 46-1) 20; Common Cause 28-29; Allen 30-31; UCC 35; and second, Plaintiffs do not plausibly allege an intent to discriminate based on race, Goodfriend 9-12, 17; Unions 20-21; Common Cause 27-28; UCC 36. These arguments fail.

**1. *Causation.*** The Unions, Common Cause, UCC, and the Allen Defendants argue they did not have the "power" or "authority" to block Plaintiffs' merger with TEGNA because only the FCC could approve the license-transfer applications or issue the HDO. *See* Unions 20 (arguing the "power to stop the Standard General-TEGNA deal … rested with the FCC alone"); Common Cause 29 ("the decision to approve the TEGNA transaction lay solely with the FCC"); UCC 35 (arguing FCC had "authority" to "approve the proposed TEGNA transaction"); Allen 30-31 ("Only the FCC had the power and ability to schedule a hearing … ."). This argument, at bottom, sounds in causation, and it fails.

Section 1981 prohibits tortious interference with contract rights "when the motivation for the interference is racial." *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) (collecting cases). The statute protects "against third parties who interfere with those rights, even if they were not part[ies] to the contract." *Inner City Contracting, LLC v. Charter Township of Northville*, 87 F.4th 743, 755 n.7 (6th Cir. 2023); *see Olumuyiwa v. Harvard Prot. Servs., Inc.*, 2000 WL 620202, at *5 (E.D.N.Y. May 12, 2000). For example, "[f]or the Ku Klux Klan to beat up nonwhites who try to enforce their contracts violates the statute

even though the Klan is not a party to the contracts." *Muhammad*, 547 F.3d at 878 (citing *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1007-08). "[T]o make out a claim for individual liability under §1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000).

The Unions, Common Cause, UCC, and the Allen Defendants interfered with Plaintiffs' contracts. Plaintiffs allege that the Allen and Goodfriend Defendants orchestrated the straw objectors to challenge Plaintiffs' deal by amplifying Mr. Allen's racially discriminatory view that an Asian American buyer did "nothing" to promote ownership diversity. Am. Compl. ¶¶19, 147-51, 174, 279. The objectors' opposition served as a pretext for the FCC Defendants' delays and unequal treatment of Plaintiffs' applications. *Id.* ¶¶137, 156, 187, 317, 323. Plaintiffs' allegations that the Unions, Common Cause, UCC, and the Allen Defendants "embarked on a long campaign to induce" the FCC Defendants "to partly or wholly displace [Plaintiffs] suffice to plead causation." *Banneker Ventures*, 798 F.3d at 1135 (reversing dismissal of tortious interference claim); *cf. Ladson v. Ulltra E. Parking Corp.*, 853 F. Supp. 699, 702 (S.D.N.Y. 1994) (holding third party could be liable under §1981 for letter complaining of plaintiff's job performance that was "utilized" by plaintiff's employer "in the arbitration in which [plaintiff] sought to enforce his rights under the labor contract").

While the Unions, Common Cause, UCC, and the Allen Defendants emphasize the buzzwords "power" and "authority," the cases they cite confirm the basic point about a third party causing the interference. *See Harris v. Allstate Ins. Co.*, 300 F.3d 1183, 1197 (10th Cir. 2002) (holding plaintiff must show defendant "actually exercised" its "authority to significantly interfere with the individual's … contracts with third parties"); *Shaikh v. City of Chicago*, 341 F.3d 627, 630 (7th Cir. 2003) (dismissing §1981 claim because what plaintiff "alleges the City did … never interfered with his ability to purchase the building"); *Ginx, Inc. v. Soho All.*, 720 F. Supp. 2d 342, 359 (S.D.N.Y. 2010) ("the acts allegedly ostensibly undertaken by [Defendants] to interfere with the Plaintiffs' contractual … rights … were not what kept [Plaintiffs' business] from getting its liquor license"). Plaintiffs have plausibly alleged causation, and the FCC's actions do not "br[eak] the causal link," *contra* Allen 30, as explained below for Plaintiffs' tortious interference claims, *infra* pp.104-06.

**2. *Discriminatory intent.*** The Goodfriend Defendants, the Unions, Common Cause, and UCC argue Plaintiffs have not plausibly alleged intent to discriminate based on race. Goodfriend 9-12, 17; Unions 20-21; Common Cause 27-28; UCC 36. The Allen Defendants do not challenge this element. Defendants' race-based intent "can be demonstrated through either direct or indirect evidence." *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1231 (D.C. Cir. 1984). Plaintiffs' "initial burden" under §1981 to survive a motion to dismiss "is not onerous." *Nanko Shipping*, 850 F.3d at 467. The amended complaint easily satisfies that burden.

**a.** Plaintiffs allege direct evidence of discriminatory intent in Defendants' FCC filings. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576-77 (D.C. Cir. 2013) (per curiam). The straw objectors said Plaintiffs' acquisition of TEGNA did "nothing to create a more … diverse … media," did "nothing to increase ownership opportunities for … people of color to enter the marketplace," and did "not promote ownership diversity as it is understood by the public interest and civil rights community, and by commission policy." Am. Compl. ¶147. They raised concerns about "shadowy foreign investors," *id.* ¶148, and "the downside of the non-citizens potentially having the ability to influence domestic elections," *id.* ¶150. Mr. Goodfriend on behalf of the Unions stoked fears over the "risks to … democracy" posed by "anonymous foreign investment in American newsrooms" and "China['s] increased tensions in the Taiwan Strait." *Id.* ¶174. Civil rights leaders, former FCC officials, and other commentators understood objectors' filings to target Mr. Kim for his Asian race. *See id.* ¶¶152-55, 235-39. And Chairwoman Rosenworcel suggested to Mr. Kim that the straw objectors said worse things behind closed doors. *See id.* ¶184. Defendants' filings "demonstrate, on their face, a racial motivation." *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 43 (D.D.C. 2007).

Defendants contest Plaintiffs' reading of the public record. They claim Plaintiffs have "willfully misconstrued" public filings, Goodfriend 10-11, "mischaracterize[d]" straw objectors' positions, Common Cause 14, 16; Unions 1; DISH 31; UCC 19, and otherwise "obfuscate[d] the facts," UCC 9; *see also* Common Cause 2; DISH 18; Allen 4 n.1.

They argue Plaintiffs' allegations "are objectively false based on the FCC's public records." Unions 21. And they maintain that public filings do not relate to Mr. Kim's Asian race. FCC 36; Goodfriend 9-12; Unions 20-21; Common Cause 14-16; DISH 17-20; UCC 9, 17-20, 36. Defendants' dispute with the inference to be drawn from these bizarre statements in Defendants' filings is not a proper basis for dismissing the complaint; inferences must be drawn in Plaintiffs' favor at this stage. *See Vullo*, 602 U.S. at 195 (acknowledging, on a motion to dismiss, that "discovery in this case might show … that certain actions should be understood differently in light of newly disclosed evidence" but "the Court must assume the well-pleaded factual allegations in the complaint are true," and reversing Second Circuit for failing to consider defendant's letters and press release "against the backdrop of other allegations in the complaint"). It is for a jury to decide, for example, what exactly Mr. Goodfriend meant when invoking "increased tensions in the Taiwan Strait" as a reason for scuttling the TEGNA acquisition. Am. Compl. ¶174.

Defendants contend their filings should be understood as raising concerns about "diversity of *viewpoints*," DISH 7; Unions 20-21; *see* Common Cause 14-15 & n.28; UCC 17-18, and "*unknown offshore investors*," Common Cause 15; UCC 18-19; *see* DISH 8; Unions 21. But again, "alternative interpretation[s] of that kind cannot overcome the need to draw inferences in the non-moving party's favor," as required under Rule 12, *Wilson*, 753 F.3d at 247-48 (holding statement interpreted and viewed "in the light most favorable to [plaintiff] … manifests discriminatory stereotyping"); *see Lucas v. Paige*, 435 F. Supp. 2d

165, 171 (D.D.C. 2006) (denying summary judgment because "if, as it must be, the statement is construed in plaintiff's favor, it may be deemed an explicit reference to plaintiff's age" and thus "proof of a discriminatory intent"); *Gipson*, 460 F. Supp. 2d at 27 (similar). Accepting Defendants' proffered "gloss on [objectors'] comments" would "unduly favor[]" Defendants. *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 568 (D.C. Cir. 2019). It would also "fail[] to analyze" objectors' filings "against the backdrop of other allegations in the complaint." *Vullo*, 602 U.S. at 195.

Defendants' alternative interpretations of their statements about diversity are inconsistent with the amended complaint's allegations and the publicly available materials cited therein. Defendants ignore that the FCC "has a long-standing goal of promoting *diversity in ownership* of broadcast stations to ensure that *diverse viewpoints and perspectives are available to the American people.*" Am. Compl. ¶104 (emphasis added) (quoting *Promoting Diversification*, 31 FCC Rcd. at 398); *see, e.g.*, *Statement of Pol'y on Minority Ownership of Broad. Facilities*, 68 F.C.C.2d 979, 981 (1978) (explaining that "minority participation in the ownership and management of broadcast facilities results in a more diverse selection of programming" and "foster[s] the inclusion of minority views in the area of programming"). The FCC has long explored "new initiatives to increase ownership of … mass media facilities by minorities" for the "purpose" of "maximizing the diversity of points of view available to the public." *In re Pol'ys & Rules Regarding Minority & Female Ownership of Mass Media Facilities*, 10 FCC Rcd. 2788, 2788 (1995). In the FCC's view, minority

ownership and viewpoint diversity are one and the same, as the amended complaint alleges. Am. Compl. ¶¶104-07. Mr. Kim's acquiring TEGNA would have created the largest-ever minority-owned station group in the United States—and the only minority-owned group in the top 10. *Id.* ¶118. The company would have been led by a 50% minority board. *Id.* Yet the straw objectors maintained that the deal "does nothing to increase ownership opportunities for … people of color" and "does not promote ownership diversity as it is understood … by commission policy." *Id.* ¶147.

Nor can Defendants explain away objectors' references to "shadowy foreign investors" simply as concerns about "off-shore investment funds," DISH 8, "*unknown offshore investors*," Common Cause 15; UCC 19, or "foreign *companies*," Unions 21. As the amended complaint alleges, Cayman Islands and British Virgin Islands funding sources are common for major acquisitions given their obvious tax advantages. Am. Compl. ¶¶71, 74, 76-77, 148; *see also id.* ¶77 (showing FCC has found that expanded access to capital furthers its stated diversity goals). Standard General disclosed those funding sources at the very beginning of the FCC proceedings. *Id.* ¶122 (citing Amended Petition for Declaratory Ruling of Teton Parent Corp., *In re Teton Parent Corp.*, MB No. 22-166 (Mar. 23, 2022), https://perma.cc/H6FU-9HGR). Standard General's filings also made clear that investors would have no role in the operations or management of the stations. *Id.* They were not "*unknown,*" *contra* Common Cause 15; UCC 19, or "anonymous," *contra* DISH 18; Unions 21, or "undisclosed," DISH 8; UCC 18-19. Indeed, the FCC had granted

countless petitions of this sort, often without objection, finding that offshore investment in broadcasting is in the public interest and recognizing that increased access to capital is necessary to achieve its goal of increasing minority ownership. Am. Compl. ¶¶72 & n.14, 77 & nn.16-17. The amended complaint alleges that references like "shadowy foreign investors" and concerns about "the non-citizens … influenc[ing] domestic elections" were not invoked in other deals with the same funding sources. *Id.* ¶¶148-51; *see id.* ¶¶77, 110, 320. Nor were they expressed more recently in the Audacy license-transfer proceeding, which had known "foreign ownership interests" and generated significant public controversy given the potential impact on the 2024 election. *Supra* pp.19-20.

Even if the Court accepted Defendants' interpretation of their statements, despite the inference owed to Plaintiffs, the amended complaint plausibly establishes "that the intent to discriminate is implicit in these comments." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996). It is well established that "[r]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016). Whether such "code words," *id.*, evidence racial animus may depend on factors including "context," "local custom," and "historical usage," *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

Here, "the complaint, assessed as a whole," shows that Defendants' FCC filings, "can be reasonably understood" as reflecting racial animus. *Vullo*, 602 U.S. at 193-94.

Objectors made their comments about the deal not promoting diversity in the context of the FCC's longstanding goal and efforts to increase minority ownership. Am. Compl. ¶¶104-07. They stoked concerns of "shadowy foreign investors" in Mr. Kim's deal, even though they did not raise any such "foreign" concerns for other acquisitions. *Id.* ¶¶148-51, 174, 320. And their "foreign" concerns reached the highest levels of government when then-Speaker Pelosi wrote a rare letter opposing the deal, *id.* ¶¶177-78, after she was seemingly misinformed that TEGNA would be foreign-owned even though Mr. Kim was a Korean American, *id.* ¶182. The concerns were baseless—Plaintiffs' funding sources were in the Caymans and British Virgin Islands, but Mr. Goodfriend was invoking "tensions in the Taiwan Strait." *Id.* ¶¶110, 122, 150, 174; *see id.* ¶¶71-78. And the baseless concerns are indicative of racial animus. As the amended complaint alleges, "Asian Americans, because of their race, are often treated 'as foreigners, regardless of their citizenship status or how long they or they family have lived in the U.S.'" *Id.* ¶149 (quoting Neil G. Ruiz et al., *Asian Americans and the 'forever foreigner' stereotype*, Pew Rsch. Ctr. (Nov. 30, 2023), https://perma.cc/3CEX-UC53); *see Chang v. County of Siskiyou*, 2024 WL 3890000, at *11-12 (E.D. Cal. Aug. 21, 2024) (holding statements characterizing Asian Americans as "not true 'citizens'" reflected racial animus); *see also Mhany Mgmt.*, 819 F.3d at 608-10 (citing "[e]mpirical evidence" supporting district court's conclusion that opposition to affordable and multi-family housing "reflected race-based animus"). Objectors' statements "send a clear message and carry the distinct tone of racial motivations and implications."

*Aman*, 85 F.3d at 1083. Public "reaction … further confirms the communications' [racial] nature." *Vullo*, 602 U.S. at 193; *see* Am. Compl. ¶¶152-55, 235-39. Construing the allegations and drawing inferences in Plaintiffs' favor, the FCC filings, at a minimum, "contained such code words consisting of stereotypes" that "provide plausible circumstantial evidence" that the opposition "was motivated in part by animus." *Ave. 6E Invs.*, 818 F.3d at 506-07.

**b.** Plaintiffs also establish discriminatory purpose of the Goodfriend Defendants, the Unions, Common Cause, and UCC through their different treatment of similarly situated license-transfer applicants. *See, e.g., Brown*, 774 F.3d at 1023; *Wilson*, 315 F. Supp. 3d at 400. Shown above, Plaintiffs are similarly situated to the license-transfer applicants in the Apollo-Cox, Scripps-ION, Gray-Quincy, and Gray-Meredith deals and of a different race. *Supra* pp.64-68. The Apollo-Cox deal required a petition for declaratory ruling because of Cayman Islands funding, yet no Defendant opposed the deal on that ground with references like "shadowy foreign investors" or concerns about "non-citizens … influenc[ing] domestic elections." *Id.* ¶¶110, 148-51, 320. While the Apollo-Cox deal involved private equity and carried the potential to slash jobs and increase retransmission fees, NewsGuild and NABET did not oppose the deal. *Id.* ¶¶109-111, 311. Furthermore, no Defendant here opposed the Scripps-ION, Gray-Quincy, or Gray-Meredith deals, which increased industry consolidation and carried the potential to cut jobs and increase retransmission fees. *Id.* ¶¶112-14, 311. For both Gray-Quincy and Gray-Meredith, Mr.

Allen and his black-owned Allen Group benefited by acquiring divested stations, but he did not benefit in Plaintiffs' deal. *Id.* ¶¶113-14, 133, 140, 320. And just recently, none of the straw objectors opposed the Skydance-Paramount deal, despite ongoing public discussion over Paramount's job cuts and the potential for more "post-closing." *Supra* pp.21-22. And Mr. Goodfriend, representing different unions, has pushed for merger conditions addressing station-level conditions, despite dismissing Standard General's binding job commitments as "meaningless." *Id.* The different treatment of similarly situated applicants by the Goodfriend Defendants, the Unions, Common Cause, and UCC establishes discriminatory intent. *Brown*, 774 F.3d at 1023; *Wilson*, 315 F. Supp. 3d at 400.

## C.  Count III: Conspiracy to interfere with civil rights, 42 U.S.C. §1985(3)

Count III asserts a claim under 42 U.S.C. §1985(3) against Chairwoman Rosenworcel, Ms. Saurer, and all private Defendants. Am. Compl. ¶¶351-56. Section 1985(3) provides relief against anyone who conspires "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws." §1985(3). A plaintiff states a §1985(3) claim by alleging (1) a conspiracy (2) for the purpose of depriving a person of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) causing injury. *Wilson*, 315 F. Supp. 3d at 400-01. The plaintiff must show "that some racial … invidiously discriminatory animus lay behind the conspirators' action." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993) (cleaned up).

Detailed above, *supra* pp.7-18, the amended complaint spends several pages outlining Defendants' unlawful conspiracy. *See* Am. Compl. ¶¶269-323.

Plaintiffs' allegations state a §1985(3) claim in two ways. First, the private Defendants conspired with Chairwoman Rosenworcel and Ms. Sauer to deprive Plaintiffs of their equal protection rights—for the FCC to treat them differently than similarly situated applicants because of Mr. Kim's race. Am. Compl. ¶¶311-13, 331, 353; *see United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*, 463 U.S. 825, 831-34 (1983). Second, the private Defendants conspired to deprive Plaintiffs of their rights to make and enforce contracts free of racial discrimination under §1981. *E.g.*, Am. Compl. ¶¶16, 18-19, 22, 137, 278-79, 353; *see Nanko Shipping, Guinea v. Alcoa, Inc.*, 330 F. Supp. 3d 439, 449 (D.D.C. 2018); *accord Alder v. Columbia Hist. Soc.*, 690 F. Supp. 9, 15 (D.D.C. 1988) ("Rights created under §1981 are federal rights that may form the basis of a claim under §1985(3)."). In furtherance of the conspiracy, Defendants, *inter alia*, filed baseless petitions and objections and generated opposition from members of Congress with six-figure political contributions to delay the FCC proceedings and provide a pretext for the pocket-veto HDO. *E.g.*, Am. Compl. ¶¶130, 135, 147-51, 162-68, 171, 174-77, 179-81, 187, 192, 201-06, 208, 222, 268. Defendants' acts derailed an $8.6 billion acquisition and caused Plaintiffs at least hundreds of millions in damages. *Id.* ¶¶263, 356. Defendants acted with the requisite discriminatory animus against Mr. Kim because he was Asian American, as explained above. *Supra* pp.57-68, 73-81.

Defendants argue Plaintiffs have not stated a §1985(3) claim because Plaintiffs (1) have not established an underlying violation of a federal right, Goodfriend 20; Common Cause 29; Allen 32-33; UCC 36-37; (2) have not plausibly alleged conspiratorial agreement, Goodfriend 19-22; Unions 22-24; FCC 32; Common Cause 29-30; DISH 20-21, 33-34; Allen 33-36; UCC 37; and (3) have not pleaded racial animus, Goodfriend 9-17; Unions 24; FCC 33-38; DISH 15-20, 33-34. These arguments fail.

**1. *Federal right.*** The Goodfriend, Allen, Common Cause, and UCC Defendants argue Plaintiffs' §1985(3) claim fails absent an underlying civil rights violation. Goodfriend 20; Common Cause 29; Allen 32-33; UCC 36-37. The Allen, Common Cause, and UCC Defendants base their argument on Plaintiffs not establishing a §1981 violation, while the Goodfriend Defendants do not specify the disputed underlying violation. But the complaint adequately alleges a §1981 violation. *Supra* pp.69-81. And it adequately alleges an equal protection violation, *supra* pp.53-69, which Defendants fail to contemplate as a separate basis for the §1985(3) claim. *See* Am. Compl. ¶353. Plaintiffs have thus plausibly established violations of "substantive federal right[s]," *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 470, 479 (D.D.C. 1994), for their §1985(3) claim.

**2. *Conspiracy.*** All Defendants argue that Plaintiffs have not plausibly alleged a conspiratorial agreement. Goodfriend 19-22; Unions 22-24; FCC 32; Common Cause 29-30; DISH 20-21, 33-34; Allen 33-36; UCC 37. Defendants ignore the amended complaint's allegations and reasonable inferences to be drawn in Plaintiffs' favor.

**a.** In pleading a conspiracy, "[p]roof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). "The circumstances of the wrongdoing generally dictate what evidence is relevant or available in deciding whether an agreement exists." *Id.* at 486. Courts consider whether defendants "are pursuing the same goal," whether they "are in contact with one another," "the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity." *Id.* at 481, 486. Courts "easi[ly]" infer agreement where, as here, defendants "are on the scene together at the same time performing acts in support of one another." *Id.* at 481. Courts also consider a defendant's "motivation to enter into a conspiracy" and whether he "acted contrary to his own independent interest." *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1488 & n.12 (D.C. Cir. 1984); *see also United States v. Hewitt*, 999 F.3d 1141, 1147 (8th Cir. 2021) (circumstantial evidence probative of conspiratorial agreement includes "common motive," "mutual knowledge with joint action," "repeated acts," and "the giving out of misinformation to cover up").

The amended complaint amply supports the alleged conspiracy, detailing circumstantial evidence that warrants an inference of conspiratorial agreement. Plaintiffs allege meetings and conversations among Defendants at critical times, including Chairwoman Rosenworcel's meeting with Mr. Ergen less than a week after the FCC proceedings began, Am. Compl. ¶127, Mr. Goodfriend's meeting with Ms. Saurer the day NewsGuild and Common Cause appeared on the docket to oppose Plaintiffs' deal, *id.* ¶¶129-30, Mr.

Allen's phone call to Mr. Kim soon thereafter trying to leverage the early speedbumps at the FCC for a piece of TEGNA, *id.* ¶133, Mr. Saurer's emails to the straw objectors, including Chairwoman Rosenworcel's request to meet, *id.* ¶¶132, 146, Ms. Saurer's voicemails for Mr. Goodfriend when Standard General made its binding commitments and the FCC opened a third comment period, *id.* ¶¶197-203, Mr. Ergen's second meeting the Monday after a Friday event hosted by Mr. Allen for prominent Democratic politicians as the clock for FCC approval wound down, *id.* ¶¶210-11, and NewsGuild's president and Chairwoman Rosenworcel speaking the day before the HDO issued, *id.* ¶213.

Plaintiffs allege that the Allen and DISH Defendants had a common motive to kill the deal and a longtime lobbyist in Mr. Goodfriend, who represented objectors while actively lobbying for the Allen Group and DISH. *Id.* ¶¶137-38, 158-60, 271, 279, 304. Mr. Goodfriend boasted that he "assembled a coalition" of objectors to oppose the deal. *Id.* ¶268. When first appearing in the proceedings, those objectors sought an extension and further information about the transaction, including Mr. Allen's failed bid. *Id.* ¶130. When the Media Bureau granted the extension and ordered Standard General to produce highly sensitive commercial documents, Mr. Allen called Mr. Kim to try to get a piece of TEGNA, suggesting that including him in the deal would smooth things over at the FCC. *Id.* ¶¶132-33. When Mr. Kim declined, objectors ramped up their opposition and Mr. Goodfriend formally appeared on their behalf. *Id.* ¶¶147-58. Plaintiffs allege how objections furthered the Allen and DISH Defendants' interests and conflicted with the straw

objectors' own professed interests like diversity in ownership, protecting jobs, and consumer pricing. *Id.* ¶¶139, 141-42, 147-48. Plaintiffs allege Mr. Allen's six-figure donations contemporaneous with Speaker Pelosi's letter opposing the deal, which her staff stated was a favor for a donor, followed by Senator Warren's letters—opposition Mr. Goodfriend concededly "generated." *Id.* ¶¶175-81, 205-06, 257, 259, 268.

Plaintiffs further allege that DISH first publicly objected and the straw objectors continued to object *after* Standard General waived contractual clauses, alleviating pricing concerns, and made binding commitments not to cut jobs. *Id.* ¶¶195-97, 199-201, 203-04, 207-08, 303. The objectors then opposed each move by Standard General simply to get a vote on the applications. *Id.* ¶¶240-43, 245. FCC staff falsely told members of Congress there was no way to reverse the HDO. *Id.* ¶244. And when Plaintiffs tried to meet with objectors to address their concerns post-HDO, the DISH Defendants, Common Cause, and UCC refused, *id.* ¶¶249-50, and the Goodfriend Defendants and the Unions would not meet absent a sweeping release of liability, *id.* ¶248. Liability for what? All the while Mr. Allen was waiting in the wings, still "in the fight" for TEGNA. *Id.* ¶¶128, 254, 264.

Plaintiffs' "allegations of conspiracy are more than just conclusory" and "are sufficient to indicate a plausible specific intent to agree." *Nanko Shipping*, 330 F. Supp. 3d at 450. The amended complaint sets forth "[m]ututally supportive activity by parties in contact with one another over a long period," which reflects "a common plan." *Halberstam*, 705 F.2d at 481. In arguing otherwise, Defendants ask the Court to "tak[e] the allegations

in isolation and fail[] to draw reasonable inferences in [Plaintiffs'] favor in violation of th[e] [Supreme] Court's precedents." *Contra Vullo*, 602 U.S. at 194-95.

Defendants scarcely acknowledge the most obvious explanation for the FCC's unprecedented derailment: Byron Allen, his public statements that he was still "in the fight" for TEGNA, his private attempt to get a piece of TEGNA from Mr. Kim, and his history of leveraging race in commercial settings. *See* Am. Compl. ¶¶17-19, 22, 128, 133, 254, 264, 280-89. Mr. Allen's deals never faced delays or objections like those made here. *Id.* ¶¶98, 113-15, 140, 277, 312. The straw objectors requested, and the Media Bureau granted, production of information about his failed bid for TEGNA. *Id.* ¶¶130, 168-73. What Defendants characterize as a "false narrative," DISH 1, 31, a "conspiratorial fever dream," Common Cause 1, and a "fantasy conspiracy," UCC 8, was in truth a series of events lambasted in real time by members of Congress, former FCC commissioners, and the press, Am. Compl. ¶¶179 & n.110, 210 & n.137, 232, 246, 258, 269, 276 & n.200.

**b.** Defendants' attempts to poke holes in the alleged conspiracy fail to "consider the allegations as a whole" and "draw reasonable inferences in [Plaintiffs'] favor." *Vullo*, 602 U.S. at 194-95. *See, e.g.*, Unions 22 (arguing "[n]o improper agreement can be inferred" from Mr. Goodfriend's meeting with Ms. Saurer the same day NewsGuild appeared to oppose the transaction); DISH 21 (dismissing allegations that Mr. Goodfriend was acting on DISH's behalf as "threadbare allegations"); Allen 34-35 (claiming "Plaintiffs do not describe when Allen Media purportedly entered into an agreement"). Only by ignoring

the complaint can Defendants claim it does not adequately allege the timing and opportunities for Defendants' unlawful conspiracy. Consider the complaint's detailed allegations about the first three months of the FCC's review:

- **April 2022:** Days after the FCC's review officially began, Mr. Ergen has a scheduled breakfast with Chairwoman Rosenworcel in Dupont Circle. Am. Compl. ¶127.

- **May 2022:** Days after Mr. Allen announced he was still "in the fight" for TEGNA and it was only "round one," Mr. Allen and Mr. Ergen's longtime lobbyist, Mr. Goodfriend, has a scheduled meeting with Ms. Saurer ostensibly about a diversity initiative. *Id.* ¶¶128-29. The same day objectors appeared on the Standard General-TEGNA docket asking for more time and for information about Mr. Allen's failed bid, among other things. *Id.* ¶130.

- **June 2022:** A day or so after the Media Bureau ordered Standard General to produce more documents about "negotiating strategy" and other confidential information, Mr. Allen calls Mr. Kim unsolicited to ask whether he could have some TEGNA stations, suggesting it might smooth things over at the FCC. *Id.* ¶¶132-33.

Defendants ignore these allegations and reasonable inferences to be drawn from them and others. For example, the Unions contend it was just coincidence that Mr. Goodfriend was meeting with Ms. Saurer the same day they asked for information about Mr. Allen. Unions 22. They ignore that Mr. Goodfriend—despite not publicly appearing in the proceedings until later—ultimately took credit for "assembl[ing] a coalition" of objectors "to join the unions in opposing the transaction," beginning with Common Cause. Am. Compl. ¶¶130, 268, 290. *Contra* Unions 23 n.13 (claiming Mr. Goodfriend "became the Unions' attorney just before September"). And the Unions ignore the reasonable inference that Mr. Goodfriend used that meeting to notify Ms. Saurer of Mr. Allen's failed

bid for TEGNA, his so-called "coalition's" incoming opposition to Mr. Kim, and Mr. Allen's plans to leverage early speed bumps at the FCC to get a piece of TEGNA from Mr. Kim. Am. Compl. ¶¶278-79. Likewise, the DISH Defendants' efforts to downplay their connection ignore that Mr. Goodfriend represented both DISH and the Allen Group during the relevant time, *see id.* ¶¶25, 38, 138, 158-60, as well as allegations of his involvement throughout the FCC proceedings, *see id.* ¶¶129, 137, 157, 162-64, 166, 171, 174, 179, 187, 192, 198, 202-03, 205-06, 208, 248, 268, 290-98. The DISH Defendants also ignore that Mr. Ergen again met with Chairwoman Rosenworcel the Monday after Mr. Allen's Friday event where Mr. Allen was reportedly courting prominent Democrats to derail the deal, *id.* ¶¶210-11, that Standard General's request to meet with DISH was brought to Mr. Ergen who personally refused, *id.* ¶249, and that Mr. Goodfriend confirmed to an associate of Mr. Kim's that Mr. Ergen was involved and wanted the deal killed, *id.* ¶297. And contrary to the Allen Defendants' claim that the complaint does not say when the conspiracy began, Allen 34-35, the complaint plausibly alleges that the conspiracy originated with Mr. Allen after losing the auction for TEGNA "sometime between February 2022 and May 2022." *Id.* ¶278. From the start, the Goodfriend "coalition" demanded information about alternative buyers for TEGNA—*i.e.*, Mr. Allen. *Id.* ¶130. And the Media Bureau later agreed it wanted that information about Mr. Allen too. *Id.* ¶¶168-70. The complaints' detailed timeline belies Defendants' arguments that the complaint does not support an inference of conspiracy. The Court "could only reach this conclusion by taking

the allegations in isolation and failing to draw reasonable inferences in [Plaintiffs'] favor in violation of th[e] [Supreme] Court's precedents." *Vullo*, 602 U.S. at 194-95.

The Unions' additional argument that "[n]o 'conspiracy' can exist between an attorney and his client if the attorney is acting 'within the scope of his employment'" is also misplaced. Unions 23. It is hornbook law that the intracorporate conspiracy doctrine barring a principal from conspiring with its own agent does not apply when "independent third parties are alleged to have joined the conspiracy." *Robison v. Canterbury Vill., Inc.*, 848 F.2d 424, 431 (3d Cir. 1988); *see* 15A C.J.S. *Conspiracy* §§10-11, Westlaw. Plaintiffs' alleged conspiracy includes several independent parties. Am. Compl. ¶¶24-25, 271-323.

Moreover, none of Defendants' proffered "obvious alternative explanation[s]" are a basis for dismissing the complaint. *Contra* FCC 37; Common Cause 30. The FCC Defendants contend that they were genuinely concerned about retransmission fees and job losses, FCC 37, and Common Cause claims it genuinely opposed Plaintiffs' applications "on the same grounds it usually asserts," Common Cause 30. The Court "cannot simply credit" those proffered "alternative explanation[s]." *Vullo*, 602 U.S. at 195; *see Doe v. Roman Cath. Diocese of Greensburg*, 581 F. Supp. 3d 176, 216 (D.D.C. 2022); *see also Oxbow Carbon & Mins. LLC v. Union Pac. R.R. Co.*, 81 F. Supp. 3d 1, 13 (D.D.C. 2015) (noting "allegations contextualizing agreement need not make any unlawful agreement more likely than independent action nor … rule out the possibility of independent action at the motion to dismiss stage"). "Without the benefit of discovery, it is not obvious" that

Defendants' proffered explanations are the "*only*" explanations for their conduct. *2301 M Cinema LLC v. Silver Cinemas Acquisition Co.*, 342 F. Supp. 3d 126, 136 (D.D.C. 2018). Nor are those proffered explanations even plausible given the FCC's own precedent foreclosing the consideration of retransmission fees and job losses and rejecting the straw objectors' very same objections. Am. Compl. ¶¶98 & n.24, 111, 114, 130, 143 & n.75. Common Cause's proffered explanation also does not explain its absence from the Gray deals where Mr. Allen benefitted by acquiring divested stations—deals that implicated the same purported concerns Common Cause "usually asserts," Common Cause 30. *See* Am. Compl. ¶¶113-14, 140, 311, 320. But even if such explanations were plausible, they do not support dismissal over Plaintiffs' plausible explanation. *See Banneker Ventures*, 798 F.3d at 1129.

The private Defendants also take issue with the allegations made on information and belief. Goodfriend 15, 21; Unions 16-19; Common Cause 11-14; DISH 20-21, 32; Allen 35; UCC 25, 28-29, 37. Allegations on "information and belief" are permissible where "the necessary information lies within the defendant's control" and the allegations are "accompanied by a statement of the facts upon which the allegations are based." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994). Thus, "making allegations based on information and belief is not necessarily fatal to a plaintiff's claims, particularly where … 'the belief is based on factual information that makes the inference of culpability plausible.'" *Kvech v. Holder*, 2011 WL 4369452, at *3 n.7 (D.D.C. Sept. 19, 2011); *see also*

*Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012) (Contreras, J.). Conspiracy claims are no exception. *E.g., Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 957 (8th Cir. 2023); *Soo Park v. Thompson*, 851 F.3d 910, 916 n.3 (9th Cir. 2017).

Only the Unions address the legal standard for allegations on information and belief, but their arguments fail. *See* Unions 16-19. The necessary information supporting Plaintiffs' allegations on information and belief lies in Defendants' controls—for example, Mr. Goodfriend's private acts before formally appearing, Am. Compl. ¶¶158, 323, parties' true motives, *id.* ¶¶171, 220, 314-15, and private conversations and communications among Defendants, *id.* ¶¶221, 278, 296, 304. *See, e.g., United States ex rel. Scollick v. Narula*, 2017 WL 3268857, at *10 (D.D.C. July 31, 2017) (accepting allegations on information and belief relating to defendant's "knowledge and intent"); *Kelleher v. Dream Catcher, L.L.C.*, 263 F. Supp. 3d 322, 326 (D.D.C. 2017) (permitting allegations on information and belief where "Plaintiff simply has no way to access, without the benefit of discovery, the financial records necessary"). And each allegation is supported by facts upon which it is based. *See, e.g., Zapata v. B. Coleman Flooring, Installation, LLC*, 2019 WL 13399855, at *2 (D.D.C. Jan. 16, 2019); *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 189 (D.D.C. 2017). The Unions can only argue otherwise by (again) ignoring the amended complaint's allegations. *See* Unions 17-18. *Contra Vullo*, 602 U.S. at 194-95. For instance, the first allegation they spotlight previews the scope of the conspiracy, Am. Compl. ¶24, which, in addition to the detailed timeline of events, is supported by more than 20 pages outlining each

conspirator's alleged involvement, *id.* ¶¶271-323. Plaintiffs' allegations on information and belief are not "improper." *Contra* Unions 19.

Finally, despite ignoring many factual allegations supporting the alleged conspiracy, Defendants fault Plaintiffs for not including *more* allegations. *See* Goodfriend 21 ("sparse and vague allegations"); Unions 19 ("no concrete facts"); Common Cause 29 ("fail to allege a single fact"); DISH 20 ("not a single factual allegation"); UCC 8 ("without factual support"). But courts have long recognized that many facts required to plead a conspiracy "by their nature would be inaccessible to Plaintiff." *Mandelkorn v. Patrick*, 359 F. Supp. 692, 696 (D.D.C. 1973). Because "conspiracies are by their very nature secretive operations," they often are "proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 34 (D.D.C. 2008) ("[D]irect allegations of conspiracy are not always possible given the secret nature of conspiracies. Nor are direct allegations necessary."). Indeed, "in most civil conspiracy cases" courts must "infer an agreement from indirect evidence." *Halberstam*, 705 F.2d at 486. Thus, "'allegations of circumstantial evidence' can survive a motion to dismiss." *Diocese of Greensburg*, 581 F. Supp. 3d at 212; *see, e.g.*, *Freeman v. Giuliani*, 2022 WL 16551323, at *10-11 (D.D.C. Oct. 31, 2022). Defendants ignore this established precedent. Plaintiffs plausibly allege a conspiracy.

**3.** ***Racial animus.*** The FCC, Goodfriend, DISH, and Union Defendants argue Plaintiffs have not plausibly alleged racial animus behind the conspiracy. Goodfriend 9-

17; Unions 24; FCC 33-38; DISH 15-20, 33-34. Plaintiffs establish racial animus of these Defendants for the §1985(3) claim for the reasons explained above on Plaintiffs' equal protection and §1981 claims. *Supra* pp.57-68, 73-81; *see, e.g.*, *Belfast v. Upsilon Chapter of Pi Kappa Alpha Fraternity at Auburn Univ.*, 267 F. Supp. 2d 1139, 1146 (M.D. Ala. 2003).

The DISH Defendants (against whom Plaintiffs do not assert a §1981 claim) argue allegations of DISH's economic concerns with the merger preclude a showing of racial animus. DISH 15-16. They do not. Section 1985(3)'s "'intent to deprive of a right' requirement demands that the defendant … act *at least in part* for the very purpose of producing it." *Bray*, 506 U.S. at 275-76 (emphasis added); *see, e.g.*, *Wells v. Rhodes*, 928 F. Supp. 2d 920, 931 (S.D. Ohio 2013). Thus, the DISH Defendants' (or any other Defendant's) mixed motives in no way preclude §1985(3) liability. *See Hobson v. Wilson*, 737 F.2d 1, 22-24 (D.C. Cir. 1984) (upholding §1985(3) verdict where conspiracy was "aimed at plaintiffs at least in part on account of their *racial politics*," *i.e.*, "a commingling of racial and political motives"), *abrogated in part on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993); *see also Grimes v. Smith*, 776 F.2d 1359, 1366 & n.12 (7th Cir. 1985) (holding §1985(3) "does not reach nonracial political conspiracies" but reaches "conspiracies animated by *both* racial and political motives"); *Emanuel Displaced Persons Ass'n 2 v. City of Portland*, 704 F. Supp. 3d 1088, 1107 (D. Or. 2023) (holding plaintiff stated §1985(3) claim given "plausible inference" that defendant "was motivated, at least in part, by racial animus" and not "only … economic or other legitimate motives").

The DISH Defendants also argue "[t]here are no genuine allegations that Defendants DISH or Ergen harbored any race-based animus against Plaintiffs." DISH 16. As a matter of law, the DISH Defendants ignore that "openly racial motives" held by members of a conspiracy "can be imputed" to coconspirators. *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000); *cf. Lagayan v. Odeh*, 199 F. Supp. 3d 21, 31-32 (D.D.C. 2016) (recognizing that statements can "be imputed" to coconspirators "for the purpose of establishing *their* racial animus"). As a matter of fact, the DISH Defendants ignore the amended complaint's allegations about coconspirators' race-based and xenophobic rhetoric. *See* Am. Compl. ¶¶147-51, 174. That includes public filings with, for example, an inexplicable reference to "increased tensions in the Taiwan Strait" as a reason to keep Mr. Kim—an American citizen raised in New York—out of local news. *Id.* ¶174. As shown, these public statements plausibly establish racial animus. *Supra* pp.74-80. Upon entering the alleged conspiracy, DISH and Mr. Ergen became liable for acts of coconspirators in furtherance of the conspiracy, including those public filings. *See, e.g., Halberstam*, 705 F.2d at 481; *Wilson*, 315 F. Supp. 3d at 401. The DISH Defendants do not address that issue. And for the same reason, the Goodfriend Defendants cannot distance themselves from statements in earlier filings that Mr. Goodfriend did not personally sign and file. *Contra* Goodfriend 9-12. Plaintiffs have alleged a plausible §1985(3) claim.

**D. Count IV: Neglect to prevent conspiracy, 42 U.S.C. §1986**

Count IV asserts a claim under 42 U.S.C. §1986 against Chairwoman Rosenworcel, Ms. Saurer, and all private Defendants. Am. Compl. ¶¶357-63. Section 1986 generally "holds civilly accountable those who have knowledge of a conspiracy, as delineated in §1985, and failed to prevent such wrongdoing." *Patterson v. Harris*, 2023 WL 346096, at *11 (D.D.C. Jan. 20, 2023). To state a §1986 claim, a plaintiff must allege that the defendant (1) had "knowledge" of a §1985 conspiracy, (2) had the "power to prevent or aid in pre-venting" the conspiracy, (3) "neglect[ed] or refuse[d]" to do so, and (4) a "wrongful act" was committed. 42 U.S.C. §1986; *see Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994). Plaintiffs allege each element. *See* Am. Compl. ¶¶357-63. Having stated a §1985(3) claim against Defendants as members of the conspiracy, Plaintiffs likewise state a §1986 claim. *See, e.g., Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 2006 WL 8439627, at *7 (E.D.N.Y. Aug. 14, 2006); *Bergman v. United States*, 551 F. Supp. 407, 415 (W.D. Mich. 1982).

The Allen and FCC Defendants do not specifically contest the merits of Plaintiffs' §1986 claim, so the claim should proceed against them. *See Doe #1 v. Am. Fed'n of Gov't Emps.*, 554 F. Supp. 3d 75, 97-98 (D.D.C. 2021); *D'Amore v. Small Bus. Admin.*, 2021 WL 6753481, at *4 (D.D.C. Sept. 16, 2021). The other Defendants challenge Plaintiffs' §1986 claim on three grounds.

**1.** The DISH Defendants, the Goodfriend Defendants, the Unions, Common Cause, and UCC argue that Plaintiffs' §1986 claim fails without an underlying §1985(3) claim.

Goodfriend 20; Unions 25; Common Cause 30; DISH 34; UCC 37. Plaintiffs do not dispute this point. *E.g.*, *In re Rodriguez*, 2005 WL 3843612, at *4 (D.C. Cir. Oct. 14, 2005) (per curiam). But as shown, Plaintiffs have plausibly alleged a §1985(3) claim. *Supra* pp.81-95.

**2.** The DISH Defendants, the Unions, Common Cause, and UCC contest the second element, arguing that they did not have "the power to prevent the purported conspiracy," DISH 34, or "control" or "actual authority" over the FCC and its decisions, Unions 25; Common Cause 30; DISH 34; UCC 37. But a defendant need only have the power to "*aid in* preventing" the conspiracy. §1986 (emphasis added). This is not a high bar. Courts have sustained §1986 claims against private parties based on a defendant's "leadership role and influence" in a conspirator company, *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 759 F. Supp. 1339, 1352 (W.D. Wis. 1991), where a defendant "did not attempt to dissuade" others from committing wrongful acts, *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1007, and where defendants were members of a conspirator association and simply "were present for, and participated in, [a] meeting" where a wrongful act was planned, *Sealed Plaintiff 1 v. Front*, 2024 WL 1395477, at *27 (E.D. Va. Mar. 31, 2024).

Plaintiffs allege Mr. Ergen's "leadership role and influence" over DISH, *see Lac du Flambeau*, 759 F. Supp. at 1352, including his personal refusal of Standard General's request to meet with DISH, Am. Compl. ¶¶36, 249. The DISH Defendants also had "influence" over Mr. Goodfriend, who previously worked at DISH, has represented DISH for

more than 15 years, and actively lobbied the FCC on behalf of DISH during the Standard General-TEGNA proceedings. *Id.* ¶160. The Unions likewise had "influence" over Mr. Goodfriend given their principal-agent, attorney-client relationship. *Lac du Flambeau*, 759 F. Supp. at 1352. The straw objectors filed baseless objections and had *ex parte* meetings with Ms. Saurer and other FCC officials. *E.g.*, Am. Compl. ¶¶129-30, 135, 162-64, 166, 171, 174, 183, 192, 208. Several times Ms. Saurer contacted them directly about their filings and developments in the proceedings. *Id.* ¶¶132, 146, 198, 202. During the proceedings, Mr. Ergen personally met with Chairwoman Rosenworcel twice at key times, *id.* ¶¶127, 211, and NewsGuild's president spoke with Chairwoman Rosenworcel days before the pocket-veto HDO issued, *id.* ¶¶213, 221. It is thus plausible that the DISH Defendants and the straw objectors "were present for, and participated in, [a] meeting" where acts to advance the conspiracy were planned or discussed, *Front*, 2024 WL 1395477, at *27. It is also plausible that they had some power to at least "aid in preventing" the alleged conspiracy, even if only "attempt[ing] to dissuade" Mr. Goodfriend, Chairwoman Rosenworcel, Ms. Saurer, or others from carrying out the conspiracy to kill Plaintiffs' deal. *Vietnamese Fishermen's Ass'n*, 518 F. Supp. at 1007.

Common Cause and UCC cite *Smith v. Trump*, which held that a private individual who is part of the conspiracy must have "actual authority to compel others to act or

refrain from acting." 2023 WL 417952, at *7 (D.D.C. Jan. 26, 2023).[5] This standard is no-where in the statute's text, which requires only that the defendant "by reasonable dili-gence could have prevented" the wrongful act. §1986. It is also an outlier in the case law. Generally, where a plaintiff "establishes the existence of the §1985(3) conspiracy and [the defendants'] advance knowledge of it, then whether or not they had the power to prevent its effectuation becomes an issue of proof." *Waller v. Butkovich*, 584 F. Supp. 909, 943 (M.D.N.C. 1984); *see Front*, 2024 WL 1395477, at *27 (explaining "discovery will result in a full record" to challenge "what supports" §1986 elements); *see also, e.g.*, *Mitchell v. County of Nassau*, 2007 WL 1580068, at *6 (E.D.N.Y. May 24, 2007); *Doe ex rel. Saulsbury v. County of Kankakee*, 2004 WL 1557970, at *7 (N.D. Ill. July 8, 2004). *Smith*'s standard also cannot be squared with §1986 claims against *public* officials. *Compare Smith*, 2023 WL 417952, at *7 (holding insufficient that defendants could have "inform[ed] law enforce-ment"), *with Peck v. United States*, 470 F. Supp. 1003, 1012-13 (S.D.N.Y. 1979) (FBI agents "could have passed along the information they had" to DOJ), *and Symkowski v. Miller*, 294 F. Supp. 1214, 1217 (E.D. Wis. 1969) (police officer merely "told" another officer "to stop beating plaintiff"). The Court should reject *Smith*'s novel reading of §1986. Even if *Smith* were applied, it would only support dismissal against Common Cause and UCC as "mere

---

[5] While Common Cause represents that the D.C. Circuit affirmed *Smith v. Trump*, *see* Common Cause 30, the D.C. Circuit did not consider or address the §1986 claim, *see Smith v. Trump*, 2023 WL 9016458, at *1 (D.C. Cir. Dec. 29, 2023) ("On appeal, the only question is whether President Trump has demonstrated his entitlement to official-act immunity.").

foot solider[s] [sic]"; all other Defendants—who do not cite *Smith*—either had "actual authority to compel others" or were "leader[s]" or conspirators "of higher rank." 2023 WL 417952, at *7.

**3.** Finally, only the Unions argue that Plaintiffs' §1986 claim is time barred. Unions 25. It is not. An action under §1986 must be "commenced within one year after the cause of action has accrued." 42 U.S.C. §1986. "A right of action 'accrues' when the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to 'file suit and obtain relief.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024). A right to sue arises "only after the plaintiff suffers the injury required to press her claim in court," *id.* at 2451—that is, "when the wrongful act or omission results in damages," *Wallace v. Kato*, 549 U.S. 384, 391 (2007). Here, Plaintiffs had no damages until May 22, 2023, when the financing agreements expired resulting in termination of the merger agreement. Am. Compl. ¶¶13-14, 261, 263. The termination triggered the $136 million breakup fee, cemented Standard General's loss of $85 million in its 10.6 million shares of TEGNA, and caused Standard General's $70 million in transaction costs to be "wasted." *E.g.*, *id.* ¶¶261, 263, 350. Those are the injuries for which Plaintiffs seek redress against the Unions under §1986. In the one case the Unions cite, the "Plaintiff's claim accrued on the day she was terminated" from her job. *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 346, 354 (E.D.N.Y. 2013). So too Plaintiffs' §1986 claim accrued when TEGNA terminated the merger agreement.

Plaintiffs did not "know[] or ha[ve] reason to know of the harm or injury that is the basis of the action" upon issuance of the HDO or the denial of the mandamus petition. *Contra* Unions 25. Plaintiffs' efforts to obtain FCC approval continued past those events through the merger expiration date. They tried to expedite the hearing, to have the ALJ certify the HDO for immediate Commission review, and to appeal directly to the full Commission. Am. Compl. ¶¶240-43. Even accepting the Unions' accrual standard, it was not until April 26, 2023—when the ALJ rejected Standard General's scheduling proposal to complete the hearing by May 17 and suspended the hearing proceeding—that Plaintiffs might have had reason to know that the deal would not be completed. *Id.* ¶242. Yet still, through May 2023, they continued to try to satisfy objectors' purported concerns and meet with Chairwoman Rosenworcel, other commissioners, and objectors to obtain FCC approval. *Id.* ¶¶253, 255-56. Plaintiffs' §1986 claim against the Unions is not time barred.

### E.  Counts V, VI: Tortious interference with contract and prospective business opportunity

Counts V and VI assert claims for tortious interference with contract and tortious interference with prospective business opportunity against all private Defendants. Am. Compl. ¶¶364-81. To state a claim for tortious interference with contract and prospective business opportunity under D.C. law, a plaintiff must allege (1) the existence of a contract or business expectancy, (2) the defendant's knowledge of the contract or business expectancy, (3) intentional interference with the contract or business expectancy, and

(4) damages. *Banneker Ventures*, 798 F.3d at 1134; *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345-46 (D.C. 2015). Plaintiffs satisfy each element.

Plaintiffs allege that Standard General had a merger contract with TEGNA, financing contracts with banks and investment funds, and a business expectancy from the deal. Am. Compl. ¶¶63-66, 365, 375. Plaintiffs allege that Defendants knew of these contracts, their relevant terms, and the business expectancy, as they were widely reported and included in public FCC filings. *Id.* ¶¶67, 366-67, 376. Plaintiffs allege that Defendants interfered with the contracts and business expectancy through their sham petitions and objections, which delayed FCC review of Plaintiffs' applications and provided a pretext for the pocket-veto HDO. *Id.* ¶¶369-70, 378. And Plaintiffs allege resulting damages, including the $136 million breakup fee, $70 million in wasted transaction costs incurred, and billions of dollars in benefits lost had the deal been completed. *Id.* ¶¶13-14, 263, 373, 381.

The Goodfriend Defendants do not address Plaintiffs' tortious interference claims, so the claims should proceed against them. *See Doe #1*, 554 F. Supp. 3d at 97; *D'Amore*, 2021 WL 6753481, at *4. The other Defendants' arguments fall in the following buckets: (1) no contract was breached, DISH 35; Allen 36-37; (2) causation, Unions 27; Common Cause 31; UCC 38; (3) the validity of Plaintiffs' business expectation, Common Cause 31; UCC 40; and (4) the alleged interference either was not "improper" or "wrongful" or was "justified" or "privileged," Unions 26-27; Common Cause 31-32; DISH 35; Allen 37.

**1. Breach.** The DISH and Allen Defendants argue that Plaintiffs' tortious interference with contract claim fails because "[n]o contract was breached." DISH 35; *see* Allen 36 (arguing "there is no underlying contract breach"). But "a breach *per se* is not required" to state a claim under D.C. law; "a 'failure of performance' will suffice." *Meyer Grp., Ltd. v. Rayborn*, 2020 WL 5763631, at *6 (D.D.C. Sept. 28, 2020); *accord Casco Marina Dev., L.L.C. v. D.C. Redev. Land Agency*, 834 A.2d 77, 84 (D.C. 2003). To state a claim for tortious interference with contract, a plaintiff need only allege "that the defendant interfered with the plaintiff's performance under a contract." *PHCDC1, LLC v. Evans & Joyce Willoughby Tr.*, 257 A.3d 1039, 1046 (D.C. 2021); *see Onyeoziri v. Spivok*, 44 A.3d 279, 286 (D.C. 2012) (explaining "the interference need not cause an actual breach … but instead may cause 'merely a failure of performance' by one of the parties"). That is exactly what Plaintiffs allege: Defendants interfered with "Standard General's performance of the merger and financing agreements' condition to obtain FCC approval of the transfer of the broadcast licenses by May 22, 2023." Am. Compl. ¶368. As a result of Defendants' interference, Standard General had to pay TEGNA a break-up fee of $136 million. *Id.* ¶350.

The DISH and Allen Defendants are wrong to argue a breach is "require[d]," DISH 35, or "an essential element of a tortious interference claim," Allen 37. The D.C. Court of Appeals has long explained that "while we have articulated the third element of tortious interference as procurement of breach, … a 'breach' as such is not required, but merely a failure of performance, whether by the terms of the contract in question or not." *Casco*

*Marina*, 834 A.2d at 84; *see Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1039 (D.C. 2015);

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 n.17 (D.C. 2008);

*accord Econ. Rsch. Servs., Inc. v. Resol. Econ., LLC*, 208 F. Supp. 3d 219, 229 n.9 (D.D.C. 2016);

*Mobile Satellite Commc'ns, Inc. v. Intelsat USA Sales Corp.*, 646 F. Supp. 2d 124, 136 n.8

(D.D.C. 2009). Plaintiffs satisfy the element of intentional interference.

**2. *Causation.*** The Unions argue they "were not the cause of Plaintiffs' purported

injuries" because "the FCC was the ultimate decisionmaker, *i.e.*, the intervening or super-

seding cause." Unions 27. Common Cause and UCC similarly argue that the FCC was

"the only entity" with "legal authority to approve the transactions." Common Cause 31;

UCC 39. Common Cause and UCC also argue that they cannot be a but-for cause of Plain-

tiffs' damages if several Defendants were a proximate cause. Common Cause 31; UCC 38.

The FCC's decision-making authority does not break the causal chain here. The

allegations that Defendants "embarked on a long campaign to induce" the FCC "to partly

or wholly displace [Plaintiffs] suffice to plead causation." *Banneker Ventures*, 798 F.3d at

1135. That campaign began with Mr. Allen, after TEGNA rejected his bid and Mr. Kim

politely declined to spin off stations to him. Am. Compl. ¶¶133, 278. Then his longtime

lobbyist, Mr. Goodfriend, took credit for "assemb[ling] a coalition" of objectors—the Un-

ions, Common Cause, and UCC. *Id.* ¶290. His "coalition" sought extensions, demanded

document productions, filed petitions to deny, and lodged objections all to delay the FCC

proceedings past Standard General's merger-agreement deadline. Am. Compl. ¶¶173,

187, 203, 321-23, 369, 378. Several courts have held that allegations of similar tactics to delay agency review or approval of a plaintiff's applications plausibly establish causation of the plaintiff's injuries resulting from the delay. *See, e.g., In re Restasis Antitrust Litig.*, 333 F. Supp. 3d 135, 158-60 (E.D.N.Y. 2018); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1306 (D. Kan. 2018); *In re Suboxone Antitrust Litig.*, 2017 WL 3967911, at *18 (E.D. Pa. Sept. 8, 2017). Indeed, that's the very premise of *Noerr-Pennington*'s sham exception. *Infra* p.128. Defendants cite no case in the context of agency review supporting their causation arguments. *See* Unions 27; Common Cause 31; UCC 38-39.

Nor was the FCC a superseding or intervening cause, because "its decision-making was impacted by [Defendants'] conduct." *Meijer, Inc. v. Ranbaxy Inc.*, 2016 WL 4697331, at *17 (D. Mass. June 16, 2016). Each move by the FCC that delayed review of Plaintiffs' license-transfer applications—extending filing deadlines, opening additional comment periods, ordering document productions, and the HDO—was influenced by the straw objectors. *See, e.g.*, Am. Compl. ¶¶130-32, 145, 164, 166, 168, 227. Therefore, the FCC's "actions do not break the causal chain." *Meijer*, 2016 WL 4697331, at *17 (denying motion to dismiss where "Defendants' acts caused the FDA to waste time on meritless applications"); *see In re Suboxone Antitrust Litig.*, 2015 WL 12910728, at *2 (E.D. Pa. Apr. 14, 2015) (denying motions to dismiss and for reconsideration and rejecting argument that the FDA's actions were a "supervening cause relieving [defendant] from liability" for wrongful petition that delayed approval of plaintiff's drug application).

Moreover, accepting the Unions' superseding-cause argument necessarily would foreclose their *Noerr-Pennington* defense. *Infra* pp.128-38. An intervening force must have been "sufficiently unforeseeable as to constitute a superseding cause." *Hundley v. District of Columbia*, 494 F.3d 1097, 1104 (D.C. Cir. 2007). For the FCC's actions in granting extensions, ordering document productions, and issuing the HDO to have been so "unforeseeable" the straw objectors' filings must have been "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PRE*), 508 U.S. 49, 60 (1993); *see infra* pp.128-32. The Unions cannot have it both ways.

Finally, Common Cause and UCC cite no support for their argument that several proximate causes preclude but-for causation. Common Cause 31; UCC 38. "Often, events have multiple but-for causes." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). Likewise, "there may not be a single proximate cause for every injury; several causes may combine to produce the harm." *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 544 (D.C. 1991). That several Defendants caused Plaintiffs' injuries does not "break the chain of causation for any one of them." *EIG Energy Fund*, 894 F.3d at 346. In any event, Plaintiffs allege that all Defendants were acting pursuant to a single conspiracy and so Defendants are liable for the acts of their coconspirators. *Supra* p.95.

**3. *Valid business expectation.*** Common Cause and UCC argue Plaintiffs had no valid business expectation because the deal was subject to government approval.

Common Cause 31; UCC 40. They cite *Jefferson-11th Street, LLC v. District of Columbia*, 2020 WL 3035038 (D.D.C. June 5, 2020), which applied *Carr v. Brown*, 395 A.2d 79 (D.C. 1978). Both cases are inapposite. *See* UCC 40 (conceding they "differ[] factually"). Plaintiffs had a valid business expectancy under *Banneker Ventures*, 798 F.3d 1119.

*Carr* and *Jefferson-11th Street* address whether a business expectancy is valid. In both, property owners asserted claims of tortious interference with prospective business against those who opposed their applications for government approval to develop their properties. The *Carr* court dismissed the claim because the owner did not allege any "prospective contractual or business relations" or "'expectancies' … of future contractual relations." 395 A.2d at 84. He instead alleged only a general "anticipated business venture" to "develop his property"—"expectations of profit that were wholly contingent upon the decisions of two governmental bodies" and "simply too remote." *Id.* at 83-84. The *Jefferson-11th Street* court dismissed the claim because the building owner's claimed expectancies—"enhancing the property's market value" and "increasing rents"—were not "valid business expectanc[ies]." 2020 WL 3035038, at *1, *8 (cleaned up). Neither case holds that one cannot have valid business expectancies associated with a deal subject to government approval. *Contra* Common Cause 31; UCC 40. *Banneker Ventures* is instructive. There, the D.C. Circuit reversed the district court's dismissal under *Carr* and held the plaintiff stated a claim of tortious interference with prospective business against a competitor who thwarted plaintiff's effort to secure a government agency's approval of a final

development agreement. 798 F.3d at 1135. Considering the plaintiff's past dealings with the agency and the agency's voting history, the court held "it was commercially reasonable for [the plaintiff] to anticipate the consummation of the deal." *Id.*

Here, Plaintiffs allege a valid business expectancy from the consummation of the merger and financing agreements and ultimate acquisition of TEGNA. Am. Compl. ¶¶375-77. Unlike the plaintiffs in *Carr* and *Jefferson-11th Street* whose alleged expectancies did not include "future contractual relations," Plaintiffs' acquisition of TEGNA *did* contemplate "prospective contractual or business relations," *Carr*, 395 A.2d at 84, namely retransmission agreements with distributors like DISH, *see* Am. Compl. ¶¶79, 83, 138, 301. Plaintiffs' expectancy, moreover, was "commercially reasonable to anticipate." *Banneker Ventures*, 798 F.3d at 1134. Plaintiffs' deal was rule compliant, received widespread support, and offered many public interest benefits. Am. Compl. ¶¶93, 116, 118. The FCC had approved all major rule-compliant broadcast transactions over the past 30 years within the 180-day shot clock; it approved the four most recent major broadcast transactions, which were not rule compliant; and it granted without issue license transfers in two prior major deals involving Mr. Kim's media companies. *Id.* ¶¶94, 109, 112-14, 117; *see Banneker Ventures*, 798 F.3d at 1135 (explaining plaintiff and agency staff "reached agreement many times" and "the Board had in the past rarely voted against a development agreement recommended by the staff"). Plaintiffs had "justified expectation[s]" associated with the TEGNA acquisition. *Banneker Ventures*, 798 F.3d at 1135.

**4.** *Justified or privileged defense.* DISH and Common Cause are wrong to argue that Plaintiffs must "plead … wrongful interference," DISH 35, or "show [the] alleged interference was improper," Common Cause 31-32. "Wrongful conduct is not an element of a prima facie case of tortious interference under [D.C.] law." *NCRIC*, 957 A.2d at 893. Rather, the defendant "bears the burden of proving" that "its intentional interference was legally justified or privileged" or, in other words, was not "wrongful" or "improper." *Id.* at 893, 901 (explaining "affirmative defense to intentional interference"); *see Armstrong v. Thompson*, 80 A.3d 177, 190 (D.C. 2013) (explaining "the burden is on the defendant to prove that her interference was not wrongful, not on the plaintiff to prove that it was"). Because "[t]he Federal Rules of Civil Procedure 'do not require a plaintiff to anticipate affirmative defenses which might be raised by a defendant,'" a "plaintiff need not allege wrongful or improper conduct in order to survive a motion to dismiss for failure to state a tortious interference claim under [D.C.] law." *Econ. Rsch. Servs.*, 208 F. Supp. 3d at 230 n.12; *see, e.g.*, *Haymon v. District of Columbia*, 610 F. Supp. 3d 101, 120 (D.D.C. 2022) (denying motion to dismiss and declining to determine whether defendant's "actions were 'legally justified or privileged'" because "a plaintiff need not *plead*" wrongful conduct). Nor must Plaintiffs allege that Defendants "engaged in conduct that is 'egregious'" to state a claim, *contra* Common Cause 31-32. *See NCRIC*, 957 A.2d at 901; *Banneker Ventures*, 798 F.3d at 1136 (holding plaintiff "need not allege" interference "through egregious means");

*707 G St. Rest., LLC v. Jemal's Mickelson, LLC*, 2023 WL 2571753, at *8 (D.D.C. Mar. 20, 2023) (same). Plaintiffs have stated prima facie claims of tortious interference.

The DISH, Allen, Union, and Common Cause Defendants have not met their burden at the pleading stage to show that their interference was legally justified or not improper. The defense that interference was justified or privileged "is of narrow scope" and "protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." *Onyeoziri*, 44 A.3d at 288.

Common Cause does not assert any legally protected interest; it instead incorrectly shifts the burden to Plaintiffs "to show any alleged interference was improper." Common Cause 31-32. Similarly, the DISH Defendants argue that Plaintiffs "do[] not plead any wrongful interference." DISH 35. They note, however, that "[p]etitioning the government and speaking on a matter of public interest is … not improper." *Id.* The Allen Defendants likewise argue their alleged conduct is "legitimate petitioning activity" that is "First-Amendment protected." Allen 37. Discussed below, the private Defendants' alleged conduct is not protected by the First Amendment. *Infra* pp.118-40.

The Unions argue they were protecting "existing economic interests" from "potentially harmful effects … on jobs, localism, and already high prices." Unions 26-27. This defense cannot be squared with allegations in the amended complaint. Plaintiffs allege an unlawful conspiracy motivated by racial animus. *See Onyeoziri*, 44 A.3d at 291

(considering, *inter alia*, "the nature of the actor's conduct" and "the actor's motive"). Of TEGNA's 6,300 employees, only a handful were NewsGuild members and several dozen were NABET members. Am. Compl. ¶136. The Unions' positions "conflicted with their own professed interests" because, for example, "squeezing the stations on retransmission fees would decrease revenue, put newsroom jobs in jeopardy, and make it more difficult to maintain high-quality local programming." *Id.* ¶139; *see 707 G St. Rest.*, 2023 WL 2571753, at *9 (rejected privilege defense in motion to dismiss where complaint did not establish that defendant's conduct "was an appropriate means of protecting [its] interest"). And the Unions never had a good-faith basis to complain about jobs given Standard General's record of investing in local journalism and local content, increasing newsroom staff, and improving employee benefits; its representations from the outset that it would not cut jobs; and its binding commitment to guarantee jobs, which other unions accepted, but not NewsGuild or NABET. Am. Compl. ¶¶55-57, 118, 142, 165, 167, 187, 199, 253; *see Onyeoziri*, 44 A.3d at 290 ("to be justified, interferer's action must be 'in good faith'"). The fact that the Unions' objections were foreclosed under binding FCC precedent further establishes lack of good faith. *See* Am. Compl. ¶¶98 & n.24, 111, 114, 130, 143 & n.75. Accordingly, viewing the allegations and drawing inferences in Plaintiffs' favor, the amended complaint shows the Unions "utilized improper means to interfere" with Plaintiffs' contracts and business expectations. *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 29 (D.D.C. 2017). At the very least, the Unions' defense presents factual issues that cannot

be resolved on a motion to dismiss. *See Armstrong*, 80 A.3d at 191; *Onyeoziri*, 44 A.3d at 290-92.

### F.  Count VII: Civil conspiracy

Count VII asserts a claim of civil conspiracy against all private Defendants. Am. Compl. ¶¶382-87. To state a claim for civil conspiracy under D.C. law, a plaintiff must allege (1) an agreement between two or more persons (2) to participate in an unlawful act and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme. *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 446 (D.C. 2013). The private Defendants argue that Plaintiffs have not established an underlying tort or that Plaintiffs otherwise fail to plausibly allege a conspiracy. Goodfriend 20-21 & n.13; Unions 27-28; Common Cause 32; DISH 36; Allen 32-36; UCC 40-41. Plaintiffs have plausibly alleged claims of tortious interference, *supra* pp.101-08, and Plaintiffs have plausibly alleged a civil conspiracy claim for the same reasons they allege the §1985(3) conspiracy, *supra* pp.83-93.

### G.  Count VIII: *Ultra vires* consideration of alternative buyer, 47 U.S.C. §310(d)

Count VIII asserts a claim under 47 U.S.C. §310(d) against the FCC Defendants for violation of the Communications Act's prohibition on considering other possible buyers when reviewing license-transfer applications. Am. Compl. ¶¶388-99. The FCC Defendants argue the Court has no jurisdiction over this claim under the *Leedom* exception and Plaintiffs otherwise fail to state a claim. FCC 26. Judicial review of *ultra vires* agency action

is available (1) where there is no express statutory preclusion of all judicial review, (2) when there is no alternative procedure for review without final agency action, and (3) when the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory. *See Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022); *accord Leedom v. Kyne*, 358 U.S. 184 (1958). As the FCC Defendants note, the third prong collapses with the merits. FCC 28 n.6. By alleging that the FCC Defendants acted contrary to §310(d)'s specific statutory command, Plaintiffs also necessarily allege that the Defendants violated §310(d). Plaintiffs meet each prong, and they state a plausible claim for relief.

First, no statutory provision precludes review of this claim. The FCC Defendants cite the Hobbs Act, 28 U.S.C. §2342(1), which gives circuit courts exclusive jurisdiction over "final orders of the [FCC]," and 47 U.S.C. §155(c)(7), which requires full Commission review as a condition precedent to judicial review of activity "made or taken pursuant to a delegation under [§155(c)(1)]." But as discussed, the Hobbs Act applies only to "final" agency actions, and there never was such a final agency action here. *Supra* pp.38-43. This is no different than *Leedom*, where the Board certification in question was "not 'a final order' and therefore [was] not subject to judicial review." 358 U.S. at 187. So just like *Leedom*, because judicial review applies to final agency actions—absent here—it does not apply to nonfinal ones. And §155(c) fares no better. While the Media Bureau's actions on delegated authority are not subject to judicial review unless an application for full

Commission review is filed, §155(c)(1) only allows the Commission to delegate "any of its functions." Plaintiffs' claim is that the Media Bureau acted outside its statutory authority and so not within a Commission function. Whether this provision bars review is thus "effectively coextensive with the merits" of Plaintiffs' ultra vires claim. *See DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 510 (D.C. Cir. 2019); *see also COMSAT Corp. v. FCC*, 114 F.3d 223, 227 (D.C. Cir. 1997) ("Thus, the statute says that the courts may not review the Commission's actions where the Commission has acted within the scope of its authority … . The no-review provision … , accordingly, merges consideration of the legality of the Commission's action with consideration of this court's jurisdiction … ."). Thus, no express provision bars review.

Second, Plaintiffs had no alternative procedure to obtain judicial review of the §310(d) violation. The FCC Defendants argue that Plaintiffs could have raised it with the ALJ and then the Commission. FCC 27. But how the ALJ could have considered the Media Bureau's unlawful consideration of an alternative buyer is unclear. The HDO expressly limited the designation to the two issues it identified—retransmission fees and jobs. *See* Hearing Designation Order 3, *In re Tegna Inc.*, MB No. 22-162 (Feb. 24, 2023), https://perma.cc/N7U5-LQ57 ("We emphasize that the scope of designation of this order is limited to the issues set forth below."). And anyway, as discussed, the FCC Defendants' pattern of delay made any meaningful review of the Media Bureau's consideration of Mr. Allen as an alternate buyer by the Commission illusory. By the time the Commission

could have heard those complaints, the ship had sailed on the deal. And Plaintiffs already sought review in the D.C. Circuit, which declined because no final agency action occurred. Am. Compl. ¶391. Put simply, without review in this Court, Plaintiffs have "'no other means, within their control,' of obtaining judicial review." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Servs. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006).

Third, Plaintiffs have plausibly alleged that the Media Bureau acted contrary to §310(d)'s "clear and mandatory" prohibition on considering other buyers. *Leedom*, 358 U.S. at 188; *see* Am. Compl. ¶¶392-97. The Communications Act plainly prohibits the FCC from considering other buyers when reviewing a license-transfer application, *see* 47 U.S.C. §310(d), and the FCC has long understood this unambiguous directive, *e.g.*, *In re Geotek Commc'ns, Inc.*, 15 FCC Rcd. 790, 811 (2000). Yet in reviewing Plaintiffs' applications, the Media Bureau requested information about "alternative transactions considered" by TEGNA, specifically Mr. Allen's failed bid. *See* Am. Compl. ¶¶168-70, 395-98. These are not "[t]hreadbare recitals." *Contra* FCC 28. "Given the [Court's] obligation to draw reasonable inference in [Plaintiffs'] favor and consider the allegations as a whole," *Vullo*, 602 U.S. at 195, Plaintiffs plausibly allege that when the Media Bureau requested this information *in the context of considering their license transfer*, the Media Bureau did so to *consider* Mr. Allen as a potential alternative buyer. The FCC Defendants argue that the "information request" alone is not prohibited by §310(d) but proffer no reason that information might be relevant to Plaintiffs' applications and lawfully considered. FCC 28. The

FCC Defendants "fail[] to analyze" the information request "against the backdrop of other allegations in the complaint," *Vullo*, 602 U.S. at 195, including Mr. Allen's leverage over the race-conscious FCC, his public remarks that he was still "in the fight" for TE-GNA, his history of obtaining FCC approval quickly, his boasting that he is "FCC approved," and his litigious history, including suing the FCC and a former FCC commissioner, Am. Compl. ¶¶17, 115, 128, 272-89. Thus, the third *Leedom* prong is met. And because Plaintiffs plausibly allege that the FCC Defendants acted contrary to §310(d)'s prohibition on considering other buyers, they state a claim for relief.

### H. Plaintiffs' common-law claims against the Unions are not preempted.

The Unions argue the National Labor Relations Act, 29 U.S.C. §157, preempts Plaintiffs' common-law claims. Unions 28. It does not. When a disputed activity is "arguably subject to §7 or §8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the [NLRB]." *San Diego Bldg. Trades Council v. Garmon*, 395 U.S. 236, 245 (1959). The party "claiming pre-emption must carry the burden of showing at least an arguable case" before the NLRB. *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 396 (1986). To satisfy this burden, the party must "demonstrate that his case is one that the [NLRB] could legally decide in his favor." *Id*. at 395. In other words, courts consider whether the cause of action "is identical to … or different from … that which could have been, but was not, presented to the Labor Board." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 197 (1978).

Here, the Unions have not shown how their claimed "petitioning" preempts Plaintiffs' causes of action. Unions 28. They have not identified an arguably unfair labor practice they could challenge before the NLRB or explained how Plaintiffs' actions arguably amount to an unfair labor practice. Nor could they. Plaintiffs are not their employer. *See Loc. 1814, Int'l Longshoremen's Ass'n v. NLRB*, 735 F.2d 1384, 1393 (D.C. Cir. 1984) ("[T]he unfair labor practices provisions of the NLRA regulate the conduct of employers and labor organizations *only* … ." (emphasis added)). The Unions cite no authority supporting the notion that a prospective future employer who never becomes the employer of union members falls within the scope of the NLRA. In any event, Plaintiffs' only actions with respect to the Unions were explicitly offering employment guarantees to appease their purported concerns. Am. Compl. ¶¶199, 253.

To be sure, *Garmon* preemption may be "determined not by the identity of the party against whom the claims are asserted, but rather by the *issues* that those claims require a court to adjudicate." *Richardson v. Kruchko & Fries*, 966 F.2d 153, 156 (4th Cir. 1992). But here, there is no NLRA dispute between the Unions and Plaintiffs, so the Court will not pass on a covered activity by hearing Plaintiffs' common-law claims. *See Sears*, 436 U.S. at 198 (holding state-law trespass claim was not preempted because "permitting the state court to adjudicate [it] would create no realistic risk of interference with the [NLRB's] primary jurisdiction to enforce the statutory prohibition against unfair labor practices"); *see also N. Cal. Newspaper Org. Comm. v. Solano Assocs.*, 193 Cal. App. 3d 1644,

1650-51 (1987) (claim by union against shopping mall that was "not an 'employer' vis-a-vis the Union" was not preempted because "[t]he controversy involves the protection of the rights of Union against the conduct of a nonemployer party unrelated to the labor dispute"). Thus, the Unions have not met their burden to show what about Plaintiffs' claims might be the subject of an NLRA claim.

## IV.  The First Amendment Does Not Immunize the Private Defendants' Conduct.

The private Defendants assert blanket immunity from the foregoing claims under the First Amendment. The DISH and Common Cause Defendants argue the First Amendment protects their speech on matters of public concern and their association with co-Defendants. Common Cause 20-21; DISH 29. The Allen Defendants argue the First Amendment protects their alleged activities. Allen 24-26. And each private Defendant invokes the *Noerr-Pennington* antitrust doctrine. Goodfriend 5-8; Unions 11-16; Common Cause 23-26; DISH 26-28; Allen 26-29; UCC 30-34. These arguments do not apply here.

### A.  Defendants' acts and conduct are not protected by the First Amendment.

Defendants are wrong to argue that Plaintiffs' claims would hold them liable for protected speech. Civil rights laws and common-law torts impose liability for acts and conduct—not speech—and the act of racial discrimination has never been afforded constitutional protection.

**1.** The DISH Defendants and Common Cause argue their "speech" and "advocacy" concerned "a matter of public interest" and therefore "cannot serve as a basis for

any statutory or tort liability." DISH 25-26, 28-29; *see* Common Cause 19-23. Federal civil rights laws, however, are not "directed at expression (*i.e.*, 'speech' or 'messages')"; they are "aimed at conduct unprotected by the First Amendment." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 389-90 (1992) (citing Title VII and §§1981 and 1982 as examples of "statute[s] directed at conduct rather than speech"). Likewise, "the First Amendment is no bar to liability under the general common law prohibition of tortious interference with contract, which, like the statutes, is directed against conduct, not speech." *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 296 (2d Cir. 1992).

Relatedly, Common Cause's and UCC's arguments that their speech is protected regardless of the speaker's racist "intent" or "motives" is misplaced. Common Cause 21-23; UCC 31. "[T]he Supreme Court has clearly held that the First Amendment does *not* protect the very act of discriminating on the basis of race." *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 (11th Cir. 2024). Courts must "recognize and enforce the critical distinction between *advocating* race discrimination and *practicing* it." *Id.* at 778. "[T]he Constitution places no value on discrimination, and while invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment it has never been accorded affirmative constitutional protections." *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (cleaned up).

Here, the amended complaint alleges Defendants' *conduct*—not speech—violated federal and state law. *E.g.*, 42 U.S.C. §§1981, 1985(3), 1986. Defendants conspired to kill Mr. Kim's acquisition of TEGNA because Mr. Allen desired it, and Mr. Allen was the right kind of owner. *E.g.*, Am. Compl. ¶¶127, 129-30, 135-39, 162, 208, 211, 249-50, 304-06, 318-19, 321-23. That Defendants' course of conduct included "assembl[ing] a coalition" of objectors, *id.* ¶268, to make statements in FCC filings does not immunize them. The First Amendment does not immunize *conduct* that violates laws prohibiting race discrimination or constitutes common-law torts. *See, e.g.*, *Fearless Fund*, 103 F.4th at 777-79 (rejecting First Amendment defense to §1981 claim); *Jews for Jesus*, 968 F.2d at 295-96 (same for §1985(3) and tortious interference claims); *SMJ Grp., Inc. v. 417 Lafayette Rest. LLC*, 2006 WL 2516519, at *7 (S.D.N.Y. Aug. 30, 2006) (same for tortious interference with prospective business); *Niman v. GPS USA, Inc*, 2015 WL 1898244, at *3 (D. Colo. Apr. 27, 2015) (same); *see also, e.g.*, *Spence v. Daily News*, 2001 WL 121938, at *3 (S.D.N.Y. Feb. 13, 2001) ("The First Amendment does not, therefore, prevent courts from enforcing statutes, such as Section 1981, that prohibit discrimination."); *A.H.D.C. v. City of Fresno*, 2000 WL 35810722, at *4 (E.D. Cal. Aug. 31, 2000) ("Unlawfully discriminatory conduct carried out by speech activities is not immunized by the First Amendment.").

Defendants' First Amendment arguments do not grapple with the nature of Plaintiffs' claims, challenging Defendants' whole course of conduct, and the relevance of some Defendants' statements in FCC filings. For example, DISH relies on *Thompson v. Trump*,

590 F. Supp. 3d 46 (D.D.C. 2022), involving whether President Trump's January 6 public statements constituted incitement. *See* DISH 28. Unlike *Thompson*, Plaintiffs' claims are not predicated on objectors' statements in FCC filings alone. The complaint details those statements because they are one of many indicators of Defendants' unlawful and conspiratorial course of conduct behind the scenes. As *Thompson* elsewhere acknowledged in its immunity analysis, sometimes "conduct … comes in the context of words uttered on matters of public concern, but it is doubtful that anyone would consider [a defendant] immune from tort liability for harm resulting from his speech." 590 F. Supp. 3d at 80. So too here, the First Amendment "does not prohibit the evidentiary use of speech … to prove motive or intent." *Mitchell*, 508 U.S. at 489; *United States v. Chansley*, 525 F. Supp. 3d 151, 164 (D.D.C. 2021); *see Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 305 (E.D.N.Y. 2018) (rejecting First Amendment argument where Defendants' speech was cited "as evidence of Defendants' racial animus" because the speech was "not the independent basis for Plaintiffs' §1985(3) claims"); *see also Armstrong v. FAA*, 296 F. App'x 88, 89 (D.C. Cir. 2008) (finding no First Amendment violation from "using [petitioner's] speech as evidence of his intent"); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 991 F.2d 1249, 1260 (7th Cir. 1993) (rejecting as "patent nonsense" argument that racially inflammatory speech cannot "serve as evidence of racial animus"). And "it has never been deemed an abridgment of freedom of speech … to make a course of conduct illegal merely because the conduct was in part initiated, evidenced,

or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

The DISH and Common Cause Defendants' freedom of association arguments are equally meritless. DISH 29; Common Cause 20-21; *see Runyon*, 427 U.S. at 176. The Supreme Court has long recognized that "[a]lthough agreements to engage in illegal conduct undoubtedly possess some element of association, the State may ban such illegal agreements without trenching on any right of association protected by the First Amendment." *Brown v. Hartlage*, 456 U.S. 45, 55 (1982). Here, Defendants associated to conspire to deprive Plaintiffs of equal protection of the law. *See* 42 U.S.C. §1985(3). Defendants have "no right to associate with others to engage in activities that are unlawful and unprotected by the First Amendment." *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1081 (9th Cir. 2002); *see United States v. Wilson*, 154 F.3d 658, 666-67 (7th Cir. 1998).

**2.** The Allen Defendants argue that their alleged "conduct" and "activities"—political donations, speaking to the press, and orchestrating objectors—are each independently protected by the First Amendment. Allen 24-26. They are not. The Allen Defendants ask the Court to "tak[e] the allegations in isolation" instead of "against the backdrop of other allegations in the complaint." *Vullo*, 602 U.S. at 194-95.

The amended complaint alleges that each of the Allen Defendants' activities were "used as an integral part of conduct which violates a valid statute," so they "are not immunized." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972). Mr. Allen's political donations and orchestrating objections—all following his failed bid for TEGNA and his failed attempt to have Mr. Kim spin off TEGNA stations to him—were part of the strategy effectuated by Mr. Goodfriend to provide a pretext for the FCC's unprecedented delays culminating in the pocket veto of Mr. Kim's acquisition. Am. Compl. ¶¶137-38, 175-81, 205-06, 210, 259, 268, 317, 323. Such activities, part of a scheme to violate federal civil rights law, are not "protected speech" but "unquestionably unprotected … conduct." *United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 144 (D.D.C. 2015) (rejecting First Amendment defense to allegations that defendant "coordinat[ed] the efforts of his conspirators"). And Mr. Allen's statements to the press are not a basis for liability but serve as evidence of his intent and motives. *See Mitchell*, 508 U.S. at 489; *supra* pp.121-22. That Mr. Allen's speech or expressive conduct was "the vehicle for violating a statute directed at regulating conduct does not render [application of] that statute unconstitutional." *Jews for Jesus*, 968 F.2d at 295-96 (collecting cases). The Supreme Court has long rejected "[s]uch an expansive" view of the First Amendment that "would make it practically impossible ever to enforce laws against … conspiracies deemed injurious to society." *Cal. Motor Transp.*, 404 U.S. at 514. The Allen Defendants' "end result is unlawful," so "it matters not that the means used in violation may be lawful." *Id.* at 515.

**B. The *Noerr-Pennington* doctrine does not bar Plaintiffs' claims.**

Each private Defendant invokes the *Noerr-Pennington* doctrine as a shield from liability. Goodfriend 5-8; Unions 11-16; Common Cause 23-26; DISH 26-28; Allen 26-29; UCC 30-34. But this doctrine applies only to antitrust claims, and Plaintiffs assert no antitrust claims. Even if *Noerr-Pennington* applied to Plaintiffs' claims, the amended complaint plausibly pleads that the private Defendants' conduct falls within the well-settled "sham" exception and the exception for misrepresentations.

**1. *Noerr-Pennington* applies only to antitrust claims.**

*Noerr-Pennington* is a "doctrine of antitrust law" that immunizes defendants "from antitrust liability." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555-56 (2014). The Supreme Court consistently describes *Noerr-Pennington* as "the doctrine of antitrust immunity," *PRE*, 508 U.S. at 51, that "protect[s] from antitrust liability," *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988). The D.C. Circuit also recognizes that it provides "immun[ity] from liability under *the antitrust laws*." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005) (emphasis added). As the D.C. Circuit has explained, the doctrine "rests ultimately upon a recognition that *the antitrust laws*, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'" *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 817 (D.C. Cir. 2001) (emphasis added).

The Supreme Court and the D.C. Circuit "have never applied the *Noerr-Pennington* doctrine … to bar liability for common law torts." *Banneker Ventures*, 798 F.3d at 1137 n.8; *see* Common Cause 24 n.32. The Unions argue otherwise, Unions 12, citing the statement in *Venetian Casino Resort, L.L.C. v. NLRB* (which predates *Banneker Ventures*) that the doctrine "has also been applied in labor cases," 793 F.3d 85, 87 (D.C. Cir. 2015). The D.C. Circuit there drew on *BE & K Construction Co. v. NLRB*, 536 U.S. 516 (2002), and *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983). But in those cases the Supreme Court only "analogiz[ed] to the antitrust context." *BE & K Constr.*, 536 U.S. at 526; *see PRE*, 508 U.S. at 59 (noting Court "invok[ed]" doctrine "by analogy"). And the Court has declined to "import[]" the doctrine elsewhere, including the Petition Clause context. *Octane Fitness*, 572 U.S. at 556-57 (rejecting application to statute governing attorney fees in patent litigation); *see Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387-89 (2011) (declining to apply *Noerr-Pennington* "sham" exception to public employee's retaliation claim under Petition Clause); *McDonald v. Smith*, 472 U.S. 479, 484-85 (1985) (declining to apply *Noerr-Pennington* and rejecting argument that Petition Clause provided immunity for allegedly libelous letters).

Plaintiffs assert no antitrust claims here. So it is at least "unclear whether *Noerr-Pennington* has any relevance" to this case. *Jefferson-11th St.*, 2020 WL 3035038, at *7; *see also Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 109 n.34 (D.D.C. 2010) (concluding "applicability in this jurisdiction with regards to common law torts remains

ambiguous"). Defendants nevertheless urge the Court to apply *Noerr-Pennington* to Plaintiffs' federal civil rights and common-law tort claims, citing decisions of district courts and other circuit courts that have applied the doctrine beyond antitrust. Goodfriend 5 n.3; Unions 12-14 & n.7; Common Cause 23-24; DISH 26-28; Allen 26-27; UCC 31-32. The Court should decline.

As an original matter, *Noerr-Pennington* is a doctrine of statutory interpretation under the Sherman Act. *E.g.*, *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1364-65 (5th Cir. 1983). As the D.C. Circuit has recognized, the "argument that *Noerr-Pennington* is no more than a method of construing the Sherman Act has some support in the cases." *Whelan v. Abell*, 48 F.3d 1247, 1254 (D.C. Cir. 1995). *Noerr* rejected the claim that "a publicity campaign designed to influence governmental action constitutes a violation of the Sherman Act." *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961). The Court found it "unnecessary to consider" First Amendment arguments because the case was decided on "the proper construction of the Sherman Act." *Id.* at 132 n.6.

*Noerr-Pennington* "is not interchangeable with the right to petition," and courts should "not blithely apply" it beyond antitrust. *Fisher Sand & Gravel Co. v. FNF Constr., Inc.*, 2013 WL 12121874, at *5 (D.N.M. Mar. 6, 2013); *see Slip-N-Slide Recs., Inc. v. TVT Recs., LLC*, 2007 WL 473273, at *7 (S.D. Fla. Feb. 8, 2007) (noting courts have extended *Noerr-Pennington* "far beyond what the exercise of judicial restraint should allow"). Courts that have done so even recognize that its "principles may be inapt in non-antitrust contexts."

*B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022); *see also DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 840 (E.D. Mich. 2003) (noting "a variety of courts have acknowledged the incongruity of applying the *Noerr-Pennington* doctrine outside of the antitrust context"). In the labor context, for example, "antitrust law and labor law differ significantly in respect to their consequences, administration, scope, history, and purposes." *BE & K Constr.*, 536 U.S. at 541 (Breyer, J., concurring).

This Court accordingly should not apply *Noerr-Pennington* to Plaintiffs' claims, none of which relates to antitrust. *See Slip-N-Slide Recs.*, 2007 WL 473273, at *7; *Rondigo, LLC v. Township of Richmond*, 2012 WL 1021726, at *4 (E.D. Mich. Mar. 27, 2012). Applying *Noerr-Pennington* to Plaintiffs' common-law claims would require the Court to determine "the construction of the tort[s] in light of the potential First Amendment conflict," *Whelan*, 48 F.3d at 1257, and the torts' "exact scope … in relation to the *Noerr-Pennington* doctrine," *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 699 (D.C. Cir. 2009). Several courts already have held that liability under Plaintiffs' federal civil rights and common-law tort claims does not violate the Speech Clause. *Supra* pp.118-23. Accepting Defendants' *Noerr-Pennington* argument "would elevate the Petition Clause to special First Amendment status" that the Supreme Court has rejected. *McDonald*, 472 U.S. at 485 (concluding "there is no sound basis for granting greater constitutional protection to statements made in a petition to the [government] than other First Amendment expressions").

### 2. Even if *Noerr-Pennington* applies, Plaintiffs' claims satisfy its sham exception.

Even if the *Noerr-Pennington* doctrine applies, the amended complaint's allegations satisfy its well-established sham exception. *Noerr-Pennington* does not "cover activity that was not genuinely intended to influence governmental action." *Allied Tube*, 486 U.S. at 507 n.10. In other words, "while genuine petitioning is immune" from liability, "sham petitioning is not." *BE & K Constr.*, 536 U.S. at 525-26. So when objections are "a mere sham to cover an attempt to interfere directly with the business relationships of a competitor," *Noerr-Pennington* does not apply. *PRE*, 508 U.S. at 51 (cleaned up).

The "classic example" of the sham exception "is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (citing *Cal. Motor Transp.*, 404 U.S. 508). To establish the "sham" exception, the plaintiff must show defendants' activity was (1) "objectively baseless in the sense that no reasonable [person] could realistically expect success on the merits" and (2) "an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *PRE*, 508 U.S. at 60-61 (cleaned up).

To survive a motion to dismiss, a plaintiff need only "plead facts sufficient to make out a claim that [defendants'] filings are shams." *Ass'n of Retail Travel Agents, Ltd. v. Air Transp. Ass'n of Am.*, 1985 WL 1635, at *3 (D.D.C. May 24, 1985). In considering the sham

exception on a motion to dismiss, the Court "must, of course, take the allegations of the complaint at face value for the purposes of th[e] motion." *Israel v. Baxter Labs., Inc.*, 466 F.2d 272, 279 (D.C. Cir. 1972). Whether petitioning activity "was in fact a sham" is a "factual inquiry" that generally "cannot be resolved at the motion to dismiss stage." *FTC v. Shire ViroPharma Inc.*, 2018 WL 1401329, at *7 (D. Del. Mar. 20, 2018); *see Abarca Health, LLC v. PharmPix Corp.*, 915 F. Supp. 2d 210, 216 (D.P.R. 2012). Accordingly, courts often decline to resolve the merits of the sham exception before discovery. *See, e.g., Reed v. Marshall*, 2022 WL 799765, at *3 (S.D. Tex. Mar. 16, 2022); *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1134 (D. Minn. 2016).

   **a. *Objectively baseless.*** Plaintiffs allege that objectors' filings were "objectively baseless" under prong one of the sham exception. Am. Compl. ¶¶317, 321. Objectors insisted on obtaining information about "alternative transactions considered" by TE-GNA—*i.e.*, Mr. Allen's failed bid—even though federal law *prohibits* the FCC's consideration of other buyers. *Id.* ¶¶130, 168-73; *see* 47 U.S.C. §310(d); *see also, e.g., In re Spanish Int'l Commc'ns Corp.*, 1 FCC Rcd. 844, 846-47 (1986) (rejecting argument that public interest would be "better served" if channels "were sold to qualified minority buyers" as "obviously illegal" under the "clear congressional prohibition of Section 310(d)"). Objectors complained about retransmission fees, Am. Compl. ¶135, even though DOJ was reviewing the deal for pricing concerns, *id.* ¶¶83, 192-93, and even though the FCC rebuked such objections to past deals because "the Commission is not the appropriate forum for

addressing private contractual matters," *id.* ¶111 (quoting *Terrier Media*, 34 FCC Rcd. at 10566); *see id.* ¶¶98 & n.24, 114, 130, 143 & n.75; *see also, e.g., In re Media Gen., Inc.*, 32 FCC Rcd. 183, 197 (2017) (finding "no apparent reason for the Commission to step in and deny one party the benefit of the negotiated bargain" for "after-acquired station clauses"). And objectors complained that the deal would result in job losses, Am. Compl. ¶135, even though Mr. Kim has a history of investing in local journalism and local content and *increasing* newsroom staff, *id.* ¶¶52-57, 142, and even though the FCC had rejected past arguments "that private equity firms typically impose cost-cutting measures that 'gut newsrooms,'" *id.* ¶111 (quoting *Terrier Media*, 34 FCC Rcd. at 10567); *see id.* ¶¶98 & n.24; *see also In re Tribune Media Co.*, MB No. 19-30, 2019 WL 4440126, at *11 n.138 (FCC Sept. 16, 2019) (rejecting Common Cause's objection that broadcaster would "potentially eliminate local sports reports and production staff" as "speculative" and a "decision … within the licensee's discretion").

Defendants' arguments about the merit of their objections are misplaced. *E.g.*, Unions 15-16 (arguing positions were "not 'objectively baseless' grounds to oppose the transaction"); Goodfriend 8 (arguing record "validat[es] and substantiat[es] Defendants' objections"). For example, while Common Cause and UCC stress that they opposed the Standard General-TEGNA deal because it "would consolidate ownership of local media outlets," Common Cause 25; UCC 33, the deal, in fact, "would have *reduced* industry consolidation," Am. Compl. ¶118, because "TEGNA would shrink in size and no new station

combinations would be created in any market," *id.* ¶142. And while objectors repeatedly expressed concerns of job losses, *id.* ¶¶135, 162, 164, Standard General represented at the outset that it "wasn't cutting jobs" and that the deal "will not result in station-level layoffs" but will "increase[] newsroom employment," *id.* ¶¶134, 142, 165; *see* Applicants' Response to Request for Documents and Information 1, *In re Tegna Inc.*, MB No. 22-162 (June 13, 2022), https://perma.cc/ZML8-N63P ("Standard General does not intend to reduce station-level staffing following the Transaction."). Standard General then made binding commitments not only that there would be no layoffs for at least two years but also that it would *increase* newsroom staffing; the other interested unions accepted that generous commitment while NewGuild and NABET refused. *Id.* ¶¶199, 253. The ultimate reasonableness of Defendants' objections and continued opposition after these commitments presents "issues of fact, which cannot be resolved in the context of a motion to dismiss." *Otsuka Pharm. Co. v. Torrent Pharms. Ltd.*, 118 F. Supp. 3d 646, 657 (D.N.J. 2015) (collecting cases); *see, e.g.*, *Azurity Pharms., Inc. v. Bionpharma Inc.*, 650 F. Supp. 3d 269, 280-81 (D. Del. 2023); *In re EpiPen*, 336 F. Supp. 3d at 1307.

Common Cause and UCC claim their petition "was not a 'sham'" because it "raised the same objections" they asserted in past deals. Common Cause 25; UCC 33. But the FCC squarely rejected those "same objections" to past deals. *See* Am. Compl. ¶¶98 & n.24, 111, 114, 130, 143 & n.75; *see also, e.g.*, *Terrier Media*, 34 FCC Rcd. at 10566-67; *Tribune Media*, 2019 WL 4440126, at *11 n.138. And FCC rules prohibit the Media Bureau from

taking any action that conflicts with prior rulings of the full Commission. Am. Compl. ¶96; *see* 47 C.F.R. §§0.5(c), 0.283(c). The Unions cite no support for their argument that the FCC's past rejections of their objections "does not mean their concerns were ever objectively baseless." Unions 15. Precedent is clear, however, that asserting arguments foreclosed by agency precedent and policy satisfies the objectively baseless prong of *Noerr-Pennington*'s sham exception. *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 273 (3d Cir. 2017) (holding plaintiffs "plausibly" established sham exception with allegations that defendant's petition "ignored more than a decade of FDA policy," "the FDA's 2002 rejection of a similar argument," and "subsequent FDA pronouncements" that defendant's arguments were "immaterial to [application] approval"); *Litton Sys., Inc. v. AT&T*, 700 F.2d 785, 809-12 (2d Cir. 1983) (applying sham exception where defendant's claims were foreclosed by "the FCC's basic position" and "[a]nyone reading the language of the *Carterfone* rehearing decision … could conclude" that defendant's filings could not be "squared with the FCC's mandate in *Carterfone*"); *see also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 181 (3d Cir. 2015) (holding objections to permit application were objectively baseless because courts had "'consistently' rejected the types of arguments offered by Defendants"). Because their objections were foreclosed by binding FCC precedent and the Media Bureau could not deviate from that precedent, Defendants could not "have realistically expected success on the merits at the time of filing." *Otsuka Pharm.*, 118 F. Supp. 3d at 657.

Nor does the HDO disprove that the petitions were objectively baseless, as Defendants argue. *Contra* Goodfriend 8; Unions 15; Common Cause 25; DISH 28; Allen 28-29; UCC 32-34. This argument gets the inquiry backwards. The objectively baseless test "looks at objective merit at the outset, not whether the claim ultimately prevailed." *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 690 (5th Cir. 2010) (citing *PRE*, 508 U.S. at 61 n.5). "The analysis, in other words, must be prospective not retrospective, and therefore should be limited to the law and the facts as they existed when the decision to file suit was made." *In re Wellbutrin SR Antitrust Litig.*, 2006 WL 616292, at *11 (E.D. Pa. Mar. 9, 2006). As explained, FCC precedent and the facts regarding the deal, including Mr. Kim's track record, show the straw objectors' petitions to deny and later objections were objectively baseless when filed.

The HDO does not insulate the private Defendants from liability. *See Israel*, 466 F.2d at 274, 279-80. The HDO was not final agency action, as the D.C. Circuit held and multiple Defendants concede. Am. Compl. ¶245; *supra* pp.39-40; FCC 13 n.2, 24 n.5; UCC 30 n.29. The D.C. Circuit has held that similar nonfinal agency action that does not include a "determination on the merits" and even results in plaintiffs' "withdrawal or abandonment of [their] applications before final agency action had taken place" does not insulate petitioning parties from liability under the sham exception. *Israel*, 466 F.2d at 274, 279-80; *see also Bio Tech. Gen. Corp. v. Genentech, Inc.*, 267 F.3d 1325, 1333 (Fed. Cir. 2001) (explaining that ALJ's "Initial Determination" that was "neither reviewed nor adopted by the

Commission" "receives no deference" in assessing sham exception because it "is not a final decision").

Nor can the private Defendants contest that their petitioning was objectively baseless by saying it was "successful." *Contra* Goodfriend 8; Common Cause 25; DISH 28; Allen 28-29; UCC 32-34. The HDO did not decide the merits of Plaintiffs' license-transfer applications; it was a pocket veto, insulating the transaction from any judicial review, Am. Compl. ¶¶225, 227, 308, 391, and the culmination of Defendants' strategy of delay to break up the TEGNA deal, *cf. Lipitor*, 868 F.3d at 274 (reversing rejection of sham exception and faulting district court for "[e]quating delay in consideration of a petition or its complexity with the petition's underlying merits," which "fails to draw inferences in … plaintiffs' favor"). The private Defendants did not successfully obtain denials of Standard General's license-transfer applications, as they had petitioned. *See Hanover 3201*, 806 F.3d at 182-83 (holding plaintiff plausibly pleaded sham exception despite defendants' "partial success" on one argument because "it did not cause the [agency] to actually reject the permit application"). Plaintiffs never had an opportunity to challenge the HDO because the unprecedented delays caused by Defendants forced TEGNA to terminate the merger contract and ultimately sunk the deal. *See Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 895-97 (2d Cir. 1981) (applying sham exception where objectors obtained early favorable ruling in trial court later reversed by state supreme court but "the protracted delays had by then forced [plaintiffs] to abandon the development"). The HDO is at most only

"a preliminary success" that "does not necessarily preclude a court from concluding that [petitioning] was baseless." *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 938 (Fed. Cir. 1995); *see Boulware v. Nev. Dep't of Hum. Res.*, 960 F.2d 793, 799 (9th Cir. 1992) (explaining "initial success" is not "determinative" of "objective merits").

   b. ***Subjective intent.*** Plaintiffs allege that the private Defendants used the FCC license-transfer application "*process*," "as opposed to the *outcome* of that process," to "interfere *directly* with the business relationships" of Plaintiffs, satisfying prong two of the sham exception. *PRE*, 508 U.S. at 60-61. The private Defendants "pursued a strategy not meant to genuinely influence or persuade the FCC to actually deny the license-transfer applications but instead to impose inordinate delay … to drag out the proceedings until Standard General's merger agreement expired." Am. Compl. ¶323. The Court must review that conduct during the FCC proceedings "against the backdrop of other allegations," *Vullo*, 602 U.S. at 195, about what came before: Mr. Allen's rejected bid for TEGNA, his public announcement he was still "in the fight" and it was only "round one," and his overtures to Mr. Kim to spin off TEGNA stations to him to make things go smoother at the FCC. Am. Compl. ¶¶128, 133.

   Following Mr. Allen's failed attempts to acquire some or all of TEGNA, Mr. Kim's opponents asserted baseless objections and pressed them incessantly, including with allegations of bad faith, even after getting everything they could have wanted with Standard General's binding commitments waiving the after-acquired clauses and guaranteeing

jobs. *Id.* ¶¶130, 135, 142, 143 & n.75, 147-51, 162, 164-67, 174, 187, 192-93, 195-97, 199, 201-03, 208-09. They requested multiple extensions. *Id.* ¶¶130-31, 145. They made unprecedented document demands beyond the limits of the FCC's review under the Communications Act. *Id.* ¶¶130, 132, 134, 162-63, 168-73, 204. And they courted members of Congress to urge "further scrutiny" of the deal with six-figure political donations. *Id.* ¶¶175-81, 205-06, 210, 257, 259, 268. All the while they encouraged the Media Bureau not to "feel pressure to complete its review by any artificial deadlines established by the shot clock or the applicants' desire for final Commission action." *Id.* ¶163. Defendants' "alleged tactic[s]," designed "to slow down the review process," show "they were more interested in delay than in redressing any grievances." *Hanover 3201*, 806 F.3d at 181 (finding subjective prong met).

In short, Defendants opposed Plaintiffs' application every step of the way, disregarding the limits of the FCC's review, as part of their impermissible "strategy of delay." *United States v. AT&T*, 524 F. Supp. 1336, 1361, 1364 (D.D.C. 1981) (applying sham exception where defendant allegedly made "groundless claims" in "a petition to the FCC requesting a general inquiry into the public interest aspects" when it "well knew that the positions it took before the FCC were baseless"); *Litton*, 700 F.2d at 809-12 (applying sham exception where defendant "consistently maintained" "baseless claims" foreclosed by "FCC's basic position" to "delay and obfuscate" proceedings, "amount[ing] to an abuse of the administrative process"); *Primetime 24 Joint Venture v. NBC, Inc.*, 219 F.3d 92, 101

(2d Cir. 2000) (holding plaintiff pleaded sham exception where it alleged a "coordinated scheme" to file "simultaneous and voluminous challenges" against plaintiff "without regard to whether the challenges had merit" to "impose expense and delay"). *Noerr-Pennington* is no shield when Defendants, by filing objections "regardless of the merits," impermissibly "sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." *Cal. Motor Transp.*, 404 U.S. at 512.

Only Common Cause, UCC, and arguably the DISH Defendants directly address the second, subjective prong of the sham exception. Common Cause 25-26; UCC 34; DISH 28. The DISH Defendants assert in one sentence that they "had genuine economic concerns with the transaction." DISH 28. But adverting to such concerns says nothing of whether "the real purpose of [D]efendants' joint efforts [wa]s to preclude, not induce, fair [FCC] consideration" of Plaintiffs' license-transfer applications, *Israel*, 466 F.2d at 279, or whether the DISH Defendants were motivated "primarily for the benefit of collateral injuries inflicted through the use of [administrative] process," *PRE*, 508 U.S. at 65, or "to thwart competition," *Octane Fitness*, 572 U.S. at 556. Common Cause and UCC claim their efforts were genuine because they "'routinely' oppose[] large mergers that result in media consolidation and threaten job losses and increased costs." Common Cause 26; UCC 34. These arguments, again, present factual issues that cannot be resolved on a motion to dismiss given the allegations that the deal would have reduced consolidation and did not threaten job losses. *Supra* pp.130-31. In any event, the FCC squarely rejected their same

objections to past deals. *Supra* pp.131-32. That Common Cause and UCC knew their objections were meritless under binding FCC precedent further evidences their impermissible motives. *See Litton*, 700 F.2d at 810; *FTC v. AbbVie Inc.*, 976 F.3d 327, 369-70 (3d Cir. 2020). So does their absence in deals involving the Allen Defendants—deals that actually implicated their purported concerns of industry consolidation and job losses. Am. Compl. ¶¶98, 113-14, 140, 320.

Accepting the amended complaint's allegations as true and drawing inferences in Plaintiffs' favor, Plaintiffs plausibly satisfy *Noerr-Pennington*'s sham exception.

### 3. Defendants' misrepresentations and misleading statements also preclude application of *Noerr-Pennington*.

Defendants' misrepresentations and misleading statements in their FCC filings provide an independent exception to their *Noerr-Pennington* defense, if *Noerr-Pennington* even applies. *Noerr-Pennington* "does not protect deliberately false or misleading statements." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) (per curiam). "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *Whelan*, 48 F.3d at 1255 (quoting *Cal. Motor Transp.*, 404 U.S. at 513); *see Allied Tube*, 486 U.S. at 500 (noting "unethical and deceptive practices can constitute abuses of administrative or judicial processes" subject to liability). A complaint overcomes a *Noerr-Pennington* defense by alleging "a series of misleading statements, of representations having the effect of actually barring access to an official body, or of an intent to mislead the body concerning central facts." *AT&T*, 524 F. Supp. at 1364.

Plaintiffs allege that the private Defendants "knowingly and intentionally" filed "deliberately misleading" objections about jobs that "were based on a series of deliberate misrepresentations of the record." Am. Compl. ¶321. Mr. Goodfriend on behalf of objectors misrepresented documents in the record to assert baseless claims that Standard General would impose layoffs. *Id.* ¶¶162, 164. Standard General explained that the documents objectors referred to contained job projections from *existing* TEGNA management, not Standard General. *Id.* ¶165. Yet Mr. Goodfriend "persisted" with the misleading arguments, "'intentionally misrepresenting' the record with 'no evidence'" and making "false and misleading allegations" and "repetitive unsupported assertions" reflecting "blatant disregard for the facts." *Id.* ¶¶166-67, 187. Defendants' acts were "material, in the sense that [they] actually altered the outcome of the proceeding," *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011), because the Media Bureau relied on them in ordering further document productions, additional public comment cycles, and issuing the HDO, Am. Compl. ¶¶168, 201, 226-27, needlessly delaying the license-transfer review process beyond expiration of the merger contract, *id.* ¶¶137, 167, 187, 203, 323, 369, 378.

Defendants' series of deliberately misleading objections and misrepresentations are not protected by *Noerr-Pennington*. *See Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 307 (D.D.C. 2012) (holding defendants were "not entitled to *Noerr-Pennington* immunity at the motion to dismiss stage" where complaint

alleged "deliberate misrepresentations by defendants"); *Gen. Aircraft Corp. v. Air Am., Inc.*, 482 F. Supp. 3, 8 (D.D.C. 1979) (holding "allegedly misleading performance reports and false disparagement engaged in by the defendants … would not be immune from antitrust liability" and claims were "not barred by the *Noerr-Pennington* doctrine"). No private Defendant argues otherwise. Accordingly, Plaintiffs have plausibly alleged that Defendants are not protected by *Noerr-Pennington*, even if it applies to this case.

## LEAVE TO AMEND

Should the Court agree with Defendants, Plaintiffs respectfully request that dismissal be without prejudice and that they be granted leave to amend. Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); *accord Foman v. Davis*, 371 U.S. 178, 182 (1962). Plaintiffs filed the amended complaint before Defendants moved to dismiss. *Cf. Haynes v. Navy Fed. Credit Union*, 282 F.R.D. 17, 20 (D.D.C. 2012). And as previewed herein, recent events at the FCC, including private Defendants' reactions or inaction, which post-date the filing of Plaintiffs' amended complaint, provide further factual support for Plaintiffs' claims. *Supra* pp.19-22.

## CONCLUSION

The Court should deny Defendants' motions to dismiss.

DATED:   November 8, 2024          Respectfully submitted,


                                   /s/ Taylor A.R. Meehan
Tyler R. Green                     Taylor A.R. Meehan*
   (DC Bar No. 982312)                (DC Bar No. 106377)
CONSOVOY MCCARTHY PLLC              Jeffrey M. Harris
222 S. Main St., 5th Fl.              (DC Bar No. 994058)
Salt Lake City, UT 84101           Frank H. Chang
(703) 243-9423                        (DC Bar No. 1686578)
tyler@consovoymccarthy.com         Daniel M. Vitagliano**
                                      (DC Bar No. 90019860)
                                   CONSOVOY MCCARTHY PLLC
Patrick Strawbridge*               1600 Wilson Blvd., Ste. 700
CONSOVOY MCCARTHY PLLC             Arlington, VA 22209
Ten Post Office Square             (703) 243-9423
8th Floor South PMB #706           taylor@consovoymccarthy.com
Boston, MA 02109                   jeff@consovoymccarthy.com
(703) 243-9423                     frank@consovoymccarthy.com
patrick@consovoymccarthy.com       dvitagliano@consovoymccarthy.com


                                   * Admitted pro hac vice
                                   ** Supervised by principals of the firm
                                   admitted to practice in VA


        *Counsel for Plaintiffs SGCI Holdings III LLC and Soohyung Kim*

**CERTIFICATE OF SERVICE**

I certify that on November 8, 2024, I filed this memorandum through the Court's

CM/ECF system, which will provide notice to all parties of record.

/s/ *Taylor A.R. Meehan*
*Counsel for Plaintiffs*