**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SGCI HOLDINGS III LLC, et al.,

        *Plaintiffs,*

    v.

FEDERAL COMMUNICATIONS
COMMISSION, *et al.*

        *Defendants*.

Case No. 1:24-cv-01204-RC

---

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT
OF DEFENDANT COMMON CAUSE'S MOTION TO DISMISS PLAINTIFFS'
AMENDED COMPLAINT**

Alison Schary (#1014050)
Marietta Catsambas (#1617526)
Davis Wright Tremaine LLP
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
alisonschary@dwt.com
mariettacatsambas@dwt.com
(202) 973-4200

*Counsel for Defendant Common Cause*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ....................................................................................................................... 3

I.   PLAINTIFFS HAVE FAILED TO ALLEGE PLAUSIBLY THAT COMMON CAUSE WAS MOTIVATED BY RACIAL ANIMUS ........................................................................ 3

    A.   Common Cause's Own Statements Are Benign ................................................. 3

    B.   Common Cause Was Not Part of a Racially-Motivated Conspiracy ..................... 6

II.   ALL OF PLAINTIFFS' CLAIMS AGAINST COMMON CAUSE ARE BARRED BY THE FIRST AMENDMENT ................................................................................. 9

    A.   Plaintiffs Target Common Cause's Protected Speech, Not Its "Conduct" ............ 9

    B.   Plaintiffs Cannot Avoid Dismissal Under *Noerr-Pennington* ............................ 11

III.  PLAINTIFFS' CLAIMS CHALLENGE THE PROPRIETY OF FCC DECISIONS THAT THIS COURT LACKS JURISDICTION TO REVIEW ...................................... 15

IV.  EACH CLAIM AGAINST COMMON CAUSE FAILS INDEPENDENTLY AS A MATTER OF LAW ................................................................................................... 16

    A.   42 U.S.C. § 1981 (Count II) ............................................................................ 16

    B.   42 U.S.C. § 1985(3) and Civil Conspiracy (Counts III and VII) ......................... 19

    C.   42 U.S.C. § 1986 (Count IV) .......................................................................... 19

    D.   Tortious Interference with Contract and with Prospective Business Opportunity (Counts V and VII) ....................................................................................... 20

V.   DISMISSAL SHOULD BE WITH PREJUDICE ...................................................... 21

CONCLUSION .................................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.H.D.C. v. City of Fresno, Cal.*,
    No. CV-F-97-5498 OWW SMS, 2000 WL 35810722 (E.D. Cal. Aug. 31, 2000).................10

*Abbas v. Foreign Pol'y Grp., LLC*,
    783 F.3d 1328 (D.C. Cir. 2015) ...............................................................................22

*Alemu v. Dep't of For-Hire Vehicles*,
    327 F. Supp. 3d 29 (D.D.C. 2018) ..........................................................................12

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*,
    103 F.4th 765 (11th Cir. 2024) ...............................................................................10

*\*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................3

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ...........................................................11, 19, 20, 21

*\*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................3

*Bio-Technology General Corp. v. Genentech, Inc.*,
    267 F.3d 1325 (Fed. Cir. 2001)...............................................................................13

*Borough of Duryea v. Guarnieri*,
    564 U.S. 379 (2011) ................................................................................................12

*Boulware v. State of Nevada, Department of Human Resources*,
    960 F.2d 793 (9th Cir. 1992) ..................................................................................13

*Brown v. Pa. Higher Educ. Assistance Agency*,
    No. 20-5095, 2021 WL 2525024 (D.C. Cir. May 17, 2021) .....................................3

*Bryant v. Mil. Dep't of Miss.*,
    597 F.3d 678 (5th Cir. 2010) ..................................................................................13

*Burnett v. Sharma*,
    511 F. Supp. 2d 136 (D.D.C. 2007) ........................................................................19

*E. Sav. Bank, FSB v. Papageorge*,
    31 F. Supp. 3d 1 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015)................14

*Elkalibe v. Ibiza Nightclub DC, LLC*,
    No. CIV.A. 10-2186 ESH, 2011 WL 1395262 (D.D.C. Apr. 13, 2011) ...............................21

*Evans Hotels, LLC v. Unite Here Loc. 30*,
    433 F. Supp. 3d 1130 (S.D. Cal. 2020)...................................................................................12

*FilmTec Corp. v. Hydranautics*,
    67 F.3d 931 (Fed. Cir. 1995)...................................................................................................13

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015)....................................................................................................13

*In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    336 F. Supp. 3d 1256 (D. Kan. 2018) .....................................................................................20

*In re Lipitor Antitrust Litigation*,
    868 F.3d 231 (3d Cir. 2017)....................................................................................................13

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    333 F. Supp. 3d 135 (E.D.N.Y. 2018) ....................................................................................20

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    No. 13-MD-2445, 2017 WL 3967911 (E.D. Pa. Sept. 8, 2017) ..............................................20

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
    24 F. Supp. 3d 32 (D.D.C. 2014) ...........................................................................................18

*Israel v. Baxter Lab'ys, Inc.*,
    466 F.2d 272 (D.C. Cir. 1972)................................................................................................13

*Jefferson-11th St., LLC v. D.C.*,
    No. 19-CV-01416 (CJN), 2020 WL 3035038 (D.D.C. June 5, 2020)....................................21

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*,
    968 F.2d 286 (2d Cir. 1992)....................................................................................................10

*Ladson v. Ulltra E. Parking Corp.*,
    853 F. Supp. 699 (S.D.N.Y. 1994) .........................................................................................19

*Landmarks Holding Corp. v. Bermant*,
    664 F.2d 891 (2d Cir. 1981)....................................................................................................13

*McDonald v. Smith*,
    472 U.S. 479 (1985)................................................................................................................12

*Mead v. Holder*,
    766 F. Supp. 2d 16 (D.D.C. 2011) .........................................................................................6

*Muhammad v. Oliver*,
  547 F.3d 874 (7th Cir. 2008) ............................................................................19

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982)............................................................................................9

*Nader v. Democratic Nat'l Comm.*,
  555 F. Supp. 2d 137 (D.D.C. 2008) ............................................................12, 13

*Niman v. GPS USA, Inc*,
  No. 13-CV-2725-RBJ, 2015 WL 1898244 (D. Colo. Apr. 27, 2015) ...................10

*Paxton v. Washington Hosp. Ctr. Corp.*,
  299 F.R.D. 335 (D.D.C. 2014)...........................................................................21

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)............................................................................................12

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)............................................................................................9

*Republic Tobacco L.P. v. N. Atl. Trading Co.*,
  No. 06 C 2738, 2007 WL 1424093 (N.D. Ill. May 10, 2007) ..............................15

*Seven-Sky v. Holder*,
  661 F.3d 1 (D.C. Cir. 2011) .......................................................6, 11, 15, 19

*Singleton v. D.C.*,
  No. CV 21-1914 (RJL), 2022 WL 4235128 (D.D.C. Sept. 14, 2022)..................21

*Smith v. Trump*,
  2023 WL 417952 (D.D.C. Jan. 26, 2023),
  *aff'd*, 2023 WL 9016458 (D.C. Cir. Dec. 29, 2023) ......................................19, 20

*SMJ Grp., Inc. v. 417 Lafayette Rest. LLC*,
  No. 06 Civ. 1774(GEL), 2006 WL 2516519 (S.D.N.Y. Aug. 30, 2006)...............10

*Spence v. Daily News*,
  No. 00 Civ. 5394(DLC), 2001 WL 121938 (S.D.N.Y. Feb. 13, 2001) .................10

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ............................................................................15

*United States ex rel. Adams v. Dell Computer Corp.*,
  496 F. Supp. 3d 91 (D.D.C. 2020).....................................................................21

*Wiggins v. Hitchens*,
  853 F. Supp. 505 (D.D.C. 1994) ........................................................................19

**Federal Statutes**

28 U.S.C. §§ 2342, 2344 ................................................................................................................15

42 U.S.C.
  § 1981 .................................................................................................................16, 18, 19
  § 1985 .................................................................................................................19
  § 1986 .................................................................................................................19, 20

Defendant Common Cause respectfully submits this reply memorandum of points and authorities in further support of its motion to dismiss the Amended Complaint of Plaintiffs SGCI Holdings III LLC ("SGCI" or "Standard General") and Soohyung Kim.

## PRELIMINARY STATEMENT

Plaintiff's bloated Opposition (ECF No. 66) begs the question why Common Cause is even named as a defendant in this case. Across 140 pages, Plaintiffs offer no well-pleaded facts that Common Cause either ***acted*** with racial animus towards Mr. Kim or even ***said*** anything that, reasonably read, reflects racial animus or a desire that the FCC turn down Standard General's application because of Mr. Kim's race. Indeed, Plaintiffs now admit that, in their view, Common Cause was a "mere foot soldier" (*see* Opp. at 99-100) in the sprawling and fanciful conspiracy they allege. And Common Cause is named as a foot soldier only because Plaintiffs have invented some imaginary "ambiguity" in Common Cause's clear statements opposing the merger and then insisted that this Court must view their invented "ambiguity" in Plaintiffs' favor. But there is no plausible ambiguity in anything Common Cause said: its objections to the acquisition were written in plain English and were plainly race neutral.

Otherwise, Plaintiffs simply repeat their disagreements with Common Cause's objections to the proposed transaction, all of which were fully briefed before the FCC (although, tellingly, Plaintiffs did not raise any allegations of "conspiracy" or "racial animus" at the time). In order to repackage their arguments as a "civil rights claim," Plaintiffs now ask this Court to accept their representation at face value that Common Cause's petition was "baseless" (despite FCC rulings to the contrary) and credit their assumption that Common Cause must have objected to the TEGNA merger because it was biased against Asian Americans.

While well-pleaded facts and reasonable inferences are granted deference on a motion to dismiss, baseless accusations of racism and inaccurate paraphrases of public filings are not. Yet

that is all Plaintiffs manage to scrounge up to support their claims against Common Cause.  To paper over their nonexistent claims, Plaintiffs lump Common Cause in with other defendants wherever possible, referring generally to "defendants" or "the straw objectors" even where referencing allegations that do not actually apply to Common Cause.  But looking solely at the allegations ***against Common Cause***, this is a very simple case: Plaintiffs are suing Common Cause for filing "standard objections" with the FCC to a major proposed broadcast merger, as Common Cause has often done.  When Common Cause addressed Mr. Kim's race – exactly ***once*** in its filings and only in response to Mr. Kim's decision to insert the issue of race into his application – Common Cause explained clearly and unambiguously that its objection to his application was ***unrelated*** to his race.  Focusing specifically on Common Cause, there is simply "no there there."  There is no plausible and well-pleaded allegation that Common Cause acted out of racial animus, and that is reason enough to dismiss the complaint.

In any event, Plaintiffs' claim is barred by the First Amendment.  Plaintiffs' assertion that filing an FCC petition during the public comment period is "*conduct* – not speech" (Opp. at 120) is nonsensical.  Indeed, crediting their theory would largely do away with the First Amendment right to petition the government for redress of grievances.  And Plaintiffs' attempt to explain away the *Noerr-Pennington* doctrine falls equally flat.  *Noerr-Pennington* does not create a specialized First Amendment protection for petitioning activity that is only applicable in the antitrust context; it describes a framework for carving out that core constitutional activity from otherwise unlawful business practices.  Whether by application or analogy, *Noerr-Pennington* explains why Plaintiffs' claims fail as a matter of law under the First Amendment.

Plaintiffs' claims against Common Cause also fail independently for the additional reasons in Common Cause's opening brief: this Court lacks subject-matter jurisdiction over what

is, in sum and substance, a collateral attack on the FCC's rulings, and Plaintiffs' threadbare allegations against Common Cause do not satisfy the pleading requirements for any of the claims asserted.  Finally, the Court should disregard any request from Plaintiffs for yet another amendment in lieu of dismissal because it would be both procedurally improper and unwarranted on the merits.

For any and all of these reasons, Plaintiffs' claims against Common Cause should be dismissed with prejudice.

## ARGUMENT

## I.    PLAINTIFFS HAVE FAILED TO ALLEGE PLAUSIBLY THAT COMMON CAUSE WAS MOTIVATED BY RACIAL ANIMUS

Our opening brief demonstrated that Plaintiffs have failed to plausibly allege that Common Cause's opposition to Mr. Kim's application was based on his race.  In response, the most that Plaintiffs can claim is that Common Cause's statements were somehow ambiguous and that other opponents allegedly may have had race in mind in their submissions.  But the first argument is demonstrably false and not well-pleaded, and the second argument is not only false but cannot, on the pleadings, be attributed to Common Cause in any event.[1]  Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the complaint against Common Cause should be dismissed.

### A.    Common Cause's Own Statements Are Benign

Common Cause's FCC pleadings referred to Mr. Kim's race once and only once.  That is now undisputed.  *See* Mot. (ECF No. 49-1) at 8-9.  It is worth reviewing that brief discussion and

---

[1] Common Cause's FCC submissions are public filings, cited in the Amended Complaint and subject to judicial notice.  They speak for themselves and Plaintiffs cannot avoid dismissal by mischaracterizing them.  *See Brown v. Pa. Higher Educ. Assistance Agency*, No. 20-5095, 2021 WL 2525024, at *1 (D.C. Cir. May 17, 2021) ("[A] court need not 'accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice." (quoting *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018))).

how it came about.  It was SGCI who inserted race into the proceedings by claiming that its

application should be approved because Mr. Kim was Asian-American and his CEO was a

woman: "The Petitioners [including Common Cause] have always claimed to value diversity, but

fail to even mention that the Transaction would create the largest minority-owned and female-led

television station group in U.S. history."  Ex. 6 to Mot. (ECF No. 49-8) (cited in Am. Compl.

¶ 141 n.74).  In response, Common Cause explained why its opposition was unrelated to

Mr. Kim's race:

> It is certainly a good thing that Mr. Kim is not barred by his race from becoming a
> successful entrepreneur with the acumen and business relationships giving him
> access to capital such that he is at the lead of this transaction.  It is certainly a
> good thing that Ms. McDermott is not barred by her gender to be selected to run a
> large corporation.  Unfortunately, it *is* rare for members of either of these groups
> to be in such a position.  But a single large LLP or corporation of the type
> proposed here is not going to ameliorate or address long-standing inequities
> produced by structural racism, xenophobia or misogyny – and is not likely to
> provide additional members of historically excluded groups the opportunity to
> gain wealth and influence in society.  The identity of the executives leading these
> companies should not and does not insulate a transaction of this scope from a
> thorough and searching review by federal regulators.

Ex. 7 to Mot. (ECF No. 49-9) at 6.[2]  These innocuous comments are, if anything, complimentary

of Mr. Kim and Ms. McDermott and their successes.  They simply ask that the SCGI application

be considered and decided on the merits in a race-neutral fashion.  These comments cannot be

transformed, as Plaintiffs would have it, into some kind of racist rant against the application

because Mr. Kim is an Asian American.  Accordingly, they do not provide a plausible basis for

Plaintiffs' claims.

---

[2] Common Cause also issued a press release along with its reply in August 2022, echoing these views: "While the diversity of the business leaders in this merger is laudable, the agency's goals to increase media ownership opportunities for women and people of color are grounded in creating pathways for multiple owners with multiple viewpoints and backgrounds to enter the marketplace."  *See* Press Release, Statement of Yosef Getachew, Media and Democracy Program Manager, Common Cause (Aug. 1, 2022), https://www.commoncause.org/press/common-cause-files-response-opposing-proposed-apollo-global-management-standard-general-tegna-merger/.

Plaintiffs also claim that Common Cause "peddled . . . xenophobia" by urging the FCC to investigate "the involvement of shadowy foreign investors" – insisting that the "shadowy foreign investor" was a covert reference to Mr. Kim, "an Asian American with a foreign-sounding last name." Am. Compl. ¶¶ 148-49. This, too, is a deliberate misreading of Common Cause's reply. Common Cause never described Mr. Kim as "foreign" or "shadowy"; it was raising concerns about SGCI's unknown offshore investors, consistent with its longstanding concern – echoed by the federal government – about anonymous hedge fund ownership of media companies. In this respect, Common Cause's entire argument was simply to point out, as federal law requires, that "involvement of large hedge funds headquartered in the Cayman Islands and the British Virgin Islands . . . necessitat[es] a waiver of the Commission's foreign ownership limits" and to call for disclosure of these offshore investors. Common Cause urged the government in this regard to explore "the involvement of shadowy foreign investors." Ex. 7 to Mot. at 20.

This is obviously not a reference to Mr. Kim. As the FCC well knew in considering his application, Mr. Kim is an American citizen, not a hedge fund headquartered in the Caribbean; he did not need, and did not seek, a waiver of foreign ownership rules; and his identity was publicly known. Moreover, Common Cause's concern about foreign ownership and the need for careful national security review by the government was entirely legitimate, as the Amended Complaint itself concedes. *See* Am. Compl. ¶ 71. As Plaintiffs admit, the very inquiry requested by Common Cause was in fact required here "because Standard General was able to finance the multi-billion-dollar deal with equity held in Cayman Islands and British Virgin Islands investment funds." *Id.* The investigation of foreign ownership interests in the proposed acquisition was mandatory in these circumstances and was undertaken by the federal government's Team Telecom without objection from Plaintiffs. Team Telecom's review was

completed by November 2022, and it registered no objections to the merger. *Id.* ¶ 189. After that point, Common Cause raised no further concerns about foreign investors. Instead, it focused only on the objections noted by the FCC and stated in the Amended Complaint: newsroom layoffs and increased costs to customers.

This is the ***entirety*** of Common Cause's utterly benign comments relating to race and Mr. Kim's application that exist in the extensive public filings in connection with this application. Plaintiffs argue that these statements are supposedly ambiguous and include "racially charged code words" (Opp. at 78) and so "inferences must be drawn in Plaintiffs favor at this stage" (*id.* at 75). But statements are not ambiguous just because the Plaintiffs say so. As a long-ago television commercial once asked, "Where's the beef?" What statement quoted above is ambiguous and suggests that Mr. Kim's application should be denied ***because of*** his race? The answer is simple: none. While the Court must draw reasonable inferences in Plaintiffs' favor for purposes of this motion, Plaintiffs are not entitled to "unreasonable inferences" or "unwarranted deductions of fact." *Mead v. Holder*, 766 F. Supp. 2d 16, 38 n.13 (D.D.C. 2011) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)), *aff'd sub nom. Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011)). Because Common Cause's statements are ***not*** ambiguous and do not plausibly support an inference of racial animus, Plaintiffs' claims should be dismissed.

### B.    Common Cause Was Not Part of a Racially-Motivated Conspiracy

Plaintiffs' other response is to ignore what Common Cause actually said and to lump its comments together with others – in particular, with those of Mr. Goodfriend, who allegedly "orchestrated" objectors to challenge Plaintiffs' deal. Am. Compl. ¶¶ 19, 25. No others are alleged to have "conspired" with Common Cause. Indeed, there are no allegations that Common Cause had any contact whatsoever with Mr. Allen, Allen Media, Mr. Ergen, or DISH, or (apart

from in connection with its public filings) with the FCC, Chairwoman Rosenworcel, or Chief of the Media Bureau Holly Saurer. The plausibility of Common Cause's supposed participation in the alleged racist conspiracy thus depends on the allegations involving Mr. Goodfriend. But there is no plausible basis to suggest that Mr. Goodfriend orchestrated Common Cause to object to SGCI's application, let alone to object on the basis of Mr. Kim's race.

Mr. Goodfriend is a lawyer who represented two other objectors, NewsGuild and NABET, both labor unions. Am. Compl. ¶ 157. The Amended Complaint alleges no connections between the labor unions themselves and Common Cause, a public interest organization. As for Mr. Goodfriend, Common Cause filed its objections before Mr. Goodfriend even appeared in the matter (as the complaint acknowledges, *see* Am. Compl. ¶¶ 135, 157). Common Cause is a regular opponent of media consolidation and it filed its standard objections against the SGCI acquisition (again as the complaint acknowledges, *see* Am. Compl. ¶ 98). It is true that Mr. Goodfriend later appeared in the same matter and lodged similar objections on behalf of his union clients. But the unions, also, are regular objectors to media consolidation (as the complaint also acknowledges). *See* Am. Compl. ¶ 98. As in *Iqbal*, the parallel conduct of Common Cause and the unions in objecting to the merger does "not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior." 556 U.S. at 680.

Looking for a way to connect Common Cause to Mr. Goodfriend and his clients in a race-based conspiracy, the Amended Complaint alleges that it is somehow sinister that Mr. Goodfriend met with the FCC Media Bureau Chief about a diversity initiative on the "***exact same day***" that Common Cause first appeared in the SGCI matter, when it asked for an extension of the public comment period. Opp. 7-8. This allegation makes no sense. Are we to think that

Mr. Goodfriend carefully timed his meeting with the FCC on an unrelated matter *so as to coordinate* with Common Cause making a routine filing on the public docket in this matter? That's silly.  It does not evidence a conspiracy, let alone a conspiracy to make race-based objections to the SGCI acquisition.  It just shows that two entities were engaged in different and unrelated business with the FCC on the same day.  One might as well roll into the "conspiracy" everyone who filed something with the FCC that day.

The plainest proof that there is no plausible connection between Common Cause and Mr. Goodfriend's alleged racist objections to the SGCI acquisition is the behavior of SGCI during the time in question.  It is true, as the complaint alleges, that various public figures (perhaps inspired by SGCI's public relations firm) publicly suggested that racism was at play in the FCC's treatment of SGCI.  *See* Am. Compl. ¶¶ 152-55.  These allegations all apparently derived from a public statement by Mr. Kim based on an out-of-context complaint about arguments made by Mr. Goodfriend and his colleagues.  Thus, in real time, Mr. Kim alleged that a series of letters from Mr. Goodfriend and his co-counsel Andrew Jay Schwartzman had sexist and racist implications.  Mr. Kim said not a word about Common Cause.

The Goodfriend/Schwartzman letters were made on behalf of their clients the NewsGuild and NABET – *but not Common Cause.*  They led to complaints from Mr. Kim: "We are extremely concerned by the manner in which Jon Schleuss [president of the NewsGuild], David Goodfriend and Andrew Schwartzman of the NewsGuild continue to ignore the facts of this deal **and more troubling are their sexist and racially charged ad hominem attacks**."[3]  The complaint even alleges that SGCI's allegations were seemingly so threatening to Mr. Goodfriend

---

[3] https://perma.cc/P493-RERE (cited in Am. Compl. ¶ 184 n.114) (emphasis in original).

and the unions that they would not even talk with SGCI without a release "from any and all liability in connection with the Standard General-TEGNA deal." Am. Compl. ¶ 248.

At the time, Mr. Kim's grievance was with Mr. Goodfriend and the two unions he represented. All are now defendants here. They have their own counsel and can speak for themselves. For what it is worth, Common Cause does not read the Goodfriend letters as Mr. Kim does and does not believe that Mr. Goodfriend, NABET, or the NewsGuild objected to the acquisition on racial grounds. But that is not Common Cause's fight. In real time, Mr. Kim saw Common Cause's objections as we do, and as they actually are – clear and unambiguous race-neutral objections *on the merits* to the acquisition. That is why he did not complain about them at the time. We do not understand why he complains about them now. There is no plausible basis for Common Cause to be in this lawsuit.

## II.    ALL OF PLAINTIFFS' CLAIMS AGAINST COMMON CAUSE ARE BARRED BY THE FIRST AMENDMENT

### A.    Plaintiffs Target Common Cause's Protected Speech, Not Its "Conduct"

Petitioning the government for redress of grievances, as Common Cause did here, lies at the heart of the First Amendment. Mot. at 19-21. As set forth above, there is no plausible basis for Plaintiffs' factual allegations that Common Cause's petitions were tainted by racist animus. But in any event, as Common Cause explained in its opening brief, Plaintiffs cannot sidestep the First Amendment's constitutional protection by conjuring supposedly "racist" insinuations and motivations from Common Cause's FCC submissions. *Id.* at 21-22. The First Amendment fully protects offensive, even racist, speech, and it applies regardless of the speaker's motivation. *Id.*; *see, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) ("[T]he right of the people to petition their representatives in government cannot properly be made to depend on their intent in doing so.") (citation omitted); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)

(First Amendment "prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed") (citations omitted).

Plaintiffs have no response to this black-letter law, which eviscerates any claim based on the content of or alleged motivation for Common Cause's FCC filings.  Instead, they pivot to a new theory: they are not attacking Common Cause's "speech" at all, but rather its "course of conduct."  Opp. at 120-21.  But this fares no better, since ***Common Cause's only alleged "course of conduct" was speech*** – i.e., its FCC petitions.  While Plaintiffs insist their "claims are not predicated on objectors' statements in FCC filings alone," they do not point to any other allegations of racially discriminatory "conduct" by Common Cause.  Opp. at 121.

Unsurprisingly, Plaintiffs fail to identify a single case endorsing their novel theory that petitioning a government agency is non-speech "conduct" falling outside the First Amendment.  Instead, they simply recite the uncontroversial point that unlawful conduct is not immunized simply because it includes some element of speech.[4]  *See id.* at 120.  But just as pointing to some element of incidental speech does not shield unlawful conduct, reframing petitioning as a "course of conduct" does not eliminate its First Amendment protection.[5]

---

[4] *See, e.g.*, *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 778-79 (11th Cir. 2024) (rejecting scholarship applicants based on race); *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 296-98 (2d Cir. 1992) (canceling hotel contract for controversial religious group's event); *SMJ Grp., Inc. v. 417 Lafayette Rest. LLC*, No. 06 Civ. 1774(GEL), 2006 WL 2516519, at *7 (S.D.N.Y. Aug. 30, 2006) (holding that defendants' leaflets violated trademark law); *Spence v. Daily News*, No. 00 Civ. 5394 (DLC), 2001 WL 121938, at *3 (S.D.N.Y. Feb. 13, 2001) (declining to run plaintiff's contracted-for advertisement); *A.H.D.C. v. City of Fresno, Cal.*, No. CV-F-97-5498 OWW SMS, 2000 WL 35810722, at *4 (E.D. Cal. Aug. 31, 2000) (engaging in race and housing discrimination); *see also Niman v. GPS USA, Inc*, No. 13-CV-2725-RBJ, 2015 WL 1898244, at *3 (D. Colo. Apr. 27, 2015) (reaffirming that tortious interference liability "is directed against conduct, not speech," and that "a plaintiff cannot succeed on a tortious interference claim predicated on speech protected by the First Amendment").

[5] Plaintiffs' cases asserting that speech can be used as "evidence" of discriminatory intent are equally unavailing because there is no "independent," non-speech basis for their claims against Common Cause, which are based solely on its FCC filings.  Opp. at 121.

## B.    Plaintiffs Cannot Avoid Dismissal Under *Noerr-Pennington*

The First Amendment conclusively disposes of Plaintiffs' claim. All Common Cause did was petition the government for redress of grievances, just as the First Amendment provides. To the extent the Court seeks to rely on an established intellectual framework for analyzing the issue, the *Noerr-Pennington* doctrine handily provides that framework. Plaintiffs insist that *Noerr-Pennington* only applies to antitrust claims, but they provide no better mechanism for analyzing the First Amendment claim and they cite no binding case law rejecting its application outside the antitrust context. The most they offer is that it is "at least unclear" whether *Noerr-Pennington* applies here. Opp. at 125 (quoting *Jefferson-11th St., LLC v. D.C.*, No. 19-CV-01416 (CJN), 2020 WL 3035038, at *7 (D.D.C. June 5, 2020)).[6]

That argument goes nowhere. Absent *Noerr-Pennington*, this Court would still have to analyze Common Cause's First Amendment claim and Plaintiffs have not suggested a better intellectual vehicle to guide that analysis or one in which their claim would survive. To the contrary, implicitly recognizing that *Noerr-Pennington* controls, the complaint parrots the two-prong objective/subjective tests of the doctrine. *See, e.g.*, Am. Compl. ¶¶ 321, 323. In any event, this Court need not define the outer limits of *Noerr-Pennington*'s application for all purposes; regardless of where that line is, this case falls well within it. As Common Cause pointed out in its brief, courts in this Circuit – and around the country – routinely employ the *Noerr-Pennington* doctrine to dismiss on First Amendment grounds tortious interference, civil

---

[6] While the D.C. Circuit recognized a lack of controlling precedent at the Circuit level in *Banneker*, it explicitly took "no position on the matter." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1137 n.8 (D.C. Cir. 2015). Further, the *Banneker* court's distinction (in *dicta*) between "private commercial activity" and "political activity" supports application of *Noerr-Pennington* here. *See id.* Common Cause is not a business competitor of Plaintiffs lobbying against their bid for a government contract, as in *Banneker*; it petitioned the FCC to enforce its rules and regulations and deny approval of a politically controversial merger. This is plainly "political" and not "business" activity.

rights, and conspiracy claims just like the ones here. Mot. at 23-24 (collecting cases). Plaintiffs do not attempt to distinguish any of these cases.[7]

To the contrary, as Plaintiffs recognize, the Supreme Court regularly "invok[es]" the reasoning of *Noerr-Pennington* by "analogy" outside the antitrust context (Opp. at 125), drawing on its "sham litigation" exception to determine whether court or administrative filings can form the basis for civil liability under the First Amendment. *See, e.g.*, *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 59 (1993) ("Whether applying *Noerr* as an antitrust doctrine or invoking it in other contexts, we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham."). It serves the same purpose here: Plaintiffs' claims against Common Cause all turn on asserting that its FCC petition was "baseless," from which they infer a motive to discriminate or tortiously interfere with Plaintiffs' expected merger. But Plaintiffs cannot satisfy *Noerr-Pennington*'s two-prong test to designate Common Cause's petitions as a "sham," because they fail to plausibly allege they were both ***objectively*** baseless and brought with ***subjectively*** wrongful intent. *See Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 157 (D.D.C. 2008).[8]

On the first prong, Common Cause's petitions cannot be objectively baseless because they were ultimately successful. *See* Mot. at 25 (collecting cases). Once again, Plaintiffs do not

---

[7] Plaintiffs also misconstrue the cases they ***do*** cite. Neither *McDonald v. Smith*, 472 U.S. 479 (1985), nor *Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011), includes any holding about the application of *Noerr-Pennington*. "*McDonald* held only that speech contained within a petition is subject to the same standards for defamation and libel as speech outside a petition." *Guarnieri*, 564 U.S. at 389, and *Guarnieri* applied a similar approach as *McDonald* to a public employee's retaliation claim.

[8] The decisions Plaintiffs cite to suggest that the "sham" analysis is improper on a motion to dismiss (Opp. at 129) were all driven by their specific facts. In fact, many courts have granted motions to dismiss on the basis that plaintiffs failed to satisfy the sham exception. *See, e.g.*, *Nader*, 555 F. Supp. 2d at 157-61; *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 52 (D.D.C. 2018); *Evans Hotels, LLC v. Unite Here Loc. 30*, 433 F. Supp. 3d 1130, 1147-51 (S.D. Cal. 2020).

distinguish any of Common Cause's cases, and the cases they cite do not support their position.[9]

Plaintiffs argue that Common Cause's petition violated agency precedent and that the HDO was

not a final decision on the merits, but these arguments miss the mark.  In the HDO, the FCC

endorsed the legitimacy of the exact concerns Common Cause had raised, namely whether

"(1) the Transactions are structured in a way that is likely to trigger a rate increase harmful to

consumers, as a result of contractual clauses that take immediate effect after the consummation

of the Transactions, and (2) the Transactions will reduce or impair localism, including whether

they will result in labor reductions at local stations."  Ex. 14 to Mot. (ECF No. 49-16) ¶¶ 2, 18.

Given that the FCC *agreed* with Common Cause about the need for a hearing on these issues,

Plaintiffs cannot plausibly claim that Common Cause's arguments contradicted agency

precedent.  Nor does the fact that the HDO was not technically final mean that the Court should

ignore it when evaluating the legitimacy of Common Cause's arguments.[10]  Plaintiffs cannot

show that "no reasonable litigant could realistically expect success on the merits" when the

agency itself credited Common Cause's concerns.  *Nader*, 555 F. Supp. 2d at 157.[11]

---

[9] *Bryant v. Mil. Dep't of Miss.*, 597 F.3d 678, 693 (5th Cir. 2010), which Plaintiffs cite to say that the Court should "look at objective merit at the outset, not whether the claim ultimately prevailed" (Opp. at 133), merely suggests that a claim's ultimate success is not *necessary* to the objective baselessness inquiry, but that it could still be *sufficient* to show that the claim was not objectively baseless.  *See Bryant*, 597 F.3d at 693 (rejecting argument that the fact suits were not prosecuted or were dismissed makes them objectively baseless).

[10] Plaintiffs' cases on this point are distinguishable.  *See* Opp. at 133-34.  Unlike here, in *Israel v. Baxter Lab'ys, Inc.*, 466 F.2d 272, 280 (D.C. Cir. 1972), the merits of the agency action were squarely before the court, so the court was able to direct the agency to consider the issue in the first instance.  And in *Bio-Technology General Corp. v. Genentech, Inc.*, 267 F.3d 1325, 1333 (Fed. Cir. 2001), the court actually *affirmed* the dismissal of the claim based on *Noerr-Pennington* immunity.

[11] The cases Plaintiffs cite to argue that the HDO did not constitute a "success" are equally distinguishable.  *See* Opp. at 134-35.  In *In re Lipitor Antitrust Litigation*, 868 F.3d 231, 273 (3d Cir. 2017), the agency actually *denied* the defendants' petition.  Unlike in *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 182 (3d Cir. 2015), the HDO was a complete and not a "partial" success; it was merely nonfinal.  Unlike in *Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 898 (2d Cir. 1981), and *Boulware v. State of Nevada, Department of Human Resources*, 960 F.2d 793, 799 (9th Cir. 1992), in which higher courts reversed earlier favorable rulings, no FCC decision was ever overturned here, and Plaintiffs voluntarily terminated the merger.  Finally, in *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 938 (Fed. Cir. 1995), the court actually found that the underlying litigation was *not* objectively baseless, even though the party ultimately lost.

On the second prong, Plaintiffs allege that Common Cause "pursued a strategy not meant to genuinely influence or persuade the FCC to actually deny the license-transfer applications but instead to impose inordinate delay . . . to drag out the proceedings until Standard General's merger agreement expired." Opp. at 135 (quoting Am. Compl. ¶ 323). Common Cause contends that it acted with subjective good faith and that the *bona fides* of Common Cause's objections is proved because it "'routinely' opposes large mergers that result in media consolidation and threaten job losses and increased costs." Mot. at 26. Plaintiffs disagree, asserting that these arguments "present factual issues that cannot be resolved on a motion to dismiss." Opp. at 137. This is preposterous. Plaintiffs themselves admit that Common Cause "routinely" objects to large media mergers, and that Common Cause raised objections at the outset about media consolidation, job losses, and increased costs before SGCI made any voluntary commitments purportedly addressing these concerns (which Common Cause believed to be inadequate). *See* Am. Compl. ¶¶ 98, 195-200; Mot. at 9. The Amended Complaint makes clear that Common Cause genuinely sought a specific "outcome" from participating in the FCC review process – namely, to persuade the FCC to block the SGCI-TEGNA merger for these reasons – rather than abusing the FCC process to interfere with SGCI's business relationships. *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 19 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015).[12]

Plaintiffs are also wrong that Common Cause made any "misrepresentations" or "misleading statements" that preclude *Noerr-Pennington* immunity. Plaintiffs point to no specific misrepresentations, and instead make a generalized allegation that objectors supposedly

---

[12] The cases Plaintiffs cite at pages 136-37 of their Opposition are inapposite, as they involve clear abuses of process like "consistently maintain[ing]" "baseless claims" and filing "simultaneous and voluminous challenges." Here, by contrast, all Common Cause did was file FCC submissions in the normal course of the notice-and-comment period, raising "standard objections" that SGCI had the opportunity to – and did – fully brief its response to.

falsely "speculated about job cuts." Am. Compl. ¶ 321. But voicing concerns about future effects cannot be "misrepresentations" since "a prediction of future events can neither be true nor false." *Republic Tobacco L.P. v. N. Atl. Trading Co*., No. 06 C 2738, 2007 WL 1424093, at *12 (N.D. Ill. May 10, 2007). And, of course, this is the exact concern that the FCC concluded warranted a hearing.

In sum, Plaintiffs cannot show that Common Cause's petition was a "sham," which means that its advocacy was fully protected by the First Amendment.

## III.    PLAINTIFFS' CLAIMS CHALLENGE THE PROPRIETY OF FCC DECISIONS THAT THIS COURT LACKS JURISDICTION TO REVIEW

Plaintiffs' claims should also be dismissed for an alternative, independent reason: this Court lacks subject-matter jurisdiction over Plaintiffs' claims. This issue was raised by multiple defendants, and dismissal on this ground would apply to all; accordingly, to avoid repetitive briefing across various reply briefs, Common Cause incorporates and joins the arguments by co-defendants as to the lack of jurisdiction and Plaintiffs' improper collateral attack on the FCC's orders. In short, the D.C. Circuit has "exclusive jurisdiction" to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" the FCC's final orders, 28 U.S.C. §§ 2342, 2344 – which is exactly what Plaintiffs ask this Court to do, in the guise of claiming that the FCC's HDO was an improper ruse born of a vast racist conspiracy. Plaintiffs sidestep the fact that the D.C. Circuit has expressly found that its jurisdiction encompasses claims of "unreasonable delay" in issuing a final order and does not just include the final order itself. *Telecomms. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 75-78 (D.C. Cir. 1984). Indeed, Plaintiffs admit that they are challenging "the entire course of the FCC proceedings" (Opp. at 39) – effectively admitting that they are using this action to collaterally attack the findings in the FCC proceedings. This Court should bar them from doing so.

15

IV.    **EACH CLAIM AGAINST COMMON CAUSE FAILS INDEPENDENTLY AS A MATTER OF LAW**

Even if this Court were to consider Plaintiffs' individual claims, it must still dismiss Common Cause from the action because Plaintiffs fail to state any claim against Common Cause.

A.    **42 U.S.C. § 1981 (Count II)**

Plaintiffs' claim under Section 1981, which provides that all persons "shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," fails because (1) they have alleged no facts showing that Common Cause intentionally discriminated against Plaintiffs on the ground of race, and (2) Common Cause had no authority to prevent Plaintiffs from entering into the contract with TEGNA. *See* Mot. 27-29.

First, Plaintiffs argue that Common Cause's FCC filings constitute "direct evidence of discriminatory intent." Opp. at 74. But this argument only works if the Court accepts Plaintiffs' deliberate mischaracterization of those filings. As set forth above, Common Cause's statements do not plausibly support the inference of racial animus and Common Cause cannot be held responsible for the statements of the other objectors.

Plaintiffs also argue that Common Cause's "different treatment of similarly situated license-transfer applicants" evinces a discriminatory motive. Opp. at 80. This is just grasping at straws and does not begin to constitute plausible evidence that Common Cause discriminated against the SGCI merger on the grounds of race. Common Cause is a small nonprofit focusing on multiple issues; it does not employ an army of lawyers and does not have the resources to appear in every single FCC proceeding. There are many, many FCC proceedings in which Common Cause has taken no position. There is no basis to attribute some nefarious motive to Common Cause simply because it weighed in on one transaction but not another.

16

Plaintiffs' cherry-picked list of allegedly "similarly situated license-transfer applicants" (Opp. at 80) does not remotely suggest that Common Cause is somehow targeting Mr. Kim – let alone targeting him because of his race – and staying away from transactions involving Mr. Allen.  As Plaintiffs admit, Common Cause ***did*** oppose the Apollo-Cox merger, raising the same concerns that it "routinely" raises (Am. Compl. ¶ 98): broadcast localism, viewpoint diversity, newsroom closures, and job losses.[13]  Indeed, SGCI was fully aware that Apollo's involvement in the TEGNA deal was the major factor motivating Common Cause and the other public-interest parties.[14]  Meanwhile, based on the public record, the two deals involving Gray that Plaintiffs cite simply did not rise to the level, in terms of scope or impact, that would draw Common Cause's attention.  Notably, in the Gray-Meredith deal, the only objections (both informal) came from a private individual and a local vendor of television antennas.[15]  No petitions to deny were filed in connection with the Gray-Quincy or Scripps-ION deals.[16]  Meanwhile, Common Cause has filed petitions to deny in many ***other*** high-profile transactions that had nothing to do with Plaintiffs or Allen Media, raising the same arguments that the mergers were not in the public interest.[17]  There is no basis to infer any "conspiracy" against

---

[13] https://www.fcc.gov/ecfs/document/1051143903250/1

[14] https://files.fcc.gov/ecfs/download/a540b274-e94a-4083-96ea-fb98b2a2ba00?orig=true&pk=cb77b2ec-1a58-dbc6-139b-ad192cfd5d9b at 4 n.10.

[15] https://www.fcc.gov/ecfs/document/1061719559180/1; https://www.fcc.gov/ecfs/document/1082699553198/1.

[16] https://www.fcc.gov/ecfs/search/search-filings/results?q=(proceedings.name:(%2220-369%22)); https://www.fcc.gov/ecfs/search/search-filings/results?q=(proceedings.name:(%2221-87%22)).  In addition to a lack of resources, another reason for declining to object is that this transaction did not raise the same level of concern—for example, Scripps and ION are both legacy media entities, so their merger is of a different nature than a private equity firm combining with a hedge fund to take over media.

[17] *E.g.*, Sinclair-Tribune (https://www.fcc.gov/ecfs/document/106210358818578/1); Tribune-Nexstar (https://www.fcc.gov/ecfs/document/1031924427034/1); T-Mobile-Sprint (https://www.commoncause.org/wp-content/uploads/2018/08/T-Mobile-Sprint-Petition-to-Deny-CC-CU-OTI-PK-WGA.pdf); Time Warner-Comcast (https://www.fcc.gov/ecfs/document/6018300657/1).

Mr. Kim based on whether or not Common Cause appeared in other FCC proceedings, let alone a "conspiracy" based on his race.

Plaintiffs also reference two recent transactions as further evidence of discrimination. *See* Opp. at 19-22.  These are improperly raised in their opposition brief and can be disregarded. *See Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 40 n.2 (D.D.C. 2014) ("On a motion to dismiss, the Court considers facts alleged within the four corners of the complaint, documents attached as exhibits or incorporated by reference in the complaint, and documents upon which a plaintiff's complaint necessarily relies.").  On their face, however, they are also irrelevant: Plaintiffs just cite two more mergers to which Common Cause did not object in the middle of a busy election year.

The second reason Plaintiffs' § 1981 claim fails is that Common Cause had no authority to prevent Plaintiffs from entering into the contract with TEGNA.  Common Cause could not "prevent" Plaintiffs from entering into a contract to transfer ownership of television stations because it had no authority or control over the FCC's decision to approve, deny, or refer the applications for further review.  Common Cause's alleged "interference" was mere advocacy: submitting briefs during the public notice-and-comment period that the FCC considered and found persuasive.  Under Plaintiffs' novel theory, anyone who submits public comments, speaks at a public hearing, or pens an op-ed opposing government approval of a controversial transaction would face personal liability under § 1981 because their advocacy may "cause" the government's decision.  Not surprisingly, Plaintiffs cannot identify a single case imposing liability under Section 1981 on similar facts, and they fail to distinguish the directly applicable

cases cited by Common Cause (Mot. at 29).[18]  Plaintiffs' Section 1981 claim against Common Cause should therefore be dismissed.

**B.      42 U.S.C. § 1985(3) and Civil Conspiracy (Counts III and VII)**

Without a Section 1981 claim, Plaintiffs' Section 1985(3) claim fails.  *See* Mot. at 29.  "There can be no recovery under section 1985(3) absent a violation of a substantive federal right."  *Wiggins v. Hitchens*, 853 F. Supp. 505, 511 (D.D.C. 1994) (dismissing Section 1985(3) claim where plaintiff failed to allege a violation of Section 1981).  In any event, as set forth above, there are no allegations to support a conspiracy for either the Section 1985(3) claim or the civil conspiracy claim.  *See* Mot. at 29-30, 32.

**C.      42 U.S.C. § 1986 (Count IV)**

Without a Section 1985(3) claim, Plaintiffs' Section 1986 claim fails.  *See* Mot. at 30.  Section 1986 permits a claim against anyone who "having knowledge [of] any of the wrongs . . . mentioned in Section 1985" fails to prevent them, having the power to do so.  A viable § 1985 claim – which Plaintiffs do not have – is required to assert a § 1986 claim.  *Burnett v. Sharma*, 511 F. Supp. 2d 136, 145 (D.D.C. 2007) (Section 1985 claim is a "prerequisite" for Section 1986 claim) (quoting *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 72 (D.D.C. 1988)).

Moreover, Plaintiffs concede that Common Cause lacked "actual authority to compel others to act or refrain from acting," as required in *Smith v. Trump*, 2023 WL 417952, at *7 (D.D.C. Jan. 26, 2023), *aff'd*, 2023 WL 9016458 (D.C. Cir. Dec. 29, 2023).  Indeed, Plaintiffs

---

[18] None of Plaintiffs' cited cases support their position; instead, they all involve defendants who allegedly abused their authority or used unlawful means to interfere with a deal.  *See* Opp. at 71-72.  For example, the defendant in *Muhammad v. Oliver* was accused of "***using her authority*** as [a contract party's] chief executive officer to cause, for racial reasons, [plaintiff's] contractual rights to be violated."  547 F.3d 874, 878 (7th Cir. 2008) (emphasis added).  In *Banneker*, a D.C. council member was accused of bartering votes, leaking confidential information, and using his role as a local official to pressure the transit authority (on whose board he sat) to abandon the plaintiff's bid in favor of a competing bid from a major donor.  798 F.3d at 1127-28.  And in *Ladson v. Ulltra E. Parking Corp.*, the defendant allegedly told employees to write "intentionally false" complaints about the plaintiff's job performance to justify his termination.  853 F. Supp. 699, 702 (S.D.N.Y. 1994).

agree that *Smith* "support[s] dismissal against Common Cause and UCC as 'mere foot soldier[s]." *See* Opp. at 99-100 (recognizing that *Smith* requires dismissal of Common Cause even if claims against other defendants survive). Indeed, Plaintiffs do not have a Section 1986 claim even under their preferred reading of the statute – where a defendant "by reasonable diligence could have prevented" the wrongful act – because they do not allege how Common Cause could possibly have prevented the failure of their application, by reasonable diligence or otherwise.

**D.    Tortious Interference with Contract and with Prospective Business Opportunity (Counts V and VII)**

Plaintiffs' tortious interference claims fail because (1) Common Cause did not cause any breach or termination of contract, and (2) Plaintiffs cannot claim a concrete business expectation because the SGCI-TEGNA deal was subject to government approval.

Plaintiffs' contention that Common Cause's objections were one of several proximate causes of the termination of the deal cannot be squared with their admission that Common Cause was at most a "mere foot soldier[]" in the alleged events. Opp. at 99-100 (alteration added). And again, Plaintiffs fail to cite a single case imposing liability for tortious interference because someone submitted public comments in the normal course of an agency proceeding – and none of the cases they do cite contain remotely similar facts.[19] *See* Opp. at 105.

Further, Plaintiffs had no valid business expectancy that the deal would close because their proposed deal was subject to FCC approval. *Banneker*, which Plaintiffs rely on, is factually

---

[19] *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 333 F. Supp. 3d 135, 144 (E.D.N.Y. 2018) (defendant allegedly submitted several sham citizen petitions, defrauded USPTO into issuing patents, wrongfully listed patents in FDA digest, and filed series of sham patent infringement lawsuits); *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1305 (D. Kan. 2018) (brand-name pharmaceutical manufacturers allegedly filed sham citizen petition with the FDA to delay generic competitors' entry into market); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 3967911, at *5 (E.D. Pa. Sept. 8, 2017) (same).

inapposite, because it involved a proposed contract *with* a government agency.  *See Banneker Ventures, LLC*, 798 F.3d at 1134-35.  And contrary to Plaintiffs' contention, *Jefferson-11th St., LLC* mandates the conclusion that Plaintiffs have not alleged a sufficiently concrete business expectancy: in that case, the plaintiff's expectancy did not enjoy legal protection because it was "subject to governmental approval" and the alleged interferer "merely appear[ed] before a government body to offer another point of view."  *Jefferson-11th St., LLC v. D.C.*, No. 19-CV-01416, 2020 WL 3035038, at \*8 (D.D.C. June 5, 2020).

## V.    DISMISSAL SHOULD BE WITH PREJUDICE

If the Court dismisses the Amended Complaint, it should not permit Plaintiffs to amend their complaint for a second time.  Plaintiffs have not made a Rule 15(a) motion, and they may not request permission to make an amendment in their opposition brief.  "[A] bare request [for leave to amend] in an opposition to a motion to dismiss – without any indication of the particular grounds on which amendment is sought – does not constitute a motion [to amend] within the contemplation of Rule 15(a)."  *Singleton v. D.C.*, No. CV 21-1914 (RJL), 2022 WL 4235128, at \*6 (D.D.C. Sept. 14, 2022) (quoting *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993)); *see also Elkalibe v. Ibiza Nightclub DC, LLC*, No. CIV.A. 10-2186 ESH, 2011 WL 1395262, at \*2 (D.D.C. Apr. 13, 2011); *United States ex rel. Adams v. Dell Computer Corp.*, 496 F. Supp. 3d 91, 102 (D.D.C. 2020) (dismissing complaint and denying request for leave to amend that was improperly included in opposition brief).

Because Plaintiffs have already amended their complaint once, they must show that further amendment would not be futile.  *See Paxton v. Washington Hosp. Ctr. Corp.*, 299 F.R.D. 335, 336 (D.D.C. 2014).  As explained above, allowing Plaintiffs to add a few more references to recent transactions will not save Plaintiffs' theory of a race-based conspiracy.  "Dismissal with prejudice is warranted when 'the allegation of other facts consistent with the challenged pleading

could not possibly cure the deficiency.'" *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) (quoting *Belizan v. Hershon*, 434 F.3d 579, 583 (D.C. Cir. 2006)). Plaintiffs' claims against Common Cause should be dismissed with prejudice.

## CONCLUSION

For the reasons above and in its opening brief, Common Cause respectfully requests that the Court dismiss all claims against it with prejudice.

Dated: December 10, 2024   Respectfully submitted,

       /s/ *Alison Schary*
       Alison Schary (#1014050)
       Marietta Catsambas (#1617526)
       Davis Wright Tremaine LLP
       1301 K Street NW, Suite 500 East
       Washington, D.C. 20005
       alisonschary@dwt.com
       mariettacatsambas@dwt.com
       (202) 973-4200

       *Counsel for Defendant Common Cause*