**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SGCI HOLDINGS III LLC AND SOOHYUNG KIM,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>FEDERAL COMMUNICATIONS COMMISSION; JESSICA ROSENWORCEL, in her official capacity as Chairwoman of the FCC; HOLLY SAURER, in her official capacity as Chief of the Media Bureau; ALLEN MEDIA GROUP, LLC, d/b/a Allen Media Group; DISH NETWORK CORPORATION; EMMER CONSULTING, INC., d/b/a I Street Advocates f/k/a The Goodfriend Group; THE NEWSGUILD-CWA; NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES AND TECHNICIANS-CWA; UNITED CHURCH OF CHRIST, OC INC., d/b/a United Church of Christ Media Justice Ministry; COMMON CAUSE; BYRON ALLEN; CHARLES ERGEN; and DAVID GOODFRIEND,<br><br>　　　　　Defendants. | Case No. 1:24-cv-1204-RC |

**REPLY IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS THE
NEWSGUILD-CWA AND NATIONAL ASSOCIATION OF
BROADCAST EMPLOYEES AND TECHNICIANS-CWA**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ……………………………………………………………….. ii

INTRODUCTION …………………………………………………………………………… 1

ARGUMENT ………………………………………………………………………………… 1

I.       *Noerr-Pennington* immunity protects the Unions from Plaintiffs' claims. …………………… 1

         A.       Plaintiffs do not refute the circuit courts' extension of *Noerr-Pennington* beyond the antitrust context. ………………………………………………………………….. 2

         B.       The Unions were not "sham" petitioning. ……………………………………….... 5

         C.       The Unions were not "deliberately misrepresenting" facts. ……………………… 10

II.      Plaintiffs' claims against the Union are barred by *Garmon* preemption. …………………... 11

III.     Plaintiffs otherwise fail to state any viable claims against the Unions. …………………… 12

         A.       Plaintiffs fail to state a claim for a violation of 42 U.S.C. § 1981. ……………….... 13

         B.       Plaintiffs fail to state a claim for a violation of 42 U.S.C § 1985(3). ……………… 17

         C.       Plaintiffs fail to state a claim for a violation of 42 U.S.C. § 1986. ……………….... 21

         D.       Plaintiffs fail to state a claim for tortious interference with contract or tortious interference with prospective business opportunity. ………………………………... 24

         E.       Plaintiffs fail to state a conspiracy claim against the Unions. …………………….. 25

CONCLUSION ……………………………………………………………………………… 25

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................ 12, 13

*Balt. Gas & Elec. Co. v. FERC,*
954 F.3d 279 (D.C. Cir. 2020) ....................................................................................7

*Banneker Ventures LLC v. Graham,*
798 F.3d 1119 (D.C. Cir. 2015) ..................................................................................3

*Bill Johnson's Restaurants, Inc. v. NLRB,*
461 U.S. 731 (1983) ....................................................................................................4

*Borough of Duryea, Pa. v. Guarnieri,*
564 U.S. 379 (2011) ....................................................................................................4

*Bowie v. Maddox,*
642 F.3d 1122 (D.C. Cir. 2011) ..........................................................................21, 23

*Brown v. Hill,*
No. 14-0140, 2021 WL 4262464 (D.D.C. Sept. 20, 2021) .......................................24

*Campbell v. PMI Food Equip. Grp., Inc.,*
509 F.3d 776 (6th Cir. 2007) ......................................................................................2

*Clark v. Clabaugh,*
20 F.3d 1290 (3d Cir. 1994) ......................................................................................22

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.,*
776 F.3d 1343 (Fed. Cir. 2014) ...............................................................................5, 6

*Crum v. Quinlan,*
No. 92-5227, 1993 WL 176141 (D.C. Cir. Apr. 29, 1993) .......................................15

*Deppner v. United States,*
No. 22-cv-680 (CRC), 2023 WL 4930085 (D.D.C. Aug. 2, 2023) ...........................21

*Doherty v. American Motors Corp.,*
728 F.2d 334 (6th Cir. 1984) ....................................................................................18

*Eastern Diamond Sports, LLC v. Monsta Ath., LLC,*
720 F. Supp. 3d 849 (C.D. Cal. 2024) ........................................................................5

*Eastex, Inc. v. N.L.R.B.*,
437 U.S. 556 (1978) ...................................................................................................12

*EDF Renewable Dev., Inc. v. Tritec Real Estate Co.*,
147 F. Supp. 3d 63 (E.D.N.Y. 2015) ...........................................................................5

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................................................................................................9

*Geomatrix, LLC v. NSF Int'l*,
82 F.4th 466 (6th Cir. 2023) .......................................................................................2

*Graves v. United States*,
961 F. Supp. 314 (D.D.C. 1997) ........................................................................ 17, 18

*Guss v. Utah Lab. Relations Bd.*,
353 U.S. 1 (1957) ......................................................................................................12

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
806 F.3d 162 (3d Cir. 2015) ........................................................................................7

*Heffernan v. Hunter*,
189 F.3d 405 (3d Cir. 1999) ......................................................................................18

*Humphrey v. Ct. of Common Pleas of York Cnty., Pa.*,
640 F. Supp. 1239 (M.D. Pa. 1986) ...........................................................................23

*In re Lipitor Antitrust Litig.*,
868 F.3d 231 (3d Cir. 2017) .................................................................................. 7, 8

*Inner City Contracting, LLC v. Charter Twp. of Northville*,
87 F.4th 743 (6th Cir. 2023) ................................................................................ 13, 14

*Irons, LLC v. Brandes*,
275 F. App'x 18 (D.C. Cir. 2008) ..............................................................................15

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) ...................................................................................15

*Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*,
552 F.3d 1033 (9th Cir. 2009) .....................................................................................6

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*,
759 F. Supp. 1339 (W.D. Wis. 1991) .................................................................... 22, 23

*Litton Systems, Inc. v. AT&T*,
700 F.2d 785 (2d Cir. 1983) ........................................................................................7

*Marcus v. District of Columbia,*
646 F. Supp. 2d 58 (D.D.C. 2009) ............................................................................15

*Mason v. Am. Prospect, Inc.,*
No. 23-2238, 2024 WL 4345855 (D.D.C. Sept. 30, 2024) ........................................15

*McDonald v. Smith,*
472 U.S. 479 (1985) ....................................................................................................4

*Meijer, Inc. v. Ranbaxy Inc.,*
No. 15-11828-NMG, 2016 WL 4697331 (D. Mass. June 16, 2016) ..........................24

*Morris v. McCarthy,*
825 F.3d 658 (D.C. Cir. 2016) ...................................................................................15

*Muhammed v. Oliver,*
547 F.3d 874 (7th Cir. 2008) .....................................................................................13

*Nader v. Democratic Nat'l Comm.,*
555 F. Supp. 2d 137 (D.D.C. 2008) ........................................................................5, 8

*NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.,*
957 A.2d 890 (D.C. 2008) ..........................................................................................25

*NM LLC v. Keller,*
No. 3:24-CV-05181-TMC, 2024 WL 4336428 (W.D. Wash. Sept. 27, 2024) .............7

*NOCO Co. v. OJ Commerce, LLC,*
35 F.4th 475 (6th Cir. 2022) ......................................................................................25

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
572 U.S. 545 (2014) .................................................................................................3, 4

*Olumuyiwa v. Harvard Prot. Services, Inc.,*
No. 98-CV-5110 (JG), 2000 WL 620202 (E.D.N.Y. May 12, 2000) ..........................14

*Omni Res. Development Corp. v. Conoco, Inc.,*
739 F.2d 1412 (9th Cir. 1984) .....................................................................................7

*Onyeoziri v. Spivok,*
44 A.3d 279 (D.C. 2012) .............................................................................................25

*Pro. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
508 U.S. 49 (1993)................................................................................................passim

*Realtek Semiconductor Corp. v. MediaTek, Inc.*,
No. 23-CV-02774-PCP, 2024 WL 1975478 (N.D. Cal. May 3, 2024) .................................................5

*Richardson v. Kruchko & Fries*,
966 F.2d 153 (4th Cir. 1992) .................................................12

*RLR Invest., LLC v. City of Pigeon Forge*,
4 F.4th 380 (6th Cir. 2021) .................................................3

*Robison v. Canterbury Vill., Inc.*,
848 F.2d 424 (3d Cir. 1988) .................................................18

*Robledo v. Bond No. 9*,
965 F. Supp. 2d 470 (S.D.N.Y. 2013) ................................................. 13, 14

*Rogin v. Bensalem Twsph.*,
616 F.2d 680 (3d Cir. 1980) .................................................22

*San Diego Bldg. Trades Council v. Garmon*,
395 U.S. 236 (1959) ................................................. 11, 12

*Sealed Plaintiff 1 v. Front*,
No. 3:22-CV-00670, 2024 WL 1395477 (E.D. Va. Mar. 31, 2024) .................................................24

*Sharma v. Washington Metro. Area Transit Auth.*,
57 F. Supp. 3d 36 (D.D.C. 2014) .................................................25

*Tabb v. D.C.*,
477 F. Supp. 2d 185 (D.D.C. 2007) .................................................18

*Terrier Media*,
34 FCC Rcd. 10554.................................................8

*Thomas v. District of Columbia*,
No. 21-cv-00584, 2022 WL 2817855 (D.D.C. July 19, 2022).................................................15

*Trs. of the Univ. of Pa. v. St. Jude Children's Research Hosp.*,
940 F. Supp. 2d 233 (E.D. Pa. 2013) .................................................5

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*,
902 F.3d 1 (1st Cir. 2018) ................................................. 5, 8

*United States v. AT&T Co.*,
524 F. Supp. 1336 (D.D.C. Sept. 11, 1981).................................................10

*United States v. Philip Morris USA Inc.*,
566 F.3d 1095 (D.C. Cir. 2009).................................................10, 11

*Venetian Casino Resort, L.L.C. v. NLRB,*
793 F.3d 85 (D.C. Cir. 2015) ................................................................ 3, 5, 8

*Vibo Corp. v. Conway,*
669 F.3d 675 (6th Cir. 2012) ....................................................................... 5

*Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan,*
518 F. Supp. 993 (S.D. Tex. 1981) ............................................................ 23

*Whelan v. Abell,*
48 F.3d 1247 (D.C. Cir. 1995) .................................................................. 10

*Whidbee v. Garzarelli Food Specialties, Inc.,*
223 F.3d 62 (2d Cir. 2000) ....................................................................... 14

*Wultz v. Islamic Republic of Iran,*
755 F. Supp. 2d 1 (D.D.C. 2010) ................................................... 12, 13, 16

*Young v. Lord & Taylor, LLC,*
937 F. Supp. 2d 246 (E.D.N.Y. 2013) ....................................................... 21

*Zic v. Italian Gov't Travel Off.,*
130 F. Supp. 2d 991 (N.D. Ill. 2001) ........................................................ 18

**Statutes**

29 U.S.C. § 157 ........................................................................................ 11

35 U.S.C. § 285 ........................................................................................ 3, 4

42 U.S.C. § 1981 ....................................................................... 13, 14, 15, 17

42 U.S.C. § 1985(3) ................................................................... 17, 18, 21, 22

42 U.S.C. § 1986 ....................................................................... 21, 22, 23, 24

**Other Authorities**

15A C.J.S. *Conspiracy* § 11, Westlaw ........................................................ 18

## INTRODUCTION

Plaintiffs try to salvage their claims against the Unions by grossly exaggerating the inferences that may be drawn from their allegations and by badly mischaracterizing much of their case law. But inferences must be plausible, and Plaintiffs cannot hide from the overwhelming authority that contradicts them. Plaintiffs' Amended Complaint does not plausibly allege a conspiracy to discriminate against Mr. Kim based on race. All they have really alleged is that the Unions wanted to stop the TEGNA transaction, citing concerns about jobs, consolidation, and viewpoint diversity. That being the case, the most Plaintiffs can be said to have ***plausibly*** alleged is that the Unions' concerns were overblown. Yet even accepting for the sake of argument that the Unions' concerns *were* unwarranted, that would not turn them into racist conspirators. Plaintiffs do not allege—indeed they could not plausibly allege—that the Unions' motive was to discriminate against Mr. Kim based on his race.

Fortunately, this Court need not sift through the prolix complaint and 171-page opposition memorandum to confirm the absence of plausible allegations against the Unions. Indeed, this case could hardly be more straightforward: The Unions petitioned the FCC to block the transaction, exercising their First Amendment right to do so. Thus, *Noerr-Pennington* immunity bars Plaintiffs' claims against the Unions.

## ARGUMENT

## I. *Noerr-Pennington* immunity protects the Unions from Plaintiffs' claims.

The *Noerr-Pennington* doctrine protects the Unions' right to petition the FCC to deny the broadcast license transfers from TEGNA to Standard General and immunizes the Unions from Plaintiffs' claims. Plaintiffs contend the immunity doctrine does not apply for three reasons: (1) the doctrine only applies to antitrust cases, (2) a "sham petition" exception applies, and (3) a "misrepresentation" exception applies. None of these arguments hold up to scrutiny.

A.   **Plaintiffs do not refute the circuit courts' extension of *Noerr-Pennington* beyond the antitrust context.**

*Noerr-Pennington* immunity is not limited to antitrust claims. As the Unions emphasized in their motion to dismiss, at least ten circuits have applied the *Noerr-Pennington* immunity doctrine outside the antitrust context, including the D.C. Circuit. For this Court to indulge Plaintiffs and hold that *Noerr-Pennington* is confined to antitrust cases would not only directly contradict its own precedent and controlling D.C. Circuit authority, but also that of nine sister circuits.

Plaintiffs all but ignore the decisions of the ten federal circuits that have extended *Noerr-Pennington* outside the antitrust context.[1] *See* Unions' Statement of Points and Authorities ("Motion"), Doc. No. 46-1 (Sept. 9, 2024), at 20.[2] Instead, Plaintiffs selectively cite lower court cases that they say support confining *Noerr-Pennington* to antitrust cases. *See* Consolidated Memorandum in Opposition ("Opp."), Doc. No. 66 (Nov. 8, 2024), at 155–56 (citing District of New Mexico, Southern District of Florida, and Eastern District of Michigan cases). Yet the first two of those district court cases arise from two of the three circuits (the Tenth and the Eleventh) that have not extended *Noerr-Pennington*. *See id.* And the other district court cases come from the Sixth Circuit, which ***has*** extended the doctrine beyond the antitrust context. *See, e.g., Campbell v. PMI Food Equip. Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007); *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 487 (6th Cir. 2023). That Plaintiffs would focus on a few district court decisions and ignore the decisions of ten circuit courts speaks volumes about the weakness of their *Noerr-Pennington* arguments. Motion at 20.

_____

[1] Plaintiffs also do not even try to engage with the Unions' explanation that the Supreme Court's reasoning behind *Noerr-Pennington* suggests that the doctrine extends to many situations in which a party petitions the government to take some action or refrain from doing so. *See* Unions' Statement of Points and Authorities, Doc. No. 46-1 (Sept. 9, 2024), at 20–21. This comes as little surprise, given the near-universal acceptance of that reasoning.

[2] Page numbers in this reply refer to the top-right page numbers on each filing, stamped by the Court.

Plaintiffs are also carefully selective in quoting *Banneker Ventures LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015). In full, the relevant quote reveals that the *Banneker* court did not decline to apply *Noerr-Pennington* to common law torts—nor did it foreclose doing so in the future:

> **To our knowledge** we have never applied the *Noerr-Pennington* doctrine, which **arose** in the context of the antitrust laws, to bar liability for common law torts; Defendants cite no case to the contrary . . . . Even were we to do so now, **and we take no position on the matter**, the doctrine does not apply to [private commercial activity].

*Id.* at 1137 n.8 (emphases added). Thus, Plaintiffs were careful to omit important words that needed to be included in order for the quote to convey its intended meaning. What's more, when the D.C. Circuit decided *Banneker*, the court had already endorsed the principle that *Noerr-Pennington* immunity applies outside the antitrust context. *Venetian Casino Resort, L.L.C. v. NLRB*, 793 F.3d 85, 87 (D.C. Cir. 2015) (Kavanaugh, J.) ("The *Noerr-Pennington* doctrine originated in the antitrust context but has also been applied in labor cases."). Published before *Banneker*, *Venetian Casino Resort* controls—revealing that the D.C. Circuit has applied *Noerr-Pennington* beyond the antitrust context. *See RLR Invest., LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 (6th Cir. 2021) ("[W]hen two precedents conflict, we are bound to follow the first in time.").

Along with misconstruing D.C. Circuit precedent, Plaintiffs also stretch their Supreme Court references to their breaking point. Plaintiffs cite several Supreme Court opinions they suggest have refused to apply the *Noerr-Pennington* doctrine more broadly, "including in the Petition clause context." Opp. at 125. Plaintiffs read far too much into these decisions.

To be sure, the Supreme Court did decline to import the sham exception's two-prong test into a statute allowing courts in "exceptional cases" of patent infringement to "award reasonable attorney fees to the prevailing party." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 548 (2014) (quoting 35 U.S.C. § 285). But the decision rested wholly on statutory interpretation—rather than any reluctance to apply *Noerr-Pennington* in non-antitrust cases. *Id.* at 556 (concluding that the sham exception found "no roots in the text of § 285," since it made "little sense in the context of

determining whether a case is so 'exceptional' as to justify an award of attorneys' fees"). Indeed, the *Octane Fitness* opinion acknowledged that "patent suits are similarly protected as acts of petitioning," but reckoned that "the mere shifting of attorney's fees" did not "significantly chill[] the exercise of the right to petition." *Id.* Since Plaintiffs are not claiming under a statute like § 285, claiming that *Octane Fitness* deprives the Unions of their right to petition the FCC is more than just a stretch.

Consider also *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011). That case stands only for the unremarkable proposition that a public employee bringing a Petition Clause claim against his government employer "must show that his speech was on a matter of public concern." *Id.* at 382–83. The Court's decision rested on the context-specific rationale that "[u]nrestrained application of the Petition Clause in the context of government employment would subject a wide range of government operations to invasive judicial superintendence." *Id.* at 390–91. In any event, the *Guarnieri* opinion recognized that *Noerr-Pennington* immunity applied "[o]utside the context of public employment"— without suggesting that the doctrine's scope was limited to the antitrust context. *Id.* at 390 (citing *Pro. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. ("PRE")*, 508 U.S. 49, 60–61 (1993)). *Guarnieri* provides no more help to Plaintiffs than *Octane Fitness* did.

The same goes for *McDonald v. Smith*, 472 U.S. 479 (1985). In that case, the Supreme Court simply held that although the Petition Clause protected letters to the President, such letters could give rise to civil liability for malicious libel to the same extent as "other First Amendment expressions." *Id.* at 485. Contrary to Plaintiffs' strained reading of the opinion, the *McDonald* court did not "decline[] to apply *Noerr-Pennington*." Opp. at 125. Indeed, the decision does not even reference *Noerr* or *Pennington*. If anything, the Court reaffirmed its view of the Petition Clause's broad reach by noting that "filing a complaint in court is a form of petitioning activity; but 'baseless litigation is not immunized by the First Amendment right to petition.'" *McDonald*, 472 U.S. at 485 (quoting *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983)).

At bottom, Plaintiffs cannot avoid the overwhelming precedent from federal circuits showing that *Noerr-Pennington* extends beyond antitrust cases. This extension is widely recognized, including in the D.C. Circuit, and this Court should not disregard that precedent, or bend it to indulge what has been characterized by other parties as a legal temper tantrum.

### B.    The Unions were not "sham" petitioning.

Plaintiffs assert the sham petition exception deprives the Unions of their *Noerr-Pennington* immunity. But for the "sham petition" exception to apply, Plaintiffs must establish two things they cannot: (1) that "no reasonable [petitioner] could realistically expect success on the merits" (the objective prong) and (2) that the petition was "brought with the specific intent to further wrongful conduct through the use of governmental process" (the subjective prong). *Venetian Casino Resort*, 793 F.3d at 92 (cleaned up); *PRE*, 508 U.S. at 60. In a sham exception analysis, the defendant's motive is irrelevant so long as the attempts to secure government action were genuine. *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 157 (D.D.C. 2008).

For starters, Plaintiffs claim that "[w]hether petitioning activity 'was in fact a sham' is a 'factual inquiry' that generally 'cannot be resolved at the motion to dismiss stage.'" Opp. at 158 (citing out-of-circuit district court cases). Not so. Indeed, federal courts routinely grant motions to dismiss or affirm dismissals based on *Noerr-Pennington* after conducting a sham exception analysis. *See, e.g., Vibo Corp. v. Conway*, 669 F.3d 675, 683–86 (6th Cir. 2012); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*, 902 F.3d 1, 4–5 (1st Cir. 2018); *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349–50 (Fed. Cir. 2014); *Trs. of the Univ. of Pa. v. St. Jude Children's Research Hosp.*, 940 F. Supp. 2d 233, 241–43 (E.D. Pa. 2013); *Eastern Diamond Sports, LLC v. Monsta Ath., LLC*, 720 F. Supp. 3d 849, 861–63 (C.D. Cal. 2024); *EDF Renewable Dev., Inc. v. Tritec Real Estate Co.*, 147 F. Supp. 3d 63, 68–71 (E.D.N.Y. 2015); *Realtek Semiconductor Corp. v. MediaTek, Inc.*, No. 23-CV-02774-PCP, 2024 WL 1975478 (N.D. Cal. May 3, 2024).

Here, both the sham exception's objective and subjective prongs cut against Plaintiffs, and confirm that the exception does not deprive the Unions of *Noerr-Pennington* immunity.

**Objective Prong.** Plaintiffs have failed to establish that the Unions' petition to the FCC was objectively baseless for three reasons.

First, to show that a petition is objectively baseless, a plaintiff must show that "***no*** reasonable [petitioner] could realistically expect success on the merits." *PRE*, 508 U.S. at 60. This is a high bar, especially when, as here, the Unions' petition was successful. Because the bar is set so high, Plaintiffs try to relitigate the merits of the FCC petitions, essentially asking the Court to engage in *de novo* review of the FCC proceedings. *See* Opp. at 158–60. Plaintiffs argue why, from their perspective, the arguments made in the Unions' filings were unreasonable. But the Unions have explained why their arguments gave the FCC grounds to issue an HDO, especially in light of 2022's unique economic circumstances. *See* Motion at 19, 22–23. The Unions did not have to be right—just sincere in their opposition. Because events have confirmed that the Unions were reasonable to expect success on the merits (they prevailed in the FCC proceeding), their petition cannot be fairly characterized as objectively baseless. *See Content Extraction & Transmission LLC*, 776 F.3d at 1350 (a lawsuit is not "objectively baseless" simply because it made losing arguments).

Second, the significance of the success of the Unions' petition cannot be overstated. Petitions are not objectively baseless when they are rewarded with at least some level of success. *PRE*, 508 U.S. at 60 n.5. *PRE* expressly forecloses Plaintiffs' contention otherwise. *Id.* ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *see also Kaiser Found. Health Plan, Inc. v. Abbott Labs., Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) ("[*PRE*'s] … inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham."). Here, the Media Bureau issued the HDO, confirming that the successful petitions cannot meet the definition of a sham.

And a petition can be "successful," even if it does not result in final agency action or a final judgment. For example, the Ninth Circuit refused to apply the sham exception when the plaintiffs had obtained a preliminary injunction in state court litigation. *Omni Res. Development Corp. v. Conoco, Inc.*, 739 F.2d 1412, 1414 (9th Cir. 1984). Although the preliminary injunction was not a final merits judgment, it provided plaintiffs with sufficient nonfinal success to establish that their suit was not "objectively baseless." *Id.* ("Indeed, the suit cannot be characterized as baseless at all; for although we do not know the outcome, at least to the point of a preliminary injunction the state court plaintiffs were successful."); *see also NM LLC v. Keller*, No. 3:24-CV-05181-TMC, 2024 WL 4336428, at *4 (W.D. Wash. Sept. 27, 2024) (the state-court suit's survival of summary judgment—a nonfinal order— confirmed the suit was not objectively baseless). Thus, the issuance of the HDO, standing alone, confirms that the sham exception does not apply here.

Third, the Unions' petition was not objectively baseless simply because the Unions made arguments Plaintiffs claim were "foreclosed by agency precedent and policy." Opp. at 161. Plaintiffs cite several cases to support this argument, but those cases did not involve changed circumstances or distinguishing facts that justified a departure from the precedent or policy. *See Litton Systems, Inc. v. AT&T*, 700 F.2d 785 (2d Cir. 1983); *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015); *In re Lipitor Antitrust Litig.*, 868 F.3d 231 (3d Cir. 2017).[3] As the Unions already explained (in their public filings and motion to dismiss), changed circumstances and different facts justified bringing their localism, job loss, and retransmission arguments again. Motion at 22–23. *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020) (noting "an adequate explanation to distinguish this case from prior decisions").

---

[3] *Litton* and *Hanover 3201 Realty* also do not apply because the plaintiffs in those cases contested a series of purportedly sham petitions. *Litton*, 806 F.3d at 809–12; *Hanover 3201 Realty*, 806 F.3d at 17– 81. When that's the case, courts apply a different standard than when the plaintiff only petitions in a single case. *See Litton*, 806 F.3d at 809–12; *Hanover 3201 Realty*, 806 F.3d at 17–81.

What is more, in the very matters Plaintiffs cite as evidence of the FCC's "reject[ion]" of localism and viewpoint diversity arguments, the FCC emphasized that there was no evidence of localism or diversity issues in that particular case. *See Terrier Media*, 34 FCC Rcd. 10554, 10566–67 (noting an "absence of any transaction-specific allegations or evidence"). In other words, the FCC looks to the particulars of each case. So too the Unions, who were not prohibited from raising similar arguments where, as here, the circumstances were different. And that is exactly what they did.[4]

For these reasons, Plaintiffs have failed to show that the Unions' petition to the FCC was objectively baseless. Because this first prong fails, the sham petition exception to *Noerr-Pennington* cannot apply. *See PRE*, 508 U.S. at 60 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."); *Nader*, 555 F. Supp. 2d at 157, 159 n.15. Although that is enough to defeat Plaintiffs' sham exception argument, Plaintiffs have also failed to establish the subjective prong of the sham exception.

**Subjective Prong.** Plaintiffs bear the burden of establishing the subjective prong, not the Unions. *See United Food & Com. Workers Unions & Emp. Midwest Health Benefits Fund*, 902 F.3d at 13; *see also Nader*, 555 F. Supp. 2d at 157 ("The plaintiff bears the burden to demonstrate that the sham exception applies"). **And** Plaintiffs have failed to plausibly allege that the Unions participated in the FCC proceedings "with the specific intent to further wrongful conduct through the use of governmental process." *Venetian Casino Resort*, 793 F.3d at 92 (cleaned up); *PRE*, 508 U.S. at 60. In support of this argument, Plaintiffs rely chiefly on conclusory allegations and implausible characterizations of events.

---

[4] Regardless, a previously-rejected argument is just one factor for the Court to consider with the objectively baseless inquiry; it is not dispositive. *See, e.g.*, *In re Lipitor Antitrust Litigation*, 868 F.3d 231, 273 (3d Cir. 2017).

For a start, Plaintiffs provide no support for their conclusory assertion that the Unions had no intention "to genuinely influence or persuade the FCC to actually deny the license-transfer applications." Opp. at 164 (quoting Amended Compl. ("Compl."), Doc. No. 36 (Aug. 9, 2024), ¶ 323). As the Unions explained throughout their motion to dismiss—unrebutted by Plaintiffs—they had reasoned grounds for their opposition to the TEGNA transaction. *See* Motion at 21–23. These included concerns over localism, job losses, and retransmission fees—all motives that a union might have to oppose the transfer of the TEGNA licenses. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 417–24 (2021); *see also* Compl. ¶ 98. By raising these concerns during the FCC proceedings, the Unions acted to further their genuine interest in the "***outcome*** of that process." *PRE*, 508 U.S. at 61 (emphasis added). Plaintiffs' spurious assertion that the Union raised baseless arguments without a hope of success on the merits is unconvincing—especially after the FCC deemed the concerns serious enough to issue an HDO, and the Unions celebrated the end result. Compl. ¶ 265.

Likewise, Plaintiffs have failed to plausibly allege that the Unions sought to "impose inordinate delay . . . to drag out the proceedings." Opp. at 164 (quoting Compl. ¶ 323). Under the facts alleged by Plaintiffs, the only step the Unions took to delay the proceedings was filing a single request for a brief (few weeks) extension to file a petition opposing the license transfer. *See id.* at 165 (citing Compl. ¶¶ 130–31); MB No. 22-162, Motion of the Public Interest Parties for Additional Information and Documents and an Extension of Time (May 12, 2022), https://perma.cc/6JE5-6C7Q. But even Plaintiffs do not claim that this request for a modest extension of time meaningfully delayed the proceedings. Nor do Plaintiffs explain how the request for more time, in and of itself, reveals that the Unions' petition was intended only as a sham in service of a racist conspiracy. Since Plaintiffs fail to plausibly allege that the Unions requested the extension in bad faith, rather than to better articulate their opposition on the merits, they have failed to satisfy their burden on the subjective prong.

### C.      The Unions were not "deliberately misrepresenting" facts.

Plaintiffs next urge the Court to discover a new exception to *Noerr-Pennington* immunity based on the Unions' alleged "misrepresentations and misleading statements in their FCC filings." Opp. at 167. But the cases Plaintiffs quote highlight that such an "exception" can apply only to "known falsehoods." *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995). False statements in petitions will remove *Noerr-Pennington* immunity only if they were made "deliberately." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1124 (D.C. Cir. 2009) ("Were these statements false, but not deliberately so, Defendants would have a better argument. But Defendants knew of their falsity at the time and made the statements with the intent to deceive."). "[A]ccidental falsehoods, or sincere attempts to persuade" still fit within *Noerr-Pennington*'s protections. *Id.*

Zealous advocacy does not destroy *Noerr-Pennington* immunity. This makes sense because exceptions to *Noerr-Pennington* "must be narrowly construed so as not to chill the rights of individuals and corporations to access to courts and to legislative and regulatory bodies." *United States v. AT&T Co.*, 524 F. Supp. 1336, 1364 (D.D.C. Sept. 11, 1981). "This principle would be hindered by a ruling which exposed an entity to antitrust liability on the basis that an official body found its contentions to be unsupported by the facts or otherwise without merit." *Id.* In *AT&T*, *Noerr-Pennington* applied because "the evidence shows little more than Bell opposed new entrants, that it made contentions which were not wholly correct, and that the FCC ultimately ruled against Bell." *Id.* at 1363–64.

In both *Whelan* and *Philip Morris*, *Noerr-Pennington* immunity did not protect parties who made deliberately false statements. In both cases, the statements were known to be false because they directly contradicted something that had already happened. *See Whelan*, 48 F.3d at 1255 (noting false statements in a letter Defendants sent); *Philip Morris*, 566 F.3d at 1108, 1122 (emphasizing false statements defendants made about the health effects of smoking).

Here, layoffs were something that could only happen in the future. In fact, it would be difficult to positively guarantee that layoffs would happen until the transaction went through—but all signs pointed that way. And even if the Unions were wrong, that does not mean that their expressions of concern were lies. To the contrary, based on the record before the Court—including information provided to the FCC by Plaintiffs—the concern about layoffs and consolidation appears to be altogether valid. *See* MB No. 22-162, Supplement to Petition to Dismiss or Deny, at 3–10 (Oct. 27, 2022), http://perma.cc/74AG-TW7U.

At the very least, the Unions had a good-faith basis for their concerns—meaning that Plaintiffs cannot plausibly claim that the Unions' statements about job losses were "deliberately misleading." Even if those statements turned out to be mistaken later, *Noerr-Pennington* still protects such an "accidental falsehood." *Philip Morris*, 566 F.3d at 1124. In other words, being wrong does not preclude *Noerr-Pennington* immunity.

## II.    Plaintiffs' claims against the Union are barred by *Garmon* preemption.

Plaintiffs insist that their common-law claims are not preempted by the National Labor Relations Act simply because they do not involve a potential dispute before the NLRB. Plaintiffs concede that the NLRA preempts state law claims targeting activities that are "arguably subject to §7 or §8" of the Act. Opp. at 145 (quoting *San Diego Bldg. Trades Council v. Garmon*, 395 U.S. 236, 245 (1959)). But Plaintiffs say *Garmon* does not preempt their common-law claims, since there is no "arguably unfair labor practice [the Unions] could challenge before the NLRB." Opp. at 146.

But this argument ignores the NLRA's text and its interpretation by the Supreme Court. Section 7 of the NLRA guarantees to employees not only "the right to self-organization, to form, join, or assist labor organizations" and "to bargain collectively through representatives of their own choosing," but also "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The Supreme Court has read Section 7 broadly

as protecting employees' attempts "to improve working conditions through resort to **administrative** and judicial forums"—such as the FCC proceedings here. *Eastex, Inc. v. N.L.R.B.*, 437 U.S. 556, 566 (1978) (emphasis added). So although there is no labor dispute involved here, Plaintiffs' common law claims impinge on rights guaranteed by the NLRA. *See id.* at 565 ("We also find no warrant for petitioner's view that employees lose their protection under [Section 7's] 'mutual aid or protection' clause when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship.").

The Supreme Court has been clear that when, as here, a right created by the NLRA is at stake, the NLRA will preempt state-law claims—whether or not there is a remedy available under the NLRA. *See Guss v. Utah Lab. Relations Bd.*, 353 U.S. 1, 10–11 (1957) (holding that state-law claims are preempted even when the NLRB refuses to assume jurisdiction).

Plaintiffs then offer the "Hail Mary" argument that *Garmon* preemption does not apply because they did not employ the Unions' members. Opp. at 146. But as Plaintiffs themselves concede, NLRA preemption turns on "the *issues* that [the state-law] claims require a court to adjudicate," rather than "the identity of the party against whom the claims are asserted." *Richardson v. Kruchko & Fries*, 966 F.2d 153, 156 (4th Cir. 1992) (quoted by Opp. at 146) (finding that NLRA preemption applies "whenever courts are required to review conduct that is arguably prohibited or protected by the NLRA, no matter what the identity of the party against whom the state-law claims are asserted"). Since Plaintiffs' common law claims require the Court to review the Unions' participation in the FCC proceedings—conduct protected by Section 7 of the NLRA—*Garmon* preemption applies.

## III.    Plaintiffs otherwise fail to state any viable claims against the Unions.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 39 (D.D.C. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This "facial

plausibility standard is satisfied when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). "Therefore, based on the factual allegations within the plaintiff's complaint, a court must conclude that it is not merely possible, but also plausible, that the plaintiff is entitled to relief." *Id.* "This determination is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). The Court should not "accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint." *Id.* Nor should the Court accept only "labels and conclusions." *Id.* None of Plaintiffs' six claims articulates a viable cause of action against the Unions.

### A.    Plaintiffs fail to state a claim for a violation of 42 U.S.C. § 1981.

The § 1981 claim is dismissible because the Unions lacked the authority to prevent the merger. *Robledo v. Bond No. 9*, 965 F. Supp. 2d 470, 477 (S.D.N.Y. 2013) (liability "only attaches to persons who actually had the power or authority to prevent the plaintiff from entering into a contract with a third party"). In response, Plaintiffs cite cases saying that § 1981 liability applies for those who interfere with contracts, even if they were not parties to the contracts. Opp. at 100–01.

But Plaintiffs ignore *Robledo*'s directive that liability can only attach to those with actual authority to stop the performance of the contract. All of Plaintiffs' cases confirm that the interfering third party must still "ha[ve] the power or authority to prevent the plaintiff from entering into" the contract. *Robledo*, 965 F. Supp. 2d at 477. For example, in *Muhammed v. Oliver*, the individual charged with violating § 1981 was "accused of[] ***using her authority as*** … chief executive officer ***to cause***, for racial reasons, MDC's contractual rights to be violated." 547 F.3d 874, 878 (7th Cir. 2008) (emphases added). Similarly, in *Inner City Contracting, LLC v. Charter Twp. of Northville*, the defendant consulting firm, although not a party to the contract at issue, held the authority to decide who should be awarded the bid to the contract. 87 F.4th 743, 749 (6th Cir. 2023). Thus, again, the defendant in

*Inner City Contracting* was only liable under § 1981 because it "had the power or authority to prevent the plaintiff" from winning the bid and "entering into a contract." *Robledo*, 965 F. Supp. at 477.[5] Finally, in *Olumuyiwa v. Harvard Prot. Services, Inc.*, the defendant companies again held authority to control the plaintiff's employment contract. No. 98-CV-5110 (JG), 2000 WL 620202, at *5 (E.D.N.Y. May 12, 2000) (defendants "**directed**" another defendant "to discriminate … in terms of hiring, termination, assignments and pay" (emphasis added)). So § 1981 liability attaches only to a party who has the power to actually stop the contract—not merely someone who expresses opposition to a contract, without the ability stop it. *See id.* And here, that power and authority rested solely with the FCC, the ultimate decisionmaker. The FCC was free to ignore the Unions' petitions and arguments as it wished.

The § 1981 claim also fails because Plaintiffs do not allege facts that would even suggest that the Unions intended to discriminate against Mr. Kim because of his race or objected with a discriminatory purpose. Plaintiffs claim they sufficiently alleged such facts because of statements the Unions made in public filings. Opp. at 103. But Plaintiffs misconstrue those filings. The Unions' statement that Plaintiffs' acquisition of TEGNA did "nothing to create a more diverse media" referred to diversity of **viewpoints**—not to racial diversity. Motion at 14, 27–28. And the statement about "shadowy foreign investors" referred to actual foreign investors—**not** Mr. Kim, who is not a foreigner. *Id.* at 28; *see also* MB No. 22-162, Reply to Applicants' Consolidated Opp. and Response to Comments, at 20 (Aug. 1, 2022), https://www.fcc.gov/ecfs/document/1080192954689/1. This Court need only take a fresh look at the Unions' public filings to see that Plaintiffs' characterizations go too far.[6] If

---

[5] The other case Plaintiffs cite is not on point. In *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62 (2d Cir. 2000), the court was not addressing the *Robledo* principle, instead deciding whether individuals can be held liable for a § 1981 hostile work environment claim. *Id.* at 69, 74–75. The court decided that individuals may be held liable under § 1981 for such a claim. This is not a hostile work environment case, and the Unions are not individuals. *Whidbee* is inapposite.

[6] *See, e.g.,* MB No. 22-162, Motion of the Public Interest Parties for Additional Information and Documents and an Extension of Time (May 12, 2022), https://perma.cc/6JE5-6C7Q; MB No. 22-

such statements can support an inference of racial animus, a petitioner could make few statements about a transaction involving a racial minority without exposing himself to § 1981 liability.

Even so, Plaintiffs claim that these public filings give rise to racial "inferences" that should be drawn in their favor. Opp. at 103–105. Not so. The Court "need not accept as true the complaint's factual allegations insofar as they contradict … public records and documents." *Thomas v. District of Columbia*, No. 21-cv-00584, 2022 WL 2817855, at *2 (D.D.C. July 19, 2022) (quoting *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004)) (quotation marks omitted); *see Mason v. Am. Prospect, Inc.*, No. 23-2238, 2024 WL 4345855, at *11 (D.D.C. Sept. 30, 2024) (rejecting allegations contradicted by public documents); *Crum v. Quinlan*, No. 92-5227, 1993 WL 176141, at *1 (D.C. Cir. Apr. 29, 1993) (rejecting allegations contradicted by the record); *Marcus v. District of Columbia*, 646 F. Supp. 2d 58, 62 (D.D.C. 2009) (same). This also means the Court need not "accept inferences" that are contradicted by the record or those public filings incorporated into the complaint. *Irons, LLC v. Brandes*, 275 F. App'x 18, 18 (D.C. Cir. 2008). The objective statements in the filings flatly refute Plaintiffs' characterizations. For these reasons, objectively looking at the content of the Unions' filings reveals that Plaintiffs do not plausibly allege the Unions intended to discriminate against Mr. Kim based on his ancestry.

Even assuming the Court could draw such inferences, there can be no inference that there was "intent to discriminate implicit in these comments," because there were no "racially charged" statements in the filings. Opp. at 107. "Racially charged" statements must be egregious, such as "nasty little white boys" or "white boys … learn[ing] a lesson." *Morris v. McCarthy*, 825 F.3d 658, 669–70 (D.C. Cir. 2016). There is nothing "racially charged" about referencing "diversity" of viewpoints or

---

162, Petition to Dismiss or Deny (June 22, 2022), http://perma.cc/9X6F-999T; MB No. 22-162, Reply to Applicants' Consolidated Opp. and Response to Comments (Aug. 1, 2022), https://www.fcc.gov/ecfs/document/1080192954689/1; MB No. 22-162, Supplement to Petition to Dismiss or Deny (Oct. 27, 2022), http://perma.cc/74AG-TW7U.

"shadowy foreign investors." The Unions' statements were perfectly ordinary expressions of their concerns that no reasonable person could interpret as expressions of racial animus towards Mr. Kim.

Laboring to find traction for their arguments, Plaintiffs move past the Unions' filings and point to other transactions to which the Unions did not object. But those circumstances provide no reasonable basis to infer that the Unions' objection to this deal and not others is evidence that the Unions' decision whether to object to a transaction is based on race. *Wultz*, 755 F. Supp. 2d at 39. Plaintiffs fail to acknowledge the inevitable differences between complex transactions, instead suggesting that all petitioners should object to any deal that might even theoretically harm them. All organizations have finite resources and must choose their battles. Plaintiffs have alleged no fact that ties the Unions' petitioning to ethnicity, and the statements noted above were hardly "racially charged." As to the Unions, every other allegation stems from some other Defendant's actions or on Plaintiffs' "information and belief" speculation.

Plaintiffs do not even bother to claim that the transactions to which the Unions did not object were materially the same as the proposed TEGNA deal. There is no allegation that the proposed deals were all the same size, that they would impact the same markets, that they would have the same effect on jobs and viewpoint diversity, or that they would have the same extent of impact overall. Without alleging facts to show how other deals were the same as the TEGNA transaction in all material respects except for the race of the parties to the transactions, it is not plausible to suppose that the Unions did not object to other deals **because of the approved of ethnicity of the buyers**. Plaintiffs' argument, taken to its logical extreme, would require organizations like the Unions to object to every proposed media transaction, lest they be accused of harboring racial hatred. In other words, it is implausible to assume an illegal motive simply because: (1) Mr. Kim is of Korean ancestry; and (2) the Unions did not object to *every* media merger.

16

And in fact, the Unions **did** object in one of the transactions in which Plaintiffs claim they did not. *See* MB 24-275, Reply of The Int'l Brotherhood of Teamsters Hollywood Local 399, Writers Guild of America West, Inc., Writers Guild of America East, Screen Actors Guild-American Federation of Television and Radio Artists, and the **Communications Workers of America** (Nov. 1, 2024), https://www.fcc.gov/ecfs/document/11010363129979/1. NABET and NewsGuild are part of the Communications Workers of America. Plaintiffs need to more carefully review their facts before lodging false allegations to buttress their tissue-thin claims.

Finally, the Court should dismiss the § 1981 claim against the Unions because Plaintiffs failed to properly plead a discriminatory purpose. Plaintiffs have pled nothing to suggest that the Unions petitioned the FCC to deny the license-transfer applications because they did not want a Korean-American to obtain broadcast licenses. Rather, the Unions have explained their objections clearly and repeatedly. This massive deal would have significantly affected a vast number of broadcasters.

For all these reasons, and the ones explained in the Unions' Motion to Dismiss, the Court should dismiss Plaintiffs' § 1981 claim against the Unions.

## B.    Plaintiffs fail to state a claim for a violation of 42 U.S.C. § 1985(3).

For this claim, Plaintiffs needed to show both a conspiracy to discriminate based on race and that the Unions acted with discriminatory animus. *Graves v. United States*, 961 F. Supp. 314, 320 (D.D.C. 1997). They have failed to plausibly allege either of those things.

**Conspiracy.** Plaintiffs' conspiracy arguments fail for two reasons: (1) the Plaintiffs try to connect the Unions to the conspiracy primarily through Mr. Goodfriend (their attorney) and (2) beyond that, all of Plaintiffs' allegations against the Unions rest on information and belief.

Plaintiffs' primary basis for connecting the Unions to this improbable conspiracy (one so vast it involved Nancy Pelosi, then Speaker of the House) is their interaction with their attorney, Mr. Goodfriend. That is not enough. Plaintiffs do not dispute that Mr. Goodfriend was acting as the

17

Unions' attorney in this matter. Instead, they assert "that the intracorporate conspiracy doctrine . . . does not apply when 'independent third parties are alleged to have joined the conspiracy.'" Opp. at 119 (quoting *Robison v. Canterbury Vill., Inc.*, 848 F.2d 424, 431 (3d Cir. 1988)). But Plaintiffs' quote is misleading and does not show that the Unions could conspire with Mr. Goodfriend.

The intracorporate conspiracy doctrine reflects the common-sense proposition that "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself or herself." 15A C.J.S. *Conspiracy* § 11, Westlaw. Federal courts have long recognized the doctrine, including by dismissing conspiracy claims premised on an alleged agreement between a corporation and its attorney. *See, e.g.*, *Heffernan v. Hunter*, 189 F.3d 405, 413 (3d Cir. 1999) (finding that an attorney's "challenged activity may violate the canons of ethics, but so long as it is within the scope of representation, it does not eliminate the exemption from a conspiracy charge under section 1985"); *Doherty v. American Motors Corp.*, 728 F.2d 334, 339-40 (6th Cir. 1984); *see also Tabb v. D.C.*, 477 F. Supp. 2d 185, 189–91 (D.D.C. 2007) (dismissing Section 1985 claim based on the intracorporate conspiracy doctrine).

To be sure, the intracorporate conspiracy doctrine does not bar all conspiracy claims involving a corporation's agents—such as when a corporation's agents conspire on its behalf with independent third parties. *See Robison*, 848 F.2d at 431 (quoted by Opp. at 119). But the doctrine allows such claims because they allege a conspiracy between the corporation and third parties—rather than between the corporation and its agents. 15A C.J.S. *Conspiracy* § 11, Westlaw ("A conspiracy can exist where a corporation conspires with a third party."); *Zic v. Italian Gov't Travel Off.*, 130 F. Supp. 2d 991, 997 (N.D. Ill. 2001) (the doctrine does not apply "where the corporation conspires with a third party").

Plaintiffs fail to suggest otherwise, quoting only a case from the Third Circuit that **affirmed** the dismissal of a § 1985 claim because it alleged that a corporation's president conspired with the corporation. *Robison*, 848 F.2d at 431 (quoted by Opp. at 119). So Plaintiffs have failed to show they

can bring a claim based on an alleged conspiracy between the Unions and their attorney. Since the intracorporate conspiracy doctrine bars this claim, Plaintiffs must show that the Unions conspired with other, independent third parties.

Even if the Unions **could** have conspired with their attorney, Plaintiffs incorrectly imply that the Unions were a part of a "coalition" Mr. Goodfriend was purportedly orchestrating. *See, e.g.*, Opp. at 114 (referring to Mr. Goodfriend "'assembl[ing] a coalition' of objectors" as evidence of a conspiracy to discriminate based on race).[7] Again, Plaintiffs misconstrued Mr. Goodfriend's words. When Mr. Goodfriend made that statement, he was referring to "'assembl[ing] a coalition' of objectors 'to **join** the **unions** in opposing the transaction,' beginning with Common Cause." *Id.* at 117 (emphases added). Thus, the Unions were **not themselves** a part of this "coalition." Rather, the coalition consisted of entities set to join the already-objecting Unions; the public record already reflected that the Unions opposed the transaction. Whatever the motivations of objectors who joined the "coalition" there is no allegation that those motivations—good or bad—were communicated to the Unions or that the Unions had the same motives. The Unions are not answerable for the unexpressed motivations of other objectors, even if those motivations were somehow unworthy.

For this reason too, Plaintiffs' allegation about the meeting between Mr. Goodfriend and Ms. Saurer has nothing to do with the Unions. Plaintiffs claim that Mr. Goodfriend **could** have "used that meeting to notify Ms. Saurer of Mr. Allen's failed bid for TEGNA, his so-called 'coalition's' incoming opposition to Mr. Kim, and Mr. Allen's plans to leverage early speed bumps." *Id.* at 117–18. None of this has anything to do with the Unions, who were not a part of the purported "coalition" that Mr. Goodfriend was assembling to add their voices to the Unions' objections. Thus, Plaintiffs have failed to explain how the meeting or messages between Mr. Goodfriend and Ms. Saurer could plausibly

---

[7] Plaintiffs only alleged that Mr. Goodfriend corralled a group of objectors to join the Unions in objecting for their own reasons—not that he corralled a group of objectors to be his racist catspaws.

suggest that the Unions were motivated by racism. The imaginative inferences that Plaintiffs would have the Court draw about this meeting are far too attenuated to factor into the Court's calculus.

Next, consider Plaintiffs' claim that they eventually "waived contractual clauses, alleviating pricing concerns, and made binding commitments not to cut jobs." *Id.* at 115. They say that the Unions' decision not to agree to such terms, absent a release of liability, shows that the Unions were part of a conspiracy to discriminate based on race. *Id.* Plaintiffs suggest there could be no reason to want releases unless the Unions were conspiring to racially discriminate. *See id.*

Not so. Plaintiffs had been accusing the Unions of racial animus throughout the FCC's review process. *See* Motion at 13 (citing MB No. 22-162, Consolidated Opp. and Response to Comments (July 7, 2022)), https://perma.cc/YAD5-54KP. It is hardly surprising that the Unions wanted to protect themselves from exactly what happened here: Being falsely accused of racial bigotry—***the very allegations Plaintiffs brought in this complaint***. Plaintiffs cannot seriously pretend that they were not threatening the Unions with this very litigation with their accusations in filings from 2022. *See* Opp. at 115 ("Liability for what?"). Nor can Plaintiffs seriously suggest that the Unions' insistence on a release was anything but prudent.[8]

**Discriminatory Animus.** To address their failure to plausibly allege racial animus on the Unions' part, Plaintiffs simply point to the section of their opposition papers in which they try to explain how the FCC violated their rights to equal protection. *Id.* at 123. Nowhere in their opposition—but more importantly, nowhere in their Amended Complaint—do Plaintiffs link that

---

[8] Plaintiffs say the Unions have information in their possession that would clarify the allegations, so they were permitted to use "information and belief" allegations. But Plaintiffs have not actually pled that such information is in the Unions' control. *See* Opp. at 121 (citing paragraphs of the Amended Complaint that lack such allegation of possession and control). Plaintiffs cannot argue about possession and control when they have not bothered to plead it.

alleged equal protection claim and the Unions' actions, let alone the Unions' purported racial motive. *See id.* at 86–97, 102–110; *see generally* Compl.

For these reasons, the Court should dismiss Plaintiffs' § 1985(3) claim against the Unions.

### C. Plaintiffs fail to state a claim for a violation of 42 U.S.C. § 1986.

As a threshold matter, Plaintiffs' § 1986 claim fails because the § 1985(3) claim fails. 42 U.S.C. § 1986; *Bowie v. Maddox*, 642 F.3d 1122, 1128 (D.C. Cir. 2011).

But even if Plaintiffs once had a viable § 1985(3) claim, it would now be barred by the one-year statute of limitations. Opp. at 129. A claim accrues "when the plaintiff knows or has reason to know of the harm or injury that is the basis of his action." *Young v. Lord & Taylor, LLC*, 937 F. Supp. 2d 246, 354 (E.D.N.Y. 2013). Consider too this Court's decision in *Deppner v. United States*, No. 22-cv-680 (CRC), 2023 WL 4930085, at *3 (D.D.C. Aug. 2, 2023). There, the Court said, "claim accrual does not require that the plaintiff know the full extent of her injury, only that she has sufficient knowledge to bring a cause of action." *Id.* "The cause of action accrues even though the full extent of the injury is not then known or predictable." *Id.* (citation omitted). And "[t]o be aware of an injury, a plaintiff need not know the full extent of his or her injury." *Id.* (citation omitted).

Plaintiffs admit that they knew they had a claim in February 2023. *See, e.g.*, Opp. at 45 ("The hearing designation order, or HDO, was an unprecedented **pocket veto**. … Everyone knew it could delay the FCC review well beyond the publicly known expiration date of Standard General's contracts." (emphasis added)). Plaintiffs knew that because of the HDO, the deal was dead. Compl. ¶ 11 ("Media Bureaus **killed** the deal" in February 2023; "[i]t was a move that **ensured** the deal would not close in time"; "[t]he HDO sounded the **death knell**" (emphases added)).[9] That is why Plaintiffs sued for mandamus in the D.C. Circuit—because they knew there was nothing left they could do at

---

[9] Plaintiffs never alleged that the HDO "**could** delay FCC review." Opp. at 45 (emphasis added). They alleged it **decimated** FCC review.

the administrative level. They had already been harmed. So at the very latest, Plaintiffs knew about their claimed injury when the D.C. Circuit rejected their mandamus petition more than a year before Plaintiffs filed this action. The ALJ's rejection of Plaintiffs' scheduling proposal was not when the claim accrued. Opp. at 130. Nor were Plaintiffs unaware of their injury simply because the financing agreements had not terminated yet either. *Id.* at 129. They knew of their injuries, even if they expected to incur more damages as time passed. Therefore, Plaintiffs' § 1986 claim is time-barred.

The § 1986 claim also fails because the Unions did not have the "power to prevent or aid in preventing" the purported conspiracy. *Clark v. Clabaugh*, 20 F.3d 1290, 1298 (3d Cir. 1994) (quoting *Rogin v. Bensalem Twsph.*, 616 F.2d 680, 696 (3d Cir. 1980)) (Section 1986 "provides a claim 'against any person who, knowing that a violation of 1985 is about to be committed and *possessing power to prevent its occurrence*, fails to take action to frustrate its execution.'" (emphasis added)). Plaintiffs claim that this requirement is "not a high bar," comparing the Unions to § 1986 defendants in three district court cases. Opp. at 126. But none of the cases is on-point.

First, Plaintiffs cite a case allowing a § 1986 claim against the spokesperson of a company in violation of § 1985(3), because "the facts tend to show [the spokesperson's] leadership role and influence" in the company. *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wis., Inc.*, 759 F. Supp. 1339, 1352 (W.D. Wis. 1991). But *Lac Du Flambeau* allowed the § 1986 claim to proceed because "the intracorporate limitation on the scope of 1985(3) [was] inapplicable," since the "corporation [was] created for the purpose of restraining plaintiffs' ability to exercise their … rights." *Id.* at 1351. Plaintiffs claim only that the Unions had "influence" over "Mr. Goodfriend given their principal-agent, attorney-client relationship." Opp. at 127. Plaintiffs do not allege that the Unions could have prevented Mr. Goodfriend from orchestrating his supposed conspiracy.[10]

---

[10] Likewise, *Lac Du Flambeau* supports the Unions because the § 1986 claims in that case was against the defendant who had the ability to stop the conspiracy—the spokesperson. The court affirmed the

Next, Plaintiffs defend their § 1986 claims with the contention the Unions "'did not attempt to dissuade' others from committing wrongful acts." Opp. at 126 (quoting *Vietnamese Fishermen's Ass'n v. Knights of Ku Klux Klan*, 518 F. Supp. 993 (S.D. Tex. 1981)). But in that case, all defendants subject to the § 1986 claim were full and active participants in the conspiracy and on equal footing. Two defendants were members of the KKK who improperly intimidated others during a boat ride, two defendants were the drivers of the boat itself, and the other defendant assisted with inviting attendees on the bad boat ride. *Id.* at 1001–02. Given each one's essential role in the conspiracy, any one of the defendants was equipped to stop any of the other defendants along the way. *Id.* at 1008.

Here, Plaintiffs have made no allegation that the Unions had control over any of the other individual or government defendants, or that they knew about unworthy motives that should be dissuaded. Plaintiffs point to nothing in *Vietnamese Fishermen's Ass'n* that relieves them of their duty to show that the Unions had "power to prevent" the conspiracy's fruition. Absent plausible allegations about the Unions' power, Plaintiffs cannot base a § 1986 claim on the bare assertion that the Unions could have "'attempt[ed] to dissuade' . . . others from carrying out the conspiracy to kill Plaintiffs' deal." Opp. at 127. *See, e.g.*, *Bowie*, 642 F.3d at 1132 (dismissing Section 1986 claim because plaintiff failed to allege that the defendants "would have had the power to prevent . . . the alleged conspiratorial acts"); *Humphrey v. Ct. of Common Pleas of York Cnty., Pa.*, 640 F. Supp. 1239, 1244 (M.D. Pa. 1986) (dismissing Section 1986 claim against the York County Bar Association, because the association had no power to discipline the attorney and judicial defendants allegedly engaged in the conspiracy).

Plaintiffs mischaracterize another case, suggesting that it allowed a § 1986 claim against the "members of a conspirator association" who simply "were present for, and participated in, [a]

---

claim because of "the facts that tend to show [the spokesperson's] leadership role and influence in" the company. *Lac Du Flambeau*, 759 F. Supp. at 1352. Plaintiffs have not alleged facts demonstrating that the Unions had a "leadership role and influence" in the purported conspiracy.

meeting" where a wrongful act was planned. Opp. at 126–27 (quoting *Sealed Plaintiff 1 v. Front*, No. 3:22-CV-00670, 2024 WL 1395477, at *27 (E.D. Va. Mar. 31, 2024)). But Plaintiffs plucked this reference to defendants attending a meeting from the opinion's discussion of whether the defendants had *knowledge* of the conspiracy—not from one on whether they had the *power* to prevent or aid in preventing the conspiracy. *See id.* The Court should not tolerate this attempt (one of many) by Plaintiffs to use misleading misquotations in support of propositions far from their original context.

Accordingly, Plaintiffs have also failed to state a § 1986 claim against the Unions. The Court should dismiss this count.

**D.    Plaintiffs fail to state a claim for tortious interference with contract or tortious interference with prospective business opportunity.**

To salvage a tortious interference claims against the Unions, Plaintiffs had to allege that the Unions caused Plaintiffs' damages. *Brown v. Hill*, No. 14-0140, 2021 WL 4262464, at *5 (D.D.C. Sept. 20, 2021). Here again, they have not done that. For starters, in support of their arguments that the FCC was not the cause of Plaintiffs' true harm, Plaintiffs again, whether mistakenly or intentionally, lump the Unions into Mr. Goodfriend's "coalition" of objectors. As explained above, the complaint itself shows that Mr. Goodfriend did not include the Unions in his reference to "coalition." At that point, the Unions' objections were already of record.

But more than that, Plaintiffs, as they have time and again, mischaracterize the cases on which they rely. Plaintiffs say the FCC could not be "a superseding or intervening cause, because 'its decision-making was impacted by [Defendants'] conduct.'" Opp. at 134 (quoting *Meijer, Inc. v. Ranbaxy Inc.*, No. 15-11828-NMG, 2016 WL 4697331, at *17 (D. Mass. June 16, 2016)). But that part of the *Meijer* opinion came from the court's analysis on whether the defendants were a proximate cause, rather than an intervening or superseding cause. As other cases establish, the FCC was the superseding cause of Plaintiffs' purported damages. *See Brown*, 2021 WL 4262464, at *5; *see also NOCO Co. v. OJ Commerce,*

*LLC*, 35 F.4th 475, 478 (6th Cir. 2022) ("When a third party that could have prevented the harm acts to cause the harm instead, then the chain of causation is broken.").[11]

If the Court were to conclude that Plaintiffs have established a prima facie case of tortious interference, the Unions still have no liability if they can show that their interference was "legally justified or privileged." *Onyeoziri v. Spivok*, 44 A.3d 279, 288 (D.C. 2012). That is because a defendant "does not interfere improperly with the other's relation if the actor believes his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." *Id.* (citation omitted). And protecting one's "existing economic interests" is a permissible justification for interfering. *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 901 (D.C. 2008).

This brings us back to *Noerr-Pennington* and the substance of the Unions' objections. The Unions already explained why and how they were acting to protect their legitimate interests. *See* Motion at 33–34. Plaintiffs argue nothing that the Unions did not already address in the motion to dismiss or above. Plaintiffs' tortious interference claims must be dismissed.

### E.    Plaintiffs fail to state a conspiracy claim against the Unions.

Because all of Plaintiffs' state-law claims fail, the conspiracy claim necessarily fails too.

## CONCLUSION

Along with the reasons argued above, the Unions join all other arguments of any Defendants here, as they may apply to the Unions as well. For the above reasons, and any reasons argued by the other Defendants, the Court should dismiss all claims against the Unions with prejudice.

---

[11] At one point, Plaintiffs argue that the Unions cannot both argue *Noerr-Pennington* (that they legitimately petitioned the government) and intervening and superseding cause. For one, the Unions are permitted to argue in the alternative. *Sharma v. Washington Metro. Area Transit Auth.*, 57 F. Supp. 3d 36, 45–46 (D.D.C. 2014). Also, the Unions' arguments are not contradictory. Under the intervening and superseding cause doctrine, the Unions started out on the causal chain, but were not the final, ultimate reason. Thus, the Unions petitioned the government with legitimate arguments under *Noerr-Pennington*. But the Unions could not ultimately make the final decision—the FCC did.

Respectfully submitted,

*/s/ Jason M. Covert*
Jason M. Covert (1016632)
Taft Stettinius & Hollister LLP
200 Massachusetts Ave. NW, Suite 500
Washington, D.C. 20001
Phone: (202) 664-1537
Fax: (202) 664-1586
jcovert@taftlaw.com

Russell S. Sayre (*admitted pro hac vice*)
Spencer S. Cowan (*admitted pro hac vice*)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 381-2838
Fax: (513) 381-0205
sayre@taftlaw.com
scowan@taftlaw.com

*Attorneys For Defendants The*
*NewsGuild-CWA and National Association of*
*Broadcast Employees and Technicians-CWA*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was filed this 10th day of December, 2024, through the Court's CM/ECF system, which will send notice of the filing to all parties of record.

*/s/ Jason M. Covert*