# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SGCI HOLDINGS III LLC and SOOHYUNG KIM, | ) ) | |
| *Plaintiffs*, | ) | |
| | ) | Case No. 24-1204-RC |
| v. | ) | |
| | ) | |
| FEDERAL COMMUNICATIONS COMMISSION, et al., | ) ) | |
| *Defendants*. | ) | |

## THE GOODFRIEND DEFENDANTS' REPLY
## MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION................................................................................................................ 1

ARGUMENT .................................................................................................................... 5

   I.   Plaintiffs cannot plead around the First Amendment by calling Defendants' petitioning "conduct" rather than "speech." ................................................................................ 6

   II.   The boundaries of the First Amendment's stringent protections for petitioning are not changed by Mr. Kim's assertion that his constitutional right to be free from discrimination was violated.................................................................................................................... 9

   III.   The broad immunity for petitioning provided by the First Amendment, under the label of the Noerr-Pennington doctrine, is not limited to immunity from antitrust claims. ............ 11

   IV.   Both because Mr. Goodfriend's petitioning was not objectively baseless and because it was the FCC's HDO Order, not Mr. Goodfriend's petitioning itself, that "killed" the deal, *Noerr-Pennington's* "sham" exception does not apply. ........................................................ 13

      A.  Prong one: Mr. Goodfriend's petitioning was not objectively baseless. .................. 144

      B.  Prong two: Mr. Goodfriend's petitioning did not "directly interfere" with Plaintiffs' financing. ............................................................................................................... 15

   V.   Even if there had been fraud on the FCC (and there was none), *Noerr-Pennington* immunity would still apply. ...................................................................................... 17

   VI.   Plaintiffs' Amended Complaint should be dismissed on First Amendment grounds. But it should also be dismissed because all of its claims require stating a plausible claim for purposeful and unlawful discrimination, which Plaintiffs have not done. ......................... 19

   VII.   As between the acknowledged economic reasons that every Defendant had to oppose Plaintiffs' transaction and the vast alleged racist conspiracy that Plaintiffs are asking the Court to infer, only the former is the "plausible conclusion" that *Iqbal* requires.............. 22

CONCLUSION ................................................................................................................ 23

# <u>TABLE OF AUTHORITIES</u>

**Cases** **Page(s)**

*\*Alemu v. Dept. of For-Hire Vehicles,*
 327 F. Supp.3d 29 (D.D.C. 2018) (Contreras, J.) .................................................................2

*Alexander v. CIGNA Corp.,*
 991 F. Supp. 427 (D.N.J. 1998) ........................................................................................17

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
 486 U.S. 492 (1988).........................................................................................................18

*\*Ashcroft v. Iqbal*
 556 U.S. 662 (2009)...................................................................................................22, 23

*BE & K Constr. Co. v. NLRB,*
 536 U.S. 516 (2002)....................................................................................................1, 12

*\*Bell Atlantic v. Twombly,*
 550 U.S. 544 (2007)..................................................................................................21, 22

*Bill Johnson's Rests., Inc. v. NLRB,*
 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983)........................................................12

*\*Borough of Duryea, Pa. v. Guarnieri,*
 564 U.S. 379 (2011)......................................................................................................6, 7

*Brandenburg v. Ohio,*
 295 U.S. 447 (1969)...........................................................................................................11

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
 404 U.S. 508 (1972)......................................................................................................9, 18

*Cantwell v. Connecticut,*
 310 U.S. 296 (1940)............................................................................................................8

*\*City of Columbia v. Omni Outdoor Advert., Inc.,*
 499 U.S. 365 (1991)...............................................................................................13, 15, 16

*Coleman v. Sears, Roebuck & Co.,*
 319 F. Supp. 2d 544 (W.D. Pa. 2003)....................................................................................17

*\*CSMN Invs., LLC v. Cordillera Metro. Dist.,*
 956 F.3d 1276 (10th Cir. 2020) .....................................................................................10, 15

*\*Eastern R.R. Presidents Conf. v. Noerr Motor-Freight, Inc.,*
 365 U.S. 127 (1961)........................................................................................... *passim*

*Eaton v. Newport Bd. Of Educ.*,
   975 F.2d 292 (6th Cir. 1992) ........................................................................9

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)........................................................................................4

*Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*,
   935 A.2d 362 (D.C. 2007) ..............................................................................5

*Gorman Towers, Inc. v. Bogoslavsky*,
   626 F.2d 607 (8th Cir. 1980) .......................................................................10

*Hess v. Indiana*,
   414 U.S. 105 (1973)......................................................................................11

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)............................................................................................8

*Hustler Mag., Inc. v. Falwell*,
   485 U.S. 46 (1988)..........................................................................................8

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*
   968 F.3d 286 (2d Cir. 1992)......................................................................7, 10

*King v. Governor of the State of New Jersey*,
   767 F.3d 216 (3rd Cir. 2014) .........................................................................7

*Kottle v. Northwest Kidney Centers*,
   146 F.3d 1056 (9th Cir. 1998) .......................................................................1

*McDonald v. Smith*,
   472 U.S. 479 (1985).......................................................................................7

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
   641 F.3d 834 (7th Cir. 2011) .......................................................................18

*In re Merck Mumps Vaccine Antitrust Litig.*,
   No. 23-3089 (3d Cir. Oct. 7, 2024)..............................................................13

*Metro Cable Co. v. CATV of Rockford, Inc.*,
   516 F.2d 220 (7th Cir. 1975) ...................................................................3, 16

*Mohegan Lake Motors, Inc. v. Maoli*,
   559 F. Supp. 3d 323 (S.D.N.Y. 2021)..........................................................17

*Morgan v. District of Columbia*,
   550 F. Supp. 465 (D.D.C. 1982)...................................................................21

*NAACP v. Button,*
371 U.S. 415 (1963) ............................................................................................4

*NAACP v. Claiborne Hardware Co.,*
458 U.S. 886 (1982) ............................................................................................8

*Nader v. The Democratic Nat'l Comm.,*
555 F. Supp. 2d 137, 157 (D.D.C. 2008) ........................................................13

*Nader v. Democratic Nat'l Comm.,*
567 F.3d 692 (D.C. Cir. 2009) ...................................................................11, 13

*Nanko Shipping, Guinea v. Alcoa, Inc.,*
330 F. Supp. 3d 439 (D.D.C. 2018) .................................................................21

*New West, L.P. v. City of Joliet,*
491 F.3d 717 (7th Cir. 2007) ....................................................................12, 18

*In re PMTS Liquidating Corp.,*
452 B.R. 498 ....................................................................................................17

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.,*
508 U.S. 49 (1993) ......................................................................13, 14, 15, 18

*R.A.V. v. City of St. Paul,*
505 U.S. 377 (1992) ...........................................................................................7

*U.S. Futures Exch. LLC v. Board of Trade,*
953 F.3d 955 (7th Cir. 2020) ...........................................................................14

*United Mine Workers v. Pennington,*
381 U.S. 657 (1965) ..................................................................................3, 9, 11

*United States v. Philip Morris USA, Inc.,*
566 F.3d 1095 (D.C. Cir. 2009) .......................................................................18

*United States v. Stanolind Crude Oil Purchasing Co.,*
113 F.2d 194 (10th Cir. 1940) .........................................................................17

*Venetian Casino Resort, LLC v. NLRB,*
793 F.3d 85 (D.C. Cir. 2015) ...........................................................................12

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.,*
858 F.2d 1075 (5th Cir. 1988) .........................................................................10

*Weiss v. Willow Tree Civic Ass'n,*
467 F. Supp. 803 (S.D.N.Y. 1979) ..................................................................10

*White v. Lee,*
227 F.3d 1214 ............................................................................................ *passim*

*Wisconsin v. Mitchell,*
508 U.S. 476 (1993) .................................................................................... 7

**Statutes**

47 C.F.R. § 1.1200 ........................................................................................ 3

15 U.S.C. § 1 .............................................................................................. 12

42 U.S.C. § 1981 .......................................................................................... 6

42 U.S.C. § 1983 ........................................................................................ 12

42 U.S.C. § 1985 .......................................................................................... 6

Fair Housing Act ........................................................................................ 12

National Labor Relations Act .................................................................... 12

Sherman Antitrust Act .................................................................... 6, 12, 13

**Other Authorities**

Douglas R. Richmond, *The Lawyer's Litigation Privilege,* 31 Am. J. Trial Advoc.
281, 288, 291 (2007) .................................................................................. 5

Eugene Volokh*, Speech as Conduct*: *Generally Applicable Laws, Illegal Courses
of Conduct, "Situation-Altering Utterances," and the Uncharted Zones,* 90
Cornell L. Rev. 1277 (2005) ................................................................ 7, 8

Fed. R. Civ. P. 9(b) .................................................................................... 17

T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation
Lawyers,* 31 Pepp. L. Rev. 915 (2004) ...................................................... 5

## INTRODUCTION

Almost daily—in federal, state, and local administrative proceedings across the country, before Congress, independent agencies, state assemblies, city and county councils, licensing commissions, and zoning boards—ordinary citizens, interest groups, and lawyers and lobbyists do what David Goodfriend did here. They urge regulators to reject plans that could result in job cuts, increased prices, or harm the public interest. Like Mr. Goodfriend, they exercise one of the most cherished First Amendment rights: the right to petition the government to try to influence its decision making. The Supreme Court has called robust petitioning "one of the most precious liberties safeguarded by the Bill of Rights," *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002), emphasizing that this right of the governed "to make their views known to" government is a cornerstone of representative democracy, indeed, the primary right on which, "to a very large extent, the whole concept of" representative democracy depends. *Eastern R.R. Presidents Conf. v. Noerr Motor-Freight, Inc.,* 365 U.S. 127, 137 (1961).

Plaintiffs' Amended Complaint is a brutal mugging of this cornerstone of our democracy. Retaliatory, speech-suppressing strategic lawsuits against public participation like this one, commonly known as "SLAPPs," impose crippling costs; even "the mere pendency" of an action like this one can chill the exercise of First Amendment rights. *Kottle v. Northwest Kidney Centers,* 146 F.3d 1056, 1063 (9th Cir. 1998). A ruling allowing this lawsuit to proceed would deter protected speech, discouraging vocal citizens, interest groups, and lobbyists everywhere who would learn about that ruling. The longstanding right to robust petitioning must not be undermined by this case.

1

\* \* \* \* \* \*

Drawing all reasonable inferences in Plaintiffs' favor, the *relevant* facts here are straightforward (despite Plaintiffs' drawn-out complaint and briefing).[1] Mr. Goodfriend urged the FCC to reject a merger transaction that Plaintiffs were proposing.[2] As Plaintiffs themselves admit, he advocated that. if their transaction were allowed to go forward, the new merged company might slash union jobs, devastate local news outlets, raise the cost of cable and satellite subscription fees, and imprudently increase anonymous foreign ownership in U.S. media and telecommunications infrastructure. Am. Compl. ¶¶ 135, 150, 174, 182. Plaintiffs also allege that Mr. Goodfriend's advocacy was conspiratorial, racially motivated, and factually unfounded. But even if those allegations were true (they are not), they are irrelevant. Mr. Goodfriend's motives, the coalition he assembled, and whether he was right or wrong about the merits of the issues he raised are immaterial. The Amended Complaint alleges no "overtly corrupt conduct," such or unlawful meetings with government officials, and thus no actions outside the protections of the First Amendment. See *Alemu v. Dept. of For-Hire Vehicles*, 327 F. Supp.3d 29, 51-52 (D.D.C. 2018) (Contreras, J.).[3] See also *United Mine Workers v. Pennington,* 381 U.S. 657, 670 (1965)

---

[1] Plaintiffs' Amended Complaint is ECF No. 36; paragraphs of it will be cited in this brief with the abbreviation "Am. Compl. ¶ __." Plaintiffs' brief in support of their motion to dismiss is ECF No. 66; pages of it will be cited in this brief as "Kim Brief at __."

[2] The Amended Complaint names both Mr. Goodfriend and his firm, Emmer Consulting, as defendants. (Emmer Consulting does business as "I Street Advocates" and was formerly known as "The Goodfriend Group"). But the Amended Complaint no allegations of acts or omissions by any member of the firm except Mr. Goodfriend. Accordingly, the firm's alleged liability is derivative of Mr. Goodfriend's. For brevity and readability, this brief sometimes refers just to "Mr. Goodfriend" rather than to "Mr. Goodfriend and Emmer Consulting," but all such references are intended to encompass both of them.

[3] Neither Plaintiffs' allegations of campaign contributions (Am. Compl. ¶¶ 176, 179, 314-15) nor their allegations of "ex parte" contacts (Am. Compl. ¶¶ 146, 162-64, 166, 171, 174) allege

("*Noerr* shields ... a concerted effort to influence public officials regardless of intent or purpose").

Advocating to try to influence government action was Mr. Goodfriend's (and his clients') constitutional right. His advocacy provided regulators with essential context bearing on longstanding national debates around issues of undeniable public concern raised by Plaintiffs' transaction: debates about jobs, local journalism, "retransmission consent" fees, media consolidation, and foreign influence and interference in American media.[4] The immunities that protected his petitioning cannot be bypassed by clever pleading, cannot be circumvented by Plaintiffs' allegations, right or wrong, that his petitioning was allegedly racially motivated or factually inaccurate.

*NAACP v. Button* teaches that the First Amendment's protections apply equally to everyone, including those accused—rightly or wrongly—of petitioning for or against contentious

---

unlawful conduct. Both are protected by the First Amendment. Campaign contributions are part of the political process; allegations concerning even substantial contribution amounts do not affect or remove First Amendment immunity. *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 230-31 (7th Cir. 1975). And the FCC expressly authorizes ex parte communications as part of its "permit-but-disclose" policy; ex parte contacts are a standard, lawful part of practicing before the FCC. 47 C.F.R. § 1.1200 *et seq.*

[4] Debates about (a) foreign ownership of the nation's telecommunication outlets and infrastructure, (b) threats to the survival of local journalism and programming, and (c) consumer protection in the cable and satellite television market are ongoing and longstanding. They are hot topics. See generally https://stefanik.house.gov/2023/2/stefanik-khanna-gallagher-work-to-counter-foreign-telecommunications-influence (describing a bill to require the FCC to shine a light on ownership in telecommunications companies by foreign governments and quoting Rep. Ro Khanna (D-CA) explaining that "It's critical for our national security that we understand the influence that foreign governments wield over our telecommunications infrastructure … This is a common-sense bipartisan bill); https://www.fcc.gov/document/fcc-proposes-policy-promote-localism (FCC notice of proposed rulemaking to modify procedures to prioritize locally originated programming); and https://www.federalregister.gov/documents/2024/04/19/2024-07404/all-in-pricing-for-cable-and-satellite-television-service (FCC rule on transparency in cable and satellite TV pricing).

causes, including for or against equal opportunity. 371 U.S. 415, 444-45 (1963). "[T]he Constitution protects expression and association without regard to … *the truth*, popularity, *or social utility* of the ideas and beliefs which are offered." *Id.* (emphasis added).

If the First Amendment did not offer this robust protection for petitioning—if objectors and commenters in agency proceedings could be sued and held liable based on a judge or jury's retrospective review of their motives—the resulting chill effect would imperil petitioning across the country. It would intolerably burden the exercise of First Amendment rights.

The right to petition is too precious to expose to doubtful claims challenging petitioners' motives. Without a robust right to petition, representative democracy cannot flourish—or survive. Petitioning requires substantial protection, including "breathing space." *NAACP v. Button*, 371 at 433 (1963) ("First Amendment freedoms need breathing space to survive"); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) ("[W]e have been especially anxious to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise").

Mr. Kim should not be permitted to avenge his frustrations with the FCC by subjecting opposing counsel*,* personally, to ruinously expensive, invasive, vexatious, and harassing revenge litigation. Under the First Amendment, the Goodfriend Defendants are entitled to dismissal of *all* claims against them.[5] Plaintiffs' insinuations notwithstanding, there is no First Amendment

---

[5] Plaintiffs' statement that "the Goodfriend Defendants do not address Plaintiffs' tortious interference claims, so th[os]e claims should proceed against them" overreaches. Kim Brief at 102. The Goodfriend Defendants' motion and opening brief clearly and repeatedly state that the Amended Complaint should be dismissed "in its entirety and with prejudice" because all claims (a) are barred by the First Amendment and (b) require well-pled facts supporting an inference of racially discriminatory intent, which is not a plausible conclusion here even at the pleadings stage. ECF 44 at 2; ECF 44-1 at 2, 5, 20, 22. See also ECF 44-1 at 5 (citing *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1084 (5th Cir. 1988) ("There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim")).

exception for suits by disgruntled participants in regulatory proceedings who happen to belong to a protected class.

* * * * * *

There is one more dimension to this case that makes Plaintiffs' claims extraordinary. In the FCC proceedings that Plaintiffs are complaining about, Mr. Goodfriend was not a party. He appeared, *as counsel*, representing two highly respected unions that opposed Plaintiffs' transaction: the NewsGuild-CWA and the National Association of Broadcast Employees and Technicians-CWA. Plaintiffs are thus suing *opposing counsel.* Such sour-grapes claims against an opponent's *lawyer* are sustainable only "in rare circumstances." *Goldschmidt v. Paley Rothman Goldstein Rosenberg & Cooper, Chartered*, 935 A.2d 362, 381 (D.C. 2007). Yet Plaintiffs have filed a 140-page brief without citing any case supporting claims against a rival's lawyer, lobbyist, or lawyer lobbyist. Ordinarily, an attorney's advocacy for a client is absolutely privileged.[6]

## ARGUMENT

The central issue in this case is self-evident—whether Mr. Goodfriend's petitioning was protected, indeed paradigmatically protected, by the First Amendment. Yet Plaintiffs delay reaching this critical question until the 118th page of their prolix brief. When they finally

---

[6] See generally, T. Leigh Anenson, *Absolute Immunity from Civil Liability: Lessons for Litigation Lawyers*, 31 Pepp. L. Rev. 915 (2004). See also, Douglas R. Richmond, *The Lawyer's Litigation Privilege*, 31 Am. J. Trial Advoc. 281, 288, 291 (2007) ("[C]ourts increasingly "see no reason to distinguish between *communications* made during the litigation process and *conduct* occurring during the litigation process" and "[a]lthough crafted in connection with defamation claims, the purposes supporting application of the privilege extend *to other causes of action* as well.") (emphasis added).

confront it, they serve up congeries of flawed assertions and defenses, asserting: (a) that they are suing Mr. Goodfriend for his "conduct," not his speech; (b) that his First Amendment rights are limited by generally applicable antidiscrimination statutes (like sections 1981 and 1985) and by tort law (like interference with business relations); (c) that *Noerr-Pennington* standards for immunity for petitioning activity are rooted in the Sherman Act, not the First Amendment, and are therefore inapplicable here; and (d) that, regardless, there is no protection for "sham" petitioning, which they allege that Mr. Goodfriend was engaged in. On all these points Plaintiffs are wrong. Their Amended Complaint should be dismissed in its entirety and with prejudice.

## I.  Plaintiffs cannot plead around the First Amendment by calling Defendants' petitioning "conduct" rather than "speech."

Plaintiffs' first defense against the pending motions to dismiss is their contention that their Amended Complaint challenges Mr. Goodfriend's "conduct," not his speech, moving this case outside the ambit of the First Amendment. Kim Brief at 118-19.

Not so.

*First*, the First Amendment has six clauses: Speech, Press, Assembly, Petitioning, Religious Establishment, and Religious Exercise. Each provides distinct protection. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011) ("Courts should not presume there is always an essential equivalence in the [Speech and Petition Clauses] or that Speech Clause precedents necessarily and in every case resolve Petition Clause Claims").[7] Plaintiffs have provided no legal

---

[7] Citing *McDonald v. Smith*, 472 U.S. 479 (1985), Plaintiffs argue that the right to petition and the right to speak are coextensive—that there can be no greater constitutional protection under the Petition Clause than under the Speech Clause. Kim Brief at 125, 127. They fail to note that the Supreme Court has explicitly rejected that position, explaining that: "This Court's opinion in *McDonald* has sometimes been interpreted to mean that the right to petition can extend no

authority for applying a speech/conduct distinction to First Amendment protections for *petitioning*.[8]

*Second*, even as applied to pure Speech Clause claims, the speech/conduct distinction is controversial—and often derided as illusory, "unprincipled and susceptible to manipulation." *King v. Governor of the State of New Jersey*, 767 F.3d 216, 228 (3rd Cir. 2014).[9]

*Third*, the idea of applying a speech/conduct distinction to petitioning borders on absurdity. Effective petitioning invariably involves assembling coalitions, getting letters and petitions written and signed, meeting with government officials (elected and appointed), and making filings. If calling those activities "conduct," "a course of conduct," or a "campaign"—rather than "speech"—were enough to strip them of constitutional protection, the constitutional right to petition would be nullified.

*Fourth*, even if speech and conduct *were* dichotomous and a speech/conduct distinction *were* relevant to constitutional protections for petitioning, Mr. Goodfriend's petitioning would still fall squarely on the "speech" side of that metaphysical line. Plaintiffs' Amended Complaint

---

further than the right to speak; but McDonald held only that speech contained within a petition is subject to the same standards for defamation and libel as speech outside a petition …. There may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis; and if that is so, the rules and principles that define the two rights might differ in emphasis and formulation." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 389 (2011).

[8] See, e.g., Kim Brief at 119 citing *Wisconsin v. Mitchell*, 508 U.S. 476 (1993); *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992); and *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.* 968 F.3d 286 (2d Cir. 1992). All three are Speech, not Petition, Clause cases.

[9] See also Eugene Volokh*, Speech as Conduct*: *Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277 (2005). (urging that "'it's not speech, it's conduct" distinctions are misguided, ask the wrong questions, and lead to the wrong results).

assails Mr. Goodfriend not merely for opposing Mr. Kim's proposed merger transaction but *for what he said* in opposing it—for the persuasive effect of his speech. According to the Amended Complaint, his advocacy influenced the FCC to conclude that Mr. Kim allegedly was not the "right kind" of minority, that "Mr. Allen's black-owned company deserved greater solicitude," and, as a result, that Plaintiffs' transaction should be stopped. Am. Compl. ¶ 70. But even drawing all inferences in Plaintiffs' favor, such advocacy by Mr. Goodfriend, even if he had engaged in it (and he did not), would still just be petitioning government to act or refrain from acting. And under binding Supreme Court precedent, such petitioning is safely on the speech side of any speech/conduct distinction.[10]

First Amendment protections for petitioning activity do not vary with the subject matter, content, or viewpoint of the petition. "A citizen's right to petition is not limited to [urging] goals that are deemed worthy," *Eaton v. Newport Bd. Of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992), or lawful, or even consistent with "the concept of equality for all persons." *White v. Lee*, 227 F.3d 1214, 1227. "The mere fact that citizens urge their government to adopt measures that

---

[10] See, e.g., *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 133, (1961) (debuting the *Noerr-Pennington* principle—in a case where railroads had launched a "malicious and fraudulent" campaign of political advertisements and lobbying in support of anti-trucking laws); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (immunizing protesters staging an economic boycott of white merchants, to pressure local elected officials to grant their demands, against claims of tortious interference); *Cantwell v. Connecticut*, 310 U.S. 296, 309 (1940) (reversing a breach-of-the-peace conviction under a generally applicable statute because the conviction was predicated on "the effect of [the speaker's] communication upon his hearers"); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988) (reasoning that publishing cruel and vulgar satire was speech not conduct and therefore that First Amendment prevents the tort of intentional infliction of emotional distress from being used to impose liability). See also *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (rejecting the government's argument that material support of designated foreign terrorist organizations, in the form of training and expert advice, was "conduct" not "speech"). See generally, Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277 (2005) (urging that "'it's not speech, it's conduct" distinctions are misguided, ask the wrong questions, and lead to the wrong results).

may be unlawful," even allegedly a violation of Equal Protection, "does not deprive the speech involved of its First Amendment protection." *Id.* at 1228. Petitioning activity is not removed from the ambit of First Amendment protection "simply because it advocates [or allegedly advocates] an unlawful act." *Id.* at 1227.

## II.    The boundaries of the First Amendment's stringent protections for petitioning are not changed by Mr. Kim's assertion that his constitutional right to be free from discrimination was violated.

First Amendment immunity for petitioning, for which "*Noerr-Pennington* is a label," ensures that "those petitioning the government"—any department of the government—"remain immune from liability" for statutory violations, notwithstanding that their activity might otherwise be [statutorily] prescribed." *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).[11]

The scope of this protection is unique to Petitioning—because of the importance of petitioning, because "to a very large extent, the whole concept of" representative democracy "depends on the ability of the people to make their wishes known to" government. *Eastern R.R. Presidents Conf. v. Noerr Motor-Freight, Inc.,* 365 U.S. 127, 137 (1961).

The protection for free speech under the *Petitioning* Clause is broader than under the *Speech* Clause. And this distinction helps clarify why, as Plaintiffs note, applying civil rights laws to prevent one private party from coercing another to cancel a contract with a third—on grounds prohibited by civil rights law—does not implicate First Amendment protected *speech* (even though the enforcement of a civil rights statute involves "state action"), which why the First Amendment did not protect the defendants in *Jews for Jesus, Inc. v. Jewish Cmty. Rels.*

---

[11] The Supreme Court extended immunity to attempts to influence the executive branch in *United Mine Workers of America v. Pennington,* 381 U.S. 657 (1965), and to attempts to influence administrative agencies in *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).

*Council of N.Y., Inc.* 968 F.3d 286 (2d Cir. 1992) (cited in Kim Brief at 119, 120, and 123). But

the rule is different for *petitioning*. Unlike efforts to persuade private actors to take actions that

would violate civil rights or tort law (as in *Jews for Jesus, supra*), which are *not* protected by the

First Amendment, efforts *to persuade government officials* to do the same thing (petitioning) *are*

protected by the First Amendment.

In short, the premise underlying Plaintiffs' motion to dismiss—that advocating "unlawful"

activity removes First Amendment protections—is simply wrong, as many cases establish. See

*CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1290 (10th Cir. 2020) ("It is

important to emphasize that a person's … petitioning activity is not removed from the ambit of

First Amendment protection simply because it advocates an unlawful act."); *White v. Lee*, 227

F.3d at 1227 (recognizing the First Amendment "right to pursue, as a group, discriminatory

policies that are antithetical to the concept of equality for all persons"). See also *Video Int'l*

*Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d at 1084 (noting that allowing

liability for petitioning activity under civil right laws, such as § 1983, "would effectively cast a

cloud over a broad range of causes that are brought before courts, legislatures, or governmental

agencies"); *Gorman Towers, Inc. v. Bogoslavsky,* 626 F.2d 607, 615 (8th Cir. 1980) ("We are

loathe to interpret section 1983 to proscribe what we thus understand to be traditional political

activity"); *Weiss v. Willow Tree Civic Ass'n*, 467 F. Supp. 803 (S.D.N.Y. 1979) (holding that the

First Amendment protected the rights of a residents' organization in New York to oppose the

development of an Orthodox Jewish housing complex on discriminatory grounds, through zoning

appeals, complaints to a state agency, and other concerted action). See also *Video Intern.*, 858

F.2d at 1084 ("There is simply no reason that a common-law tort doctrine can any more

10

permissibly abridge or chill the constitutional right of petition than can a statutory claim").[12]

In light of the authorities cited in the last paragraph, Plaintiffs' assertions that the First Amendment is no bar to liability under "civil rights laws and common-law torts" are wrong. Kim Brief at 118.

### III. The broad immunity for petitioning provided by the First Amendment, under the label of the Noerr-Pennington doctrine, is not limited to immunity from antitrust claims.

Because of the breadth and strength of *Noerr-Pennington* immunity, Plaintiffs try to escape it, arguing that "*Noerr-Pennington* applies only to antitrust claims." Brief at 124. That's not accurate.

As the D.C. Circuit has explained, "*Noerr* and *Pennington* are antitrust cases, but they stand for the proposition that when a person petitions the government for redress, *the First Amendment* prohibits any sanction on that action … so long as the petition was in good faith." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009) (emphasis added).

---

[12] In *Brandenburg v. Ohio*, the Supreme Court excluded "advocacy" that is "directed to inciting or producing imminent *lawless* action" and is "likely to incite or produce such action" from First Amendment protections. 395 U.S. 444, 447 (1969). It is clear both that the "advocacy" protected by the *Brandenburg* test encompasses not just activity protected by the First Amendment's Speech Clause but also activity protected by the Amendment's other clauses, including petitioning; and that imminent "lawless" action, as used in *Brandenburg*, means "violence or physical disorder in the nature of a riot." *White v. Lee*, 227 F.3d 1214, 1227-28 (9th Cir. 2000). Here, the Amended Complaint does not, and in good faith could not, allege that Mr. Goodfriend's advocacy was intended to incite violence or riotous disorder. And likewise, it neither alleges nor could allege that Mr. Goodfriend advocated for *imminent* action of any kind; indeed, the thrust of Plaintiffs' case is that Mr. Goodfriend advocated agency *in*action for the indefinite future, which is not actionable. *Id.,* 227 F.3d at 1227 ("Advocacy is unprotected only 'if it is "intended to produce, and likely to produce, imminent disorder'; 'advocacy of illegal action at some indefinite future time' is not actionable. *Hess v. Indiana,* 414 U.S. 105, 108–09 (1973)").

*Noerr-Pennington* extends far beyond antitrust law, where it originated. *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). It is overwhelmingly understood today "as an application of the First Amendment's speech and petitioning clauses." *Id.* (affirming the propriety of applying *Noerr-Pennington* to civil rights claims under § 1983). The immunity for petitioning, commonly called "*Noerr-Pennington* immunity, applies and protects petitioning "in all contexts." *White v. Lee*, 227 F.3d at 1231 (applying the doctrine in the context of the Fair Housing Act). As the Supreme Court has confirmed, it is not merely an antitrust doctrine. See *Bill Johnson's Rests., Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (applying *Noerr-Pennington* principles in the labor law context under the NLRA); *BE & K Constr. Co. v. NLRB,* 536 U.S. 516 (2002) (same). As the D.C. Circuit has put it, *Noerr-Pennington* implements the "general principle" that petitioning the government is *First Amendment* protected conduct. *Venetian Casino Resort, LLC v. NLRB*, 793 F.3d 85, 89-90 (D.C. Cir. 2015) (emphasis added). In asserting the contrary, Plaintiffs are fighting an uphill battle, arguing to *change* the law, not apply it.

Fundamentally, *Noerr-Pennington* would make no sense as a stand-alone interpretation of the Sherman Act, which is what Plaintiffs are arguing. Kim Brief at 124, 126 ("*Noerr-Pennington* applies only to antitrust claims …. *Noerr-Pennington* is a doctrine of statutory interpretation under the Sherman Act"). The Sherman Act is not about speech or petitioning. It is about consumers, markets, and competition. *Noerr-Pennington* could not be rooted in the Sherman Act: no textualist could squeeze an immunity doctrine out of the Sherman Act's notoriously terse language, which mentions neither immunity nor petitioning and says no more than that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce … is declared to be illegal," 15 U.S.C. § 1.

*Noerr-Pennington* is an application of the First Amendment, not an application of the Sherman Act.

**IV.  Both because Mr. Goodfriend's petitioning was not objectively baseless and because it was the FCC's HDO Order, not Mr. Goodfriend's petitioning itself, that "killed" the deal, Noerr-Pennington's "sham" exception does not apply.**

To be sure, as Plaintiffs note, there is no immunity for "sham" petitioning. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* ("*P.R.E.*"), 508 U.S. 49 (1993). But for a petition to be considered a sham, two conditions must be met—neither of which applies here *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* ("*P.R.E.*"), 508 U.S. 49 (1993); *In re Merck Mumps Vaccine Antitrust Litig.*, No. 23-3089, 2024 WL 4432076, at *5 (3d Cir. Oct. 7, 2024).

*First*, to qualify as a "sham" a petition must be "objectively baseless." *P.R.E.*, 508 U.S. at 60 (1993). An objectively reasonable effort can never be "sham." *Id.* "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.* See also *Nader v. The Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 157 (D.D.C. 2008), *aff'd on other grounds sub nom. Nader v. Democratic Nat'l Comm.*, 567 F.3d 692 (D.C. Cir. 2009).

*Second*, even when petitioning is objectively baseless, immunity *still* attaches unless, *in addition*, the petitioner subjectively intended to "use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon" to "interfere *directly* with the business relationships of a competitor." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380-81 (1991) (emphasis added).

Under this two-pronged test and as a matter of law, the Goodfriend Defendants' petitioning was not a "sham."

13

### A. Prong one: Mr. Goodfriend's petitioning was not objectively baseless.

The Goodfriend Defendant's petitioning was not objectively baseless.

*First*, it successfully induced agency action—it raised questions about the risks that Plaintiffs' transaction would slash jobs and raise prices, and because of those questions, the FCC ordered Plaintiffs to provide information clarifying their position on both issues. Am. Compl. ¶¶ 130-32.

*Second*, the defendants in this case were not the only groups opposing Plaintiffs' transaction. Their transaction was also opposed by Graham Broadcasting and by Altice USA, whom Plaintiffs have not sued; both companies raised concerns about the transaction substantially similar to the concerns UCC, Common Cause, DISH, and Mr. Goodfriend were raising (on behalf of NewsGuild-CWA and NABET-CWA).[13]

*Third*, Defendants' petitioning here did not only induce agency action. It also induced Plaintiffs to make concessions. It produced results. *Id.* ¶¶ 195-97.[14]

---

[13] Altice USA's concerns—about how Plaintiffs appeared to be engineering their proposed transaction to raise retransmission consent prices, harming consumers and the public interest, are available in the public record at https://www.fcc.gov/ecfs/document/10200716619235/1. Graham Media Group's comments, concerning risks to competition and local news programming, are available in the public record at https://www.fcc.gov/ecfs/document/106220765721875/1.

[14] Plaintiffs mistakenly assert that Mr. Goodfriend's petitioning was not "successful"—because the FFC "did not decide the merits of Plaintiffs' license-transfer applications." Brief at 134. But *ultimate* success is not the legal standard. Encouraging a regulator to consider shortcomings in an application, as the Goodfriend Defendants did here, is not sham petitioning. *U.S. Futures Exchange LLC v. Board of Trade*, 953 F.3d 955, 966 (7th Cir. 2020) ("Even if petitioners believe a regulator may ultimately approve an application [rejecting their objections], that does not eliminate their right to encourage the governing body to consider shortcomings in the application"). Plaintiffs also mistakenly suggest that, by making concessions, they rendered continuing objections, after those concessions, "baseless." Not so. *First*, as the FCC determined, Plaintiffs' eleventh-hour "commitments" did not "adequately mitigate" and there was

For all these reasons, this was successful not sham petitioning. See *P.R.E.*, 508 U.S. at 56 ("In *Noerr* itself, we found that a publicity campaign by railroads seeking legislation harmful to truckers was no sham in that the 'effort to influence legislation' was 'not only genuine *but also highly successful*'") (emphasis added). The Supreme Court has "explicitly observed that a successful 'effort to influence governmental action ... *certainly cannot* be characterized as a sham.'" Successful petitioning "is *by definition* a reasonable effort at petitioning for redress and therefore not a sham." *Id.* at 58 and 61 n.5 (emphasis added) (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 502 (1988)).

### B.  Prong two: Mr. Goodfriend's petitioning did not "directly interfere" with Plaintiffs' financing.

*Even if* Mr. Goodfriend's petitioning had been objectively baseless (and it was not), he and his clients were not petitioning for proscribed reasons.

Neither (a_ selfish nor anticompetitive motives, nor (b) petitioning for "the purpose of delaying a competitor's entry into the market," nor (c) "seek[ing] … to get [an] opponent ignored" are proscribed reasons. They do not destroy *Noerr-Pennington* immunity. *Omni Outdoor Advertising*, 499 U.S. at 381-382. And for the same reasons, neither do motives allegedly "antithetical to the concept of equality for all persons." *White v. Lee*, 227 F.3d at 1227.

To state the point again, *the premise underlying Plaintiffs' motion to dismiss*—that advocating "unlawful" activity removes First Amendment protections—*is simply wrong. CSMN Invs.,* 956 F.3d at 1290 ("It is important to emphasize that a person's … petitioning activity is not

---

"conflicting evidence" about them. FCC Hrg. Designation Order ¶¶ 2, 4, 24-25, 31-32, 43-44. *Second,* it was not "baseless" for Mr. Goodfriend to continue to advocate for *further* commitments, including binding commitments regarding union jobs *extending beyond* the two-year "commitment" that Plaintiffs had offered.

removed from the ambit of First Amendment protection simply because it advocates an unlawful act."); *White v. Lee*, 227 F.3d at 1227 (recognizing the First Amendment "right to pursue, as a group, discriminatory policies that are antithetical to the concept of equality for all persons").

The *only* motive that can pierce petitioning immunity is an intent to "directly interfere" with a competitor's business relationships. And explaining that standard, the Supreme Court has emphasized "the import of the critical word 'directly.'" *Omni Outdoor*, 499 U.S. at 381. In a manner akin to abuse of process, petitioning is a sham only when undertaken for the sake of occasioning delay through "*the very process"* of petitioning *itself. Omni Outdoor Advertising*, 499 U.S. at 381. Here, by contrast, as the Amended Complaint repeatedly emphasizes, the harm for which Plaintiffs are suing did not result from the *process* of petitioning but rather from the *outcome* the petitioning achieved: the entry of an HDO. As the Amended Complaint makes very clear, the delay that was fatal to Plaintiffs' transaction did not result from Defendants' lobbying but from *government action itself*—from the FCC's order setting Plaintiffs' application for a hearing. See Am. Compl. ¶ 11 (*the HDO* "ensured the deal would not close on time"); ¶ 22 (Defendants Rosenworcel and Saurer—not Mr. Goodfriend or his petitioning —"killed the deal by pocket veto *with the HDO*); ¶ 107 ("*the FCC* [not Mr. Goodfriend or his petitioning] killed the … transaction via an *HDO")*; ¶ 125 ("*the Media Bureau* [not Mr. Goodfriend or his petitioning] … *issued the HDO and* killed the" deal); ¶ 229 ("*The HDO* sounded the dell knell" for the transaction).

This distinction between process and outcome is at the heart of the Court's decision in *Omni Outdoor Advertising*, which goes to pains to explain that "the purpose of delaying a competitor's entry into the market does *not* render lobbying activity a 'sham,' unless (as no evidence suggested was true here) the delay is sought to be achieved *only by the lobbying*

*process itself, and not by the governmental action that the lobbying seeks*. 499 U.S. at 381

(emphasis added). Indeed, the Court added, "If *Noerr* teaches anything it is that an intent to

restrain trade as a *result* of the government action sought ... does not foreclose protection." *Id.*

(emphasis in original; internal quotation marks omitted).[15]

Under the plain allegations of their Amended Complaint, Plaintiff's theory for application

of the "sham" exception is unsound.

## V.    Even if there had been fraud on the FCC (and there was none), *Noerr-Pennington* immunity would still apply.

In the last of its congeries of arguments, Plaintiffs point to paragraphs 162-167, 187, and

321of the Amended Complaint, which, they say, successfully plead fraud, which, they say, is

sufficient to establish a triable issue on the applicability of *Noerr-Pennington* immunity, at least

at the motion to dismiss stage. Brief at 138-39. Not so.

*First*, fraud allegations are subject to the heightened pleading burden of Fed. R. Civ. P.

9(b), a standard that Plaintiffs' Amended Complaint fails to meet. The Amended Complaint does

not identify any fraudulent statement(s). The closest Plaintiffs come to alleging a false statement

is in paragraph 164, where they allege that Mr. Goodfriend "baselessly claim[ed] that Standard

General['s disclosures] '*may* have raised *potential* issues of material representation' about job

losses …" (emphasis added). But that allegation does not plead fraud. A statement that Plaintiffs'

---

[15] Likewise, the Amended Complaint's allegations that the government and private Defendants were co-conspirators also provides no basis for denying the private Defendants' the protection of *Noerr-Pennington* immunity here. As the Supreme Court has made clear, there is no conspiracy exception to *Noerr-Pennington* immunity. *Omni Outdoor Advertising*, 499 U.S. at 382-83. See also *Metro Cable Co. V. CATV of Rockford, Inc.*, 516 F.2d 220, 230 (7th Cir. 1975) ("Such a rule would in practice abrogate the *Noerr* doctrine. It would be unlikely that any effort to influence legislative action could succeed unless one or more m0embers of the legislative body became such conspirators").

disclosures "*may* have raised *potential* issues" is *doubly* conditional. It's not a false statement of past or present fact. It's not even a statement of fact. It's a speculative statement and, therefore, not a misrepresentation for purposes of a fraud claim—even if it turns out to be wrong.[16] Plaintiffs' attempt to get around *Noerr Pennington* by pleading fraud therefore fails. They have not properly pled fraud.

*Second*, in *P.R.E.* the Supreme Court explicitly declined to establish any fraud exception to *Noerr Pennington* immunity. 508 U.S. at 61 n.6 ("We need not decide here whether and, if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations").

*Third*, as Judge Easterbrook has pointed out, "the holding of *Noerr* is that lobbying is protected whether or not the lobbyist used deceit." *New West*, 491 F.3d at 722. See also *Noerr*, 365 U.S. at 145 (noting that "deception, reprehensible as it is, can be of no consequence," while holding the railroads immune). Without an overruling of *Noerr*, neither appellate nor district courts can create a fraud exception. Cf. *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009).

---

[16] See, e.g., *United States v. Stanolind Crude Oil Purchasing Co.,* 113 F.2d 194, 201 (10th Cir. 1940) ("Statements or representations as to contingent events do not constitute fraud, although they turn out to be false."); *Mohegan Lake Motors, Inc. v. Maoli,* 559 F. Supp. 3d 323, 342 (S.D.N.Y. 2021), *opinion clarified sub nom. Mohegan Lake Motors, Inc. v. Maoli,* No. 16-CV-6717 (NSR), 2023 WL 1070247 (S.D.N.Y. Jan. 27, 2023) ("Statements as to … expectations or probabilities … do not constitute misrepresentations, even though they may turn out to be wrong"); *Alexander v. CIGNA Corp.*, 991 F. Supp. 427 (D.N.J. 1998) (same); *Coleman v. Sears, Roebuck & Co.*, 319 F. Supp. 2d 544, 551 (W.D. Pa. 2003) (same). See also *In re PMTS Liquidating Corp.,* 452 B.R. 498. 507 (Bankr. D. Del. 2011) ("Because the statements … alleging fraud all relate to conditional expressions of opinion or prediction … the … fraud claim fails").

*Fourth*, even *if* there *were* a fraud exception to *Noerr-Pennington*, it would extend only to adjudicative proceedings, which the FCC proceedings here were *not*—at least until March 2023, when Plaintiffs' application was referred to an ALJ. See *Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 499–500 (1988) ("A publicity campaign directed at the general public, [or] seeking legislation or executive action, enjoys antitrust immunity *even when the campaign employs unethical and deceptive methods*") (emphasis added; citation omitted); *California Motor Transp.,* 404 U.S. at 513 (noting that misrepresentations are "condoned in the political arena"); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834 (7th Cir. 2011) (discussing how proceedings that allow ex parte lobbying of officials—as FCC proceedings do—resemble legislative or political processes, where even fraudulent misrepresentations are immunized, more than they resemble adjudicative proceedings where rules against fraud are stricter).

## VI. Plaintiffs' Amended Complaint should be dismissed on First Amendment grounds. But it should also be dismissed because all of its claims require stating a plausible claim for purposeful and unlawful discrimination, which Plaintiffs have not done.

To survive the Goodfriend Defendants' motion to dismiss, Plaintiffs must allege *facts* that, if true, would plausibly show that Mr. Goodfriend harbored discriminatory animus toward them. The Amended Complaint fails to do that.

*First*, none of the statements alleged in the Amended Complaint as evidence of discriminatory animus are attributable to Mr. Goodfriend. In his opening brief (ECF 44-1 at 9-12), Mr. Goodfriend established three key points: (1) *he* never spoke or used the words "shadowy foreign investor"—about Mr. Kim or anyone else; (2) when he alluded to "increased tensions in the Taiwan Strait," it was in the same sentence as a discussion of global geopolitics, including how "Russia [had] invaded Ukraine"; and (3) *he* never claimed that Plaintiffs' transaction would "do nothing" to advance diversity. Significantly, Plaintiffs' brief does not dispute these points,

leaving no statements attributable to Mr. Goodfriend on which to base any claim of discriminatory animus.

    *Second*, even if *all* of these statements *were* attributable to Mr. Goodfriend, they *still* would not defeat his motion to dismiss. None are racial slurs or probative of racial intent. The phrase "shadowy foreign investor," is an *accurate* description of *anonymous* (and therefore "shadowy") foreign investors and, furthermore, a statement that evidences no hostility to Korean Americans or to Mr. Kim in any event. The second statement--- about "increased tensions in the Taiwan Strait" and how "Russia invaded Ukraine"—is, again, an *accurate* factual statement. And it likewise evidences no hostility to Korean Americans or to Mr. Kim. The third statement—that if Plaintiffs' transaction went through it would "do nothing" to advance diversity—also cannot support a reasonable and plausible inference of Mr. Goodfriend's alleged racial animus. It provides no plausible basis for inferring that Mr. Goodfriend *agreed to represent clients in the FCC proceedings* because *he* harbored racist animus against Mr. Kim. *None* of the statements alleged in the Amended Complaint contain either explicitly racist content or "code words" sufficient to create a plausible inference of discriminatory intent, much less to create any plausible inference of *Mr. Goodfriend's* alleged discriminatory intent. Compare Kim Brief at 80 ("the FCC filings, at a minimum, contained such code words consisting of stereotypes that provide plausible circumstantial evidence that the opposition was motivated in part by animus") (internal quotation marks removed).

    *Third*, these shortcomings cannot be overcome by Plaintiffs' conspiracy allegations and claims, which do not relieve Plaintiffs of the obligation to plead a plausible basis for inferring that *Mr. Goodfriend's specific* intent was invidious, purposeful, and discriminatory. To allege any defendant's participation in a racial conspiracy, a plaintiff must present factual allegations

plausibly supporting an inference that *that* defendant "manifested *the specific* intent to agree to deprive someone of their civil rights *based on a racially discriminatory motive.*" *Nanko Shipping, Guinea v. Alcoa, Inc.*, 330 F. Supp. 3d 439, 450 (D.D.C. 2018); *Morgan v. District of Columbia*, 550 F. Supp. 465, 470 (D.D.C. 1982) (emphasis added). There are no such plausible allegations against Mr. Goodfriend.

*Fourth*, there are two key "tells" in Plaintiffs' filings that spotlight the implausibility of the inference they are asking the Court to draw. They are Plaintiffs' strained use of the phrases "obvious" explanation and "obvious" inference, and their reliance on that adjective rather than facts to make a point. Thus:

- Plaintiffs postulate that "the most *obvious* explanation[s] for the FCC's" treatment of Plaintiffs' application are: "*Byron Allen*, *his* public statements that he was still 'in the fight' for TEGNA, *his* private attempt to get a piece of TEGNA from Mr. Kim, and *his* history of leveraging race in commercial settings." Kim Brief at 87 (emphasis added). Yet none of those points about *Mr. Allen*, nor even all of them together, create what is required to sustain claims against *Mr. Goodfriend:* a plausible inference that *Mr. Goodfriend* had a specific intent to discriminate against Plaintiffs and to discriminate against Mr. Kim because Mr. Kim is Korean American.

- Similarly, Plaintiffs claim that "the *obvious* inference to be drawn" from the "timeline of events" is that NewsGuild-CWA, NABET-CWA, UCC, Common Cause, and DISH were all "straw objectors," acting at the behest of Mr. Goodfriend, who in turn acted at the behest of Mr. Allen, as did the Government Defendants, because *all* of them shared the same goal of thwarting Mr. Kim *because* he is Korean American. Am. Compl. ¶ 137. But such a vast conspiracy is not a plausible inference. And more importantly, neither is the conclusion that *Mr. Goodfriend* was

motivated to represent clients in the FCC proceedings because *he* harbored racial animus toward Mr. Kim. "Inferences" like that do not begin to get "across the line from conceivable to plausible*." Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007). They're not inferences. They're stretches, overreaches, speculations, and conjecture.

## VII. As between the acknowledged economic reasons that every Defendant had to oppose Plaintiffs' transaction and the vast alleged racist conspiracy that Plaintiffs are asking the Court to infer, only the former is the "plausible conclusion" that *Iqbal* requires.

*Twombly* teaches that complaints must be evaluated based on the plausibility of the theories they allege, taking, into account "obvious alternative explanation[s]." *Twombly*, 550 U.S. at 567.

*Iqbal* teaches that "as between 'obvious alternative explanation[s]'" and "purposeful, invidious discrimination," when discrimination is not a "plausible conclusion," it should be rejected—even at the pleadings stage. *Ashcroft v. Iqbal* 556 U.S. 662, 682 (2009) (holding that detainee's complaint failed to plead sufficient facts to state a claim for purposeful and unlawful discrimination).

Applying *Twombly* and *Iqbal*, Plaintiffs' Amended Complaint should be dismissed:

- Because Mr. Goodfriend was an advocate, not a principal, in the FCC proceedings—he was representing clients' interests not his own—it is simply too implausible to conclude that he had any specific intent of his own, much less his own specific intent to purposefully and invidiously discriminate against Mr. Kim because he is Korean American. And

- Because everyone—Mr. Allen, DISH, the UCC, Common Cause, the unions, and the non-defendant commenters (Altice USA and Graham Media Group)—had acknowledged, undisputed, race-neutral reasons for opposing Plaintiffs' transaction, it is too implausible to conclude that race was a but-for cause for anyone's conduct. Mr. Allen had a continuing interest

in buying TEGNA. Am. Compl. ¶¶ 18, 60-62. DISH was trying to save millions in retransmission fees. Am. Compl. ¶¶ 138, 304 & 319. NewsGuild-CWA, NABET-CWA, UCC, and Common Cause were motivated by concerns over job losses and increased retransmission fees, and they "routinely" express concerns about those issues. Am. Compl. ¶¶ 98, 111. Mr. Goodfriend functioned as an advocate representing others.

In short, considering the "obvious alternative explanation[s]," as *Twombly* instructs this Court to do, 550 U.S. at 567, a vast, allegedly racist conspiracy, involving both private and Governmental defendants, *all* of them somehow and improbably united by an alleged desire to purposefully and invidiously thwart Mr. Kim *because* he is a Korean American, is not plausible here. And just as in *Iqbal*, where because "discrimination [was] not a plausible conclusion" dismissal was required, 556 U.S. at 682, dismissal is required here as well.

## CONCLUSION

Plaintiffs' Amended Complaint should be dismissed in its entirety and with prejudice. Its claims are barred by the First Amendment, and, separately, it also fails to plead facts creating a plausible inference of racial animus, on which all of its claims depend.

Dated: December 10, 2024

Respectfully submitted,

*/s Joshua Karsh*

*One of the Attorneys for*
*the Goodfriend Defendants*

Cyrus Mehri
CMehri@findjustice.com
Mehri & Skalet PLLC
2000 K Street NW, Suite 325
Washington, D.C. 20006
Tel: (202) 822-5100

Joshua Karsh (pro hac vice)
jkarsh@findjustice.com
Mehri & Skalet PLLC
1237 Judson Ave.
Evanston, IL 60202
Tel: 773-505-7533

*Attorneys for the Goodfriend Defendants*

**<u>Certificate of Service</u>**

I certify that I caused a true and accurate copy of the foregoing reply memorandum of law in support of Defendant David Goodfriend's motion to dismiss to be filed today, December 10, 2024, through the Court's CM/ECF system, which will send notice to all parties of record.

<u>/s/ Joshua Karsh</u>