IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SGCI HOLDINGS III LLC,** *et al.,*   )   <br>    )   <br>    **Plaintiff,**    )   <br>    )   <br>    v.    ) **Civil Action No.: 1:24-CV-1204-RC**   <br>    )   <br>    **FEDERAL COMMUNICATIONS**    )   <br>    **COMMISSION.,** *et al.,*    )   <br>    )   <br>    **Defendants.**    )   <br>    ) | |

**DEFENDANT UNITED CHURCH OF CHRIST, OC. INC. D/B/A
UNITED CHURCH OF CHRIST MEDIA JUSTICE MINISTRY'S
<u>REPLY TO PLAINTIFFS' OPPOSITION TO ITS MOTION TO DISMISS</u>**

Defendant, United Church of Christ, OC. Inc. d/b/a United Church of Christ Media Justice Ministry (hereinafter "UCC Media Justice"), by and through undersigned counsel, hereby files this Reply to Plaintiffs' Opposition to Motion to Dismiss.

Respectfully submitted,

*/s/ Paul M. Finamore*
Paul M. Finamore (# 423410)
Pessin Katz Law, P.A.
5950 Symphony Woods Road, Suite 510
Columbia, Maryland 21044
T: (410) 740-3170
pfinamore@pklaw.com
*Counsel for Defendant,*
*United Church Of Christ, OC Inc.,*
*D/B/A United Church Of Christ Media*
*Justice Ministry*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT……………………………………………………………5

II.  ARGUMENT……………………………………………………………………………...5

    a. "Defendants" Alleged Actions Do Not Include UCC Media Justice……………..5

    b. Plaintiffs Fail to Make Plausible Allegations of Racial Animus by UCC Media Justice………………………………………………………………………………….6

    c. UCC Media Justice is Protected by the First Amendment....................................8

    d. UCC Media Justice Did Not Violate 42 USC § 1981 (Contract)……………..…11

    e. UCC Media Justice Did Not Violate 42 USC § 1985(3) (Conspiracy)…..............13

    f. UCC Media Justice Did Not Violate 42 U.S.C. § 1986 (Neglect to Prevent)..….14

    g. UCC Media Justice Did Not Tortiously Interfere with Existing Contractual Relationships or Prospective Business Opportunity…………………………….16

    h. Conspiracy is not an Independent Tort……………………………………………18

    i. Plaintiffs' Failed to Exhaust Administrative Remedies………………………...18

    j. Plaintiffs Should Be Prohibited From Another Attempt At Amendment………19

**CONCLUSION**………………………………………………………………………...19

# TABLE OF AUTHORITIES

**Cases**

*Adarand v. Pena*,
 515 U.S. 200 (2000) ............................................................................................................. 8
*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
 486 U.S. 492 ...................................................................................................................... 10
*Banneker Ventures, LLC v. Graham*,
 798 F.3d 1119 (D.C. Cir. 2015) ......................................................................................... 16
*Bennett Enters. v. Domino's Pizza*,
 45 F.3d 493 (D.D.C. 1995) ................................................................................................ 17
*Burnett v. Sharma*,
 511 F.Supp.2d 136 (D.D.C. 2007) ..................................................................................... 14
*Bush v. Butler*,
 521 F.Supp.2d 63 (D.D.C 2007) ........................................................................................ 14
*Cal. Motor Transport Co. v. Trucking Unlimited*,
 404 U.S. 508 (1972) ............................................................................................................ 8
*Cheryl Lloyd Humphrey Land Inv. Co., LLC v. Resco Prods.*,
 377 NC. 384 (2021) ............................................................................................................. 9
*Citizens Untied v. Schneiderman*,
 882 F.3d 374 (2d Cir. 2018) .............................................................................................. 14
*City of Columbia v. Omni Outdoor Advertising*,
 499 U.S. 365 (1991) ............................................................................................................ 9
*Crawford v. Margabandhu (*In re *Maya Rests., Inc.)*,
 585 B.R. 761 ........................................................................................................................ 9
*Domino's Pizza Inc. v. McDonald*,
 546 U.S. 470, 126 S.Ct. 1246 ............................................................................................ 11
*Federal Communications Commission, et al., v. Prometheus Radio Project, et al.*,
 529 U.S. (2021) ................................................................................................................. 13
*McDonald v. Smith*,
 472 U.S. 479 (1985) ............................................................................................................ 9
*Nader v. Democratic Nat'l Comm.*,
 567 F.3d 692 ........................................................................................................................ 8
*Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
 508 U.S. 49, 113 S.Ct. 1920, 123 L. Ed. 2d 611 (1993) ..................................................... 9
*Robledo v. Bond No. 9*,
 965 F.Supp. 2d 470 (S.D.N.Y. 2013) ..................................................................... 7, 11, 13
*Smith v. Trump*,
 2023 U.S. Dist. LEXIS 13602, *23 .............................................................................. 15,16
*Times Warner Entm't v. FCC*,
 144 F.3d 75, 330 U.S. App. 126 (D.C. Cir. 1998) ............................................................ 19
*Venetian Casino Resort, L.L.C. v. N.L.R.B.*,
 793 F.3d 85 (D.C. Cir. 2015) .............................................................................................. 8
*Viasat, Inc. v. FCC*,
 47 F.4th 769 (D.C.Cir. 2022) ............................................................................................ 19

**Statutes**

42 U.S.C. § 1986 .................................................................................................................. 14, 15
42 U.S.C. § 1981 ....................................................................................................................... 11
42 U.S.C. § 1985(3) ............................................................................................................ 13, 18
47 U.S.C. § 155(c)(1) ................................................................................................................ 18
47 U.S.C. § 405 .................................................................................................................. 18, 19
47 U.S.C. §1985 ................................................................................................................. 14, 15

**Other Authorities**

FCC Second Report and Order,
    FCC 16-107, at ¶ 236-37, (Aug. 25, 2016) ............................................................................ 8
In the Matter of Applications of Tribune Media Company and Sinclair Broadcast Group, Inc.,
  MB,
    33 FCC Rcd 6830 (2018) ................................................................................................ 13, 17

I. **PRELIMINARY STATEMENT**[1]

Plaintiffs' Opposition clearly establishes that UCC Media Justice is entitled to dismissal. Rather than set forth any facts in support of the claims against UCC Media Justice, Plaintiffs cite only two "facts" regarding UCC Media Justice: first, that it joined in a Petition to Deny and second, that its Petition to Deny raised the same objections to this transaction that it had to many prior transactions, not involving Mr. Kim. Both facts evidence UCC Media Justice's exercise of its First Amendment right to petition the government. Beyond those "facts," Plaintiffs are silent as to the substantive basis of any plausible claims against UCC Media Justice. The Opposition itself demonstrates that UCC Media Justice must be dismissed.

**ARGUMENT**

a. **"Defendants" Alleged Actions Do Not Include UCC Media Justice**

Plaintiffs' nebulous references to "Defendants" cannot withstand scrutiny as they relate to UCC Media Justice. Once each of the references is reviewed, it is clear that UCC Media Justice was not a participant in the alleged actions of others, even if those concocted allegations could create sufficient facts to withstand the Motions to Dismiss from the affected parties in the first instance. Plaintiffs can state no plausible allegations against UCC Media Justice, thus warranting dismissal with prejudice.

UCC Media Justice corrects Plaintiffs' allegations relating to "Defendants" as follows:

(1) UCC Media Justice did not participate in the public bidding for TEGNA. *See* Am. Compl. at ¶ 61;

(2) UCC Media Justice did not demand documents. *See* Am. Compl. at ¶¶ 130, 132, 134, 162, 163, 166, 168, and 171; *see also* n. 68, 71, 94, 95, 99, 101, and 103.

---

[1] Defendant UCC Media Justice adopts and incorporates its prior Statement of Points and Authority In Support of its Motion to Dismiss.

(3) UCC Media Justice did request an extension for the public comment period. *Id*. at ¶¶ 130-131.

(4) UCC Media Justice did not have access to Plaintiffs' sensitive documents. *Id*. at ¶ 209-10; *see also* n. 136.

(5) UCC Media Justice did not make political contributions or host political events. *Id*. at ¶ 315;

(6) UCC Media Justice did not attend meetings with Chairwoman Rosenworcel, *Id*. at ¶ 127, or attend meetings with FCC Media Bureau Chief Holly Saurer. *Id*. at ¶¶ 129, 159; and,

(7) UCC Media Justice did not use the terminology "Taiwan Strait."[2]

A review of the citations to "Defendants" actions reveals that UCC Media Justice was not a participant in any of them.  Plaintiffs' Amended Complaint must be dismissed with prejudice.

### b. Plaintiffs Fail to Make Plausible Allegations of Racial Animus by UCC Media Justice

Plaintiffs' Opposition is noteworthy for its failure to address the fact that *Plaintiffs* were the first to raise the issue of race. Plaintiffs also chose to ignore that its claims of anti-Asian bias are unjustified and farcical given that Asian Americans Advancing Justice | AAJC advocated the same position as UCC Media Justice as it relates to ownership diversity.  Plaintiffs go to great strides to set forth allegations against other defendants, which those defendants have capably opposed on their own, but yet they fail to make any similar allegations against UCC Media Justice.[3]  In fact, Plaintiffs have pointedly decided *not* to make any such direct assertions, instead

---

[2] *See* Reply to Applicants' Consolidated Opposition and Response to Commons of The Newsguild-CW, National Association of Broadcast Employees and Technicians -CWA, United Church of Christ Media Justice Ministry and Common Cause ("Joint Reply"), *In re Tegna, Inc.*, MB No. 22-162 (August 1, 2022), https://perma.cc/QY5N-HPB3, at pg. 5. *Cf.* Am. Compl. ¶ 174 (citing use of the term).

3 Because UCC Media Justice had no involvement in these alleged acts, it makes no comment on them.

choosing to use the ambiguous and nebulous term "Defendants" without making any effort to address each Defendant's alleged role in the fictional conspiracy.

Here, as stated above, Plaintiffs fail to allege any discriminatory actions by UCC Media Justice and fail to set forth any facts evidencing racial animus by it. In contrast, Plaintiffs admit that UCC Media Justice "routinely files petitions to deny license-transfer applications and express concerns over job losses and increased retransmission fees." *See* Am. Compl. at ¶ 98. "[A] complaint with other possible motives for the alleged conduct that does not contain specific facts supporting a claim of racial animus contradicts a claim of racial discrimination." *Robledo v. Bond No. 9*, 965 F.Supp. 2d 470, 475 (S.D.N.Y. 2013).

Plaintiffs ignore that it was *they* who first raised the issue of race and gender when they filed an Amended Petition for Declaratory Ruling of Teton Parent Corp.[4] Plaintiffs insisted that the identity of key executives were a reason for the Commission to grant its application.[5] If Plaintiffs had not introduced and interjected race into these proceedings, it would never have been an issue. Plaintiffs attacked UCC Media Justice and Common Cause by stating that UCC Media Justice and Common Cause "valued diversity, but failed to even mention that the Transaction would create the largest minority-owned and female-led television group in U.S. history."[6] It is UCC Media Justice that explained race was *not* relevant to the FCC's review of the transaction: "The identity of the executives leading these companies should not and does not insulate a transaction of this scope from a thorough and searching review by federal regulators."[7]

---

[4] *See* UCC Media Justice's Motion to Dismiss, at pg. 11, n. 5, 6.
[5] *Id*. at pgs. 2-4, 13-17.
[6] Applicants' Consolidated Opposition and Response to Comments ("Opposition"), *In re Tegna Inc.*, MB No. 22-162 (July 7, 2022), https://perma.cc/YAD5-54KP, at pg. 2.
[7] *See* Reply to Applicants' Consolidated Opposition and Response to Commons of The Newsguild-CW, National Association of Broadcast Employees and Technicians -CWA, United Church of Christ Media Justice Ministry and Common Cause ("Joint Reply"), *In re Tegna, Inc.*, MB No. 22-162 (August 1, 2022), https://perma.cc/QY5N-HPB3, at pg. 6.

In so doing, UCC Media Justice raised concerns that were echoed by Asian Americans Advancing Justice | AAJC. The allegation of anti-Asian bias, therefore, is groundless. Plaintiffs' claim must be dismissed as a matter of law.[8]

### c. UCC Media Justice is Protected by the First Amendment.

UCC Media Justice's actions are fully protected by the First Amendment, as argued *infra* and as extensively argued in its Motion to Dismiss. Plaintiffs now contend that Defendants' conduct, not speech, violated federal and state law such that the First Amendment does not apply. Plaintiffs failed to set forth any facts demonstrating that UCC Media Justice did anything other than file objections to the transaction as permitted by law. The First Amendment "extends to [petitioning] all departments of the Government," including administrative agencies. *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). Accordingly, "[w]hen 'a person petitions the government' in good faith, 'the First Amendment prohibits any sanction on that action.'" *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 793 F.3d 85 (D.C. Cir. 2015) (Kavanaugh, J.) (quoting *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692. 696 (D.C. Cir. 2009)). That is exactly what happened here, UCC Media Justice exercised its right to object to Plaintiffs' application before the FCC. Not only that, but the FCC issued a Public Notice allowing petitioners and commenters to weigh in on the applications. UCC Media Justice filed its petition questioning whether the proposed transaction served the public interest. As such, UCC Media Justice is protected by the First Amendment.

---

[8] Plaintiffs conflate the FCC's goal to adopt structural ownership rules that will promote a multiplicity of owners with Plaintiffs' apparent belief that its proposed transaction deserved approval based on the identity of the owners alone regardless of whether it met existing rules and policy. The FCC has not exercised racial preference since *Adarand v. Pena*, 515 U.S. 200 (2000). FCC Second Report and Order FCC 16-107, at ¶ 236-37, (Aug. 25, 2016), available at https://docs.fcc.gov/public/attachments/FCC-16-107A1_Rcd.pdf.

Plaintiffs contend that, because they did not assert antitrust claims, the *Noerr-Pennington* doctrine does not apply. Plaintiffs are legally incorrect. "Although the holdings from *Noerr* and its progeny – the *Noerr-Penington* doctrine – originated in the anti-trust context, the First Amendment principles upon which the doctrine rests are foundational to our political system. Therefore, the protections afforded by the right to petition, recognized in the First Amendment, are not limited to antitrust matters." *Cheryl Lloyd Humphrey Land Inv. Co., LLC v. Resco Prods.*, 377 NC. 384, 388 (2021) (citing *Prof'l. Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 59, 113 S.Ct. 1920, 1927, 123 L. Ed. 2d 611 (1993) and *McDonald v. Smith*, 472 U.S. 479, 485 (1985)).

A plaintiff must prove that petitions were objectively baseless to the extent that no reasonable complainant could realistically expect success on the merits; only if the challenged complaint is objectively meritless may a court then examine the complainant's subjective motivation. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993); *see also Crawford v. Margabandhu (*In re *Maya Rests., Inc.)*, 585 B.R. 761, 773 (Bankr. W.D. Pa. (2018) ("[U]nder the 'sham' exception . . . the action must be 'objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.' If the action is objectively meritless, then the second part [of the 'sham' exception test] requires the Court to examine the subjective motivation of the petitioning party."). Even if a petitioner's claims were objectively baseless, the subjective-prong under *Noerr-Pennington* clarifies that "[a] 'sham' situation involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, not one 'who genuinely seeks to achieve his governmental result, but does so *through improper means*.'" *City of Columbia v. Omni Outdoor Advertising*, 499 U.S.

9

365, 380 (1991) (first quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n. 4 (1988) and then quoting *id.* at 508 n. 10) (emphasis in original).

Again, the Plaintiffs refer to objectors and Defendants generally in their Amended Complaint and opposition. Plaintiffs contend that "objectors' filings were objectively baseless under prong one of the sham exception," because the "[o]bjectors insisted on obtaining information about alternative transactions considered by TEGNA – *i.e.,* Mr. Allen's failed bid – even though federal law *prohibits* the FCC's consideration of other buyers." *See* Pl. Opp., at pg. 129. UCC Media Justice did not participate in the request for documents or information about Mr. Allen's failed bid.[9] Instead, UCC Media Justice raised two concerns: (1) localism and (2) retransmission fees.[10] UCC Media Justice raised the same objections it routinely asserts when a proposed transaction would consolidate ownership of local media outlets. Am. Compl. at ¶ 98. The HDO alone demonstrates that UCC Media Justice's petition was not a sham. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 58 (1993).

Plaintiffs contend that Mr. Kim's "binding commitments" about retransmission fees and job security should have been sufficient for UCC Media Justice. UCC Media Justice responded to those "commitments" and explained that the proposed commitments were insufficient because the commitments would not project journalism jobs, did not address the need for structural, rather than behavioral remedies, and failed to address the opportunity for collusion in labor and retransmission consent negotiations.[11] Having offered inadequate concessions on the issues, and having failed to respond to UCC Media Justice's timely explanation as to why the concessions

---

[9] *See* Section I(a) *supra.*
[10] Hearing Designation Order, *In re Tegna Inc.*, MB No. 22-162 (Feb. 24, 2023) at ¶¶ 2, 18.
[11] Comments of the NewsGuild-CWA, NABET-CWA, UCC Media Justice, and Common Cause ("Joint Comments"), *In re Tegna Inc.*, MB No. 22-162 (Jan. 13, 2023), https://perma.cc/2D73-4LRX. *See* Am. Compl. ¶ 208, n.134.

did not address the concerns, it is now too little too late for Plaintiffs to claim that the concerns were baseless. UCC Media Justice had a legitimate concern about localism and retransmission fees, which directly affected the communities it served, which as Plaintiffs concede is action that UCC Media Justice has taken on many prior transactions, which has nothing to do with Mr. Kim's race. As such, the Plaintiffs' Amended Complaint must be dismissed with prejudice.

### d. UCC Media Justice Did Not Violate 42 USC § 1981 (Contract).

Plaintiffs have not plead, nor does their Opposition set forth with specificity any plausible allegations, intentional and purposeful discrimination or racial animus by UCC Media Justice. Pl. Opp., at pgs. 69-70. To survive a motion to dismiss, "the events of the intentional and purposeful discrimination, as well as the racial animus constituting the motivating factor of the defendant's actions must be specifically pleaded in the complaint." *Robledo v. Bond No. 9*, 965 F.Supp. 2d 470, 475 (S.D.N.Y. 2013). "[C]onclusory or naked allegations are insufficient; fact-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required." *Id*.

While conveniently ignoring that they interjected race into the FCC's consideration of the transaction, the Amended Complaint and Plaintiffs' Opposition misquotes and mischaracterizes the FCC filings to imply that UCC Media Justice had no legitimate complaint with the transaction. As to the conclusory allegations against "Defendants," once stripped of their generalities as set forth above, it is evident that UCC Media Justice did not act with "racial discrimination" to block "the creation of a contractual relationship." *Domino's Pizza Inc. v. McDonald*, 546 U.S. 470, 476, 126 S.Ct. 1246, 1250, 163, L.Ed.2d 1069 (2006). The Joint Reply to which they cite explained that "[a] single owner controlling numerous stations throughout the country, producing news often far from the local communities those stations serve

and likely reducing the number of journalists (who could be women, people of color, people with disabilities, members of the LGBTQ community to name a few) would not produce diversity or advance the Communications Act's public interest standard."[12] UCC Media Justice explained the Commission's pursuit of diversity should "promot[e] antagonistic and competing viewpoints in a vibrant marketplace of ideas," but "[u]nder the Applicants' theory of diversity, the U.S. could achieve ownership diversity through a single owner of all television and radio stations in the country as long as that owner is a person of color or a woman."[13]

As discussed in the Motion to Dismiss, the Joint Reply raised legitimate concerns about the request for waivers of the FCC's foreign investment cap and the undisclosed foreign investors from the Cayman Islands and the British Virgin Islands, carefully distinguishing them from Mr. Kim, "[t]he Applicants *and their anonymous funders located in the Cayman and British Virgin Islands*…."[14] The ownership structure of TEGNA was unknown and posed questions about whether voting control would in fact be held by Mr. Kim.[15] Once the investment issue was cleared, it was never raised again.

Plaintiffs rely on four other license transfer applications (Scripps-ION, Gray-Quincy, Gray-Meredith, and Apollo-Cox) to allege that UCC Media Justice acted with a discriminatory purpose.[16] Not only is the decision for how to pursue its interests protected by the First Amendment, but also it must be noted that UCC Media Justice is a small organization with limited resources, such that it cannot participate in every transaction. Plaintiffs seek to speculate that UCC Media Justice's decision not to participate in other transactions is somehow "evidence"

---

[12] *See* Joint Reply, at pg. 5.
[13] *Id.*
[14] *Id.,* at pg. 1.
[15] *Id.*, at pg. 24.
[16] To the extent that one or more of these transactions occurred after the transaction at issue renders them irrelevant.

of racial animus relating to this transaction but ignore that there is no inference to be drawn from a lack of action. Further, directly contrary to Plaintiffs' assertions, UCC Media Justice raised nearly identical concerns in the Apollo-Cox application as it did in the Standard General/TEGNA transaction.[17] Scripps-ION, Gray-Quincy, and Gray-Meredith did not receive opposition from *any* party.[18] Plaintiffs ignore the transaction most similar to theirs, Sinclair-Tribune, which was vigorously opposed by UCC Media Justice and Common Cause for similar reasons, also resulted in a Commission-issued HDO.[19] Plaintiffs' Amended Complaint fails to set forth plausible allegations that UCC Media Justice acted with "intentional and purposeful discrimination, as well as racial animus." *Robledo*, 965 F. Supp. 2d. at 475. The Amended Complaint must be dismissed against UCC Media Justice.

### e. UCC Media Justice Did Not Violate 42 USC § 1985(3) (Conspiracy).

As stated above, once the threadbare allegations are exposed, there are no plausible allegations to support a conspiracy involving UCC Media Justice.  UCC Media Justice did not attend any meetings with Ms. Saurer or Chairwoman Rosenworcel, and did not participate in generating opposition from members of Congress with political contributions.[20] Further, UCC Media Justice did not participate in the filings requesting an extension and demanding sensitive commercial documents. *Id*. The Amended Complaint fails to allege "the existence of any events, conversations, or documents indicating there was an agreement between the defendants to violate

---

[17] *See* Petition to Deny of Common Cause, Common Cause Ohio, and United Church of Christ, OC Inc., In the Matter of Applications to Transfer Control of NBI Holdings, LLC, and Cox Enterprises, Inc., to Terrier Media Buyer, Inc., MB No. 19-98 (May 10, 2019), available at: https://www.fcc.gov/ecfs/document/1051143903250/1
[18] The U.S. Supreme Court upheld the FCC's relaxation of its media ownership caps just before those transactions were reviewed. UCC Media Justice, Common Cause and CWA participated vigorously as Respondents in that litigation. *Federal Communications Commission, et al., v. Prometheus Radio Project, et al.,* 529 U.S. 414 (2021).
[19] In the Matter of Applications of Tribune Media Company and Sinclair Broadcast Group, Inc., MB Docket 17-179, Hearing Designation Order, 33 FCC Rcd 6830, 6841-46 (2018), https://www.fcc.gov/document/fcc-issues-hdo-tribune-media-company-and-sinclair-broadcast-group.
[20] *See* Section I(a) *supra*.

his rights." *Bush v. Butler*, 521 F.Supp.2d 63, 68 (D.D.C 2007). The Plaintiffs' Amended Complaint fails to offer any plausible facts that UCC Media Justice entered into a conspiracy, because UCC Media Justice was not involved in a conspiracy. As such, the Amended Complaint must be dismissed with prejudice.

In a desperate attempt to survive the Motion to Dismiss, Plaintiffs contend that allegations on "information and belief are permissible where the necessary information lies within the defendant's control." *See* Pl. Opp. at pg. 91. Plaintiffs rely on paragraphs 158, 171, 220, 221, 278, 296, 304, 314, 315, and 323 of the Amended Complaint to assert that the necessary information lies within the "Defendants'" control, but Plaintiffs belie their own argument when it is clear that the cited paragraphs do not involve UCC Media Justice. Plaintiffs cannot rely on the phrase "upon information and belief" to convert a conclusory allegation into a non-conclusory allegation. *Citizens Untied v. Schneiderman*, 882 F.3d 374, 384 (2d Cir. 2018).

### f. UCC Media Justice Did Not Violate 42 U.S.C. § 1986 (Neglect to Prevent).

The failure to allege a claim under §1985 is fatal to Plaintiffs' §1986 claim. A claim under § 1985 is a prerequisite "to stating an adequate claim for neglect to prevent under § 1986." *Burnett v. Sharma*, 511 F.Supp.2d 136, 145 (D.D.C. 2007). UCC Media Justice has conclusively established that there is no plausible claim under §1985, which also dooms this claim.

Further, in addition to failing to meet the prerequisite for stating a claim under §1985, Plaintiffs then attempt to resurrect their claim by resorting to the nebulous "Defendants," as they contend that "Defendants" only needed to have the power to "aid in preventing" the conspiracy, offering a string of cases relating to: (1) a defendant's leadership role and influence in a conspirator company; (2) a defendant did not attempt to dissuade others from committing wrongful acts; and (3) where defendants were members of a conspirator association and simply

were present for, and participated in a meeting where the wrongful act was planned. *See* Pl. Opp., at pg. 97. By Plaintiffs' own admissions, UCC Media Justice was a "mere foot soldier," and should be dismissed. *See* Pl. Opp., at pgs. 99-100.

Plaintiffs offer the following scenarios in support of their argument: (1) Mr. Ergen's connection with DISH; (2) DISH's alleged influence of Mr. Goodfriend; (3) the Unions relationship with Mr. Goodfriend; and (4) straw objectors filed baseless objections and *ex parte* meetings. Theories one through three do not apply to UCC Media Justice. Under the fourth theory, UCC Media Justice did not attend or participate in any *ex parte* meetings,[21] and Plaintiffs concession that UCC Media Justice "routinely file[s] petitions to deny license-transfer applications and express[es] concerns over job losses and increased retransmission fees, among other things" contradicts their own argument that UCC Media Justice's objections here are part of a racist conspiracy. *See* Am. Compl. at ¶ 98. None of the four alleged scenarios apply to UCC Media Justice. Indeed, assuming *arguendo* that Plaintiffs' §1985 claim could possibly survive scrutiny, by referring to UCC Media Justice as a "straw objector," even in Plaintiffs own concocted version of the alleged conspiracy UCC Media Justice was simply a minion following directions from others with more power and influence. Based on their own characterization of UCC Media Justice as simply a "straw objector" and a "foot soldier"[22] this Court should apply *Smith v. Trump's* reading of § 1986 where the Court held:

> the person must be someone with actual authority to compel others to act or refrain from acting. That approach is consistent with what Reconstruction-era legislators would have understood the term 'power' to mean. It means that the leader of the conspiracy or someone of higher rank within the conspiracy would qualify, but a mere foot soldier would not.

---

[21] *See* Section I(a) *supra*.
[22] *See* Pl. Opp., at pg. 99-100.

15

*Smith v. Trump*, 2023 U.S. Dist. LEXIS 13602, *23 (citations omitted). As such, Plaintiffs' claim must be dismissed as a matter of law.

### g. UCC Media Justice Did Not Tortiously Interfere with Existing Contractual Relationships or Prospective Business Opportunity.

"To state claims for tortious interference under District of Columbia law [with respect to contract or prospective business opportunity], a plaintiff must allege the existence of a contract or business expectancy, the defendant's knowledge of the contract or business expectancy, intentional interference causing the breach of the contract or termination of the business expectancy, and damages." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015). Plaintiffs attempt to rely on *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) to distinguish *Jefferson v. 11th Street* from this matter, however, whether the Court applies *Jefferson-11th Street* or *Banneker Venture*, the result is the same. Plaintiffs' business expectations were contingent on FCC approval, over which UCC Media Justice had no control.

In their Opposition, Plaintiffs claim to rely on prior FCC proceedings in which action was taken within the 180-day "shot clock" as the basis for contending that their business expectancy was reasonable. As explained in detail in the Motion to Dismiss and not contested by Plaintiffs, the transaction at issue was a unique and highly complicated series of four related, but sequential transactions that were the subject of extensive review and investigation by the FCC. At the same time, TPC, as a subsidiary of SGCI Holdings and the proposed indirect parent of the TEGNA stations, also filed a Petition for Declaratory Ruling (PDR) requesting that the Commission allow it to exceed the 25% foreign ownership benchmark related to certain Cayman Island and British Virgin Islands investment funds. Amended Petition for Declaratory Ruling of Teton Parent Corp., MB Docket No. 22-166 (filed Apr. 1, 2022). *See* HDO at note 5. A major transaction, Sinclair-Tribune, which received widespread public opposition, was not approved and resulted in

16

an HDO just a few years before.[23] Plaintiffs were surely aware that a large and complex transaction such as theirs could easily exceed more than 180 days and is not guaranteed. Plaintiffs admitted as much: "Standard General secured billions of dollars in funding to buy TEGNA, *contingent* on clearing regulatory hurdles at the Department of Justice and the FCC." *See* Am. Compl. at ¶ 8 (emphasis added).

Plaintiffs contend that their allegation that "Defendants" "embarked on a long campaign to induce the FCC to partly or wholly displace Plaintiffs suffices to plead causation." *See* Pl. Opp., at pg. 104. According to Plaintiffs, UCC Media Justice was merely a "foot soldier" in this transaction, thus warranting dismissal. *See* Pl. Opp. 99-100. How can UCC Media Justice be a proximate cause if it was merely a foot soldier and a straw objector? It cannot. Plaintiffs' Opposition ignores that UCC Media Justice had standing to file an objection to the proposed transaction.[24] UCC Media Justice was not a "but for" cause of Plaintiffs' failure to secure FCC approval.

Intentional interference requires the specific element of intent, "a general intent to interfere or knowledge that conduct will injure plaintiff's business dealings is insufficient to impose liability." *Bennett Enters. v. Domino's Pizza*, 45 F.3d 493, 499 (D.D.C. 1995). The Amended Complaint lacks allegations that UCC Media Justice acted with specific intent, and Plaintiffs' Opposition does nothing to support those threadbare allegations. According to Plaintiffs' own admissions and in direct contradiction to the alleged conspiracy based on race, UCC Media Justice "routinely files petitions to deny license-transfer applications and express

---

[23] In the Matter of Applications of Tribune Media Company and Sinclair Broadcast Group, Inc., MB Docket 17-179, Hearing Designation Order, 33 FCC Rcd 6830, 6841-46 (2018), https://www.fcc.gov/document/fcc-issues-hdo-tribune-media-company-and-sinclair-broadcast-group.

[24] In the HDO, the FCC found that UCC Media Justice had standing to oppose this transaction and to appear as a party in interest to the hearing.

concerns over job losses and increased retransmission fees." *See* Am. Compl. at ¶ 98. UCC Media Justice exercised its right to question whether the transaction served the public interest as it regularly does when large complex transactions, like the transaction here, are presented before the FCC. As such, Plaintiffs' claims must be dismissed with prejudice.

### h. Conspiracy is not an Independent Tort.

Plaintiffs contend that they sufficiently plead claims of tortious interference and 1985(3) conspiracy, and thus sufficiently pled a viable claim for civil conspiracy. Again, Plaintiffs have failed to set forth any facts in support of their allegations that UCC Media Justice was part of any alleged conspiracy. Without plausible allegations, there is no underlying tortious act to support a claim of civil conspiracy. As such, Plaintiffs' Amended Complaint should be dismissed in its entirety. Regardless, there are no plausible allegations supporting that UCC Media Justice was involved in an alleged conspiracy with the other Defendants to "kill Mr. Kim's acquisition of TEGNA because Mr. Allen desired it, and Mr. Allen was the right kind of owner." *See* Pl. Opp. at pg. 120.

### i. Plaintiffs' Failed to Exhaust Administrative Remedies.

Plaintiffs now contend that they are taking issue with the entire FCC proceeding, not just the issuance of the HDO. *See* Pl. Opp. at pgs. 24-25. However, by Plaintiffs' own admission, they should have been filing for reconsideration throughout the process, which did not occur here. "After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 5(c)(1) [47 USC § 155(c)(1)], any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action. . ." 47 USC § 405. "[S]ection

18

405(a) requires all claims to be flagged or teed up before the Commission, whether by the appellant or some other party, before they may be pursued in court." *Viasat, Inc. v. FCC*, 47 F.4th 769, 778 (D.C.Cir. 2022) (*quoting Times Warner Entm't v. FCC*, 144 F.3d 75, 79-81, 330 U.S. App. 126 (D.C. Cir. 1998)). Having failed to tee up their claims before the Commission, Plaintiffs failed to exhaust their administrative remedies before the FCC and their Amended Complaint must be dismissed.[25]

### j. Plaintiffs Should Be Prohibited From Another Attempt At Amendment

Plaintiffs have now filed their Complaint and the Amended Complaint, both of which failed to allege plausible claims. In their Opposition, as discussed above, Plaintiffs have pointed to no plausible allegations against UCC Media Justice. They should not be permitted to continue attempts to raise allegations to circumvent dismissal.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant, United Church of Christ, OC. Inc. d/b/a United Church of Christ Media Justice Ministry, respectfully requests that this Court grant its Motion to Dismiss the Amended Complaint and dismiss all claims against United Church of Christ, OC. Inc. d/b/a United Church of Christ Media Justice Ministry with prejudice, along with such other and further relief the Court deems appropriate.

---

[25] UCC Media Justice adopts and incorporates footnote 29 of its Statement of Points and Authority In Support of its Motion to Dismiss.

Respectfully submitted,

*/s/ Paul M. Finamore*_____
Paul M. Finamore (# 423410)
Pessin Katz Law, P.A.
5950 Symphony Woods Road, Suite 510
Columbia, Maryland 21044
T: (410) 740-3170
pfinamore@pklaw.com
*Counsel for Defendant,*
*United Church Of Christ, OC Inc., d/b/a*
*United Church Of Christ Media Justice*
*Ministry*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of December, 2024, a copy of the foregoing Reply was served via ECF upon all counsel of record.

*/s/ Paul M. Finamore*_____
Paul M. Finamore