**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| SGCI HOLDINGS III LLC, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 24-1204 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 44, 46, 47, 49, |
| | : | | 54, 56, 57, 59 |
| FEDERAL COMMUNICATIONS | : | | |
| COMMISSION, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**<u>MEMORANDUM OPINION</u>**

**GRANTING DEFENDANTS' MOTIONS TO DISMISS**

**I.  INTRODUCTION**

In April 2024, Soohyung Kim and SGCI Holdings III LLC (collectively, "Plaintiffs")

sued a panoply of public and private actors—including the Federal Communications

Commission ("FCC"), two FCC officers in their official capacity, a media company, a satellite

television company, two unions, two non-profit organizations, and individuals associated with

those entities (collectively, "Defendants")—alleging that a racist conspiracy amongst these

actors derailed an $8.6 billion merger contingent on FCC approval.  Plaintiffs allege that various

combinations of Defendants violated (1) the Fifth Amendment's Equal Protection Clause; (2) a

statute related to FCC consideration of broadcast license-transfer applications, 47 U.S.C.

§ 310(d); (3) various civil rights statutes, 42 U.S.C. §§ 1981, 1985(3), 1986; and (4) D.C.

common law tortious interference and civil conspiracy claims.  Defendants separately moved to

dismiss the claims against them under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

For the reasons stated below, Defendants' motions to dismiss are granted.

## II.  BACKGROUND

### A.  Factual Background[1]

Kim immigrated to the United States from South Korea at age five.  First Amended Compl. ("FAC") ¶ 20, ECF No. 36.  He was raised in New York, where he still lives, and is an American citizen.  *Id.* ¶¶ 20, 29.  Since graduating from Princeton, Kim has spent 25 years in the finance industry, and over 15 of those years building his investment company, Standard General, which has earned him a reputation as a successful leader in the media industry.  *Id.* ¶¶ 20–21, 52. Kim is the "founder and chief investment officer of Standard General and [a] managing member of SGCI Holdings III, an affiliate of Standard General."  *Id.* ¶ 29.  As of 2022, "Standard General's affiliates owned [broadcast] stations across the country, all run by CEO Deborah McDermott."  *Id.* ¶ 7.

In early 2022, Standard General won a public bidding auction to buy TEGNA, Inc., a publicly traded broadcast and media company, beating out the Allen Media Group—which is run by Byron Allen, who is black.  *Id.* ¶¶ 1, 7, 17, 59–62.  "As with other large mergers in the industry, the Standard General-TEGNA merger was conditioned on clearing three regulatory hurdles: (1) review by the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector, an inter-agency committee coordinated by DOJ and commonly known as 'Team Telecom,' (2) expiration of the DOJ's antitrust waiting period under the Hart-Scott-Rodino (HSR) Act, and (3) approval to transfer the broadcast licenses by the FCC."  *Id.* ¶ 68.  Under the merger agreement, Standard General effectively had until May 22,

---

[1] In resolving these motions to dismiss at the pleading stage, the Court "accept[s] all the well-pleaded factual allegations of the complaint as true and draw[s] all reasonable inferences from those allegations in the plaintiff's favor."  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1125 n.1 (D.C. Cir. 2015).

2023 to clear these hurdles or TEGNA would terminate the merger agreement, and Standard General would owe a $136 million fee.  *Id.* ¶¶ 63, 66.  This deadline was "widely reported and included in Standard General's public filings with the FCC."  *Id.* ¶ 67.  Plaintiffs expected that the 450-day window would be "ample," in part due to Kim's previous experiences where "the FCC had approved without issue license-transfer applications in two major broadcast television deals involving Mr. Kim's media companies."  *Id.* ¶¶ 63, 117.

The Communications Act requires the FCC to determine whether "the public interest, convenience, and necessity will be served" before approving the transfer of a broadcast station license.  47 U.S.C. § 310(d).  If the FCC is unable to make a determination based on "the application, the pleadings filed, or other matters which it may officially notice" because a "substantial and material question of fact is presented," then the FCC "shall formally designate the application for hearing."  *Id.* § 309(d)(2), (e).  The FCC has delegated review of broadcast license-transfer applications to its Media Bureau.  *See id.* § 155(c); 47 C.F.R. § 0.61(a).

"Standard General, TEGNA, and Cox Media Group (which would acquire eight existing TEGNA stations as part of the deal) filed the required license-transfer applications and petition for declaratory ruling in March 2022."  FAC ¶ 120.  After additional correspondence, on April 21, 2022, "the Media Bureau deemed Standard General's license-transfer applications and petition for declaratory ruling complete."  *Id.* ¶ 126.  At this point, Plaintiffs expected that the transfers would be approved around October 2022 based on past FCC practice, including the FCC's 180-day "shot clock."  *Id.*  But according to Plaintiffs, certain bad actors intended to prevent that from happening.

Amongst those bad actors was FCC Chairwoman Jessica Rosenworcel, who Plaintiffs assert was "under the thumb of high-ranking Democrats in Congress" and who "had her staffer,"

Media Bureau Chief Holly Saurer, "kill the deal with a pocket veto without ever putting it before the other Senate-Confirmed FCC commissioners." *Id.* ¶¶ 4, 11.[2]  According to Plaintiffs, Rosenworcel felt political pressure at the time Standard General filed for FCC approval because "the Senate was considering President Biden's nomination of Gigi Sohn to fill" the vacant FCC commissioner spot, and "many wanted to see [Sohn] serve as the new chair of the FCC, instead of Chairwoman Rosenworcel." *Id.* ¶ 124.  But Rosenworcel and Saurer allegedly were not acting alone.

A central figure in the alleged scheme was lobbyist David Goodfriend of Emmer Consulting, Inc., formerly known as the Goodfriend Group.  *See id.* ¶¶ 25, 37.  "Mr. Allen's longtime lobbyist," Goodfriend, allegedly "orchestrated objections to the Standard General-TEGNA transaction by labor unions and public interest groups at the FCC," while also lobbying the FCC on behalf of Allen and DISH Network.  *Id.*  Goodfriend also had ties to Rosenworcel through their time working at the FCC during the Clinton administration, as well as Goodfriend's subsequent support of Rosenworcel's advancement at the FCC.  *Id.* ¶ 161.

On April 27, 2022, "Chairwoman Rosenworcel had a scheduled meeting with DISH's [chairman and majority shareholder] Charlie Ergen for breakfast at The Dupont Circle Hotel." *Id.* ¶¶ 24, 36, 127.  Though the Complaint does not allege what was discussed at this breakfast, Plaintiffs assert DISH "had a direct interest in the Standard General-TEGNA retransmission fees it would pay to carry the TEGNA stations." *Id.* ¶ 138.

On May 8, 2022, Allen told reporters that he had not given up on his efforts to buy TEGNA. *Id.* ¶ 128.  Four days later, "Mr. Allen's longtime lobbyist [David Goodfriend] had a

---

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Rosenworcel and Media Bureau Chief Saurer, who are sued only in their official capacity, have been substituted for their successors.

scheduled meeting with Ms. Saurer" to discuss "a diversity initiative that [Goodfriend] was spearheading." *Id.* ¶ 129. Goodfriend had already filed a petition related to that initiative, on which Common Cause and United Church of Christ Media Justice Ministry ("UCC")—two nonprofits that are "frequent objectors at the FCC"—were co-petitioners, and Goodfriend later represented the Allen Group in connection with that diversity initiative as well. *Id.* ¶¶ 41, 111, 129.

The same day as Goodfriend's meeting with Saurer, NewsGuild—a sector of the Communications Workers of America Union—and Common Cause "asked the Media Bureau to extend the public comment cycle and to order Standard General to produce additional information about the transaction," which the Media Bureau did. *Id.* ¶¶ 39, 130–31. "On June 3, 2022, the Media Bureau ordered Standard General to produce highly sensitive commercial documents and answer requests for information, including confidential information regarding 'negotiating strategy' and other financial terms," a request Standard General complied with later that month. *Id.* ¶¶ 132, 134. The morning of June 3, "Ms. Saurer emailed counsel for Common Cause to request a phone call" relating to its motion. *Id.* ¶ 132.

"On or about June 4, 2022, Mr. Allen called Mr. Kim unsolicited about the Standard General-TEGNA transaction." *Id.* ¶ 133. "Mr. Allen said he heard that Mr. Kim was having a hard time at the FCC," of which Kim was unaware. *Id.* "Mr. Allen proposed that Mr. Kim include him on the deal by selling some of the TEGNA stations to the Allen Group, suggesting that doing so would smooth things over at the FCC," but Kim told Allen that the deal was already done. *Id.*

At the end of June, NewsGuild, the National Association of Broadcast Employees and Technicians ("NABET"), another sector of the Communications Workers of America Union

(collectively, the "Unions"), UCC, and Common Cause "filed petitions to deny the license-transfer applications, raising two primary objections: (1) Standard General would cut newsroom jobs, and (2) Standard General would increase retransmission fees, resulting in higher prices to . . . distributors and, ultimately, to their customers." *Id.* ¶ 135.  These objectors "routinely file petitions to deny license-transfer applications and express concerns over job losses and increased retransmission fees, among other things." *Id.* ¶ 98.  On July 7, 2022, Standard General responded to the objections, and noted that the petitions failed to acknowledge that the deal "would substantially increase the number of minority-owned commercial TV stations . . . and create the largest minority-owned and female-led television station group in U.S. history." *Id.* ¶ 141.

"The objectors' replies were due at the end of July," but "[o]n July 8, they asked for an extension." *Id.* ¶ 145.  On July 11, Saurer provided NewsGuild's counsel with advance notice that the Media Bureau would grant the extension and invited him for a meeting about his petition. *Id.* ¶ 146.  On July 12, the Media Bureau granted the objectors' extension request. *Id.* On July 18, Saurer followed up with NewsGuild's counsel, writing that "The Chairwoman would very much like to get an ex parte in the docket noting that David [Strickland] and I met with your [sic] to discuss your petition, at our request."[3] *Id.* (alterations in original).

On August 1, 2022, the Unions, UCC, and Common Cause filed a consolidated reply objecting to the transaction. *Id.* ¶ 147 & n.78; Reply to Applicants' Consolidated Opposition and Response to Comments ("Unions, UCC, and Common Cause FCC Reply"), *In re Tegna Inc.*,

---

[3] The FCC has promulgated regulations concerning *ex parte* presentations, which include "permit-but-disclose" proceedings, and Plaintiffs have not alleged that Defendants violated these regulations. *See* 47 C.F.R. § 1.1200 *et seq.*

MB No. 22-162 (Aug. 1, 2022), https://perma.cc/QY5N-HPB3.[4]  Because Plaintiffs selectively

quote from this filing throughout the Complaint, the Court provides relevant provisions in full:

> The Applicants [Plaintiffs] express concern that the Petitioners' [the Unions, UCC, and Common Cause] long-standing support for ownership diversity means that they should automatically support a transaction as long as a woman or person of color is at the helm of a transaction. . . . The proposed transactions will do nothing to create a more accurate, diverse or independent media.
>
> Just as the Commission and the Supreme Court have consistently found, the Commission's public interest goals are not focused on promoting one kind of owner over another.  Rather, it is promoting antagonistic and competing viewpoints in a vibrant marketplace of ideas. . . . Under the Applicants' theory of diversity, the U.S. could achieve ownership diversity through a single owner of all television and radio stations in the country as long as that owner is a person of color or a woman.  Further, this transaction does nothing to increase ownership opportunities for women and people of color to enter the marketplace.  To the contrary, the applicants' business model of laying off reporters and reducing local news coverage creates a race to the bottom approach that would pose significant challenges for any new entrants to meaningfully compete with TEGNA post-transaction and provide robust local programming.
>
> Petitioners, as well as the progressive and civil rights communities[,] also support economic success for all people, counteracting centuries of policies that exclude people of certain backgrounds or with particular attributes from the opportunity to acquire and pass down wealth.  Broad participation by members of historically excluded groups is not only just, but also a sign that a market is robustly competitive.  It is certainly a good thing that Mr. Kim is not barred by his race from becoming a successful entrepreneur with the acumen and business relationships giving him access to capital such that he is at the lead of this transaction.  It is certainly a good thing that Ms. McDermott is not barred by her gender to be selected to run a large corporation.  Unfortunately, it *is* rare for members of either of these groups to be in such a position.  But a single large LLP or corporation of the type proposed here is not going to ameliorate or address long-standing inequities produced by structural racism, xenophobia or misogyny - and is not likely to provide additional members of historically excluded groups the opportunity to gain wealth and influence in society.  The identity of the executives leading these companies should not and does not insulate a transaction of this scope from a thorough and searching review by federal regulators.
>
> . . . .

---

[4] In ruling on the pleadings, the Court may also consider "any documents either attached to or incorporated in the complaint" and matters subject to judicial notice.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  As Plaintiffs acknowledge, "FCC dockets and filings 'are public records subject to judicial notice on a motion to dismiss.'" Pls.' Opp'n at 19 n.1 (quoting *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004)).

> As [a union] has pointed out in letters to President Biden, involvement of large hedge funds headquartered in the Cayman Islands and the British Virgin Islands, thus necessitating a waiver of the Commission's foreign ownership limits, are flashing red lights that cry out for further inquiry.  Standard General and its financiers have failed to produce the documents detailing whose money they invest and whether they agreed to cut costs at the expense of hardworking Americans in order to pay the interest on.  Transparency is a core tenet of good journalistic ethics; the involvement of shadowy foreign investors must be explored at hearing.

Unions, UCC, and Common Cause FCC Reply at 4–6, 20 (footnotes omitted).  Plaintiffs consider these comments "racially charged."  FAC ¶ 152.

Plaintiffs allege that these objections were "orchestrated by the Goodfriend Group and Mr. Goodfriend's longtime clients at the Allen Group and DISH," but also concede that the Goodfriend Group did not publicly appear in the FCC proceedings on behalf of the Unions until later in August 2022.  *Id.* ¶¶ 156–57.  Around that time, "NewsGuild, NABET, and Common Cause disclosed that Mr. Goodfriend and other counsel had an *ex parte* meeting with the Media Bureau about the deal."  *Id.* ¶ 162.  In September 2022, Goodfriend disclosed additional *ex parte* discussions with the Media Bureau in which he raised additional document requests and concerns with job cuts and the "foreign" nature of the transaction.  *Id.* ¶¶ 163–67, 174.  In one of those letters, Goodfriend stated:

> President Biden's recent Executive Order regarding enforcement practices of the Committee on Foreign Investment in the U.S. ("CFIUS"), the first of its kind in about 50 years, underscores that we are living in unusual times when it comes to foreign investment issues.  Since the announcement of the proposed transaction in this proceeding, Russia invaded Ukraine and China increased tensions in the Taiwan Strait.  The Commission should not assume that CFIUS alone is responsible for the implications of anonymous foreign investment.  Notably, while CFIUS focuses on national security, the Commission has a broader mandate that also encompasses public interest considerations, including maintaining localism, diversity, and a robust free market for news.

Letter from David R. Goodfriend to Marlene H. Dortch, Sec'y, Fed. Commc'ns Comm'n ("Goodfriend Letter") at 5, *In re Tegna Inc.*, MB No. 22-162 (Sep. 29, 2022),

https://perma.cc/3TTV-PAJN (footnote omitted). Plaintiffs quote from this paragraph, specifically the reference to China and the Taiwan Strait, to support that the Unions, UCC, and Common Cause "disparaged Mr. Kim and maligned him as a foreigner." FAC ¶ 19

On September 29, 2022, the Media Bureau ordered a second round of public comments and requested additional documents from Standard General, TEGNA, and Cox Media Group. *Id.* ¶ 168. "The additional document requests covered 'alternative transactions considered' by TEGNA," including Allen's failed bid. *Id.* ¶ 168.

On October 6, 2022, then-Speaker of the House Nancy Pelosi "sent a lengthy letter to Chairwoman Rosenworcel opposing the Standard General-TEGNA deal." *Id.* ¶ 177. Plaintiffs attribute this and other statements of opposition to the deal made by politicians to "Mr. Allen, with the help of Mr. Goodfriend, court[ing] Democratic politicians to chime in against the transaction," including with sizeable donations totaling $350,000 to the House and Senate Majority PACs just days after Pelosi's letter.[5] *Id.* ¶ 175.

On November 10, 2022, Standard General had an in-person meeting with Rosenworcel during which "Mr. Kim raised the issue of objectors' race-laden rhetoric, expressed that it had no place in the FCC review process, and inquired what the FCC could do about it." *Id.* ¶ 184. In response, "Chairwoman Rosenworcel started to get up, laughed, and told Mr. Kim he should hear what was said about him behind closed doors." *Id.* ¶ 184. Plaintiffs allege that as of November 2022, "Chairwoman Rosenworcel and Ms. Saurer [were] wait[ing] to see whether DOJ would bring an action to block the Standard General-TEGNA deal and the transaction would fall apart or TEGNA would elect to terminate the transaction at the 'outside date.'" *Id.* ¶ 186. "On

---

[5] Plaintiffs do not allege that Defendants violated any laws related to political donations.

November 17, 2022, Team Telecom told the FCC that it had no objection to the deal," clearing one of Plaintiffs' regulatory hurdles. *Id.* ¶ 189.

"In mid-November 2022, DISH stopped retransmission consent negotiations with Standard General's affiliates' stations to extend their distribution agreements," and a few weeks later, "DISH unilaterally blacked out Cox Media Group's television stations after they failed to reach a new retransmission deal." *Id.* ¶ 188. "On November 22, 2022, the initial outside date, TEGNA elected not to terminate the deal but to extend the outside date to February 22, 2023." *Id.* ¶ 194.

In December 2022, Standard General attempted to address the objections by making commitments regarding jobs and after-acquired clauses for retransmission fees. *See id.* ¶¶ 195–200. The Media Bureau then issued another notice period, and Saurer called and emailed Goodfriend to make sure he saw the notice. *Id.* ¶¶ 201–02. On December 28, 2022, DISH publicly appeared in the FCC proceedings for the first time. *Id.* ¶ 204. On January 13, 2023, DISH filed its Comment and Opposition to the deal, and the Unions, UCC, and Common Cause filed joint comments. *Id.* ¶ 208 & nn.133–34. A week later, "Allen hosted an event organized by the Democratic Congressional Campaign Committee at his Los Angeles home," which was attended by many prominent Democratic politicians. *Id.* ¶ 210. The following Monday, "Rosenworcel had another scheduled meeting with DISH's Mr. Ergen." *Id.* ¶ 211.

Plaintiffs allege that "[f]rom the end of November 2022 to February 2023, Standard General asked the Media Bureau and Chairwoman Rosenworcel at least 16 times for the status of the review and for the chance to meet to address any concerns the FCC might have" but were "either ignored or declined" each time. *Id.* ¶ 213. "On or around February 20, 2023, DOJ confirmed that the HSR waiting period had ended," another regulatory hurdle Plaintiffs had

faced.  *Id.* ¶ 216.  "The only obstacle left was Chairwoman Rosenworcel, Ms. Saurer, and the

Media Bureau."  *Id.* ¶ 217.  "[O]n February 21, 2023, TEGNA elected to extend the outside date

a second time for another three months to May 22, 2023."  *Id.* ¶ 218.  According to Plaintiffs, at

that time "Chairwoman Rosenworcel and Ms. Saurer knew they had to kill the deal to placate

Ms. Sohn's supporters, including Mr. Allen.  Otherwise, Chairwoman Rosenworcel would be out

as chair."  *Id.* ¶ 220.  "On February 21, 2023, Chairwoman Rosenworcel had a call with Jon

Schleuss, president of . . . NewsGuild."  *Id.* ¶ 221.

On February 24, 2023, the Media Bureau issued the Hearing Designation Order ("HDO")

referring the matter to an Administrative Law Judge ("ALJ").  *Id.* ¶ 222; Hearing Designation

Order ("HDO"), *In re Tegna Inc.*, MB No. 22-162 (Feb. 24, 2023), https://perma.cc/N7U5-

LQ57.  The HDO found "that substantial and material questions of fact exist regarding whether:

(1) the Transactions are structured in a way that is likely to trigger a rate increase harmful to

consumers, as a result of contractual clauses that take immediate effect after the consummation

of the Transactions, and (2) the Transactions will reduce or impair localism, including whether

they will result in labor reductions at local stations."  HDO ¶ 2.  Because no ALJ hearing relating

to "a broadcast license-transfer application had been completed in fewer than 358 days," with

only 87 days until Standard General's merger agreement would expire, the "HDO sounded the

death knell for the Standard General-TEGNA transaction."  FAC ¶ 229.  "Standard General

made multiple attempts to save the deal by trying to expedite the hearing or to get the license-

transfer applications before the full Commission for a vote," but to no avail.  *Id.* ¶¶ 240, 243.

"Having exhausted its options at the FCC, Standard General appealed the HDO to the D.C.

Circuit and petitioned for mandamus at the end of March" 2023.  *Id.* ¶ 245.  "The D.C. Circuit

said there was no jurisdiction for an appeal because there had been no 'resolution by the full

Commission' of Standard General's license-transfer applications." *Id.* (quoting Order, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr. 3, 2023) (per curiam)).  And the D.C. Circuit later denied the petition for a writ of mandamus, "stating it was not 'crystal clear' that the Commission should have ruled before a hearing."  *Id.* (quoting Order, *In re SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir. Apr. 21, 2023) (per curiam)).

On May 22, 2023, TEGNA terminated the merger agreement, and "Standard General was left to pay a $136 million breakup fee to TEGNA, in addition to roughly $70 million in its own transaction costs."  *Id.* ¶¶ 261, 263.  The next day, Allen "publicly reiterated that the Allen Group remained 'very interested in' acquiring TEGNA," and that he thought he would be able to clear the deal with the FCC.  *Id.* ¶ 264.  "With the deal dead, and having failed to give Standard General a chance to receive a decision on its license-transfer applications before its merger agreement expired, the ALJ terminated the hearing proceedings as moot on June 1, 2023."  *Id.* ¶ 267.

Defendants could finally celebrate their work paying off, *id.* ¶ 265, and the Goodfriend Group issued a statement on its success, explaining "how it 'assembled a coalition of consumer advocacy and civil rights groups to join the unions in opposing the transaction' and 'generated unusually strong statements of concern or outright opposition' from then-Speaker Pelosi and Senator Warren."  *Id.* ¶ 268.  But the story did not end there.

**B.  Procedural Background**

Plaintiffs initiated this action by filing their initial Complaint in April 2024, before filing the operative Complaint[6] in August 2024.  *See* Compl., ECF No. 1; FAC.  The Complaint alleges

---

[6] Unless otherwise specified, "Complaint" refers to Plaintiffs' First Amended Complaint (ECF No. 36).

eight causes of action against various combinations of Defendants. FAC ¶¶ 324–99. Count I alleges that the FCC, Rosenworcel, and Sauer (collectively, the "FCC Defendants") violated Plaintiffs' Fifth Amendment Equal Protection rights by discriminating against Kim and his company on the basis of race. *Id.* ¶¶ 324–35. Count VIII, which is also brought against only the FCC Defendants, alleges that the FCC took *ultra vires* agency action by considering another buyer when reviewing Plaintiffs' license-transfer application, in violation of 47 U.S.C. § 310(d). FAC ¶¶ 388–99. Count II alleges that all of the Private Defendants,[7] other than DISH and Ergen (collectively, the "DISH Defendants"), interfered with Plaintiffs' right to make and perform contracts free from racial discrimination, in violation of 42 U.S.C. § 1981. FAC ¶¶ 336–50. Count III alleges that all Defendants other than the FCC itself engaged in a conspiracy to deprive Plaintiffs of their civil rights, in violation of 42 U.S.C. § 1985(3). FAC ¶¶ 351–56. Count IV alleges that those same Defendants failed to prevent the conspiracy described above, despite their ability to do so, in violation of 42 U.S.C. § 1986. FAC ¶¶ 357–63. Counts V and VI allege that the Private Defendants tortiously interfered with Plaintiffs' contracts and prospective business opportunities. *Id.* ¶¶ 364–81. And Count VII alleges that those same Defendants were engaged in an unlawful civil conspiracy. *Id.* ¶¶ 382–87. Though not obvious from the Complaint, Plaintiffs have clarified that they seek only declaratory and injunctive relief from the FCC Defendants, and damages from the Private Defendants in an amount "including but not limited to the $136 million breakup fee [Plaintiffs] paid to TEGNA." Pls.' Consolidated Mem. P. & A. Opp'n Defs.' Mots. Dismiss ("Pls.' Opp'n") at 25, ECF No. 66; FAC at 140.

---

[7] The "Private Defendants" include Allen and the Allen Media Group (collectively, the "Allen Defendants"), Goodfriend and the Goodfriend Group (collectively, the "Goodfriend Defendants"), DISH and Ergen (collectively, the "DISH Defendants"), the Unions, UCC, and Common Cause.

Defendants separately moved to dismiss all claims brought against them under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Goodfriend Defs.' Mot. Dismiss Pls.' Am. Compl. ("Goodfriend MTD"), ECF No. 44; Mot. Dismiss by Defs. NewsGuild-CWA & Nat'l Ass'n Broad. Emps. & Technicians-CWA ("Unions MTD"), ECF No. 46; Federal Defs.' Mot. Dismiss Am. Compl. ("FCC MTD"), ECF No. 47; Def. Common Cause's Mot. Dismiss Pls.' Am. Compl. ("Common Cause MTD"), ECF No. 49; Defs. DISH Network Corp.'s & Charles Ergen's Mot. Dismiss Pls.' Am. Compl. ("DISH MTD"), ECF No. 54; Defs. Byron Allen & Allen Media, LLC's Mot. Dismiss First Am. Compl. ("Allen MTD"), ECF No. 56; Def. United Church of Christ, OC. Inc. D/B/A United Church of Christ Media Just. Ministry's Mot. Dismiss ("UCC MTD"), ECF No. 57. The DISH Defendants also moved for sanctions.[8] Mot. Rule 11 Sanctions by Defs. DISH Network Corp. & Charles Ergen, ECF No. 59. Plaintiffs filed a

---

[8] The DISH Defendants moved for sanctions under Federal Rule of Civil Procedure 11. Mot. Rule 11 Sanctions by Defs. DISH Network Corp. & Charles Ergen, ECF No 59. The gravamen of the sanctions motion rehashes the DISH Defendants' motion to dismiss arguments, but it goes one step further to argue that the Complaint "evidences that it was filed for an improper purpose" because it is "both legally and factually frivolous." *See* Reply in Supp. of Mot. for Rule 11 Sanctions at 16, ECF No. 62. In response, Plaintiffs argue that DISH's motion for sanctions itself warrants Rule 11 sanctions. *See* Pls.' Mem. P. & A. in Opp'n to Mot. Rule 11 Sanctions at 42–45, ECF No. 60. Plaintiffs' position is that based on "the timing of DISH's Rule 11 motion and its repetition of DISH's Rule 12 arguments, it was brought for the improper purpose to intimidate, gain a strategic advantage, or needlessly increase the cost of litigation." *Id.* at 45. The purpose of Rule 11 sanctions is to "protect the court from frivolous and baseless filings that are not well grounded, legally untenable, or brought with the purpose of vexatiously multiplying the proceedings." *Cobell v. Norton*, 157 F. Supp. 2d 82, 86 n.8 (D.D.C. 2001). "The imposition of Rule 11 sanctions is not something the court takes lightly; Rule 11 sanctions are an extreme punishment for filing pleadings that frustrate judicial proceedings." *Naegele v. Albers*, 355 F. Supp. 2d 129, 144 (D.D.C. 2005). Though the Court agrees that the Complaint is legally insufficient, the DISH Defendants have not provided "patently clear" evidence of a Rule 11(b) violation. *See Doe I v. Exxon Mobil Corp.*, No. 01-cv-1357, 2021 WL 1910892, at *3 (D.D.C. May 12, 2021) (citation omitted). Even so, the timing of DISH's motion and its emphasis on the lack of factual support for Plaintiffs' claims does not independently support the extreme punishment of Rule 11 sanctions, either. *See Naegele*, 355 F. Supp. 2d at 144. Accordingly, the Court will exercise its discretion to deny both requests for sanctions. Each party shall bear its own expenses related to this motion.

consolidated response in opposition to Defendants' motions to dismiss, ECF No. 66, and

Defendants separately replied, ECF Nos. 67–73. The motions are now fully briefed and ready

for this Court's consideration.

### III. LEGAL STANDARD

When deciding a motion to dismiss for lack of subject-matter jurisdiction under

Rule 12(b)(1), courts "assume the truth of all material factual allegations in the complaint and

'construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be

derived from the facts alleged,' and upon such facts determine jurisdictional questions." *Abuzeid*

*v. Mayorkas*, 62 F.4th 578, 583 (D.C. Cir. 2023) (alteration in original) (quoting *Am. Nat'l Ins.*

*Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Courts "may consider materials outside the

pleadings to determine [their] jurisdiction," including whether a plaintiff has standing. *Jibril v.*

*Mayorkas*, 101 F.4th 857, 866 (D.C. Cir.), *cert. denied*, 145 S. Ct. 550 (2024) (quoting *Kareem*

*v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021)). A plaintiff "need only make a plausible

allegation of facts establishing each element of standing" at the pleading stage. *Cutler v. U.S.*

*Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id.* But courts need not "accept as true the complaint's factual

allegations insofar as they contradict exhibits to the complaint or matters subject to judicial

notice." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272–73 (D.C. Cir. 2018) (superseded by

15

statute on other grounds) (quoting *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004)).

"Public records are subject to judicial notice on a motion to dismiss when referred to in the

complaint and integral to the plaintiff's claim." *Id.* at 273.  Further, courts need not accept as

true conclusory allegations or legal conclusions. *Iqbal*, 556 U.S. at 678, 681.  Instead, courts

must draw upon their "judicial experience and common sense" to determine whether the "well-

pleaded facts" support a reasonable inference rising above just the "mere possibility of

misconduct" to establish a plausible claim. *Id.* at 679.

## IV.  ANALYSIS

The Court first analyzes its subject matter jurisdiction over Plaintiffs' claims.  The Court

concludes that Plaintiffs lack standing to sue the FCC Defendants for prospective relief because

Plaintiffs have not shown that any future injury is certainly impending.  On the merits, the Court

applies the *Noerr-Pennington* doctrine to conclude that Plaintiffs' claims against the Private

Defendants are barred by the First Amendment's Petition Clause.  For the reasons explained

below, the Court will grant Defendants' motions to dismiss in their entirety.

### A.  Subject Matter Jurisdiction

To determine whether this Court has subject matter jurisdiction over Plaintiffs' claims,

the Court first analyzes Plaintiffs' standing and then whether the FCC's statutory scheme

precludes jurisdiction.  Because the Court concludes Plaintiffs lack standing as to the FCC

Defendants, the Court grants their Rule 12(b)(1) motion.

#### 1.  Standing as to FCC Defendants

To ensure federal courts do not exceed their Article III authority, standing doctrine

"limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress

for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  "A plaintiff establishes

standing by showing '(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *Jibril*, 101 F.4th at 867 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). But "standing is not dispensed in gross." *TransUnion*, 594 U.S. at 431. "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion*, 594 U.S. at 431). "To establish standing for prospective relief, a plaintiff opposing a motion to dismiss must plausibly allege facts that show 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Jones v. U.S. Secret Serv.*, 143 F.4th 489, 495 (D.C. Cir. 2025) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). "Importantly, the standing inquiry is 'especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional . . . .'" *Kareem*, 986 F.3d at 865 (alteration in original) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–09 (2013)). Though past wrongs may be "evidence bearing on 'whether there is a real and immediate threat of repeated injury,'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)), "'[p]ast exposure to illegal conduct,' without more, is insufficient to establish standing for prospective relief," *Jones*, 143 F.4th at 495 (quoting *O'Shea*, 414 U.S. at 495).

Here, Plaintiffs seek "(1) a declaration that the FCC Defendants violated Mr. Kim's equal protection rights, (2) a permanent injunction ordering the FCC Defendants to refrain from discriminating based on race, (3) a declaration that the FCC Defendants violated §310(d) of the Communications Act, and (4) a permanent injunction ordering the FCC Defendants to refrain

from considering alternative buyers in future proceedings involving Mr. Kim." Pls.' Opp'n at 25. Plaintiffs do not seek damages from the FCC Defendants, and instead seek only prospective declaratory and injunctive relief as to those Defendants. *See id.* at 25, 29. Thus, standing as to the FCC Defendants turns on whether Plaintiffs have plausibly alleged a threat of imminent future harm.[9] *See* FCC MTD at 15; Pls.' Opp'n at 29.

### a. Racial Discrimination

The Court begins by analyzing Plaintiffs' theories of past harm, as pleadings of past injury, though not independently sufficient, can inform Plaintiffs' theories of future injury. *See Murthy*, 603 U.S. at 59 ("Keep in mind . . . that the past is relevant only insofar as it is a launching pad for a showing of imminent future injury."). Plaintiffs allege that the FCC Defendants discriminated against Kim and his company on the basis of race, in violation of the Fifth Amendment's Equal Protection Clause. FAC ¶¶ 324–35. Plaintiffs assert three theories of this claim: (1) that "the FCC considers race of broadcast owners in reviewing license-transfer applications, and in Plaintiffs' case, it used Mr. Kim's race as a negative and a stereotype given its preference for Mr. Allen as an alternative buyer;" (2) that "even if considered facially neutral, the FCC's license-transfer review resulted in racially disproportionate impact and was motivated by a discriminatory purpose;" and (3) that "the FCC treated Plaintiffs differently than similarly situated applicants." Pls.' Opp'n at 53–54. The Court concludes that each of these theories of past discrimination is weak, and certainly insufficient to support a plausible theory of future discrimination.

---

[9] As the Supreme Court explained in *California v. Texas*, 593 U.S. 659, 672 (2021), "declaratory-judgment actions must satisfy Article III's case-or-controversy requirement," such that the remedy "will redress the individual plaintiffs' injuries." Here, Plaintiffs' standing for declaratory relief is coterminous with their standing for injunctive relief, and will turn on the same inquiry into imminent future harm. *See* FCC MTD at 19 n.3.

For starters, the Complaint lacks any factual allegation from which to infer that the FCC used Kim's race negatively. To support their theory of negative treatment, Plaintiffs selectively quote from the private objectors' petitions. *See* Pls.' Opp'n at 56. According to Plaintiffs, "[o]bjectors declared that Mr. Kim's deal did 'nothing' for ownership diversity and presumed he was unlike others in 'historically excluded groups' who had suffered 'inequities produced by structural racism,'—all evidence of impermissible racial stereotyping." *Id.* (citation omitted) (quoting FAC ¶ 147). The Court quoted these objections at length above, and again provides context to these quotes to dispel Plaintiffs', hopefully unintentional, mischaracterization of the record.

The objectors did not say that the deal did "nothing for ownership diversity." *Contra id.* Rather, they said that the transactions would "do nothing to create a more accurate, diverse or independent media" because "the applicants' business model . . . would pose significant challenges for any new entrants to meaningfully compete with TEGNA post-transaction and provide robust local programming." Unions, UCC, and Common Cause FCC Reply at 4, 6. Further, the Unions, UCC, and Common Cause explained that market concentration would do "nothing to increase ownership opportunities for women and people of color to enter the marketplace." *Id.* at 5.

And these objectors did not "presume[] [Kim] was unlike others in 'historically excluded groups' who had suffered 'inequities produced by structural racism.'" *Contra* Pls. Opp'n at 56. Rather, they explained:

> ***Broad participation*** by members of historically excluded groups is not only just, but also a sign that a market is robustly competitive. ***It is certainly a good thing that Mr. Kim is not barred by his race*** from becoming a successful entrepreneur with the acumen and business relationships giving him access to capital such that he is at the lead of this transaction. It is certainly a good thing that Ms. McDermott is not barred by her gender to be selected to run a large corporation. Unfortunately,

> it *is* rare for members of either of these groups to be in such a position.  But a single large LLP or corporation of the type proposed here is not going to ameliorate or address long-standing inequities produced by structural racism, xenophobia or misogyny - and is not likely to provide ***additional members*** of historically excluded groups the opportunity to gain wealth and influence in society.

Unions, UCC, and Common Cause FCC Reply at 5–6 (emphases added) (footnotes omitted).

Plaintiffs either mischaracterize or misunderstand these Defendants' concerns.

What is more, Plaintiffs fail to tie these statements made by private organizations to the FCC officials.  Plaintiffs "do not allege that such statements were made or endorsed by the Federal Defendants."  Federal Defs.' Reply Supp. Mot. Dismiss Am. Compl. ("FCC Reply") at 19, ECF No. 68.  And the fact that the FCC requested information about bids TEGNA had rejected, including a bid placed by a "black-owned media company," does not raise Plaintiffs' speculations that the decisions were racially driven beyond a mere possibility.  *See* Pls.' Opp'n at 56–57.  Plaintiffs fail to allege facts that plausibly support that the FCC used Kim's race against him.

Next, Plaintiffs argue a discriminatory purpose can be inferred based on the factors articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–68 (1977).  *See* Pls.' Opp'n at 57.  This argument falls flat.  The "impact" of the FCC Defendants' actions does not bear "more heavily on one race than another."  *See Arlington Heights*, 429 U.S. at 266 (citation omitted).  After all, only a single transaction is at issue in this case.  And Plaintiffs allege that Kim has not had any issues with his prior FCC approvals.  *See* FAC ¶ 117.  Common sense suggests that the transaction at issue, and not Kim's race, caused the delay this time.  Further, the "historical background" of the FCC's license-transfer review does not reflect a discriminatory purpose, especially not one that "reveals a series of official actions taken for invidious purposes."  *See Arlington Heights*, 429 U.S. at 267.  Plaintiffs describe the FCC's minority broadcast ownership goals as "long-standing," FAC ¶ 104; Pls.' Opp'n at 59,

20

and, accepting that as true, Kim would theoretically have benefited from those policies in his past FCC dealings. The "specific sequence of events leading up to" the FCC's actions, even if unprecedented, also fails to evince a racially discriminatory purpose. *See Arlington Heights*, 429 U.S. at 267. Further, Plaintiffs' claims of "race-based and xenophobic rhetoric in FCC filings" melt away at the slightest of scrutiny. *See* Pls.' Opp'n at 60.

Take, for example, Plaintiffs' allegations that the Unions, UCC, and Common Cause "stoked fears about 'shadowy foreign investors,' the 'risks to . . . democracy' posed by 'anonymous foreign investment in American newsrooms,' and 'China['s] increased tensions in the Taiwan Strait,'" as well as the argument that "the [FCC] [D]efendants adopted these views in their treatment of Plaintiffs' applications." *Id.* at 61 (alterations in original) (citations omitted) (quoting FAC ¶¶ 148, 174). To begin, that use of "shadowy foreign investors" clearly referred to the "involvement of large hedge funds headquartered in the Cayman Islands and the British Virgin Islands," and not Kim, whose identity everyone knew. *See* Unions, UCC, and Common Cause FCC Reply at 20. Moreover, the reference to Taiwan was made in the context of another geopolitical event, and neither reference had anything to do with South Korea: "Since the announcement of the proposed transaction in this proceeding, Russia invaded Ukraine and China increased tensions in the Taiwan Strait. The Commission should not assume that CFIUS alone is responsible for the implications of anonymous foreign investment." *See* Goodfriend Letter at 5. Read in context, no reasonable person would assume this reference to China was actually an attack on Kim's race. To the extent Plaintiffs allege procedural and substantive departures in the FCC proceedings, absent any facts tying the FCC's actions to race, the Court finds these

arguments similarly unpersuasive as evincing racial animus.[10]  *See* Pls.' Opp'n at 62–64.

Applying the *Arlington Heights* factors here, a reasonable inference of discriminatory intent or

purpose is tenuous at best.

Plaintiffs' third theory of their equal protection claim is based on disparate treatment.

*See id.* at 64–68.  Plaintiffs argue that "Standard General's deal was *better situated* than the

others yet, remarkably, was subjected to unprecedented delays, not approved, and referred for a

hearing."  *Id.* at 66.  But "it cannot be enough to simply allege that the plaintiff was treated

differently from a 'similarly situated' comparator, without additional allegations showing the

comparators are in fact 'similarly situated' in some meaningful respect."  *Joyner v. Morrison &*

*Foerster LLP*, 140 F.4th 523, 531 (D.C. Cir. 2025).  Plaintiffs cite to four comparator

transactions in their Complaint, but not one of these transactions was valued at even half of the

$8.6 billion Standard General-TEGNA deal.  FAC ¶¶ 1, 109–15 (valuing the comparator deals at

$3.1 billion, $2.65 billion, $925 million, and $2.8 billion).  Plaintiffs also admit that the "level of

_____

[10] Some Defendants argue that Plaintiffs' claims are "barred by collateral estoppel, also known as issue preclusion."  *See, e.g.*, Statement of P. & A. Supp. Defs. DISH Network Corp. & Charles Ergen's Mot. Dismiss Pls.' Am. Compl. at 24–25, ECF No. 55.  The D.C. Circuit Court dismissed Plaintiffs' appeal as premature without reaching the merits, Order, *SGCI Holdings III LLC v. FCC*, No. 23-1083 (D.C. Cir. Apr. 3, 2023) (per curiam), so that decision is not preclusive.  And the Circuit Court also denied Plaintiffs' petition for mandamus because they had not met the high bar for mandamus by showing that the FCC had a "'crystal clear' duty to rule on their applications without resort to a hearing."  Order, *In re SGCI Holdings III LLC*, No. 23-1084 (D.C. Cir. Apr. 21, 2023) (per curiam) (quoting *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022).  "Issue preclusion applies where the issues in the two cases are indeed identical and the other rules of collateral estoppel are carefully observed," and "issues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same."  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 153–54 (2015) (citation modified).  Thus, the D.C. Circuit mandamus proceedings do not have preclusive effect here.

Even so, the Circuit Court's denial of Plaintiffs' mandamus petition supports this Court's conclusion that the alleged procedural irregularities were not so severe as to support an inference of invidious racial animus in the FCC proceedings, absent other factual allegations.

public opposition" to their deal was "unprecedented." *See* Pls.' Opp'n at 67–68. Though this Court must accept Plaintiffs' well-pleaded allegations, the FCC was not required to do so when considering Plaintiffs' applications, so an unprecedented level of public opposition would tend to support an unprecedented response. *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003) ("[T]here is nothing unusual or untoward in . . . government officials' responsiveness to public opinion."). What is more, Kim has been granted license-transfers without issue, despite his race being an immutable trait. *See* Pls.' Opp'n at 108. The difference in treatment appears to be related to the deals at issue, not Kim's race. In light of these facts, Plaintiffs' "comparators" are not similarly situated.

Having concluded that Plaintiffs' allegations of a past equal protection violation are weak at best, the Court turns back to standing. Plaintiffs argue they have met their burden to plead an imminent future injury in three ways, *id.* at 29, none of which the Court finds persuasive. First, Kim has declared that he will appear before the FCC soon because a Standard General affiliate has acquired a media network under terms giving Standard General "the option to acquire the stations" and the media network "the option to require Standard General to purchase the stations." *Id.* at 30. Kim posits that he would exercise the option "immediately . . . if not for the fact that the FCC's 'discriminatory policy prevents' those applications from being considered 'on an equal basis.'" *Id.* at 30–31 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). It is not clear the practice or policy to which Kim is referring. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1176 (D.C. Cir. 2012) ("We have similarly found standing lacking where plaintiffs claimed future injury based on speculation about alleged discriminatory practices unconnected to concrete policies."). Plaintiffs also fail to explain what policy changed such that the FCC previously "granted without issue license

transfers in two prior major deals involving Mr. Kim's media companies," but now holds them up due to racism. *See* Pls.' Opp'n at 108. And Plaintiffs' argument that Kim's future applications would be processed by the same individuals is no longer accurate—Rosenworcel has been succeeded by FCC Chairman Brendan Carr and Saurer has been replaced by Media Bureau Chief Erin Boone. *Contra id.* at 31. Kim has not pleaded facts making it plausible that the current or future FCC officials would use his race against him.

Second, Plaintiffs allege they will appear before the FCC when they renew licenses as early as 2029. *Id.* For the same reasons above, absent plausible allegations of future discrimination, the proximity in time of Kim's next FCC appearance is immaterial. *But see Jibril v. Mayorkas*, 20 F.4th 804, 812 (D.C. Cir. 2021) (holding that Plaintiffs sufficiently pleaded substantial future harm based on allegations that they would "soon fly again and that they remain on a terrorist watchlist," thus exposing them to an "an imminent risk of invasive and undue Government actions").

Third, Plaintiffs argue they have "changed their immediate broadcast strategy" to "delay the need for FCC approval" in response to the FCC's alleged discrimination. Pls.' Opp'n at 33. But it is well established that "self-inflicted injuries are not fairly traceable" to government action. *See Clapper*, 568 U.S. at 417–18. Thus, Plaintiffs altered broadcast strategies cannot support their theory of standing.

In sum, the Court concludes that Plaintiffs failed to "plausibly allege facts that show the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *See Jones*, 143 F.4th at 495 (internal quotation marks omitted). Thus, Plaintiffs' equal protection claim (Count I) must be dismissed for lack of standing.

### b. Statutory Violation

The Court reaches a similar conclusion for Plaintiffs' statutory claim based on 47 U.S.C.

§ 310(d)'s prohibition on consideration of alternative buyers.  Even assuming that Plaintiffs have

alleged a past statutory violation, Plaintiffs themselves called the request for information on

alternative transactions "unprecedented for a broadcast transaction."  FAC ¶ 396.  Plaintiffs do

not allege that Kim "will again experience injury as the result of that practice even if continued."

*See Lyons*, 461 U.S. at 109.  Plaintiffs fail to provide facts to support that this alleged aberration

will occur again, let alone to them.  *See* FCC Reply at 10–11.  Accordingly, Plaintiffs' statutory

claim of *ultra vires* agency action (Count VIII) must also be dismissed for lack of standing.

### c. Conspiracy Claims

As the FCC Defendants explain, § 1985(3) and § 1986 are conspiracy statutes.  FCC

Reply at 6; *see* 42 U.S.C. § 1985(3) ("If two or more persons in any State or Territory

conspire . . . ."); *id.* § 1986 ("Every person who, having knowledge that any of the wrongs

conspired to be done, and mentioned in section 1985 of this title . . . .").  The Court agrees that

"because Plaintiffs allege that the purpose of the alleged conspiracy was to 'thwart the Standard

General-TEGNA deal,' their pleading could not plausibly be read to imply a conspiracy existing

beyond the termination of that deal to which prospective relief could be directed."  FCC Reply

at 6 (quoting FAC ¶¶ 353, 359).  Thus, Plaintiffs have failed to establish standing for prospective

relief, and Counts III and IV must be dismissed as against Rosenworcel and Saurer's successors.

### 2. Standing as to Private Defendants

The Goodfriend Defendants also moved to dismiss under Rule 12(b)(1) for lack of

standing, relying primarily on *Murthy v. Missouri*, 603 U.S. 43 (2024).  Goodfriend MTD at 18–

19.  The Goodfriend Defendants reason that Plaintiffs failed to plead plausible allegations that

the Goodfriend Defendants caused their injuries because the FCC exercised its independent judgment in issuing the HDO, breaking the causal chain. *See id.* at 18–19. In *Murthy*, the plaintiffs sought "anticipatory" relief for injuries that depended on "guesswork as to how independent decisionmakers will exercise their judgment" in the future. *See Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 413). Here, in contrast, Plaintiffs' claims for past damages from the Private Defendants involve no such guesswork. The Complaint plausibly alleges that the FCC's actions were influenced by the Goodfriend Defendants' activities before the FCC, such that the Court can reasonably infer that the FCC's actions—including the HDO—were plausibly caused, in whole or in part, by the Goodfriend Defendants' lobbying and petitioning efforts. As Plaintiffs explain, this theory of causation is "the very premise of *Noerr-Pennington*'s sham exception," and all Private Defendants argue that the *Noerr-Pennington* doctrine applies.[11] Pls.' Opp'n at 105, 118. At the pleading stage, the Court is satisfied that Plaintiffs have standing to sue the Private Defendants for their alleged actions that resulted in the HDO, which caused Plaintiffs' past harms. Thus, the Court will not grant the Goodfriend Defendants' motion on this basis.

### 3. Exhaustion and Exclusivity of Jurisdiction

Defendants argue that this Court is without subject matter jurisdiction because Plaintiffs failed to exhaust their claims before the FCC and because the D.C. Circuit has exclusive

---

[11] Under the *Noerr-Pennington* doctrine, "petitioning the Government for redress of grievances, whether by efforts to influence legislative or executive action or by seeking redress in court, is immune from liability under the antitrust laws." *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 677 (D.C. Cir. 2005). The Court addresses the applicability of the *Noerr-Pennington* doctrine below.

jurisdiction over Plaintiffs' claims. *See, e.g.*, Common Cause MTD at 1. Other than with respect to Count VIII,[12] the Court concludes that Plaintiffs have the better argument.

"It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive,' as it has here with regard to final FCC actions, a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecommunications Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 77 (D.C. Cir. 1984) (footnotes omitted). As applicable here, "[a]ppeals may be taken from decisions and orders of the [FCC] to the United States Court of Appeals for the District of Columbia . . . [b]y any party to an application for authority to transfer, assign, or dispose of any [station license], or any rights thereunder, whose application is denied by the Commission." 47 U.S.C. § 402(b)(3). And "[i]n general, failure to exhaust administrative remedies bars judicial review of FCC orders." *Coal. for Pres. of Hisp. Broad. v. FCC*, 931 F.2d 73, 76–77 (D.C. Cir. 1991); *see* 47 U.S.C. § 155(c)(7) ("The filing of an application for review under this subsection shall be a condition precedent to judicial review of any order, decision, report, or action made or taken pursuant to a delegation under paragraph (1) of this subsection.").

Plaintiffs argue that they are not challenging a specific FCC order, such as the validity of the HDO, but that their "claims are instead about the entire course of the FCC proceedings and Defendants' unlawful and unconstitutional treatment of Plaintiffs." Pls.' Opp'n at 39. The Court agrees that the bulk of Plaintiffs' claims are not "of the type Congress intended to be reviewed

---

[12] The Court would dismiss Count VIII for lack of jurisdiction, even were it to conclude that Plaintiffs had standing to assert that claim. *See Tooley v. Napolitano*, 586 F.3d 1006, 1009 (D.C. Cir. 2009) ("A court need not assess whether a plaintiff has standing before dismissing on alternative jurisdictional grounds.").

within [the FCC's] statutory structure."[13]  *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186

(2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994)).  As the Supreme

Court has made clear, "a statutory review scheme . . . does not necessarily extend to every claim

concerning agency action."  *Id.* at 185–86.  Rather, courts must still ask "whether the particular

claims brought [are] 'of the type Congress intended to be reviewed within this statutory

structure.'"  *Id. (quoting Thunder Basin*, 510 U.S. at 212).  To answer that question, courts

consider: (1) whether precluding district court jurisdiction forecloses all meaningful judicial

review, (2) whether the claim is wholly collateral to the statute's review provisions, and

(3) whether the claim is outside the agency's expertise.  *See id.* at 186.  But even if the "factors

point in different directions," the "ultimate question is how best to understand what Congress has

done—whether the statutory review scheme, though exclusive where it applies, reaches the claim

in question."  *Id.*

     Here, Count VIII provides a helpful point of comparison.  Plaintiffs allege that, in the

process of deciding a license-transfer application, the FCC violated a statutory procedural

prohibition on considering other transferees.  *See* 47 U.S.C. § 310(d).  Plaintiffs raised this

concern to Saurer, FAC ¶ 170, and could have theoretically exhausted the issue before the FCC.

The claim would not be wholly collateral to the review provision, as the procedural violation

would bear directly on the FCC's substantive decision whether to approve the license-transfer.

And the claim, concerning the purposes for which the FCC can consider past transactions, would

---

[13] Defendants' reliance on *TRAC* is misplaced.  *See* FCC MTD at 24 n.5.  There, the D.C. Circuit held that "where a statute commits final agency action to review by the Court of Appeals, the appellate court has exclusive jurisdiction to hear suits *seeking relief that might affect its future statutory power of review*."  *TRAC*, 750 F.2d at 72 (emphasis added).  The relief Plaintiffs seek does not implicate the D.C. Circuit's future jurisdiction over FCC orders, so *TRAC* does not change the Court's analysis.

be within the agency's expertise. Thus, the *Thunder Basin* factors would support the exclusivity of review of Plaintiffs' 47 U.S.C. § 310(d) claim.[14]

Contrast this with Plaintiffs' other claims involving a racist conspiracy. Those claims asserting federal civil rights violations would not have been appropriately raised before the FCC, would have been wholly collateral to processing their license-transfer applications, and would have been outside the FCC's expertise. *See Axon Enter.*, 598 U.S. at 186. Thus, the Court is satisfied that Congress did not intend to strip this Court's jurisdiction over Counts II through VII by virtue of its jurisdictional scheme for FCC proceedings. But to the extent Plaintiffs seek to relitigate the FCC's determinations on Plaintiffs' license-transfer applications, this Court lacks subject matter jurisdiction to hear those challenges. Having dismissed all claims against the FCC Defendants and assured itself of jurisdiction over the claims against the Private Defendants, the Court proceeds to analyze the merits of Plaintiffs' remaining claims.

### B.  Failure to State a Claim

Each Private Defendant argues that the Court should apply the *Noerr-Pennington* doctrine as a framework for vindicating their First Amendment right to petition. Counts II through IV are brought under federal civil rights statutes, FAC ¶¶ 336–63, and Counts V through VII are D.C. common law claims predicated on tortious interference, *id.* ¶¶ 364–87. Though this Circuit has not extended the *Noerr-Pennington* doctrine beyond the antitrust and labor contexts, the Court sees good reason to do so here. Because the Court concludes that all of Plaintiffs' claims against the Private Defendants are premised on petitioning conduct, the Court proceeds to

---

[14] For similar reasons, the *Leedom* exception to review *ultra vires* agency action— the "Hail Mary pass" that "rarely succeeds"—would also fail because "there is [an] alternative procedure for review of the statutory claim" by exhausting the issue before the FCC. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 721–22 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

consider Plaintiffs' arguments that *Noerr-Pennington* is no shield to the Private Defendants

because their petitioning was a sham or involved misrepresentations.  As discussed above, the

Court accepts all well-pleaded, non-conclusory facts alleged as true, and draws all reasonable

inferences from those facts in Plaintiffs' favor.  *See Iqbal*, 556 U.S. at 678–79.  This includes

allegations based on information and belief, so long as those allegations are "accompanied by a

statement of the facts upon which the allegations are based."  *Kareem*, 986 F.3d at 866 (quoting

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)).  But the Court need

not accept as true factual allegations that contradict exhibits to the Complaint or matters subject

to judicial notice, such as FCC filings.  *See Owens*, 897 F.3d at 272–73.  For the reasons

discussed below, the Court concludes that Plaintiffs have failed to state a plausible claim to relief

as to the Private Defendants.

### 1.  Applicability of *Noerr-Pennington*

"The First Amendment's Petition Clause protects 'the right of the people . . . to petition

the Government for a redress of grievances.'"  *Venetian Casino Resort, LLC v. NLRB*, 793 F.3d

85, 89 (D.C. Cir. 2015) (quoting U.S. Const. amend. I).  The Supreme Court and D.C. Circuit

have recognized the "right to petition as one of 'the most precious of the liberties safeguarded by

the Bill of Rights,' and have explained that the right is implied by '[t]he very idea of a

government, republican in form.'"  *BE & K Const. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002)

(alteration in original) (first quoting *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*,

389 U.S. 217, 222 (1967); and then quoting *United States v. Cruikshank*, 92 U.S. 542, 552

(1876)).  "When 'a person petitions the government' in good faith, 'the First Amendment

prohibits any sanction on that action.'"  *Venetian Casino*, 793 F.3d at 89 (quoting *Nader v.*

*Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C.Cir.2009)).  The *Noerr-Pennington* doctrine

provides a framework to apply that principle.  *See id.* at 90.

      To date, the D.C. Circuit has applied *Noerr-Pennington* "only to justify narrow

constructions of federal law," specifically antitrust and labor law.  *See Whelan v. Abell*, 48 F.3d

1247, 1254 (D.C. Cir. 1995); *Venetian Casino*, 793 F.3d at 87.  And the Circuit has "take[n] no

position" on whether the doctrine may be applied "to bar liability for common law torts."

*Banneker*, 798 F.3d at 1137 n.8.  Even so, the Court is not in uncharted waters—at least five

other Circuits have extended *Noerr-Pennington* to claims arising under other federal statutes and

state tort common law claims.  *See Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839

F.2d 155, 158, 160 (3d Cir. 1988) (applying *Noerr-Pennington* to tortious interference and civil

conspiracy claims); *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d

1075, 1084 (5th Cir. 1988) (applying *Noerr-Pennington* to tortious interference and § 1983

claims); *New W., LP v. City of Joliet*, 491 F.3d 717, 720–22 (7th Cir. 2007) (applying *Noerr-

Pennington* to claims brought under 42 U.S.C. §§ 1982, 1983, and the Fair Housing Act);

*Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607, 615 (8th Cir. 1980) (applying *Noerr-

Pennington* to a § 1983 claim); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991,

1007 (9th Cir. 2008) (applying *Noerr-Pennington* to tortious interference claims); *Manistee

Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000) (applying *Noerr-Pennington*

to a § 1983 claim).

      Plaintiffs urge this Court not to apply *Noerr-Pennington* here, arguing that it "applies

only to antitrust claims."  Pls.' Opp'n at 124.  Though the applicability of *Noerr-Pennington* to

Plaintiffs' claims is ambiguous under Circuit precedent, their arguments for why the doctrine

should not bar claims predicated on the petitioning conduct at issue here fall flat.  Plaintiffs argue

that the Supreme Court "has declined to 'import[]' the doctrine elsewhere, including the Petition

Clause context." *Id.* at 125. But the three cases Plaintiffs cite do not counsel against applying

the doctrine here. In the first case, the Supreme Court held that the doctrine's sham exception

had no applicability "in the context of determining whether a case is so 'exceptional' as to justify

an award of attorney's fees in patent litigation" under 35 U.S.C. § 285. *Octane Fitness, LLC v.

ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014). The Court explained that while it had

"crafted the *Noerr–Pennington* doctrine—and carved out only a narrow exception for 'sham'

litigation—to avoid chilling the exercise of the First Amendment right to petition the government

for the redress of grievances," it was "not clear why the shifting of fees in an 'exceptional' case

would diminish that [petitioning] right." *Id.* Thus, the *Noerr-Pennington* sham exception was

inapt.

In the second case Plaintiffs cite, the Supreme Court held that "the public concern test

developed in Speech Clause cases" should also apply "to Petition Clause claims by public

employees." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 389 (2011). In doing so, the Court

explained that "[u]nrestrained application of the Petition Clause in the context of government

employment would subject a wide range of government operations to invasive judicial

superintendence." *Id.* at 390–91. But none of these Private Defendants are public employees, so

those concerns are not at issue here.

And the Supreme Court explained that the third case on which Plaintiffs rely, *McDonald

v. Smith*, 472 U.S. 479, (1985), "held only that speech contained within a petition is subject to

the same standards for defamation and libel as speech outside a petition." *Guarnieri*, 564 U.S. at

389. Neither right is absolute, a reality for which the *Noerr-Pennington* doctrine's sham

exception accounts.  *See McDonald*, 472 U.S. at 484–85.  Thus, none of these cases counsels

against application of the *Noerr-Pennington* doctrine to the petitioning conduct here.

Plaintiffs also argue that courts that have applied *Noerr-Pennington* beyond antitrust

"recognize that its 'principles may be inapt in non-antitrust contexts.'"  Pls.' Opp'n at 126

(quoting *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022)).  But that quote is

taken out of context.  In that § 1983 action, the court explained that because the "doctrine and its

sham exception arose in the antitrust context," and the "sham-exception principles" accordingly

"discuss whether petitioning is done for an anticompetitive purpose or to interfere with a

competitor's business relationships," those principles should not be treated as "rigid

requirements."  *B&G Foods*, 29 F.4th at 536.  Rather, courts should "rely on them to create

analogous standards suitable to each case's context."  *Id.*  Read in context, this case does not

support Plaintiffs' position either.

And the Court sees no reason why it must determine the exact scope of the claims

Plaintiffs bring against the Private Defendants to apply the doctrine.  *See* Pls.' Opp'n at 127.

Regardless of the permissibility of these causes of action in other circumstances, here, the

alleged conduct falls squarely within the core of the right to petition.  "The right to petition

allows citizens to express their ideas, hopes, and concerns to their government and their elected

representatives . . . ."  *Guarnieri*, 564 U.S. at 388.  "[F]or purposes of the *Noerr–Pennington*

doctrine, parties exercise their right to petition when they 'advocate their causes and points of

view respecting resolution of their business and economic interests,' or attempt to 'influence the

passage or enforcement of laws."  *Venetian Casino*, 793 F.3d at 90 (citations omitted) (first

quoting *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 511 (1972); and

then quoting *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961)).

"Whether conduct constitutes protected petitioning activity 'depends not only on its impact, but also on the context and nature of the activity.'" *Id.* (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 504 (1988)). But at minimum, in the absence of sham, *Noerr-Pennington* immunity extends to "concerted efforts to influence th[e] government[] through direct lobbying, publicity campaigns, and other traditional avenues of political expression." *Allied Tube*, 486 U.S. at 510.

Here, the Private Defendants' conduct was certainly "expression directed to the government seeking redress of a grievance." *See Guarnieri*, 564 U.S. at 388. In fact, as detailed *ad nauseam* above, the numerous communications and meetings between the Private Defendants and the FCC Defendants—the government—are the entire basis of Plaintiffs' conspiracy claims. *See supra* subpart II.A. Specifically, the Unions, UCC, and Common Cause filed literal petitions with the FCC. *See* FAC ¶ 111. The Goodfriend Defendants lobbied the FCC in meetings and assisted the Unions with filing these petitions. *See, e.g.*, *id.* ¶¶ 137, 157, 163–68. Ergen allegedly lobbied the FCC and politicians in connection with these filings, and later DISH publicly appeared in the FCC proceedings and filed comments. *See, e.g.*, *id.* ¶¶ 204, 206, 208, 211. Allen appealed directly to politicians by allegedly "courting" them in his efforts to stop the deal from being approved, and Goodfriend was allegedly lobbying the FCC on the Allen Group's and DISH's behalf, orchestrating these various actors. *See, e.g.*, *id.* ¶¶ 19, 175, 184, 210. This conduct was all directly related to the petitions filed with the FCC, and comprises the entirety of their alleged unlawful conduct. The Court has no trouble concluding that this conduct falls within the core of the Petition Clause's ambit. These "direct petitions to the legislature and government officials," *McDonald*, 472 U.S. at 482—here, directly asking politicians and FCC officials not to approve the broadcast license-transfers—are quintessential communications of

concerns "to the government" requesting "action by the government to address those concerns." *Guarnieri*, 564 U.S. at 388–89.  Thus, the Court finds it appropriate to analyze whether Plaintiffs' claims might "chill[] the exercise of" the Private Defendants' "First Amendment right to petition the government for the redress of grievances" under the doctrine the Supreme Court crafted for that purpose, the *Noerr-Pennington* doctrine.  *See Octane Fitness*, 572 U.S. at 556.

### 2.  Sham Exception

The right to petition, of course, is not absolute.  *See McDonald*, 472 U.S. at 485.  The *Noerr-Pennington* doctrine accounts for this reality through its sham exception to immunity.  *See Noerr*, 365 U.S. at 144 ("There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.")  The Supreme Court has adopted a two-part definition for sham petitioning: "first, it 'must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'; second, the litigant's subjective motivation must 'concea[l] an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process*-as opposed to the *outcome* of that process-as an anticompetitive weapon.'"  *BE & K Const.*, 536 U.S. at 526 (alterations in original) (quoting *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 60–61 (1993)).  Plaintiffs argue that "[e]ven if the *Noerr-Pennington* doctrine applies, the amended complaint's allegations satisfy its well-established sham exception."  Pls.' Opp'n at 128.  The Court cannot agree.

"A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."  *PRE*, 508 U.S. at 60 n.5.  Plaintiffs get "the inquiry backwards" by

confusing the necessary with the sufficient.  *See* Pls.' Opp'n at 133.  Though a successful petition is not a sham, an unsuccessful petition may not be a sham if the party had a reasonable basis for bringing it.  *See PRE*, 508 U.S. at 60 n.5.  Here, Private Defendants' petitions were a success, as the FCC's Media Bureau based its HDO on two substantive issues their petitions had raised: increased rates and job cuts.  *See* FAC ¶¶ 135, 227.

Even were the Court to discount the probative value of the HDO because it was a preliminary determination, the result is the same.  *Contra* Pls.' Opp'n at 133–35.  Plaintiffs admit that the Unions, UCC, and Common Cause "routinely file petitions to deny license-transfer applications and express concerns over job losses and increased retransmission fees."  FAC ¶ 98.  These Private Defendants' conduct of frequently raising these issues before the FCC suggests that the concerns are not objectively baseless.  What is more, it is exceedingly hard for Plaintiffs to argue that "no reasonable [petitioner] could realistically expect success on the merits," *PRE*, 508 U.S. at 60, because other companies that are not parties in this lawsuit were also raising similar concerns to the FCC.  *See, e.g.*, Comments of Graham Media Group, *In re Tegna Inc.*, MB No. 22-162 (June 22, 2022), https://perma.cc/J3FX-STWH (raising concerns of market consolidation); Altice USA, Inc. Ex Parte Communication, *In re Tegna Inc.*, MB No. 22-162 (Oct. 20, 2022), https://perma.cc/7SEF-B33T (raising concerns of increased retransmission rates).  That other independent actors shared Private Defendants' concerns strongly supports that their petitions raising those concerns were not "objectively baseless."

Moreover, Plaintiffs' response to Private Defendants' demands also demonstrates that they were not *entirely* baseless.  "On December 16, 2023, Standard General made binding commitments to the FCC that it would permit any retransmission agreement with TEGNA in effect as of the time immediately prior to the Closing to continue to apply to the TEGNA

Stations as of and following the Closing." FAC ¶ 197 (citation modified). "On December 22, 2023, Standard General committed that it would not conduct any news staffing or other station-level layoffs for a minimum of two years following the transactions and reemphasized that Standard General planned to *increase* newsroom staffing." *Id.* ¶ 199. "Then on December 23, 2023, Standard General again made binding commitments to the FCC that Cox Media Group would not be part of any joint agreements or have access to information about retransmission fees." *Id.* ¶ 200. If Private Defendants' (and third parties') concerns had been so baseless that no reasonable person would have expected success in pressing those issues before the FCC, then why did Plaintiffs feel pressure to make "binding commitments to the FCC" about those issues? *See id.* Such conduct would defy logic. *See New W., LP*, 491 F.3d at 722 (reasoning that because the plaintiff had settled a related state court suit for a "substantial payment," that suit "cannot have been a sham"). The Court's analysis need go no further. *See PRE*, 508 U.S. at 60 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."). Because the Court cannot conclude that the Private Defendants' petitions were objectively baseless, the sham exception does not apply.

Plaintiffs' final stand against application of *Noerr-Pennington* immunity is that Defendants' statements to the FCC were misrepresentations and misleading. Pls.' Opp'n at 138–40. "[N]either the *Noerr–Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) (alteration in original) (quoting *Edmondson & Gallagher v. Alban Towers Tenants Ass'n,* 48 F.3d 1260, 1267 (D.C. Cir. 1995)). Though Plaintiffs repeatedly use the word "misleading," they fail to explain what exactly Defendants "knowingly and intentionally" told the FCC that was false or misleading. *See* Pls.' Opp'n at 139.

The only issue Plaintiffs identify was Goodfriend's persistent concern that Standard General would impose layoffs after the merger was completed. *See id.* But the representations on which Plaintiffs rely for these allegations are a series of letters imploring the Commission to explore the matter thoroughly because the issue might warrant an HDO. *See, e.g.*, FAC ¶¶ 164, 166 (citing Letter from David R. Goodfriend to Marlene H. Dortch, Sec'y, Fed. Commc'ns Comm'n at 1–2, *In re Tegna Inc.*, MB No. 22-162 (Sep. 21, 2022), https://perma.cc/AR9L-WFPG ("There is considerable information in the record indicating that if the applications are granted, Standard General intends to cut jobs at TEGNA in its local as well as its national units, including what could be media worker jobs.")); Goodfriend Letter at 2 ("The Applicants appear to be contradicting themselves when they say that post-closing job cuts ('synergies') already have happened. Based on an examination of the confidential record, it appears that Applicants did and likely still do intend to cut station-level jobs, including what could be journalism and news-gathering related jobs."). The FCC agreed further inquiry was warranted. *See* FAC ¶ 227. Plaintiffs identify no material fact from which to infer that Goodfriend's statements were fraudulent. In sum, Plaintiffs fail to explain why *Noerr-Pennington* does not bar their claims. Accordingly, Plaintiffs' claims, which are all predicated on the Private Defendants' petitioning conduct, must be dismissed.

## C. Leave to Amend

In Plaintiffs' opposition brief, they requested that if the Court grants Defendants' motions to dismiss, they be granted leave to amend. Pls.' Opp'n at 140. Plaintiffs "previewed" that they would amend their Complaint to include "recent events at the FCC" to "provide further factual support" for their claims, but Plaintiffs did not file a proposed pleading pursuant to Local Civil Rules 7(i) and 15.1. *Id.* Absent from Plaintiffs' preview are any facts that would alter the

Court's analysis in this Opinion.  For example, even were a recent FCC license-transfer approval to be a more apt comparator for Plaintiffs' equal protection claim, this still would do nothing to evince a risk of *future* harm.  "A district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss."  *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) (citation modified). Because the Court concludes that "the complaint would remain deficient despite the proposed changes," the Court will not grant Plaintiffs leave to amend.  *See Paxton v. Washington Hosp. Ctr. Corp.*, 299 F.R.D. 335, 336 (D.D.C. 2014).  Thus, Plaintiffs' claims as to the FCC Defendants (Counts I, III, IV, and VIII) will be dismissed for lack of jurisdiction, and Plaintiffs' claims as to the Private Defendants (Counts II–VII) will be dismissed for failure to state a claim.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss (ECF Nos. 44, 46, 47, 49, 54, 56, 57) are **GRANTED**; and Defendants DISH Network Corporation and Charles Ergen's Motion for Sanctions (ECF No. 59) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  August 19, 2025                                    RUDOLPH CONTRERAS
                                                           United States District Judge